## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Estate of Ty'rique Riley, et al | : | |
| Plaintiffs | : | CIVIL ACTION |
| | : | |
| V. | : | NO. 4:20-cv-325 |
| | : | |
| Brian Clark,  et.al. | : | JURY TRIAL DEMANDED |
| Defendants | : | |

## STATEMENT OF UNDISPUTED MATERIAL FACTS ON BEHALF OF DEFENDANTS BRIAN CLARK, DAUPHIN COUNTY, ANDREW KLAHR, STEVE SMITH, MARK NEIDIGH, RICHARD ARMERMANN, GREG MENDENHALL, SCOTT GRIEB, JASON ADAMS, MICHAEL BLOUCH, SCOTT LEWIS, KEITH BITER, ROBERT INGERSOLL, CAMERON WEAVER, TAYLOR GLENN, MARTIN MYERS, DELTA BAUER, STEVE SINGLETON, KEITH HOFFMAN, AND TAMI DONOVAN

Defendants Brian Clark, Dauphin County, Andrew Klahr, Steve Smith, Mark Neidigh, Richard Armermann, Greg Mendenhall, Scott Grieb, Jason Adams, Michael Blouch, Scott Lewis, Keith Biter, Robert Ingersoll, Cameron Weaver, Taylor Glenn, Martin Myers, Delta Bauer, Steve Singleton, Keith Hoffman, and Tami Donovan (hereinafter referred to as "Answering Defendants")[1] by and through

---

[1] Defendants Derek Umberger, Joseph Doyle, Richard Otten, and Michael Sheaffer and Rowe were dismissed by Stipulation of the parties.  (Doc. 172).  Although Defendants Neidigh and Smith were named, there are no documented reports or video evidence of them having contact with the Decedent. Neither were reported as witnesses to any event nor were they interviewed by Detective Brian Walborn.

1

their attorneys, Lavery Law, file their Statement of Undisputed Material Facts in support of their Motion for Summary Judgement as follows:

## DECEDENT'S ARREST

1. Ty'rique Riley ("Decedent") was the biological son of Carmen Riley and Thomas Matthews-Kemrer, the Plaintiffs in this case.  (Ex. A, Riley Depo., p. 14, lns. 21-23, Ex. B, Matthews-Kemrer Depo., p. 164, lns. 16-18).

2. Carmen Riley lived at 1931 Franklin Avenue, Harrisburg, at the time of the incident with Decedent, her brother, her mother, and Thomas Matthews-Kemrer, Decedent's father. (Ex. A, Riley Depo., p. 11, lns. 16-22, p. 47, lns. 22-23).

3. The incident occurred at 2003 Franklin Avenue, Harrisburg, Pennsylvania 17109. (Ex. A, Riley Depo., p. 46, lns. 11-15, p. 47, lns. 8-17, Ex. C, Susquehanna Township Police Report CID000041).

4. On June 18, 2019, Carmen Riley called 911 and advised that Decedent was in a fight with Thomas Matthews-Kemrer and Decedent was hitting him with a sledgehammer. (Ex. D, Haines Depo., p. 37, lns. 3-9, Ex. C, Susquehanna Township Police Report CID000041).

5. When asked by the 911 operator if she or Matthews-Kemrer felt in danger because of Decedent's presence, Carmen Riley responded affirmatively. (Ex. A, Riley Depo., p. 82, lns. 17-20).

6. Susquehanna Township Police were immediately dispatched to 2003 Franklin Avenue. (Ex. D, Haines Depo., p. 37, lns. 3-5, 14-15, Ex. C, Susquehanna Township Police Report CID000041).

7. Haines, Corporal Wilson, and Patrolman First Class (PFC) Glen responded to the 911 call made by Carmen Riley on June 18, 2019, and arrived at 2003 Franklin Avenue. (Ex. D, Haines Depo., p. 37, lns. 3-9, 14-15, p. 42, lns. 11-12).

8. The 911 dispatcher informed Haines that Carmen Riley reported that the Decedent was actively beating Thomas Matthews-Kemrer with a sledgehammer. (Ex. D, Haines Depo., p. 37, lns. 5-8, p. 40, lns. 2-6).

9. Corporal Wilson took charge of the scene and directed Haines to remove the Decedent from the home and remain with the Decedent while Wilson and Glen went inside. (Ex. D, Haines Depo., p. 42, lns. 16-21, p. 45, lns. 6-11).

10. Decedent was arrested on June 18, 2019, for Aggravated Assault and Simple Assault by Physical Menace. (Ex. D, Haines Depo., p. 45, lns. 15-16, Ex. C, Susquehanna Township Police Report CID000039, 42).

11. Corporal Wilson instructed Haines to transport the Decedent to the Dauphin County Judicial (Booking) Center to be processed and arraigned. (Ex. D, Haines Depo., p. 45, lns. 13-19, Ex. C, Susquehanna Township Police Report CID000042).

12. There was no indication to Haines, Wilson, or Glen that the Decedent needed to be transported to the hospital instead of the Judicial Center. (Ex. D, Haines Depo., p. 48, ln. 5, lns. 18-21, p. 50, lns. 13-15).

13. Decedent never received mental health counseling nor was diagnosed with a mental health disorder before his arrest. (Ex. A, Riley Depo. p. 29, lns. 4-7, lns. 12-16).

14. Neither Carmen Riley, Thomas Matthews-Kemrer, or other family members recommended Decedent receive mental health treatment before his arrest. (Ex. A, Riley Depo. p. 29, lns. 21-24, p. 30, ln. 1).

15. Decedent was under the care of a family doctor for about five years prior to his arrest. (Ex. A, Riley Depo. p. 34, lns. 20-24, p. 35, lns. 1-2).

16.  Carmen Riley did not believe Decedent needed mental health treatment in the days leading up to her 911 call. (Ex. A, Riley Depo. p. 52, lns. 3-8, p. 54, lns. 13-19).

17. When asked by a 911 operator if Decedent had mental health problems, Carmen Riley responded that he "snapped." (Ex. A, Riley Depo. p. 77, lns. 22-24, p. 78, lns. 1-6).

18. Carmen Riley was referring to Decedent's fear that someone was going to break into their property a few days earlier. (Ex. A, Riley Depo. p. 78, lns. 4-6).

19. Carmen Riley told the 911 operator that she felt like she and Matthews-Kemrer were in danger with Decedent there. (Ex. A, Riley Depo. p. 82, lns. 17-20).

20. Carmen Riley did not believe Decedent was having a mental break or mental illness when he told her he believed someone might break in. (Ex. A, Riley Depo. p. 78, ln. 24, p. 79, lns. 1-3).

21. Carmen Riley would have secured mental health treatment for Decedent if she felt he needed it. (Ex. A, Riley Depo. p. 80, lns. 3-9).

22. Carmen Riley did not tell the 911 operator she wanted Decedent taken to the hospital. (Ex. A, Riley Depo. p. 84, lns. 11-15).

23. Carmen Riley did not tell the 911 operator Decedent needed to be taken to a psychiatric or mental health facility. (Ex. A, Riley Depo. p. 84, lns. 16-21).

24. Carmen Riley did not tell the Susquehanna Township police officers that she thought Decedent needed to be taken to the hospital. (Ex. A, Riley Depo. p. 84, lns. 22-24, p. 85, lns. 1-4).

25. Carmen Riley did not contact Dauphin County Prison at any point to inquire about Decedent's health. (Ex. A, Riley Depo. p. 96, lns. 6-11).

26. Mr. Matthews-Kemrer believed Decedent may have had mental health or emotional health issues prior to his arrest, as he was having headaches, sweating, and confusion the days following his birthday on June 14, 2019.

(Ex. B, Matthews-Kemrer Depo. p. 28, lns. 21-24, p. 29, lns. 3-6, lns. 15-18).

27. Matthews-Kemrer did not notice these symptoms before June 14, 2019. (Ex. B, Matthews-Kemrer Depo. p. 29, lns. 19-22).

28. Matthews-Kemrer was not concerned about Decedent's mental health status, nor did he consider securing medical attention for Decedent between June 14 and June 18, 2019. (Ex. B, Matthews-Kemrer Depo. p. 72, ln. 24, p. 73, lns. 1-13).

29. After Matthews-Kemrer left Holy Spirit Hospital on June 18, 2018, for injuries he sustained from being hit with the sledgehammer, he did not contact police, Crisis Intervention, the District Attorney's Office, or anyone to tell them Decedent needed mental health assistance. (Ex. B, Matthews-Kemrer Depo. p. 130, lns. 10-15).

30. Matthews-Kemrer did not believe Decedent needed mental health assistance after he was arrested. (Ex. B, Matthews-Kemrer Depo. p. 130, lns. 16-19).

31. While in route to the Judicial Center, the Decedent kicked the cage in the patrol car, removed his seatbelt, and began moving around in the back of the vehicle. (Ex. D, Haines Depo., p. 60, lns. 18-25, p. 61).

32. Haines notified staff at the Judicial Center that he arrived with the Decedent and requested assistance to transport him inside the facility because of the Decedent's behavior in the police car. (Ex. D, Haines Depo., p. 61, lns. 3-8).

33. Haines indicated to the officers that Decedent may have been under the influence of a substance. (Ex. D, Haines Depo., p. 62, lns. 2-4, p. 73, lns. 4-5).

### DECEDENT'S ARRIVAL AT JUDICIAL CENTER

34. Defendants Mendenhall, Ingersoll, and Weaver attempted to remove Decedent from the Susquehanna Township Police vehicle into the Dauphin County Judicial (Booking) Center. (Ex. E, Mendenhall Depo., p. 39, ln. 23, p. 40, lns. 1, 12, p. 41, lns. 8-10, Ex. F, Video #1[2], at 1:26 01-JC Garage).

35. Susquehanna Township Police did not instruct Mendenhall why Decedent was brought in, nor was he given any information about the Decedent's mental status. (Ex. E, Mendenhall Depo., p. 39).

36. Decedent was resistant to instructions to exit the vehicle, and subsequently became dead weight and refused to walk. (Ex. E, Mendenhall Depo., p. 41, lns. 9-10, p. 43, lns. 1-2, Ex. D, Haines Depo., p. 64, lns. 4-6, Ex. F, Video #1, at 1:32 01-JC Garage).

---

[2] A copy of the Video Synopsis of the June 18, 2019, Judicial Center videos compiled by Detective Walborn is attached and marked as Exhibit F, CID001706-1708. A copy of the videos will be provided to the Court.

37. Once inside the booking center, Decedent was given instructions to stand and face the wall but did not comply. (Ex. E., Mendenhall Depo., p. 45, lns. 6-10, Ex. D, Haines Depo., p. 65, lns. 7-8, lns. 15-16).

38. Decedent was given a second command to comply, which he resisted and pulled away from the officers. (Ex. E, Mendenhall Depo. p. 45, lns. 6-12, Ex. D, Haines Depo., p. 65, lns. 18-23).

39. Decedent was taken to the floor by officers, which is standard practice if the inmate does not comply. (Ex. E, Mendenhall Depo., p. 45, lns. 11-12, p. 47, lns. 1-4, 13-17, Ex. F, Video #4, at 0:51 04-JC Booking).

40. While on the floor, officers attempted to remove the handcuffs and leg irons from Decedent to be returned to the Susquehanna Township Police and search the Decedent for contraband or weapons. (Ex. E, Mendenhall Depo., p. 48, lns. 11-15, Ex. D, Haines Depo., p. 66, lns. 3-6, Ex. F, Video #4, at 0:51; 2:17-2:25 04-JC Booking).

41. Decedent pulled his body away when correctional officers attempted to remove the restraints, at which time Mendenhall administers Oleoresin Capsicum (OC) spray. (Ex. E, Mendenhall Depo., p. 47, lns. 23-24, p. 48, lns. 16-17, Ex. H, Mendenhall Report 000138-39, Ex. D, Haines Depo., p. 68, lns. 20-22, Ex. F, Video #4, at 2:25 04-JC Booking).

42. Decedent was placed in restraint handcuffs and taken to a holding cell. (Ex. E, Mendenhall Depo., p. 51, lns. 18-21, Ex. F, Video #4 04-JC Booking).

43. Haines observed no excessive use of force incidents by correctional officers during his time in the Judicial Center. (Ex. D, Haines Depo., p. 98, ln. 24, p. 99, lns. 3-4).

44. A photo of Decedent was taken and included in Mendenhall's extraordinary occurrence report after the OC spray was deployed, which is standard after it is used. (Ex. E, Mendenhall Depo., p. 58, lns. 4-6).

45. Mendenhall instructed the medical department to flush Decedent's eyes since OC spray was used. (Ex. E, Mendenhall Depo., p. 53, lns. 12-16 ).

46. OC spray was administered once and not used again on Decedent (Ex. E, Mendenhall Depo., p. 52, lns. 5-7).

47. PrimeCare medical assistant Vanessa Talley entered the holding cell to flush Decedent's eyes. (Ex. E, Mendenhall Depo., p. 53, lns. 5-7, Ex. F, Video #4, at 6:27 04-JC Booking).

48. Officer Bauer observed the struggle as the Decedent was entering the Judicial Center and assisted in trying to control the Decedent's legs. (Ex. G, Investigation Report CID000018, Ex. H, Bauer Report CID 000142, Ex. I, Bauer Transcribed Statement CID000540-547).

49. Correctional Officers Mendenhall, Ingersoll, Weaver, and Bauer completed a use of force memo for this incident as standard practice to report all uses of force. (Ex. E, Mendenhall Depo., p. 55, lns. 24-25, p.56, lns. 1-3, 24-25, Ex. G, Investigation Report CID000015, 18, Ex. H, Bauer Report CID 000142, Ex. H, Ingersoll Report CID000144, Ex. H, Mendenhall Report 000138-39, Ex. H, Weaver Report CID000141).

50. All correctional staff receive yearly training on the use of force policy for Dauphin County Prison and are provided with a copy of the policy. (Ex. E, Mendenhall Depo., p. 28, lns. 17-20, p. 32, lns. 15-17).

51. Defendants Mendenhall, Ingersoll, Weaver, and Bauer subsequently gave transcribed statements to Dauphin County Criminal Investigation Division Detective Brian Walborn. (Ex. I, Mendenhall Transcribed Statement CID000404-412, Ex. I, Ingersoll Transcribed Statement CID000489-493, Ex. I, Weaver Transcribed Statement CID000449-456, Ex. I, Bauer Transcribed Statement CID000540-547).

52. No excessive use of force was documented for this incident, nor is it visible on the video recording capturing the event. (Ex. F, Video #4, at 0:19-6:29 04-JC Booking).

53. While Decedent was in the holding cell, he slipped his handcuffs from the back of his body to the front of his body and began banging on the cell door and window. (Ex. F, Video #14, at 21:00-28:37 14-JC Booking Cell).

54. Supervisory and Correctional Officer Defendants Adams, Armermann, Blouch, Glenn, Grieb, and Meyers entered the holding cell and attempted to place Decedent in a restraint belt so he could not harm himself and Decedent was not compliant. (Ex. F, Video #14, at 28:37-31:37 14-JC Booking Cell).

55. Sergeant Adams reported that it took time to get the restraint belt on the Decedent because the officers wanted to use the minimal amount of force necessary. (Ex. G, Investigation Report CID000020, Ex. H, Adams Transcribed Statement CID000384-391).

56. Lt. Armermann only gave the Decedent verbal commands and therefore did not use any physical force on the Decedent, nor did he see any other officer strike, kick, punch, choke, or pin Decedent to a hard object. (Ex. G, Investigation Report CID000015, Ex. H, Armermann Transcribed Statement CID000414-418; Video #14, at 28:37-31:37 14-JC Booking Cell).

57. Defendants Adams, Armermann, Blouch, Glenn, Grieb, and Myers completed use of force reports for this incident and later gave transcribed

statements to Dauphin County Criminal Investigation Division Detective

Walburn.[3]

58. No excessive use of force was documented or captured in the video of this

event. (Ex. F, Video #14, at 21:38-31:37 14-JC Booking Cell).

59.  Decedent walked around the holding cell without visible injury after the

correctional officers left the cell.  (Ex. F, Video #14, at 21:38-60:00 14-JC

Booking Cell).

60. All correctional officers are trained on DCP's use of force policy. (Ex. J,

Lucas Depo. p. 18, lns. 16-19, Ex. K, Danner Depo. p. 43, ln. 3).

61. DCP's use of force policy requires the on-duty shift commander to ensure

that an inmate is immediately seen by the Medical Department if force is

used. (Ex. K, Danner Depo. p. 49, lns. 2-10).

**PRIMECARE MEDICAL**

62. Decedent was assessed by a member of the PrimeCare Medical staff for an

intake. (Ex. L, Betancourt Depo., p. 20, lns. 16-19).

63. Dauphin County and PrimeCare Medical entered into a Comprehensive

Health Services Agreement. (Ex. M, Briggs Depo., p. 16, lns. 2-5).

---

[3] Exhibits H and I, Armermann Report CID000145-46, Armermann Transcribed Statement CID000414-418, Adams Report CID000149, Adams Transcribed Statement CID000384-391, Blouch Report CID000150, Blouch Transcribed Statement CID000370-76, Glenn Report CID000151, Glenn Transcribed Statement CID000503-510, Grieb Report CID000143, Grieb Transcribed Statement CID000364-68, Myers Report CID000152, Myers Transcribed Statement CID000481-87.

64.  The medical provider is responsible for medically clearing all detainees for admission into the Dauphin County Prison.  (Ex. M, Briggs Depo., p. 15, lns. 9-16, p. 22, lns. 17-23, Ex. N, Medical and Health Services Policy, DFS 304-306).

65.  The medical provider  is required to reach the applicable criteria in the Prison's mental health program policy. (Ex. M, Briggs Depo., p. 49, lns. 8-22, p. 51, lns. 8-19, Ex. N, Medical and Health Services Policy, DFS 304-306).

66.  Decisions and actions regarding health care provided to detainees and inmates are the sole responsibility of PrimeCare's qualified health care professionals. (Ex. M, Briggs Depo., p. 15, lns. 9-16, p. 22, lns. 17-23, Ex. N, Medical and Health Services Policy, DFS 304-306).

67.  Decedent was arraigned and bail was set by Magisterial District Judge Lenker. (Ex. M, Briggs Depo., p. 37, lns. 8-9, Ex. G, Investigation Report CID000006).

68.  At this time, Decedent was considered an unsentenced inmate of the prison rather than a detainee of the Judicial Center. (Ex. M, Briggs Depo., p. 37, lns. 8-12).

## KASSANDRA BETANCOURT, MA

69. On June 18, 2019, Kassandra Betancourt was employed by Defendant
PrimeCare and worked at the Dauphin County Prison as a medical assistant.
(Ex. L, Betancourt Depo., p. 17, lns. 11-15).

70. Betancourt attempted to perform a medical intake of Decedent upon his
arrival at the Judicial Center. (Ex. L, Betancourt Depo., p. 20, lns. 16-22).

71. Betancourt took Decedent's vitals and noted his level of awareness as
"confused." (Ex. L, Betancourt Depo., p. 34, lns. 8-22).

72. During the intake process, Decedent tried to break through his handcuffs,
causing injuries to his wrist/forearms. (Ex. L, Betancourt Depo., p. 47, lns.
4-12).

73. Betancourt observed correctional officers verbally instruct Decedent to stop,
which he did.  (Ex. L, Betancourt Depo., p. 48, lns. 20-21, p. 49, ln. 4).

74. None of the officers made physical contact with Decedent at this time. (Ex.
L, Betancourt Depo., p. 48, lns. 22-25).

75. Betancourt noted Decedent was calm while she cleaned and bandaged his
wrists. (Ex. L, Betancourt Depo., p. 50, lns. 1-9).

76. Betancourt did not record that Decedent had any injury or condition that
would require him to be sent to the hospital. (Ex. L, Betancourt Depo., p. 81,
lns. 13-21).

77. Betancourt observed Decedent shaking his head and nodding in response to her first few questions. Because Decedent did not answer all questions, Betancourt stopped questioning Decedent. (Ex. L, Betancourt Depo., p. 35, lns. 4-8).

78. Betancourt determined that she could not complete Decedent's intake process. (Ex. L, Betancourt Depo., p. 55, lns. 15-18).

79. A non-complete intake is marked as an inmate refusal for every situation. (Ex. L, Betancourt Depo., p. 56, lns. 15-21).

80. Betancourt checked boxes on the intake form noting "Restrict from until cleared by psychologist, psychiatrist." (Ex. L, Betancourt Depo., p. 40, lns. 6-19).

81. If medical staff cannot complete an intake, detainees/arrestees are automatically placed at a Level 1, which is a suicide watch with checks done every ten minutes. (Ex. L, Betancourt Depo., p. 40, lns. 23-25, p. 41, lns. 1-2, 12-15).

82. Decedent was automatically placed at Level 1 because medical staff did not complete his intake. (Ex. L, Betancourt Depo., p. 40, lns. 22-25, p. 41, lns. 1-2).

83. If an inmate repeatedly refuses to answer or is unable to answer the intake questions, the inmate remains on Level 1 until they are sentenced or released. (Ex. L, Betancourt Depo., p. 76, lns. 21-25, p. 77, lns. 1-2).

84. A psychiatrist or psychologist can order constant observations of a detainee/arrestee to evaluate the need to move the detainee/arrestee to another level. (Ex. L, Betancourt Depo., p. 41, lns. 3-10).

85. Only a psychiatrist **or psychologist** can remove a detainee/arrestee to another level. (Ex. L, Betancourt Depo., p. 41, lns. 16-20).

86. Medical staff attempts to complete the intake process three times per day in a twenty-four-hour period. (Ex. L, Betancourt Depo., p. 77, lns. 11-14).

87. Decedent remained on Level 1, suicide watch, because his intake was not completed after multiple attempts. (Ex. O, Rosas Depo.,[4] p. 83, lns. 11-19, p. 99, lns. 1-5).

### DR. GARRETT ROSAS, PSY.D

88. Dr. Garrett Rosas is a licensed psychologist employed with PrimeCare and was working in the Dauphin County Prison (DCP) during the period Decedent was housed at DCP. (Ex. O, Rosas Depo., p. 14, lns. 7-8, p. 24, lns. 9-13).

---

[4] All citations to Dr. Rosas's Deposition refer to his first deposition taken on July 7, 2022.

89. Dr. Rosas was authorized to recommend that a detainee or inmate receive additional treatment in a hospital setting if he felt it was necessary. (Ex. O, Rosas Depo., p. 32, lns. 3-5).

90. Dr. Rosas's first encountered Decedent on June 18, 2019. Decedent could not be seen in the Medical Department due to his uncooperative behavior. (Ex. O, Rosas Depo., p. 35, lns. 1-5).

91. DCP corrections staff are always present when an inmate is in the Medical Department for security reasons. (Ex. O, Rosas Depo., p. 37, lns. 12-18).

92. Dr. Rosas noted that it was difficult to communicate with Decedent as he was speaking nonsensically. (Ex. O, Rosas Depo., p. 39, lns. 16-24).

93. Decedent answered Dr. Rosas's specific questions about suicide. (Ex. O, Rosas Depo., p. 41, lns. 8-11).

94. Decedent responded "no" when asked by Dr. Rosas if he intended to harm himself or others. (Ex. O, Rosas Depo., p. 41, lns. 12-18).

95. Dr. Rosas concluded Decedent was in a depressed mood, moderately distressed, and may have had impaired judgment. (Ex. O, Rosas Depo., p. 42, lns. 17-23).

96. Dr. Rosas did not observe injuries on Decedent other than a bandage on his right wrist. (Ex. O, Rosas Depo., p. 48, lns. 2-12).

97. On June 19, 2019, Dr. Rosas noted Decedent had deteriorated from the previous day. (Ex. O, Rosas Depo., p. 54, lns. 20-25, p. 55, lns. 1-2, p. 58, lns. 10-11).

98. Dr. Rosas noted this could be indicative of a psychiatric disorder, but this alone would not lead to an inmate being transferred to a hospital for treatment. (Ex. O, Rosas Depo., p. 58, lns. 13-20, p. 59, lns. 9-16).

99. Psychiatric disorders are routinely treated by the medical staff without the need for hospital intervention. (Ex. O, Rosas Depo., p. 59, lns. 18-21).

100. Dr. Rosas did not observe injuries on Decedent on June 19, 2019. (Ex. O, Rosas Depo., p. 60, lns. 14-20).

101. Decedent was uncooperative on June 20, 2019, and medical staff was unable to complete the intake. (Ex. O, Rosas Depo., p. 62, lns. 2-9).

102. On June 20, 2019, Dr. Rosas noted Decedent's presentation did not improve. (Ex. O, Rosas Depo., p. 66, lns. 2-9).

103. Dr. Rosas noted Decedent's presentation could have been indicative of Decedent having drugs in his system, which would cause a person to intentionally withhold engagement. (Ex. O, Rosas Depo., p. 70, lns. 4-18).

104. Although the Decedent remained classified as a suicide status, Dr. Rosas reported that this was not because Decedent was suicidal. (Ex. O, Rosas Depo., p. 74, lns. 15-25, p. 80, lns. 3-8).

105.    Decedent remained on Level 1 because repeated attempts to complete his intake were not successful. (Ex. O, Rosas Depo., p. 83, lns. 11-19, p. 99, lns. 1-5).

106.    Inmates classified as Level 1 are seen daily by qualified mental health staff. (Ex. O, Rosas Depo., p. 103, lns. 7-12).

107.    Dr. Rosas was authorized to move an inmate from Level 1 to a "constant watch" if he concluded it was medically necessary. Dr. Rosas did not move Decedent from Level 1 to "constant watch". (Ex. O, Rosas Depo., p. 87, lns. 2-8).

108.    Dr. Rosas believed Decedent may have had a mental health disorder rather than a substance use disorder. (Ex. O, Rosas Depo., p. 100, lns. 1-12).

109.    Medical staff were unable to determine if Decedent used any substance because Decedent refused detox checks. (Ex. P, Miller Depo., p. 31, lns. 12-17).

110.    Dr. Rosas discussed the possibility of sending Decedent to the hospital, but it was determined that Decedent did not need urgent medical care. (Ex. O, Rosas Depo., p. 110, lns. 23-25, p. 111, lns. 1-9, p. 116, lns. 4-10).

## SUSAN IRVINE

111.    On June 18, 2019, Susan Irvine was a licensed social worker employed with DCP as the Treatment Coordinator. (Ex. Q, Irvine Depo., p. 11, ln. 3, p. 14., lns. 20-22).

112.    Irvine was asked to see Decedent because he was reported to have not completed his intake and was not communicative with people.  (Ex. Q, Irvine Depo., p. 20, lns. 9-13, p. 25, lns. 7-12).

113.    Based on her experience as the Treatment Coordinator, Irvine observed that many inmates refused to complete their intakes, and it was not unusual. (Ex. Q, Irvine Depo., p. 25, lns. 20-25, p. 26, lns. 1-4).

114.    Staff cannot make an inmate talk, and sometimes they nod because they are afraid to speak due to their charges. (Ex. Q, Irvine Depo., p. 26, lns. 4-6).

115.    It was common for inmates to remain quiet because they do not trust people and may have had negative experiences with mental health treatment in the past. (Ex. Q, Irvine Depo., p. 26, lns. 6-9).

116.    Irvine attempted to engage Decedent but was generally unsuccessful, so she referred him to the Medical Department.  (Ex. Q, Irvine Depo., p. 28, lns. 19-25, p. 29, lns. 1-5).

117.     Irvine observed Plaintiff refuse his medication. (Ex. Q, Irvine Depo., p. 29, lns. 22-25, p. 30, lns. 1-2).

## DR. ROBIN KATE MILLER

118.     Dr. Miller was employed as a staff psychiatrist with PrimeCare Medical from 2016-2020. (Ex. P, Miller Depo., p. 11, lns. 5-7).

119.     Dr. Miller reported it was not common for an inmate to be sent to an outside facility for mental health treatment. (Ex. P, Miller Depo., p. 19, lns. 15-16).

120.     Prison staff were reluctant to remove Decedent from his cell and take him to the medical unit because his behavior may have required them to use force. (Ex. P, Miller Depo. p. 17, lns. 12-15, p. 18, lns. 7-12).

121.     Dr. Miller believed it likely would not be useful to remove Decedent from his cell. (Ex. P, Miller Depo. p. 72, lns. 24-25, p. 73, lns. 1-2).

122.     No DCP staff tried to force the Decedent to leave his cell. (Ex. P, Miller Depo. p. 74, lns. 5-9).

123.     While Decedent was in his cell, the Medical Staff could evaluate him cell-side daily. (Ex. R, PrimeCare Medical Full Patient History for Ty'Rique Riley CID000263-000291).

124.     Dr. Miller started Decedent on medication, which included Zyprexa and Depakote. (Ex. P, Miller Depo. p. 29, lns. 9-14).

125.    Dr. Miller called Decedent's family on two occasions and left

messages for a call back to determine if he had any mental health history,

critical information for Decedent's diagnosis and treatment. (Ex. P, Miller

Depo. p. 31, lns. 17-24).

126.    A nurse manager attempted to contact Decedent's family. (Ex. P,

Miller Depo. p. 32, lns. 1-2, p. 63, lns. 24-25, p. 64, lns. 1-2).

127.    Decedent's family did not return the calls. (Ex. P, Miller Depo. p. 31,

ln. 25, p. 32, lns. 1-11, p. 62, lns. 21-22, p. 63, lns. 24-25, p. 64, lns. 1-2).

128.    Dr. Miller observed Decedent eating and sleeping on June 21, 2019,

and believed that the medication prescribed for Decedent would begin to

take effect shortly. (Ex. P, Miller Depo. p. 34, lns. 4-6).

129.    Decedent's actions on June 21, 2019, did not give Dr. Miller cause for

alarm. (Ex. P, Miller Depo. p. 34, lns. 4-7).

130.    Dr. Miller did not see any injuries on Decedent other than a bandage

on his right wrist. (Ex. P, Miller Depo. p. 38, lns. 8-12).

131.    Dr. Miller was forced to rule out substance induced psychotic

disorder because she had no information about the Decedent's possible

substance use history. (Ex. P, Miller Dep. p. 41, lns. 12-15).

132.     Dr. Miller and the Medical Staff were treating many patients under the influence of K2 synthetic marijuana. (Ex. P, Miller Depo. p. 41, lns. 15-16).

133.     K2 synthetic marijuana causes patients to become psychotic. (Ex. P, Miller Depo. p. 41, lns. 16-17).

134.     Dr. Miller was unable to determine if Decedent ingested K2, as it would not appear on a toxicology screen. (Ex. P, Miller Depo. p. 41, lns. 20-22).

135.     Decedent refused to participate in detox tests that were ordered by the Medical Department. (Ex. P, Miller Depo. p. 31, lns. 12-17).

136.     Dr. Miller was unable to determine if the Decedent's actions were caused by substance use. (Ex. P, Miller Depo. p. 31, lns. 8-17).

137.      It was common for Medical Staff at DCP to treat inmates with psychotic disorders. (Ex. P, Miller Depo. p. 75, ln. 25, p. 76, lns. 1-7).

138.     Dr. Miller reported that psychosis can often be caused by drug use. (Ex. P, Miller Depo. p. 76, ln. 9).

139.     Psychotic inmates are often successfully treated with medications. (Ex. P, Miller Depo. p. 76, lns. 15-16).

140.     Dr. Miller attempted to treat Decedent with medications. (Ex. P, Miller Depo. p. 76, lns. 17-19).

141.    On June 24, 2019, Dr. Miller did not believe Decedent needed to be transferred to a hospital. (Ex. P, Miller Dep. p. 68, lns. 11-19).

142.    On June 25, 2018, neither Dr. Miller nor Dr. Rosas believed it was warranted to send Decedent to the hospital because Decedent was still eating, drinking, and sleeping. (Ex. P, Miller Depo. p. 52, lns. 22-25, p. 69, lns. 16-19, 25, p. 70, lns. 1-3).

143.    On June 26, 2019, Dr. Miller ordered Decedent to be transported to a hospital because the Medical Staff reported that Decedent's mental status changed.  (Ex. P, Miller Depo. p. 45, lns. 19-24, p. 46, lns. 3-5).

## DEFENDANTS' PLACEMENT IN THE RESTRAINT CHAIR

144.    PrimeCare Medical staff ordered the emergency transport of Decedent by County vehicle on the morning of June 26, 2019. (Ex. K, Danner Depo. p. 58, lns. 24-25.)

145.    PrimeCare medical staff determine whether the transport is considered an emergency. (Ex. K, Danner Depo. p. 59, lns. 16-17).

146.    Officer Danner first encountered the Decedent on June 26, 2019, to transport Decedent to the hospital. (Ex. K, Danner Depo. p. 57, lns. 8-21).

147.    Officer Danner was told the transport was an emergency because of Decedent's altered mental status. (Ex. K, Danner Depo. p. 60, lns. 9-10).

148.    Officer Danner went to Decedent's cell with Officer Singleton and told Decedent to change into the DCP uniform all inmates were required to wear when on transport out of DCP. (Ex. K, Danner Depo. p. 68, lns. 16-19, 25, p. 69, lns. 1-3, p. 70, lns. 14-15, Ex. H, Danner Report CID000161, Ex. I, Danner Transcribed Statement CID000521-33, Ex. H, Singleton Report CID000162, Ex. I, Singleton Transcribed Statement CID000467-79, Ex. G, Investigation Report CID000007-8, Ex. S, Video #18[5], at 22:37 18-A-1 to front 0927 to 1000 AM Medical Assessment).

149.    Decedent refused to comply with the order to change clothes and grabbed Officer Danner's wrist and arm. (Ex. K, Danner Depo. p. 70, lns. 1-6, Ex. H, Danner Report CID000161, Ex. I, Danner Transcribed Statement CID000521-33).

150.    Sergeant Lewis heard Officer Danner tell Decedent to "stop grabbing my hands." (Ex. I, Lewis Transcribed Statement CID000346-52, Ex. G, Investigation Report CID000008).

151.    Officer Hoffman walked to Decedent's cell where he observed officers attempting to get Decedent to comply with orders to change into the DCP uniform.  (Ex. H, Hoffman Report CID000165, Ex. I, Hoffman

---

[5] A copy of the Video Synopsis of the June 26, 2019, DCP videos compiled by Brian Walborn is attached and marked as Exhibit S, CID001709-1712. A copy of the videos will be provided to the Court.

Transcribed Statement CID000495-501, Ex. G, Investigation Report

CID000008, Ex. S, Video #18, at 23:22 18-A-1 to front 0927 to 1000 AM

Medical Assessment).

152.     Officer Hoffman attempted to assist with placing Decedent in a DCP

uniform.  Decedent resisted and kicked. (Ex. H, Hoffman Report

CID000165, Ex. I, Hoffman Transcribed Statement CID000495-501, Ex. G,

Investigation Report CID000008, Ex. S, Video #18, at 23:22 18-A-1 to front

0927 to 1000 AM Medical Assessment).

153.     Officer Hoffman placed restraints on Decedent's legs. (Ex. H,

Hoffman Report CID000165, Ex. I, Hoffman Transcribed Statement

CID000495-501, Ex. G, Investigation Report CID000008, Ex. S, Video #18,

at 23:22 18-A-1 to front 0927 to 1000 AM Medical Assessment).

154.     Because Decedent refused to comply with orders, Officer Danner and

Officer Singleton took Decedent to the ground. (Ex. K, Danner Depo. p. 70,

lns. 21-25, Ex. H, Danner Report CID000161, Ex. I, Danner Transcribed

Statement CID000521-33, Ex. H, Singleton Report CID000162, Ex. I,

Singleton Transcribed Statement CID000467-79, Ex. G, Investigation

Report CID000007-8, Ex. S, Video #18, at 22:37 18-A-1 to front 0927 to

1000 AM Medical Assessment).

155.    Taking an inmate to the ground is the safest method for an officer to

gain control of an inmate. (Ex. K, Danner Depo. p. 71, lns. 19-20).

156.    Decedent continued to resist officers Danner and Singlton and would

not allow handcuffs to be placed on him. (Ex. K, Danner Depo. p. 74, lns. 2-

6).

157.    Officer Danner was able to roll Decedent onto his stomach and to

secure Decedent's hands behind his back. Leg shackles were also applied to

Decedent's ankles. (Ex. K, Danner Depo. p. 74, lns. 4-16, 18-24).

158.    Officers Danner, Singleton, and Hoffman did not use any physical

force on the Decedent before the Decedent grabbed Officer Danner's arm

while in the cell. (Ex. K, Danner Depo. p. 110, lns. 9-12, p. 113, lns. 15-20).

159.    Officer Donovan can be seen repeatedly entering and exiting

Decedent's cell, but she never had any physical contact with the Decedent.

(Ex. H, Donovan Report, CID000095-96, 176, Ex. I, Donovan Transcribed

Statement CID000512-519, Ex. S, Video #18, at 22:37-30:24 18-A-1 to front

0927 to 1000 AM Medical Assessment).

160.    Decedent was never thrown or slammed to the ground, and no part of

the Plaintiff's head hit the floor when he was taken to the ground.  (Ex. K,

Danner Depo. p. 114, lns. 16-18, p. 115, lns. 9-11).

161.     Because Decedent continued to resist, Officer Danner called for assistance in case additional officers were needed for the transport.  (Ex. K, Danner Depo. p. 75, lns. 16-25, p. 76, ln. 1).

162.     Officers Hoffman, Swanson, and Donovan, Sergeants Hess, Biter, and Lewis, and Captain Klahr responded to assist. (Ex. K, Danner Depo. p. 76, lns. 13-14, p. 77, lns. 1-5, Ex. S, Video #18, at 27:57, 29:19 18-A-1 to front 0927 to 1000 AM Medical Assessment).

163.     Captain Klahr was the Shift Commander in the prison on June 26, 2019. (Ex. G, Investigation Report CID000009, Ex. H, Klahr Report 000159-60, Ex. I, Klahr Transcribed Statement CID000557-562).

164.     Captain Klahr and Sergeant Lewis arrived at Decedent's cell and observed Officers Danner and Singleton place Decedent on the floor. (Ex. G, Investigation Report CID000009, Ex. S, Video #18, at 27:57 18-A-1 to front 0927 to 1000 AM Medical Assessment).

165.     Captain Klahr told Decedent they were there to help him, and Decedent needed to change his clothes to go to the hospital. (Ex. G, Investigation Report CID000009, Ex. H, Klahr Report 000159-60, Ex. I, Klahr Transcribed Statement CID000557-562).

166.     Captain Klahr observed Decedent spit towards Officer Danner's feet and grab Officer Danner's arm. (Ex. G, Investigation Report CID000009,

Ex. H, Klahr Report 000159-60, Ex. I, Klahr Transcribed Statement CID000557-562).

167.    Captain Klahr called for the restraint chair to be used and for a spit shield to be placed on Decedent. (Ex. G, Investigation Report CID000009, Ex. H, Klahr Report 000159-60, Ex. I, Klahr Transcribed Statement CID000557-562).

168.    Sergeant Biter was ordered to bring a restraint chair to Decedent's cell.  (Ex. G, Investigation Report CID000010, Ex. H, Biter Report CID000163, Ex. I, Biter Transcribed Statement CID000378-382, Ex. S, Video #18, at 29:19 18-A-1 to front 0927 to 1000 AM Medical Assessment).

169.    It was appropriate to place Decedent in the restraint chair because Decedent was combative and did not comply with orders.  (Ex. K, Danner Depo. p. 83, lns. 16-25).

170.    Sergeant Lewis attempted to assist the other officers in placing Decedent in the restraint chair. (Ex. H, Lewis Report CID000164, Ex. I, Lewis Transcribed Statement CID000346-52, Ex. S, Video #18, at 30:30 18-A-1 to front 0927 to 1000 AM Medical Assessment).

171.     Sergeant Lewis applied a hypoglossal pressure point to Decedent, when needed, for approximately one second each. (Ex. H, Lewis Report

CID000164, Ex. I, Lewis Transcribed Statement CID000346-52, Ex. G,

Investigation Report CID000008).

172.    Decedent's behavior presented a threat to himself and others.   (Ex. K,

Danner Depo. p. 84, lns. 10-23).

173.    A mesh fabric spit shield was placed on the Decedent as a

precautionary measure as there was spit coming from Decedent's mouth.

(Ex. K, Danner Depo. p 88, lns. 19-25, p. 89, lns. 4-7, lns. 17-22).

174.    Decedent was initially responsive when placed in the restraint chair

and was moving his legs, hips, and shoulders. (Ex. K, Danner Depo. p. 91,

lns. 6-9, Ex. S, Video #18, at 30:48 18-A-1 to front 0927 to 1000 AM

Medical Assessment).

175.    Decedent became unresponsive while the restraint chair was being

moved off the block in order to transfer Decedent to the hospital. (Ex. K,

Danner Depo. p. 90, lns. 22-25, p. 91, lns. 1-2, Ex. S, Video #18, at 31:50

18-A-1 to front 0927 to 1000 AM Medical Assessment).

176.    Sergeant Biter performed two sternum rubs on the Decedent but there

was no response. (Ex. K, Danner Depo. p. 92, lns. 8-10, lns. 15-16, Ex. G,

Investigation Report CID000009, Ex. H, Biter Report CID000163, Ex. I,

Biter Transcribed Statement CID000378-382).

177.    A medical emergency was called, and medical staff were immediately
notified to respond. (Ex. K, Danner Depo. p. 92, lns. 20-21, 24-25, p. 93, lns.
1-2, Ex. G, Investigation Report CID000009, Ex. H, Klahr Report 000159-
60, Ex. I, Klahr Transcribed Statement CID000557-562, Ex. S, Video #18, at
32:25 18-A-1 to front 0927 to 1000 AM Medical Assessment).

178.    Captain Klahr issued an order for Decedent to be taken to the Medical
Department because the officers would likely be able to transport the
Decedent to the Medical Department before the medical staff would be able
to reach Decedent's cell. (Ex. K, Danner Depo. p. 93, lns. 4-6, lns. 13-23,
Ex. G, Investigation Report CID000009, Ex. H, Klahr Report 000159-60,
Ex. I, Klahr Transcribed Statement CID000557-562, Ex. S, Video #18, at
32:34 18-A-1 to front 0927 to 1000 AM Medical Assessment).

179.    Upon entering the Medical Department, officers removed the straps to
remove Decedent from the restraint chair, and removed the handcuffs,
shackles, and spit hood to perform life-saving procedures. (Ex. K, Danner
Depo. p. 94, lns. 4-10, p. 95, lns. 4-6).

180.    Officer Danner began to perform at least one series of chest
compressions until other staff rotated in. (Ex. K, Danner Depo. p. 94, lns.
23-25, p. 95, lns. 1-3, Ex. H, Danner Report CID000161, Ex. I, Danner
Transcribed Statement CID000521-33).

181.    No excessive use of force was documented or captured in the video

for the duration of this event. (Ex. S, Video #18, at 22:37-32:58 18-A-1 to

front 0927 to 1000 AM Medical Assessment).

## PLAINTIFF'S MEDICAL EVENT AND TRANSPORTATION TO THE HOSPITAL

182.    Life Team EMS arrived and took over Decedent's medical care and

transported him to Harrisburg Hospital. (Ex. G, Investigation Report CID

000007, Ex. S, Video #25, at 12:33 25-Med-waitroom-1001 to 1051 AM

Medical Assessment).

183.    Plaintiff arrived in the emergency department and was admitted to the

ICU after being resuscitated following cardiac arrest. (Ex. T, UPMC Medical

Records p. 23, 24).

184.    The medical personnel at UPMC Harrisburg Hospital were initially

going to transport the Plaintiff back to the Dauphin County Prison when he

was medically stable. (Ex. T, UPMC Medical Records p. 170).

185.    Based on significant metabolic abnormalities, Medical Staff at UPMC

Harrisburg Hospital suspected Decedent's condition to be the result of a drug

overdose. (Ex. T, UPMC Medical Records p. 28).

186.    Decedent's urine drug screen tested positive for a cannabinoid

substance. (Ex. T, UPMC Medical Records p. 27, 53).

187.    UPMC medical staff noted the Decedent had self-inflicted superficial

lacerations on his wrists and ankles that were consistent with the use of

handcuffs. (Ex. T, UPMC Medical Records p. 56).

188.    Medical staff determined the small buckle fracture of the Decedent's

sternum could have occurred due to chest compressions. (Ex. T, UPMC

Medical Records p. 93, 97, 98, 153).

189.    Decedent was declared brain dead and passed away on July 1, 2019.

(Ex. T, UPMC Medical Records p. 73).

**CORONER'S REPORT AND INVESTIGATION**

190.    The Coroner's Office conducted a full autopsy on Decedent. (Ex. U,

Coroner's Report p. 3).

191.    An autopsy was performed on July 2, 2019, by Dr. Wayne K. Ross to

determine the cause and manner of Decedent's death. (Ex. V, Postmortem

Report p. 1).

192.    The autopsy noted several contusions and abrasions on the Decedent's

body.  Most of the contusions and abrasions were determined to be

compatible with the use of hand or leg restraints, or medical effects. (Ex. V,

Postmortem Report p. 2-4).

193.    Dr. Ross confirmed that the fractured sternum was likely related to

CPR. (Ex. V, Postmortem Report p. 6).

194.    Dr. Ross reviewed videos from DCP as part of his analysis. (Ex. V, Postmortem Report p. 8).

195.    Dr. Ross did not opine that any of Decedent's injuries were related to the use of excessive force. (Ex. V, Postmortem Report).

196.    Dr. Ross opined that the Decedent's cause of death was Complications of Cerebral Vasculitis. (Ex. V, Postmortem Report p. 9).

197.    Dr. Ross ruled the manner of death to be Natural. (Ex. V, Postmortem Report p. 9).

198.    Dr. Ross concluded that vasculitis to the brain is consistent with cocaine usage or infection. (Ex. V, Postmortem Report p. 9).

199.    Cocaine was found in the Decedent's hair samples during a toxicology examination, indicating Decedent used cocaine. (Ex. V, Postmortem Report p. 9).

200.    The effects of cocaine can include euphoria, excitement, restlessness, risk taking, sleep disturbance, and aggression; a period of mental and physical fatigue and somnolence can follow the use of cocaine. (Ex. W, Toxicology Report p. 2).

201.    Decedent's toxicology report was positive for Delta-9 THC, which is the active psychoactive ingredient of marijuana. (Ex. W, Toxicology Report p. 2).

202.    Carmen Riley was aware that Decedent was using marijuana at the time of his death. (Ex. A, Riley Depo. p. 27, lns. 12-15).

203.    Carmen Riley heard that her son may have been using cocaine or heroin before his death. (Ex. A, Riley Depo. p. 27, lns. 21-24).

204.    After Decedent's arrest, Matthews-Kemrer called the narcotics unit of the Susquehanna Township Police Department to tell them that a friend of Decedent gave Decedent a bag of what resembled a marijuana-like substance on June 14, 2019. (Ex. B, Matthews-Kemrer Depo. p. 122, lns. 15-24, p. 123, lns. 3-17, p. 124, lns. 4-21).

205.    Matthews-Kemrer suspected the bag to contain synthetic marijuana. (Ex. B, Matthews-Kemrer Depo. p. 124, lns. 16-19).

206.    Matthews-Kemrer was concerned that Decedent's friend had given him something he might have used that would have caused his unusual behavior. (Ex. B, Matthews-Kemrer Depo. p. 127, lns. 7-12).

207.    The prescription drug Zyprexa, prescribed to Decedent by Dr. Miller, was also present in the samples; the toxicology report noted that side effects of Zyprexa can include cardiovascular complications and altered mental status. (Ex. W, Toxicology Report p. 3).

## DETECTIVE BRIAN WALBORN

208.     Brian Walborn was a Detective with the Dauphin County District Attorney's Criminal Investigation Division in June 2019. (Ex. X, Walborn Depo. p. 12, lns. 22-25, p. 13, ln. 1).

209.     Detective Walborn investigated Decedent's death to determine if any criminal activity occurred. (Ex. X, Walborn Depo. p. 17, lns. 18-22).

210.     Detective Walborn reviewed the DCP extraordinary occurrence reports and memos written by officers regarding Decedent, and reviewed medical records, and videos. (Ex. X, Walborn Depo. p. 18, lns. 11-19).

211.     Detective Walborn attempted to interview Carmen Riley and Thomas Matthews-Kemrer to gather information about Decedent. (Ex. X, Walborn Depo. p. 42, lns. 18-25, p. 43, lns. 1-4, 25).

212.     Carmen Riley and Thomas Matthews-Kemrer became uncooperative and ended the interview. (Ex. X, Walborn Depo. p. 43, lns. 13-15, ln. 25, p. 44, lns. 1-20).

213.      Matthews-Kemrer refused to speak with Detective Walborn again in regard to Decedent's death. (Ex. B, Matthews-Kemrer Depo. p. 147, lns. 22-24, p. 148, lns. 1-5, p.158, lns. 16-23).

214.     Detective Walborn interviewed individual officers from the Judicial Center and Prison. (Ex. X, Walborn Depo. p. 18, lns. 6-19).

215.      Because Dr. Ross concluded Decedent's death was natural, Detective

Walborn used that information to determine that a crime had not been

committed. (Ex. X, Walborn Depo. p. 57, lns. 18-25).

## DAUPHIN COUNTY PRISON TRAINING POLICIES AND PROCEDURES
## WARDEN GREGORY BRIGGS

216.      Gregory Briggs is the Warden of the Dauphin County Prison. (Ex. M,

Briggs Depo. p. 4, lns. 16-17).

217.      Warden Briggs was the Assistant Warden in October 2018 until his

title changed to Warden in 2019. (Ex. M, Briggs Depo. p. 4, lns. 20-24).

218.       PrimeCare Medical is the medical provider for DCP. (Ex. M, Briggs

Depo. p. 15, lns. 17-20).

219.       PrimeCare was the medical provider on June 18, 2019.  (Ex. M,

Briggs Depo. p. 39, lns. 17-19).

220.      The relationship between PrimeCare Medical and DCP is governed by

a contract. (Ex. M, Briggs Depo. p. 16, lns. 2-5).

221.      Arrestees with new charges go to the Dauphin County Judicial Center

("Booking Center"). (Ex. M, Briggs Depo. p. 19, lns. 13-19).

222.      Upon commitment to the Booking Center, PrimeCare Medical staff

perform an evaluation to clear an individual for incarceration at DCP. (Ex.

M, Briggs Depo. p. 15, lns. 4-16).

223.     PrimeCare determines when a clearance to incarcerate is required. (Ex M, Briggs Depo. p. 43, lns. 5-7).

224.     Dauphin County policy requires that all necessary medical treatment be provided to a detainee in a timely manner. (Ex. M, Briggs Depo. p. 22, lns. 10-12).

225.     The typical practice is to call a PrimeCare Medical staff member to perform the evaluation.  (Ex. M, Briggs Depo. p. 22, lns. 24-25, p. 23, lns. 1-3, 9-12, 17-20).

226.     PrimeCare determines if a detainee is under the influence of alcohol or any other controlled substance to the extent that they present a danger to themselves or others. (Ex. M, Briggs Depo. p. 28, lns. 6-16).

227.     DCP does not discipline PrimeCare employees regarding their decision whether or not to clear someone for admission into the prison. (Ex. M, Briggs Depo. p. 29, lns. 1-7).

228.     DCP has a policy regarding what to do if PrimeCare Medical Staff determines an inmate needs emergency medical or detoxification clearance; the policy directs arresting officers to obtain clearance from an outside medical doctor before DCP and PrimeCare accepts responsibility of the prisoner. (Ex. M, Briggs Depo. p. 41, lns. 14-20).

229.     All nurses are employed by PrimeCare. (Ex. M, Briggs Depo. p. 41, lns. 23-25, p. 42, ln. 1).

230.     DCP policy requires that if a detainee makes a claim of excessive use of force by a police officer, medical staff must determine if the arrestee needs medical clearance or not. (Ex. M, Briggs Depo. p. 43, lns. 13-19).

231.     If a correctional officer observes police brutality, the officer must demand that a medical examination be done before the arrestee is accepted into DCP. (Ex. M, Briggs Depo. p. 43, lns. 20-23, p. 44, ln. 1).

232.     The only role a correctional officer has in ensuring that an arrestee obtains medical clearance before acceptance is relaying the arrestee's needs. (Ex. M, Briggs Depo. p. 45, lns. 7-12).

233.     PrimeCare determines what to do if an arrestee is not responsive, confused, or does not make sense during a physical examination. (Ex. M, Briggs Depo. p. 46, lns. 11-21).

234.     DCP has a mental health program designed to examine, diagnose, and provide access to all inmates who have significant mental illness. (Ex. M, Briggs Depo. p. 49, lns. 10-16).

235.     PrimeCare is contractually required to carry out the requirements of the mental health program. (Ex. M, Briggs Depo. p. 51, lns. 8-19).

236.     All inmates suspected of having mental health problems are housed in specific locations. (Ex. M, Briggs Depo. p. 52, lns. 2-4).

237.     Decedent remained on the classification block, or A-block, during his period of incarceration because he was going through the classification process. (Ex. M, Briggs Depo. p. 53, lns. 12-24).

238.     DCP conducts annual training for correctional staff on suicide prevention and intervention, and how to deal with arrestees and inmates with mental health concerns. (Ex. M, Briggs Depo. p. 55, lns. 12-17, p. 57, lns. 8-12).

239.     The same training applies to arrestees and inmates. (Ex. M, Briggs Depo. p. 58, lns. 4-7).

240.     The level of suicide watch that an inmate is placed on is a determination made by PrimeCare medical staff. (Ex. M, Briggs Depo. p. 57, lns. 15-19, p. 61, lns. 11-19).

241.     A correctional officer does not have the ability to overrule a decision made by PrimeCare Medical Staff regarding whether a detainee needs to go to an outside facility to receive clearance, nor can they demand outside medical attention. However, a correctional officer may request a medical assessment from PrimeCare staff. (Ex. M, Briggs Depo. p. 60, lns. 7-23).

242.

243.     If an inmate is not capable of telling someone that he or she needs

medical attention, correctional officers have a duty to inform medical staff.

(Ex. M, Briggs Depo. p. 62, lns. 10-17).

244.     A correctional officer would be disciplined if they are in a situation

where they are obligated to notify medical and fail to do so. (Ex. M, Briggs

Depo. p. 62, lns. 23-25, p. 63, lns. 1-3).

245.     Dauphin County maintained policies and procedures related to the

Judicial Center.  (Ex. M, Briggs Depo. DFS 290-298).

246.     All individuals booked into Judicial Center were subject to a search

for contraband. (Ex. M, Briggs Depo. DFS 290-291).

247.     If a detainee is injured and requires medical attention, the PrimeCare

staff member assigned to the Judicial Center shall be notified.  (Ex. M,

Briggs Depo. DFS 292, ¶D).

248.     It is the practice of Dauphin County Prison to adhere to the policies of

its Medical provider.  (Ex. M, Briggs Depo. DFS 304).

249.     All matters of medical judgment are the sole province of the medical

provider.  (Ex. M, Briggs Depo. DFS 305).

250.     Any inmates brought into DCP with claims of police brutality or acute

mental health crisis shall be examined by the medical unit before

acceptance.  (Ex. M, Briggs Depo. DFS 314).

251.    Each inmate shall be provided with medical care from the time of admission, throughout the period of incarceration.  (Ex. M, Briggs Depo. DFS 316).

252.    Any inmate whose condition is beyond the range of services at DCP may be transferred to a non-correctional facility.  (Ex. M, Briggs Depo. DFS 318).

253.    All staff shall be trained in the use of force. (Ex. M, Briggs Depo. DFS 227).

254.    DCP maintained policies related to security and control of inmates. (Ex. M, Briggs Depo. DFS 228-232; 233-235; 236-243).

## MAJOR ROGER LUCAS

255.    Major Lucas was Director of Security at DCP from March 2019 until March 2022. (Ex. J, Lucas Depo. p. 8, lns. 21-25, p. 9, ln. 1).

256.    Major Lucas was the DCP training officer from February 2012 until March 2019. (Ex. J, Lucas Depo. p. 9, lns. 4-7).

257.    There are procedures regarding when an arrestee or an inmate can be placed in a cell while wearing handcuffs; the procedure is dictated by the arrestee or inmate's behavior. (Ex. J, Lucas Depo. p. 16-20).

258.    An individual could be in a cell while wearing handcuffs if DCP staff believed they could cause harm to themselves, if they were unruly, not

listening, or causing unsafe conditions for officers. (Ex. J, Lucas Depo. p. 11, lns. 24-25, p. 12, lns. 1-6).

259.    Officers are trained on these procedures and scenarios. (Ex. J, Lucas Depo. p. 12, lns. 10-11).

260.    DCP had a use of force policy in place prior to June 18, 2019. (Ex. J, Lucas Depo. p. 15, lns. 9-12).

261.    All correctional officers are trained on DCP's use of force policy. (Ex. J, Lucas Depo. p. 18, lns. 16-19).

262.    Prison training officers conduct use of force training. (Ex. J, Lucas Depo. p. 18, lns. 20-23).

263.    Use of force training is conducted annually.  (Ex. J, Lucas Depo. p. 20, lns. 2-10).

264.    Correctional officers report use of force incidents to the shift commander, lieutenants, and captains on duty and document the incidents with a written memo. (Ex. K, Danner Depo. p. 51, lns. 6-11).

265.    Correctional officers received annual suicide prevention training and mental health training. (Ex. K, Danner Depo. p. 53, lns. 14-18).

266.    Officers were trained to report any wrongdoing by a coworker. (Ex. K, Danner Depo. p. 54, lns. 14-25, p. 55, lns. 1-10).

267.    Sign-in sheets are used to monitor the dates when officers receive their annual training. (Ex. J, Lucas Depo. lns. 19-20).

268.    If an officer does not attend training, they would be disciplined.  (Ex. J, Lucas Depo. p. 21, lns. 23-24).

269.    When officers are trained in the use of force, they are taught to consider the situation as a whole when dealing with inmates who have mental health conditions.  (Ex. J, Lucas Depo. p. 22, lns. 17-23).

270.    An officer notifies a shift commander any time physical force is used. (Ex. J, Lucas Depo. p. 23, lns. 9-14).

271.    If an officer does not notify the shift commander that force was used, the officer would be disciplined. (Ex. J, Lucas Depo. p. 23, lns. 18-25).

272.    Officers are trained on how to administer OC spray, which includes training on how often an individual may receive OC spray. (Ex. J, Lucas Depo. p. 19-25).

273.    The spray should be used on an inmate or detainee's face in short bursts, and if the spray is not having any effect, the officers are to discontinue use. (Ex. J, Lucas Depo. p. 1-4).

274.    Correctional officers do not have the authority to determine when a restraint chair can be used. (Ex. J, Lucas Depo. p. 31, lns. 3-8, p. 33, lns. 2-4).

275.    Officers are trained to use shackles for transporting an inmate or when they become so unruly that they begin to use their feet as weapons. (Ex. J, Lucas Depo. p. 34, lns. 20-22).

276.    Officers are trained to use restraint belts for transport or when an inmate becomes unruly but not difficult enough to warrant the use of the restraint chair. (Ex. J, Lucas Depo. p. 35, lns. 5-6, lns. 12-14).

277.    Restraint belts are to be used when a lesser amount of force than the restraint chair can be used to restrain the inmate. (Ex. J, Lucas Depo. p. 35, lns. 17-20).

278.    The use of shackles and/or a restraint belt does not require prior approval from the Warden, the Deputy Warden, or Major. (Ex. J, Lucas Depo. p. 36, lns. 1-6).

279.    After reviewing video footage involving Decedent, Major Lucas did not observe any actions of the officers applying the restraint belt on Decedent to be contrary to their training. (Ex. J, Lucas Depo. p. 38, lns. 1-8).

280.    Major Lucas did not observe any actions of the officers placing the Decedent in the restraint chair that was contrary to their training. (Ex. J, Lucas Depo. p. 38, lns. 15-19, lns. 22-23).

281.    Correctional officers were provided with annual training on use of force.  (See, Ex. K, Danner Depo., DFS 233-225; 244-288).

Respectfully submitted,

LAVERY LAW

Date: January 29, 2024   /s/ Frank Lavery, Jr.
             PA Bar No. 42370
             225 Market Street, Suite 304
             Harrisburg, PA 17101-2126
             (717) 233-6633 (phone)
             (717) 233-7003 (fax)
             flavery@laverylaw.com
             Attorney for Defendants, Brian Clark,
             Dauphin County, Andrew Klahr,
             Steve Smith, Mark Neidigh, Richard
             Armermann, Greg Mendenhall, Scott Grieb,
             Jason Adams, Michael Blouch, Scott Lewis,
             Keith Biter, Robert Ingersol, Cameron
             Weaver, Taylor Glenn, Martin Myers,
             Delta Bauer, Steve Singleton, Keith
             Hoffman, and Tami Donovan

## CERTIFICATE OF SERVICE

I, Cathleen A. Sheaffer, an employee with the law firm of Lavery Law, do hereby certify that on this 29th day of January, 2024, I served a true and correct copy of the foregoing via the United States District Court for the Middle District's ECF on the following:

Riley H. Ross, III, Esquire
Kevin Mincey, Esquire
Mincey Fitzpatrick Ross, LLC
Two Penn Center
1500 JFK Boulevard, Suite 1525
Philadelphia, PA  19102
Email:  rileyross@rosslegalpractice.com
*Attorney for Plaintiffs*

David J. MacMain, Esquire
Matthew S. Polaha, Esquire
The MacMain Law Group LLC
101 Lindenwood Drive, Suite 160
Malvern, PA  19355
Email:  dmacmain@macmainlaw.com
*Attorney for Susquehanna Township Police Department Defendants*
*Officer Michael Darcey, Officer Demetrius Glenn, Corporal Richard Wilson and*
*Officer Christopher Haines*

John R. Ninosky, Esquire
Marshall Dennehey Warner Coleman & Goggin
100 Corporate Center Drive, Suite 201
Camp Hill, PA  17011
Email:  jrninosky@mdwcg.com
*Attorney for Defendant PrimeCare Medical, Inc.*

Donald L. Carmelite, Esquire
Marshall Dennehey Warner Colseman & Goggin
100 Corporate Center Drive, Suite 201
Camp Hill, PA  17011
Email:  dlcarmelite@mdwcg.com
*Attorney for Defendant Angela Swanson and Matthew Danner*

*s/ Cathleen A. Sheaffer*
Cathleen A. Sheaffer, RP, Pa.C.P.
Senior Paralegal