Certified Copy

Page 1

1          UNITED STATES DISTRICT COURT

      FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

2

3   CARMEN RILEY, et al.   : CIVIL ACTION

       Plaintiffs      : DOCKET NO.

4                    : 4:20-cv-00325

         v.          :

5                    :

  WARDEN BRIAN CLARK, et  :

6  al.                :

       Defendants      :

7                    :

                   :

8               - - -

      TUESDAY, FEBRUARY 22, 2022

9               - - -

10          Remote Oral Deposition of

11  CARMEN RILEY, taken pursuant to notice, at

12  Philadelphia, Pennsylvania, beginning at

13  approximately 1:30 p.m., before Jeanne

14  Christian, Professional Reporter and Notary

15  Public.

16

17

18

19

20            ****

21      VERITEXT LEGAL SOLUTIONS

22       MID-ATLANTIC REGION

23    1801 MARKET STREET, 18TH FLOOR

24     b  PHILADELPHIA, PA 19103

**Page 2**

```
1 A P P E A R A N C E S : (REMOTELY)
2
3   MINCEY FITZPATRICK ROSS, LLC
    BY:  RILEY H. ROSS, III, ESQUIRE
4   One Liberty Place
    1650 Market Street, Suite 3600
5   Philadelphia, Pennsylvania 19103
    Phone:  (215) 550-1999
6   rross@minceyfitzross.com
    Representing the Plaintiffs
7
8
    MacMAIN, CONNELL & LEINHAUSER
9   BY:  DAVID J. MacMAIN, ESQUIRE
    433 W. Market Street, Suite 200
10  West Chester, Pennsylvania 19382
    Phone:  (484) 318-7106
11  dmacmain@macmainlaw.com
    Representing Defendants
12  Susquehanna Township
    Police Officer Michael Darcy,
13  Officer Demetrius Glenn,
    Officer Aaron Osman,
14  Sergeant Richard Adams,
    Corporal Richard Wilson and
15  Officer Christopher Haines
16
    LAVERY LAW
17  BY:  ANDREW W. NORFLEET, ESQUIRE
    225 Market Street
18  Harrisburg, Pennsylvania 17108
    Phone: (717) 233-6633
19  awn@laverylaw.com
    Representing Dauphin County
20  Prison Defendants
21
22
23
24
```

**Page 3**

```
1  APPEARANCES CONTINUED:  (Remotely)
2
3   MARSHALL DENNEHEY WARNER COLEMAN
    & GOGGIN
4   BY:  JOHN R. NINOSKY, ESQUIRE
    100 Corporate Center Drive, Suite 201
5   Camp Hill, Pennsylvania 17011
    Phone: (717) 651-3709
6   jrninosky@mdwcg.com
    Representing Defendant PrimeCare
7   Medical, Inc.
8
    MARSHALL DENNEHEY WARNER COLEMAN
9   & GOGGIN
    BY:  DONALD L. CARMELITE, ESQUIRE
10  100 Corporate Center Drive, Suite 201
    Camp Hill, Pennsylvania 17011
11  Phone: (717) 651-3504
    dlcarmelite@mdwcg.com
12  Representing Defendant Angela Swanson
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 4**

```
1           I N D E X
            - - -
2
    EXAMINATION              PAGE
3 CARMEN RILEY
4   BY MR. MacMAIN         5, 173
    BY MR. NINOSKY          105
5   BY MR. CARMELITE      114, 196
    BY MR. NORFLEET     121, 176, 203
6   BY MR. ROSS         145, 192, 200
7
         E X H I B I T S
8            - - -
  NUMBER     DESCRIPTION    PAGE MARKED
9
10   (NO EXHIBITS WERE MARKED.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 5**

```
1        CARMEN RILEY, after having
2  been first duly sworn, was examined and
3  testified as follows:
4            - - -
5        EXAMINATION
6            - - -
7 BY MR. MacMAIN:
8 Q.   Good afternoon, Ms. Riley.  My name is
9 David MacMain.  I'm going to be the one
10 that's going to at least start asking you
11 questions, and I think the other attorneys
12 will ask you questions as well.
13        Could you first just state
14 your full name for the record?
15 A.   Carmen Ann Riley.
16 Q.   And how do you prefer that I refer to
17 you?  Carmen?  Ms. Riley?
18 A.   You can call me Carmen.
19 Q.   Carmen?  Okay, thank you.  I appreciate
20 it.  So my name is David MacMain.  I
21 represent the Susquehanna Township police
22 officers, as well as, I believe, the Township
23 is named as well.
24        I'm going to ask you questions
```

2 (Pages 2 - 5)

CARMEN RILEY

Page 6

1  today, and then when I am finished, the other
2  attorneys around the screen here may ask you
3  questions as well.  They represent various
4  other parties.
5           If, at any point in time, I
6  can't hear you or you can't hear me, or
7  Jeanne, most importantly, can't hear one of
8  us, just raise your hand or kind of make an
9  indication, so we don't miss anything.
10          Carmen, have you ever been
11 deposed before?
12 A.   No, I have not.
13 Q.   So as I am sure your very capable
14 counsel mentioned to you, a deposition is an
15 opportunity for the lawyer, lawyer or lawyers,
16 on the other side to ask questions of you,
17 about your background, about your son and his
18 background, about the incident, about the
19 lawsuit and about damages.   A deposition is
20 not like a TV show.  I'm not trying to trick
21 you.   I just want to get information to the
22 questions I ask you.
23          If, at any point, I ask you a
24 question that you can't answer, either because

Page 7

1  you don't know the answer or you just can't
2  answer it, then say so.   There may be things
3  I ask you that you just can't answer, and
4  that's the perfectly correct and accurate
5  answer.
6           You are under oath, just like
7  you would be in a courtroom, subject to the
8  same penalties and the fact we are doing it by
9  Zoom doesn't change that, either.
10          If I use a term you don't
11 understand -- I try not to talk like a lawyer.
12 I try to use plain English.  But if I ask you
13 a question you don't understand, let me know,
14 and I will rephrase it.   If I use a term you
15 don't understand, I will rephrase it.
16          If, at any point in time
17 during the deposition, you need to take a
18 break, just speak up and say so, whether it be
19 to stretch your legs, use the bathroom.  What
20 may be the only exception is, if there is a
21 question pending, you need to answer the
22 question first before we take a break.
23          All your answers have to be
24 verbal, so, in normal conversation, I would

Page 8

1  ask you a simple question, and you shake your
2  head yes.  The court reporter can only take
3  down verbal responses, so make sure all your
4  answers are verbal.
5           Two final things; one is,
6  Jeanne is taking everything down that
7  everybody says, so if there is any objection
8  from your counsel, if I am asking a question,
9  if you are answering a question, if another
10 attorney says something, she is trying to make
11 an accurate transcript of all the proceedings,
12 which means that we all have to be very
13 conscious not to talk over one another, to
14 speak loudly and clearly and slowly, and that
15 helps Jeanne do her job better.
16          There may be times where I am
17 halfway through a question, you know what I'm
18 asking, and you jump in and begin to answer
19 it.  Please try not to do that, because we
20 will be talking over one another.  And I will
21 try to do the same thing.  If you are halfway
22 through an answer, I will try not to cut in,
23 and if I do, it is unintentional.
24          And then the final instruction

Page 9

1  I will give you is that if, at any point
2  during the deposition, you realize that an
3  answer you had given to a prior question,
4  whether it be the question just before or one
5  an hour ago is inaccurate in any way or needs
6  to be corrected or changed or clarified, just
7  speak up, and I will let you go on the record
8  and explain how a prior answer needs to be
9  changed or supplemented in some way.
10          Do you have any questions of
11 me about the deposition process before we
12 begin?
13 A.   No.
14 Q.   So I'm going to start with some
15 preliminary stuff about you, about your son,
16 and then we will get into some more specifics
17 about the incident, so I will try to -- as we
18 go to a different -- I'm sorry?
19          MR. ROSS:  Sorry, Dave, this
20 is Riley.  Two things; one, I want to make
21 sure that you all hear me.  I am just coming
22 in on her mic, if I need to object.  So you
23 can hear me fine?
24          MR. MacMAIN:  Yes.

3 (Pages 6 - 9)

CARMEN RILEY

Page 10

1      MR. ROSS: Okay, great.
2          The second thing is, I don't
3  think we said at the beginning, but I would
4  like to reserve all objections, except for
5  those as to form, and otherwise, the usual
6  stipulations.
7          MR. MacMAIN: Very good. We
8  did forget that housekeeping, so thanks for
9  reminding us.
10 BY MR. MacMAIN:
11 Q.   So, Carmen, what I will try to do is, if
12 I go into a different topic area, I will try
13 to signal for you. Again, I'm not trying to
14 confuse you or trick you. I want to just get
15 information that you may have in support of
16 your claim.
17         So let me ask you first, are
18 you on any kind of medication or doctor's
19 orders or doctor's care currently?
20 A.   Yes.
21 Q.   And what for?
22 A.   High blood pressure and diabetes.
23 Q.   And is that something you have had for
24 some time?

Page 11

1  A.   Blood pressure, yes, yes.
2  Q.   I guess my question is, is it your
3  belief that your high blood pressure is
4  related to anything involving this suit or is
5  it something you have just had for some time,
6  and it is just part of health issues that we
7  all have?
8  A.   Oh, I had it for some time.
9  Q.   And any of the medications you are on,
10 do they affect your ability to recall
11 information or affect your ability to answer
12 questions that I have of you today?
13 A.   No.
14 Q.   Where do you currently live?
15 A.   1931 Franklin Avenue, Asbury, PA, 17109.
16 Q.   And I can check briefly, but is that
17 where you lived at the time of this incident?
18 A.   Yes.
19 Q.   And who do you currently live there
20 with?
21 A.   It would be my brother, my mother, and
22 Thomas.
23 Q.   And how long have the, I guess, four of
24 you lived at that residence? And you can

Page 12

1  approximate, by the way. I don't need an
2  exact year.
3  A.   Oh, okay. You mean all of us living
4  there or just me and my mom and -- I don't
5  know what you --
6  Q.   It sounds like the answer would be more
7  complicated if I made it that way. So how
8  long have you lived there?
9  A.   Okay, I have been there, I guess, since
10 I was -- oh, 54, 54, 53 years.
11 Q.   A total of 53 or 54 years?
12 A.   Yes.
13 Q.   I assume it is the house you grew up in?
14 A.   Yes.
15 Q.   And is it your mom's house or do you own
16 the house?
17 A.   It is both, you know, it is in both our
18 names.
19 Q.   How long has your husband lived there?
20 A.   He has been there not as long as us.
21 It was two-year stay, off and on, so I don't
22 know exactly how many years for him.
23 Q.   How long have you and Thomas been
24 married?

Page 13

1  A.   Well, we are not married, but we have
2  been together 23 years.
3  Q.   Are you currently employed?
4  A.   No, I'm not.
5  Q.   And when was the last time you were
6  employed?
7  A.   2014.
8  Q.   And what did you do?
9  A.   Department -- I worked for the
10 Department of Transportation.
11 Q.   Why did you stop working for the --
12 PennDOT, I assume?
13 A.   That's correct.
14 Q.   And why did you stop working at PennDOT?
15 A.   Well, I had enough time in, so I went on
16 and retired.
17 Q.   So you retired from PennDOT and are
18 getting a pension?
19 A.   Yes.
20 Q.   How about Thomas? Is he employed,
21 currently?
22 A.   No, he is not.
23 Q.   And when was he last employed?
24 A.   I don't know the answer to that.

4 (Pages 10 - 13)

CARMEN RILEY

Page 14

1 Q.   Is Thomas on any kind of disability?
2 A.   Yes.
3 Q.   And has he been -- do you know how long
4 he has been collecting disability?
5 A.   No, I do not.
6 Q.   And what is his disability?
7 A.   He has heart problems.  I don't know
8 what all his ailments are, but I know heart
9 problems.
10 Q.   I want to ask you a little bit about
11 your educational background.   What is the
12 highest grade you completed?
13 A.   12.
14 Q.   Are you a Harrisburg native?
15 A.   Yes.
16 Q.   I want to talk about Tyrique, and let me
17 just express my condolences.  I wish you and I
18 hadn't met under this circumstance, but you
19 certainly have the condolences of both myself
20 and my client.
21        Do you have other children
22 besides Tyrique?
23 A.   No, I do not.
24 Q.   So I may, during the course of the

Page 15

1 deposition, either call Tyrique by his name or
2 say your son, so we are only talking about --
3 you only have one child, so we are talking
4 about the same person.
5        Have you received any type of
6 counseling as a result of your son's death?
7 A.   I have.
8 Q.   And who have you received counseling
9 through?
10 A.   Jeanne, the name is Jeanne Fisk.
11 Q.   And do you know what kind of
12 professional Jeanne is?  Is Jeanne a woman,
13 first of all, or a man?
14 A.   Yes.
15 Q.   A woman?
16 A.   Yes, she is a woman.
17 Q.   Can you spell her first and last name?
18 A.   J-E-A-N-N-E; last name, Fisk, F-I-S-K.
19 Q.   Okay.  And do you know what kind of
20 professional Jeanne is?  Is she a
21 psychiatrist, a psychologist, a counselor?
22 A.   She is a counselor.
23 Q.   And where is Jeanne located?
24 A.   She is out of Hershey, Pennsylvania.

Page 16

1 Q.   Is she with Hershey Med or just she is
2 located in Hershey?
3 A.   I don't know the answer to that.
4 Q.   How long have you been seeing Jeanne?
5 A.   Over a year.
6 Q.   Okay.  And how often do you see Jeanne?
7 A.   Weekly.
8 Q.   Has it been weekly for the whole
9 approximate year you have been seeing her?
10 A.   Yes.
11 Q.   And how was it you went to Jeanne?  Did
12 somebody recommend her to you?
13 A.   Yes.
14 Q.   And who recommended -- I'm sorry?
15 A.   Our attorneys.
16 Q.   Your attorneys?
17 A.   Yes.
18 Q.   Do you have a family doctor that you
19 see?
20 A.   I do, yes.
21 Q.   And who is your family doctor?
22 A.   Christina Johnsbaugh.
23 Q.   Can you spell the last name for me?
24 A.   J-O-H-N-S-B-A-U-G-H.

Page 17

1 Q.   How long has Doctor Johnsbaugh, if I'm
2 pronouncing it correctly, how long has she
3 been your family doctor?
4 A.   I don't know exact date, exact time.
5 Q.   Has it been more than -- did it predate
6 your son's death?
7 A.   Say that again.  I'm not understanding.
8 Q.   Yes, sure.  So you are not sure how long
9 Doctor Johnsbaugh has been your family doctor.
10 Has it been more than five years?
11 A.   Yes.
12 Q.   Have you received any kind of
13 medications for anxiety, mental health,
14 counseling, any of those things, through
15 Doctor Sensebaugh -- I'm sorry, Johnsbaugh?
16 A.   Johnsbaugh, no.
17 Q.   You are on no medications for anxiety,
18 those kind of things, through Counselor Fisk;
19 is that correct?
20 A.   That's correct.
21 Q.   Other than seeing Counselor Fisk, have
22 you ever seen any other counselors for any
23 reason whatsoever, either since your son's
24 death or prior to your son's death?

5 (Pages 14 - 17)

CARMEN RILEY

Page 18

1  A.   I seen one, I was seeing another
2  counselor, and that wasn't working out.
3  Q.   Okay, who were you seeing?
4  A.   I don't remember her name, but it was --
5  the place was Winding Creek.
6  Q.   Where was that located?
7  A.   Mechanicsburg.
8  Q.   And when were you getting counseling at
9  Winding Creek?
10  A.   I don't remember.
11  Q.   Was it before your son's death or after
12  your son's death?
13  A.   It was after.
14  Q.   And what was the counseling for at
15  Winding Creek?
16  A.   For grieving.
17  Q.   And is that the same thing you have been
18  seeing Jeanne Fisk for, kind of the grieving
19  process, or have there been other issues that
20  have been involved?
21  A.   The grieving and some other things.
22  Q.   What are the other things that you are
23  seeing the counselor for?
24  A.   Just problems with me and Mr. Matthews.

Page 19

1  Q.   Relationship or -- I guess relationship
2  issues?
3  A.   Relationship issues.
4  Q.   What kind of things, what kind of
5  relationship issues are you addressing in your
6  counseling?
7  A.   Well, he be -- sometimes, he be
8  snapping, he be snappy, and also, our sexual
9  life is just -- it is not there.
10  Q.   Were these issues that predated your
11  son's death or did they occur after -- at some
12  point after your son's death?
13  A.   After.
14  Q.   And is it your belief and/or Ms. Fisk's
15  belief that your son's death is the root of
16  these problems or is it unrelated?
17        MR. ROSS:  Objection to the
18  form of the question.  You can answer.
19  BY MR. MacMAIN:
20  Q.   Let me break it in two questions then.
21        Has Counselor Fisk told you
22  that she believes that these relationship
23  problems between you and Thomas are as a
24  result of your son's death or some other

Page 20

1  reason?
2  A.   Some other reason.
3  Q.   Has she indicated what she believes that
4  reason is?
5        Did you understand my question
6  or do you want me to rephrase it?
7  A.   Rephrase it.
8  Q.   Sure.  So I was asking about these
9  relationship issues, and you said that the
10  counselor has said that she doesn't believe it
11  is related to your son's death.  You told me
12  you thought that she told you there was
13  another reason, and my question is, has she
14  told you what the other reason is that's
15  causing relationship problems between you and
16  Thomas?
17  A.   Just our, you know -- our, you know,
18  arguing with each other so much.
19  Q.   Other than Winding Creek and Counselor
20  Fisk, any other professionals you have seen at
21  any point for any reason for either emotional
22  distress, counseling, psychiatry, psychology,
23  any of those kind of mental health fields?
24  A.   No.

Page 21

1  Q.   Have you -- and I apologize, I have to
2  ask some of these questions, because I am
3  trying to get a full picture of everything.
4        Have you ever received any
5  treatment for any kind of addiction, such as
6  alcohol, drugs, substance abuse?
7  A.   No.
8  Q.   Have you ever been convicted of a crime?
9  A.   No.
10  Q.   I want to ask -- I'm going to ask some
11  of the same questions now about Tyrique, okay?
12        So, at the time of Tyrique's
13  death, was he employed?
14  A.   No.
15  Q.   Was he in school anywhere?
16  A.   No, he was not.
17  Q.   When -- and I know you answered some
18  questions that we had sent, and I'm going to
19  make it easier on all of us and find those
20  answers, but let me ask you first, while I'm
21  looking, when was -- prior to Tyrique's death,
22  do you recall when the last time he was
23  employed?
24  A.   I don't remember.

6 (Pages 18 - 21)

CARMEN RILEY

Page 22

1 Q.   Looking at your -- this is your answer
2 to a question called an Interrogatory that my
3 office sent, and in there, it indicates that
4 Tyrique worked at Elwood Staffing and at UPS.
5        Do you know when he worked at
6 those two locations?
7 A.   I don't remember the date.
8 Q.   How long he worked -- we will start
9 first with Elwood Staffing.  Do you know how
10 long he worked through Elwood Staffing?
11 A.   I don't know the exact date.  I don't
12 know.
13 Q.   Do you know if it was a month, six
14 months, a year?  Can you give me some
15 estimate?
16 A.   As they needed him, you know, they would
17 call him, and they would say, hey, we have a
18 job, you know, and he might work two months,
19 he might work three months.
20 Q.   I'm assuming Elwood Staffing, they would
21 be contracted by other employers for help for
22 different things?  Is that what your
23 understanding is?
24 A.   Yes.

Page 23

1 Q.   What kind of stuff did Tyrique do when
2 Elwood Staffing would get him a job?
3 A.   He would do warehouse work.
4 Q.   Okay, like stacking inventory and those
5 kind of things?
6 A.   Stacking and packing.
7 Q.   But you don't know how long or what time
8 period he worked through this Elwood Staffing?
9 A.   I do not.
10 Q.   What about UPS?  Do you know when he
11 worked at UPS and for how long?
12 A.   He didn't work at UPS long, because what
13 had happened was, you know, he got the job,
14 and then, you know, the work wasn't -- wasn't
15 much work.  So, of course, they are going to
16 let the ones who has been there the longest,
17 you know, go to work.  So he was like really
18 like on call.  If they need him, then he would
19 go in.
20 Q.   What did he do for UPS?
21 A.   Picking and packing.
22 Q.   Same kind or similar, it sounds like, to
23 the Elwood --
24 A.   Um-hum, yes, sir, yes.

Page 24

1 Q.   And do you know, and I may have asked
2 you this before, and if I did, I apologize,
3 during what time period he worked at UPS?  Or
4 how long?  Like a month, six months?
5 A.   I don't know.  I don't know the answer.
6 Q.   Any other jobs other than Elwood
7 Staffing or UPS that Tyrique worked?
8 A.   Those are the only two I know.
9 Q.   Do you know if Tyrique filed tax
10 returns?
11 A.   Yes.
12 Q.   Do you have copies or have access to his
13 tax returns?
14 A.   Yes.  Yes, I do.  I would have to look
15 for them.
16 Q.   And just so I'm clear, you are the
17 administrator of the estate; correct?
18 A.   That's correct.
19 Q.   Can you tell me what information you
20 gathered, specifically, financial information
21 for the estate, like monies owed to people,
22 assets, tax returns, anything you have
23 gathered as the administrator of the estate?
24 A.   I haven't.

Page 25

1 Q.   You haven't gathered -- there is no
2 financial records you have gathered for the
3 estate?
4 A.   No.
5 Q.   But in terms of the tax returns, you are
6 going to look, you may have some, you are not
7 sure?
8 A.   Yes.
9 Q.   How about education?  What was the
10 highest grade that Tyrique completed?
11 A.   12th.
12 Q.   Then where did he graduate from?
13 A.   Susquehanna Township High School.
14 Q.   Did Tyrique have any children?
15 A.   He did not.
16 Q.   Did he have a -- at the time of his
17 death, did he have a serious girlfriend?
18 A.   He did not.
19 Q.   And at the time of his death, where was
20 he living?
21 A.   1931 Franklin Avenue, Harrisburg.
22 Q.   And was he there all the time or was
23 there other places he may stay for a day or
24 two?

7 (Pages 22 - 25)

CARMEN RILEY

Page 26

1 A.   He was there most of the time.  Yes.
2 Q.   I want to ask you, while I'm on it, so I
3 don't forget, there was a reference in one of
4 the -- a report, and I can direct you to it,
5 if you like.  This was information that
6 Thomas provided to Susquehanna, which
7 indicated that Tyrique was possibly staying in
8 an apartment complex called Beaufort
9 Apartments.  Are you familiar with that at
10 all?
11 A.   That has nothing -- that call has
12 nothing to do with Tyrique.
13 Q.   I'm going to -- I will read it to you.
14 This is Susquehanna Bates Number 12.  "Thomas
15 Matthew Kemrer called in reference to this
16 prior incident, which the suit is about.  I
17 called him and advised that his son, Tyrique
18 Riley, is possibly staying in Lower Paxton
19 Township in an apartment complex called
20 Beaufort Apartments."
21       Do you know anything about
22 that?
23 A.   Yes, Tyrique did not stay there.  That
24 call was not for Tyrique when Mr. Matthews

Page 27

1 called it in.
2 Q.   What was he speaking about?
3 A.   He was talking about someone else that
4 lives there.
5 Q.   Would that be Shauna Hart?
6 A.   She doesn't live there.  Her son lives
7 there at that apartment complex.
8 Q.   Who is her son?
9 A.   Rashawn Thomas.
10 Q.   Was Rashawn a friend of Tyrique's or --
11 A.   Yes.
12 Q.   Do you know whether Tyrique was using
13 marijuana, cocaine or heroin during the time
14 period before his death?
15 A.   Marijuana, but not no cocaine or -- I am
16 aware of the marijuana.
17 Q.   Did Thomas ever indicate to you that he
18 believed that Tyrique was using cocaine or
19 heroin?
20 A.   No.
21 Q.   So is this the first -- my question, is
22 this the first time you have heard this?
23 A.   No, this isn't the first time I heard
24 it.

Page 28

1 Q.   Have you ever spoken to Thomas about him
2 calling the police and wanting the dealer
3 that's been selling drugs to Tyrique
4 investigated or charged?
5 A.   He had mentioned it.
6 Q.   Did Thomas indicate who he believed was
7 selling drugs to Tyrique?
8 A.   No, he did not.
9 Q.   Did he indicate to you what drugs he
10 thought were being sold to Tyrique?
11 A.   The only thing was marijuana.
12 Q.   Okay.  Other than this incident, do you
13 know whether Tyrique had ever been arrested by
14 any police agencies?
15 A.   He has not.
16 Q.   And --
17       MR. ROSS:  When you said this
18 incident, we are going back to June 18th, not
19 about the drug dealing you were just
20 referencing before, right?
21       MR. MacMAIN:  Correct, yes,
22 the incident at the house when Tyrique was
23 arrested and taken to prison.
24 BY MR. MacMAIN:

Page 29

1 Q.   Other than that, Tyrique had never been
2 arrested before?
3 A.   He has not.
4 Q.   Did Tyrique ever receive any kind of
5 counseling at any point for any kind of mental
6 health reasons at all?
7 A.   No.
8 Q.   Had he ever been diagnosed with any kind
9 of mental health issues, bipolar,
10 schizophrenia, anything at all?
11 A.   No.
12 Q.   Had he ever -- to your knowledge, had he
13 ever gone to a mental health professional to
14 be seen for any kind of concern about mental
15 health issues?
16 A.   No.
17 Q.   Had you ever recommended to him that,
18 perhaps, he wants to see somebody for some
19 kind of mental health concerns?
20 A.   No.
21 Q.   Do you know whether Thomas, I guess your
22 mom, your brother, anybody, had ever
23 recommended that Tyrique be seen for any kind
24 of mental health problems?

8 (Pages 26 - 29)

CARMEN RILEY

Page 30

1  A.   No.
2  Q.   Had -- I know in your answers to -- let
3  me back up.
4         I'm referring to these things
5  called Interrogatories, which are just a
6  lawyer's way of saying questions.  Have you
7  seen those and reviewed them and approved that
8  the answers that were provided were factually
9  accurate?
10 A.   Yes.
11 Q.   In terms of financial support, did
12 Tyrique pay any kind of rent to you or your
13 mom or anybody else at 1931?
14 A.   No, he would help out with like
15 groceries, but he never paid rent.
16 Q.   If he wasn't working, how would he be
17 able to help out with groceries?
18 A.   Well, when he would work, when he would
19 work and get a paycheck, he would, you know,
20 offer.
21 Q.   And I think I asked you this before, but
22 when was the last time prior to his death that
23 he worked?
24 A.   Oh, I can't answer that.

Page 31

1  Q.   Do you know anybody who would be able to
2  answer that?  Like, if I wanted to get a
3  snapshot of Tyrique's work history, how, other
4  than you, as his mother, or you, as the
5  administrator, where else I could get that
6  information?
7  A.   No.
8  Q.   Now, I asked about financial -- his
9  contribution to the house.  You said he might
10 offer to help pay for groceries or he may pay
11 towards groceries.
12        Is there anything else he did
13 financially to help with the house where you
14 all lived?
15 A.   No.
16 Q.   In other words, did he pay for cable?
17 Did he contribute to paying the electric bill,
18 anything like that?
19 A.   No.
20 Q.   Did he have any regularly assigned
21 chores, like, he would cut the grass or he
22 would wash the windows or anything, any chore
23 or thing that he did on a routine basis at the
24 house?

Page 32

1  A.   He would cut grass, and he would chop
2  firewood, throw it in the house, shovel snow.
3  Q.   Anything else you can think of?
4  A.   He would help with the -- help me raking
5  the leaves.
6  Q.   Does the home have a fireplace or like a
7  wood-burning stove?
8  A.   A wood-burning stove.
9  Q.   Is that the primary source of heat at
10 the house?
11 A.   Yes.
12 Q.   Anything else in terms of chores or
13 helping around the house, other than what you
14 told me?
15 A.   That's pretty much it.
16 Q.   So I had asked before about whether you
17 had any financial documents or anything.  You
18 said you didn't, but let me ask you some
19 questions to try to get a kind of financial
20 picture.
21        Did Tyrique own a car at the
22 time of his death?
23 A.   No, he did not.
24 Q.   Did he have a bank account, checking,

Page 33

1  savings, any type of financial account at the
2  time of his death?
3  A.   He had a savings account.
4  Q.   How much was in the savings account,
5  ballpark?
6  A.   Probably less than $20, enough to keep
7  it open.
8  Q.   Did he have any debts at the time of his
9  death?  Did he have like a credit card bill
10 that he owed?  Did he have -- really,
11 anything, any type of debts that he owed?
12 A.   No debt.
13 Q.   Did he own anything like a motorcycle,
14 any assets at the time of his death?
15 A.   No.
16 Q.   What about health insurance?  Did he
17 have health insurance?
18 A.   Yes, he did.
19 Q.   And who was that through?  Was that his
20 own plan or was that something that he was on
21 your plan through PennDOT?
22 A.   He was on my plan through PennDOT.
23 Q.   Do you know who the medical provider was
24 on your plan?  Was it Blue Cross?  Was it --

9 (Pages 30 - 33)

CARMEN RILEY

Page 34

1  A.    Highmark.
2  Q.    He was under, I guess, 27, so he had
3  full healthcare?  Whatever you got through
4  Highmark, he had as well?
5  A.    Yes.
6  Q.    And do you know whether or not that
7  included any kind of mental health counseling
8  under the plan, that if you wanted mental
9  health counseling, that would have been
10  provided through the medical plan?
11  A.    Yes.
12  Q.    In terms of his health at the time of
13  his death, did he have any -- was he on any
14  kind of medications?
15  A.    No medications.
16  Q.    Any kind of medical issues at all that
17  you are aware of, high blood pressure, you
18  know, anything at all?
19  A.    No.
20  Q.    And his family doctor, I think it is in
21  one of these answers, was who?
22  A.    Doctor Rose.
23  Q.    And had Doctor Rose been his kind of
24  primary care physician for, say, five years

Page 35

1  prior to his death?
2  A.    Yes.
3  Q.    Okay, so I want to talk to you -- I want
4  to now move to -- I am done, I think, with the
5  background information.  Other people may have
6  some questions, but I'm going to move to the
7  date of the incident, okay?
8  A.    Yes.
9  Q.    So I want you to first talk to me about
10  what occurred that caused you to call 911.
11  A.    Okay.  We were -- we were sleeping.
12  And Tyrique was sleeping on the couch.  We
13  were on the bed.  And Tyrique jumped up, and
14  he mumbled something, and then he went out
15  into the kitchen.
16  Q.    May I just stop you there real quick?
17  A.    Um-hum.
18  Q.    You said we were on the bed.  You and
19  Thomas were in your bed?
20  A.    Yes.
21  Q.    And so Tyrique was sleeping on the
22  couch?
23  A.    Okay, the couch -- Tyrique was on the
24  couch.  The bed also was in the living room.

Page 36

1  Q.    So it is all in the same room where you
2  and Thomas are sleeping?
3  A.    Yes.
4  Q.    And where Tyrique and the couch -- it is
5  all in the same room?
6  A.    Yes.
7  Q.    And as I read the reports, this would
8  have been about 4:00 a.m. in the morning?
9  A.    Yes.  Okay, so he --
10  Q.    Go ahead, I'm sorry.  I just had to
11  clear up a couple of things, so continue on.
12  A.    Okay.  So after he had jumped up, he
13  went into the kitchen, and he picked up a
14  sledgehammer.
15  Q.    Carmen, I'm sorry, when you say he,
16  since there are two --
17  A.    Tyrique, sorry.
18  Q.    Tyrique.
19  A.    Tyrique picked up the sledgehammer, and
20  then he comes back towards the living room.
21  And he just leans up like -- leans against the
22  door frame of the, you know, the kitchen and
23  the living room.  He just like leaned up
24  against it, like, was holding it like this,

Page 37

1  leaning up against like that.  And he didn't
2  say anything.  And then, I guess, all of a
3  sudden, he just went back into the kitchen and
4  sat down.  And I said to his father, Thomas
5  Matthews, I said, he picked a sledgehammer --
6  Tyrique picked a sledgehammer up.  And then
7  his father jumped -- his father got up, and he
8  goes into the kitchen.  Then they meet, like
9  -- once Dad went into the kitchen, Tyrique
10  started coming this way, you know, like, they
11  meet.
12  Q.    Let me stop you there and ask you some
13  questions about what you have just told me.
14  A.    Okay.
15  Q.    You were referring to Thomas as his dad.
16  I assume Thomas had been his -- whether he was
17  -- let me start over.
18          Was Thomas his biological
19  father?
20  A.    Yes.
21  Q.    Oh, Thomas was his biological father?
22  A.    Yes.
23  Q.    Okay.  Now, you said something, went
24  into the kitchen and got a sledgehammer.  Why

10 (Pages 34 - 37)

CARMEN RILEY

Page 38

1 was there a sledgehammer in the kitchen?
2 A. That's just where we -- that's where it
3 was.
4 Q. Okay, was it being -- it is a bit
5 unusual to have a sledgehammer in a kitchen.
6 Was there a project going on, some kind of
7 rehab project? Was the sledgehammer used for
8 something?
9 A. It just was in the -- it probably wasn't
10 being used for something, but it just was left
11 in the kitchen.
12 Q. So it was there prior to that night? It
13 wasn't like Tyrique went out to a garage or a
14 shed or went down the basement or whatever and
15 brought a sledgehammer? There was already a
16 sledgehammer in the kitchen?
17 A. Yes, it was already in the kitchen.
18 Q. So you also told me that you and Thomas
19 were sleeping. Did something wake you up
20 that caused you to, at 4:00 in the morning,
21 look over and see that Tyrique had a
22 sledgehammer?
23 A. Well, when he mumbled, I woke up. I
24 woke up. He mumbled something, and then I

Page 39

1 woke up from him mumbling.
2 Q. What did he mumble, if you know, I mean,
3 if you could hear it?
4 A. I couldn't. I couldn't figure it out.
5 Q. So did Thomas also -- I assume Thomas
6 also woke up after hearing Tyrique's mumbling?
7 A. No, he didn't wake up. He hadn't woke
8 up. I had woke up.
9 Q. And then you woke up Thomas and said,
10 hey, look, he has got a sledgehammer?
11 A. And then I said to him, after Tyrique
12 went back into the kitchen, I said to his
13 father, Thomas, I said, he picked a
14 sledgehammer up.
15 Q. Was that the conversation with you and
16 Thomas that this is -- why is he picking up a
17 sledgehammer at 4:00 a.m.?
18 A. Yeah, that's what I was -- I said, he
19 picked the sledgehammer up. And so then his
20 father jumped, got up off the bed, and went
21 into the kitchen. And then when his father
22 went in the kitchen, they just like met. And
23 then, his father said, what you trying to do,
24 get your dad?

Page 40

1 Q. Why did -- why would he say that? Did
2 Tyrique swing it at Thomas? Did he pick it up
3 over his head and look like he was going to
4 hit Thomas? Why would Thomas --
5 A. No, he just had it like this
6 (indicating). He would have to have it -- the
7 thing is like this long (indicating), so he
8 had to have it like -- you know, both hands
9 had to be on it.
10 Q. So Carmen, since we are not --
11 A. And he got up and just stood up with it,
12 just like, you know, stood up with it.
13 Q. Let me -- this is a little more
14 challenging to do these when it is by Zoom,
15 because I can't see your hands. I think you
16 had your hands like this, like you picked up a
17 sledgehammer, like you were about to pick it
18 up, and I guess, swing it?
19 A. He had it just like this (indicating).
20 Q. Indicating that two hands at chest level
21 high, holding onto the handle of the
22 sledgehammer?
23 A. Yes, yes.
24 Q. And the "he" that had the sledgehammer

Page 41

1 was Tyrique?
2 A. Yes.
3 Q. And you described that he and Thomas
4 kind of had this -- they met. What do you
5 mean by they met? Did they physically touch?
6 Were they near each other? What does met
7 mean?
8 A. Well, Thomas went into the kitchen, and
9 when he came into the kitchen, Tyrique gets up
10 off the chair, and then he walks -- you know,
11 they started -- you know, they just like came
12 like this and went together like this
13 (indicating.)
14 Q. You are indicating they kind of came
15 face to face?
16 A. Not really face to face, but just like
17 this. They just came like this.
18 Q. Like closer together?
19 A. Right, closer together.
20 Q. And could you see all this from where
21 you were?
22      MR. ROSS: David, let me just
23 interject. Carmen, I remind you that the
24 court reporter is taking everything down, so

11 (Pages 38 - 41)

CARMEN RILEY

Page 42

1 when you say like that, she may not -- she
2 won't be able to describe that, so if you can
3 describe it as you are talking, because
4 although we can see you, she is taking it down
5 and will be typing it later, and we are not
6 going to be able to see that later, so just
7 make sure you describe what you are showing.
8          THE WITNESS: Okay.
9          MR. MacMAIN: Thank you,
10 Riley.
11 BY MR. MacMAIN:
12 Q.   Where you were located, you could see
13 all this in the kitchen?
14 A.   I got up. I had got up off the bed.
15 And I came, and I stood in the doorway of the
16 living room.
17 Q.   You got out of bed, walked over towards
18 the kitchen, you had a clear view of all this?
19 A.   Yes.
20 Q.   So Tyrique has got the sledgehammer in
21 his hand, he stands up, he and your husband
22 kind of move closer together, and your husband
23 says -- what did he say? Are you going to hit
24 your dad or do something to your dad? What

Page 43

1 was it he said?
2 A.   He said -- Mr. Thomas said, what are you
3 going to do, hit your dad?
4 Q.   And what did Tyrique say?
5 A.   He didn't say anything.
6 Q.   Okay, so what happened next?
7 A.   So Mr. Matthews tried to take it, tried
8 to take the sledgehammer and put his hands on
9 it.
10 Q.   And what happened next?
11 A.   Once he put his hands on it, then that's
12 when it went like this, then like this
13 (indicating.)
14 Q.   And indicating -- I'm going to try to
15 paint the picture, so tell me if I'm
16 incorrect. They were kind of tussling over
17 the sledgehammer. They both had their hands
18 on the handle, and it was a tussle over the
19 sledgehammer?
20 A.   Yes.
21 Q.   Did you say anything at this point,
22 like, what are you guys doing?
23 A.   Well, I was trying to tell him to stop.
24 Q.   What did you say? What did you say,

Page 44

1 what did they say? Kind of tell me what
2 happened.
3 A.   You know, they didn't say nothing to me.
4 I just told them to stop, just stop it. And
5 it was just --
6 Q.   Okay, and did they stop?
7 A.   Not when I said stop, no.
8 Q.   What happened?
9 A.   Okay, so they ended up going down this
10 small hallway, and because everything was just
11 so -- it was just fast. It just was like
12 (indicating). And then Mr. Matthews ended up
13 going to one of the back bedrooms. He ended
14 up going back to the back bedroom. And then
15 Mr. Matthews was in there being like this
16 (indicating), like in the door frame.
17 Q.   Let me stop and try to paint the picture
18 again.
19          So they are tussling over this
20 sledgehammer. They go down a hallway;
21 correct?
22 A.   Yes.
23 Q.   And the whole time they are going down
24 the hallway, they both have their hand on the

Page 45

1 handle, and they are kind of struggling with
2 it?
3 A.   They both had their hands on it.
4 Q.   Okay, how long is this hallway they went
5 down?
6 A.   I'm not really good with feet.
7 Q.   How many steps would it take to get from
8 where they started in the kitchen to where
9 they got in the bedroom? If you were just
10 walking, how many steps would it take? Is it
11 a -- it sounds like you are trying to figure
12 out distance and having some trouble.
13 A.   Yeah, I can't. I was just going to say,
14 I'm just not good with it, you know.
15 Q.   That's fine. So did they have to pass
16 any other rooms as they are going down this
17 hallway until they got to the back bedroom?
18 A.   There is a bathroom.
19 Q.   So they are going down the hallway,
20 tussling over the handle of the sledgehammer.
21 They would pass a bathroom?
22 A.   Yes.
23 Q.   Would they pass anything else before
24 they got to this bedroom that you started to

12 (Pages 42 - 45)

CARMEN RILEY

Page 46

1  tell me about?
2  A.  And it is two bedrooms.  It is two
3  bedrooms back -- towards the back of the
4  house.
5  Q.  Are they on either side of the hallway,
6  like across from one another?
7  A.  Well, yes, they across from one another,
8  kind of across from one another.
9  Q.  So, at this point, with this commotion,
10  did your mom wake up?
11  A.  We weren't at 1931 Franklin Avenue.  We
12  weren't at that.  It was 2003 Franklin
13  Avenue.
14  Q.  Okay, so this incident happened at 2003?
15  A.  That's correct.
16  Q.  So the only people living in that house
17  are you, Thomas and your son?
18  A.  I don't live there.
19  Q.  I'm probably -- I am confused.
20  A.  I don't live there.  Mr. Matthews was
21  staying over at 2003.
22  Q.  So this incident happened at --
23  A.  We were staying over there, we would
24  stay over there, but Mr. Matthews was staying

Page 47

1  over at 2003.
2  Q.  Let me break this down, so I make sure
3  I'm following you.
4      So you have lived at 1931
5  Franklin Avenue most of your life; correct?
6  And that's where you live now?
7  A.  Yes.
8  Q.  But this incident occurred at 2003?
9  A.  Yes.
10  Q.  Franklin Avenue?
11  A.  Correct.
12  Q.  And is that a different building or is
13  it the same building, but different units?
14  A.  The same building, but different units.
15  Q.  So why was it -- strike that.
16      So help me understand who --
17  at the time of the incident, who lived in what
18  unit?  Who lived in 1931 at the time of the
19  incident?
20  A.  Who lived there?
21  Q.  Yes.  Go ahead, I'm sorry.
22  A.  Okay, who lived there at 1931 would be
23  my mother, my brother, myself and Tyrique.
24  Q.  Okay.  And at the time of this incident,

Page 48

1  Thomas was living in the same building, but a
2  different unit, 2003?
3  A.  Yes, he was living in another, you know,
4  property.
5  Q.  Okay, I want to make sure I understand.
6  2003 is an entirely different building?
7  A.  Yes.
8  Q.  Or is it -- okay.  And so this tussle
9  over the sledgehammer is happening at 2003 or
10  at 1931?
11  A.  2003.
12  Q.  So you went and stayed at Thomas' place
13  at least that night?
14  A.  Yes.
15  Q.  And Tyrique stayed at Thomas' place at
16  least that night?
17  A.  That's right.
18  Q.  How often would you -- how often would
19  you stay at 2003, instead of the 1931 address?
20  A.  Here and there.  I wouldn't stay there
21  -- I wouldn't stay there all the time, because
22  there was cats there.  I wouldn't stay there
23  all the time.
24  Q.  So your primary residence where you

Page 49

1  primarily lived was 1931, but you sometimes
2  would stay at 2003?
3  A.  Correct.
4  Q.  The same question with Tyrique, how
5  often would he stay at 2003?
6  A.  Not that -- no, he hardly stayed at
7  2003.
8  Q.  Why was he staying at 2003 that night?
9  A.  Because he was talking about somebody
10  running up in our house and people on our
11  property.
12  Q.  So he didn't want to be there?
13  A.  Well, I don't think he -- I think he was
14  afraid of someone running up in our house.
15  Q.  So he was afraid that people were coming
16  up into 1931, so he decided to stay at Thomas'
17  place, as did you, at 2003?
18  A.  Yes.
19  Q.  And had there been break-ins?  Was there
20  someone -- why were people running up into
21  1931?
22  A.  I don't know why --
23      MR. ROSS:  Objection to the
24  form of the question.  You can answer.

13 (Pages 46 - 49)

CARMEN RILEY

Page 50

1     THE WITNESS: I don't know why
2 he thought someone would be running up in our
3 house.
4 BY MR. MacMAIN:
5 Q.   Did anyone actually run up to 1931 or it
6 was just something he was talking about?
7 A.   That's something he was talking
8 about, somebody running up in there and
9 talking about them being on -- people outside
10 on our property.
11 Q.   But you didn't see any of that?  You
12 didn't think that was -- you didn't see that?
13 A.   What do you mean, didn't see --
14 Q.   Sure, so --
15 A.   You mean people outside our house or
16 what?  I don't know what you mean.
17 Q.   So let me -- I wasn't very clear with my
18 question.  That's on me.
19     Tyrique was concerned that
20 people were going to come into 1931.  He was
21 concerned about that; correct?
22 A.   Correct.
23 Q.   My question to you was, was that
24 actually happening to your knowledge or that

Page 51

1 was just something that he kind of was
2 thinking, but it wasn't actually occurring?
3 Do you understand what I'm asking?
4 A.   No.
5 Q.   Were people to your -- based on your
6 observation, did you see people trying to get
7 into 1931, like Tyrique had said there were?
8 A.   No.
9 Q.   Did you think he was hallucinating or
10 seeing things that weren't really happening or
11 were you just of the view that you just didn't
12 see it, but his concern was valid?
13 A.   I just thought he was -- what was the
14 word, hallucinating?
15 Q.   Hallucinating or just, you know --
16 A.   Yes, I just thought he was -- yes.
17 Q.   Did you -- at that point, were you
18 concerned that maybe he had some kind of
19 mental health problem, and you needed to get
20 him help?
21 A.   Not at that time, no.
22 Q.   And when was this in relation to the
23 4:00 a.m. sledgehammer tussle?  Was this
24 earlier that day?  Was it a week before?

Page 52

1 A.   I think it was a couple of days, he was
2 -- it was a couple of days.
3 Q.   And during those couple of days, you
4 didn't think he needed any kind of medical or
5 mental health treatment; is that correct?
6 A.   No, I didn't think he needed it, because
7 he would just say about these people running
8 up in our house and on our property.
9 Q.   So my question is -- I think you
10 answered this, but I just want to be clear,
11 because it is important.  Did you think he was
12 like making this up or he just was seeing
13 things that didn't exist or were you concerned
14 that what he was saying was accurate, that
15 there may have been people trying to get into
16 1931?
17 A.   Yeah, I mean -- no, I didn't think he
18 was making it up.
19 Q.   You didn't think he was making it up?
20 A.   No.
21 Q.   No?  Okay.  Did you call the police out
22 of concern for your mom, your brother, you,
23 that someone was trying to get into 1931
24 address?

Page 53

1 A.   No.
2 Q.   How many -- other than the -- prior to
3 this night, how many nights had you stayed at
4 2003?  Was it just that night or was it for a
5 couple of nights, you stayed there?
6 A.   Just that night.
7 Q.   And what about Tyrique?  Was it just
8 that night or had he stayed there the night
9 before and the night before that?
10 A.   That night.
11 Q.   Was your mom and your brother, who lived
12 at 1931, aware of Tyrique's concern that maybe
13 people were trying to break in to 1931?
14 A.   No.
15 Q.   Weren't you concerned for your mom and
16 your brother, that they may be in harm's way
17 as well?
18 A.   Well, rephrase that.  I'm not really --
19 Q.   Sure.  Let me try to make it simpler.
20     You and Tyrique are concerned
21 enough that someone is trying to break into
22 1931, that you leave and stay somewhere else.
23 My question is, did you warn or were you
24 concerned for your mom, who I assume was much

14 (Pages 50 - 53)

CARMEN RILEY

Page 54

1 older or older than you, and your brother,
2 that, hey, you might want to live, stay
3 somewhere else or call the police, because
4 someone may be trying to break into 1931?
5            MR. ROSS: Objection to the
6 form of the question.
7            THE WITNESS: I didn't think
8 -- if someone was going to try to break in
9 there and try to run up in our house, I am
10 pretty sure we would -- we probably would have
11 heard it.
12 BY MR. MacMAIN:
13 Q.   At least up to the point of the tussle
14 over the sledgehammer on the night of the
15 incident at 4:00 a.m., you had not had any
16 concern prior to that that Tyrique needed
17 medical or mental health treatment; is that
18 correct?
19 A.   That's correct.
20 Q.   Have you listened to your 911 call on
21 the night of the incident?
22 A.   Yes.
23 Q.   You mentioned something about he,
24 meaning Tyrique, snapped a couple of days ago.

Page 55

1 What were you referring to?
2 A.   I was referring to him talking about
3 someone going try to run up in our house and
4 people on our property.
5 Q.   But I thought I just asked you, and you
6 said you kind of thought he didn't make it up,
7 he may actually -- it may be a legitimate
8 concern; correct?
9 A.   Yes.
10 Q.   But when you called 911, when you were
11 referring to he snapped, you were referring to
12 this concern he had that someone might be
13 running up to 1931? That's what you were
14 referring to with the snapped?
15 A.   Yes.
16 Q.   Was there anything else that happened
17 prior to that day that gave you any concern
18 that Tyrique had some kind of mental or
19 medical health problem for which he needed
20 treatment right away?
21 A.   No.
22 Q.   So I'm going to jump back to the
23 sledgehammer tussle.  You talked about he and
24 your -- not your husband, Thomas -- made it

Page 56

1 all the way down this hallway.  Where we left
2 off was, Thomas was in kind of the frame of a
3 bedroom door, and that's where we stopped
4 talking about it.  So I want you to pick up
5 with what happened next.
6 A.   Mr. Matthews had sweatpants on, and they
7 fell down.
8 Q.   He fell down on his own?  He wasn't
9 pushed?
10 A.   No, his sweatpants fell down to his
11 feet.  Mr. Matthews' sweatpants fell down to
12 his feet.  And he said, great.
13 Q.   And so his sweatpants fell down to his
14 feet, and that caused him to fall?
15 A.   Yeah.
16 Q.   Tyrique had, really, nothing to do with
17 it?
18 A.   No.
19 Q.   Do you know why, after the struggle in
20 the kitchen, down the hallway, why, all of a
21 sudden, his pants fell?
22 A.   Well, he done lost some weight, so the
23 pants just -- Mr. Matthews lost weight.
24 Q.   I'm trying to figure out why, during the

Page 57

1 struggle, they didn't fall down until they got
2 all the way to the back of the hallway in the
3 door frame.  Did a drawstring come off?  Did
4 -- do you know why they all of a sudden fell
5 then?
6 A.   Yeah, they are just old.  The sweatpants
7 are old sweatpants and not that tight, you
8 know, tight.  It is just the oldest pants that
9 he had.
10 Q.   Now, I had asked you to give me an
11 estimate of the distance between where the
12 struggle began and where it ended up in the --
13 at the end of the hallway, and you really
14 weren't able to do that, which is fair.  Can
15 you give me an estimate of how long of a time
16 between when they both grabbed onto this
17 sledgehammer to when -- the point where they
18 are in the back hallway, and Mr. Matthews
19 falls to the ground?  Was it five seconds,
20 ten seconds?  Can you give me a reasonable
21 estimate?
22 A.   No, I can't.
23 Q.   So we are going to pick back up.  Mr.
24 Matthews -- when you say Mr. Matthews, and I

15 (Pages 54 - 57)

CARMEN RILEY

Page 58

1  say Thomas, it is the same person, right?
2  A.   That's correct.
3  Q.   I just want to make sure we are not --
4  he falls to the ground.   What happens next?
5  A.   Okay, once he falls down to the ground,
6  and the sledgehammer is like across his waist,
7  since he went down, he went back this way, and
8  he fell down, and it is across his waist.
9  Q.   So who is across who -- who had the
10 sledgehammer?
11 A.   They both still was holding onto it.
12 Q.   So Thomas goes to the ground.   Does
13 Tyrique fall on top of him?
14 A.   No, he didn't fall on top of him.
15 Tyrique was more like -- how do I say it?  He
16 was more like to the -- you know, to the side,
17 like, you know, like this (indicating).
18 Q.   But did both Thomas and Tyrique each
19 have two hands on the sledgehammer after
20 Thomas fell?
21 A.   Yes.
22 Q.   So they are still both grabbed onto the
23 sledgehammer, Thomas is on the ground, Tyrique
24 is still upright?

Page 59

1  A.   Yes.
2  Q.   Okay, so what happened next?
3  A.   Okay.   So Mr. Matthews wanted me to
4  call the ambulance.   And so I go to the
5  kitchen, because the cellphone was in the
6  kitchen, and I go to the -- and I called the
7  ambulance for Mr. Matthews.
8  Q.   Up to this point, you didn't call 911,
9  this was the first call that was made;
10 correct?
11 A.   That's correct.
12 Q.   And that was because Thomas said, I need
13 medical attention, or call an ambulance, I'm
14 hurt, or something like that?
15 A.   Call an ambulance, yes.
16 Q.   Okay, what happened next?
17 A.   Okay.   So when I go to -- I go to call.
18 I had to go out to the kitchen, because that's
19 where the phone was.   And I went, and I
20 called 911 and asked for an ambulance.   And
21 then I walked back to the bedroom.   After I
22 asked for the ambulance, then I started
23 walking back to the bedroom where Thomas was.
24 And then, when I got back there, Tyrique was

Page 60

1  standing over the other bedroom with it,
2  because I had asked Mr. Matthews before I got
3  out, I said, do you have it?  He had his hand
4  on it.  And he said that he had it.  And then
5  he goes -- you know, when I come back from the
6  kitchen from making the phone call for the
7  911, you know, then I see he just -- Mr.
8  Matthews just said, forget it, you know, he
9  just gave it to me.  He just let loose of the
10 sledgehammer.
11 Q.   Let me stop you there.   When you left
12 to go make the call --
13 A.   Um-hum, yes.
14 Q.   -- they both had their hand on the
15 sledgehammer; correct?
16 A.   Correct.
17 Q.   And then when you come back, Thomas is
18 laying where?
19 A.   On the back -- in the bedroom.
20 Q.   Okay.   And Tyrique is in the other
21 bedroom?
22 A.   Yes, there is another bedroom, yes.
23 Q.   And they are directly across from each
24 other?

Page 61

1  A.   Yes.
2  Q.   And Tyrique has got the sledgehammer,
3  and Thomas is laying on the ground?
4  A.   Yes.
5  Q.   Okay.   By the way, during this tussle
6  with the sledgehammer, it starts in the
7  kitchen, it goes down the hallway, it
8  initially ends with Thomas going to the
9  ground, were either one of them saying
10 anything to one another?
11 A.   No.
12 Q.   Were you saying anything?
13 A.   Just basically just saying, stop, you
14 know, just stop.
15 Q.   So you come back from making the call?
16 A.   Yes.
17 Q.   You have the phone on the whole time;
18 correct, at that point?
19 A.   Yes.
20 Q.   Because you are -- you said you have
21 listened to the 911 call, you were kind of
22 talking while the operator is trying to get
23 information from you; correct?
24 A.   Yes.

16 (Pages 58 - 61)

CARMEN RILEY

Page 62

1  Q.   And at this point, when you begin the
2  call, Tyrique is in another bedroom with the
3  sledgehammer, Thomas is on the ground.  What
4  happens next?
5  A.   Okay.  After that, I told him -- I
6  remember telling him to put it down, and I
7  told him to put it over by the refrigerator.
8  Q.   You are telling Tyrique this?
9  A.   Yes.
10 Q.   And what was his response?
11 A.   He ended up putting it by the
12 refrigerator.
13 Q.   How long after you told him to put it
14 back down -- I assume down the hallway, in the
15 kitchen, by the refrigerator, how many times
16 did you have to tell him that before he did
17 what you asked him to do?
18 A.   A few times.
19 Q.   I'm sorry, a few?
20 A.   A couple.  It was -- I don't -- I don't
21 know.
22 Q.   At any point, did he go back into the
23 bedroom where his father was?
24 A.   After he had -- after he had put it

Page 63

1  down, he went back towards that way, yes.
2  Q.   So you asked him, I think you said two
3  or a few, but a handful of times, he, meaning
4  Tyrique, to put it down, he goes down the
5  hallway, puts the sledgehammer in the kitchen,
6  comes back, and then goes into the bedroom
7  where his dad is; is that correct?
8  A.   Yes.
9  Q.   What happens at that point?
10 A.   Okay, at that point, I told him that, I
11 said, help your dad up.  Mr. Matthews was
12 like, no, no, you know.  He just said no, no,
13 no.
14 Q.   Okay, and what happened next?
15 A.   Okay, so he was just like -- I was
16 sitting in the kitchen, and he was just
17 walking around, you know, walking around out
18 in the kitchen with me.
19 Q.   Tyrique?
20 A.   Yes.
21 Q.   And Thomas is still in the bedroom.  Is
22 he still on the floor?
23 A.   He is still on the floor.
24 Q.   Let me jump ahead, and I'm going to fill

Page 64

1  in the gap in between.
2        At some point, the police
3  arrive; correct?
4  A.   Yes.
5  Q.   When they arrive --
6        MR. ROSS:  If we are going to
7  start talking about that, can we take a
8  five-minute break?  We have been going for a
9  little bit more than an hour.
10       MR. MacMAIN:  Let me finish
11 this one question, and then we will take a
12 break.
13       MR. ROSS:  Okay.
14 BY MR. MacMAIN:
15 Q.   When the police arrive, where are you,
16 where is Tyrique, where is your husband?  Or
17 I'm sorry, your -- Thomas?
18 A.   Thomas is still in the bedroom on the
19 floor.  Tyrique and I are in the kitchen.
20 Q.   Okay, we are going to take a break.
21 I'm going to probably play the 911 call at
22 some point after we come back from the break.
23       Riley, five minutes,
24 ten minutes?

Page 65

1        MR. ROSS:  Is five minutes
2  okay or do you want ten minutes?
3        MR. MacMAIN:  Let's go ten.
4  It is 2:44.  We will come back at 2:54.
5  Thanks, guys and gals.
6        - - -
7        (Whereupon a short break was
8  taken at this time.)
9        - - -
10 BY MR. MacMAIN:
11 Q.   Carmen, I'm going to ask you, is there
12 anything that we have covered so far that you
13 need to clarify or correct in any way any of
14 your answers, things you thought of maybe over
15 the break?
16 A.   No.
17 Q.   Okay, good.  So I'm going to play the
18 911 call for you in a second, so I'm going to
19 ask you some questions about that, but just so
20 I understand the sequence, when you call 911,
21 Thomas is on the floor, he needs medical
22 attention, Tyrique is in the other bedroom, he
23 has got the sledgehammer, and you are on the
24 phone; is that correct?  Kind of when the call

17 (Pages 62 - 65)

CARMEN RILEY

Page 66

1  gets made?  Or had Tyrique taken the
2  sledgehammer down the hall in the kitchen when
3  you called?
4  A.   No, he was over in the bedroom when I
5  called.
6  Q.   He still had the sledgehammer when you
7  called?
8  A.   Yeah.
9  Q.   Okay.  So I'm going to play the 911
10 call, and I'm going to stop it every so often
11 and ask you questions, okay?
12 A.   Okay.
13        MR. MacMAIN:  So the first
14 thing I have to do -- the first thing I have
15 to do is call my paralegal in here.  Let me
16 play this and see if other people can hear.
17 I'm going to give this a test here.  Raise
18 your hand, if you can hear it.
19        What I'm going to do is, I'm
20 going to play it for a period and stop and ask
21 you questions at certain points.  If, at any
22 point, Carmen, during this -- or I guess I
23 will throw this out to all counsel, if
24 everyone is okay with it, if there is

Page 67

1  something in particular that I go past and
2  don't ask a question that someone is
3  interested in asking, rather than replay this
4  multiple times, I think that would be the
5  easiest.
6        Does that make sense for
7  everyone?
8        MR. ROSS:  That's fine.  Can I
9  just ask that when you stop, can you give us a
10 marker?
11       MR. MacMAIN:  Absolutely.
12       MR. ROSS:  Thanks.
13            - - -
14       (Whereupon the 911 call was
15 played.)
16            - - -
17 BY MR. MacMAIN:
18 Q.   Okay, I'm going to stop there, Carmen.
19 You -- at this point, I didn't keep track, but
20 you told Tyrique -- I think you call him Ty --
21 A.   Yes.
22 Q.   -- multiple times to put the
23 sledgehammer down.  Is he still in the
24 bedroom or is he moved out of the bedroom when

Page 68

1  you are telling him to put the sledgehammer
2  down?
3  A.   He was still in the bedroom, and I was
4  in the hallway.
5        MR. ROSS:  Can you give us the
6  mark on the tape, please?
7        MR. MacMAIN:  Oh, yes, I'm
8  sorry.  We just stopped it at 1:39.
9        MR. ROSS:  Thank you.
10 BY MR. MacMAIN:
11 Q.   Carmen, I have a question.  I'm going to
12 reverse by about ten seconds, and I want you
13 to listen carefully, because I'm going to ask
14 you what you said, okay?  So I'm bringing it
15 back to about 1:09.
16            - - -
17       (Whereupon the 911 call was
18 played.)
19            - - -
20 BY MR. MacMAIN:
21 Q.   Right there, you are asked, did he get
22 pushed over?  And you said yes.  Did I hear
23 that correctly?  And this is at -- we stopped
24 at the 1:38 mark, so it would have been within

Page 69

1  five, ten seconds prior to us stopping?
2  A.   Yes, that's correct.
3  Q.   So you told the operator that Thomas got
4  pushed over; correct?
5  A.   Yes.
6  Q.   And you told us today that he fell, but
7  you told the operator he got pushed over;
8  correct?
9  A.   Yes.
10 Q.   I'm going to continue on at 1:38, keep
11 playing some more, and I will stop it again.
12            - - -
13       (Whereupon the 911 call was
14 played.)
15            - - -
16 BY MR. MacMAIN:
17 Q.   I just stopped it, Carmen, at 2:09.  And
18 early on, you would agree with me that you
19 told Ty several more times to put the
20 sledgehammer down; is that correct?
21 A.   Yes.
22 Q.   Was he still in the bedroom or had he
23 moved out into the hallway or to the kitchen?
24 A.   He --

18 (Pages 66 - 69)

CARMEN RILEY

Page 70

1  Q.   And if he was moving during this time,
2  you can tell me that as well.  I'm just trying
3  you to figure out where he was when --
4  A.   I don't remember.
5  Q.   Okay, you don't remember.
6           Let me just backtrack by a
7  tiny bit, and backtrack the two minutes.  I'm
8  going to restart again.
9           - - -
10          (Whereupon the 911 call was
11  played.)
12          - - -
13 BY MR. MacMAIN:
14 Q.   Okay, that part that I just played, it
15 is between 2:05 and 2:09, you say:  No, Ty, we
16 didn't do anything, you started it.
17          Did I hear you correctly?
18 A.   Yes.
19 Q.   And what was Tyler saying that prompted
20 you to say that, no, you started it?  If you
21 remember.
22 A.   I don't remember.
23 Q.   I am going to keep playing.  We are
24 starting at 2:09.

Page 71

1           - - -
2           (Whereupon the 911 call was
3  played.)
4           - - -
5  BY MR. MacMAIN:
6  Q.   Okay, I just stopped it at 2:32, and you
7  just said, if I heard correctly:  No, we are
8  not putting you away.   We need to get help
9  for Dad.
10          Did I hear that correctly?
11 A.   You heard that correctly.
12 Q.   And what was -- can you explain to me
13 what Tyler said about putting him away?
14 What's that about?
15 A.   I don't -- no, I don't remember.
16 Q.   Okay.  Had there been talk about having
17 Tyler committed somewhere prior to this 911
18 call?
19 A.   No.
20 Q.   No talk about having him committed to a
21 hospital?
22 A.   No.
23 Q.   No talk about having him committed to
24 any kind of mental health unit or psychiatric

Page 72

1  ward?
2  A.   No.
3  Q.   Had there ever been talk about that with
4  Tyler, that he needed some kind of help for
5  emotional or mental health issues?
6           MR. ROSS:  Just for the
7  record, Tyrique.  I think you said Tyler a
8  few times, David.
9           MR. MacMAIN:  Oh, I'm sorry,
10 yes, I will just say Ty, to make it easier.
11 Thank you.
12          THE WITNESS:  No.
13 BY MR. MacMAIN:
14 Q.   So no concerns, no discussion up to this
15 point about Tyrique or Ty -- not Tyler --
16 being institutionalized or getting any kind of
17 mental health treatment?
18 A.   No.
19 Q.   Do you recall what Tyrique said that
20 would have prompted you to say, no, we are not
21 putting you away, we are trying to get help
22 for Dad?
23 A.   I guess because of the -- you know, the
24 struggle.

Page 73

1  Q.   Well, I'm asking, did he say, like, you
2  are not going to have me arrested, you are not
3  going to have me put in jail?
4  A.   No.
5  Q.   Do you recall what he said?
6  A.   No, he didn't say anything.
7  Q.   Okay.  I'm going to keep playing from
8  -- we are starting again at 2:32.
9           - - -
10          (Whereupon the 911 call was
11  played.)
12          - - -
13 BY MR. MacMAIN:
14 Q.   So, Carmen, I just stopped it at 3:28.
15 At least, at this point, it sounds like Ty has
16 still not put the sledgehammer down, because
17 you are telling him again, please put it down.
18 Is that correct?
19 A.   Yes.
20 Q.   And at this point, was Thomas conscious
21 or unconscious, if you know?
22 A.   He was conscious.
23 Q.   Was there ever a point that he became
24 unconscious prior to the police arriving?

19 (Pages 70 - 73)

CARMEN RILEY

Page 74

1  A.   No.
2  Q.   So he was conscious the entire time up
3  until when the police came, at least?
4  A.   Yes.
5  Q.   We are going to continue on from 3:28.
6          - - -
7          (Whereupon the 911 call was
8  played.)
9          - - -
10 BY MR. MacMAIN:
11 Q.   Okay, you just said -- I stopped it at
12 3:44.  You said:  No, nobody is going to do
13 anything.
14          Do you know what prompted you
15 to say that?
16 A.   No, I don't know.
17 Q.   Then you said something about "no
18 decoy."  What are you referring to there?
19 What's that about?
20 A.   I don't remember.
21 Q.   Okay, I'm going to keep playing at 3:44.
22          - - -
23          (Whereupon the 911 call was
24 played.)

Page 75

1          - - -
2  BY MR. MacMAIN:
3  Q.   Okay, I just stopped it at 4:38.  You
4  were asked:  Did your son put the sledgehammer
5  down yet?  And you said no.
6          Is that correct?  Do you want
7  me to replay it?  Carmen?
8  A.   I don't remember.  I don't remember.
9  Q.   Okay, but first of all, did I hear
10 correctly where the 911 operator said:  Did he
11 put the sledgehammer down yet, and you said
12 no?
13          I can replay it.  It is not a
14 guessing game.  So I'm going back to 4:27.
15          - - -
16          (Whereupon the 911 call was
17 played.)
18          - - -
19 BY MR. MacMAIN:
20 Q.   Okay, did you hear that?  He is asking
21 whether he put the sledgehammer down yet, and
22 you said no; is that correct?
23 A.   That's correct.
24 Q.   And do you recall hearing it the second

Page 76

1  time whether Ty had put the sledgehammer down
2  or not?
3          Let me strike that.  Let me
4  ask it a different way.  At the time this is
5  happening, you are reporting that he hadn't
6  put the sledgehammer down yet.  I guess my
7  question is, do you have any reason to think,
8  as you sit here now, some time later, that he
9  still -- that he did not put the sledgehammer
10 down?
11 A.   I don't --
12 Q.   You just don't know one way or the
13 other?
14 A.   No.
15 Q.   Okay, that's fair.  I'm going to keep
16 playing at 4:39.
17          - - -
18          (Whereupon the 911 call was
19 played.)
20          - - -
21 BY MR. MacMAIN:
22 Q.   So, Carmen, I want to ask about that.
23 We just stopped it at 5:17.  The 911 operator
24 asked:  Does he have any kind of mental

Page 77

1  conditions that we need to be aware of?  And
2  you said:  Yeah, he snapped.
3          Okay?  Did I record that
4  correctly?
5  A.   Yes.
6  Q.   And when you said about he snapped, we
7  had talked about that earlier, you had said
8  that a day or two before, he talked about
9  people coming to 1931, trying to get into
10 1931; correct?  Is that what you were
11 referring to, about the snapped?
12 A.   Yes.
13 Q.   But I think, and correct me, if I'm
14 wrong, that you told me earlier that you kind
15 of didn't think that was unusual or you kind
16 of had some concerns as well; is that correct?
17          MR. ROSS:  Objection to the
18 form of the question.  You can answer.
19          THE WITNESS:  Repeat that
20 again.
21 BY MR. MacMAIN:
22 Q.   Sure.  So you told the operator, in
23 response to a question about whether Tyrique
24 had any kind of mental health problems, you

20 (Pages 74 - 77)

CARMEN RILEY

Page 78

1 kind of thought for a brief second, and you
2 said, yeah, he snapped a couple of days ago.
3 Correct? That's what you said to --
4 A.    No, I was telling him, I was meaning
5 about him saying people would run up into the
6 house and people on the property.
7 Q.    Right, but -- and that's what you told
8 me earlier, that was what Tyrique was telling
9 you.
10          My questions are as follows.
11 My first question is, when Tyrique had said
12 that a couple of days before this, did you
13 think that he was having some kind of mental
14 breakdown?
15 A.    I didn't believe it at first.
16 Q.    Right, so you didn't -- when he was
17 talking about people breaking into 1931, you
18 didn't believe him; correct?
19 A.    No.
20 Q.    Did you believe he was making it up or
21 you just couldn't believe that someone was
22 trying to break into 1931?
23 A.    No, somebody breaking into 1931.
24 Q.    Did you think that he was having some

Page 79

1 kind of mental break or some kind of mental
2 illness problem when he told you that?
3 A.    No.
4 Q.    So when you are asked, when this
5 incident is unfolding, and you are on the
6 call, and you said he snapped, you are
7 referring to this breaking into 1931 concern;
8 correct?
9 A.    That's correct.
10 Q.    But up to this point, at least, when you
11 are on the -- until you are on the phone with
12 the 911 operator, you didn't think there was a
13 mental illness problem for which Ty needed
14 medical treatment or mental health treatment;
15 correct?
16 A.    Rephrase that again. Say it again.
17 Q.    Sure. So, a day or two before Tyrique
18 starts talking about somebody breaking into
19 1931, and I think, if I understand your
20 answer, you didn't think, at least up until
21 the time of this call, that Ty had any kind of
22 mental illness or mental break for which he
23 needed treatment; correct?
24       MR. ROSS: Objection to the

Page 80

1 form of the question. You can answer.
2 BY MR. MacMAIN:
3 Q.    Let me ask it a different way. I'm
4 assuming, as his mom, who loved him and wanted
5 the best for him, that if you were concerned
6 he had some kind of mental illness for which
7 he needed treatment, that you would have
8 gotten it for him; correct?
9 A.    Yes.
10 Q.    So you didn't think, at that point, he
11 had any kind of -- any need for mental health
12 treatment up to this point; correct?
13       MR. ROSS: Objection to the
14 form of the question. You can answer.
15       THE WITNESS: Yes.
16 BY MR. MacMAIN:
17 Q.    So I'm going to continue on. We are
18 going to continue from 5:17, and then I may
19 ask some additional questions.
20       MR. NORFLEET: Before you
21 start the 911 tape, I just wanted to note that
22 you referred to Tyrique as Tyler before that
23 series of questions about the mental health,
24 so I just want to make sure everyone

Page 81

1 understands you were asking about Tyrique.
2       MR. MacMAIN: Yes, Riley
3 already corrected me on that, so if I segue
4 into Tyler, instead of Ty or Tyrique, we are
5 all -- I'm talking about the same guy. My
6 apologies.
7       MR. NORFLEET: We will have
8 that as a standing understanding; correct?
9       MR. MacMAIN: Correct.
10       - - -
11       (Whereupon the 911 call was
12 played.)
13       - - -
14       MR. ROSS: Do you understand
15 that when he says Tyler, he is talking about
16 Tyrique?
17       THE WITNESS: Yes.
18       MR. MacMAIN: My apologies.
19 Let me get back to the -- okay, we are going
20 to pick up at 5:20.
21       - - -
22       (Whereupon the 911 call was
23 played.)
24       - - -

21 (Pages 78 - 81)

CARMEN RILEY

Page 82

1  BY MR. MacMAIN:
2  Q.   So, Carmen, again, you say, "no decoy."
3  Do you know what you are referring to?
4        MR. ROSS:  You have to speak
5  up, Carmen.
6        THE WITNESS:  No.  I don't
7  remember, I don't remember.
8        MR. ROSS:  David, could you
9  give us --
10        MR. MacMAIN:  The time stamp
11  is 5:50.  So we are going to continue on.
12              - - -
13        (Whereupon the 911 call was
14  played.)
15              - - -
16  BY MR. MacMAIN:
17  Q.   So the question that was posed was, do
18  you guys feel you are in danger with him, and
19  you said yes.  Is that correct?
20  A.   Yes.
21  Q.   What were you concerned -- what danger?
22  What was your concern?
23  A.   Well, because of what he was saying a
24  couple of days ago about, you know, people

Page 83

1  running up in our house and on our property.
2  Q.   Okay, anything else?  And let me be more
3  specific.   You explained to me there was just
4  kind of this tug of war over the sledgehammer,
5  but were you concerned that he was going to
6  use the sledgehammer on your husband or your
7  -- on Thomas?
8  A.   No.
9  Q.   Okay.  I'm going to pick back up.  We
10  ended at the six-minute mark.  I'm going to
11  continue playing the 911 call.
12              - - -
13        (Whereupon the 911 call was
14  played.)
15              - - -
16  BY MR. MacMAIN:
17  Q.   Okay, I just stopped it at 7:01.  It
18  sounds like, just before I stopped it, you
19  were talking to Tyrique, and you make a
20  comment or you say something to him, you
21  messed up.  Did I hear that correctly?
22  A.   Yes.
23  Q.   What were you referring to?
24  A.   The tussling with his father.

Page 84

1  Q.   Was there any discussion at this point
2  about him being -- Tyrique being arrested?
3  A.   No.
4  Q.   I'm going to probably stop at this
5  point.  I don't think there is anything for
6  the rest of the call that I need to ask you
7  about, but other people may, so I don't want
8  to tell you you are done with the 911 call,
9  but I think that's all I really needed to ask
10  you about.
11        Let me ask you, at any point
12  during the call, did you indicate that you
13  wanted Tyrique -- Tyrique, not Thomas -- taken
14  to the hospital?
15  A.   No.
16  Q.   Did you indicate at any point during the
17  call with the 911 operator that you thought
18  that Tyrique needed to be taken to any kind of
19  psychiatric facility or a mental health
20  facility?
21  A.   No.
22  Q.   Same question, I'm jumping ahead now,
23  the police have arrived, they leave with
24  Tyrique.  At any point when the police were

Page 85

1  there, did you indicate to the officers that
2  you thought Tyrique needed to be taken to a
3  hospital?
4  A.   No.
5  Q.   So I want to jump ahead now.  The
6  police arrive, and I want you to tell me in
7  your own words what you remember about the
8  police arrival, what people said, what you
9  said and so forth.  And again, much like the
10  911 call, I'm probably going to stop you every
11  so often and ask you more specific questions.
12  A.   Okay.  There was a knock on the back
13  door, and I told Tyrique, I said, open the
14  door for the ambulance.  So he goes and opens
15  the door.  The screen door is locked, so he
16  had to unlock the screen door.  So he goes
17  and unlocks it, and there is three officers
18  outside.  And he then pushed -- he pushed the
19  screen door, just pushed the screen door, like
20  that, open.  And one of the officers said,
21  come out and put your hands behind your back.
22  So he came out, and he put his hands behind
23  his back.
24  Q.   Can you describe any of the three

22 (Pages 82 - 85)

CARMEN RILEY

Page 86

1 officers? White, black, old, young, tall,
2 short?
3 A.   Okay, it was two white and one black.
4 Q.   Had you ever spoken or seen any one of
5 these three officers before?
6 A.   Yes.
7 Q.   Which one had you seen before? Or which
8 ones, if it is more than one?
9 A.   Okay, I seen Richard Wilson.
10 Q.   And how did you have a prior interaction
11 with him?
12 A.   I just know him from -- like, sometimes,
13 like, every so often, the township, they send
14 like books out, and they tell you things,
15 what's happening in the -- you know, the
16 community or what's -- things just like that.
17 Q.   You just kind of knew him as an officer,
18 maybe had spoken with him once or twice, but
19 that's kind of the extent of it?
20 A.   Yeah.
21 Q.   Any bad experiences with Officer Wilson?
22 A.   No.
23 Q.   How about the other two guys? Did you
24 know either one of them?

Page 87

1 A.   No.
2 Q.   And then Wilson was one of the two
3 Caucasian officers?
4 A.   That's correct.
5 Q.   So you described that they asked Tyrique
6 -- I almost said Tyler -- Tyrique, to come
7 out, he comes out, he gets handcuffed, and
8 then he gets taken away; is that correct?
9 A.   All three of them left.
10 Q.   I'm sorry, I interrupted you. That was
11 my fault. Sorry.
12 A.   After they handcuffed him, they all just
13 left.
14 Q.   I'm sorry, I did it again. I thought
15 you were done. So they left, and then I kind
16 of cut you off, I apologize.
17       So did you have any
18 conversation with the officers before they
19 left?
20 A.   No.
21 Q.   Was there -- did you tell them or did
22 they ask you questions about what had
23 happened?
24 A.   Well, okay, the only one that -- okay,

Page 88

1 all three left, and the only one that came
2 back inside was Richard Wilson.
3 Q.   So I want you to tell me about your
4 conversation with Wilson when he came back in.
5 A.   Okay, when Richard Wilson came back in,
6 he said, did he strike? I said no. He says,
7 ma'am, did he strike? And I said, nobody
8 struck nobody. And then, Mr. Matthews,
9 Thomas Matthews, had a pill bottle -- had pill
10 bottles on the kitchen table. And I seen
11 Wilson pick it up, and then he tried to -- he
12 picked it up, and then he scribbled something
13 on a little tablet. And then he asked me my
14 -- he asked me about my name and my phone
15 number. And then he was done with it. He
16 didn't say no more, you know, to me.
17 Q.   And was this just you and Wilson talking
18 or was Thomas involved in this?
19 A.   Well, Thomas was still back on the
20 floor.
21 Q.   Do you know, were there -- I'm sorry.
22 A.   I said Thomas still was back on the
23 floor. He still was on the floor. And Mr.
24 -- Thomas had like moved. And Wilson did

Page 89

1 like this (indicating), looked at him, and
2 just went (indicating), and just turned his
3 head back around like that.
4 Q.   What you indicated is, he kind of turns
5 --
6 A.   Yeah, he turned and looked at -- when he
7 heard Mr. Matthews had moved, he looked at
8 him, and then just turned his head back.
9 Q.   Do you know whether Wilson interviewed
10 Thomas at some point to get his version of
11 what happened?
12 A.   No.
13 Q.   You don't know one way or the other or
14 you --
15 A.   No, he didn't, no.
16 Q.   Okay, have you looked at any of the
17 police reports that narrate and summarize an
18 interview with Matthews-Kemrer as to what
19 happened?
20 A.   Yes.
21 Q.   And in that report, and I'm going to
22 summarize it, Matthews-Kemrer said he was
23 struck several times with the sledgehammer by
24 Tyrique; correct?

23 (Pages 86 - 89)

CARMEN RILEY

Page 90

1  A.   Yes, that's what it said.
2  Q.   And do you believe that that's what
3  Thomas told the officer or do you think that's
4  just made up?
5           MR. ROSS:  Objection to the
6  form of the question.   You can answer.
7           THE WITNESS:  No, he didn't
8  tell the officers that.
9  BY MR. MacMAIN:
10  Q.   No?
11  A.   No.
12  Q.   How do you know that he never told the
13  officers that?
14  A.   Because he didn't -- it didn't happen.
15  Q.   Well, I'm not asking --
16  A.   Wilson had already asked, did he strike,
17  and I said no, and then he said, ma'am, did he
18  strike?  And I said no.  So why would he say
19  that?  I don't understand why Thomas Matthews
20  would say it.  I had already told Wilson that
21  nobody struck nobody.
22  Q.   I knew what you told the officer.  My
23  question is, do you know that Thomas didn't
24  tell the officer something different than what

Page 91

1  you told him?
2  A.   No.
3  Q.   You don't know one way or the other what
4  Thomas told the officer?
5  A.   That's correct.
6  Q.   Okay.  I want to do a share screen
7  again, so bear with me.  I might have to get
8  my assistant in here again.
9           Okay, can everybody see that?
10          MR. ROSS:  No.
11          MR. MacMAIN:  Okay, I will be
12  right back.  Let me get my assistant, my
13  apologies.
14              - - -
15          (Whereupon a short break was
16  taken at this time.)
17              - - -
18  BY MR. MacMAIN:
19  Q.   Okay, can everybody see that?
20  A.   Yes.
21  Q.   Okay.  So, Carmen, I'm going to show
22  you, and this is Bates labeled Susquehanna --
23  I don't know what happened.  Can you all
24  still hear and see me?

Page 92

1  A.   Yes.
2  Q.   Okay, there we go.  This is Bates
3  labeled Susquehanna 000056, and it continues
4  on for several pages.
5           So, Carmen, I'm going to
6  scroll through these with you.  I will
7  represent to you that these were photographs
8  taken at Holy Spirit Hospital by Officer
9  Wilson on June 18, 2019 at 5:45 a.m., okay?
10          MR. ROSS:  David, hang on one
11  second.  Okay.
12  BY MR. MacMAIN:
13  Q.   Carmen, can you see what I have got on
14  the screen?
15  A.   Yes.
16  Q.   So this is the first page, which is the
17  cover sheet.  Okay, this is a picture of
18  Thomas; correct?
19  A.   That's correct.
20  Q.   Were you at the hospital with him or no?
21  A.   No.
22  Q.   Here is another picture, and there are
23  some marks on his right arm.  Do you know how
24  he got those marks?

Page 93

1  A.   From a radiator heater.
2  Q.   Okay, how did he get marks from a
3  radiator heater on his arm?
4  A.   When he fell back, and the radiator
5  doesn't have a case on it.  It is just a metal
6  -- you know.
7  Q.   And where in the struggle did this
8  happen?  Was this in the kitchen, in the
9  hallway?
10  A.   That was in the bathroom.
11  Q.   The next picture is just a close-up.
12  That's the same arm.  I'm looking at injuries
13  to his right kind of kneecap area.  Do you
14  know how this happened?
15  A.   That came from the rugs.
16  Q.   When he fell or at what point?
17  A.   When he fell back, then he end up
18  turning onto his front, so his legs was on --
19  his knees was on that rug.
20  Q.   The next one, this is a close-up of the
21  same location, and then this is Susquehanna
22  000062.  This looks like the right elbow, arm
23  area.  Do you know how that injury occurred?
24  A.   No, I guess from falling back -- when he

24 (Pages 90 - 93)

CARMEN RILEY

Page 94

1  fell down, I don't know.
2  Q.   I'm on to Susquehanna 00063.   This is a
3  photograph of the side of the left face and
4  the upper left chest area?
5  A.   Yes.
6  Q.   Do you know, I'm referring kind of to
7  some things on that upper left chest area.  Do
8  you know how those injuries occurred?
9  A.   That's where his pacemaker is.
10  Q.   Right.  Onto the next slide, no
11  questions about that, okay.
12          Have you ever looked at the
13  medical records for the treatment that Thomas
14  received on the date of the incident?
15  A.   No.
16  Q.   Have you ever spoken to Thomas about
17  what he told the medical personnel at the
18  hospital as to what happened in the incident?
19  A.   No.
20  Q.   Have you and Thomas ever talked about
21  the incident, what happened that caused 911 to
22  be called?
23  A.   No.
24  Q.   So you haven't had a conversation about

Page 95

1  what happened that day?
2  A.   No.
3  Q.   Is that -- did this incident cause some
4  of the marital stress that you -- that you and
5  Thomas have, currently?
6  A.   Yes.
7  Q.   Do you blame him in some manner for
8  Tyrique's death?
9  A.   No.
10  Q.   Do you believe that he has reported to
11  the police that Tyrique assaulted him with the
12  sledgehammer?
13  A.   No.
14  Q.   So from the time that Tyrique was driven
15  away by the police, did you ever see Tyrique
16  in person ever again?
17  A.   I hadn't, no.
18  Q.   Did you speak with him at all during --
19  I guess it was about two weeks later when he
20  passed away.  Did you speak with him at any
21  point during those two weeks?
22  A.   No.
23  Q.   Did he attempt to call you at any point
24  during those two weeks?

Page 96

1  A.   No, he didn't call.
2  Q.   Do you know if anybody from your family
3  had any contact with Tyrique during those two
4  weeks?
5  A.   No.
6  Q.   Did you contact the prison at any point
7  during those two weeks to check on Tyrique to
8  see how he was, how his health was, how he was
9  doing?
10  A.   No.
11  Q.   Why not?
12  A.   Because I thought Tyrique would call --
13  he was supposed to call us first.
14  Q.   Did there come a point during the two
15  weeks, where you thought, I haven't heard from
16  him, I should probably call over and see how
17  he is doing or what is going on?
18  A.   Okay, this is what I am going to get to.
19  When -- on June 18th, Officer Wilson had
20  called.  He was -- he already said, you know,
21  what his bail was going to be.  He said that
22  it took a while to reach the judge.  And so he
23  pretty much already had told us, told me, you
24  know, what was going on.

Page 97

1  Q.   So that was on June 18th.  Was there
2  any further communication with Wilson, Officer
3  Wilson, or anybody else from Susquehanna?
4  A.   No, just Wilson.
5  Q.   Okay.  Any other communication from
6  Wilson, other than on June 18th?
7  A.   Just June 18th.
8  Q.   And no -- just so I'm clear, no
9  communication between you and anybody from the
10  prison up until the time of your son's death;
11  is that correct?
12  A.   Okay, well, after Wilson was about to
13  hang up the phone with me, he said:  Did you
14  receive another call?  And I said no, but
15  later on that night, a call came in from the
16  prison.
17  Q.   Okay, tell me about that call.
18  A.   Okay.  So I picked the phone up, and I
19  said hello.  And his name was Keith Biter.
20  He said: Is this Carmen?  I said yes.  He
21  said: Tyrique's bail is 20,000 straight.  And
22  hung up.
23  Q.   Do you know who Keith Biter is?  Is he
24  someone at the prison or is he like a court

25 (Pages 94 - 97)

Page 98

1  officer, a bail bondsman?
2  A.   No, he is from the prison.
3  Q.   And was that the extent of the
4  conversation that you can recall?
5  A.   That's all he said, and he hung up on
6  me.
7  Q.   Did you -- I think you have answered
8  this already, but just to be complete, you
9  didn't call the prison and follow up in any
10  way about bail, about how Tyrique was doing,
11  about what was going on?
12  A.   No, because he said 20,000 straight.
13  And that's going to take somebody some time to
14  get $20,000 straight.  I mean, it is going to
15  take some time.
16  Q.   I have asked about conversations with
17  Susquehanna, I have asked about conversations
18  with anybody from the prison.  Did you speak
19  to any lawyers about Tyrique and trying to get
20  him help or get him representation?  And if
21  you did, don't tell me about what you spoke
22  about first, okay?
23  A.   No, I did not.
24  Q.   Do you know if any other family members

Page 99

1  reached out to any lawyers regarding the
2  situation with Tyrique while he was
3  incarcerated?
4  A.   No.
5        MR. MacMAIN:  Okay, I think
6  this is probably a good time for another short
7  break.  I'm going to check my notes.  I think
8  I am close to being wrapped up, but why don't
9  we take another short ten-minute break?
10        MR. ROSS:  Okay, we will come
11  back at 4:00?
12        MR. MacMAIN:  Yes, 4:00
13  o'clock sounds good.
14           - - -
15     (Whereupon a short break was
16  taken at this time.)
17           - - -
18  BY MR. MacMAIN:
19  Q.   Carmen, the same question I had when we
20  took another break before.  Is there any
21  answers you have given me so far that you
22  think need to be corrected or added to or
23  clarified in any way?
24  A.   Back to when Wilson called on June 18th,

Page 100

1  he also said that Dad is not going to press no
2  charges, so -- and he also said, when a
3  preliminary hearing come up, that Thomas
4  Matthews would have his time to speak.  And he
5  also said -- asked how he was doing.  And I
6  said, well, he is home already.   And he said,
7  no, but how is he doing, though?  I said, he's
8  okay.   And I just wanted to add that on.
9  And then, he also said -- wait a minute.  He
10  also said it took a while to see the judge.
11  He said it took a while to see the judge.
12  And that's when he said, you know, about
13  Tyrique was being charged with assault and the
14  amount of his bail.  That's what I wanted to
15  add on.
16  Q.   Anything else?  Nothing else you wanted
17  to supplement or add to?
18  A.   That's it.
19  Q.   Okay.   I'm probably close to being
20  done, so let me -- I'm going to kind of jump
21  around a little bit.
22        I had asked you before about
23  Thomas, and you said, in terms of employment,
24  he has not been employed for some period of

Page 101

1  time, he is collecting disability.  When he
2  was working, what kind of jobs did he do?
3  What field was he in?
4  A.   Over-the-road truck driving.
5  Q.   And I think I asked this in the
6  beginning, but do the two of you currently
7  live together?
8  A.   Well, sometimes, I am over at 1930 -- I
9  mostly stay over at 1931.
10  Q.   Are you -- if I understand it, 1931 is
11  kind of your place, your mom --
12  A.   Yes.
13  Q.   -- your brother --
14        MR. ROSS:  Let him finish.
15        THE WITNESS:  Repeat it.
16  BY MR. MacMAIN:
17  Q.   Yes.  So, as I understood earlier, 1931
18  is kind of your primary residence, your mom,
19  your brother, and Thomas' primary residence is
20  2003; correct?
21  A.   Correct.
22  Q.   So my question is, are you living --
23  currently living under the same roof or do you
24  live separately?

26 (Pages 98 - 101)

CARMEN RILEY

Page 102

1  A.    We have been staying kind of under the
2  same roof now since this happened.
3  Q.    So you are living -- so he is living at
4  1931 or 19 --
5  A.    No, he is living at -- he is staying
6  over at 2003.
7  Q.    And you are staying at 2003?
8  A.    I'm staying over there.
9  Q.    Have you -- and this is going to be kind
10 of an odd question.  I apologize.  Have you
11 ever been the victim of domestic violence?
12 A.    No, I haven't.
13 Q.    Have you ever witnessed domestic
14 violence?
15 A.    No.
16 Q.    In terms of damages, I asked you earlier
17 on about financial support of Tyrique.  To
18 you, I asked some questions about Tyrique's
19 financial situation.  I want to follow up a
20 little bit on that.
21        Is there any -- was there any
22 other financial support beyond what you have
23 already told me that Tyrique provided to you
24 or his dad?

Page 103

1  A.    No.
2  Q.    And in terms of going the other way, in
3  terms of financial support that you and/or his
4  dad provided to Tyrique, he had a house to
5  live in; correct?  He lived under your roof?
6  A.    Yes.
7  Q.    You provided him with medical insurance
8  through your medical plan; correct?
9  A.    Yes.
10 Q.    I'm assuming that you provided food and
11 nourishment other than when he would
12 occasionally assist in helping pay for the
13 food in the household; correct?
14 A.    Yes.
15 Q.    Was there any other financial support
16 that you and/or his dad provided to Tyrique,
17 whether clothes, various other things?
18 A.    Clothes.
19 Q.    And so I'm clear, there has been no --
20 to your knowledge, there is no debts from the
21 estate?  Like nothing that's owed that has to
22 be paid out?
23 A.    No.
24 Q.    Any medical bills that have to be paid

Page 104

1  that you are aware of?
2  A.    No.
3  Q.    Any funeral expenses, anything like that
4  that have to be paid?
5  A.    No, that's paid.
6  Q.    Okay, who paid for the funeral?
7  A.    I did.
8  Q.    Is there any financial -- and I'm going
9  to separate it to be clear, and I apologize
10 for being this blunt about it, but I'm going
11 to separate financial versus emotional, okay?
12 So is there any financial -- has there been
13 any financial impact on your family with
14 Tyrique's passing?
15 A.    No.
16 Q.    So do you know whether Thomas has gotten
17 any counseling over his son's death?
18 A.    We go to the same counselor.
19 Q.    Oh, do you go to the counselor together
20 or completely separately?
21 A.    We do like we are doing now, like, Zoom.
22 Q.    Okay, but you had told me earlier, the
23 counselor that you are seeing, that's just you
24 or that's you and Thomas together or some

Page 105

1  combination of you have solo visits and then
2  couple visits?
3  A.    Yes, together.
4  Q.    So all the counseling has been as a
5  couple?
6  A.    I have missed a few, but usually, it is
7  together.
8  Q.    So if you can't make it, is it just
9  Thomas and the counselor?
10 A.    Yes.
11 Q.    Have there been any sessions where it
12 has been just you and not Thomas?
13 A.    No.
14 Q.    Okay, I think that's all the questions I
15 have.  And rather than hold everybody up while
16 I double-check my notes, I'm going to let
17 other people ask questions, and if I miss
18 something, I will come back to it.  Thank you
19 for your time and your candor.  And again, my
20 condolences on the loss of your son.
21 A.    Thank you.
22        - - -
23        EXAMINATION
24        - - -

27 (Pages 102 - 105)

CARMEN RILEY

Page 106

1 BY MR. NINOSKY:
2 Q.   I'm not sure who is up next, but I will
3 go first.  I will turn my mic on.
4         Ma'am, I'm John Ninosky.  I
5 represent the medical folks, PrimeCare
6 Medical, in this case.   I'm just going to
7 have a few follow-up questions for you, okay?
8 A.   Okay.
9 Q.   And the same rules that Mr. MacMain had
10 given you apply for my questions as well.
11 Most importantly, if you don't understand
12 anything I ask you, let me know, so I can
13 restate it or rephrase it for you, all right?
14 A.   Okay.
15 Q.   I'm going to make sure I wrote some of
16 these things down correctly.
17         Tyrique graduated from
18 Susquehanna Township High School; correct?
19 A.   Yes.
20 Q.   Did he have any other formal education
21 after Susquehanna Township?
22 A.   No.
23 Q.   Was there any type of particular
24 curriculum that he took at Susquehanna

Page 107

1 Township?
2 A.   No.
3 Q.   What type of student was he?
4 A.   He was a C student, and he -- he tried
5 hard.
6 Q.   Did he graduate on grade level?  In
7 other words, did he pass everything through or
8 was he ever held back?
9 A.   No, he passed everything through.
10 Q.   Did he play any sports at the Hanna?
11 A.   No sports.
12 Q.   Can you give me an estimate as to the
13 longest amount of time that he would have been
14 employed?
15 A.   I can't.
16 Q.   Would it be fair to say that he never
17 was employed more than six months at one time?
18 A.   Yes.
19 Q.   And I guess it would have been
20 approximately three years or so from the time
21 that he graduated until the time of his
22 passing?  Is that about right?
23 A.   That's about right.
24 Q.   Were the jobs that you had referenced to

Page 108

1 us, the temp agency, as well as UPS, were
2 those jobs always after he had graduated?
3 A.   Yes.
4 Q.   Out of that approximately three-year
5 period, can you tell me, how many months do
6 you think he actually worked?
7 A.   I don't remember.
8 Q.   Do you think it was less than a year
9 total, though?
10 A.   Yes.
11 Q.   Were the jobs ever full time in nature
12 or was it always part-time work?
13 A.   Well, I mean, he got eight hours in, but
14 they weren't like -- because it was a temp
15 service.
16 Q.   I understand that.  So, really, my
17 question is, was he ever getting 40 hours a
18 week or was it always something less than that
19 or at least generally less than that?
20 A.   I would say -- yeah, I would say
21 40 hours.
22 Q.   Was there a tax service that would do
23 his taxes?
24 A.   I remember us going to a place, they did

Page 109

1 it for free, so I don't -- but I can't
2 remember where it was.   I don't know if it
3 was like AARP.  I'm not sure, but it was for
4 free.  I know that.
5 Q.   Other than the two places of employment
6 that you shared with us, was there any other
7 income that Ty was able to get or obtain?
8 A.   No.  Sometimes, he would do yard work,
9 but that would be -- you know, they paid in
10 cash, you know, to do yard work for someone
11 else.
12 Q.   How often would he do that for other
13 folks, ma'am?
14 A.   I guess it was only when someone asked,
15 you know, if they needed help.
16 Q.   Unfortunately, I didn't have an
17 opportunity to meet your son, so I don't know
18 his interests and those types of things.  What
19 type of interests did he have?  What did he
20 like to do?
21 A.   He liked to do -- well, he liked to
22 sing.  He liked to try to, you know, make
23 music.
24 Q.   What type of music did he like to make?

28 (Pages 106 - 109)

CARMEN RILEY

Page 110

1  A.   Rap.
2  Q.   And when he wasn't working, how would he
3  fill his day, you know, what would he do?
4  A.   Whatever we would need around the house
5  to be done.
6  Q.   And you had told us earlier that he
7  would help with cutting your own grass; is
8  that correct?
9  A.   Yes.
10  Q.   By the way, ma'am, the house, you were
11  giving us the addresses, it was 1931 and then
12  2000 -- is it 3?  Did I get that right?
13  A.   Yes.
14  Q.   Is that two double homes or what is
15  that?
16  A.   Yes.
17  Q.   Okay.  So there is a little bit of a
18  yard there then?
19  A.   Yes.
20  Q.   So he would help with mowing the grass,
21  he would help shoveling whenever it would
22  snow; is that correct?
23  A.   Yes, raking leaves, chopping wood.
24  Q.   How about when -- for laundry, who would

Page 111

1  do the -- well, who would do his laundry?
2  A.   Well, we would go together.
3  Q.   Would you go to a laundromat?
4  A.   Yeah, we would go to the laundromat.
5  Q.   Okay.  And he would do that, he would do
6  his own, and then you would go with him?
7  A.   Well, when we went to the laundromat, we
8  washed all our clothes at one time.
9  Q.   How about the cooking around the house?
10  Who did most of the cooking?
11  A.   I did.
12  Q.   Did he ever live anywhere else, other
13  than with you?
14  A.   Nowhere else.
15  Q.   And there was some question that I think
16  I was getting confused in my mind.  At one
17  point, did Thomas make a phone call to Lower
18  Paxton Township Police about a dealer, a drug
19  dealer that was giving drugs to Ty?
20  A.   He made a call to Susquehanna Township
21  Police.
22  Q.   Okay.  Tell me about that phone call.
23  A.   I wasn't around.  I mean, I wasn't
24  around, you know, to listen to the whole call.

Page 112

1  Q.   Let's do it this way.  I'm not going to
2  ask you for a transcript of the call, but is
3  it -- here is how I'm taking it from your
4  testimony, that Thomas was concerned about
5  Ty's drug use; fair?
6  A.   Yes.
7  Q.   And part of that concern was, he wanted
8  to report the drug dealer to the police to see
9  if they could do something about it; is that
10  fair?
11  A.   Say that again.
12  Q.   Sure.  Thomas called Susquehanna
13  Township Police; correct?
14  A.   Correct.
15  Q.   And the purpose of that call was to tell
16  the police about who was dealing drugs to Ty;
17  correct?
18       MR. ROSS:  Objection to the
19  form of the question.  You can answer.
20       THE WITNESS:  Yes.
21  BY MR. NINOSKY:
22  Q.   And you said that the only drugs that
23  you are aware of that Ty used included just
24  marijuana; is that correct?

Page 113

1  A.   Correct.
2  Q.   So you are not aware of any other drugs
3  that he may have used?
4  A.   No.
5  Q.   Did you ever see him use marijuana?
6  A.   No.
7  Q.   Do you know how often he would have used
8  marijuana?
9  A.   No.
10  Q.   And I apologize, I don't have the police
11  report in front of me, as to when Thomas
12  called Susquehanna Police about the drug
13  dealer, so can you give me a timeframe as to
14  when that happened?
15  A.   No.
16  Q.   Are you aware of whether there was ever
17  an arrest of Ty's drug dealer?
18  A.   No.
19  Q.   I'm just flipping through my notes.  I
20  might be about done, and then somebody else
21  may have some questions.
22       I want to make sure, did you
23  ever speak with anybody at PrimeCare Medical
24  or the folks in the medical department at

29 (Pages 110 - 113)

CARMEN RILEY

Page 114

1 Dauphin County Prison?
2 A.   I did not.
3 Q.   And that's even after Ty's death, did
4 you speak with anybody?
5 A.   I did not.
6 Q.   Other than making his music, is there
7 anything else that he liked to do or he was
8 interested in that you can tell me?
9 A.   Mostly, his music.   He just liked doing
10 his music.
11 Q.   Well, ma'am, as with Mr. MacMain, I'm
12 sorry that we had to meet this way, and I'm
13 sorry for your loss.   At this point, I don't
14 have any more questions for you.   Thank you
15 for being here and being so patient today.
16 A.   Thank you.
17         MR. NORFLEET:  Don, I will
18 defer to you. I will go last.
19         - - -
20         EXAMINATION
21         - - -
22 BY MR. CARMELITE:
23 Q.   Good afternoon, ma'am.  My name is Dan
24 Carmelite.  I represent Angela Swanson.  She

Page 115

1 worked at the Dauphin County Prison.
2         Have you ever spoken to Ms.
3 Swanson?
4 A.   I have not.
5 Q.   Do you know if Thomas has ever spoken to
6 Ms. Swanson?
7 A.   No.
8 Q.   Have you spoken to anybody about Ms.
9 Swanson, other than your lawyers?
10 A.   No.
11 Q.   Do you know who Ms. Swanson is?
12 A.   No.
13 Q.   Do you know what Ms. Swanson's role is
14 in your lawsuit on behalf of your son?
15 A.   She was an officer, a correctional
16 officer.
17 Q.   Other than that, do you have any idea
18 what her role is?
19 A.   I don't know her role.
20 Q.   Okay.  I want to just pick up a little
21 bit on some of the questions Mr. Ninosky was
22 asking you.   And this is basically about your
23 son, and I kind of want to get to know him a
24 little better, because at some point in trial,

Page 116

1 if this case goes to trial, you are going to
2 tell us about your son, so I kind of want to
3 hear what you have to say today, and not wait
4 until trial, if it goes that far.
5         As I understand it, from your
6 testimony, since graduating high school, your
7 son had some employment, he wasn't pursuing
8 any other education, and from time to time, he
9 helped out around your house?
10 A.   Yes.
11 Q.   Okay.  It is also my understanding that
12 his employment wasn't regular, you know, 9:00
13 to 5:00, 40 hours a week, week in and week
14 out; is that fair?
15 A.   That's fair.
16 Q.   Just tell me, what was a typical day in
17 the life of your son?  Did he typically wake
18 up at a certain time?  Did he -- you know,
19 those types of things.  Just give me a day in
20 the life of your son.
21 A.   He would just wake up, and then whatever
22 we needed, you know, done around the house, we
23 did.
24 Q.   Okay.  Did that take him all day to do?

Page 117

1 A.   No, it didn't take all day to do.
2 Q.   So when he was done helping out around
3 the house, what would he do?
4 A.   He probably be on his phone or watching
5 TV.
6 Q.   Anything else?
7 A.   No.
8 Q.   Okay.  I'm a little confused, and part
9 of that is because, at times, my Zoom kind of
10 zoomed in and out, so it got garbled a little
11 bit.  I have heard a bunch of addresses on
12 Franklin Street.  Can you just run through
13 the addresses on Franklin, whether Franklin
14 Avenue, Franklin Street for me.  I have got
15 -- 1931 is one of them.  What else is there?
16 A.   There is 2003 Franklin Avenue.
17 Q.   Okay, so 1931 and 2003; correct?
18 A.   That's correct.
19 Q.   Are there any other addresses that you
20 have talked about today on Franklin Avenue?
21 A.   No.
22 Q.   1931 is the house that your mom and you
23 own?
24 A.   That's correct.

30 (Pages 114 - 117)

CARMEN RILEY

Page 118

1  Q.   And then, 2003 is the house that Thomas
2  owns; correct?
3  A.   He doesn't own it, no.
4  Q.   He rents -- he leases it?
5  A.   Somebody used to -- it was a friend of
6  his that used to live there, and then he --
7  Q.   A friend of his used to live there?
8  A.   Yes.
9  Q.   So, at the time, when the incident
10  happened, where you called 911, the 2003
11  address was one that Thomas rented from a
12  friend?
13  A.   He didn't rent it.
14  Q.   Okay, the friend let him live there?
15  A.   Yes.
16  Q.   What was the name of the friend?
17  A.   I don't remember his name.
18  Q.   Was it a man or a woman?
19  A.   A man.
20  Q.   And where does Thomas live now?
21  A.   2003.
22  Q.   The same address, okay.
23  A.   Yes.
24  Q.   As I understood your testimony, you had

Page 119

1  some question about your son's -- let me
2  withdraw it.
3            As I understand your
4  testimony, the purpose you slept at the 2003
5  address on the night of the 911 call was
6  because Ty was uncomfortable sleeping at home
7  at 1931? Yes?
8  A.   Yes.
9  Q.   Okay, and he was uncomfortable, because
10  he thought people were coming into the house
11  or were going to break in or something like
12  that; is that fair?
13  A.   That's fair.
14  Q.   And was that the first night that
15  everybody slept there for that purpose?
16  A.   Well, that's the first night we slept in
17  there.
18  Q.   Ma'am, you mumbled, and I couldn't --
19  A.   That was the first time we slept in
20  there.
21  Q.   Okay, for that purpose of being away
22  from the 1931 house, because someone might
23  break in?
24  A.   Yes.

Page 120

1  Q.   Okay.  Mr. MacMain asked you some
2  questions about statements Thomas made to the
3  Susquehanna Township Police.  Do you remember
4  that?
5  A.   Yes.
6  Q.   And I just want to make sure I
7  understand.  When Thomas made those
8  statements to the police, were you present?
9  A.   I was there when he first like called,
10  and he said about non-emergency, but then I
11  had got up and walked off.
12  Q.   So when Thomas made the statements to
13  the Susquehanna Police, you were there for how
14  much of the conversation?
15  A.   Hardly none of it.
16  Q.   None of it, okay, all right.  And so
17  that -- and that's the -- I guess the genesis
18  of my questions.  I just want to make sure.
19  It is not like you were present and heard
20  Thomas say something different than what you
21  reported on the police report?
22  A.   Right.
23  Q.   You just disagree with what's on the
24  police report?

Page 121

1  A.   Correct.
2  Q.   With regard to communicating with your
3  son once he was taken to the Dauphin County
4  Prison, did anybody tell you you weren't
5  allowed to communicate with him?
6  A.   No.
7  Q.   Did you believe you weren't allowed to
8  communicate with him?
9  A.   No.
10  Q.   Okay.  That's all the questions I have
11  right now.  Mr. Norfleet will, I think, have
12  some questions for you.  Ma'am, I appreciate
13  your patience.  I know this is a difficult
14  moment for you, and obviously, my condolences
15  on your son and thanks.
16  A.   Thank you.
17            - - -
18            EXAMINATION
19            - - -
20  BY MR. NORFLEET:
21  Q.   Ms. Riley, good afternoon.  My name is
22  Andy Norfleet.  I am an attorney,
23  representing Brian Clark, Dauphin County, and
24  the individual correctional officers named in

31 (Pages 118 - 121)

CARMEN RILEY

Page 122

1 this action, with the exception of Officer
2 Swanson.  You heard that Mr. Carmelite is
3 representing her.
4          As everyone else has said to
5 you, I'm sorry we are meeting under these
6 circumstances.  My condolences on your loss,
7 and thank you for participating and giving us
8 your time today.
9          I will try not to ask too many
10 repeat questions.  It is difficult being the
11 last one to go to make sure you don't ask a
12 lot of the same questions, but I will do my
13 best.
14          Ma'am, I want to start with
15 the call that you testified to that came in on
16 June 18th, after Tyrique was taken to Dauphin
17 County Prison.  You indicated that that call
18 came from an individual named Keith Biter?
19 A.    Yes.
20 Q.    Do you know how that name was spelled or
21 are you just -- is that your best recollection
22 of how he pronounced his name?
23 A.    That's how he pronounced his name.
24 Q.    Did he give you any indication that he

Page 123

1 was calling from Dauphin County Prison?
2 A.    Well, he said his title, you know.  I'm
3 not sure if he said corporal or sergeant, but
4 he said -- I know he said his title before his
5 name.
6 Q.    Do you recall about what time you
7 received that call?
8 A.    Probably around 8:30 at night.
9 Q.    8:30 p.m., on June 18th?
10 A.    Yes.
11 Q.    And if you recall, about how long had
12 Tyrique been at Dauphin County Prison before
13 you received that call?
14 A.    How long he had been there?
15 Q.    Yes, ma'am.
16 A.    That day.
17 Q.    And that's what I'm trying to figure
18 out.  Can you give me an idea of how long
19 that time span was from the time that the
20 Susquehanna Township Police left with Tyrique
21 until you received the call from Officer or
22 Mr. Biter?
23 A.    I don't remember that.  I don't
24 remember.

Page 124

1 Q.    The call that came in, did you receive
2 that call on a cellular phone or a landline?
3 A.    He called on a landline.
4 Q.    And what was the number that he called
5 on?
6 A.    (717) 232-8135.
7 Q.    And do you know the service provider for
8 that landline at the time?
9 A.    Verizon.
10 Q.    And would that landline have been under
11 your name or Thomas'?
12 A.    It would have been under my mother's
13 name.
14 Q.    And what was your -- what is your
15 mother's name, ma'am?
16 A.    Doris, D-O-R-I-S; Riley, R-I-L-E-Y.
17 Q.    Okay.  So you were back at the
18 residence that you shared with your mother
19 when you received that call?
20 A.    Yes.
21 Q.    You were no longer staying at Mr.
22 Thomas' address?
23 A.    No, because I thought Tyrique was going
24 to call me, you know.  I thought he would be

Page 125

1 calling.
2 Q.    And did you believe that if Tyrique was
3 going to call you, that he would call you on
4 that landline?
5 A.    Yes.
6 Q.    Do you know why Tyrique would call you
7 on that landline, if it wasn't safe to be at
8 the house?
9          MR. ROSS:  Objection to the
10 form of the question.  You can answer.
11          THE WITNESS:  Repeat that
12 again.
13 BY MR. NORFLEET:
14 Q.    Yes, ma'am.  You had indicated earlier
15 that you were staying at Thomas' residence,
16 because Tyrique was concerned about people
17 running up on the house that you shared with
18 your mother; correct?
19 A.    Yes.
20 Q.    And I'm only asking you, if you know,
21 you said that you expected Tyrique to call you
22 on the landline at the house you shared with
23 your mother; correct?
24 A.    That's correct.

CARMEN RILEY

Page 126

1 Q.   So my original question to you was, do
2 you know why Tyrique would call you at that
3 residence if he thought it was not safe for
4 you to be there?
5        MR. ROSS:  Objection to the
6 form of the question.   You can answer.
7        THE WITNESS:  Well, that was
8 our main -- you know, our main number, so
9 that's where I thought he would call, you
10 know, on that phone.
11 BY MR. NORFLEET:
12 Q.   When Tyrique left with the Susquehanna
13 Township Police, the last place that he saw
14 you was at Mr. Thomas' residence; correct?
15 A.   That's correct.
16 Q.   Do you know about how long the call
17 lasted?
18 A.   With who?
19 Q.   With Mr. Biter?
20 A.   Not long.
21 Q.   When you say not long, can you give me
22 an idea of, was it a minute, two minutes?
23 A.   I would say about two, two minutes.
24 Q.   In that two minutes, did you have an

Page 127

1 opportunity to ask Mr. Biter how Tyrique was
2 doing?
3 A.   No, he hung up, he just hung up.   He
4 just wanted to tell me that amount, and he
5 hung up.   I couldn't even ask him, like, I
6 was getting ready to say, well, what did --
7 and it seemed like I was going to try to ask
8 him something, and he hung up.
9 Q.   He hung up after two minutes; is that
10 right?
11 A.   He hung up the phone, yes.
12 Q.   Did you attempt to call Dauphin County
13 Prison back after Mr. Biter hung up the phone?
14 A.   I did not.
15 Q.   Did you attempt to return that call to
16 Dauphin County Prison at any time while
17 Tyrique was housed at Dauphin County Prison?
18 A.   I did not.
19 Q.   Ma'am, you have testified that Tyrique
20 was -- had some concerns about staying at the
21 house that you shared with your mother,
22 because people were going to run up to the
23 house.   Was there any concern that that was
24 related to the telephone call that Thomas made

Page 128

1 regarding the drug dealer?
2 A.   No.
3 Q.   But it is your testimony today that you
4 don't have any idea who Tyrique was concerned
5 about running up on your house?
6 A.   Correct.
7 Q.   Did you ask Tyrique who he thought was
8 going to run up on your house?
9 A.   No, I didn't.
10 Q.   And you had been at Mr. -- or at Thomas'
11 residence for a couple of days before the
12 incident happened; correct?
13 A.   No, not a couple of days.
14 Q.   How long were you at Mr. Thomas -- at
15 Thomas' residence before Tyrique was arrested?
16 A.   About June 8th -- June 18th.
17 Q.   So prior to Tyrique being arrested, can
18 you just tell me how many days you were at
19 Thomas' residence with Tyrique?
20 A.   I was there one night with Tyrique.
21 Q.   And during that one night, you didn't
22 ask him any -- for any further details about
23 why he was afraid that your house was going to
24 be run up on?

Page 129

1 A.   No, I didn't.
2 Q.   Had anyone ever broken into the
3 residence that you shared with your mother
4 before?
5 A.   No.
6 Q.   Had you ever had any concerns about
7 anyone running up on the house before Tyrique
8 shared that information with you?
9 A.   No.
10 Q.   Had any other homes on that block been
11 broken into, anything that gave you concern?
12 A.   I don't know if other houses -- I don't
13 know of other houses.
14 Q.   Ma'am, when, I believe it was Attorney
15 Ninosky who asked you what Tyrique liked to do
16 or how he spent his days, and you said he
17 spent a lot of time on his phone; is that
18 correct?
19 A.   Yes.
20 Q.   How did he pay for his phone, ma'am?
21 A.   I would pay for it.
22 Q.   Do you still have Tyrique's cellular
23 phone?
24 A.   No.

33 (Pages 126 - 129)

CARMEN RILEY

Page 130

1 Q.   Can you tell me what happened to the
2 phone?
3 A.   It had broke.  It had broke a long time
4 ago.
5 Q.   Did he have that -- did his phone still
6 work on the day that he was arrested?
7 A.   No.
8 Q.   Did he own a phone on the day that he
9 was arrested?
10 A.   No.
11 Q.   About how long before he was arrested
12 did his phone break?
13 A.   His phone was broke, like, probably well
14 over a year.
15 Q.   A year prior to the incident?
16 A.   Yeah, yes.
17 Q.   So when Mr. Ninosky asked you how
18 Tyrique was spending his days, for at least a
19 year prior to this incident, he was not
20 spending time on his phone?
21 A.   Not on his phone, no.
22 Q.   Who provided the -- what company
23 provided the service for Tyrique's phone,
24 ma'am?

Page 131

1 A.   Team Mobil.
2 Q.   Do you remember the number associated
3 with his phone?
4 A.   No, I do not.
5 Q.   Do you know when you stopped paying the
6 bill for that telephone?
7 A.   I do not.
8 Q.   Do you have any idea if you stopped
9 paying for the bill before or after Tyrique
10 was arrested?
11 A.   I don't remember.
12 Q.   Was the account in your name, ma'am?
13 A.   Yes.
14 Q.   Was there any discussion about you
15 replacing Tyrique's telephone during that
16 year's time after it broke?
17 A.   No.
18 Q.   Ma'am, you testified that you were aware
19 that Tyrique was using marijuana; is that
20 correct?
21 A.   Correct.
22 Q.   Do you know how he was obtaining
23 marijuana?
24 A.   I do not.

Page 132

1 Q.   Were you giving him money for marijuana?
2 A.   I was not.
3 Q.   Are you aware of anyone giving money to
4 Tyrique to buy marijuana?
5 A.   I'm not aware, no.
6 Q.   And were you -- you weren't aware how or
7 from whom he was obtaining it from; correct?
8 A.   Correct.
9 Q.   Did you ever discuss Tyrique's marijuana
10 use with him?
11 A.   Yes.
12 Q.   What type of discussions did you have
13 with Tyrique about his marijuana use?
14 A.   I basically was telling him that, you
15 know, that, nowadays, these jobs now require
16 drug tests, so, you know, how do you expect to
17 pass, pass a drug test, if you are out here
18 smoking marijuana?
19 Q.   Other than the concerns that you had for
20 Tyrique not being able to pass a drug test,
21 did you express any other concerns to Tyrique
22 about his marijuana use?
23 A.   No, I just was -- just talking about him
24 not being able to pass any of the tests,

Page 133

1 because most jobs require it now.
2 Q.   When you had that conversation with
3 Tyrique, did you ask him to stop using
4 marijuana?
5 A.   I didn't tell him to stop.   I just told
6 him how I felt.
7 Q.   Did he give you any indication that he
8 would stop using marijuana, so that he could
9 pass a drug test?
10 A.   I don't remember.
11 Q.   Did you have any concerns that Tyrique
12 was using an illegal drug?
13 A.   No.
14 Q.   Did Tyrique have any close friends in
15 the area, ma'am?
16 A.   He had a lot of friends.
17 Q.   At the time of his arrest, can you tell
18 me maybe two or three of his closest friends?
19 A.   No.
20 Q.   Can you give me the name of one of his
21 closest friends?
22 A.   No.
23 Q.   Did you ever meet his friends?
24 A.   I have met, you know, quite a few of

34 (Pages 130 - 133)

CARMEN RILEY

Page 134

1 them.
2 Q. Did you ever ask who they were?
3 A. Well, I knew them from school, you know,
4 like, a lot of kids would come over, you know,
5 so I knew a lot of them, you know, from
6 school, when he went to school.
7 Q. At the time that Tyrique was arrested,
8 that was approximately three years after he
9 graduated; correct?
10 A. Correct.
11 Q. So during that three-year time, did he
12 make any new friends?
13 A. No.
14 Q. Would his friends come to your house?
15 A. Sometimes -- well, sometimes, they would
16 walk over, and then they will walk off, you
17 know, walk somewhere.
18 Q. Did he have one or two friends that he
19 hung out with more than others?
20 A. No, no.
21 Q. Did Tyrique have a driver's license,
22 ma'am?
23 A. No driver's license.
24 Q. And so he didn't have a vehicle; is that

Page 135

1 correct?
2 A. That's correct.
3 Q. Was there a reason why he never obtained
4 a driver's license, that you are aware of?
5 A. Well, he got his permit, and the reason
6 why he never got his driver's license was due
7 to the fact that my car was broke, so we
8 didn't get a chance to take him.
9 Q. About how long did he have his permit,
10 ma'am?
11 A. I don't remember.
12 Q. When Mr. Ninosky was asking you about
13 his education at Susquehanna Township, I just
14 wanted to follow up on his disciplinary
15 record. Was he ever suspended from school at
16 Susquehanna Township?
17 A. I don't remember.
18 Q. Do you know if he ever had any
19 detentions?
20 A. I don't remember.
21 Q. Sitting here today, do you recall
22 anything about his disciplinary record at
23 Susquehanna Township High School?
24         MR. ROSS: Objection to the

Page 136

1 form of the question. You can answer.
2         MR. NORFLEET: I will rephrase
3 it.
4         THE WITNESS: I mean, he
5 probably had detention.
6 BY MR. NORFLEET:
7 Q. So, ma'am, your attorney objected to
8 that question. I will try to rephrase it to
9 satisfy the objection.
10         You testified that you
11 couldn't remember if he was suspended, you
12 initially said that you couldn't recall if he
13 had any detentions, and I now believe you may
14 recall something about a detention; is that
15 fair?
16 A. That's fair.
17 Q. Were you ever called to go to the school
18 and meet with a teacher or a principal about
19 his behavior?
20 A. I don't remember.
21 Q. Did Tyrique have what we call an IEP?
22 Do you know what an IEP is?
23 A. Yes, he had an IEP.
24 Q. How long was that IEP in place?

Page 137

1 A. I would say since first grade.
2 Q. Was that IEP something that had to be
3 updated yearly?
4 A. Yes.
5 Q. So he had an IEP from first grade until
6 the time he graduated from high school?
7 A. Yes.
8 Q. Do you recall anything specific about
9 the IEP?
10 A. Well, he had a learning disability, and
11 he had trouble with math.
12 Q. Did he carry any type of diagnosis,
13 ma'am, related to his learning disability,
14 like dyslexia, ADHD, anything that you can
15 recall?
16 A. No.
17 Q. No, you can't recall, or no, he didn't
18 have any of those things?
19 A. He didn't have none of those things.
20 Q. Other than having difficulty with math,
21 do you recall any other reasons why Tyrique
22 had an IEP?
23 A. Some reading and -- reading and writing.
24         MR. ROSS: Andy, can I ask

35 (Pages 134 - 137)

CARMEN RILEY

Page 138

1 that we just get a definition of IEP, just to
2 make sure we are all talking about and
3 understanding the same thing?
4          MR. NORFLEET:  Sure.  My
5 understanding of an IEP, and I can look up the
6 specific definition for you, but I believe it
7 is an Independent Education Plan.
8          MR. ROSS:  Is that your
9 understanding, Carmen?
10          THE WITNESS:  Yes.
11          MR. ROSS:  Thank you.
12          MR. NORFLEET:  Yes, sir.
13 BY MR. NORFLEET:
14 Q.   Ma'am, did he have any -- did Tyrique
15 have any accommodations at school related to
16 his IEP?
17 A.   No, he didn't have any accommodations,
18 because he was in a regular class, he was in
19 with a regular class, but some of the teachers
20 did have assistance in the classroom, so I
21 guess some of the kids needed some one-on-one,
22 and she would assist.
23 Q.   Do you know if Tyrique had a teacher's
24 assistant assigned to him?

Page 139

1 A.   No.
2 Q.   Do you know if he ever received any
3 assistance in the classroom from one of those
4 teacher's helpers or teacher's assistants?
5 A.   I wouldn't know that.
6 Q.   Were you -- as his parent, did you
7 attend the annual IEP reviews?
8 A.   I did.
9 Q.   Did you ever miss any of those?
10 A.   No.
11 Q.   Did anyone attend the IEP meetings with
12 you?
13 A.   Thomas might have, you know, came with
14 me, you know, to one of them.
15 Q.   Do you recall if Tyrique had any type of
16 vocational training while he was in high
17 school?
18 A.   No.
19 Q.   Ma'am, Attorney -- I'm going to try not,
20 again, to duplicate questions, but I'm going
21 to ask you some questions similar to what
22 Attorney Carmelite asked you.
23          Have you ever had any
24 conversations with Brian Clark?

Page 140

1 A.   I have not.
2 Q.   Do you know who Brian Clark is?
3 A.   Yes.
4 Q.   Who is Brian Clark, ma'am?
5 A.   He was the warden at Dauphin County
6 Prison.
7 Q.   So, prior to your son's passing, or
8 after your son's passing, you had never talked
9 with Brian Clark?
10 A.   I have not.
11 Q.   Other than your attorneys, do you know
12 anyone in your family or any of your friends
13 or anyone who talked with Brian Clark about
14 Tyrique?
15 A.   I don't remember.
16 Q.   Do you know what role Brian Clark plays
17 in this Complaint, ma'am?
18 A.   No.
19 Q.   Ma'am, you have named 24 individual
20 Dauphin County correctional officers.  Can we
21 agree to that?
22          MR. ROSS:  Objection to the
23 form of the question.  You can answer.
24 BY MR. NORFLEET:

Page 141

1 Q.   I will rephrase.
2          Ma'am, do you know how many
3 Dauphin County correctional officers have been
4 named in your Complaint?
5 A.   No, I don't know.
6 Q.   If I represented to you, ma'am, that 24
7 -- well, 25, total, understanding I don't
8 represent Officer Swanson -- if I represented
9 to you that there were 24 additional
10 individual Dauphin County correctional
11 officers named, does that sound accurate?
12 A.   That sounds accurate.
13 Q.   And I'm only going to do this one time,
14 all right?  I promise you.  I'm just going to
15 read their names:
16          Captain Andrew Clark, Captain
17 Steve Smith, Captain Mark Neidigh, Lieutenant
18 Richard Armermann, Lieutenant Greg Mendenhall,
19 Sergeant Scott Rowe, Sergeant Scott Grieb,
20 Sergeant Jason Adams, Sergeant Michael Blouch,
21 Sergeant Scott Lewis, Sergeant Keith Biter,
22 and then we have Officer Robert Ingersoll,
23 Cameron Weaver, Taylor Glenn, Martin Myers,
24 Delta Bauer, Matthew Danner, Steve Singleton,

36 (Pages 138 - 141)

CARMEN RILEY

Page 142

1  Derek Umberger, Joseph Doyle, Richard Otten --
2  that's O-T-T-E-N -- Keith Hoffman, Michael
3  Shaeffer, S-H-A-E-F-F-F-E-R, and Tami,
4  T-A-M-I, Donovan.
5  A.  Yes.
6  Q.  Does that sound accurate, ma'am, that
7  those individuals have been named as the
8  individual Dauphin County officers in your
9  Complaint?
10 A.  Yes.
11 Q.  Have you talked -- prior to your son's
12 passing or after your son's passing, have you
13 ever spoke with any of those individual
14 officers?
15 A.  I have not.
16 Q.  Have you had any communication with
17 those officers at all through any type of
18 writing, electronic correspondence, any type
19 of communication at all?
20 A.  I have not.
21 Q.  Other than any investigation that your
22 attorneys have done, because I don't want to
23 know about that, are you aware of any family
24 members, friends or anyone else you know who

Page 143

1  may have contacted any of those 24 individuals
2  regarding Tyrique?
3  A.  I do not.
4  Q.  And as I asked, ma'am, with Brian Clark,
5  do you know the role that any of those 24
6  individual correctional officers play in this
7  complaint?
8  A.  Rephrase that again.
9  Q.  Yes, ma'am.  The 24 officers that I
10 asked you about, that you said those were the
11 officers named in the Complaint, do you
12 understand what their role is in the
13 Complaint?
14 A.  No, not -- no.
15 Q.  And ma'am, I know that Attorney MacMain
16 told you at the beginning of the deposition
17 that we are not here to try to trick you, and
18 I kind of feel like I want to go back to keep
19 that promise.
20          I asked you about the 24
21 individual officers, and I included Sergeant
22 Keith Biter, B-I-T-E-R.
23 A.  Okay.
24 Q.  And I am not sure if you can tell me if

Page 144

1  that's the same officer that you believe that
2  you spoke with?  Can you tell me if that -- if
3  the officer named in the Complaint is the same
4  officer you talked with on June 18th?
5  A.  Yes.
6  Q.  That is the same officer?
7  A.  Yes.
8  Q.  And that's why I wanted to clear that
9  up, ma'am, because I kind of read all those
10 names to you, and you had already told me
11 about Keith Biter, so I wanted to keep our
12 promise that we are not trying to trick you.
13 A.  Okay.
14 Q.  So we will just agree that you told us
15 about your conversation with Keith Biter; is
16 that fair?
17 A.  That's fair.
18 Q.  Okay, but none of the other 23 officers;
19 is that fair?
20 A.  That's fair.
21 Q.  Ma'am, did you or any other family
22 member contact Dauphin County Prison regarding
23 your concerns about Tyrique's mental health?
24 A.  No.

Page 145

1          MR. NORFLEET:  That's all I
2  have.  Thank you, ma'am.
3            - - -
4          EXAMINATION
5            - - -
6  BY MR. ROSS:
7  Q.  I have some questions for Ms. Riley.
8  Carmen, we will start with the
9  -- we will talk about the properties, 1931 and
10 2003.  How far -- how long would it take to
11 walk from 1931 to 2003?
12 A.  I'm not sure.
13 Q.  Would it take you -- go ahead.
14 A.  I'm not sure.
15 Q.  Would it take you more than a minute to
16 walk?
17 A.  Oh, yeah, a minute.
18 Q.  Are the properties next to each other?
19 A.  Yes.
20 Q.  And then someone had asked you, I
21 believe, about there being maybe some grass
22 between them.  Do they share a yard?
23 A.  Yeah, yeah, it shares a yard.
24 Q.  And is it a large yard, a small yard,

37 (Pages 142 - 145)

CARMEN RILEY

Page 146

1 medium-sized?
2 A.   Large.
3 Q.   And you talked about a residence
4 belonging to Thomas and a residence where you
5 stay.  Do you consider these to be separate
6 places or do you come and go as you please
7 between the two?
8 A.   Come and go as we please.
9 Q.   Do you treat it like it is both yours
10 and Thomas' property?
11 A.   Yeah.
12 Q.   You were asked at the beginning, I want
13 to talk about, there was a conversation about
14 Tyrique mentioning that or stating that people
15 were coming up on the property.
16        Do you remember that
17 discussion?
18 A.   Yes.
19 Q.   And you stated, I believe, earlier, that
20 Tyrique had mentioned this a few days before
21 the date he was arrested; is that right?
22 A.   Yes.
23 Q.   Did he also mention that the day that he
24 was arrested?  I'm sorry, let me strike that.

Page 147

1        You all went to bed in the
2 residence at 2003 the night before he was
3 arrested; correct?
4 A.   Correct.
5 Q.   That day before you went to bed at 2003,
6 had he mentioned concerns about someone coming
7 on the property?
8 A.   Yes.
9 Q.   And I believe that there was questions
10 about why you decided to sleep at 2003.  Do
11 you recall being asked about that?
12 A.   Yes.
13 Q.   Did you decide to sleep at 2003 because
14 you, yourself, were concerned that people were
15 going to be coming onto the property at 1931?
16 A.   No.
17 Q.   Okay.  Why did you decide to sleep at
18 2003 that night?
19 A.   Because Tyrique was saying, talking
20 about someone coming up on the property.
21 Q.   And how would sleeping at the 2003
22 address what Tyrique was talking about?
23 A.   Phrase it another way.
24 Q.   Okay, that's fair.  I guess I am trying

Page 148

1 to -- I want to know, why did you decide to
2 sleep at 2003?  What about sleeping at 2003
3 would have anything to do with what Tyrique
4 was saying about people coming on the
5 property?
6        Let me ask you this.  I'm
7 sorry.  They are bad questions.  Were you
8 concerned about Tyrique and him saying that
9 people were coming up on the property?
10 A.   I was concerned, yeah.
11 Q.   Did that concern have anything to do
12 with your decision to sleep at 2003 that
13 night?
14 A.   Yes, because that's what -- yes, because
15 he was saying about -- yes, because he said
16 about somebody coming there, coming up on the
17 property, so --
18 Q.   And your mother stayed that night at
19 1931, right?
20 A.   Yes.
21 Q.   And you weren't concerned that your
22 mother was in danger at 1931; correct?
23 A.   That's correct.
24 Q.   Did you believe that someone was going

Page 149

1 to be coming up on the property in 1931?
2 A.   No.
3 Q.   But you believed that Tyrique believed
4 that; is that right?
5 A.   Yes, that's correct.
6 Q.   Was that something out of the ordinary
7 for Tyrique to be -- to believe?
8        MR. NORFLEET:  Objection to
9 form.
10 BY MR. ROSS:
11 Q.   Tyrique believing that someone was
12 coming up on the property, was that something
13 he frequently said before -- okay, let me
14 start over.
15        The first time that you heard
16 Tyrique explain or state that someone was
17 coming up on the property was approximately
18 three days before he was arrested; is that
19 right?
20 A.   Correct.
21 Q.   Before those three days, had he ever
22 expressed anything like that, about being
23 concerned about someone putting either him or
24 you in harm's way?

38 (Pages 146 - 149)

CARMEN RILEY

Page 150

1 A.   Can you -- no, he was only saying
2 hisself, he was talking about himself, as far
3 as someone coming up on our property, but I
4 don't know if he was --
5 Q.   Was that something that was unusual for
6 him?
7          MR. NORFLEET: Objection to
8 form.
9          THE WITNESS: Yeah, yeah, it
10 was little usual for him to say that.
11 BY MR. ROSS:
12 Q.   Had you ever heard him -- had you ever
13 seen him behave that way before?
14 A.   No.
15 Q.   You were asked before whether or not you
16 had called or tried to take him to a mental
17 health hospital based on him saying that.  Do
18 you remember being asked about that?  I'm
19 asking you, do you remember being asked about
20 that today?
21 A.   Yes.
22 Q.   Okay.  When he said that, and I want to
23 focus on the night that you decided to sleep
24 at 2003, when you went to bed that night, did

Page 151

1 you believe that Tyrique needed to go to a
2 mental health hospital?
3 A.   No.
4 Q.   We played the 911 tape, and you were
5 asked some questions about the part of the
6 tape where you told the dispatcher that he --
7 that Thomas was pushed over.  Do you remember
8 that?
9 A.   Yes.
10 Q.   You had previously testified, in
11 response to Mr. MacMain's question, that
12 Thomas had fallen down when his pants had
13 fallen down; is that right?
14 A.   Yes.
15 Q.   Do you feel that what you told MacMain
16 about Thomas falling down was different in any
17 way from what you told the dispatcher about
18 Thomas being pushed over?
19          MR. NORFLEET: Objection to
20 form.
21          MR. MacMAIN: Same objection.
22          MR. NINOKSY: Join.
23          THE WITNESS: No, I don't.
24 BY MR. ROSS:

Page 152

1 Q.   Okay, can you explain to me how -- why
2 they are not different, any different?
3          MR. CARMELITE: I will object
4 to that one.
5          MR. NINOSKY: Me as well.
6 BY MR. ROSS:
7 Q.   Can you explain to me what happened with
8 how Thomas came to fall down?
9 A.   Okay, his pants had fell down to his
10 ankles, down to his feet.  So that's how they
11 got, you know -- that's how he fell, from his
12 pants falling down from his feet.
13 Q.   Was he still -- I think the word that
14 was used earlier by Mr. MacMain was there was
15 a tussle between Tyrique and Tom over the
16 sledgehammer.  Was Thomas still engaged in
17 that tussle for the sledgehammer when he fell
18 down?
19 A.   Yes.
20 Q.   Do you think that his pants falling down
21 to his ankles caused him to fall over during
22 that time?
23          MR. NORFLEET: Objection to
24 form.

Page 153

1          MR. NINOSKY: Objection to
2 form.
3          MR. CARMELITE: Objection to
4 form.
5          MR. MacMAIN: Join.
6          THE WITNESS: Yes.
7 BY MR. ROSS:
8 Q.   There was a point in the tape, and I
9 don't think you were asked about this, do you
10 recall, from the 911 tape, when you told the
11 dispatcher that Tyrique did not hit Thomas
12 with the hammer, the sledgehammer?
13 A.   Yes.
14 Q.   Did you ever see Tyrique hit Tom with
15 the sledgehammer?
16 A.   No.
17 Q.   You mentioned about a call that you
18 received after Tyrique was arrested from
19 Officer Wilson.
20          Is there anything else about
21 that call that you hadn't told us about that
22 you remember?
23 A.   No, that was it, what I said was it.
24 Q.   And after Tyrique was taken away, were

39 (Pages 150 - 153)

CARMEN RILEY

Page 154

1 you concerned about him?
2 A.    Yes.
3 Q.    And you were asked some questions about
4 whether or not you had called the prison.
5 Why didn't you call the prison?
6 A.    Because I was under the understanding
7 that, you know, he would be calling us.  He
8 should have been calling us first.  I thought
9 he would be calling us.
10 Q.    Had you ever had a situation with
11 Tyrique where you -- where he went to jail
12 before this happened, and you knew to call the
13 prison?
14 A.    No, he never been -- no.
15 Q.    And why did you think that Tyrique would
16 be calling you?
17 A.    Because Officer Wilson had said his bail
18 was set at $20,000, so I figured he probably
19 would be calling.  Mr. Wilson said his bail
20 was set for $20,000.
21 Q.    Did you know that you could -- if you
22 called -- did you know that if you called the
23 prison, that you would be able to speak to
24 Tyrique?

Page 155

1 A.    I didn't know.
2 Q.    Did anyone ever tell you that -- did the
3 officers, when they arrested Tyrique, did they
4 tell you, we are taking him to the prison, and
5 if you ever want to talk to him, you can call
6 the prison?
7          MR. NORFLEET:  Objection to
8 form.
9          MR. CARMELITE:  Join.
10 BY MR. ROSS:
11 Q.    Let me finish the question before you
12 answer, Carmen.  And I will restate the
13 question.
14          When the officers arrested
15 Tyrique, did they tell you -- did any of the
16 officers tell you that you could call the
17 prison and you could speak with Tyrique?
18 A.    They did not.
19          MR. NORFLEET:  Same objection.
20 BY MR. ROSS:
21 Q.    Were you told anything about Tyrique
22 having a court case?
23 A.    Yes.
24 Q.    Okay, what were you told?

Page 156

1 A.    Well, I got a phone call from Keith
2 Biter.
3 Q.    Is this the same phone call you were
4 speaking about before?
5 A.    No, Keith Biter called another day.
6 Q.    You told us about Keith Biter calling
7 and telling you about Tyrique's bail; correct?
8 A.    That's correct.
9 Q.    Is this the same phone call you are
10 talking about or did he call you more than
11 once?
12 A.    He called me more than once.
13 Q.    Okay, so let's -- what happened?  What
14 was said the first time he called?
15 A.    The first time, he said, is this Carmen?
16 And I said yes.  And he said, Tyrique's bail
17 is 20,000 straight.  And he hung up.
18 Q.    And when was that?
19 A.    June 18th.
20 Q.    That was the same day that Tyrique was
21 taken, was arrested?
22 A.    Correct.
23 Q.    I think, before, you said that that call
24 lasted about two minutes.  So was more said

Page 157

1 during that call?
2 A.    No, it seemed like he was about to like
3 ask me something, but then he hung up.  He
4 hung up on me.  It seemed like he wanted -- he
5 was about to say what -- like, he hung up.
6 Q.    So, him saying, is this Carmen, and then
7 saying that bail is 20,000 and hanging up,
8 that doesn't take two minutes.  So do you
9 think that you were incorrect about how long
10 the call took?
11          MR. NORFLEET:  Objection to
12 form.
13          MR. CARMELITE:  Join.
14          THE WITNESS:  Yes.
15 BY MR. ROSS:
16 Q.    Was anything else said during that call,
17 other than what you just told me?
18 A.    Nothing else.
19 Q.    Now, you said that you spoke to Keith
20 Biter an additional time; is that right?
21 A.    That's correct.
22 Q.    When is the next time you spoke?
23 A.    I don't remember the exact date, but he
24 called and gave me the name, the date, the

40 (Pages 154 - 157)

CARMEN RILEY

Page 158

1  time of the preliminary hearing and where to
2  be.
3  Q.    Was that the same day that Tyrique was
4  arrested or later?
5  A.    That was later.
6  Q.    Do you know how many days later that
7  was?
8  A.    I think the 22nd.
9  Q.    June 22nd?
10  A.    June 22nd.
11  Q.    Do you remember the date that you were
12  given for Tyrique's preliminary hearing?
13  A.    June 27th.
14  Q.    June 27th?
15  A.    Yes.
16  Q.    And did you attend Tyrique's preliminary
17  hearing?
18  A.    I did.
19  Q.    And did you see Tyrique that day?
20  A.    I did not.
21  Q.    And what, if anything, happened at
22  Tyrique's preliminary hearing? Let me strike
23  that.
24        Did his preliminary hearing

Page 159

1  occur?
2  A.    It did not.
3  Q.    Do you know why?
4  A.    Well, because we had got a -- once we
5  got there, to the preliminary hearing, and it
6  seems like they were starting to get started
7  and everything, and there was a woman there,
8  who acted like she was going to go to someone
9  else, and Mr. Matthews, Thomas Matthews, said,
10  wait, wait, I was here first, I was here
11  first. And then she goes, what's your name?
12  She said, what is your name? And he said, I'm
13  Thomas Matthews, I'm Tyrique Riley's father.
14  And she said, oh, that's been continued.  And
15  we were like -- we didn't even know what --
16  you know.  And so she goes like this, then she
17  says about -- something like victim activist,
18  that she sent him some papers, and she said,
19  you are going to fill them papers out, if I
20  got to come to your house. And Mr. Matthews
21  is like, I'm not filling them papers out.
22        And then, by me sitting next
23  to him, she go, who are you? Pointing at me.
24  And I said, I'm Carmen Riley, I'm Tyrique's

Page 160

1  mother.  And she went -- she gave me this
2  puzzled look like -- and she goes -- she just
3  put her hand up.  Then she goes into the
4  courtroom, and she started whispering, like
5  she was whispering to this other lady, you
6  know.  And then it seems like she leaves the
7  courtroom, and she goes out front of the
8  District Justice Office.  And then, next thing
9  you know, the front door of the District
10  Justice Office opens up, and Aaron Osman,
11  Officer Aaron Osman, opens the door and says,
12  Mr. Matthews, could you step out here, please?
13  So he gets up, and he asked, was it okay for
14  me to come.  And he shook his head like
15  (indicating).  And then we go out, we go out
16  in front of the -- outside the door and
17  talked.
18  Q.    Okay, you said a lot there.  When this
19  happened, when you were having the
20  conversation with the woman who you said may
21  be from victim services, was that inside the
22  courtroom or outside the courtroom?
23  A.    That was outside.
24  Q.    So you were in the hallway?

Page 161

1  A.    We were just sitting there.
2  Q.    You said that she went into the
3  courtroom and began talking to someone.  How
4  do you know that?
5  A.    Because the door was open, and she was
6  standing like right there, and you could see
7  her like talking to this other woman.
8  Q.    And when the gentleman came out and
9  asked Mr. Matthews to step into somewhere,
10  where was he asking him to step into?
11  A.    Out front of the District Justice
12  Office.
13  Q.    And you then went with Tom and spoke
14  with this gentleman?
15  A.    I just listened, you know, I didn't talk
16  to him.
17  Q.    And what was said?
18  A.    He said, your son is in ICU.  And he
19  said he was at the Harrisburg Hospital, and we
20  should get down there.  And he -- so Mr.
21  Matthews was like, what about me? Because I
22  was supposed to be here. What about -- they
23  was like, he said, it is over, it is done,
24  there is not going to be nothing.

41 (Pages 158 - 161)

CARMEN RILEY

Page 162

1 Q.   Who was the person that told you this
2 information?
3 A.   Aaron Osman.
4 Q.   How do you know that that's his name?
5 A.   Because when he opened the door, he had
6 it on -- a little name.
7 Q.   Do you know his title?
8 A.   Susquehanna Township Police Officer. He
9 was an officer.
10 Q.   Did he say anything about how Tyrique
11 came to be in the hospital?
12 A.   No, he didn't say that.
13 Q.   Had you been told anything about Tyrique
14 going to the hospital before Officer Osman
15 said this to you?
16 A.   No.
17 Q.   Had you heard anything about Tyrique's
18 condition before Mr. Osman said this to you?
19 A.   No.
20 Q.   How long were you at the courthouse for
21 the preliminary hearing before you had this
22 conversation with the officer?
23 A.   I got there early, so we had to wait.
24 I'm not sure.

Page 163

1 Q.   More than an hour?
2 A.   I don't think it was more than an hour.
3 Q.   What did you do -- what, if anything,
4 did you do next?
5 A.   What did we do?
6 Q.   Yes.
7 A.   We left and went to the hospital, went
8 down to Harrisburg Hospital.
9 Q.   And what happened when you got to the
10 hospital? Did you see your son at the
11 hospital?
12 A.   When we first got there, we couldn't go
13 up.  We couldn't go upstairs, you know, like,
14 we went to the front desk, and then we
15 couldn't go up.  They said we had to get some
16 kind of clearance.  And Mr. Matthews had to
17 call -- I think he had to call -- I think they
18 told him he has to just get permission to go
19 see Tyrique.
20 Q.   Okay.
21 A.   And then it like took a while for him to
22 get this clearance, so he ended up getting
23 clearance that he can go, but they said only
24 15 minutes.  He was only given 15 minutes to

Page 164

1 go upstairs to ICU.
2 Q.   Were you given permission to go
3 upstairs?
4 A.   Not at first, no, they said only Dad can
5 go, and so, then, eventually, we -- once Mr.
6 Matthews got up there, and he was up there a
7 while, and then they -- one of their hospital
8 securities came and went like this
9 (indicating), go on, you know, said it was
10 okay for me to come.
11 Q.   And then what happened?
12 A.   We go up, and I go up, and Mr. Matthews,
13 he still was standing there, you know, he was
14 like talking to one of the doctors.  And then
15 I had to put on a smock.  I remember I had to
16 put on a smock.  And then I was -- went in
17 there in Tyrique's room.
18 Q.   And what happened when you went in the
19 room? Did you see Tyrique?
20 A.   Yes.
21 Q.   How did he look?
22 A.   When I seen him, his right lip, he had a
23 -- it was busted.  I could see his lip was --
24 on the right, it looked like somebody had hit

Page 165

1 him. And then, on both wrists, both of his
2 wrists, there was white tape on both wrists.
3 And then they had like a ventilator that went
4 down and --
5 Q.   Do you know if he was alive at that
6 point when you saw him?
7 A.   I felt like he wasn't.
8 Q.   Did anyone tell you how he came to be in
9 that condition?
10 A.   No, they didn't tell me.
11 Q.   Can you tell me what -- I'm sorry.
12 A.   Because Mr. Matthews -- no, they didn't
13 tell -- they didn't talk to me.
14 Q.   Can you tell me, if you can, what you
15 were thinking and feeling when you saw him?
16 A.   I just feel like he was gone, because he
17 wasn't -- he couldn't raise his hand.
18 Q.   I'm sorry, Carmen.  I know this is not
19 easy to talk about.
20 A.   He just was laying there.  He just
21 wasn't moving, just was still.  Every day we
22 went down there, he just -- he was just still.
23 Q.   How many days did you go down to see
24 him?

42 (Pages 162 - 165)

CARMEN RILEY

Page 166

1  A.    From the 27th until July 1st.
2  Q.    Were you ever able to talk to him again?
3  A.    No.
4  Q.    Was he able to talk to you?
5  A.    No.
6  Q.    At any point when you went there, from
7  June 27th to July 1st, did anyone tell you
8  what had happened to Tyrique?
9  A.    I remember one of the doctors said on
10 July 1st, these two doctors came in, and they
11 was talking about oxygen.  And one doctor said
12 that -- about not restarting his -- he said,
13 if his heart stop, just let him go peacefully,
14 don't try to restart it, just let him go
15 peacefully.  And the other doctor talked
16 about him being -- not getting -- he said,
17 after so many minutes of you not getting no
18 oxygen, he said it could start brain damage,
19 and he said about -- he didn't -- like, he
20 said 30 something minutes or 40 something
21 minutes with no oxygen, he said, and he just,
22 you know --
23 Q.    Carmen, would you like to take a break?
24 I'm going to ask you some questions about

Page 167

1  Tyrique and his life and some of the things
2  that you talked about, so would you like to
3  take a break before I start that?
4  A.    Yes.
5        MR. ROSS:  Why don't we take a
6  break, and I will come back and finish up my
7  questions, and we can come back around 5:35?
8        - - -
9        (Whereupon a short break was
10 taken at this time.)
11       - - -
12 BY MR. ROSS:
13 Q.    Okay, Carmen, I just wanted to go back,
14 and you were asked some questions about what
15 Tyrique was like.  Is there -- what can you
16 tell me about who Tyrique was?  First of all,
17 how old was he on the date that he was
18 arrested?
19 A.    He was 21.
20 Q.    21?
21 A.    Yes.
22 Q.    When did he turn 21?
23 A.    June 14th.
24 Q.    Just a few days before?

Page 168

1  A.    Yes.
2  Q.    And you mentioned that he had a lot of
3  friends?
4  A.    Yes.
5  Q.    Would you describe him as a social
6  person or a loner?
7  A.    I would say, after school, I mean, after
8  they graduated, you know, everybody started
9  going their own ways, but I wouldn't say he
10 was a loner.
11 Q.    Was he active while he was in school?
12 A.    Yes.
13 Q.    And did he hang out with his friends
14 after school?
15 A.    Yes.
16 Q.    And you said people went their own ways
17 after school or after they graduated, but did
18 he still hang with friends after he graduated?
19 A.    A few, yeah, a few.
20 Q.    Did he date?
21 A.    He only had one girlfriend.
22 Q.    And was that while he was in school or
23 after he graduated or both?
24 A.    That would have been in school.

Page 169

1  Q.    Okay, what was this girlfriend's name?
2  A.    Nicole.
3  Q.    Do you recall actually meeting -- or not
4  meeting, but seeing the mother of the girl
5  that he dated while we were meeting with the
6  District Attorney in connection with this
7  case?
8  A.    I did.
9  Q.    Tell me about that.
10 A.    Well, when we was waiting for our
11 meeting, she come up, and she introduced
12 herself to us.  And she told us, you know,
13 that Tyrique and her daughter were boyfriend
14 and girlfriend at one point.  And she also
15 said, you know, how nice of a person he was.
16 She talked about him coming over to their
17 home, painting, painting a few of her rooms.
18 Q.    And this occurred after Tyrique passed
19 away; correct?
20 A.    That's correct.
21 Q.    And where were you when this woman came
22 up to you?
23 A.    We were at the courthouse.
24 Q.    Did she work at the courthouse?

43 (Pages 166 - 169)

CARMEN RILEY

Page 170

1  A.   Yes, she did.
2  Q.   Do you know who she worked for?
3  A.   Fran Chardo.
4  Q.   I want to ask you, how has Tyrique's
5  death affected you?  Are you different in any
6  ways since he died?
7  A.   I'm angry, I lose weight, I gain weight,
8  I took on more responsibilities, I --
9  Q.   When you say you took on more
10 responsibilities, what do you mean by that?
11 A.   I don't have -- well, with the firewood,
12 helping with the grass.  I have to shovel the
13 snow, because Mr. Matthews can't.
14 Q.   Why can't he do that?
15 A.   Because of his heart.  I have to do all
16 the errands.  Mr. Matthews can't even put his
17 own socks on.  I have to do that.
18 Q.   Is that something that Tyrique used to
19 do?
20 A.   Tyrique used to put his socks on.
21 Q.   Has Tyrique ever complained that he had
22 to put his father's socks on?
23 A.   He never complained.  He knew he
24 couldn't do it.  He knew he couldn't do it.

Page 171

1  He never complained.
2  Q.   Has Tyrique's death affected your
3  relationship with Tom?
4  A.   Yes.
5  Q.   In what way?
6  A.   Sometimes, Mr. Matthews, I can ask him
7  to do something simple, and he gets snappy,
8  and I'm like, I didn't really, you know, say
9  anything.  It could be just something simple.
10 He snaps, you know.
11 Q.   Let me ask you about your perspective.
12 Do you feel like you are -- do you feel like
13 you treat Tom any differently since your son's
14 death?
15 A.   Yes.
16 Q.   In what way?
17 A.   As far as sex, I just don't want -- I
18 have no desire.
19 Q.   At the beginning of this deposition -- I
20 know it seems like a long time ago -- you were
21 asked about therapy sessions, and I believe
22 that there was a question or maybe a statement
23 that as to whether or not your therapist
24 believes that your problems in your marriage

Page 172

1  had anything to do with Tyrique's death.  Do
2  you recall talking to your therapist about
3  whether or not Tyrique's death had any impact
4  on your marriage?
5         MR. NORFLEET:  Riley, I'm
6  sorry.  Can you repeat that question?  I
7  didn't get much of it.
8  BY MR. ROSS:
9  Q.   Sorry.  Let me try to scoot closer to
10 the computer.
11        Do you recall, at the
12 beginning of this deposition, talking about
13 your conversations with the counselor about
14 your marriage?
15 A.   Yes.
16 Q.   Counselor Fisk?
17 A.   Yes.
18 Q.   Do you recall having discussions with
19 Counselor Fisk about whether or not Tyrique's
20 death has affected your marriage?
21 A.   Yes.
22 Q.   And what were those conversations?
23 A.   Just what I just said about, you know,
24 snapping, and you know, I snap on him, too.

Page 173

1  I just don't think it is -- I think I am just
2  asking something minor, and he just snaps, and
3  it is constant.
4  Q.   Did Counselor Fisk ever say that she
5  believes that that has a connection to
6  Tyrique's death?
7  A.   We told her we thought that's what it
8  has -- you know, his death has a lot to do
9  with it.
10 Q.   And what was her response, if anything?
11 A.   Well she asked -- I can remember her
12 asking Mr. Matthews, why do you, you know,
13 snap, why do you snap, when she just asks you,
14 like, something simple.  And then, so, when
15 he does that, I just don't want to do nothing.
16 As far as sex, I be like I don't want to do
17 anything.
18        MR. ROSS:  Okay, Carmen, I
19 think that's all I have.  Thank you.  There
20 may be some more questions, but thank you.
21        - - -
22        EXAMINATION
23        - - -
24 BY MR. MacMAIN:

44 (Pages 170 - 173)

CARMEN RILEY

Page 174

1 Q. Carmen, I just had a couple of brief
2 questions. You just described Thomas as
3 being so infirm prior to Tyrique's death, that
4 Tyrique had to put his socks on for him; is
5 that correct?
6 A. Yes.
7 Q. And was there any other physical
8 limitations, other than he couldn't even put
9 his own socks on? I know we talked about the
10 pacemaker. You said Ty had to put his
11 father's socks on for him. Any other physical
12 limitations?
13 A. Well, he has scoliosis. He has
14 scoliosis also. Tyrique would help him, you
15 know, put his socks on for him, because Mr.
16 Matthews, his back is just messed up.
17 Q. These were all conditions that he had
18 while Ty, that night, had the sledgehammer and
19 was fighting with his dad down the hallway,
20 onto the ground? All those conditions
21 occurred -- or were in existence at that time;
22 correct?
23 A. That's correct.
24 Q. And yet -- and Tyrique was aware of all

Page 175

1 this; correct?
2 A. Yes.
3 Q. Like he knew about his dad's infirmities
4 and difficulties and physical limitations;
5 correct?
6 A. Yes.
7 Q. And during the course, at least during
8 the 911 call, you repeatedly asked Ty to put
9 away the sledgehammer; correct?
10 A. That's correct.
11 Q. And you kept reminding him of how infirm
12 his dad was; correct?
13 A. Yes.
14 Q. And yet, he still didn't put the
15 sledgehammer down, until you asked repeatedly
16 over a several-minute time period; correct?
17 A. Correct.
18 Q. I am going -- your counsel will -- you
19 will speak to your counsel about this, but
20 either I or one of the other attorneys are
21 going to be sending you some HIPAA forms for
22 you to sign, so we can get the records from
23 the counselor and some other records we are
24 going to need, so I just wanted to give you a

Page 176

1 heads-up for that.
2         And that was all the questions
3 I had.
4         MR. NINOSKY: Nothing further,
5 ma'am.
6         MR. CARMELITE: Andy, I will
7 defer to you, if you have questions.
8         MR. NORFLEET: All right,
9 thank you.
10        - - -
11        EXAMINATION
12        - - -
13 BY MR. NORFLEET:
14 Q. Ma'am, when you and I were -- when I was
15 asking you questions, and you were providing
16 me answers, is it fair to say that you did not
17 tell me about the second telephone call with
18 Mr. Biter?
19 A. Yes, I -- yes.
20 Q. Is there a reason you didn't tell me
21 about that second phone call with Mr. Biter?
22 A. No reason. I just forgot, you know, to
23 tell you about it.
24 Q. Are there any additional contacts with

Page 177

1 anybody from Dauphin County Prison or anyone
2 who you believe was from Dauphin County Prison
3 that you forgot to tell me about?
4 A. No, just Keith Biter. That's it.
5 Q. And I'm going to ask you some of the
6 same questions about that second telephone
7 call, ma'am. You said that telephone call
8 occurred about four days later?
9 A. Yes.
10 Q. The first call was on June 18th;
11 correct?
12 A. Yes.
13 Q. And you said the second call was on
14 June 22nd; correct?
15 A. That's correct.
16 Q. So we can agree that's about four days
17 later?
18 A. That's correct.
19 Q. What time did that second call come in?
20 A. In the evening, like after 8:00, around
21 8:30.
22 Q. And was that on a landline or a cellular
23 phone?
24 A. He called on the landline.

45 (Pages 174 - 177)

CARMEN RILEY

Page 178

1  Q.   And you said that during that phone
2  call, Mr. Biter shared with you information
3  about Tyrique's preliminary hearing; correct?
4  A.   That's correct.
5  Q.   What other information was shared with
6  you or that you may have discussed with Mr.
7  Biter during that call?
8  A.   All he said was the date and time and
9  where to be, and I repeated it.  He told me
10 what District Justice Office to be at, and
11 then I -- after he told me, you know, all the
12 information, I said, okay, we will be there.
13 And he laughed.  He laughed, and he said,
14 okay.
15 Q.   How long did this telephone call last,
16 ma'am?
17 A.   I don't remember.
18 Q.   Did Mr. Biter end the conversation or
19 did you hang up?  Did he hang up?
20 A.   We both hung up.
21 Q.   And you had not talked with Tyrique
22 during those four days between June 18th and
23 June 22nd; correct?
24 A.   That's correct.

Page 179

1  Q.   And it is your testimony that you didn't
2  talk with him, because you didn't know that
3  you could call him first; correct?
4  A.   Correct.
5  Q.   When Mr. Biter called on June 22nd, did
6  you ask him if you were allowed to call
7  Tyrique?
8  A.   No, I didn't.
9  Q.   Did you ask him if Tyrique had an
10 attorney?
11 A.   I did not.
12 Q.   Did you ask him about anything to do
13 with Tyrique's preliminary hearing?
14 A.   I did not.
15 Q.   Did you ask if Tyrique was allowed to
16 call you?
17 A.   I did not.
18 Q.   Did you ask him how you could go about
19 getting in touch with Tyrique?
20 A.   I did not.
21 Q.   Did you know what a preliminary hearing
22 was, ma'am?
23 A.   Just -- no, I didn't know.
24 Q.   You knew it was a court date; correct?

Page 180

1  A.   It was a court date, yes.
2  Q.   Did you believe that Tyrique needed an
3  attorney for that court date?
4  A.   I don't know.  I don't know.
5  Q.   You don't know if he needed an attorney
6  or not?
7  A.   No.
8  Q.   Did you think it would have been a good
9  idea if he would have had an attorney to go to
10 court with?
11 A.   Well, the reason why we didn't get -- we
12 didn't get an attorney is because of what
13 Officer Wilson said.  He said, Dad is not
14 going to press charges, so I figured, why
15 would we get an attorney?
16 Q.   But you knew that there was a hearing
17 scheduled?
18 A.   His father is not going to press
19 charges, so what would we need to get an
20 attorney for?
21 Q.   But you knew that there was a hearing
22 scheduled; correct?
23 A.   That's correct.
24 Q.   Did you contact the Public Defender's

Page 181

1  Office about Tyrique?
2  A.   I did not.
3  Q.   Ma'am, has anybody in -- you have never
4  been arrested; correct?
5  A.   That's correct.
6  Q.   Has Mr. Thomas ever been arrested?
7  A.   Yes.
8  Q.   And when I say -- I apologize, I said
9  Mr. Thomas.  It is Thomas?
10 A.   Yes, yes.
11 Q.   What is your understanding of the
12 reasons why Thomas has been arrested?
13 A.   I don't know.
14 Q.   Well, let me back up.  How many times
15 has Thomas been arrested?
16 A.   I don't know.
17 Q.   Was he arrested in Dauphin County?
18 A.   I don't know.
19 Q.   You just know that he was arrested?
20 A.   Yes.
21 Q.   Have you ever talked to him about why he
22 was arrested?
23 A.   No.
24 Q.   Do you know if Thomas was ever housed at

46 (Pages 178 - 181)

CARMEN RILEY

Page 182

1 Dauphin County Prison?
2 A.   Yes, I think he did mention that once.
3 Q.   What did he tell you about Dauphin
4 County Prison?
5 A.   I think it had something to do with
6 child support.
7 Q.   So, to the best of your knowledge, Mr.
8 Thomas had been detained at Dauphin County
9 Prison?
10 A.   Yes.
11 Q.   Do you know for how long?
12 A.   No.
13 Q.   Do you know how many times he was at
14 Dauphin County Prison?
15 A.   No.
16 Q.   Do you know if Mr. Thomas ever called
17 anybody from Dauphin County Prison?
18 A.   No.
19 Q.   Did you ask Mr. Thomas if you could call
20 someone incarcerated at Dauphin County Prison?
21 A.   No.
22 Q.   And he never offered that information to
23 you?
24 A.   No.

Page 183

1 Q.   I just have a couple more questions for
2 you, ma'am.
3        When was Thomas diagnosed with
4 suffering from scoliosis?
5 A.   Since he was, I guess, an infant.
6 Q.   Since he was an infant?
7 A.   Yeah, since he was young.
8 Q.   Do you know how long he has been on
9 disability?
10 A.   No, I don't know.
11 Q.   Do you know if that disability is
12 through his employer or if it is through the
13 Social Security Administration?
14 A.   Social Security Administration.
15 Q.   And how old is Thomas?
16 A.   64 -- he is in his 60's.
17 Q.   Do you know if he is retirement age or
18 if he has not reached retirement age yet?
19 That's approximately 67.
20 A.   No, he is not retirement age.
21 Q.   Is he on disability for the scoliosis?
22 A.   No.
23 Q.   Is he on disability because of his
24 heart?

Page 184

1 A.   Yes.
2 Q.   Any other reason why he is on
3 disability, other than his heart?
4 A.   I don't know.
5 Q.   Ma'am, you have -- and I'm sorry I'm
6 going to ask you these questions, but you have
7 testified to it a few times.  You have
8 testified that your sexual relationship with
9 Thomas has changed since your son's death;
10 correct?
11 A.   That's correct.
12 Q.   How often were you and Mr. Thomas having
13 sex before Tyrique passed away?
14 A.   At least twice a week.
15 Q.   And how often has that been occurring
16 since Tyrique passed away?
17 A.   Rephrase that.
18 Q.   How often are you having sex after
19 Tyrique passed away?
20 A.   Not at all.
21 Q.   Are you withholding sex from Thomas or
22 is he withholding sex from you or is it
23 mutual?
24        MR. ROSS:  Objection to the

Page 185

1 form of the question.
2 BY MR. NORFLEET:
3 Q.   I will rephrase.
4        Are you refusing to have sex
5 with Thomas?
6 A.   Yes.
7 Q.   Is he refusing to have sex with you?
8 A.   No.
9 Q.   So it is all -- it is simply you
10 refusing; correct?
11 A.   That's correct.
12 Q.   Was there any concerns with Thomas and
13 his heart condition about engaging in sex?
14 A.   No.
15 Q.   His heart condition didn't prevent him
16 from having sex with you twice a week?
17 A.   No.
18 Q.   Did his scoliosis prevent him from
19 having sex with you twice a week?
20 A.   No.
21 Q.   You said, ma'am, that you have taken on
22 additional responsibilities, and one of the
23 things that you indicate is you have to do
24 more errands; is that correct?

47 (Pages 182 - 185)

CARMEN RILEY

Page 186

1  A.    That's correct.
2  Q.    You testified earlier that Tyrique did
3  not have a driver's license; correct?
4  A.    That's correct.
5  Q.    So he couldn't drive and go do errands
6  on his own, right?
7  A.    No.
8  Q.    What errands did Tyrique do for you on
9  his own prior to his death?
10  A.    Well, at that time, my car was broke, so
11  I would have to get, you know, neighbors to
12  run me around.
13  Q.    Well, if you can tell me, prior to his
14  death, what errands was Tyrique responsible
15  for doing for you and Thomas?
16  A.    He wouldn't do none of the errands.
17  Q.    And how often are you chopping firewood,
18  ma'am?
19  A.    Maybe once or -- it all depends on how
20  the wood gets burnt.
21  Q.    In an average week, can you tell me how
22  many times a week you chop wood?
23  A.    Maybe once a week.
24  Q.    Does anyone help you with that?

Page 187

1  A.    Yes.
2  Q.    Who helps you with that, ma'am?
3  A.    My brother, he helps.
4  Q.    What is your brother's name?
5  A.    Leonard Riley.
6  Q.    He lives near you?
7  A.    Yes.
8  Q.    What is his address?
9  A.    1931 Franklin Avenue.
10  Q.    He is the brother who lives with you at
11  the house that you and your mother own?
12  A.    Yes.
13  Q.    Do you have any other siblings, ma'am?
14  A.    I do not.
15  Q.    Does anyone from Thomas' family help
16  you?
17  A.    No.
18  Q.    Does he have any family in the area?
19  A.    He does.
20  Q.    What family does Thomas have in the
21  area, ma'am?
22  A.    He has a sister.
23  Q.    What is her name?
24  A.    Michelle Arrington.

Page 188

1  Q.    A-R-R-I-N-G-T-O-N?
2  A.    That's correct.
3  Q.    And do you know her address, ma'am?
4  A.    I do not.
5  Q.    Does he have any other family in the
6  area?
7  A.    No.
8  Q.    Is Thomas close with Ms. Arrington?
9  A.    No.
10  Q.    Do you have any friends or any other
11  family members who help you out?
12  A.    Well, we might have -- we have -- not no
13  family, but as far as friends, we also have to
14  have like dry wood dropped off, like, you know
15  what I'm saying by dry wood, like skids to go
16  along with the tree wood, so, you know, we
17  have some people that have trucks that could
18  drop off skids to us.
19  Q.    And who is doing that for you, ma'am?
20  A.    Whoever, you know.
21  Q.    The last couple of questions for you,
22  ma'am, you mentioned a conversation that you
23  had at the District Attorney's Office with
24  Tyrique's high school girlfriend, and you said

Page 189

1  her name was Nicole; correct?
2  A.    That's correct.
3  Q.    What is Nicole's last name?
4        MR. ROSS:  Objection to the
5  form of the question.  I think your question
6  misstated what she testified to.
7        MR. NORFLEET:  Okay, I will
8  rephrase.
9        MR. ROSS:  You said she had a
10  conversation with Nicole there.
11        MR. NORFLEET:  I will
12  rephrase.
13        MR. ROSS:  Okay.
14  BY MR. NORFLEET:
15  Q.    Ma'am, this conversation that you had
16  with the District Attorney's Office, was that
17  with Nicole?
18  A.    No, it was not.
19  Q.    It was with Nicole's mother?
20  A.    Yes.
21  Q.    Okay, what is Nicole's name, her last
22  name?
23  A.    I don't know her last name.
24  Q.    When was the last time you saw Nicole?

48 (Pages 186 - 189)

CARMEN RILEY

Page 190

1  A.   I don't remember.
2  Q.   It was prior to your son's arrest?
3  A.   I don't remember.
4  Q.   You don't remember?  And that's a fine
5  answer, ma'am.  If you don't remember, you
6  don't remember.
7  A.   I don't remember.
8  Q.   Okay.  Nicole's mother, what is her
9  name?
10  A.   I don't remember that.
11  Q.   You don't remember her first or last
12  name?
13  A.   No.
14  Q.   Had you ever met her before that meeting
15  at the District Attorney's Office?
16  A.   No.
17  Q.   Did she tell you what she -- she told
18  you she works for Mr. Chardo?
19  A.   Yes.
20  Q.   Did she tell you in what role she works
21  for Mr. Chardo?
22  A.   Secretary.
23  Q.   Was she Caucasian, Hispanic,
24  African-American?

Page 191

1  A.   Caucasian.
2  Q.   Can you tell me anything else that you
3  might remember about what she looked like?
4  A.   She had blonde hair, I think.
5  Q.   Was she -- how tall are you, ma'am?
6  A.   I am about five-three.
7  Q.   Was she taller than you?
8  A.   She was taller than me.
9  Q.   Would you say she was significantly
10  taller than you or just a few inches?
11  A.   Significantly taller than me.
12  Q.   And you indicated that she told you that
13  Tyrique used to come to her house and paint?
14  A.   Yes, she wanted some painting done, and
15  he went -- it was on a Saturday and went over
16  to paint.
17  Q.   Do you have any idea when that would
18  have occurred?
19  A.   No, I don't.
20  Q.   How many times did you meet Nicole while
21  Tyrique was dating her?
22  A.   I will say once.
23  Q.   Do you know how long they dated?
24  A.   It started in tenth grade.

Page 192

1  Q.   And how long did that go on, ma'am?
2  A.   I don't remember how long.
3  Q.   And to the best of your recollection,
4  that was Tyrique's only girlfriend?
5  A.   Correct.
6           MR. NORFLEET:  That's all I
7  have.  Thank you.
8           - - -
9           EXAMINATION
10           - - -
11  BY MR. ROSS:
12  Q.   Ms. Riley, just real quick, there was
13  more questions about what you did or did not
14  do after Tyrique was arrested.  Were you
15  worried about Tyrique when he was arrested?
16  A.   Yes.
17  Q.   Did you lose any sleep while he was in
18  the Dauphin County Prison?
19  A.   Yes.
20  Q.   Did it affect your eating?
21  A.   Yes.
22  Q.   In what way?
23  A.   I just wouldn't eat.  I would just like
24  snack on something, or I might just eat -- you

Page 193

1  know, try to eat some of my dinner.
2  Q.   Did it cause you to feel any stress?
3  A.   Yes.
4  Q.   And did you feel helpless?
5           MR. NORFLEET:  I'm going to
6  object to the form.  I mean, you are kind of
7  leading her, Riley.  If you want to ask her
8  how she felt, that's fine, but you are leading
9  her as to what she thought or felt.
10  BY MR. ROSS:
11  Q.   I will ask you, did you feel helpless?
12  A.   Yes.
13  Q.   Any other things that you felt while he
14  was -- after he was arrested, before he passed
15  away?
16  A.   I felt helpless, and the amount of money
17  they was asking, I knew I couldn't come up
18  with that.
19  Q.   If you knew that you could have called
20  the prison and spoken to your son while he was
21  at Dauphin County Prison, would you have done
22  that?
23  A.   Yes.
24           MR. NORFLEET:  I didn't hear

49 (Pages 190 - 193)

CARMEN RILEY

Page 194

1 that.
2 BY MR. ROSS:
3 Q.   If you knew you could have called --
4 there was some testimony, you were asked
5 earlier whether or not you called Dauphin
6 County Prison, and my question is, if you knew
7 you could call and speak to your son while he
8 was in Dauphin County Prison, would you have
9 done that?
10 A.   Yes.
11         MR. NORFLEET:  Objection to
12 form.
13         MR. CARMELITE:  Same.
14 BY MR. ROSS:
15 Q.   You also were asked about getting him an
16 attorney, and you said that you mentioned
17 about Officer Wilson telling you that -- you
18 testified earlier that Officer Wilson had told
19 you that Tom was not going to be pressing
20 charges.  Do you remember that?
21 A.   I remember that.
22 Q.   What impact, if any, did it have on your
23 decision about getting an attorney?
24 A.   Well, once Officer Wilson said his

Page 195

1 father wasn't going to press no charges, I
2 didn't think we needed any.
3 Q.   And why is that?  Let me strike that.
4         Did you think that Tyrique was
5 going to be released?
6 A.   Yes.
7 Q.   At the preliminary hearing, did you
8 think he was going to be released that day?
9         MR. NORFLEET:  Objection to
10 form.
11         MR. CARMELITE:  Join.
12 BY MR. ROSS:
13 Q.   Let me rephrase.
14         When you went to court that
15 day, were you expecting Tyrique to be
16 released?
17         MR. CARMELITE:  Objection to
18 form.
19         MR. NORFLEET:  Form.
20 BY MR. ROSS:
21 Q.   You can answer.
22 A.   Yes.
23 Q.   What led you to believe that?
24 A.   Because Mr. Matthews wasn't going to

Page 196

1 press charges.
2         MR. ROSS:  That's all I have.
3         - - -
4         EXAMINATION
5         - - -
6 BY MS. CARMELITE:
7 Q.   I have some follow-up.
8         Mrs. Riley, tell me everything
9 you did from the date your son was arrested
10 until the preliminary hearing to ease your
11 concerns and your worries about your son and
12 help him.
13         MR. ROSS:  Don, I think you
14 may have cut out a little bit.  Can you
15 restate that?
16         MR. CARMELITE:  Sure, I will
17 happily restate it.
18 BY MS. CARMELITE:
19 Q.   Ma'am, you just testified that you were
20 very concerned, you were very worried, you
21 were helpless, you felt helpless for your son.
22 Do you remember that?
23 A.   Yes, I remember that.
24 Q.   I want to know everything you did

Page 197

1 between the date your son was arrested and the
2 date of the preliminary hearing to help your
3 son.
4 A.   I basically just tried to stay around
5 the house, and thinking, you know, maybe he
6 was going to call.
7 Q.   So you waited by the phone for your son
8 to call; correct?
9 A.   That's correct.
10 Q.   Did you do anything else?
11 A.   Just stayed around the house.
12 Q.   And the purpose of staying around the
13 house was to be there in case your son called;
14 correct?
15 A.   That's correct.
16 Q.   Okay.  And I apologize, it has been
17 really hard to hear sometimes when you speak
18 and Mr. Ross speaks, probably because of the
19 masks and the Zoom.  And I'm really confused.
20 Who told you that -- someone told you that
21 someone was not going to press charges, right,
22 against --
23 A.   Yes.
24 Q.   Is it that Officer Wilson told you that

50 (Pages 194 - 197)

CARMEN RILEY

Page 198

1 Mr. Matthews was not going to press charges?
2 A.   That's correct.
3 Q.   Why is it that a police officer has to
4 tell you that Mr. Matthews wasn't going to
5 press charges?
6            MR. ROSS: Objection to the
7 form of the question.
8 BY MS. CARMELITE:
9 Q.   Had you discussed with Mr. Matthews ever
10 whether he was going to press charges against
11 your joint son?
12 A.   No, he wasn't -- we didn't discuss it.
13 I knew he just -- Tyrique didn't do anything.
14 Q.   Okay, I understand that.
15 A.   Why would his dad press charges on him?
16 Q.   I understand that, ma'am, but it is my
17 understanding from your testimony that the
18 first time you learned that charges weren't
19 going to be pressed against your son was via
20 communication from a police officer, not your
21 shared spouse; correct?
22            MR. ROSS: Objection to the
23 form of the question.  You can answer.
24            THE WITNESS: That's correct.

Page 199

1 BY MS. CARMELITE:
2 Q.   And it was based upon that information
3 from the officer that you had some heightened
4 expectation that your son was going to be
5 released from prison?
6 A.   That's correct.
7 Q.   Okay.  Once you learned that your son
8 was going to be what you believed to be
9 released from prison, what did you do after
10 that?
11 A.   We just waited until the -- we just
12 waited on until the preliminary hearing come.
13 Q.   Did you tell anybody?
14 A.   No, I didn't tell anybody.
15 Q.   After the police officer told you that
16 your spouse, Mr. Matthews, wasn't going to
17 press charges against your son, did you reach
18 out and talk to Mr. Matthews about that at
19 all?
20            MR. ROSS: Objection to the
21 form of the question.
22            THE WITNESS: No.
23 BY MS. CARMELITE:
24 Q.   Why not?

Page 200

1 A.   Because he already said he wasn't
2 pressing charges, and Mr. Wilson said his
3 father is not going to press charges, off of
4 that.
5 Q.   Were you communicating with Mr. Matthews
6 after your son was arrested?
7 A.   Yes.
8            MR. CARMELITE: Okay, I have
9 no other questions.  I think Mr. Norfleet may
10 have some.
11            MR. NORFLEET: I'm good.
12            MR. MacMAIN: No further
13 questions.
14            MR. NINOSKY: Nothing further.
15            - - -
16            EXAMINATION
17            - - -
18 BY MR. ROSS:
19 Q.   I want to follow up on that, Ms. Riley.
20            With regards to Officer Wilson
21 telling you that Tom wasn't going to press
22 charges, was that confirmation for you that
23 Tyrique was not going to be prosecuted?
24            MR. CARMELITE: Objection to

Page 201

1 form.
2            MR. NORFLEET: Objection to
3 form.
4            THE WITNESS: Rephrase that.
5 BY MR. ROSS:
6 Q.   Did you believe that --
7            MR. CARMELITE: Objection to
8 form.
9            MR. ROSS: To do you believe
10 that?
11            MR. CARMELITE: Because the
12 next thing that's going to come out of your
13 mouth is going to be a leading question.
14 What, if anything, did you believe about X,
15 that's fine.
16 BY MR. ROSS:
17 Q.   You just testified with regards to what
18 Officer Wilson told you.  I think that your
19 testimony was that you already knew that -- or
20 you believed that nothing happened; is that
21 right?  You believed that Tyrique didn't do
22 anything?
23 A.   Correct.
24 Q.   So were you surprised to learn -- were

51 (Pages 198 - 201)

CARMEN RILEY

Page 202

1 you surprised when Officer Wilson told you
2 that Tom Matthews was not pressing charges?
3 A.   Yes.
4 Q.   Okay, why were you surprised?  Did you
5 believe that Tom was going to press charges?
6 A.   No.
7 Q.   Okay, so why were you surprised when
8 Officer Wilson told you that?
9 A.   Well, because I don't know really what
10 was said at the time.  I don't know -- I
11 didn't go to the hospital, so I really didn't
12 know, you know, what Mr. Matthews had said
13 until Officer Wilson called.
14 Q.   Okay.  When Officer Wilson called, this
15 was how many days after Tom had gone to the
16 hospital?
17 A.   He called on the 18th.
18 Q.   Okay, so this is later that day?
19 A.   Yes, he called later that day.
20 Q.   Had Tom come back home?  When Officer
21 Wilson called you, had Tom returned home from
22 the hospital?
23 A.   Yes.
24        MR. ROSS:  Okay, that's all I

Page 203

1 have.  Thanks.
2           - - -
3           EXAMINATION
4           - - -
5 BY MR. NORFLEET:
6 Q.   Okay, I have just got a couple, because
7 I am confused now.
8        Ma'am, when did Officer -- it
9 was Officer Wilson who told you that Tyrique
10 was not going to be charged; correct?
11 A.   He said Dad is not going to press
12 charges.
13 Q.   When did that conversation occur with
14 Officer Wilson?
15 A.   June 18, 2019.
16 Q.   And you did not participate in that
17 conversation; correct?
18 A.   No.
19 Q.   That conversation was between Thomas and
20 Officer Wilson?
21 A.   Whoever took -- whoever followed the
22 ambulance to the hospital.
23        MR. ROSS:  Andy, can I get a
24 clarification what conversation you are

Page 204

1 talking about?
2        MR. NORFLEET:  Yes, I thought
3 it was clear.  I'm sorry.
4 BY MR. NORFLEET:
5 Q.   So on June 18th -- again, I'm only
6 talking to you about what Officer Wilson told
7 you, if he told you anything, okay?  So my
8 initial question was, when did the
9 conversation occur where Officer Wilson said,
10 Tom or Thomas is not going to press charges?
11 A.   June 18th.
12 Q.   And what time did that conversation
13 occur?
14 A.   Around 11:00, 11:00 o'clock.
15 Q.   A.M. or P.M.?
16 A.   A.M.
17 Q.   And Officer Wilson reached out to you.
18 Did he call you directly?
19 A.   He called me directly.
20 Q.   Okay, on your cellular phone or your
21 landline?
22 A.   Landline.
23 Q.   And no one else participated in that
24 conversation; correct?

Page 205

1 A.   That's correct.
2 Q.   And your testimony was, you did not
3 share that information with anyone else,
4 including Thomas; correct?
5 A.   Correct.
6 Q.   Did you ask Officer Wilson when Tyrique
7 would be released?
8 A.   I did not.
9        MR. NORFLEET:  Okay, that's
10 all I have.
11        Anyone else?
12        MR. MacMAIN:  No.  I guess I
13 will wrap up.  So we are concluded with the
14 deposition.  Please, Jeanne, I would like a
15 copy.  I guess full and mini and electronic
16 is fine.
17        THE COURT REPORTER:  Okay,
18 thank you.
19        MR. ROSS:  Same.
20        MR. NORFLEET:  Same.
21        MR. NINOSKY:  Same.
22        MR. CARMELITE:  I'm not going
23 to rock the boat.  I will do the same, too.
24           - - -

52 (Pages 202 - 205)

CARMEN RILEY

Page 206

1     (Witness excused.)
2         - - -
3     (Whereupon the deposition was
4  concluded at 6:21 p.m.)
5         - - -
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 208

1     INSTRUCTIONS TO WITNESS
2
3     Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the appropriate
6  space on the errata sheet for any corrections
7  that are made.
8     After doing so, please sign the errata
9  sheet and date it.
10    You are signing same subject to the
11 changes you have noted on the errata sheet,
12 which will be attached to your deposition.
13    It is imperative that you return the
14 original errata sheet to the deposing attorney
15 within thirty (30) days of receipt of the
16 deposition transcript by you.  If you fail to
17 do so, the deposition transcript may be deemed
18 to be accurate and may be used in court.
19
20
21
22
23
24

Page 207

1     C E R T I F I C A T E
2
3     I, Jeanne Christian, a Notary Public, do
4  hereby certify that the foregoing deposition
   of CARMEN RILEY, was taken before me, REMOTELY
5  pursuant to notice, at the time and place
   indicated; that said deponent was by me duly
6  sworn to tell the truth, the whole truth, and
   nothing but the truth; that the testimony of
7  said deponent was correctly recorded in
   machine shorthand by me and thereafter
8  transcribed under my supervision with
   computer-aided transcription; that the
9  deposition is a true record of the testimony
   given by the witness; and that I am neither of
10 counsel nor kin to any party in said action,
   nor interested in the outcome thereof.
11
      WITNESS my hand this 3rd day of March, 2022.
12
13
14
15
   _____
16  Jeanne Christian
17  Notary Public
18
19
20
21
22
23
24

Page 209

1         - - - - -
          E R R A T A
          - - - - -
2
3  PAGE   LINE   CHANGE
4  ___ ___ ___ _____
5  Reason for
6  Change:_____
7  ___ ___ ___ _____
8  Reason for
9  Change:_____
10 ___ ___ ___ _____
11 Reason for
12 Change:_____
13 ___ ___ ___ _____
14 Reason for Change:
15 _____
16 ___ ___ ___ _____
17 Reason for Change:
18 _____
19 ___ ___ ___ _____
20 Reason for Change:
21 _____
22 ___ ___ ___ _____
23 Reason for Change:
24 _____

53 (Pages 206 - 209)

CARMEN RILEY

Page 210

```
1       ACKNOWLEDGMENT OF DEPONENT
2           I, _____, do
3  hereby certify that I have read the foregoing
4  pages __ to ___ and that the same is a correct
5  transcription of the answers given by me to
6  the questions therein propounded, except for
7  the corrections or changes in form or
8  substance, if any, noted in the attached
9  Errata Sheet.
10
11  _____        _____
12  DATE              SIGNATURE
13
14          Subscribed and sworn to before
15  me this_____ day of _____,
16  2022.
17
18          My commission expires:
19
20          _____
21
22          _____
23          Notary Public
24
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

| & | | |
|---|---|---|
| **&** | 2:8 3:3,9 | |

**0**

**000056** 92:3
**000062** 93:22
**00063** 94:2
**00325** 1:4

**1**

**100** 3:4,10
**1012** 207:13
**105** 4:4
**114** 4:5
**11:00** 204:14,14
**12** 14:13 26:14
**121** 4:5
**12th** 25:11
**145** 4:6
**14th** 167:23
**15** 163:24,24
**1650** 2:4
**17011** 3:5,10
**17108** 2:18
**17109** 11:15
**173** 4:4
**176** 4:5
**18** 92:9 203:15
**1801** 1:23
**18th** 1:23 28:18
  96:19 97:1,6,7
  99:24 122:16
  123:9 128:16
  144:4 156:19
  177:10 178:22
  202:17 204:5,11
**19** 102:4
**19103** 1:24 2:5
**192** 4:6
**1930** 101:8
**1931** 11:15 25:21
  30:13 46:11 47:4

47:18,22 48:10,19
49:1,16,21 50:5,20
51:7 52:16,23
53:12,13,22 54:4
55:13 77:9,10
78:17,22,23 79:7
79:19 101:9,10,17
102:4 110:11
117:15,17,22
119:7,22 145:9,11
147:15 148:19,22
149:1 187:9
**19382** 2:10
**196** 4:5
**1:09** 68:15
**1:30** 1:13
**1:38** 68:24 69:10
**1:39** 68:8
**1st** 166:1,7,10

**2**

**20** 33:6
**20,000** 97:21 98:12
  98:14 154:18,20
  156:17 157:7
**200** 2:9 4:6
**2000** 110:12
**2003** 46:12,14,21
  47:1,8 48:2,6,9,11
  48:19 49:2,5,7,8
  49:17 53:4 101:20
  102:6,7 117:16,17
  118:1,10,21 119:4
  145:10,11 147:2,5
  147:10,13,18,21
  148:2,2,12 150:24
**201** 3:4,10
**2014** 13:7
**2019** 92:9 203:15
**2022** 1:8 207:11
  210:16

**203** 4:5
**21** 167:19,20,22
**215** 2:5
**22** 1:8
**225** 2:17
**22nd** 158:8,9,10
  177:14 178:23
  179:5
**23** 13:2 144:18
**232-8135** 124:6
**233-6633** 2:18
**24** 140:19 141:6,9
  143:1,5,9,20
**25** 141:7
**27** 34:2
**27th** 158:13,14
  166:1,7
**2:05** 70:15
**2:09** 69:17 70:15
  70:24
**2:32** 71:6 73:8
**2:44** 65:4
**2:54** 65:4

**3**

**3** 110:12
**30** 166:20 208:15
**318-7106** 2:10
**3600** 2:4
**3:28** 73:14 74:5
**3:44** 74:12,21
**3rd** 207:11

**4**

**40** 108:17,21
  116:13 166:20
**433** 2:9
**484** 2:10
**4:20** 1:4
**4:27** 75:14
**4:38** 75:3

**4:39** 76:16

**5**

**5** 4:4
**53** 12:10,11
**54** 12:10,10,11
**550-1999** 2:5
**5:00** 116:13
**5:17** 76:23 80:18
**5:20** 81:20
**5:35** 167:7
**5:45** 92:9
**5:50** 82:11

**6**

**60's** 183:16
**64** 183:16
**651-3504** 3:11
**651-3709** 3:5
**67** 183:19
**6:21** 206:4

**7**

**717** 2:18 3:5,11
  124:6
**7:01** 83:17

**8**

**8:00** 177:20
**8:30** 123:8,9
  177:21
**8th** 128:16

**9**

**911** 35:10 54:20
  55:10 59:8,20
  60:7 61:21 64:21
  65:18,20 66:9
  67:14 68:17 69:13
  70:10 71:2,17
  73:10 74:7,23
  75:10,16 76:18,23
  79:12 80:21 81:11
  81:22 82:13 83:11

83:13 84:8,17
85:10 94:21
118:10 119:5
151:4 153:10
175:8

**a**

**a.m.** 36:8 39:17
51:23 54:15 92:9
204:15,16
**aaron** 2:13 160:10
160:11 162:3
**aarp** 109:3
**ability** 11:10,11
**able** 30:17 31:1
42:2,6 57:14
109:7 132:20,24
154:23 166:2,4
**absolutely** 67:11
**abuse** 21:6
**access** 24:12
**accommodations**
138:15,17
**account** 32:24
33:1,3,4 131:12
**accurate** 7:4 8:11
30:9 52:14 141:11
141:12 142:6
208:18
**acknowledgment**
210:1
**acted** 159:8
**action** 1:3 122:1
207:10
**active** 168:11
**activist** 159:17
**adams** 2:14
141:20
**add** 100:8,15,17
**added** 99:22
**addiction** 21:5

**additional** 80:19
141:9 157:20
176:24 185:22
**address** 48:19
52:24 118:11,22
119:5 124:22
147:22 187:8
188:3
**addresses** 110:11
117:11,13,19
**addressing** 19:5
**adhd** 137:14
**administration**
183:13,14
**administrator**
24:17,23 31:5
**advised** 26:17
**affect** 11:10,11
192:20
**afraid** 49:14,15
128:23
**african** 190:24
**afternoon** 5:8
114:23 121:21
**age** 183:17,18,20
**agencies** 28:14
**agency** 108:1
**ago** 9:5 54:24 78:2
82:24 130:4
171:20
**agree** 69:18
140:21 144:14
177:16
**ahead** 36:10 47:21
63:24 84:22 85:5
145:13
**aided** 207:8
**ailments** 14:8
**al** 1:3,6
**alcohol** 21:6

**alive** 165:5
**allowed** 121:5,7
179:6,15
**ambulance** 59:4,7
59:13,15,20,22
85:14 203:22
**american** 190:24
**amount** 100:14
107:13 127:4
193:16
**andrew** 2:17
141:16
**andy** 121:22
137:24 176:6
203:23
**angela** 3:12
114:24
**angry** 170:7
**ankles** 152:10,21
**ann** 5:15
**annual** 139:7
**answer** 6:24 7:1,2
7:3,5,21 8:18,22
9:3,8 11:11 12:6
13:24 16:3 19:18
22:1 24:5 30:24
31:2 49:24 77:18
79:20 80:1,14
90:6 112:19
125:10 126:6
136:1 140:23
155:12 190:5
195:21 198:23
**answered** 21:17
52:10 98:7
**answering** 8:9
**answers** 7:23 8:4
21:20 30:2,8
34:21 65:14 99:21
176:16 210:5

**anxiety** 17:13,17
**anybody** 29:22
30:13 31:1 96:2
97:3,9 98:18
113:23 114:4
115:8 121:4 177:1
181:3 182:17
199:13,14
**apartment** 26:8,19
27:7
**apartments** 26:9
26:20
**apologies** 81:6,18
91:13
**apologize** 21:1
24:2 87:16 102:10
104:9 113:10
181:8 197:16
**appearances** 3:1
**apply** 106:10
**appreciate** 5:19
121:12
**appropriate** 208:5
**approved** 30:7
**approximate** 12:1
16:9
**approximately**
1:13 107:20 108:4
134:8 149:17
183:19
**area** 10:12 93:13
93:23 94:4,7
133:15 187:18,21
188:6
**arguing** 20:18
**arm** 92:23 93:3,12
93:22
**armermann**
141:18
**arrest** 113:17
133:17 190:2

**arrested** 28:13,23
  29:2 73:2 84:2
  128:15,17 130:6,9
  130:11 131:10
  134:7 146:21,24
  147:3 149:18
  153:18 155:3,14
  156:21 158:4
  167:18 181:4,6,12
  181:15,17,19,22
  192:14,15 193:14
  196:9 197:1 200:6
**arrington** 187:24
  188:8
**arrival** 85:8
**arrive** 64:3,5,15
  85:6
**arrived** 84:23
**arriving** 73:24
**asbury** 11:15
**asked** 24:1 30:21
  31:8 32:16 55:5
  57:10 59:20,22
  60:2 62:17 63:2
  68:21 75:4 76:24
  79:4 87:5 88:13
  88:14 90:16 98:16
  98:17 100:5,22
  101:5 102:16,18
  109:14 120:1
  129:15 130:17
  139:22 143:4,10
  143:20 145:20
  146:12 147:11
  150:15,18,19
  151:5 153:9 154:3
  160:13 161:9
  167:14 171:21
  173:11 175:8,15
  194:4,15

**asking** 5:10 8:8,18
  20:8 51:3 67:3
  73:1 75:20 81:1
  90:15 115:22
  125:20 135:12
  150:19 161:10
  173:2,12 176:15
  193:17
**asks** 173:13
**assault** 100:13
**assaulted** 95:11
**assets** 24:22 33:14
**assigned** 31:20
  138:24
**assist** 103:12
  138:22
**assistance** 138:20
  139:3
**assistant** 91:8,12
  138:24
**assistants** 139:4
**associated** 131:2
**assume** 12:13
  13:12 37:16 39:5
  53:24 62:14
**assuming** 22:20
  80:4 103:10
**atlantic** 1:22
**attached** 208:12
  210:8
**attempt** 95:23
  127:12,15
**attend** 139:7,11
  158:16
**attention** 59:13
  65:22
**attorney** 8:10
  121:22 129:14
  136:7 139:19,22
  143:15 169:6
  179:10 180:3,5,9

  180:12,15,20
  194:16,23 208:14
**attorney's** 188:23
  189:16 190:15
**attorneys** 5:11 6:2
  16:15,16 140:11
  142:22 175:20
**avenue** 11:15
  25:21 46:11,13
  47:5,10 117:14,16
  117:20 187:9
**average** 186:21
**aware** 27:16 34:17
  53:12 77:1 104:1
  112:23 113:2,16
  131:18 132:3,5,6
  135:4 142:23
  174:24
**awn** 2:19

|   |
| --- |
| **b** |

**b** 1:24 4:7 16:24
  143:22
**back** 28:18 30:3
  36:20 37:3 39:12
  44:13,14,14 45:17
  46:3,3 55:22 57:2
  57:18,23 58:7
  59:21,23,24 60:5
  60:17,19 61:15
  62:14,22 63:1,6
  64:22 65:4 68:15
  75:14 81:19 83:9
  85:12,21,23 88:2,4
  88:5,19,22 89:3,8
  91:12 93:4,17,24
  99:11,24 105:18
  107:8 124:17
  127:13 143:18
  167:6,7,13 174:16
  181:14 202:20

**background** 6:17
  6:18 14:11 35:5
**backtrack** 70:6,7
**bad** 86:21 148:7
**bail** 96:21 97:21
  98:1,10 100:14
  154:17,19 156:7
  156:16 157:7
**ballpark** 33:5
**bank** 32:24
**based** 51:5 150:17
  199:2
**basement** 38:14
**basically** 61:13
  115:22 132:14
  197:4
**basis** 31:23
**bates** 26:14 91:22
  92:2
**bathroom** 7:19
  45:18,21 93:10
**bauer** 141:24
**bear** 91:7
**beaufort** 26:8,20
**bed** 35:13,18,19
  35:24 39:20 42:14
  42:17 147:1,5
  150:24
**bedroom** 44:14
  45:9,17,24 56:3
  59:21,23 60:1,19
  60:21,22 62:2,23
  63:6,21 64:18
  65:22 66:4 67:24
  67:24 68:3 69:22
**bedrooms** 44:13
  46:2,3
**began** 57:12 161:3
**beginning** 1:12
  10:3 101:6 143:16
  146:12 171:19

[beginning - candor]

172:12
**behalf** 115:14
**behave** 150:13
**behavior** 136:19
**belief** 11:3 19:14
19:15
**believe** 5:22 20:10
78:15,18,20,21
90:2 95:10 121:7
125:2 129:14
136:13 138:6
144:1 145:21
146:19 147:9
148:24 149:7
151:1 171:21
177:2 180:2
195:23 201:6,9,14
202:5
**believed** 27:18
28:6 149:3,3
199:8 201:20,21
**believes** 19:22
20:3 171:24 173:5
**believing** 149:11
**belonging** 146:4
**best** 80:5 122:13
122:21 182:7
192:3
**better** 8:15 115:24
**beyond** 102:22
**bill** 31:17 33:9
131:6,9
**bills** 103:24
**biological** 37:18
37:21
**bipolar** 29:9
**bit** 14:10 38:4 64:9
70:7 100:21
102:20 110:17
115:21 117:11
196:14

**biter** 97:19,23
122:18 123:22
126:19 127:1,13
141:21 143:22
144:11,15 156:2,5
156:6 157:20
176:18,21 177:4
178:2,7,18 179:5
**black** 86:1,3
**blame** 95:7
**block** 129:10
**blonde** 191:4
**blood** 10:22 11:1,3
34:17
**blouch** 141:20
**blue** 33:24
**blunt** 104:10
**boat** 205:23
**bondsman** 98:1
**books** 86:14
**bottle** 88:9
**bottles** 88:10
**boyfriend** 169:13
**brain** 166:18
**break** 7:18,22
19:20 47:2 49:19
53:13,21 54:4,8
64:8,12,20,22 65:7
65:15 78:22 79:1
79:22 91:15 99:7
99:9,15,20 119:11
119:23 130:12
166:23 167:3,6,9
**breakdown** 78:14
**breaking** 78:17,23
79:7,18
**brian** 1:5 121:23
139:24 140:2,4,9
140:13,16 143:4
**brief** 78:1 174:1

**briefly** 11:16
**bringing** 68:14
**broke** 130:3,3,13
131:16 135:7
186:10
**broken** 129:2,11
**brother** 11:21
29:22 47:23 52:22
53:11,16 54:1
101:13,19 187:3
187:10
**brother's** 187:4
**brought** 38:15
**building** 47:12,13
47:14 48:1,6
**bunch** 117:11
**burning** 32:7,8
**burnt** 186:20
**busted** 164:23
**buy** 132:4

**c**

**c** 2:1 107:4 207:1,1
**cable** 31:16
**call** 5:18 15:1
22:17 23:18 26:11
26:24 35:10 52:21
54:3,20 59:4,8,9
59:13,15,17 60:6
60:12 61:15,21
62:2 64:21 65:18
65:20,24 66:10,15
67:14,20 68:17
69:13 70:10 71:2
71:18 73:10 74:7
74:23 75:16 76:18
79:6,21 81:11,22
82:13 83:11,13
84:6,8,12,17 85:10
95:23 96:1,12,13
96:16 97:14,15,17
98:9 111:17,20,22

111:24 112:2,15
119:5 122:15,17
123:7,13,21 124:1
124:2,19,24 125:3
125:3,6,21 126:2,9
126:16 127:12,15
127:24 136:21
153:17,21 154:5
154:12 155:5,16
156:1,3,9,10,23
157:1,10,16
163:17,17 175:8
176:17,21 177:7,7
177:10,13,19
178:2,7,15 179:3,6
179:16 182:19
194:7 197:6,8
204:18
**called** 22:2 26:8,15
26:17,19 27:1
30:5 55:10 59:6
59:20 66:3,5,7
94:22 96:20 99:24
112:12 113:12
118:10 120:9
124:3,4 136:17
150:16 154:4,22
154:22 156:5,12
156:14 157:24
177:24 179:5
182:16 193:19
194:3,5 197:13
202:13,14,17,19
202:21 204:19
**calling** 28:2 123:1
125:1 154:7,8,9,16
154:19 156:6
**cameron** 141:23
**camp** 3:5,10
**candor** 105:19

**capable** 6:13
**captain** 141:16,16
  141:17
**car** 32:21 135:7
  186:10
**card** 33:9
**care** 10:19 34:24
**carefully** 68:13
  208:4
**carmelite** 3:9 4:5
  114:22,24 122:2
  139:22 152:3
  153:3 155:9
  157:13 176:6
  194:13 195:11,17
  196:6,16,18 198:8
  199:1,23 200:8,24
  201:7,11 205:22
**carmen** 1:3,11 4:3
  5:1,15,17,18,19
  6:10 10:11 36:15
  40:10 41:23 65:11
  66:22 67:18 68:11
  69:17 73:14 75:7
  76:22 82:2,5
  91:21 92:5,13
  97:20 99:19 138:9
  145:8 155:12
  156:15 157:6
  159:24 165:18
  166:23 167:13
  173:18 174:1
  207:4
**carry** 137:12
**case** 93:5 106:6
  116:1 155:22
  169:7 197:13
**cash** 109:10
**cats** 48:22
**caucasian** 87:3
  190:23 191:1

**cause** 95:3 193:2
**caused** 35:10
  38:20 56:14 94:21
  152:21
**causing** 20:15
**cellphone** 59:5
**cellular** 124:2
  129:22 177:22
  204:20
**center** 3:4,10
**certain** 66:21
  116:18
**certainly** 14:19
**certify** 207:4
  210:3
**chair** 41:10
**challenging** 40:14
**chance** 135:8
**change** 7:9 209:3,6
  209:9,12,14,17,20
  209:23
**changed** 9:6,9
  184:9
**changes** 208:11
  210:7
**chardo** 170:3
  190:18,21
**charged** 28:4
  100:13 203:10
**charges** 100:2
  180:14,19 194:20
  195:1 196:1
  197:21 198:1,5,10
  198:15,18 199:17
  200:2,3,22 202:2,5
  203:12 204:10
**check** 11:16 96:7
  99:7 105:16
**checking** 32:24
**chest** 40:20 94:4,7

**chester** 2:10
**child** 15:3 182:6
**children** 14:21
  25:14
**chop** 32:1 186:22
**chopping** 110:23
  186:17
**chore** 31:22
**chores** 31:21
  32:12
**christian** 1:14
  207:3,15
**christina** 16:22
**christopher** 2:15
**circumstance**
  14:18
**circumstances**
  122:6
**civil** 1:3
**claim** 10:16
**clarification**
  203:24
**clarified** 9:6 99:23
**clarify** 65:13
**clark** 1:5 121:23
  139:24 140:2,4,9
  140:13,16 141:16
  143:4
**class** 138:18,19
**classroom** 138:20
  139:3
**clear** 24:16 36:11
  42:18 50:17 52:10
  97:8 103:19 104:9
  144:8 204:3
**clearance** 163:16
  163:22,23
**clearly** 8:14
**client** 14:20
**close** 93:11,20
  99:8 100:19

  133:14 188:8
**closer** 41:18,19
  42:22 172:9
**closest** 133:18,21
**clothes** 103:17,18
  111:8
**cocaine** 27:13,15
  27:18
**coleman** 3:3,8
**collecting** 14:4
  101:1
**combination**
  105:1
**come** 50:20 57:3
  60:5,17 61:15
  64:22 65:4 85:21
  87:6 96:14 99:10
  100:3 105:18
  134:4,14 146:6,8
  159:20 160:14
  164:10 167:6,7
  169:11 177:19
  191:13 193:17
  199:12 201:12
  202:20
**comes** 36:20 63:6
  87:7
**coming** 9:21 37:10
  49:15 77:9 119:10
  146:15 147:6,15
  147:20 148:4,9,16
  148:16 149:1,12
  149:17 150:3
  169:16
**comment** 83:20
**commission**
  210:18
**committed** 71:17
  71:20,23
**commotion** 46:9

communicate
121:5,8
communicating
121:2 200:5
communication
97:2,5,9 142:16,19
198:20
community 86:16
company 130:22
complained
170:21,23 171:1
complaint 140:17
141:4 142:9 143:7
143:11,13 144:3
complete 98:8
completed 14:12
25:10
completely 104:20
complex 26:8,19
27:7
complicated 12:7
computer 172:10
207:8
concern 29:14
51:12 52:22 53:12
54:16 55:8,12,17
79:7 82:22 112:7
127:23 129:11
148:11
concerned 50:19
50:21 51:18 52:13
53:15,20,24 80:5
82:21 83:5 112:4
125:16 128:4
147:14 148:8,10
148:21 149:23
154:1 196:20
concerns 29:19
72:14 77:16
127:20 129:6
132:19,21 133:11

144:23 147:6
185:12 196:11
concluded 205:13
206:4
condition 162:18
165:9 185:13,15
conditions 77:1
174:17,20
condolences 14:17
14:19 105:20
121:14 122:6
confirmation
200:22
confuse 10:14
confused 46:19
111:16 117:8
197:19 203:7
connection 169:6
173:5
connell 2:8
conscious 8:13
73:20,22 74:2
consider 146:5
constant 173:3
contact 96:3,6
144:22 180:24
contacted 143:1
contacts 176:24
continue 36:11
69:10 74:5 80:17
80:18 82:11 83:11
continued 3:1
159:14
continues 92:3
contracted 22:21
contribute 31:17
contribution 31:9
conversation 7:24
39:15 87:18 88:4
94:24 98:4 120:14
133:2 144:15

146:13 160:20
162:22 178:18
188:22 189:10,15
203:13,17,19,24
204:9,12,24
conversations
98:16,17 139:24
172:13,22
convicted 21:8
cooking 111:9,10
copies 24:12
copy 205:15
corporal 2:14
123:3
corporate 3:4,10
correct 7:4 13:13
17:19,20 24:17,18
28:21 44:21 46:15
47:5,11 49:3
50:21,22 52:5
54:18,19 55:8
58:2 59:10,11
60:15,16 61:18,23
63:7 64:3 65:13
65:24 69:2,4,8,20
73:18 75:6,22,23
77:10,13,16 78:3
78:18 79:8,9,15,23
80:8,12 81:8,9
82:19 87:4,8
89:24 91:5 92:18
92:19 97:11
101:20,21 103:5,8
103:13 106:18
110:8,22 112:13
112:14,17,24
113:1 117:17,18
117:24 118:2
121:1 125:18,23
125:24 126:14,15
128:6,12 129:18

131:20,21 132:7,8
134:9,10 135:1,2
147:3,4 148:22,23
149:5,20 156:7,8
156:22 157:21
169:19,20 174:5
174:22,23 175:1,5
175:9,10,12,16,17
177:11,14,15,18
178:3,4,23,24
179:3,4,24 180:22
180:23 181:4,5
184:10,11 185:10
185:11,24 186:1,3
186:4 188:2 189:1
189:2 192:5 197:8
197:9,14,15 198:2
198:21,24 199:6
201:23 203:10,17
204:24 205:1,4,5
210:4
corrected 9:6 81:3
99:22
correctional
115:15 121:24
140:20 141:3,10
143:6
corrections 208:4
208:6 210:7
correctly 17:2
68:23 70:17 71:7
71:10,11 75:10
77:4 83:21 106:16
207:7
correspondence
142:18
couch 35:12,22,23
35:24 36:4
counsel 6:14 8:8
66:23 175:18,19
207:10

**counseling** 15:6,8
17:14 18:8,14
19:6 20:22 29:5
34:7,9 104:17
105:4
**counselor** 15:21
15:22 17:18,21
18:2,23 19:21
20:10,19 104:18
104:19,23 105:9
172:13,16,19
173:4 175:23
**counselors** 17:22
**county** 2:19 114:1
115:1 121:3,23
122:17 123:1,12
127:12,16,17
140:5,20 141:3,10
142:8 144:22
177:1,2 181:17
182:1,4,8,14,17,20
192:18 193:21
194:6,8
**couple** 36:11 52:1
52:2,3 53:5 54:24
62:20 78:2,12
82:24 105:2,5
128:11,13 174:1
183:1 188:21
203:6
**course** 14:24
23:15 175:7
**court** 1:1 8:2
41:24 97:24
155:22 179:24
180:1,3,10 195:14
205:17 208:18
**courthouse** 162:20
169:23,24
**courtroom** 7:7
160:4,7,22,22

161:3
**cover** 92:17
**covered** 65:12
**credit** 33:9
**creek** 18:5,9,15
20:19
**crime** 21:8
**cross** 33:24
**currently** 10:19
11:14,19 13:3,21
95:5 101:6,23
**curriculum**
106:24
**cut** 8:22 31:21
32:1 87:16 196:14
**cutting** 110:7
**cv** 1:4

**d**

**d** 4:1 124:16
**dad** 37:9,15 39:24
42:24,24 43:3
63:7,11 71:9
72:22 100:1
102:24 103:4,16
164:4 174:19
175:12 180:13
198:15 203:11
**dad's** 175:3
**damage** 166:18
**damages** 6:19
102:16
**dan** 114:23
**danger** 82:18,21
148:22
**danner** 141:24
**darcy** 2:12
**date** 17:4 22:7,11
35:7 94:14 146:21
157:23,24 158:11
167:17 168:20
178:8 179:24

180:1,3 196:9
197:1,2 208:9
210:12
**dated** 169:5
191:23
**dating** 191:21
**daughter** 169:13
**dauphin** 2:19
114:1 115:1 121:3
121:23 122:16
123:1,12 127:12
127:16,17 140:5
140:20 141:3,10
142:8 144:22
177:1,2 181:17
182:1,3,8,14,17,20
192:18 193:21
194:5,8
**dave** 9:19
**david** 2:9 5:9,20
41:22 72:8 82:8
92:10
**day** 25:23 51:24
55:17 77:8 79:17
95:1 110:3 116:16
116:19,24 117:1
123:16 130:6,8
146:23 147:5
156:5,20 158:3,19
165:21 195:8,15
202:18,19 207:11
210:15
**days** 52:1,2,3
54:24 78:2,12
82:24 128:11,13
128:18 129:16
130:18 146:20
149:18,21 158:6
165:23 167:24
177:8,16 178:22
202:15 208:15

**dealer** 28:2 111:18
111:19 112:8
113:13,17 128:1
**dealing** 28:19
112:16
**death** 15:6 17:6,24
17:24 18:11,12
19:11,12,15,24
20:11 21:13,21
25:17,19 27:14
30:22 32:22 33:2
33:9,14 34:13
35:1 95:8 97:10
104:17 114:3
170:5 171:2,14
172:1,3,20 173:6,8
174:3 184:9 186:9
186:14
**debt** 33:12
**debts** 33:8,11
103:20
**decide** 147:13,17
148:1
**decided** 49:16
147:10 150:23
**decision** 148:12
194:23
**decoy** 74:18 82:2
**deemed** 208:17
**defendant** 3:6,12
**defendants** 1:6
2:11,20
**defender's** 180:24
**defer** 114:18 176:7
**definition** 138:1,6
**delta** 141:24
**demetrius** 2:13
**dennehey** 3:3,8
**department** 13:9
13:10 113:24

depends 186:19
deponent 207:5,7
  210:1
deposed 6:11
deposing 208:14
deposition 1:10
  6:14,19 7:17 9:2
  9:11 15:1 143:16
  171:19 172:12
  205:14 206:3
  207:4,9 208:3,12
  208:16,17
derek 142:1
describe 42:2,3,7
  85:24 168:5
described 41:3
  87:5 174:2
description 4:8
desire 171:18
desk 163:14
details 128:22
detained 182:8
detention 136:5,14
detentions 135:19
  136:13
diabetes 10:22
diagnosed 29:8
  183:3
diagnosis 137:12
died 170:6
different 9:18
  10:12 22:22 47:12
  47:13,14 48:2,6
  76:4 80:3 90:24
  120:20 151:16
  152:2,2 170:5
differently 171:13
difficult 121:13
  122:10
difficulties 175:4

difficulty 137:20
dinner 193:1
direct 26:4
directly 60:23
  204:18,19
disability 14:1,4,6
  101:1 137:10,13
  183:9,11,21,23
  184:3
disagree 120:23
disciplinary
  135:14,22
discuss 132:9
  198:12
discussed 178:6
  198:9
discussion 72:14
  84:1 131:14
  146:17
discussions 132:12
  172:18
dispatcher 151:6
  151:17 153:11
distance 45:12
  57:11
distress 20:22
district 1:1,1
  160:8,9 161:11
  169:6 178:10
  188:23 189:16
  190:15
dlcarmelite 3:11
dmacmain 2:11
docket 1:3
doctor 16:18,21
  17:1,3,9,9,15
  34:20,22,23
  166:11,15
doctor's 10:18,19
doctors 164:14
  166:9,10

documents 32:17
doing 7:8 43:22
  96:9,17 98:10
  100:5,7 104:21
  114:9 127:2
  186:15 188:19
  208:8
domestic 102:11
  102:13
don 114:17 196:13
donald 3:9
donovan 142:4
door 36:22 44:16
  56:3 57:3 85:13
  85:14,15,15,16,19
  85:19 160:9,11,16
  161:5 162:5
doorway 42:15
doris 124:16
double 105:16
  110:14
doyle 142:1
drawstring 57:3
drive 3:4,10 186:5
driven 95:14
driver's 134:21,23
  135:4,6 186:3
driving 101:4
drop 188:18
dropped 188:14
drug 28:19 111:18
  112:5,8 113:12,17
  128:1 132:16,17
  132:20 133:9,12
drugs 21:6 28:3,7
  28:9 111:19
  112:16,22 113:2
dry 188:14,15
due 135:6
duly 5:2 207:5

duplicate 139:20
dyslexia 137:14

e

e 2:1,1 4:1,7 15:18
  15:18 124:16
  142:2,3,3 143:22
  207:1,1 209:1
earlier 51:24 77:7
  77:14 78:8 101:17
  102:16 104:22
  110:6 125:14
  146:19 152:14
  186:2 194:5,18
early 69:18 162:23
ease 196:10
easier 21:19 72:10
easiest 67:5
easy 165:19
eat 192:23,24
  193:1
eating 192:20
education 25:9
  106:20 116:8
  135:13 138:7
educational 14:11
eight 108:13
either 6:24 7:9
  15:1 17:23 20:21
  46:5 61:9 86:24
  149:23 175:20
elbow 93:22
electric 31:17
electronic 142:18
  205:15
elwood 22:4,9,10
  22:20 23:2,8,23
  24:6
emergency 120:10
emotional 20:21
  72:5 104:11

[employed - first]                                                          Page 9

employed  13:3,6
  13:20,23 21:13,23
  100:24 107:14,17
employer  183:12
employers  22:21
employment
  100:23 109:5
  116:7,12
ended  44:9,12,13
  57:12 62:11 83:10
  163:22
ends  61:8
engaged  152:16
engaging  185:13
english  7:12
entire  74:2
entirely  48:6
errands  170:16
  185:24 186:5,8,14
  186:16
errata  208:6,8,11
  208:14 210:9
esquire  2:3,9,17
  3:4,9
estate  24:17,21,23
  25:3 103:21
estimate  22:15
  57:11,15,21
  107:12
et  1:3,5
evening  177:20
eventually  164:5
everybody  8:7
  91:9,19 105:15
  119:15 168:8
exact  12:2 17:4,4
  22:11 157:23
exactly  12:22
examination  4:2
  5:5 105:23 114:20
  121:18 145:4

173:22 176:11
  192:9 196:4
  200:16 203:3
examined  5:2
exception  7:20
  122:1
excused  206:1
exhibits  4:10
exist  52:13
existence  174:21
expect  132:16
expectation  199:4
expected  125:21
expecting  195:15
expenses  104:3
experiences  86:21
expires  210:18
explain  9:8 71:12
  149:16 152:1,7
explained  83:3
express  14:17
  132:21
expressed  149:22
extent  86:19 98:3

f

f  15:18 142:3,3,3
  207:1
face  41:15,15,16
  41:16 94:3
facility  84:19,20
fact  7:8 135:7
factually  30:8
fail  208:16
fair  57:14 76:15
  107:16 112:5,10
  116:14,15 119:12
  119:13 136:15,16
  144:16,17,19,20
  147:24 176:16
fall  56:14 57:1
  58:13,14 152:8,21

fallen  151:12,13
falling  93:24
  151:16 152:12,20
falls  57:19 58:4,5
familiar  26:9
family  16:18,21
  17:3,9 34:20 96:2
  98:24 104:13
  140:12 142:23
  144:21 187:15,18
  187:20 188:5,11
  188:13
far  65:12 99:21
  116:4 145:10
  150:2 171:17
  173:16 188:13
fast  44:11
father  37:4,7,7,19
  37:21 39:13,20,21
  39:23 62:23 83:24
  159:13 180:18
  195:1 200:3
father's  170:22
  174:11
fault  87:11
february  1:8
feel  82:18 143:18
  151:15 165:16
  171:12,12 193:2,4
  193:11
feeling  165:15
feet  45:6 56:11,12
  56:14 152:10,12
fell  56:7,8,10,11
  56:13,21 57:4
  58:8,20 69:6 93:4
  93:16,17 94:1
  152:9,11,17
felt  133:6 165:7
  193:8,9,13,16
  196:21

field  101:3
fields  20:23
fighting  174:19
figure  39:4 45:11
  56:24 70:3 123:17
figured  154:18
  180:14
filed  24:9
fill  63:24 110:3
  159:19
filling  159:21
final  8:5,24
financial  24:20
  25:2 30:11 31:8
  32:17,19 33:1
  102:17,19,22
  103:3,15 104:8,11
  104:12,13
financially  31:13
find  21:19
fine  9:23 45:15
  67:8 190:4 193:8
  201:15 205:16
finish  64:10
  101:14 155:11
  167:6
finished  6:1
fireplace  32:6
firewood  32:2
  170:11 186:17
first  5:2,13 7:22
  10:17 15:13,17
  21:20 22:9 27:21
  27:22,23 35:9
  59:9 66:13,14
  75:9 78:11,15
  92:16 96:13 98:22
  106:3 119:14,16
  119:19 120:9
  137:1,5 149:15
  154:8 156:14,15

159:10,11 163:12
164:4 167:16
177:10 179:3
190:11 198:18
**fisk** 15:10,18
17:18,21 18:18
19:21 20:20
172:16,19 173:4
**fisk's** 19:14
**fitzpatrick** 2:3
**five** 17:10 34:24
57:19 64:8,23
65:1 69:1 191:6
**flipping** 113:19
**floor** 1:23 63:22
63:23 64:19 65:21
88:20,23,23
**focus** 150:23
**folks** 106:5 109:13
113:24
**follow** 98:9 102:19
106:7 135:14
196:7 200:19
**followed** 203:21
**following** 47:3
**follows** 5:3 78:10
**food** 103:10,13
**foregoing** 207:4
210:3
**forget** 10:8 26:3
60:8
**forgot** 176:22
177:3
**form** 10:5 19:18
49:24 54:6 77:18
80:1,14 90:6
112:19 125:10
126:6 136:1
140:23 149:9
150:8 151:20
152:24 153:2,4

155:8 157:12
185:1 189:5 193:6
194:12 195:10,18
195:19 198:7,23
199:21 201:1,3,8
210:7
**formal** 106:20
**forms** 175:21
**forth** 85:9
**four** 11:23 177:8
177:16 178:22
**frame** 36:22 44:16
56:2 57:3
**fran** 170:3
**franklin** 11:15
25:21 46:11,12
47:5,10 117:12,13
117:13,14,16,20
187:9
**free** 109:1,4
**frequently** 149:13
**friend** 27:10 118:5
118:7,12,14,16
**friends** 133:14,16
133:18,21,23
134:12,14,18
140:12 142:24
168:3,13,18
188:10,13
**front** 93:18 113:11
160:7,9,16 161:11
163:14
**full** 5:14 21:3 34:3
108:11 205:15
**funeral** 104:3,6
**further** 97:2
128:22 176:4
200:12,14

**g**

**g** 16:24 188:1
**gain** 170:7
**gals** 65:5
**game** 75:14
**gap** 64:1
**garage** 38:13
**garbled** 117:10
**gathered** 24:20,23
25:1,2
**generally** 108:19
**genesis** 120:17
**gentleman** 161:8
161:14
**getting** 13:18 18:8
72:16 108:17
111:16 127:6
163:22 166:16,17
179:19 194:15,23
**girl** 169:4
**girlfriend** 25:17
168:21 169:14
188:24 192:4
**girlfriend's** 169:1
**give** 9:1 22:14
57:10,15,20 66:17
67:9 68:5 82:9
107:12 113:13
116:19 122:24
123:18 126:21
133:7,20 175:24
**given** 9:3 99:21
106:10 158:12
163:24 164:2
207:9 210:5
**giving** 110:11
111:19 122:7
132:1,3
**glenn** 2:13 141:23
**go** 9:7,18 10:12
23:17,19 36:10

44:20 47:21 59:4
59:6,17,17,18
60:12 62:22 65:3
67:1 92:2 104:18
104:19 106:3
111:2,3,4,6 114:18
122:11 136:17
143:18 145:13
146:6,8 151:1
159:8,23 160:15
160:15 163:12,13
163:15,18,23
164:1,2,5,9,12,12
165:23 166:13,14
167:13 179:18
180:9 186:5
188:15 192:1
202:11
**goes** 37:8 58:12
60:5 61:7 63:4,6
85:14,16 116:1,4
159:11,16 160:2,3
160:7
**goggin** 3:3,9
**going** 5:9,10,24
9:14 21:10,18
23:15 25:6 26:13
28:18 35:6 38:6
40:3 42:6,23 43:3
43:14 44:9,13,14
44:23 45:13,16,19
50:20 54:8 55:3
55:22 57:23 61:8
63:24 64:6,8,20,21
65:11,17,18 66:9
66:10,17,19,20
67:18 68:11,13
69:10 70:8,23
73:2,3,7 74:5,12
74:21 75:14 76:15
80:17,18 81:19

[going - hearing]

82:11 83:5,9,10
84:4 85:10 89:21
91:21 92:5 96:17
96:18,21,24 98:11
98:13,14 99:7
100:1,20 102:9
103:2 104:8,10
105:16 106:6,15
108:24 112:1
116:1 119:11
124:23 125:3
127:7,22 128:8,23
139:19,20 141:13
141:14 147:15
148:24 159:8,19
161:24 162:14
166:24 168:9
175:18,21,24
177:5 180:14,18
184:6 193:5
194:19 195:1,5,8
195:24 197:6,21
198:1,4,10,19
199:4,8,16 200:3
200:21,23 201:12
201:13 202:5
203:10,11 204:10
205:22
**good**  5:8 10:7 45:6
45:14 65:17 99:6
99:13 114:23
121:21 180:8
200:11
**gotten**  80:8 104:16
**grabbed**  57:16
58:22
**grade**  14:12 25:10
107:6 137:1,5
191:24
**graduate**  25:12
107:6

**graduated**  106:17
107:21 108:2
134:9 137:6 168:8
168:17,18,23
**graduating**  116:6
**grass**  31:21 32:1
110:7,20 145:21
170:12
**great**  10:1 56:12
**greg**  141:18
**grew**  12:13
**grieb**  141:19
**grieving**  18:16,18
18:21
**groceries**  30:15,17
31:10,11
**ground**  57:19 58:4
58:5,12,23 61:3,9
62:3 174:20
**guess**  11:2,23 12:9
19:1 29:21 34:2
37:2 40:18 66:22
72:23 76:6 93:24
95:19 107:19
109:14 120:17
138:21 147:24
183:5 205:12,15
**guessing**  75:14
**guy**  81:5
**guys**  43:22 65:5
82:18 86:23

**h**

**h**  2:3 4:7 16:24,24
142:3
**haines**  2:15
**hair**  191:4
**halfway**  8:17,21
**hall**  66:2
**hallucinating**  51:9
51:14,15

**hallway**  44:10,20
44:24 45:4,17,19
46:5 56:1,20 57:2
57:13,18 61:7
62:14 63:5 68:4
69:23 93:9 160:24
174:19
**hammer**  153:12
**hand**  6:8 42:21
44:24 60:3,14
66:18 160:3
165:17 207:11
**handcuffed**  87:7
87:12
**handful**  63:3
**handle**  40:21
43:18 45:1,20
**hands**  40:8,15,16
40:20 43:8,11,17
45:3 58:19 85:21
85:22
**hang**  92:10 97:13
168:13,18 178:19
178:19
**hanging**  157:7
**hanna**  107:10
**happen**  90:14 93:8
**happened**  23:13
43:6,10 44:2,8
46:14,22 55:16
56:5 59:2,16
63:14 87:23 89:11
89:19 91:23 93:14
94:18,21 95:1
102:2 113:14
118:10 128:12
130:1 152:7
154:12 156:13
158:21 160:19
163:9 164:11,18
166:8 201:20

**happening**  48:9
50:24 51:10 76:5
86:15
**happens**  58:4 62:4
63:9
**happily**  196:17
**hard**  107:5 197:17
**harm's**  53:16
149:24
**harrisburg**  2:18
14:14 25:21
161:19 163:8
**hart**  27:5
**head**  8:2 40:3 89:3
89:8 160:14
**heads**  176:1
**health**  11:6 17:13
20:23 29:6,9,13,15
29:19,24 33:16,17
34:7,9,12 51:19
52:5 54:17 55:19
71:24 72:5,17
77:24 79:14 80:11
80:23 84:19 96:8
144:23 150:17
151:2
**healthcare**  34:3
**hear**  6:6,6,7 9:21
9:23 39:3 66:16
66:18 68:22 70:17
71:10 75:9,20
83:21 91:24 116:3
193:24 197:17
**heard**  27:22,23
54:11 71:7,11
89:7 96:15 117:11
120:19 122:2
149:15 150:12
162:17
**hearing**  39:6
75:24 100:3 158:1

158:12,17,22,24
159:5 162:21
178:3 179:13,21
180:16,21 195:7
196:10 197:2
199:12
**heart** 14:7,8
166:13 170:15
183:24 184:3
185:13,15
**heat** 32:9
**heater** 93:1,3
**heightened** 199:3
**held** 107:8
**hello** 97:19
**help** 22:21 30:14
30:17 31:10,13
32:4,4 47:16
51:20 63:11 71:8
72:4,21 98:20
109:15 110:7,20
110:21 174:14
186:24 187:15
188:11 196:12
197:2
**helped** 116:9
**helpers** 139:4
**helping** 32:13
103:12 117:2
170:12
**helpless** 193:4,11
193:16 196:21,21
**helps** 8:15 187:2,3
**heroin** 27:13,19
**hershey** 15:24
16:1,2
**hey** 22:17 39:10
54:2
**high** 10:22 11:3
25:13 34:17 40:21
106:18 116:6

135:23 137:6
139:16 188:24
**highest** 14:12
25:10
**highmark** 34:1,4
**hill** 3:5,10
**hipaa** 175:21
**hispanic** 190:23
**hisself** 150:2,2
**history** 31:3
**hit** 40:4 42:23 43:3
153:11,14 164:24
**hoffman** 142:2
**hold** 105:15
**holding** 36:24
40:21 58:11
**holy** 92:8
**home** 32:6 100:6
119:6 169:17
202:20,21
**homes** 110:14
129:10
**hospital** 71:21
84:14 85:3 92:8
92:20 94:18
150:17 151:2
161:19 162:11,14
163:7,8,10,11
164:7 202:11,16
202:22 203:22
**hour** 9:5 64:9
163:1,2
**hours** 108:13,17
108:21 116:13
**house** 12:13,15,16
28:22 31:9,13,24
32:2,10,13 46:4,16
49:10,14 50:3,15
52:8 54:9 55:3
78:6 83:1 103:4
110:4,10 111:9

116:9,22 117:3,22
118:1 119:10,22
125:8,17,22
127:21,23 128:5,8
128:23 129:7
134:14 159:20
187:11 191:13
197:5,11,13
**housed** 127:17
181:24
**household** 103:13
**housekeeping** 10:8
**houses** 129:12,13
**hum** 23:24 35:17
60:13
**hung** 97:22 98:5
127:3,3,5,8,9,11
127:13 134:19
156:17 157:3,4,5
178:20
**hurt** 59:14
**husband** 12:19
42:21,22 55:24
64:16 83:6

**i**

**icu** 161:18 164:1
**idea** 115:17
123:18 126:22
128:4 131:8 180:9
191:17
**iep** 136:21,22,23
136:24 137:2,5,9
137:22 138:1,5,16
139:7,11
**iii** 2:3
**illegal** 133:12
**illness** 79:2,13,22
80:6
**impact** 104:13
172:3 194:22

**imperative** 208:13
**important** 52:11
**importantly** 6:7
106:11
**inaccurate** 9:5
**incarcerated** 99:3
182:20
**inches** 191:10
**incident** 6:18 9:17
11:17 26:16 28:12
28:18,22 35:7
46:14,22 47:8,17
47:19,24 54:15,21
79:5 94:14,18,21
95:3 118:9 128:12
130:15,19
**included** 34:7
112:23 143:21
**including** 205:4
**income** 109:7
**incorrect** 43:16
157:9
**independent** 138:7
**indicate** 27:17
28:6,9 84:12,16
85:1 185:23
**indicated** 20:3
26:7 89:4 122:17
125:14 191:12
207:5
**indicates** 22:3
**indicating** 40:6,7
40:19,20 41:13,14
43:13,14 44:12,16
58:17 89:1,2
160:15 164:9
**indication** 6:9
122:24 133:7
**individual** 121:24
122:18 140:19
141:10 142:8,13

143:6,21
**individuals** 142:7
143:1
**infant** 183:5,6
**infirm** 174:3
175:11
**infirmities** 175:3
**information** 6:21
10:15 11:11 24:19
24:20 26:5 31:6
35:5 61:23 129:8
162:2 178:2,5,12
182:22 199:2
205:3
**ingersoll** 141:22
**initial** 204:8
**initially** 61:8
136:12
**injuries** 93:12
94:8
**injury** 93:23
**ins** 49:19
**inside** 88:2 160:21
**institutionalized**
72:16
**instruction** 8:24
**instructions** 208:1
**insurance** 33:16
33:17 103:7
**interaction** 86:10
**interested** 67:3
114:8 207:10
**interests** 109:18
109:19
**interject** 41:23
**interrogatories**
30:5
**interrogatory**
22:2
**interrupted** 87:10

**interview** 89:18
**interviewed** 89:9
**introduced** 169:11
**inventory** 23:4
**investigated** 28:4
**investigation**
142:21
**involved** 18:20
88:18
**involving** 11:4
**issues** 11:6 18:19
19:2,3,5,10 20:9
29:9,15 34:16
72:5

**j**

**j** 2:9 15:18 16:24
**jail** 73:3 154:11
**jason** 141:20
**jeanne** 1:13 6:7
8:6,15 15:10,10,12
15:12,20,23 16:4,6
16:11 18:18
205:14 207:3,15
**job** 8:15 22:18
23:2,13
**jobs** 24:6 101:2
107:24 108:2,11
132:15 133:1
**john** 3:4 106:4
**johnsbaugh** 16:22
17:1,9,15,16
**join** 151:22 153:5
155:9 157:13
195:11
**joint** 198:11
**joseph** 142:1
**jrninosky** 3:6
**judge** 96:22
100:10,11
**july** 166:1,7,10

**jump** 8:18 55:22
63:24 85:5 100:20
**jumped** 35:13
36:12 37:7 39:20
**jumping** 84:22
**june** 28:18 92:9
96:19 97:1,6,7
99:24 122:16
123:9 128:16,16
144:4 156:19
158:9,10,13,14
166:7 167:23
177:10,14 178:22
178:23 179:5
203:15 204:5,11
**justice** 160:8,10
161:11 178:10

**k**

**k** 15:18
**keep** 33:6 67:19
69:10 70:23 73:7
74:21 76:15
143:18 144:11
**keith** 97:19,23
122:18 141:21
142:2 143:22
144:11,15 156:1,5
156:6 157:19
177:4
**kemrer** 26:15
89:18,22
**kept** 175:11
**kids** 134:4 138:21
**kin** 207:10
**kind** 6:8 10:18
14:1 15:11,19
17:12,18 18:18
19:4,4 20:23 21:5
23:1,5,22 29:4,5,8
29:14,19,23 30:12
32:19 34:7,14,16

34:23 38:6 41:4
41:14 42:22 43:16
44:1 45:1 46:8
51:1,18 52:4 55:6
55:18 56:2 61:21
65:24 71:24 72:4
72:16 76:24 77:14
77:15,24 78:1,13
79:1,1,21 80:6,11
83:4 84:18 86:17
86:19 87:15 89:4
93:13 94:6 100:20
101:2,11,18 102:1
102:9 115:23
116:2 117:9
143:18 144:9
163:16 193:6
**kitchen** 35:15
36:13,22 37:3,8,9
37:24 38:1,5,11,16
38:17 39:12,21,22
41:8,9 42:13,18
45:8 56:20 59:5,6
59:18 60:6 61:7
62:15 63:5,16,18
64:19 66:2 69:23
88:10 93:8
**kneecap** 93:13
**knees** 93:19
**knew** 86:17 134:3
134:5 154:12
170:23,24 175:3
179:24 180:16,21
193:17,19 194:3,6
198:13 201:19
**knock** 85:12
**know** 7:1,13 8:17
12:5,17,22 13:24
14:3,7,8 15:11,19
16:3 17:4 20:17
20:17 21:17 22:5

| | | | |
|---|---|---|---|
| 22:9,11,12,13,16 | 142:23,24 143:5 | laundromat 111:3 | leinhauser 2:8 |
| 22:18 23:7,10,13 | 143:15 148:1 | 111:4,7 | leonard 187:5 |
| 23:14,17 24:1,5,5 | 150:4 152:11 | laundry 110:24 | level 40:20 107:6 |
| 24:8,9 26:21 | 154:7,21,22 155:1 | 111:1 | lewis 141:21 |
| 27:12 28:13 29:21 | 158:6 159:3,15,16 | lavery 2:16 | liberty 2:4 |
| 30:2,19 31:1 | 160:6,9 161:4,15 | laverylaw.com | license 134:21,23 |
| 33:23 34:6,18 | 162:4,7 163:13 | 2:19 | 135:4,6 186:3 |
| 36:22 37:10 39:2 | 164:9,13 165:5,18 | law 2:16 | lieutenant 141:17 |
| 40:8,12 41:10,11 | 166:22 168:8 | lawsuit 6:19 | 141:18 |
| 44:3 45:14 48:3 | 169:12,15 170:2 | 115:14 | life 19:9 47:5 |
| 49:22 50:1,16 | 171:8,10,20 | lawyer 6:15,15 | 116:17,20 167:1 |
| 51:15 56:19 57:4 | 172:23,24 173:8 | 7:11 | liked 109:21,21,22 |
| 57:8 58:16,17 | 173:12 174:9,15 | lawyer's 30:6 | 114:7,9 129:15 |
| 60:5,7,8 61:14 | 176:22 178:11 | lawyers 6:15 | limitations 174:8 |
| 62:21 63:12,17 | 179:2,21,23 180:4 | 98:19 99:1 115:9 | 174:12 175:4 |
| 72:23 73:21 74:14 | 180:4,5 181:13,16 | laying 60:18 61:3 | line 209:3 |
| 74:16 76:12 82:3 | 181:18,19,24 | 165:20 | lip 164:22,23 |
| 82:24 86:12,15,24 | 182:11,13,16 | leading 193:7,8 | listen 68:13 |
| 88:16,21 89:9,13 | 183:8,10,11,17 | 201:13 | 111:24 |
| 90:12,22,23 91:3 | 184:4 186:11 | leaned 36:23 | listened 54:20 |
| 91:23 92:23 93:6 | 188:3,14,16,20 | leaning 37:1 | 61:21 161:15 |
| 93:14,23 94:1,6,8 | 189:23 191:23 | leans 36:21,21 | little 14:10 40:13 |
| 96:2,20,24 97:23 | 193:1 196:24 | learn 201:24 | 64:9 88:13 100:21 |
| 98:24 100:12 | 197:5 202:9,10,12 | learned 198:18 | 102:20 110:17 |
| 104:16 106:12 | 202:12 | 199:7 | 115:20,24 117:8 |
| 109:2,4,9,10,15,17 | knowledge 29:12 | learning 137:10 | 117:10 150:10 |
| 109:22 110:3 | 50:24 103:20 | 137:13 | 162:6 196:14 |
| 111:24 113:7 | 182:7 | leases 118:4 | live 11:14,19 27:6 |
| 115:5,11,13,19,23 | | leave 53:22 84:23 | 46:18,20 47:6 |
| 116:12,18,22 | **l** | leaves 32:5 110:23 | 54:2 101:7,24 |
| 121:13 122:20 | l 3:9 124:16 | 160:6 | 103:5 111:12 |
| 123:2,4 124:7,24 | labeled 91:22 92:3 | led 195:23 | 118:6,7,14,20 |
| 125:6,20 126:2,8 | lady 160:5 | left 38:10 56:1 | lived 11:17,24 |
| 126:10,16 129:12 | landline 124:2,3,8 | 60:11 87:9,13,15 | 12:8,19 31:14 |
| 129:13 131:5,22 | 124:10 125:4,7,22 | 87:19 88:1 94:3,4 | 47:4,17,18,20,22 |
| 132:15,16 133:24 | 177:22,24 204:21 | 94:7 123:20 | 49:1 53:11 103:5 |
| 134:3,4,5,17 | 204:22 | 126:12 163:7 | lives 27:4,6 187:6 |
| 135:18 136:22 | large 145:24 146:2 | legal 1:21 | 187:10 |
| 138:23 139:2,5,13 | lasted 126:17 | legitimate 55:7 | living 12:3 25:20 |
| 139:14 140:2,11 | 156:24 | legs 7:19 93:18 | 35:24 36:20,23 |
| 140:16 141:2,5 | laughed 178:13,13 | | 42:16 46:16 48:1 |

48:3 101:22,23
102:3,3,5
llc 2:3
located 15:23 16:2
18:6 42:12
location 93:21
locations 22:6
locked 85:15
loner 168:6,10
long 11:23 12:8,19
12:20,23 14:3
16:4 17:1,2,8 22:8
22:10 23:7,11,12
24:4 40:7 45:4
57:15 62:13
123:11,14,18
126:16,20,21
128:14 130:3,11
135:9 136:24
145:10 157:9
162:20 171:20
178:15 182:11
183:8 191:23
192:1,2
longer 124:21
longest 23:16
107:13
look 24:14 25:6
38:21 39:10 40:3
138:5 160:2
164:21
looked 89:1,6,7,16
94:12 164:24
191:3
looking 21:21 22:1
93:12
looks 93:22
loose 60:9
lose 170:7 192:17
loss 105:20 114:13
122:6

lost 56:22,23
lot 122:12 129:17
133:16 134:4,5
160:18 168:2
173:8
loudly 8:14
loved 80:4
lower 26:18
111:17

## m

m 142:4
ma'am 88:7 90:17
106:4 109:13
110:10 114:11,23
119:18 121:12
122:14 123:15
124:15 125:14
127:19 129:14,20
130:24 131:12,18
133:15 134:22
135:10 136:7
137:13 138:14
139:19 140:4,17
140:19 141:2,6
142:6 143:4,9,15
144:9,21 145:2
176:5,14 177:7
178:16 179:22
181:3 183:2 184:5
185:21 186:18
187:2,13,21 188:3
188:19,22 189:15
190:5 191:5 192:1
196:19 198:16
203:8
machine 207:7
macmain 2:8,9 4:4
5:7,9,20 9:24 10:7
10:10 19:19 28:21
28:24 42:9,11
50:4 54:12 64:10

64:14 65:3,10
66:13 67:11,17
68:7,10,20 69:16
70:13 71:5 72:9
72:13 73:13 74:10
75:2,19 76:21
77:21 80:2,16
81:2,9,18 82:1,10
82:16 83:16 90:9
91:11,18 92:12
99:5,12,18 101:16
106:9 114:11
120:1 143:15
151:15,21 152:14
153:5 173:24
200:12 205:12
macmain's 151:11
macmainlaw.com
2:11
main 126:8,8
making 52:12,18
52:19 60:6 61:15
78:20 114:6
man 15:13 118:18
118:19
manner 95:7
march 207:11
marijuana 27:13
27:15,16 28:11
112:24 113:5,8
131:19,23 132:1,4
132:9,13,18,22
133:4,8
marital 95:4
mark 68:6,24
83:10 141:17
marked 4:8,10
marker 67:10
market 1:23 2:4,9
2:17

marks 92:23,24
93:2
marriage 171:24
172:4,14,20
married 12:24
13:1
marshall 3:3,8
martin 141:23
masks 197:19
math 137:11,20
matthew 26:15
141:24
matthews 18:24
26:24 37:5 43:7
44:12,15 46:20,24
56:6,11,23 57:18
57:24,24 59:3,7
60:2,8 63:11 88:8
88:9 89:7,18,22
90:19 100:4 159:9
159:9,13,20
160:12 161:9,21
163:16 164:6,12
165:12 170:13,16
171:6 173:12
174:16 195:24
198:1,4,9 199:16
199:18 200:5
202:2,12
mdwcg.com 3:6
3:11
mean 12:3 39:2
41:5,7 50:13,15,16
52:17 98:14
108:13 111:23
136:4 168:7
170:10 193:6
meaning 54:24
63:3 78:4
means 8:12

mechanicsburg 18:7
med 16:1
medical 3:7 33:23 34:10,16 52:4 54:17 55:19 59:13 65:21 79:14 94:13 94:17 103:7,8,24 106:5,6 113:23,24
medication 10:18
medications 11:9 17:13,17 34:14,15
medium 146:1
meet 37:8,11 109:17 114:12 133:23 136:18 191:20
meeting 122:5 169:3,4,5,11 190:14
meetings 139:11
member 144:22
members 98:24 142:24 188:11
mendenhall 141:18
mental 17:13 20:23 29:5,9,13,14 29:19,24 34:7,8 51:19 52:5 54:17 55:18 71:24 72:5 72:17 76:24 77:24 78:13 79:1,1,13,14 79:22,22 80:6,11 80:23 84:19 144:23 150:16 151:2
mention 146:23 182:2
mentioned 6:14 28:5 54:23 146:20

147:6 153:17 168:2 188:22 194:16
mentioning 146:14
messed 83:21 174:16
met 14:18 39:22 41:4,5,6 133:24 190:14
metal 93:5
mic 9:22 106:3
michael 2:12 141:20 142:2
michelle 187:24
mid 1:22
middle 1:1
mincey 2:3
minceyfitzross.c... 2:6
mind 111:16
mini 205:15
minor 173:2
minute 64:8 83:10 99:9 100:9 126:22 145:15,17 175:16
minutes 64:23,24 65:1,2 70:7 126:22,23,24 127:9 156:24 157:8 163:24,24 166:17,20,21
missed 105:6
misstated 189:6
mobil 131:1
mom 12:4 29:22 30:13 46:10 52:22 53:11,15,24 80:4 101:11,18 117:22
mom's 12:15

moment 121:14
money 132:1,3 193:16
monies 24:21
month 22:13 24:4
months 22:14,18 22:19 24:4 107:17 108:5
morning 36:8 38:20
mother 11:21 31:4 47:23 124:18 125:18,23 127:21 129:3 148:18,22 160:1 169:4 187:11 189:19 190:8
mother's 124:12 124:15
motorcycle 33:13
mouth 201:13
move 35:4,6 42:22
moved 67:24 69:23 88:24 89:7
moving 70:1 165:21
mowing 110:20
multiple 67:4,22
mumble 39:2
mumbled 35:14 38:23,24 119:18
mumbling 39:1,6
music 109:23,24 114:6,9,10
mutual 184:23
myers 141:23

**n**

n 2:1 4:1 15:18,18 16:24 142:2 188:1 188:1

name 5:8,14,20 15:1,10,17,18 16:23 18:4 88:14 97:19 114:23 118:16,17 121:21 122:20,22,23 123:5 124:11,13 124:15 131:12 133:20 157:24 159:11,12 162:4,6 169:1 187:4,23 189:1,3,21,22,23 190:9,12
named 5:23 121:24 122:18 140:19 141:4,11 142:7 143:11 144:3
names 12:18 141:15 144:10
narrate 89:17
native 14:14
nature 108:11
near 41:6 187:6
necessary 208:4
need 7:17,21 9:22 12:1 23:18 59:12 65:13 71:8 77:1 80:11 84:6 99:22 110:4 175:24 180:19
needed 22:16 51:19 52:4,6 54:16 55:19 72:4 79:13,23 80:7 84:9,18 85:2 109:15 116:22 138:21 151:1 180:2,5 195:2
needs 9:5,8 65:21

neidigh  141:17
neighbors  186:11
neither  207:9
never  29:1 30:15
  90:12 107:16
  135:3,6 140:8
  154:14 170:23
  171:1 181:3
  182:22
new  134:12
nice  169:15
nicole  169:2 189:1
  189:10,17,24
  191:20
nicole's  189:3,19
  189:21 190:8
night  38:12 48:13
  48:16 49:8 53:3,4
  53:6,8,8,9,10
  54:14,21 97:15
  119:5,14,16 123:8
  128:20,21 147:2
  147:18 148:13,18
  150:23,24 174:18
nights  53:3,5
ninoksy  151:22
ninosky  3:4 4:4
  106:1,4 112:21
  115:21 129:15
  130:17 135:12
  152:5 153:1 176:4
  200:14 205:21
non  120:10
norfleet  2:17 4:5
  80:20 81:7 114:17
  121:11,20,22
  125:13 126:11
  136:2,6 138:4,12
  138:13 140:24
  145:1 149:8 150:7
  151:19 152:23

155:7,19 157:11
  172:5 176:8,13
  185:2 189:7,11,14
  192:6 193:5,24
  194:11 195:9,19
  200:9,11 201:2
  203:5 204:2,4
  205:9,20
normal  7:24
notary  1:14 207:3
  207:16 210:23
note  80:21
noted  208:11
  210:8
notes  99:7 105:16
  113:19
notice  1:11 207:5
nourishment
  103:11
nowadays  132:15
number  4:8 26:14
  88:15 124:4 126:8
  131:2

**o**

o  16:24 124:16
  142:2 188:1
o'clock  99:13
  204:14
oath  7:6
object  9:22 152:3
  193:6
objected  136:7
objection  8:7
  19:17 49:23 54:5
  77:17 79:24 80:13
  90:5 112:18 125:9
  126:5 135:24
  136:9 140:22
  149:8 150:7
  151:19,21 152:23
  153:1,3 155:7,19

157:11 184:24
  189:4 194:11
  195:9,17 198:6,22
  199:20 200:24
  201:2,7
objections  10:4
observation  51:6
obtain  109:7
obtained  135:3
obtaining  131:22
  132:7
obviously  121:14
occasionally
  103:12
occur  19:11 159:1
  203:13 204:9,13
occurred  35:10
  47:8 93:23 94:8
  169:18 174:21
  177:8 191:18
occurring  51:2
  184:15
odd  102:10
offer  30:20 31:10
offered  182:22
office  22:3 160:8
  160:10 161:12
  178:10 181:1
  188:23 189:16
  190:15
officer  2:12,13,13
  2:15 86:17,21
  90:3,22,24 91:4
  92:8 96:19 97:2
  98:1 115:15,16
  122:1 123:21
  141:8,22 144:1,3,4
  144:6 153:19
  154:17 160:11
  162:8,9,14,22
  180:13 194:17,18

194:24 197:24
  198:3,20 199:3,15
  200:20 201:18
  202:1,8,13,14,20
  203:8,9,14,20
  204:6,9,17 205:6
officers  5:22 85:1
  85:17,20 86:1,5
  87:3,18 90:8,13
  121:24 140:20
  141:3,11 142:8,14
  142:17 143:6,9,11
  143:21 144:18
  155:3,14,16
oh  11:8 12:3,10
  30:24 37:21 68:7
  72:9 104:19
  145:17 159:14
okay  5:19 10:1
  12:3,9 15:19 16:6
  18:3 21:11 23:4
  28:12 35:3,7,11,23
  36:9,12 37:14,23
  38:4 42:8 43:6
  44:6,9 45:4 46:14
  47:22,24 48:5,8
  52:21 58:5 59:2,3
  59:16,17 60:20
  61:5 62:5 63:10
  63:14,15 64:13,20
  65:2,17 66:9,11,12
  66:24 67:18 68:14
  70:5,14 71:6,16
  73:7 74:11,21
  75:3,9,20 76:15
  77:3 81:19 83:2,9
  83:17 85:12 86:3
  86:9 87:24,24
  88:5 89:16 91:6,9
  91:11,19,21 92:2,9
  92:11,17 93:2

94:11 96:18 97:5
97:12,17,18 98:22
99:5,10 100:8,19
104:6,11,22
105:14 106:7,8,14
110:17 111:5,22
115:20 116:11,24
117:8,17 118:14
118:22 119:9,21
120:1,16 121:10
124:17 143:23
144:13,18 147:17
147:24 149:13
150:22 152:1,9
155:24 156:13
160:13,18 163:20
164:10 167:13
169:1 173:18
178:12,14 189:7
189:13,21 190:8
197:16 198:14
199:7 200:8 202:4
202:7,14,18,24
203:6 204:7,20
205:9,17
**old** 57:6,7 86:1
167:17 183:15
**older** 54:1,1
**oldest** 57:8
**once** 37:9 43:11
58:5 86:18 121:3
156:11,12 159:4
164:5 182:2
186:19,23 191:22
194:24 199:7
**ones** 23:16 86:8
**open** 33:7 85:13
85:20 161:5
**opened** 162:5
**opens** 85:14
160:10,11

**operator** 61:22
69:3,7 75:10
76:23 77:22 79:12
84:17
**opportunity** 6:15
109:17 127:1
**oral** 1:10
**orders** 10:19
**ordinary** 149:6
**original** 126:1
208:14
**osman** 2:13
160:10,11 162:3
162:14,18
**otten** 142:1
**outcome** 207:10
**outside** 50:9,15
85:18 160:16,22
160:23
**owed** 24:21 33:10
33:11 103:21
**owns** 118:2
**oxygen** 166:11,18
166:21

**p**

**p** 2:1,1
**p.m.** 1:13 123:9
204:15 206:4
**pa** 1:24 11:15
**pacemaker** 94:9
174:10
**packing** 23:6,21
**page** 4:2,8 92:16
209:3
**pages** 92:4 210:4
**paid** 30:15 103:22
103:24 104:4,5,6
109:9
**paint** 43:15 44:17
191:13,16

**painting** 169:17
169:17 191:14
**pants** 56:21,23
57:8 151:12 152:9
152:12,20
**papers** 159:18,19
159:21
**paralegal** 66:15
**parent** 139:6
**part** 11:6 70:14
108:12 112:7
117:8 151:5
**participate** 203:16
**participated**
204:23
**participating**
122:7
**particular** 67:1
106:23
**parties** 6:4
**party** 207:10
**pass** 45:15,21,23
107:7 132:17,17
132:20,24 133:9
**passed** 95:20
107:9 169:18
184:13,16,19
193:14
**passing** 104:14
107:22 140:7,8
142:12,12
**patience** 121:13
**patient** 114:15
**paxton** 26:18
111:18
**pay** 30:12 31:10
31:10,16 103:12
129:20,21
**paycheck** 30:19
**paying** 31:17
131:5,9

**peacefully** 166:13
166:15
**penalties** 7:8
**pending** 7:21
**penndot** 13:12,14
13:17 33:21,22
**pennsylvania** 1:1
1:12 2:5,10,18 3:5
3:10 15:24
**pension** 13:18
**people** 24:21 35:5
46:16 49:10,15,20
50:9,15,20 51:5,6
52:7,15 53:13
55:4 66:16 77:9
78:5,6,17 82:24
84:7 85:8 105:17
119:10 125:16
127:22 146:14
147:14 148:4,9
168:16 188:17
**perfectly** 7:4
**period** 23:8 24:3
27:14 66:20
100:24 108:5
175:16
**permission** 163:18
164:2
**permit** 135:5,9
**person** 15:4 58:1
95:16 162:1 168:6
169:15
**personnel** 94:17
**perspective**
171:11
**philadelphia** 1:12
1:24 2:5
**phone** 2:5,10,18
3:5,11 59:19 60:6
61:17 65:24 79:11
88:14 97:13,18

[phone - professionals]

111:17,22 117:4
124:2 126:10
127:11,13 129:17
129:20,23 130:2,5
130:8,12,13,20,21
130:23 131:3
156:1,3,9 176:21
177:23 178:1
197:7 204:20
**photograph** 94:3
**photographs** 92:7
**phrase** 147:23
**physical** 174:7,11
175:4
**physically** 41:5
**physician** 34:24
**pick** 40:2,17 56:4
57:23 81:20 83:9
88:11 115:20
**picked** 36:13,19
37:5,6 39:13,19
40:16 88:12 97:18
**picking** 23:21
39:16
**picture** 21:3 32:20
43:15 44:17 92:17
92:22 93:11
**pill** 88:9,9
**place** 2:4 18:5
48:12,15 49:17
101:11 108:24
126:13 136:24
207:5
**places** 25:23 109:5
146:6
**plain** 7:12
**plaintiffs** 1:3 2:6
**plan** 33:20,21,22
33:24 34:8,10
103:8 138:7

**play** 64:21 65:17
66:9,16,20 107:10
143:6
**played** 67:15
68:18 69:14 70:11
70:14 71:3 73:11
74:8,24 75:17
76:19 81:12,23
82:14 83:14 151:4
**playing** 69:11
70:23 73:7 74:21
76:16 83:11
**plays** 140:16
**please** 8:19 68:6
73:17 146:6,8
160:12 205:14
208:3,8
**point** 6:5,23 7:16
9:1 19:12 20:21
29:5 43:21 46:9
51:17 54:13 57:17
59:8 61:18 62:1
62:22 63:9,10
64:2,22 66:22
67:19 72:15 73:15
73:20,23 79:10
80:10,12 84:1,5,11
84:16,24 89:10
93:16 95:21,23
96:6,14 111:17
114:13 115:24
153:8 165:6 166:6
169:14
**pointing** 159:23
**points** 66:21
**police** 2:12 5:21
28:2,14 52:21
54:3 64:2,15
73:24 74:3 84:23
84:24 85:6,8
89:17 95:11,15

111:18,21 112:8
112:13,16 113:10
113:12 120:3,8,13
120:21,24 123:20
126:13 162:8
198:3,20 199:15
**posed** 82:17
**possibly** 26:7,18
**predate** 17:5
**predated** 19:10
**prefer** 5:16
**preliminary** 9:15
100:3 158:1,12,16
158:22,24 159:5
162:21 178:3
179:13,21 195:7
196:10 197:2
199:12
**present** 120:8,19
**press** 100:1 180:14
180:18 195:1
196:1 197:21
198:1,5,10,15
199:17 200:3,21
202:5 203:11
204:10
**pressed** 198:19
**pressing** 194:19
200:2 202:2
**pressure** 10:22
11:1,3 34:17
**pretty** 32:15 54:10
96:23
**prevent** 185:15,18
**previously** 151:10
**primarily** 49:1
**primary** 32:9
34:24 48:24
101:18,19
**primecare** 3:6
106:5 113:23

**principal** 136:18
**prior** 9:3,8 17:24
21:21 26:16 30:22
35:1 38:12 53:2
54:16 55:17 69:1
71:17 73:24 86:10
128:17 130:15,19
140:7 142:11
174:3 186:9,13
190:2
**prison** 2:20 28:23
96:6 97:10,16,24
98:2,9,18 114:1
115:1 121:4
122:17 123:1,12
127:13,16,17
140:6 144:22
154:4,5,13,23
155:4,6,17 177:1,2
182:1,4,9,14,17,20
192:18 193:20,21
194:6,8 199:5,9
**probably** 33:6
38:9 46:19 54:10
64:21 84:4 85:10
96:16 99:6 100:19
117:4 123:8
130:13 136:5
154:18 197:18
**problem** 51:19
55:19 79:2,13
**problems** 14:7,9
18:24 19:16,23
20:15 29:24 77:24
171:24
**proceedings** 8:11
**process** 9:11 18:19
**professional** 1:14
15:12,20 29:13
**professionals**
20:20

**project** 38:6,7
**promise** 141:14
  143:19 144:12
**prompted** 70:19
  72:20 74:14
**pronounced**
  122:22,23
**pronouncing** 17:2
**properties** 145:9
  145:18
**property** 48:4
  49:11 50:10 52:8
  55:4 78:6 83:1
  146:10,15 147:7
  147:15,20 148:5,9
  148:17 149:1,12
  149:17 150:3
**propounded** 210:6
**prosecuted** 200:23
**provided** 26:6
  30:8 34:10 102:23
  103:4,7,10,16
  130:22,23
**provider** 33:23
  124:7
**providing** 176:15
**psychiatric** 71:24
  84:19
**psychiatrist** 15:21
**psychiatry** 20:22
**psychologist** 15:21
**psychology** 20:22
**public** 1:15 180:24
  207:3,16 210:23
**purpose** 112:15
  119:4,15,21
  197:12
**pursuant** 1:11
  207:5
**pursuing** 116:7

**pushed** 56:9 68:22
  69:4,7 85:18,18,19
  151:7,18
**put** 43:8,11 62:6,7
  62:13,24 63:4
  67:22 68:1 69:19
  73:3,16,17 75:4,11
  75:21 76:1,6,9
  85:21,22 160:3
  164:15,16 170:16
  170:20,22 174:4,8
  174:10,15 175:8
  175:14
**puts** 63:5
**putting** 62:11 71:8
  71:13 72:21
  149:23
**puzzled** 160:2

**q**

**question** 6:24 7:13
  7:21,22 8:1,8,9,17
  9:3,4 11:2 19:18
  20:5,13 22:2
  27:21 49:4,24
  50:18,23 52:9
  53:23 54:6 64:11
  67:2 68:11 76:7
  77:18,23 78:11
  80:1,14 82:17
  84:22 90:6,23
  99:19 101:22
  102:10 108:17
  111:15 112:19
  119:1 125:10
  126:1,6 136:1,8
  140:23 151:11
  155:11,13 171:22
  172:6 185:1 189:5
  189:5 194:6 198:7
  198:23 199:21
  201:13 204:8

**questions** 5:11,12
  5:24 6:3,16,22
  9:10 11:12 19:20
  21:2,11,18 30:6
  32:19 35:6 37:13
  65:19 66:11,21
  78:10 80:19,23
  85:11 87:22 94:11
  102:18 105:14,17
  106:7,10 113:21
  114:14 115:21
  120:2,18 121:10
  121:12 122:10,12
  139:20,21 145:7
  147:9 148:7 151:5
  154:3 166:24
  167:7,14 173:20
  174:2 176:2,7,15
  177:6 183:1 184:6
  188:21 192:13
  200:9,13 210:6
**quick** 35:16
  192:12
**quite** 133:24

**r**

**r** 2:1 3:4 124:16,16
  142:3 143:22
  188:1,1 207:1
  209:1,1
**radiator** 93:1,3,4
**raise** 6:8 66:17
  165:17
**raking** 32:4
  110:23
**rap** 110:1
**rashawn** 27:9,10
**reach** 199:17
**reached** 99:1
  183:18 204:17
**read** 26:13 36:7
  141:15 144:9

  208:3 210:3
**reading** 137:23,23
**ready** 127:6
**real** 35:16 192:12
**realize** 9:2
**really** 23:17 33:10
  41:16 45:6 51:10
  53:18 56:16 57:13
  84:9 108:16 171:8
  197:17,19 202:9
  202:11
**reason** 17:23 20:1
  20:2,4,13,14,21
  76:7 135:3,5
  176:20,22 180:11
  184:2 208:5 209:5
  209:8,11,14,17,20
  209:23
**reasonable** 57:20
**reasons** 29:6
  137:21 181:12
**recall** 11:10 21:22
  72:19 73:5 75:24
  98:4 123:6,11
  135:21 136:12,14
  137:8,15,17,21
  139:15 147:11
  153:10 169:3
  172:2,11,18
**receipt** 208:15
**receive** 29:4 97:14
  124:1
**received** 15:5,8
  17:12 21:4 94:14
  123:7,13,21
  124:19 139:2
  153:18
**recollection**
  122:21 192:3
**recommend** 16:12

**recommended**
  16:14 29:17,23
**record**  5:14 9:7
  72:7 77:3 135:15
  135:22 207:9
**recorded**  207:7
**records**  25:2 94:13
  175:22,23
**refer**  5:16
**reference**  26:3,15
**referenced**  107:24
**referencing**  28:20
**referred**  80:22
**referring**  30:4
  37:15 55:1,2,11,11
  55:14 74:18 77:11
  79:7 82:3 83:23
  94:6
**refrigerator**  62:7
  62:12,15
**refusing**  185:4,7
  185:10
**regard**  121:2
**regarding**  99:1
  128:1 143:2
  144:22
**regards**  200:20
  201:17
**region**  1:22
**regular**  116:12
  138:18,19
**regularly**  31:20
**rehab**  38:7
**related**  11:4 20:11
  127:24 137:13
  138:15
**relation**  51:22
**relationship**  19:1
  19:1,3,5,22 20:9
  20:15 171:3 184:8

**released**  195:5,8
  195:16 199:5,9
  205:7
**remember**  18:4,10
  21:24 22:7 62:6
  70:4,5,21,22 71:15
  74:20 75:8,8 82:7
  82:7 85:7 108:7
  108:24 109:2
  118:17 120:3
  123:23,24 131:2
  131:11 133:10
  135:11,17,20
  136:11,20 140:15
  146:16 150:18,19
  151:7 153:22
  157:23 158:11
  164:15 166:9
  173:11 178:17
  190:1,3,4,5,6,7,10
  190:11 191:3
  192:2 194:20,21
  196:22,23
**remind**  41:23
**reminding**  10:9
  175:11
**remote**  1:10
**remotely**  2:1 3:1
  207:4
**rent**  30:12,15
  118:13
**rented**  118:11
**rents**  118:4
**repeat**  77:19
  101:15 122:10
  125:11 172:6
**repeated**  178:9
**repeatedly**  175:8
  175:15
**rephrase**  7:14,15
  20:6,7 53:18

79:16 106:13
  136:2,8 141:1
  143:8 184:17
  185:3 189:8,12
  195:13 201:4
**replacing**  131:15
**replay**  67:3 75:7
  75:13
**report**  26:4 89:21
  112:8 113:11
  120:21,24
**reported**  95:10
  120:21
**reporter**  1:14 8:2
  41:24 205:17
**reporting**  76:5
**reports**  36:7 89:17
**represent**  5:21 6:3
  92:7 106:5 114:24
  141:8
**representation**
  98:20
**represented**  141:6
  141:8
**representing**  2:6
  2:11,19 3:6,12
  121:23 122:3
**require**  132:15
  133:1
**reserve**  10:4
**residence**  11:24
  48:24 101:18,19
  124:18 125:15
  126:3,14 128:11
  128:15,19 129:3
  146:3,4 147:2
**response**  62:10
  77:23 151:11
  173:10
**responses**  8:3

**responsibilities**
  170:8,10 185:22
**responsible**
  186:14
**rest**  84:6
**restart**  70:8
  166:14
**restarting**  166:12
**restate**  106:13
  155:12 196:15,17
**result**  15:6 19:24
**retired**  13:16,17
**retirement**  183:17
  183:18,20
**return**  127:15
  208:13
**returned**  202:21
**returns**  24:10,13
  24:22 25:5
**reverse**  68:12
**reviewed**  30:7
**reviews**  139:7
**richard**  2:14,14
  86:9 88:2,5
  141:18 142:1
**right**  28:20 41:19
  48:17 55:20 58:1
  68:21 78:7,16
  91:12 92:23 93:13
  93:22 94:10
  106:13 107:22,23
  110:12 120:16,22
  121:11 127:10
  141:14 146:21
  148:19 149:4,19
  151:13 157:20
  161:6 164:22,24
  176:8 186:6
  197:21 201:21
**riley**  1:3,11 2:3 4:3
  5:1,8,15,17 9:20

26:18 42:10 64:23
81:2 121:21
124:16 145:7
159:24 172:5
187:5 192:12
193:7 196:8
200:19 207:4
**riley's** 159:13
**road** 101:4
**robert** 141:22
**rock** 205:23
**role** 115:13,18,19
140:16 143:5,12
190:20
**roof** 101:23 102:2
103:5
**room** 35:24 36:1,5
36:20,23 42:16
164:17,19
**rooms** 45:16
169:17
**root** 19:15
**rose** 34:22,23
**ross** 2:3,3 4:6 9:19
10:1 19:17 28:17
41:22 49:23 54:5
64:6,13 65:1 67:8
67:12 68:5,9 72:6
77:17 79:24 80:13
81:14 82:4,8 90:5
91:10 92:10 99:10
101:14 112:18
125:9 126:5
135:24 137:24
138:8,11 140:22
145:6 149:10
150:11 151:24
152:6 153:7
155:10,20 157:15
167:5,12 172:8
173:18 184:24

189:4,9,13 192:11
193:10 194:2,14
195:12,20 196:2
196:13 197:18
198:6,22 199:20
200:18 201:5,9,16
202:24 203:23
205:19
**routine** 31:23
**rowe** 141:19
**rross** 2:6
**rug** 93:19
**rugs** 93:15
**rules** 106:9
**run** 50:5 54:9 55:3
78:5 117:12
127:22 128:8,24
186:12
**running** 49:10,14
49:20 50:2,8 52:7
55:13 83:1 125:17
128:5 129:7

**s**

**s** 2:1 4:7 15:18
16:24 124:16
142:3
**safe** 125:7 126:3
**sat** 37:4
**satisfy** 136:9
**saturday** 191:15
**savings** 33:1,3,4
**saw** 126:13 165:6
165:15 189:24
**saying** 30:6 52:14
61:9,12,13 70:19
78:5 82:23 147:19
148:4,8,15 150:1
150:17 157:6,7
188:15
**says** 8:7,10 42:23
81:15 88:6 159:17

160:11
**scheduled** 180:17
180:22
**schizophrenia**
29:10
**school** 21:15 25:13
106:18 116:6
134:3,6,6 135:15
135:23 136:17
137:6 138:15
139:17 168:7,11
168:14,17,22,24
188:24
**scoliosis** 174:13,14
183:4,21 185:18
**scoot** 172:9
**scott** 141:19,19,21
**screen** 6:2 85:15
85:16,19,19 91:6
92:14
**scribbled** 88:12
**scroll** 92:6
**second** 10:2 65:18
75:24 78:1 92:11
176:17,21 177:6
177:13,19
**seconds** 57:19,20
68:12 69:1
**secretary** 190:22
**securities** 164:8
**security** 183:13,14
**see** 16:6,19 29:18
38:21 40:15 41:20
42:4,6,12 50:11,12
50:13 51:6,12
60:7 66:16 91:9
91:19,24 92:13
95:15 96:8,16,22
100:10,11 112:8
113:5 153:14
158:19 161:6

163:10,19 164:19
164:23 165:23
**seeing** 16:4,9
17:21 18:1,3,18,23
51:10 52:12
104:23 169:4
**seen** 17:22 18:1
20:20 29:14,23
30:7 86:4,7,9
88:10 150:13
164:22
**segue** 81:3
**selling** 28:3,7
**send** 86:13
**sending** 175:21
**sense** 67:6
**sensebaugh** 17:15
**sent** 21:18 22:3
159:18
**separate** 104:9,11
146:5
**separately** 101:24
104:20
**sequence** 65:20
**sergeant** 2:14
123:3 141:19,19
141:20,20,21,21
143:21
**series** 80:23
**serious** 25:17
**service** 108:15,22
124:7 130:23
**services** 160:21
**sessions** 105:11
171:21
**set** 154:18,20
**sex** 171:17 173:16
184:13,18,21,22
185:4,7,13,16,19
**sexual** 19:8 184:8

[shaeffer - specific]                                                    Page 23

shaeffer  142:3
shake  8:1
share  91:6 145:22
  205:3
shared  109:6
  124:18 125:17,22
  127:21 129:3,8
  178:2,5 198:21
shares  145:23
shauna  27:5
shed  38:14
sheet  92:17 208:6
  208:9,11,14 210:9
shook  160:14
short  65:7 86:2
  91:15 99:6,9,15
  167:9
shorthand  207:7
shovel  32:2 170:12
shoveling  110:21
show  6:20 91:21
showing  42:7
siblings  187:13
side  6:16 46:5
  58:16 94:3
sign  175:22 208:8
signal  10:13
signature  207:13
  210:12
significantly  191:9
  191:11
signing  208:10
similar  23:22
  139:21
simple  8:1 171:7,9
  173:14
simpler  53:19
simply  185:9
sing  109:22
singleton  141:24

sir  23:24 138:12
sister  187:22
sit  76:8
sitting  63:16
  135:21 159:22
  161:1
situation  99:2
  102:19 154:10
six  22:13 24:4
  83:10 107:17
sized  146:1
skids  188:15,18
sledgehammer
  36:14,19 37:5,6,24
  38:1,5,7,15,16,22
  39:10,14,17,19
  40:17,22,24 42:20
  43:8,17,19 44:20
  45:20 48:9 51:23
  54:14 55:23 57:17
  58:6,10,19,23
  60:10,15 61:2,6
  62:3 63:5 65:23
  66:2,6 67:23 68:1
  69:20 73:16 75:4
  75:11,21 76:1,6,9
  83:4,6 89:23
  95:12 152:16,17
  153:12,15 174:18
  175:9,15
sleep  147:10,13,17
  148:2,12 150:23
  192:17
sleeping  35:11,12
  35:21 36:2 38:19
  119:6 147:21
  148:2
slept  119:4,15,16
  119:19
slide  94:10

slowly  8:14
small  44:10
  145:24
smith  141:17
smock  164:15,16
smoking  132:18
snack  192:24
snap  172:24
  173:13,13
snapped  54:24
  55:11,14 77:2,6,11
  78:2 79:6
snapping  19:8
  172:24
snappy  19:8 171:7
snaps  171:10
  173:2
snapshot  31:3
snow  32:2 110:22
  170:13
social  168:5
  183:13,14
socks  170:17,20,22
  174:4,9,11,15
sold  28:10
solo  105:1
solutions  1:21
somebody  16:12
  29:18 49:9 50:8
  78:23 79:18 98:13
  113:20 118:5
  148:16 164:24
son  6:17 9:15 15:2
  26:17 27:6,8
  46:17 75:4 105:20
  109:17 115:14,23
  116:2,7,17,20
  121:3,15 161:18
  163:10 193:20
  194:7 196:9,11,21
  197:1,3,7,13

198:11,19 199:4,7
  199:17 200:6
son's  15:6 17:6,23
  17:24 18:11,12
  19:11,12,15,24
  20:11 97:10
  104:17 119:1
  140:7,8 142:11,12
  171:13 184:9
  190:2
sorry  9:18,19
  16:14 17:15 36:10
  36:15,17 47:21
  62:19 64:17 68:8
  72:9 87:10,11,14
  88:21 114:12,13
  122:5 146:24
  148:7 165:11,18
  172:6,9 184:5
  204:3
sound  141:11
  142:6
sounds  12:6 23:22
  45:11 73:15 83:18
  99:13 141:12
source  32:9
space  208:6
span  123:19
speak  7:18 8:14
  9:7 82:4 95:18,20
  98:18 100:4
  113:23 114:4
  154:23 155:17
  175:19 194:7
  197:17
speaking  27:2
  156:4
speaks  197:18
specific  83:3 85:11
  137:8 138:6

[specifically - take]                                                                 Page 24

specifically  24:20
specifics  9:16
spell  15:17 16:23
spelled  122:20
spending  130:18
130:20
spent  129:16,17
spirit  92:8
spoke  98:21
142:13 144:2
157:19,22 161:13
spoken  28:1 86:4
86:18 94:16 115:2
115:5,8 193:20
sports  107:10,11
spouse  198:21
199:16
stacking  23:4,6
staffing  22:4,9,10
22:20 23:2,8 24:7
stamp  82:10
standing  60:1 81:8
161:6 164:13
stands  42:21
start  5:10 9:14
22:8 37:17 64:7
80:21 122:14
145:8 149:14
166:18 167:3
started  37:10
41:11 45:8,24
59:22 70:16,20
159:6 160:4 168:8
191:24
starting  70:24
73:8 159:6
starts  61:6 79:18
state  5:13 149:16
208:5
stated  146:19

statement  171:22
statements  120:2
120:8,12
states  1:1
stating  146:14
stay  12:21 25:23
26:23 46:24 48:19
48:20,21,22 49:2,5
49:16 53:22 54:2
101:9 146:5 197:4
stayed  48:12,15
49:6 53:3,5,8
148:18 197:11
staying  26:7,18
46:21,23,24 49:8
102:1,5,7,8 124:21
125:15 127:20
197:12
step  160:12 161:9
161:10
steps  45:7,10
steve  141:17,24
stipulations  10:6
stood  40:11,12
42:15
stop  13:11,14
35:16 37:12 43:23
44:4,4,6,7,17
60:11 61:13,14
66:10,20 67:9,18
69:11 84:4 85:10
133:3,5,8 166:13
stopped  56:3 68:8
68:23 69:17 71:6
73:14 74:11 75:3
76:23 83:17,18
131:5,8
stopping  69:1
stove  32:7,8
straight  97:21
98:12,14 156:17

street  1:23 2:4,9
2:17 117:12,14
stress  95:4 193:2
stretch  7:19
strike  47:15 76:3
88:6,7 90:16,18
146:24 158:22
195:3
struck  88:8 89:23
90:21
struggle  56:19
57:1,12 72:24
93:7
struggling  45:1
student  107:3,4
stuff  9:15 23:1
subject  7:7 208:10
subscribed  210:14
substance  21:6
210:8
sudden  37:3 56:21
57:4
suffering  183:4
suit  11:4 26:16
suite  2:4,9 3:4,10
summarize  89:17
89:22
supervision  207:8
supplement
100:17
supplemented  9:9
support  10:15
30:11 102:17,22
103:3,15 182:6
supposed  96:13
161:22
sure  6:13 8:3 9:21
17:8,8 20:8 25:7
42:7 47:2 48:5
50:14 53:19 54:10
58:3 77:22 79:17

80:24 106:2,15
109:3 112:12
113:22 120:6,18
122:11 123:3
138:2,4 143:24
145:12,12,14
162:24 196:16
surprised  201:24
202:1,4,7
suspended  135:15
136:11
susquehanna  2:12
5:21 25:13 26:6
26:14 91:22 92:3
93:21 94:2 97:3
98:17 106:18,21
106:24 111:20
112:12 113:12
120:3,13 123:20
126:12 135:13,16
135:23 162:8
swanson  3:12
114:24 115:3,6,9
115:11 122:2
141:8
swanson's  115:13
sweatpants  56:6
56:10,11,13 57:6,7
swing  40:2,18
sworn  5:2 207:6
210:14

| t |
|---|

t  4:7 142:2,2,4
143:22 188:1
207:1,1 209:1
table  88:10
tablet  88:13
take  7:17,22 8:2
43:7,8 45:7,10
64:7,11,20 98:13
98:15 99:9 116:24

117:1 135:8
145:10,13,15
150:16 157:8
166:23 167:3,5
**taken** 1:11 28:23
65:8 66:1 84:13
84:18 85:2 87:8
91:16 92:8 99:16
121:3 122:16
153:24 156:21
167:10 185:21
207:4
**talk** 7:11 8:13
14:16 35:3,9
71:16,20,23 72:3
145:9 146:13
155:5 161:15
165:13,19 166:2,4
179:2 199:18
**talked** 55:23 77:7
77:8 94:20 117:20
140:8,13 142:11
144:4 146:3
160:17 166:15
167:2 169:16
174:9 178:21
181:21
**talking** 8:20 15:2,3
27:3 42:3 49:9
50:6,7,9 55:2 56:4
61:22 64:7 78:17
79:18 81:5,15
83:19 88:17
132:23 138:2
147:19,22 150:2
156:10 161:3,7
164:14 166:11
172:2,12 204:1,6
**tall** 86:1 191:5
**taller** 191:7,8,10
191:11

**tami** 142:3
**tape** 68:6 80:21
151:4,6 153:8,10
165:2
**tax** 24:9,13,22
25:5 108:22
**taxes** 108:23
**taylor** 141:23
**teacher** 136:18
**teacher's** 138:23
139:4,4
**teachers** 138:19
**team** 131:1
**telephone** 127:24
131:6,15 176:17
177:6,7 178:15
**tell** 24:19 43:15,23
44:1 46:1 62:16
70:2 84:8 85:6
86:14 87:21 88:3
90:8,24 97:17
98:21 108:5
111:22 112:15
114:8 116:2,16
121:4 127:4
128:18 130:1
133:5,17 143:24
144:2 155:2,4,15
155:16 165:8,10
165:11,13,14
166:7 167:16
169:9 176:17,20
176:23 177:3
182:3 186:13,21
190:17,20 191:2
196:8 198:4
199:13,14 207:6
**telling** 62:6,8 68:1
73:17 78:4,8
132:14 156:7
194:17 200:21

**temp** 108:1,14
**ten** 57:20 64:24
65:2,3 68:12 69:1
99:9
**tenth** 191:24
**term** 7:10,14
**terms** 25:5 30:11
32:12 34:12
100:23 102:16
103:2,3
**test** 66:17 132:17
132:20 133:9
**testified** 5:3
122:15 127:19
131:18 136:10
151:10 184:7,8
186:2 189:6
194:18 196:19
201:17
**testimony** 112:4
116:6 118:24
119:4 128:3 179:1
194:4 198:17
201:19 205:2
207:6,9
**tests** 132:16,24
**thank** 5:19 42:9
68:9 72:11 105:18
105:21 114:14,16
121:16 122:7
138:11 145:2
173:19,20 176:9
192:7 205:18
**thanks** 10:8 65:5
67:12 121:15
203:1
**therapist** 171:23
172:2
**therapy** 171:21
**thereof** 207:10

**thing** 8:21 10:2
18:17 28:11 31:23
40:7 66:14,14
138:3 160:8
201:12
**things** 7:2 8:5 9:20
17:14,18 18:21,22
19:4 22:22 23:5
30:4 36:11 51:10
52:13 65:14 86:14
86:16 94:7 103:17
106:16 109:18
116:19 137:18,19
167:1 185:23
193:13
**think** 5:11 10:3
30:21 32:3 34:20
35:4 40:15 49:13
49:13 50:12 51:9
52:1,4,6,9,11,17
52:19 54:7 63:2
67:4,20 72:7 76:7
77:13,15 78:13,24
79:12,19,20 80:10
84:5,9 90:3 98:7
99:5,7,22 101:5
105:14 108:6,8
111:15 121:11
152:13,20 153:9
154:15 156:23
157:9 158:8 163:2
163:17,17 173:1,1
173:19 180:8
182:2,5 189:5
191:4 195:2,4,8
196:13 200:9
201:18
**thinking** 51:2
165:15 197:5
**thirty** 208:15

| | | | |
|---|---|---|---|
| **thomas**  11:22 | **thought**  20:12 | 137:6 141:13 | 163:18 169:12 |
| 12:23 13:20 14:1 | 28:10 50:2 51:13 | 149:15 152:22 | 173:7 178:9,11 |
| 19:23 20:16 26:6 | 51:16 55:5,6 | 156:14,15 157:20 | 190:17 191:12 |
| 26:14 27:9,17 | 65:14 78:1 84:17 | 157:22 158:1 | 194:18 197:20,20 |
| 28:1,6 29:21 | 85:2 87:14 96:12 | 167:10 171:20 | 197:24 199:15 |
| 35:19 36:2 37:4 | 96:15 119:10 | 174:21 175:16 | 201:18 202:1,8 |
| 37:15,16,18,21 | 124:23,24 126:3,9 | 177:19 178:8 | 203:9 204:6,7 |
| 38:18 39:5,5,9,13 | 128:7 154:8 173:7 | 186:10 189:24 | **tom**  152:15 153:14 |
| 39:16 40:2,4,4 | 193:9 204:2 | 198:18 202:10 | 161:13 171:3,13 |
| 41:3,8 43:2 46:17 | **three**  22:19 85:17 | 204:12 207:5 | 194:19 200:21 |
| 48:1,12,15 49:16 | 85:24 86:5 87:9 | **timeframe**  113:13 | 202:2,5,15,20,21 |
| 55:24 56:2 58:1 | 88:1 107:20 108:4 | **times**  8:16 62:15 | 204:10 |
| 58:12,18,20,23 | 133:18 134:8,11 | 62:18 63:3 67:4 | **top**  58:13,14 |
| 59:12,23 60:17 | 149:18,21 191:6 | 67:22 69:19 72:8 | **topic**  10:12 |
| 61:3,8 62:3 63:21 | **throw**  32:2 66:23 | 89:23 117:9 | **total**  12:11 108:9 |
| 64:17,18 65:21 | **tight**  57:7,8 | 181:14 182:13 | 141:7 |
| 69:3 73:20 83:7 | **time**  6:5 7:16 | 184:7 186:22 | **touch**  41:5 179:19 |
| 84:13 88:9,18,19 | 10:24 11:5,8,17 | 191:20 | **township**  2:12 |
| 88:22,24 89:10 | 13:5,15 17:4 | **tiny**  70:7 | 5:21,22 25:13 |
| 90:3,19,23 91:4 | 21:12,22 23:7 | **title**  123:2,4 162:7 | 26:19 86:13 |
| 92:18 94:13,16,20 | 24:3 25:16,19,22 | **today**  6:1 11:12 | 106:18,21 107:1 |
| 95:5 100:3,23 | 26:1 27:13,22,23 | 69:6 114:15 116:3 | 111:18,20 112:13 |
| 101:19 104:16,24 | 30:22 32:22 33:2 | 117:20 122:8 | 120:3 123:20 |
| 105:9,12 111:17 | 33:8,14 34:12 | 128:3 135:21 | 126:13 135:13,16 |
| 112:4,12 113:11 | 44:23 47:17,18,24 | 150:20 | 135:23 162:8 |
| 115:5 118:1,11,20 | 48:21,23 51:21 | **told**  19:21 20:11 | **track**  67:19 |
| 120:2,7,12,20 | 57:15 61:17 65:8 | 20:12,14 32:14 | **training**  139:16 |
| 124:11,22 125:15 | 70:1 74:2 76:1,4,8 | 37:13 38:18 44:4 | **transcribed**  207:8 |
| 126:14 127:24 | 79:21 82:10 91:16 | 62:5,7,13 63:10 | **transcript**  8:11 |
| 128:10,14,15,19 | 95:14 97:10 98:13 | 67:20 69:3,6,7,19 | 112:2 208:16,17 |
| 139:13 146:4,10 | 98:15 99:6,16 | 77:14,22 78:7 | **transcription** |
| 151:7,12,16,18 | 100:4 101:1 | 79:2 85:13 90:3 | 207:8 210:5 |
| 152:8,16 153:11 | 105:19 107:13,17 | 90:12,20,22 91:1,4 | **transportation** |
| 159:9,13 174:2 | 107:20,21 108:11 | 94:17 96:23,23 | 13:10 |
| 181:6,9,9,12,15,24 | 108:12 111:8 | 102:23 104:22 | **treat**  146:9 171:13 |
| 182:8,16,19 183:3 | 116:8,8,18 118:9 | 110:6 133:5 | **treatment**  21:5 |
| 183:15 184:9,12 | 119:19 122:8 | 143:16 144:10,14 | 52:5 54:17 55:20 |
| 184:21 185:5,12 | 123:6,19,19 124:8 | 151:6,15,17 | 72:17 79:14,14,23 |
| 186:15 187:15,20 | 127:16 129:17 | 153:10,21 155:21 | 80:7,12 94:13 |
| 188:8 203:19 | 130:3,20 131:16 | 155:24 156:6 | **tree**  188:16 |
| 204:10 205:4 | 133:17 134:7,11 | 157:17 162:1,13 | |

[trial - tyrique's]                                          Page 27

**trial**  115:24 116:1
  116:4
**trick**  6:20 10:14
  143:17 144:12
**tried**  43:7,7 88:11
  107:4 150:16
  197:4
**trouble**  45:12
  137:11
**truck**  101:4
**trucks**  188:17
**true**  207:9
**truth**  207:6,6,6
**try**  7:11,12 8:19
  8:21,22 9:17
  10:11,12 32:19
  43:14 44:17 53:19
  54:8,9 55:3
  109:22 122:9
  127:7 136:8
  139:19 143:17
  166:14 172:9
  193:1
**trying**  6:20 8:10
  10:13 21:3 39:23
  43:23 45:11 51:6
  52:15,23 53:13,21
  54:4 56:24 61:22
  70:2 72:21 77:9
  78:22 98:19
  123:17 144:12
  147:24
**tuesday**  1:8
**tug**  83:4
**turn**  106:3 167:22
**turned**  89:2,6,8
**turning**  93:18
**turns**  89:4
**tussle**  43:18 48:8
  51:23 54:13 55:23
  61:5 152:15,17

**tussling**  43:16
  44:19 45:20 83:24
**tv**  6:20 117:5
**twice**  86:18 184:14
  185:16,19
**two**  8:5 9:20 12:21
  19:20 22:6,18
  24:8 25:24 36:16
  40:20 46:2,2
  58:19 63:2 70:7
  77:8 79:17 86:3
  86:23 87:2 95:19
  95:21,24 96:3,7,14
  101:6 109:5
  110:14 126:22,23
  126:23,24 127:9
  133:18 134:18
  146:7 156:24
  157:8 166:10
**ty**  67:20 69:19
  70:15 72:10,15
  73:15 76:1 79:13
  79:21 81:4 109:7
  111:19 112:16,23
  119:6 174:10,18
  175:8
**ty's**  112:5 113:17
  114:3
**tyler**  70:19 71:13
  71:17 72:4,7,15
  80:22 81:4,15
  87:6
**type**  15:5 33:1,11
  106:23 107:3
  109:19,24 132:12
  137:12 139:15
  142:17,18
**types**  109:18
  116:19
**typical**  116:16

**typically**  116:17
**typing**  42:5
**tyrique**  14:16,22
  15:1 21:11 22:4
  23:1 24:7,9 25:10
  25:14 26:7,12,17
  26:23,24 27:12,18
  28:3,7,10,13,22
  29:1,4,23 30:12
  32:21 35:12,13,21
  35:23 36:4,17,18
  36:19 37:6,9
  38:13,21 39:11
  40:2 41:1,9 42:20
  43:4 47:23 48:15
  49:4 50:19 51:7
  53:7,20 54:16,24
  55:18 56:16 58:13
  58:15,18,23 59:24
  60:20 61:2 62:2,8
  63:4,19 64:16,19
  65:22 66:1 67:20
  72:7,15,19 77:23
  78:8,11 79:17
  80:22 81:1,4,16
  83:19 84:2,13,13
  84:18,24 85:2,13
  87:5,6 89:24
  95:11,14,15 96:3,7
  96:12 98:10,19
  99:2 100:13
  102:17,23 103:4
  103:16 106:17
  122:16 123:12,20
  124:23 125:2,6,16
  125:21 126:2,12
  127:1,17,19 128:4
  128:7,15,17,19,20
  129:7,15 130:18
  131:9,19 132:4,13
  132:20,21 133:3

  133:11,14 134:7
  134:21 136:21
  137:21 138:14,23
  139:15 140:14
  143:2 146:14,20
  147:19,22 148:3,8
  149:3,7,11,16
  151:1 152:15
  153:11,14,18,24
  154:11,15,24
  155:3,15,17,21
  156:20 158:3,19
  159:13 162:10,13
  163:19 164:19
  166:8 167:1,15,16
  169:13,18 170:18
  170:20,21 174:4
  174:14,24 178:21
  179:7,9,15,19
  180:2 181:1
  184:13,16,19
  186:2,8,14 191:13
  191:21 192:14,15
  195:4,15 198:13
  200:23 201:21
  203:9 205:6
**tyrique's**  21:12,21
  27:10 31:3 39:6
  53:12 95:8 97:21
  102:18 104:14
  129:22 130:23
  131:15 132:9
  144:23 156:7,16
  158:12,16,22
  159:24 162:17
  164:17 170:4
  171:2 172:1,3,19
  173:6 174:3 178:3
  179:13 188:24
  192:4

**u**

u  16:24
um  23:24 35:17
  60:13
umberger  142:1
uncomfortable
  119:6,9
unconscious  73:21
  73:24
understand  7:11
  7:13,15 20:5
  47:16 48:5 51:3
  65:20 79:19 81:14
  90:19 101:10
  106:11 108:16
  116:5 119:3 120:7
  143:12 198:14,16
understanding
  17:7 22:23 81:8
  116:11 138:3,5,9
  141:7 154:6
  181:11 198:17
understands  81:1
understood
  101:17 118:24
unfolding  79:5
unfortunately
  109:16
unintentional  8:23
unit  47:18 48:2
  71:24
united  1:1
units  47:13,14
unlock  85:16
unlocks  85:17
unrelated  19:16
unusual  38:5
  77:15 150:5
updated  137:3
upper  94:4,7

upright  58:24
ups  22:4 23:10,11
  23:12,20 24:3,7
  108:1
upstairs  163:13
  164:1,3
use  7:10,12,14,19
  83:6 112:5 113:5
  132:10,13,22
usual  10:5 150:10
usually  105:6

**v**

v  1:4
valid  51:12
various  6:3 103:17
vehicle  134:24
ventilator  165:3
verbal  7:24 8:3,4
veritext  1:21
verizon  124:9
version  89:10
versus  104:11
victim  102:11
  159:17 160:21
view  42:18 51:11
violence  102:11,14
visits  105:1,2
vocational  139:16

**w**

w  2:9,17
waist  58:6,8
wait  100:9 116:3
  159:10,10 162:23
waited  197:7
  199:11,12
waiting  169:10
wake  38:19 39:7
  46:10 116:17,21
walk  134:16,16,17
  145:11,16

walked  42:17
  59:21 120:11
walking  45:10
  59:23 63:17,17
walks  41:10
want  6:21 9:20
  10:14 14:10,16
  20:6 21:10 26:2
  35:3,3,9 48:5
  49:12 52:10 54:2
  56:4 58:3 65:2
  68:12 75:6 76:22
  80:24 84:7 85:5,6
  88:3 91:6 102:19
  113:22 115:20,23
  116:2 120:6,18
  122:14 142:22
  143:18 146:12
  148:1 150:22
  155:5 170:4
  171:17 173:15,16
  193:7 196:24
  200:19
wanted  31:2 34:8
  59:3 80:4,21
  84:13 100:8,14,16
  112:7 127:4
  135:14 144:8,11
  157:4 167:13
  175:24 191:14
wanting  28:2
wants  29:18
war  83:4
ward  72:1
warden  1:5 140:5
warehouse  23:3
warn  53:23
warner  3:3,8
wash  31:22
washed  111:8

watching  117:4
way  9:5,9 12:1,7
  30:6 37:10 53:16
  56:1 57:2 58:7
  61:5 63:1 65:13
  76:4,12 80:3
  89:13 91:3 98:10
  99:23 103:2
  110:10 112:1
  114:12 147:23
  149:24 150:13
  151:17 171:5,16
  192:22
ways  168:9,16
  170:6
weaver  141:23
week  51:24 108:18
  116:13,13,13
  184:14 185:16,19
  186:21,22,23
weekly  16:7,8
weeks  95:19,21,24
  96:4,7,15
weight  56:22,23
  170:7,7
went  13:15 16:11
  35:14 36:13 37:3
  37:9,23 38:13,14
  39:12,20,22 41:8
  41:12 43:12 45:4
  48:12 58:7,7
  59:19 63:1 89:2
  111:7 134:6 147:1
  147:5 150:24
  154:11 160:1
  161:2,13 163:7,7
  163:14 164:8,16
  164:18 165:3,22
  166:6 168:16
  191:15,15 195:14

[west - zoomed]

**west** 2:10
**whatsoever** 17:23
**whispering** 160:4
  160:5
**white** 86:1,3 165:2
**wilson** 2:14 86:9
  86:21 87:2 88:2,4
  88:5,11,17,24 89:9
  90:16,20 92:9
  96:19 97:2,3,4,6
  97:12 99:24
  153:19 154:17,19
  180:13 194:17,18
  194:24 197:24
  200:2,20 201:18
  202:1,8,13,14,21
  203:9,14,20 204:6
  204:9,17 205:6
**winding** 18:5,9,15
  20:19
**windows** 31:22
**wish** 14:17
**withdraw** 119:2
**withholding**
  184:21,22
**witness** 42:8 50:1
  54:7 72:12 77:19
  80:15 81:17 82:6
  90:7 101:15
  112:20 125:11
  126:7 136:4
  138:10 150:9
  151:23 153:6
  157:14 198:24
  199:22 201:4
  206:1 207:9,11
  208:1
**witnessed** 102:13
**woke** 38:23,24
  39:1,6,7,8,9

**woman** 15:12,15
  15:16 118:18
  159:7 160:20
  161:7 169:21
**wood** 32:7,8
  110:23 186:20,22
  188:14,15,16
**word** 51:14 152:13
**words** 31:16 85:7
  107:7
**work** 22:18,19
  23:3,12,14,15,17
  30:18,19 31:3
  108:12 109:8,10
  130:6 169:24
**worked** 13:9 22:4
  22:5,8,10 23:8,11
  24:3,7 30:23
  108:6 115:1 170:2
**working** 13:11,14
  18:2 30:16 101:2
  110:2
**works** 190:18,20
**worried** 192:15
  196:20
**worries** 196:11
**wrap** 205:13
**wrapped** 99:8
**wrists** 165:1,2,2
**writing** 137:23
  142:18
**wrong** 77:14
**wrote** 106:15

**x**

**x** 4:1,7 201:14

**y**

**y** 124:16
**yard** 109:8,10
  110:18 145:22,23
  145:24,24

**yeah** 39:18 45:13
  52:17 56:15 57:6
  66:8 77:2 78:2
  86:20 89:6 108:20
  111:4 130:16
  145:17,23,23
  146:11 148:10
  150:9,9 168:19
  183:7
**year** 12:2,21 16:5
  16:9 22:14 108:4
  108:8 130:14,15
  130:19 134:11
**year's** 131:16
**yearly** 137:3
**years** 12:10,11,22
  13:2 17:10 34:24
  107:20 134:8
**young** 86:1 183:7

**z**

**zoom** 7:9 40:14
  104:21 117:9
  197:19
**zoomed** 117:10