## Page 1

```
 1        THE UNITED STATES DISTRICT COURT
 2     FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 3               -   -   -
 4   CARMEN RILEY, Administrator    :
     of the Estate of TY'RIQUE      :
 5   RILEY, et al.,                 :
                  Plaintiffs,       :
 6                                  :
     -vs.-                          :
 7                                  :
     BRIAN CLARK, Warden of         :
 8   Dauphin County Prison,         :
     et al.,                        :
 9           Defendants.      : No. 4:20-CV-00325
10               -   -   -
11        Tuesday, April 25, 2023
12               -   -   -
13           Videoconferenced deposition of
14   THOMAS MATTHEWS, taken pursuant to notice, was
15   held virtually in the Commonwealth of
16   Pennsylvania, commencing at 10:02 a.m., on the
17   above date, before Jared Carey, a Professional
18   Reporter and Notary Public in and for the
19   Commonwealth of Pennsylvania.
20               -   -   -
21        ESQUIRE DEPOSITION SERVICES
                1835 Market Street
22                 Suite 555
           Philadelphia, Pennsylvania 19103
23               (215) 988-9191
24
```

## Page 2

```
 1   APPEARANCES:
 2   MINCEY FITZPATRICK ROSS, LLC
     BY: KEVIN MINCEY, ESQUIRE
 3      RILEY H. ROSS, III, ESQUIRE
     1650 Market Street, 36th floor
 4   Philadelphia, Pennsylvania 19103
     215.550.1999
 5   Attorney for the Plaintiffs
     (Appearing via Zoom)
 6
 7   LAVERY LAW
     BY: FRANK J. LAVERY, JR., ESQUIRE
 8   225 Market Street, Suite 304
     PO Box 1245
 9   Harrisburg, Pennsylvania 17108
     717.233.6633
10   Attorney for Defendants, Dauphin County,
     et al.
11
12   MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN
     BY: DONALD L. CARMELITE, ESQUIRE
13   100 Corporate Center Drive
     Suite 201
14   Camp Hill, Pennsylvania 17011
     717.651.3504
15   Attorney for Defendants, Matthew Danner and
     Angela Swanson
16   (Appearing via Zoom)
17
18   MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN
     BY: JOHN R. NINOSKY, ESQUIRE
19   100 Corporate Center Drive
     Suite 201
20   Camp Hill, Pennsylvania 17011
     717.651.3709
21   Attorney for the Defendants, PrimeCare,
     et al.
22
23
24
```

## Page 3

```
 1        APPEARANCES: (Continued)
 2
 3   MACMAIN LEINHAUSER
     BY: MATTHEW S. POLAHA, ESQUIRE
 4   433 W. Market Street, Suite 200
     West Chester, Pennsylvania 19382
 5   484.463.1014
     Attorney for Defendants, The Susquehanna
 6   Defendants
     (Appearing via Zoom)
 7
 8
 9
10   ALSO PRESENT:
11   Carmen Riley
12
13
14
15
16
17
18
19
20
21
22
23
24
```

## Page 4

```
 1             I N D E X
 2   WITNESS                          PAGE
 3   THOMAS MATTHEWS
 4   BY: MR. LAVERY                    6
 5       MR. NINOSKY                  164
 6       MR. POLAHA                   165
 7       MR. CARMELITE                170
 8       MR. MINCEY                   180
 9         E X H I B I T S
10   MARKED      DESCRIPTION          PAGE
11   TMK 1    Ganz Ske Facebook        31
12   TMK 2    Call Summary Report      42
13   TMK 3    Call synopsis            84
14   TMK 4    Susquehanna Call reports 94
15   TMK 5    Ambulance trip sheet    106
16   TMK 6    Photos Holy Spirit Hosp. 109
17   TMK 7    Toxicology records      114
18   TMK 8    Holy Spirit Hosp. records 116
19   TMK 9    Call Summary 6/28/19    160
20
21
22
23
24
```



Page 5

```
 1
 2                    DEPOSITION SUPPORT INDEX
 3
 4   Direction to Witness Not to Answer
 5   Page Line        Page Line        Page Line
 6   None
 7
 8
 9   Request for Production of Documents
10   Page Line        Page Line        Page Line
11   None
12
13
14   Stipulations
15   Page Line        Page Line        Page Line
16   None
17
18
19   Question Marked
20   Page Line        Page Line        Page Line
21   None
22
23
24
```

Page 6

```
 1                       - - -
 2            THOMAS MATTHEWS, having been duly
 3   sworn, was examined and testified as follows:
 4                       - - -
 5                   EXAMINATION
 6                       - - -
 7   BY MR. LAVERY:
 8       Q.    Good morning.  My name is Frank
 9   Lavery.  I am a lawyer, if you can tell it or
10   not but I am.  In any event I represent the
11   Dauphin County Prison defendants in a lawsuit in
12   which you are a plaintiff along with Carmen
13   Riley.  And it deals with the death of Ty'Rique
14   Riley back in 2019.  I will ask you some
15   questions concerning the case in what is called
16   a deposition.
17            Have you ever given a deposition
18   before?
19       A.    No.  Can you hear me?
20       Q.    I can hear you better now.  If
21   you can just keep your voice up.  That is one of
22   the instructions I will give you.  Keep your
23   voice up.  That would be helpful.
24            Were you present for the
```

Page 7

```
 1   deposition of Carmen Riley?
 2       A.    Yes.
 3       Q.    Essentially it's going to be the
 4   same ground rules.  It's a question-and-answer
 5   session.  You understand that you have sworn to
 6   tell the truth just as if you were actually
 7   sitting in a courtroom.  Do you understand that?
 8       A.    Yes.
 9       Q.    A couple ground rules that will
10   make things go quicker hopefully for the court
11   reporter because there is going to be both a
12   stenographic and I believe a video record of the
13   deposition.
14            But in any event, answer all of
15   the questions verbally if you would, sir.  Do
16   not shake your head, nod your head, say uh-huh,
17   mm-mmh, that type of thing.  Because the court
18   reporter cannot interpret that.  Give me a
19   verbal answer:  Yes, no, or whatever the
20   appropriate verbal response is.  Do you
21   understand that?
22       A.    Yes.
23       Q.    Let me finish my question and I
24   will let you finish your answer so we are not
```

Page 8

```
 1   talking over each other.  Is that acceptable to
 2   you?
 3       A.    Yes.
 4       Q.    If you do not hear or understand
 5   me at any time just ask me to rephrase or re-ask
 6   the question for you.  I will do that.  I don't
 7   want you to answer anything that you do not
 8   fully hear or understand.  Is that acceptable to
 9   you?
10       A.    Yes.
11       Q.    If you do answer the question I
12   will assume that you heard the question, you
13   understood the question, and you are trying to
14   give me your best answer to the question.  Is
15   that fair for you?
16       A.    Yes.
17       Q.    If at any time you want to take a
18   break just let me know.  That is fine.  We will
19   be happy to do that.  If you need to go back at
20   any point and you realize you wanted to add
21   something to a question or you wanted to correct
22   an answer to a question, that is fine.  Just let
23   me know that.
24            I would be happy to accommodate
```



Page 9

1 you.  You can certainly go back and do that.  Do
2 you understand that?
3      A.    Yes.
4      Q.    Are you currently taking any type
5 of medications, sir?
6      A.    I am supposed to be but I'm not.
7      Q.    Fair enough.  What are you
8 supposed to be taking?
9      A.    Tizanidine, which is a muscle
10 relaxer for scoliosis.  No. 2, metoprolol, which
11 is a statin.  No. 3, atorvastatin, cholesterol;
12 No. 4, diazepam, which is the generic name which
13 is called Valium for anxiety, three a day.  The
14 other ones were one a day; Tizanidine, three a
15 day.
16     Q.    When was the last time you took
17 the Valium three times per day?
18     A.    The end of January, beginning of
19 February.
20     Q.    When was the last time you took
21 any of the other medications?
22     A.    Probably about two weeks ago.
23     Q.    What did you take approximately
24 two weeks ago?

Page 10

1      A.    Atorvastatin, metoprolol.  And
2 there was another drug called Prazosin.
3      Q.    And since approximately two weeks
4 ago you have not taken any of those medications;
5 is that correct?
6      A.    Correct.
7      Q.    Have you consumed any alcohol in
8 the last 24 hours?
9      A.    No.
10     Q.    Have you ever had a medical
11 marijuana card?
12     A.    No.
13     Q.    Is there any reason today why you
14 would not be able to fully understand and answer
15 questions about this lawsuit?
16     A.    No.
17     Q.    Did you speak to anybody to
18 prepare for your deposition?
19     A.    My lawyer.
20     Q.    And I don't want you to tell me
21 what you talked about with your law firm.  But
22 when did you meet with them about the
23 deposition?
24     A.    Sunday 2:00 p.m.

Page 11

1      Q.    Was that in person or was that by
2 Zoom or video?
3      A.    Zoom.
4      Q.    Have you spoken to anybody else
5 about your deposition?
6      A.    Carmen Riley.
7      Q.    When did you speak to Carmen
8 Riley?
9      A.    Every night, every day.
10     Q.    And what have you talked to
11 Carmen Riley about your deposition?
12     A.    How to approach this.
13     Q.    And what did you and she talk
14 about in terms of how to approach this?
15     A.    What the topic can possibly be.
16     Q.    And did you also talk about what
17 the possible answers might be to those topics?
18     A.    Some.
19     Q.    Which possible answers did you
20 talk about with Carmen Riley?
21     A.    A lot.
22     Q.    A lot.  Okay.  You talked about a
23 lot of potential questions and what a lot of the
24 potential answers should be to those questions;

Page 12

1 is that right?
2      A.    Yes.
3      Q.    Have you looked at any documents
4 to get ready for the deposition?
5      A.    Repeat the question, please.
6      Q.    What documents did you look at,
7 if any, to prepare for the deposition?
8      A.    I believe the police departments.
9      Q.    I am sorry.  Can you say that
10 again?
11     A.    I believe the police department.
12     Q.    Oh.  Records from Susquehanna
13 Police Department?
14     A.    Yes.
15     Q.    Any other records other than
16 records from Susquehanna Police Department?
17     A.    No other.  Can I rephrase that?
18     Q.    Sure.
19     A.    Holy Spirit Hospital.
20     Q.    Would those be records concerning
21 you from Holy Spirit Hospital?
22     A.    Yes.
23     Q.    I sent over to your attorney nine
24 exhibits.  They are premarked TMK-1 through



Page 13

1 TMK-9. Have you looked through those documents?
2      A.    I couldn't see from the Zoom
3 meeting. But I seen a white paper with
4 highlighting on it. And it was read to me by
5 Kevin Mincey, my attorney.
6      Q.    You don't have to tell me about
7 that. That's fine.
8          Have you reviewed any videos?
9      A.    No.
10      Q.    Have you looked at the transcript
11 of Carmen Riley's deposition?
12      A.    No.
13      Q.    What is your date of birth, sir?
14      A.    2/26/1961.
15      Q.    What is your educational
16 background?
17      A.    Eleven and a half grade.
18      Q.    Where did you complete the eleven
19 and a half years? At what school?
20      A.    John Harris, Harrisburg,
21 Pennsylvania, High School.
22      Q.    Are you currently employed?
23      A.    No.
24      Q.    When was the last time that you

Page 14

1 were employed?
2      A.    August 23, 2008; 2:00 p.m.
3      Q.    You seem to know that pretty
4 specifically. What happened on August 23, 2008
5 at 2:00 p.m.? Do you understand my question?
6      A.    Repeat that, please.
7      Q.    Let me rephrase it. What
8 happened in August 2008 at 2:00 p.m. on some day
9 that month that caused you to stop working?
10      A.    I think it was a change in
11 management for, one. Two, I was let go. They
12 didn't give me a reason why I was let go.
13      Q.    Which company let you go?
14      A.    Saratoga Transport I believe it
15 was.
16      Q.    Do you know if they are still in
17 business?
18      A.    No. They are not as far as I
19 know.
20      Q.    Back in 2008 where were they
21 located?
22      A.    I don't know the correct address.
23 I just know Saratoga Springs, New York.
24      Q.    What did you do for that company?

Page 15

1      A.    I personally was a over-the-road
2 truck driver. It was a local company from out
3 of that area that pulled for Anheuser Busch,
4 Coca-Cola and Pepsi. That's what I did.
5      Q.    As part of your job did you have
6 to actually handle the freight?
7      A.    Yes.
8      Q.    Have you had any employment since
9 August of 2008?
10      A.    No.
11      Q.    Why is that?
12      A.    I retired.
13      Q.    And at some point did you start
14 collecting disability?
15      A.    2010.
16      Q.    Where did you start collecting
17 disability from in 2010?
18      A.    Social Security Retirement
19 Disability.
20      Q.    Do you currently collect Social
21 Security Retirement Disability?
22      A.    Yes, I do.
23      Q.    How much do you collect per
24 month?

Page 16

1      A.    $1,650.
2      Q.    Do you have any other source of
3 income other than Social Security Disability?
4      A.    No, I do not.
5      Q.    Where do you currently reside,
6 sir?
7      A.    1931 Franklin Avenue, Harrisburg,
8 PA 17109.
9      Q.    And who do you reside with
10 currently at that address?
11      A.    Carmen Riley, Leonard Riley,
12 Thomas Matthews.
13      Q.    Anybody else?
14      A.    No. They are deceased now.
15      Q.    What's that?
16      A.    Her mother was living until
17 November. She passed away.
18      Q.    Is that Carmen's mother?
19      A.    Yes.
20      Q.    Does Carmen live with you at that
21 address?
22      A.    It is her house. I live with
23 her.
24      Q.    And Leonard Riley is who? Is

Page 17

1  that a relation to Carmen Riley?
2      A.    Yes.
3      Q.    And what relationship do those
4  two have?
5      A.    Older brother.
6      Q.    Thomas Matthews, what the
7  relationship of Thomas Matthews to you, if any?
8      A.    You are speaking to him.
9      Q.    Okay.  That's you; is that
10  correct?
11     A.    Yes.  Blows your mind, right?
12     Q.    I didn't know if there was
13  another Thomas Matthews.  I thought you were
14  Thomas Matthews-Kemrer.  But anyway --
15     A.    Yes.  Same thing.
16     Q.    My bad.  I apologize.
17          How long have you lived at 1931
18  Franklin Avenue?
19     A.    26 years, I believe.
20     Q.    Have you ever lived at 2003
21  Franklin Avenue?
22     A.    No.
23     Q.    Do you know who lived there back
24  in June of 2019 at the 2003 address?

Page 18

1      A.    Two cats, Royal and Precious.
2      Q.    Two cats.  Royal and Precious.
3  Anybody else?
4      A.    No.
5      Q.    No human inhabitants?
6      A.    I stayed there occasionally.  I
7  was the groundskeeper of the property.
8      Q.    How occasionally did you stay
9  there back in June 2019?
10     A.    I would say every other day
11  maybe, yeah.
12     Q.    And every other day how much time
13  would you spend at that place, 2003 Franklin
14  Avenue?
15     A.    In the property on the property?
16     Q.    Sorry?
17     A.    In the property or on the
18  property?
19     Q.    Either.
20     A.    Either?
21     Q.    Yep.
22     A.    On the property daily.  In the
23  property an hour a day, maybe in the evening for
24  the cats or a place to go to think about things

Page 19

1  and get out of the heat at that time.
2      Q.    Who owned the cats?
3      A.    A previous tenant, yes.
4      Q.    Who would that have been?
5      A.    The name of I believe it was
6  Larry Lynch.
7      Q.    Was he also the owner of the
8  property?
9      A.    No, he was not.
10     Q.    Who was the owner of the
11  property, if you know?
12     A.    David Smith.
13     Q.    To your knowledge did Mr. Smith
14  ever live on the property?
15     A.    No, not at all.
16     Q.    How was it that it came to be
17  that Royal and Precious were there and you
18  became the groundskeeper for that property?
19     A.    The previous tenant up and left.
20  We are good friends.  He was a neighbor.  And
21  handed me the keys and said, You can stay there
22  if you want.  And I was in and out.  He left the
23  cats and just disappeared.
24     Q.    Who was that person?

Page 20

1      A.    Larry Lynch.
2      Q.    Sorry.  You said that.
3          Did you ever pay rent to
4  Mr. Smith?
5      A.    No, sir.
6      Q.    Do you know if Mr. Lynch ever
7  paid rent to Mr. Smith?
8          MR. MINCEY:  Objection, if you
9     know.
10         THE WITNESS:  I don't know.  I
11    don't know his business.
12  BY MR. LAVERY:
13     Q.    That's the answer then.
14     A.    Okay.  Good to you?
15     Q.    Yes.
16     A.    Okay.
17     Q.    Now, were you ever married to
18  Carmen Riley?
19     A.    No.
20     Q.    How many children did you have?
21     A.    At the time I had two grown boys.
22     Q.    At that time we are talking about
23  June of 2019, correct, sir?
24     A.    Yes.



THOMAS MATTHEWS
CARMEN RILEY vs BRIAN CLARK

April 25, 2023
21–24

Page 21

1    Q.    Was one of those sons Ty'Rique?
2    A.    Ty'Rique Riley.
3    Q.    And who was the other son?
4    A.    Brandon Holloman.
5    Q.    Which of your sons was older?
6 Ty'Rique or Brandon?
7    A.    Brandon.
8    Q.    When was Brandon born
9 approximately?
10    A.    1985.
11    Q.    How about Ty'Rique approximately?
12    A.    1997.
13         MR. MINCEY:  Frank, it's
14 Ty'Rique, not Ty'Rique.
15         MR. LAVERY:  Sorry, sir?
16         MR. MINCEY:  It's Ty'Rique, not
17 Ty'Rique.
18         MR. LAVERY:  Ty'Rique.  Okay.
19 Sorry.
20 BY MR. LAVERY
21    Q.    And Brandon, was he living with
22 you in June of 2019 at 1931 Franklin?
23    A.    No.
24    Q.    Where was he living?

Page 22

1    A.    Kennesaw, Georgia, outside of
2 Atlanta.
3    Q.    How long had he been down in that
4 area?
5    A.    Six to ten years.
6    Q.    Now, with Ty'Rique -- am I
7 pronouncing that right now?  I just want to make
8 sure I am not saying it the wrong way.
9         MR. MINCEY:  Yes.
10 BY MR. LAVERY
11    Q.    With Ty'Rique, can you describe
12 your relationship with Ty'Rique?
13    A.    A very strong bond.  He was my
14 copilot.  When I worked and I drove a truck I
15 took him with me -- both of them.  Carmen and
16 Ty'Rique occasionally.  He would read the map
17 for me, help me load and unload.
18         He would unhook the trailer, hook
19 the trailer.  Move the tandem wheels, the
20 trailer wheels, slide them back and forth.  I
21 taught him a lot in reference to that
22 occupation.
23    Q.    And after you retired how would
24 you describe your relationship with Ty'Rique?

Page 23

1    A.    I got to spend more time with him
2 in his life and be home more.
3    Q.    Did you still have the same close
4 bond with him that you had before?
5    A.    Even closer.  I could mentor him
6 through life.
7    Q.    What are the kinds of things that
8 you would do together with Ty'Rique after you
9 retired?
10    A.    Fish, work on cars, rebuild lawn
11 mowers of all types, weed wackers, lawn care.  I
12 was kind of helping him build up a landscaping
13 business on his own so he can go work
14 independently.
15    Q.    Was Ty'Rique doing anything
16 employment-wise at the time of his death?
17    A.    No.  He was supposed to have been
18 incarcerated at the time of his death.
19    Q.    I get that.  Before his arrest as
20 of June -- the date he was arrested in June of
21 2019 at the house, I think it might been
22 June 18th or 19th, did he have a job somewhere?
23 Was he employed?
24    A.    He worked for a temp service

Page 24

1 possibly.  Several at that time.  He was not
2 working.  He was waiting on a transition to
3 another facility.
4    Q.    What was the name of that service
5 that he worked through at that time?
6    A.    Me myself have no clue.  My wife,
7 his mother, she knew.  I didn't.
8    Q.    That's fine.
9         When was the last time he had
10 actually worked somewhere through that service
11 as -- sorry, sir.  Bad question.
12         As of the time of his arrest
13 where was the last placement that he had had
14 through whatever service he was working through?
15    A.    Actually I transported him to and
16 from work in Mechanicsburg which would have been
17 Silver Springs Road, Chewy warehouse, dog and
18 cat food.
19    Q.    When in time would that have been
20 in relation to June 18, 2019?
21    A.    Beginning of April into May.
22 5:00 a.m. to 3:00 or 4:00 p.m., five days a
23 week.
24    Q.    And why did Ty'Rique leave that

Page 25

1 placement?

2      MR. MINCEY: Objection to form.

3   You can answer.

4      THE WITNESS: Trying to figure it

5   out. I don't know offhand.

6 BY MR. LAVERY

7   Q.    Before working over at Chewy in

8 Mechanicsburg do you recall the placement that

9 Ty'Rique had before through this service?

10   A.    I believe another building on the

11 same property across from that building. He

12 stayed in that area of that industrial park from

13 his temp services, yes. All I know is that is

14 where I dropped him off. Which building he went

15 in it varied based upon his assignments that he

16 got.

17   Q.    When was it he would have worked

18 at the other building? You said that he worked

19 at the Chewy building in April/May. When was it

20 he worked at the other buildings?

21   A.    One day, another day at the other

22 building. I come back and he is coming out

23 another building to pick him up. So he bounced

24 from three buildings side by side from each

Page 26

1 other. I don't know what was in those buildings

2 other than Chewy and maybe other contractors.

3   Q.    Maybe this will make the question

4 clearer. When did he start working over in that

5 complex of buildings through the service?

6   A.    It might have been December the

7 following year.

8   Q.    Do you know of any other places

9 that Ty'Rique worked before he worked in this

10 complex of buildings beginning approximately

11 December the year before his death?

12   A.    I don't know.

13   Q.    Did Ty'Rique perform any services

14 around the house for you before his death

15 obviously?

16   A.    Yes. He provided firewood. We

17 burned firewood for heat. He helped cut the

18 grass. He ran the weed wacker -- excuse me.

19 I'm in pain. I ran the riding mower. He used

20 the push mower. He does -- he did -- sorry --

21 cut the firewood to keep us warm throughout the

22 winter. Summertime he did the grass.

23   Q.    Anything else that he did?

24   A.    Worked on his own car. I was

Page 27

1 teaching him how to be self-sufficient and be

2 his own mechanic, how to soup up his car.

3   Q.    Now, you just said you were in

4 pain. Do you want to take a break? If you need

5 a break you just let me know. I probably should

6 have said that at the beginning of the

7 deposition. If you need a break --

8   A.    I came in with pain. I'm okay.

9   Q.    You are okay to continue?

10   A.    Yes. I'm dealing with this every

11 day.

12   Q.    I got it. You can understand my

13 questions and answers, correct?

14   A.    Yes, sir.

15   Q.    Good enough.

16      Did Ty'Rique have a family

17 physician or a primary care physician prior to

18 his death?

19   A.    Yes, he did. I don't know his

20 name, though. I just know it was at the

21 Hummelstown area, Harrisburg. I took him there

22 many times. The end of Derry Street in

23 Harrisburg, Hummelstown. I took him there many

24 times. I don't offhand know the name of the

Page 28

1 place.

2   Q.    What would he go there to be seen

3 for when you took him many times?

4   A.    I believe it would have been

5 primary care.

6   Q.    Do you know if Ty'Rique was ever

7 treated for any type of emotional issues or

8 emotional problems prior to his death?

9   A.    No.

10   Q.    No, you don't know? Or, no, he

11 was not?

12   A.    No. I am sorry. No.

13   Q.    Do you know if Ty'Rique was ever

14 treated for any type of mental health issues

15 prior to his death?

16   A.    No, he was not.

17   Q.    Do you know if Ty'Rique ever saw

18 a counselor, a psychiatrist, or a psychologist

19 before his death?

20   A.    No, he was not.

21   Q.    Did you believe that Ty'Rique had

22 any type of mental health or emotional health

23 issues prior to his death?

24   A.    Yes.



Page 29

1    Q.    Can you describe that for me,
2 please?
3    A.    I believe June 14, 2019 he was
4 having migraines, not too talkative, just
5 confused, sweating, headaches and confused is
6 what I seen back then.  It's been a long time.
7    Q.    I understand that, sir.  You can
8 tell me what you remember.
9    A.    I'm trying to go back.  Give me a
10 second.
11    Q.    That's fine.
12    A.    I am not going to say hysterical.
13 But in a sense he was trying to tell me
14 something that I couldn't understand.  I would
15 say delusional but no.  A confused look, a
16 hollow look the last few days from his birthday,
17 a disappointed look, a depressed look.  Yeah,
18 that was it.
19    Q.    Had he ever manifested any of
20 these symptoms before approximately June 14,
21 2019?
22    A.    No.
23    Q.    Did you talk to Ty'Rique about
24 what was bothering him, what his situation was

Page 30

1 at that time?
2    A.    Yes, I did in a sense.  He always
3 kept my phone.  And I don't understand the young
4 generation with the emojis, if you know what
5 emojis are?
6    Q.    Yeah.  I know what they are.
7    A.    Okay.  I didn't at that time.  I
8 am still learning.  He constantly sat as if he
9 is playing a game on TV with his fingers and
10 talking to himself through the phone to
11 somebody.  And emojiing and back and forth day
12 and night.  It's like a war, like a PS3 game,
13 you know?
14    Q.    So he was exchanging emojis with
15 somebody over his phone as best you can recall
16 it?  I am trying to understand what you are
17 saying because I am not big on those things
18 either.
19        So that would be accurate,
20 correct?  He was exchanging emojis on his phone
21 with somebody; is that right?
22    A.    Yes.
23    Q.    Did he ever do that before to the
24 best of your knowledge?

Page 31

1    A.    Not at that pace.
2        (Exhibit 1 was marked for
3 identification.)
4        MR. LAVERY:  If you can show
5 Mr. Matthews TMK-1.  Kevin, you might be
6 the closest to him.
7        MR. MINCEY:  I'm pulling it up
8 right now.
9        MR. LAVERY:  Fair enough.
10 BY MR. LAVERY
11    Q.    This is a three-page document.
12 It's got markings on the bottom because it was
13 obtained from Dauphin County CID.  The first
14 page is marked 1013.  It's 1014, 1015 and 1016.
15 Do you see those?
16    A.    Yes.
17    Q.    Do you recognize this document?
18    A.    I do not recognize the document.
19 I recognize the individual holding cash in it.
20 And the picture is down below, yes.
21    Q.    Who is the individual holding
22 cash in the picture?
23    A.    That would have been a school
24 friend that I don't know his name.  I took him

Page 32

1 every day to summer school two years straight.
2 As a father I put my son in summer school.  I
3 don't know this kid's name.  I dropped him off
4 in the city at his grandmother's.
5    Q.    Do you know where this person
6 lived?
7    A.    North Street with his
8 grandmother.  I just dropped him off there.
9 That's all I did.  No communication with him.
10    Q.    And you see at least on this
11 there is a lot of emojis there?  Do you see
12 that?
13    A.    Yes.  That's what I was talking
14 about.
15    Q.    That's why I'm asking you about
16 it because I thought that might be the case.
17    A.    Yes.  That's it there.  That's
18 what was on my phone.  But I'm not sure it came
19 from -- this individual was dead.  Right here
20 this guy here was killed in a parking lot in the
21 city.  Him and another kid sitting in a car by a
22 older man.  That was his friend.  He was hurt
23 over this friend, the loss of his friend.
24        He only went to school with this



Page 33

1  guy.  He didn't socialize with this guy.  I
2  remember that clearly.  I don't know his name.
3      Q.    Do you know recall approximately
4  when this person would have passed away?
5      A.    2019.  The following year that
6  summer, yeah.
7      Q.    Did he die before Ty'Rique died?
8      A.    Yes.  Clearly.
9      Q.    There seems to be a thing it says
10  at least here for the name Ganz, G-A-N-Z, Ske,
11  S-K-E.  Do you see that?
12      A.    Yes.  Hold on.  Wait a minute.
13  Yeah, yeah, yeah.
14      Q.    Then underneath the photo on the
15  top where the individual is holding the cash
16  again it says Ganz Ske June 14.  Do you see
17  that?
18      A.    Yes.  Looking right at it.
19      Q.    Do you know if this person was
20  alive on June 14, 2019?
21      A.    No.  He was dead.
22      Q.    He was dead.  So that would have
23  had to have been June 14th the year before; is
24  that right?

Page 34

1          MR. MINCEY:  Objection.
2          THE WITNESS:  He was alive then.
3  BY MR. LAVERY:
4      Q.    Okay.
5      A.    Before he was alive but he was
6  not with Ty'Rique.
7      Q.    Now, you talked about the photos
8  that are below there kind of next to where the
9  emojis and the other letters are.  Do you see
10  those three photos?
11      A.    Yes.  That's from their high
12  school.  That's when they were in high school.
13  And they would take selfies in the cafeteria and
14  then in back of the classroom.  That one there
15  would be two guys that's on the bus.  He rode
16  the bus home.
17      Q.    Is Ty'Rique in any of those
18  photos?
19      A.    All three.  Little picture he is
20  in the middle.
21      Q.    Okay.
22      A.    The first picture, that would be
23  to the left, the first picture with the green
24  background I believe he is on the left.  I don't

Page 35

1  know if that character in the middle is Ganz.
2  The other character I don't know.  Same as the
3  middle one.  My son is in the middle one.  That
4  is the middle picture.  The last picture my
5  son's face is clear right there.
6      Q.    He is the person in the
7  foreground of the picture, correct?
8      A.    Yes.
9      Q.    On the --
10      A.    There are emojis clear as
11  day.
12      Q.    I can see them.  Going back to
13  the first picture on the left, you said the
14  individual on the left in that first picture to
15  the left was Ty'Rique; is that correct?
16      A.    Looks like him.
17      Q.    The picture in the middle, was
18  that Ganz -- sorry.  The individual in the
19  middle of the first picture on the left, is that
20  Ganz?
21      A.    Yes.
22      Q.    I think you said you don't know
23  who the third person was; is that correct?
24      A.    Yes.  Sorry.  Never seen him

Page 36

1  before.
2      Q.    Can you go to the second page
3  which is marked on the bottom CID 1014?
4      A.    Purple drank?
5      Q.    Yes.  Do you see that?
6      A.    Yes.  I am getting educated here,
7  yeah.
8      Q.    That's actually where I was
9  headed.  As of June 2019 did you know what
10  purple drank was?
11      A.    Not by that name.
12      Q.    What did you know it by?
13      A.    Lean and syrup.
14      Q.    In fact, if you look at that page
15  under purple drank it says a/k/a and the first
16  word is "lean"?
17      A.    Yeah.
18      Q.    The third word is "syrup",
19  correct?
20      A.    Yes.
21      Q.    There seems to be two entries
22  again for Ganz Ske.  One June 13th over on the
23  right and one for June 14th which again has some
24  words, some letters, and a whole lot of emojis.



THOMAS MATTHEWS
CARMEN RILEY vs BRIAN CLARK

April 25, 2023
37–40

Page 37

1  Would you agree?
2      A.    Oh, yeah.
3      Q.    It says under the June 13th entry
4  it's either, Ohatt or Chatt, why I drank syrup.
5           Do you see that?
6      A.    I believe it's a D-H-A-T-T.
7  Dhatt why I drank syrup.  And the emojis are --
8      Q.    Thank you.
9      A.    Where the emojis are is the same
10  phrase I believe.  June 14th.  D-H-A-T-T?  See
11  where it says?
12     Q.    Yes, I do.
13     A.    Now we are on to something here.
14     Q.    All right.  Did you ever know
15  Ty'Rique to consume either lean, syrup or drank?
16     A.    No, I didn't.  I complained about
17  my cough syrup missing.  Did one of his friends
18  take it?  He never answered me.  It never came
19  up still to this day I can't find it.
20     Q.    When in time was that that you
21  noticed your cough syrup was missing?
22     A.    His birthday.
23     Q.    And when would that be again?
24     A.    June 14th.

Page 38

1      Q.    June 14th.
2      A.    Hold on.  June 14, 2019 -- I have
3  to calm down.  I am sorry.
4      Q.    Take your time.  If you want a
5  break let me know.  That's fine.
6      A.    No.  He is on to something here.
7      Q.    June 14, 2019 would have been his
8  birthday, correct?
9      A.    Correct.  And you have to excuse
10  me.  I'm upset from the emojis that I couldn't
11  get answers from him as to why you have my
12  phone.
13     Q.    Do you know if any of these pages
14  came from your phone?
15     A.    No, I don't.
16     Q.    When was it that you noticed your
17  cough syrup was gone?  Was it June 14, 2019?
18     A.    Yes.
19     Q.    That would have been four days
20  before the incident where Ty'Rique was arrested,
21  correct?
22     A.    Yes.
23     Q.    Did you talk to Ty'Rique about
24  your cough syrup being missing?

Page 39

1      A.    Yes.  Most definitely.
2      Q.    Did he tell you anything about
3  that?
4      A.    Other than he didn't know where
5  it was.
6      Q.    I think you testified before that
7  June 14th was approximately the date where
8  Ty'Rique started having the issues with respect
9  to -- I think I asked you if he had any
10  emotional problems.  And you mentioned about the
11  emojis and he was having migraines and that type
12  of thing.  That was around June 14 as well; is
13  that correct?
14     A.    Yes, it is.
15     Q.    Did you consider whether or not
16  any of those out of the ordinary symptoms that
17  Ty'Rique was experiencing to potentially have
18  been related to lean, syrup or purple drank?
19     A.    Confused.  I was unaware of this
20  diagnosis at that time.  I was confused on how
21  he was acting to me to make a judgment if he
22  needed help or anything.  It left me baffled.
23     Q.    Okay.  My question was did you in
24  your own mind at that time, if you remember, did

Page 40

1  you in your own mind think that maybe what was
2  causing this could have been Ty'Rique consuming
3  lean, syrup or drank or whatever you want to
4  call it.
5      A.    No.
6      Q.    Okay.
7      A.    Sorry.  I felt a little too
8  anxious to answer the question.
9      Q.    That's fine.
10     A.    You are on point with something
11  here.
12     Q.    If you can go to the next page of
13  the exhibit marked at the bottom CID 1015.  It's
14  the third page.  There is two pictures.  One of
15  shows a young man.  Looks like he might be
16  sitting in a trunk of a vehicle that's open.  Do
17  you see that?
18     A.    Yes, I do.
19     Q.    Can you identify that individual?
20     A.    No, I cannot.  He has his head
21  down.
22     Q.    Yes, he does.  I agree with you.
23  He does.  Does it like look he has cash in his
24  hands?



THOMAS MATTHEWS
CARMEN RILEY vs BRIAN CLARK

April 25, 2023
41–44

Page 41

1    A.    Yes.
2    Q.    Do you know if Ty'Rique had a
3  Facebook account as of June 2019?
4    A.    I don't know what he had.
5    Q.    I take it you are not a Facebook
6  guy, right?
7    A.    No.  He had set my account up but
8  I didn't know how to even get on.
9    Q.    You and me both, my friend.
10   A.    Okay.  I don't feel bad.
11   Q.    I'm finished with that document
12  at this point.
13   A.    Okay.
14        MR. MINCEY:  Can we take a quick
15  break so I can go to the restroom?
16        MR. LAVERY:  Sure.  Let's take
17  ten minutes.
18        (Discussion held off the record.)
19  BY MR. LAVERY
20   Q.    Mr. Matthews, you mentioned
21  before that you were taking I think it was
22  Valium for anxiety; is that correct?
23   A.    Yes.
24   Q.    Approximately for what period of

Page 42

1  time have you been taking Valium -- strike that.
2        When did you start taking Valium
3  I guess is the best way to start this.
4    A.    2017, I believe.
5    Q.    And I think you said you took it
6  three times a day; is that right?
7    A.    Yes.
8    Q.    And are you doing that on a
9  continual basis up until now?
10   A.    Until the end of January.
11   Q.    Sorry.  You are right.  You said
12  that you stopped taking it the end of January
13  of 2023; is that correct?
14   A.    Yes.
15   Q.    Did the doctor either in
16  Hummelstown Road or on Derry Street, do you know
17  if that person ever prescribed any medication
18  for Ty'Rique?
19   A.    No.
20   Q.    To your knowledge was any
21  medication ever prescribed for Ty'Rique before
22  his arrest?
23   A.    No.
24        (Exhibit 2 was marked for

Page 43

1  identification.)
2  BY MR. LAVERY
3    Q.    Now, if you can show Mr. Matthews
4  TMK-2.  Just so we are on the same page,
5  Mr. Matthews, what that exhibit is it's a
6  grouping of Call Summary Reports from
7  Susquehanna Township Police Department involving
8  your residence and your neighborhood.  These are
9  a variety.  They go from 2016 I think through
10  2018.  Do you have that exhibit in front of you?
11   A.    Yes.
12   Q.    I will ask if you remember any of
13  these events.  The first two pages of the
14  exhibit marked CID 567 and 568 pertain to a
15  report that took place on May 9, 2016.  Do you
16  see that?
17   A.    I see it.  I have not read it
18  yet.
19   Q.    That was going to be my next
20  question.  Have you read any of these reports
21  before now?  I am talking now about the entire
22  exhibit.  All of these reports -- these are a
23  compilation of reports called Summary Reports.
24  They start in 2016.  And they go through 2018.

Page 44

1        These are for different days.  My
2  question to you is have you seen any of these
3  reports before now that make up this exhibit?
4    A.    No, I have not.
5    Q.    Take a look at the first two
6  pages.  This appears to be a report of May 9,
7  2016.  And it involves a report of criminal
8  mischief to your vehicle.
9    A.    Okay.
10   Q.    567 and 568.  The first two
11  pages.
12   A.    Yes.  I remember that one.  Onto
13  the second page.
14   Q.    Are you reading the second page
15  now, sir?
16   A.    Yes.  Give me a second, please.
17   Q.    Surely.
18   A.    Okay.
19   Q.    Can you remember that particular
20  encounter?  I think it was with a patrolman
21  Arroyo.
22   A.    Yes, I do.
23   Q.    Tell me what you remember about
24  that.



THOMAS MATTHEWS
CARMEN RILEY vs BRIAN CLARK

April 25, 2023
45–48

Page 45

1    A.    He laughed me off.
2    Q.    He laughed you off?
3    A.    Yes.  When I filed a complaint in
4  regards to slashing of the tires.
5    Q.    How did he laugh you off?
6    A.    Like there was something wrong
7  with me.
8    Q.    Had you ever had any encounters
9  with that particular patrolman before?
10    A.    Quite a few.
11    Q.    So you knew him and he knew you,
12  right?
13    A.    Yes.
14    Q.    And he laughed off your complaint
15  at that time.  Can you go to the third page of
16  the exhibit.  And that is on the bottom CID 572.
17  The second page concerning that incident is 573.
18  It appears to pertain to a report that took
19  place on July 17, 2016.  Do you see that?
20    A.    Yes.
21    Q.    Do you want some time to read
22  that?
23    A.    No.
24    Q.    Do you remember making a report

Page 46

1  about people in the home across the street from
2  you?
3    A.    Yes.
4    Q.    What was reason for that report
5  at that point?
6    A.    Because the people that lived
7  there had previously asked me from my porch to
8  watch their house.  They were new to the
9  neighborhood from possibly the Poconos.  They
10  moved in.  And they were going to stay in
11  Florida.  So I watched their house.
12    Q.    If you go to the second page of
13  the exhibit it says -- and this again is the
14  officer's report.  This would be officer Wagner.
15  Did you know Wagner?
16    A.    No.
17    Q.    He said you expressed a concern
18  with some people cruising the street and casing
19  the house earlier today.  Is that accurate?  Did
20  you tell him something along those lines?
21    A.    No, I didn't.
22    Q.    What did you tell him?
23    A.    I said the landlord had went in
24  that house from the back, opened the front door,

Page 47

1  looked at me and closed it real fast while I was
2  sitting across the street on the porch.
3    Q.    Now, he says that in his report
4  that he believed that you can have a disconnect
5  with reality at times.  And he also indicates
6  that you suffer from PTSD and you advised the
7  officer that you suffer from PTSD.  Did you tell
8  that to the officer?
9    A.    Yes, I did.
10    Q.    What did you say to the officer
11  about having PTSD?
12    A.    I just said I have PTSD.
13    Q.    And from what did you have PTSD
14  from?  What caused that in your mind as you
15  understand it?
16        MR. MINCEY:  Objection.  You can
17    answer.
18        THE WITNESS:  I don't know what
19    caused it.
20  BY MR. LAVERY
21    Q.    When did you first experience it?
22        MR. MINCEY:  Objection.  If you
23    know.
24        THE WITNESS:  I don't know.

Page 48

1  BY MR. LAVERY
2    Q.    Did you continue to have it,
3  this is 2016, did you continue to have it in
4  June of 2019?
5    A.    Yes.
6    Q.    How serious did you in your mind
7  believe your PTSD was?
8    A.    Repeat the question, please.
9    Q.    In your mind how serious did you
10  believe your PTSD was?
11    A.    I didn't believe it was serious.
12    Q.    Do you get any medical treatment
13  for that?
14    A.    At that time, no.
15    Q.    How about after that?
16    A.    No.
17    Q.    How about until this day?
18    A.    Yes.
19    Q.    When did you first get treatment
20  for your PTSD?
21    A.    Three years ago.
22    Q.    Was that before or after
23  Ty'Rique's death?
24    A.    After Ty'Rique's death.



THOMAS MATTHEWS
CARMEN RILEY vs BRIAN CLARK

April 25, 2023
49–52

Page 49

1    Q.    If you go to the next report
2 which is from September 25, 2016 from officer
3 Brian Tienter.  It's CID 577.  It's the first
4 page -- sorry.  It's only one page.  My bad.
5 Sorry, Mr. Matthews.  My bad.
6         It's 9/25/16 for Mr. Tienter and
7 it's CID 577.  Have you seen this before?
8    A.    No.
9    Q.    Can you read it now, please?
10        MR. ROSS:  What page?
11        MR. LAVERY:  577.  It's the fifth
12   page of the exhibit.
13        MR. POLAHA:  Frank, if I may it's
14   officer Brian Tienter.
15        MR. LAVERY:  Okay.  Thank you.
16        THE WITNESS:  Give me a second,
17   please.
18 BY MR. LAVERY
19    Q.    Yes.  Sure.  Let me know when you
20 are ready.
21    A.    Okay.
22    Q.    Did you have any information at
23 that time, and we are talking about
24 September 2016, that the police received

Page 50

1 anonymous information about possible drug
2 violations at your residence on Franklin Avenue?
3    A.    No.  I'm unaware of that.
4    Q.    It seems to indicate here that
5 one of the offices had arrested three juveniles
6 in the lot of the Pines for marijuana that were
7 allegedly going to see your son when they lived
8 at the Pines -- when I guess the other three
9 juveniles did.
10        Did you have any concern about
11 your son using any type of illicit drugs at that
12 time, your son Ty'Rique?
13    A.    No.
14    Q.    Next page is CID 1029.  It's a
15 three-page summary report.  It goes from page
16 1029 through 1030 to 1031.  And it's 11/23/16.
17 And it appears that it is from a detective
18 Darryl Brown.  Do you see that?
19    A.    Yes.
20    Q.    Take your time to read those
21 three pages.
22    A.    Okay.
23    Q.    Have you had a chance to read
24 that, Mr. Matthews?

Page 51

1    A.    Yes.
2    Q.    It indicates here -- did you know
3 at that time in November 2016 who detective
4 Darryl Brown was?
5    A.    No.
6    Q.    It says at the bottom of the
7 first page that on November 23, 2016 chief
8 Martin received information of possible drug
9 activity being conducted at 1931 Franklin
10 Avenue.  Do you see that?
11    A.    Yes.
12    Q.    Was there any drug activity going
13 on at the residence at that time?
14    A.    No.  I was not aware of it.
15    Q.    Were you aware of any
16 surveillance by the police in that area around
17 that time?
18    A.    Yes.
19    Q.    Did you believe they were
20 watching your house?
21    A.    Just mine?  No.
22    Q.    Now, it indicates in here they
23 did a criminal history check.  And they found
24 in 2002 you had been arrested and pled guilty to

Page 52

1 attempt to possess a controlled substance.  Do
2 you see that?
3    A.    Yes.
4    Q.    Is that accurate?
5    A.    Yes.
6    Q.    And what was the controlled
7 substance that you attempted to possess at that
8 time?
9    A.    Crack cocaine.
10    Q.    And did you spend any time in
11 Dauphin County Prison over that incident?
12    A.    No, I didn't.
13    Q.    Have you ever been in Dauphin
14 County Prison incarcerated?
15    A.    One day.
16    Q.    When was that, sir?
17    A.    1989 I believe.
18    Q.    What were you there for in 1989?
19    A.    Child support.
20    Q.    Let's go to the next page then
21 that is at the bottom marked CID 1032.  Date of
22 the report of the incident was August 23, 2017,
23 officer Andrew Brady.  It seems there was some
24 sort of dispute between Michele Arrington and



THOMAS MATTHEWS
CARMEN RILEY vs BRIAN CLARK

April 25, 2023
53–56

Page 53

1 Ty'Rique who is described as her nephew.  Do you
2 see that?
3     A.    Yes, I do.
4     Q.    Were you aware of that incident
5 at the time?
6     A.    Yes, I am.
7     Q.    Tell me what your awareness was
8 at that time of what had gone on in that
9 incident.
10     A.    Ty'Rique woke me up to go there
11 to cut her grass.  That's my sister and her
12 husband.  I was sick that day.  I got up and got
13 dressed, loaded the truck up and went over.
14         I pulled the riding mower off the
15 truck with Ty'Rique and started cutting the
16 grass.  I started in the front of the house.
17 Ty'Rique was weed wacking the mailbox in the
18 front along the street and the driveway.  My
19 sister came out and started scolding him telling
20 him something.  But I had the lawnmower running
21 and I couldn't hear.
22         I stopped to the truck, shut the
23 mower off.  And she, my sister, was attempting
24 to argue with Ty'Rique about cutting the grass.

Page 54

1 My sister's nature is she raised her hand to hit
2 my son.  I spoke upon that and said, I don't
3 think you want to do that.  She said, I will do
4 you one better.  She reached into her back
5 pocket and pulled a cell phone out and dialed
6 911 for Lower Paxton Police Department.
7         I said, Come on, Ty.  We got to
8 go.  We loaded the truck and we left.  I went
9 home and got something to eat and continued with
10 cutting grass at other properties.  When I came
11 home Carmen Riley and Doris Riley mentioned that
12 Lower Paxton Police Department had just left the
13 house about two hours ago looking for
14 (indiscernible).
15     Q.    Sorry.  Looking for who, sir?
16     A.    Me and Ty'Rique.  They came to
17 the house looking for us in regards to Ty'Rique.
18 Ty'Rique did nothing wrong.  He was just arguing
19 with his aunt verbally.  I got in the truck.  I
20 left and went home.
21         MR. MINCEY:  Frank, one second.
22     A phone is ringing in here.  I'm not sure
23     why.
24         MR. LAVERY:  Okay.

Page 55

1         MR. MINCEY:  We're good.
2 BY MR. LAVERY
3     Q.    Mr. Matthews, do you know what
4 your sister was angry or upset at Ty'Rique
5 about?  What was he doing that caused her to be
6 angry at least from what she was saying?
7         MR. MINCEY:  Objection.  You can
8     answer.
9         THE WITNESS:  She was angry
10     because we were there early in the morning.
11     And it started raining.  And we were still
12     cutting the grass.  And she stated her
13     husband was sleeping and that we were going
14     to wake him up.  I acknowledged that.  I
15     said I will come back.  I put the lawn
16     mower on the truck.  She was arguing with
17     Ty'Rique -- my sister.
18 BY MR. LAVERY
19     Q.    The report indicates that your
20 sister told the police that Ty'Rique began
21 cursing and screaming profanities at her.  Is
22 that true?
23     A.    She was first.
24     Q.    That's fair.  But was Ty'Rique

Page 56

1 doing the same thing, though, then after?  Was
2 he cursing and screaming profanities at her?
3     A.    Yes.  We have been through this
4 several times before.  He does not get respected
5 being he is my son from her.  I don't get
6 respect from her as her brother.  Never did
7 since a child.
8     Q.    Okay.  So I take it this would
9 not then be unusual that the two of them would
10 be I guess from want of a better phrase going at
11 it and cursing and screaming at each other?
12     A.    Yep.
13     Q.    If you can go then to the next
14 report, sir.  And it's a three-page document.
15 And it's CID 574, CID 575 and CID 576 on the
16 bottom.  The date is September 2, 2017.  And it
17 indicates that it's by a officer Shawk --
18 S-H-A-W-K and I think that's an I.  Lacey,
19 officer Lacey.  Do you see that?
20     A.    I am looking for the officer's
21 name.
22     Q.    It's up at the top.
23     A.    Yes.
24     Q.    Did you know that officer?



THOMAS MATTHEWS                                    April 25, 2023
CARMEN RILEY vs BRIAN CLARK                        57–60

Page 57

1     A.    No, I didn't.
2     Q.    It again looks like it was a
3 report.  It was 8/24/17.  It was approved on
4 9/2/17.  And according to this report this
5 officer was told to make contact with a Vicki
6 Mosten in reference to potential drug activity
7 taking place on Franklin Avenue.  Do you see
8 that?
9     A.    Yes.
10    Q.    Do you know Vicki Mosten?
11    A.    Yes, we do.  Yes, I do.
12    Q.    Does she still live in the
13 neighborhood?
14    A.    Yes.
15    Q.    Where does she live actually?
16    A.    Three doors up on the right-hand
17 side above us.
18    Q.    2015 Franklin Avenue?
19    A.    I'm at 1931.  So I don't know her
20 address above me at the top of the block.
21    Q.    So she is at the top of the block
22 above you, correct?
23    A.    Yes.
24    Q.    Fair enough.  And how long has

Page 58

1 she lived there?
2     A.    Couldn't answer that.  She --
3 wait a minute.  She lived there in that
4 community all of her life.  But she moved out in
5 the city and came back maybe I would say 2012.
6     Q.    Now, she indicates here that she
7 thought there was drug activity taking place at
8 your residence because multiple vehicles come to
9 the residence at all hours day and night.  And
10 the visitors either go into the residence for
11 short periods of time or Thomas Matthews comes
12 out to the vehicle for short periods of time and
13 returns to the residence; is that accurate?
14    A.    Yes, it is.  I'm not allowed to
15 have company?
16    Q.    I'm just asking questions, sir.
17 This is just what she is saying and the
18 conclusions she is drawing, not the ones that
19 I'm drawings.
20          MR. MINCEY:  He will ask the
21    questions.
22 BY MR. LAVERY
23    Q.    I am not trying to give you a
24 hard time, sir.  I am just going through what

Page 59

1 she is reporting here.
2          She says that one other piece of
3 information she believes substantiates her
4 belief that there was drug activity.  She stated
5 she believed Thomas' son Ty'Rique was actually
6 arrested two years ago for dealing drugs.  Do
7 you see that?
8     A.    I don't have to read this.  Go
9 ahead.
10    Q.    Has Ty'Rique ever been arrested
11 as a juvenile or as an adult for dealing drugs?
12    A.    No.
13    Q.    Was Ty'Rique ever arrested for
14 anything as a juvenile to the best of your
15 knowledge?
16    A.    No.
17    Q.    If you go down to the next
18 paragraph it indicates that Ms. Mosten believed
19 that Thomas, that being you, and Leonard, I
20 guess that is Leonard Riley, may be responsible
21 for most of the thefts occurring in the area.
22 And that she personally knows that you and
23 Leonard stole firewood from other residences to
24 heat their homes.  Is that accurate?

Page 60

1     A.    No, it is not.
2     Q.    If you go to the next report,
3 that's again from officer -- how do you
4 pronounce that officer's name again?
5          MR. POLAHA:  Brian Tienter.
6 BY MR. LAVERY
7     Q.    It's reported June 19, 2018.  Do
8 you remember having an encounter with a officer
9 Tienter at that point?
10    A.    Which CID are you on?
11    Q.    I'm on CID 569.  It's a
12 one-pager.  Let me know when you are finished,
13 sir.
14    A.    Okay.
15    Q.    Do you remember encountering
16 officer Tienter around that time?
17    A.    I remember this incident.
18    Q.    Tell me what you remember about
19 this incident.
20    A.    I wasn't informed that he was an
21 officer.  He was just a suspicious person to me,
22 which I still deal with to today.
23    Q.    When you encountered him was he
24 dressed in uniform or not in uniform?



THOMAS MATTHEWS
CARMEN RILEY vs BRIAN CLARK

April 25, 2023
61–64

Page 61

1      A.    Plain clothes.
2      Q.    The reason I ask is it says in
3 the report that you asked him or you wanted to
4 know what he was doing on the street and tried
5 to lean in the car to see a name tag; is that
6 accurate?
7      A.    Exactly.
8      Q.    So was he in plain clothes with a
9 name tag?
10     A.    At that time he was in a uniform.
11     Q.    Was he in an unmarked vehicle,
12 though?
13     A.    He was in a patrol car.  I
14 remember this now.
15     Q.    It says here that you wanted to
16 know what he was doing on the street and tried
17 to lean in the car to see his name tag; is that
18 accurate?
19     A.    Yes, it is accurate.
20     Q.    It indicates when he was pulling
21 away you said, uh-uh, uh-uh.  I got you.  Is
22 that accurate?
23     A.    It is not.
24     Q.    Did you say anything to this

Page 62

1 officer as he was pulling away?
2      A.    Yes, I did.
3      Q.    What did you say?
4      Q.    Where is officer Wilson?
5      Q.    Why did you ask that?
6      A.    Because I know everybody.
7      Q.    You know officer Wilson?
8      A.    Wilson?  Yes.  I know the police
9 force.
10     Q.    You know most of them or all of
11 them or quite a few of them?
12     A.    In the past, yes.
13     Q.    The last of the group that I have
14 here as part of this exhibit appears to be again
15 with officer Tienter and a report on
16 November 23, 2018.  Do you see that CID 578 and
17 579?
18     A.    Yes.
19     Q.    Have you had a chance to read
20 that?
21     A.    Yes.
22     Q.    This is officer Tienter.  Did you
23 have any contact with officer Tienter on that
24 date?

Page 63

1      A.    At the top of my street, yes, I
2 did.
3      Q.    Tell me what you remember about
4 that contact.
5      A.    That day?
6      Q.    Yes.
7      A.    I was on my way to the doctors
8 with Carmen.  And I came out the house.  And a
9 police car sped away from the front of my house
10 and went up the street.  I went up the street
11 shortly behind him.  But he was not in front of
12 me.  He was not in sight.
13           And when I got to the stop sign
14 he was parked behind a tree hiding.  I turned
15 around and drove down to him and I asked him
16 what was up.  Was there something I needed to
17 know that was going on in the neighborhood?  And
18 he stated to me, oh, no.  Nothing is going on.
19 I said okay.  And I backed up, turned around and
20 went on to proceed to my doctor.
21     Q.    His report indicates that you had
22 used profanity to him at that time.  Is that
23 correct or not?
24     A.    No.  There was no need to.

Page 64

1      Q.    And were you in a Chevrolet
2 truck?
3      A.    Green pick-up, Silverado.
4      Q.    The red vehicle, did you know who
5 was driving the red vehicle?
6      A.    No.
7      Q.    If you go back to the first page
8 it mentions a Shonnea Hart.  Do you see that?
9           MR. MINCEY:  Do you mean the
10     first page of this set of documents?
11           MR. LAVERY:  Yes.  578.  The
12     first page of this set of documents.
13 BY MR. LAVERY
14     Q.    It's under Complainant and
15 contact information.  The second grouping talks
16 about a Shonnea Hart.  Do you see that?  CID
17 578.
18     A.    Yes.
19           MR. MINCEY:  The second to last
20     page of the PDF.
21 BY MR. LAVERY
22     Q.    Where it says, Shonnea Hart and
23 the address 102 Sutherland Road, Lancaster, PA.
24 Do you see that?



THOMAS MATTHEWS
CARMEN RILEY vs BRIAN CLARK

April 25, 2023
65–68

Page 65

1     A.     Yes.
2     Q.     Did you know her at the time?
3     A.     No, I didn't.
4     Q.     Did you know if she was a friend
5 of your son at that time?
6     A.     No, I didn't.
7     Q.     Did you ever know your son to
8 stay or live for a period of time down in
9 Lancaster, PA with her?
10     A.     He never did.
11     Q.     Any other incidents or encounters
12 that you recall with the Susquehanna Police
13 Department other than these incidents from 2016
14 up until the time of your son's arrest on
15 June 18, 2019?
16     A.     Can you repeat that again?
17     Q.     Sorry.  It's probably a bad
18 question.
19          What I'm asking is do you recall
20 any encounters between you and the police
21 department that stand out to you between
22 again 2016 May and the date of Ty'Rique's arrest
23 June 19th, 2019 other than these?
24     A.     No.

Page 66

1          MR. LAVERY:  So I'm fished with
2     that.  I wouldn't mind a ten-minute break
3     at this point.
4          (Discussion held off the record.)
5 BY MR. LAVERY
6     Q.     Mr. Matthews, were you using
7 cocaine, either powder or crack, in June of
8 2019?
9     A.     Yes.
10     Q.     And how often -- or which one was
11 it?  Or was it both?
12     A.     It was crack.
13     Q.     And how did you consume crack?
14 Did you smoke it?
15     A.     Yes.
16     Q.     And how often would you smoke
17 crack cocaine as of June of 2019?
18     A.     Sometimes once a month, sometimes
19 twice a month.
20     Q.     Do you recall the last time
21 you -- did you also use any powder cocaine or
22 just crack?
23     A.     Crack.
24     Q.     When was the last time to the

Page 67

1 best of your knowledge approximately that you
2 would have used crack before June 18th of 2019,
3 the date of Ty'Rique's arrest?
4     A.     I don't remember.
5     Q.     The reason I ask -- and I will
6 get to it in a while.  There is a tox screen
7 they did at the hospital when you were admitted.
8 It was positive for cocaine metabolite.  I am
9 wondering if you had any idea when would have
10 been the last time was that you would have used
11 that before the date of Ty'Rique's arrest?
12     A.     Might have been the 12th.
13     Q.     Did Ty'Rique know that you smoked
14 crack cocaine?
15     A.     I'm not sure.
16     Q.     Did you ever smoke it in front of
17 Ty'Rique?
18     A.     No.
19     Q.     Did Leonard Riley also smoke
20 crack cocaine?
21     A.     I don't know what Leonard does.
22 I don't know his life.  I don't know.
23     Q.     Fair enough.  Did you ever smoke
24 crack cocaine with Leonard Riley?

Page 68

1     A.     No.
2     Q.     Did you ever smoke crack cocaine
3 at 1931 Franklin Avenue?
4     A.     Yes.
5     Q.     Did you use any other illicit
6 drugs as of June 2019 other than crack cocaine?
7     A.     No.
8     Q.     For how long had you used crack
9 cocaine approximately?  When did you start using
10 it?
11     A.     2000.
12     Q.     I know it's approximate.  And
13 that's fine.  And did you use it continuously on
14 some basis from 2000 through 2019?
15     A.     Never continuously.
16     Q.     There would be breaks and times
17 you would use it; is that right?
18     A.     Yes.
19     Q.     What is the longest period of
20 time you went without using crack cocaine during
21 that timeframe?
22     A.     Over a year.
23     Q.     Approximately when would that
24 have been?



THOMAS MATTHEWS
CARMEN RILEY vs BRIAN CLARK

April 25, 2023
69–72

Page 69

1    A.    I would say 2017.
2    Q.    Do you currently use crack
3 cocaine?
4    A.    No, not currently.
5    Q.    When was the last time that you
6 would have used crack cocaine?
7    A.    I don't -- can't give you a date.
8    Q.    Has it been this year in 2023?
9    A.    It's been a while.  I would say
10 February.
11    Q.    February of 2023?
12    A.    Yes.
13    Q.    Let's talk now about the
14 incident, the date of the incident.  As I
15 understand it, this incident did not occur at
16 1931 Franklin Avenue.  It occurred at the other
17 residence where the cats were located at 2003
18 Franklin Avenue; is that right?
19    A.    Yes.
20    Q.    Had you been staying there for
21 any period of time?
22    A.    No periods of time.
23    Q.    You were sleeping there, though,
24 that night, correct?

Page 70

1    A.    Yes.  That particular night.
2    Q.    And Carmen was there that night
3 too; is that right?
4    A.    Yes.
5    Q.    And Ty'Rique was there too as
6 well, correct?
7    A.    Yes.
8    Q.    Why were the three of you at 2003
9 Franklin Avenue as opposed to 1931?
10    A.    No. 1, the cats.  No. 2, at that
11 time the humidity was really bad.  The heat in
12 house was really bad at her house.  It was the
13 wee hours of the morning and the sun would be
14 coming up soon.  And I would come back over and
15 deal with the cats.  And we just decided to
16 let's all stay over there.  Maybe it's cooler in
17 there.
18    Q.    So do you recall around when it
19 would have been that Ty'Rique would have gotten
20 to 2003 that night?
21    A.    3:00 a.m. to 4:00 a.m.
22    Q.    Do you know where he had been
23 before that?
24    A.    Yes.  With us in the yard at 1931

Page 71

1 Franklin Avenue.
2    Q.    How long had you been out there
3 in the yard at 1931 Franklin Avenue with
4 Ty'Rique before going over to 2003 Franklin?
5    A.    10:00 p.m. to the early morning
6 sitting out in the yard, the backyard.
7    Q.    Do you know where Ty'Rique was
8 before 10:00 p.m. that evening?
9    A.    On the porch of the house in a
10 chair.
11    Q.    How long had he been on the porch
12 of the house -- strike that.
13        How long had he been at 1931?
14 Had he been there the entire day?  Had he been
15 elsewhere?  Where had he been that day to the
16 best of your knowledge?
17    A.    The entire day at that house.
18    Q.    At 1931?
19    A.    Yes.
20    Q.    Then you go over to 2003.  And I
21 know these are approximates around 3:00 or 4:00
22 in the morning; is that right?
23    A.    Correct.
24    Q.    Had you interacted with Ty'Rique

Page 72

1 that day at 1931?
2    A.    Yes.
3    Q.    How would you describe him?
4    A.    Frustrated, depressed,
5 despondent.
6    Q.    Was he still doing the emoji
7 thing at that point?
8    A.    No.
9    Q.    Was he talking or was he not
10 communicative at that point?
11    A.    He was communicative.  He talked.
12    Q.    Do you remember what you and he
13 talked about?
14    A.    Repairs to his car, his next job
15 assignment.  That was what I know, yes.
16    Q.    Did he appear better than he had
17 been back on June 14th when he was, as you said,
18 you first noticed him having the migraines and
19 doing the emojis and texts and that type thing?
20 Did you think he was better on the 18th than he
21 was on the 14th or about the same?  How would
22 you describe it?
23    A.    About the same.
24    Q.    Were you concerned about him at



THOMAS MATTHEWS
CARMEN RILEY vs BRIAN CLARK

April 25, 2023
73–76

Page 73

1 that time?
2    A.    Not too much.  I thought it would
3 pass.  I thought he had got a virus, hay fever,
4 or something.
5    Q.    Did you consider getting Ty'Rique
6 any type of medical attention between again
7 approximately the 14th of June up through the
8 18th when this incident occurred?
9    A.    No.
10    Q.    And if you thought he had needed
11 any type of medical attention you would have
12 gotten it for him; is that right?
13    A.    Most certainly.
14    Q.    Now, was there a sledgehammer at
15 the 2003 residence?
16    A.    Yes.
17    Q.    Where was that located?
18    A.    In the kitchen.  As soon as you
19 go in to the left between the wall and the
20 refrigerator along the wall.
21    Q.    And whose sledgehammer was that?
22    A.    Mine.
23    Q.    Mr. Matthews, did you answer
24 that?

Page 74

1    A.    Yes.
2    Q.    Whose sledgehammer was it?
3    A.    Mine.
4    Q.    That was yours.  What was that
5 sledgehammer doing --
6       MR. ROSS:  I think the mic is in
7    that.  You are speaking into the phone.  So
8    speak towards the television.
9       THE WITNESS:  Okay.  Will do.
10 BY MR. LAVERY
11    Q.    Why was there a sledgehammer in
12 the kitchen there?  Why was your sledgehammer
13 there in that kitchen?
14    A.    Because I couldn't keep my tools
15 in the shed or outside or they would get stolen
16 by the neighbors or people that come through.
17    Q.    Were there any other tools of
18 yours in that kitchen other than the
19 sledgehammer?
20    A.    Oh, yes.
21    Q.    Like give me some examples of
22 what else you would have kept in there.
23    A.    Every tool to work on wood,
24 electrical and by hand.  Everything except for

Page 75

1 the riding mower to cut grass.  I made this a
2 apartment for a groundskeeper instead of a shed
3 outside.  I can keep everything in the kitchen
4 and in the living room.
5    Q.    I guess you couldn't keep a
6 riding mower in the kitchen, right?
7    A.    I tried.  I tried.
8    Q.    All right.  Fair enough.
9       Now, when you get over to 2003
10 where is everybody sleeping at that time as you
11 recall it?
12    A.    You open the kitchen door in the
13 back, the storm door, a regular door.  You walk
14 into the kitchen.  It's a very small apartment.
15 It's a doorway, no door, living room.  That's
16 the font of the house.
17       Then off to the right is a small
18 hallway, a bathroom to the right, two other
19 small bedrooms in the back.  That's it.  Then
20 the living room with a mattress on the floor and
21 a box spring and a couch to the left.
22    Q.    Was Carmen with you at that
23 point?
24    A.    Yes.

Page 76

1    Q.    Was Carmen on the mattress too?
2    A.    Yes.
3    Q.    You and Carmen are on the
4 mattress sleeping; is that right?
5    A.    Trying to sleep, yes.
6    Q.    Where was Ty'Rique at that point?
7    A.    To the left on the red leather
8 couch.
9    Q.    In the living room?
10    A.    Yes.
11    Q.    Do you recall if you actually had
12 fallen asleep?
13    A.    Semiconscious.
14    Q.    When did you first become aware
15 of something unusual with Ty'Rique after you
16 were semiconscious?
17    A.    Ty'Rique was talking and Carmen
18 was telling me, Tom, Tom, get up.  And Ty was
19 standing at the kitchen doorway to the living
20 room hollering, Dad, dad, dad.  Someone is
21 outside.
22    Q.    Did he have the sledgehammer at
23 that point?
24    A.    Yes.



Page 77

1     Q.    So he is in the doorway of the
2 kitchen; is that right?  And this is Ty'Rique.
3     A.    Yes.
4     Q.    You are on the mattress, correct,
5 at that point?
6     A.    Yes.
7     Q.    Carmen is where?
8     A.    Laying on the bed.
9     Q.    So what happens next?
10     A.    Ty'Rique is saying, Dad, dad,
11 dad.  We got to go.  Somebody is outside.  We
12 got to go outside.  Somebody is out there.
13 Somebody is walking around out there.  I stated
14 if I get up off this bed it's not going to be
15 good.
16     Q.    Why did you say that?
17     A.    Because I was tired.  We were
18 going to argue.
19     Q.    What happens after that?
20     A.    I attempted to get up.  I got up.
21 And I grabbed the sledgehammer from him telling
22 him to put it down.  And he kept saying no, no.
23     Q.    Where is Ty'Rique at this point
24 with the sledgehammer?

Page 78

1     A.    Standing in the kitchen.  And his
2 back was turned towards the small hallway.
3     Q.    So you are facing him; is that
4 correct?
5     A.    Yes.
6     Q.    So he has the sledgehammer.  Did
7 he have it in both hands?
8     A.    Yes.
9     Q.    How was he holding it?
10     A.    Like this (indicating).
11     Q.    In front of him?
12     A.    Yes.
13     Q.    The wooden part of it in front of
14 him with two hands?
15     A.    Yes.  It's heavy.  It's like
16 this.
17     Q.    I get it.  Would one of his hands
18 been on the metal part -- sorry -- the iron part
19 or whatever the sledging part of it is?
20     A.    It's a long, wooden handle.
21     Q.    So his one hand would have been
22 on one end of the handle.  And his other hand
23 would have been on the other end of the handle
24 is what you're telling me?

Page 79

1     A.    Yes.
2         MR. MINCEY:  Frank, if I can just
3 say -- Tom, when you are doing "like this"
4 the court reporter cannot write "like
5 this."
6         So you need to describe it.  That
7 is why Mr. Lavery was describing what you
8 were doing.
9         THE WITNESS:  Can I --
10         MR. MINCEY:  You are fine.  You
11 are fine.  I just wanted to let you know.
12         THE WITNESS:  Okay.  Sorry about
13 that, Jared.
14 BY MR. LAVERY
15     Q.    You are fine.  So you were trying
16 to take the sledgehammer from Ty'Rique; is that
17 correct?
18     A.    Yes.
19     Q.    Tell me what happens next then.
20     A.    A struggle and we went in that
21 direction of push/pull struggle to a left/right
22 swing to try to get me to let go.
23     Q.    Who made the swing?  Was that
24 Ty'Rique?

Page 80

1     A.    Yes.  A push, yes.  He pushed me
2 to try to let go.
3     Q.    Did he swing the sledgehammer at
4 you at any time?
5     A.    No, he didn't.
6     Q.    Did he strike you with any part
7 of the sledgehammer at any point?  What I mean
8 by that, so we are clear, either with the
9 business end of it or with the wooden part of
10 the sledgehammer did he at any time strike you
11 with any portion of that sledgehammer?
12     A.    No, he didn't strike me.
13     Q.    He didn't strike you in the back
14 at all?
15     A.    No.
16     Q.    He didn't strike you in the
17 shoulder?
18     A.    No.
19     Q.    He didn't strike you in the knee?
20     A.    No.
21     Q.    Carmen in her deposition had
22 indicated she said something to Ty'Rique during
23 all this to the effect of, What are you trying
24 to do?  Get dad?

THOMAS MATTHEWS
CARMEN RILEY vs BRIAN CLARK

April 25, 2023
81—84

Page 81

1         Do you remember her saying that?
2     A.    No.
3     Q.    So anyway you are trying to get
4 the sledgehammer away from Ty'Rique.  What
5 happens at that point then?
6     A.    It started with a push/pull
7 struggle between two of us facing each other.
8 Then it went -- that was not working.  So he was
9 trying to shake my hands from the handle.  We
10 both had the handle.  So we did a switch back
11 and forth.
12        Then that went from front to back
13 facing each other.  And then one switched and
14 one switch to the right.  And I went with the
15 right, the motion with the right, which began my
16 motion to be pushed down towards the wall in the
17 other room.
18     Q.    What room are you in at this
19 point?
20     A.    In the hallway outside the
21 bathroom and the other bedrooms.
22     Q.    That is the little hallway you
23 were describing before?
24     A.    Yes.

Page 82

1     Q.    And you and Ty'Rique got from the
2 kitchen to that little hallway at that time?
3     A.    Yes.  It's only one step.  One
4 and a half steps.  It's very small.
5     Q.    And if you can do this:  If you
6 can estimate how far it would have been from the
7 doorway of the kitchen to that area in the
8 little hallway where you end up standing with
9 Ty'Rique when you are going to the right?
10     A.    10 feet.  It's very small.
11     Q.    All right.  So are you pulling to
12 the right?  Or is Ty'Rique pulling you to the
13 right?  How are you going to the right I guess
14 is what I am trying to figure out?
15     A.    I am left-handed.  And I pulled
16 to the left normally.  He pulled to the right
17 stronger than me.  And I went with that.  And I
18 started to stumble.
19     Q.    So he is pulling essentially you
20 to the right and that's when you start to
21 stumble?
22     A.    Yes.
23     Q.    So where did you stumble to?
24     A.    To the nearest bedroom, no door,

Page 83

1 up against the wall.
2     Q.    Did you go to the ground?
3     A.    Yes.  I hit the wall and slid to
4 the floor.  My sweatpants during those two steps
5 had fallen.  I didn't have them tied.  They slid
6 down to the floor which restricted my legs from
7 being separated to keep my balance.  I have
8 equilibrium problems.
9     Q.    At any point during this time do
10 you know if Carmen is on the phone with a 911
11 operator?
12     A.    No.
13     Q.    Did you ever ask Carmen to call
14 911?
15     A.    Yes.
16     Q.    At what point was it that you
17 would have asked Carmen to call 911?
18     A.    When I slid down the wall to the
19 floor and hit my shoulder on the radiator
20 baseboard.  The radiator had no cover.  I hit my
21 arm.  It left a abrasion on my shoulder.
22     Q.    You are pointing to your right
23 shoulder; is that right?  Or you had been
24 pointing to your right shoulder; is that right?

Page 84

1     A.    Yes.
2     Q.    So was it at that point that you
3 told her to call 911?
4     A.    After I hit the floor, yes.
5     Q.    Had you told her to call 911 at
6 any time before that?
7     A.    No.
8     Q.    Do you know if she on her own
9 called 911 at any time before that?
10     A.    No.
11     Q.    No, she didn't?  Or, no, you
12 don't know?
13     A.    No, she did not call until I
14 responded to her.
15        (Exhibit 3 was marked for
16     identification.)
17 BY MR. LAVERY
18     Q.    Fair enough.  I will show you
19 another exhibit at this point.  We will go to
20 the next one, which is Exhibit 3.  It's a 3-page
21 document.  It's a subpoena, by the way, from
22 your attorneys to Susquehanna Township.
23        And as part of that subpoena
24 there was a telephone call synopsis 6/18/19.



Page 85

1 It's also marked CID 120.  Do you see that?
2      A.    Not yet.  I got it now.
3      Q.    Can you just read through that?
4      A.    Okay.
5      Q.    I will represent to you,
6 Mr. Matthews, for purposes of these questions
7 that I have listened to the audio and looked at
8 the summary.  And it appears to be accurate in
9 terms of the timing and the things that were
10 said.  So I will ask you to accept that for
11 purposes of the questions I will ask you at this
12 point.
13             It says it was a call synopsis
14 6/18/19, 4:40.49 hours to 4:53.52 hours in the
15 morning.  Does that appear accurate to you as to
16 when the phone call took place?
17      A.    Yes, it does.
18      Q.    It also indicates that Carmen
19 Riley called the Communications Center using
20 your cell phone; is that accurate?
21      A.    Yes, it is.
22      Q.    Now, it indicates, and again,
23 this is a summary of what is on the actual 911
24 dispatch recording.  At .18 seconds Carmen tells

Page 86

1 Ty to put it down.  Do you remember Carmen
2 telling Ty to put it down?
3      A.    Yes, I do.
4      Q.    And did Ty have the sledgehammer
5 at that time?
6      A.    Yes, he did.
7      Q.    The next entry then is 1 minute
8 and 30 seconds in.  It says that Carmen tells
9 the dispatcher that Ty'Rique was arguing with
10 us.  Is that accurate?
11      A.    Yes, it is.
12      Q.    Going down to the third entry it
13 says at 1 minute and 42 seconds in the call that
14 Carmen told the dispatcher he has a
15 sledgehammer; is that accurate?
16      A.    Yes, it is.
17      Q.    The fifth entry then is at 2
18 minutes and 47 seconds -- sorry.  2 minutes and
19 5 seconds Carmen said to the dispatcher, No, Ty.
20 We didn't start it.  You started it.  You picked
21 it up; is that accurate?
22      A.    Yes, it is.
23      Q.    So you heard all of that,
24 correct?

Page 87

1      A.    Yes, I did laying on the floor.
2      Q.    2 minutes and 47 seconds into the
3 recording it indicates dispatcher asks Carmen
4 who started this and Carmen doesn't respond.
5 Did you hear that?
6             MR. MINCEY:  Objection.
7             MR. LAVERY:  Strike that.
8 BY MR. LAVERY
9      Q.    Could you hear Carmen's side and
10 the dispatcher's side?  Was it on speaker or was
11 it not on speaker, the telephone?
12      A.    It was on speaker.
13      Q.    It was on speaker?
14      A.    Yes, it was.
15      Q.    So you can hear what both the
16 dispatcher and Carmen were saying; is that
17 correct?
18      A.    Yes.  Clearly.
19      Q.    Do you remember the dispatcher
20 asking Carmen what started this as it's
21 indicated here on the summary?
22      A.    Yes.
23      Q.    The next entry on the synopsis is
24 23 minutes and 42 seconds into the call.  Carmen

Page 88

1 states to Ty, which I take to be Ty'Rique, No
2 decoy, no decoy.
3             Do you remember that being said
4 by Carmen to Ty'Rique?
5      A.    No, that was not said.
6      Q.    So that would not be accurate,
7 correct?
8      A.    No.  What is a decoy?  No.  I am
9 not going to -- no.
10      Q.    You don't believe Carmen said
11 that to Ty'Rique at that point, No decoy, no
12 decoy.  Correct?
13      A.    No.
14      Q.    The next entry would be 5 minutes
15 and 6 seconds into the call where the dispatcher
16 asks Carmen if he has a mental disorder.  And
17 Carmen says yes.  And then it says in quotes,
18 "he just snapped the last couple days."
19             Is that accurate?
20      A.    Yes.
21      Q.    You actually heard that?
22      A.    Yes.  Clearly.
23      Q.    Then the next entry on the
24 synopsis is at 5 -- and you are on the ground



Page 89

1 during all of this, correct?
2     A.    I was laying on the ground, yes.
3     Q.    The next entry is 5 minutes and
4 55 seconds into the recording.  It indicates
5 dispatcher asks, Do you feel in danger by him
6 right now?  And Carmen's reply is yes.  Do you
7 remember that?
8     A.    Yes.
9     Q.    Then the next entry is 5:55.
10 Dispatcher asks, Do you feel endangered by him
11 right now?  Carmen's reply, Yeah.
12          Do you remember that, hearing
13 that?
14     A.    Yes.
15     Q.    The next entry is 6:35 into the
16 recording.  It says dispatcher asks Carmen her
17 son's name twice.  Carmen didn't respond.
18          Do you remember the dispatcher
19 asking Carmen her son's name?
20     A.    No, I don't.
21     Q.    6:53 is the next entry in the
22 recording.  Carmen states, "No, there are no
23 decoys, and you messed up."  Both are in quotes.
24          Do you remember Carmen saying

Page 90

1 that to the dispatcher?
2     A.    No, I do not.
3     Q.    You don't remember that?
4     A.    No.
5     Q.    Were you conscious the whole time
6 of that phone call?
7     A.    Yes, I was.
8     Q.    The next to last entry here is 8
9 minutes and 12 seconds.  And it says Carmen says
10 to Ty, "Nobody is trying to do anything to you."
11 And that is in quotes.
12          Do you remember that being said
13 by Carmen to Ty at that point?
14     A.    Yes, I do.
15     Q.    Then again at 10:22 which is the
16 last entry in the synopsis it says, Carmen
17 states again, "There are no decoys."
18          Do you remember -- strike that.
19 Let me put this question to you.  Do you recall
20 at any time in the conversation with the
21 dispatcher Carmen making a comment about there
22 not being any decoys or there were no decoys?
23     A.    I remember she did not state that
24 or make that comment.

Page 91

1     Q.    Okay.  Because on the bottom
2 there, and again I don't know who actually did
3 this synopsis, but it says throughout the entire
4 recording Carmen says "put it down" repeatedly
5 and "there are no decoys" and "no decoys"
6 repeatedly.
7          Do you remember Carmen repeatedly
8 telling Ty'Rique to put down the hammer during
9 the call?
10     A.    Only, "Put it down, Ty.  Put it
11 down.  Put it back."
12     Q.    And approximately how many times
13 did Carmen tell Ty'Rique that?
14     A.    Two times.
15     Q.    And you don't ever remember her
16 saying anything about there are no decoys at all
17 to Ty'Rique; is that correct?
18     A.    Exactly.  No decoys.  No, she did
19 not say that.
20     Q.    Fair enough.  So you are on the
21 ground.  Do you ever lose consciousness while
22 you are on the ground?
23     A.    No.
24     Q.    Do you remember the police

Page 92

1 getting to the scene?
2     A.    Yes, I do.
3     Q.    How long approximately, if you
4 can remember, or approximately, and I know it's
5 not exact, approximately how long was it after
6 you fell to the ground -- I think you said you
7 hit your shoulder on the radiator -- before the
8 police got there?
9     A.    Within four minutes, five
10 minutes.
11     Q.    Did you see Ty'Rique being taken
12 into custody?
13     A.    No.
14     Q.    Were you on the ground the entire
15 time the police -- strike that.
16          On the floor the entire time the
17 police were at the residence?
18     A.    Yes.
19     Q.    Was an ambulance dispatched to
20 the scene too?
21     A.    Yes.
22     Q.    Did the ambulance get there after
23 the police got there?
24     A.    Yes.



Page 93

1    Q.    Approximately how long after the
2 police got there was it that the ambulance got
3 there?
4    A.    Within ten minutes.
5    Q.    You said before that you did ask
6 Carmen to call 911, correct?
7    A.    Yes.
8    Q.    Why at that point did you want
9 Carmen to call 911?
10   A.    I have a pacemaker.  I had heart
11 problems.
12   Q.    And you also have scoliosis at
13 that point; is that correct?
14   A.    Yes, I do.
15   Q.    Did Ty'Rique know that?
16   A.    Yes, he did.
17   Q.    Were you concerned that Ty'Rique
18 at any point was going to strike you with that
19 hammer?
20   A.    No, I was not.
21   Q.    Why did you try to take it from
22 him?
23   A.    Because I didn't want him going
24 outside with it.

Page 94

1    Q.    What did you think he intended to
2 do with it?
3       MR. MINCEY:  Objection.
4 BY MR. LAVERY:
5    Q.    If you know?  If you had any
6 thought -- that's a fair objection.
7       Did you have any thought in your
8 mind as to what Ty'Rique intended to do with the
9 sledgehammer?
10   A.    No.
11   Q.    But you were not concerned with
12 him striking you or Carmen; is that right?
13   A.    No.
14   Q.    Did you speak to the police
15 officer after they got there, any of the police
16 officers after they got there?
17   A.    Yes.
18   Q.    And were you still on the floor
19 at that point?
20   A.    Yes, I was.
21       (Exhibit 4 was marked for
22   identification.)
23 BY MR. LAVERY:
24   Q.    I want to show you -- I will ask

Page 95

1 that your counsel show what we marked as Exhibit
2 TMK-4.  It's a ten-page document which is the
3 Susquehanna Police Department Call Report
4 concerning this particular incident.  So when
5 they put that in front of you I will ask you a
6 question or two about it.
7    A.    Okay.
8    Q.    Have you seen this report before,
9 Mr. Matthews?
10   A.    No.
11   Q.    Do you recall which officer or
12 officers that you spoke to while you were on the
13 floor after they got there?
14   A.    Officer Wilson.
15   Q.    Was there any other officers
16 there with officer Wilson when you were speaking
17 to him?
18   A.    Officer Demetrus (ph).  There
19 were three officers.  I don't know the other
20 ones.
21   Q.    So you know officer Demetrus.
22 You know officer Wilson.  And there was a third
23 one there whose name you do not recall; is that
24 right?

Page 96

1    A.    Correct.
2    Q.    Can you go to page 4 of 10.  It
3 says at the bottom also Susquehanna 72.
4    A.    I got it.
5    Q.    Read both page 4 and page 5 of 10
6 and let me know when you are finished.
7    A.    Okay.
8    Q.    I will ask you start down around
9 the middle of page 4 where it talks about -- and
10 this would be officer Wilson speaking to you.
11 It says, While PFC Haines was taking care of T.
12 Riley I entered the house and found
13 Matthews-Kemrer lying prone in the first floor
14 southeast bedroom.
15       Is that the bedroom that you were
16 on the floor in?
17   A.    Yes.
18   Q.    It indicates in the report that
19 you were not conscious at that time but you were
20 breathing; is that accurate?
21   A.    No, it is not.
22   Q.    So when you first encountered
23 officer Wilson as best you can recall you were
24 conscious; is that correct?



Page 97

1    A.    Yes, I was.

2    Q.    He indicates at this point that

3  you were naked but your sweatpants were found

4  near your feet; is that accurate?

5    A.    Yes, it is.

6    Q.    It goes on to indicate that

7  officer Wilson advised the dispatcher to have

8  EMS speed up their response for you.  Do you

9  recall him doing that?

10    A.    Yes, I do.

11    Q.    Now, according to this report

12  Wilson says that he began talking to Carmen

13  about what had happened.  And that while talking

14  to her you began to wake up and you started to

15  talk.  I take it that you don't think that's

16  accurate; is that correct?

17    A.    No, that's not.

18    Q.    Next paragraph says that C. Riley

19  and Matthews-Kemrer advised they lived at 1931

20  Franklin Ave. with T. Riley.  That is accurate?

21    A.    Yes.

22    Q.    They advised T. Riley was

23  temporarily staying at this location to watch a

24  unknown person's cats.  Did you make that

Page 98

1  statement or did Carmen make that statement to

2  the police?

3    A.    I think we both did.

4    Q.    It says C. Riley and

5  Matthews-Kemrer advised they decided to spend

6  the night with T. Riley at this house.  That is

7  accurate, correct?

8    A.    Rephrase that -- re-do that

9  again.

10    Q.    Sure.  It says here C. Riley and

11  Matthews Kermer advised they decided to spend

12  the night with T. Riley at this house?

13    A.    Yes.

14    Q.    I think that what you said

15  before.  And that's why I said I think that's

16  accurate.

17    A.    Yes.

18    Q.    The next paragraph says, C. Riley

19  and Matthews-Kemrer advised they were asleep in

20  the bed, were awokened by T. Riley who was

21  standing over them holding a sledgehammer.

22        Did either you or Carmen tell the

23  police officer that?

24    A.    Carmen did.  Can I rephrase that?

Page 99

1    Q.    Sure.  You can rephrase or add

2  whatever you want.

3    A.    During the course of this we both

4  did same story.

5    Q.    Fair enough.  But Carmen had

6  awakened before you did, correct?

7    A.    Yes.

8    Q.    Next paragraph says,

9  Matthews-Kemrer advised that T. Riley was

10  mumbling something nonsensical.

11        Did you say that to officer

12  Wilson?

13    A.    Yes.

14    Q.    It goes on to say,

15  Matthews-Kemrer stated that he knew T. Riley was

16  about to assault him with the sledgehammer.

17        Did you say that to the officer?

18    A.    No, I didn't.

19    Q.    And then the last sentence of

20  that paragraph says, Matthews-Kemrer was scared

21  he was about to be killed.

22        Did you say that to the officer?

23    A.    I didn't.

24    Q.    Going to the next paragraph says

Page 100

1  Matthews-Kemrer jumped up and began to struggle

2  with T. Riley in a attempt to get the

3  sledgehammer away from him.

4        That is accurate, correct?

5    A.    Yes, it is.

6    Q.    Did you tell him that at that

7  time?

8    A.    Yes, I did.

9    Q.    It goes, The struggle continued

10  into the bedroom where Matthews, Kermer was

11  found.

12        That is accurate as well,

13  correct?

14    A.    Yes, it is.

15    Q.    Did you tell him that at the time

16  as well?

17    A.    Yes, I did.

18    Q.    The next sentence says,

19  Matthews-Kemrer was struck several times with

20  the sledgehammer by T. Riley.

21        Is that accurate?

22    A.    No, it is not.

23    Q.    You never said that to the police

24  officer?



Page 101

1    A.    No.
2    Q.    It says, During the physically
3  exhaustive struggle Matthews-Kemrer was knocked
4  to the ground where he lost consciousness.
5          Let's break that up.  I think you
6  already testified that you were knocked to the
7  ground; is that right?
8    A.    Yes, I did several times.
9    Q.    Did you tell that to the officer
10  at the time?
11    A.    Yes, I did.
12    Q.    Did you tell the officer that you
13  lost consciousness at any point?
14    A.    No, I didn't.
15    Q.    Going to the next page of the
16  report.  It indicates there that at some point
17  Ty'Rique walked to the kitchen and stood there
18  with the sledgehammer.  And that is where he was
19  taken into custody.
20          Did Ty'Rique ever leave the
21  bedroom and go back to the kitchen to the best
22  of your knowledge?
23    A.    Yes, he did.
24    Q.    Was that before the police got

Page 102

1  there?
2    A.    Yes, it was.
3    Q.    Do you know approximately how
4  long it would have been before the police got
5  there that Ty'Rique did that, walked to the
6  kitchen?
7    A.    Under five minutes.
8    Q.    Again on page 5 of the report it
9  indicates that EMS arrived to assess you.  That
10  did happen, correct?
11    A.    Eventually, yes.
12    Q.    It says, A paramedic advised that
13  due to your injuries you would need to be
14  transported to the nearest trauma center.
15          Do you remember the paramedics
16  saying something like that?
17    A.    To me, yes.
18    Q.    It goes on to say in that
19  paragraph that Matthews-Kemrer also started to
20  show signs of a possible cardiac event as well.
21          Is that accurate?
22    A.    No, that's not.
23    Q.    Were you having any symptoms that
24  you thought might have involved your heart at

Page 103

1  that time?  Again I am asking you as a
2  layperson.
3    A.    Yes, there were symptoms.
4    Q.    What symptoms were you showing at
5  that point?
6    A.    Due to the humidity, the heat,
7  and EMS slapping on fresh oxygen, the sudden
8  change in breathing occurred.
9    Q.    Were you having trouble
10  breathing?
11    A.    Of course.
12    Q.    It says that patrolman D'Arcey
13  took custody of the sledgehammer and will enter
14  it into evidence.  But it also says that
15  patrolman D'Arcey also went to the hospital to
16  photograph your injuries.
17          Do you remember a Susquehanna
18  police officer going to the hospital to
19  photograph the injuries that you had?
20    A.    Yes, I do.
21    Q.    Do you remember speaking to that
22  officer?
23    A.    Yes, I do.
24    Q.    Let's go on to page 6.  If you

Page 104

1  can read that and I will end with that and then
2  we can take our break if that's all right.
3          But if you can look at page 6 so
4  I can finish with this exhibit.  And then we
5  will take the break.
6    A.    Okay.
7    Q.    Have you read that yet, Mr.
8  Matthews?
9    A.    Yes, I did.
10    Q.    Great.  If you go to page 6 third
11  paragraph, it's indicated by this patrolman,
12  D'Arcey, Michael D'Arcey, that while taking
13  photographs of you you told him that your son
14  had beat you with the sledgehammer.
15          Did you make a statement to that
16  effect?
17    A.    No, I didn't.
18    Q.    The officer's report also
19  indicated that you stated that Ty'Rique was
20  acting paranoid and that several people in the
21  neighborhood was coming to kill him.  And he
22  acting very erratic and very strange.
23          Did you say that to the officer?
24    A.    Yes, I did.



Page 105

1    Q.    Did you tell officer D'Arcey that
2  you and your wife had invited Ty'Rique to stay
3  over with you over night to keep an eye on him?
4    A.    Yes, I did.
5    Q.    Did you tell that officer that
6  around the time of the incident your wife woke
7  you up saying that Ty'Rique was standing over
8  the bed with a sledgehammer?
9    A.    Yes, I did.
10   Q.    It goes on to indicate that you
11  told this officer that you confronted Ty'Rique
12  as to what he was doing and that Ty'Rique
13  attacked you; is that accurate?
14   A.    No, that's not.
15   Q.    It indicates that you told the
16  officer that you and Ty'Rique fought for
17  approximately ten minutes.  And during that time
18  you were struck repeatedly on the body with the
19  sledgehammer; is that accurate?
20   A.    No, it is not.
21   Q.    Were you complaining of pain that
22  you were having at that time to the officer?
23   A.    Yes.
24   Q.    It says here you were complaining

Page 106

1  of severe pain due to injuries; is that
2  accurate?
3    A.    It is not accurate.
4    Q.    What actually were you
5  complaining of at that point, if anything?
6    A.    The pains that I have currently,
7  the pains that I've had for many years.
8    Q.    Where are those on your body,
9  sir?
10   A.    Lumbar.  They call that sciatica.
11   Q.    Yep.  They sure do.
12   A.    Right hip fracture, tailbone
13  fracture, bad hip, bad knee, right side only.
14  That is why I cannot sit still.  And this is
15  what I am going through to today.
16   Q.    Anything else?
17   A.    No.
18        MR. LAVERY:  I think I am
19  finished with that exhibit.  Let's go off
20  the record.
21        (A recess was taken from 1:08
22  p.m. to 1:36 p.m.)
23        (Exhibit 5 was marked for
24  identification.)

Page 107

1  BY MR. LAVERY:
2    Q.    Mr. Matthews, do you recall being
3  transported by the ambulance to Holy Spirit
4  Hospital?
5    A.    Yes.
6    Q.    Were you conscious the whole
7  time?
8    A.    Yes, I was.
9    Q.    Have you reviewed the trip log
10  documents which we marked as TMK-5 which is also
11  CID 305 through I believe 308.
12   A.    Hold on.  It's coming to me now.
13   Q.    Have you ever seen this document
14  before now?
15   A.    No.
16   Q.    Take a look at the document.  And
17  particularly what I will ask you some questions
18  about is page 2 of 3.  It's CID 307 on the
19  bottom, third page of the exhibit.  Let me know
20  when you are ready.
21   A.    You want me to read all this?
22   Q.    You can if you want.  The only
23  thing I want you to read, though, would be the
24  second page where there is the narrative

Page 108

1  section.  It's in the middle of the page there.
2  That is what I'm going to ask you questions
3  about.  But you can the read the whole thing if
4  you want.
5    A.    Detective Brian Walburn.
6    Q.    That's the cover page.
7    A.    Go ahead with the questions.
8    Q.    That is CID 305.  If you look at
9  CID 306, 307 and 308 that appears to be the trip
10  sheet for your ambulance ride to Holy Spirit
11  Hospital.
12        What I want to ask you about is
13  the second page of the actual report, CID 307,
14  at the bottom where it says, Narrative.
15   A.    Yes.
16   Q.    Let me know when you are finished
17  reading that.
18   A.    I read it.
19   Q.    If you see the second paragraph
20  of the narrative it indicates that when the EMS,
21  the paramedics, got there you were on the floor
22  at that point; is that accurate?
23   A.    Yes.
24   Q.    It said at that point you were



THOMAS MATTHEWS
CARMEN RILEY vs BRIAN CLARK

April 25, 2023
109–112

Page 109

1 awake, you were alert and oriented to person,
2 place, time and event; is that accurate?
3      A.    Yes.
4      Q.    Then under History of Present
5 Illness it indicates, Patient states that his
6 son hit him with a sledgehammer on his neck,
7 back, hip and knee.
8           Did you tell that to any of the
9 members of the ambulance crew or paramedics that
10 were there?
11     A.    No.
12     Q.    Do you know why that would be in
13 there if you didn't say it?
14     A.    No.
15           MR. MINCEY:  Objection.
16 BY MR. LAVERY
17     Q.    The report goes on to indicate
18 that he, States he may have lost consciousness
19 but was not hit in the head.
20           Did you make a statement to that
21 effect to the paramedics or the ambulance crew?
22     A.    No.
23           (Exhibit 6 was marked for
24     identification.)

Page 110

1 BY MR. LAVERY
2      Q.    The next exhibit will be the
3 photographs that were taken at the hospital.
4 That's TMK-6.  The numbers on the bottom are CID
5 691 through 698.  I will ask if your attorney
6 can give you that and if you can look at those
7 photographs.
8      A.    Okay.
9      Q.    Have you ever seen those
10 photographs before, Mr. Matthews?
11     A.    Yes.
12     Q.    When had you seen them prior to
13 this time?
14     A.    Two weeks ago maybe.
15     Q.    Who showed them to you?
16     A.    My law firm.
17     Q.    The first photograph in Exhibit
18 6, it's marked on bottom CID 691, appears to
19 show a individual in a collar laying on a
20 pillow.  Can you tell if that's you?
21     A.    This is me.
22     Q.    If you go to the next page it's
23 692.  It appears to be a photograph again of
24 your left side of your face as well as of your

Page 111

1 neck and shoulder area.  Do you see that?
2      A.    Yes, I do.
3      Q.    Do you see some bruising in your
4 neck and shoulder area there?
5      A.    That's not bruising.  That's
6 incisions for a pacemaker.
7      Q.    That is what I was going to ask.
8 Can you explain what that is?
9      A.    Incisions for a inserted
10 pacemaker.
11     Q.    And do you know when those
12 incisions had been made?
13     A.    2014.
14     Q.    So your neck area would have
15 looked like that since 2014?
16     A.    All the time.
17     Q.    Exactly like that?
18     A.    Right now as we speak.
19     Q.    Fair enough.  Can you go to the
20 next photograph which is 693.  It appears to be
21 a photograph of your elbow and arm area.  Do you
22 see that?
23     A.    Yes, I do.
24     Q.    Do you see any red marks,

Page 112

1 abrasions or bruising there in that photograph?
2      A.    Yes, I do.
3      Q.    That is located in your elbow and
4 arm area; is that correct?
5      A.    Yes, it is.
6      Q.    What caused that?
7      A.    Carpet burns.
8      Q.    Was that caused by the incident
9 with Ty'Rique?
10     A.    Yes, it is.
11     Q.    Now, the next photograph is the
12 next page is CID 694 which appears to show your
13 knee.  Do you see that?
14     A.    Yes.  Right knee.
15     Q.    And it appears again to show some
16 red marks, bruising, abrasions, that type of
17 thing.  Do you see that?
18     A.    Yes, I do.
19     Q.    Did that occur in the incident
20 with Ty'Rique?
21     A.    From the carpet, yes, it did.
22     Q.    695 is supposed to be another
23 picture of the knee; is that correct?
24     A.    Yes.  That is the same knee.

THOMAS MATTHEWS                                    April 25, 2023
CARMEN RILEY vs BRIAN CLARK                        113–116

Page 113

1    Q.    That looks to be your right knee
2  as well, correct?
3    A.    Yes.
4    Q.    And 696, do you see that?
5    A.    Yes.  Right shoulder.
6    Q.    And there somewhat appears to be
7  red marks and abrasions there, correct?
8    A.    Yes.  Those I talked about.
9    Q.    Again, for the record, did you
10 incur those in the incident with Ty'Rique?
11   A.    Yes, I did.
12   Q.    How did you incur that injury
13 again?
14   A.    From the baseboard radiator
15 without a cover on it.
16   Q.    Then the next page, which is CID
17 697, the photograph on there again appears to
18 show the marks or injuries to your shoulder
19 area; is that correct?
20   A.    That's correct.
21   Q.    The last photograph is 698 and
22 that appears to show your upper torso and your
23 face; is that correct?  Well, part of your upper
24 torso anyway from like the shoulders on up?

Page 114

1    A.    Yes.
2    Q.    And that shows the area also that
3  you say is the area for the insertion of the
4  pacemaker; is that correct?
5    A.    Yes.
6          (Exhibit 7 was marked for
7    identification.)
8  BY MR. LAVERY
9    Q.    The next exhibit is Exhibit 7
10 from the hospital records.  It's the tox screen
11 records.  And it's pages 49 through 56 of the
12 Holy Spirit Hospital records.  Do you have that?
13   A.    Yes.  Can I look at it?
14   Q.    Yes, sure.  Take your time.  It
15 indicates that the tox screen for urine was
16 positive for benzodiazepines.  It says positive.
17 You were taking the Valium at that point; is
18 that right?
19   A.    Yes, I was.
20   Q.    Was that prescribed for you?
21   A.    Yes, it is.
22   Q.    Who was your doctor who
23 prescribed that for you?
24   A.    Internist Group, Lemoyne, PA.

Page 115

1  Dr. Dominic Mirarchi.
2    Q.    And then it also showed positive
3  for the cocaine metabolite as well, correct?
4    A.    Yes.  I see that there.
5    Q.    And your testimony was that you
6  had not smoked crack since February; is that
7  right?
8    A.    The 12th of that month.
9    Q.    The 12th of February?
10   A.    Yes.
11         MR. MINCEY:  Objection.
12         MR. LAVERY:  What was wrong with
13   it?  I will fix the question.
14         MR. MINCEY:  I think you might be
15   conflating when the last time he said he
16   took crack cocaine this year versus when he
17   took it in June of 2019.
18         MR. LAVERY:  You may be right.
19   Thank you.  That's a good objection then.
20         MR. MINCEY:  That's two of them.
21         MR. LAVERY:  Every now and again,
22   right?
23 BY MR. LAVERY
24   Q.    So your attorney may be right.

Page 116

1  When was the last the time you would have smoked
2  crack before the incident with Ty'Rique on
3  June 18th?
4    A.    The 12th.
5          (Exhibit 8 was marked for
6    identification.)
7  BY MR. LAVERY
8    Q.    Fair enough.
9          If you would look at Exhibit 8
10 which appears to be the history and physical
11 exam and then I think the discharge
12 documentation as well from Holy Spirit.  Just
13 for the record it is pages 134 through 142 from
14 the hospital records.
15         I will ask your attorneys if they
16 put that in front of you.  I will not ask you
17 about all of it.  But you can read through it if
18 you like.  It's up to you.  Take a look through
19 the exhibit and let me know when you are ready.
20   A.    Okay.
21   Q.    On the first page which is page
22 134 of the hospital records it's under History
23 and Physical Examination.  And it says HPI/CC,
24 which is like history of present injury.

Page 117

1    It indicates here that you stated
2 to somebody at the hospital that you were woken
3 up in the middle of the night by your son.  He
4 was hit in the back and in the back of the neck
5 with the sledgehammer several times.
6          Did you tell anybody that at the
7 hospital?
8    A.    No.
9    Q.    It indicates that you stated
10 there was no loss of consciousness, which I
11 think you testified to before.  Did you say that
12 at the hospital?
13    A.    I don't really know.
14    Q.    It also says there was no head
15 trauma.  Is that something that you would have
16 said at the hospital?
17    A.    No.
18    Q.    You said you were having neck and
19 lower back pain.  Is that accurate?  Did you say
20 that at the hospital?
21    A.    No.
22    Q.    If you go to the next to last
23 page of the exhibit, which is 141 on the bottom.
24 It talks about a history of physical exam which

Page 118

1 was actually done by the doctor, a fellow by the
2 name of Jeffrey Wertz, DO.  Do you see that at
3 the top of the page?  He did a history and
4 physical exam of you?
5    A.    History and physical discharge
6 records.
7    Q.    Yes.
8    A.    Got it.
9    Q.    Next to last page of that exhibit
10 it says on the bottom of page 141.
11    A.    Okay.
12    Q.    It's at the top of the page.
13    A.    Okay.
14    Q.    Again this appears to be a
15 History and Physical Examination report from a
16 Dr. Jeffrey Wertz.  It's dated 6/18/19 at
17 6:32 a.m. at Geisinger Holy Spirit.  Do you see
18 that?
19    A.    Yes.
20    Q.    Is states in there that you
21 told -- that Dr. Wertz performed a History and
22 Physical Examination of you.  It says including
23 specifically on history patient reports he was
24 struck with a hammer on the back by his son, no

Page 119

1 loss of consciousness, on ROS -- no chest pain,
2 no shortness of breath.
3          Did you tell Dr. Wertz that you
4 were struck with a hammer by your son on your
5 back?
6    A.    No, I didn't.
7    Q.    Do you remember being discharged
8 from Holy Spirit emergency room?
9    A.    Do I remember?
10    Q.    Yes.  Do you remember that?
11    A.    Clearly.
12    Q.    Them sending you home?
13    A.    Clearly.
14    Q.    And where did you go after Holy
15 Spirit hospital when they let you go?
16    A.    1931 Franklin Avenue.
17    Q.    Who took you home?  Was that
18 Carmen?
19    A.    Uber.
20    Q.    So you Ubered back to 1931 then,
21 right?
22    A.    Yes.
23    Q.    Were you in any pain at that
24 point?

Page 120

1    A.    All the time, yes.
2    Q.    What was hurting?
3    A.    Hip and knee.  Right hip and
4 right knee.
5    Q.    How about your back?
6    A.    No.
7    Q.    No back pain?
8    A.    No.
9    Q.    Neck pain?
10    A.    No.
11    Q.    Shoulder pain?
12    A.    No.
13    Q.    What did you do that day after
14 you got home?
15    A.    Took a bath, laid down.
16    Q.    At some point did you do anything
17 about attempting to find out what was going on
18 with Ty'Rique?
19    A.    When I got up, yes, I did.
20    Q.    Would that have been the same day
21 you got back from the hospital, the 18th?
22    A.    Yes.
23    Q.    What did you do?
24    A.    Started calling.



THOMAS MATTHEWS                                    April 25, 2023
CARMEN RILEY vs BRIAN CLARK                        121–124

Page 121

1    Q.    Who did you call?
2    A.    DCP, Dauphin County Prison.
3    Q.    Did you talk to anyone at Dauphin
4  County Prison?
5    A.    At that time I couldn't get
6  through.
7    Q.    How many times did you try to
8  call Dauphin County Prison the day you were
9  released from Holy Spirit hospital and couldn't
10 get through?
11   A.    Three to five.
12   Q.    Do you recall which number you
13 would have dialed?
14   A.    No, I don't.
15   Q.    Other than calling Dauphin County
16 Prison did you do anything else?  Did you call
17 the police or any other law enforcement or
18 judicial agencies?
19   A.    No.  Just my family.
20   Q.    Was Carmen with you at that time?
21   A.    Yes.
22   Q.    Do you know if she called anyone
23 that day?
24   A.    I don't know.

Page 122

1    Q.    Did you ever call back to Dauphin
2  County Prison?
3    A.    During that day three to five
4  times.
5    Q.    I know that.  You said that.  I
6  got that one.  After that?
7    A.    No.
8    Q.    Do you know if Carmen ever called
9  Dauphin County Prison?
10   A.    I don't know.  I don't know what
11 she did.
12   Q.    Did you call anyone at the DA's
13 office at any time after you got home?
14   A.    No.
15   Q.    Did you call anyone at the
16 Susquehanna Police Department at any time after
17 you got home?
18   A.    Yes.
19   Q.    Who did you call over there?
20   A.    Narcotics unit.
21   Q.    And when was that call?
22   A.    I can't tell you offhand.  I
23 don't remember.
24   Q.    Was that after you had received

Page 123

1  word that Ty'Rique was in the hospital?
2    A.    Before.
3    Q.    Okay.  Why were you calling the
4  narcotics unit over there?
5    A.    Because of one of Ty'Rique's
6  friends that came to the house.
7    Q.    Which friend was that?
8    A.    Rishaun Thomas, red Buick.
9    Q.    Rishaun Thomas.  Was there
10 another one?
11   A.    That's it.
12   Q.    Just Rishaun?
13   A.    Rishaun Thomas.
14   Q.    When did Rishaun come over to the
15 house?
16   A.    The day of his birthday,
17 June 14th.
18   Q.    And did you know Rishaun before
19 that?
20   A.    Yes.  As a classmate from high
21 school, middle school and high school.
22   Q.    And did you call over to
23 Susquehanna Police Department narcotics about
24 Rishaun?

Page 124

1    A.    Yes, I did.
2    Q.    Why did you call them with
3  respect to Rishaun?
4    A.    I called them and let them know
5  he is driving under a suspended or no driving
6  license.  And also the call was in regards to a
7  bag of -- $10 bag of suspected marijuana, which
8  was not marijuana, that was given to my son.
9    Q.    By Rishaun?
10   A.    Yes.
11   Q.    You said suspected bag of
12 marijuana but it was not a bag of marijuana.
13 What did you mean by that?
14   A.    Potpourri, incense.  It had a
15 fragrance of musk cologne.
16   Q.    Do you know if that had been
17 sprayed with any type of synthetic marijuana?
18   A.    I couldn't tell you.  I don't
19 know.  I suspected it.
20   Q.    You suspected that it had been?
21   A.    Something was not right with it.
22   Q.    Have you ever heard of K2?  Do
23 you know what that is?
24   A.    Recently I have but back then I



THOMAS MATTHEWS
CARMEN RILEY vs BRIAN CLARK

April 25, 2023
125–128

Page 125

1  didn't.

2     Q.     Okay.  But you thought there was

3  something even though it was suspected

4  marijuana, but it was actually potpourri that

5  you thought there was something wrong with that,

6  correct?

7     A.     Yes.

8     Q.     With that bag?

9     A.     Yes.

10     Q.     Who did you speak to at the

11  Susquehanna Police Department Narcotics about

12  that?

13     A.     An officer in narcotics.  I don't

14  know his name offhand.

15     Q.     Was it a male officer, though?

16     A.     Yes.

17     Q.     What did you tell this officer?

18  You said you talked about the suspended license.

19  But what specifically did you tell the officer

20  as best you can remember it about the bag that

21  Rishaun had left?

22     A.     I just told you.  You want me to

23  repeat what I just told you?

24     Q.     You don't have to repeat it.  If

Page 126

1  that is all you said that's fine.  The testimony

2  is on the record.

3     A.     Yes.

4     Q.     Did you think that what was in

5  that bag may have been the cause of what was the

6  issues that you had started seeing with Ty'Rique

7  on the 14th?

8     A.     No.

9     Q.     Why did the bag concern you then?

10     A.     I was looking for anything to try

11  to figure out what was wrong with my son, why

12  did he snap, what caused him to snap.

13     Q.     I get you.  That's why I'm asking

14  these questions.

15     A.     I was desperately looking for

16  answers.

17     Q.     Did you think one of the answers

18  might have been what was in that bag might have

19  contributed to why he was acting the way he was?

20     A.     No.  Because it was never used.

21     Q.     Were you concerned that Rishaun

22  may have given Ty'Rique something that had been

23  used?

24     A.     No.

Page 127

1     Q.     Okay.

2     A.     Let me rephrase that.

3     Q.     Sure.

4     A.     Repeat that question again.

5     Q.     You said that you were not

6  concerned about the bag that was there because

7  it had not been used.  My question to you was

8  were you concerned that Rishaun may have given

9  Ty'Rique something else that he may have used

10  that may have been contributing to what was

11  going on with Ty'Rique?

12     A.     Yes.  That I didn't know about.

13     Q.     And you told this to the officer?

14     A.     I might have, yes.

15     Q.     You might have or you did?

16     A.     I said I did.

17     Q.     Did the officer come out to your

18  house or anyone from Susquehanna PD come out to

19  your house to interview you?

20     A.     No.

21     Q.     Did anyone from the department

22  contact you --

23     A.     No.

24     Q.     -- about this afterwards?

Page 128

1     A.     No.  Not afterwards.  After I

2  called, no.

3     Q.     Okay.  Did you speak to officer

4  Wilson?

5     A.     What day?  When?

6     Q.     From the time of Ty'Rique's

7  arrest after you got out of the hospital until

8  you found out about Ty'Rique being in the

9  hospital?

10     A.     Me personally?  No.

11     Q.     Do you know if Carmen did?

12     A.     No, I don't.

13     Q.     Did you know if any type of

14  hearing had been set up for Ty'Rique?

15     A.     About the 20th -- between the

16  20th and the 23rd of June we got notification or

17  subpoena or summons or something in the the mail

18  of a court date on June 27th at the district

19  justice office of Susquehanna Township.

20     Q.     All right.  Who was that subpoena

21  from; do you recall?

22     A.     No, I don't.  I didn't look at

23  it.

24     Q.     Did you ever call either officer



THOMAS MATTHEWS
CARMEN RILEY vs BRIAN CLARK

April 25, 2023
129–132

Page 129

1 Wilson or anyone else at Susquehanna Township
2 between the time you got back from the hospital
3 and the time that you found out that Ty'Rique
4 was in the hospital to tell them that you did
5 not want to press charges against Ty'Rique?
6     A.    No.
7     Q.    Why not?
8     A.    I told them that in the hospital.
9     Q.    When Ty'Rique was in the
10 hospital?
11     A.    I told Darcy that when I was in
12 the hospital.
13     Q.    Okay.  Officer Darcy.  So that
14 would have been when you were brought to the
15 hospital you said you told that to Darcy you
16 didn't want to press charges, right?
17     A.    Yes.
18     Q.    Did you ever call to confirm with
19 anybody else after that that you didn't want to
20 press charges?
21     A.    I myself personally?  No.
22     Q.    Do you know if Carmen did?
23     A.    No, I don't.
24     Q.    Do you know if anyone else from

Page 130

1 the family did?
2     A.    No.
3     Q.    Did you ever talk to anyone from
4 the Dauphin County District Attorney's Officer?
5     A.    No.
6     Q.    About whether or not you wanted
7 to press charges before you found out that
8 Ty'Rique was in the hospital?
9     A.    No, I didn't.
10     Q.    After you got home from the
11 hospital on the 18th, did you ever indicate to
12 anyone in authority, the police, 911, crisis,
13 DA's office, anybody that you thought Ty'Rique
14 needed mental health assistance?
15     A.    No.
16     Q.    Did you think that Ty'Rique
17 needed mental health assistance after he was
18 arrested?
19     A.    No.
20     Q.    Did you think that Ty'Rique's
21 issues and problems were likely drug-related?
22     A.    No.
23     Q.    You didn't know what they were?
24     A.    Exactly.

Page 131

1     Q.    How did you find out that
2 Ty'Rique was in the hospital?
3     A.    June 27th at the justice's
4 office.  By officer -- I don't remember his name
5 now.
6     Q.    Osmon or Osman or something like
7 that?
8     A.    Possibly Osman.  Instead of the
9 district justice telling me they called for a
10 officer to come to talk to me.  He opened the
11 front door to the lobby and asked me to step
12 out.  And I stepped out.
13          And he told me.  Carmen came out
14 behind me and he told both of us along with the
15 criminal advocate.  I don't remember her name.
16 She stepped out behind Carmen too.  And the
17 officer proceeded to say what he had to say,
18 that I needed to go to Harrisburg Hospital ICU.
19 My son was in the ICU unit.
20          There will be no court date.
21 It's over.  It's done.  He is not going to be
22 here.  You need to go see him.  The advocate
23 said that it would be extended.  And them two
24 got to argue.  It is over.  She did not believe

Page 132

1 that it was over and stormed into the building
2 and went into the judge's chamber and closed the
3 door.  We left.  That's all I remember.
4     Q.    Was that the victim advocate that
5 you are talking about?
6     A.    Yes.  Very arrogant, yes.
7     Q.    Do you recall the name of the
8 individual?
9     A.    I don't remember her name.  But I
10 remember in detail from what she told me.  That
11 she would come to my house and make me sign
12 those papers to press these charges on my son.
13 And I said, no, I'm not.  We got into a verbal
14 argument.
15     Q.    This is at the district justice's
16 office?
17     A.    Yes, it was outside the door.
18 The police officer, whatever his name was, took
19 it over.  He told me I got to go.  Go, go, go.
20 He handled her.  She was irate.
21     Q.    But it was before that she told
22 you that you would have to sign papers to press
23 charges against Ty'Rique; is that right?
24     A.    For what?



THOMAS MATTHEWS                                    April 25, 2023
CARMEN RILEY vs BRIAN CLARK                        133–136

Page 133

1      Q.   I think you said that you got
2  into a argument because she said she would come
3  over to your house or something --
4      A.   It was -- I am sorry.  It was
5  during that.
6      Q.   That is what I am getting at.  So
7  it was during that time she told you that?
8      A.   Yes.
9      Q.   And this was a woman.  Can you
10  describe her?  Was she a white woman, black
11  woman?
12     A.   White woman, blonde hair, thin,
13  bloodshot eyes.
14     Q.   So did you -- I take it you went
15  to the hospital then; is that correct?
16     A.   ASAP.
17     Q.   What did you find when you got to
18  the hospital?  What happened there?
19     A.   I went into the courtesy desk and
20  asked them where my son was.  She said ICU unit.
21  You can't go up there.  You got to talk to the
22  warden Brian Clark.
23     Q.   Did you talk to Brian Clark?
24     A.   I was handed the phone.  They

Page 134

1  dialed -- the courtesy dialed the number for me.
2  Several attempts went by and he finally picked
3  up.  He said that I couldn't -- I was not
4  allowed to see him.
5      Q.   This is Brian Clark who says
6  this?
7      A.   Yes.
8      Q.   Did he tell you why?
9      A.   No.  The phone was -- he hung up
10  the phone.  I left and went upstairs on my own
11  to the ICU.  I couldn't get in because I didn't
12  have a swipe card to swipe the door.  I turned
13  around and came back to the lobby.  I tried the
14  phone call again.  I got him on the phone.
15          During that time the hospital
16  security came up from behind and took the phone
17  from my ear and took the phone call over.
18  Harrisburg Hospital security took the phone call
19  over along with a Harrisburg police officer.  I
20  don't know his name.  He was there too.
21          They talked to Brian Clark.  I
22  walked away to console my wife Carmen.  I was
23  standing in front of her.  And the guards came
24  up from behind and said, Mr. Matthews, come on.

Page 135

1  We're going up.  They escorted me up.  I started
2  to walk with them.  I said, What about her?  She
3  can't come.
4          Okay.  I am still walking with
5  them.  Hit the elevator to go up.  I go in with
6  Harrisburg Hospital security, walk up to a
7  cubicle with the drape around it where my son
8  is.  There two CO guards standing there armed.
9  And I said, I'm Ty'Rique's father.  They told me
10  I was not to see him.  I said, What you mean?
11  I'm here.  I want to see my son.  They said to
12  me -- I had a cell phone in my hand at the time.
13  They must have assumed I was going to pull the
14  drapes and take pictures.
15          They said you cannot take
16  pictures.  I said, I'm not taking pictures.  I
17  put the cell phone on the head nurse's desk
18  which is a cart with a computer on it with
19  medicines or whatever apparatuses.  They said
20  you got to put it down on it.  The Puerto Rican
21  CO pulled the drawer open and handed me a smock.
22          I put the smock on, biohazard
23  smock, put it on.  Took one step forward, pulled
24  the drapes back.  I pulled the drapes back.  And

Page 136

1  I said, What the hell did you do to him?  What
2  the hell went on?  What did you do to my son?
3  One step more I grabbed his wrist from the
4  gurney, picked his wrist up.  And in my hand was
5  his left hand and his wrist.  It was severed at
6  his wrist all the way to the bone.
7          And it was like that because
8  fresh flesh would have been like meat steak at
9  the store.  His flesh was black.  It's been
10  exposed to the air for a long period of time to
11  turn flesh to black.  I dropped his hand in
12  disbelief.
13          I take my hand.  And I go to his
14  head.  And his head -- I rub my hand across his
15  head.  I don't feel the top of his head.  I
16  don't feel -- see this here?  I don't feel his
17  skull and his hair.  I take my hand away.  I am
18  looking at his eye, a laceration.  His lips,
19  laceration.  His front teeth, poked out, poked
20  out.
21          I reach to the bed at the bottom,
22  his feet.  Once step that way.  I start pulling
23  on his covers.  I can't get them loose.  Okay.
24  He is wrapped like a mummy.  I yanked them as



THOMAS MATTHEWS
CARMEN RILEY vs BRIAN CLARK

April 25, 2023
137–140

Page 137

1 hard as I could.  And up came dry ice.  And I
2 could feel hot air blowing on him from a heater
3 on the other side of the bed that I didn't see.
4          When I looked from his feet up to
5 his testicles was nothing but red, black, purple
6 bruises and lacerations to his penis.  I held
7 those covers up to look.  And in a matter of
8 seconds a nurse came in and took a karate chop
9 and knocked the covers out of my hand and said,
10 You can't do this.  You can't be doing this --
11 like that.
12          At that time I was rushed by
13 doctors, clipboards.  They wanted to tell me
14 what was wrong with my son, that I needed to
15 listen to them.  Right before they came in
16 Carmen walked past me and went to the other side
17 of the bed into the room.  I didn't go all the
18 way in.  She went all the way in the room and
19 started screaming, Ty'Rique, Ty'Rique, Ty'Rique.
20 Oh, my God.  Oh, my God.
21          Those doctors commenced to
22 talking to me.  The Puerto Rican CO was off to
23 the left.  A little short white guy, guard, CO,
24 armed, was standing behind me.  I turned to talk

Page 138

1 to the doctor, a tall Indian or Asian guy.  He
2 was telling me what was going on.
3          And that guard behind me was
4 talking to a nurse.  The nurse whispered
5 something into his ear.  And I caught vibes.
6 The words, "Yeah, we killed another nigger last
7 night" -- from that guard.
8      Q.    Which guard said that?
9      A.    I don't know his name.  It was a
10 little, short white guy.  The other guy was
11 Spanish.  He didn't say a word.
12      Q.    Was he there when the white guard
13 said, We killed another N word?
14      A.    Standing on the left side of him.
15 He looked at him.  I looked at him.  And he
16 shook his head no, no -- as if not me.  See?
17 Not me.  The Spanish guard did that.  I
18 looked -- I didn't have no choice.  I got
19 snatched from the doctors.
20          They said, Mr. Matthews, I need
21 you to pay attention to what I am trying to tell
22 you is wrong with your son.  He was still
23 standing behind me.  I turned around and said,
24 What the fuck did you say?  His response was he

Page 139

1 started screaming, Security, security, security.
2 They were already there.  They were already
3 standing there.
4      Q.    Who was screaming that?
5      A.    The CO that was standing behind
6 me.
7      Q.    The little white CO?
8      A.    Yes, yes.
9      Q.    The one that used the N word?
10      A.    Yes.
11      Q.    Did he use the N word in front of
12 the nurses and the doctors in there too?
13      A.    Oh, yes.  Oh, yes.  The CO was a
14 whisper.  And he hit me from the back of my
15 head.  I asked him, What the fuck did you say?
16 So I turned back around to listen to the
17 doctors.  I blocked that out.  The doctor said
18 that his nasal cavities in his head, the sinus
19 cavity, completely closed with Mace.  It was
20 nothing they could do to get that Mace out of
21 his sinus cavity.
22          They never seen it this bad like
23 this.  His face was orange by the way.  Like
24 iodine.  You ever put iodine on your skin like

Page 140

1 that?  My son's whole face was like that.  He
2 told me they did toxicology.  And it came back
3 nothing synthetic, very little trace of THC.  A
4 overwhelmingly heavy dose of Depakote.
5          I said to him, Depakote?  They
6 gave him a depressant in the prison.  He don't
7 take that because the doctor asked me did my son
8 take any prescription drugs.  I said to him, No.
9 The only thing he would take would be Benadryl
10 for allergies.  He said that ain't Benadryl.  He
11 stated what else he had on that clipboard.
12          I turned around to the Spanish CO
13 and the Harrisburg Hospital security.  I said,
14 Can you escort me to the door?  I'm done.  I'm
15 done.  I walked past that little white guard and
16 around him and went out of the ICU unit.  The
17 Spanish CO followed behind me.  Harrisburg
18 Hospital followed behind me.
19          I went out across the hallway.  I
20 leaned against the wall.  The Spanish CO came
21 near and stood there.  He said, Look, man, I
22 don't know what went on in there in the prison.
23 But all I can tell you is that when Ty was in
24 there on his shift, and I don't know what shift



Page 141

1 he had, that he was very polite and very
2 respectful. I watched him every 15 minutes.
3 This was the Spanish guard telling me this.
4         He said, Something went on in
5 that prison after my shift. I don't know what.
6 He took his hands and folded them together and
7 started pointing with a finger up and down to
8 the guard that I just had a problem with inside
9 the ICU that was standing there looking at him.
10 The Spanish guard told me he had something to do
11 with it. I couldn't get his name or the Spanish
12 guard's name. I got disillusioned and asked
13 Harrisburg Hospital to please escort me to the
14 door -- to the nearest door out of this
15 building. That is all I said to that guard.
16        Before I walked away he said,
17 look, man, I got kids too. But I can't imagine
18 what you are feeling right now. I feel really
19 bad. But I don't have nothing to do with what
20 happened there. I walked away from him. I went
21 outside the emergency room and stood in the
22 parking lot to try to get a ride home. Carmen
23 came out a few minutes later. We got a ride
24 home by cab.

Page 142

1         Q.    So this little white guard that
2 you described, approximately how tall was he?
3         A.    Five-five, five-ten. I'm
4 five-eleven. He was shorter than me.
5         Q.    Do you know how much shorter than
6 you he was?
7         A.    2 inches, 3 inches.
8         Q.    And can you describe him? Dark
9 hair? Light hair?
10        A.    Dark hair.
11        Q.    You said when he used the N word
12 did you say he whispered that to somebody?
13        A.    He said it. His body was facing
14 my back. A person was whispering in his ear.
15        Q.    In his ear? In the white guard's
16 ear?
17        A.    The nurse was whispering in his
18 left ear. He is facing me. He gave an answer
19 to that nurse. Yeah, we killed another nigger
20 last night.
21        Q.    Did he whisper --
22        A.    That was his response to the
23 nurse.
24        Q.    Did the guard who used the N

Page 143

1 word, did he whisper that? Or did he say that
2 in a voice above a whisper?
3         A.    A soft-toned whisper that bounced
4 off the back of my ears like your breath when
5 you speak to someone too damn close. It hit the
6 back of my ears. And it burned. It caused me
7 to turn around and say, What the fuck did you
8 just say? Excuse my language. But it is what
9 it is.
10        Q.    Did he respond when you said
11 that?
12        A.    Security, security, security.
13 That's what he responded. So what does that
14 tell you? He said what he said.
15        Q.    Okay. Did the nurse hear it?
16        MR. MINCEY: Objection.
17 BY MR. LAVERY
18        Q.    Was it loud enough -- it was loud
19 enough for you to hear it, correct?
20        A.    It was loud enough for everybody
21 to hear it.
22        Q.    Everyone in the room could hear
23 that comment?
24        MR. MINCEY: Objection.

Page 144

1         MR. LAVERY: I am sorry?
2         MR. MINCEY: Objection.
3 BY MR. LAVERY
4         Q.    I got that. Mr. Matthews, did he
5 use that language in a voice loud enough that
6 everyone in the room can hear when he used the N
7 word?
8         A.    There is no room. That is the
9 ICU unit. Practically everyone on that damn
10 floor could hear what he said. Okay? Let me
11 calm down a second, please.
12        MR. MINCEY: Can we take a break?
13        MR. LAVERY: That's fine. Let's
14    take a break.
15        (Discussion held off the record.)
16 BY MR. LAVERY
17        Q.    Did you go home after you were at
18 the hospital, sir?
19        A.    Yes, I did.
20        Q.    The comment -- I am using your
21 words -- that the little white guard or white
22 CO -- I forget which one you said -- made about,
23 We killed another N word, did you ever report
24 that to anyone at the county?



THOMAS MATTHEWS
CARMEN RILEY vs BRIAN CLARK

April 25, 2023
145–148

Page 145

1    A.    I got a phone call from the
2 county by Brian Clark.
3    Q.    When was that?
4    A.    He asked me -- when was it?
5    Q.    Yes.
6    A.    A couple days afterwards.  And he
7 asked me, What did that guard say?  I told him
8 that.  And he said, No, he didn't.  I said, Yes
9 he did.  I heard what he said.  And that was the
10 end of the conversation right there.  He has a
11 habit of hanging up on people.  You know what I
12 mean?
13    Q.    I know what you mean by people
14 hanging up on you.  But my question, though, is
15 he called you, correct?
16    A.    Yes.
17    Q.    And he brought up this CO that
18 was at the hospital?
19    A.    Exactly.
20    Q.    And you said what then to
21 Mr. Clark, that he had made the comment that you
22 told me before?
23    A.    Exactly.  Brian Clark asked me
24 what went on at the ICU in Harrisburg Hospital

Page 146

1 with this particular guard.  I don't remember
2 his name.  He knew his name.  But I didn't know
3 his name.  But I told him what he said.  He
4 said, No, he didn't.  I said, Yes he, did.  And
5 that was it.
6    Q.    Did you ever talk to anyone else
7 at the County about this comment?
8    A.    I called to find out where my son
9 was from the beginning.  I finally got through.
10 I spoke to regards to where my son was, not
11 about any drug or anything like that -- where my
12 son was.  Confirm that he is there.  Gloria was
13 one of the names.  Dawn or Diane was the other.
14 They kept saying we are going to switch you to
15 Brian Clark.
16    Q.    When was that that you would have
17 talked to Gloria and Diane?  Was that the same
18 day that you talked to Clark?
19    A.    No.
20    Q.    When with that?
21    A.    The sequence went Dawn or Diane.
22 I believe it was Dawn first.  I couldn't get
23 through to anybody.  I tried again.  This time a
24 woman by the name of Gloria picked up.  I don't

Page 147

1 know her job title.  She finally hit the right
2 extension and I got Lucas, Lieutenant Lucas on
3 the phone.
4        I asked him where my son was.  I
5 was his father.  I don't even recall what else
6 he said to me.  But I didn't get anywhere with
7 him.  And I had to speak with Brian Clark.
8    Q.    When was this, though?  Was this
9 before you found out that Ty was in the
10 hospital?  When did this happen?
11    A.    Before I found out Ty was in the
12 hospital in between the 20th and the 24th.
13 Somewhere in there.
14    Q.    After you spoke to Clark about
15 the CO's conduct at the hospital did you speak
16 to anybody else at the County about that CO?
17    A.    No.
18    Q.    Did you ever talk to anybody from
19 the district attorney's office, the Dauphin
20 County CID, about that individual?
21    A.    No, I didn't.
22    Q.    Were you ever interviewed by
23 Dauphin County CID?
24    A.    An attempt to interview me.  I

Page 148

1 refused.  Detective Walburn.
2    Q.    Do you recall approximately when
3 that was detective Walburn attempted to
4 interview you?
5    A.    In regards to my son's death.
6    Q.    Yes.
7        MR. MINCEY:  When?
8 BY MR. LAVERY
9    Q.    Approximately.
10    A.    July.  I will say July 1st.  The
11 end of June 29th and the first of July -- in
12 that range.
13    Q.    Thank you.  Did you ever speak to
14 anyone at the coroner's office?
15    A.    Tom.  I don't know his last name.
16 At the hospital.  The coroner's name was Tom.
17 He approached me and asked me to go to the
18 conference room with him.  At the ICU unit -- I
19 was talking to my son spiritually.  He
20 interrupted and asked me can we have a meeting.
21 I said yes.
22    Q.    Did you have a meeting with him?
23    A.    Yes.  Me, my sister and Carmen
24 sat in the conference room and had a meeting



THOMAS MATTHEWS
CARMEN RILEY vs BRIAN CLARK

April 25, 2023
149–152

Page 149

1 with him and the organ donors, which I declined
2 to consent to. We had a meeting. His statement
3 was he was going to get to the bottom of this no
4 matter what it took. He was going to get me
5 some answers. I am with you all the way.
6      Q.     Anything else that was said
7 during that meeting?
8      A.     He handed me a card with his
9 phone number. That was it.
10      Q.     Did you ever talk to anybody
11 again from that office?
12      A.     No. Up until we were supposed to
13 have a meeting with Hetrick and Tom.
14      Q.     When was that going to be?
15      A.     Like towards the end of July.
16      Q.     Did that happen?
17      A.     Hold on. Hold on. I would look
18 at August, the end of August.
19      Q.     Did that meeting happen?
20      A.     Yes. With my law firm I have now
21 and I and my wife, yes.
22      Q.     So you met with who from the
23 coroner's office with your wife and your law
24 firm?

Page 150

1      A.     Graham Hetrick. Tom the coroner
2 that is supposed to have done the autopsy.
3      Q.     What do you recall that took
4 place at that meeting?
5      A.     That my son had died of natural
6 causes, that there were no injuries on his body.
7 That was the two most interesting things that I
8 know of.
9      Q.     I am sorry?
10      A.     That was the two most interesting
11 things that I know of.
12      Q.     So you state you were told -- who
13 told you that your son died from natural causes?
14      A.     Graham Hetrick.
15      Q.     And he said there were no
16 injuries on his body?
17      A.     Exactly.
18      Q.     Who said that? Was that Hetrick
19 or one of the other people there?
20      A.     Hetrick said that.
21      Q.     Was the pathologist who did the
22 autopsy there?
23      A.     Yes. He never said a word in
24 regards to his findings.

Page 151

1      Q.     Did you ask him about his
2 findings?
3      A.     I didn't, no.
4      Q.     Did anybody from your law firm
5 ask him about his findings?
6      A.     I don't remember.
7      Q.     Do you know if anyone from your
8 law firm asked Mr. Hetrick any questions about
9 his conclusions?
10      A.     Kevin Mincey.
11      Q.     What did Mr. Mincey ask
12 Mr. Hetrick as best you can recall?
13      A.     How did he get the injuries that
14 I spoke about previously. The same things I
15 spoke about previously Kevin Mincey brought up
16 to Graham Hetrick.
17      Q.     And what was -- go ahead.
18      A.     I don't remember his response.
19      Q.     Did you ever watch any of the
20 video of Ty'Rique either at the Dauphin County
21 Judicial Center or at the Dauphin County Prison?
22      A.     I couldn't tell the difference.
23 But I did watch surveillance video of what went
24 on. I couldn't tell if it was booking or the

Page 152

1 mainstream prison.
2      Q.     Did you watch the video that was
3 taken the day that Ty'Rique was brought into the
4 jail?
5      A.     Yes, I did.
6      Q.     Did you watch the video of what
7 happened on the day that Ty'Rique was sent to
8 the hospital?
9      A.     Yes.
10      Q.     Do you know if CPR was performed
11 on Ty'Rique at the prison?
12           MR. MINCEY: Objection, you can
13      answer.
14           THE WITNESS: No. I didn't see
15      any surveillance footage of that.
16 BY MR. LAVERY
17      Q.     Do you know if any chest
18 compressions were done either at the prison or
19 later on Ty'Rique?
20      A.     No. I didn't see any camera
21 footage of that.
22      Q.     Did you ever see any camera
23 footage of what Ty'Rique was doing in the
24 holding cell at the booking center after he was



THOMAS MATTHEWS
CARMEN RILEY vs BRIAN CLARK

April 25, 2023
153–156

Page 153

1 placed in there on the day of his admission?
2     A.    Yes, I did see the camera
3 footage.
4     Q.    Did you see him slip the
5 handcuffs.
6         MR. MINCEY: Objection.
7         THE WITNESS: No, I didn't.
8 BY MR. LAVERY
9     Q.    You didn't see that. Did you see
10 the struggle that took place when Ty'Rique was
11 brought into the booking area originally?
12     A.    Yes, I did.
13     Q.    Did you see Ty'Rique being placed
14 in the restraining chair after being taken out
15 of his cell?
16     A.    Yes, I did.
17     Q.    Did you discuss any of that video
18 with any of the individuals at the coroner's
19 office when you had this meeting?
20     A.    I didn't.
21     Q.    So you don't remember what the
22 response was from either Mr. Hetrick, this
23 person Thomas, or anybody else from the
24 coroner's office when Mr. Mincey asked how

Page 154

1 Ty'Rique got the injuries that were on his body;
2 is that correct?
3     A.    Yes. At the time I don't
4 remember because I was losing it over his
5 comments sarcastically. I was losing my
6 tolerance I would say.
7     Q.    Did you think that the people
8 from the coroner's officer were being sarcastic
9 to you?
10     A.    Oh, yes. Oh definitely, yes.
11     Q.    Who from the coroner's office was
12 being sarcastic to you?
13     A.    Graham Hetrick. Tom was very
14 polite. The coroner Tom, very polite. Graham
15 Hetrick performed.
16     Q.    He what?
17     A.    He performed.
18     Q.    Performed. Okay.
19     A.    His comments were out of pocket,
20 out of line.
21     Q.    What comments did he make that
22 were out of line?
23     A.    Black father, black son. I see
24 where Ty'Rique gets it from.

Page 155

1     Q.    What were you talking about when
2 Mr. Hetrick said, I see where Ty'Rique gets it
3 from?
4     A.    I wouldn't know. I think you
5 have to ask him.
6     Q.    Okay. I will. Who else -- was
7 Carmen with you at that point?
8     A.    Yes. And Kevin Mincey.
9     Q.    Was anybody else?
10     A.    Riley Ross. And Tom, I don't
11 know his last name.
12     Q.    Anything else that you remember
13 being said at that meeting either sarcastically
14 or otherwise either by Hetrick, Tom or anybody
15 else from the coroner's office?
16     A.    Not to me directly. They were
17 talking to my representation. I sat and I
18 listened.
19     Q.    Were they being sarcastic to your
20 representatives?
21     A.    In the beginning in a certain way
22 in the beginning, yes. It's like saying -- can
23 I say this? Hetrick assumed that these two
24 gentlemen were just friends of the family or

Page 156

1 pastors, deacon and pastors. Until Riley and
2 Mincey reached in their pocket, got their wallet
3 out and pulled out a card and stated the name on
4 the card. Then they realized that is my
5 representation. Then the tone changed. He took
6 the matter seriously then. But everything else
7 was a joking matter.
8     Q.    At what point was it that the
9 cards were pulled out to show these were legal
10 people or attorneys?
11     A.    At the end when Hetrick stated
12 there were no injuries on Ty'Rique's body. And
13 Kevin Mincey rejected that statement and
14 answered with his.
15     Q.    So before that had either Mr.
16 Mincey or Mr. Ross advised the individuals at
17 the coroner's office that they were attorneys
18 representing you?
19     A.    At that time, yes.
20     Q.    No. Before that time?
21     A.    No.
22         MR. MINCEY: Objection.
23 BY MR. LAVERY
24     Q.    In the beginning did either



Page 157

1  Mr. Mincey or Mr. Ross advise --
2      A.    No --
3            MR. MINCEY:  Let him ask the
4      question first.
5  BY MR. LAVERY
6      Q.    Let me ask and then you can put
7  the objection on.
8            The question is I know you said
9  at the end of the interview -- and that is when
10  things changed -- that either Mr. Mincey or
11  Mr. Ross or both produced cards showing they
12  were attorneys.
13           My question to you is before that
14  from the start of the meeting did either
15  Mr. Mincey or Mr. Ross indicate that they were
16  attorneys representing you at that time?
17     A.    What I seen, my perspective, was
18  all of us sitting in a room.  Tom came in first
19  and sat next to me and put his hand on my
20  shoulder.  And he said, Everything is going to
21  be okay.  Sat down next to me, called me dad.
22  Tom the examiner called me dad.
23           The next came in Graham Hetrick.
24  There was no -- I can't remember at that time

Page 158

1  that -- nothing was asked as to who those
2  individuals were at that time.  He walked in and
3  walked around the filing cabinets behind Carmen
4  and Riley Ross and scooted along the wall and
5  scooted past Kevin Mincey to come and sit at the
6  other end of the table.  I don't recall him
7  being introduced at that point in the beginning.
8      Q.    But do you recall in the
9  beginning either of your attorneys advising the
10  representatives of the coroner's office that
11  they were attorneys representing you?
12     A.    I don't recall.
13     Q.    Was anything else said at that
14  meeting that you recall other than what?
15     A.    I gave it to you.  That was it.
16     Q.    Fair enough.  Did you ever meet
17  with a representative of the district attorney's
18  office?
19     A.    A attempt was made, yes.  I went
20  down there for a meeting.  Detective Walburn and
21  my previous representative Tracey Lewis and
22  Carmen Riley went down there for a meeting.  But
23  it abruptly changed.
24     Q.    Were you there for that?

Page 159

1      A.    Yes, I was.
2      Q.    When was that in time?
3      A.    I don't recall what day it was.
4  But it was before that I hired my new law firm.
5      Q.    So would it have been before the
6  time of the meeting at the coroner's office; is
7  that right?
8      A.    Yes.  This would have been July,
9  beginning of July sometime.
10     Q.    What was the purpose of that
11  meeting as you understood it?
12     A.    No.  I didn't know at the time.
13  I would assume to gather information on my son.
14     Q.    Who were you supposed to meet
15  with?
16     A.    Detective Walburn.
17     Q.    And did you meet with detective
18  Walburn?
19     A.    Yes, I did.
20     Q.    And who else was present for that
21  meeting?
22     A.    Previous representation Tracey
23  Lewis and Carmen Riley.
24     Q.    And what was discussed at that

Page 160

1  meeting?
2      A.    I can't remember.  I lost
3  control.
4      Q.    Do you remember anything that was
5  said?
6      A.    No.
7      Q.    Any other meetings with anyone
8  else affiliated with the county other than ones
9  that you just told me about?
10     A.    No.
11           (Exhibit 9 was marked for
12      identification.)
13  BY MR. LAVERY
14     Q.    Would you take a look at Exhibit
15  9.  Do you have it in front of you?
16     A.    In the process.
17     Q.    If you can take a look at it
18  first and I have a couple questions on it.
19     A.    I got it.
20     Q.    Let me know when you are
21  finished.
22     A.    Okay.  7/26.  Let's see.  Okay.
23     Q.    This indicates that on the 28th
24  of June at 15:23:20 you contacted Susquehanna



THOMAS MATTHEWS
CARMEN RILEY vs BRIAN CLARK

April 25, 2023
161–164

Page 161

1 Police Department and apparently ended up
2 speaking to a corporal Ferrufino. Do you see
3 that?
4     A.    Yes.
5     Q.    Do you remember that phone call?
6     A.    Yes, I do.
7     Q.    Was that after you found out
8 about Ty being in the hospital?
9     A.    I would say yes.
10     Q.    It says in the call notes that
11 according to you you indicated that your son may
12 be staying with the owner of the vehicle. The
13 owner of the vehicle is a Shonnea Hart. And the
14 vehicle is a cherry red Buick Lacrosse bearing
15 PA registration KRV3124 registered to Shonnea
16 Hart with a Lancaster address.
17           Did you advise the police at that
18 point that your son may have been staying with
19 Shonnea?
20     A.    How can my son be staying with
21 her when he was booked and in the hospital at
22 that time? This was the 28th. Okay? Also he
23 was never staying with Shaun. Shaun came to my
24 house to visit in a red Buick owned by his

Page 162

1 mother. I don't know that name. But his name
2 is Rishaun Thomas. That is all I know.
3     Q.    That is the Rishaun Thomas that
4 we talked about before, correct?
5     A.    Yes, it is. My son never lived
6 with him.
7     Q.    How about Shonnea Hart, did your
8 son ever live with her to the best of your
9 knowledge?
10     A.    They didn't live together.
11 That's his mother.
12     Q.    That's Rishaun's mother?
13     A.    Yes, it is. That's her car in
14 her name.
15     Q.    You said you had talked to them
16 previously about Rishaun driving a vehicle
17 without a license, correct?
18     A.    Yes. We are going around in
19 circles, yes.
20     Q.    And Shonnea is Rishaun's mother,
21 correct?
22     A.    Yes. I don't know her.
23     Q.    It says you advised that your son
24 usually takes Valley Road to North Progress to

Page 163

1 go back and forth to his house. This is where
2 he has drugs on him. He advised he uses
3 marijuana but suspects cocaine or heroin. Did
4 you say that to the police?
5     A.    No, I didn't.
6     Q.    Did you ever tell any of the
7 police officers from Susquehanna Township that
8 you wanted to get the drug dealer that had been
9 dealing your son drugs?
10     A.    Yes. And that was the drug
11 dealer.
12     Q.    Was that in your view potentially
13 Rishaun?
14     A.    Yes. At that time that's what I
15 thought. That's what I had come to realize that
16 could have been possibly true. I was searching
17 for answers.
18           MR. LAVERY: Understood. I think
19     I'm about finished. That's all I have for
20     now.
21           THE WITNESS: Thank you.
22           - - -
23           EXAMINATION
24           - - -

Page 164

1 BY MR. NINOSKY:
2     Q.    Mr. Matthews, my notes are not
3 clear on this. I just want to get it straight.
4 Did you marry Carmen Riley?
5     A.    No. Never did.
6     Q.    So you were referred to her as
7 your wife but you are not legally married; is
8 that correct?
9     A.    I consider common law like my
10 parents. They've been together 43 years. They
11 never signed a paper.
12     Q.    I wanted to make sure I had that
13 straight. There is no marriage certificate out
14 there or anything like that?
15     A.    All right.
16     Q.    And Ty'Rique is your biological
17 son?
18     A.    Yes. By Carmen Riley.
19           MR. NINOSKY: That is all I have
20     for you, sir. Thank you for your time
21     today.
22           THE WITNESS: Hey, you have a
23     wonderful evening.
24           - - -



THOMAS MATTHEWS
CARMEN RILEY vs BRIAN CLARK

April 25, 2023
165–168

Page 165

1              EXAMINATION
2              - - -
3 BY MR. POLAHA
4       Q.    Mr. Matthews, my name is Matt
5 Polaha. I represent the officers from
6 Susquehanna Township Police Department. I just
7 have a few follow-up questions for you to
8 clarify your previous testimony.
9       A.    Okay.
10      Q.    You previously testified that you
11 had cough syrup missing from your home. Did you
12 ever notice any sort of other medications or
13 crack cocaine that you used on or about June
14 12th was missing?
15      A.    No.
16      Q.    On the evening of June -- or the
17 morning of June 18th of 2019 you testified that
18 you were in the backyard of 1931 Franklin from
19 approximately 10:00 p.m. to I guess 3:00 to
20 4:00 a.m. What were you doing in the backyard
21 at that time?
22      A.    Carmen mother's has dementia. We
23 as a family, the three of us, cannot sit in the
24 house and carry a conversation. So we sit

Page 166

1 outside to discuss our bills, our bill payments,
2 his way to and from work, Ty'Rique Riley, and me
3 buying parts to fix his car to maintain it to
4 get him to and from work.
5              We normally have our discussions
6 outside since it's summertime sitting away from
7 the house so we do not have a distraction from a
8 person that has a mental illness as dementia.
9       Q.    I understand that. Thank you.
10             You mentioned that at the
11 district court on or about June 26th of 2019
12 there was a officer present from the Susquehanna
13 Township Police Department when you went to the
14 courthouse for the hearing for Ty'Rique Riley.
15      A.    Yes. I suddenly forgot his name,
16 yeah.
17      Q.    It's officer Osman?
18      A.    There you go. Starts with O.
19      Q.    It was not exactly clear to me.
20 And I'm not sure it's exactly clear on the
21 record. So I want to ask you the question
22 again. What was -- please describe what officer
23 Osman's involvement that day at the courthouse
24 was.

Page 167

1       A.    About 3:00, 3:30 he showed up in
2 the car, parked his car in front of the
3 courthouse, walked over and opened the door and
4 asked would I step out -- Tom Matthews.  He
5 seemed to know who I was. I was sitting by the
6 door. He called me outside. Carmen followed
7 behind me.
8              And he stated once again that I
9 needed to go to the ICU unit. There is not
10 going to be a case today. We're done. There is
11 not going to be a case at all. We are done.
12 You need to get to the ICU unit. Your son is in
13 the hospital.
14      Q.    And that's all he said to you?
15      A.    To me, yes.
16      Q.    Anything else about your
17 interaction that day with officer Osman?
18      A.    No. That was it.
19      Q.    Prior to June 26th of 2019 did
20 you ever try to physically go to Dauphin County
21 Prison and visit Ty'Rique Riley?
22      A.    No.
23      Q.    And jumping back to the last
24 exhibit Mr. Lavery showed you, TMK-9. Do you

Page 168

1 still have that in front of you?
2       A.    Yes.
3       Q.    I will ask you a few questions
4 about TMK-9. So is this a conversation that is
5 recorded on TMK-9? Is that separate from the
6 previous conversation you had with this
7 Susquehanna Township narcotics officer about the
8 suspected bag of potpourri that you found at
9 your home?
10      A.    That was part of that
11 conversation.
12      Q.    So it was the same -- sorry.
13      A.    That was part of the
14 conversation.
15      Q.    So it was not a separate phone
16 call?
17      A.    No.
18      Q.    Just some clarification: On
19 paragraph 4 it says you received a phone call
20 from officer Dupler. Do you recall receiving a
21 phone call from officer Dupler from Susquehanna
22 Township at any point?
23      A.    Dupler?
24      Q.    Do you know or you don't



Page 169

1  remember?
2       A.    I don't know.  I don't remember.
3  I can't recall that name.
4       Q.    Okay.  Thank you.  Going back to
5  June 18th of 2019 when you were laying on the
6  floor I believe at 2003 Franklin you saw the
7  Susquehanna police officers come into the
8  residence; is that correct?
9       A.    Yes.
10      Q.    And they took Ty'Rique out,
11  Ty'Rique Riley out of the residence to the
12  police car.  Do you recall that?
13      A.    Took him out of the residence.  I
14  don't know where they went.
15      Q.    In that moment that you saw the
16  officer with Ty'Rique Riley, did any of the
17  officers kick or hit or strike Ty'Rique Riley in
18  any way?
19      A.    Me myself did not see.  I heard.
20  I was laying on the floor in the bedroom.  I can
21  only hear.
22      Q.    What did you hear?
23      A.    Them asking Ty'Rique to step out
24  of the building, which he did.  And then I

Page 170

1  heard -- I know these officers.  I heard officer
2  Demetrus says, Let me look into your eyes.  And
3  I then I heard the click of a flashlight.  Then
4  I heard the clicking of handcuffs.  After the
5  handcuffs -- the grass is high.  I heard a march
6  sound away from the apartment building through
7  the tall grass to a driveway adjacent to the
8  apartment building.  And it's quiet after that.
9  That is what I heard.
10      MR. POLAHA:  Thank you.  That is
11  all the questions that I have.
12      THE WITNESS:  Thank you.
13      - - -
14      EXAMINATION
15      - - -
16  BY MR. CARMELITE
17      Q.    Sir, my name is Don Carmelite.  I
18  represent correctional officers Danner and
19  Swanson in the suit you and your wife have
20  filed.  Now, I will do some cleanup.  Bear with
21  me.  I will jump around a little bit.  Do you
22  need a break?
23      A.    No.  I'm good.
24      Q.    So I want to go back to this

Page 171

1  meeting you had with Graham Hetrick and a
2  individual by the name of Tom and your lawyers
3  Mr. Mincey and Mr. Ross were there.  Okay?
4       A.    Okay.
5       Q.    You made some statement when
6  Mr. Hetrick told you that your son died of
7  natural causes and he had no injuries that
8  Mr. Muncey then spoke to Mr. Hetrick and
9  responded for you.  Do you remember that?
10      A.    Kevin Mincey.
11      MR. MINCEY:  It's Mincey, Don.
12  BY MR. CARMELITE
13      Q.    Am I saying Muncey?  I'm sorry.
14  I apologize.
15      But do you remember testifying
16  that Mr. Mincey then responded to Mr. Hetrick?
17      A.    Yes.
18      Q.    What did Mr. Mincey say?
19      A.    How did he get a punctured lung,
20  broken ribs, broken teeth, lacerations to the
21  eye, lacerations to the lips?  That's what I
22  know.
23      Q.    What did Mr. Hetrick say?
24      A.    I don't remember his response to

Page 172

1  that.  I was losing it.
2       Q.    Do you know up until that point
3  had Mr. Mincey seen your son before?
4       A.    He had never seen my son.  Mincey
5  has never seen my son.
6       Q.    Do you know where Mr. Mincey got
7  the information about the injuries that you
8  described to the lips, the lacerations to the
9  lips, the lungs and his head?  Where did
10  Mr. Mincey get that information from?
11      A.    Wherever they get their
12  information from.  I don't know.  I have no
13  knowledge of that.
14      Q.    You also testified that detective
15  Walburn from the CID Dauphin County Criminal
16  Investigation Division attempted to interview
17  you but you refused.  Do you remember that?
18      A.    Attempted to interview.  I
19  abruptly ended it.
20      Q.    Why did you abruptly end it?
21      A.    Because he was sarcastic and
22  arrogant.
23      Q.    How was he sarcastic and
24  arrogant?



THOMAS MATTHEWS
CARMEN RILEY vs BRIAN CLARK

April 25, 2023
173–176

Page 173

1    A.    He looked to try to incriminate
2  me and my wife in some kind of way by his
3  approach towards me in the conference room of
4  the administration building.  Once he did that I
5  said, meeting adjourned.  "You are disrespecting
6  me," is what I said.
7    Q.    If you can help me understand how
8  was it that he was being disrespectful towards
9  you in trying to frame -- I think was the word
10  you used -- you and Carmen?  Was it his physical
11  actions?  Was it words?
12    A.    Verbally.
13    Q.    What did he say?
14    A.    His words.
15    Q.    What words did he use that you
16  found to be disrespectful?
17    A.    I don't recall the words.  But
18  his approach verbally was as if my son was a
19  criminal and his parents committed some kind of
20  crime.
21    Q.    Do you remember -- you don't
22  remember the words he used to give you that
23  impression?
24    A.    No, I don't.  No, no.

Page 174

1    Q.    But is it fair to say your
2  general recollection was that it left you with
3  the impression that you just described?
4    A.    Exactly.
5    Q.    But you don't remember the words
6  he used?
7    A.    No.  It was way out of line.  He
8  was out of line.  I was out of line.  I gave him
9  the respect that he was giving me.  What he gave
10  me I gave back to him and said we are done.  We
11  are done.  We are done.
12    Q.    Did he raise his voice?
13    A.    Didn't get a chance to.  He had a
14  stack of files like as if they were criminal
15  records.  You know?  He is going to court, slams
16  them on the table like that.  And puts his elbow
17  on them and starts grilling my wife with
18  disrespect.  I don't remember because of the
19  anger that I started to receive or deal with.
20    Q.    Let's go back to the incident in
21  the ICU with your son and the nurse and the
22  statement that the little white CO made.  Okay?
23    A.    Okay.
24    Q.    So can you just give me a

Page 175

1  approximation -- withdraw it.  We will move on
2  from that.
3    A.    Thank you.
4    Q.    You testified when Mr. Lavery was
5  asking you some questions about a bag that you
6  believe was marijuana.  And I guess later
7  determined that it was potpourri.  Is that what
8  you said?
9    A.    Yes, I did.
10    Q.    And how is it that you determined
11  it was potpourri?
12    A.    Because of the look of it it
13  looked look lawn grass.  Marijuana comes from
14  seeds, I believe, buds.  This looked like I took
15  a pair of scissors and cut grass off the lawn
16  and picked up lawn clippings and put it in a
17  little tiny pouch the size enough to put two
18  earrings in like the lobe of my ear.  That is
19  how big the pouch was.  I smelled it.  It
20  smelled like musk, Avon or something, a smelly
21  fragrance.  I know the difference between
22  marijuana and that.
23    Q.    Mr. Lavery asked you some
24  questions about whether it was sprayed with

Page 176

1  anything.  And my understanding is you were not
2  sure whether it was or was not; is that correct?
3    A.    I wouldn't know that.
4    Q.    And you also testified --
5  Mr. Lavery asked you a question in relation to
6  that substance you found.  And you responded
7  that, no, that it had never been used.  Do you
8  remember that?
9    A.    That was never opened, never been
10  used.  A $10 bag is not much in there.  Looked
11  like it was never used to me.  It still had the
12  ziplock seal on it.  My son handed it to me and
13  said, dad, look at this.  He is 21 years old.
14  He can make his own judgments.  He judged to
15  bring it to me.  Said this ain't right.
16  Something ain't right.  I didn't know what it
17  was.  I know it was not marijuana.
18    Q.    Let's go back to the night with
19  the sledgehammer.  Mr. Lavery asked you some
20  questions about whether you were concerned that
21  Ty'Rique was going to hit you with the
22  sledgehammer.  And you said, no, you were not
23  concerned about that.  You were concerned that
24  he was going to go outside with this



THOMAS MATTHEWS
CARMEN RILEY vs BRIAN CLARK

April 25, 2023
177–180

Page 177

1  sledgehammer.  Do you remember that?
2      A.   Yes.
3      Q.   Why were you concerned that he
4  was going to go outside with the sledgehammer?
5      A.   Because he wanted to get to the
6  door with it.  I was pulling him away from the
7  door.  That is why we were still in the middle
8  of the kitchen and the hallway.  I turned him
9  away from the door.  His back was facing the
10 living room.  I was standing in the kitchen and
11 the separation from the hallway.
12     Q.   Other than just generally not
13 wanting him to go outside with the sledgehammer,
14 was there a specific reason why you didn't want
15 him to go outside?
16     A.   It was not necessary.  The
17 situation was not necessary.
18     Q.   In June of 2019 was it -- let's
19 go back to the morning before the sledgehammer
20 or I guess the same day as the sledgehammer.
21 Was it normal for you to be outside at 3:00 or
22 4:00 in the morning?
23     A.   Oh, yes.  Every day in the
24 summertime.  We don't have air-conditioning.

Page 178

1  It's what we do.
2      Q.   And in June of 2019 did Ty'Rique
3  have any sort of regular schedule?  Did he go to
4  bed at a certain time?  Wake up at a certain
5  time?  Go to work at a certain time?
6      A.   The man was 21 years old.  No, he
7  does not.
8      Q.   Did you have a regular schedule
9  at that time?
10     A.   No, I didn't.  I hardly sleep.
11     Q.   I know Mr. Lavery asked questions
12 about the fact you are on disability.  What is
13 the disability that you've been granted?
14     A.   Diabetes is one.  Heart problems,
15 two.  Cardiopulmonary/cardiovascular, four heart
16 attacks.
17     Q.   As I began my questioning, sir, I
18 indicated I represent a individual by the name
19 of Matthew Danner.  Do you know Mr. Danner at
20 all?
21     A.   No, I don't.
22     Q.   Have you ever spoken to
23 Mr. Danner?
24     A.   No.  I never did.

Page 179

1      Q.   Do you have any knowledge as to
2  what Mr. Danner did or didn't do to your son?
3      A.   At what time?
4      Q.   Any time.
5      A.   Up until this deposition -- put
6  it that way.  I didn't know him at all up until
7  his last -- or just -- his deposition.  Same as
8  Angela Swanson.
9      Q.   So up until you heard his
10 testimony you had no factual knowledge about
11 Mr. Danner; is that fair?
12     A.   Exactly.
13     Q.   And what information you have
14 about Mr. Danner you learned exclusively from
15 his deposition?
16     A.   Exactly.
17     Q.   Is the same true for Angela
18 Swanson?
19     A.   Exactly.
20         MR. CARMELITE:  I don't have any
21 further questions.
22              - - -
23         EXAMINATION
24              - - -

Page 180

1  BY MR. MINCEY:
2      Q.   Going back to TMK-9.  Do you have
3  that in front of you?  I'm looking at CID 1036,
4  page 1 of 2.  This is regarding the call that
5  you made on June 28, 2019 where you spoke with
6  corporal Ferrufino.  Do you remember that?
7      A.   Yes.
8      Q.   We talked about that with
9  Mr. Lavery?
10     A.   Yes, I do.
11     Q.   Who did you know or who did you
12 believe was staying in Lower Paxton Township on
13 June 28, 2019?
14     A.   Rishaun Thomas.
15     Q.   Is that who you told corporal
16 Ferrufino was staying in Lower Paxton Township
17 in June 28, 2019?
18     A.   Yes, I did.
19     Q.   When we look at this report and
20 it says that you advised him, corporal
21 Ferrufino, that Ty'Rique was staying in Lower
22 Paxton Township, is that accurate?
23     A.   No, it's not.
24     Q.   Because you knew Ty'Rique to be



THOMAS MATTHEWS
CARMEN RILEY vs BRIAN CLARK

April 25, 2023
181–184

Page 181

1 in the hospital at that point; is that right?
2      A.      Yes.
3      Q.      And when you were telling
4 corporal Ferrufino about the individual who
5 takes Valley Road to North Progress Road, who
6 were you talking about?
7      A.      Rishaun Thomas.
8      Q.      When you were telling corporal
9 Ferrufino about the individual who you suspected
10 to use marijuana, cocaine and heroin, who were
11 you talking about?
12      A.      Rishaun Thomas, marijuana.  I
13 don't know anything about anything else.
14      Q.      Thank you.
15      A.      Yes.
16      Q.      Earlier when we were talking --
17 and I don't need you to look at it -- we were
18 talking about Exhibit 1 which was the emojis.
19      A.      Yes.
20      Q.      You said that you saw Ty'Rique
21 typing on the phone?
22      A.      Yes.
23      Q.      Whose phone was he using?
24      A.      Mine.

Page 182

1      Q.      Did Ty'Rique have his own phone?
2      A.      No.
3      Q.      Other than your phone did you
4 know Ty'Rique to have access to the internet any
5 other way?
6      A.      No.  Just my phone.
7      Q.      When you saw him typing emojis,
8 was that text messages or was it something else?
9      A.      I don't understand that.  But I
10 would say text message only.  No phone calls.
11      Q.      Did you know Ty'Rique to have
12 access to social media?
13      A.      I don't even know if my phone --
14 he probably did, yes.  He does whatever he does
15 on the phone -- this young generation.
16      Q.      Did he have his own social media
17 page?
18      A.      I wouldn't know.
19      Q.      Taking you to June 18, 2019.  Do
20 you recall when we were talking about the call
21 summary, the 911 call summary, when they were
22 talking about Carmen's call with 911?
23      A.      Yes.
24      Q.      And do you recall the section

Page 183

1 where it said Carmen said Ty'Rique had just
2 snapped like a few days ago?
3      A.      Yes.
4      Q.      Had you noticed any behavior of
5 Ty'Rique that would lead you to believe
6 something similar?
7      A.      Erratic, compulsive, pacing.
8      Q.      When you say erratic, what did
9 you see that makes you say that Ty'Rique was
10 behaving in a erratic way?
11      A.      Couldn't sit still.
12      Q.      Was there anything else?
13      A.      A hollow look.
14      Q.      A hollow look?
15      A.      Like he is not there.
16      Q.      I was going to say can you -- I
17 want to make sure I understand what you are
18 saying when you say that.  So when you say a
19 hollow look you are talking about looking at his
20 face?
21      A.      Like I am looking at you, yeah.
22      Q.      And what was -- can you describe
23 what his face looked like that made you say it
24 was a hollow look?

Page 184

1      A.      What I said didn't matter to him.
2 No matter what I say don't matter.
3      Q.      Was he responding to anything
4 that you were saying to him?
5      A.      No.
6      Q.      Do you remember what you were
7 saying to him when he was not responding to you?
8      A.      Put it down, put the hammer down.
9      Q.      So when you said he had a hollow
10 look, this is when you were struggling over the
11 hammer?
12      A.      Yes.
13      Q.      At any time before the incident
14 with the hammer had you seen Ty'Rique with that
15 hollow look that you described?
16      A.      Yes.
17      Q.      When?
18      A.      The past four days previous.
19      Q.      Was that something that was on
20 and off?  Was it that something that was
21 consistent for four days?
22      A.      On and off.
23      Q.      When you noticed that did you try
24 talk to Ty'Rique about it?



THOMAS MATTHEWS
CARMEN RILEY vs BRIAN CLARK

April 25, 2023
185–188

Page 185

1   A.   Yes.
2   Q.   Was he responsive to you?
3   A.   No.
4   Q.   Did you talk to Carmen about it?
5   A.   Yes.
6   Q.   What did you and Carmen talk
7 about in relation to the look you were receiving
8 from Ty'Rique?
9   A.   Hope he lays down, gets some
10 rest.  Maybe this will pass.  Is he sick?  We
11 were lost for words.
12   Q.   Was it something that you had
13 seen from Ty'Rique before?
14   A.   No.
15   Q.   Did you describe any of this
16 behavior or look to the police when they came to
17 the house on June 18, 2019?
18   A.   No.  I never really got a chance
19 to.
20   Q.   Did any of the officers when they
21 came into the house ask you about what happened
22 between you and Ty'Rique?
23   A.   No.
24   Q.   You mentioned that you had

Page 186

1 relayed to the police that Ty'Rique seemed
2 paranoid and afraid.  Do you remember that?
3   A.   In the hospital, yes.
4   Q.   Do you recall when was the first
5 time was that you recognized that Ty'Rique was
6 acting paranoid?
7   A.   2015.
8   Q.   2015?
9   A.   That four days previous.
10   Q.   Four days previous to what?
11   A.   The 18th.
12   Q.   June 18th?
13   A.   Yes.
14   Q.   Are you talking about 2019?
15   A.   2019, yes.
16   Q.   You just told me 2015.
17   A.   I am sorry.  Sorry.
18   Q.   So when we are talking about four
19 days prior you are talking about four days prior
20 to June 18, 2019?
21   A.   Yes.
22   Q.   You need to keep your voice up.
23   A.   Okay.
24   Q.   What was it that you saw Ty'Rique

Page 187

1 doing that made you feel he was acting paranoid?
2   A.   Compulsive pacing, sweating,
3 complaining of headaches, and sitting on the
4 porch and in the kitchen of the apartment
5 constantly working my phone with his thumbs,
6 texting and looking into the phone as if he is
7 hypnotized.
8   Q.   What type of effect will you say
9 that the death of Ty'Rique has had on your
10 relationship with Carmen?
11   A.   Depressed, traumatized from what
12 I seen.
13   Q.   When you are saying that are you
14 talking about yourself or Carmen?
15   A.   The two of us.  You asked me
16 about myself of talking about myself.
17   Q.   Would you describe your
18 relationship as being one that has brought the
19 two of you closer since this happened or are the
20 two of you more distant?
21   A.   Distant.
22   Q.   What about your relationship now
23 makes you say the two of you are more distant
24 towards each other?

Page 188

1   A.   We do not cuddle.  We do not have
2 sex.  All we do is sit and ask ourselves why did
3 this happen, how did this happen, what caused
4 this to happen, what are we going to do day in
5 and day out?
6   Q.   Before Ty'Rique passed away how
7 would you have characterized yours and Carmen's
8 relationship?
9   A.   Pretty much mutual.  We did sit
10 next to each other and maybe hold hands or
11 something like that.  You know?
12   Q.   What does mutual mean when you
13 say pretty much mutual?
14   A.   I give when she gives back.  What
15 she gives me I give her back.
16   Q.   How would you describe the
17 intimacy in your relationship before Ty'Rique
18 passed away?
19   A.   How would I describe that?
20   Q.   How would you describe the
21 frequency of the intimacy in your relationship
22 before Ty'Rique passed away?
23   A.   Pretty much strong.
24   Q.   Did the two of you have an active



THOMAS MATTHEWS                                                      April 25, 2023
CARMEN RILEY vs BRIAN CLARK                                          189–192

Page 189

1 sex life before Ty'Rique passed away?

2    A.    Somewhat.

3    Q.    What does somewhat mean?

4    A.    How many times?

5    Q.    I'm asking you what "somewhat"

6 yes means.

7    A.    You are referring to how many

8 times we had sex?  Made love?

9    Q.    How often would the two of you --

10    A.    We had --

11    Q.    Let me ask you the question.

12 Before Ty'Rique passed away, in a week how often

13 would the two of you have sex?

14    A.    Once or twice.

15    Q.    Since Ty'Rique passed what is the

16 frequency in which you and Carmen have had sex?

17    A.    We have not.

18    Q.    At all?

19    A.    At all.

20    Q.    Have you sought any therapy to

21 help you deal with the aftermath of Ty'Rique

22 passing away?

23    A.    Yes.

24    Q.    Are you currently seeing anybody?

Page 190

1    A.    Yes.

2    Q.    Who?

3    A.    Hershey Medical Center.  Jeanne

4 Fisk.

5    Q.    How often do you see Jeanne Fisk?

6    A.    Once a week.

7    Q.    For how long have you been seeing

8 Jeanne Fisk?

9    A.    Three years.

10    Q.    Did you have the need to see --

11 is this individual therapy or couples therapy?

12    A.    Couples.

13    Q.    In your opinion did you have a

14 need to see couples therapy prior to Ty'Rique

15 passing?

16    A.    No.

17    Q.    A few minutes ago you told

18 Mr. Carmelite that you do not sleep.

19    A.    No, I don't.

20    Q.    Is that something that was

21 happening before Ty'Rique passed away?

22    A.    Yes.

23    Q.    Before Ty'Rique passed away how

24 many hours a night would you sleep?

Page 191

1    A.    About the same as it is now.

2    Q.    How many hours do you sleep a

3 night now?

4    A.    One hour and 45 minutes.

5    Q.    When you do fall asleep is there

6 anything that keeps you from staying asleep?

7    A.    Yes.

8    Q.    What is that?

9    A.    Nightmares.

10    Q.    When you say you have nightmares,

11 what are you having nightmares about?

12    A.    My son being beaten.  People

13 coming to do harm to me, me being killed in my

14 sleep while I'm sleeping.

15    Q.    Did you have those types of

16 nightmares before Ty'Rique passed away?

17    A.    Not as bad.

18    Q.    Did you have nightmares about

19 Ty'Rique being beaten before he was arrested on

20 June 18, 2019?

21    A.    No.

22    Q.    How often do you have these

23 nightmares?

24    A.    I would say once or twice a week.

Page 192

1    Q.    When was the last time you had

2 one of these nightmares?

3    A.    This morning at 5:00 a.m.

4    Q.    On the night of -- I guess the

5 early morning -- it's the night of June 17th and

6 the early morning of June 18th, it was you,

7 Ty'Rique and Carmen in the backyard together?

8    A.    Yes.

9    Q.    Was Ty'Rique talking then?

10    A.    Yes.

11    Q.    Were you able to understand what

12 he was saying?

13    A.    Yes.

14    Q.    When did it get to a point where

15 Ty'Rique was saying things that were I think it

16 was described in one of the reports as mumbling

17 nonsensically.  When did that happen?

18    A.    In the evening when he would get

19 my phone and start doing his little thumb thing

20 with the emojis and texting.

21    Q.    Is that the only time that it

22 happened?

23    A.    Yes.

24    Q.    During the struggle between you



THOMAS MATTHEWS
CARMEN RILEY vs BRIAN CLARK

April 25, 2023
193–195

Page 193

1 and Ty'Rique over the sledgehammer, was Ty'Rique
2 saying anything to you then?
3     A.    Words, no.  Grunt/groans, yes.
4     Q.    Ty'Rique was making grunts and
5 groans?
6     A.    Yes.  Struggling with me, yes.
7     Q.    Had you ever heard Ty'Rique make
8 sounds like that before?
9     A.    No.  Up until that point, no.
10     Q.    Did any portion of the
11 sledgehammer, whether it's the steel head or the
12 handle, did any portion of that hit your body
13 during the struggle with Ty'Rique?
14     A.    Only the wood handle.
15     Q.    What part of your body did the
16 hand touch or hit?
17     A.    My upper part of my stomach and
18 the middle part of my chest.
19     Q.    When the handle hit your body was
20 that as a result of Ty'Rique swinging the handle
21 at you?
22     A.    Pushing and pulling.
23     Q.    That is when the two of you both
24 had your hands on the handle?

Page 194

1     A.    Yes.
2     Q.    I think you said Ty'Rique never
3 swung the sledgehammer at you; is that right?
4     A.    Right.  No room.  No room to
5 swing.  It's a small apartment.  Up or down or
6 across there is no room.
7         MR. MINCEY:  I don't have any
8     other questions for you.
9         (Witness excused.)
10         (Deposition concluded at 3:51
11 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 195

1
2         C E R T I F I C A T I O N
3
4
5         I, JARED CAREY, Court Reporter,
6 certify that the foregoing is a true and
7 accurate transcript of the foregoing deposition,
8 that the witness was first sworn by me at the
9 time, place and on the date herein before set
10 forth.
11         I further certify that I am neither
12 attorney nor counsel for, not related to nor
13 employed by any of the parties to the action in
14 which this deposition was taken; further, that I
15 am not a relative or employee of any attorney or
16 counsel employed in this case, nor am I
17 financially interested in this action.
18
19
20
21
   Jared Carey
22 Court Reporter
   and Notary Public
23 Date: May 7, 2023
24

