THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

–   –   –

CARMEN RILEY,                    :
Administrator of the             :
Estate of Ty'rique              :
Riley, et al                     :    CIVIL ACTION NO.
                                 :    4:20-CV-00325
     vs.                         :
                                 :
BRIAN CLARK, Warden of           :
Dauphin County Prison,           :
et al                            :

–   –   –

Zoom deposition of CORPORAL

CHRISTOPHER HAINES, taken pursuant to notice,

beginning at 10:10 A.M., on Wednesday, February 9,

2022, before Nicholas DiPiero, Registered Professional

Reporter and Notary Public.

–   –   –

DIPIERO COURT REPORTING
Registered Professional Reporters
1175 Marlkress Road, Unit 2460
Cherry Hill, NJ  08034
(215) 735-8101
dipieroreporting@aol.com

CORP. CHRISTOPHER HAINES

2  (Pages 2 to 5)

---

Page 2

1  APPEARANCES:
2
   MINCEY FITZPATRICK ROSS, LLC
3  BY: RILEY H. ROSS, III, ESQUIRE
       KEVIN V. MINCEY, ESQUIRE
4     One Liberty Place
       1650 Market Street
5     Suite 3600
       Philadelphia, PA  19103
6     (215)550-1995
       Riley@minceyfitzross.com
7  Co-counsel for the Plaintiffs
8
   LAVERY LAW
9  BY: ANDREW W. NORFLEET, ESQUIRE
       225 Market Street
10    P.O. Box 1245
       Harrisburg, PA  17108
11    (717) 233-6633
       Awn@laverylaw.com
12 Counsel for Defendant,
   Lt. Greg Mendenhall
13
14 MARSHALL DENNEHEY
   BY: DONALD CARMELITE, ESQUIRE
15    100 Corporate Drive, Suite 201
       Camp Hill, PA  17011
16    (717) 651-3529
       Dcarmelite@mdwcg.com
17 Counsel for Defendant,
   Angela Swanson
18
19
   MacMAIN, CONNELL & LEINHAUSER
20 BY: DAVID J. MacMAIN, ESQUIRE
       433 West Market Street, Suite 200
21    West Chester, PA  19382
       (484) 463-1014
22    Mpolaha@macmainlaw.com
   Counsel for Susquehanna Defendants
23
24
25

---

Page 3

1
   APPEARANCES: (Cont'd.)
2
3     MARSHALL DENNEHEY
       BY: ALEX K. YODER, ESQUIRE
4        100 Corporate Drive, Suite 201
          Camp Hill, PA  17011
5        (717) 651-3529
          Akyoder@mdwcg.com
6     Counsel for Defendant,
       Prime Care
7
                - - -
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 4

1              INDEX OF WITNESS
2
   NAME                          PAGE
3
4  CORP. CHRISTOPHER HAINES
5    BY MR. ROSS:                    5
6    BY MR. MacMAIN:                96
7    BY MR. NORFLEET:              100
8
                - - -
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 5

1         (It is stipulated and agreed by and
2  among counsel that signing, sealing, certification and
3  filing are waived, and that all objections, except as
4  to the form of the questions, are reserved until the
5  time of trial.)
6            - - -
7         CORP. CHRISTOPHER HAINES,
8  been duly sworn, was examined and testified
9  as follows:
10           - - -
11 BY MR. ROSS:
12 Q.      Corporal Haines?
13 **A.      Yes.**
14 Q.      I will do my best to refer to you as Corporal
15 Haines but I may sometimes say Officer Haines.  I hope
16 that is okay.
17 **A.      That is perfectly fine.**
18 Q.      All right. My name is Riley Ross as you heard
19 and I represent along with my partner Kevin Mincey the
20 plaintiffs in this matter.
21         Have you ever been deposed before?
22 **A.      Once before.**
23 Q.      How long ago was that?
24 **A.      In the last ten years.**
25 Q.      I'm going to go over just to make sure we're

CORP. CHRISTOPHER HAINES

Page 6

1  on the same page, I'm just going to go over some of
2  the rules of today's deposition.  And if at any time
3  you don't understand anything I'm saying just let me
4  know and I'll try and repeat it. But this is merely a
5  question and answer session.
6          The Rules of Civil Procedure allow
7  me as the counsel for the plaintiffs to ask you some
8  questions and get some information about the case.
9  I'm really just asking questions in order to gain your
10 knowledge of specific subject matters. It's not a kind
11 of got you game or anything like that. I'm simply
12 asking questions and asking that you answer them to
13 the best of your ability, okay.
14 **A.      Yes, sir.**
15 Q.      And like I said, I'm looking for your
16 recollection to the best of your ability. I'm not
17 expecting you to guess or to estimate unless I
18 specifically ask you to estimate something or to guess
19 or to speculate.  But I'm really just asking to the
20 best of your ability for the things that you can
21 recall.
22          And if at any point you are
23 approximating such as the time or the date just let me
24 know that that is an approximation and maybe not the
25 exact in that's the case, okay?

Page 7

1  **A.      Yes, sir.**
2  Q.      And just like you're doing because we have a
3  court reporter here that's taking down everything
4  that's being said. Your answers do need to be verbal
5  just like you've been doing. Even though we can see
6  one another shaking or nodding your head is not going
7  to be enough for the court reporter to record
8  everything so I ask that you respond verbally each
9  time you want to respond, okay?
10 **A.      I understand.**
11 Q.      I will do my best to ask the questions but if
12 it's not clear just simply let me know and I do my
13 best to repeat it so that it is clear. But if you do
14 give an answer I'm going to assume that you understood
15 my question; is street that fair?
16 **A.      That is.**
17 Q.      And again, because we have a court reporter
18 who's trying to take down everything that we say it's
19 important that we not talk over each other.  So I'm
20 going to do my best to allow you to complete your
21 answer before I begin with another question.  And I
22 ask that you allow me to get out my question
23 completely even if you know exactly what the question
24 is, let me get it out completely before you answer,
25 okay?

Page 8

1  **A.      Yes.**
2  Q.      We can take a break at any time if you need
3  to use the restroom, if you need to consult with your
4  attorney we can do that. That's fine I would only ask
5  that if there's a question that's been asked that you
6  answer it first before we take a break, okay?
7  **A.      Understood.**
8  Q.      Do you understand all of those rules that we
9  just discussed?
10 **A.      Yes, I do.**
11 Q.      Have you taken any medication in the last 24
12 hours that would impact your ability to sit for this
13 deposition today?
14 **A.      No, I haven't.**
15 Q.      Have you consumed any alcohol in the past 24
16 hours?
17 **A.      No.**
18 Q.      And have you taken any medication or anything
19 in the past 24 hours that will impact your ability to
20 recall details from the past?
21 **A.      No.**
22 Q.      Do you have any current medical or physical
23 conditions that would interfere with your ability to
24 sit for today's deposition?
25 **A.      No.**

Page 9

1  Q.      And do you have any medical or mental or any
2  type of conditions that will affect your ability to
3  recall information from the past?
4  **A.      No, I do not.**
5  Q.      Do you understand that the oath that you took
6  a few minutes ago is the same oath that you would have
7  taken if we were sitting in a courtroom before a Judge
8  and a jury?
9  **A.      Yes, I do.**
10 Q.      And is there any reason that you're not
11 prepared to go forward with today's deposition?
12 **A.      No, I'm prepared.**
13 Q.      Have you reviewed any documents or any
14 materials in preparation for today's deposition?
15 **A.      Yes, I have.**
16 Q.      What have you reviewed?
17 **A.      My reports and also the videos.**
18 Q.      When you say the videos what are you
19 referring to?
20 **A.      The dash-cam from my patrol car that day and
21 also the video of when I was at the prison.**
22 Q.      And when you say that day my belief is that
23 the date that you're referring to is June 18, 2019; is
24 that correct?
25 **A.      I believe that is correct.**

CORP. CHRISTOPHER HAINES

Page 10

1  Q.    Are there any other documents or material
2  that you reviewed in preparation for your deposition
3  today?
4  A.    No. There's not.
5  Q.    And you do realize that you are named as a
6  defendant in this lawsuit; is that right?
7  A.    I do. Yes.
8  Q.    Have you turned over any documents or
9  materials in connection with this lawsuit?
10        MR. MacMAIN: Other than the reports
11 that were provided.
12        MR. ROSS: Well, I don't know if he
13 turned them over so I'm asking if he's turned over
14 anything.
15 Q.    I'm asking, have you produced yourself any
16 documents or materials in connection with this
17 lawsuit? Have you given it to anyone?
18 A.    No. The only thing that was turned over was
19 my report. That's the only thing that's been produced.
20 Q.    And I'm going to ask you some more questions
21 about that report when we get to it but I want to
22 start by just getting some background information.
23        Again, can you state for the record
24 your full name.
25 A.    Sure. My first name is Christopher and my

Page 11

1  last name is Haines, it's H-A-I-N-E-S.
2  Q.    And what's your date of birth?
3  A.    It is August 2nd of 1975.
4  Q.    And where did you graduate from high school?
5  A.    That was Bible Baptist High School, that's
6  located in Shiretown, Pennsylvania.
7  Q.    What's the name of town?
8  A.    Shiretown, it's S-H-I-R-E-T-O-W-N.
9  Q.    Did you attend college?
10 A.    I did.
11 Q.    Where did you go college?
12 A.    I went to Harrisburg Area( Community College.
13 Q.    Did you receive a degree there?
14 A.    Yes.
15 Q.    What was your degree and what year did you
16 receive it?
17 A.    It was an associates in criminal justice
18 1996.
19 Q.    And I'm sorry. What year did you graduate
20 from high school?
21 A.    1994.
22 Q.    Have you received any other, did you attend
23 any other colleges?
24 A.    I attended a couple courses through Messiah
25 College when I was employed there but I did not get

Page 12

1  any degree or anything.
2  Q.    Was this before or after you attended
3  Harrisburg Community College?
4  A.    That was after.
5  Q.    Do you have any other degrees other than the
6  associate degree?
7  A.    No, I do not.
8  Q.    What town do you currently live in?
9        MR. MacMAIN: Objection. I don't let
10 officers answer personal questions where they live. If
11 you need to reach him obviously the police station or
12 through me.
13        MR. ROSS: So he can't tell me if he
14 lives in Harrisburg?
15        MR. MacMAIN: No.
16 Q.    At the time of -- you can object but I'm
17 going to ask. At the time of -- I'm going to refer to
18 the date of the incident that we just talked about
19 June 18, 2019. Throughout the deposition I'm just
20 going to refer to that as the date of incident. Do you
21 understand that, Corporal Haines?
22 A.    Yes, sir.
23 Q.    So the date of the incident how were you
24 employed?
25 A.    I was employed as a police officer for

Page 13

1  Susquehanna Township.
2  Q.    And at that time were you a resident of
3  Susquehanna Township?
4        MR. MacMAIN: Same objection.
5  Q.    Have you ever been arrested?
6  A.    No.
7  Q.    Have you ever, other than this lawsuit have
8  you ever been a party to a lawsuit?
9  A.    No.
10 Q.    You mentioned that you had taken a deposition
11 in the past ten years. What was that in reference to?
12 A.    Sure. One of my duties for the Susquehanna
13 Township Police Department is I'm part of the Dauphin
14 County Accident Reconstruction Team. I investigated an
15 accident where a Pembroke Borough police car was
16 involved in hitting another vehicle on the street. So
17 I was the investigating officer. So I was more or less
18 a witness and that's how I was deposed.
19 Q.    Was that a personal injury lawsuit?
20 A.    Yes.
21 Q.    Do you know if you were a witness for the
22 plaintiff or the defendant?
23 A.    I'm sorry. I think both.
24 Q.    Any other depositions that you sat for?
25 A.    No.

CORP. CHRISTOPHER HAINES

Page 14

1 Q.      And were you ever a witness in any other
2 lawsuits?
3 A.      No.
4 Q.      I think you may have said this, but what is
5 your current occupation?
6 A.      I'm a police officer.
7 Q.      And for what department?
8 A.      Susquehanna Township.
9 Q.      How long have you been a police office for
10 Susquehanna Township?
11 A.      21 years.
12 Q.      Do you remember the year that you began or
13 the date that you began?
14 A.      It was late October 2021.
15 Q.      I'm sorry.  I think you said 2021. Did you
16 mean 2000?
17 A.      I'm sorry. It was 2001.
18 Q.      I may have heard you wrong.
19 A.      Let me rewind. It was 2001.
20 Q.      And did you attend a Police Academy before
21 joining the Susquehanna Police Department?
22 A.      Yes, I did.
23 Q.      What Police Academy did you attend?
24 A.      It was the Harrisburg Area Community College
25 Police Academy. I was in the 75th class.

Page 15

1 Q.      That Police Academy did you attend that in
2 connection with obtaining your associates degree?
3 A.      That was completely separate.
4 Q.      What year did you graduate from the Academy?
5 A.      I believe it was early, late '99 early 2000.
6 Q.      What year did you start?
7 A.      It was a six month academy. When did I start
8 the academy; is that what your asking?
9 Q.      Yes.
10 A.      I believe the fall of '99.
11 Q.      At the time that you joined the Academy in
12 the fall of 1999 were you employed?
13 A.      I was in a leave of absence from Messiah
14 College when I was in the Police Academy.
15 Q.      What did you do at Messiah College before
16 that leave of absence?
17 A.      The title was public safety officer.
18 Q.      And when did you hold that position of public
19 safety officer, what were the dates?
20 A.      Again, I'm going to have to estimate, I'm
21 going to have to guess. I'm going to say late 1997 to
22 early 2000.
23 Q.      And what was the reason for your leave of
24 absence?
25 A.      Because the Police Academy was full-time and

Page 16

1 I wanted to become a police officer.
2 Q.      You obtained your associates degree in 1996
3 and began as a public safety officer in 1997. Did you
4 hold any jobs in between those two times?
5 A.      I was a community service officer pretty much
6 from I'm going to say 1994 the whole way up to when I
7 got hired up at Messiah College and that was for Lower
8 Allen Township Police in Camp Hill, Pennsylvania.
9 Q.      And did you begin that position before or
10 after your high school graduation?
11 A.      That would have been after.
12 Q.      And what were your duties as a community
13 service officer with the Lower Allen Town Township
14 Police Department?
15 A.      So we didn't have any arrest powers or
16 anything. We would assist the police officers in any
17 way they would need us. Whether it was directing
18 traffic at an accident scene, handling dog calls,
19 anything that you would not need an officer with
20 arrest powers that can handle is what the community
21 service officer does.
22 Q.      Was this a volunteer position or a paid
23 position?
24 A.      It was a paid position. It was paid but I'll
25 say it was kind of like a paid internship.

Page 17

1 Q.      Was it full-time?
2 A.      No.
3 Q.      And that position the community service
4 officer you said you held from '94 to '97 was that at
5 the same location with the Lower Allen Town Ship?
6 A.      That is correct.
7 Q.      Were you ever subject to any type of
8 discipline when you were a community service officer
9 with the lower Allen Town Township Police Department?
10 A.      No, sir.
11 Q.      Did you ever receive any complaints filed
12 against you during that time?
13 A.      No.
14 Q.      And after that you went to Messiah College as
15 a public safety officer; is that correct?
16 A.      That is correct.
17 Q.      And what were your duties as a public safety
18 officer?
19 A.      To make it general, we were general campus
20 security is what we did, 24/7.
21 Q.      Did you carry a firearm?
22 A.      We did not.
23 Q.      And I should have asked this. But as a
24 community service officer did you carry a firearm?
25 A.      No.

CORP. CHRISTOPHER HAINES

Page 18

1  Q.      And back to Messiah College as a public
2  safety officer did you have any arrest powers?
3  A.      **No, I did not.**
4  Q.      Were you ever ever subject to any discipline
5  as a public safety officer?
6  A.      **No.**
7  Q.      Did you ever receive any complaints against
8  you?
9  A.      **No.**
10 Q.      That you're aware of?
11 A.      **No.**
12 Q.      And then you took a leave of absence from
13 Messiah College to joint the Police Academy, correct?
14 A.      **That is correct.**
15 Q.      And you graduated in '99 or 2000; is that
16 correct?
17 A.      **That is correct.**
18 Q.      What did you, what if anything did you do for
19 employment after you graduated from the Police
20 Academy?
21 A.      **After I graduated the Police Academy I went**
22 **back to Messiah for a month or two at the most and**
23 **then I was hired as a police officer for Manor**
24 **Township in Lancaster County.**
25 Q.      Do you remember the date that you were hired

Page 19

1  at Manor County?
2  A.      **Manor Township, no, I don't remember the**
3  **dates.**
4  Q.      How about the year?
5  A.      **I'm going to say summer of 2000. But again,**
6  **that's an estimate.**
7  Q.      And what was your title with the Manor
8  Township Police Department?
9  A.      **Police officer.**
10 Q.      And how long were you employed there?
11 A.      **I was continuous all the way up to when I got**
12 **hired by Susquehanna Township in I believe it was**
13 **October of 2001. So about a year and a half I believe.**
14 Q.      Did you ever receive any discipline at Manor
15 Township Police?
16 A.      **No, sir, I did not.**
17 Q.      Did you ever receive any complaints against
18 you?
19 A.      **No.**
20 Q.      Were you the subject of any type of
21 investigation at Manor?
22 A.      **No.**
23 Q.      What caused you to leave the Manor Police
24 Department?
25 A.      **So Manor is in Lancaster County, and**

Page 20

1  Susquehanna Township was closer to where I grew up so
2  that's why I switched jobs.
3  Q.      Are there any other jobs that you held in any
4  type of law enforcement capacity or community safety
5  capacity that we have not discussed?
6  A.      **The one thing we didn't discuss was I am a**
7  **veteran so from July 1994 the whole way up to July of**
8  **2000 I was in the reserves for the United States**
9  **Marine Corp. In that capacity we were an artillery**
10 **unit and my job was radio communicator.**
11          **And there was one other police job.**
12 **To be honest I almost forgot about. I worked for**
13 **Shiremanstown Borough in Cumberland County for weeks,**
14 **two or three weeks before I went to Manor Township.**
15 **And that was only as a part-time officer.**
16 Q.      Let me take those in order. As a reserve for
17 the U.S. Marines did you have any type of law
18 enforcement duties while you were a reserve?
19 A.      No.
20 Q.      And what caused you to stop being with the
21 reserves in the U.S. Marines?
22 A.      **I completed my six year enlistment and at the**
23 **end of those six years I was a police officer. And to**
24 **be blunt I was working weekends already and I did not**
25 **want to, I served my country and I thought I was done.**

Page 21

1  Q.      And then at the Shiremanstown Borough you
2  were there two to three weeks, was this after you had
3  completed the Police Academy?
4  A.      **Yes, it was.**
5  Q.      And what caused you to leave there and I
6  believe that you went from there to Manor, what caused
7  you to leave?
8  A.      **Shiremanstown Borough was part-time and I was**
9  **only getting 10, 15 hours a week and Manor Township**
10 **offered me full-time and that was the only reason why**
11 **I left Shiremanstown Borough.**
12 Q.      Any other employment in the law enforcement
13 or public safety capacity that we haven't discussed?
14 A.      **No, sir.**
15 Q.      Have you received any special certifications
16 of any type in your role as a law enforcement officer?
17 A.      **Yes.**
18 Q.      For any department. Can you tell me about
19 those. If you can go in order that would be great. If
20 not that's fine too.  Let me start again. If you can
21 go by police department that would be great.
22 A.      **Sure. For Shiremanstown and Manor Township if**
23 **we're on the same page there was no special**
24 **certifications other than me receiving my training for**
25 **the Police Academy if that's what you're asking. I do**

CORP. CHRISTOPHER HAINES

Page 22

1  have a list when I start Susquehanna and that's where
2  a lot of my certifications are from.
3  Q.      Okay.
4  A.      So starting in Susquehanna I am a field
5  training officer more or less meaning that I train new
6  officers. I have also been a school resource officer
7  more or less school police. As I said earlier I'm a
8  member of the Dauphin County Accident Reconstruction
9  Team.  More or less if there's a fatal accident or a
10 near fatal accident I can assist any municipal
11 jurisdiction in Dauphin County that requests it. I'm
12 part of the Dauphin County Strike Team which is more
13 or less we will respond if there's a riot somewhere
14 and I have a certification in that.
15 Q.      Anything else?
16 A.      No. Not off the top of my head. That is it.
17 Q.      Out of those that you have mentioned are
18 there any of those certifications that happened after
19 the date of the incident after June 18, 2019?
20 A.      No. They were all previous.
21 Q.      So you were certified in all of these
22 respects on the date of the incident?
23 A.      That is correct.
24 Q.      As we said before your title today is
25 Corporal?

Page 23

1  A.      That is correct.
2  Q.      Can you walk me through your time at
3  Susquehanna for each promotion that you received or
4  each title change that you received beginning when you
5  first started Susquehanna.
6  A.      Sure. I'm not going to know the exact date.
7  I'm going to go, and I'm thinking here.  So I was a
8  patrol officer from 2001 and I'm going to have to
9  estimate this date when I got my first promotion. 2012
10 to 2013 is when I got promoted to patrolman first
11 class. So that's 2012-2013 actually till, I held that
12 rank until September of the 2021 and then that is when
13 I picked up the promotion to my current rank as
14 corporal.
15 Q.      Any other promotions?
16 A.      No.
17 Q.      Did you ever receive any demotions?
18 A.      No, sir.
19 Q.      So on the date of the incident you were a
20 patrolman first class?
21 A.      That is correct.
22 Q.      And if I see PFC on any documents that's what
23 is that stands for; is that right?
24 A.      That is correct.
25 Q.      And what are your duties as a patrolman first

Page 24

1  class, what were your duties?
2  A.      PFC is the first line supervisor on the
3  street. So as I explained earlier there's patrolmen
4  and then there's PFC's. The patrolman first class will
5  assist the patrolman in and I'll say in general
6  supervision when they're handling calls or if they
7  have questions about an incident that is happening.
8  It's more or less the first line supervisor.
9  Q.      Any other duties that separate a patrolman
10 first class from a patrol officer other than what
11 you've mentioned?
12 A.      Normally when you're a patrol officer you
13 don't have those I believe there were four or five
14 certifications that I told you. You normally don't get
15 those certifications until you start going up the
16 chain of command. So that's when you start becoming a
17 field training officer or when you start getting
18 specialized in certain areas of your career.
19 Q.      Those duties that you just outlined as a
20 patrolman first class, is it fair to say that those
21 were your duties on the date of the incident on June
22 18, 2019?
23 A.      That is correct.
24 Q.      And is it a fair question to ask your chain
25 of command as a patrolman first class who do you

Page 25

1  supervise and then who do you report to as patrolman
2  first class?
3  A.      As a patrolman first class I would supervise
4  another PFC who is in lower rank than me or any
5  patrolman. As of who I report to it will be anybody
6  above me, that would be a Corporal, a Sergeant, a
7  Lieutenant, Deputy Director of Public Safety, the
8  Captain and the Chief.
9  Q.      I'm going to ask you now about some policies
10 at the Susquehanna Police Department.  Are you aware
11 of any policy that instructs officers on how to
12 evaluate civilians that they encounter for mental
13 health issues?
14           MR. MACMAIN: Riley, do you mean a
15 written policy or do you mean practice and training or
16 separating them out in separate in things?
17           MR. ROSS: I want to just start out
18 with policies in general and then I'll get more
19 specific, just anything that you're aware of, any
20 policies that you're aware that involve making
21 evaluations of civilians for mental health issues.
22 A.      I think I understand your question. I'm
23 trying to think if we have any specific policies that
24 would govern on that. I would say there's some
25 procedure and protocol that we would follow if that's

CORP. CHRISTOPHER HAINES

Page 26

1  what you're asking.
2  Q.      Yes. So I would like to use the loosest
3  definition of policy as possible. So if there's
4  practices, if there's procedures, if there's protocols
5  I would like to incorporate all of those. So why
6  don't we start with the procedures and protocols that
7  were just coming to your mind and tell me about those.
8  A.      Sure. I'll just say if we have a mental
9  health call we would respond there and we would be
10 evaluating the person in their current state to see if
11 they need any type of medical assistance or not
12 medical assistance. Again, I've been doing this over
13 20 years so a lot of it just has to come with
14 experience.
15        I will say that we have some
16 guidelines where we follow that if we think we need to
17 call I'm going to say a professional we have Dauphin
18 County Crisis Intervention that we can call. A lot of
19 times the guideline before we call them is is this
20 person a danger to himself or is this person a danger
21 to anybody else. And that is the guideline that we
22 use.
23        Currently and I'll say even during
24 the pandemic we actually have a mental health
25 counselor riding along with Susquehanna Township.

Page 27

1  She is not a police officer but she is employed by the
2  Dauphin County Crisis Intervention Team where we can
3  bring her on scene when she's working and use her as a
4  resource.
5  Q.      I want to go back to the guidelines that you
6  talked about for that you follow if you need to call a
7  professional. Are these guidelines written?
8  A.      Not that I recall that there is anything
9  written.
10 Q.      Do you recall taking a class and being taught
11 about these guidelines? How did you become aware of
12 the guidelines?
13 A.      So these guidelines, probably when I was a
14 probationary officer I believe my field training
15 officer told me about these guidelines. I mean, they
16 have been around that long.
17 Q.      But you don't recall seeing them in written
18 form; is that right?
19 A.      No, sir, I don't.
20 Q.      The mental health counselor that does ride
21 along was this program in existence on the date of the
22 incident?
23 A.      No, sir. It was not.
24 Q.      Do you know when it was implemented?
25 A.      I don't have an exact date. I'm going to say

Page 28

1  in the last year, year and a half.
2  Q.      And is that a program that has been reduced
3  to writing? Have you read anything regarding that
4  program and how that program runs?
5  A.      I personally have not seen any paperwork
6  about it, no.
7  Q.      Do you know if any such paperwork exists?
8  A.      I would believe that there is. But again,
9  once again, I have not seen that.
10 Q.      Do you know why, I'm just asking if you know.
11 Do you know why this program was implemented?
12 A.      I'm going to say mostly probably because of
13 the pandemic. Our mental health cases have skyrocketed
14 and it is, it's more or less bringing the mental
15 health worker to the people instead of in person to
16 person.
17 Q.      Are there any other policies or protocols,
18 practices that you're aware that involve evaluating
19 civilians for mental health issues?
20 A.      So as I explained, during the Police Academy
21 we did have an instruction about mental health, about
22 first aid and about CPR. I also, the State of
23 Pennsylvania requires us yearly to take updates,
24 they're mandatory that we must complete before the end
25 of the year to keep our certification as a police

Page 29

1  officer. And again, through my 20 years I have taken
2  numerous courses that reference mental health and in
3  evaluating individuals.
4         I also and I just thought about this
5  and I can't give you a date. We have had some inhouse
6  training in how to deal with mental health and how to
7  just deescalate situations to limit the use of force.
8  And I would say that has been in the last two or three
9  years.
10 Q.      The courses that you have taken regarding
11 evaluating individuals for mental health issues were
12 these courses, have you taken these types of courses
13 as of June 18th of 2019?
14 A.      Yes.
15 Q.      How many of these courses do you think you've
16 taken up until at the time of June of 2019?
17 A.      The only one that I can say for sure that I'm
18 not sure if I had before the case we're talking about
19 today was the one the deescalation for the use of
20 force. I'm not sure if that was before this or after
21 this case. But all the other ones, the Police Academy,
22 the yearly updates were before this incident.
23 Q.      And are the yearly updates were they given,
24 were these instructions ever given in written form?
25 A.      Yes. So and again, I'm going to use an

CORP. CHRISTOPHER HAINES

Page 30

1  estimate date.  The first 15 years of my employment we
2  had person-to-person classes where we would actually
3  give papers and we would actually have tests at the
4  end of the class. I don't know what changed but from,
5  I'm going to use that estimate date.  From the last 6,
6  7 years to present there is now all on line and we
7  take on line courses with a test at the end of that
8  course.
9  Q.     Do you have access to these on line courses?
10 What I mean is the courses that you've taken in the
11 past on line, do you have access to them?
12 A.     So are you asking like for the certifications
13 or -- I would say yes. It's going to be part of my
14 train file through the MPOETC, that's the Municipal
15 Police Officers Education Training Center. That is
16 what certifies me every year as a police officer.  So
17 I'm going to say I don't work for MPOETC but I'm going
18 to assume that yes, they have all those training
19 records.
20             MR. MACMAIN: Mr. Riley, if I can
21 answer your question because it may save time. There
22 should be a listing of every course that Corporal
23 Haines took or any officer took through the state
24 training agency MPOETC. There will be a list of
25 everything they took.

Page 31

1             In terms of the actual materials
2  they would have to be obtained through MPOETC, the
3  state training agency. And they may or may not produce
4  documents to a third party. I hope that answers your
5  question.
6             I can provide a list of everything
7  he's taken and I believe we can download it.  But
8  we're not going to have access to it unless to it
9  unless it's an inhouse course.
10             MR. ROSS: Okay.  And that's what I
11 was going to ask for. I wanted to make sure, my
12 understanding is that he would have access to at least
13 a list of courses he's taken so I would like to get a
14 list of those courses so thanks.
15 BY MR. ROSS:
16 Q.     Other than what you've already discussed are
17 there any other policies or procedures or protocols
18 regarding evaluating a civilian's mental health status
19 that you haven't discussed already?
20 A.     None that I can recall right now. I mean, I'm
21 going to say common sense which is not a course.
22 Q.     I want to ask you specifically about the
23 making the decision or determination to take someone
24 to a mental health hospital. Do you receive any
25 specialized or specific training in deciding this

Page 32

1  person should go to a mental health hospital as
2  opposed to a jail?
3  A.     I think I answered this one already. It's
4  when I would feel that I would need to call crisis
5  intervention and more or less ask for guidance. And
6  that's when I would as I said earlier if I felt that
7  they were a harm to themselves or anybody else. And
8  that's when if I felt there was a need for that, yes,
9  I would take them to the hospital first instead of to
10 the prison.
11 Q.     Are there any other criteria that you would
12 use in making that determination that they needed to
13 go to a hospital instead of a prison other than what
14 you have just stated meaning a harm to themselves or
15 others?
16 A.     No.
17 Q.     And is that based on the training that you
18 received?
19 A.     That is correct.
20 Q.     And then how about the decision to reach out
21 to crisis intervention, what criteria do you use in
22 deciding whether or not you're going to reach out to
23 crisis intervention?
24 A.     As a police officer I guess that would be my
25 discretion.  I mean, as a police officer that is

Page 33

1  something you got to be capable of doing. We use our
2  discretion every day as a police officer.
3  Q.     Are there any guidelines that you've been
4  taught on how to use your discretion in deciding
5  whether to contact crisis intervention?
6  A.     I would just say how I was taught from my
7  field training officer and then my supervisors through
8  the years. I'm going to say the experience.
9             When you are a rookie officer
10 numerous -- the majority of time you don't go to a
11 call by yourself. There's always a second officer
12 there.  So that officer would be a senior officer
13 whether a supervisor or not that would be guiding me
14 and training me and molding me to become the police
15 officer that Susquehanna Township Police Department
16 would want.
17 Q.     Have you ever made the decision to take an
18 individual to a hospital as opposed to a jail based on
19 their mental health status?
20 A.     Yes.
21 Q.     How many times have you done that?
22 A.     Well, let me back up. Maybe I misunderstood
23 that. Have I made the decision to I'll say quote have
24 somebody committed to a mental health hospital or more
25 or less divert to the hospital instead of the prison.

Page 34

1  Is that what you're asking?
2  Q.      Let's start with diverting to the hospital
3  instead of the prison. Have you ever made that
4  decision?  And I say that meaning without regard to
5  whether you took them yourself and I'm asking you
6  about you making that determination, that decision?
7  A.      So I'm going to say yes. Can I give you a
8  particular incident, a particular date and time no. I
9  can say through my 21 years of experience I have gone
10  to Harrisburg Hospital or Osteopathic Hospital
11  numerous times where I'm going to say the arrestee had
12  to be cleared from the hospital before I could take
13  them to the prison.  And when I say cleared I mean
14  medically cleared, whether it be a physical injury or
15  whether it would be mental health.
16  Q.      And just speaking strictly in the terms of
17  mental health or at least having mental health issues
18  present are you saying that you have made that
19  decision to divert someone to a hospital instead of to
20  jail?
21  A.      Yes.
22  Q.      And is there a, you used the term divert
23  first.  Is there a distinction between -- did that
24  term involve as opposed to any other decision that's
25  made.  Because I think you've seemed to distinguish

Page 35

1  between diverting versus commitment. So I want to know
2  if there's a specific reason if divert means something
3  different than taking the person to the hospital?
4  A.      I think when I used the word divert, let's
5  say I'm on a scene that I was called to for whatever
6  reason. And the person was arrested I'm just going to
7  say for aggravated assault. Before I leave that
8  residence I would believe that they would need some
9  type of mental health counseling before they were
10  taken to the prison.  So I'm using the word divert as
11  instead of going to the prison directly I would divert
12  to the hospital first and then get them cleared and
13  then go to the prison. That's how I'm using that word
14  divert.
15          I don't think there's any -- if
16  you're looking for the word divert to have a
17  particular police meaning I'm just -- no.
18  Q.      And in deciding to divert someone to a mental
19  health hospital to get clearance before taking them to
20  the jail what's your criteria for deciding that that
21  person needs to go to the mental health hospital to be
22  cleared first?
23  A.      I would just say that they are a harm to
24  themselves or others.
25  Q.      So it's the same criteria we talked about?

Page 36

1  A.      Uh-hum.
2  Q.      Before you had mentioned counseling and so
3  you said that maybe they needed to go for counseling.
4  And so I wanted to just see if that was part of the
5  criteria as well, like could it be something less than
6  being a harm to themselves or to others.
7  A.      I think you're trying to -- we have to deal
8  with every circumstance as it comes. I don't want to
9  give a blanket statement and say, I have to look at
10  every situation and deal with the facts that are there
11  before I make my decision to do whatever. Does that
12  answer your question?
13  Q.      I think so.  I'm really just trying to figure
14  out if there are other things that you look at other
15  than harm to themselves or others. So if that is
16  something else that you look at then that is the
17  answer.
18          Okay. Let's focus on, I want to take
19  our attention to the actual incident that occurred. Do
20  you understand that this incident occurred on or that
21  you responded to a home on Franklin Avenue; is that
22  correct.
23  A.      Correct. That's what this incident is about,
24  yes.
25  Q.      So I'm just going to refer to Franklin

Page 37

1  Avenue. Do you know what caused you to go to Franklin
2  Avenue on the date of the incident, June 18, 2019?
3  A.      Sure. So on the date of the incident the
4  county dispatchers, there's the ones that speak over
5  our radio dispatched us to Franklin Avenue. They
6  received a 911 call that a mother was saying her son
7  was beating her husband and his father with a
8  sledgehammer. And that he was actively beating, and he
9  was still to be on the scene.
10  Q.      And you responded to that call from dispatch?
11  A.      Yes, I did.
12  Q.      Were you by yourself or with a partner when
13  you responded?
14  A.      Well, I was in my own patrol car. Two other
15  officers responded along in their own patrol cars.
16  Q.      When you received a call from dispatch do you
17  know if that what you receive from dispatch is
18  recorded in any way?
19  A.      The 911 tapes, yes, is recorded.
20  Q.      What I'm asking you is that, it sounds like
21  you said to me that you received from dispatch a
22  recounting of what the 911 call is; is that correct,
23  or did you receive the 911 call yourself?
24  A.      I did not -- the 911 center receives the
25  phone call. Then the 911 center dispatches the

Page 38

1  information to me over my radio through my computer.
2  Q.        So my question was, the information that
3  dispatch sends to you is that, do you know if that is
4  recorded in any way?
5  A.        Yes. I believe that it is.
6  Q.        How is it recorded?
7  A.        So again, I don't work for the county but I
8  believe that the actual 911 tape is recorded. I also
9  believe that my radio transmissions are recorded. And
10 lastly, as I said, we receive the information over our
11 computers. I'm going to refer to kind of like an
12 e-mail and that information is also recorded. That
13 information there is called a chronological report. In
14 that chronological report it tells us what the 911
15 call is, when the officers are responding, when
16 they're arriving and any updated information that they
17 may give us.
18 Q.        Have you, regarding this incident have you
19 listened to any radio transmissions from that evening
20 since that evening?
21 A.        No. Not that I believe I have. I would not
22 have access to that.
23 Q.        How about the chronological report, have you
24 viewed that chronological report from that evening?
25 A.        When it was on my actual computer that

Page 39

1  evening yes. Since no.
2          MR. ROSS: Dave, I'm going to ask for
3  if you have access either to the transmission and/or,
4  not and/or, but I would like the transmission and the
5  chronological report if you have access to either of
6  them.
7          MR. MACMAIN: I'm not sure that I
8  have access. I'm fairly sure but I'm not positive
9  that the 911 call from your client to 911 is recorded
10 and has been produced by somebody, maybe the county.
11         MR. ROSS: I do have that. I do have
12 that. But not the transmissions from dispatch to
13 Corporal Haines.
14         MR. MACMAIN: Sure. If it's something
15 I have access I will produce it. It sounds like it may
16 have come from the county. I would just ask to the
17 extent there's documents you're asking for I will try
18 to keep a list but if you send me letter, actually to
19 all counsel after the dep and we'll get it to you.
20         MR. ROSS: Will do.
21 BY MR. ROSS:
22 Q.        So Corporal Haines, again, can you tell me
23 again what you recall dispatch telling you about the
24 incident at Franklin Avenue?
25 A.        Sure. They gave the address on Franklin

Page 40

1  Avenue, I believe it was the 2100 block, 2000 block,
2  I'm not sure. And came in as an active call that a
3  mother was calling in saying that her son was actively
4  beating her husband, his father with a sledgehammer
5  and he was still on the scene and still had the
6  sledgehammer.
7  Q.        Do you recall whether or not dispatch
8  mentioned to you anything about the suspect's mental
9  health condition?
10 A.        I don't recall ever being advised anything
11 about that.
12 Q.        I'm going to play the 911 tape here.
13         MR. MACMAIN: Just to be clear, he's
14 said he's never listened to it and he wouldn't have
15 listened to it that night. So I'm happy to have him
16 answer questions. But just to be clear he's never
17 heard this nor would he have heard it that night so.
18         MR. ROSS: And you raise a good
19 question.
20 Q.        Corporal Haines, have you listed to the 911
21 tape since that incident?
22         MR. MACMAIN: I think the question is
23 whether he's ever listened because he wouldn't have
24 gotten the 911 call directly. The information is
25 summarized or communicated in some form to him. So

Page 41

1  maybe the first question I think he answered was did
2  you get the 911 call.
3          MR. ROSS: No. I'm asking him has he
4  since then, since the incident. I know that he did not
5  receive it but I just want for the record to know
6  whether or not he's heard it since the date of the
7  incident.
8  A.        No, sir. I have never heard the 911 tape
9  before the incident or after the incident.
10 Q.        Okay. I'm going to start this and then stop
11 it to see make sure you all can hear.
12         (911 CALL BEING PLAYED)
13 Q.        Do you recall dispatch telling you to come
14 around the back door to gain entry to the Franklin
15 Avenue residence?
16 A.        I know that we did. I'm not, I don't recall
17 them telling me that specifically but we did go around
18 to the back door so I assume that they did but I can't
19 say for sure.
20         MR. MACMAIN: He doesn't want you to
21 assume.
22 A.        I don't recall if they told me that or not.
23 Q.        When you arrived I think you stated there
24 were other officers that on the scene already; is that
25 correct?

Page 42

1   **A.      I was the first officer that arrived but the**
2   **two other officers were right behind me.**
3   Q.      And you said, did you approach the residence
4   by yourself or with the other officers?
5   **A.      The other two officers were right with me.**
6   Q.      And do you know, did they both arrive at the
7   same time as well?
8   **A.      Very very close. I don't know if it was one,**
9   **two, three but we all pulled up within a very close**
10  **timeframe together.**
11  Q.      Who were the other two officers?
12  **A.      That was Corporal Wilson and then PFC Glen.**
13  Q.      And I'll let you answer this but I think I
14  know, but what was the chain of command for the three
15  of you officers on that scene?
16  **A.      So it was Corporal Wilson would have been the**
17  **officer in charge. I would have been second in charge**
18  **because I have more time in my rank than PFC Glen.**
19  Q.      And did Corporal Wilson take charge of the
20  scene?
21  **A.      Yes, sir, he did.**
22  Q.      Do you recall if dispatch told you that the
23  caller had been asked about the medical condition of
24  the suspect and stated that he snapped tonight and in
25  the last couple of days?

Page 43

1   **A.      I don't recall ever being told that.**
2   Q.      Do you recall dispatch telling you anything
3   about the suspect's mental condition?
4   **A.      No, I don't.**
5           MR. NORFLEET: Objection to form.
6   Q.      Do you recall the dispatch telling you
7   anything about the suspect's mental condition?
8   **A.      No, I don't.**
9   Q.      Do you recall dispatch telling you at any
10  point that the caller stated that the suspect did not
11  hit anyone with the hammer?
12  **A.      I don't recall that.**
13  Q.      Do you recall dispatch ever telling you that
14  the caller believed that the suspect was a danger to
15  her and to her husband?
16  **A.      I don't recall them saying that.**
17  Q.      Is there anything about the in now hearing
18  911 tape that refreshes your memory about anything
19  that dispatch told you that you didn't previously
20  relay to me?
21  **A.      No.**
22          MR. ROSS: Why don't we take a break.
23  It's 11:27 now. Is five minutes enough for everyone or
24  do we need longer?
25          (Recess taken.)

Page 44

1   BY MR. ROSS:
2   Q.      Corporal Haines, why don't you just go ahead
3   and describe to me what happened when you arrived at
4   the Franklin Avenue residence on the date of the
5   incident.
6   **A.      Sure. I'll leave off after all three officers**
7   **walked to the rear of the residence. And there was a**
8   **door open. The interior door was open but a screen**
9   **door was locked. Corporal Wilson as I said earlier was**
10  **the senior officer, the lead investigator. I believe**
11  **it was actually his beat, his assigned area that day.**
12          **When we got to the door and I**
13  **remember this vividly, I was on the far right, PFC**
14  **Glen was in the middle and Corporal Wilson was on the**
15  **far left, and we were all looking into the door.**
16  **Corporal Wilson tugged on the screen door and it**
17  **didn't come up open. The next thing we see is Mr.**
18  **Riley come walking I'm going to say in the doorway but**
19  **maybe like 5, 7 feet away from the door from our left**
20  **towards our right. We see down, I'm sorry -- I see**
21  **down by his side a sledgehammer. So the ball of the**
22  **hammer is like on the ground almost, I won't call it**
23  **was dragging it but he still had ahold of it.**
24          **Corporal Wilson asked him if at that**
25  **time very calmly to open the door. I believe he had to**

Page 45

1   ask another time or two.  Then Mr. Riley did open the
2   **door. Mr. Riley was asked to step outside and at that**
3   **time he was detained by myself. When I mean detained**
4   **he was put in handcuffs but not officially arrested.**
5           **At this time, during this whole time**
6   **there was an absolute downpour of rain. Corporal**
7   **Wilson directed me to stay with Mr. Riley while he and**
8   **PFC Glen went into the residence. I escorted Mr. Riley**
9   **probably no more than 10 or 15 feet away from the door**
10  **and underneath a big tree more or less to protect us**
11  **from the rain. I stayed with him there. Mr. Riley and**
12  **I from what I recall we never even conversed.**
13          **Within a few minutes Corporal Wilson**
14  **came back outside and directed me to take Mr. Riley**
15  **down to the booking center for charges of aggravated**
16  **assault. At that time Patrolman D'Arcy arrived on**
17  **scene and we both escorted Mr. Riley down to my patrol**
18  **car. He was searched, nothing was found and he was put**
19  **in the rear of my patrol car.**
20  Q.      Anything else happen at the scene?
21  **A.      Nothing that I can recall. It was pretty**
22  **simple.**
23  Q.      Did you drive away at that time or did more
24  time elapse before you drove away?
25  **A.      I would say within a minute, two minutes at**

CORP. CHRISTOPHER HAINES

Page 46

1   the most I drove away. I already had my directions and
2   what I was supposed to do. Again, it was a downpour. I
3   kind of remember wiping my face off and kind of
4   getting myself situated before I drove away but there
5   wasn't much time lapse.
6   Q.      When you first saw Ty'rique Riley appear in
7   the doorway did he say anything?
8   A.      I remember him mumbling something but nothing
9   that I could make out. I also heard some voices from
10  inside but, again, nothing that I can understand.
11  Q.      For Mr. Riley when you say you couldn't
12  understand what he was saying was that because you
13  couldn't hear it audibly or you couldn't kind of
14  understand it because the words coming out of his
15  mouth didn't make sense?
16  A.      I couldn't hear it audibly because remember I
17  said, there was a good five to seven foot distance
18  with a closed door. And again, when I say it was a
19  downpour it was a downpour of rain.
20  Q.      When Corporal Wilson asked him to open the
21  door did he respond, did Ty'rique Riley respond in any
22  way verbally?
23  A.      Not that I recall, no.
24  Q.      And then you talked about him stepping
25  outside, you were walking under a tree.  Do you recall

Page 47

1   him saying anything during that time that he came out
2   of the house?
3   A.      No, sir. Nothing at all.
4   Q.      With regard to Corporal Wilson directing you
5   to take him to the booking center was there discussion
6   about him going to the booking center or was there
7   simply that was the order that you were given?
8   A.      That was the order that I was given.
9   Q.      Do you know if Corporal Wilson had a
10  discussion with anyone about whether or not Ty'rique
11  should go to a hospital that evening?
12  A.      I never went into the house so I don't know
13  what was said in the house with anyone else.
14  Q.      My next question is not going to be limited
15  to what was said in the house.  I'm just asking you,
16  do you know if Corporal Wilson had a discussion with
17  anyone regarding taking Ty'rique Riley to a hospital
18  that evening?
19  A.      He never said anything to me. I don't know if
20  he said anything to anybody else.
21  Q.      Did you have an opinion -- at the time that
22  Corporal Wilson had directed to you take Ty'rique
23  Riley to the booking center did you have an opinion on
24  whether or not Ty'rique Riley should go to a hospital?
25  A.      Yeah. I didn't think he needed to go to the

Page 48

1   hospital.
2   Q.      Was that something that you had considered
3   and decided that that was not necessary or was that
4   something that you had considered?
5   A.      No. There was no indication that I needed to.
6   Q.      As a PFC do you have the ability to if you
7   had learned any information that had made you feel
8   that an individual in your custody needed to go to a
9   hospital did you have the authority, would you have
10  the authority to take that individual to a hospital?
11  A.      Absolutely. Even a patrolman if they know
12  something that they don't see is right they need to
13  bring it up to the supervisor. So if I or I'm just
14  saying Patrolman Smith would have saw something, yes,
15  we have the right to divert if we need to.
16  Q.      At any point that evening did you ever
17  contemplate taking Ty'rique Riley to a hospital?
18  A.      Again, I'm always constantly evaluating the
19  situation.  That's what a police officer does. There
20  was no clues that gave me any indication that I would
21  have needed to take Mr. Riley to the hospital.
22  Q.      And I'm not asking for the entire night. I'm
23  not just talking about up until the time you placed
24  him in your patrol car. At any point after you drove
25  away from Franklin Avenue did the situation cause you

Page 49

1   to consider taking him to a hospital?
2   A.      No, sir.
3   Q.      You heard the 911 tape now.  Is there any
4   other information that you heard on the 911 tape that
5   you believe had you been told would have given you a
6   reason to take him to a hospital?
7   A.      I don't think there's any new information
8   that would have changed my mind.
9   Q.      How about the fact that Carmen Riley had
10  reported that in response to a question as to whether
11  or not he had mental health issues that he had
12  snapped, would that have had an impact on your
13  decision to take him to the hospital?
14          MR. MACMAIN: Objection to the form.
15  Q.      You can answer the question if you understand
16  it.
17  A.      Ask it again for me, please.
18  Q.      Did you hear on the 911 tape when Carmen
19  Riley was asked if her son had a mental condition?
20  A.      Yes.
21  Q.      And did you hear her respond that he had
22  snapped tonight and also it may have been the last
23  couple of days?
24  A.      I did hear that, yes.
25  Q.      If you had been told that information about

CORP. CHRISTOPHER HAINES

Page 50

1  Ty'rique Riley would that have impacted your, would
2  that have been something you would have considered in
3  taking him to a hospital?
4            Let me ask that again. I'm sorry.
5  If you had heard that information would that have
6  caused you to take Ty'rique Riley to a hospital?
7  **A.      Simply just that information no.**
8  Q.      And can you tell me why not?
9  **A.      Well, one of the things that I'm aware of is**
10 **when I take somebody to the booking center there is a**
11 **medical professional there that does evaluate the**
12 **arrestee and they have to be cleared medically before**
13 **I'm able to leave. But begin, there was no indication**
14 **that there was any type of mental health need in my**
15 **dealing with Mr. Riley.**
16 Q.      When you say that the individual needs to be
17 cleared medically before you're allowed to leave can
18 you tell me more about that, what do you mean by that?
19 **A.      Sure. And I don't have a list of questions**
20 **but I believe there may be a list of questions that**
21 **the, I'm going to call it the nurse. I'm not sure**
22 **what her title is but I'm going to call her the nurse,**
23 **comes and talks to the person. And I'm going to use**
24 **quotations, evaluates the person. They evaluate them**
25 **for medical needs and then they normally say yes or**

Page 51

1  **no, we can accept this person.**
2  Q.      And do those medical needs include mental
3  health needs?
4  **A.      I believe so, yes.**
5  Q.      And what's the basis for your belief that it
6  does?
7  **A.      Just part the questions that they ask from my**
8  **experience of dropping off numerous individuals there.**
9  Q.      What are those questions that they ask that
10 you believe that they're evaluating for mental health
11 needs.
12 **A.      I don't know if I know the questions. I know**
13 **they ask are you injured, like physically injured. I**
14 **can't give you the answer of what the questions they**
15 **ask.**
16 Q.      And did that occur with Ty'rique Riley that
17 night?
18 **A.      To the best of my knowledge yes.**
19 Q.      Do you recall being given clearance to leave
20 because of an evaluation that had occurred to Ty'rique
21 Riley?
22 **A.      I recall the and I don't know what the rank**
23 **is of the shift supervisor from the prison saying that**
24 **I was cleared to leave.**
25 Q.      Do you know the name of that shift

Page 52

1  supervisor?
2  **A.      No. I don't know any of them personally.**
3  Q.      With regard to this evaluation that you're
4  aware that occurred at the booking center, do you
5  receive some type of training that has told you that
6  the evaluation that occurred at the Dauphin County
7  Booking Center a satisfactory evaluation that can
8  address mental health issues?
9            MR. MACMAIN: Objection to form.
10 Q.      Do you understand the question?
11           MR. MACMAIN: Riley, I'm not sure I
12 understand your question. Your question is what
13 assurances does the officer have or what kind of
14 training does he have that Dauphin County and/or Prime
15 Care's evaluation is a good evaluation?
16 Q.      So, Corporal Haines, you have received
17 training as to resources that you can use to help you
18 evaluate mental health issues, right? You told us
19 about the Crisis Intervention Center; is that correct?
20 **A.      That is correct.**
21 Q.      Have you been given specific places that you
22 can take an individual for mental health evaluations?
23 **A.      I don't think there's any particular place,**
24 **No, if I'm understanding your question.**
25 Q.      I believe before you mentioned taking someone

Page 53

1  to Harrisburg Hospital?
2  **A.      Correct.**
3  Q.      Have you been trained that that is an
4  appropriate place to take someone for a mental health
5  evaluation?
6  **A.      I don't if I've been trained but through**
7  **common practice, past practice. If that answers your**
8  **question.**
9  Q.      That's what I'm getting at. I'm getting at
10 whether or not this is something you have been taught
11 as opposed to this has been your experience. So with
12 regard to the Dauphin County Booking Center has
13 anyone, has your training ever said that the Dauphin
14 County Booking Center is a place where you can take
15 someone for a mental health evaluation?
16 **A.      My training has taught me through my**
17 **experience that if the Dauphin County Prison accepts**
18 **somebody for I am cleared of any liability medically.**
19 **And that I am free to go. That they more or less**
20 **accept the responsibility of my prisoner and now it's**
21 **their problem. Does that make sense? Not their**
22 **problem. That's not the right word. It is their**
23 **authority to make sure this person is okay.**
24 Q.      Okay. So what I'm hearing you saying is that
25 they will then assume the responsibility for your

CORP. CHRISTOPHER HAINES

Page 54

1 prisoner if they have cleared you to leave; is that
2 correct?
3 A.      Yes. Responsibility is a better word than
4 what I used, yes.
5 Q.      Separate from them accepting responsibility
6 I'm interested in just any training that you receive
7 regarding getting an individual a mental health
8 evaluation. So with regard to your experience for
9 Dauphin County booking you talked about medically
10 being medically cleared. Do you mean medically to
11 include mental health issues being addressed?
12 A.      Yes. Because they are physically taking
13 responsibility of a physical body. And more or less
14 saying, Corporal Haines, you are now allowed to leave.
15 When I say taking responsibility I mean medically,
16 mentally, the physical body, the whole thing.
17 Q.      Separate from the liability issue or the
18 responsibility issue is it safe to say that you have
19 not received any training where you have been told
20 that if you need to have someone evaluated for a
21 mental health issue you've never been told that
22 Dauphin County Booking is the place to take someone;
23 is that correct?
24            MR. MACMAIN: Objection. Are you
25 assuming in that question that the person doesn't have

Page 55

1 criminal charges and there's no legal authority to
2 take him to prison as opposed to a facility?
3            MR. ROSS: No. I'm not making those
4 assumptions. I'm just asking, I'm just clarifying or
5 getting confirmation that he's never been told that
6 Dauphin County booking is the place to take someone to
7 get a mental health evaluation.
8            MR. MACMAIN: Objection to form. I'm
9 not sure what you're asking him.
10 Q.      Have you ever been told that the Dauphin
11 County Booking Center in the place, is a suitable
12 place to take an arrestee for a mental health
13 evaluation?
14            MR. NORFLEET: Objection to form.
15 Q.      You can answer the question, Corporal.
16 A.      I don't know that I've ever been told that.
17 So I would call, if I felt there was a need that night
18 for a mental health evaluation I would have taken him
19 to the hospital. I did not feel that there was a need.
20 So when I take him to the prison, and again, I'm going
21 to use the nurse.  I don't know what term they use for
22 their medical person that clears him.  The nurse is
23 also a second evaluator of I'm going to say my
24 decision.  If the nurse would have thought that I
25 would have been wrong in taking him to the prison and

Page 56

1 not to the hospital in my practice I would have been
2 told that.
3            In past practice there was at least
4 one occurrence where they did not accept somebody
5 medically because of a I believe it was a cut in the
6 finger. And I had to take them to the hospital and get
7 they medically cleared and then bring them back. Does
8 that answer your question?
9 Q.      Yeah, it does. Thank you. And for Ty'rique
10 Riley's case, you did not believe that he needed to go
11 to a hospital for a mental health evaluation; is that
12 correct?
13 A.      No. If I thought there was a need I would
14 have taken him to the hospital.
15 Q.      I want to show you some videos of patrol cars
16 arriving at Franklin Avenue and I'm not sure if I have
17 yours. Give me one second.
18            MR. ROSS: Maybe I can try and
19 shortcut this and, Dave, you can help me here. I have
20 three different cameras, what I think are three
21 different patrol cars approaching.  One is marked
22 Richard Wilson, one is marked Richard Adams and one
23 marked Demetrius Glen.
24 Q.      Is there any reason that the vehicle you were
25 driving would have been labeled with any of those

Page 57

1 names?
2 A.      No. Mine should be with my name and then Unit
3 1235. That's the car number.
4            MR. MACMAIN: And, Riley, I'm looking
5 in my folder. I have four folders. Christopher Haines
6 and that where his dash-cam video is. There's two. One
7 is looking forward at the front of the car.  One is
8 looking internally back towards Mr. Riley.
9            I have a folder labeled Demetrius
10 Glen.  And I've not looked at it recently but it looks
11 like a dash-cam video is in that folder.  And then
12 there is one Richard Adams.  I'm not sure what's in
13 there. It looks like there's some type of --
14            MR. ROSS: There should be two for
15 Richard Adams and two for Richard Wilkinson.
16            MR. MACMAIN: Yeah. I'd have to look
17 at them. I know there's two for now Corporal Haines,
18 one looking forward, one looking back to the back
19 seat.
20            MR. ROSS: Right. So, David, those
21 two are, seem to be both of arrests like taking him to
22 the booking center. The videos for the other officers
23 seem to be videos arriving at Franklin Avenue.  But I
24 don't think I have a Corporal Haines video arriving at
25 Franklin Avenue.

Page 58

1      MR. MACLAIN: Okay. So why don't we
2  start doing questions, he might, I don't know if he
3  can answer.
4  BY MR. ROSS:
5  Q.      Well, let me ask you this. Demetrius Glen, is
6  that an officer that arrived on the scene; are you
7  aware?
8  A.      **That is PFC Glen.**
9  Q.      And how about Richard Adams?
10 A.      **That is Sergeant Adams. Sergeant Adams was**
11 **never on the scene when I was on the scene.  So I**
12 **believe he arrived after I left with Mr. Riley.**
13 Q.      And then Richard Wilson is Corporal Wilson?
14 A.      **That is correct.**
15      MR. ROSS: Yeah.  Dave, I don't think
16 I have the video of him arriving to the scene and so
17 I'll ask for that. Because I do have a few videos that
18 you're referring to for Corporal Haines, the one of
19 facing forward and then looking back at Ty'rique
20 Riley, but I don't have the video of him arriving
21 there.
22      MR. MACMAIN: I don't know if there
23 is a video. Do you --
24 A.      **So I have never seen a video of me arriving.**
25 **Maybe if explain how our car cameras work.**

Page 59

1  Q.      Sure.
2  A.      **So our car cameras are actively recording all**
3  **the time, more or less 24/7.  But nothing is saved**
4  **until we have manually pushed the button to record or**
5  **we activate our overhead lights. Or we go over I think**
6  **it's 82 or 83 miles an hour.  Then it automatically**
7  **comes on.**
8      **I can't say for sure. Again, I've**
9  **never seen my video. I may -- the other officers may**
10 **have activated their lights and that's what activated**
11 **the camera. I recall activating in my car**
12 **manually when I drove away because that is part of our**
13 **policy and procedure if we have a prisoner.**
14 Q.      And do you recall if you rode to the Franklin
15 Avenue address with your lights on?
16 A.      **I don't recall if I did or didn't. I say I**
17 **can recall. I was the first physical car there so I**
18 **was assuming, I don't want to assume. I was the first**
19 **car there and I cannot recall whether I had my**
20 **overhead lights on or not.**
21      MR. MACMAIN: Mr. Ross, just one
22 thing. If there's video of him arriving I'll provide
23 it. If there's no video it wasn't downloaded or there
24 wasn't any video to start with.
25      MR. ROSS: Yes. So that will be an

Page 60

1  official request because I think that his video is
2  very important.  If it has been captured we definitely
3  want it.
4  BY MR. ROSS:
5  Q.      So let's move on to what happened when you
6  got to the booking center.  So please tell me what you
7  recall. First of all on your journey to the booking
8  center is there anything that you recall occurring
9  between yourself and Ty'rique Riley?
10 A.      **So Mr. Riley kept saying yo and then he would**
11 **ask me a question.  I would answer him and then there**
12 **would be no response. Within another short time period**
13 **he would go yo again and ask me some other question. I**
14 **think some of the questions were, I'm sure it's all on**
15 **the video, why did you arrest me, can you take me**
16 **home. I think at one point I think he said, I didn't**
17 **do this.**
18      **When I was getting close to the**
19 **booking center he kicked the -- the car that I had had**
20 **a prisoner cage in it. He kicked the prisoner cage and**
21 **there was loud racket behind me and I told him to**
22 **knock it off. Soon after that I don't recall exactly**
23 **why I knew it but he took his seat belt off and he**
24 **really started moving around.  So per policy we do**
25 **seat belt everybody in. I believe that was almost on**

Page 61

1  **Mall Road, only a couple hundred yards away from the**
2  **booking center.**
3      **So when I arrived at the booking**
4  **center I pushed the little button that notifies the**
5  **booking agents that I'm out there and that I have a**
6  **prisoner.  And then I notified them that my defendant**
7  **was moving around a lot in the back of the car and I**
8  **didn't know why and I asked somebody to come out.**
9  Q.      And what happened next?  I'm sorry, Corporal.
10 You said you pushed a little button. What are you
11 referring to?
12 A.      **So there's a button that would go, it's a**
13 **stand to notify the booking agents inside. It's like a**
14 **doorbell and then I can converse with them real**
15 **quickly.  And that's when I asked them to come out.**
16 Q.      This is something that you pulled up to in
17 your vehicle?
18 A.      **Yes.**
19 Q.      And you rolled down the window?
20 A.      **I rolled down the window. I literally I could**
21 **touch it with my left hand.**
22 Q.      Got you. Okay.
23 A.      **I don't recall. At one point I tell the**
24 **booking agents, I asked them to come out that my**
25 **subject is moving around in the back of the car and**

CORP. CHRISTOPHER HAINES

Page 62

1  that is when I say, I'm not sure if it's then or when
2  I actually pull into the garage and they come out. I
3  say, I'm not sure if my detainee is under the
4  influence or if it is a mental health. I say that, I
5  don't recall exactly but I'm sure it's right on the
6  video when I do say it.
7  Q.      Have you viewed this video since the
8  incident?
9  A.      Yes, I have.
10  Q.      More than once?
11  A.      Yes.
12  Q.      How many times do you believe that you viewed
13  it?
14  A.      Two, three, four.
15  Q.      When is the last time that you viewed it?
16  A.      I did view it this morning here.
17  Q.      Why did you tell the -- why did you state
18  that you didn't know if he was behaving in the way he
19  was behaving because he was high or if it was a mental
20  health issue?
21  A.      Because of our conversation -- I hate to call
22  it a conversation. What he was saying in the back of
23  the car was not an intelligent conversation, like it
24  was all one sided on his end.  And if he would ask me
25  a question it didn't seem like he really cared what my

Page 63

1  answer was. From my experience of years in law
2  enforcement that could tell me that he could be under
3  the influence of some substance.
4  Q.      But you also thought that it could be a
5  mental health issue; is that correct?
6  A.      Yes.
7  Q.      And is this belief that it could have been
8  substance abuse, a substance or mental health issue,
9  is this something that developed through the
10  conversation or what you say, we'll put in quotes --
11  A.      Yes.
12  Q.      -- conversation that you had during
13  transporting him to the booking center?
14  A.      I would say yes.
15  Q.      Nothing about, this wasn't developed based on
16  anything that you saw in him before transporting him
17  to the booking center?
18  A.      Correct.
19  Q.      And what happened next?
20  A.      We were inside, they, when I say they, the
21  booking center closes the garage door behind us. I see
22  I believe it was three guards came out and that's when
23  I conversed with them real quickly. They walked to the
24  back of my car and to Mr. Riley while I walk over to
25  the gun locker so I'm not allowed to take my firearm

Page 64

1  into the booking center.
2           So I put my firearm into the lock
3  box and at that time the booking agents have gotten
4  Mr. Riley out of my car. They start walking Mr. Riley
5  towards the door and that's when Mr. Riley more or
6  less goes limp and almost like falls on the ground.
7  Q.      Do you hear, did Mr. Riley make any
8  statements or did he make any statements when the
9  guards approached him while he was in the vehicle?
10  A.      None that I heard.
11  Q.      How about when he was taken out of the
12  vehicle, did you hear him make any statements?
13  A.      No.
14  Q.      How about any statements made by the guards
15  to him to Mr. Riley?
16  A.      I recall them asking him to get out of the
17  car. I don't recall if he had a response or not.
18  Q.      And do you know the identity of any of the
19  guards?
20  A.      No. I do not.
21  Q.      How about as you sit here today, you don't
22  know who they are even today; is that right?
23  A.      If they were in this room with me I don't
24  think I would be able to the identify them.
25  Q.      And what happened next?

Page 65

1  A.      The guards if we're going the call them
2  guards take him inside and I follow behind. We have to
3  go through two doors. Once we get inside of the actual
4  booking center where the booking room is that's when
5  Mr. Riley starts to become more agitated.
6  Q.      What do you mean by that?
7  A.      He wasn't listening to the guards. He was
8  trying to pull away from them a little bit.
9  Q.      And do you recall him saying anything?  Do
10  you recall Ty-rique Riley saying anything?
11  A.      I don't recall if he had any conversation
12  with them.
13  Q.      How about the guards, do you recall them
14  saying anything to him or at all?
15  A.      I remember them giving him I'm going to say
16  commands. I couldn't tell you what the commands were.
17  Q.      What happened next?
18  A.      He just continued to resist them. They were
19  asking him to do certain things. At one point he just,
20  I'm going to use the word argumentative. I don't know
21  if he was verbally talking to them but he was just not
22  listening to them and the guards took him to the
23  ground.
24  Q.      Do you recall what kind of commands the
25  officers were giving to Ty'rique Riley?

CORP. CHRISTOPHER HAINES

Page 66

1  **A.      I don't. I'm sure it's on the video. Just the**
2  **normal commands. I know, well, I would say I recall**
3  **like that they probably, no, not probably. They would**
4  **have been trying to search him to make sure there**
5  **weren't any weapons on him that I might have missed**
6  **and just more or less directing him towards the bench.**
7  **And he was refusing to go do so.**
8  Q.      The video that you said you watched was that
9  one video or more than one video of what occurred at
10 the booking center?
11 **A.      I think it's all one video but there's two**
12 **different views from two different cameras.**
13 Q.      Did the video you watched or the videos that
14 you watched did it contain audio?
15 **A.      No. I don't believe there was any audio from**
16 **the prison.**
17 Q.      You had mentioned before that you had said
18 about, you know, you didn't know if it was the high or
19 mental health issue. I'm assuming that video had
20 audio, correct?
21 **A.      Yes.  I understand where you're going I**
22 **believe. I had my mic pack still on me.  My mic pack**
23 **is my voice recorder. So when I walked into the**
24 **booking room that was still recording. And I believe**
25 **that's the audio you're talking about. I don't believe**

Page 67

1  **there was any audio from the actual prison.**
2  Q.      Okay. That's exactly what I was wanted to ask
3  so thank you for clearing that up.
4  **A.      Sure.**
5  Q.      Did there come a time when your mic pack was
6  turned off while you were still at the booking center?
7  **A.      I know it abruptly ends. I don't remember**
8  **turning it off but the battery shelf life if that's**
9  **what we're going to use those words is not very long**
10 **so at times they just abruptly turn off.**
11 Q.      You said you don't recall turning it off.
12 Does that mean that you may have turned it off and
13 just forgot or are you saying that like I didn't turn
14 it off and this may have been what caused it to go
15 off?
16 **A.      So there is a sign that the officers are**
17 **supposed to leave their, all body cams and/or mics out**
18 **in the vehicle. And I did not, I left my mic pack on**
19 **that day. So I don't know if I turned it off or if the**
20 **battery died is my answer.**
21 Q.      When you say there's sign are you saying
22 there's a sign at the booking center?
23 **A.      Yes.**
24 Q.      And it directs officers to leave their
25 cameras and microphones in their vehicle; is that what

Page 68

1  you're saying?
2  **A.      I don't know what exactly it says but I**
3  **believe it says all electronic devices which would**
4  **include a body cam or the mic.**
5  Q.      And the direction is to leave electric
6  devices in your vehicle?
7  **A.      Uh-hum, right.**
8  Q.      And either before this incident had you had
9  occasions where you've gone to the booking center and
10 left your camera and microphone in your vehicle per
11 that instruction?
12 **A.      Yes.**
13 Q.      What else occurred at the booking center?
14 **A.      I think where we left off he was, Mr. Riley**
15 **was taken to the ground. He was resisting the guards**
16 **there. I believe it was three males. There was also a**
17 **4th guard who was a female there that came over and**
18 **assisted the guards while Mr. Riley was on the ground.**
19 **They were trying to get him under control.**
20 **           At one point one of the guards did**
21 **pepper spray him and it seemed to calm him down a**
22 **little bit. And at one point I know from past practice**
23 **they put leg shackles on. There was leg shackles up on**
24 **the booking desk and I asked the female guard did she**
25 **want me to the bring the leg shackles over.  It**

Page 69

1  **appeared she was having a little trouble controlling**
2  **Mr. Riley's legs, she said yes. I bring the leg**
3  **shackles over to her or over to Mr. Riley and I**
4  **actually put the leg shackles on Mr. Riley.**
5  Q.      Do you recall if you put the leg shackles on
6  before or after he was pepper sprayed?
7  **A.      Honestly I don't know. I'm sure the video**
8  **would show that.**
9  Q.      What next?
10 **A.      I know there was some talking to Mr. Riley**
11 **was gotten up. There was some talking with the guards**
12 **amongst themselves and soon thereafter the, I'm going**
13 **to assume it was the shift supervisor that dismissed**
14 **me and said that I was free to leave.**
15 Q.      When you stated that Ty'rique Riley was
16 brought up and there was talk amongst the guards what
17 did you hear them saying?
18 **A.      I don't recall exactly what they said.  I**
19 **mean, it was -- after they got him up I stepped back**
20 **another 10 or 15 feet.  I'm not exactly sure how it**
21 **was so I'm not sure what they said.  So I'm in their**
22 **house so -- I'm in their house so if they have any**
23 **questions they will ask me or if I have any questions**
24 **I will ask them. Does that make sense?  I don't know**
25 **if I explained that one.**

CORP. CHRISTOPHER HAINES

Page 70

1  Q.    No, I understand. Even if you don't recall
2  everything that was said do you recall them saying
3  anything ?
4  A.    **I don't recall them -- I remember them**
5  **conversing amongst themselves.  I have no idea what**
6  **they said.**
7  Q.    Ty'rique Riley, do you recall him saying
8  anything either while he was on the ground or when he
9  stood up, do you recall him saying anything?
10  A.    **No, I do not remember.  Because I stepped**
11  **back 10, 15 feet and.**
12  Q.    Well, I'm not just talking about just when
13  you stepped back. Like for instance, you said that you
14  put the leg shackles on him. Do you recall him saying
15  anything at any point in the booking center?
16  A.    **No.**
17  Q.    How about do you recall him saying get off me
18  or cursing anyone, anything like that?
19  A.    **I remember him being boisterous at times like**
20  **being loud. I do not know what he was saying or if he**
21  **was making any other type of noises. I'm just going to**
22  **be very generic and boisterous.**
23  Q.    And I need to harp on this because it's
24  important because I want to make sure I have a clear
25  understanding of what you heard. There's a difference

Page 71

1  between someone not saying anything at all and someone
2  saying something but you're just not understanding it
3  or remembering it.  Are you saying that Ty'rique Riley
4  was saying something you just don't know what it was
5  or you don't recall him saying anything at all?
6  A.    **I remember him saying something.  I don't**
7  **remember exactly what he said at all.**
8  Q.    I want to take a, actually I want to -- let's
9  look at the video.
10     MR. ROSS: Dave, I still need to take
11  a pause and just read over that document because I'm
12  probably going to introduce it as an exhibit but I
13  haven't seen the whole thing that you went over this
14  morning. So why don't we do the video first and then
15  I'll review the document after that.
16     (Video being played.)
17  Q.    Do you see that?
18  A.    **Yes, I can.**
19  Q.    Do you recognize that's Ty'rique Riley?
20  A.    **Yes, I do.**
21  Q.    And you see that his lips are moving but we
22  can't hear anything. Can you explain that.
23  A.    **I assume there's a delay in the mic pack**
24  **picking it up.**
25  Q.    This is him in the back of your vehicle; is

Page 72

1  that correct?
2  A.    **That is correct.**
3  Q.    The audio will kick in so I just wanted to
4  have a record of why we can't hear the beginning.
5  Corporal Haines, did you hear him mention something
6  about possibly sexual assault?
7  A.    **Yes.**
8  Q.    Was there any allegations of any sexual
9  assaults that occurred that you were responding to
10  that evening regarding Ty'rique Riley?
11  A.    **I was never told of any allegations of sexual**
12  **assault. Again, I never spoke with his parents so I**
13  **was never made aware of any such allegations.**
14  Q.    What did you think when he mentioned that at
15  the time?  Do you recall thinking anything when he
16  mentioned sexual assault?
17  A.    **It didn't spark any interest with me if**
18  **that's what you're asking.**
19  Q.    Okay. I'm going to resume the video. Corporal
20  Haines, those questions that you just gave you to
21  Ty'rique Riley what caused you to ask those questions?
22  A.    **Because he was moving around in the back of**
23  **the car a lot.  And as I said before, he was asking me**
24  **questions like yo, take me home, yo, do this. But he**
25  **never, when I would respond to him he wouldn't respond**

Page 73

1  **back to me.  So it was like he wasn't even wanted to**
2  **start the conversation. He just wanted to say**
3  **something and not have an intelligent conversation**
4  **among ourselves. It gave me the impression that he was**
5  **under the influence of something.**
6  Q.    With regard to being under the influence of
7  something did you receive any training as to how to
8  treat a civilian that you suspect to be under the
9  influence of something?
10  A.    **Well, sure. I mean, that's basic first aid**
11  **through the Police Academy, through my yearly updates,**
12  **good common sense again. A lot of the training that we**
13  **talked about earlier.**
14  Q.    Could that also, could someone being under
15  the influence be a reason to divert someone to a
16  hospital rather than a jail?
17  A.    **I believe that it could be. But it wasn't in**
18  **this instance.**
19  Q.    When you say it wasn't in this instance what
20  do you mean?
21  A.    **I didn't think there was any need to take him**
22  **to the hospital that night. I mean, as I said earlier**
23  **every instance has to be evaluated on its own merits.**
24  **The merits of this case did not give me any reason to**
25  **go to the hospital that night.**

CORP. CHRISTOPHER HAINES

Page 74

1  Q.      Have there been occasions where you have
2  taken someone who you suspected to be under the
3  influence where you've diverted them to a hospital
4  rather than a jail because of your suspicions that
5  they were under the influence?
6  A.      **I would say -- give me a second to think**
7  **about that one. I would say if we're going to -- no. I**
8  **don't recall us diverting anybody to the hospital.**
9  **I've known on the scene for like public intoxication**
10 **some people transport to the hospital via ambulance.**
11 Q.      So that's the only occasion where you can
12 recall someone going, someone who you suspect to be
13 under the influence going to a hospital rather than a
14 jail?
15 A.      Yes.
16 Q.      I'm going to start the video again. Just for
17 the record we're at the 6:45 minute, 6 minutes, 45
18 seconds. I'm going to pick up from there.
19             Corporal Haines, what did you hear
20 Ty'rique say regarding the feds?
21 A.      **It's hard to make out what he's saying. Don't**
22 **forget, I'm driving at this time so I'm multi-tasking**
23 **and there's a petition between him and I. So I believe**
24 **this individual was probably clearer than today than**
25 **what it was the day I was driving or the day of the**

Page 75

1  incident.
2  Q.      Your response was that responding because you
3  did not hear him or because you did not understand why
4  he was reference the feds?
5  A.      **I heard it here today. I did not hear him the**
6  **day of the incident.**
7  Q.      So your response was because you did not hear
8  what he said? Your response on the video when you
9  said to him what is because you did not hear what he
10 said. Is that what you're saying?
11 A.      **Maybe we need to back it up but.**
12 Q.      Okay. I'll back it up. Go back to the 9:42
13 mark. So your response there was -- what I'm asking
14 is, did you hear him say the he was going to the feds
15 and that's what you're responding to or were you
16 responding that you did not hear what he said?
17 A.      **I think when he said am I going to the feds**
18 **my response was what as in I didn't understand what he**
19 **just said.**
20 Q.      I'm going to continue from there. We're at
21 the 10 minute mark.
22             So Corporal Haines, I want to go
23 back to the incident because when I heard it sounded
24 to me like you heard him say feds but didn't
25 understand why he would think he was going to the feds

Page 76

1  and that's why you told him he was actually going to
2  booking. Is my assumption incorrect?
3  A.      **No. I think that's a fair assumption, yes.**
4  Q.      Is that when you were referring to earlier in
5  your testimony when you were pressing a button you
6  were communicating with those at the booking center?
7  A.      **Yes.  That's when I said it was like ringing**
8  **a doorbell.**
9  Q.      Thank you. So Corporal Haines, I think you
10 explained this before. I just want to make it clear
11 for the record.  If we can still hear audio is that
12 because the audio is being picked up by your body mic
13 that's on your person; is that correct?
14 A.      **Yes. So the system that we had was there's**
15 **cameras in the car and I had a mic on my person. It's**
16 **different from what Susquehanna Township uses today.**
17 Q.      How is it different?
18 A.      **Today we actually have body cams on our**
19 **person with the camera the microphone in the center**
20 **inside of my chest.  Back in 2019 the cameras were in**
21 **the car and no camera on my person and a mic was up**
22 **here.  I always put mine on my right shoulder.**
23 Q.      And the camera in the car does not record
24 audio; is that correct?
25 A.      **I don't believe so.**

Page 77

1  Q.      You talked earlier about recordings coming on
2  under certain conditions.  For instance lights are on,
3  a certain speed or manually activated.  Is that only
4  regarding the actual recording in the vehicle or does
5  that related to the microphone as well?
6  A.      **So you can turn the recordings on in the car**
7  **and then you will also have to turn on the microphone**
8  **that would be on my person.**
9  Q.      Is there any condition where the microphone
10 on your person automatically is activated or does it
11 always have to be manually activated?
12 A.      **So if it is on my person from, again, it's**
13 **been, it's switched to a different system. If it's on my**
14 **person it will be automatically activated when I turn**
15 **the car on. If the microphone is up in the charging**
16 **case it will not be activated.**
17 Q.      And when you say -- again, and thanks for
18 that's clarification. We're talking about the system
19 as it existed on the date of the incident in 2019. You
20 said if it's on your person the microphone will be
21 automatically activated when you turn the car on. Do
22 you mean when you turn the car's recording devices on
23 or actually turn on the car in the sense of turning on
24 the ignition?
25 A.      **The recording devices, not actually just**

Page 78

1  turning the engine on.
2  Q.     So I want to go back a few because I want to
3  mark for the record when Ty'rique Riley is taken out
4  of the vehicle so that we know, because we're going to
5  see other videos without the audio. I want to kind of
6  make a record of how long we're able to still hear the
7  audio. So I'm going to back this up just a little bit
8  to where the door closes. So I'm backing this up to
9  the 12:13 mark on the video and then I'll pause it
10  again when the door closes just to mark that for the
11  record.
12          Do you agree that we heard the door
13  close in your vehicle at the 12:40 mark?
14  A.     Yes.
15  Q.     I'm going to play it from there from the
16  12:40 mark.
17          Corporal Haines, at that point I
18  think I just heard someone mention shackles. Do you
19  recognize that as your voice? Do you think that was
20  you talking?
21  A.     I believe that was me as we talked earlier. I
22  was asking the female guard if she wanted the
23  shackles.
24  Q.     So you believe at this time you're in the
25  booking center?

Page 79

1  A.     Yes.
2  Q.     I'm going to play it from there. We're now at
3  the 14:17 mark. We'll continue it playing.
4          Corporal Haines, I thought I just
5  heard somebody say oh, no. Do you recognize that voice
6  to be Ty'rique Riley's voice?
7  A.     I don't know that I would be able to
8  recognize his voice.
9  Q.     Did you hear someone say oh, no?
10  A.     I heard something. I couldn't make it out.
11  Q.     I'll continue at 14:37. And it sounds like
12  the audio just dropped out at about the 15:30 mark; is
13  that fair?
14  A.     Yeah. I haven't heard anything for the last
15  couple of seconds.
16  Q.     And we're at 15:32. I'm not going to play the
17  rest because I'll represent that I don't believe
18  there's any other audio and it's just sitting at this
19  car until it leaves. But unless you would like to see
20  it I don't have a reason to play the rest of it.
21  A.     I don't need to see it.
22  Q.     So if the audio stopped at 15:30 and we
23  started it when the door slammed at 12:40 then we have
24  almost three minutes, we have 2 minutes and 50 seconds
25  of audio. Do you agree with that?

Page 80

1  A.     You mean of no audio?
2  Q.     Of audio. We started, remember the door
3  slammed at the 12:40 mark?
4  A.     Yes.
5  Q.     We heard audio until the 15:30 mark. So that
6  gives us almost three minutes, 2 machines and 50
7  seconds of audio that we're able to hear on your audio
8  mic even though we can't see video that matches with
9  it?
10  A.     Correct.
11  Q.     I'm now going to go to the video at the
12  booking center. And just for the record, these are all
13  videos that I received from, I believe I received them
14  all from defendants but believe all of them from your
15  counsel. And I'm sorry if I'm mistaken, but these are
16  all videos that were obtained from the defendants.
17          So we have a still shot here. Do you
18  recognized this scene.
19  A.     Yes. That's the sally port, the booking
20  center.
21  Q.     I'm going to start playing the video there.
22  I'm going to pause it at time 55 second mark. Do you
23  recognize the vehicle that just pulled into the port?
24  A.     Yes, that was the vehicle I was driving that
25  night.

Page 81

1  Q.     And have you seen this video before?
2  A.     Just this morning.
3  Q.     Is that the only time you've seen it?
4  A.     Yes.
5  Q.     I'm going to continue playing. And I lied.
6  I'm going to stop it for a second. When you viewed it
7  did it have any audio?
8  A.     No. I don't believe it did.
9  Q.     I'm going to start it again at 58 seconds. So
10  we saw Ty'rique Riley being removed from your vehicle
11  and we saw the doors of your vehicle being closed and
12  we're now at the 1:30 mark; is that correct?
13  A.     That is correct.
14  Q.     I'm going to start the video from there. I'm
15  going to pause it at the 2:07 mark because now you
16  have followed the other officers and Ty'rique Riley
17  into a doorway; is that correct?
18  A.     That is correct.
19  Q.     I'm going to stop this video here. You've
20  seen it before. There's no other video with you and
21  Ty'rique Riley in this video so I'm going to move to
22  another video. Can you see that video?
23  A.     I can, yes.
24  Q.     I'm going to start playing. Corporal Haines,
25  do you recognize this area?

Page 82

1 **A.      Yes. I said earlier there were two doors that**
2 **we need to go through to get into the actual booking**
3 **center.  This is the view from in the first door going**
4 **into the second door.**
5 Q.      At the 40 second mark do you recognize those
6 as the officers that were coming out to meet you when
7 you pulled up into the port?
8 **A.      That appears to be the same three, yes.**
9 Q.      And again, you don't know who any of those
10 officers are; is that correct?
11 **A.      No, I do not know them.**
12 Q.      I'm going to fast forward just a few seconds
13 just to help us save some time to the 2 minute mark.
14 What are we seeing here?
15 **A.      It looks like they're escorting Mr. Riley in**
16 **and I'm closing the door. And Mr. Riley is resisting.**
17 Q.      I'm going to stop the video there at the 2:28
18 mark. Do you see this video?
19 **A.      Yes. That looks like inside of the booking**
20 **center at the door, the second door that we would have**
21 **had to come through.**
22 Q.      I'm going to start playing that video and I'm
23 going to fast forward just to save us time to the
24 1:55 mark. Please tell us what you see there.
25 **A.      Mr. Riley is still resisting. The three**

Page 83

1 **officers escort him in and I come behind.**
2 Q.      So now you're actually inside the booking
3 center; is that correct?
4 **A.      That is correct.**
5 Q.      I'm going to stop it there at the 2:32 mark,
6 go to another video. Do you see that video?
7 **A.      Yes.  It looks like the overall view of the**
8 **booking center.**
9 Q.      I'm going to start it there.  We're at the 23
10 second mark. Can you tell me what you're seeing?
11 **A.      At the bottom of the scene it looks like Mr.**
12 **Riley is still resisting, the three guards are holding**
13 **him and maybe they're trying to search him.  And then**
14 **I see a 4th guard come from the desk area, the female**
15 **officer and she puts her gloves on. I don't see myself**
16 **in the picture at all yet.**
17 Q.      You cannot see yourself there?
18 **A.      No. I cannot but I'm missing a little bit of**
19 **the screen with everybody else's face on the screen.**
20 Q.      Can you minimize the faces. If they're on the
21 right hand side and there's like four squares you can
22 go to the top of it and make it one or you can move
23 the squares around.
24           MR. MACMAIN: What is it we're trying
25 to do? Maybe he can answer your question without

Page 84

1 manipulating the screen and lose it.
2           MR. ROSS: He's saying he cannot see
3 himself in the frame and I can see him so I wanted him
4 to try and --
5           MR. MACMAIN: Is that your legs on
6 the far right hand corner of the screen? Do you think
7 that's your pant legs?
8 **A.      I can't see myself at all right now. And**
9 **that's because I'm there and then Mr. Norfleet.**
10           MR. ROSS: Yeah. I think it's just a
11 matter of how he has his pictures oriented not about
12 the video.
13           MR. MACMAIN: I can see his legs on
14 the far right hand side. It's right where all he has
15 on his right hand side all his camera views. His
16 screen is not as big as mine.
17 Q.      If you have a recollection of being their,
18 Corporal Haines, that's fine. I just wanted to let you
19 know how close you were to everyone.
20 **A.      If it helps yes. I recall being to the right.**
21 **I see myself now and then walking over and it looks**
22 **like grabbing the shackles.**
23 Q.      I'm going to pause here at the 1:06 mark. Do
24 you believe that that was the time that he had the
25 exchange where you had mentioned the shackles and then

Page 85

1 retrieved them that we heard on the audio?
2 **A.      That is correct.**
3 Q.      I'm going to pause it right there at the 1:42
4 mark. Corporal Haines, at that point you assisted with
5 the removal of shoes of Mr. Riley and the leg
6 shackling; is that correct?
7 **A.      That is correct.**
8 Q.      Do you as you're looking at the video can you
9 observe one gentleman with his knee on the neck of
10 Ty'rique Riley?
11           MR. MACMAIN: I'm going to object to
12 the form.
13 Q.      You can answer. What I'm asking is whether or
14 not you see that on the video?
15 **A.      It appears that the gentleman that's on my**
16 **screen in the blue shirt on the left it does appear**
17 **that there is a knee there in that general area, yes.**
18 Q.      What I'll do is, the first question is, do
19 you recall seeing the gentleman placing his knee on
20 the neck of Ty'rique Riley during this time?
21 **A.      No, sir.**
22 Q.      At any point during while you were in the
23 booking center do you recall seeing that?
24 **A.      No, I do not.**
25 Q.      I'm going to play it and if at any point you

Page 86

1 don't agree with my representation that the gentleman
2 has his knee on Ty'rique Riley's neck will you let me
3 know, please?
4 A.      Yes, sir.
5 Q.      I'm going to back it up just a little bit
6 just so we don't start from that point. So I'm
7 starting from 1:22. At the 1:29 mark is when I saw the
8 knee go onto the neck. Do you agree with that?
9 A.      I see the knee in that area, yes, sir.
10 Q.      I'll continue from 1:30. I'm going to pause
11 it at the 1:33 mark. Is this when your assistance with
12 regard to go leg shackles, you're no longer assisting
13 the officers with the leg shackles; is that fair to
14 say?
15 A.      That is correct.
16 Q.      Are you authorized to assist these officers
17 in doing things like putting on leg shackles?  I guess
18 my question is, it's not against the rules for you to
19 do what you did; is that correct?
20 A.      No. Again it's their house.  I would always
21 ask before I do anything.
22           MR. NORFLEET: I'm sorry, Riley. You
23 guys are going into questions and answers pretty
24 quick. I just want to put an objection to form on that
25 last question.

Page 87

1 A.      So there's nothing that prohibits me from
2 assisting if they ask or if I see an immediate need.
3 Q.      So even if you don't, even if not asked
4 there's nothing that prohibits you from getting
5 involved if you see a need to do that; is that
6 correct?
7 A.      If I see an immediate need yes, I would
8 assist.
9 Q.      I'm going to continue from 2:33. I'm at the
10 3:32 mark. And were you able to see yourself, Corporal
11 Haines?
12 A.      Yes. I believe I saw the handcuffs were
13 taken off and they were handed back to me. I believe
14 that's what I saw.
15 Q.      I'm going to backup just a second. I'm at the
16 3:27 mark. I don't know if you can see your right side
17 of the screen but it looked to me like you handed the
18 female correction officer a set of handcuffs?
19 A.      Yeah. I did see that, yes, that time.
20 Q.      And again this is you assisting the officers,
21 correct?
22 A.      I would assume that they asked for the
23 handcuffs so yes, I gave it to them.
24 Q.      And there's nothing that prohibits you from
25 them the handcuffs or otherwise assisting them,

Page 88

1 correct?
2 A.      No.
3           MR. NORFLEET: Objection to form.
4 Q.      I'm starting at the 3:33 mark. I'm stopping
5 at 4:27. Did you witness your involvement there at
6 all, Corporal Haines?
7 A.      I believe that is when they hand me my
8 handcuffs back.
9 Q.      It looked to me like they put the handcuffs
10 on him and then removed your handcuffs to give them
11 back to you. Is that fair to say?
12 A.      Yes.  There's was placed on and mine was
13 removed.
14 Q.      Okay. I'm going to start it at 4:27. I'm
15 pausing at 4:41.  At this point it looks like Mr.
16 Riley is taken into a room. Do you know if that's a
17 cell or if it's just a room?
18 A.      I believe it's a cell but I can't say 100
19 percent sure.
20 Q.      Okay. That's fine.
21 A.      I know the medical office is right in that
22 corner and I'm not sure which door it is.
23 Q.      Okay. I'm going to start at 4:41. And I'm
24 going to stop it at 5:14. I don't know if you can see
25 yourself again on the right hand side but it appeared

Page 89

1 that you were coughing a few times.  The female
2 security guard also came out and it appeared that she
3 was coughing.  Do you recall coughing at all in the
4 booking center?
5 A.      I do. Yes.
6 Q.      And do you know what caused that coughing?
7 A.      There was OC sprayed.
8 Q.      Do you recall, I don't recall seeing the OC
9 sprayed on the video.  Do you recall seeing it being
10 sprayed at any point?
11 A.      I thought, again, I don't know what time or
12 point but I thought it was when Mr. Riley was laying
13 straight across the screen is when it was sprayed.
14 Q.      Okay. And I'll go back and see that. I must
15 have missed that. But by this time that he was in this
16 either room or cell the OC spray had already occurred;
17 is that your recollection?
18 A.      That is correct.
19 Q.      I'm going to start at 5:14. I'm pausing at
20 6:06. Right now it looks like I see at least four,
21 possibly five correctional officers outside of or
22 around the entryway to either the room or the cell. Do
23 you know what's being discussed at this time, Corporal
24 Haines, by those officers?
25 A.      I don't recall.  I don't know what they were

CORP. CHRISTOPHER HAINES

Page 90

1  discussing.
2  Q.      Do you recall hearing Ty'rique Riley saying
3  anything at this time?
4  A.      No. I don't recall.
5  Q.      I'll continue the video from there. I'm
6  stopping at 6:29. It looks like someone walked in from
7  the left hand side of the screen. Do you recall seeing
8  someone else come into, go into that room or the cell?
9  A.      Yes.  So as I explained earlier, that corner
10 is I'm going to call it the nurse's office and that
11 appeared to be the nurse to me.  Normally they wear
12 hospital scrubs.
13 Q.      Do you recall the nurse coming in at some
14 point while you were there at the booking center?
15 A.      Yes.
16 Q.      What happened when she came in?
17 A.      I remember her going into the room. Again, I
18 kept my distance.  I don't know what was said or
19 wasn't said.
20 Q.      I'm going to play it from there from 6:29.
21 The video stops there shortly after what I saw as the
22 nurse leaving the room and the officers coming out
23 going back to the desk near where you were standing.
24 Do you recall anything happening after that video
25 stopped with any of the officers?

Page 91

1  A.      No. I believe one of them soon thereafter
2  said I was released and I left.
3  Q.      Did you have any further interactions at all
4  with Ty'rique Riley?
5  A.      No, sir.
6  Q.      I'm going to show you a document.
7          MR. MACMAIN: Riley, if we can get a
8  short break. We've been going for a while.
9          MR. ROSS: I actually may be done in
10 the next two or three minutes.
11          MR. Macmain: Okay.  I don't know if
12 other people have questions.
13          MR. ROSS: Why don't I finish up and
14 then if people have questions we can take a break. And
15 if not we'll be done.
16 BY MR. ROSS:
17 Q.      Do you see the document on the screen,
18 Corporal Haines?
19 A.      Yes.
20 Q.      What is this document?  If you know.
21 A.      Sure. This is my supplemental that I
22 completed about this incident.
23 Q.      I see that it's assigned on January 10, 2022
24 and it's approved on January 20, 2022. Does that mean
25 that this report was drafted on, this report we're

Page 92

1  looking at now was drafted on January 10, 2022?
2  A.      That is correct.
3  Q.      Can you explain why in January of 2022 this
4  report was drafted?
5  A.      So when I knew this deposition was coming I
6  started to review the reports and the video that we
7  had inhouse. And I could not find my supplemental
8  report. I spoke with my administration and I told them
9  I remember doing a report.  It was actually a
10 directive.  And to be honest it could not be located
11 and that's why it's dated 1/10 of '22 and back when
12 this incident happened.
13 Q.      So as I understand it you were directed to do
14 a report when the incident occurred; is that correct?
15 A.      Soon thereafter. I can't give you a date.
16 Q.      But you said it was a directive meaning you
17 were ordered to do it as opposed to you just decided
18 hey, this is something that I'm going to do; is that
19 right?
20 A.      Yes.
21 Q.      And that you recall doing that report at that
22 time?
23 A.      I do.
24 Q.      But it could not be located, right?
25 A.      That is correct.

Page 93

1  Q.      I just want to know, is there anything in
2  this report that you disagree with?
3  A.      No. I wrote it.  I mean, it goes along with
4  the videos and everything else that was said today.
5  Q.      And you wrote this report in connection with
6  reviewing other reports and videos of the incident in
7  January 2022?
8  A.      So I remembered this incident vividly. For
9  the most part this came directly from my recollection.
10 Q.      Is there anything about this incident that
11 caused you to remember it vividly individually?
12 A.      Sure. It's my first lawsuit in 21 years. It's
13 amazing how you remember stuff when you get sued.
14 Q.      Okay. Was there anything else, anything
15 significant about this incident at the time that stood
16 out?
17 A.      Absolutely not. To be honest if there wasn't
18 a lawsuit I would not be recollecting this.
19 Q.      Was there ever any investigation conducted
20 within the Susquehanna Police Department related to
21 the arrest of Ty'rique Riley that you're aware?
22 A.      So it was not within the Susquehanna Township
23 Police Department. It was reviewed by the Dauphin
24 County District Attorney's Office which oversees us.
25 Q.      And tell me about that review.

Page 94

1  **A.      My part of the review was that I spoke with**
2  **one of detectives and I gave him an account of what I**
3  **did that day.**
4  Q.      Do you recall when you spoke to this
5  detective?
6  **A.      It was after the death of Mr. Riley.**
7  Q.      Do you recall if it was within weeks of his
8  death, months of his death?
9  **A.      Weeks to months. I couldn't give you a date.**
10 Q.      Did you have any other involvement in the
11 review by the District Attorney's Office?
12 **A.      No, sir.**
13 Q.      Were you given any reports of the conclusion
14 of the investigation by the District Attorney's
15 Office?
16 **A.      No. I was not.**
17 Q.      Were you provided any documents in connection
18 with the review by the District Attorney's Office?
19 **A.      No.**
20 Q.      Any other investigations or reviews relating
21 to the incident involving Ty'rique Riley that you're
22 aware of?
23 **A.      No.**
24           MR. ROSS: Let me take this down. I
25 would like to consult with my partner so why don't we

Page 95

1  take a couple of minutes to do that and if anyone has
2  questions when we back we can address them and see
3  where we are; is that all right?
4            MR. NORFLEET: Yes.
5            MR. ROSS: It's about 1:26. Do you
6  want to come back at 1:30 or do we need a little
7  longer?
8            MR. MACMAIN: Probably more than five
9  minutes.
10           MR. ROSS: Okay. Five to ten minutes
11 we'll come back.
12           (Recess taken.)
13           MR. ROSS: The plaintiffs, we're all
14 done. So I'll turn it over to the defendants if they
15 have any questions.
16           MR. MACMAIN: Anybody else have
17 questions? I have some but I figured I would go last.
18           MR. NORFLEET: This is Andy Norfleet.
19 Unless I have a follow-up to something that someone
20 else asks I don't have any questions at this point.
21           MR. CARMELITE: On behalf of Swanson
22 I don't have any questions unless further questions
23 from Mr. MacMain trigger that need.
24           MR. MacMAIN:: Mr. Yoder, any
25 questions you have?

Page 96

1            MR. YODER: Nothing from me at this
2  time, thanks.
3  BY MR. MacMAIN:
4  Q.      So I just want to ask you a few.  Corporal
5  Haines, one of the pieces of information or one of the
6  things you suspected was that Mr. Riley may be under
7  the influence of drugs or alcohol, correct?
8  **A.      That is correct.**
9  Q.      Can you give me a percentage of how many
10 people you arrest and transport to prison that you
11 suspect are under the influence of drugs or alcohol?
12 **A.      Sure.  I would say a high percent, probably**
13 **50 percent or more.**
14 Q.      You were asked about some concern or
15 suspicion that Mr. Riley may have some kind of mental
16 challenge or mental illness.  The same question. A
17 percentage of people that you deal with in your line
18 of work and/or transport to the prison. Can you give
19 us percentage of how many people you have some
20 suspicion.
21 **A.      I would say it's another high amount. Not as**
22 **much as intoxicated but 30 to 40 percent.**
23 Q.      The other information you had is that Mr.
24 Riley was being arrested pursuant to an incident of
25 domestic violence.  Percentage of people you arrest

Page 97

1  that are involved in some type of domestic violence
2  incident?
3  **A.      Easily another 50 percent I'm thinking.**
4  Q.      And there was nothing at any point in your
5  observations or anything that was told you that you
6  thought that Mr. Riley needed immediate medical or
7  mental health attention at a facility other than the
8  correctional facility you took him to?
9  **A.      That is correct.**
10 Q.      You were asked some questions about what
11 specific list of questions and information medical
12 staff at Dauphin County Booking Center asks arrestees.
13 And my question to you is, are you present when those
14 questions are asked or is that something that's done
15 outside of your presence?
16 **A.      It's normally done outside of my earshot.**
17 Q.      So all you're told is they're cleared, they
18 can be admitted or no they're not cleared, you have to
19 take them somewhere else?
20 **A.      I'm just looking for the yes or the no.**
21 Q.      And in this instance you were told that Mr.
22 Riley had been cleared by medical professionals to be
23 admitted to Dauphin County Prison?
24 **A.      That is correct.**
25 Q.      You were asked some questions on the video,

Page 98

1  specifically at one point Attorney Ross had indicated
2  that he was observing one of the corrections officers
3  with his knee in the area of Mr. Riley's head or neck.
4  Do you recall those questions?
5  A.      I do.
6  Q.      During the time that was happening did you
7  observe that?
8  A.      I did not.
9  Q.      And, in fact, if I looked at the video there
10 was actually corrections officers between you and the
11 top of Mr. Riley's head and neck area; is that
12 correct?
13 A.      That's correct. I was at the very tail end
14 at his feet.
15 Q.      And if I recall from the video you were
16 actually engaged in trying to put leg shackles on Mr.
17 Riley's ankles during that same time period?
18 A.      That is correct.
19 Q.      During the time that you were in the booking
20 center and force was being used in an attempt to try
21 to secure Mr. Riley was there anything that you saw as
22 a police officer that you thought would be considered
23 unnecessary or excessive force?
24 A.      I did not see any excessive force.
25 Q.      Did you see any reason or anything you

Page 99

1  observed that would cause you to intervene and step in
2  and take some kind of action?
3  A.      There was nothing I saw that would cause me
4  to do that.
5  Q.      One other question. During transport, one of
6  things that Mr. Riley says quite a bit is I didn't do
7  it. Percentage of people that you transport to the
8  prison that say those kind of things to you as an
9  officer?
10 A.      Very very high.
11         MR. ROSS: I'm going to object to the
12 form of the question. You can answer.
13 Q.      So nothing unusual about someone saying I
14 didn't do it when they're being transported to the
15 prison?
16 A.      That's correct.
17         MR. MacMAIN: Okay. That's all the
18 questions I had.
19 BY MR. ROSS:
20 Q.      Corporal Haines, quick question. At the time
21 of the incident did the Susquehanna Police Department
22 have any prohibitions to officers being able to place
23 their knee on a suspect's neck in order to detain
24 them?
25 A.      I believe, I can't give you an exact date but

Page 100

1  there is something in place now. I don't know if it
2  was before this incident or after this incident.
3  Q.      And what is in place now as you remember it?
4  A.      A knee is not supposed to be in somebody's
5  neck.
6          MR. ROSS: Thank you. That's all I
7  have and thank you for your time today.
8          MR. NORFLEET: I have a couple
9  follow-up.
10 BY MR. NORFLEET:
11 Q.      Corporal Haines, I just have a couple and it
12 will end my portion of your deposition. You had
13 mentioned that at some point custody is transferred
14 from you as the arresting officer to the booking
15 center; is that correct?
16 A.      That is correct.
17 Q.      Start generally with me. At what point
18 generally does that custody transfer from the
19 arresting officer to the folks at the booking center?
20 A.      I think it's very -- I think I can state
21 something very clear. It's more or less when the
22 supervisor of the booking center I am free to go and
23 that is after the medical clearance. I know I am
24 personally not allowed to leave until they are
25 medically cleared.

Page 101

1  Q.      And so and I appreciate that answer. So
2  based on that answer Mr. Riley was in your custody
3  until you were cleared and then told that you can go?
4          MR. MacMAIN: Objection to form. You
5  can answer it.
6  A.      Do I assume some responsibility I guess. I
7  guess when we walking into the booking center I would
8  say it is the guard's responsibility because it's
9  their house. When the guards do their process I would
10 say the person is in their custody. I am also I'm
11 going to use quotations in the custody and I
12 am not released until the guards say that I am free to
13 go.
14 Q.      So when you entered the sally port and Mr.
15 Riley was in your vehicle was Mr. Riley in your
16 custody at that point?
17 A.      I would say once he was removed from my
18 vehicle I think it would have been transferred over to
19 the correction officers.
20 Q.      So let me back up. So when you arrived at the
21 booking center and before you roll down your window
22 and hit the button to talk to anyone Mr. Riley is in
23 your custody; is that correct?
24 A.      That is correct.
25 Q.      And when you hit the button and told them

Page 102

1 that Mr. Riley was in the back and was moving around
2 he was in your custody, correct?
3 A.      That is correct.
4 Q.      And prior to your pulling into the gate which
5 we saw on the video Mr. Riley was in your custody,
6 correct?
7 A.      Correct.
8 Q.      And as he was sitting in your vehicle and you
9 were waiting for the guards to come out he was in your
10 custody, correct?
11 A.      That is correct.
12 Q.      And then is it your testimony that as soon as
13 the guards enter the sally port that that's when your
14 custody ends?
15 A.      I'm going to go with it as a shared custody
16 at that point.
17 Q.      And when do you believe the shared custody
18 ends?
19 A.      The shared custody is when I am told by the
20 guard that the defendant is, they're taking custody,
21 I'm released and I am free to go. If they were not
22 taking full responsibility for the defendant I would
23 not be free to go.
24          MR. NORFLEET: Okay. Thank you.
25 That's all.

Page 103

1          MR. ROSS: Can I ask for a
2 clarification on that last answer.
3 BY MR. ROSS:
4 Q.      Corporal Haines, were you saying in general
5 or were you saying specifically for what we saw on the
6 video?
7 A.      You have to give me more specifics about
8 your -- what are you getting at there?
9 Q.      I thought Andy was asking you when did the
10 shared custody end for Ty'rique Riley but your answer
11 sounded like you were saying more in a general sense
12 of when shared custody ends so I'm just trying to --
13 A.      I would think it would be, for Mr. Riley the
14 custody going 100 percent to Dauphin County is when I
15 was released.
16          MR. NORFLEET: And prior to that
17 that's what's you're describing as shared custody?
18          MR. MacMAIN: Hold on a second. Let
19 me renew my objection.  It seems to me, he can answer
20 the questions factually, but it seems to me that we
21 lawyers are talking perhaps about a different custody
22 than what the officer is qualified to testify to.  But
23 I'll let him answer the question with that objection.
24          MR. NORFLEET: Understood. Thank you.
25 A.      So ask the question one more time, please.

Page 104

1 BY MR. NORFLEET:
2 Q.      Sure. You had testified that you believed
3 that there was a shared custody between you and the
4 folks at the booking center and you believed that the
5 shared custody terminated when a supervisor or someone
6 told you you're released, you can go. And I just want
7 to make sure that I understand that correctly.
8 A.      Sure. Because if Mr. Riley or any other
9 defendant that I take to the booking if the prison
10 would not accept them they would give the custody back
11 to me and I would have to leave with the defendant and
12 get them cleared of the prison.
13          Why I'm saying it's shared is like I
14 have maybe the expectation that custody might come
15 back to me that I might have to leave with him, Again,
16 I referred to it many times. It's Dauphin County's
17 prison. So it's not Corporal Haines' prison. So that's
18 why I'm saying until I am officially released.  That's
19 why I am using the word shared custody.
20 Q.      Sure.
21 A.      It's more or less if I give you something
22 it's not until you officially accept it maybe that
23 it's yours.
24 Q.      Okay. And you've testified a number of times
25 and you were very clear on this, that at no point

Page 105

1 during your interaction with Ty'rique Riley did you
2 believe he needed to be transported to a hospital,
3 correct?
4 A.      That is one hundred percent sure.
5 Q.      And after you rang the bell at the booking
6 center if you believed Ty'rique Riley needed to go to
7 the hospital you could have taken him at that point,
8 correct?
9 A.      If I would have needed to, yes.
10          MR. NORFLEET: All right. That's all
11 I have.
12          MR. MacMAIN: Anyone else? Okay. The
13 deposition is adjourned.
14          (Witness excused.)
15          (Deposition concluded 1:52 P.M.)
16          - - -
17
18
19
20
21
22
23
24
25

CORP. CHRISTOPHER HAINES

Page 106

1          C E R T I F I C A T I O N
2
3
4          I hereby certify that the proceedings,
5   evidence and objections noted, are contained fully and
6   accurately in the notes taken by me on the hearing of
7   this matter, and that this copy is a correct
8   transcript of the same.
9
10
11
12   _____
13          NICHOLAS DiPIERO, R.P.R.
            Registered Professional Reporter
14          Notary Public
15
16
17
18          (The foregoing certification of this
19   transcript does not apply to any reproduction of the
20   same by any means unless under the direct control
21   and/or supervision of the certifying reporter.)
22
23
24
25

DiPIERO COURT REPORTING
(215) 735-8101

CORP. CHRISTOPHER HAINES

Page 107

**A**

**ability** 6:13,16,20
8:12,19,23 9:2
48:6
**able** 50:13 64:24
78:6 79:7 80:7
87:10 99:22
**abruptly** 67:7,10
**absence** 15:13,16
15:24 18:12
**absolute** 45:6
**Absolutely** 48:11
93:17
**abuse** 63:8
**academy** 14:20,23
14:25 15:1,4,7,8
15:11,14,25
18:13,20,21 21:3
21:25 28:20
29:21 73:11
**accept** 51:1 53:20
56:4 104:10,22
**accepting** 54:5
**accepts** 53:17
**access** 30:9,11 31:8
31:12 38:22 39:3
39:5,8,15
**accident** 13:14,15
16:18 22:8,9,10
**account** 94:2
**accurately** 106:6
**action** 1:5 99:2
**activate** 59:5
**activated** 59:10,10
77:3,10,11,14,16
77:21
**activating** 59:11
**active** 40:2
**actively** 37:8 40:3
59:2
**actual** 31:1 36:19
38:8,25 65:3 67:1
77:4 82:2
**Adams** 56:22

57:12,15 58:9,10
58:10
**address** 39:25 52:8
59:15 95:2
**addressed** 54:11
**adjourned** 105:13
**administration**
92:8
**Administrator** 1:4
**admitted** 97:18,23
**advised** 40:10
**affect** 9:2
**agency** 30:24 31:3
**agents** 61:5,13,24
64:3
**aggravated** 35:7
45:15
**agitated** 65:5
**ago** 5:23 9:6
**agree** 78:12 79:25
86:1,8
**agreed** 5:1
**ahead** 44:2
**ahold** 44:23
**aid** 28:22 73:10
**Akyoder@mdw...**
3:5
**al** 1:5,8
**alcohol** 8:15 96:7
96:11
**ALEX** 3:3
**allegations** 72:8,11
72:13
**Allen** 16:8,13 17:5
17:9
**allow** 6:6 7:20,22
**allowed** 50:17
54:14 63:25
100:24
**amazing** 93:13
**ambulance** 74:10
**amount** 96:21
**ANDREW** 2:9
**Andy** 95:18 103:9

**and/or** 39:3,4
52:14 67:17
96:18 106:21
**Angela** 2:17
**ankles** 98:17
**answer** 6:5,12 7:14
7:21,24 8:6 12:10
30:21 36:12,17
40:16 42:13
49:15 51:14
55:15 56:8 58:3
60:11 63:1 67:20
83:25 85:13
99:12 101:1,2,5
103:2,10,19,23
**answered** 32:3
41:1
**answers** 7:4 31:4
53:7 86:23
**anybody** 25:5
26:21 32:7 47:20
74:8 95:16
**appear** 46:6 85:16
**APPEARANCES**
2:1 3:1
**appeared** 69:1
88:25 89:2 90:11
**appears** 82:8 85:15
**apply** 106:19
**appreciate** 101:1
**approach** 42:3
**approached** 64:9
**approaching** 56:21
**appropriate** 53:4
**approved** 91:24
**approximating**
6:23
**approximation**
6:24
**area** 11:12 14:24
44:11 81:25
83:14 85:17 86:9
98:3,11
**areas** 24:18

**argumentative**
65:20
**arrest** 16:15,20
18:2 60:15 93:21
96:10,25
**arrested** 13:5 35:6
45:4 96:24
**arrestee** 34:11
50:12 55:12
**arrestees** 97:12
**arresting** 100:14
100:19
**arrests** 57:21
**arrive** 42:6
**arrived** 41:23 42:1
44:3 45:16 58:6
58:12 61:3
101:20
**arriving** 38:16
56:16 57:23,24
58:16,20,24
59:22
**artillery** 20:9
**asked** 8:5 17:23
42:23 44:24 45:2
46:20 49:19 61:8
61:15,24 68:24
87:3,22 96:14
97:10,14,25
**asking** 6:9,12,12
6:19 10:13,15
15:8 21:25 26:1
28:10 30:12 34:1
34:5 37:20 39:17
41:3 47:15 48:22
55:4,9 64:16
65:19 72:18,23
75:13 78:22
85:13 103:9
**asks** 95:20 97:12
**assault** 35:7 45:16
72:6,12,16
**assaults** 72:9
**assigned** 44:11

91:23
**assist** 16:16 22:10
24:5 86:16 87:8
**assistance** 26:11
26:12 86:11
**assisted** 68:18 85:4
**assisting** 86:12
87:2,20,25
**associate** 12:6
**associates** 11:17
15:2 16:2
**assume** 7:14 30:18
41:18,21 53:25
59:18 69:13
71:23 87:22
101:6
**assuming** 54:25
59:18 66:19
**assumption** 76:2,3
**assumptions** 55:4
**assurances** 52:13
**attempt** 98:20
**attend** 11:9,22
14:20,23 15:1
**attended** 11:24
12:2
**attention** 36:19
97:7
**attorney** 8:4 98:1
**Attorney's** 93:24
94:11,14,18
**audibly** 46:13,16
**audio** 66:14,15,20
66:25 67:1 72:3
76:11,12,24 78:5
78:7 79:12,18,22
79:25 80:1,2,5,7
80:7 81:7 85:1
**August** 11:3
**authority** 48:9,10
53:23 55:1
**authorized** 86:16
**automatically** 59:6
77:10,14,21

**Avenue** 36:21 37:1
  37:2,5 39:24 40:1
  41:15 44:4 48:25
  56:16 57:23,25
  59:15
**aware** 18:10 25:10
  25:19,20 27:11
  28:18 50:9 52:4
  58:7 72:13 93:21
  94:22
**Awn@laverylaw...**
  2:11
**A.M** 1:12

**B**

**back** 18:1,22 27:5
  33:22 41:14,18
  45:14 56:7 57:8
  57:18,18 58:19
  61:7,25 62:22
  63:24 69:19
  70:11,13 71:25
  72:22 73:1 75:11
  75:12,12,23
  76:20 78:2,7 86:5
  87:13 88:8,11
  89:14 90:23
  92:11 95:2,6,11
  101:20 102:1
  104:10,15
**background** 10:22
**backing** 78:8
**backup** 87:15
**ball** 44:21
**Baptist** 11:5
**based** 32:17 33:18
  63:15 101:2
**basic** 73:10
**basis** 51:5
**battery** 67:8,20
**beat** 44:11
**beating** 37:7,8 40:4
**becoming** 24:16
**began** 14:12,13

16:3
**beginning** 1:12
  23:4 72:4
**behalf** 95:21
**behaving** 62:18,19
**belief** 9:22 51:5
  63:7
**believe** 9:25 15:5
  15:10 19:12,13
  21:6 24:13 27:14
  28:8 31:7 35:8
  38:5,8,9,21 40:1
  44:10,25 49:5
  50:20 51:4,10
  52:25 56:5,10
  58:12 60:25
  62:12 63:22
  66:15,22,24,25
  68:3,16 73:17
  74:23 76:25
  78:21,24 79:17
  80:13,14 81:8
  84:24 87:12,13
  88:7,18 91:1
  99:25 102:17
  105:2
**believed** 43:14
  104:2,4 105:6
**bell** 105:5
**belt** 60:23,25
**bench** 66:6
**best** 5:14 6:13,16
  6:20 7:11,13,20
  51:18
**better** 54:3
**Bible** 11:5
**big** 45:10 84:16
**birth** 11:2
**bit** 65:8 68:22 78:7
  83:18 86:5 99:6
**blanket** 36:9
**block** 40:1,1
**blue** 85:16
**blunt** 20:24

**body** 54:13,16
  67:17 68:4 76:12
  76:18
**boisterous** 70:19
  70:22
**booking** 45:15
  47:5,6,23 50:10
  52:4,7 53:12,14
  54:9,22 55:6,11
  57:22 60:6,7,19
  61:2,3,5,13,24
  63:13,17,21 64:1
  64:3 65:4,4 66:10
  66:24 67:6,22
  68:9,13,24 70:15
  76:2,6 78:25
  80:12,19 82:2,19
  83:2,8 85:23 89:4
  90:14 97:12
  98:19 100:14,19
  100:22 101:7,21
  104:4,9 105:5
**Borough** 13:15
  20:13 21:1,8,11
**bottom** 83:11
**box** 2:10 64:3
**break** 8:2,6 43:22
  91:8,14
**BRIAN** 1:7
**bring** 27:3 48:13
  56:7 68:25 69:2
**bringing** 28:14
**brought** 69:16
**button** 59:4 61:4
  61:10,12 76:5
  101:22,25

**C**

**C** 106:1,1
**cage** 60:20,20
**call** 26:9,17,18,19
  27:6 32:4 33:11
  37:6,10,16,22,23
  37:25 38:15 39:9

40:2,24 41:2,12
  44:22 50:21,22
  55:17 62:21 65:1
  90:10
**called** 35:5 38:13
**caller** 42:23 43:10
  43:14
**calling** 40:3
**calls** 16:18 24:6
**calm** 68:21
**calmly** 44:25
**cam** 68:4
**camera** 59:11,11
  68:10 76:19,21
  76:23 84:15
**cameras** 56:20
  58:25 59:2 66:12
  67:25 76:15,20
**Camp** 2:15 3:4
  16:8
**campus** 17:19
**cams** 67:17 76:18
**capable** 33:1
**capacity** 20:4,5,9
  21:13
**Captain** 25:8
**captured** 60:2
**car** 9:20 13:15
  37:14 45:18,19
  48:24 57:3,7
  58:25 59:2,11,17
  59:19 60:19 61:7
  61:25 62:23
  63:24 64:4,17
  72:23 76:15,21
  76:23 77:6,15,21
  77:23 79:19
**Care** 3:6
**cared** 62:25
**career** 24:18
**Care's** 52:15
**CARMELITE**
  2:14 95:21
**Carmen** 1:4 49:9

49:18
**carry** 17:21,24
**cars** 37:15 56:15
  56:21
**car's** 77:22
**case** 6:8,25 29:18
  29:21 56:10
  73:24 77:16
**cases** 28:13
**cause** 48:25 99:1,3
**caused** 19:23 20:20
  21:5,6 37:1 50:6
  67:14 72:21 89:6
  93:11
**cell** 88:17,18 89:16
  89:22 90:8
**center** 30:15 37:24
  37:25 45:15 47:5
  47:6,23 50:10
  52:4,7,19 53:12
  53:14 55:11
  57:22 60:6,8,19
  61:2,4 63:13,17
  63:21 64:1 65:4
  66:10 67:6,22
  68:9,13 70:15
  76:6,19 78:25
  80:12,20 82:3,20
  83:3,8 85:23 89:4
  90:14 97:12
  98:20 100:15,19
  100:22 101:7,21
  104:4 105:6
**certain** 24:18
  65:19 77:2,3
**certification** 5:2
  22:14 28:25
  106:18
**certifications**
  21:15,24 22:2,18
  24:14,15 30:12
**certified** 22:21
**certifies** 30:16
**certify** 106:4

CORP. CHRISTOPHER HAINES

**certifying** 106:21
**chain** 24:16,24
    42:14
**challenge** 96:16
**change** 23:4
**changed** 30:4 49:8
**charge** 42:17,17,19
**charges** 45:15 55:1
**charging** 77:15
**Cherry** 1:23
**chest** 76:20
**Chester** 2:21
**Chief** 25:8
**Christopher** 1:11
    4:4 5:7 10:25
    57:5
**chronological**
    38:13,14,23,24
    39:5
**circumstance** 36:8
**Civil** 1:5 6:6
**civilian** 73:8
**civilians** 25:12,21
    28:19
**civilian's** 31:18
**clarification** 77:18
    103:2
**clarifying** 55:4
**CLARK** 1:7
**class** 14:25 23:11
    23:20 24:1,4,10
    24:20,25 25:2,3
    27:10 30:4
**classes** 30:2
**clear** 7:12,13 40:13
    40:16 70:24
    76:10 100:21
    104:25
**clearance** 35:19
    51:19 100:23
**cleared** 34:12,13
    34:14 35:12,22
    50:12,17 51:24
    53:18 54:1,10

56:7 97:17,18,22
    100:25 101:3
    104:12
**clearer** 74:24
**clearing** 67:3
**clears** 55:22
**client** 39:9
**close** 42:8,9 60:18
    78:13 84:19
**closed** 46:18 81:11
**closer** 20:1
**closes** 63:21 78:8
    78:10
**closing** 82:16
**clues** 48:20
**college** 11:9,11,12
    11:25 12:3 14:24
    15:14,15 16:7
    17:14 18:1,13
**colleges** 11:23
**come** 26:13 39:16
    41:13 44:17,18
    61:8,15,24 62:2
    67:5 82:21 83:1
    83:14 90:8 95:6
    95:11 102:9
    104:14
**comes** 36:8 50:23
    59:7
**coming** 26:7 46:14
    77:1 82:6 90:13
    90:22 92:5
**command** 24:16,25
    42:14
**commands** 65:16
    65:16,24 66:2
**commitment** 35:1
**committed** 33:24
**common** 31:21
    53:7 73:12
**communicated**
    40:25
**communicating**
    76:6

**communicator**
    20:10
**community** 11:12
    12:3 14:24 16:5
    16:12,20 17:3,8
    17:24 20:4
**complaints** 17:11
    18:7 19:17
**complete** 7:20
    28:24
**completed** 20:22
    21:3 91:22
**completely** 7:23,24
    15:3
**computer** 38:1,25
**computers** 38:11
**concern** 96:14
**concluded** 105:15
**conclusion** 94:13
**condition** 40:9
    42:23 43:3,7
    49:19 77:9
**conditions** 8:23 9:2
    77:2
**conducted** 93:19
**confirmation** 55:5
**connection** 10:9,16
    15:2 93:5 94:17
**CONNELL** 2:19
**consider** 49:1
**considered** 48:2,4
    50:2 98:22
**constantly** 48:18
**consult** 8:3 94:25
**consumed** 8:15
**contact** 33:5
**contain** 66:14
**contained** 106:5
**contemplate** 48:17
**continue** 75:20
    79:3,11 81:5
    86:10 87:9 90:5
**continued** 65:18
**continuous** 19:11

**control** 68:19
    106:20
**controlling** 69:1
**Cont'd** 3:1
**conversation** 62:21
    62:22,23 63:10
    63:12 65:11 73:2
    73:3
**converse** 61:14
**conversed** 45:12
    63:23
**conversing** 70:5
**copy** 106:7
**corner** 84:6 88:22
    90:9
**Corp** 4:4 5:7 20:9
**corporal** 1:10 5:12
    5:14 12:21 22:25
    23:14 25:6 30:22
    39:13,22 40:20
    42:12,16,19 44:2
    44:9,14,16,24
    45:6,13 46:20
    47:4,9,16,22
    52:16 54:14
    55:15 57:17,24
    58:13,18 61:9
    72:5,19 74:19
    75:22 76:9 78:17
    79:4 81:24 84:18
    85:4 87:10 88:6
    89:23 91:18 96:4
    99:20 100:11
    103:4 104:17
**Corporate** 2:15
    3:4
**correct** 9:24,25
    17:6,15,16 18:13
    18:14,16,17
    22:23 23:1,21,24
    24:23 32:19
    36:22,23 37:22
    41:25 52:19,20
    53:2 54:2,23

56:12 58:14 63:5
    63:18 66:20 72:1
    72:2 76:13,24
    80:10 81:12,13
    81:17,18 82:10
    83:3,4 85:2,6,7
    86:15,19 87:6,21
    88:1 89:18 92:2
    92:14,25 96:7,8
    97:9,24 98:12,13
    98:18 99:16
    100:15,16 101:23
    101:24 102:2,3,6
    102:7,10,11
    105:3,8 106:7
**correction** 87:18
    101:19
**correctional** 89:21
    97:8
**corrections** 98:2
    98:10
**correctly** 104:7
**coughing** 89:1,3,3
    89:6
**counsel** 2:12,17,22
    3:6 5:2 6:7 39:19
    80:15
**counseling** 35:9
    36:2,3
**counselor** 26:25
    27:20
**country** 20:25
**county** 1:8 13:14
    18:24 19:1,25
    20:13 22:8,11,12
    26:18 27:2 37:4
    38:7 39:10,16
    52:6,14 53:12,14
    53:17 54:9,22
    55:6,11 93:24
    97:12,23 103:14
**County's** 104:16
**couple** 11:24 42:25
    49:23 61:1 79:15

95:1 100:8,11
course 30:8,22
  31:9,21
courses 11:24 29:2
  29:10,12,12,15
  30:7,9,10 31:13
  31:14
court 1:1,22 7:3,7
  7:17
courtroom 9:7
Co-counsel 2:7
CPR 28:22
criminal 11:17
  55:1
crisis 26:18 27:2
  32:4,21,23 33:5
  52:19
criteria 32:11,21
  35:20,25 36:5
Cumberland 20:13
current 8:22 14:5
  23:13 26:10
currently 12:8
  26:23
cursing 70:18
custody 48:8
  100:13,18 101:2
  101:10,11,16,23
  102:2,5,10,14,15
  102:17,19,20
  103:10,12,14,17
  103:21 104:3,5
  104:10,14,19
cut 56:5

**D**

danger 26:20,20
  43:14
dash-cam 9:20
  57:6,11
date 6:23 9:23 11:2
  12:18,20,23
  14:13 18:25
  22:19,22 23:6,9

23:19 24:21
  27:21,25 29:5
  30:1,5 34:8 37:2
  37:3 41:6 44:4
  77:19 92:15 94:9
  99:25
dated 92:11
dates 15:19 19:3
Dauphin 1:8 13:13
  22:8,11,12 26:17
  27:2 52:6,14
  53:12,13,17 54:9
  54:22 55:6,10
  93:23 97:12,23
  103:14 104:16
Dave 39:2 56:19
  58:15 71:10
David 2:20 57:20
day 9:20,22 33:2
  44:11 67:19
  74:25,25 75:6
  94:3
days 42:25 49:23
Dcarmelite@md...
  2:16
deal 29:6 36:7,10
  96:17
dealing 50:15
death 94:6,8,8
decided 48:3 92:17
deciding 31:25
  32:22 33:4 35:18
  35:20
decision 31:23
  32:20 33:17,23
  34:4,6,19,24
  36:11 49:13
  55:24
deescalate 29:7
deescalation 29:19
defendant 2:12,17
  3:6 10:6 13:22
  61:6 102:20,22
  104:9,11

defendants 2:22
  80:14,16 95:14
definitely 60:2
definition 26:3
degree 11:13,15
  12:1,6 15:2 16:2
degrees 12:5
delay 71:23
Demetrius 56:23
  57:9 58:5
demotions 23:17
DENNEHEY 2:14
  3:3
dep 39:19
department 13:13
  14:7,21 16:14
  17:9 19:8,24
  21:18,21 25:10
  33:15 93:20,23
  99:21
deposed 5:21
  13:18
deposition 1:10 6:2
  8:13,24 9:11,14
  10:2 12:19 13:10
  92:5 100:12
  105:13,15
depositions 13:24
Deputy 25:7
describe 44:3
describing 103:17
desk 68:24 83:14
  90:23
details 8:20
detain 99:23
detained 45:3,3
detainee 62:3
detective 94:5
detectives 94:2
determination
  31:23 32:12 34:6
developed 63:9,15
devices 68:3,6
  77:22,25

died 67:20
difference 70:25
different 35:3
  56:20,21 66:12
  66:12 76:16,17
  77:13 103:21
DiPiero 1:13,22
  106:13
dipieroreporting...
  1:24
direct 106:20
directed 45:7,14
  47:22 92:13
directing 16:17
  47:4 66:6
direction 68:5
directions 46:1
directive 92:10,16
directly 35:11
  40:24 93:9
Director 25:7
directs 67:24
disagree 93:2
discipline 17:8
  18:4 19:14
discretion 32:25
  33:2,4
discuss 20:6
discussed 8:9 20:5
  21:13 31:16,19
  89:23
discussing 90:1
discussion 47:5,10
  47:16
dismissed 69:13
dispatch 37:10,16
  37:17,21 38:3
  39:12,23 40:7
  41:13 42:22 43:2
  43:6,9,13,19
dispatched 37:5
dispatchers 37:4
dispatches 37:25
distance 46:17

90:18
distinction 34:23
distinguish 34:25
District 1:1,2
  93:24 94:11,14
  94:18
divert 33:25 34:19
  34:22 35:2,4,10
  35:11,14,16,18
  48:15 73:15
diverted 74:3
diverting 34:2 35:1
  74:8
document 71:11
  71:15 91:6,17,20
documents 9:13
  10:1,8,16 23:22
  31:4 39:17 94:17
dog 16:18
doing 7:2,5 26:12
  33:1 58:2 86:17
  92:9,21
domestic 96:25
  97:1
DONALD 2:14
door 41:14,18 44:8
  44:8,9,12,15,16
  44:19,25 45:2,9
  46:18,21 63:21
  64:5 78:8,10,12
  79:23 80:2 82:3,4
  82:16,20,20
  88:22
doorbell 61:14
  76:8
doors 65:3 81:11
  82:1
doorway 44:18
  46:7 81:17
download 31:7
downloaded 59:23
downpour 45:6
  46:2,19,19
drafted 91:25 92:1

CORP. CHRISTOPHER HAINES

92:4
**dragging** 44:23
**drive** 2:15 3:4
   45:23
**driving** 56:25
   74:22,25 80:24
**dropped** 79:12
**dropping** 51:8
**drove** 45:24 46:1,4
   48:24 59:12
**drugs** 96:7,11
**duly** 5:8
**duties** 13:12 16:12
   17:17 20:18
   23:25 24:1,9,19
   24:21
**D'Arcy** 45:16

**E**

**E** 106:1
**earlier** 22:7 24:3
   32:6 44:9 73:13
   73:22 76:4 77:1
   78:21 82:1 90:9
**early** 15:5,5,22
**earshot** 97:16
**Easily** 97:3
**Education** 30:15
**either** 39:3,5 68:8
   70:8 89:16,22
**elapse** 45:24
**electric** 68:5
**electronic** 68:3
**else's** 83:19
**employed** 11:25
   12:24,25 15:12
   19:10 27:1
**employment** 18:19
   21:12 30:1
**encounter** 25:12
**ends** 67:7 102:14
   102:18 103:12
**enforcement** 20:4
   20:18 21:12,16

63:2
**engaged** 98:16
**engine** 78:1
**enlistment** 20:22
**enter** 102:13
**entered** 101:14
**entire** 48:22
**entry** 41:14
**entryway** 89:22
**escort** 83:1
**escorted** 45:8,17
**escorting** 82:15
**ESQUIRE** 2:3,3,9
   2:14,20 3:3
**Estate** 1:5
**estimate** 6:17,18
   15:20 19:6 23:9
   30:1,5
**et** 1:5,8
**evaluate** 25:12
   50:11,24 52:18
**evaluated** 54:20
   73:23
**evaluates** 50:24
**evaluating** 26:10
   28:18 29:3,11
   31:18 48:18
   51:10
**evaluation** 51:20
   52:3,6,7,15,15
   53:5,15 54:8 55:7
   55:13,18 56:11
**evaluations** 25:21
   52:22
**evaluator** 55:23
**evening** 38:19,20
   38:24 39:1 47:11
   47:18 48:16
   72:10
**everybody** 60:25
   83:19
**evidence** 106:5
**exact** 6:25 23:6
   27:25 99:25

**exactly** 7:23 60:22
   62:5 67:2 68:2
   69:18,20 71:7
**examined** 5:8
**excessive** 98:23,24
**exchange** 84:25
**excused** 105:14
**exhibit** 71:12
**existed** 77:19
**existence** 27:21
**exists** 28:7
**expectation** 104:14
**expecting** 6:17
**experience** 26:14
   33:8 34:9 51:8
   53:11,17 54:8
   63:1
**explain** 58:25
   71:22 92:3
**explained** 24:3
   28:20 69:25
   76:10 90:9
**extent** 39:17
**e-mail** 38:12

**F**

**F** 106:1
**face** 46:3 83:19
**faces** 83:20
**facility** 55:2 97:7,8
**facing** 58:19
**fact** 49:9 98:9
**facts** 36:10
**factually** 103:20
**fair** 7:15 24:20,24
   76:3 79:13 86:13
   88:11
**fairly** 39:8
**fall** 15:10,12
**falls** 64:6
**far** 44:13,15 84:6
   84:14
**fast** 82:12,23
**fatal** 22:9,10

**father** 37:7 40:4
**February** 1:12
**feds** 74:20 75:4,14
   75:17,24,25
**feel** 32:4 48:7
   55:19
**feet** 44:19 45:9
   69:20 70:11
   98:14
**felt** 32:6,8 55:17
**female** 68:17,24
   78:22 83:14
   87:18 89:1
**field** 22:4 24:17
   27:14 33:7
**figure** 36:13
**figured** 95:17
**file** 30:14
**filed** 17:11
**filing** 5:3
**find** 92:7
**fine** 5:17 8:4 21:20
   84:18 88:20
**finger** 56:6
**finish** 91:13
**firearm** 17:21,24
   63:25 64:2
**first** 8:6 10:25 23:5
   23:9,10,20,25
   24:2,4,8,10,20,25
   25:2,3 28:22 30:1
   32:9 34:23 35:12
   35:22 41:1 42:1
   46:6 59:17,18
   60:7 71:14 73:10
   82:3 85:18 93:12
**FITZPATRICK**
   2:2
**five** 24:13 43:23
   46:17 89:21 95:8
   95:10
**focus** 36:18
**folder** 57:5,9,11
**folders** 57:5

**folks** 100:19 104:4
**follow** 25:25 26:16
   27:6 65:2
**followed** 81:16
**follows** 5:9
**follow-up** 95:19
   100:9
**foot** 46:17
**force** 29:7,20 98:20
   98:23,24
**foregoing** 106:18
**forget** 74:22
**forgot** 20:12 67:13
**form** 5:4 27:18
   29:24 40:25 43:5
   49:14 52:9 55:8
   55:14 85:12
   86:24 88:3 99:12
   101:4
**forward** 9:11 57:7
   57:18 58:19
   82:12,23
**found** 45:18
**four** 24:13 57:5
   62:14 83:21
   89:20
**frame** 84:3
**Franklin** 36:21,25
   37:1,5 39:24,25
   41:14 44:4 48:25
   56:16 57:23,25
   59:14
**free** 53:19 69:14
   100:22 101:12
   102:21,23
**front** 57:7
**full** 10:24 102:22
**fully** 106:5
**full-time** 15:25
   17:1 21:10
**further** 91:3 95:22

**G**

**gain** 6:9 41:14

CORP. CHRISTOPHER HAINES

**game** 6:11
**garage** 62:2 63:21
**gate** 102:4
**general** 17:19,19
24:5 25:18 85:17
103:4,11
**generally** 100:17
100:18
**generic** 70:22
**gentleman** 85:9,15
85:19 86:1
**getting** 10:22 21:9
24:17 46:4 53:9,9
54:7 55:5 60:18
87:4 103:8
**give** 7:14 29:5 30:3
34:7 36:9 38:17
51:14 56:17
73:24 74:6 88:10
92:15 94:9 96:9
96:18 99:25
103:7 104:10,21
**given** 10:17 29:23
29:24 47:7,8 49:5
51:19 52:21
94:13
**gives** 80:6
**giving** 65:15,25
**Glen** 42:12,18
44:14 45:8 56:23
57:10 58:5,8
**gloves** 83:15
**go** 5:25 6:1 9:11
11:11 21:19,21
23:7 27:5 32:1,13
33:10 35:13,21
36:3 37:1 41:17
44:2 47:11,24,25
48:8 53:19 56:10
59:5 60:13 61:12
65:3 66:7 67:14
73:25 75:12,22
78:2 80:11 82:2
83:6,22 86:8,12

89:14 90:8 95:17
100:22 101:3,13
102:15,21,23
104:6 105:6
**goes** 64:6 93:3
**going** 5:25 6:1 7:6
7:14,20 10:20
12:17,17,20
15:20,21,21 16:6
19:5 23:6,7,8
24:15 25:9 26:17
27:25 28:12
29:25 30:5,13,17
30:17 31:8,11,21
32:22 33:8 34:7
34:11 35:6,11
36:25 38:11 39:2
40:12 41:10
44:18 47:6,14
50:21,22,23
55:20,23 65:1,15
65:20 66:21 67:9
69:12 70:21
71:12 72:19 74:7
74:12,13,16,18
75:14,17,20,25
76:1 78:4,7,15
79:2,16 80:11,21
80:22 81:5,6,9,14
81:15,19,21,24
82:3,12,17,22,23
83:5,9 84:23 85:3
85:11,25 86:5,10
86:23 87:9,15
88:14,23,24
89:19 90:10,17
90:20,23 91:6,8
92:18 99:11
101:11 102:15
103:14
**good** 40:18 46:17
52:15 73:12
**gotten** 40:24 64:3
69:11

**govern** 25:24
**grabbing** 84:22
**graduate** 11:4,19
15:4
**graduated** 18:15
18:19,21
**graduation** 16:10
**great** 21:19,21
**Greg** 2:12
**grew** 20:1
**ground** 44:22 64:6
65:23 68:15,18
70:8
**guard** 68:17,24
78:22 83:14 89:2
102:20
**guards** 63:22 64:9
64:14,19 65:1,2,7
65:13,22 68:15
68:18,20 69:11
69:16 83:12
101:9,12 102:9
102:13
**guard's** 101:8,11
**guess** 6:17,18
15:21 32:24
86:17 101:6,7
**guidance** 32:5
**guideline** 26:19,21
**guidelines** 26:16
27:5,7,11,12,13
27:15 33:3
**guiding** 33:13
**gun** 63:25
**guys** 86:23

—————————
**H**
—————————

**H** 2:3
**Haines** 1:11 4:4
5:7,12,15,15 11:1
12:21 30:23
39:13,22 40:20
44:2 52:16 54:14
57:5,17,24 58:18

72:5,20 74:19
75:22 76:9 78:17
79:4 81:24 84:18
85:4 87:11 88:6
89:24 91:18 96:5
99:20 100:11
103:4 104:17
**half** 19:13 28:1
**hammer** 43:11
44:22
**hand** 61:21 83:21
84:6,14,15 88:7
88:25 90:7
**handcuffs** 45:4
87:12,18,23,25
88:8,9,10
**handed** 87:13,17
**handle** 16:20
**handling** 16:18
24:6
**happen** 45:20
**happened** 22:18
44:3 60:5 61:9
63:19 64:25
65:17 90:16
92:12
**happening** 24:7
90:24 98:6
**happy** 40:15
**hard** 74:21
**harm** 32:7,14
35:23 36:6,15
**harp** 70:23
**Harrisburg** 2:10
11:12 12:3,14
14:24 34:10 53:1
**hate** 62:21
**head** 7:6 22:16
98:3,11
**health** 25:13,21
26:9,24 27:20
28:13,15,19,21
29:2,6,11 31:18
31:24 32:1 33:19

33:24 34:15,17
34:17 35:9,19,21
40:9 49:11 50:14
51:3,10 52:8,18
52:22 53:4,15
54:7,11,21 55:7
55:12,18 56:11
62:4,20 63:5,8
66:19 97:7
**hear** 41:11 46:13
46:16 49:18,21
49:24 64:7,12
69:17 71:22 72:4
72:5 74:19 75:3,5
75:7,9,14,16
76:11 78:6 79:9
80:7
**heard** 5:18 14:18
40:17,17 41:6,8
46:9 49:3,4 50:5
64:10 70:25 75:5
75:23,24 78:12
78:18 79:5,10,14
80:5 85:1
**hearing** 43:17
53:24 90:2 106:6
**held** 17:4 20:3
23:11
**help** 52:17 56:19
82:13
**helps** 84:20
**hey** 92:18
**high** 11:4,5,20
16:10 62:19
66:18 96:12,21
99:10
**Hill** 1:23 2:15 3:4
16:8
**hired** 16:7 18:23
18:25 19:12
**hit** 43:11 101:22,25
**hitting** 13:16
**hold** 15:18 16:4
103:18

holding 83:12
home 36:21 60:16
    72:24
honest 20:12 92:10
    93:17
Honestly 69:7
hope 5:15 31:4
hospital 31:24 32:1
    32:9,13 33:18,24
    33:25 34:2,10,10
    34:12,19 35:3,12
    35:19,21 47:11
    47:17,24 48:1,9
    48:10,17,21 49:1
    49:6,13 50:3,6
    53:1 55:19 56:1,6
    56:11,14 73:16
    73:22,25 74:3,8
    74:10,13 90:12
    105:2,7
hour 59:6
hours 8:12,16,19
    21:9
house 47:2,12,13
    47:15 69:22,22
    86:20 101:9
hundred 61:1
    105:4
husband 37:7 40:4
    43:15
H-A-I-N-E-S 11:1

                I
idea 70:5
identify 64:24
identity 64:18
ignition 77:24
III 2:3
illness 96:16
immediate 87:2,7
    97:6
impact 8:12,19
    49:12
impacted 50:1

implemented
    27:24 28:11
important 7:19
    60:2 70:24
impression 73:4
incident 12:18,20
    12:23 22:19,22
    23:19 24:7,21
    27:22 29:22 34:8
    36:19,20,23 37:2
    37:3 38:18 39:24
    40:21 41:4,7,9,9
    44:5 62:8 68:8
    75:1,6,23 77:19
    91:22 92:12,14
    93:6,8,10,15
    94:21 96:24 97:2
    99:21 100:2,2
include 51:2 54:11
    68:4
incorporate 26:5
incorrect 76:2
INDEX 4:1
indicated 98:1
indication 48:5,20
    50:13
individual 33:18
    48:8,10 50:16
    52:22 54:7 74:24
individually 93:11
individuals 29:3
    29:11 51:8
influence 62:4 63:3
    73:5,6,9,15 74:3
    74:5,13 96:7,11
information 6:8
    9:3 10:22 38:1,2
    38:10,12,13,16
    40:24 48:7 49:4,7
    49:25 50:5,7 96:5
    96:23 97:11
inhouse 29:5 31:9
    92:7
injured 51:13,13

injury 13:19 34:14
inside 46:10 61:13
    63:20 65:2,3
    76:20 82:19 83:2
instance 70:13
    73:18,19,23 77:2
    97:21
instruction 28:21
    68:11
instructions 29:24
instructs 25:11
intelligent 62:23
    73:3
interaction 105:1
interactions 91:3
interest 72:17
interested 54:6
interfere 8:23
interior 44:8
internally 57:8
internship 16:25
intervene 99:1
intervention 26:18
    27:2 32:5,21,23
    33:5 52:19
intoxicated 96:22
intoxication 74:9
introduce 71:12
investigated 13:14
investigating 13:17
investigation 19:21
    93:19 94:14
investigations
    94:20
investigator 44:10
involve 25:20
    28:18 34:24
involved 13:16
    87:5 97:1
involvement 88:5
    94:10
involving 94:21
issue 54:17,18,21
    62:20 63:5,8

66:19
issues 25:13,21
    28:19 29:11
    34:17 49:11 52:8
    52:18 54:11

                J
J 2:20
jail 32:2 33:18
    34:20 35:20
    73:16 74:4,14
January 91:23,24
    92:1,3 93:7
job 20:10,11
jobs 16:4 20:2,3
joined 15:11
joining 14:21
joint 18:13
journey 60:7
Judge 9:7
July 20:7,7
June 9:23 12:19
    22:19 24:21
    29:13,16 37:2
jurisdiction 22:11
jury 9:8
justice 11:17

                K
K 3:3
keep 28:25 39:18
kept 60:10 90:18
Kevin 2:3 5:19
kick 72:3
kicked 60:19,20
kind 6:10 16:25
    38:11 46:3,3,13
    52:13 65:24 78:5
    96:15 99:2,8
knee 85:9,17,19
    86:2,8,9 98:3
    99:23 100:4
knew 60:23 92:5
knock 60:22

know 6:4,24 7:12
    7:23 10:12 13:21
    23:6 27:24 28:7
    28:10,10,11 30:4
    35:1 37:1,17 38:3
    41:4,5,16 42:6,8
    42:14 47:9,12,16
    47:19 48:11
    51:12,12,12,22
    51:25 52:2 55:16
    55:21 57:17 58:2
    58:22 61:8 62:18
    64:18,22 65:20
    66:2,18,18 67:7
    67:19 68:2,22
    69:7,10,24 70:20
    71:4 78:4 79:7
    82:9,11 84:19
    86:3 87:16 88:16
    88:21,24 89:6,11
    89:23,25 90:18
    91:11,20 93:1
    100:1,23
knowledge 6:10
    51:18
known 74:9

                L
labeled 56:25 57:9
Lancaster 18:24
    19:25
lapse 46:5
lastly 38:10
late 14:14 15:5,21
LAVERY 2:8
law 2:8 20:4,17
    21:12,16 63:1
lawsuit 10:6,9,17
    13:7,8,19 93:12
    93:18
lawsuits 14:2
lawyers 103:21
laying 89:12
lead 44:10

learned 48:7
leave 15:13,16,23
  18:12 19:23 21:5
  21:7 35:7 44:6
  50:13,17 51:19
  51:24 54:1,14
  67:17,24 68:5
  69:14 100:24
  104:11,15
leaves 79:19
leaving 90:22
left 21:11 44:15,19
  58:12 61:21
  67:18 68:10,14
  85:16 90:7 91:2
leg 68:23,23,25
  69:2,4,5 70:14
  85:5 86:12,13,17
  98:16
legal 55:1
legs 69:2 84:5,7,13
LEINHAUSER
  2:19
letter 39:18
let's 34:2 35:4
  36:18 60:5 71:8
liability 53:18
  54:17
Liberty 2:4
lied 81:5
Lieutenant 25:7
life 67:8
lights 59:5,10,15
  59:20 77:2
limit 29:7
limited 47:14
limp 64:6
line 24:2,8 30:6,7,9
  30:11 96:17
lips 71:21
list 22:1 30:24 31:6
  31:13,14 39:18
  50:19,20 97:11
listed 40:20

listened 38:19
  40:14,15,23
listening 65:7,22
listing 30:22
literally 61:20
little 61:4,10 65:8
  68:22 69:1 78:7
  83:18 86:5 95:6
live 12:8,10
lives 12:14
LLC 2:2
located 11:6 92:10
  92:24
location 17:5
lock 64:2
locked 44:9
locker 63:25
long 5:23 14:9
  19:10 27:16 67:9
  78:6
longer 43:24 86:12
  95:7
look 36:9,14,16
  57:16 71:9
looked 57:10 87:17
  88:9 98:9
looking 6:15 35:16
  44:15 57:4,7,8,18
  57:18 58:19 85:8
  92:1 97:20
looks 57:10,13
  82:15,19 83:7,11
  84:21 88:15
  89:20 90:6
loosest 26:2
lose 84:1
lot 22:2 26:13,18
  61:7 72:23 73:12
loud 60:21 70:20
lower 16:7,13 17:5
  17:9 25:4
Lt 2:12

_____

**M**

machines 80:6
MACLAIN 58:1
MacMAIN 2:19,20
  4:6 10:10 12:9,15
  13:4 25:14 30:20
  39:7,14 40:13,22
  41:20 49:14 52:9
  52:11 54:24 55:8
  57:4,16 58:22
  59:21 83:24 84:5
  84:13 85:11 91:7
  91:11 95:8,16,23
  95:24 96:3 99:17
  101:4 103:18
  105:12
majority 33:10
making 25:20
  31:23 32:12 34:6
  55:3 70:21
males 68:16
Mall 61:1
mandatory 28:24
manipulating 84:1
Manor 18:23 19:1
  19:2,7,14,21,23
  19:25 20:14 21:6
  21:9,22
manually 59:4,12
  77:3,11
Marine 20:9
Marines 20:17,21
mark 75:13,21
  78:3,9,10,13,16
  79:3,12 80:3,5,22
  81:12,15 82:5,13
  82:18,24 83:5,10
  84:23 85:4 86:7
  86:11 87:10,16
  88:4
marked 56:21,22
  56:23
Market 2:4,9,20
Marlkress 1:23
MARSHALL 2:14

3:3
matches 80:8
material 10:1
materials 9:14
  10:9,16 31:1
matter 5:20 84:11
  106:7
matters 6:10
mean 14:16 25:14
  25:15 27:15
  30:10 31:20
  32:25 34:13 45:3
  50:18 54:10,15
  65:6 67:12 69:19
  73:10,20,22
  77:22 80:1 91:24
  93:3
meaning 22:5
  32:14 34:4 35:17
  92:16
means 35:2 106:20
medical 8:22 9:1
  26:11,12 42:23
  50:11,25 51:2
  55:22 88:21 97:6
  97:11,22 100:23
medically 34:14
  50:12,17 53:18
  54:9,10,10,15
  56:5,7 100:25
medication 8:11
  8:18
meet 82:6
member 22:8
memory 43:18
Mendenhall 2:12
mental 9:1 25:12
  25:21 26:8,24
  27:20 28:13,14
  28:19,21 29:2,6
  29:11 31:18,24
  32:1 33:19,24
  34:15,17 35:9,18
  35:21 40:8 43:3,7

49:11,19 50:14
  51:2,10 52:8,18
  52:22 53:4,15
  54:7,11,21 55:7
  55:12,18 56:11
  62:4,19 63:5,8
  66:19 96:15,16
  97:7
mentally 54:16
mention 72:5
  78:18
mentioned 13:10
  22:17 24:11 36:2
  40:8 52:25 66:17
  72:14,16 84:25
  100:13
merely 6:4
merits 73:23,24
Messiah 11:24
  15:13,15 16:7
  17:14 18:1,13,22
metal 34:17
mic 66:22,22 67:5
  67:18 68:4 71:23
  76:12,15,21 80:8
microphone 68:10
  76:19 77:5,7,9,15
  77:20
microphones
  67:25
mics 67:17
middle 1:2 44:14
miles 59:6
Mincey 2:2,3 5:19
mind 26:7 49:8
mine 57:2 76:22
  84:16 88:12
minimize 83:20
minute 45:25
  74:17 75:21
  82:13
minutes 9:6 43:23
  45:13,25 74:17
  79:24,24 80:6

91:10 95:1,9,10
**missed** 66:5 89:15
**missing** 83:18
**mistaken** 80:15
**misunderstood**
  33:22
**molding** 33:14
**month** 15:7 18:22
**months** 94:8,9
**morning** 6:9
  71:14 81:2
**mother** 37:6 40:3
**mouth** 46:15
**move** 60:5 81:21
  83:22
**moving** 60:24 61:7
  61:25 71:21
  72:22 102:1
**MPOETC** 30:14
  30:17,24 31:2
**Mpolaha@mac...**
  2:22
**multi-tasking**
  74:22
**mumbling** 46:8
**municipal** 22:10
  30:14

_____

**N**

**N** 106:1
**name** 4:2 5:18
  10:24,25 11:1,7
  51:25 57:2
**named** 10:5
**names** 57:1
**near** 22:10 90:23
**necessary** 48:3
**neck** 85:9,20 86:2
  86:8 98:3,11
  99:23 100:5
**need** 7:4 8:2,3
  12:11 16:17,19
  26:11,16 27:6
  32:4,8 35:8 43:24

48:12,15 50:14
54:20 55:17,19
56:13 70:23
71:10 73:21
75:11 79:21 82:2
87:2,5,7 95:6,23
**needed** 32:12 36:3
  47:25 48:5,8,21
  56:10 97:6 105:2
  105:6,9
**needs** 35:21 50:16
  50:25 51:2,3,11
**never** 40:14,16
  41:8 45:12 47:12
  47:19 54:21 55:5
  58:11,24 59:9
  72:11,12,13,25
**new** 22:5 49:7
**Nicholas** 1:13
  106:13
**night** 40:15,17
  48:22 51:17
  55:17 73:22,25
  80:25
**NJ** 1:23
**nodding** 7:6
**noises** 70:21
**Norfleet** 2:9 4:7
  43:5 55:14 84:9
  86:22 88:3 95:4
  95:18,18 100:8
  100:10 102:24
  103:16,24 104:1
  105:10
**normal** 66:2
**normally** 24:12,14
  50:25 90:11
  97:16
**Notary** 1:14
  106:14
**noted** 106:5
**notes** 106:6
**notice** 1:11
**notified** 61:6

**notifies** 61:4
**notify** 61:13
**number** 57:3
  104:24
**numerous** 29:2
  33:10 34:11 51:8
**nurse** 50:21,22
  55:21,22,24
  90:11,13,22
**nurse's** 90:10

_____

**O**

**O** 106:1
**oath** 9:5,6
**object** 12:16 85:11
  99:11
**objection** 12:9
  13:4 43:5 49:14
  52:9 54:24 55:8
  55:14 86:24 88:3
  101:4 103:19,23
**objections** 5:3
  106:5
**observations** 97:5
**observe** 85:9 98:7
**observed** 99:1
**observing** 98:2
**obtained** 16:2 31:2
  80:16
**obtaining** 15:2
**obviously** 12:11
**OC** 89:7,8,16
**occasion** 74:11
**occasions** 68:9
  74:1
**occupation** 14:5
**occur** 51:16
**occurred** 36:19,20
  51:20 52:4,6 66:9
  68:13 72:9 89:16
  92:14
**occurrence** 56:4
**occurring** 60:8
**October** 14:14

19:13
**offered** 21:10
**office** 14:9 88:21
  90:10 93:24
  94:11,15,18
**officer** 5:15 12:25
  13:17 14:6 15:17
  15:19 16:1,3,5,13
  16:19,21 17:4,8
  17:15,18,24 18:2
  18:5,23 19:9
  20:15,23 21:16
  22:5,6 23:8 24:10
  24:12,17 27:1,14
  27:15 29:1 30:16
  30:23 32:24,25
  33:2,7,9,11,12,12
  33:15 42:1,17
  44:10 48:19
  52:13 58:6 83:15
  87:18 98:22 99:9
  100:14,19 103:22
**officers** 12:10
  16:16 22:6 25:11
  30:15 37:15
  38:15 41:24 42:2
  42:4,5,11,15 44:6
  57:22 59:9 65:25
  67:16,24 81:16
  82:6,10 83:1
  86:13,16 87:20
  89:21,24 90:22
  90:25 98:2,10
  99:22 101:19
**official** 60:1
**officially** 45:4
  104:18,22
**oh** 79:5,9
**okay** 5:16 6:13,25
  7:9,25 8:6 22:3
  31:10 36:18
  41:10 53:23,24
  58:1 61:22 67:2
  72:19 75:12

88:14,20,23
89:14 91:11
93:14 95:10
99:17 102:24
104:24 105:12
**once** 5:22 28:9
  62:10 65:3
  101:17
**ones** 29:21 37:4
**open** 44:8,8,17,25
  45:1 46:20
**opinion** 47:21,23
**opposed** 32:2
  33:18 34:24
  53:11 55:2 92:17
**order** 6:9 20:16
  21:19 47:7,8
  99:23
**ordered** 92:17
**oriented** 84:11
**Osteopathic** 34:10
**outlined** 24:19
**outside** 45:2,14
  46:25 89:21
  97:15,16
**overall** 83:7
**overhead** 59:5,20
**overseas** 93:24

_____

**P**

**PA** 2:5,10,15,21
  3:4
**pack** 66:22,22 67:5
  67:18 71:23
**page** 4:2 6:1 21:23
**paid** 16:22,24,24
  16:25
**pandemic** 26:24
  28:13
**pant** 84:7
**papers** 30:3
**paperwork** 28:5,7
**parents** 72:12
**part** 13:13 22:12

CORP. CHRISTOPHER HAINES

Page 116

30:13 36:4 51:7
59:12 93:9 94:1
**particular** 34:8,8
35:17 52:23
**partner** 5:19 37:12
94:25
**party** 13:8 31:4
**part-time** 20:15
21:8
**patrol** 9:20 23:8
24:10,12 37:14
37:15 45:17,19
48:24 56:15,21
**patrolman** 23:10
23:20,25 24:4,5,9
24:20,25 25:1,3,5
45:16 48:11,14
**patrolmen** 24:3
**pause** 71:11 78:9
80:22 81:15
84:23 85:3 86:10
**pausing** 88:15
89:19
**Pembroke** 13:15
**Pennsylvania** 1:2
11:6 16:8 28:23
**people** 28:15 74:10
91:12,14 96:10
96:17,19,25 99:7
**pepper** 68:21 69:6
**percent** 88:19
96:12,13,22 97:3
103:14 105:4
**percentage** 96:9,17
96:19,25 99:7
**perfectly** 5:17
**period** 60:12 98:17
**person** 26:10,20,20
28:15,16 32:1
35:3,6,21 50:23
50:24 51:1 53:23
54:25 55:22
76:13,15,19,21
77:8,10,12,14,20

101:10
**personal** 12:10
13:19
**personally** 28:5
52:2 100:24
**person-to-person**
30:2
**petition** 74:23
**PFC** 23:22 24:2
25:4 42:12,18
44:13 45:8 48:6
58:8
**PFC's** 24:4
**Philadelphia** 2:5
**phone** 37:25
**physical** 8:22
34:14 54:13,16
59:17
**physically** 51:13
54:12
**pick** 74:18
**picked** 23:13 76:12
**picking** 71:24
**picture** 83:16
**pictures** 84:11
**pieces** 96:5
**place** 2:4 52:23
53:4,14 54:22
55:6,11,12 99:22
100:1,3
**placed** 48:23 88:12
**places** 52:21
**placing** 85:19
**plaintiff** 13:22
**plaintiffs** 2:7 5:20
6:7 95:13
**play** 40:12 78:15
79:2,16,20 85:25
90:20
**played** 41:12 71:16
**playing** 79:3 80:21
81:5,24 82:22
**please** 49:17 60:6
82:24 86:3

103:25
**point** 6:22 43:10
48:16,24 60:16
61:23 65:19
68:20,22 70:15
78:17 85:4,22,25
86:6 88:15 89:10
89:12 90:14
95:20 97:4 98:1
100:13,17 101:16
102:16 104:25
105:7
**police** 12:11,25
13:13,15 14:6,9
14:20,21,23,25
15:1,14,25 16:1,8
16:14,16 17:9
18:13,19,21,23
19:8,9,15,23
20:11,23 21:3,21
21:25 22:7 25:10
27:1 28:20,25
29:21 30:15,16
32:24,25 33:2,14
33:15 35:17
48:19 73:11
93:20,23 98:22
99:21
**policies** 25:9,18,20
25:23 28:17
31:17
**policy** 25:11,15
26:3 59:13 60:24
**port** 80:19,23 82:7
101:14 102:13
**portion** 100:12
**position** 15:18 16:9
16:22,23,24 17:3
**positive** 39:8
**possible** 26:3
**possibly** 72:6
89:21
**powers** 16:15,20
18:2

**practice** 25:15
53:7,7 56:1,3
68:22
**practices** 26:4
28:18
**preparation** 9:14
10:2
**prepared** 9:11,12
**presence** 97:15
**present** 30:6 34:18
97:13
**pressing** 76:5
**pretty** 16:5 45:21
86:23
**previous** 22:20
**previously** 43:19
**Prime** 3:6 52:14
**prior** 102:4 103:16
**prison** 1:8 9:21
32:10,13 33:25
34:3,13 35:10,11
35:13 51:23
53:17 55:2,20,25
66:16 67:1 96:10
96:18 97:23 99:8
99:15 104:9,12
104:17,17
**prisoner** 53:20
54:1 59:13 60:20
60:20 61:6
**probably** 27:13
28:12 45:9 66:3,3
71:12 74:24 95:8
96:12
**probationary**
27:14
**problem** 53:21,22
**procedure** 6:6
25:25 59:13
**procedures** 26:4,6
31:17
**proceedings** 106:4
**process** 101:9
**produce** 31:3

39:15
**produced** 10:15,19
39:10
**professional** 1:13
1:22 26:17 27:7
50:11 106:13
**professionals**
97:22
**program** 27:21
28:2,4,4,11
**prohibitions** 99:22
**prohibits** 87:1,4,24
**promoted** 23:10
**promotion** 23:3,9
23:13
**promotions** 23:15
**protect** 45:10
**protocol** 25:25
**protocols** 26:4,6
28:17 31:17
**provide** 31:6 59:22
**provided** 10:11
94:17
**public** 1:14 15:17
15:18 16:3 17:15
17:17 18:1,5
21:13 25:7 74:9
106:14
**pull** 62:2 65:8
**pulled** 42:9 61:16
80:23 82:7
**pulling** 102:4
**pursuant** 1:11
96:24
**pushed** 59:4 61:4
61:10
**put** 45:4,18 63:10
64:2 68:23 69:4,5
70:14 76:22
86:24 88:9 98:16
**puts** 83:15
**putting** 86:17
**P.M** 105:15
**P.O** 2:10

CORP. CHRISTOPHER HAINES

Page 117

---

**Q**

qualified 103:22
question 6:5 7:15
7:21,22,23 8:5
24:24 25:22
30:21 31:5 36:12
38:2 40:19,22
41:1 47:14 49:10
49:15 52:10,12
52:12,24 53:8
54:25 55:15 56:8
60:11,13 62:25
83:25 85:18
86:18,25 96:16
97:13 99:5,12,20
103:23,25
questions 5:4 6:8,9
6:12 7:11 10:20
12:10 24:7 40:16
50:19,20 51:7,9
51:12,14 58:2
60:14 69:23,23
72:20,21,24
86:23 91:12,14
95:2,15,17,20,22
95:22,25 97:10
97:11,14,25 98:4
99:18 103:20
quick 86:24 99:20
quickly 61:15
63:23
quite 99:6
quotations 50:24
101:11
quote 33:23
quotes 63:10

---

**R**

R 106:1
racket 60:21
radio 20:10 37:5
38:1,9,19
rain 45:6,11 46:19
raise 40:18

rang 105:5
rank 23:12,13 25:4
42:18 51:22
reach 12:11 32:20
32:22
read 28:3 71:11
real 61:14 63:23
realize 10:5
really 6:9,19 36:13
60:24 62:25
rear 44:7 45:19
reason 9:10 15:23
21:10 35:2,6 49:6
56:24 73:15,24
79:20 98:25
recall 6:21 8:20 9:3
27:8,10,17 31:20
39:23 40:7,10
41:13,16,22
42:22 43:1,2,6,9
43:12,13,16
45:12,21 46:23
46:25 51:19,22
59:11,14,16,17
59:19 60:7,8,22
61:23 62:5 64:16
64:17 65:9,10,11
65:13,24 66:2
67:11 69:5,18
70:1,2,4,7,9,14
70:17 71:5 72:15
74:8,12 84:20
85:19,23 89:3,8,8
89:9,25 90:2,4,7
90:13,24 92:21
94:4,7 98:4,15
receive 11:13,16
17:11 18:7 19:14
19:17 23:17
31:24 37:17,23
38:10 41:5 52:5
54:6 73:7
received 11:22
21:15 23:3,4

32:18 37:6,16,21
52:16 54:19
80:13,13
receives 37:24
receiving 21:24
Recess 43:25 95:12
recognize 71:19
78:19 79:5,8
80:23 81:25 82:5
recognized 80:18
recollecting 93:18
recollection 6:16
84:17 89:17 93:9
Reconstruction
13:14 22:8
record 7:7 10:23
41:5 59:4 72:4
74:17 76:11,23
78:3,6,11 80:12
recorded 37:18,19
38:4,6,8,9,12
39:9
recorder 66:23
recording 59:2
66:24 77:4,22,25
recordings 77:1,6
records 30:19
recounting 37:22
reduced 28:2
refer 5:14 12:17,20
36:25 38:11
reference 13:11
29:2 75:4
referred 104:16
referring 9:19,23
58:18 61:11 76:4
refreshes 43:18
refusing 66:7
regard 34:4 47:4
52:3 53:12 54:8
73:6 86:12
regarding 28:3
29:10 31:18
38:18 47:17 54:7

72:10 74:20 77:4
Registered 1:13,22
106:13
related 77:5 93:20
relating 94:20
relay 43:20
released 91:2
101:12 102:21
103:15 104:6,18
remember 14:12
18:25 19:2 44:13
46:3,8,16 65:15
67:7 70:4,10,19
71:6,7 80:2 90:17
92:9 93:11,13
100:3
remembered 93:8
remembering 71:3
removal 85:5
removed 81:10
88:10,13 101:17
renew 103:19
repeat 6:4 7:13
report 10:19,21
25:1,5 38:13,14
38:23,24 39:5
91:25,25 92:4,8,9
92:14,21 93:2,5
reported 49:10
reporter 1:14 7:3,7
7:17 106:13,21
Reporters 1:22
REPORTING
1:22
reports 9:17 10:10
92:6 93:6 94:13
represent 5:19
79:17
representation
86:1
reproduction
106:19
request 60:1
requests 22:11

requires 28:23
reserve 20:16,18
reserved 5:4
reserves 20:8,21
residence 35:8
41:15 42:3 44:4,7
45:8
resident 13:2
resist 65:18
resisting 68:15
82:16,25 83:12
resource 22:6 27:4
resources 52:17
respects 22:22
respond 7:8,9
22:13 26:9 46:21
46:21 49:21
72:25,25
responded 36:21
37:10,13,15
responding 38:15
72:9 75:2,15,16
response 49:10
60:12 64:17 75:2
75:7,8,13,18
responsibility
53:20,25 54:3,5
54:13,15,18
101:6,8 102:22
rest 79:17,20
restroom 8:3
resume 72:19
retrieved 85:1
review 71:15 92:6
93:25 94:1,11,18
reviewed 9:13,16
10:2 93:23
reviewing 93:6
reviews 94:20
rewind 14:19
Richard 56:22,22
57:12,15,15 58:9
58:13
ride 27:20

---

**riding** 26:25
**right** 5:18 10:6
  23:23 27:18
  31:20 42:2,5
  44:13,20 48:12
  48:15 52:18
  53:22 57:20 62:5
  64:22 68:7 76:22
  83:21 84:6,8,14
  84:14,15,20 85:3
  87:16 88:21,25
  89:20 92:19,24
  95:3 105:10
**Riley** 1:4,5 2:3
  5:18 25:14 30:20
  44:18 45:1,2,7,8
  45:11,14,17 46:6
  46:11,21 47:17
  47:23,24 48:17
  48:21 49:9,19
  50:1,6,15 51:16
  51:21 52:11 57:4
  57:8 58:12,20
  60:9,10 63:24
  64:4,4,5,7,15
  65:5,10,25 68:14
  68:18 69:3,4,10
  69:15 70:7 71:3
  71:19 72:10,21
  78:3 81:10,16,21
  82:15,16,25
  83:12 85:5,10,20
  86:22 88:16
  89:12 90:2 91:4,7
  93:21 94:6,21
  96:6,15,24 97:6
  97:22 98:21 99:6
  101:2,15,15,22
  102:1,5 103:10
  103:13 104:8
  105:1,6
**Riley's** 56:10 69:2
  79:6 86:2 98:3,11
  98:17

**Riley@minceyfit...**
  2:6
**ringing** 76:7
**riot** 22:13
**Road** 1:23 61:1
**rode** 59:14
**role** 21:16
**roll** 101:21
**rolled** 61:19,20
**rookie** 33:9
**room** 64:23 65:4
  66:24 88:16,17
  89:16,22 90:8,17
  90:22
**Ross** 2:2,3 4:5 5:11
  5:18 10:12 12:13
  25:17 31:10,15
  39:2,11,20,21
  40:18 41:3 43:22
  44:1 55:3 56:18
  57:14,20 58:4,15
  59:21,25 60:4
  71:10 84:2,10
  91:9,13,16 94:24
  95:5,10,13 98:1
  99:11,19 100:6
  103:1,3
**rules** 6:2,6 8:8
  86:18
**runs** 28:4
**R.P.R** 106:13

_____
        **S**
_____
**safe** 54:18
**safety** 15:17,19
  16:3 17:15,17
  18:2,5 20:4 21:13
  25:7
**sally** 80:19 101:14
  102:13
**sat** 13:24
**satisfactory** 52:7
**save** 30:21 82:13
  82:23

**saved** 59:3
**saw** 46:6 48:14
  63:16 81:10,11
  86:7 87:12,14
  90:21 98:21 99:3
  102:5 103:5
**saying** 6:3 34:18
  37:6 40:3 43:16
  46:12 47:1 48:14
  51:23 53:24
  54:14 60:10
  62:22 65:9,10,14
  67:13,21 68:1
  69:17 70:2,7,9,14
  70:17,20 71:1,2,3
  71:4,5,6 74:21
  75:10 84:2 90:2
  99:13 103:4,5,11
  104:13,18
**says** 68:2,3 99:6
**scene** 16:18 27:3
  35:5 37:9 40:5
  41:24 42:15,20
  45:17,20 58:6,11
  58:11,16 74:9
  80:18 83:11
**school** 11:4,5,20
  16:10 22:6,7
**screen** 44:8,16
  83:19,19 84:1,6
  84:16 85:16
  87:17 89:13 90:7
  91:17
**scrubs** 90:12
**sealing** 5:2
**search** 66:4 83:13
**searched** 45:18
**seat** 57:19 60:23,25
**second** 33:11 42:17
  55:23 56:17 74:6
  80:22 81:6 82:4,5
  82:20 83:10
  87:15 103:18
**seconds** 74:18

  79:15,24 80:7
  81:9 82:12
**secure** 98:21
**security** 17:20 89:2
**see** 7:5 23:22 26:10
  36:4 41:11 44:17
  44:20,20 48:12
  63:21 71:17,21
  78:5 79:19,21
  80:8 81:22 82:18
  82:24 83:6,14,15
  83:17 84:2,3,8,13
  84:21 85:14 86:9
  87:2,5,7,10,16,19
  88:24 89:14,20
  91:17,23 95:2
  98:24,25
**seeing** 27:17 82:14
  83:10 85:19,23
  89:8,9 90:7
**seen** 28:5,9 58:24
  59:9 71:13 81:1,3
  81:20
**send** 39:18
**sends** 38:3
**senior** 33:12 44:10
**sense** 31:21 46:15
  53:21 69:24
  73:12 77:23
  103:11
**sent** 71:13
**separate** 15:3 24:9
  25:16 54:5,17
**separating** 25:16
**September** 23:12
**Sergeant** 25:6
  58:10,10
**served** 20:25
**service** 16:5,13,21
  17:3,8,24
**session** 6:5
**set** 87:18
**seven** 46:17
**sexual** 72:6,8,11,16

**shackles** 68:23,23
  68:25 69:3,4,5
  70:14 78:18,23
  84:22,25 86:12
  86:13,17 98:16
**shackling** 85:6
**shaking** 7:6
**shared** 102:15,17
  102:19 103:10,12
  103:17 104:3,5
  104:13,19
**shelf** 67:8
**shift** 51:23,25
  69:13
**Ship** 17:5
**Shiremanstown**
  20:13 21:1,8,11
  21:22
**Shiretown** 11:6,8
**shirt** 85:16
**shoes** 85:5
**short** 60:12 91:8
**shortcut** 56:19
**shortly** 90:21
**shot** 80:17
**shoulder** 76:22
**show** 56:15 69:8
  91:6
**side** 44:21 83:21
  84:14,15 87:16
  88:25 90:7
**sided** 62:24
**sign** 67:16,21,22
**significant** 93:15
**signing** 5:2
**simple** 45:22
**simply** 6:11 7:12
  47:7 50:7
**sir** 6:14 7:1 12:22
  17:10 19:16
  21:14 23:18
  27:19,23 41:8
  42:21 47:3 49:2
  85:21 86:4,9 91:5

CORP. CHRISTOPHER HAINES

94:12
**sit** 8:12,24 64:21
**sitting** 9:7 79:18
  102:8
**situated** 46:4
**situation** 36:10
  48:19,25
**situations** 29:7
**six** 15:7 20:22,23
**skyrocketed** 28:13
**slammed** 79:23
  80:3
**sledgehammer**
  37:8 40:4,6 44:21
**Smith** 48:14
**snapped** 42:24
  49:12,22
**somebody** 33:24
  39:10 50:10
  53:18 56:4 61:8
  79:5
**somebody's** 100:4
**son** 37:6 40:3
  49:19
**soon** 60:22 69:12
  91:1 92:15
  102:12
**sorry** 11:19 13:23
  14:15,17 44:20
  50:4 61:9 80:15
  86:22
**sounded** 75:23
  103:11
**sounds** 37:20
  39:15 79:11
**spark** 72:17
**speak** 37:4
**speaking** 34:16
**special** 21:15,23
**specialized** 24:18
  31:25
**specific** 6:10 25:19
  25:23 31:25 35:2
  52:21 97:11

**specifically** 6:18
  31:22 41:17 98:1
  103:5
**specifics** 103:7
**speculate** 6:19
**speed** 77:3
**spoke** 72:12 92:8
  94:1,4
**spray** 68:21 89:16
**sprayed** 69:6 89:7
  89:9,10,13
**squares** 83:21,23
**staff** 97:12
**stand** 61:13
**standing** 90:23
**stands** 23:23
**start** 10:22 15:6,7
  21:20 22:1 24:15
  24:16,17 25:17
  26:6 34:2 41:10
  58:2 59:24 64:4
  73:2 74:16 80:21
  81:9,14,24 82:22
  83:9 86:6 88:14
  88:23 89:19
  100:17
**started** 23:5 60:24
  79:23 80:2 92:6
**starting** 22:4 86:7
  88:4
**starts** 65:5
**state** 10:23 26:10
  28:22 30:23 31:3
  62:17 100:20
**stated** 32:14 41:23
  42:24 43:10
  69:15
**statement** 36:9
**statements** 64:8,8
  64:12,14
**States** 1:1 20:8
**station** 12:11
**status** 31:18 33:19
**stay** 45:7

**stayed** 45:11
**step** 45:2 99:1
**stepped** 69:19
  70:10,13
**stepping** 46:24
**stipulated** 5:1
**stood** 70:9 93:15
**stop** 20:20 41:10
  81:6,19 82:17
  83:5 88:24
**stopped** 79:22
  90:25
**stopping** 88:4 90:6
**stops** 90:21
**straight** 89:13
**street** 2:4,9,20 7:15
  13:16 24:3
**strictly** 34:16
**Strike** 22:12
**stuff** 93:13
**subject** 6:10 17:7
  18:4 19:20 61:25
**substance** 63:3,8,8
**sued** 93:13
**suitable** 55:11
**Suite** 2:5,15,20 3:4
**summarized** 40:25
**summer** 19:5
**supervise** 25:1,3
**supervision** 24:6
  106:21
**supervisor** 24:2,8
  33:13 48:13
  51:23 52:1 69:13
  100:22 104:5
**supervisors** 33:7
**supplemental**
  91:21 92:7
**supposed** 46:2
  67:17 100:4
**sure** 5:25 10:25
  13:12 21:22 23:6
  26:8 29:17,18,20
  31:11 37:3 39:7,8

39:14,25 40:2
  41:11,19 44:6
  50:19,21 52:11
  53:23 55:9 56:16
  57:12 59:1,8
  60:14 62:1,3,5
  66:1,4 67:4 69:7
  69:20,21 70:24
  73:10 88:19,22
  91:21 93:12
  96:12 104:2,7,8
  104:20 105:4
**suspect** 42:24
  43:10,14 73:8
  74:12 96:11
**suspected** 74:2
  96:6
**suspect's** 40:8 43:3
  43:7 99:23
**suspicion** 96:15,20
**suspicions** 74:4
**Susquehanna** 2:22
  13:1,3,12 14:8,10
  14:21 19:12 20:1
  22:1,4 23:3,5
  25:10 26:25
  33:15 76:16
  93:20,22 99:21
**Swanson** 2:17
  95:21
**switched** 20:2
  77:13
**sworn** 5:8
**system** 76:14 77:13
  77:18
**S-H-I-R-E-T-O-...**
  11:8

---

**T**

**T** 106:1,1
**tail** 98:13
**take** 7:18 8:2,6
  20:16 28:23 30:7
  31:23 32:9 33:17

34:12 36:18
  42:19 43:22
  45:14 47:5,22
  48:10,21 49:6,13
  50:6,10 52:22
  53:4,14 54:22
  55:2,6,12,20 56:6
  60:15 63:25 65:2
  71:8,10 72:24
  73:21 91:14
  94:24 95:1 97:19
  99:2 104:9
**taken** 1:11 8:11,18
  9:7 13:10 29:1,10
  29:12,16 30:10
  31:7,13 35:10
  43:25 55:18
  56:14 64:11
  68:15 74:2 78:3
  87:13 88:16
  95:12 105:7
  106:6
**talk** 7:19 69:16
  101:22
**talked** 12:18 27:6
  35:25 46:24 54:9
  73:13 77:1 78:21
**talking** 29:18
  48:23 65:21
  66:25 69:10,11
  70:12 77:18
  78:20 103:21
**talks** 50:23
**tape** 38:8 40:12,21
  41:8 43:18 49:3,4
  49:18
**tapes** 37:19
**taught** 27:10 33:4
  33:6 53:10,16
**Team** 13:14 22:9
  22:12 27:2
**tell** 12:13 21:18
  26:7 39:22 50:8
  50:18 60:6 61:23

CORP. CHRISTOPHER HAINES

Page 120

62:17 63:2 65:16
82:24 83:10
93:25
**telling** 39:23 41:13
41:17 43:2,6,9,13
**tells** 38:14
**ten** 5:24 13:11
95:10
**term** 34:22,24
55:21
**terminated** 104:5
**terms** 31:1 34:16
**test** 30:7
**testified** 5:8 104:2
104:24
**testify** 103:22
**testimony** 76:5
102:12
**tests** 30:3
**thank** 56:9 67:3
76:9 100:6,7
102:24 103:24
**thanks** 31:14 77:17
96:2
**thing** 10:18,19
20:6 44:17 54:16
59:22 71:13
**things** 6:20 25:16
36:14 50:9 65:19
86:17 96:6 99:6,8
**think** 13:23 14:4
14:15 25:22,23
26:16 29:15 32:3
34:25 35:4,15
36:7,13 40:22
41:1,23 42:13
47:25 49:7 52:23
56:20 57:24
58:15 59:5 60:1
60:14,16,16
64:24 66:11
68:14 72:14
73:21 74:6 75:17
75:25 76:3,9

78:18,19 84:6,10
100:20,20 101:18
103:13
**thinking** 23:7
72:15 97:3
**third** 31:4
**thought** 20:25 29:4
55:24 56:13 63:4
79:4 89:11,12
97:6 98:22 103:9
**three** 20:14 21:2
29:8 42:9,14 44:6
56:20,20 62:14
63:22 68:16
79:24 80:6 82:8
82:25 83:12
91:10
**till** 23:11
**time** 5:5 6:2,23 7:9
8:2 12:16,17 13:2
15:11 17:12 23:2
29:16 30:21
33:10 34:8 42:7
42:18 44:25 45:1
45:3,5,5,16,23,24
46:5 47:1,21
48:23 59:3 60:12
62:15 64:3 67:5
72:15 74:22
78:24 80:22 81:3
82:13,23 84:24
85:20 87:19
89:11,15,23 90:3
92:22 93:15 96:2
98:6,17,19 99:20
100:7 103:25
**timeframe** 42:10
**times** 16:4 26:19
33:21 34:11
62:12 67:10
70:19 89:1
104:16,24
**title** 15:17 19:7
22:24 23:4 50:22

**today** 8:13 10:3
22:24 29:19
64:21,22 74:24
75:5 76:16,18
93:4 100:7
**today's** 6:2 8:24
9:11,14
**told** 24:14 27:15
41:22 42:22 43:1
43:19 49:5,25
52:5,18 54:19,21
55:5,10,16 56:2
60:21 72:11 76:1
92:8 97:5,17,21
101:3,25 102:19
104:6
**tonight** 42:24
49:22
**top** 22:16 83:22
98:11
**touch** 61:21
**town** 11:7 12:8
16:13 17:5,9
**Township** 13:1,3
13:13 14:8,10
16:8,13 17:9
18:24 19:2,8,12
19:15 20:1,14
21:9,22 26:25
33:15 76:16
93:22
**traffic** 16:18
**train** 22:5 30:14
**trained** 53:3,6
**training** 21:24
22:5 24:17 25:15
27:14 29:6 30:15
30:18,24 31:3,25
32:17 33:7,14
52:5,14,17 53:13
53:16 54:6,19
73:7,12
**transcript** 106:8
106:19

**transfer** 100:18
**transferred** 100:13
101:18
**transmission** 39:3
39:4
**transmissions** 38:9
38:19 39:12
**transport** 74:10
96:10,18 99:5,7
**transported** 99:14
105:2
**transporting** 63:13
63:16
**treat** 73:8
**tree** 45:10 46:25
**trial** 5:5
**trigger** 95:23
**trouble** 69:1
**try** 6:4 39:17 56:18
84:4 98:20
**trying** 7:18 25:23
36:7,13 65:8 66:4
68:19 83:13,24
98:16 103:12
**tugged** 44:16
**turn** 67:10,13 77:6
77:7,14,21,22,23
95:14
**turned** 10:8,13,13
10:18 67:6,12,19
**turning** 67:8,11
77:23 78:1
**two** 16:4 18:22
20:14 21:2 29:8
37:14 42:2,5,9,11
45:1,25 57:6,14
57:15,17,21
62:14 65:3 66:11
66:12 82:1 91:10
**type** 9:2 17:7 19:20
20:4,17 21:16
26:11 35:9 50:14
52:5 57:13 70:21
97:1

**types** 29:12
**Ty'rique** 1:5 46:6
46:21 47:10,17
47:22,24 48:17
50:1,6 51:16,20
56:9 58:19 60:9
65:25 69:15 70:7
71:3,19 72:10,21
74:20 78:3 79:6
81:10,16,21
85:10,20 86:2
90:2 91:4 93:21
94:21 103:10
105:1,6
**Ty-rique** 65:10

---
**U**
**Uh-hum** 36:1 68:7
**underneath** 45:10
**understand** 6:3
7:10 8:8 9:5
12:21 25:22
36:20 46:10,12
46:14 49:15
52:10,12 66:21
70:1 75:3,18,25
92:13 104:7
**understanding**
31:12 52:24
70:25 71:2
**understood** 7:14
8:7 103:24
**unit** 1:23 20:10
57:2
**United** 1:1 20:8
**unnecessary** 98:23
**unusual** 99:13
**updated** 38:16
**updates** 28:23
29:22,23 73:11
**use** 8:3 26:2,22
27:3 29:7,19,25
30:5 32:12,21
33:1,4 50:23

CORP. CHRISTOPHER HAINES

52:17 55:21,21 65:20 67:9 101:11
**uses** 76:16
**U.S** 20:17,21

**V**

**V** 2:3
**vehicle** 13:16 56:24 61:17 64:9 64:12 67:18,25 68:6,10 71:25 77:4 78:4,13 80:23,24 81:10 81:11 101:15,18 102:8
**verbal** 7:4
**verbally** 7:8 46:22 65:21
**versus** 35:1
**veteran** 20:7
**video** 9:21 57:6,11 57:24 58:16,20 58:23,24 59:9,22 59:23,24 60:1,15 62:6,7 66:1,8,9,9 66:11,13,19 69:7 71:9,14,16 72:19 74:16 75:8 78:9 80:8,11,21 81:1 81:14,19,20,21 81:22,22 82:17 82:18,22 83:6,6 84:12 85:8,14 89:9 90:5,21,24 92:6 97:25 98:9 98:15 102:5 103:6
**videos** 9:17,18 56:15 57:22,23 58:17 66:13 78:5 80:13,16 93:4,6
**view** 62:16 82:3 83:7

**viewed** 38:24 62:7 62:12,15 81:6
**views** 66:12 84:15
**violence** 96:25 97:1
**vividly** 44:13 93:8 93:11
**voice** 66:23 78:19 79:5,6,8
**voices** 46:9
**volunteer** 16:22
**vs** 1:6

**W**

**W** 2:9
**waiting** 102:9
**waived** 5:3
**walk** 23:2 63:24
**walked** 44:7 63:23 66:23 90:6
**walking** 44:18 46:25 64:4 84:21 101:7
**want** 7:9 10:21 20:25 25:17 27:5 31:22 33:16 35:1 36:8,18 41:5,20 56:15 59:18 60:3 68:25 70:24 71:8 71:8 75:22 76:10 78:2,2,5 86:24 93:1 95:6 96:4 104:6
**wanted** 16:1 31:11 36:4 67:2 72:3 73:1,2 78:22 84:3 84:18
**Warden** 1:7
**wasn't** 46:5 59:23 59:24 63:15 65:7 73:1,17,19 90:19 93:17
**watched** 66:8,13 66:14

**way** 16:6,17 19:11 20:7 37:18 38:4 46:22 62:18
**weapons** 66:5
**wear** 90:11
**Wednesday** 1:12
**week** 21:9
**weekends** 20:24
**weeks** 20:13,14 21:2 94:7,9
**went** 11:12 17:14 18:21 20:14 21:6 45:8 47:12
**weren't** 66:5
**West** 2:20,21
**we'll** 39:19 63:10 79:3 91:15 95:11
**we're** 5:25 21:23 29:18 31:8 65:1 67:9 74:7,17 75:20 77:18 78:4 78:6 79:2,16 80:7 81:12 83:9,24 91:25 95:13
**We've** 91:8
**Wilkinson** 57:15
**Wilson** 42:12,16 42:19 44:9,14,16 44:24 45:7,13 46:20 47:4,9,16 47:22 56:22 58:13,13
**window** 61:19,20 101:21
**wiping** 46:3
**witness** 4:1 13:18 13:21 14:1 88:5 105:14
**word** 35:4,10,13 35:16 53:22 54:3 65:20 104:19
**words** 46:14 67:9
**work** 30:17 38:7 58:25 96:18

**worked** 20:12
**worker** 28:15
**working** 20:24 27:3
**wouldn't** 40:14,23 72:25
**writing** 28:3
**written** 25:15 27:7 27:9,17 29:24
**wrong** 14:18 55:25
**wrote** 93:3,5

**Y**

**yards** 61:1
**Yeah** 47:25 56:9 57:16 58:15 79:14 84:10 87:19
**year** 11:15,19 14:12 15:4,6 19:4 19:13 20:22 28:1 28:1,25 30:16
**yearly** 28:23 29:22 29:23 73:11
**years** 5:24 13:11 14:11 20:23 26:13 29:1,9 30:1 30:6 33:8 34:9 63:1 93:12
**yo** 60:10,13 72:24 72:24
**Yoder** 3:3 95:24 96:1

**Z**

**Zoom** 1:10

**0**

**08034** 1:23

**1**

**1/10** 92:11
**1:06** 84:23
**1:22** 86:7
**1:26** 95:5

**1:29** 86:7
**1:30** 81:12 86:10 95:6
**1:33** 86:11
**1:42** 85:3
**1:52** 105:15
**1:55** 82:24
**10** 21:9 45:9 69:20 70:11 75:21 91:23 92:1
**10:10** 1:12
**100** 2:15 3:4 4:7 88:18 103:14
**11:27** 43:23
**1175** 1:23
**12:13** 78:9
**12:40** 78:13,16 79:23 80:3
**1235** 57:3
**1245** 2:10
**14:17** 79:3
**14:37** 79:11
**15** 21:9 30:1 45:9 69:20 70:11
**15:30** 79:12,22 80:5
**15:32** 79:16
**1650** 2:4
**17011** 2:15 3:4
**17108** 2:10
**18** 9:23 12:19 22:19 24:22 37:2
**18th** 29:13
**19103** 2:5
**19382** 2:21
**1975** 11:3
**1994** 11:21 16:6 20:7
**1996** 11:18 16:2
**1997** 15:21 16:3
**1999** 15:12

**2**

**2** 79:24 80:6 82:13

CORP. CHRISTOPHER HAINES

**2nd** 11:3
**2:07** 81:15
**2:28** 82:17
**2:32** 83:5
**2:33** 87:9
**20** 26:13 29:1
  91:24
**200** 2:20
**2000** 14:16 15:5,22
  18:15 19:5 20:8
  40:1
**2001** 14:17,19
  19:13 23:8
**201** 2:15 3:4
**2012** 23:9
**2012-2013** 23:11
**2013** 23:10
**2019** 9:23 12:19
  22:19 24:22
  29:13,16 37:2
  76:20 77:19
**2021** 14:14,15
  23:12
**2022** 1:13 91:23,24
  92:1,3 93:7
**21** 14:11 34:9
  93:12
**2100** 40:1
**215** 1:24
**215)550-1995** 2:6
**22** 92:11
**225** 2:9
**23** 83:9
**233-6633** 2:11
**24** 8:11,15,19
**24/7** 17:20 59:3
**2460** 1:23

**3**

**3:27** 87:16
**3:32** 87:10
**3:33** 88:4
**30** 96:22
**3600** 2:5

**4**

**4th** 68:17 83:14
**4:20-CV-00325** 1:6
**4:27** 88:5,14
**4:41** 88:15,23
**40** 82:5 96:22
**433** 2:20
**45** 74:17
**463-1014** 2:21
**484** 2:21

**5**

**5** 4:5 44:19
**5:14** 88:24 89:19
**50** 79:24 80:6
  96:13 97:3
**55** 80:22
**58** 81:9

**6**

**6** 30:5 74:17
**6:06** 89:20
**6:29** 90:6,20
**6:45** 74:17
**651-3529** 2:16 3:5

**7**

**7** 30:6 44:19
**717** 2:11,16 3:5
**735-8101** 1:24
**75th** 14:25

**8**

**82** 59:6
**83** 59:6

**9**

**9** 1:12
**9:42** 75:12
**911** 37:6,19,22,23
  37:24,25 38:8,14
  39:9,9 40:12,20
  40:24 41:2,8,12
  43:18 49:3,4,18
**94** 17:4

**96** 4:6
**97** 17:4
**99** 15:5,10 18:15