

# Dauphin County CID - Confidential

2 South 2nd Street 3rd Floor
Harrisburg PA, 17101
717-780-6200

Case Number: 19-0000136 ORI #: PA0222600

**Narrative(s)**

Assigned: 7/2/2019 14:50 to officer: WALBORN, BRAIN
Approved: by: ,

**7-1-19**

At 1548 hrs Sgt. **Todd Johnson** called me and informed me that a Dauphin County Prison (DCP) inmate named **Tyrique Riley** (victim) passed away at the Harrisburg Hospital. Sgt. Johnson said that the victim was taken from DCP to the Harrisburg Hospital on 6-26-19. Sgt. Johnson informed me that he will attend to autopsy tomorrow morning while I should start my investigation.

**7-2-19**

At 0700 hrs I started obtaining information and reports from DCP about the incident.

I then discovered that the victim has no criminal history.

I then discovered that the victim was arrested by Susquehanna Township Police Department (SUS) for Aggravated Assault on 6-18-19 where he struck his father, **Thomas Matthews-Kemrer** with a sledge hammer repeatedly. The Matthews-Kemrer told SUS that he was awoke by the victim standing over him holding a sledge hammer. The victim was mumbling something nonsensical. Matthews-Kemrer said that he was scared he was about to be killed. Matthews-Kemrer jumped up and began to struggle with the victim. Matthews-Kemrer was struck several times with the sledgehammer by the victim.

Matthews-Kemrer was transported to Holy Spirit Hospital medical treatment. At this location Matthews-Kemrer told a SUS Police Officer that the victim was acting paranoid and that people in the neighborhood were coming to kill him. The victim was acting erratic and very strange.

On 6-18-19 at 0510 hrs SUS transported the victim to the Dauphin County Booking Center. At the Booking Center, the victim was non-compliant and eventually taken to the floor and sprayed with mace. The victim was handcuffed and shackled. He was placed in room 132 and checked by medical staff. The victim remained in handcuffed and shackled until his behavior dictates that the handcuffs can be removed.

On 6-18-19 at 0912 hrs the victim was arraigned by District Justice (DJ) **James Lenker** who set bail at $20,000.

On 6-18-19 at 0920 hrs the victim began to hit his restraints against the glass window of his cell door. Booking Center Correctional Officers (CO) entered room 132 and ordered to sit on the bench to remove his handcuffs so a waist belt could be applied so he could not his the glass window on his door with the handcuffs. The victim refused and minimal use of force was used to sit the victim down. The transfer from handcuffs to a waist belt was accomplished. The victim was checked by medical staff.

The victim was not processed (finger printed and photograph) for his charge of Aggravated Assault due to his uncooperative and non responsive behavior.

On 6-18-19 at 1039 hrs, the victim was transported to DCP. The victim was placed on a Level 1 Suicide Watch in cell A-1-5 due to his behavior.

On 6-26-19 it was determined that due to the victim's continuing behavior, he needed to be transported to Harrisburg Hospital for an evaluation.





DCP Correctional Officers (CO) had to change the victim from his suicide prevention clothes (smock) to a regular DCP inmate uniform to leave DCP.

CO's entered the victim's cell and requested the victim to change clothes which the victim did not respond.

The CO's attempted to change the victim's clothes but a struggle began with the victim being taken to the floor. The victim was handcuffed and shackled.

A restraint chair was request and with the arrival of it, CO' placed a spit shield on the victim and the victim was placed in the restraint chair. Once the victim was in the restraint chair and secured, the victim went limp. The victim appeared not to be breathing and he was rushed to the DCP Medical Ward where life saving attempts were preformed.

With the arrival of Life Team EMS, they took over medical care and transported the victim to Harrisburg Hospital.

I then discovered that inmates in cells on either side of A-1-5 were **Sean Reiley** and **Joshua Marion** in A-1-4 and **Thomas Dopp** in A-1-6.

At 1102 hrs I met with Dopp. Dopp informed me that he arrived in cell A-1-6 on 6-22-19. He said he knew the victim was in cell A-1-5. The victim seemed angry and slammed his door a lot. Dopp does not recall anything occurring in cell A-1-5 on 6-26-19. A recorded statement was obtained (see transcribed copy).

At 1122 hrs I met with Marion. Marion informed me that he entered cell A-1-4 on 6-24-19. He informed me that he heard the inmate in cell A-1-5 constantly screaming and yell "help, let me out of here", the inmate would bang on the door a lot and be in a weird state of mind. Marion did hear CO's say to the inmate that they were taking him somewhere, they were here to help him and to get him dressed. Marion added that prior to 6-26-19 the inmate would yell an hour at a time where other inmates would tell him to knock it off. A recorded statement was obtained (see transcribed copy).

At 1151 hrs I met with Reiley. Reiley informed me that he came into DCP on 6-25-19 and was adamant that he does not recall anything happening on 6-26-19 in cell A-1-5. No recorded statement was obtained.

I then obtained Booking Center when the victim was there on 9-18-19 from 0511 hrs to 1039 hrs. I then obtained DCP video of the incident on 9-26-19 from 0818 hrs to 1049 hrs.

A synopsis of both videos were completed (see attached documents).

At 1330 hrs Sgt. Johnson who attended the victim's autopsy gave me 3 evidence bags containing blood, and nail scrapings. These were secured in our evidence refrigerator. Sgt. Johnson also provided me with a CD of photographs he took at the autopsy.

**7-3-19**

I discovered that the CO's who entered the victim's cell on 6-26-19 to remove the victim's smock and have him changed into a DCP uniform were **Matthew Danner** and **Steven Singleton**.

At 0916 hrs I interviewed CO Singleton





CO Singleton informed me that he assigned with CO Danner to transport the victim for an examination at a hospital 6-26-19. They entered cell A-1-5 and informed the victim to change clothes. With no response, the CO's attempted to change the victim's clothes but a struggle started. The victim was eventually shackled and handcuffed behind the back. The restraint chair was requested and upon its' arrival, the victim was placed in it. At this point the victim became unresponsive. CO Singleton said at no time did he or any other CO strike, kick, punch, choke or pin the victim against a solid object. A recorded statement was obtained (see transcribed copy).

At 1033 hrs I met with CO Sgt. **Scott Lewis**.

Sgt. Lewis informed me that he was working the "intake lobby" on 6-26-19 when he accompanied Capt. **Andrew Klahr** to cell A-1-5 at the request of other CO's since the victim refused to change into DCP clothes for his transport to the hospital. As Sgt. Lewis was approaching cell A-1-5, he heard CO Danner stating "stop grabbing my hands" repeatedly. Upon his arrival. Sgt. Lewis saw CO Danner bent over the victim holding the handcuffs which were on the victim. Capt. Klahr spoke with the victim and asked for the restraint chair. Upon the arrival of the restraint chair, a spit shield was placed on the victim. As the victim was being brought out of the cell, Sgt. Lewis went to the rear of the restraint chair. As the victim was being placed in the restraint chair, Sgt. Lewis felt the victim twisting his body and heard a unknown CO yell for the victim to stop kicking. At this point Sgt. Lewis applied a Hypoglossal Pressure Point to the victim. Sgt. Lewis did this in the hope to gain compliance from the victim to stop kicking. Sgt. Lewis added that as he controlled the victim's head his hands were only at the Hypoglossal nerve and he would only apply pressure when needed and that would only be for approx. 1 second. Sgt. Lewis informed me that he had control of the victim's for less then a minute. Once the victim was secured in the restraint chair, Sgt. Lewis went to transport the victim when they noticed the victim head roll back and not responsive. Capt. Klahr called a "Medical Emergency" and took the victim to the Medical Ward. Sgt. Lewis returned to his duties at the "intake lobby". A recorded statement was obtained (see transcribed copy).

At 1143 hrs I met with CO **Keith Hoffman**.

CO Hoffman informed me that on 6-26-19 he was working A block. CO Hoffman knew the victim would be leaving DCP on a transport and saw CO Danner and Singleton go to cell A-1-5. CO Hoffman heard verbal commands given to the victim to go to the back of the cell and to change clothes 3 to 4 times. CO Hoffman was sitting at a desk near the front of the cell block so he left the desk and walked to cell A-1-5. Upon his arrival, he noticed CO Singleton and Danner attempting to get the victim dressed. CO Hoffman entered the cell and attempted to assist CO's Singleton and Danner in dressing the victim. The attempts failed due to the victim resistance, struggling and kicking. The victim was taken to the floor and CO Hoffman shackled his legs. With the arrival of Capt. Klahr, CO Hoffman left the cell and returned to the desk to finish completing his paperwork. CO Hoffman than only saw the victim being placed in the restraint chair. A recorded statement was obtained (see transcribed copy).

**7-5-19**

At 0900 hrs I met with CO Danner.

CO Danner informed me that he was requested along with CO Singleton to transport the victim to a hospital. Both CO's proceeded to cell A-1-5 with DCP clothing which the victim will have to change into since he is currently in a smock at this time. The CO's also brought a handcuff belt and shackles. The victim was standing at the door facing the door. The victim had white foam around his mouth. The victim was instructed to move to the back of the cell which he did but just a little. The cell door was opened and the CO's entered with CO Danner instructing the victim to move further back. The victim mumbled something (unknown what) but complied. CO Danner ordered the victim to remove his smock but the victim did not respond verbally or physically. CO Danner again ordered the victim to remove his smock and that they (CO's) were taking the victim to a hospital. The



**Dauphin County CID - Confidential**
2 South 2nd Street 3rd Floor
Harrisburg PA, 17101
717-780-6200

Case Number: 19-0000136 ORI #: PA0222600

smock was removed with CO Danner and Singleton assisting the victim. The DCP uniform was offered to the victim while at the same time instructed to put on the DCP uniform. The victim did not respond verbally or physically but just stood there with a blank stare. CO Danner repeated his request with the DCP uniform extended towards the victim. At this point the victim grabbed CO Danner's hand. CO Danner reversed the grip and along with other CO's, attempted to dress the victim. They were successful in getting the shirt over his head but the victim was able to remove it. A struggle in dressing the victim was becoming unsuccessful and it was determined to take the victim to the floor. In attempting to handcuffed the victim was difficult due to the victim contorting his body, grabbing CO's and keeping his hands away from the CO's reach. The victim was eventually handcuffed behind his back and shackled. A Captain was requested and upon his arrival, CO Danner placed a spit shield on the victim. CO Danner then remembers the order to place the victim in the restraint chair. Unknown CO's picked up the victim and placed him in the restraint chair. Once in the restraint chair, the victim was kicking and putting his shoulders on the back of the chair and arching his back to resist being restrained. CO Danner pushes the victim's hips into the seat portion of the chair so the restraints can be secured. Once the victim was secured, someone inquired if the victim was breathing. CO Danner looked at the victim and his head fell backwards. 2 CO's gave the victim a sternum rub but the victim did not respond. Due to being so close to the Medical Ward, they took the victim there via the restraint chair. In the Medical Ward, CO's and medical staff performed CPR and used the AED to treat the victim. Once local EMS arrived, they took over medical treatment. Per CO Danner, when they transported the victim to the hospital, he did accompany them in the ambulance. There was no CPR during the transportation of the victim due to them obtaining a heart beat. A recorded statement was obtained (see transcribed copy).

At 1102 hrs I met with Capt. Klahr.

Capt. Klahr informed me that he was Shift Commander on 6-26-19. He was in a meeting when he was informed that the victim would have to be transported to a hospital for an evaluation. Capt. Klahr confirmed this and returned to his meeting. At approx. 0945 to 0950 hrs Sgt. Lewis entered the meeting to inform him that there was a problem with the victim not changing into his DCP uniform. Capt. Klahr and Sgt. Lewis walked to A block and once on the block Capt. Klahr did not hear anything coming from cell A-1-5. Upon their arrival at said cell, Capt. Klahr saw the victim stomach down on the floor with his head towards the rear of the cell. CO Singleton was standing at the victim's feet with CO Danner standing beside the victim around the victim's shoulder area. CO Danner was holding the handcuffs that were on the victim. Capt. Klahr enters the cell and tells the victim that they are here to help you, take you to the hospital and the victim needs to change his clothes. Per Capt. Klahr, the victim mumbled something but Capt. Klahr could not understand it. At this point, the victim spits something towards CO Danner's feet and grabs at CO Danner's arms. Capt. Klahr calls for the restraint chair which arrived approx. 2 minutes later. With the arrival of the restraint chair, Capt. Klahr had a spit shield placed on the victim. Capt. Klahr and CO Singleton stood the victim up and CO Singleton and an unknown CO attempted to place the victim in the restraint chair. At this point the victim began to kick repeatedly. Capt. Klahr saw Sgt. Lewis apply the Hypoglossal Pressure Point to the victim. Once the victim was restrained in the restraint chair, Capt. Klahr placed the smock over the victim due to him being naked. Per Capt. Klahr, he noticed the victim's body become relaxed so he checked to see if he was breathing. Capt. Klahr and Sgt. **Keith Biter** attempted sternum rubs to see if the victim would react but received negative responsive on both attempts. Capt. Klahr called a medical emergency but decided to move the victim to the Medical Ward since it was so close then to wait till Medical Staff respond to them. They moved the victim to the Medical Ward where CPR and the AED were administered until EMS arrived. EMS personnel took over treatment and transported the victim to a hospital. A recorded statement was obtained (see transcribed copy).

At 1200 hrs I met with Sgt. Biter.

Sgt. Biter informed me that he was working on 6-26-19 in the Booking portion of DCP when CO's Danner and Singleton told him that they had to do a hospital transport. Due to the victim being in the smock, both CO's went





to A block to have the victim change into a DCP uniform. The next thing Sgt. Biter knows is that the restraint chair is being requested on A block. Sgt. Biter obtained the restraint chair and went to cell A-1-5. Upon his arrival he could barely see into the cell due to a lot of CO's already in there but he was able to see for a moment that the victim was on his right side on the floor. Sgt. Biter could not tell if he was handcuffed or shackled. An unknown CO asked for a spit shield and Sgt. Biter retrieved one from the restraint chair and handed into the cell. Sgt. Biter does not know who placed the spit shield on the victim. Sgt. Biter next observes the victim at the cell door and he was handcuffed behind the back and shackled. Sgt. Biter assisted placing the victim in the restraint chair. Sgt. Lewis applies Hypoglossal Pressure Point due to the victim's resistance to prevent getting the restraints of the restraint chair into place. Once the victim was restrained in the restraint chair, they started to move the victim when Sgt. Biter noticed the victim's head fall backwards. Sgt. Biter felt the victim's chest and they took him directly to the Medical Ward where CPR and the AED were used. A recorded statement was obtained (see transcribed copy).

At 1252 hrs I met with CO **Tami Donovan**.

CO Donovan informed me that she was on vacation from 6-14-19 to 6-26-19 which 6-26-19 was her first day back to work.

On 6-26-19 CO Donovan started her shift at 0600 hrs on A block. As part of relieving the previous CO, the CO being relieved would walk the block with the relief CO (CO Donovan) and explain and special duties. As CO Donovan was walking the block with the relieving CO, she noticed the victim was in his cell and he was "clucking like a chicken" and naked. CO Donovan assumed her responsibilities and due to the victim being on a Level 1 Suicide Watch she checked him every 10 minutes and noticed dry white stuff around his mouth and thought that the victim was not drinking. During "Pill Call" CO Donovan assisted in getting the victim dressed in his smock. Medical Staff were there and gave him some pills and a small cup of water. The victim took the pills and when he put water in his mouth, the water and pills came back out as if he did not swallow either. The next thing CO Donovan noticed was that CO Danner and Singleton were in cell A-1-5 with the victim. CO Danner said to the victim that he needs to get dressed with CO Donovan saying the they are taking you to get help. CO Donovan said that they took off the victim's smock with CO Danner, Singleton and Hoffman trying to dress the victim in a DCP uniform. This occurred while all were standing. CO Donovan asked CO Danner if she should notify the Shift Commander and CO Danner said yes. CO Donovan left cell A-1-5 ran to A/B Control to have them call for the Shift Commander. CO Donovan returned to cell A-1-5 and noticed the victim on his stomach and his head towards the rear of the cell. Shackles were on the victim but he was not handcuffed. The victim was resisting being handcuffed and then next thing CO Donovan remembers is Capt. Klahr arriving with Sgt. Lewis telling the female CO's to leave the area because the victim was naked. CO Donovan leaves the area and goes to front of A block. CO Donovan does observe the victim resisting while being placed in the restraint chair but really did not pay attention as far as who did what. The next thing CO Donovan remembers is Capt. Klahr calling a Medical Emergency and the victim looking like he passed out. The victim then was transported off of A block in the restraint chair. A recorded statement was obtained (see transcribed copy).

**7-8-19**

At 0843 hrs I met with Sgt. **Ann Hess**.

Sgt. Hess informed me that her primary function is Central Control but she would also relieve CO's for their lunch breaks and other duties. Between 6-18-19 and 6-26-19 Sgt. Hess had contact with the victim due to relieving A block CO's for their lunch breaks or other duties. Sgt. Hess said that she never had a conversation nor did she ever hear him speak. Sgt. Hess added that she would do her 10 minute checks on the victim due to his Level 1 Suicide Watch and the victim would always be standing at the door or lying on his bunk. Sgt. Hess never feed the victim nor took back his food but she did hear a rumor that he was not drinking. On 6-26-19 Sgt.





Hess came onto A block to relieve CO **Angela Swanson** for her lunch break. Sgt. Hess knew CO Danner and Singleton were going to transport the victim and they had to change the victim's clothes. Sgt. Hess saw CO Donovan at cell A-1-5 and walked to said cell. Upon her arrival she saw the victim laying on his right side on the floor with his head towards the rear of the cell. CO Danner was kneeling but unsure where, CO Singleton was standing beside the victim with CO Hoffman standing at the victims feet. All CO's were trying to control the victim due to his resistance (contorting his body) but Sgt. Hess can not recall if the victim was handcuffed or shackled. Someone said to get Capt. Klahr and Sgt. Hess went to the front of A block to get Capt. Klahr. Capt. Klahr came onto the block with Sgt. Lewis and said to get the restraint chair. Sgt. Hess goes to get the restraint chair but Sgt. Biter was all ready en route with it. Upon Sgt. Biter's arrival, Sgt. Hess holds A block gate open for him. Sgt. Hess proceeds to cell A-1-5 with Sgt. Biter and the restraint chair. Someone asks for a spit shield. Sgt. Lewis then tells all female CO's to leave because the victim is naked. Sgt. Hess. CO's Donovan and Swanson leave the area. From the front of A block, Sgt. Hess can see the CO's put the victim in the restraint chair but the next thing she can remember is the victim's head falling backwards and Capt. Klahr calling a Medical Emergency. The victim was removed from the block with Sgt. Hess remaining on the block. A recorded statement was obtained (see transcribed copy).

At 1048 hrs I spoke with Psychiatrist Dr. **Robin Miller**. I discovered that Dr. Miller requested that the victim been seen at a hospital due to his behavior after she received a telephone call from **Susan Deloe** of Prime Care at DCP.

This is the hospital transport CO Danner and Singleton were tasked to complete.

Dr. Miller informed me that she knew the victim was on a Level 1 Suicide Watch, the victim would not answer intake questions (medical or mental) from 6-18-19 to 6-26-19 at DCP. The victim was non responsive, refusal of medications and psychotic behavior all contributed to Dr. Miller's decision to have a hospital evaluation completed on the victim.

DCP Director **Roger Lucas** informed me that on 6-28-19 he spoke with Matthews-Kemrer via telephone. Matthews-Kemrer inquired if he could see the victim at the hospital. In further conversation, Matthews-Kemrer told Director Lucas that the victim was at a party prior to the victim assaulting him. Matthews-Kemrer said that his son was not acting right and Matthews-Kemrer feels that someone may have slipped something into his drink at the party. Director Lucas completed a report to this conversation. (see attached copy for further details).

**7-9-19**

At 1126 hrs I discovered that the victim did not make any telephone calls nor did he receive any visits from 6-18-19 to 6-26-19. It is DCP policy of no visits while a person is on A block which is a classification block. Once a person is classified and moved to another block, they then can receive visitors.

At 1206 hrs I met with **Kasandra Betancourt** of Prime Care at DCP. Present also was Prime Care Attorney **Thomas Weber**.

Betancourt informed me that on 6-18-19 at approx. 0900 hrs she was called to the Booking Center to medical clear the victim for incarceration due to an injury to his right wrist. The injury was a minor laceration. Betancourt informed me that the victim would not answer her questions and only would state repeatedly "Bra, I didn't do it". Betancourt said that she could not do his DCP medical intake due to his hostility. The victim kept trying to break out of his waist belt handcuffs, would not remain seated and would not respond to questions. In Betancourt's opinion, it appeared that the victim was on some type of drug due to his aggressiveness and extremely non responsiveness which is indicative of some type of hallucinogenic drug.





Betancourt said that this evaluation only took 5 to 6 minutes and due to the victim's actions, she classified him as a "Level 1 Suicide Watch".

At 1243 hrs I met with **Susan Irvine**.

Irvine is the Dauphin County Treatment Coordinator for the Mental Illness Substance Abuse (MISA). Irvine knew the victim had some type of mental health issues and went to visit him on 6-26-19 at approx. 0930 hrs to complete his "intake". The victim was naked and had trouble standing. Irvine smelled an odor of urine. Irvine asked a couple of questions and received a response of "Riley" and "I did a really bad thing". Irvine said that the victim's skin appeared to be pale in color. Irvine obtained the attention of a male Prime Care nurse on the block and told him that the victim did look well. The Prime Care nurse came over and attempted to give the victim his medication. They gave the victim his medication and water but the pills and water came back out of the victim's mouth. Irvine added that there was white foam around his mouth. The Prime Care nurse said that the victim looked dehydrated. The Prime Care nurse said he should be seen by Medical Staff. Irvine went to medical and told "Dawn" that the victim needed to be seen. It was decided to have the victim brought to the Medical Ward. Irvine took a wheel chair to the victim and CO's put the victim in the wheel chair. The victim was taken to the Medical Ward. Once in the Medical Ward, the victim began bucking the wheel chair backwards. Nurse "Dawn" and "Susan" attended to the victim. During the treatment, the victim resisted the Medical Staff's examination. The victim did state "I don't my male parts taken away from me" and pulled up the smock he was wearing and looked at his genitals to insure that they were still there. Irvine left the area and when she returned, the victim was not there and was told he was returned to his cell. Irvine was satisfied that the victim was in the hands of the Medical Ward. A recorded statement was obtained (see transcribed copy).

At 1330 hrs I met with CO Swanson.

CO Swanson informed me that she works a permanent shift of 6-2 and an assigned to A block. CO Swanson knew of the victim in cell A-1-5. Between 6-18-19 and 6-26-18 CO Swanson had contact with the victim at feeding time. CO Swanson would attempt to talk to the victim but he would not talk to her, the victim would stare at CO Swanson. CO Swanson said on 6-25-19 or 6-26-19 the victim yelled out his door "peanut butter and jelly" and something else unintelligible and she was surprised that it was the victim speaking. CO Swanson only remembered one time that the victim ate his food and would only drink sometimes. CO Swanson was working A block on 6-26-19 when the Medical Staff called to have the victim brought to the Medical Ward. Another CO took the victim to the Medical Ward via a wheel chair and 10 to 15 minutes later the victim returned to A block. Approx. another 10 to 15 minutes later A block received information that the victim was going to be sent out to a local hospital. Per CO Swanson then another 15 to 20 minutes later CO's Danner and Singleton arrived on the block with a uniform for the victim to change into since he was in smock. CO Swanson heard CO's Danner and Singleton tell the victim that they were taking him to the hospital. CO Swanson went to the cell and saw CO Danner, Singleton and Hoffman trying to dress the victim in a DCP uniform. They had trouble getting the victim dressed. The victim was taken to the floor with Capt. Klahr then arriving at the cell. A spit shield was requested unknown who put it on the victim. CO Swanson and other females were ordered out of the area due to the victim being naked. CO Swanson returned to the front of the A block. CO Swanson did not see the victim being placed in the restraint. The next thing CO Swanson knows that they were moving the victim off of the block in the restraint chair. A recorded statement was obtained (see transcribed copy).

At 1406 hrs I met with CO **Godofredo Carranza**.

CO Carranza was tasked to guard the victim at the Harrisburg Hospital on 6-27-19. CO Carranza informed me that Matthews-Kemrer came to the hospital to see his son (victim). While in conversation with Matthews-Kemrer, Matthews-Kemrer admitted to CO Carranza that the victim smoked marijuana then night of his birthday party. The victim was born on 6-14-98. Matthews-Kemrer added that the victim shown him what he thought to be





synthetic marijuana that the victim found in the yard and was concerned that someone had it at the party.

**7-12-19**

At 1004 hrs I met with Matthews-Kemrer, the victim's mother, **Carmen Riley** and a neighborhood friend named **Tracey Lewis** at my office.

I arranged this meeting with the hope of developing background information on the victim due to him not having a criminal history and limited contact in the local Police databases.

I first informed the family that I would provide them with what information I have and can share with them but I needed information from them in reference to the victim and his habits.

Matthews-Kemrer informed me that he brought up the victim the correct way and that is all I need to know.

I confirmed that through Carmen Riley that the victim was born on 6-14-98 and he graduated in Susquehanna Township High School in 2016.

I then inquired after the birth of the victim, was he was diagnosed with any mental or physical birth defects. At this point Lewis became aggressive and inquired why Dauphin County District Attorney (DA) **Francis Chardo** wrote a letter to the family saying the victim had "blunt force trauma". I informed Lewis I did not know anything about this letter and when I asked if I could see said letter, they informed me that they did not have it with them. I then called DA Chardo and he said that he did a Petition For Modification of Bail due to the state the victim was in while at the Harrisburg Hospital. DA Chardo did not have a copy of this in his office but said it should be logged in with the Dauphin County Clerk of Courts office. Lewis said she could not believe that I work for the District Attorney's office and we don't know what the other half is doing. Lewis ended the interview and said we can reschedule it.

I then went to the Dauphin County Clerk of Courts office with Lewis and obtained a copy of the Petition For Modification of Bail that DA Chardo filed on 7-1-19. DA Chardo does stated the victim had "Traumatic Injury" not "blunt force trauma".

**7-18-19**

At 0928 hrs I met with Prime Care RN **Carl Daubenspeck** and Health Service Administrator **Dawn Flickinger**. With them was Prime Care Attorney **Kathryn Peters**.

Daubenspeck informed me that 6-26-19 around 0830 hrs he was doing "Pill Call" on A block. An unknown female (later identified as Irvine) was talking to someone in cell A-1-5 along with CO Donovan. Per Daubenspeck, they were trying to get the inmate in said cell to put on his smock. Daubenspeck went over to assist and entered the cell. The victim had a distant glazed look about him. The victim's skin was dry and warm. The victim said something but it was unintelligible and the victim had some unknown crusty substance around his mouth. Daubenspeck asked the victim to take his pills and the victim put his hand out, which he did. The victim put the pills in his mouth and they gave him water. When the victim put the water in his mouth, the water and pills just ran out of his mouth. Daubenspeck informed CO Donovan that the victim needs to be seen at the Medical Ward. When the victim was in the Medical Ward, Daubenspeck attempted to place the blood pressure cuff on the victim but the victim pushed it away. They gave the victim some water but he just crushed the cup. They gave the victim some Gatorade and he took a sip of it and stated "this is not Gatorade". The victim then stated without being asked "I'm not gay". I CO responded to the victim "we don't think you are gay" with the victim responding "I don't want to be a woman". The victim then began pushing the wheelchair he was in backwards. It was decided



Dauphin County CID - Confidential

2 South 2nd Street 3rd Floor
Harrisburg PA, 17101
717-780-6200



to take him back to his cell and the Medical Staff will call Dr. Miller for her input on how to treat the victim. A recorded statement was obtained (see transcribed copy).

At 0947 hrs Flickinger informed me that the victim was brought to the Medical Ward at Irvine's request. Flickinger heard individuals getting loud and she went to the victim. Flickinger noticed the victim had crusty material around his mouth and smelled of urine. Flickinger attempted to take vital signs of the victim but he pushed her away. Due to not being able examine the victim, the victim was sent back to his cell. Dr. Miller was contacted and she approved sending the victim to a local hospital were better treatment could occur. The victim eventually returned to the Medical Ward where the victim needed CPR and AED. Both were administered until EMS arrived and took over medical treatment. The victim then was transported by EMS to the Harrisburg Hospital. Flickinger added that notification of family could not have been because since the victim entered DCP on 6-18-19, numerous attempts were made via Medical Staff and Mental Health Staff to complete an intake but the victim never responded to their questions. Flickinger said that sometime between 6-27-19 and 7-1-19 she spoke with the victim's father, Matthews-Kemrer via telephone on several occasions. Matthews-Kemrer informed Flickinger said that the victim smoked something bad or someone one gave the victim something bad and he was going to find out whose theses individuals were. A recorded statement was obtained (see transcribed copy).

Flickinger helped me review the chart notes of the victim's DCP medical records from the time Betancourt saw him on 6-18-19 at Central Booking to 6-26-19 at DCP.

On 6-18-19 the victim was seen twice and refused to complete intake and to sign the refusal form.

On 6-19-19 the victim was seen twice and refused to complete intake and to sign the refusal form.

On 6-20-19 the victim was seen twice and refused to complete intake and to sign the refusal form.

On 6-21-19 the victim was seen once and refused to complete intake and to sign the refusal form.

On 6-22-19 the victim was seen twice and refused to complete intake and to sign the refusal form.

On 6-23-19 the victim was seen once and refused to complete intake and to sign the refusal form.

On 6-24-19 the victim was seen twice and refused to complete intake and to sign the refusal form.

On 6-25-19 the victim was seen once and refused to complete intake and to sign the refusal form.

On 6-26-19 the victim was seen at 0728 hrs and refused detox check and to sign the refusal form.

**7-19-19**

At 1030 hrs I received the SUS Mobile Vehicle Recorder (MVR) of SUS Police Officer's **Chris Haines** Unit 1235. This was the SUS Police Officer and Unit that transported the victim from the location of his arrest to Central Booking. A synopsis of the video was completed (see attached documents).

At 1425 hrs I received the sledge hammer used by the victim to assault Matthews-Kemrer on 6-18-19 from **Chris Everett**.

**7-22-19**

At 1014 hrs I received Dauphin County Communications Center's telephone calls, Police, EMS and Fire radio





dispatches from 6-18-19 and from 6-26-19.

A synopsis of the telephone call Carmen Riley made on 6-18-19 was completed (see attached document).

At 1039 hrs I called Matthews-Kemrer to schedule another interview with him and his wife but there was no answer. I did leave a message for him to call me.

**7-23-19**

At 1158 hrs I spoke with **Nicole Jackson** via telephone to obtain biographical information about the victim. Jackson did date the victim for sometime in the past.

Jackson informed me that they were boyfriend/girlfriend on and off for a year while they were in High School (Susquehanna Township). This was approx. 5 years ago. Jackson describes the victim as a good kid, never in trouble, a shy person who got along well with his parents. Jackson said that his only hobbies was clothes, rapping and keeping a good relationship with his family and friends. Jackson added that the victim was not into athletics. Jackson said that she did not know the victim to drink alcohol but he smoked marijuana everyday. Jackson has never met any of the victim's siblings but heard talk about a brother. Per Jackson, 2 to 3 months ago, the victim was able to contact her through social media and wanted to get back together. Jackson told the victim it's been 5 years ago and they done. Jackson then blocked the victim from contacting her through social media. Jackson heard rumors that the victim overdosed. We ended our interview with Jackson informing me that the only friend she knew of the victim's was a person named **Shawn Brown**. Jackson will attempt to get me a telephone number for Brown since she does not know where he lives and call me with that telephone number.

**7-24-19**

As of 0751 hrs I have not heard from Matthews-Kemrer thus I called him again. There was no answer but I did leave a message for him to call me.

At 1048 hrs met with Lt. **Richard Armermann** at DCP.

Lt. Armermann informed me that he was the daylight Lt. on 6-18-19 and his shift began at 0830 hrs. On 6-18-19 Lt. Armermann was at the Booking Center when the CO's attempted to place the waist belt on the victim. Lt. Armermann did enter cell #132 and give orders to the victim to comply. Lt. Armermann did not use any physical force on the victim nor did he see any CO strike, kick, punch, choke or pin the victim to any hard object. A recorded statement was obtained (see transcribed copy).

**7-25-19**

At 0839 hrs I met with CO **Robert Ingersoll** at DCP.

CO Ingersoll informed me that on 6-18-19 he was working the Booking Center and around 0501 hrs a SUS Unit arrived at Central Booking and via the intercom, the SUS Officer informed them that the victim maybe a problem. CO Ingersoll and other CO's went into the Booking Center garage to assist the SUS Officer. Per CO Ingersoll, the victim did not want to get out of the SUS Unit when instructed. When the CO's went to move the victim out of the SUS Unit, the victim stood up on his own. As they escorted the victim towards the door that leads into Central Booking, the victim became dead weight and braced his feet against objects to prevent going into Central Booking. Once in Central Booking, the victim was going to be placed on the bench to be searched and handcuffs removed. This was not accomplished due to the victim resisting their attempts by contorting his body, pushing off objects using his feet, pulling away from CO's etc... The victim was taken to the floor where his resistance





continued. The CO's now searched the victim for weapons and contraband, took any personal items that could be used by the victim to harm himself and place shackles on his legs. While attempting to accomplish this, it was difficult due to so due to the victim's resistance thus Lt. **Greg Mendenhall** maced the victim. With the victim maced, the CO's were able to complete their tasks and with that done, the victim was placed in cell #132. Medical Staff checked the victim for injuries and a photograph was taken of the victim. After all CO's left cell #132, CO Ingersoll had no further action and his shift ended at 0600 hrs. The only verbiage the victim would say is "yo".

Per CO Ingersoll, on 6-19-19 he worked A block and only noticed that the victim was naked with him not saying anything. A recorded statement was obtained (see transcribed copy).

At 1306 I have not heard from Matthews-Kemrer so I called him. There was no answer but I did leave a message for him to call me.

I then called Carmen Riley's phone number but there was no answer or answering machine.

**7-26-19**

At 0758 hrs I received a message that Tracey Lewis called me.

At 0801 hrs I called Tracey Lewis and she will check with Matthews-Kemrer and Carmen Riley to see if they would let me interview them again and call me back.

At 0906 hrs I met with CO **Michael Blouch** at DCP.

CO Blouch informed me that he was working the 0600 to 1400 hrs at Central Booking on 6-18-19. At approx. 0730 hrs, they removed the victim from his cell to process him. In doing so, the victim need to be switched from the handcuffs that were behind his back to a waist belt. The victim was not complying and returned to his cell. Around 0755 hrs, the victim was interviewed by Pre-Trial but the victim would not respond to the questions. CO Blouch only recalls the victim grunting when asked questions by Pre-Trial. Around 0910 hrs the victim was video arraigned and all CO Blouch can recall the victim saying is "I didn't do it". After the victim was video arraigned, he was placed back in his cell. Sometime later, CO Blouch noticed the victim had slipped the handcuffs from behind his back to the front of the his body. The victim now was tapping the handcuffs on the window of his cell door. It was decided to enter the victim's cell to place a waist belt on him so he can not damage any property. In attempting to place the waist belt on the victim, a struggle occurred but it was eventually accomplished. During the struggle, the victim did not say anything. Around 0953 hrs, the victim was taken to medical for his intake with Betancourt. CO Blouch only recalls the victim maybe given Betancourt one word answers. After the victim was seen in medical, he was returned to his cell until he was transported to DCP. A recorded statement was obtained (see transcribed copy).

At 1052 hrs I met with CO **Martin Myers** at DCP.

CO Myers informed me that he was working the 0600 to 1400 hrs shift at Central Booking on 6-18-19. At approx. 0730 hrs the victim was removed from his cell to process him. CO Myers only recalls the victim saying "Bra, I didn't do it". The victim resisted switching the handcuffs to a waist belt and was returned to his cell. CO Myers only recalls the victim saying in his cell "ok,ok,ok,". Sometime later Pre-Trial came in and asked the victim questions prior to his arraignment. CO Myers said that the victim did not respond to Pre-Trial's questions. The victim was removed from his cell for his arraignment but had a blank look while be arraigned. Once the victim was in his cell after the arraignment, victim had slipped the handcuffs from behind his back to the front of the his body. When the CO's entered the cell to place a waist belt on the victim, the victim resisting this attempt and a





struggle started. The victim refused to comply to orders given to him but at the same time said nothing. When the victim was seen by medical, the victim refused to answer questions except he would state "Bra, I didn't do it". With medical unable to complete their intake, CO Myers told the victim to stand up but he didn't respond. CO Myers stood the victim up and took him to his cell. CO Myers had no further contact with the victim. A recorded statement was obtained (see transcribed copy).

**7-29-19**

At 0914 hrs I met with Sgt. **Scott Grieb** at DCP.

Sgt. Grieb informed me that on 6-18-19 he was working Central Booking. Sgt. Grieb used the upstairs bathroom and when he returned downstairs to the booking desk via the elevator, he noticed the victim on the floor resisting (moving legs, contorting body, failing to comply etc...). Sgt. Grieb assisting in searching the victim for contraband, weapons and personal property. Once that was completed, the victim was placed in cell #132. The victim was seen by medical and Sgt. Grieb took a picture of the victim since the CO's went "hands on" with the victim. Sgt. Grieb had no further contact with the victim while he was assigned to Central Booking.

Sgt. Grieb then was instructed to work overtime at the DCP Booking Desk. Per Sgt. Grieb, part of his duties at the DCP Booking Desk is to transport prisoner from Central Booking to DCP and process them into the DCP system (photographs, change clothes, log in personal property etc...). Sgt. Grieb informed me approx. late morning of 6-18-19 he and CO **Joseph Doyle** went to Central Booking to transport the victim to DCP. The victim came out of this cell but need to be repeatedly asked to accompany them. The victim appeared to be confused and not coherent. The victim gave them a blank stare and made no verbal comments. Sgt. Grieb and CO Doyle were able to talk the victim into leaving Central Booking and getting into the transport vehicle after repeated requests and explanations on what is going to happen. Once at DCP and at the Records desk, the victim states "get it over with". Sgt. Grieb responds "what are you talking about?". The victim responds "I know you are going to do it, slit my throat and get it over with". Sgt. Grieb responds "I just want to get you through our booking process and get you to our housing unit so you can lay down and relax". The victim did not respond and just gave Sgt. Grieb a blank stare. Per Sgt. Grieb informed me that they were able to process the victim and take him to A block without any problems. A recorded statement was obtained (see transcribed copy).

At 1050 hrs I met with CO **Taylor Glenn** at DCP.

CO Glenn informed me that on 6-18-19 she was working the 0600 to 1400 hrs shift at Central Booking. When she began her shift at 0600 hrs, she was informed by the previous CO's that they had problems with the victim. The first interaction CO Glenn had with the victim was when they went to put a waist belt on him so they could process him. The victim said something CO Glenn could not understand. The victim resisted the waist belt being placed on him so the victim was returned to his cell. Per CO Glenn the victim was yelling something in his cell that did not make sense. CO Glenn's second interaction with the victim was when Pre-Trial had questions for the victim but again his responses didn't make sense. The third interaction with the victim is when he was arraigned and the DJ would ask the victim questions but the victim would not answer them. After the arraignment, the victim was placed back in the cell. The forth interaction with the victim is when he slipped the handcuffs from behind him to his front and tapped them repeatedly on the cell door window. CO Glenn and other CO's went into the victim's cell to place him in a waist belt. As they went into the cell, they gave verbal instructions to the victim about what they are about to do. The victim did not respond and gave them a blank stare. As they attempted to put on the waist belt, the victim struggled with them. CO Glenn attempt to control the victim's legs. The last interaction was that the victim was seen in the medical office but CO Glenn does not know what was said. She did observe CO Myers putting the victim back in his cell. The victim then was transported to DCP without any





issues. CO Glenn informed me that on 6-22-19 or 6-24-19 she worked an overtime shift (1400 - 2200 hrs) on A block. During this shift she heard screaming and realized it was the victim. CO Glenn looked into the victim's cell (A-1-5) and saw the victim naked and playing in the water in his sink. The victim stated "I'm locked in the basement". Per CO Glenn, this was her last contact with the victim. A recorded statement was obtained (see transcribed copy).

I then requested video of the victim's arrival at DCP to when he enters cell A-1-5 on 6-18-19.

**7-30-19**

At 1353 hrs I called Tracey Lewis since I didn't hear from her. Tracey Lewis informed me that she will check with Matthews-Kemrer and Carmen Riley and call me tomorrow.

**7-31-19**

At 1300 hrs I received the video of the victim's arrival at DCP to when he enters cell A-1-5 on 6-18-19. I reviewed said footage and the victim appears to comply with struggle noted.

At 1438 hrs I received a telephone call from Tracey Lewis. She informed me that I will be getting a call from a **Riley Ross** an Attorney from Philadelphia since Matthews-Kemrer and Carmen Riley have retained that law firm.

**8-1-19**

At 0846 hrs I received a message from **Kevin Mincey** of the law firm of Mincey, Fitzpatrick & Ross law firm in Philadelphia to call him.

At 1013 hrs I called Mincey and spoke with him. I inquired with him to speak with Matthews-Kemrer and Carmen Riley reference to "victimology" of the victim. Mincey informed me that as of right now they do not want to speak with me but he will check and let me know.

At 1256 hrs I met with CO Delta Bauer at my office.

CO Bauer informed me that on 6-18-19 she was working at the Booking Center and knew that a SUS Unit was bringing in a prisoner that was agitated. CO's **Cameron Weaver** and Ingersoll along with Lt. Mendenhall went into the garage when the SUS Unit arrived. CO Bauer could not hear or see anything that occurred in the garage and first notices the victim as they come in the door into booking. Per CO Bauer, the victim was dragging his feet and nor walking. The victim was not complying with orders of "stand up" or responding to the question "do you have anything in your pockets?". The victim became dead weight, pushed against the CO's and using his feet pushed off the metal bench where they were standing while contorting his body. It is standard practice when an arrestee acts like this is to take that person to the floor to search the arrestee for contraband, weapons and personal property. The victim was taken to the floor. CO Bauer assisted in trying to control the victim's legs. The victim still resisted by contorting his body while the CO's were trying to search him for weapons, contraband and taking of his personal property (items that he could hurt himself with). At this point Lt. Mendenhall sprayed the victim once with mace to gain compliance. Once the searching was completed and the SUS Officer handcuffs were switched out, the victim was placed in cell #132. The victim was seen by medical and a photograph was taken of the victim. CO Bauer had no further contact with the victim. A recorded statement was obtained (see transcribed copy).

At 1530 hrs I met with CO Weaver at my office.





CO Weaver informed me that on 6-18-19 he was working at the Booking Center. The Booking Center received a call from Dauphin Communication Center that SUS Unit had a problem with the victim. Upon the arrival of the SUS Unit at Central Booking, the Officer informed them via the intercom that he may need help getting the victim out of his SUS Unit. CO Weaver, Ingersoll and Lt. Mendenhall went into the garage of the Booking Center to assist. The victim was instructed to get out of the SUS Unit repeatedly with no response. They got the victim out of the SUS Unit and as they were walking him to the door that leads into a small hallway, the victim became dead weight and braced his legs against the floor and door to prevent going into the hallway. Once in the small hallway, the victim did the same type of resisting as he did in the garage. Once the were in booking CO Weaver informed me the same as CO Bauer. A recorded statement was obtained (see transcribed copy).

**8-6-19**

At 1130 hrs I received a letter from Mincey informing me that Matthews-Kemrer and Carmen Riley do not wish to have another interview with me.

**8-7-19**

At 0822 hrs I met with Lt. Mendenhall at DCP.

Lt. Mendenhall informed me that on 6-18-19 he was working at Central Booking when the SUS Unit arrived with the victim. Lt. Mendenhall and other CO's met the victim in the garage. Per Lt. Mendenhall, the victim was not lucid and non responsive with no reaction to their verbal commands except for one time when the victim stated to them "what do you mean?". The CO's assisted in standing the victim up and out of the SUS Unit. They walked to towards the door leading into a small hallway when the victim became dead weight and then began to brace his legs against the floor to prevent being taken into booking. Once in the small hallway, the victim continued his actions but was taken into booking. Once in booking Lt. Mendenhall told the victim "to stand up face the wall" repeatedly but received no response from the victim. At this point the intent was to search the victim for weapons and contraband, take the victim's personal property, take any items (belt & shoelaces) that the victim could hurt himself with and to switch handcuffs so the SUS Officer can get his handcuffs back. The victim began to push against the CO's and attempted to stand on the bench at this location. The victim being uncooperative was then taken to the floor so they could complete there search and of taking property. On the floor the victim was contorting his body in resisting their attempts to search him and take property. At this point Lt. Mendenhall deployed mace to the victim's face which let the CO's complete their search and property. With that completed, the victim was placed in cell #132 was seen by medical and a photograph was taken. Lt. Mendenhall added that the victim did not say anything during this interaction with him. Sometime later it was determined to process the victim (finger print & photograph). To do so, the victim had to have his handcuffs switched out to a waist belt. Sgt. **Jason Adams** removed the victim from his cell and attempted to put the waist belt on the victim while giving the victim verbal commands. The victim did not respond to the commands and went dead weight. The victim was taken back to cell #132. While in cell #132, Lt. Mendenhall explained to the victim what they want to do reference to processing but the victim did not give any verbal response but did make eye contact with him. They made a second attempt to put on the waist belt while in the cell but ended when the victim became dead weight so they placed him on the bench in the cell and left. Per Lt. Mendenhall. Pre-Trial entered the cell to interview the victim prior to his Preliminary Arraignment but the victim did not answer any questions. Lt. Mendenhall shift then ended and he had no further contact with the victim. A recorded statement was obtained (see transcribed copy).

At 0909 hrs I met with Sgt. Adams at DCP.

Sgt. Adams informed me that he worked Central Booking on 6-18-19 and started his shift at 0600 hrs. The previous shift informed him that they could not process the victim due to him being "high". Around 0730 hrs Sgt. Adams had the victim come out of his cell to place a waist belt on him to process him. Sgt. Adams said that he



Dauphin County CID - Confidential
2 South 2nd Street 3rd Floor
Harrisburg PA, 17101
717-780-6200



explained to the victim what was going to occur and how they were going to do it. The victim said something to him but Sgt. Adams can not recall what he said. As Sgt. Adams was trying to put the waist belt on the victim, the victim went dead weight and was taken to the floor. The victim was returned to his cell. A second attempt was made to put the waist belt on the victim but due to his resistance, it was not accomplished. All CO's then left the victim's cell. Pre-Trial then attempts to interview the victim. Sometime later Sgt. Adams and other CO's get the victim for his Preliminary Arraignment. They explain to him that he needs to see the DJ with the victim responding "Na Bra". The victim was taken to his Preliminary Arraignment and then returned to his cell. In his cell the victim slips his handcuffs from behind him to his front. Per Sgt. Adams, they entered the cell again to place a waist belt on the victim. A struggle started with it took awhile to get the waist belt on the victim. When I asked Sgt. Adams why it took so long, he response was that they wanted to use only minimal force thus it took more time to switch from handcuffs to the waist belt. Sgt. Adams had no further contact with the victim. A recorded statement was obtained (see transcribed copy).

**8-9-19**

At 1100 hrs our office discovered that the victim had a Facebook page - https://www.facebook.com/XxRIQUE23xX were he talks about drinking SYRUP which is a mixture of Codeine and soda to obtain euphoria.

I then developed a Probable Cause Affidavit for a Search Warrant to obtain information from the victim's Facebook page.

I did inquire with DA Chardo if I should proceed with the Facebook Search Warrant. DA Chardo informed me to standby on that until he informs me on which way to proceed.

**8-14-19**

At 0922 hrs I obtained a recorded interview from Director Lucas to what he informed me on 7-8-19 (see transcribed copy).

**8-20-19**

At 1029 hrs I obtained a recorded interview from CO Carranza to what he informed me on 7-9-19 (see transcribed copy).

**8-21-19**

At 1241 hrs I obtained a recorded interview from inmate Reiley to what he informed me on 7-2-19 (see transcribed copy).

**8-27-19**

At 0939 hrs a meeting was held at the Dauphin County Coroner's Office reference this case. Present was Forensic Pathologist Dr. **Wayne Ross**, Dauphin County Coroner **Graham Hetrick**, Assistant County Coroner **Thomas Reinhard**, DA Chardo and myself.

At this meeting, information gathered as of this time was shared.

**8-28-19**



Dauphin County CID - Confidential
2 South 2nd Street 3rd Floor
Harrisburg PA, 17101
717-780-6200

Case Number: 19-0000136 ORI #: PA0222600

At 1220 hrs I met with Dauphin County Probation/Parole Officer **Derron Pellman** and his client **Shane Pozoic**. Pozoic has information related to this case.

Pozoic informed me that he received a text from telephone number (717) 836-0208 on 8-16-19. Pozoic returned the text inquiring if it was a CO. The number texts back not confirming who it was but goes onto say that they were helping the family out and he knows Pozoic was "tuned up" unnecessarily and inquired if Pozoic wanted to talk. The unknown person texts to Pozoic that they are looking into a civil rights lawsuit and that boy shouldn't have died.

Pozoic deleted the text messages but took screen shots of a few of them.

I then had Pozoic call said number but there was no answer and it went to a Google messaging system. No message was left.

I then obtained a recorded interview from Pozoic (see transcribed copy).

I then had Dauphin Communication Center cross reference said telephone number but ended with negative results.

I then had DCP check said telephone number as belonging to any CO but ended with negative results.

I then had DCP check said telephone number as ever being used in DCP's inmate telephone system but ended with negative results.

I then check CLEAR with said telephone number but ended with negative results.

I then called said telephone number and received the same Google messaging system. This time I left a message for someone to call me.

**9-4-19**

At 0840 hrs I received a copy of the Autopsy Report from Assistant County Coroner Reinhard. In reviewing the Autopsy Report, Dr. Ross declared the cause of the victim's death as complications of Cerebral Vasculitis/Encephalitis, Thromboemboli and Rhabdomyolysis with the manner of death being natural.

All interviews, audio recordings, transcribed recordings videos, photographs, County telephone/radio, medical records and miscellaneous reports were not transferred into IN-SYNCH due to size. All computerized copies will be kept in "T-Drive Confidential 2019-0136".

CASE CLOSED