**INTERVIEW WITH SGT. SCOTT LEWIS**
**Q=Det. Brian Walborn**
**A=Sgt. Scott Lewis**

Q:   Tod- today is July 3, 2019. Time will be 1122 hours. We're at Dauphin County Prison. Present is myself, Detective Brian Walborn and Sergeant Scott Lewis. For the record, state your name and spell your last.

A:   Scott Kirk Lewis, L-E-W-I-S.

Q:   Sergeant Lewis, any promises or threats been made to you for this interview?

A:   No sir.

Q:   Are you currently un- under the influence any drugs or alcohol?

A:   No sir.

Q:   Can you read and write the English language?

A:   Yes sir.

Q:   The highest grad- the highest grade in school you completed?

A:   Twelfth grade.

Q:   You're a sergeant of correctional officers here at Dauphin County Prison, correct?

A:   Yes sir.

Q:   How long have you been employed here?

A:   Twenty-three and a half years.

Q:   As part of your duties have you had any - had any specialized training?

A:   Uh, yes sir. I'm, uh, team leader of the hostage rescue team. I'm a defensive

| | | |
|---|---|---|
| 46<br>47<br>48 | | task instructor. I'm a cell extraction instructor and I've run numerous cert activations here. |
| 49<br>50 | Q: | How long have you been employed here? |
| 51<br>52 | A: | Twenty-three and a half years. |
| 53<br>54 | Q: | And on June 26, 2019 what shift were you working? |
| 55<br>56 | A: | First shift. Uh, 0600 to 1400 hours. |
| 57<br>58 | Q: | And what was your function that day? |
| 59<br>60 | A: | I was the intake lobby officer sir. |
| 61<br>62 | Q: | Is that near the control center? |
| 63<br>64 | A: | Near central control yes. |
| 65<br>66<br>67 | Q: | On this day, um, did you have an opportunity to make contact with Captain Klahr? |
| 68<br>69<br>70<br>71<br>72 | A: | Uh, yes. I was - I received a phone call from central control that they needed Captain Klahr. Uh, inmate Riley who was goin' on a medical transport had to be changed over from a suicide smock to a inmate uniform was refusing to put the uniform on and was being disruptive. |
| 73<br>74 | Q: | About what time was this? |
| 75<br>76 | A: | Uh, I think it was around 10 o'clock in the morning. It was 1000 hours. |
| 77<br>78<br>79 | Q: | So, you were asked by control to get Captain Klahr. What di- di- what did you do? |
| 80<br>81<br>82<br>83<br>84 | A: | Uh, Captain Klahr was at a staff meeting so I went to where the staff meeting was being held in the hearing room, knocked on the door, interrupted the meeting, told Captain Klahr that they needed him. Briefly apprised him of the situation and he and I went to A block where Riley was being housed. |
| 85<br>86 | Q: | Do you know what cell that was? |
| 87<br>88 | A: | I believe it was A-1-5. |
| 89<br>90 | Q: | So, you and Captain Klahr responded to A-1-5. Uh, prior to your arrival did you hear anything? |

91

92   A:          Upon a- approaching the cell I heard who I believed to be inmate - or, uh,
93               Officer Danner, excuse me, giving orders to stop grabbing - stop grabbing my
94               hands.
95

96   Q:          And that wa- wa- was clear? I mean, you could actually hear that?
97

98   A:          Yes.
99

100  Q:          Okay. Then you arrived at cell A-1-5, what did you observe?
101

102  A:          Captain Klahr went in before me. I was in the doorway of the cell. I saw Mr.
103              Riley proned out on the cell floor. He was handcuffed behind his back. Officer
104              Danner was leaning on the wall and had his hands on the handcuffs.
105

106  Q:          How was inmate Riley - you said proned out. How was he proned out?
107

108  A:          He was on his stomach with his head towards the back of the cell.
109

110  Q:          You said he was handcuffed?
111

112  A:          Yes sir.
113

114  Q:          Behind the back?
115

116  A:          Yes sir.
117

118  Q:          And you said Officer Danner was leaning on the wall. Was Officer Danner
119              standing or kneeling?
120

121  A:          I believe he was standing.
122

123  Q:          And in a previous interview you said he had ahold of the handcuffs that were
124              on Riley's hands behind his back?
125

126  A:          Yes sir.
127

128  Q:          Was any other COs in that cell?
129

130  A:          Uh, to my knowledge Officer Singleton was there, Captain Klahr, Danner, and
131              myself.
132

133  Q:          Was anyone on top of inmate Riley?
134

135  A:          No.

| 136 | | |
|---|---|---|
| 137 | Q: | Was inmate Riley saying anything? |
| 138 | | |
| 139 | A: | Uh, he was mumbling incoherently. |
| 140 | | |
| 141 | Q: | You couldn't make out what he said? |
| 142 | | |
| 143 | A: | No sir. |
| 144 | | |
| 145 | Q: | What happened then? |
| 146 | | |
| 147 | A: | Captain Klahr said, "Hey what's going on buddy?" Riley continued to |
| 148 | | mumble. It was either Danner or Singleton said that he was refusing to put the |
| 149 | | uniform on. At - I believe it was that time Captain Klahr called for the |
| 150 | | restraint chair to be brought. A brief time later the restraint chair came. |
| 151 | | Captain Klahr ordered the spit shield for Riley. We placed the spit shield on |
| 152 | | his head. |
| 153 | | |
| 154 | Q: | Who placed the spit shield on his head? |
| 155 | | |
| 156 | A: | I don't recall sir. Due to the fact that Riley was unclothed at the time, I turned |
| 157 | | around and told the three female officers present to head up towards the |
| 158 | | control center so we could place him in the restraint chair and I moved to the |
| 159 | | back of the restraint chair to steady it so we could place him in said chair. |
| 160 | | |
| 161 | Q: | Continue. |
| 162 | | |
| 163 | A: | Inmate Riley was brought out of the cell. He was resisting so I steadied the |
| 164 | | chair as we... |
| 165 | | |
| 166 | Q: | You said resisting, describe that. |
| 167 | | |
| 168 | A: | Just dead weight resistance. He wasn't complying. He wasn't walking. They |
| 169 | | brought him outta the cell. I - he was turned to be sat in the chair and I tried to |
| 170 | | guide his hands down into the recess that's built into the chair to |
| 171 | | accommodate the arms cuffed behind the back. Once we got him sat properly |
| 172 | | in the chair officers present started to strap him into the chair and it was at that |
| 173 | | time I could feel his body in the chair moving a little bit. Someone said he was |
| 174 | | kicking. So, I controlled his head and utilized a hypoglossal pressure point to |
| 175 | | gain compliance. |
| 176 | | |
| 177 | Q: | Hypoglossal pressure point. Describe that. |
| 178 | | |
| 179 | A: | It is a pressure point, uh, located about an inch forward of the R angle of the |
| 180 | | jaw. Touch pressure is used at an upward angle. |

181
182   Q:        Did that gain compliance?
183
184   A:        He stopped kicking, so I would say yes.
185
186   Q:        So, you used both hands - this pressure point, you use both hands one on...
187
188   A:        Yes, because you - you stabilize the head and utilize upward touch pressure.
189
190   Q:        And this was through the spit shield?
191
192   A:        Yes sir.
193
194   Q:        Did the spit shield seem taunt at all?
195
196   A:        Uh, I don't recall. I - I know it was on his head, but it didn't seem to be tight.
197
198   Q:        The - the spit shield's a very fine material that's extremely breathable.
199
200   A:        Absolutely.
201
202   Q:        The spit shield goes over the whole head, correct?
203
204   A:        Yes sir.
205
206   Q:        It's a solid piece over the top of the head?
207
208   A:        Yes.
209
210   Q:        So, the open end is that just loose or is it elastic?
211
212   A:        There's, uh, an elastic band in the - it's built into the shield to keep it in place.
213
214   Q:        So, you have control of his head. You have your thumbs just a little bit
215             forward of his L shape of the jaw and you apply pressure in an upward
216             manner?
217
218   A:        Yes.
219
220   Q:        The whole time you had control of his head while they're strapping him in,
221             correct?
222
223   A:        Yes.
224
225   Q:        Other COs are doing that. Are you constantly puting pressure up?

INTERVIEW WITH SGT. SCOTT LEWIS
Interviewer: Det. Brian Walborn
7-03-19/11:22 am
Case # C2019-0136
Page 6

| | | |
|---|---|---|
| 226 | | |
| 227 | A: | No. You use momentary pressure. I- if you apply a pressure point hold as per |
| 228 | | our PPCT manual, you don't use constant pressure, otherwise it defeats the |
| 229 | | whole purpose of it. |
| 230 | | |
| 231 | Q: | Approximately how many times did you apply pressure while controlling his |
| 232 | | head? |
| 233 | | |
| 234 | A: | I can't recall. |
| 235 | | |
| 236 | Q: | At what point in time did you release control of his head? |
| 237 | | |
| 238 | A: | Once he was secured in the chair properly. |
| 239 | | |
| 240 | Q: | And without looking at the video approximately how long did you have your |
| 241 | | hands on either side of his jaw? |
| 242 | | |
| 243 | A: | I'd say about a minute. |
| 244 | | |
| 245 | Q: | So, once he was secured, you released the head, then what happened? |
| 246 | | |
| 247 | A: | We were getting ready to take him off the block and his head rolled back - or |
| 248 | | his head kind of fell back and his eyes rolled up in his head. Captain Klahr |
| 249 | | turned around and said, "Is he breathing?" I responded, "I don't know." At |
| 250 | | that time I remember Captain Klahr doing a sternum rub. Um, no affect. |
| 251 | | Sergeant Biter also attempted a sternum rub and it was at that time that |
| 252 | | Captain Klahr called medical emergency to A block. |
| 253 | | |
| 254 | Q: | What happened next? |
| 255 | | |
| 256 | A: | I suggested to the captain since he's already in the restraint chair we can get |
| 257 | | him to medical faster if we just take him rather than waiting for medical to get |
| 258 | | there. We rapidly proceeded off the block taking him up to medical and it was |
| 259 | | at that time I realized that nobody was covering booking or the intake lobby |
| 260 | | post. So, I turned left to resume my post and Sergeant Biter, Captain Klahr, |
| 261 | | and inmate Riley, who was in the restraint chair at the time, went back |
| 262 | | towards medical. |
| 263 | | |
| 264 | Q: | Would you agree it's a short distance from, let's say, A - cell A-1-5 to |
| 265 | | medical? |
| 266 | | |
| 267 | A: | Yes. |
| 268 | | |
| 269 | Q: | A block's the closest block to medical... |
| 270 | | |

| 271 | A: | Yes sir. |
| 272 | | |
| 273 | Q: | ...of all the blocks. At any point in time did you see anyone strike, kick, |
| 274 | | punch, or pin inmate Riley? |
| 275 | | |
| 276 | A: | No sir. |
| 277 | | |
| 278 | Q: | I think that's all the questions I have. Is there anything you'd like to add to |
| 279 | | this statement? |
| 280 | | |
| 281 | A: | No sir. |
| 282 | | |
| 283 | Q: | Okay. We'll conclude the interview. Time will be 11:34. |
| 284 | | |
| 285 | | |
| 286 | | The transcript has been reviewed with the audio recording submitted and it is an accurate |
| 287 | | transcription. |
| 288 | | Signed_____ |

INTERVIEW WITH SGT. SCOTT GRIEB
Interviewer: Det. Brian Walborn
07-29-19
Case # C2019-0136
Page 1

**INTERVIEW WITH SGT. SCOTT GRIEB**
**Q=Det. Brian Walborn**
**A=Sgt. Scott Grieb**

Q:     Today's July 29, 2019. We're at the Dauphin County Prison. Present is myself Detective Brian Walborn and Sergeant Scott Grieb of the Dauphin County Prison. Sir for the record you give me permission to record this interview?

A:     Yes.

Q:     Have any promises or threats been made to you for this interview?

A:     No.

Q:     Are you currently under the influ- any influence of drugs or alcohol?

A:     No.

Q:     The highest grade in school you completed?

A:     Uh, college.

Q:     And you can read and write the English language?

A:     Yes.

Q:     For the record state your name and spell your last.

A:     My name is Scott Kenneth Grieb, G-R-I-E-B, rank of sergeant at Dauphin County Prison.

Q:     And how long have you been a, uh, Dauphin County correctional officer?

A:     Going on 13 years.

Q:     What'd you do prior to that?

A:     I worked five years at Harrisburg Hospital as security.

CID000364

| | | |
|---|---|---|
| 46 | | |
| 47 | Q: | And prior to that? |
| 48 | | |
| 49 | A: | I, uh, graduated college with an Associate's Degree in criminal justice. |
| 50 | | |
| 51 | Q: | Okay. Which shift do you work? |
| 52 | | |
| 53 | A: | I work the 2200 to 0600 shift. |
| 54 | | |
| 55 | Q: | So you started your shift on June 17, 2019? |
| 56 | | |
| 57 | A: | Correct. |
| 58 | | |
| 59 | Q: | And what were you assigned to that day? |
| 60 | | |
| 61 | A: | I was assigned down to the central booking. |
| 62 | | |
| 63 | Q: | I want you taken into the morning hours of June 18, 2019 at booking. A Tyr- |
| 64 | | Tyrique Riley was brought into the Dauphin County Booking Center by the |
| 65 | | Susquehanna Township Police Department. Do you recall that? |
| 66 | | |
| 67 | A: | Yes I do. |
| 68 | | |
| 69 | Q: | What was the first interaction you had with inmate Riley? |
| 70 | | |
| 71 | A: | I was upstairs using the restroom when inmate Riley was brought in. When I |
| 72 | | came downstairs and exited the elevator I saw that my fellow officers and the |
| 73 | | Susquehanna officer had inmate Riley proned out on the floor. Inmate Riley |
| 74 | | was contorting his body, kicking his feet, uh, resisting all staffs' attempts to |
| 75 | | gain control of him and put our leg shackles on him. I immediately, uh, glo- |
| 76 | | put gloves on and assisted in searching inmate Riley for weapons, contraband |
| 77 | | and removing, uh, personal property that presents a da- would present a |
| 78 | | danger to himself and/or staff. Um, during this search, uh, detainee Riley - or |
| 79 | | inm- I'm sorry. Inmate Riley was - uh, continued to contort his body, kick his |
| 80 | | legs, um, bring his knees up. He was refusing verbal - all verbal orders given. |
| 81 | | Um, once the search was completed and all his property was, uh, removed we |
| 82 | | then assisted inmate Riley off of the floor and escorted him into Cell 132 |
| 83 | | where he was, um, placed on the floor so that medical could come in and |
| 84 | | evaluate him and medical did flush his eyes due to the use of oleoresin |
| 85 | | capsicum spray and also we doc- took pictures to document his injuries or/and |
| 86 | | from the spray. The - we exited the cell. The door was closed and that |
| 87 | | concluded our interaction with him down there at the, uh - central booking. |
| 88 | | |
| 89 | Q: | Your interaction. |
| 90 | | |

INTERVIEW WITH SGT. SCOTT GRIEB
Interviewer: Det. Brian Walborn
07-29-19
Case # C2019-0136
Page 3

| | | |
|---|---|---|
| 91 | A: | My interaction. Correct. |
| 92 | | |
| 93 | Q: | Now at 0600 your shift is over... |
| 94 | | |
| 95 | A: | Correct. |
| 96 | | |
| 97 | Q: | ...at central booking but you were held over? |
| 98 | | |
| 99 | A: | I had volunteered and was working a overtime shift from 0600 to 1400 hours. |
| 100 | | |
| 101 | Q: | Where was that assignment? |
| 102 | | |
| 103 | A: | I was assigned to the DCP booking. |
| 104 | | |
| 105 | Q: | Later that morning you had an opportunity to go down to central booking? |
| 106 | | |
| 107 | A: | Yes. I was assigned by Central Control at the Dauphin County Prison to go |
| 108 | | down with CO Joe Doyle to pick up inmate Riley and transport him up to the |
| 109 | | prison. |
| 110 | | |
| 111 | Q: | And that's normal procedure because he was arraigned and committed to |
| 112 | | Dauphin County Prison on a certain amount of bail. |
| 113 | | |
| 114 | A: | Correct. |
| 115 | | |
| 116 | Q: | Let me back up. Your interaction as a central booking officer with inmate |
| 117 | | Riley. Did he say anything at this point in time that you recall? |
| 118 | | |
| 119 | A: | Not that I recall. |
| 120 | | |
| 121 | Q: | His demeanor. Is that indicative of anything that you've seen in your |
| 122 | | experience as a correctional officer as hospital security or training, your |
| 123 | | education in college? |
| 124 | | |
| 125 | A: | In my going on 13 years of experience in the career field his behavior |
| 126 | | indicated to me that he was under the influence of some sort of narcotic, |
| 127 | | unknown amount, unknown strength, um, but he was definitely - his |
| 128 | | mannerisms, his lack of focus, his l- incoherence to any orders given to me |
| 129 | | indicated that he was definitely under the influence. |
| 130 | | |
| 131 | Q: | And right now we're just talking while you were a central booking officer. |
| 132 | | Now you said you had an opportunity to go later on that morning back down |
| 133 | | to the booking c- center to transport inmate Riley up to DCP. Tell us about |
| 134 | | that. |
| 135 | | |

INTERVIEW WITH SGT. SCOTT GRIEB
Interviewer: Det. Brian Walborn
07-29-19
Case # C2019-0136
Page 4

| | | |
|---|---|---|
| 136 | A: | When we, uh - we arrived at the booking center of central booking we went |
| 137 | | in, we obtained m- detained - or inmate's Riley's property and paperwork to |
| 138 | | be brought up to the jail and we went to the cell door and opened it to |
| 139 | | transport him. He was already restrained at that point. Um, his - his focus was |
| 140 | | still - was still off. He was incoherent. He was making statements. I do not |
| 141 | | recall the exact wording but they were not making sense. He was not able to |
| 142 | | hold a fluid conversation nor did he seem able to fully understand what was |
| 143 | | going on. Um, myself and fellow officers, we used our verbal skills to talk |
| 144 | | inmate Riley into accompanying us out to the transport vehicle which he did |
| 145 | | hesitantly. It didn't seem like he understood fully what was going on. He s- |
| 146 | | had to explain things to him several times but once we got out to the vehicle |
| 147 | | he was hesitant, uh, to get into the vehicle. It was explained by myself and - |
| 148 | | and fellow officers that we were just going to transport him up to the prison to |
| 149 | | get him through our booking process, take him to the housing unit so that he |
| 150 | | could have a cell, a bunk and he could lay down and relax. Um, we explained |
| 151 | | that he was going - that he would have a hearing scheduled, that he would be |
| 152 | | able to tell his side of the story to - to the judge when he saw him and to get |
| 153 | | his legal issues taken care of but for now this - the process was to transport |
| 154 | | him up to the - the jail and get him through our booking process. After several |
| 155 | | minutes of the verbal - using our verbal skills we were able to talk him into |
| 156 | | the vehicle. I myself assisted him up into the vehicle by helping him by his |
| 157 | | right arm. Due to his restraints it can make it difficult to get into the vehicle. |
| 158 | | Once in the vehicle myself and CO Doyle transported him up here to Dauphin |
| 159 | | County Prison. Um, during the short ride it's - was - there was no physical or |
| 160 | | verbal interaction from inmate Riley at that time. Uh, after we had pulled into |
| 161 | | our north alley we got inmate Riley out of the vehicle and escorted him up to |
| 162 | | the records window, handed him the paperwork and while we were waiting |
| 163 | | for the paperwork in return to take him into the prison and - and go through |
| 164 | | the booking process inmate Riley looked at me and stated, "Just get it over |
| 165 | | with," and I did not fully comprehend exactly what he meant so I asked him, |
| 166 | | "What do you mean?" Inmate Riley looked at me and said, "I know you're |
| 167 | | going to do it. Just slit my throat and get it over with." At that point I further |
| 168 | | reassured inmate Riley that none of that was going to happen, that we were |
| 169 | | going to take him in, get him changed over, get through our booking process |
| 170 | | and take him to the housing unit so that he could lie down on a nice bunk and |
| 171 | | relax. We escorted him straight into the booking area, we were able to using |
| 172 | | our verbal skills complete the booking process and get him photographed, get |
| 173 | | him changed over and he was then escorted to the housing area without any, |
| 174 | | uh, physical altercations at that time. Um, during the whole process his focus |
| 175 | | was off, he was incoherent. His - his mannerisms were that of someone that |
| 176 | | definitely to me in my opinion seemed like he was under the influence of a - a |
| 177 | | serious narcotic still at that time. |
| 178 | | |
| 179 | Q: | Okay. Now since Dauphin County Prison took over the booking center an |
| 180 | | inmates' medical intake is done down there? |

181
182  A:          Correct.
183
184  Q:          So once they come up here they leave th- Dauphin County Prison's booking
185              and they go straight to their cell.
186
187  A:          Correct.
188
189  Q:          Okay. While inside DCP during the process did he say anything to ya?
190
191  A:          Once again I don't recall any of the exact wording but I do remember thinking
192              to myself that I was having trouble understanding his meaning. He was very -
193              he was not able to hold a f- fluid conversation.
194
195  Q:          Okay. In your booking process here at the prison you said you had to use a lot
196              of hand gestures for him to understand.
197
198  A:          Correct.
199
200  Q:          Okay. At any point in time did you or any CO strike, kick, shove, punch,
201              choke or pin inmate Riley to any fixed object for any extended period of time?
202
203  A:          No.
204
205  Q:          Is there anything el- anything else you would like to add to this statement?
206
207  A:          No.
208
209  Q:          Okay. We're going conclude the interview. Time would be 1008 hours.
210
211
212  The transcript has been reviewed with the audio recording submitted and it is an accurate
213  transcription.
214  Signed_____

1
2
3
4
5
6
7                  **INTERVIEW WITH SGT. MICHAEL BLOUCH**
8                        **Q=Det. Brian Walborn**
9                        **A=Sgt. Michael Blouch**
10
11
12 Q:        Today is July 26, 2019. Time will be 1012 hours. We're at the Dauphin
13             County Prison. Present is myself Detective Brian Walborn and Correctional
14             Officer Michael Blouch. For the record sir you give me permission to record
15             this interview?
16
17 A:        Yes.
18
19 Q:        Have any promises or threats been made to you for this interview?
20
21 A:        No.
22
23 Q:        Are you currently under the influence of any drugs or alcohol?
24
25 A:        No.
26
27 Q:        The highest grade in school you completed?
28
29 A:        Twelfth.
30
31 Q:        Can you read and write the English language?
32
33 A:        Yes.
34
35 Q:        For the record state your name and spell your last.
36
37 A:        Michael Blouch. B-L-O-U-C-H.
38
39 Q:        And you work for the Dauphin County Prison.
40
41 A:        Yes.
42
43 Q:        And your title here is?
44
45 A:        Sergeant.

CID000370

46
47  Q:      I'm gonna take you back to June 18, 2019. What was your function that day?
48
49  A:      I was assigned to the booking center officer to, uh, work with Jason Adams
50          and Martin Myers and Glenn - CO Glenn.
51
52  Q:      What time did you report to work?
53
54  A:      Uh, 0550.
55
56  Q:      And what time did you arrive at the booking center?
57
58  A:      Approximately 0600.
59
60  Q:      And you were relieving basically the midnight shift.
61
62  A:      Yes. It was an overnight third shift.
63
64  Q:      Was anything, uh, relayed to you as far as what was going on currently in the
65          booking center?
66
67  A:      They relie- relayed to us that the detainee Riley had, uh, been uncooperative
68          when he just came in at approximately 10 after 5:00 and that he had been
69          sprayed with the oleoresin capsicum and that he had been restrained.
70
71  Q:      Anything else?
72
73  A:      Uh, not - not at that point. No.
74
75  Q:      Okay. Approximately what time was your first interaction with, uh, inmate
76          Riley?
77
78  A:      Approximately 0652 hours we, uh, went over to the cell to pull him out for
79          processing.
80
81  Q:      What was his demeanor at that time?
82
83  A:      He was a little, uh, uncooperative. He was resistant to coming out for us going
84          in to bring him out of the cell.
85
86  Q:      Did he say anything to you?
87
88  A:      No. He would mumble, maybe groan a little bit, one word answers, no formed
89          sentences that were relevant to, uh, any direction or questions that were asked.
90

INTERVIEW WITH SGT. MICHAEL BLOUCH
Interviewer: Det. Brian Walborn
07-26-19/10:12 am
Case # C2019-0136
Page 3

| 91<br>92 | Q: | What do you recall him saying if anything? |
|---|---|---|
| 93<br>94<br>95<br>96 | A: | He m- said, "No," or, "Nah, Bro," and at one point he may have said that - related to his case that he didn't do it but it was unprompted. No questions were asked related to that. |
| 97<br>98 | Q: | How - was he restrained in any manner? |
| 99<br>100<br>101 | A: | He did have restraints on, uh, behind his back handcuffed and then he had leg shackles around his ankles. |
| 102<br>103 | Q: | Now for processing what do you mean by processing? |
| 104<br>105<br>106 | A: | We had to pull him out of the cell and take him to a different section to fingerprint them and enter their information, take pictures. |
| 107<br>108 | Q: | But he's cuffed behind the back? |
| 109<br>110<br>111<br>112 | A: | At this point he's cuffed behind the back so we have to bring his hands forward so we attempted to put a restraint belt on him that would bring his hands to the front so we could access the fingerprint machine. |
| 113<br>114 | Q: | And were you successful putting a restraint belt on him? |
| 115<br>116<br>117 | A: | No. That was unsuccessful. He resisted and continued to try to drop and, uh, pull himself away from the officers. |
| 118<br>119 | Q: | So what happened? |
| 120<br>121<br>122 | A: | So at that time we placed the inmate back in a cell and removed ourselves from the cell, unsuccessful attempts to process him. |
| 123<br>124<br>125<br>126 | Q: | This interaction with inmate Riley, at any point in time did anybody strike, kick, shove, punch, choke or pin him down for any exten- extended period of time? |
| 127<br>128<br>129<br>130 | A: | No. At that point in time he dropped himself to the floor, we gained, uh, control of him, picked him up and then just helped assist him back into the cell back to the bench. |
| 131<br>132<br>133 | Q: | Okay. Um, approximately what time did you guys go back into his cell - is - you - on your next interaction with him? |
| 134<br>135 | A: | I believe at the next interaction was for pretrial services at about 0756. |

| | | |
|---|---|---|
| 136 | Q: | And what's - what does that entail? |
| 137 | | |
| 138 | A: | Pretrial has a list of questions that they ask detainees about their history, their |
| 139 | | family, where they live, employment, past, uh, criminal history, those type of |
| 140 | | things. |
| 141 | | |
| 142 | Q: | So a - eh, there's a pretrial worker that does this? |
| 143 | | |
| 144 | A: | Yes. |
| 145 | | |
| 146 | Q: | And how was inmate Riley's responses to that pretrial employee? |
| 147 | | |
| 148 | A: | So pretrial typically will ask questions in their office. At that point we didn't |
| 149 | | feel comfortable takin' him to the office because he was uncooperative so |
| 150 | | pretrial went to the cell, we entered the cell, uh, pretrial continued to ask |
| 151 | | questions off of their questionnaire and inmate Riley was giving one-word |
| 152 | | answers that were irrelevant to the questions, um, at no avail. The pretrial |
| 153 | | could not obtain any information about his housing or any of his information |
| 154 | | that - that they were asking and at that point we left the cell. |
| 155 | | |
| 156 | Q: | And his one-word answers, what would they have been? |
| 157 | | |
| 158 | A: | Uh, most of 'em were mumbling, sometimes it was no or just groans and |
| 159 | | grunts to, uh, not correspond with any of the questions that were being |
| 160 | | answered, asked. |
| 161 | | |
| 162 | Q: | Now this interaction in the cell, which - what was the cell's number? |
| 163 | | |
| 164 | A: | It was Cell 132. |
| 165 | | |
| 166 | Q: | No one went hands-on with him at that time? |
| 167 | | |
| 168 | A: | No. At that point we were just there for the protection of pretrial and to have |
| 169 | | them ask him questions. |
| 170 | | |
| 171 | Q: | Mm-kay. According to the video that we have approximately around 9 o'clock |
| 172 | | you and your fellow correctional officers had another opportunity to deal with |
| 173 | | inmate Riley. |
| 174 | | |
| 175 | A: | Yes. At that point the judge came on the screen for the video arraignment and |
| 176 | | we attempted to pull - did - inmate Riley out to go over to the next adjacent |
| 177 | | room to the video screen. At that point he was very resistive, didn't maybe |
| 178 | | know where he was going. We tried to explain to him it was just to see the |
| 179 | | judge on the video for his arraignment. At that time we escort him from Cell |
| 180 | | 132 next-door to the arraignment room where he seen the judge. |

INTERVIEW WITH SGT. MICHAEL BLOUCH
Interviewer: Det. Brian Walborn
07-26-19/10:12 am
Case # C2019-0136
Page 5

| 181 | | |
|---|---|---|
| 182 | Q: | And how - was he still restrained - handc-... |
| 183 | | |
| 184 | A: | He was still restrained - restrained behind the back with handcuffs and leg |
| 185 | | irons. |
| 186 | | |
| 187 | Q: | You mean shackles? |
| 188 | | |
| 189 | A: | The shackles. Yes. |
| 190 | | |
| 191 | Q: | Did he say anything then during the arraignment? |
| 192 | | |
| 193 | A: | No. I don't think he understood what the judge was fully telling him. If, um - |
| 194 | | his response was groans, grunts, maybe, uh, from what I can recall he was a |
| 195 | | little confused in - in what the judge was telling him so at that point we |
| 196 | | removed him from the arraignment room and took him back to Cell 132. |
| 197 | | |
| 198 | Q: | Was he compliant? |
| 199 | | |
| 200 | A: | Uh, at that time he was still a little resistive trying to drop himself to the floor |
| 201 | | and hold back against our escort to the cell. |
| 202 | | |
| 203 | Q: | Once you placed him in the cell anything happen? |
| 204 | | |
| 205 | A: | At that point we closed the door and he remained in the cell for a short period |
| 206 | | of time. His handcuffs were still behind his back and then shortly after that I |
| 207 | | noticed that the detainee or inmate Riley was standing at the cell door with his |
| 208 | | handcuffs in front of him kind of tapping on the window with his fists and his |
| 209 | | sha- and his, uh, handcuffs so at that point I notified the other officers that I |
| 210 | | was working with that we needed to go in and apply a restraint belt to inmate |
| 211 | | Riley so then we gathered together and we entered his cell. Inmate Riley |
| 212 | | resisted the attempts of us to put the restraint belt on him. |
| 213 | | |
| 214 | Q: | Describe that resistance. |
| 215 | | |
| 216 | A: | He was pulling away, he was falling to the floor, he was trying to prevent us |
| 217 | | from putting the belt around him by struggling and twisting and turning. |
| 218 | | |
| 219 | Q: | Was - were y- you and your COs successful of removing the handcuffs from |
| 220 | | behind his back and placing the waist belt on him? |
| 221 | | |
| 222 | A: | Well he had already had the handcuffs in front of him... |
| 223 | | |
| 224 | Q: | That's true. |
| 225 | | |

| | | |
|---|---|---|
| 226 | A: | ...so we were successful then at placing the restraint belt around his waist and |
| 227 | | then inserting the handcuffs through the restraint belt so that he was restrained |
| 228 | | with the belt and cuffs. |
| 229 | | |
| 230 | Q: | Once that was accomplished you guys left the cell? |
| 231 | | |
| 232 | A: | At that point we exited the cell. |
| 233 | | |
| 234 | Q: | This incident, did anyone strike, kick, punch, shove, choke or pin inmate |
| 235 | | Riley in any form? |
| 236 | | |
| 237 | A: | No. It was just, uh, us grabbing his arms and getting the belt around him and |
| 238 | | restraint. |
| 239 | | |
| 240 | Q: | Okay. The next time you had contact with inmate Riley, that would been for |
| 241 | | medical? |
| 242 | | |
| 243 | A: | Yeah. After the restraint belt was applied we took him to medical. Because of |
| 244 | | the resistance he had cuts to his wrists so medical, uh, cleaned the wounds and |
| 245 | | put dressings on them and then we replaced him back into Cell 132. |
| 246 | | |
| 247 | Q: | Did he say anything during his medical treatment? |
| 248 | | |
| 249 | A: | I was not present in the room during the medical treatment. |
| 250 | | |
| 251 | Q: | So you don't know? |
| 252 | | |
| 253 | A: | So I don't know if he said anything to medical staff but the other officer... |
| 254 | | |
| 255 | Q: | Was there any struggle putting inmate Riley back in the cell after medical |
| 256 | | treatment? |
| 257 | | |
| 258 | A: | Yeah. I noticed that, uh, Correctional Officer Myers bringing him out of the |
| 259 | | medical department and inmate Riley was again trying to drop himself to the |
| 260 | | floor and resisting walking into the cell and then CO Myers placed him into |
| 261 | | the cell by himself and we shut the door. |
| 262 | | |
| 263 | Q: | Again did any CO punch, strike, kick? |
| 264 | | |
| 265 | A: | No. There was no other physical force used. |
| 266 | | |
| 267 | Q: | Short time later then, uh, he was transported Dauphin County Prison. |
| 268 | | |
| 269 | A: | Yes. I then called for the transport to come down and get him after he saw |
| 270 | | medical and they transported him to the Dauphin County Prison. |

271
272   Q:          And there was no issues...
273
274   A:          No i...
275
276   Q:          ...with it?
277
278   A:          No i- incidents. No physical force needed s- to - he actually walked out on
279               himself.
280
281   Q:          Did inmate Riley during your whole interaction with him seem normal?
282
283   A:          No. It appeared that he was under some sort of influence whether it was drugs
284               or, um, mental altercation or mental, uh, status that was undiagnosed but at -
285               at all the times that we had interaction with him his correspondence with us
286               was unrelated to any questions or direction we were giving him.
287
288   Q:          You say he seemed confused?
289
290   A:          Yeah. I - I think you could, you could say that he was confused, a little
291               hesitant on, uh, reacting to our - our, uh, direction.
292
293   Q:          All right, Sergeant. Is there anything else you like - you'd like to add to this
294               statement?
295
296   A:          No. I have nothing else to add to this.
297
298   Q:          All right. We're going conclude the interview. Time will be 10:25.
299
300
301   The transcript has been reviewed with the audio recording submitted and it is an accurate
302   transcription.
303   Signed _____

INTERVIEW WITH SGT KEITH BITER
Interviewer: Det. Brian Walborn
07-05-19/12:30 pm
Case #C2019-0136
Page 1

**INTERVIEW WITH SGT KEITH BITER**
**Q=Det. Brian Walborn**
**A=Sgt. Keith Biter**

1
2
3
4
5
6
7
8
9
10
11
12 Q: Today is July 5, 2019. Time will be 1230 hours. We're at the Dauphin County
13 prison. Present are myself, Detective Brian Walborn and Sergeant Keith Biter.
14 Sir, for the record, state your name and spell your last.
15
16 A: Keith Walter, Biter, B-I-T-E-R.
17
18 Q: Have any promises or threats been made to you for this interview?
19
20 A: No.
21
22 Q: You understand this interview is being recorded?
23
24 A: Yes.
25
26 Q: Are you currently unner- under the influence of any drugs or alcohol?
27
28 A: No.
29
30 Q: Can you read and write the English language?
31
32 A: Yes.
33
34 Q: The highest grade in school you completed?
35
36 A: 12th.
37
38 Q: You're a sergeant with Dauphin County prison, correct?
39
40 A: Yes.
41
42 Q: How long have you been employed by the Dauphin County prison?
43
44 A: Uh, 21 years.
45

46 Q: While you've been employed here 21 years, have you had any specialized
47 training?
48
49 A: I've been an EMT, uh, First Aid, AED/CPR instructor, Fire instructor and
50 that's about it.
51
52 Q: On June 26, 2019, you were working the 0600 to 1400 hour shift?
53
54 A: Correct.
55
56 Q: And what was your assignment that day?
57
58 A: I'm Booking Officer.
59
60 Q: Which would include what duties?
61
62 A: Basically everybody leaving and entering the prison goes through the booking
63 part of, uh, the facility even if they're going out to a hearing or court, anything
64 like that.
65
66 Q: During your shift on that date, did you have knowledge that CO Singleton,
67 CO Danner were doing a transport?
68
69 A: Yes, I was informed they were taking an inmate off of A block to Harrisburg
70 ER. I knew no other details other than that.
71
72 Q: Do you know who that inmate was?
73
74 A: No.
75
76 Q: Continue.
77
78 A: Okay. Uh, they were hanging out waiting to get their weapons. And I'm not
79 sure if Central called them or something called them and told them get a
80 uniform, go to A block to get this guy. He was in a suicide smock at the time
81 and we needed to put him in a full uniform to take him out on a transport. I
82 went about my business. I was handing in paperwork to Central. And I heard
83 bring a restraint chair to A block. So, I went into Segregation where you -
84 restraint chairs are stored, brought one to A block. And wasn't sure what cell I
85 was actually going to. I went to where there was officers - a door was open
86 and there was officers in the cell. There was multiple officers in there. I only
87 know - I saw Danner, Singleton, Captain Klahr. Uh, there was other officers
88 there but I really wasn't paying attention to who all was there. I was more
89 worried about what was going on with the inmate.
90

| | | |
|---|---|---|
| 91 | Q: | Could you see the inmate? |
| 92 | | |
| 93 | A: | When I first got to the door with the restraint chair, I could see the inmate. He |
| 94 | | was laying, it seemed like on his right side with his head towards the back of |
| 95 | | the cell. Uh, go ahead. |
| 96 | | |
| 97 | Q: | Could you see if he was handcuffed and shackled? |
| 98 | | |
| 99 | A: | At that time I could not tell. Uh, once - once it seemed like they had him |
| 100 | | restrained then so- they - the officers started exiting the cell, Sergeant Lewis |
| 101 | | ordered the female officers to leave. I wasn't really paying attention who was |
| 102 | | there. I believe CO Donovan, Sergeant Hess. At that time as they were |
| 103 | | walking out sort of blocking my view into the cell, the next thing I know the |
| 104 | | inmate is at the cell door on the floor, appeared to be he was sort of in |
| 105 | | between his back and his right side, not completely on either one. At that point |
| 106 | | I helped CO Singleton. He was restrained at that point, handcuffed behind his |
| 107 | | back, shackles on his feet. We lifted him up, put him in the restraint chair. His |
| 108 | | arms were behind his back but way up towards his shoulders. |
| 109 | | |
| 110 | Q: | Let me stop you there a second and go back. Um, in an earlier interview you |
| 111 | | mentioned about a spit shield. |
| 112 | | |
| 113 | A: | Oh, correct. Uh, as they were - it looked like they were still struggling. That's |
| 114 | | why I couldn't tell if he was cuffed at the time because they - seemed like |
| 115 | | there was still a lot of movement from the inmate. Someone asked for a spit |
| 116 | | shield, which was stored in a pouch behind his, uh, restraint chair. I handed |
| 117 | | the spit shield into the cell, I'm not even sure who took it, who actually placed |
| 118 | | it on the inmate but the - when he came out of the cell he had handcuffs, |
| 119 | | shackles and a spit shield. |
| 120 | | |
| 121 | Q: | Okay. So now you said s- you and CO Singleton picked up this inmate and |
| 122 | | placed him in the restraint chair? |
| 123 | | |
| 124 | A: | Correct. |
| 125 | | |
| 126 | Q: | Which the restraint chair's a molded chair or plastic designed to keep your |
| 127 | | legs in one spot and your hands, it's molded so it's more comfortable when |
| 128 | | you put your hands behind your back to sit down inside, correct? |
| 129 | | |
| 130 | A: | Correct. |
| 131 | | |
| 132 | Q: | And it's on wheels? |
| 133 | | |
| 134 | A: | Yes. |
| 135 | | |

Case 4:20-cv-00325-MWB-WIA   Document 175-10   Filed 01/30/24   Page 23 of 129

INTERVIEW WITH SGT KEITH BITER
Interviewer: Det. Brian Walborn
07-05-19/12:30 pm
Case #C2019-0136
Page 4

| | | |
|---|---|---|
| 136 | Q: | Okay. So you and CO Singleton attempt to put him in the restraint chair? |
| 137 | | |
| 138 | A: | At that point he was still pushing back, arching back. I got his arms down into |
| 139 | | the molded part where the - your handcuffed arms should be and then he still |
| 140 | | started arching back. That's when CO Lew- or Sergeant Lewis controlled his |
| 141 | | head. We put the shoulder straps on. And I saw his feet were still moving, not |
| 142 | | - he wasn't restrained at - with shackles onto the chair. He had shackles on his |
| 143 | | feet but you shackle him actually to the restraint chair. I helped CO Singleton |
| 144 | | restrain his feet to the chair. Then we started to move him off the block and to |
| 145 | | - go ahead. |
| 146 | | |
| 147 | Q: | Let me ask you this, would you characterize his actions as resistance to |
| 148 | | attempt not being restrained in the chair? |
| 149 | | |
| 150 | A: | He was resisting everything that the officers were ordering him to sit back. He |
| 151 | | really didn't give any verbal responses but he still continued to struggle |
| 152 | | against the officers. Uh, we started to wheel him off and I looked at his chest. |
| 153 | | He didn't appear to me to be breathing. I placed my hand on his chest. I didn't |
| 154 | | feel any movement. At that time I did a sternum rub, which is basically a skill |
| 155 | | we learn in EMT just to try to - it's a painful stimuli. So if someone is trying |
| 156 | | to pretend they're not awake, they would - they would respond to a painful |
| 157 | | stimuli. I did it. He had got no response. Captain Klahr did the same thing. At |
| 158 | | that point he called the medical emergency. Since he was already in a mobile |
| 159 | | chair we decided it was quicker to take him to medical and start our response |
| 160 | | than to pull him out of the chair on the block. All our medical equipment is |
| 161 | | stored in medical for emergencies so we figured that was the best place to get |
| 162 | | him. By the time we got him to medical they were just opening the door. So it |
| 163 | | definitely was a quicker response us getting him back there. As soon as we got |
| 164 | | him into medical, the spit shield was removed. He was removed from the |
| 165 | | chair. All restraints taken off and I began CPR. As I was doing CPR someone |
| 166 | | else applied the AED. It allowed us to shock him one time only. And every |
| 167 | | other time it was no shock advised. I continued to do CPR. The ambulance |
| 168 | | was called. A few different people rotated in to do CPR with me. I did the bag |
| 169 | | valve mask to give him breaths while other people were doing CPS. The |
| 170 | | ambulance arrived. They took their - our AED off, put theirs on. I handed ours |
| 171 | | to Warden Briggs. And then I continued to rode in - rotate in and do CPR until |
| 172 | | the removed him from the facility. |
| 173 | | |
| 174 | Q: | Now you mentioned Sergeant Lewis did this hypoglossal pressure point, |
| 175 | | which is underneath the - the jaw. |
| 176 | | |
| 177 | A: | Correct. |
| 178 | | |
| 179 | Q: | And it's towards the rear of the jaw? |
| 180 | | |

CID000381

| 181 | A: | Correct. |
| 182 | | |
| 183 | Q: | By Sergeant Lewis applying that, did you guys receive compliance? |
| 184 | | |
| 185 | A: | What - it was - within seconds after that he went completely limp. And |
| 186 | | basically by the way his head was tilted, that should've opened up his airway |
| 187 | | the way his head - when you do that maneuver it opens up your airway. So it |
| 188 | | was shortly after he actually touched his head that he went limp. |
| 189 | | |
| 190 | Q: | From the time you first observe the inmate, now is it your arrival at A-1-5 'til |
| 191 | | you were moving and you realized he went limp, wasn't responding, how long |
| 192 | | was that would you guess? |
| 193 | | |
| 194 | A: | In these situations it seems like forever but, it had to be - I couldn't have been |
| 195 | | at the cell more than two, three minutes at the door. |
| 196 | | |
| 197 | Q: | At any point in time did you hear the inmate say anything? |
| 198 | | |
| 199 | A: | No. |
| 200 | | |
| 201 | Q: | At any point in time did you ever - did you strike, kick, punch or pin his body |
| 202 | | to a hard object? |
| 203 | | |
| 204 | A: | No. |
| 205 | | |
| 206 | Q: | Choke him? |
| 207 | | |
| 208 | A: | No. |
| 209 | | |
| 210 | Q: | Did you see any other CO do that? |
| 211 | | |
| 212 | A: | No. |
| 213 | | |
| 214 | Q: | Is there anything else you'd like to add to this statement? |
| 215 | | |
| 216 | A: | Not at this time. |
| 217 | | |
| 218 | Q: | All right. We're going to conclude the interview. Time will be 12:41. |
| 219 | | |
| 220 | | |
| 221 | | The transcript has been reviewed with the audio recording submitted and it is an accurate |
| 222 | | transcription. |
| 223 | | Signed_____ |

INTERVIEW WITH SGT. JASON ADAMS
Interviewer: Det. Brian Walborn
08-07-19/9:47 am
Case # C2019-0136
Page 1

```
 1
 2
 3
 4
 5
 6
 7                          INTERVIEW WITH SGT. JASON ADAMS
 8                             Q=Det. Brian Walborn
 9                             A=Sgt. Jason Adams
10
11
12    Q:        Today's August 7, 2019, time will be 9:47 hours. We're at the Dauphin
13              County Prison. Present is myself, Detective Brian Walborn and Sergeant
14              Jason Adams. Sir, do you give me permission to record this interview?
15
16    A:        Yes, sir.
17
18    Q:        Have any promises or threats been made to you for this interview?
19
20    A:        No, sir.
21
22    Q:        Are you currently - currently under the influence of any drugs or alcohol?
23
24    A:        No, sir.
25
26    Q:        Highest grade in school you completed?
27
28    A:        College, sir.
29
30    Q:        Can you read and write the English language?
31
32    A:        Yes, sir.
33
34    Q:        For the record, state your name and spell your last.
35
36    A:        Jason Adams, A-D-A-M-S.
37
38    Q:        And you're a Sergeant here at Dauphin County Prison?
39
40    A:        Yes, sir.
41
42    Q:        And how long you been employed here as a correctional officer?
43
44    A:        Um, 19 years, two months, sir.
45
```

| | | |
|---|---|---|
| 46 | Q: | Any previous correctional experience? |
| 47 | | |
| 48 | A: | No, sir. |
| 49 | | |
| 50 | Q: | Mm-kay, how long you been a sergeant? |
| 51 | | |
| 52 | A: | Uh, believe 2010, no 2009, so it's been 10 years, sir. |
| 53 | | |
| 54 | Q: | I'm going take you back to June 18, 2019. What shift were you working? |
| 55 | | |
| 56 | A: | Uh, 0600 to 1400. |
| 57 | | |
| 58 | Q: | What was your assignment that day? |
| 59 | | |
| 60 | A: | Uh, I was assigned to the Judicial Center, sir. |
| 61 | | |
| 62 | Q: | Also known as booking? |
| 63 | | |
| 64 | A: | Yes, sir. |
| 65 | | |
| 66 | Q: | What time did you arrive there? |
| 67 | | |
| 68 | A: | Approximately 0600, uh, between 0600 - 0605, sir. |
| 69 | | |
| 70 | Q: | And when you arrived to relieve the previous shift, are you guys informed of |
| 71 | | anything? |
| 72 | | |
| 73 | A: | Yes, sir. They do a shift report at that time. They tell us how many people |
| 74 | | need processed, how many people need arraigned, and if there's any, uh, |
| 75 | | individuals or any pr- any problems that we may encounter. |
| 76 | | |
| 77 | Q: | Did you receive any information that day? |
| 78 | | |
| 79 | A: | Uh, yes, sir, that the individual, I believe was in Cell 132, was under the |
| 80 | | influence of something and needed to be processed be- uh, prior to his |
| 81 | | arraignment. |
| 82 | | |
| 83 | Q: | Do you know who that person in Cell 132 is? |
| 84 | | |
| 85 | A: | At the time, I did not, uh, turns out it was Tyrique Riley. |
| 86 | | |
| 87 | Q: | Okay. Your first interaction with Riley, approximately what time was that? |
| 88 | | |
| 89 | A: | Uh, roughly 7:30 in the morning. |
| 90 | | |

| | | |
|---|---|---|
| 91<br>92 | Q: | And why did you have an encounter with him? |
| 93<br>94<br>95 | A: | Uh, he needed to be brought out so that we could do pictures and prints or complete his processing so that he could be seen by the judge. |
| 96<br>97 | Q: | Was he secured in any manner? |
| 98<br>99<br>100<br>101 | A: | Uh, he was handcuffed behind his back, sir and I believe he had shackles on. I can't remember if he did or didn't. I know he was definitely handcuffed behind his back. |
| 102<br>103 | Q: | So you approached and confined Riley? |
| 104<br>105 | A: | Yes, sir. |
| 106<br>107 | Q: | Tell me about that. |
| 108<br>109<br>110<br>111<br>112 | A: | Um, went up to the cell, told Mr. Riley that we were going take him over to the CPIN machine so that we could do pictures and photographs of him, then pre-trial would come and talk to him and then he would get a chance to see the judge. |
| 113<br>114 | Q: | Did you have any intention of moving his handcuffs around? |
| 115<br>116<br>117<br>118<br>119 | A: | Yes, sir. When they're, uh, removed from the cell, we place them in waist belts so that we can, uh, do fingerprints, uh with him being handcuffed behind his back, it would've been impossible for us to do the fingerprints in that way so he was transitioned into a belt. |
| 120<br>121 | Q: | That was your intent. |
| 122<br>123 | A: | Yes, sir. |
| 124<br>125 | Q: | And this first contact you had with Riley. |
| 126<br>127 | A: | Yes, sir. |
| 128<br>129 | Q: | What was his demeanor? |
| 130<br>131<br>132<br>133 | A: | Um, he s- when I opened the cell door, it stunk, and he was talking but I really can't tell you what he was saying. It just didn't make much sense. Um, he appeared like he was under the influence of something. |
| 134<br>135 | Q: | Did he make eye contact with you? |

| | | |
|---|---|---|
| 136 | A: | Uh, no, he k- kind of turned his head, kept looking around. |
| 137 | | |
| 138 | Q: | You said there was an odor from the cell. |
| 139 | | |
| 140 | A: | Yes. |
| 141 | | |
| 142 | Q: | Was that odor coming from Riley? |
| 143 | | |
| 144 | A: | Yes. |
| 145 | | |
| 146 | Q: | Was... |
| 147 | | |
| 148 | A: | Smelled like a real bad body odor, um, his breath was bad. He s- and it |
| 149 | | smelled like, uh, like he had a synthetic substance, like a synthetic marijuana. |
| 150 | | |
| 151 | Q: | You can recognize the smell of marijuana? |
| 152 | | |
| 153 | A: | Uh, th- marijuana has a unique smell, you can tell. |
| 154 | | |
| 155 | Q: | Did you smell that? |
| 156 | | |
| 157 | A: | I did not remember smelling marijuana, no sir. |
| 158 | | |
| 159 | Q: | Dealing with people who've been arrested for public intoxication, you |
| 160 | | recognize the odor of alcohol? |
| 161 | | |
| 162 | A: | Yes, sir. |
| 163 | | |
| 164 | Q: | Did he smell like that? |
| 165 | | |
| 166 | A: | No, sir. I didn't smell alcohol. |
| 167 | | |
| 168 | Q: | So he exited the cell. |
| 169 | | |
| 170 | A: | Yes, sir. |
| 171 | | |
| 172 | Q: | What happened next? |
| 173 | | |
| 174 | A: | Attempted to place him into, uh, restraint belt, uh, I don't believe it was |
| 175 | | successful. I believe that he, uh, went down to the floor. He threw himself |
| 176 | | down to the floor. I don't believe we were able to get the belt on him at that |
| 177 | | point. Um, think we took him back into the cell and had him have a seat on |
| 178 | | the bench and then exited the cell. |
| 179 | | |
| 180 | Q: | And you said fell to the floor, is that like referred to as dead weight? |

181
182   A:      Yeah, that'd be the correct way of saying it.

183
184   Q:      Did he say anything?

185
186   A:      He was saying a lot. I can't remember verbatim what he was saying but it was
187           nonsensical. It didn't really make sense. It was, uh, like I said before, it was
188           like he was under the influence of something.

189
190   Q:      Next time you had contact with inmate Riley, I believe you said that was
191           during pretrial.

192
193   A:      Uh, pretrial had - we would have to take him to see pretrial. We were unable
194           to get him out of the cell so pretrial came to talk to him in the cell. Uh, I was
195           outside the cell, but from what I can remember, the individual wasn't able to
196           get any information from him.

197
198   Q:      He was nonresponsive to their questions?

199
200   A:      I believe he was either nonresponsive or the inf- or what he was saying was
201           just, like I said before, nonsensical - wasn't making any sense to pretrial.

202
203   Q:      So once pretrial was finished, everybody left the cell, cell door was closed.

204
205   A:      Yes, sir.

206
207   Q:      What was your next contact with Riley?

208
209   A:      Believe it would be when we got to take him over for arraignment.

210
211   Q:      Tell me about that?

212
213   A:      Um, from what I remember, Sergeant Blouch was attempting to get him out of
214           the cell. Uh, I was standing there. I think he said something to the effect of,
215           "Nah, brah - nah, brah," and, uh, Sergeant Blouch escorted him out of the cell
216           and we took him over in front of the judge. Right a- right around the, uh, right
217           off to the side of where he was housed is where the video arraignments are
218           held.

219
220   Q:      And we reviewed a video where s- he was actually grabbed by Sergeant
221           Blouch and removed from the cell.

222
223   A:      Yes, sir.

224
225   Q:      That's because the judge was waiting for him.

CID000388

| | | |
|---|---|---|
| 226 | | |
| 227 | A: | Yes. |
| 228 | | |
| 229 | Q: | What - were you present for the - the District Justice when he arraigned Riley? |
| 230 | | |
| 231 | A: | I believe I was, but I can't be 100% certain without looking at it again. Um, |
| 232 | | I'm pretty certain that I was at least outside the door standing, if I wasn't in |
| 233 | | the room. |
| 234 | | |
| 235 | Q: | Do you recall him answering questions with the judge? |
| 236 | | |
| 237 | A: | To be honest, I don't. |
| 238 | | |
| 239 | Q: | Once the arraignment was over, which is in a separate room from the cell, |
| 240 | | what happened next? |
| 241 | | |
| 242 | A: | Uh, when the arraignment is concluded then the individuals are returned to the |
| 243 | | cell - to the housing unit there. He was walked over and placed back in his - |
| 244 | | back in the cell. |
| 245 | | |
| 246 | Q: | What's the next thing you recall about Riley? |
| 247 | | |
| 248 | A: | Uh, Mr. Riley was in, uh, restraint belt but he had slipped it down his waist, |
| 249 | | stepped over it, and he was, uh, hitting the glass cell door with the cuffs. |
| 250 | | |
| 251 | Q: | He was in a restraint belt or was he still handcuffed behind the back? |
| 252 | | |
| 253 | A: | No, he would've been - I guess he was handcuffed behind his back. He |
| 254 | | stepped down out of that, because that would be why we went into place him |
| 255 | | in a restraint belt. |
| 256 | | |
| 257 | Q: | So after he was hitting the door window of his cell with the handcuffs, you |
| 258 | | guys decide to make... |
| 259 | | |
| 260 | A: | Yes. |
| 261 | | |
| 262 | Q: | ...another attempt to put him in a waist belt. |
| 263 | | |
| 264 | A: | Yes, sir. |
| 265 | | |
| 266 | Q: | Tell me about that. |
| 267 | | |
| 268 | A: | Uh, with the individual tapping or hitting on the glass, the glass has a chance |
| 269 | | to break, we don't want anything to happen so we made the determination at |
| 270 | | that point to place him in a - in a waist restraint belt so that he couldn't do |

| | | |
|---|---|---|
| 271 | | that. We made entrance into the cell, um, orders were given for him to back |
| 272 | | away from the glass - the cell door and have a seat at the bench. He had |
| 273 | | refused the orders. Uh, when we went in, we placed him down on the bench at |
| 274 | | which point we started to try and take his left hand and take the cuff off so |
| 275 | | that we could put it in the, uh, handcuff that's being held by the restraint belt. |
| 276 | | Um, then it - to try and transition, he was struggling trying to pull his hands |
| 277 | | away from us. Um, we were able to get the handcuff off of the right one. Get |
| 278 | | the right restraint belt cuff on, then we placed the res- we, uh, secured the |
| 279 | | restraint belt. |
| 280 | | |
| 281 | Q: | This took some time. |
| 282 | | |
| 283 | A: | Yeah. |
| 284 | | |
| 285 | Q: | Why? |
| 286 | | |
| 287 | A: | Um, because he was struggling with us and we were trying to not really use |
| 288 | | any force against him, just trying to control his arms and - and hold onto him |
| 289 | | and get the restraints there to where they could be double locked and secured |
| 290 | | and get him, uh, belted so that he was no longer able to - to hit that glass. |
| 291 | | |
| 292 | Q: | Once that was accomplished, everyone left the cell? |
| 293 | | |
| 294 | A: | Yes, sir. |
| 295 | | |
| 296 | Q: | Did you have any further action with inmate Riley? |
| 297 | | |
| 298 | A: | No, sir. I don't believe so. |
| 299 | | |
| 300 | Q: | From the time you started working at the Booking Center that day, 0600 hours |
| 301 | | until inmate Riley left booking to go to DCP, did you or any CO kick him? |
| 302 | | |
| 303 | A: | No, sir. |
| 304 | | |
| 305 | Q: | Punch him? |
| 306 | | |
| 307 | A: | No, sir. |
| 308 | | |
| 309 | Q: | Strike him in any manner? |
| 310 | | |
| 311 | A: | No, sir. |
| 312 | | |
| 313 | Q: | Choke him? |
| 314 | | |
| 315 | A: | No, sir. |

316
317   Q:         Pin him to any solid object for extended period of time?
318
319   A:         No, sir.
320
321   Q:         That's all I have. Is there anything you'd like to add to this statement,
322              Sergeant Adams?
323
324   A:         No, sir.
325
326   Q:         All right, well, we'll conclude the interview. Time will be 0959 hours.
327
328
329   The transcript has been reviewed with the audio recording submitted and it is an accurate
330   transcription.
331   Signed_____

1
2
3
4
5
6
7       **INTERVIEW WITH LT. GREG MENDENHALL**
8             **Q=Det. Brian Walborn**
9           **A=Lt. Greg Mendenhall**
10
11
12   Q:     Today is August 7, 2019. Time will be 0842 hours. We're at the Dauphin
13          County Prison. Present is myself Detective Brian Walborn and Lieutenant
14          Greg Mendenhall. Sir, you give me permission to record your voice.
15
16   A:     Yes.
17
18   Q:     Have any promises or threats been made to you for this interview?
19
20   A:     No.
21
22   Q:     Are you currently under the influence of any drugs or alcohol?
23
24   A:     No.
25
26   Q:     Highest grade in school you completed?
27
28   A:     Uh, twelfth.
29
30   Q:     And you can read and write the English language.
31
32   A:     Yes.
33
34   Q:     For the record, state you name and spell your last.
35
36   A:     Uh, Greg Mendenhall, M-E-N-D-E-N-H-A-L-L.
37
38   Q:     And you're a Lieutenant here at Dauphin County Prison?
39
40   A:     Yes.
41
42   Q:     And how many years you've been employed here?
43
44   A:     Thirty-six.
45

46    **Q:**    And I'm going take you back to June 18, 2019. Were you working?

48    **A:**    Yes.

50    **Q:**    What shift do you normally work?

52    **A:**    Uh, 2100 hours to 0900 hours.

54    **Q:**    So on the 18th, you actually started your shift on the 17th. It ran into the 18th.

56    **A:**    Correct.

58    **Q:**    And what was your function that day?

60    **A:**    I was the, uh, officer in charge of the Judicial Center.

62    **Q:**    I'm going take you to the morning hours of the 18th, r- roughly 5 o'clock in
63          the morning. Susquehanna Police Department had an opportunity to bring in,
64          uh, an inmate, arrestee, Tyrique Riley, do you recall that?

66    **A:**    Yes.

68    **Q:**    What's the first thing you recall?

70    **A:**    Uh, when the officer at the, uh, when he pushed the call button that he had a
71          prisoner, he stated, uh, "This is Susquehanna Township. I have a male that
72          I'm going to need help getting out of the car."

74    **Q:**    Did you and some other COs leave the booking desk and come into the
75          garage?

77    **A:**    We did. At that point, the officer gets out of the car. Uh, states, you know, the
78          guy is not cooperating. At that point, I opened the rear passenger side door
79          where he was seated. I gave the command to exit the vehicle. Uh, he did not. I
80          gave the command again to exit the vehicle. Uh, he didn- h- no, he did not the
81          second time. At that point, Officer Ingersoll reached in, took him by the arm,
82          and just removed him from the vehicle.

84    **Q:**    Basically, he stood him up.

86    **A:**    Stood him up.

88    **Q:**    Did he say anything to you?

90    **A:**    He said nothing to me.

CID000405

| | | |
|---|---|---|
| 91 | | |
| 92 | Q: | In an earlier interview, you s- you said that h- and I quote th-, Riley said |
| 93 | | "what do you mean," one time. |
| 94 | | |
| 95 | A: | Yeah, when I - when I gave the first command, I - yeah you're, uh, I told |
| 96 | | Riley to well, I didn't know the name of the inmate at the time, but I told him |
| 97 | | to exit the vehicle, he said, "What do you mean?" I gave the command again |
| 98 | | to exit the vehicle. He d- gave no response. |
| 99 | | |
| 100 | Q: | Okay, so CO Ingersoll stood up... |
| 101 | | |
| 102 | A: | Stood him up. |
| 103 | | |
| 104 | Q: | ...inmate Riley. What happened next? |
| 105 | | |
| 106 | A: | We walked him to the entrance door, at which point, he went limp. He tried to |
| 107 | | - became uncooperative. He became dead weight and refused to walk into the |
| 108 | | facility. |
| 109 | | |
| 110 | Q: | Did he do anything else? |
| 111 | | |
| 112 | A: | He just attempted to scurry away, um, kick, um, basically uncooperative. At |
| 113 | | which point, we - I had him by one arm, CO Ingersoll had him by the other |
| 114 | | and we took him into the Judicial Center. |
| 115 | | |
| 116 | Q: | Well from that door of the garage, you go into a hallway. |
| 117 | | |
| 118 | A: | Yes. |
| 119 | | |
| 120 | Q: | While in that hallway, did Riley say anything? |
| 121 | | |
| 122 | A: | No. |
| 123 | | |
| 124 | Q: | Did Riley do anything in that hallway. |
| 125 | | |
| 126 | A: | He attempted to scurry away. He did not want to enter the facility or - he was |
| 127 | | kicking. |
| 128 | | |
| 129 | Q: | Okay, and when you say scurry away, would that be like pulling away from |
| 130 | | you? |
| 131 | | |
| 132 | A: | Pulling away from us, yes. |
| 133 | | |
| 134 | Q: | Then there's another door that goes into booking. |
| 135 | | |

| | | |
|---|---|---|
| 136 | A: | Yes. |
| 137 | | |
| 138 | Q: | You went through that door. |
| 139 | | |
| 140 | A: | Yes. |
| 141 | | |
| 142 | Q: | Tell us about that. |
| 143 | | |
| 144 | A: | Once we got into the Booking Center through the - through that door, uh, |
| 145 | | there's a little bench there which is basically where all the, uh, detainees are |
| 146 | | taken in an attempt to conduct a pat search. |
| 147 | | |
| 148 | Q: | Well, let's talk about that bench, um, what is your mission to accomplish there |
| 149 | | at the bench? |
| 150 | | |
| 151 | A: | Basically, it's to r-, uh, do a pat search of the person and make sure they have |
| 152 | | no contraband. |
| 153 | | |
| 154 | Q: | Which to include is drugs or weapons. |
| 155 | | |
| 156 | A: | Drugs or weapons. Uh, I told him to, uh, stand straight up and face the wall so |
| 157 | | we can conduct the pat search. He looked at me, didn't say anything, I gave |
| 158 | | the command again, at which point, he attempted to stand on it and, um, |
| 159 | | became totally uncooperative. He, um, he was uncooperative with the process |
| 160 | | at which point, he was taken to the ground. |
| 161 | | |
| 162 | Q: | You said stand on it, stand on the bench? |
| 163 | | |
| 164 | A: | Basically, he tried to get up on the bench. |
| 165 | | |
| 166 | Q: | Okay, um, in an earlier interview, besides the pat down for weapons and |
| 167 | | contraband, you're also taking any personal property of his. |
| 168 | | |
| 169 | A: | All personal property. |
| 170 | | |
| 171 | Q: | You're also takin' anything that he could hurt himself with, i.e., his shoelaces, |
| 172 | | his belt. |
| 173 | | |
| 174 | A: | Yes. |
| 175 | | |
| 176 | Q: | And also, your intent is to switch out the handcuffs that belong to |
| 177 | | Susquehanna and you put your handcuffs on. |
| 178 | | |
| 179 | A: | Yes. |
| 180 | | |

| 181 | Q: | So that's what you are trying to attempt to do at the bench. |
| 182 | | |
| 183 | A: | Yes. |
| 184 | | |
| 185 | Q: | And you were not successful with that? |
| 186 | | |
| 187 | A: | No. |
| 188 | | |
| 189 | Q: | When you have n- a person pushing off of walls, pushing off bench, |
| 190 | | contorting his body, pulling away from you, what is standard procedure then? |
| 191 | | |
| 192 | A: | Basically, it's to take him to the ground. |
| 193 | | |
| 194 | Q: | And you guys did take Riley to the ground. |
| 195 | | |
| 196 | A: | Yes. |
| 197 | | |
| 198 | Q: | What happened there? |
| 199 | | |
| 200 | A: | Uh, we were attempting to - we - uh, I told him th- uh, we were attempting to |
| 201 | | switch the cuffs off cause the cops still had their restraints on, leg irons and |
| 202 | | handcuffs. Uh, he was given a command by me to cooperate. He was told wh- |
| 203 | | what we wanted done. I told him what we wanted done and if he was gonna |
| 204 | | cooperate, which I got no response. Uh, at that point and while, he be- he |
| 205 | | started kicking, he started scurrying, trying to get away. At that point, I |
| 206 | | administered oleores- oleoresin capsicum solution to the facial area in order to |
| 207 | | gain compliance. |
| 208 | | |
| 209 | Q: | How many times? |
| 210 | | |
| 211 | A: | Once. He - we were able to finish the task of changing the handcuffs out - or |
| 212 | | the restraints from the officers to ours. At that point, he was compliant after |
| 213 | | being sprayed. At which point, we were able to lift him up and place him in |
| 214 | | Cell 132. |
| 215 | | |
| 216 | Q: | So your handcuffs were placed on him. The handcuffs were given back to |
| 217 | | Susquehanna Patrol Officer. Were there shackles applied to his legs? |
| 218 | | |
| 219 | A: | Yes. |
| 220 | | |
| 221 | Q: | Okay, so once that was accomplished, he went into Cell 132. |
| 222 | | |
| 223 | A: | Yeah, we lifted him up and just basically walked him into Cell 132. |
| 224 | | |
| 225 | Q: | What occurred next? |

INTERVIEW WITH LT. GREG MENDENHALL
Interviewer: Det. Brian Walborn
08-07-19/8:42 am
Case # C2019-0136
Page 6

| 226 | | |
|---|---|---|
| 227 | A: | We, uh, we - well once we got him into Cell 132 or - yeah 132, we were |
| 228 | | trying to - he was cuffed (unintelligible). |
| 229 | | |
| 230 | Q: | Pardon? |
| 231 | | |
| 232 | A: | He went limp again. |
| 233 | | |
| 234 | Q: | Mm-kay. |
| 235 | | |
| 236 | A: | Okay, he, uh, basically - he was ordered to sit on the bench, he went limp, and |
| 237 | | a- once again he was on the floor. |
| 238 | | |
| 239 | Q: | Once you left the cell, did, uh, well while you're still there, did medical come |
| 240 | | in? |
| 241 | | |
| 242 | A: | U- medical did come in, uh, to assess detainee Riley. Uh, medical asked if he |
| 243 | | had any injuries to which they got no response. At that point, he was on the |
| 244 | | bench and his eyes were washed with normal saline solution as a result of |
| 245 | | being exposure to the OC. |
| 246 | | |
| 247 | Q: | Do you recall Sergeant Grieb then entering the cell and taking a picture? |
| 248 | | |
| 249 | A: | Yeah, he did that under my, uh, directive. |
| 250 | | |
| 251 | Q: | Because h- Riley was maced. |
| 252 | | |
| 253 | A: | He was maced and... |
| 254 | | |
| 255 | Q: | And that's standard procedure. |
| 256 | | |
| 257 | A: | Standard procedure. |
| 258 | | |
| 259 | Q: | Everyone exited the cell and then sometime later, Sergeant Adams along with |
| 260 | | other COs went to process. |
| 261 | | |
| 262 | A: | Yeah, uh, uh, Sergeant Adams went in, we attempted to process him. Uh, he |
| 263 | | opened the cell door. Detainee Riley came out, uh, Sergeant Adams explained |
| 264 | | that he was going take the handcuffs off and basically cuff him to the side |
| 265 | | 'cause... |
| 266 | | |
| 267 | Q: | He was cuffed behind the back at that time. |
| 268 | | |
| 269 | A: | Yes. |
| 270 | | |

| 271 | Q: | And s- in the videos, Sergeant Adams has a waist belt. |
| 272 | | |
| 273 | A: | He has a waist belt. He's explains he's going put the waist belt on, remove the |
| 274 | | handcuffs from his back and handcuff him to th- his side. At that point, |
| 275 | | detainee Riley went limp and went to the floor. |
| 276 | | |
| 277 | Q: | He was taken back into Cell 132. |
| 278 | | |
| 279 | A: | Yes, he was taken back by Officer's Myers, uh, Adams. |
| 280 | | |
| 281 | Q: | Now on the video, looks like you're trying to talk to him. Do you recall what |
| 282 | | you were saying? |
| 283 | | |
| 284 | A: | Yes, I was explaining what - what Sergeant Adams was trying to do or what |
| 285 | | we're trying to do is get him processed, what he needed to do, um, to which I |
| 286 | | got no response, and we exited the cell. |
| 287 | | |
| 288 | Q: | Well in the video there was a second attempt to put the waist belt on him |
| 289 | | inside... |
| 290 | | |
| 291 | A: | Yes. |
| 292 | | |
| 293 | Q: | ...Cell 132. Was that successful? |
| 294 | | |
| 295 | A: | No. |
| 296 | | |
| 297 | Q: | So he was placed back on the bench, you guys exited the cell. |
| 298 | | |
| 299 | A: | Yes. |
| 300 | | |
| 301 | Q: | Short time later, Pre-trial ties to interview him. |
| 302 | | |
| 303 | A: | Yes. |
| 304 | | |
| 305 | Q: | Tell me about that. |
| 306 | | |
| 307 | A: | Uh, Pre-trial went in to ask the standard questions they have to ask before they |
| 308 | | see the judge or before they're arraigned. Uh, they asked him what his name |
| 309 | | was, uh, where he lived and who he lived with, and they got no res- the only |
| 310 | | response they - I - I do recall him saying, "What do you mean?" Uh, they |
| 311 | | asked what your name is, "What do you mean?" Do you know where you |
| 312 | | live? Who do you live with? They got no response and basically that was the |
| 313 | | end of their interview. |
| 314 | | |
| 315 | Q: | Okay. |

316
317 A:     Once again, we exited the cell.
318
319 Q:     And by this time is at the end of your shift.
320
321 A:     It was the end of my shift. That was my last dealing with Mr. Riley.
322
323 Q:     Mr. Riley was tr- uh, arraigned and committed to Dauphin County Prison on
324        the 18th of June. Between the 18th of June and the 26th of June, did you have
325        a- any other contact with...
326
327 A:     I had no other contact with him.
328
329 Q:     Okay. How long you been a - employed by Dauphin County Prison?
330
331 A:     Thirty-six years.
332
333 Q:     So you've seen a lot.
334
335 A:     Yes.
336
337 Q:     The demeanor of Mr. Riley is that indicative of anything to you? Does that
338        indicate anything to you?
339
340 A:     His behavior, I would say that my experience as a Correctional Officer and a
341        supervisor that he was under the influence of some substance.
342
343 Q:     And what - give me some indications.
344
345 A:     Uh, he was very incoherent. Could not and would not recognize any
346        commands. He - he was basically, uh, uh, I mean like I said, un- heavily under
347        the influence of something. He just would not cooperate, he would not - he
348        just did not understand what was being said to him.
349
350 Q:     Is this the worst you ever seen?
351
352 A:     In my experience, I've - I would say it was the worst I've ever seen.
353
354 Q:     Okay, is there anything else you'd like to add to this statement?
355
356 A:     No.
357
358 Q:     One last question, did you or did you see any CO punch inmate Riley?
359
360 A:     No.

CID000411

361
362     Q:          Strike him?
363
364     A:          No.
365
366     Q:          Kick him?
367
368     A:          No.
369
370     Q:          Choke him?
371
372     A:          No.
373
374     Q:          Pin him to any solid object for extended period of time?
375
376     A:          No.
377
378     Q:          All right, we're going conclude the interview. Time will be 0857 hours.
379
380
381     The transcript has been reviewed with the audio recording submitted and it is an accurate
382     transcription.
383     Signed_____

CID000412

INTERVIEW WITH LT. RICHARD ARMERMANN
Interviewer: Det. Brian Walborn
07-24-19 /11:16 am
Case # C2019-0136
Page 1

1
2
3
4
5
6
7 **INTERVIEW WITH LT. RICHARD ARMERMANN**
8 **Q=Det. Brian Walborn**
9 **A=Lt. Richard Armermann**
10
11
12 Q:        Today is July 24, 2019. Time will be 1116 hours. We're at the Dauphin
13          County Prison and it's myself, Detective Brian Walborn and Lieutenant
14          Richard Armermann. Sir, for the record do you give me permission to record
15          this statement?
16
17 A:        Yes I do.
18
19 Q:        Have any promises or threats been made to you for this statement?
20
21 A:        No.
22
23 Q:        Are you currently under the influence of any drugs or alcohol?
24
25 A:        No.
26
27 Q:        Can you read and write the English language?
28
29 A:        Yes.
30
31 Q:        And the highest grade in school you completed?
32
33 A:        Some college.
34
35 Q:        You're a Lieutenant here at Dauphin County Prison, correct?
36
37 A:        That's correct.
38
39 Q:        State your name and spell your last name.
40
41 A:        Richard Armermann. Last name is A-R-M-E-R-M-A-N-N.
42
43 Q:        What time - I'm going take you back to June 18, 2019. What shift do you
44          work?
45

| 46 | A: | I work what's called A Platoon - 0900 to 2100 hours. |
| 47 | | |
| 48 | Q: | You report to work at 0900 on the 18th? |
| 49 | | |
| 50 | A: | Yes. |
| 51 | | |
| 52 | Q: | And you report to where? |
| 53 | | |
| 54 | A: | I reported to the prison first and then down to the judicial center. |
| 55 | | |
| 56 | Q: | Which is commonly known as booking? |
| 57 | | |
| 58 | A: | The booking center, yes. |
| 59 | | |
| 60 | Q: | About what time did you get down to the booking center? |
| 61 | | |
| 62 | A: | A little after 9:00. |
| 63 | | |
| 64 | Q: | And when you arrived there did you notice anything going on? |
| 65 | | |
| 66 | A: | There was an incident with somebody in one of the cells where they were |
| 67 | | hitting the cell window with their handcuffs. |
| 68 | | |
| 69 | Q: | Then what occurred? |
| 70 | | |
| 71 | A: | We went in and we took the handcuffs off and put a restraint belt on the |
| 72 | | individual. |
| 73 | | |
| 74 | Q: | Do you know who the individual was? |
| 75 | | |
| 76 | A: | I had been made aware that it was Tyrique Riley. |
| 77 | | |
| 78 | Q: | Did you have an opportunity to review a video of the booking center? |
| 79 | | |
| 80 | A: | Ah - ah, yes just now - yes. |
| 81 | | |
| 82 | Q: | Okay and that refreshed your memory? |
| 83 | | |
| 84 | A: | Yes. |
| 85 | | |
| 86 | Q: | Okay. Tell me something about going into - and I believe that is cell 132 - that |
| 87 | | occurred in his cell. |
| 88 | | |
| 89 | A: | Uh, I went - I sent officers in and I then went in behind the officers. We |
| 90 | | attempted to take the handcuffs off of Mr. Riley to put the belt on him. |

INTERVIEW WITH LT. RICHARD ARMERMANN
Interviewer: Det. Brian Walborn
07-24-19 /11:16 am
Case # C2019-0136
Page 3

91
92   Q:   Let me stop you a second. Where were the handcuffs on him?
93
94   A:   They were in front of his body.
95
96   Q:   Is that normal?
97
98   A:   No, we handcuff behind the body.
99
100   Q:   Do you know how or when they came in front of the body?
101
102   A:   I was not there for that.
103
104   Q:   So apparently he slipped them underneath...
105
106   A:   Yes.
107
108   Q:   ...his legs? Sorry - continue.
109
110   A:   No, that's fine. Uh, when we were attempting to take the handcuffs off and
111       put the restraint belt on, he was resistant to our actions and would not listen to
112       verbal orders.
113
114   Q:   What were some of the verbal orders?
115
116   A:   Verbal orders were stay seated in the position that we have you in. Uh, allow
117       us to take your hands. Uh, stop pulling back with your hands. Uh, allow us to
118       put the belt on you.
119
120   Q:   And he failed to do that?
121
122   A:   Yes numerous times.
123
124   Q:   What were the actions of you and the CO's?
125
126   A:   Uh, the officers - myself - I was more of a coach in the situation. The officers
127       were trying to, um, maintain his legs so he would not kick. He kicked at one
128       of the officers and knocked her glasses off. Uh, one of the officers was
129       maintaining the position on - around his arms to keep him down to - onto the
130       bench so he would not stand up towards the officers and two other officers
131       were trying to remove the cuffs and place the belt on at the same time.
132
133   Q:   Did he give any verbal response?
134
135   A:   Not that I recall.

CID000416

| 136 | | |
|---|---|---|
| 137 | Q: | Did he say anything? |
| 138 | | |
| 139 | A: | Not that I recall. |
| 140 | | |
| 141 | Q: | Did he make any noises? |
| 142 | | |
| 143 | A: | Again, not that I recall. |
| 144 | | |
| 145 | Q: | That was successful taking the handcuffs off his wrists and putting a waist belt |
| 146 | | handcuffs on? |
| 147 | | |
| 148 | A: | We were eventually yes. |
| 149 | | |
| 150 | Q: | And you've been here at Dauphin County Prison how long? |
| 151 | | |
| 152 | A: | Uh, just short of 18 years. |
| 153 | | |
| 154 | Q: | You had dealings with numerous people? |
| 155 | | |
| 156 | A: | Yes. |
| 157 | | |
| 158 | Q: | Thousands? |
| 159 | | |
| 160 | A: | Yes. |
| 161 | | |
| 162 | Q: | Did you take any notice to this individual, eh, his demeanor? |
| 163 | | |
| 164 | A: | Uh, he didn't seem like lucid conversation was going to be adequate. He |
| 165 | | wasn't responding to what we were just trying to say - even just normal |
| 166 | | phrases. Um, I didn't deem him to be disciplinary. I deemed it to be more |
| 167 | | either, you know, chemical or psychological but I'm not an expert on that. |
| 168 | | So... |
| 169 | | |
| 170 | Q: | Did you make eye contact with him at all? |
| 171 | | |
| 172 | A: | Uh, I'm sure I did but I don't recall. |
| 173 | | |
| 174 | Q: | Okay. At any point in time did you see any CO kick him? |
| 175 | | |
| 176 | A: | No. |
| 177 | | |
| 178 | Q: | Strike him? |
| 179 | | |
| 180 | A: | No. |

181

182    Q:    Punch him?

183

184    A:    No.

185

186    Q:    Choke him?

187

188    A:    No.

189

190    Q:    Pin his body's torso to any side object for any extended period of time?

191

192    A:    No other than trying to keep him in a seated position.

193

194    Q:    Did you see any injuries on him?

195

196    A:    I did not.

197

198    Q:    Once you were successful and you and other CO's left Cell 132, did you have
199         any other contact with him?

200

201    A:    I personally did not - no.

202

203    Q:    Okay. That's the only questions I have. Is there anything else you'd like to
204         add to this statement?

205

206    A:    No, sir.

207

208    Q:    All right we'll conclude the interview. Time will be 11:21.

209

210

211    The transcript has been reviewed with the audio recording submitted and it is an accurate
212    transcription.
213    Signed_____

CID000418

1
2
3
4
5
6
7                 **INTERVIEW WITH OFC. CAMERON WEAVER**
8                       **Q=Det. Brian Walborn**
9                   **A=Ofc. Cameron Weaver**
10
11
12    Q:            Today's August 1, 2019. Time will be 1546 hours. We're at the Dauphin
13                   County CID conference room. Present is myself Detective Brian Walborn and
14                   Correctional Officer Cameron Weaver. Sir, do you give me permission to
15                   record this interview?
16
17    A:            Yes.
18
19    Q:            Have any promises or threats been made to you for this interview?
20
21    A:            No.
22
23    Q:            Are you currently under the influence of any drugs or alcohol?
24
25    A:            No.
26
27    Q:            The highest grade in school you completed?
28
29    A:            Uh, college.
30
31    Q:            And you can read and write the English language?
32
33    A:            Yes.
34
35    Q:            For the record state your name and spell your last.
36
37    A:            Cameron Weaver, W-E-A-V-E-R.
38
39    Q:            And you're a correctional officer at Dauphin County Prison?
40
41    A:            Correct.
42
43    Q:            Prior to - and how long have you been there? Sorry.
44
45    A:            Almost five years.

CID000449

| 46 | | |
|---|---|---|
| 47 | Q: | Prior to that do you have any previous correctional experience? |
| 48 | | |
| 49 | A: | No. |
| 50 | | |
| 51 | Q: | I'm going take you back to June 18, 2019. What shift did you work? |
| 52 | | |
| 53 | A: | Third shift which is 2200 to 0600. |
| 54 | | |
| 55 | Q: | So you actually started work on the 17th then? |
| 56 | | |
| 57 | A: | Correct. |
| 58 | | |
| 59 | Q: | And what was your assignment that day? |
| 60 | | |
| 61 | A: | Booking center. |
| 62 | | |
| 63 | Q: | On the 18th of June around roughly 5 o'clock in the morning did you have an |
| 64 | | opportunity to come in contact with Tyrique Riley? |
| 65 | | |
| 66 | A: | Yes. |
| 67 | | |
| 68 | Q: | Tell us about that. |
| 69 | | |
| 70 | A: | The - Susquehanna brought in the - Riley. He got on the intercom, told us that |
| 71 | | there was a - there could be a potential issue with the individual he was |
| 72 | | bringing in, um, being non-compliant so myself, CO Ingersoll and Lieutenant |
| 73 | | Mendenhall went out to assist him in the garage. |
| 74 | | |
| 75 | Q: | What happened there? |
| 76 | | |
| 77 | A: | The door was opened for Riley to step out on his own. He was told several |
| 78 | | times to get out. He refused to do so so he was escorted out of the car and we |
| 79 | | started to escort him in to the booking center. |
| 80 | | |
| 81 | Q: | Okay. So from the garage until you get into booking there's a door at the |
| 82 | | garage, a small hallway, then the door to enter into booking? |
| 83 | | |
| 84 | A: | Correct. |
| 85 | | |
| 86 | Q: | Did anything happen between the door that Susquehanna police cruiser and |
| 87 | | the door leading into that hallway? |
| 88 | | |
| 89 | A: | Mr. Riley refused to walk on his own. He went dead weight so we escorted |
| 90 | | him. Um, he started to kick and push off of everything that he could. |

| | | |
|---|---|---|
| 91 | | |
| 92 | Q: | Was he saying anything? |
| 93 | | |
| 94 | A: | He repeated said, "Yo," and nothing else. |
| 95 | | |
| 96 | Q: | You able to get him through the first door into that small hallway? |
| 97 | | |
| 98 | A: | Yes. |
| 99 | | |
| 100 | Q: | Anything happen in that small hallway? |
| 101 | | |
| 102 | A: | He resisted more and refused our orders to walk. He kept just kicking and |
| 103 | | pushing off things. |
| 104 | | |
| 105 | Q: | So you describe resisting as kicking, pushing off the walls, doors... |
| 106 | | |
| 107 | A: | Yes. |
| 108 | | |
| 109 | Q: | Was he contorting his body twisting about? |
| 110 | | |
| 111 | A: | Yes. |
| 112 | | |
| 113 | Q: | Was he saying anything then? |
| 114 | | |
| 115 | A: | Not that I recall. |
| 116 | | |
| 117 | Q: | Now you're at the second door. You move through the second door and now |
| 118 | | you're into booking. What is the standard procedure of dealing with a brand |
| 119 | | new prisoner? |
| 120 | | |
| 121 | A: | The standard procedure is to take 'em over near the bench, have 'em stand at |
| 122 | | the bench with their back towards us, we pat them down for any contraband or |
| 123 | | any personal items and remove it. We remove the handcuffs, place our hands |
| 124 | | on the wall and pat them down and then remove shoelaces, belts, drawstrings, |
| 125 | | anything they could use to harm themselves. |
| 126 | | |
| 127 | Q: | Then what would happen to an average prisoner? |
| 128 | | |
| 129 | A: | They would sign for their property and we would take 'em to a cell where |
| 130 | | they would wait until we process them. |
| 131 | | |
| 132 | Q: | And you wouldn't process until you received the criminal complaint from the |
| 133 | | Police Department? |
| 134 | | |
| 135 | A: | Correct. |

136
137    Q:          Was this a n- normal inst- uh, prisoner...

138
139    A:          No s...

140
141    Q:          ...when he got to the bench?

142
143    A:          No sir.

144
145    Q:          Describe what happened.

146
147    A:          He was told multiple times just to stand up so we could do the pat-down
148                process and remove his personal items. He refused to even stand. He was told
149                multiple times to stand up and refused to do so. He kept kicking off the wall,
150                kicking off the bench, trying to spin around and contort his body.

151
152    Q:          Did he say anything now?

153
154    A:          Not that I recall.

155
156    Q:          So when you have an individual that is like that, what is the normal procedure
157                now?

158
159    A:          Place him on the ground or on the floor and pat them down and do it with the
160                process on the floor.

161
162    Q:          The same process you just described?

163
164    A:          Yes.

165
166    Q:          But he - if he was combative that person wouldn't be able to sign for stuff, for
167                his items.

168
169    A:          Correct.

170
171    Q:          So he would be...

172
173    A:          Put away until he c- either decided to sign or calm down.

174
175    Q:          So you took him to the floor, Mr. Riley?

176
177    A:          Yes. Yes sir.

178
179    Q:          What happened now?

180

INTERVIEW WITH OFC. CAMERON WEAVER
Interviewer: Det. Brian Walborn
08-01-19/3:46 pm
Case # CC-2017-294
Page 5

| 181 | A: | We held him in place, patted him down, checked for any personal items, |
| 182 | | removed his belt, shoestrings, shoes, socks, everything that he could |
| 183 | | potentially harm himself with. |
| 184 | | |
| 185 | Q: | Was he compliant to this? |
| 186 | | |
| 187 | A: | No sir. |
| 188 | | |
| 189 | Q: | What was he doin'? |
| 190 | | |
| 191 | A: | Kicking, contorting his body. He kept tryin' to spin around. |
| 192 | | |
| 193 | Q: | Eventually you compl- would you - excuse me here. What was your function |
| 194 | | there on the - on the floor? |
| 195 | | |
| 196 | A: | I was holding his - the left side of his body and I was checking pockets to |
| 197 | | make sure he didn't have anything stashed in his pockets. |
| 198 | | |
| 199 | Q: | Other COs were applying shockel - shackles? |
| 200 | | |
| 201 | A: | Yes. |
| 202 | | |
| 203 | Q: | Also completing the search and taking his personal property? |
| 204 | | |
| 205 | A: | Yes. |
| 206 | | |
| 207 | Q: | And the handcuffs that were on him belonged to Susquehanna Township |
| 208 | | police officer. |
| 209 | | |
| 210 | A: | Correct. |
| 211 | | |
| 212 | Q: | What'd you switch out the cuffs? |
| 213 | | |
| 214 | A: | Yes. We left the Susquehanna police officer's cuffs on, put our cuffs on and |
| 215 | | then removed his. |
| 216 | | |
| 217 | Q: | Up to this point has Riley said anything? |
| 218 | | |
| 219 | A: | Not that I recall. No sir. |
| 220 | | |
| 221 | Q: | Then what happened. |
| 222 | | |
| 223 | A: | He continued to resist, contort his body, spin around, wiggle around. |
| 224 | | Lieutenant Mendenhall applied OC spray. |
| 225 | | |

| | | |
|---|---|---|
| 226 | Q: | Did that help control inmate Riley? |
| 227 | | |
| 228 | A: | A little bit. He was still contorting his body and kicking and resisting. |
| 229 | | |
| 230 | Q: | With all that completed what happened next? |
| 231 | | |
| 232 | A: | After everything was done we escorted him to the cell, put him in the cell, um, |
| 233 | | attempted to sit him on the bench so that medical could come see him. He |
| 234 | | resisted. |
| 235 | | |
| 236 | Q: | Did he - did he remain on the bench? |
| 237 | | |
| 238 | A: | I don't recall. |
| 239 | | |
| 240 | Q: | Did medical ever come in and check him? |
| 241 | | |
| 242 | A: | Yes. Medical came in, checked him and flushed his eyes out due to being |
| 243 | | sprayed. |
| 244 | | |
| 245 | Q: | And then what occurred? |
| 246 | | |
| 247 | A: | We left the cell, got the camera, took pictures of his injury - took pictures of |
| 248 | | his face for injuries. |
| 249 | | |
| 250 | Q: | Were there any injuries that you could see? |
| 251 | | |
| 252 | A: | No sir. |
| 253 | | |
| 254 | Q: | Is he saying anything now? |
| 255 | | |
| 256 | A: | Not that I recall. No. |
| 257 | | |
| 258 | Q: | After pictures were taken all COs exited the cell? |
| 259 | | |
| 260 | A: | Yes. |
| 261 | | |
| 262 | Q: | Did you have any more contact with Riley? |
| 263 | | |
| 264 | A: | No sir. |
| 265 | | |
| 266 | Q: | Now he came in somewhere around 5 o'clock. Your shift ends at 6 o'clock. |
| 267 | | |
| 268 | A: | Correct. |
| 269 | | |
| 270 | Q: | On that day at 6 o'clock did you leave the booking center... |

| | | |
|---|---|---|
| 271 | | |
| 272 | A: | Yes. |
| 273 | | |
| 274 | Q: | ...when you were relieved? |
| 275 | | |
| 276 | A: | Yes sir. |
| 277 | | |
| 278 | Q: | So you had no further contact with inmate Riley? |
| 279 | | |
| 280 | A: | No sir. |
| 281 | | |
| 282 | Q: | Did you hear him say anything then? |
| 283 | | |
| 284 | A: | Not that I recall. No. |
| 285 | | |
| 286 | Q: | In your past five years as a correctional officer how often are you in booking? |
| 287 | | |
| 288 | A: | Since we took it over couple months ago maybe one or two times a week. |
| 289 | | |
| 290 | Q: | So you had a lot of dealings with prisoners coming in off the street arrested by |
| 291 | | Police Departments? |
| 292 | | |
| 293 | A: | Yes. |
| 294 | | |
| 295 | Q: | Did his demeanor strike anything with you? |
| 296 | | |
| 297 | A: | Yeah. He wasn't - I don't know what normal would be for him but it - he |
| 298 | | wasn't acting normal. He wasn't listening. He wasn't verbalizing anything. |
| 299 | | |
| 300 | Q: | At the Dauphin County Booking Center have you had an opportunity to come |
| 301 | | in contact with arrestees that were high or intoxicated? |
| 302 | | |
| 303 | A: | Yes. |
| 304 | | |
| 305 | Q: | Did his demeanor indicate to you any of that? |
| 306 | | |
| 307 | A: | Yes. |
| 308 | | |
| 309 | Q: | You're not a doctor. I'm not a doctor... |
| 310 | | |
| 311 | A: | Correct. |
| 312 | | |
| 313 | Q: | ...but through your experience? |
| 314 | | |
| 315 | A: | Yes. Through my experience I would say he was on some sort of drugs. |

316
317   Q:          At any point in time did you punch him?
318
319   A:          No sir.
320
321   Q:          Strike him in any manner?
322
323   A:          No sir.
324
325   Q:          Kick him?
326
327   A:          No.
328
329   Q:          Choke him?
330
331   A:          No.
332
333   Q:          Pin him to any hard (service) - surface for an extended period of time?
334
335   A:          N- no other than holding him onto the ground while we completed the pat-
336               down search for a brief amount of time.
337
338   Q:          Now I asked you'd done any of that. Did you see any other CO do that?
339
340   A:          No sir.
341
342   Q:          Is there anything you'd like to add to this statement?
343
344   A:          No sir.
345
346   Q:          All right. We're going to conclude the interview. Time will be 1557 hours.
347
348
349   The transcript has been reviewed with the audio recording submitted and it is an accurate
350   transcription.
351   Signed_____

1
2
3
4
5
6
7 **INTERVIEW WITH CO STEVEN SINGLETON**
8 **Q=Det. Brian Walborn**
9 **A=CO Steven Singleton**
10
11
12 Q:      Today is July 3, 2019. Time will be 1000 hours. We're at the Dauphin County
13          Prison. Present is myself, Detective Brian Walborn and Correction Officer
14          Steven Singleton. Steven, for the record state your name and spell your last.
15
16 A:      Steven Singleton, S-I-N-G-L-E-T-O-N.
17
18 Q:      And what is your profession here at Dauphin County Prison?
19
20 A:      Correctional Officer.
21
22 Q:      Okay. CO Singleton, for the record have any promises or threats been made to
23          you for this interview?
24
25 A:      No.
26
27 Q:      Are you currently under the influence of any drugs or alcohol?
28
29 A:      Nope.
30
31 Q:      Can you read and write the English language?
32
33 A:      Yes.
34
35 Q:      And the highest grade in school you completed?
36
37 A:      Graduated 12th grade.
38
39 Q:      You understand this interview's being recorded and you give me permission
40          to record your voice?
41
42 A:      Yes.
43
44 Q:      Were you working on June 26, 2019?
45

CID000467

| | | |
|---|---|---|
| 46 | A: | Yes. |
| 47 | | |
| 48 | Q: | What was your assignment that day? |
| 49 | | |
| 50 | A: | F block. |
| 51 | | |
| 52 | Q: | At some point in time - oh sorry, what is your shift? |
| 53 | | |
| 54 | A: | Six to two. |
| 55 | | |
| 56 | Q: | 0600 to 1400 hours? |
| 57 | | |
| 58 | A: | Yes. |
| 59 | | |
| 60 | Q: | At some point in time in your shift you were requested to, uh, report to |
| 61 | | central, 'bout what time was that? |
| 62 | | |
| 63 | A: | Uh, I think it as - a little after 9 o'clock. |
| 64 | | |
| 65 | Q: | And you reported to central? |
| 66 | | |
| 67 | A: | Yes. |
| 68 | | |
| 69 | Q: | And when you got to central what happened? |
| 70 | | |
| 71 | A: | They told me that we were goin' on a, uh, transport - take an inmate to the |
| 72 | | hospital. |
| 73 | | |
| 74 | Q: | Did you know the inmates name? |
| 75 | | |
| 76 | A: | Well they told me there, but I didn't know him. |
| 77 | | |
| 78 | Q: | What was the name given to you? |
| 79 | | |
| 80 | A: | Uh, Tyrique Riley. |
| 81 | | |
| 82 | Q: | And Tyrique was being housed in what cell? |
| 83 | | |
| 84 | A: | A-1-5. |
| 85 | | |
| 86 | Q: | So, once they told you that what'd you do? |
| 87 | | |
| 88 | A: | Uh, we went and got our - our weapons and then we secured 'em and came |
| 89 | | back in. |
| 90 | | |

| 91 | Q: | And your weapon is what? |
|---|---|---|
| 92 | | |
| 93 | A: | It's, uh - uh, Glock, uh, model 22 and, uh, 45 rounds of ammunition. |
| 94 | | |
| 95 | Q: | Glock 22, what caliber? |
| 96 | | |
| 97 | A: | Forty. |
| 98 | | |
| 99 | Q: | And 45 rounds of ammunition? |
| 100 | | |
| 101 | A: | Mm-hm. |
| 102 | | |
| 103 | Q: | That's on a gun belt? |
| 104 | | |
| 105 | A: | Yeah. |
| 106 | | |
| 107 | Q: | What else is on the gun belt? |
| 108 | | |
| 109 | A: | Uh, you have an ASP, handcuffs, and pepper spray. |
| 110 | | |
| 111 | Q: | Any extra magazines? |
| 112 | | |
| 113 | A: | Uh, two, yeah, that's - yeah. Two extra magazines. That makes up the 45. |
| 114 | | |
| 115 | Q: | Now when you say you secured your weapon, uh, where was that secured? |
| 116 | | |
| 117 | A: | In the lockbox out there, uh, North Sally. The gun locker. |
| 118 | | |
| 119 | Q: | But everything else stayed on you? Were the magazines also secured? |
| 120 | | |
| 121 | A: | The magazines were secured and the cell phone. |
| 122 | | |
| 123 | Q: | And a cell phone, but the ASP the handcuffs, and the mace remains on the gun belt? |
| 124 | | |
| 125 | | |
| 126 | A: | Correct. |
| 127 | | |
| 128 | Q: | Then what did you guys - what'd you do? Who - better yet, who was with you? |
| 129 | | |
| 130 | | |
| 131 | A: | It was me and CO Danner. |
| 132 | | |
| 133 | Q: | Then what did you guys do? |
| 134 | | |
| 135 | A: | Well, then they told us to go get a uniform and put on him so we went and got |

| | | |
|---|---|---|
| 136 | | a uniform and went to A-1-5. |
| 137 | | |
| 138 | Q: | Did they tell you anything else about this prisoner transport to the hospital? |
| 139 | | |
| 140 | A: | I was - I was told it - it was - he was - it as because of a- his altered mental |
| 141 | | state. |
| 142 | | |
| 143 | Q: | So, you knew there was some type of mental issue goin- involved - being |
| 144 | | involved going into this? |
| 145 | | |
| 146 | A: | Yes. |
| 147 | | |
| 148 | Q: | So, when you arrived at cell A-1-5 what's the first thing you observe? |
| 149 | | |
| 150 | A: | Uh, he was standing at his door, like, kind of, like foaming at the mouth. |
| 151 | | |
| 152 | Q: | You say foaming at the mouth, describe that. |
| 153 | | |
| 154 | A: | Like a white foam that's coming out on his chin and everything. |
| 155 | | |
| 156 | Q: | The center of his mouth? The corners of his mouth? |
| 157 | | |
| 158 | A: | No, uh, the bottom going down his chin. |
| 159 | | |
| 160 | Q: | Did he say anything to you? |
| 161 | | |
| 162 | A: | No. |
| 163 | | |
| 164 | Q: | Did you guy - you or CO Danner say anything to him? |
| 165 | | |
| 166 | A: | I think CO Danner did tell him to go to the back of the cell. |
| 167 | | |
| 168 | Q: | Did he move to the back of the cell? |
| 169 | | |
| 170 | A: | He was - yeah. |
| 171 | | |
| 172 | Q: | Did you guys explain to him at this point in time why you told him to go to |
| 173 | | the back of the cell? |
| 174 | | |
| 175 | A: | Yeah, we told him we were trying to, you know, take him to the hospital and |
| 176 | | we brought him a uni- we thought the uniform would - you know what I |
| 177 | | mean? He would put the uniform on and just go to the hospital, but he didn't. |
| 178 | | |
| 179 | Q: | At this point in time the door didn't open yet? The door of the cell? |
| 180 | | |

181   A:   Yeah, we went in and he...
182
183   Q:   Okay, so...
184
185   A:   ...was at the back of the cell standing and we were in front of him.
186
187   Q:   So, when he moved to the back of the cell, that's when the door - you had A
188        Control open the door?
189
190   A:   I don't know if he was the whole way to the back, but whenever we went in
191        then he backed up the rest of the way.
192
193   Q:   Okay. And while you were inside the cell you guys informed him he was
194        going to the hospital? Did you - how was he dressed then?
195
196   A:   He had a smock on.
197
198   Q:   Describe it.
199
200   A:   A suicide smock. It's, uh, it has Velcro over the shoulders and it's like a -
201        almost like a skirt or something.
202
203   Q:   And why was - why was he wearing that?
204
205   A:   'Cause he was on suicide watch. A Level 1 wears a smock.
206
207   Q:   Okay. Did you tell him to take the smock off?
208
209   A:   Yeah.
210
211   Q:   Did he do it?
212
213   A:   No.
214
215   Q:   How many times do you think you requested that?
216
217   A:   I think at least twice and then we just took it off.
218
219   Q:   How'd you take it off?
220
221   A:   It's just Velcro. It just un-velcros and it comes right off. It's not anything...
222
223   Q:   So, you and CO Danner approached him, did you take control of him by-
224        before you removed the smock?
225

| 226 | A: | Uh, I think Danner had ahold of his arm over here and I reached over and |
| 227 | | grabbed the smock and un-velcroed it and it just came right off. |
| 228 | | |
| 229 | Q: | Now your motion there CO Danner had him - had control of him. Is it by the |
| 230 | | arms? |
| 231 | | |
| 232 | A: | Just by one arm, yeah. |
| 233 | | |
| 234 | Q: | Did you take control of the other arm? |
| 235 | | |
| 236 | A: | Nah, I just pulled the smock off. |
| 237 | | |
| 238 | Q: | The smock came off? Did he say anything? |
| 239 | | |
| 240 | A: | N- n- no. |
| 241 | | |
| 242 | Q: | Did he resist you at this time? |
| 243 | | |
| 244 | A: | Not really - too bad right then. It wasn't until the uniform... |
| 245 | | |
| 246 | Q: | So, he's standing there, is he wearing any clothes? |
| 247 | | |
| 248 | A: | No. |
| 249 | | |
| 250 | Q: | Now you say you tried to put the uniform on. You're talking a normal |
| 251 | | Dauphin County Prison inmate uniform? |
| 252 | | |
| 253 | A: | Well it was a lock in uniform, yeah, the orange and white... |
| 254 | | |
| 255 | Q: | But it's just a shirt... |
| 256 | | |
| 257 | A: | Shirt and pants. |
| 258 | | |
| 259 | Q: | What item did you guys try to place on him first? |
| 260 | | |
| 261 | A: | The shirt. |
| 262 | | |
| 263 | Q: | Did you give him an opportunity to dress himself? |
| 264 | | |
| 265 | A: | Well we told him to put this on, but he wouldn't - there was nothing just - he |
| 266 | | just stared. |
| 267 | | |
| 268 | Q: | Is that foam still coming out of his mouth? |
| 269 | | |
| 270 | A: | Yes. |

INTERVIEW WITH CO STEVEN SINGLETON
Interviewer:  Det. Brian Walborn
7-03-19/10:00 am
Case # C2019-0136
Page 7

271
272 Q:     Who attempted to put the shirt on him?
273
274 A:     Well I tried to put - put his hand in it and he just wouldn't let that happen. He
275        fought that - grabbed ahold of the shirt and pushed it away.
276
277 Q:     Okay. Did CO Danner try also?
278
279 A:     No. He was holding him by the other arm.
280
281 Q:     In the previous interview you said CO Keith Hoffman then came in?
282
283 A:     Yes.
284
285 Q:     What'd he try to do?
286
287 A:     He tried to put the shirt over top of his - on his head - over his head so he
288        could put it on him.
289
290 Q:     But what happened?
291
292 A:     Uh, he fought that too and resisted.
293
294 Q:     And you mean resisted he's grabbing the shirt to prevent the shirt from going
295        over top of his head? Okay. Then what happened?
296
297 A:     Well then after we realized we couldn't get the uniform on him then we took
298        him, uh, and laid him on the floor.
299
300 Q:     Did anyone at that point in time request a captain?
301
302 A:     It was right about there, yeah, or maybe even before we laid him on the floor,
303        uh, yeah.
304
305 Q:     And why would someone request the captain's presence?
306
307 A:     S- he probably was gonna have to go in the chair because we couldn't do
308        anything with him. That's the captain's call, you know, once it gets to that
309        point.
310
311 Q:     Okay. So, you took him to the floor. How was he taken to the floor?
312
313 A:     We just, like, laid him down on the floor.
314
315 Q:     Well you're indicating there, like...

316
317   A:        With - with our hands.
318
319   Q:        You're indicating that you forced him to the floor by someone taking control
320            of his arm? You had one arm?
321
322   A:        Uh, no I didn't have an arm. Danner had an arm and - and I was at his legs
323            trying to get him to go - and then he went down on his - like, on his knees and
324            then I straightened his legs out and then he was prone on the floor.
325
326   Q:        Prone on his stomach? His side?
327
328   A:        His stomach.
329
330   Q:        Was CO Hoffman helping you guys?
331
332   A:        No, I don't believe.
333
334   Q:        Who handcuffed him?
335
336   A:        I did.
337
338   Q:        His hands? In front or behind him?
339
340   A:        In the back.
341
342   Q:        Okay. In the previous interview you said he was shackled also.
343
344   A:        Yep.
345
346   Q:        You guys already had the shackles with you?
347
348   A:        Mm-hm.
349
350   Q:        When you...
351
352   A:        See whenever we take 'em out on a transport, they get belted and shackled.
353
354   Q:        Who shackled him?
355
356   A:        I did.
357
358   Q:        Okay. So, he's cuffed behind the back and shackled. He's laying on his
359            stomach inside cell A-1-5?
360

| | | |
|---|---|---|
| 361 | A: | Yes. |
| 362 | | |
| 363 | Q: | Was any - did anyone apply pressure to his body with their knees, their arms, |
| 364 | | their hands? |
| 365 | | |
| 366 | A: | No. |
| 367 | | |
| 368 | Q: | While attempting to shackle him and cuff him was he doing anything? |
| 369 | | |
| 370 | A: | He was resisting. |
| 371 | | |
| 372 | Q: | And resisting you mean by... |
| 373 | | |
| 374 | A: | Like, flailing around and trying to keep from being handcuffed and shackled. |
| 375 | | |
| 376 | Q: | In an earlier interview you said he was kicking? |
| 377 | | |
| 378 | A: | Yes. |
| 379 | | |
| 380 | Q: | He was grabbing at other CO's clothing? |
| 381 | | |
| 382 | A: | Yep. |
| 383 | | |
| 384 | Q: | Okay. Did he say anything at this time? |
| 385 | | |
| 386 | A: | No, he didn't - he never talked. |
| 387 | | |
| 388 | Q: | In an earlier interview you said Captain Klahr arrives at this time. |
| 389 | | |
| 390 | A: | After we got him handcuffed and shackled, yep. |
| 391 | | |
| 392 | Q: | What'd Captain Klahr do? |
| 393 | | |
| 394 | A: | He called for the - the chair - the restraint chair. |
| 395 | | |
| 396 | Q: | Anything else? |
| 397 | | |
| 398 | A: | Well once the chair came and stuff he said to, uh, take him out and so then he |
| 399 | | - he called for a spit shield and they put that on him in the cell. |
| 400 | | |
| 401 | Q: | Okay. So, he- he's in the cell cuffed behind the back, laying on his stomach, |
| 402 | | and shackled with a spit shield on. How long was he there? |
| 403 | | |
| 404 | A: | That was only not even a minute with his - the shield on. As soon as we put |
| 405 | | the shield on then we took him out. |

406
407    Q:          Okay. Who took him out?
408
409    A:          It was, uh, Captain Klahr and myself tried to get him out the door.
410
411    Q:          And how big are you?
412
413    A:          Five, ten. About 240.
414
415    Q:          How big's Captain Klahr?
416
417    A:          Uh, I don't know.
418
419    Q:          Is he a big man?
420
421    A:          Yeah.
422
423    Q:          The cell door to A-1-5, is it a small...
424
425    A:          Yes.
426
427    Q:          ...very small door?
428
429    A:          The whole - I mean, the bunk and everything there you - it's really small.
430
431    Q:          So, you had trouble - did you have an easy time or trouble getting' him out the
432                door?
433
434    A:          Trouble maneuvering.
435
436    Q:          Tell me about that.
437
438    A:          Well the captain and I picked him up off the floor and tried to go out the door
439                and we didn't fit. So, I tried to get him, uh, laid - I laid him down on the floor
440                on his side and then CO Biter came over and - and him and I picked him up
441                and placed him in the chair.
442
443    Q:          At this point in time is he saying anything?
444
445    A:          No.
446
447    Q:          Now placing someone in a restr- and you say chair, it's a restraint chair?
448
449    A:          Yes.
450

| | | |
|---|---|---|
| 451 | Q: | He's cuffed behind the back and shackled. Was he cooperative? |
| 452 | | |
| 453 | A: | No - no not at all. |
| 454 | | |
| 455 | Q: | What was he doing? |
| 456 | | |
| 457 | A: | He was kicking and - and contorting his body and flailing around. |
| 458 | | |
| 459 | Q: | What was your job while trying to put him in the chair? |
| 460 | | |
| 461 | A: | I was trying to get his legs shackled to the chair. |
| 462 | | |
| 463 | Q: | Could you see what any other CO was doing? |
| 464 | | |
| 465 | A: | Not really. I was concentrated on doing my job. |
| 466 | | |
| 467 | Q: | Were you able eventually to get him sh- shackled... |
| 468 | | |
| 469 | A: | Yes. |
| 470 | | |
| 471 | Q: | ...to the chair? His legs? How long did that take? |
| 472 | | |
| 473 | A: | Uh, it was probably only maybe 30 seconds, a minute, I don't know. |
| 474 | | |
| 475 | Q: | Now the restraint chair has multiple buckles? |
| 476 | | |
| 477 | A: | Yes. |
| 478 | | |
| 479 | Q: | To the legs, to the waist, and I believe it has a strap coming across each, uh, |
| 480 | | side of the shoulders and locks in diagonally at the waist, correct? |
| 481 | | |
| 482 | A: | Yes. |
| 483 | | |
| 484 | Q: | So, there's other COs there doing that while you're trying to do the legs? |
| 485 | | |
| 486 | A: | Yes. |
| 487 | | |
| 488 | Q: | Okay. Once that was accomplished, how long from beginning to end do you |
| 489 | | believe? |
| 490 | | |
| 491 | A: | For what? |
| 492 | | |
| 493 | Q: | From the time he - you guys placed him in the chair until he was finally |
| 494 | | secured. |
| 495 | | |

CID000477

| | | |
|---|---|---|
| 496 | A: | Well, it was, uh, probably a minute or so - couple minutes. |
| 497 | | |
| 498 | Q: | Once he was secured in the chair what happened? |
| 499 | | |
| 500 | A: | Well then, uh, he went limp and his head went back and, uh, the captain said, |
| 501 | | "Is he breathing?" And he said, "Get that mask off of him." You know, so he |
| 502 | | took the mask off - the spit shield. |
| 503 | | |
| 504 | Q: | Did any- when, uh, Captain Klahr asked if he was breathing, did someone |
| 505 | | respond? |
| 506 | | |
| 507 | A: | I thought I heard somebody say I don't think so and then we - he called |
| 508 | | emergency and we went to medical. |
| 509 | | |
| 510 | Q: | Then you said that he - when they - when someone responded I don't think so, |
| 511 | | the spit shield was immediately removed? |
| 512 | | |
| 513 | A: | Yes. |
| 514 | | |
| 515 | Q: | And while Riley he was still in the chair, they took him to medical? |
| 516 | | |
| 517 | A: | Yes. |
| 518 | | |
| 519 | Q: | How would you describe the movement from A-1-5 to medical? |
| 520 | | |
| 521 | A: | As fast as I could go. |
| 522 | | |
| 523 | Q: | Almost to a run? |
| 524 | | |
| 525 | A: | Yes. |
| 526 | | |
| 527 | Q: | And A-1-5 is not a great distance from medical? |
| 528 | | |
| 529 | A: | No. |
| 530 | | |
| 531 | Q: | So, they get to medical, what happens? |
| 532 | | |
| 533 | A: | He immediately got taken out of the chair and placed on the floor and shackles |
| 534 | | and cuffs were taken off and they started CPR immediately. |
| 535 | | |
| 536 | Q: | Was it all COs or some medical personnel? |
| 537 | | |
| 538 | A: | No, it was medical and COs and... |
| 539 | | |
| 540 | Q: | Then what happened? |

| | | |
|---|---|---|
| 541 | | |
| 542 | A: | Uh, then I - I took the shackles and stuff off and then I had to go out and get, |
| 543 | | uh, the, uh, get the strap- get my - my weapon and everything and go out to |
| 544 | | the, uh, chase car for the ambulance. |
| 545 | | |
| 546 | Q: | Okay. So, you left medical, recovered your gear, and you were going follow |
| 547 | | an am- Riley was going be placed in an ambulance... |
| 548 | | |
| 549 | A: | Yeah. |
| 550 | | |
| 551 | Q: | ...and taken to the hospital. |
| 552 | | |
| 553 | A: | Yeah, I had to be ready to go whenever they got him in the ambulance. |
| 554 | | |
| 555 | Q: | At any time did you strike, kick, punch, choke Mr. Riley? |
| 556 | | |
| 557 | A: | No sir. |
| 558 | | |
| 559 | Q: | Did you pin Mr. Riley's body to any solid object at any point in time using |
| 560 | | your knee or your arms, your hand, or your body? |
| 561 | | |
| 562 | A: | No. |
| 563 | | |
| 564 | Q: | Did you see any other CO do the above? |
| 565 | | |
| 566 | A: | No. |
| 567 | | |
| 568 | Q: | CO Singleton, is there anything else you can add to this statement? |
| 569 | | |
| 570 | A: | No. |
| 571 | | |
| 572 | Q: | From the time you first confronted Riley in A-1-5 'til you left medical did he |
| 573 | | say anything? |
| 574 | | |
| 575 | A: | No. |
| 576 | | |
| 577 | Q: | All right. We're going conclude the interview. Time will be 10:21. |
| 578 | | |
| 579 | | |
| 580 | | The transcript has been reviewed with the audio recording submitted and it is an accurate |
| 581 | | transcription. |
| 582 | | Signed_____ |

1
2
3
4
5
6
7        **INTERVIEW WITH OFC. MARTIN MYERS**
8            **Q=Det. Brian Walborn**
9            **A=Ofc. Martin Myers**
10
11
12   Q:       Today is July 26, 2019. Time will be 1131 hours. We're at the Dauphin
13            County Prison. Present is myself, Detective Brian Walborn. And Correctional
14            Officer Martin Myers. Sir, do you give me permission to record this
15            interview?
16
17   A:       Yes, sir.
18
19   Q:       Have any promises or threats been made to you for this interview?
20
21   A:       No, sir.
22
23   Q:       Are you currently under the influence of any drugs or alcohol?
24
25   A:       No, sir.
26
27   Q:       The highest grade in school you completed?
28
29   A:       College.
30
31   Q:       Can you read and write the English language?
32
33   A:       Yes.
34
35   Q:       For the record state your name and spell your last.
36
37   A:       Martin Myers, last name is spelled M-Y-E-R-S.
38
39   Q:       As we state you are a correctional officer with Dauphin County Prison,
40            correct?
41
42   A:       Yes, sir.
43
44   Q:       What shift do you work?
45

| 46 | A: | 6:00 am to 2:00 pm. |
| 47 | | |
| 48 | Q: | I want to take you back to June 18, 2019. Were you working that day? |
| 49 | | |
| 50 | A: | Yes, sir. |
| 51 | | |
| 52 | Q: | What time did you start your shift? |
| 53 | | |
| 54 | A: | Six o'clock. |
| 55 | | |
| 56 | Q: | And what were your duties that day? |
| 57 | | |
| 58 | A: | Dauphin County Booking Center. |
| 59 | | |
| 60 | Q: | Approximately what time did you arrive at the booking center? |
| 61 | | |
| 62 | A: | After 6 o'clock am. |
| 63 | | |
| 64 | Q: | All right, and when you arrived there you were relieving the 10:00 at night to |
| 65 | | 6:00 in the morning shift? |
| 66 | | |
| 67 | A: | Yes, sir. |
| 68 | | |
| 69 | Q: | Do they give you a quick brief on what they have at that time? |
| 70 | | |
| 71 | A: | Just who needs process. |
| 72 | | |
| 73 | Q: | Did they say that an inmate in 130- Cell 132 needed processed? |
| 74 | | |
| 75 | A: | Yes, sir. |
| 76 | | |
| 77 | Q: | And do you know that inmates name? |
| 78 | | |
| 79 | A: | Tyrique Riley. |
| 80 | | |
| 81 | Q: | Okay. Your first interaction with, uh, Inmate Riley? What was that about? |
| 82 | | What was your purpose? He needed processed, correct? |
| 83 | | |
| 84 | A: | Yes. Yes, oh, yeah. It was bringing the cuffs from the back to the front to be |
| 85 | | placed in a restraint belt because that's in policy and when it's done at the |
| 86 | | booking center. That needs processed. You need to be in a restraint belt. |
| 87 | | |
| 88 | Q: | 'Cause you're taking their picture and rolling their prints? |
| 89 | | |
| 90 | A: | Exactly. |

| | | |
|---|---|---|
| 91 | | |
| 92 | Q: | All right, so… |
| 93 | | |
| 94 | A: | It's not easy for us to have cuffed out fronts without even control the hands. |
| 95 | | |
| 96 | Q: | So you and your fellow CO's entered the cell to was - well let - let me ask you |
| 97 | | this. Was he cuffed behind the back? |
| 98 | | |
| 99 | A: | Yes, sir. |
| 100 | | |
| 101 | Q: | Did he have shackles on? |
| 102 | | |
| 103 | A: | Can't recall. |
| 104 | | |
| 105 | Q: | So you were going in to replace the cuffs in the ba- from his back to moving |
| 106 | | to the front. |
| 107 | | |
| 108 | A: | Yes, sir. |
| 109 | | |
| 110 | Q: | You and the COs went in. Describe what happened. |
| 111 | | |
| 112 | A: | Inmate was not allowing us to remove the handcuffs and place him in the |
| 113 | | restraint belt. |
| 114 | | |
| 115 | Q: | Did he say anything to you? |
| 116 | | |
| 117 | A: | No. Very blank stare. Very uncooperative. |
| 118 | | |
| 119 | Q: | Was this unusual? |
| 120 | | |
| 121 | A: | Unusual for what? |
| 122 | | |
| 123 | Q: | Any other time you have interaction with inmates? |
| 124 | | |
| 125 | A: | Depends on who they are. If they are under the influence or anything like that. |
| 126 | | |
| 127 | Q: | And you said he was uncooperative, resisting, was he kicking, punching |
| 128 | | anybody? |
| 129 | | |
| 130 | A: | Not giving us hands - not - not allowing us to remove his hands and put them |
| 131 | | into the restraint belt. |
| 132 | | |
| 133 | Q: | Okay. Then you just left him - you just left Inmate Riley as is? |
| 134 | | |
| 135 | A: | Yes, sir. |

| 136 | | |
|---|---|---|
| 137 | Q: | Okay. Short time later he was seen by Pre-trial services. Were you there for |
| 138 | | that? |
| 139 | | |
| 140 | A: | A little after. |
| 141 | | |
| 142 | Q: | Was there any hands on with Inmate Riley then? |
| 143 | | |
| 144 | A: | No, sir. |
| 145 | | |
| 146 | Q: | From what you did hear - hear or see was... |
| 147 | | |
| 148 | A: | Pre-trial service was in there trying to get his address and he kept on saying, |
| 149 | | "Bra, I didn't do it." And he was uncooperative with giving us his address and |
| 150 | | his information that we needed. Of that pretrial meeting actually. |
| 151 | | |
| 152 | Q: | He just wouldn't respond or he kept on repeating that? |
| 153 | | |
| 154 | A: | He kept on repeating the phrase, "Bra, I didn't do it." |
| 155 | | |
| 156 | Q: | After Pre-trial's attempt failed did everybody leave the cell then? |
| 157 | | |
| 158 | A: | Yes, sir. |
| 159 | | |
| 160 | Q: | Your next interaction with him was the arraignment? |
| 161 | | |
| 162 | A: | Yes. |
| 163 | | |
| 164 | Q: | Did you take him over to the arraignment office? |
| 165 | | |
| 166 | A: | I assisted the other officers with getting him from Cell 132 over to the |
| 167 | | arraignment room. |
| 168 | | |
| 169 | Q: | During the arraignment he's being video arraigned by a District Justice. |
| 170 | | |
| 171 | A: | Yes, sir. |
| 172 | | |
| 173 | Q: | Was he saying anything then? |
| 174 | | |
| 175 | A: | "Bra, I didn't do it." |
| 176 | | |
| 177 | Q: | Once the arraignment was over then what happened? |
| 178 | | |
| 179 | A: | We attempted to escort Detainee Riley back to Cell 132 and he fell to the floor |
| 180 | | and dead weight not allowing us - not allowing us to take him back to the cell. |

| | | |
|---|---|---|
| 181 | | And he was resisting us and falling to the ground and not letting us help him |
| 182 | | to a cell. |
| 183 | | |
| 184 | Q: | You were able to get him back to the cell? |
| 185 | | |
| 186 | A: | Yes, sir. |
| 187 | | |
| 188 | Q: | The cell door was closed. Cell door was closed? |
| 189 | | |
| 190 | A: | Yeah. |
| 191 | | |
| 192 | Q: | What do you recall next that happened? |
| 193 | | |
| 194 | A: | We get him back into his cell and - we get him back into his cell and mostly |
| 195 | | he slipped the handcuffs from the back and bring to - to the front. Start |
| 196 | | banging on the door - glass. We go in, take the handcuffs from the back and |
| 197 | | put him in the - a restraint belt. |
| 198 | | |
| 199 | Q: | Did he offer any resistance to that? |
| 200 | | |
| 201 | A: | Yes, he was not allowing us to take his cuffs from the back of him and put |
| 202 | | him into the restraint belt. The thing about it is there was pictures taken of his |
| 203 | | wrist. |
| 204 | | |
| 205 | Q: | But you were successful in getting him into a waist belt? |
| 206 | | |
| 207 | A: | Yes, sir. |
| 208 | | |
| 209 | Q: | Okay, during this time did he say anything? |
| 210 | | |
| 211 | A: | Okay, okay, okay. And that was it. |
| 212 | | |
| 213 | Q: | All right. He wasn't acting aggressively trying to hurt you guys. It was more |
| 214 | | him contorting his body? |
| 215 | | |
| 216 | A: | Yeah, just resisting or not - not allowing us to do what we needed to do in |
| 217 | | order to put him in a belt. He was resisting that action. |
| 218 | | |
| 219 | Q: | Okay. So once that was accomplished everyone exited the cell, door was |
| 220 | | closed? |
| 221 | | |
| 222 | A: | Yes, sir. |
| 223 | | |
| 224 | Q: | You had one more opportunity to come into contact with Inmate Riley. I |
| 225 | | believe that was a medical check? |

| | | |
|---|---|---|
| 226 | | |
| 227 | A: | Yes, sir. |
| 228 | | |
| 229 | Q: | Tell me about that. |
| 230 | | |
| 231 | A: | Inmate Riley was taken from Cell 132 over to the medical department to have |
| 232 | | his - not arraignment - his, um, to be processed by medical. At this time |
| 233 | | medical asked him the basic questions about are you on any drugs or, uh, |
| 234 | | family history about medical conditions. If you take any medication on the - |
| 235 | | on the street and things like that. At this time Inmate Riley "Bra, I didn't do |
| 236 | | it." - "Bra, I didn't do it." he was not answering the nurse's question. |
| 237 | | |
| 238 | Q: | So what'd the nurse say? |
| 239 | | |
| 240 | A: | After multiple attempts and us saying, "Hey, we need your - we need this |
| 241 | | info." she concluded that he was not allowing us to - for him to be processed. |
| 242 | | So at this time she concluded this process and put him on a Level 1 status. |
| 243 | | |
| 244 | Q: | Level 1 what? |
| 245 | | |
| 246 | A: | Suicide status watch. |
| 247 | | |
| 248 | Q: | So she was done with him? What happened next? |
| 249 | | |
| 250 | A: | I escorted Inmate Riley back over to Cell 132, placed him on a bench and left |
| 251 | | the cell and closed the door. |
| 252 | | |
| 253 | Q: | Well, let me take you back to our previous interview. Did you ask him to |
| 254 | | stand up? |
| 255 | | |
| 256 | A: | Yes, sir. |
| 257 | | |
| 258 | Q: | Did he respond? |
| 259 | | |
| 260 | A: | No, sir. |
| 261 | | |
| 262 | Q: | What was his demeanor? |
| 263 | | |
| 264 | A: | Very blank stare like he didn't know what was taking place or - or that he |
| 265 | | wasn't comprehending what I was telling him to do. |
| 266 | | |
| 267 | Q: | Okay, you took him back to Cell 132. The door was closed. Did you have any |
| 268 | | other interaction with Inmate Riley? |
| 269 | | |
| 270 | A: | No, sir. |

271
272    Q:        Okay. At any point in time with your interaction and your observations of
273               other CO's interacting with Inmate Riley did anyone punch him?
274
275    A:        No, sir.
276
277    Q:        Strike him?
278
279    A:        No, sir.
280
281    Q:        Kick him?
282
283    A:        No, sir.
284
285    Q:        Choke him?
286
287    A:        No, sir.
288
289    Q:        Pin him in any manner?
290
291    A:        No, sir.
292
293    Q:        You or any other CO?
294
295    A:        No, sir.
296
297    Q:        In your experience as a correctional officer have you ever seen this - the
298               demeanor that Inmate Riley portrayed. Have you ever seen that before?
299
300    A:        Not every single detail but certain aspects yes. People that are drunk or under
301               the influence of any type of substance.
302
303    Q:        Okay, CO Myers do you have anything else to add to this statement?
304
305    A:        No, sir.
306
307    Q:        Okay, we'll conclude the interview. Time will be 1140 hours.
308
309
310 The transcript has been reviewed with the audio recording submitted and it is an accurate
311 transcription.
312 Signed_____

1
2
3
4
5
6
7                 **INTERVIEW WITH ROBERT INGERSOLL**
8                       **Q=Det. Brian Walborn**
9                       **A=Robert Ingersoll**
10
11
12   Q:          Today is July 25, 2019. We're at the Dauphin County Prison, myself,
13                Detective Brian Walborn, and Correctional Officer Robert Ingersoll. Sir, for
14                the record do you give me permission to record this interview?
15
16   A:          Yes, I do.
17
18   Q:          Have any promises or threats been made to you for this interview?
19
20   A:          No.
21
22   Q:          Are you currently u- under the in- influence of drugs or alcohol?
23
24   A:          No.
25
26   Q:          The highest grade in school you completed?
27
28   A:          Twelfth.
29
30   Q:          Can you read and write the English language?
31
32   A:          Yes, I can.
33
34   Q:          For the record state your name and spell your last.
35
36   A:          Robert W. Ingersoll, I-N-G-E-R-S-O-L-L.
37
38   Q:          And what is your occupation, sir?
39
40   A:          I'm a Correctional Officer at Dauphin County Prison.
41
42   Q:          And how long you been employed here?
43
44   A:          Uh, approximately 10 years.
45

| 46 | Q: | Any previous corrections experience? |
|---|---|---|
| 47 | | |
| 48 | A: | Prior to that, no. |
| 49 | | |
| 50 | Q: | You were working on June 18, 2019. |
| 51 | | |
| 52 | A: | Yes, I was. |
| 53 | | |
| 54 | Q: | What were your duties that day? |
| 55 | | |
| 56 | A: | I was a Correctional Officer down at the, uh, booking center. |
| 57 | | |
| 58 | Q: | At approximately 5 o'clock in the morning, uh, did you have an opportunity to |
| 59 | | come in contact with the Susquehanna Police Department? |
| 60 | | |
| 61 | A: | Yes, I did. Uh, at approximately 5 o'clock in the morning, a Susquehanna |
| 62 | | Police Department officer rang the doorbell or the bell at, uh, the judicial |
| 63 | | center informing us that he had a subject in the back of the vehicle, um, |
| 64 | | Tyrique Riley who may be a little bit of a problem because he had slipped his |
| 65 | | belt. Uh, we proceeded to go outside, we opened the door, we then asked |
| 66 | | Riley to es- exit the vehicle. Uh, he did not exit the vehicle. All he - all he |
| 67 | | responded to us is by saying, "Yo." Uh, I then grabbed him, escorted him up |
| 68 | | into a standing position as we begin - began to take him to the entrance door... |
| 69 | | |
| 70 | Q: | Let me interrupt you a second here. You reviewed the video of the |
| 71 | | Susquehanna marked unit MVR, and you also reviewed video of the booking |
| 72 | | center cameras. |
| 73 | | |
| 74 | A: | Yes, I did. |
| 75 | | |
| 76 | Q: | Um, when you said you took and stood him up, did you have to lift him, or did |
| 77 | | he do it on his own power? |
| 78 | | |
| 79 | A: | He did it under his own power. |
| 80 | | |
| 81 | Q: | So he was compliant? |
| 82 | | |
| 83 | A: | He was compliant at the time that we, uh, stood him up. |
| 84 | | |
| 85 | Q: | Okay. |
| 86 | | |
| 87 | A: | At that point in time, we began to walk him to the first entry door. Uh, he then |
| 88 | | went dead leg. He just did not wanna walk anymore and just took his weight |
| 89 | | and put him in our arms. At that point in time, he proceeded to try and push |
| 90 | | off the door. We, uh, myself, Lieutenant Mendenhall, and Correctional Officer |

INTERVIEW WITH ROBERT INGERSOLL
Interviewer:  Det. Brian Walborn
07-25-19
Case # C2019-0136
Page 3

| | | |
|---|---|---|
| 91 | | Cameron Weaver, uh, then escorted him through the door when, again, he |
| 92 | | continued to resist through both doors and again into the main entryway of the |
| 93 | | booking center. We then attempted to stand him up at the bench where we |
| 94 | | were attempting to pat him down to make sure he had no weapons, no |
| 95 | | property on him. Uh, at that point in time, he put his feet up on the bench, |
| 96 | | began to resist, push off. At that point in time, myself and Officer Weaver |
| 97 | | took Riley to the ground, uh, where we then placed him in leg - leg rest- leg |
| 98 | | restraints and switched out the handcuffs from, uh, Susquehanna officers' |
| 99 | | cuffs into the judicial center cuffs. Uh, at that point in time he continued to |
| 100 | | resist. He was fighting with us as far as refusing to follow any orders given. |
| 101 | | At that point in time, Lieutenant Mendenhall sprayed him with oleoresin |
| 102 | | capsicum to try and, uh, receive compliance. Uh, he continued to resist. Um, |
| 103 | | we then at that point in time did manage to gain control of him. We then, uh, |
| 104 | | attempted to stand him up, take him into Cell 132. Uh, upon entering Cell 132, |
| 105 | | uh, Riley again went dead leg and was taken to the ground again. Uh, at that |
| 106 | | point in time he was again resistant. We managed to, again, regain |
| 107 | | compliance. We sat him up and then waited for medical to come in and flush |
| 108 | | his eyes of the oleoresin capsicum. Then at that point in time, the cell door |
| 109 | | was closed. We then returned to take photographs of Riley's face, uh, because |
| 110 | | of the fact that oleoresin capsicum had been deployed. Uh, and at that point in |
| 111 | | time, he was then left in the cell, uh, with hand restraints on him, uh, and that |
| 112 | | was the - the last interaction that we had, uh, that evening or that morning. |
| 113 | | | |
| 114 | Q: | Because at 0600 hours, your - it was the end of your shift. |
| 115 | | | |
| 116 | A: | Correct. |
| 117 | | | |
| 118 | Q: | During any time did inmate Riley say anything? |
| 119 | | | |
| 120 | A: | No, he was, uh, other than when we first got him out of the vehicle and he |
| 121 | | said, "Yo," uh, there really was no verbal interaction with him other than us |
| 122 | | telling him or giving him orders to follow. Uh, he really did not interact at all |
| 123 | | vocally with us. |
| 124 | | | |
| 125 | Q: | What was his demeanor? |
| 126 | | | |
| 127 | A: | Uh, he was very noncompliant. Uh, he - he - I'm trying to come up with the |
| 128 | | proper word. Uh, just he was - didn't seem fully lucid, um, perhaps not, uh, in |
| 129 | | the right state of mind, whether that be because of, uh, a mental issue or |
| 130 | | because of any drugs he may have been on, but he certainly didn't act in any |
| 131 | | normal fashion that most people would come in acting like. |
| 132 | | | |
| 133 | Q: | Okay, any point in time in your interaction with inmate Riley that morning, |
| 134 | | did you strike, kick, shove, punch, choke inmate Riley? |
| 135 | | | |

| | | |
|---|---|---|
| 136 | A: | No, I did not. Uh, other than taking him to the ground, uh, upon entering the |
| 137 | | booking center at the bench, uh, and then holding him down, there was - at no |
| 138 | | point in time did we strike him at all. |
| 139 | | |
| 140 | Q: | And this is just a guess, how long do you think you had him on the floor? |
| 141 | | |
| 142 | A: | Uh, maybe five to six minutes? |
| 143 | | |
| 144 | Q: | That long? |
| 145 | | |
| 146 | A: | Uh, uh, when you're in the middle of interacting with somebody it's hard to, |
| 147 | | uh, know the time frame. |
| 148 | | |
| 149 | Q: | Okay, um, then I asked you that, but did you see any other COs do the above |
| 150 | | to him? |
| 151 | | |
| 152 | A: | No, I did not. |
| 153 | | |
| 154 | Q: | Okay, after the 18th of June, did you have any contact with inmate Riley? |
| 155 | | |
| 156 | A: | I did. I, uh, interacted with, uh, inmate Riley on the night of, uh, June 19. |
| 157 | | |
| 158 | Q: | Did you have any physical contact with him? |
| 159 | | |
| 160 | A: | No, I did not. On June 19, I was on A Block as a, uh, extra officer. Uh, the |
| 161 | | only interaction I had with him inmate Riley at that point in time, he was in |
| 162 | | Cell A-1-5, and when on A Block as an officer, our job duties are to check on |
| 163 | | inmates at intervals anywhere between 10 to 15 minutes to make sure that |
| 164 | | they have not attempted to harm themselves. Uh, my interaction then was to |
| 165 | | walk by and inspect the cell to make sure that inmate Riley was, uh, alive. Uh, |
| 166 | | the only interaction that he really gave in response was to stand in the cell, uh, |
| 167 | | unclothed with no clothing on at all, uh, staring out the window, uh, |
| 168 | | incoherent, uh, actions. He - he did not speak to us at any point in time during |
| 169 | | that evening. |
| 170 | | |
| 171 | Q: | Did you know he - he was on a level I suicide watch at the time? |
| 172 | | |
| 173 | A: | Yes, I did. |
| 174 | | |
| 175 | Q: | That level I suicide watch, uh, he had been issued a suicide smock. |
| 176 | | |
| 177 | A: | Correct. |
| 178 | | |
| 179 | Q: | W- and it was, I guess, his decision not to wear it? |
| 180 | | |

| | | |
|---|---|---|
| 181 | A: | That's correct. |
| 182 | | |
| 183 | Q: | Was there any conversation with inmate Riley on the 19th at Cell A-1-5? |
| 184 | | |
| 185 | A: | No, there was not. He, uh, uh, and again, he just stared out the well - out the |
| 186 | | cell window, uh, never making any attempt to speak with officers or request |
| 187 | | anything from officers. |
| 188 | | |
| 189 | Q: | Any sounds coming from that cell? |
| 190 | | |
| 191 | A: | Uh, not that I can recall. |
| 192 | | |
| 193 | Q: | Okay. Anything else you'd like to add to this statement, sir? |
| 194 | | |
| 195 | A: | Not at this time. |
| 196 | | |
| 197 | Q: | All right, we'll conclude the interview. The time will be 0934 hours. |
| 198 | | |
| 199 | | |
| 200 | | The transcript has been reviewed with the audio recording submitted and it is an accurate |
| 201 | | transcription. |
| 202 | | Signed_____ |

CID000493

1
2
3
4
5
6
7                              **INTERVIEW WITH CO KEITH HOFFMAN**
8                                     **Q=Det. Brian Walborn**
9                                     **A=CO Keith Hoffman**
10
11
12   Q:         Today is July 3, 2019. Time will 12:09 hours. We're at the Dauphin County
13                Prison. Present is myself, Detective Brian Walborn and Correctional Officer
14                Keith Hoffman. Keith for the record, state your name and spell your last.
15
16   A:         Uh, my name is Keith Hoffman. Last name spelled H-O-F-F-M-A-N.
17
18   Q:         You give me permission to record your...
19
20   A:         I do.
21
22   Q:         ...voice? Have any promises or threats been made to you for this interview?
23
24   A:         No.
25
26   Q:         Are you currently under the influence of any drugs or alcohol?
27
28   A:         No sir.
29
30   Q:         And the highest grade in school you completed?
31
32   A:         High school.
33
34   Q:         You - you can read and write...
35
36   A:         Uh, 12th - 12th - 12th grade.
37
38   Q:         You can read and write the English language?
39
40   A:         Yes sir.
41
42   Q:         How long have you been a Dauphin County correctional officer?
43
44   A:         This October will be ten years.
45

CID000495

| 46 | Q: | And you work 0600 to 1400 hour shift? |
|---|---|---|
| 47 | | |
| 48 | A: | Yes sir. |
| 49 | | |
| 50 | Q: | And what block do you predominantly work? |
| 51 | | |
| 52 | A: | I predominantly work A block or A and B control. |
| 53 | | |
| 54 | Q: | Since June 18, 2019 have you had contact with Tyrique Riley? |
| 55 | | |
| 56 | A: | Yes sir. |
| 57 | | |
| 58 | Q: | How's his demeanor towards you? |
| 59 | | |
| 60 | A: | Uh, his - his demeanor is he always looked at you like he was incoherent. Uh, |
| 61 | | when you tried to talk to him during feed time he would give you a blank stare |
| 62 | | and be unresponsive to anything that you would ask or tell him to do such as |
| 63 | | return his meal tray or Styrofoam I should say because he was a finger food |
| 64 | | from the time he was there. |
| 65 | | |
| 66 | Q: | Have you ever had a conversation with him? |
| 67 | | |
| 68 | A: | Uh, I tried to speak to him, but with no avail. He would not respond to |
| 69 | | anything. |
| 70 | | |
| 71 | Q: | Did you ever hear him talk to anybody? |
| 72 | | |
| 73 | A: | I'd hear him shout out the cell door, but I couldn't understand anything he was |
| 74 | | sayin'. |
| 75 | | |
| 76 | Q: | Was he on any type of special watch? |
| 77 | | |
| 78 | A: | Yes, he was a level 1 suicide watch. Uh, and he wore a smock and he nev- he |
| 79 | | wouldn't even come out of his cell to even go to medical. Uh, medical came |
| 80 | | over to see him there. |
| 81 | | |
| 82 | Q: | Would he always wear his smock? |
| 83 | | |
| 84 | A: | Sometimes he would be naked in his cell, but most of the time, yes, he did |
| 85 | | have his smock on. |
| 86 | | |
| 87 | Q: | Would he eat his food? |
| 88 | | |
| 89 | A: | Uh, the - the few times that I assisted in feeding him and - and getting him to |
| 90 | | return his Styrofoam tray he hardly ate any of his food. |

91
92   Q:      And the times he spoke you couldn't understand what he was saying?
93
94   A:      No sir.
95
96   Q:      On June 26, 2019, were you working your 06 to 1400 hour shift?
97
98   A:      Yes, sir I was.
99
100  Q:      What was your assignment that day?
101
102  A:      My assignment was A extra top tier on A block.
103
104  Q:      Around 9:50 on that date where were you on the block?
105
106  A:      I was sitting at the table at the front of the block there doing my paperwork,
107          uh, as far as doing my watch sheets for the top tier.
108
109  Q:      You were sitting at a table that's on ground level?
110
111  A:      Yes sir.
112
113  Q:      And is that towards the front of the block or the back of the block?
114
115  A:      Yes, it towards the entrance to the block. It's up before you get to cell one.
116
117  Q:      Around that time did you see CO Singleton and CO Danner enter the block?
118
119  A:      Yes, I did.
120
121  Q:      Do you know why they entered the block?
122
123  A:      Yes, I was told that he - he was gonna be transported to the hospital for
124          evaluation.
125
126  Q:      You're - you're s- you're referring to inmate Riley?
127
128  A:      Yes sir.
129
130  Q:      Okay. How - that table you were sitting at doing your paperwork, how far
131          away is that from Riley's cell, which was A-1-5?
132
133  A:      Uh, my - my guess would probably be, uh, let's see, maybe 30 yards - 25
134          yards.
135

INTERVIEW WITH CO KEITH HOFFMAN
Interviewer: Det. Brian Walborn
7-03-19/12:09 pm
Case # C2019-0136
Page 4

| 136 | Q: | So yo- did you see CO Singleton and CO Danner go to inmate Riley's cell? |
| 137 | | |
| 138 | A: | Yes, I did. |
| 139 | | |
| 140 | Q: | But then you continued with your paperwork? |
| 141 | | |
| 142 | A: | Yes sir. |
| 143 | | |
| 144 | Q: | What'd you hear or see next? |
| 145 | | |
| 146 | A: | Uh, I heard one of the COs - it was either - I think it was Danner - CO Danner |
| 147 | | command inmate Riley to go to the back of his cell that he was gonna have to |
| 148 | | put a uniform on and he did say that numerous times until the cell door was |
| 149 | | opened. |
| 150 | | |
| 151 | Q: | Okay. What happened next? |
| 152 | | |
| 153 | A: | Uh, the cell door was opened and I happened to glance down and I see CO |
| 154 | | Danner and Singleton go in the cell and command Riley to put on the uniform |
| 155 | | that they had for him. |
| 156 | | |
| 157 | Q: | How many times do you think they said that? |
| 158 | | |
| 159 | A: | They probably said it at least ten times. |
| 160 | | |
| 161 | Q: | Then what happened? |
| 162 | | |
| 163 | A: | Uh, I heard a little bit of commotion goin' on so I - I stopped doin' my |
| 164 | | paperwork and I walked down to the cell and they were, uh, th- CO Danner |
| 165 | | and CO Singleton were trying to put the shirt on him and it wasn't workin'. |
| 166 | | So, I figured I might be able to help out. |
| 167 | | |
| 168 | Q: | What'd you mean it wasn't working? |
| 169 | | |
| 170 | A: | Uh, they - he was - he was struggling with 'em. He was resisting. Uh, he was |
| 171 | | doin' everything he could not to get that shirt on. He was not gonna put that |
| 172 | | uniform on regardless. |
| 173 | | |
| 174 | Q: | Was he saying anything? |
| 175 | | |
| 176 | A: | He was not saying anything. |
| 177 | | |
| 178 | Q: | Was there anything comin' out of his mouth? |
| 179 | | |
| 180 | A: | Yeah, he was - he always had that white foam around his mouth all the time. |

CID000498

| | | |
|---|---|---|
| 181 | | You know, it was like it - it's - i- it looks like when you're - you're dried out |
| 182 | | or somethin' and you got white - white, uh, salt deposits or somethin' around |
| 183 | | your mouth. I know before - right before that - an hour or so he - we went to |
| 184 | | give him meds and when he went to - to - to take the meds he took a drink of |
| 185 | | water and it all just came right back out of his mouth, like, he wouldn't |
| 186 | | swallow 'em. |
| 187 | | |
| 188 | Q: | When you were able to s- see into the cell was inmate Riley standing up? |
| 189 | | |
| 190 | A: | At that point, yes sir. |
| 191 | | |
| 192 | Q: | And CO Danner and CO Singleton were also standing there? |
| 193 | | |
| 194 | A: | Yes. |
| 195 | | |
| 196 | Q: | Were they on either side of him? |
| 197 | | |
| 198 | A: | Yes, they were on both sides of him, uh, tryin' to get the shirt on him so I |
| 199 | | figured I would assist and the best I could do was get the shirt up to, uh, his |
| 200 | | right arm. I got the shirt on there and when I went to put the shirt over his |
| 201 | | head all - uh, he just resisted to no extent and the shirt came flyin' off. |
| 202 | | |
| 203 | Q: | Now you're saying resisting, you're - is he twisting his body? Is he... |
| 204 | | |
| 205 | A: | Yes. |
| 206 | | |
| 207 | Q: | Is he grabbing for things? |
| 208 | | |
| 209 | A: | Yes. He's grabbing. He's twisting. He's kicking. He's tryin' to do everything |
| 210 | | he can not to get that shirt on. |
| 211 | | |
| 212 | Q: | So, after your failed attempt at getting the shirt on what happened? |
| 213 | | |
| 214 | A: | Uh, at that point, uh, he started kicking so he went down to his knees and I |
| 215 | | shackled his ankles so this kicking motion would stop and then they, uh, CO |
| 216 | | Danner and Singleton were trying to put handcuffs on him behind his back |
| 217 | | and he was still resisting to no extent. |
| 218 | | |
| 219 | Q: | At any point in time did you hear any CO request the captain? |
| 220 | | |
| 221 | A: | Yes, I did. I heard, uh, CO Danner tell somebody outside the cell to get the |
| 222 | | shift commander. |
| 223 | | |
| 224 | Q: | And who is the shift commander? |
| 225 | | |

| 226 | A: | Uh, that's, uh, Captain Klahr. |
| 227 | | |
| 228 | Q: | In a previous interview you said Captain Klahr then arrived. |
| 229 | | |
| 230 | A: | Yes, he, uh, Captain Klahr did come within - I - I couldn't even speculate how |
| 231 | | much time it was, but it was not that long of a period of time. He came over to |
| 232 | | the cell and when he entered the cell I released, uh, inmate Riley's feet and |
| 233 | | exited the cell. |
| 234 | | |
| 235 | Q: | So, when you left the cell inmate Riley was still on his knees or was he proned |
| 236 | | out? |
| 237 | | |
| 238 | A: | Uh, he was kinda proned down by then. |
| 239 | | |
| 240 | Q: | On his side? On his stomach? |
| 241 | | |
| 242 | A: | Uh, he was laying on his stomach. |
| 243 | | |
| 244 | Q: | You can't recall if he was handcuffed or not? |
| 245 | | |
| 246 | A: | Uh, I cannot recall that. No sir. |
| 247 | | |
| 248 | Q: | Was anyone on top - did anyone have their knee, arms, or their body on |
| 249 | | inmate Riley's body? |
| 250 | | |
| 251 | A: | Uh, I can really say I didn't observe any of that sir. |
| 252 | | |
| 253 | Q: | Okay. So, Captain Klahr comes in, you exit the cell? |
| 254 | | |
| 255 | A: | Yes, I exited the cell and went back to doing my duties on A block, which is |
| 256 | | watching the top tier and - and catching up on paperwork. |
| 257 | | |
| 258 | Q: | Did you see inmate Riley anymore? |
| 259 | | |
| 260 | A: | Uh, I saw him when they were wheeling him out on - on - on the restraint |
| 261 | | chair. |
| 262 | | |
| 263 | Q: | Okay. You didn't see them - I say them, other COs put him in the restraint |
| 264 | | chair? |
| 265 | | |
| 266 | A: | Uh, I saw a little bit of a struggle down there, but I did not really pay much |
| 267 | | attention to it sir. |
| 268 | | |
| 269 | Q: | Is there anything else you can add to this statement? |
| 270 | | |

| | | |
|---|---|---|
| 271 | A: | Uh, the only thing I can - I can s- s- add to this is every time I - I tried to feed |
| 272 | | inmate Riley with the help of other COs there he was, uh, kinda, incoherent |
| 273 | | towards what you were tryin' to tell him, you know, and he responded to |
| 274 | | nothing, just had a blank stare about him. |
| 275 | | |
| 276 | Q: | During this whole altercation that you described, did inmate Riley say |
| 277 | | anything? |
| 278 | | |
| 279 | A: | No sir. |
| 280 | | |
| 281 | Q: | Did you strike, kick, punch, or pin inmate Riley to any fixed object? |
| 282 | | |
| 283 | A: | No sir. |
| 284 | | |
| 285 | Q: | Did you see any other CO do that? |
| 286 | | |
| 287 | A: | No sir. |
| 288 | | |
| 289 | Q: | That's about all I have to ask. Is there anything else you'd like to add? |
| 290 | | |
| 291 | A: | No sir. |
| 292 | | |
| 293 | Q: | All right. We'll conclude the interview. Time will be 12:21. |
| 294 | | |
| 295 | | |
| 296 | | The transcript has been reviewed with the audio recording submitted and it is an accurate |
| 297 | | transcription. |
| 298 | | Signed_____ |

1
2
3
4
5
6
7          **INTERVIEW WITH OFC. TAYLOR GLENN**
8                  **Q=Det. Brian Walborn**
9                  **A=Ofc. Taylor Glenn**
10
11
12   Q:          Today is July 29, 2019. Time will be 1112 hours. We're at the Dauphin
13               County Prison. Present is myself Detective Brian Walborn and Correctional
14               Officer Taylor Glenn. For the record, you understand this interview is being
15               recorded?
16
17   A:          I do.
18
19   Q:          Any promises - promises or threats been made to you for this interview?
20
21   A:          No.
22
23   Q:          Are you currently under the influence of any drugs or alcohol?
24
25   A:          No.
26
27   Q:          The highest grade in school you completed?
28
29   A:          College.
30
31   Q:          Bachelor's or Associate's?
32
33   A:          Associate's.
34
35   Q:          And you can read and write the English language?
36
37   A:          Correct.
38
39   Q:          For the record, state your name and spell your last.
40
41   A:          My name is Taylor Glenn, G-L-E-N-N.
42
43   Q:          And you're a correctional officer here at Dauphin County Prison, correct?
44
45   A:          Correct.

46
47  Q:      How long have you been employed by Dauphin County Prison?
48
49  A:      Four and a half years.
50
51  Q:      Do you have any prior correctional officer exp- experience?
52
53  A:      No.
54
55  Q:      On June 18, 2019, did you work that day?
56
57  A:      I did.
58
59  Q:      What was your shift that day?
60
61  A:      My shift that day was 0600 to 1400.
62
63  Q:      And what were you assigned to?
64
65  A:      I was assigned to Central Booking.
66
67  Q:      What time did you arrive there?
68
69  A:      Approximately 0600 hours.
70
71  Q:      And your shift was relieving the midnight shift, correct?
72
73  A:      Correct.
74
75  Q:      Were you told anything from the previous shift CO's about any inmates in
76          Booking?
77
78  A:      Just that they had one come in who was being an issue and that, um, he was
79          handcuffed behind the back and being housed in Number 132.
80
81  Q:      Do you know that person's name?
82
83  A:      Tyrique Riley.
84
85  Q:      Okay. Your first interaction with Inmate Riley, describe that.
86
87  A:      We went to get him out of the cell to take him to do his fingerprints and photo
88          for processing to be arraigned by a judge. We got him out of the cell and
89          started to switch him from the handcuffs into a restraint belt per policy and he
90          went deadweight and dropped to the floor.

INTERVIEW WITH OFC. TAYLOR GLENN
Interviewer: Det. Brian Walborn
07-29-19/11:12 am
Case # C2019-0136
Page 3

| | | |
|---|---|---|
| 91 | | |
| 92 | Q: | Was that - wh- did you have hands on with him at that time? |
| 93 | | |
| 94 | A: | I did not have hands on him at that time. |
| 95 | | |
| 96 | Q: | What did you do? |
| 97 | | |
| 98 | A: | I grabbed gloves and made my way over to them to assist with getting him |
| 99 | | back into the cell. |
| 100 | | |
| 101 | Q: | And once he was placed back in the cell? |
| 102 | | |
| 103 | A: | We sat him down on the bench, left the cell and shut the door behind us. |
| 104 | | |
| 105 | Q: | Did you notify the District Justice? |
| 106 | | |
| 107 | A: | We did, we contacted the judge's office, advised him that we had Inmate |
| 108 | | Riley at the Booking Center, that he needed to be arraigned but we were |
| 109 | | unable to process him and we were calling to see if the judge would still |
| 110 | | arraign him without the processing. |
| 111 | | |
| 112 | Q: | And? |
| 113 | | |
| 114 | A: | The judge said yes he would see him. |
| 115 | | |
| 116 | Q: | Okay. Now Inmate Riley's in Cell Number 132, you're going - you're doing |
| 117 | | your normal work, paperwork? |
| 118 | | |
| 119 | A: | Correct. |
| 120 | | |
| 121 | Q: | Did you hear anything come from Cell Number 132? |
| 122 | | |
| 123 | A: | There was a lot of yelling coming from the cell but none of it made sense, it |
| 124 | | was a bunch of incoherent words. |
| 125 | | |
| 126 | Q: | Okay. Um, your next encounter with Inmate Riley, what was that about? I |
| 127 | | believe Pre-trial? |
| 128 | | |
| 129 | A: | Yes. Our next encounter was pre-trial, normally we would take them over to |
| 130 | | the Pre-trial room but because of the issues we were having with Inmate |
| 131 | | Riley, um, we escorted Pre-trial into the cell and had him attempt to ask |
| 132 | | Inmate Riley the questions in the cell. |
| 133 | | |
| 134 | Q: | What was Inmate Riley's response? |
| 135 | | |

| 136 | A: | A bunch of words that made no sense. |
| 137 | | |
| 138 | Q: | He wasn't answering the questions? |
| 139 | | |
| 140 | A: | He was not answering the questions. |
| 141 | | |
| 142 | Q: | Did he seem confused? |
| 143 | | |
| 144 | A: | Kind of. |
| 145 | | |
| 146 | Q: | Would he make a - some type of response to each question or was this just, |
| 147 | | made comments that made no sense? |
| 148 | | |
| 149 | A: | It was just made comments that made no sense. |
| 150 | | |
| 151 | Q: | After that Pre-trial just left? |
| 152 | | |
| 153 | A: | After that we escorted Pre-trial out of cell and shut the cell door. |
| 154 | | |
| 155 | Q: | Then you're waiting for the arraignment - preliminary arraignment? |
| 156 | | |
| 157 | A: | We waited for the arraignment. |
| 158 | | |
| 159 | Q: | Was Inmate Riley saying anything then or was he quiet? |
| 160 | | |
| 161 | A: | No. We escorted Inmate Riley from the cell and to the room that we do video |
| 162 | | arraignments, we sat him down in front of the judge, the judge began asking |
| 163 | | him questions and he just sat there and stared at the judge. |
| 164 | | |
| 165 | Q: | Made no comments whatsoever? |
| 166 | | |
| 167 | A: | Made no comments. Not that I can recall. |
| 168 | | |
| 169 | Q: | Once the preliminary arraignment was over what happened? |
| 170 | | |
| 171 | A: | Once the preliminary arraignment was over, uh, we esce- escorted him out of |
| 172 | | the arraignment room and we were taking him back to the cell when he |
| 173 | | decided to stop walking so we guided him into the cell, sat him on the bench, |
| 174 | | left the cell, shut the door. |
| 175 | | |
| 176 | Q: | What's the next thing you know then? |
| 177 | | |
| 178 | A: | After that he managed to somehow get his cuffs from behind his back to in |
| 179 | | front of him and he was hitting the glass of the cell door with the cuffs. So we |
| 180 | | decided to go in and switch him from being handcuffed into a belt so he |

| | | |
|---|---|---|
| 181 | | couldn't hit the glass anymore bcause we were afraid that he would end up |
| 182 | | breaking the glass out of the cell. |
| 183 | | |
| 184 | Q: | Describe what happened. |
| 185 | | |
| 186 | A: | We went in and we started to switch him from the handcuffs to the belt. About |
| 187 | | part way through he started to fight with us, um, and I held his legs so he |
| 188 | | couldn't kick because he was kicking his legs, and we managed to get him |
| 189 | | switched over from the handcuff to a belt. Once we had him into the belt we |
| 190 | | exited the cell and shut the door behind us. |
| 191 | | |
| 192 | Q: | Now let me take you back a little bit, when you went into the cell did someone |
| 193 | | explain to him what they were going do... |
| 194 | | |
| 195 | A: | Yes. |
| 196 | | |
| 197 | Q: | ...what was going happen? |
| 198 | | |
| 199 | A: | Yes. They explained to him that because he had slipped his cuffs we were |
| 200 | | going to change him over into a restraint belt so that way he couldn't hit the |
| 201 | | glass anymore. |
| 202 | | |
| 203 | Q: | What was his response? |
| 204 | | |
| 205 | A: | He didn't say anything. |
| 206 | | |
| 207 | Q: | Did he look like he understood what was being said? It's your opinion. |
| 208 | | |
| 209 | A: | In my opinion, a little bit. |
| 210 | | |
| 211 | Q: | Now this struggle had ensued. Describe his physical actions, what was he |
| 212 | | doing that caused this struggle? |
| 213 | | |
| 214 | A: | He started kicking his legs and then he started wiggling, trying to get off of |
| 215 | | the bench while we were trying to switch him over from the cuffs to the |
| 216 | | restraint belt. |
| 217 | | |
| 218 | Q: | Was he trying to assault the COs? |
| 219 | | |
| 220 | A: | I don't know if he was trying to assault the COs on purpose but that's why I |
| 221 | | held his legs down so that none of us got kicked. |
| 222 | | |
| 223 | Q: | But his physical actions, were they designed to prevent switching the cuffs to |
| 224 | | a waist belt? |
| 225 | | |

INTERVIEW WITH OFC. TAYLOR GLENN
Interviewer: Det. Brian Walborn
07-29-19/11:12 am
Case # C2019-0136
Page 6

| | | |
|---|---|---|
| 226 | A: | Yes. |
| 227 | | |
| 228 | Q: | Okay. Once - and you said once that was - yo- that was accomplished |
| 229 | | everyone exited the cell? |
| 230 | | |
| 231 | A: | Correct. |
| 232 | | |
| 233 | Q: | All right. He's in the cell, the door is closed, do you hear anything coming |
| 234 | | from the cell? |
| 235 | | |
| 236 | A: | Yelling. |
| 237 | | |
| 238 | Q: | Could you tell what he was saying? |
| 239 | | |
| 240 | A: | No. |
| 241 | | |
| 242 | Q: | There's a lot of yelling - a lot of the inmates down there want things, they ask |
| 243 | | you for things, they scream and yell, correct? |
| 244 | | |
| 245 | A: | Correct. |
| 246 | | |
| 247 | Q: | So that's not unusual. |
| 248 | | |
| 249 | A: | No. |
| 250 | | |
| 251 | Q: | Inmate Riley was removed again from the cell, I believe for a medical check? |
| 252 | | |
| 253 | A: | Correct. They escorted Inmate Riley from his cell, uh, into the medical room |
| 254 | | which is directly beside the cell to get checked by Medical. |
| 255 | | |
| 256 | Q: | Is there any cameras in Medical? |
| 257 | | |
| 258 | A: | There is not. |
| 259 | | |
| 260 | Q: | Do you know what was said in Medical? |
| 261 | | |
| 262 | A: | I do not. |
| 263 | | |
| 264 | Q: | Why? |
| 265 | | |
| 266 | A: | I was doing paperwork. |
| 267 | | |
| 268 | Q: | What's the next thing you know that happens? |
| 269 | | |
| 270 | A: | After Medical, Inmate Riley was placed back into the cell, the door was shut, |

CID000508

| | | |
|---|---|---|
| 271 | | um, the prison was then called for a transport for him to come up to the prison. |
| 272 | | |
| 273 | Q: | So the prison tran- DCP transport arrived, did you see, uh, their interaction |
| 274 | | with Inmate Riley at all? |
| 275 | | |
| 276 | A: | I did. We - or they opened the cell door, um, Inmate Riley walked out, we put |
| 277 | | a pair of shower shoes in front of him, put the shower shoes on and then they |
| 278 | | left with Inmate Riley. |
| 279 | | |
| 280 | Q: | Did they have any trouble getting him out of the cell, did they have to plead |
| 281 | | with him? |
| 282 | | |
| 283 | A: | They explained to him several times what was happening. Um, he was |
| 284 | | hesitant to come out of the cell and then finally he came out of the cell. |
| 285 | | |
| 286 | Q: | Okay. And once he left Booking you didn't see him again that day? |
| 287 | | |
| 288 | A: | That day, no. |
| 289 | | |
| 290 | Q: | You told me in a previous interview that, uh, on June 22 or the 24th you were |
| 291 | | relieving A Block officers for lunch. |
| 292 | | |
| 293 | A: | Correct. |
| 294 | | |
| 295 | Q: | You had an opportunity to come across Inmate Riley again, describe that. |
| 296 | | |
| 297 | A: | Um, he was yelling once again a bunch of stuff that made no sense. Um, I was |
| 298 | | doing one of my walks to check on him, I stopped in front of the cell to see if I |
| 299 | | could find out why he was yelling. Um, when asked what was wrong, Inmate |
| 300 | | Riley said something along the lines of that he was locked in a basement. I |
| 301 | | repeated back to him what he had said in question form and he said that he |
| 302 | | was locked in a basement and couldn't get out. At that point I noticed that |
| 303 | | Inmate Riley was completely naked standing in front of the cell so as a female |
| 304 | | officer I walked away from the cell. |
| 305 | | |
| 306 | Q: | Now he was on a Level 1 suicide watch... |
| 307 | | |
| 308 | A: | Correct. |
| 309 | | |
| 310 | Q: | ...which required you to check on him every ten minutes. |
| 311 | | |
| 312 | A: | Correct. |
| 313 | | |
| 314 | Q: | And in a previous interview you believed this was your last check before the |
| 315 | | people - the COs you relieved were coming back. |

| | | |
|---|---|---|
| 316 | | |
| 317 | A: | Correct. During my first couple walks he wasn't yelling. |
| 318 | | |
| 319 | Q: | During the time at Central Booking when you and the COs had put your hands |
| 320 | | on Inmate Riley did you or any CO punch him? |
| 321 | | |
| 322 | A: | No. |
| 323 | | |
| 324 | Q: | Kick him? |
| 325 | | |
| 326 | A: | No. |
| 327 | | |
| 328 | Q: | Strike him? |
| 329 | | |
| 330 | A: | No. |
| 331 | | |
| 332 | Q: | Choke him? |
| 333 | | |
| 334 | A: | No. |
| 335 | | |
| 336 | Q: | Pin him for any extended period of time against a fixed object, the ground, the |
| 337 | | wall? |
| 338 | | |
| 339 | A: | No. |
| 340 | | |
| 341 | Q: | Okay. Is there anything else you'd like to add to this statement? |
| 342 | | |
| 343 | A: | No. |
| 344 | | |
| 345 | Q: | All right. We'll conclude the interview, time will be 1125. |
| 346 | | |
| 347 | | |
| 348 | | The transcript has been reviewed with the audio recording submitted and it is an accurate |
| 349 | | transcription. |
| 350 | | Signed_____ |

```
1
2
3
4
5
6
7               INTERVIEW WITH CO TAMI DONOVAN
8                    Q=Det. Brian Walborn
9                    A=CO Tami Donovan
10
11
12   Q:      Today is July 5, 2019. The time will be 1325 hours. We're at the Dauphin
13           County Prison. Present, myself, Detective Brian Walborn, and Correctional
14           Officer Tami Donovan. Tami, for the record, state your name and spell your
15           last.
16
17   A:      Tami Jane Donovan, D-O-N-O-V-A-N.
18
19   Q:      You know this interview is being recorded?
20
21   A:      Yes.
22
23   Q:      I have your permission to record your voice?
24
25   A:      Yes.
26
27   Q:      Have any promises or threats been made to you for this interview?
28
29   A:      No.
30
31   Q:      Are you currently under the influence of any drugs or alcohol?
32
33   A:      No.
34
35   Q:      You can read and write the English language?
36
37   A:      Yes.
38
39   Q:      Highest grade in school you completed?
40
41   A:      Uh, 12.
42
43   Q:      Okay. You're employed here as correctional officer with Dauphin County
44           Prison. Correct?
45
```

| | | |
|---|---|---|
| 46 | A: | Yes. |
| 47 | | |
| 48 | Q: | And how many years have you been working here? |
| 49 | | |
| 50 | A: | Twelve and a half. |
| 51 | | |
| 52 | Q: | From Ju- your last day of work was June 14, 2019, and your next day back to |
| 53 | | work was June 26, 2019. |
| 54 | | |
| 55 | A: | Yes. |
| 56 | | |
| 57 | Q: | On June 26, 2019, what shift were you working? |
| 58 | | |
| 59 | A: | Um, 6:00 to, uh, 2:00 shift. |
| 60 | | |
| 61 | Q: | 0600 to 1400 hours? |
| 62 | | |
| 63 | A: | Yes sir. |
| 64 | | |
| 65 | Q: | And on that day what block were you assigned to? |
| 66 | | |
| 67 | A: | I was assigned to A Bottom Tier. |
| 68 | | |
| 69 | Q: | So you reported to A - A Block at 0600 hours? |
| 70 | | |
| 71 | A: | Yes. |
| 72 | | |
| 73 | Q: | It was shift change. |
| 74 | | |
| 75 | A: | Yes. |
| 76 | | |
| 77 | Q: | What's the normal - A Block is a classification block. What's the normal |
| 78 | | procedure of shift change? |
| 79 | | |
| 80 | A: | Uh, shift change, you walk with the - the officer that you're following. And |
| 81 | | you check all the level watches, the Level 1, Level 2 and Level 3 watches to |
| 82 | | sign off on them to make sure they're okay. |
| 83 | | |
| 84 | Q: | Now you do not know Inmate Tyrique Riley. Correct? |
| 85 | | |
| 86 | A: | Not prior to that day. |
| 87 | | |
| 88 | Q: | He was in cell A-1-5. |
| 89 | | |
| 90 | A: | That is correct. |

INTERVIEW WITH CO TAMI DONOVAN
Interviewer: Det. Brian Walborn
07-05-19/1:25 pm
Case #C2019-0136
Page 3

91

92    Q:       When you were walking with the officer you were relieving, did you notice
93                anything about Inmate Riley in Cell A-1-5?

94

95    A:       Yes. Inmate Riley was naked and he was acting in a bizarre manner.

96

97    Q:       Was he making any sounds, any noises? Was he talking?

98

99    A:       He was making a kind of clucking sound at the time.

100

101    Q:       Clucking.

102

103    A:       Like a chicken.

104

105    Q:       Did you try to talk to him at all?

106

107    A:       Not at that time, no.

108

109    Q:       Now Inmate Riley, I believe was a...

110

111    A:       Level 1 suicide watch.

112

113    Q:       And what is that?

114

115    A:       Uh, that means I am to watch him every ten minutes to make sure that he is
116                not harming himself.

117

118    Q:       Was he dressed at all?

119

120    A:       At that time, no. He had a smock in his cell, but he was not wearing it.

121

122    Q:       So your first check 0600. And then you did ten-minute checks ever - ever
123                since that. Anything else with Inmate Riley you can tell me about? His
124                demeanor, his actions, his appearance.

125

126    A:       Just every time I checked him, he was naked in the cell and he just acted
127                bizarre. Uh, I would tell him to lay down occasionally, but he didn't seem to
128                comprehend.

129

130    Q:       Describe his bizarre behavior.

131

132    A:       Just being naked in a cell is bizarre behavior. Most inmates are dressed in a
133                cell especially when there's a female checking on him every ten minutes.

134

135    Q:       Anything else?

| | | |
|---|---|---|
| 136 | | |
| 137 | A: | Um, not until pill call. |
| 138 | | |
| 139 | Q: | Then tell us about pill call. |
| 140 | | |
| 141 | A: | At pill call, uh, when Carl gave him his meds... |
| 142 | | |
| 143 | Q: | Carl? |
| 144 | | |
| 145 | A: | Carl, uh, I don't know what Carl's last name is. |
| 146 | | |
| 147 | Q: | What does Carl do? |
| 148 | | |
| 149 | A: | He is - he passes out meds to the inmates. He comes to the block and passes |
| 150 | | out meds. He does other things, I'm sure. But that's his main duty. On that |
| 151 | | day, that's his main duty. |
| 152 | | |
| 153 | Q: | So you went with Carl to Inmate Riley's cell? |
| 154 | | |
| 155 | A: | Yes. |
| 156 | | |
| 157 | Q: | What happened? |
| 158 | | |
| 159 | A: | Uh, we did put his smock on. We attempted to put his smock on. Oh we |
| 160 | | accomplished it. Uh, and when he got the med, the pills, he took the water but |
| 161 | | it came out of his mouth like a gush, kind of like in a fountain kind of way. |
| 162 | | He didn't spit it, but it was like he just couldn't swallow it almost or he didn't |
| 163 | | want to swallow it. |
| 164 | | |
| 165 | Q: | Did he have anything around his mouth? In an early interview you said he like |
| 166 | | white foam. |
| 167 | | |
| 168 | A: | Yes. Well it was like, uh, pasty white stuff from looked like from not |
| 169 | | drinking. You know, your mouth gets dry and you kind of have a - a paste, a |
| 170 | | film around your mouth, yes. |
| 171 | | |
| 172 | Q: | Did you ever try talking to him? |
| 173 | | |
| 174 | A: | Um, simply tell him to lay down a few times. |
| 175 | | |
| 176 | Q: | Did he ever talk to you? |
| 177 | | |
| 178 | A: | Not that I can remember, not prior to pill call. Pill call, he may have mumbled |
| 179 | | some stuff that was incoherent that I did not understand. |
| 180 | | |

181  Q:        Now Inmate Riley left A Block that morning for medical. Correct?
182
183  A:        Yes.
184
185  Q:        Did - did he return?
186
187  A:        Yes.
188
189  Q:        Did you know that he was being sent out to the hospital for mental evaluation?
190
191  A:        Not right away. I wasn't aware until a little later that Danner and, uh,
192            Singleton were gonna be taking him to the hospital.
193
194  Q:        CO Danner, CO Singleton?
195
196  A:        Yes.
197
198  Q:        You saw them come on the block?
199
200  A:        Yes.
201
202  Q:        Did you accompany them to the cell?
203
204  A:        I believe I did.
205
206  Q:        Do you remember CO Danner or CO Singleton talking with him?
207
208  A:        I remember Danner telling him that he was gonna get dressed.
209
210  Q:        Did you say anything to Riley at this point?
211
212  A:        I do remember telling him maybe two or three times that they were trying to
213            take him out to get him help.
214
215  Q:        Did he respond in any way?
216
217  A:        He didn't seem to comprehend, no.
218
219  Q:        Was Inmate Riley still in his smo- smock?
220
221  A:        Initially he was, but then Danner and Stevie Steel and I believe Hoffman were
222            attempting to get him into a uniform so that they were able to take him out.
223            We don't take inmates to - anywhere in smocks. They have uniforms on.
224
225  Q:        You said Stevie Steel?

INTERVIEW WITH CO TAMI DONOVAN
Interviewer: Det. Brian Walborn
07-05-19/1:25 pm
Case #C2019-0136
Page 6

| 226 | | |
|---|---|---|
| 227 | A: | I'm sorry, uh, Steve Singleton. |
| 228 | | |
| 229 | Q: | Oh. |
| 230 | | |
| 231 | A: | It's his common nickname. |
| 232 | | |
| 233 | Q: | So when they were trying to get him dressed, they took him - took the smock |
| 234 | | off him. That everybody was standing up, nobody was laying on the floor at |
| 235 | | all. |
| 236 | | |
| 237 | A: | No. Everybody was standing. |
| 238 | | |
| 239 | Q: | Okay. And what happened then? |
| 240 | | |
| 241 | A: | Uh, when I noticed that they were struggling to get him dressed, I... |
| 242 | | |
| 243 | Q: | Let me stop you there. Describe that struggle. |
| 244 | | |
| 245 | A: | Um, it looked like Danner was trying to restrain him. He was actively trying |
| 246 | | to get away from them. And, uh, Singleton and Hoffman were trying to put his |
| 247 | | shirt on. That's the part I remember. |
| 248 | | |
| 249 | Q: | Okay. |
| 250 | | |
| 251 | A: | Uh, I forget where I was at. I... |
| 252 | | |
| 253 | Q: | You asked Danner... |
| 254 | | |
| 255 | A: | I asked Danner if, uh, he wanted me to notify somebody that the guy wasn't |
| 256 | | cooperating that Riley didn't, you know, he - he just wasn't cooperating. And |
| 257 | | he said, "Yes." So at that point, I went to A and B Control and told CO |
| 258 | | Hockenberry that there was, you know, an issue in the cell that he was |
| 259 | | resisting and he wasn't cooperating getting dressed. She then made some |
| 260 | | calls. And I went back to tell Danner that they were to get out of the cell until |
| 261 | | the Shift Commander arrived. But at that time, they had Riley on the ground, |
| 262 | | shackles on his feet, and they were attempting to cuff him. |
| 263 | | |
| 264 | Q: | Did you see them eventually cuff him? |
| 265 | | |
| 266 | A: | No I did not see that. |
| 267 | | |
| 268 | Q: | Because you walked away again? |
| 269 | | |
| 270 | A: | I believe I went and checked on the rest of my watches at that time. I had 20 |

| 271 | | other inmates that needed to be watched by me. |
|---|---|---|
| 272 | | |
| 273 | Q: | And what's the next thing you remember? |
| 274 | | |
| 275 | A: | I remember Klahr entering the block, I believe with Sergeant Lewis. Uh, |
| 276 | | Klahr called for the restraint chair over the radio. Um, Sergeant Lewis told the |
| 277 | | ladies to step aside due to the inmate - to the Riley's, uh, modesty and being |
| 278 | | naked. Uh, I believe at that time I went and either did paperwork or checked |
| 279 | | on my other watches. I'm not really sure. |
| 280 | | |
| 281 | Q: | And earlier, you said you were sitting at a desk probably doing some |
| 282 | | paperwork. |
| 283 | | |
| 284 | A: | Yeah. |
| 285 | | |
| 286 | Q: | And that's up towards the one end of the... |
| 287 | | |
| 288 | A: | Yeah. |
| 289 | | |
| 290 | Q: | ...block. Do you recall them trying to get Inmate Riley into the restraint chair? |
| 291 | | |
| 292 | A: | Um, I don't remember really watching it. I do know that they pulled him out |
| 293 | | of the cell, put him into the restraint chair. Um, I believe he was still |
| 294 | | struggling, but I don't - I didn't really pay attention. |
| 295 | | |
| 296 | Q: | You do recall Riley - Inmate Riley in the restraint chair? |
| 297 | | |
| 298 | A: | Yes, yes. |
| 299 | | |
| 300 | Q: | And did you notice anything about his demeanor then when you do remember |
| 301 | | it? |
| 302 | | |
| 303 | A: | Um, I - I remember Klahr calling a medical emergency. And I remember |
| 304 | | looking, and he appeared to be passed out in the chair. That's all I remember |
| 305 | | about him being in the chair. |
| 306 | | |
| 307 | Q: | What happened then? |
| 308 | | |
| 309 | A: | Uh, he was taken off the block. |
| 310 | | |
| 311 | Q: | Did you ever see Inmate Riley again? |
| 312 | | |
| 313 | A: | No. |
| 314 | | |
| 315 | Q: | Okay. From the things that you did witness, did you see any CO strike, punch, |

| | | |
|---|---|---|
| 316 | | kick, choke or pin Inmate Riley against any hard objects? |
| 317 | | |
| 318 | A: | No. |
| 319 | | |
| 320 | Q: | Okay. Is there anything else you'd like to add to this statement? |
| 321 | | |
| 322 | A: | No. |
| 323 | | |
| 324 | Q: | All right we're gonna conclude the interview. The time will be 1337. |
| 325 | | |
| 326 | | |
| 327 | The transcript has been reviewed with the audio recording submitted and it is an accurate |
| 328 | transcription. |
| 329 | Signed_____ |

```
1
2
3
4
5
6
7                          INTERVIEW WITH CO MICHAEL DANNER
8                               Q=Det. Brian Walborn
9                               A=CO Matthew Danner
10
11
12   Q:           Today is July 5, 2019. The time will be 1017 hours. We're at the Dauphin
13                County Prison. Present are myself, Detective Brian Walborn and Correction
14                Officer Matthew Danner. Sir, for the record, state your name and spell your
15                last.
16
17   A:           Matthew Danner - D-A-N-N-E-R.
18
19   Q:           Do you give me permission to record this interview?
20
21   A:           Yes.
22
23   Q:           Have any promises or threats been made to you for this interview?
24
25   A:           No.
26
27   Q:           Are you…
28
29   Radio:       (Unintelligible).
30
31   Q:           Are you currently under the influence of any drugs or alcohol?
32
33   A:           No.
34
35   Q:           Can you read and write the English language?
36
37   A:           Yes.
38
39   Q:           And the highest grade in - in school that you've completed?
40
41   A:           12th.
42
43   Q:           Your position here at Dauphin County Prison is a correction officer?
44
45   A:           Correct.
```

CID000521

INTERVIEW WITH CO MICHAEL DANNER
Interviewer: Det. Brian Walborn
07-05-19/10:17 am
Case # C2019-136
Page 2

46
47   Q:            How long have you been a correctional officer at Dauphin County Prison?
48
49   A:            15 years.
50
51   Q:            Any other correctional experience?
52
53   A:            No.
54
55   Q:            I'm gonna take you back to June 26th. Which shift do you work?
56
57   A:            First.
58
59   Q:            Which is 0600 to 1400?
60
61   A:            Correct.
62
63   Q:            And your assignment that day was what?
64
65   A:            P Floor.
66
67   Q:            That means you were basically a floater on P-Block?
68
69   A:            Correct.
70
71   Q:            In the morning hours, approximately what time, ah, you were requested to
72                 perform an extra duty?
73
74   A:            I don't know.
75
76   Q:            Was it in the morning?
77
78   A:            The morning hours, yes.
79
80   Q:            And, ah, what were you reque- requested to do?
81
82   A:            I was requested to report to Central for an emergency transport.
83
84   Q:            And what does that mean?
85
86   A:            I was to take an individual to the hospital that they deemed was an emergency
87                 by a county vehicle.
88
89   Q:            And to do that, what's standard procedure, the usual procedure?
90

| | | |
|---|---|---|
| 91<br>92<br>93 | A: | Report to Central, go to the armory, get issued a transport belt firearm and report back into the prison after you've been armed. |
| 94<br>95 | Q: | You mentioned a belt, do you mean a gun belt? |
| 96<br>97<br>98 | A: | A duty belt. It has a firearm holster, a two-magazine, a twin magazine pouch, an asp baton, handcuffs and OC spray. |
| 99<br>100<br>101 | Q: | So once you obtained those things, you go into the North Sally Port and you secure the firearm and the magazines, correct? Cell phone? |
| 102<br>103 | A: | Correct, in the locker. |
| 104<br>105 | Q: | And then, where do you go? |
| 106<br>107 | A: | Report into the lobby with Central with a transport box. |
| 108<br>109 | Q: | In that transport box, what's in there? |
| 110<br>111<br>112 | A: | Ah, zip tie cuffs, regular cuffs, and a belt, a leather belt, a chain belt, shackles, spit shield. |
| 113<br>114<br>115<br>116 | Q: | Now as usual procedure, in a previous interview you said that most of the times, the individuals who are being transported are up in medical or in intake? |
| 117<br>118 | A: | Correct. |
| 119<br>120 | Q: | But you were told to transport who and where was that person? |
| 121<br>122 | A: | Riley in A-1-5. |
| 123<br>124 | Q: | Who was with you? |
| 125<br>126 | A: | Ah, CO Singleton. |
| 127<br>128<br>129 | Q: | So to go to A-1-5, you - you took some of that equipment with you? You took all of it? |
| 130<br>131 | A: | We took the belt, leather belt and cuffs and shackles. |
| 132<br>133<br>134 | Q: | And now you're going to A-5 for Inmate Riley. Were you told anything about his health, state of mind, anything, like, that? |
| 135 | A: | We were transporting due to, ah, I believe it was stated, altered mental status |

INTERVIEW WITH CO MICHAEL DANNER
Interviewer: Det. Brian Walborn
07-05-19/10:17 am
Case # C2019-136
Page 4

| | | |
|---|---|---|
| 136 | | or - or - a - a checkup for mental status. |
| 137 | | |
| 138 | Q: | That's why he wasn't moved up to intake? |
| 139 | | |
| 140 | A: | I believe so. |
| 141 | | |
| 142 | Q: | Now, A block, what is that? |
| 143 | | |
| 144 | A: | Classification Intake Block. |
| 145 | | |
| 146 | Q: | And do you know if he was on a suicide watch? |
| 147 | | |
| 148 | A: | He was on a suicide watch. He was on a Level 1. That's why he was in a |
| 149 | | smock. |
| 150 | | |
| 151 | Q: | What is Level 1? |
| 152 | | |
| 153 | A: | That's a 10-minute watch, ah, no personal items. The only thing they're issued |
| 154 | | is a suicide mattress, a suicide blanket and a suicide smock. Finger food, so |
| 155 | | they're not eating a tray. They're eating, ah, finger food for lunch - breakfast, |
| 156 | | lunch and dinner. |
| 157 | | |
| 158 | Q: | So you knew that Inmate Riley was in a suicide smock? |
| 159 | | |
| 160 | A: | Correct. |
| 161 | | |
| 162 | Q: | And what's that? |
| 163 | | |
| 164 | A: | It's a velcro, ah, garment that goes across the shoulders and velcro's in the |
| 165 | | front almost, like, a dress or skirt coming across the chest down to about the |
| 166 | | knees. |
| 167 | | |
| 168 | Q: | Okay. So once you obtained what you needed, the belt, the shackles, you |
| 169 | | entered A block? |
| 170 | | |
| 171 | A: | Yes. |
| 172 | | |
| 173 | Q: | Upon entering A block, do you hear anything from Inmate Riley? |
| 174 | | |
| 175 | A: | No, not Inmate Riley. |
| 176 | | |
| 177 | Q: | You proceed to A-1-5? |
| 178 | | |
| 179 | A: | Correct. |
| 180 | | |

CID000524

INTERVIEW WITH CO MICHAEL DANNER
Interviewer: Det. Brian Walborn
07-05-19/10:17 am
Case # C2019-136
Page 5

| | | |
|---|---|---|
| 181 | Q: | And upon your arrival at A-1-5, do you hear anything from Mr. Riley? |
| 182 | | |
| 183 | A: | No. |
| 184 | | |
| 185 | Q: | Do you see Inmate Riley? |
| 186 | | |
| 187 | A: | Yes. |
| 188 | | |
| 189 | Q: | Describe his demeanor. |
| 190 | | |
| 191 | A: | The inmate was standing at the door facing outward, ah, looking at this officer |
| 192 | | with a white, cakey, frothy substance around his mouth and lips. |
| 193 | | |
| 194 | Q: | Was he saying anything to you? |
| 195 | | |
| 196 | A: | No. |
| 197 | | |
| 198 | Q: | How close was he to the door? |
| 199 | | |
| 200 | A: | Within a foot of the door. |
| 201 | | |
| 202 | Q: | And the door itself has a plexiglass window you can see in? |
| 203 | | |
| 204 | A: | Yes. |
| 205 | | |
| 206 | Q: | What happened next? |
| 207 | | |
| 208 | A: | Ah, I gave the order to Inmate Riley to back away from the door, at which |
| 209 | | time he did. I then motioned for the door to open. The door did open. |
| 210 | | |
| 211 | A: | Well, let me stop you. How far did he back away from the door? |
| 212 | | |
| 213 | A: | He took several steps, approximately, the middle of the cell before the door |
| 214 | | was opened. |
| 215 | | |
| 216 | Q: | But was you orders for him to do? |
| 217 | | |
| 218 | A: | Back away from the door. |
| 219 | | |
| 220 | Q: | Okay. Not to the back of the cell? |
| 221 | | |
| 222 | A: | I'm not sure. |
| 223 | | |
| 224 | Q: | So the door opens. Inmate Riley's in the middle of the cell. What happened |
| 225 | | next? |

226

227  A:   I entered the cell, ah, directing him towards the back of the cell to the wall
228       area of the cell. Ah, he complied.
229

230  Q:   Has he said anything to you yet?
231

232  A:   No. At which time, I told the inmate that he was going to be transported or
233       that he had to remove the smock for transport. He gave me a blank stare, at
234       which time I repeated the order. The inmate reached up and grabbed the
235       shoulder piece of the smock to un-velcro it, and the smock was removed.
236

237  Q:   Did Riley do that? Was he assisted by anybody else?
238

239  A:   I'm not positive. I'm not sure if he was assisted or not. I remember the smock
240       being removed. I remember him reaching, too. My focus was more on the
241       inmate and his actions than the removal of the smock.
242

243  Q:   What happened next?
244

245  A:   I ordered the inmate to put on the uniform that I had. It was a lock-in uniform.
246       I offered it to him and told him to put it on. He gave me the blank stare. Ah, I
247       repeated the order and attempted it to hand it to him, at which time, Inmate
248       Riley grabbed ahold of my arm, my wrist - my left wrist.
249

250  Q:   What happened then?
251

252  A:   At which time I reversed his grab and re-grabbed his arm pulling him forward.
253       He was bent over at the waist. We attempted to place the uniform top on him.
254       It went over his head, at which time, Riley removed the top from his head
255       with his hands.
256

257  Q:   Well, and let me back you up one second. If you had ahold of his left hand,
258       and it was only - he was able to remove it with his free hand?
259

260  A:   Correct.
261

262  Q:   Okay. At this point in time, do you realize if trying to dress Inmate Riley was
263       going be successful or not?
264

265  A:   We decided it was not going to be successful to probably be able to dress
266       Riley, so at which time we attempted to take him to the ground.
267

268  Q:   But how - how did you attempt to take him to the - to the floor?
269

270  A:   Officers attempted to remove his feet from beneath him so we could take him

INTERVIEW WITH CO MICHAEL DANNER
Interviewer: Det. Brian Walborn
07-05-19/10:17 am
Case # C2019-136
Page 7

| 271 | | to the floor to better control or restrain him and, ah, the one leg was removed. |
|---|---|---|
| 272 | | I looked down, and the other leg was still posted on the floor. So I used my |
| 273 | | leg to remove his leg from underneath him, and I directed his upper part, |
| 274 | | torso, to the floor. |
| 275 | | |
| 276 | Q: | At that point in time, did he go to his stomach? Was he on his side? |
| 277 | | |
| 278 | A: | He went to his back facing upward at me. |
| 279 | | |
| 280 | Q: | Which direc- in the cell, and he's on his back, is his head towards the front of |
| 281 | | the cell or the back of the cell? |
| 282 | | |
| 283 | A: | To the back of the cell. |
| 284 | | |
| 285 | Q: | He's on his back. His head's towards the back of the cell. Continue. |
| 286 | | |
| 287 | A: | At which time, they were attempting to shackle him or - or apply shackles to |
| 288 | | legs. I was controlling the upper part of his body on the floor and attempting |
| 289 | | to roll him to his stomach. The legs were shackled. I ended up gaining control |
| 290 | | of his right arm, placing it behind his back, and a cuff was placed on that |
| 291 | | hand. The inmate continued to post or keep his left hand away from this |
| 292 | | officer resisting all attempts to cuff that hand. Eventually, we received that |
| 293 | | hand and cuffed it. |
| 294 | | |
| 295 | Q: | I know you mentioned resisting. Describe that. |
| 296 | | |
| 297 | A: | Contorting his body, ah, pushing against objects and people to resist any kind |
| 298 | | of control. |
| 299 | | |
| 300 | Q: | Were you able to get control of the left hand? |
| 301 | | |
| 302 | A: | Yes. |
| 303 | | |
| 304 | Q: | And what happened? |
| 305 | | |
| 306 | A: | The handcuffs were applied. He was then shackled and handcuffed behind his |
| 307 | | back lying face down on the floor. He continued to contort his body, rolling |
| 308 | | up onto his hips, ah, moving his torso left and right. |
| 309 | | |
| 310 | Q: | At this point in time, and up to this point in time, his - did - was he ever put |
| 311 | | into chokehold? Was his neck ever grabbed at all? |
| 312 | | |
| 313 | A: | No. |
| 314 | | |
| 315 | Q: | Up to this point in time, did - was his body pinned to any hard surface? |

CID000527

| 316 | | |
|---|---|---|
| 317 | A: | No. |
| 318 | | |
| 319 | Q: | Did anyone have their knee in his back, up on his neck? |
| 320 | | |
| 321 | A: | No. |
| 322 | | |
| 323 | Q: | At this point in time, did anyone strike him? |
| 324 | | |
| 325 | A: | No. |
| 326 | | |
| 327 | Q: | Punch him? |
| 328 | | |
| 329 | A: | No. |
| 330 | | |
| 331 | Q: | Kick him? |
| 332 | | |
| 333 | A: | No. |
| 334 | | |
| 335 | Q: | So now he's secured, handcuffed behind the back, on his stomach. The legs |
| 336 | | are shackled, and his head's towards the back of the cell. What happened |
| 337 | | next? |
| 338 | | |
| 339 | A: | I called for a spit shield to be placed over his head because of the white, frothy |
| 340 | | material around his mouth. He was breathing and spitting, and it - it was being |
| 341 | | - ah, I don't know how to word that. |
| 342 | | |
| 343 | Q: | Expelled? |
| 344 | | |
| 345 | A: | Yes, from his mouth or - or that area. |
| 346 | | |
| 347 | Q: | Now, having trouble with - with Inmate Riley, did you request any assistance? |
| 348 | | |
| 349 | A: | I requested for them to call a supervisor or somebody of authority that could |
| 350 | | make a decision of if were still taking him on transport or what we were doing |
| 351 | | from this point once he was restrained on the floor. |
| 352 | | |
| 353 | Q: | Did anyone of authority show up? |
| 354 | | |
| 355 | A: | Ah, the Captain did show up. |
| 356 | | |
| 357 | Q: | What happened then? |
| 358 | | |
| 359 | A: | Ah, the order was given to place him in the restraint chair. |
| 360 | | |

INTERVIEW WITH CO MICHAEL DANNER
Interviewer: Det. Brian Walborn
07-05-19/10:17 am
Case # C2019-136
Page 9

| | | |
|---|---|---|
| 361 | Q: | And? |
| 362 | | |
| 363 | A: | The inmate was removed from the cell by, ah, other officers and placed in the |
| 364 | | chair or removed from the cell and was being placed in the chair. |
| 365 | | |
| 366 | Q: | What - what happened once he was in the chair? |
| 367 | | |
| 368 | A: | When I was exiting the cell, I noticed the inmate was kicking, at which time - |
| 369 | | at - when they trying to place him in the chair. They then - he then was placed |
| 370 | | against the chair. He arched his back using his shoulders and his feet to push |
| 371 | | his hips up. I then used my hands to place his torso or his hips down into the |
| 372 | | chair so the, ah, belt could be placed on him. Ah, meanwhile, the inmate was - |
| 373 | | when his hips went into the chair, the inmate started kicking again while |
| 374 | | Officer Singleton was trying to shackle his legs to the chair. |
| 375 | | |
| 376 | Q: | Now let's talk about this chair. This chair is actually a big piece of plastic |
| 377 | | that's molded into a chair that has grooves for your arms that are locked |
| 378 | | behind your back, handcuffed behind your back. It has grooves to place your |
| 379 | | legs into. The chair's on wheels to easily transport it - a prisoner? |
| 380 | | |
| 381 | A: | Correct. |
| 382 | | |
| 383 | Q: | It has multiple straps on it? |
| 384 | | |
| 385 | A: | Correct. |
| 386 | | |
| 387 | Q: | How many straps down around the legs? |
| 388 | | |
| 389 | A: | One strap around the legs. |
| 390 | | |
| 391 | Q: | Where then, coming up the body, where would the next strap be? |
| 392 | | |
| 393 | A: | There's a strap that comes across the lap. There's then two straps that come |
| 394 | | over each shoulder, one strap per shoulder - two straps come across each |
| 395 | | shoulder. |
| 396 | | |
| 397 | Q: | And you and CO Singleton mainly dealt with the legs? |
| 398 | | |
| 399 | A: | Yes. |
| 400 | | |
| 401 | Q: | There was other CO's present? |
| 402 | | |
| 403 | A: | Correct. |
| 404 | | |
| 405 | Q: | And they were handling the other straps? |

| | | |
|---|---|---|
| 406 | | |
| 407 | A: | Correct. |
| 408 | | |
| 409 | Q: | Is it procedure to control the head? |
| 410 | | |
| 411 | A: | It is. |
| 412 | | |
| 413 | Q: | If a... |
| 414 | | |
| 415 | A: | It is so it cannot be used as a weapon or for spitting reasons to also, ah, keep |
| 416 | | control of the individual from harming staff members that are trying to place |
| 417 | | the straps. |
| 418 | | |
| 419 | Q: | What, ah, what is the standard procedure of controlling the head? Do you |
| 420 | | know? |
| 421 | | |
| 422 | A: | No. |
| 423 | | |
| 424 | Q: | Okay. At this point, has Inmate Riley said anything? |
| 425 | | |
| 426 | A: | No. Inmate Riley did not say anything. |
| 427 | | |
| 428 | Q: | So Inmate Riley's now completely restrained in the restraint chair? |
| 429 | | |
| 430 | A: | Correct. |
| 431 | | |
| 432 | Q: | What happened? |
| 433 | | |
| 434 | A: | Ah, I noticed - I noticed that Inmate Riley's head was laying back on the |
| 435 | | chair. Ah, somebody, another officer, said they did not believe he was |
| 436 | | breathing. A second officer repeated the same thing. They did not believe he |
| 437 | | was breathing, and they did sternum rubs to try to get a reaction from him to |
| 438 | | find out if he had, ah, signs of life. I guess that's the way to put it. Ah, too, I - |
| 439 | | I remember noticing two sternum rubs being done by separate people. There |
| 440 | | was no reaction. Medical emergency was called, and we were ordered to take |
| 441 | | the inmate to medical 'cause it would be faster than having medical respond to |
| 442 | | A block. |
| 443 | | |
| 444 | Q: | Well, let's get an image of this. A block, being the first block, is that the |
| 445 | | closest to the medical ward? |
| 446 | | |
| 447 | A: | It is the closest block on the main side to the medical ward, yes. |
| 448 | | |
| 449 | Q: | Which is not a very long distance at all? |
| 450 | | |

INTERVIEW WITH CO MICHAEL DANNER
Interviewer: Det. Brian Walborn
07-05-19/10:17 am
Case # C2019-136
Page 11

| 451 | A: | No. |
|---|---|---|
| 452 | | |
| 453 | Q: | So you - you did - you rushed him to medical? |
| 454 | | |
| 455 | A: | I did. I wheeled - I wheeled the restraint chair off A block and back to |
| 456 | | medical. The order was to remove him from the restraint chair and lay him on |
| 457 | | the ground where, ah, CPR was started, and the AED was applied to Riley. |
| 458 | | Um, other staff members, a nurse and that, started the CPR, and we then got |
| 459 | | the AED attached, and it did shock him. It advised the shocking, and we went |
| 460 | | off the prompt of the AED to continue CPR or to stand back for a - a shock. |
| 461 | | Ah, I did a series of chest compressions on Inmate Riley back in medical. |
| 462 | | |
| 463 | Q: | Just one set? |
| 464 | | |
| 465 | A: | I did one set. |
| 466 | | |
| 467 | Q: | Did a local EMS company arrive? |
| 468 | | |
| 469 | A: | They did. |
| 470 | | |
| 471 | Q: | They took over treatment? |
| 472 | | |
| 473 | A: | Ah, they did. |
| 474 | | |
| 475 | Q: | And they transported? |
| 476 | | |
| 477 | A: | They did. |
| 478 | | |
| 479 | Q: | Did you accompany the transport? |
| 480 | | |
| 481 | A: | I did. I rode in the ambulance with Riley to Harrisburg Hospital. |
| 482 | | |
| 483 | Q: | I'm gonna take you back to when you first centered the cell. Did you ever tell |
| 484 | | Inmate Riley, while you were trying to get him dressed, and explain to him |
| 485 | | that he was going - actually going to the hospital? |
| 486 | | |
| 487 | A: | I believe I did. I told him that we had get him out of the smock and into a |
| 488 | | uniform to take him to the hospital. |
| 489 | | |
| 490 | Q: | And when you asked him to get dressed, you just said that one time or |
| 491 | | repeated commands? |
| 492 | | |
| 493 | A: | It was repeated more than once. |
| 494 | | |
| 495 | Q: | During his resistance, was he informed to stop resisting? |

| | | |
|---|---|---|
| 496 | | |
| 497 | A: | Yes. Multiple times the order was given to stop resisting. Ah, "We're cuffing |
| 498 | | you. Place your hands behind your back. We're cuffing you up." Stuff, like, |
| 499 | | that. |
| 500 | | |
| 501 | Q: | And from your - from the time you encountered Mr. Inmate Riley 'til you |
| 502 | | went to the hospital, which hospital was that? |
| 503 | | |
| 504 | A: | Harrisburg. |
| 505 | | |
| 506 | Q, | Did anybody strike, kick, punch, choke or pin him in any solid object? |
| 507 | | |
| 508 | A: | No. |
| 509 | | |
| 510 | Q: | He never spoke? |
| 511 | | |
| 512 | A: | No. |
| 513 | | |
| 514 | Q: | And from the time you entered his cell until Inmate Riley exited cell A-1-5, |
| 515 | | how long do you think that was? |
| 516 | | |
| 517 | A: | I'm not sure. |
| 518 | | |
| 519 | Q: | A short time? A long time? |
| 520 | | |
| 521 | A: | It didn't - it - it didn't feel, like, a long time then. |
| 522 | | |
| 523 | Q: | Have you - have you ever had any previous encounters with Inmate Riley? |
| 524 | | |
| 525 | A: | No. |
| 526 | | |
| 527 | Q: | That was the first time you ever saw him? |
| 528 | | |
| 529 | A: | As far as I know, yes. |
| 530 | | |
| 531 | Q: | Have - do you know of him having any problems with anyone inside the |
| 532 | | Dauphin County Prison? |
| 533 | | |
| 534 | A: | No. |
| 535 | | |
| 536 | Q: | That's the only questions, CO Danner. Is there anything else you'd like to add |
| 537 | | to this statement? |
| 538 | | |
| 539 | A: | No. |
| 540 | | |

541   Q:                    We're gonna conclude the interview. The time will be 1041 hours.
542
543
544   The transcript has been reviewed with the audio recording submitted and it is an accurate
545   transcription.
546   Signed_____

1
2
3
4
5
6
7                             **INTERVIEW WITH DELTA BAUER**
8                                  **Q=Det. Brian Walborn**
9                                  **A=Delta Bauer**
10
11
12 **Q:**      Today is August 1, 2019. Time will be 1332 hours. We're at the Dauphin
13            County Criminal Investigation Division Conference Room. Present is myself,
14            Detective Brian Walborn and Dauphin County Prison Correctional Officer
15            Delta Bauer. Ma'am for the record, do you give me r- permission to record
16            your voice?
17
18 **A:**      Yes.
19
20 **Q:**      Have any promises or threats been made to you for this interview?
21
22 **A:**      No.
23
24 **Q:**      Are you currently under the influence of any drugs or alcohol?
25
26 **A:**      No.
27
28 **Q:**      The highest grade in school you completed?
29
30 **A:**      Uh, high school diploma.
31
32 **Q:**      And you can read and write the English language.
33
34 **A:**      Correct.
35
36 **Q:**      For the record, stel- state your name and spell your last.
37
38 **A:**      Delta Bauer, B-A-U-E-R.
39
40 **Q:**      As we said, you're a correctional officer at Dauphin County Prison.
41
42 **A:**      Correct.
43
44 **Q:**      How long you been employed there?
45

| | | |
|---|---|---|
| 46 | A: | I was hired January 1st of 18. |
| 47 | | |
| 48 | Q: | And do you have any previous correctional officer experience? |
| 49 | | |
| 50 | A: | No. |
| 51 | | |
| 52 | Q: | Have you had any formalized training on restraining individuals? |
| 53 | | |
| 54 | A: | Yes. |
| 55 | | |
| 56 | Q: | Okay, I'm gonna take you back to June 18, 2019. You worked what shift? |
| 57 | | |
| 58 | A: | Uh, 2200 to 0600. |
| 59 | | |
| 60 | Q: | So on June 18, 2019, you actually started your shift at 2200 hours on the 17th. |
| 61 | | |
| 62 | A: | Correct. |
| 63 | | |
| 64 | Q: | What was your assignment that day? |
| 65 | | |
| 66 | A: | Uh, uh, Dauphin County Judicial Center. |
| 67 | | |
| 68 | Q: | Basically, a Booking officer? |
| 69 | | |
| 70 | A: | Correct. |
| 71 | | |
| 72 | Q: | Have you worked there before? |
| 73 | | |
| 74 | A: | Yes. |
| 75 | | |
| 76 | Q: | Do you always work there? |
| 77 | | |
| 78 | A: | A good amount of time, yes. |
| 79 | | |
| 80 | Q: | I'm gonna take you back to June 18, 2019 around 5 o'clock in the morning. |
| 81 | | Did you have an opportunity to come in contact with a Tyrique Riley? |
| 82 | | |
| 83 | A: | Yes. |
| 84 | | |
| 85 | Q: | Prior to Riley being brought into the Booking desk, were you informed of |
| 86 | | anything? |
| 87 | | |
| 88 | A: | Um, by Susquehanna Booking. They informed us that we have an aggravated, |
| 89 | | uh, male coming in. |
| 90 | | |

INTERVIEW WITH DELTA BAUER
Interviewer: Det. Brian Walborn
08-01-19/1:32 pm
Case # C2019-0136
Page 3

| 91<br>92 | Q: | Now, they would've pulled into the garage. |
| 93<br>94 | A: | Correct. |
| 95<br>96 | Q: | Garage door would've closed. |
| 97<br>98 | A: | Yes. |
| 99<br>100<br>101 | Q: | To get from the Booking desk to the garage, you have to go through a hallway and two doors. |
| 102<br>103 | A: | Correct. |
| 104<br>105 | Q: | Did you go into the garage? |
| 106<br>107 | A: | No. |
| 108<br>109 | Q: | Do you know who did? |
| 110<br>111 | A: | Uh, yes. Uh, CO Ingersoll, CO Weaver, and Lieutenant Mendenhall. |
| 112<br>113 | Q: | Could you see what was going on in the garage? |
| 114<br>115 | A: | No. |
| 116<br>117<br>118 | Q: | Now, they would've brought him back through the first set of doors and then that hallway. |
| 119<br>120 | A: | Correct. |
| 121<br>122 | Q: | Then the second door would lead you back into Booking. |
| 123<br>124 | A: | Correct. |
| 125<br>126 | Q: | When they came into that hallway, could you see what was going on. |
| 127<br>128 | A: | I can see bodies but nothing of what's going on. |
| 129<br>130 | Q: | Could you hear anything? |
| 131<br>132 | A: | No. |
| 133<br>134<br>135 | Q: | Mm-kay. Comin' back into Booking and breaching that second door, is that the first time you caught sight of Riley? |

CID000542

| | | |
|---|---|---|
| 136<br>137 | A: | Yes. |
| 138<br>139 | Q: | Describe that. |
| 140<br>141<br>142 | A: | Um, he was dragging his feet, um, resisting officers, um, uh, contorting his body, um, pulling away, dragging his feet, became dead weight. |
| 143<br>144 | Q: | Weres- was anyone giving him any verbal commands at that time? |
| 145<br>146 | A: | Yes, uh... |
| 147<br>148 | Q: | Could you tell who? |
| 149<br>150<br>151 | A: | I could not tell you who, um, I just know they were telling him to stand up, walk, um, basically just to comply. |
| 152<br>153 | Q: | Was he? |
| 154<br>155 | A: | No. |
| 156<br>157 | Q: | Was Riley saying anything? |
| 158<br>159 | A: | No. |
| 160<br>161<br>162 | Q: | Now when in - the police bring, uh, a- a person arrested into Booking, what is the normal procedure? What was the first thing they would do? |
| 163<br>164 | A: | Uh, they would usually come - the officer would come over to... |
| 165<br>166 | Q: | An officer would do what? |
| 167<br>168<br>169<br>170 | A: | Uh, they would come over to the - the desk where I would be entered into the computer. Um, and then they would take him over to the bench. The officers would take him over to the bench. |
| 171<br>172 | Q: | What's the intention at the bench? |
| 173<br>174<br>175 | A: | Um, to pat him down, to do search to see if he has any contraband and or weapons. |
| 176<br>177 | Q: | What else occurs at the bench? |
| 178<br>179<br>180 | A: | Um, they take off the handcuffs, uh, they, uh, they - they take off the handcuffs, they continue the pat search, um, just to make sure, um, and at the point in time if they are cooperating, then we go from there but Riley was not |

INTERVIEW WITH DELTA BAUER
Interviewer: Det. Brian Walborn
08-01-19/1:32 pm
Case # C2019-0136
Page 5

181      cooperating.

182

183   Q:   Okay, at the bench, what occurred?

184

185   A:   Um, he was pushing off the bench with his feet. He was fighting.

186

187   Q:   He was...

188

189   A:   Contorting his bod- contorting his body, uh, pulling away from officers, um,
190        when the officers tried to hold him up, he would became dead weight and
191        drop to the floor.

192

193   Q:   At the bench, did any COs give him any commands?

194

195   A:   Uh, to stand up, comply, stop resisting.

196

197   Q:   In an earlier interview, you said that one of the COs sa- asked Riley, "Do you
198        have anything in your pockets?"

199

200   A:   Correct, uh, yes, t-, uh, trying to find out if he had any weapons on him, but
201        Riley was not responding.

202

203   Q:   Verbally?

204

205   A:   Verbally.

206

207   Q:   You mean while he was pushing off, contorting his body.

208

209   A:   Correct.

210

211   Q:   Becoming dead weight.

212

213   A:   Correct.

214

215   Q:   Pushing against the wall, Co's.

216

217   A:   Correct.

218

219   Q:   When you have an uncooperative person, what's the standard procedure then?

220

221   A:   Um, you - they will usually take them to the ground so we can perform, uh, a
222        search, um, safely without harming the detainee and or harming the officers.
223        Um, make sure anything's taken off of him that he shouldn't have to harm
224        himself. Um, we'll switch out handcuffs and apply shackles.

225

| 226 | Q: | So that's why they took him to the ground. |
| 227 | | |
| 228 | A: | Correct. |
| 229 | | |
| 230 | Q: | Okay, what'd you do then? |
| 231 | | |
| 232 | A: | I restrained the legs from hi- to prevent him from kicking. Uh... |
| 233 | | |
| 234 | Q: | Is that the first time you had physical contact with him? |
| 235 | | |
| 236 | A: | Yes. |
| 237 | | |
| 238 | Q: | Sorry, continue. |
| 239 | | |
| 240 | A: | Um, I p- I placed the shackles on him, double locked the shackles, uh, and |
| 241 | | proceeded to remove the shoes and socks to make sure there was nothing in |
| 242 | | there. |
| 243 | | |
| 244 | Q: | At this point, is inmate Riley saying anything? |
| 245 | | |
| 246 | A: | No, not that I can recall. |
| 247 | | |
| 248 | Q: | Is he being cooperative with this? |
| 249 | | |
| 250 | A: | No. |
| 251 | | |
| 252 | Q: | What was he doing? |
| 253 | | |
| 254 | A: | Kicking, flailing, um, trying to get o- officers off of him, um, I was restraining |
| 255 | | the legs and all his legs did would trying to kick and move and all I did was |
| 256 | | try to hold them down so no one got kicked. |
| 257 | | |
| 258 | Q: | You were able to get the shackles on his legs. |
| 259 | | |
| 260 | A: | Correct. |
| 261 | | |
| 262 | Q: | At any point in time, was he maced? |
| 263 | | |
| 264 | A: | Yes. |
| 265 | | |
| 266 | Q: | Do you recall who did that? |
| 267 | | |
| 268 | A: | Uh, not that I remember, no. |
| 269 | | |
| 270 | Q: | Once the search for contraband, weapons, was completed, you removed any |

INTERVIEW WITH DELTA BAUER
Interviewer: Det. Brian Walborn
08-01-19/1:32 pm
Case # C2019-0136
Page 7

| | | |
|---|---|---|
| 271 | | items from him that could hurt himself with... |
| 272 | | |
| 273 | A: | Correct. |
| 274 | | |
| 275 | Q: | ...what happened then? |
| 276 | | |
| 277 | A: | Uh, he was taken to Cell 132, um, where he was placed on the ground and |
| 278 | | waited for medical treatment. |
| 279 | | |
| 280 | Q: | Did medical arrive? |
| 281 | | |
| 282 | A: | Yes. |
| 283 | | |
| 284 | Q: | After medical treatment, was anything else done? |
| 285 | | |
| 286 | A: | Uh, we left the cell. Uh, pictures were taken. |
| 287 | | |
| 288 | Q: | After the pictures were taken and you and all the COs left the cell, did you |
| 289 | | have any further contact with inmate Riley? |
| 290 | | |
| 291 | A: | No. |
| 292 | | |
| 293 | Q: | Due to your shift ending at 0600? |
| 294 | | |
| 295 | A: | Correct. |
| 296 | | |
| 297 | Q: | From the time you left the cell to you ended your shift, how was inmate Riley. |
| 298 | | |
| 299 | A: | Um, he screamed a lot, yelled, hollered, um, other than that, just kind of paced |
| 300 | | back and forth in his cell once he stood up. |
| 301 | | |
| 302 | Q: | Could you understand what he was saying? |
| 303 | | |
| 304 | A: | "I didn't do it". |
| 305 | | |
| 306 | Q: | He just said that once? |
| 307 | | |
| 308 | A: | I - I can't remember, I do remember him saying that. |
| 309 | | |
| 310 | Q: | Repeatedly? |
| 311 | | |
| 312 | A: | I can't remember to be honest. |
| 313 | | |
| 314 | Q: | All right. At any point in time, did you strike, kick, punch, choke, or pin |
| 315 | | inmate Riley to any fixed object for extended period of time? |

316
317  A:          No.
318
319  Q:          Did you see any Dauphin County Prison correctional officer do that?
320
321  A:          No.
322
323  Q:          This isn't the first detainee, arrestee that's been like this...
324
325  A:          Correct.
326
327  Q:          ...s- since you've been working there.
328
329  A:          Correct.
330
331  Q:          You do have disruptive people.
332
333  A:          Yes.
334
335  Q:          It's a common practice.
336
337  A:          Yes.
338
339  Q:          That's the only questions I have. Do you have anything you'd like to add to
340              this statement?
341
342  A:          No, sir.
343
344  Q:          All right, we're going conclude the interview. Time will be 1342.
345
346
347  The transcript has been reviewed with the audio recording submitted and it is an accurate
348  transcription.
349  Signed_____

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
```

**INTERVIEW WITH CAPT. ANDREW KLAHR**
**Q=Det. Brian Walborn**
**A=Capt. Andrew Klahr**

Q:   Today is July 5, 2019. We're at the Dauphin County Prison. Present is myself, Detective Brian Walborn and Captain Andrew Klahr. Sir, for the record state your name and spell your last.

A:   Andrew Klahr, K-L-A-H-R.

Q:   And you're a captain here at Dauphin County Prison?

A:   Yes.

Q:   How long you been employed here at Dauphin County Prison?

A:   About 22 years.

Q:   Any other prior correctional experience?

A:   No.

Q:   You understand this interview's being recorded?

A:   Yes.

Q:   Have any promises or threats been made to you for this interview?

A:   No.

Q:   Are you cu- currently under - under the influence of any drugs or alcohol?

A:   Nope.

Q:   You can read and write the English language?

A:   Yes.

CID000557

| | | |
|---|---|---|
| 46<br>47 | Q: | And the highest grade in sc- school you completed? |
| 48<br>49 | A: | Uh, some college. |
| 50<br>51<br>52 | Q: | You're a captain here at Dauphin County Prison. What is your responsibility sir? |
| 53<br>54<br>55<br>56 | A: | Um, I'm the shift commander, um, from 8:30 to 8:30, Wednesday through Saturday. Um, I oversee everything from scheduling to everyday function of the prison. |
| 57<br>58 | Q: | You said 8:30 to 8:30, that's 0830 hours to 2030 hours, correct? |
| 59<br>60 | A: | Correct. |
| 61<br>62 | Q: | Were you working on June 26, 2019? |
| 63<br>64 | A: | Yes. |
| 65<br>66 | Q: | And you arrived for work at 0830? |
| 67<br>68 | A: | A little bit before that. |
| 69<br>70 | Q: | Tell us what happened that day. |
| 71<br>72<br>73<br>74<br>75<br>76<br>77<br>78<br>79<br>80 | A: | Uh, I came in. Spoke with the shift I was relieving and went directly to a staff meeting that started roughly 9 o'clock. Um, as the meeting progressed, Sergeant Lewis came into the meeting, informed me that there was a gentleman going out to the hospital. Uh, I excused myself from the meeting, went to talk to the sergeant in central. He explained to me that the inmate that was going out was going out for a mental status change and he already had two people lined up to take him, um, and everything was in order. So, I returned to the meeting. A little while later, Sergeant Lewis came to the meeting again. |
| 81<br>82 | Q: | Let me stop you there. Did you know who the inmate was at that time? |
| 83<br>84<br>85<br>86 | A: | At that time I think they did tell me his last name was Riley, but at the time it really didn't mean anything to me. Uh, I don't recall I've ever seen him before. |
| 87<br>88 | Q: | Sorry, continue. |
| 89<br>90 | A: | Um, the second time Sergeant Lewis came in said the gentleman that was going to the hospital won't get dressed. They're having some issues with him |

| | | |
|---|---|---|
| 91<br>92<br>93<br>94<br>95<br>96 | | so myself and Sergeant Lewis left the meeting and went to A block A-1-5 to assess the situation and see what was going on. When I got there, uh, two officers were in the cell, Danner and Singleton. Uh, the inmate was cuffed and shackled laying face down in the cell. Um, Danner was around his shoulder area. Um, Singleton was closer to his feet. |
| 97<br>98 | Q: | The inmate - inmate Riley, was he face down, on his side, or on his back? |
| 99<br>100 | A: | Face down. |
| 101<br>102 | Q: | Was his head towards the front or the back of the cell? |
| 103<br>104<br>105 | A: | Towards the back, uh, towards the window si- side of the cell, which is the back of the cell. |
| 106<br>107 | Q: | You said CO Danner was around his shoulder area? |
| 108<br>109 | A: | Yeah. |
| 110<br>111 | Q: | Was CO Danner pinning him to the floor with any part of his body? |
| 112<br>113<br>114 | A: | No. The only thing that - contacting the inmate was his hands. He was holding his right wrist or hand area. |
| 115<br>116 | Q: | CO Singleton, was he on top pinning inmate Riley to the floor in any manner? |
| 117<br>118 | A: | No. |
| 119<br>120 | Q: | He - he was just standing there? |
| 121<br>122 | A: | Yeah. |
| 123<br>124 | Q: | Off to the side? Continue. |
| 125<br>126<br>127<br>128<br>129<br>130<br>131<br>132<br>133<br>134<br>135 | A: | Um, I asked the inmate something along the lines do you understand we're trying to help you? Will you please get dressed? We're trying to take you to the hospital and he mumbled something incoherent. Um, about that time I called over the radio for the restraint chair to be brought. Um, My intentions were we'll put him in the restraint chair, take him to medical so he can be watched, call an ambulance to help get him to the hospital safely and I was hoping that by seeing the ambulance crew with the gurney it would calm him and get him in - you know, get him there without further issue. Um, a few moments later Sergeant Biter showed up with the restraint chair. Um, during - just prior to this the inmate had spit in the direction of Danner's feet and we- and he was grabbing at Danner's wrists, um, and his feet were moving. The restraint chair |

| | | |
|---|---|---|
| 136 | | got there. I asked for the restraint - the, uh, spit shield so he couldn't- couldn't |
| 137 | | spit on any of us. Uh, one of the officers outside the cell handed me a spit |
| 138 | | shield. I handed it to, I believe, Danner who placed it on the inmate. Um, soon |
| 139 | | as the spit shield was put on him I grabbed him by one of his arms up close to |
| 140 | | the armpit and Officer Singleton grabbed the other side. We picked him up. |
| 141 | | He was standing. I was walking towards the door and I - I tripped. Uh, |
| 142 | | Singleton, uh, struggled with him. One of the officers from outside came in |
| 143 | | and assisted while I got my balance. 'Til I got outta the cell they were placing |
| 144 | | him in the restraint chair. Um, he was leaning forward. Sergeant Lewis pulled |
| 145 | | his back to the back of the chair. Um, and the inmate was kicking in the |
| 146 | | direction of the officers. Sometime during that point Sergeant Lewis used a |
| 147 | | hypoglossal pressure point technique to hold him back in the chair while the |
| 148 | | officer secured his legs. Um, using a second, uh, set of leg irons. Um, I |
| 149 | | grabbed either a smock or suicide blanket and placed it over the inmate's lap |
| 150 | | because he was unclothed. As soon as his legs were secured I noticed he went |
| 151 | | limp or relaxed. I stepped - I took a step back, looked at his chest, and didn't |
| 152 | | see any signs of breathing. Uh, I did a sternum rub and Sergeant Biter also did |
| 153 | | a sternum rub with no results, no response. At that time I called for a medical |
| 154 | | emergency. As I was calling it I was thinking this gentleman's in - in a chair |
| 155 | | with wheels. We're close to medical. There's more equipment and more staff |
| 156 | | there so I changed that call and took him directly to medical and once in |
| 157 | | medical we removed him from the chair. Um, removed all restraints, placed |
| 158 | | him flat on the floor. Uh, medical staff started performing chest compressions |
| 159 | | and getting an airway started. I was handed an AED from someone. I opened |
| 160 | | it up, got the - the, uh, self-adhesive pads out. I don't recall if either I put them |
| 161 | | on or one of the nurses put the pads on while I was turning the machine on. |
| 162 | | The machine did it's cycle - doing it's check, advised a shock. I pressed the |
| 163 | | button when shock was advised. He was shocked, chest compressions called - |
| 164 | | were started. Just prior to this as soon as we walked in the, uh, medical office |
| 165 | | I instructed - I believe it was Tim Good to call an ambulance. Um, the chest |
| 166 | | compressions - the Ambu bag giving him oxygen through a bag, uh, was |
| 167 | | started and that continued using, uh, Prime Care medical staff, security staff to |
| 168 | | rotate through doing compressions so nobody got exhausted and then Life |
| 169 | | Team ambulance arrived and took over. Um, during that time, uh, they |
| 170 | | switched over to their - I guess it's an AED that monitors the heartbeat and |
| 171 | | they, uh, had a heartbeat started going and all that stuff. So, they put him on |
| 172 | | the gurney and left. |
| 173 | | |
| 174 | Q: | During any of this did inmate Riley say anything? |
| 175 | | |
| 176 | A: | The only thing I heard come out of his mouth was when I talked to him in the |
| 177 | | cell and it was incoherent. It was mumbling. |
| 178 | | |
| 179 | Q: | When he was in the chair, was he kicking at all? |
| 180 | | |

INTERVIEW WITH CAPT. ANDREW KLAHR
Interviewer: Det. Brian Walborn
7-05-19
Case # C2019-0136
Page 5

| 181 | A: | At first, he was kicking and then he went, uh, I think the best term would be |
| 182 | | his body relaxed and that's when I noticed he wasn't breathing. |
| 183 | | |
| 184 | Q: | Would you say that he resisted getting into the chair? |
| 185 | | |
| 186 | A: | Yes. |
| 187 | | |
| 188 | Q: | At any point in time did you see any CO or yourself strike inmate Riley? |
| 189 | | |
| 190 | A: | No. |
| 191 | | |
| 192 | Q: | Punch him? |
| 193 | | |
| 194 | A: | No. |
| 195 | | |
| 196 | Q: | Kick him? |
| 197 | | |
| 198 | A: | No. |
| 199 | | |
| 200 | Q: | Pin his body to any solid object? |
| 201 | | |
| 202 | A: | No. |
| 203 | | |
| 204 | Q: | Choke him? |
| 205 | | |
| 206 | A: | No. |
| 207 | | |
| 208 | Q: | The only use of force you saw was the hypoglossal pressure point by Sergeant |
| 209 | | Lewis? |
| 210 | | |
| 211 | A: | Yes. |
| 212 | | |
| 213 | Q: | Now you mentioned that one of - one of your correctional officers that was on |
| 214 | | duty with him at the Harrisburg Hospital mentioned that a family member said |
| 215 | | he was smoking something? |
| 216 | | |
| 217 | A: | The night before he was charged or the night that he was charged was |
| 218 | | smoking something. I wish I could remember the exact quote, but, um... |
| 219 | | |
| 220 | Q: | And who was that correctional officer? |
| 221 | | |
| 222 | A: | Uh - uh, I call him Gordie, but it's Godfredo Corranza. |
| 223 | | |
| 224 | Q: | Is there anything else you'd like to add to this statement? |
| 225 | | |

226    A:              Not that I can think of.
227
228    Q:              Okay. We're going conclude the interview. Time will be 11:41.
229
230
231    The transcript has been reviewed with the audio recording submitted and it is an accurate
232    transcription.
233    Signed_____