THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

–  –  –

CARMEN RILEY,                    :
Administrator of the            :
Estate of Ty'rique              :
Riley, et al                    :   CIVIL ACTION NO.
                                :   4:20-CV-00325
        vs.                     :
                                :
BRIAN CLARK, Warden of          :
Dauphin County Prison,          :
et al                           :

–  –  –

Zoom deposition of MAJOR ROGER

LUCAS, taken pursuant to notice, beginning at 11:52

A.M., on Tuesday, April 19, 2022, before Nicholas

DiPiero, Registered Professional Reporter and Notary

Public.

–  –  –

DIPIERO COURT REPORTING
Registered Professional Reporters
1175 Marlkress Road, Unit 2460
Cherry Hill, NJ  08034
(215) 735-8101
dipieroreporting@aol.com

## Page 2

1  APPEARANCES:
2
   MINCEY FITZPATRICK ROSS, LLC
3  BY: RILEY H. ROSS, III, ESQUIRE
      One Liberty Place
4     1650 Market Street
      Suite 3600
5     Philadelphia, PA  19103
      (215)550-1995
6     Riley@minceyfitzross.com
   Counsel for the Plaintiffs
7
8  LAVERY LAW
   BY: FRANK J. LAVERY, JR., ESQUIRE
9     225 Market Street
      P.O. Box 1245
10    Harrisburg, PA  17108
      (717) 233-6633
11    Flavery@laverylaw.com
   Counsel for Defendant,
12 Lt. Greg Mendenhall
13
   MARSHALL DENNEHEY
14 BY: JOHN R. NINOSKY, ESQUIRE
      DONALD CARMELITE, ESQUIRE
15    100 Corporate Drive, Suite 201
      Camp Hill, PA  17011
16    (717) 651-3529
      Jrninosky@mdwcg.com
17    Dlcarmelite@mdwdg.com
   Counsel for Defendant,
18 Prime Care
19
   MacMAIN, CONNELL & LEINHAUSER
20 BY: MATTHEW S. POLAHA, ESQUIRE
      433 West Market Street, Suite 200
21    West Chester, PA  19382
      (484) 463-1014
22    Mpolaha@macmainlaw.com
   Counsel for Susquehanna Defendants
23
24        - - -
25

## Page 3

1          INDEX OF WITNESS
2  NAME                    PAGE
3
   MAJOR ROGER LUCAS
4
   BY MR. ROSS:              4
5
6
7          - - -
8
9
          INDEX OF EXHIBITS
10
11 NUMBER      DESCRIPTION      PAGE
12
   DCP 2   USE OF FORCE POLICIES
13
   DCP 3   METHODS OF RESTRAINT
14
15         - - -
16
17
18
19
20
21
22
23
24
25

## Page 4

1         (It is stipulated and agreed by and
2  among counsel that sealing, certification and filing
3  are waived, and that all objections, except as to the
4  form of the questions, are reserved until the time of
5  trial.)
6          - - -
7         MAJOR ROGER LUCAS, having been
8  duly sworn, was examined and testified as
9  follows:
10         - - -
11        MR. LAVERY: Riley, before you get
12 going, just in fairness to you so you know. He was the
13 former training officer out there.  So if you have any
14 other questions on training that you don't think were
15 covered before you can ask him those too and I'll
16 concede that those would be covered by your notice.
17 So I wanted to let you know that.
18        MR. ROSS: Thank you.
19 BY MR. ROSS:
20 Q.     Mr. Lucas, my name is Riley Ross. I represent
21 the plaintiffs in this lawsuit. My first question is,
22 were you present throughout the deposition session
23 with Warden Briggs?
24 **A.     Yes.**
25 Q.     You probably heard my introduction about the

## Page 5

1  deposition but I'm going to have to go through it with
2  you since you're now on record. But have you ever been
3  depose before?
4  **A.     Yes.**
5  Q.     Then you know that this is a question and
6  answer session.  My job is just to ask you some
7  questions. Your job is to answer them. You're serving
8  in the capacity as a 30(b)(6) witness which means you
9  are serving as a representative of Dauphin County and
10 Dauphin County Prison.  And it's my understanding that
11 you're going to be answering certain questions.  But
12 before I get to that let me just go through kind of
13 the basics for the deposition.
14        If I ask you a question you don't
15 understand it please just let me know and I'll do my
16 best to rephrase it. But if you answer the question
17 I'm going to assume you understood it.  Is that fair?
18 **A.     Yes.**
19 Q.     And of course we have a court reporter here
20 taking down everything that you say so it's really
21 important that you answer verbally all of the
22 questions. So shaking your head and nodding your head
23 won't work. Do you understand that?
24 **A.     I do.**
25 Q.     And because the court reporter is taking down

Page 6

1  everything it's important that we try not to talk over
2  each other.  So I ask that you allow me to complete my
3  question before you being to answer and I will do my
4  best to allow you to complete your answer before I
5  begin another question.  Is that fair?
6  A.      That's fair.
7  Q.      If at any point you want to come back to an
8  answer because you need to modify it or revise it or
9  add to it, anything, any reason, just let me know and
10  we can come to that question or to that topic, okay?
11  A.      Sure.
12  Q.      If at any point you need to take a break, you
13  need to use the restroom, you want to talk to your
14  lawyer, for any reason.  That's fine.  Just let me
15  know.  However, I ask that if I've asked you a question
16  that you answer that question before we take that
17  break, okay?
18  A.      Okay.
19  Q.      Do you understand these rules for the
20  deposition?
21  A.      I do.
22  Q.      Have you taken any medication that would
23  interfere with your ability to move forward with the
24  deposition today?
25  A.      No.

Page 7

1  Q.      Have you consumed any alcohol in the past 24
2  hours?
3  A.      No.
4  Q.      Have you taken any medication in the past 24
5  hours whether prescribed or over the counter?
6  A.      None.
7  Q.      Is there any reason you're not prepared to go
8  forward with the deposition today?
9  A.      There is not.
10  Q.      Have you reviewed any documents in
11  preparation for today's deposition?
12  A.      Yes.
13  Q.      What have you reviewed?
14  A.      I reviewed some of the power points on the
15  suicide prevention crisis, CIT training, Crisis
16  Intervention Training, those training documents.
17  Q.      I'm not going to show you all of those today
18  but I will ask you some questions about some of those
19  documents then also some specific policy documents and
20  then you can tell me if once we get to them if you're
21  prepared to discuss them.
22          But my understanding is that you are
23  here to talk about some specific categories that I had
24  previously outlined to Dauphin County as what are
25  going to be out topics for today. And my understanding

Page 8

1  is that you're prepared to testify about Category 3 in
2  my Notice of Deposition which is the policy and
3  procedures that govern the use for force by Dauphin
4  County Prison correctional officers.  And Category 7
5  which are the policies and procedures that govern the
6  use of restraints on Dauphin County Prison detainees
7  and inmates; is that correct?
8  A.      Yes.
9  Q.      Before we get into those questions let me
10  just get some information about your background. I
11  understand that you're a former training officer for
12  Dauphin County Prison; is that correct?
13  A.      That is correct.
14  Q.      What is your current occupation?
15  A.      I'm the Major, Custody Major at Dauphin
16  County Prison.
17  Q.      And what does Custody Major mean?
18  A.      I oversee the correctional officers and the
19  mid level supervisor staff.
20  Q.      And how long have you been the Custody Major?
21  A.      About one month prior to that. I did the same
22  job, it was just under a different title of Director
23  of Security.
24  Q.      And then can you give me the month and years
25  when you were the Director of Security?

Page 9

1  A.      It was March of 2019 to March of 2022.
2  Q.      What was your title before that you were with
3  Dauphin County Prison?
4  A.      Training officer.
5  Q.      And what month and years were you the
6  training officer?
7  A.      February 2012 until March of 2019.
8  Q.      Did you hold any other position with Dauphin
9  County Prison before February 2012?
10  A.      Yes.
11  Q.      What position? And you can go either backward
12  from 2012 to the first position or forward.
13  A.      I was a correctional officer from June of
14  2003 until I believe it was February of 2009.
15  Q.      Then how about after February 2009?
16  A.      From 2009 to 2012 I was a correctional
17  Sergeant.
18  Q.      Before June of 2003 did you work as a
19  correctional officer at any other facility?
20  A.      I did not.
21  Q.      Did you work in any type of correctional
22  facility positions?
23  A.      I did not.
24  Q.      How about any, were you a law enforcement
25  officer at any point?

Page 10

1  **A.      No.**
2  Q.      Do you have the a college degree?
3  **A.      No.**
4  Q.      When did you graduate from high school -- did
5  you graduate from high school?
6  **A.      Yes.**
7  Q.      When did you graduate from high school?
8  **A.      1992.**
9  Q.      And from 1992 to 2003 did you have any jobs
10 at any type of either law enforcement capacity or
11 correctional capacity?
12 **A.      No.**
13 Q.      I want to start off by talking about the use
14 of force and I think you mentioned some of the
15 training slides that you reviewed. I had seen that
16 there was one on tactical handcuffs. Is that one of
17 the packages you reviewed?
18 **A.      Yes.**
19 Q.      I'm not going to introduce that. I just want
20 to ask you a question about handcuffs in again. Is it
21 policy to allow inmates to be in a cell handcuffed?
22 **A.      There's procedure. I don't think it's**
23 **spelled out in a particular policy.**
24 Q.      What procedures, what situation would dictate
25 an inmate being in a cell but handcuffed just wearing

Page 11

1  handcuffs? I'm not saying handcuffed to a railing or
2  anything, but just to be in a cell in handcuffs?
3              MR. LAVERY: Riley, just so, I'm not
4  trying to give you a hard time. Are we're talking
5  about inmates at the prison or are we talking about
6  people at the Judicial Center or both I guess.
7              MR. ROSS: No. I appreciate that,
8  frank.
9  Q.      Let's talk about arrestees at the Judicial
10 Center. Is that allowed, is a CO allowed to put an
11 inmate in a cell in handcuffs?
12 **A.      Yes.**
13 Q.      Are there policies that govern when an inmate
14 should be placed into a cell in handcuffs?
15 **A.      There's --**
16 Q.      I'm sorry. I said inmate. I'm talking just
17 about the Judicial Center so let's stick with that
18 with arrestees.
19 **A.      There are procedures dictated by their**
20 **behavior.**
21 Q.      And what can you give me an example of
22 behaviors that would warrant an arrestee being placed
23 in a cell in handcuffs?
24 **A.      If they were assaultive, if they were**
25 **pounding to the point that we believed that they may**

Page 12

1  **cause harm to themselves.**
2  Q.      Any other situations would warrant an
3  arrestee being place in a cell with handcuffs?
4  **A.      Just generalized unruly, not listening,**
5  **making it an unsafe conditions for officers to**
6  **unhandcuff them at the time.**
7  Q.      And these conditions are there written
8  policies that speak to situations where an arrestee
9  should be placed into a cell with handcuffs?
10 **A.      Written in procedures and the training that**
11 **the officers receive.**
12 Q.      So other than the slide shows that were done
13 with training are you saying that there's actually
14 written policies that pertain to when an arrestee
15 should be placed in a handcuffs?
16 **A.      I can't speak to a policy where it's written**
17 **specifically on the conditions that would warrant them**
18 **to be handcuffed inside of a cell.**
19 Q.      You didn't review any written policies that
20 govern placing an arrestee in a cell in handcuffs; did
21 you?
22 **A.      I did not.**
23 Q.      I have not seen them so I just want to -- I'm
24 really just trying to get at if they exist or not. But
25 it's your understanding that a written policy form

Page 13

1  outside of training materials that they don't exist?
2  **A.      To my knowledge.**
3  Q.      I do want to show you some of the written
4  policies regarding use of force. Do you have policies
5  with you today?
6              MR. LAVERY: I think I have them
7  here, Riley. So what do you want him to look at?
8              MR. ROSS: I'm going to starts with
9  -- I have three different policies that I have are
10 Policies 9.17, 9.17T and 9.22. And I'm going to put
11 them up.
12             MR. LAVERY: Are they bates numbered
13 there?
14             MR. ROSS: Yes.
15             MR. LAVERY: What are they? I'll give
16 them to him just to look at them.
17             MR. ROSS: It begins with DFS 227 to
18 235.
19             MR. LAVERY: I'm handing him now the
20 policies that covered by 227 to 235, so he's got them
21 in front of him.
22 BY MR. ROSS:
23 Q.      Your title is Major Lucas; is that right?
24 **A.      That's correct.**
25 Q.      Major Lucas, can you just, I'm not going to

Page 14

1    ask you read them all yet. We'll get to some
2    specifics. But can you just look through those and
3    make sure you have policies 9.22, 9.17 and 9.17T.
4    **A.    I do.**
5    Q.    Those are the policies that I received that
6    are the written policies that govern the use of force.
7    And I'm not talking about the training materials but
8    just the written policies. Are you aware of any other
9    written policies that govern the use of force for
10   Dauphin County Prison?
11             MR. LAVERY: There are, Riley. Do you
12   want the numbers?
13             MR. ROSS: Yes.
14             MR. LAVERY: What I'm talking about
15   is some of the restraint policies because that's
16   technically use of force. You should have them.
17             MR. ROSS: You're right. I do have
18   them. The use restraint policies count.
19             MR. LAVERY: I think that will be 236
20   to 243.
21             MR. ROSS: Right. And I will go over
22   those.
23   BY MR. ROSS:
24   Q.    Let's start with where we are with policy 922
25   which is beginning on 227 and that goes actually

Page 15

1    that's just a one page. Do you know if this policy has
2    been updated since September of 2017?
3    **A.    We do have a Use of Force Policy that's**
4    **currently in effect right now but that wasn't in**
5    **effect at that time.**
6    Q.    When you say this time that are you referring
7    to June 18, 2019?
8    **A.    Yes. Of 2019, yes.**
9    Q.    And I guess we actually have kind of a date
10   range.  So would this policy be the policy in effect
11   for June of 2019?
12   **A.    Yes.**
13   Q.    Can you just tell me with regard to, the only
14   question I have for this policy is that it references
15   special teams. Do you see that under procedure. All
16   staff shall be trained annually in the use of force.
17   Special teams shall be trained not only annually but
18   during additional training that they attend. So what
19   are special teams?
20   **A.    The special teams we have it is the special**
21   **response teams, special operation response team.**
22   Q.    Is special teams a heading for different
23   types of special teams or is there just one type of
24   special teams?
25   **A.    It's just the one type of special team. They**

Page 16

1    **would receive more training on cell extractions and**
2    **those types of incidents.**
3    Q.    Do correctional officers that are members of
4    the special team other than doing those assignments
5    that are reserved for the special team do they do
6    anything, do they just perform as a regular
7    correctional officer outside of those special teams?
8    Does that make sense?
9    **A.    Yes. They are regular correctional officers.**
10   **They would just be called off of their posts should**
11   **that need arise.**
12   Q.    And this special team in June of 2019, if you
13   know, the special team consisted of how many
14   correctional officers?
15   **A.    I'm not sure of the exact number at that**
16   **time. Over ten.**
17   Q.    Is there a list kept of the members of the
18   special for any given period?  For instance, if I
19   wanted to know who were the members of the special
20   team in June of 2019 is there a list that I can
21   consult?
22   **A.    I don't believe it was kept by date. If**
23   **someone were to be added or removed it would just be**
24   **added or removed.  It wouldn't be dated for that time.**
25   **So I don't believe there's a list that would be**

Page 17

1    **specific to a certain date.**
2    Q.    But if I were to name a correctional officer
3    there would be a way to determine if he or she was a
4    member of a special team on any given date. Is that
5    correct?
6    **A.    I wouldn't be able to say on a specific date**
7    **if they were on the team at that time or not depending**
8    **on when they got on or when they had gotten off. It**
9    **wouldn't have a specific date assigned to it.**
10   Q.    Okay. So for instance, where would you go to
11   determine who, like for today, where would you go to
12   determine who was a member of the special teams today?
13   **A.    We would have a list of what people are on**
14   **the list today. But it wouldn't be dated as changed on**
15   **this date. If you understand what I'm saying.**
16   Q.    Okay. Is that list something that's
17   computerized or is it a written list that's kept
18   somewhere?
19   **A.    Computerized.**
20   Q.    Let's go to the next policy which is the next
21   page 9.17. It's 5 pages. I'm going to ask you some
22   questions and if you need to -- if there's anything I
23   need you to read I'll point that out.  But I want to
24   ask you some general questions.  And if you need more
25   time to read it over just let had me know. But the

MAJOR ROGER LUCAS

Page 18

1  title is use of force. It's Chapter 9, Security and
2  Control. Then the reference says PPCT Defensive
3  Tactics Instructor Manual.
4              Is this a use of force policy for a
5  special type of correctional officer employee?
6  **A.      This is for all the correctional officers.**
7  Q.      What does PPCT mean?
8  **A.      Off the top of my head I can't remember. I**
9  **think it's pressure point control tactics. It's an**
10 **outside company that we would go to to be trained as**
11 **instructors.**
12 Q.      So the reference that is being used for this
13 particular policy is a instructor manual that deals
14 with PPCT; is that right?
15 **A.      Yes. That's that was the company.**
16 Q.      And you said that so for this particular Use
17 of Force Policy all correctional officers are trained
18 in this Use of Force Policy?
19 **A.      Yes.**
20 Q.      Who does the training?
21 **A.      The training officers, prison staff.**
22 Q.      I'm sorry?
23 **A.      The prison staff training officers.**
24 Q.      And you're a former training officer so you
25 were one of several training officers; is that

Page 19

1  correct?
2  **A.      Yes.**
3  Q.      How many training officers are there?
4  **A.      Now or then?**
5  Q.      Let's talk about present day.
6  **A.      There are currently two.**
7  Q.      And do you know how many training officers
8  there were in June of 2019?
9  **A.      Two.**
10 Q.      And 2019 you were one of the two?
11 **A.      Until March.**
12 Q.      And who took over for you once you were
13 promoted?
14 **A.      That was open for sometime. I can't recall**
15 **when that position was filled.**
16 Q.      And it was eventually filled though?
17 **A.      Yes.**
18 Q.      Who was it filled by eventually?
19 **A.      James Labomski.**
20 Q.      And then who was the other officer in 2019
21 while you were a training officer, who were the other
22 training officers?
23 **A.      Mark Salvatore.**
24 Q.      And the training on the use of force did this
25 occur at a specific time in the year for the

Page 20

1  correctional officers?
2  **A.      It wasn't always the same time. Just sometime**
3  **during the year.**
4  Q.      And were the correctional officers all
5  trained at the same time or was it broken up into
6  schedules?
7  **A.      Broken up into schedules.**
8  Q.      And is this use of force training done just
9  once a year?
10 **A.      Yes.**
11 Q.      Who decides what type of training is given to
12 the correctional officer? Let's say in 2019, who made
13 the decision as to what type of training in use of
14 force correctional officers received?
15 **A.      Prison administration ultimately approves it**
16 **and the training officers build the curriculum and**
17 **teach the classes.**
18 Q.      Is the curriculum that's built by the
19 training officers something that's unique to Dauphin
20 County Prison or is it a curriculum that's shared and
21 used throughout the state?
22 **A.      The details are unique but it's based upon**
23 **the PPCT G36. Trainings which many agencies they**
24 **utilize those.**
25 Q.      And PPCT you did say it was a company.  Is

Page 21

1  that a private company?
2  **A.      I believe it is.**
3  Q.      Are there any state guidelines that the
4  training officers have to follow in making a specific
5  curriculum?
6  **A.      Not that I'm aware of.**
7  Q.      And I'm going to limit my questions about
8  training to use of force to include also restraints
9  that we're going to talk about in a little bit just so
10 you understand it. But if I'm just saying to training
11 I'm only referring to use of force, okay?
12 **A.      Okay.**
13 Q.      Are correction officers disciplined if they
14 do not undergo the use of force training?
15 **A.      They're not disciplined unless they refuse to**
16 **attend it.**
17 Q.      And how is that monitored? How do you monitor
18 who is attending the use of force training?
19 **A.      We kept a sheet of the dates when they would**
20 **receive their trainings.**
21 Q.      And if they failed to show up for their
22 training what happens?
23 **A.      They would get disciplined for failure to**
24 **report to a scheduled training.**
25 Q.      What type of discipline could they be

MAJOR ROGER LUCAS

Page 22

1  subjected to?
2  **A.      It could be a verbal counseling.  If it's**
3  **multiple it could be suspension days.**
4  Q.      And how is that, if there's discipline that's
5  given out how is that, how is a record of that
6  discipline kept?
7  **A.      It's just documented into their HR files.**
8  Q.      Is that the only place that that record is
9  kept?
10 **A.      That I'm aware of.**
11 Q.      In creating the curriculum for use of force
12 training how is mental health considered if at all?
13            MR. LAVERY: Object to form.  You can
14 answer. Are you talking about use of force training?
15            MR. ROSS: Yes.
16            MR. LAVERY: Okay. Go ahead.
17 **A.      For use of force with the mental health it's**
18 **only mentioned that you have to take in the entire**
19 **situation and everything that's going on with it. So**
20 **if there appears to be mental health conditions that**
21 **you have to understand that there's different ways**
22 **that you deal with inmates with mental health**
23 **conditions.**
24 Q.      And those different ways are taking those
25 things into account are those things that are

Page 23

1  discussed during the training?
2  **A.      Yeah.**
3  Q.      Classes that the correctional officers take?
4  **A.      Yes.**
5  Q.      Those are some of the things are the found
6  like in the slide presentations that we talked about?
7  **A.      Yes.**
8  Q.      I want to ask you about something specific
9  but I have to find it in the policy. I believe there
10 is a requirement in this policy that an officer
11 notifies the shift commander and/or submits a written
12 report when the use of force is written so that's what
13 I'm looking for here.
14            Under No. 7 I believe on DFS 229.
15 What happens if anything to an officer that does not
16 notify the shift commander or acting shift commander
17 when physical force is used?
18 **A.      They would receive a discipline.**
19 Q.      And what could they be subjected to for by
20 way of discipline?
21 **A.      It could be a verbal reprimand, it could be**
22 **termination. Depending on the level of force.**
23 Q.      And you see that next sentence, it talks
24 about the officer who used physical force just submit
25 a written report to the shift commander no later than

Page 24

1  the conclusion of the officer's shift and shall
2  include and then it lists a bunch of things that need
3  to be included?
4  **A.      Yes.**
5  Q.      Is there a form used, a form report that,
6  when I say form I mean a standardized form that is
7  used for submitting this written report?
8  **A.      No. It's only a prison memo sheet, a blank**
9  **sheet.**
10 Q.      Give me one second. I want to show you
11 something. I am showing what's been marked as DFS 1.
12 I'm not going to introduce this as an exhibit.
13            MR. LAVERY: It was previously
14 marked; wasn't it?
15            MR. ROSS: Yes.
16 Q.      I just want to ask you, this is report of
17 extraordinary occurrence. Would this be an example of
18 a written report regarding use of force?
19 **A.      That's the report that the mid level**
20 **supervision do to submit to prison administration.**
21 **They'll gather the memos from the officers that were**
22 **there and then put it all into one report that**
23 **summarizes the incident.**
24 Q.      So if we scroll through this we'll come to
25 something like this. Would this be an example of the

Page 25

1  written report?
2  **A.      That is.**
3  Q.      And I'm not saying this specifically but this
4  is how it would come. It would come as a memo as you
5  mentioned before; is that correct?
6  **A.      That's correct.**
7            MR. ROSS: I did not state this
8  before, but we will call these use of force policies
9  that we're going now, the three that we're
10 talking about, we'll make this just DCP 2. The three
11 policies we're talking about we'll make them as DCP-2.
12 Q.      I want to ask you a question you about one
13 particular use of force. We are on DFS 230. And you
14 see here 3-A, it talks about the OC spray.  I've heard
15 the term OC spray and I'm not going to try and
16 pronounce the actual name.  But is that what is
17 referenced here OC spray as letter A?
18 **A.      That is.**
19 Q.      Regarding the training that's given do you
20 train your officers or are officers trained that there
21 is a limit on how often an individual should be given
22 OC spray?
23 **A.      Yes.**
24 Q.      What is that, what is the training that
25 discusses the limit?

Page 26

1  **A.      They utilize a spray onto the inmate's face**
2  **or the detainee's face and for a short bursts. And if**
3  **it's not having any direct effect on him it's not**
4  **working so there's no need to continually apply that.**
5  Q.      So the training is if it doesn't appear to be
6  effective in short bursts do not continue to apply it?
7  **A.      Yes.  As long as you did, you were able to**
8  **put it onto the inmate's face. So if you missed then**
9  **obviously you have to reapply.  But if you made**
10 **contact onto the inmate's face then there's no need to**
11 **continue with it if it's not having an effect.**
12 Q.      You mentioned inmate. Is the same true for
13 detainees or arrestees that are in the Judicial
14 Center?
15 **A.      Yes.**
16 Q.      Are officers trained that there should be an
17 amount of time that should lapse between uses of the
18 OC spray?
19 **A.      There is no set amount of time in between. I**
20 **can't give you an example of an allowable time in**
21 **between the uses.**
22 Q.      So that's not part of the training that the
23 correctional officers receive?
24 **A.      No.**
25 Q.      I'm going to the last page DFS 232. Do you

Page 27

1  know if this policy has been updated since May of
2  2014?
3            MR. LAVERY: This specific policy?
4            MR. ROSS: Yes.  We're talking about
5  9.17.
6  **A.      There was 9.17T from July of 2015.**
7  Q.      We'll get into that next. But other than
8  then, is T than an update of this policy; is that what
9  you're saying?
10 **A.      It appears it's just a reiteration of it to**
11 **give more examples.**
12 Q.      Let's move onto that then. We're still on the
13 same exhibit but we're going to go to DFS 232 and that
14 goes to 234. So could you tell me the difference in
15 9.17T which is what we're looking at now and 9.17 that
16 we just looked at?
17 **A.      It is shorter. It gives basically just a**
18 **breakdown of it and then it gives some examples of**
19 **some court cases.**
20 Q.      I do want to direct your attention to the
21 court cases. How often are correctional officers
22 trained in court cases, judicial decisions.
23            MR. LAVERY: Object to the form of
24 the question. You can answer.
25 **A.      It's not a regular occurrence. We will use**

Page 28

1  **examples of them during the training just to give some**
2  **backing to the training.**
3  Q.      For instance, this particular policy we're
4  looking at discusses a case Graham versus Connor,
5  1989. It discusses a few other cases. Is the training
6  that the officers receive where court cases are given
7  are those updated with more recent court cases?
8  **A.      No.**
9  Q.      Does anyone in the training in putting
10 together the curriculum look to see whether or not
11 there are updated court cases that should be included
12 in the training?
13            MR. LAVERY: Object to form.  You can
14 answer.
15 **A.      No.**
16 Q.      Is it the job of anyone that's involved with
17 creating the curriculum for the training is it their
18 job to review or monitor or research court cases to
19 determine if there are recent court cases that should
20 be included in the training?
21            MR. LAVERY: Object to the form of
22 the question.  You can answer if you know.
23 **A.      In the training department we don't review or**
24 **look for updates in court cases.**
25 Q.      I'm looking at DFS 235.  It says that this

Page 29

1  was signed on July 2015. Do you know if there's any
2  revisions since July of 2015 for this policy?
3  **A.      There were revisions to the use of force**
4  **policy but not to the one that was in effect in 2019.**
5  Q.      So this would be the policy that was in
6  effect in June of 2019?
7  **A.      Yes.**
8  Q.      Would you consider the policy that had been
9  updated since that time to have significant changes in
10 the Use of Force Policies?
11 **A.      No. I do not.**
12 Q.      Do you know what the reason for the updates
13 are?
14 **A.      They would just change from PPCT to TJA.  So**
15 **just the outside companies had changed.**
16 Q.      So the source material that's used for the
17 curriculum changed companies; is that fair to say?
18 **A.      Yes.**
19 Q.      I just want to show you something here. We're
20 done with that exhibit. Do you see the manual on the
21 screen?
22 **A.      Yes.**
23 Q.      This is bate stamped Dauphin DFS 244 and it
24 goes through 288.  Is this one of the slide shows or
25 the presentations that were used during the training

Page 30

1  on use of force?
2  **A.       Yes.**
3  Q.       And this had a date of 2017 on it. Do you
4  know if this would have been the presentation that was
5  made for training that occurred in 2019?
6  **A.       To the best of my knowledge.**
7  Q.       Do you know if this would have been the
8  presentation that would have been used for 2018?
9  **A.       To the best of my knowledge it would be.**
10 Q.       Thank you. One other policy to show you. I am
11 putting on the screen what is bate stamped it looks
12 like DFS 236 through 243, eight pages.
13            MR. LAVERY: Right. That's it.
14 Q.       Do you know what this document is, Major
15 Lucas.
16 **A.       Yes.**
17 Q.       What is it?
18 **A.       It's a method of restraint policy for Dauphin**
19 **County Prison.**
20 Q.       Now, when we were looking at the Use of Force
21 Policy they had policy numbers. Is there a policy
22 number associated with this policy on restraint?
23 **A.       I do not believe there is.**
24 Q.       Is this policy held in a certain place, is it
25 part of a manual, is a standalone guidance or?

Page 31

1  **A.       It the would belong in the policy book**
2  **maintained by prison administration.**
3  Q.       Under action do you see there where it says
4  essentially that the use of the restraint chair four
5  points restraint procedure or other restrain policys
6  may be utilized only under the authorization of the
7  Warden, Deputy Warden or Major. Do you see that?
8  **A.       Yes.**
9  Q.       And first of all, when it says or Major is
10 there only one Major within the system?
11 **A.       Yes.**
12 Q.       And that currently you, correct?
13 **A.       Yes.**
14 Q.       Who was the Major in June of 2019 if you
15 know?
16 **A.       There was none.**
17 Q.       And do you know why there was none?
18 **A.       It was restructuring of the prison**
19 **administration and that position was dissolved.**
20 Q.       So the position existed before 2019 and it
21 was dissolved and it's since come back; is that
22 correct?
23 **A.       Yes.**
24 Q.       Any idea when this policy was written?
25 **A.       I can't guess to it.**

Page 32

1  Q.       Was this policy the policy that was in place
2  in June of 2019?
3  **A.       Yes.**
4  Q.       So when it references Major you believe that
5  it was referencing at the time a position that
6  actually existed?
7  **A.       It could. The Major and the Deputy Warden**
8  **were rolled into one as the Director of Security.**
9  Q.       At the time in 2019 who was the Deputy Warden
10 in June of 2019?
11 **A.       There was none. It was then titled director.**
12 **Director of Security.**
13 Q.       And who was the Director of Security at the
14 time in June of 2019?
15 **A.       I was.**
16 Q.       And at the time in June of 2019 who was the
17 Warden?
18 **A.       Warden Greg Briggs.**
19 Q.       Are you sure that Warden Greg Briggs was the
20 Warden in June of 2019?
21 **A.       Off the top of my head, I can't recall the**
22 **exact date that it was.**
23 Q.       Let's go back to the policy we talked about
24 that only the Warden, Deputy Warden or Major could
25 authorize it. How was that authorization given by any

Page 33

1  of those positions? How does that happen?
2  **A.       The shift commander would contact one of**
3  **those and notify that use of the restraint chair had**
4  **to be utilized.**
5  Q.       The policy see talks about the restraint
6  chair and the four point restraint. Can you tell me
7  the difference in the use of the two. Are there
8  policies that govern when you should use one versus
9  when you should use the other?
10 **A.       There's not a big breakdown. The use of the**
11 **four point restraint as it's listed is not utilized at**
12 **the prison or the Judicial Center.**
13 Q.       Today it's not utilized; is that what you're
14 saying?
15 **A.       Yes.**
16 Q.       Was it utilized in June of 2019?
17 **A.       No, it was not.**
18 Q.       Is there a reason that it was not utilized in
19 June of 2019?
20 **A.       The use of the 4 point restraints at the**
21 **prison and the Judicial Center have not been used for**
22 **many years and just because the use of the restraint**
23 **chair can serve the purpose that's needed for any**
24 **unruly inmates.**
25 Q.       Okay. So are you saying that the only reason

Page 34

1  that the 4-point restraint has not been used in the
2  prison or the Judicial Center is because the restraint
3  chair can serve that purpose on its own?
4  **A.       Yes.**
5  Q.       Any other reasons that that 4-point restraint
6  is not used?
7  **A.       Not that I'm aware of.**
8  Q.       I want to ask you about other forms of
9  restraint. Is the shackling of an inmate or arrestee a
10 form of restraint?
11 **A.       Yes, it is.**
12 Q.       How about the use of a restraint belt in
13 handcuffing an inmate or arrestee, is that a form of
14 restraint?
15 **A.       That also is.**
16 Q.       For training purposes what guides the use of
17 shackles? Is there something that's written that is
18 used to govern when shackles should and shouldn't be
19 used?
20 **A.       Yes. We use shackles for transports or if an**
21 **inmate becomes so unruly that they then begin using**
22 **their feet as weapons.**
23 Q.       And is that what you described, is that
24 something that's written down as a policy?
25 **A.       I don't think it is written down for that.**

Page 35

1  **That's trained upon.**
2  Q.       How about the use of a restraint belt. Are
3  there any written policies that govern when a
4  restraint belt should be used?
5  **A.       No. Other than we use that for transport of**
6  **the inmates outside the facility as well.**
7  Q.       How about the use of a restraint belt for an
8  arrestee in the Judicial Center, are there written
9  policies that govern when a restraint belt should be
10 used on an arrestee in the Judicial Center?
11 **A.       Not that I can point to. Also it's trained as**
12 **part of having an unruly inmate or detainee that we**
13 **don't have to restrain in the restraint chair to help**
14 **keep him from harming himself or harming others.**
15 Q.       Would the use of a restraint belt for as you
16 described that type of unruly, and I don't know if you
17 used the word unruly. But for that type of arrestee is
18 an restraint belt considered an alternative to the
19 restraint chair?
20 **A.       Depending on the situation. If an inmate is**
21 **causing self-harm to himself we would lean more**
22 **towards the restraint chair than to the restraint**
23 **belt.**
24 Q.       The use of the decision to use a restraint
25 belt on an arrestee and this is for anything for an

Page 36

1  unruly or uncooperative arrestee is that something
2  that requires authorization from the Warden, Deputy
3  Warden or Major?
4  **A.       It does not.**
5  Q.       How about the use of shackles?
6  **A.       It does not either.**
7  Q.       Are there any policies that you reviewed in
8  preparation for your deposition, I mean written
9  policies, I'm not talking about the training
10 materials, any written policies that you reviewed that
11 we did not discuss today?
12 **A.       Not that I'm aware of.**
13 Q.       How about any written policies that you're
14 aware of in general even if you didn't review then for
15 this deposition, are there any written policies
16 regarding use of force that we did not discuss today
17 that you're aware of?
18 **A.       Just the ones that came after the 2019.**
19 Q.       Understood. Okay. Can you give me a couple
20 minutes. I'm going to go off camera and see if I have
21 any other questions.
22 **A.       Okay. No problem.**
23         (Pause.)
24 Q.       Major, I'm going to show you two videos. Give
25 me a second to pull those up. Are you able to see

Page 37

1  that?
2  **A.       Yes.**
3  Q.       I'm going to represent to you that this is a
4  video we received from Dauphin County. It is from June
5  18th. It is the Judicial Center and I'm going to fast
6  forward to a section where it appears to be the
7  officers coming in and putting a restraint belt on Mr.
8  Riley.
9         I'm going to play the video for you
10 while the belt is being put on and then I'm going to
11 ask you whether or not the application of the
12 restraint belt was in your opinion done in accordance
13 with the training that's given to correctional
14 officers?
15         MR. LAVERY: Just before you do that,
16 Riley, I'm just going to put an objection on the
17 record. He's not here to give an expert opinion on the
18 policy. He's here to testify on policy.  But go ahead.
19 I just want to make sure the objection is on the
20 record though. I won't disturb you again.
21         MR. ROSS: Thank you, Frank.
22 Q.       I'm going to start it from it looks like
23 28.16 and it will play for maybe two minutes or so.
24         Major Lucas, was there anything that
25 you saw in the video that you would say in your

Page 38

1 capacity as a training officer back in 2018 and 2019
2 that did not comport with the training that you
3 rendered to correctional officers regarding restraint
4 belts?
5           MR. LAVERY: Object to form. You can
6 answer.
7 **A.      No. I didn't see anything that seemed to be**
8 **out of the training.**
9 Q.      I'll show you one other video. And I will
10 tell you that this is the video from June 26th that
11 was received from Dauphin County. I'm going to fast
12 forward it to the point wherever the restraint chair
13 is used and ask you the same question at the end of
14 that. I'm going to start it from the 29:50 mark.
15           Okay. Major Lucas, is there anything
16 that you saw in that video of Ty'rique Riley being
17 placed in the restraint chair that went against the
18 training that you administered as a training officer
19 regarding the use of a restraint chair.
20           MR. LAVERY: Same objection to form.
21 But go ahead. You can answer.
22 **A.      I did not see anything that went against the**
23 **training in that video either.**
24 Q.      All right. Do you as part of you training in
25 creating the curriculum when you were doing that as a

Page 39

1 training officer would you review videos of things
2 like inmates being placed in restraint chairs or
3 restraint belts to determine what should and shouldn't
4 be done?
5 **A.      On occasion we do.**
6 Q.      So that is a method of developing your
7 curriculum or it was I should say?
8 **A.      More so just to make sure that the training**
9 **is being followed.**
10 Q.      As part of the training were correction
11 officers ever shown videos of inmates or arrestees
12 being placed in restraint chairs as part of the
13 training?
14 **A.      On occasion.**
15           MR. RILEY: All right. I don't have
16 any further questions.  I'll see if anyone else has
17 questions for you. Thank you for your time.
18           MR. LAVERY: Anybody else?
19           MR. CARMELITE: I have no questions.
20           MR. POLAHA: No questions.
21           MR. ROSS: Thank you.
22           (Witness excused.)
23           (Deposition concluded 1:04 P.M.)
24           - - -
25

Page 40

1           C E R T I F I C A T I O N
2
3
4           I hereby certify that the proceedings,
5 evidence and objections noted, are contained fully and
6 accurately in the notes taken by me on the hearing of
7 this matter, and that this copy is a correct
8 transcript of the same.
9
10
11
12           _____
13           NICHOLAS DiPIERO, R.P.R.
              Registered Professional Reporter
14           Notary Public
15
16
17
18           (The foregoing certification of this
19 transcript does not apply to any reproduction of the
20 same by any means unless under the direct control
21 and/or supervision of the certifying reporter.)
22
23
24
25

Page 41

1
2
3
4
5           WITNESS CERTIFICATION
6
7           I have read the foregoing transcript
8 of my deposition given on Tuesday, April 19, 2022, and
9 it is true, correct and complete, to the best of my
10 knowledge, recollection and belief, except for the
11 list of corrections, if any, attached on a separate
12 sheet herewith.
13
14
15           _____
16           MAJOR ROGER LUCAS
17 _____DATE
18
19
20
21
22
23
24
25

**A**

ability 6:23
able 17:6 26:7
  36:25
account 22:25
accurately 40:6
acting 23:16
action 1:5 31:3
actual 25:16
add 6:9
added 16:23,24
additional 15:18
administered
  38:18
administration
  20:15 24:20 31:2
  31:19
Administrator 1:4
agencies 20:23
agreed 4:1
ahead 22:16 37:18
  38:21
al 1:5,8
alcohol 7:1
allow 6:2,4 10:21
allowable 26:20
allowed 11:10,10
alternative 35:18
amount 26:17,19
and/or 23:11 40:21
annually 15:16,17
answer 5:6,7,16,21
  6:3,4,8,16 22:14
  27:24 28:14,22
  38:6,21
answering 5:11
Anybody 39:18
appear 26:5
APPEARANCES
  2:1
appears 22:20
  27:10 37:6
application 37:11
apply 26:4,6 40:19

appreciate 11:7
approves 20:15
April 1:12 41:8
arrestee 11:22 12:3
  12:8,14,20 34:9
  34:13 35:8,10,17
  35:25 36:1
arrestees 11:9,18
  26:13 39:11
asked 6:15
assaultive 11:24
assigned 17:9
assignments 16:4
associated 30:22
assume 5:17
attached 41:11
attend 15:18 21:16
attending 21:18
attention 27:20
authorization 31:6
  32:25 36:2
authorize 32:25
aware 14:8 21:6
  22:10 34:7 36:12
  36:14,17
A.M 1:12

**B**

back 6:7 31:21
  32:23 38:1
background 8:10
backing 28:2
backward 9:11
based 20:22
basically 27:17
basics 5:13
bate 29:23 30:11
bates 13:12
beginning 1:11
  14:25
begins 13:17
behavior 11:20
behaviors 11:22
belief 41:10

believe 9:14 16:22
  16:25 21:2 23:9
  23:14 30:23 32:4
believed 11:25
belong 31:1
belt 34:12 35:2,4,7
  35:9,15,18,23,25
  37:7,10,12
belts 38:4 39:3
best 5:16 6:4 30:6
  30:9 41:9
big 33:10
bit 21:9
blank 24:8
book 31:1
Box 2:9
break 6:12,17
breakdown 27:18
  33:10
BRIAN 1:7
Briggs 4:23 32:18
  32:19
broken 20:5,7
build 20:16
built 20:18
bunch 24:2
bursts 26:2,6

**C**

C 40:1,1
call 25:8
called 16:10
camera 36:20
Camp 2:15
capacity 5:8 10:10
  10:11 38:1
Care 2:18
CARMELITE
  2:14 39:19
CARMEN 1:4
case 28:4
cases 27:19,21,22
  28:5,6,7,11,18,19
  28:24

categories 7:23
Category 8:1,4
cause 12:1
causing 35:21
cell 10:21,25 11:2
  11:11,14,23 12:3
  12:9,15,18,20
  16:1
Center 11:6,10,17
  26:14 33:12,21
  34:2 35:8,10 37:5
certain 5:11 17:1
  30:24
certification 4:2
  40:18 41:5
certify 40:4
certifying 40:21
chair 31:4 33:3,6
  33:23 34:3 35:13
  35:19,22 38:12
  38:17,19
chairs 39:2,12
change 29:14
changed 17:14
  29:15,17
changes 29:9
Chapter 18:1
Cherry 1:23
Chester 2:21
CIT 7:15
CIVIL 1:5
CLARK 1:7
classes 20:17 23:3
college 10:2
come 6:7,10 24:24
  25:4,4 31:21
coming 37:7
commander 23:11
  23:16,16,25 33:2
companies 29:15
  29:17
company 18:10,15
  20:25 21:1
complete 6:2,4

41:9
comport 38:2
computerized
  17:17,19
concede 4:16
concluded 39:23
conclusion 24:1
conditions 12:5,7
  12:17 22:20,23
CONNELL 2:19
Connor 28:4
consider 29:8
considered 22:12
  35:18
consisted 16:13
consult 16:21
consumed 7:1
contact 26:10 33:2
contained 40:5
continually 26:4
continue 26:6,11
control 18:2,9
  40:20
copy 40:7
Corporate 2:15
correct 8:7,12,13
  13:24 17:5 19:1
  25:5,6 31:12,22
  40:7 41:9
correction 21:13
  39:10
correctional 8:4,18
  9:13,16,19,21
  10:11 16:3,7,9,14
  17:2 18:5,6,17
  20:1,4,12,14 23:3
  26:23 27:21
  37:13 38:3
corrections 41:11
counsel 2:6,11,17
  2:22 4:2
counseling 22:2
count 14:18
counter 7:5

**County** 1:8 5:9,10
7:24 8:4,6,12,16
9:3,9 14:10 20:20
30:19 37:4 38:11
**couple** 36:19
**course** 5:19
**court** 1:1,22 5:19
5:25 27:19,21,22
28:6,7,11,18,19
28:24
**covered** 4:15,16
13:20
**creating** 22:11
28:17 38:25
**crisis** 7:15,15
**current** 8:14
**currently** 15:4
19:6 31:12
**curriculum** 20:16
20:18,20 21:5
22:11 28:10,17
29:17 38:25 39:7
**Custody** 8:15,17
8:20

**D**

**date** 15:9 16:22
17:1,4,6,9,15
30:3 32:22 41:17
**dated** 16:24 17:14
**dates** 21:19
**Dauphin** 1:8 5:9
5:10 7:24 8:3,6
8:12,15 9:3,8
14:10 20:19
29:23 30:18 37:4
38:11
**day** 19:5
**days** 22:3
**DCP** 3:12,13 25:10
**DCP-2** 25:11
**deal** 22:22
**deals** 18:13
**decides** 20:11

**decision** 20:13
35:24
**decisions** 27:22
**Defendant** 2:11,17
**Defendants** 2:22
**Defensive** 18:2
**degree** 10:2
**DENNEHEY** 2:13
**department** 28:23
**depending** 17:7
23:22 35:20
**depose** 5:3
**deposition** 1:10
4:22 5:1,13 6:20
6:24 7:8,11 8:2
36:8,15 39:23
41:8
**Deputy** 31:7 32:7,9
32:24 36:2
**described** 34:23
35:16
**DESCRIPTION**
3:11
**details** 20:22
**detainee** 35:12
**detainees** 8:6
26:13
**detainee's** 26:2
**determine** 17:3,11
17:12 28:19 39:3
**developing** 39:6
**devices** 31:5
**DFS** 13:17 23:14
24:11 25:13
26:25 27:13
28:25 29:23
30:12
**dictate** 10:24
**dictated** 11:19
**difference** 27:14
33:7
**different** 8:22 13:9
15:22 22:21,24
**DiPiero** 1:13,22

40:13
**dipieroreporting...**
1:24
**direct** 26:3 27:20
40:20
**director** 8:22,25
32:8,11,12,13
**discipline** 21:25
22:4,6 23:18,20
**disciplined** 21:13
21:15,23
**discuss** 7:21 36:11
36:16
**discussed** 23:1
**discusses** 25:25
28:4,5
**dissolved** 31:19,21
**DISTRICT** 1:1,2
**disturb** 37:20
**Dlcarmelite@m...**
2:17
**document** 30:14
**documented** 22:7
**documents** 7:10,16
7:19,19
**doing** 16:4 38:25
**DONALD** 2:14
**Drive** 2:15
**duly** 4:8

**E**

**E** 40:1
**effect** 15:4,5,10
26:3,11 29:4,6
**effective** 26:6
**eight** 30:12
**either** 9:11 10:10
36:6 38:23
**employee** 18:5
**enforcement** 9:24
10:10
**entire** 22:18
**ESQUIRE** 2:3,8
2:14,14,20

**essentially** 31:4
**Estate** 1:5
**et** 1:5,8
**eventually** 19:16
19:18
**evidence** 40:5
**exact** 16:15 32:22
**examined** 4:8
**example** 11:21
24:17,25 26:20
**examples** 27:11,18
28:1
**excused** 39:22
**exhibit** 24:12
27:13 29:20
**EXHIBITS** 3:9
**exist** 12:24 13:1
**existed** 31:20 32:6
**expert** 37:17
**extractions** 16:1
**extraordinary**
24:17

**F**

**F** 40:1
**face** 26:1,2,8,10
**facility** 9:19,22
35:6
**failed** 21:21
**failure** 21:23
**fair** 5:17 6:5,6
29:17
**fairness** 4:12
**fast** 37:5 38:11
**February** 9:7,9,14
9:15
**feet** 34:22
**files** 22:7
**filing** 4:2
**filled** 19:15,16,18
**find** 23:9
**fine** 6:14
**first** 4:21 9:12 31:9
**FITZPATRICK**

2:2
**Flavery@laveryl...**
2:11
**follow** 21:4
**followed** 39:9
**follows** 4:9
**force** 3:12 8:3
10:14 13:4 14:6,9
14:16 15:3,16
18:1,4,17,18
19:24 20:8,14
21:8,11,14,18
22:11,14,17
23:12,17,22,24
24:18 25:8,13
29:3,10 30:1,20
36:16
**foregoing** 40:18
41:7
**form** 4:4 12:25
22:13 24:5,5,6,6
27:23 28:13,21
34:10,13 38:5,20
**former** 4:13 8:11
18:24
**forms** 34:8
**forward** 6:23 7:8
9:12 37:6 38:12
**found** 23:5
**four** 31:4 33:6,11
**frank** 2:8 11:8
37:21
**front** 13:21
**fully** 40:5
**further** 39:16

**G**

**gather** 24:21
**general** 17:24
36:14
**generalized** 12:4
**give** 8:24 11:4,21
13:15 24:10
26:20 27:11 28:1

MAJOR ROGER LUCAS

36:19,24 37:17
**given** 16:18 17:4
  20:11 22:5 25:19
  25:21 28:6 32:25
  37:13 41:8
**gives** 27:17,18
**go** 5:1,12 7:7 9:11
  14:21 17:10,11
  17:20 18:10
  22:16 27:13
  32:23 36:20
  37:18 38:21
**goes** 14:25 27:14
  29:24
**going** 4:12 5:1,11
  5:17 7:17,25
  10:19 13:8,10,25
  17:21 21:7,9
  22:19 24:12 25:9
  25:15 26:25
  27:13 36:20,24
  37:3,5,9,10,16,22
  38:11,14
**gotten** 17:8
**govern** 8:3,5 11:13
  12:20 14:6,9 33:8
  34:18 35:3,9
**graduate** 10:4,5,7
**Graham** 28:4
**Greg** 2:12 32:18,19
**guess** 11:6 15:9
  31:25
**guidance** 30:25
**guidelines** 21:3
**guides** 34:16
**G36** 20:23

**H**

**H** 2:3
**handcuffed** 10:21
  10:25 11:1 12:18
**handcuffing** 34:13
**handcuffs** 10:16
  10:20 11:1,2,11

11:14,23 12:3,9
  12:15,20
**handing** 13:19
**happen** 33:1
**happens** 21:22
  23:15
**hard** 11:4
**harm** 12:1
**harming** 35:14,14
**Harrisburg** 2:10
**head** 5:22,22 18:8
  32:21
**heading** 15:22
**health** 22:12,17,20
  22:22
**heard** 4:25 25:14
**hearing** 40:6
**held** 30:24
**help** 35:13
**herewith** 41:12
**high** 10:4,5,7
**Hill** 1:23 2:15
**hold** 9:8
**hours** 7:2,5
**HR** 22:7

**I**

**idea** 31:24
**III** 2:3
**important** 5:21 6:1
**incident** 24:23
**incidents** 16:2
**include** 21:8 24:2
**included** 24:3
  28:11,20
**INDEX** 3:1,9
**individual** 25:21
**information** 8:10
**inmate** 10:25
  11:11,13,16
  26:12 34:9,13,21
  35:12,20
**inmates** 8:7 10:21
  11:5 22:22 33:24

35:6 39:2,11
**inmate's** 26:1,8,10
**inside** 12:18
**instance** 16:18
  17:10 28:3
**instructor** 18:3,13
**instructors** 18:11
**interfere** 6:23
**Intervention** 7:16
**introduce** 10:19
  24:12
**introduction** 4:25
**involved** 28:16

**J**

**J** 2:8
**James** 19:19
**job** 5:6,7 8:22
  28:16,18
**jobs** 10:9
**JOHN** 2:14
**JR** 2:8
**Jrninosky@md...**
  2:16
**judicial** 11:6,9,17
  26:13 27:22
  33:12,21 34:2
  35:8,10 37:5
**July** 27:6 29:1,2
**June** 9:13,18 15:7
  15:11 16:12,20
  19:8 29:6 31:14
  32:2,10,14,16,20
  33:16,19 37:4
  38:10

**K**

**keep** 35:14
**kept** 16:17,22
  17:17 21:19 22:6
  22:9
**kind** 5:12 15:9
**know** 4:12,17 5:5
  5:15 6:9,15 15:1

16:13,19 17:25
  19:7 27:1 28:22
  29:1,12 30:4,7,14
  31:15,17 35:16
**knowledge** 13:2
  30:6,9 41:10

**L**

**Labomski** 19:19
**lapse** 26:17
**LAVERY** 2:8,8
  4:11 11:3 13:6,12
  13:15,19 14:11
  14:14,19 22:13
  22:16 24:13 27:3
  27:23 28:13,21
  30:13 37:15 38:5
  38:20 39:18
**law** 2:8 9:24 10:10
**lawsuit** 4:21
**lawyer** 6:14
**lean** 35:21
**LEINHAUSER**
  2:19
**letter** 25:17
**let's** 11:9,17 14:24
  17:20 19:5 20:12
  27:12 32:23
**level** 8:19 23:22
  24:19
**Liberty** 2:3
**limit** 21:7 25:21,25
**list** 16:17,20,25
  17:13,14,16,17
  41:11
**listed** 33:11
**listening** 12:4
**lists** 24:2
**little** 21:9
**LLC** 2:2
**long** 8:20 26:7
**look** 13:7,16 14:2
  28:10,24
**looked** 27:16

**looking** 23:13
  27:15 28:4,25
  30:20
**looks** 30:11 37:22
**Lt** 2:12
**Lucas** 1:11 3:3 4:7
  4:20 13:23,25
  30:15 37:24
  38:15 41:16

**M**

**MacMAIN** 2:19
**maintained** 31:2
**Major** 1:10 3:3 4:7
  8:15,15,17,20
  13:23,25 30:14
  31:7,9,10,14 32:4
  32:7,24 36:3,24
  37:24 38:15
  41:16
**making** 12:5 21:4
**manual** 18:3,13
  29:20 30:25
**March** 9:1,1,7
  19:11
**mark** 19:23 38:14
**marked** 24:11,14
**Market** 2:4,9,20
**Marlkress** 1:23
**MARSHALL** 2:13
**material** 29:16
**materials** 13:1
  14:7 36:10
**matter** 40:7
**MATTHEW** 2:20
**mean** 8:17 18:7
  24:6 36:8
**means** 5:8 40:20
**medication** 6:22
  7:4
**member** 17:4,12
**members** 16:3,17
  16:19
**memo** 24:8 25:4

memos 24:21
Mendenhall 2:12
mental 22:12,17,20
  22:22
mentioned 10:14
  22:18 25:5 26:12
method 30:18 39:6
METHODS 3:13
mid 8:19 24:19
MIDDLE 1:2
MINCEY 2:2
minutes 36:20
  37:23
missed 26:8
modify 6:8
monitor 21:17
  28:18
monitored 21:17
month 8:21,24 9:5
move 6:23 27:12
Mpolaha@mac...
  2:22
multiple 22:3

**N**

N 40:1
name 3:2 4:20 17:2
  25:16
need 6:8,12,13
  16:11 17:22,23
  17:24 24:2 26:4
  26:10
needed 33:23
Nicholas 1:12
  40:13
NINOSKY 2:14
NJ 1:23
nodding 5:22
Notary 1:13 40:14
noted 40:5
notes 40:6
notice 1:11 4:16
  8:2
notifies 23:11

notify 23:16 33:3
number 3:11 16:15
  30:22
numbered 13:12
numbers 14:12
  30:21

**O**

O 40:1
Object 22:13 27:23
  28:13,21 38:5
objection 37:16,19
  38:20
objections 4:3 40:5
obviously 26:9
OC 25:14,15,17,22
  26:18
occasion 39:5,14
occupation 8:14
occur 19:25
occurred 30:5
occurrence 24:17
  27:25
officer 4:13 8:11
  9:4,6,13,19,25
  16:7 17:2 18:5,24
  19:20,21 20:12
  23:10,15,24 38:1
  38:18 39:1
officers 8:4,18 12:5
  12:11 16:3,9,14
  18:6,17,21,23,25
  19:3,7,22 20:1,4
  20:14,16,19 21:4
  21:13 23:3 24:21
  25:20,20 26:16
  26:23 27:21 28:6
  37:7,14 38:3
  39:11
officer's 24:1
okay 6:10,17,18
  17:10,16 21:11
  21:12 22:16
  33:25 36:19,22

38:15
once 7:20 19:12
  20:9
ones 36:18
open 19:14
operation 15:21
opinion 37:12,17
outlined 7:24
outside 13:1 16:7
  18:10 29:15 35:6
oversee 8:18

**P**

PA 2:5,10,15,21
packages 10:17
page 3:2,11 15:1
  17:21 26:25
pages 17:21 30:12
part 26:22 30:25
  35:12 38:24
  39:10,12
particular 10:23
  18:13,16 25:13
  28:3
Pause 36:23
PENNSYLVAN...
  1:2
people 11:6 17:13
perform 16:6
period 16:18
pertain 12:14
Philadelphia 2:5
physical 23:17,24
place 2:3 12:3 22:8
  30:24 32:1
placed 11:14,22
  12:9,15 38:17
  39:2,12
placing 12:20
plaintiffs 2:6 4:21
play 37:9,23
please 5:15
point 6:7,12 9:25
  11:25 17:23 18:9

33:6,11,20 35:11
  38:12
points 7:14 31:5
POLAHA 2:20
  39:20
policies 3:12 8:5
  11:13 12:8,14,19
  13:4,4,9,10,20
  14:3,5,6,8,9,15
  14:18 25:8,11
  29:10 33:8 35:3,9
  36:7,9,10,13,15
policy 7:19 8:2
  10:21,23 12:16
  12:25 14:24 15:1
  15:3,10,10,14
  17:20 18:4,13,17
  18:18 23:9,10
  27:1,3,8 28:3
  29:2,4,5,8 30:10
  30:18,21,21,21
  30:22,24 31:1,24
  32:1,1,23 33:5
  34:24 37:18,18
position 9:8,11,12
  19:15 31:19,20
  32:5
positions 9:22 33:1
posts 16:10
pounding 11:25
power 7:14
PPCT 18:2,7,14
  20:23,25 29:14
preparation 7:11
  36:8
prepared 7:7,21
  8:1
prescribed 7:5
present 4:22 19:5
presentation 30:4
  30:8
presentations 23:6
  29:25
pressure 18:9

prevention 7:15
previously 7:24
  24:13
Prime 2:18
prior 8:21
prison 1:8 5:10 8:4
  8:6,12,16 9:3,9
  11:5 14:10 18:21
  18:23 20:15,20
  24:8,20 30:19
  31:2,18 33:12,21
  34:2
private 21:1
probably 4:25
problem 36:22
procedure 10:22
  15:15 31:5
procedures 8:3,5
  10:24 11:19
  12:10
proceedings 40:4
Professional 1:13
  1:22 40:13
promoted 19:13
pronounce 25:16
Public 1:14 40:14
pull 36:25
purpose 33:23
  34:3
purposes 34:16
pursuant 1:11
put 11:10 13:10
  24:22 26:8 37:10
  37:16
putting 28:9 30:11
  37:7
P.M 39:23
P.O 2:9

**Q**

question 4:21 5:5
  5:14,16 6:3,5,10
  6:15,16 10:20
  15:14 25:12

27:24 28:22
38:13
**questions** 4:4,14
5:7,11,22 7:18
8:9 17:22,24 21:7
36:21 39:16,17
39:19,20

**R**

**R** 2:14 40:1
**railing** 11:1
**range** 15:10
**read** 14:1 17:23,25
41:7
**really** 5:20 12:24
**reapply** 26:9
**reason** 6:9,14 7:7
29:12 33:18,25
**reasons** 34:5
**recall** 19:14 32:21
**receive** 12:11 16:1
21:20 23:18
26:23 28:6
**received** 14:5
20:14 37:4 38:11
**recollection** 41:10
**record** 5:2 22:5,8
37:17,20
**reference** 18:2,12
**referenced** 25:17
**references** 15:14
32:4
**referencing** 32:5
**referring** 15:6
21:11
**refuse** 21:15
**regard** 15:13
**regarding** 13:4
24:18 25:19
36:16 38:3,19
**Registered** 1:13,22
40:13
**regular** 16:6,9
27:25

**reiteration** 27:10
**remember** 18:8
**removed** 16:23,24
**rendered** 38:3
**rephrase** 5:16
**report** 21:24 23:12
23:25 24:5,7,16
24:18,19,22 25:1
**reporter** 1:13 5:19
5:25 40:13,21
**Reporters** 1:22
**REPORTING**
1:22
**represent** 4:20
37:3
**representative** 5:9
**reprimand** 23:21
**reproduction**
40:19
**requirement** 23:10
**requires** 36:2
**research** 28:18
**reserved** 4:4 16:5
**response** 15:21,21
**restrain** 31:5 35:13
**restraint** 3:13
14:15,18 30:18
30:22 31:4,5 33:3
33:5,6,11,22 34:1
34:2,5,9,10,12,14
35:2,4,7,9,13,15
35:18,19,22,22
35:24 37:7,12
38:3,12,17,19
39:2,3,12
**restraints** 8:6 21:8
33:20
**restroom** 6:13
**restructuring**
31:18
**review** 12:19 28:18
28:23 36:14 39:1
**reviewed** 7:10,13
7:14 10:15,17

36:7,10
**revise** 6:8
**revisions** 29:2,3
**right** 13:23 14:17
14:21 15:4 18:14
30:13 38:24
39:15
**Riley** 1:4,5 2:3
4:11,20 11:3 13:7
14:11 37:8,16
38:16 39:15
**Riley@minceyfit...**
2:6
**Road** 1:23
**ROGER** 1:10 3:3
4:7 41:16
**rolled** 32:8
**Ross** 2:2,3 3:4 4:18
4:19,20 11:7 13:8
13:14,17,22
14:13,17,21,23
22:15 24:15 25:7
27:4 37:21 39:21
**rules** 6:19
**R.P.R** 40:13

**S**

**S** 2:20
**Salvatore** 19:23
**saw** 37:25 38:16
**saying** 11:1 12:13
17:15 21:10 25:3
27:9 33:14,25
**says** 18:2 28:25
31:3,9
**scheduled** 21:24
**schedules** 20:6,7
**school** 10:4,5,7
**screen** 29:21 30:11
**scroll** 24:24
**sealing** 4:2
**second** 24:10 36:25
**section** 37:6
**Security** 8:23,25

18:1 32:8,12,13
**see** 15:15 23:23
25:14 28:10
29:20 31:3,7 33:5
36:20,25 38:7,22
39:16
**seen** 10:15 12:23
**self-harm** 35:21
**sense** 16:8
**sentence** 23:23
**separate** 41:11
**September** 15:2
**Sergeant** 9:17
**serve** 33:23 34:3
**serving** 5:7,9
**session** 4:22 5:6
**set** 26:19
**shackles** 34:17,18
34:20 36:5
**shackling** 34:9
**shaking** 5:22
**shared** 20:20
**sheet** 21:19 24:8,9
41:12
**shift** 23:11,16,16
23:25 24:1 33:2
**short** 26:2,6
**shorter** 27:17
**show** 7:17 13:3
21:21 24:10
29:19 30:10
36:24 38:9
**showing** 24:11
**shown** 39:11
**shows** 12:12 29:24
**signed** 29:1
**significant** 29:9
**situation** 10:24
22:19 35:20
**situations** 12:2,8
**slide** 12:12 23:6
29:24
**slides** 10:15
**sorry** 11:16 18:22

**source** 29:16
**speak** 12:8,16
**special** 15:15,17,19
15:20,20,21,22
15:23,24,25 16:4
16:5,7,12,13,18
16:19 17:4,12
18:5
**specific** 7:19,23
17:1,6,9 19:25
21:4 23:8 27:3
**specifically** 12:17
25:3
**specifics** 14:2
**spelled** 10:23
**spray** 25:14,15,17
25:22 26:1,18
**staff** 8:19 15:16
18:21,23
**stamped** 29:23
30:11
**standalone** 30:25
**standardized** 24:6
**start** 10:13 14:24
37:22 38:14
**starts** 13:8
**state** 20:21 21:3
25:7
**STATES** 1:1
**stick** 11:17
**stipulated** 4:1
**Street** 2:4,9,20
**subjected** 22:1
23:19
**submit** 23:24
24:20
**submits** 23:11
**submitting** 24:7
**suicide** 7:15
**Suite** 2:4,15,20
**summarizes** 24:23
**supervision** 24:20
40:21
**supervisor** 8:19

MAJOR ROGER LUCAS

**sure** 6:11 14:3
16:15 32:19
37:19 39:8
**suspension** 22:3
**Susquehanna** 2:22
**sworn** 4:8
**system** 31:10

**T**

**T** 27:8 40:1,1
**tactical** 10:16
**tactics** 18:3,9
**take** 6:12,16 22:18
23:3
**taken** 1:11 6:22 7:4
40:6
**talk** 6:1,13 7:23
11:9 19:5 21:9
**talked** 23:6 32:23
**talking** 10:13 11:4
11:5,16 14:7,14
22:14 25:10,11
27:4 36:9
**talks** 23:23 25:14
33:5
**teach** 20:17
**team** 15:21,25 16:4
16:5,12,13,20
17:4,7
**teams** 15:15,17,19
15:20,21,22,23
15:24 16:7 17:12
**technically** 14:16
**tell** 7:20 15:13
27:14 33:6 38:10
**ten** 16:16
**term** 25:15
**termination** 23:22
**testified** 4:8
**testify** 8:1 37:18
**Thank** 4:18 30:10
37:21 39:17,21
**things** 22:25,25
23:5 24:2 39:1

**think** 4:14 10:14
10:22 13:6 14:19
18:9 34:25
**three** 13:9 25:9,10
**time** 4:4 11:4 12:6
15:5,6 16:16,24
17:7,25 19:25
20:2,5 26:17,19
26:20 29:9 32:5,9
32:14,16 39:17
**title** 8:22 9:2 13:23
18:1
**titled** 32:11
**TJA** 29:14
**today** 6:24 7:8,17
7:25 13:5 17:11
17:12,14 33:13
36:11,16
**today's** 7:11
**top** 18:8 32:21
**topic** 6:10
**topics** 7:25
**train** 25:20
**trained** 15:16,17
18:10,17 20:5
25:20 26:16
27:22 35:1,11
**training** 4:13,14
7:15,16,16 8:11
9:4,6 10:15 12:10
12:13 13:1 14:7
15:18 16:1 18:20
18:21,23,24,25
19:3,7,21,22,24
20:8,11,13,16,19
21:4,8,10,14,18
21:22,24 22:12
22:14 23:1 25:19
25:24 26:5,22
28:1,2,5,9,12,17
28:20,23 29:25
30:5 34:16 36:9
37:13 38:1,2,8,18
38:18,23,24 39:1

39:8,10,13
**trainings** 20:23
21:20
**transcript** 40:8,19
41:7
**transport** 35:5
**transports** 34:20
**trial** 4:5
**true** 26:12 41:9
**try** 6:1 25:15
**trying** 11:4 12:24
**Tuesday** 1:12 41:8
**two** 19:6,9,10 33:7
36:24 37:23
**type** 9:21 10:10
15:23,25 18:5
20:11,13 21:25
35:16,17
**types** 15:23 16:2
**Ty'rique** 1:5 38:16

**U**

**ultimately** 20:15
**uncooperative**
36:1
**undergo** 21:14
**understand** 5:15
5:23 6:19 8:11
17:15 21:10
22:21
**understanding**
5:10 7:22,25
12:25
**understood** 5:17
36:19
**unhandcuff** 12:6
**unique** 20:19,22
**Unit** 1:23
**UNITED** 1:1
**unruly** 12:4 33:24
34:21 35:12,16
35:17 36:1
**unsafe** 12:5
**update** 27:8

**updated** 15:2 27:1
28:7,11 29:9
**updates** 28:24
29:12
**use** 3:12 6:13 8:3,6
10:13 13:4 14:6,9
14:16,18 15:3,16
18:1,4,16,18
19:24 20:8,13
21:8,11,14,18
22:11,14,17
23:12 24:18 25:8
25:13 27:25 29:3
29:10 30:1,20
31:4 33:3,7,8,9
33:10,20,22
34:12,16,20 35:2
35:5,7,15,24,24
36:5,16 38:19
**uses** 26:17,21
**utilize** 20:24 26:1
**utilized** 31:6 33:4
33:11,13,16,18

**V**

**verbal** 22:2 23:21
**verbally** 5:21
**versus** 28:4 33:8
**video** 37:4,9,25
38:9,10,16,23
**videos** 36:24 39:1
39:11
**vs** 1:6

**W**

**waived** 4:3
**want** 6:7,13 10:13
10:19 12:23 13:3
13:7 14:12 17:23
23:8 24:10,16
25:12 27:20
29:19 34:8 37:19
**wanted** 4:17 16:19
**Warden** 1:7 4:23

31:7,7 32:7,9,17
32:18,19,20,24
32:24 36:2,3
**warrant** 11:22
12:2,17
**wasn't** 15:4 20:2
24:14
**way** 17:3 23:20
**ways** 22:21,24
**weapons** 34:22
**wearing** 10:25
**went** 38:17,22
**West** 2:20,21
**we'll** 14:1 24:24
25:10,11 27:7
**we're** 11:4 21:9
25:9,9,11 27:4,12
27:13,15 28:3
29:19
**witness** 3:1 5:8
39:22 41:5
**word** 35:17
**work** 5:23 9:18,21
**working** 26:4
**wouldn't** 16:24
17:6,9,14
**written** 12:7,10,14
12:16,19,25 13:3
14:6,8,9 17:17
23:11,12,25 24:7
24:18 25:1 31:24
34:17,24,25 35:3
35:8 36:8,10,13
36:15

**Y**

**Yeah** 23:2
**year** 19:25 20:3,9
**years** 8:24 9:5
33:22

**Z**

**Zoom** 1:10

**0**

MAJOR ROGER LUCAS

**08034** 1:23

---

**1**

**1** 24:11
**1:04** 39:23
**100** 2:15
**11:52** 1:11
**1175** 1:23
**1245** 2:9
**1650** 2:4
**17011** 2:15
**17108** 2:10
**18** 15:7
**18th** 37:5
**19** 1:12 41:8
**19103** 2:5
**19382** 2:21
**1989** 28:5
**1992** 10:8,9

---

**2**

**2** 3:12 25:10
**200** 2:20
**2003** 9:14,18 10:9
**2009** 9:14,15,16
**201** 2:15
**2012** 9:7,9,12,16
**2014** 27:2
**2015** 27:6 29:1,2
**2017** 15:2 30:3
**2018** 30:8 38:1
**2019** 9:1,7 15:7,8
   15:11 16:12,20
   19:8,10,20 20:12
   29:4,6 30:5 31:14
   31:20 32:2,9,10
   32:14,16,20
   33:16,19 36:18
   38:1
**2022** 1:12 9:1 41:8
**215** 1:24
**215)550-1995** 2:5
**225** 2:9
**227** 13:17,20 14:25

**229** 23:14
**230** 25:13
**232** 26:25 27:13
**233-6633** 2:10
**234** 27:14
**235** 13:18,20 28:25
**236** 14:19 30:12
**24** 7:1,4
**243** 14:20 30:12
**244** 29:23
**2460** 1:23
**26th** 38:10
**28.16** 37:23
**288** 29:24
**29:50** 38:14

---

**3**

**3** 3:13 8:1
**3-A** 25:14
**30(b)(6)** 5:8
**3600** 2:4

---

**4**

**4** 3:4 33:20
**4-point** 34:1,5
**4:20-CV-00325** 1:6
**433** 2:20
**463-1014** 2:21
**484** 2:21

---

**5**

**5** 17:21

---

**6**

**651-3529** 2:16

---

**7**

**7** 8:4 23:14
**717** 2:10,16
**735-8101** 1:24

---

**9**

**9** 18:1
**9.17** 13:10 14:3
   17:21 27:5,15

**9.17T** 13:10 14:3
   27:6,15
**9.22** 13:10 14:3
**922** 14:24



# DAUPHIN COUNTY

## JUDICIAL CENTER

DAUPHIN COUNTY JUDICIAL CENTER
451 MALL ROAD
HARRISBURG, PA 17111
(717) 547-4000



**BOARD OF COMMISSIONERS**
JEFF HASTE, CHAIRMAN
MIKE PRIES, VICE CHAIRMAN
GEORGE P. HARTWICK III, SECRETARY

**CHIEF CLERK/CHIEF OF STAFF**
Chad Saylor

**DIRECTOR OF JUDICIAL CENTER**
Stanley M. Pleskonko

## Dauphin County Judicial Center Policies and Procedures

### Part 1 -- Booking/Intake Procedure

#### I. INTAKE SEARCHES

1. Pat Search

   A. All individuals booked into the Dauphin County Judicial Center shall be subject to a thorough pat search, in order to retrieve contraband, prior to being accepted from the arresting law enforcement agency. Pat searches are conducted by an officer that is the same gender as the individual being searched.

2. Method

   A. All detainees will be searched upon entry in the secure area of the booking center and before they are placed in a holding cell. Any items not specifically allowed shall be removed. Weapons, evidence, or contraband shall be immediately returned to the accompanying police officer before accepting the detainee. A thorough hand search shall be conducted on individuals before any restraints are removed. If possible, the hand search will be conducted by an officer of the same gender as the detainee.

   1. Visually inspect the detainee for obvious injuries.
   2. When you are satisfied it is safe, remove handcuffs, shackels and instruct detainee to place hands on the wall.
   3. Conduct an outer clothing search of the detainee. Run hands under shirt collar and down upper part of each arm to wrist. Check along underside of arms and armpits, sweeping hands down shirt front to belt from front to back. Run hands down front and back of legs to shoe tops and back up sides of legs. A thorough search includes all areas where items can be hidden, waistband, crotch, pockets, hat etc.
   4. Instruct the detainee to face you and open their mouth, lift their tongue. Do a visual inspection of the oral cavity to insure nothing is being concealed.
   5. If the detainee has long hair, have them run their fingers through their hair and lift the hair off their neck so you can see nothing is hidden. If they are wearing a wig, ask them to remove it or assist them in removing the wig (if it is not sewn in).



EXHIBIT

DCP-1

4-19-22   ND

**Dauphin DFS 290**

6. Ask the detainee to be seated on the bench, remove their shoes and hand them to you. Avoid bending down in front of the detainee.

7. After you have inspected the shoes and are satisfied they are free of contraband or weapons, ask the detainee to remove their socks, turn them inside out and show you the bottom of their feet.

8. Remove shoelaces, drawstrings and any other item the detainee is not allowed to have on their person while in the DCJC.

9. When all property has been taken from the detainee, instruct them to walk through the Cell Sense metal detector and insure they are clear of contraband.

10. If the detainee is not cooperative, or you have a security concern, use a set of lockable flex cuffs to secure their hands prior to walking through the Cell Sense metal detector.

11. After clearing the detainee through the Cell Sense, instruct the detainee to kneel up on the bench with both legs (if possible), or with one leg at a time.  Apply, check for fit, and double lock the leg restraints. Do not bend down in front of detainee to apply or remove restraints unless the detainee is physically unable to stand

B.   All safety and security precautions should be adhered to while searching detainees.

C.   A strip search shall not be performed unless authorized by the Director of the Judicial Center or their designee.  If a strip search is ordered it will be conducted by an officer of the same gender as the detainee and will take place in the medical area of the facility.

## II. Property

A.   It is the policy of the Dauphin County Judicial Center to ensure that all detainee property is accounted for.  In order for a possible transfer to a detention facility and due to space limitations, certain items will not be maintained at the judicial center.

B.   The following items will not be accepted by the center and shall be immediately turned over to the accompanying police officer:
   1. Weapons
   2. Tobacco products and lighters/matches
   3. Food items
   4. All Medication – No Exceptions
   5. Electronics to include cell phone and all accessories.  The exception to this policy is that cell phones will be held for summary arrest detainees that will be released from the Judicial Center.
   6. Toiletries
   7. Purses/Backpacks/Luggage

C.   The following items will be removed from a detainee and held at the center during detention period only:
   1. Shoelaces
   2. Belts
   3. Drawstrings

Dauphin DFS 291

4. Jewelry, Watches, and Piercings
5. All hair ties, barrettes, bobby pins, head bands, elastic bands
6. Coats, Jackets, Sweaters, Sweat Shirts
7. Hats
8. Suspenders
9. Gloves
10. Wallet
11. Keys

D. All allowable items that remain at the center shall be inventoried and these items shall be returned to detainee upon a release to the street or accompany the detainee to a detention facility.
   1. An inventory sheet for each detainee shall be maintained.
   2. The property inventory receipt will be removed from the inventory bag either upon release on bail or after transfer to a detention facility. The receipt will be stapled to the completed Booking Form.
   3. Once sealed, the property bag is not to be opened by any individual without express permission from the Judicial Center Director or their designee.

E. The property container shall be kept in the designated area within the center and only center staff shall have access to said property.

I. **Medical Treatment**

A. All necessary medical treatment shall be provided to detainees in a timely manner.
B. All detainees presented at the Judicial Center shall be asked if they are injured.
   1. Detainees with injuries requiring a medical clearance to incarcerate will not be accepted at the center without noted clearance.
   2. If a PrimeCare Medical staff member is present, they will make the determination regarding a clearance to incarcerate.
   3. If PrimeCare is not present, the processing JCO will determine if the nature of the injury requires a clearance to incarcerate.

C. Detainees determined to be under the influence of alcohol or a controlled substance to the extent that they present a danger to themselves, or who present with a similar condition, will be taken by the arresting officer to a medical facility for evaluation and treatment before being committed to the Judicial Center.

D. Upon noting a detainee injury after commitment to the center that requires medical attention the PrimeCare staff member assigned to the Judicial Center will be notified.
   1. If a PrimeCare staff member is not present at the center, PrimeCare at the Dauphin County Prison will be notified immediately of noted injury.
   2. Emergency first-aid will be utilized by the Judicial Center Staff until the arrival of medical personnel.

E. Prisoners will not be given or permitted to take any medications without the supervision of authorized medical personnel.

**Dauphin DFS 292**

## II.  Holding Cells

A.  Holding cells at the Judicial Center shall be utilized on an as needed basis for the temporary housing of detainees awaiting arraignment, or awaiting release from custody, or transportation to a detention facility.

B.  Available cell space will be utilized in a manner that does not cause overcrowding of a particular holding cell.
1.  Male and female detainees will not be held in the same holding cells.
2.  Juveniles should be held in the designated cell and separated by gender.

C.  While detainees are being held in a holding cell there will be at least one officer monitoring the holding area.  A periodic check of detainees shall be conducted.
1.  Two of the monitors at the control desk will rotate views of the holding cells.
2.  A physical check of detainees will occur at least every thirty minutes.
3.  An officer will not open a cell or enter a cell unless there is another officer present in the booking/intake area.

D.  All holding cells will be inspected before and after a detainee is housed there for contraband and/or damage.  Discrepancies will be reported through the proper channels.

## III.  Police Reporting Procedure

A.  Police Officers with detainees will report to the Judicial Center via the secure garage entrance located at the lower level of the center.
1.  If transporting several detainees, the agency will notify the center in advance.
2.  Police Officers will identify who they are via the intercom system located at the drive-up.

B.  The secure garage area is designed to hold two vehicles at a time.
1.  Once the secure garage door is closed, the Police Officer will secure their firearms in a locker.
2.  Only two prisoners per transporting agency will be admitted to the booking/intake area at one time.
3.  A Judicial Center Officer will meet the committing agency at the door and begin the search process with the detainee.
4.  While a Judicial Center Officer is searching and securing the detainees, the committing agency will be completing the necessary paperwork for commitment.

C.  As soon as the paperwork is completed and it has been determined there are no medical concerns with the detainee, the committing agency may exit the center.

## IV.  Detainee Processing

A.  All detainees will be processed through the Dauphin County Judicial Center in as timely and efficient manner as possible.

Dauphin DFS 293

B.  The listed steps for processing will be utilized as needed for each detainee.
1.  Detainee Record of Supervision
2.  CPIN Photographs
3.  LiveScan Finger/Palm Prints
4.  Detainee Property Receipt

C.  None of the listed records shall be released to the public without authorization.

V.  **Juvenile Procedure**

A.  The following procedure must be followed when a police officer arrests a juvenile offender.  This procedure does not pertain to juveniles who are being direct filed into the Adult Criminal Justice System and who do not fall under the jurisdiction of the Pennsylvania Juvenile Act.  FOLLOW ADULT PROCEDURE FOR ALL DIRECT FILE CASES.
1.  When a police officer arrests a juvenile offender and secure detention is being requested, the police officer will contact the juvenile probation officer on duty and request detention.
2.  If the detention request is approved by the juvenile probation officer, the police officer will transport the juvenile to the Dauphin County Judicial Center.  The juvenile transportation company will pick the juvenile up at the Judicial Center and transport him to an appropriate juvenile detention facility.
3.  If fingerprinting capabilities are available to the officer at the arresting police station or at a nearby station, fingerprinting and processing of the juvenile should take place at that location before the juvenile is transported to the Judicial Center.
4.  If fingerprinting capabilities are <u>not</u> available to the officer at the arresting police station or at a nearby station, the officer will transport the juvenile to the Judicial Center and fingerprint him there.  The juvenile transportation company will transport the juvenile to a juvenile detention facility after the fingerprinting is completed.
5.  Anticipated fingerprinting and processing time must be communicated to the juvenile probation officer so the juvenile transportation company can be notified when the juvenile will be ready to be transported to a juvenile detention facility.
6.  When a police officer arrests a juvenile offender and placement in shelter at the Schaffner Youth Center is being requested, the police officer will transport the juvenile to the police station and contact the juvenile probation officer on duty and request shelter.
7.  If shelter is approved by the juvenile probation officer, the police officer will fingerprint and process the juvenile at either the arresting police station, a nearby police station, or at the Dauphin County Judicial Center.  After the fingerprinting and processing is completed, the police officer will transport the juvenile to the Schaffner Youth Center for admission to shelter.
8.  When a police officer arrests a juvenile offender and releases the offender to his parent/guardian, or other responsible adult, the police officer will need to fingerprint and process the juvenile at the arresting station, a nearby station, or at the Dauphin County Judicial Center.  After the fingerprinting and processing has

**Dauphin DFS 294**

occurred, the police officer must ensure that the juvenile is released before the police officer leaves the Judicial Center.

9. Prior to transporting a juvenile offender to the Judicial Center, the arresting officer must call the center and notify staff that they will be bringing a juvenile to the center.

## VI. Pregnant Females

A. The purpose of this order is to establish guidelines to provide adequate safeguards to monitor the pregnant detainee during processing and detention at the Dauphin County Judicial Center.

1. Judicial Center Officers shall not shackle female detainees who are known to be pregnant, or who self- report pregnancy during intake, processing, or detention.
2. Shackling is defined as placement of ankle restraints.
3. Female detainees who are pregnant should only be restrained by handcuffing in the front of their body.
4. Only standard handcuffs, checked for fit, and double locked should be applied. No transport belts or flex cuffs are permitted.

B. Extraordinary Occurrences

Section III shall not bar reasonable restraint provided the staff assigned to the detainee makes an individualized determination that the detainee presents a substantial risk of imminent flight, or some other extraordinary medical, or security circumstance dictates that the detainee be restrained to ensure the safety and security of the detainee.

1. Reporting

When an extraordinary occurrence takes place, the supervisor shall report the incident by telephone to the Director or his designee as soon as practicable. The officer shall complete a written report detailing the circumstances which led to the determination the detainee was at substantial risk for imminent flight, or other extraordinary medical or security circumstance. This report shall be completed prior to going off duty.

## PART 2 – EMERGENCY PLANS

I. Emergency Evacuations

A. In the event that it is determined that the Dauphin County Judicial Center requires evacuation, every effort should be made to proceed in an orderly manner. Examples of why the center would be evacuated include, but are not limited to, major fire, and/or man-made or natural disasters.

Dauphin DFS 295

B.   In case of a total or partial evacuation of the Dauphin County Judicial Center, the Director, Deputy Director, or the Manager shall be notified immediately.

C.   Judicial Center Officers are responsible for removing all detainees from holding cells in a timely manner.  Detainees should be secured to each other and evacuated to one of the parking lot areas.  Dauphin County Communications (EMA) and the Dauphin County Prison shall be notified immediately upon determining that evacuation is necessary.

D.   At least one officer should remain with the detainees at all times and any removal to other temporary holding facilities shall be coordinated.  Accountability of detainees shall be maintained at all times.

E.   In case of evacuation, Judicial Center Officers will ensure that all areas of the Judicial Center are evacuated.   All staff and visitors shall be directed to the nearest safe exit.

F.   The center shall not be reoccupied until it is deemed safe by the appropriate authority or it is directed by the Director or their designee.

G.   In the event of a partial or total evacuation of the center, an incident report will be completed by a Judicial Center Officer.

II.   Escape

A.   In the event of an escape from the Dauphin County Judicial Center, the officers will ensure the following:
1.   Check to see that all remaining detainees are secured.
2.   Dauphin County Communications (EMA) shall be notified immediately, a detailed description of the escapee shall be provided.
3.   The Dauphin County Prison shall be notified and provided with a description.
4.   The Director, Deputy Director, or Manager shall be notified immediately of an escape.  For all escapes an incident report is required by a Judicial Center Officer.
5.   The arresting agency (of the escaped detainee) shall be notified and the on-call Victim Witness Advocate shall also be notified.
6.   If the detainee is recaptured, all involved agencies/individuals shall be notified as soon as possible.
7.   A recaptured detainee shall be medically examined by PrimeCare personnel and any injuries shall be recorded on the incident report.

III.   Mass Arrest/Overcrowding

A.   In the case of a mass arrest program instituted by local law enforcement, the center should receive prior notice and steps will be put into place to handle the additional detainees.
1.   Coordination with the Courts for timely arraignment of detainees.

**Dauphin DFS 296**

    2. Additional DCJC staff may be utilized. This will be coordinated by the Director or their designee.
    3. Coordination with the Dauphin County Prison to expedite the transfer of applicable prisoners.
    4. The utilization of the Derry Township Police Department holding area.
    5. Release of detainees on summons as provided for in the Pennsylvania Rules of Criminal Procedure.

B. In the event that mass arrests occur without the prior knowledge of the DCJC or the holding areas become overcrowded, the Director or their designee will be notified and a combination of the above listed methods will be utilized.

C. The large holding cells in the booking intake area (116 and 135) will house no more than ten detainees. The small holding cells will house no more than four each; and the two designated juvenile holding cells will house no more than four each. At no time will inmates of a different gender be housed together. Adults will not be housed with juvenile detainees.

D. In the event of overcrowding, the cells on the second floor of the facility will be utilized. Holding cell 219 can house up to ten prisoners while holding cell 220 can hold four prisoners. All listed rules of observation will apply while detainees are held in these holding cells.

# PART 3 -- Court Operations

## I. Detainee Hearings

A. After detainees are processed in the booking area they shall be placed back in a holding cell until appearance in front of a Magisterial District Justice.

B. The Night Court staff will determine when a detainee is to be presented before an MDJ.
    1. If no MDJ is present the detainee will be arraigned via video feed and this can be accomplished in the court room or the designated location in the booking/intake area depending on the circumstances.
    2. During the hours Night Court is not in operation it is the Judicial Staff responsibilities to arrange for a video arraignment with the designated MDJ.

C. All detainees presented before an MDJ will be restrained with both handcuffs and leg irons at all times and will be escorted by a JCO.

D. Prisoners will be transported from the booking/intake area to the courtroom area by the secure elevator. At no time will a detainee be in an elevator without restraints (handcuffs and leg irons).

Dauphin DFS 297

E.   In the case of a disruptive or combative detainee the Night Court staff shall be notified and if the detainee is still requested to appear in front of the sitting MDJ, two officers will escort.

F.   After the hearing, provided the detainee is cooperating they will be given an opportunity to make a phone call to arrange bail, if applicable, upon return to the booking/intake area.

## II.   Courtroom Security

A.   Courtroom doors will be secured at all times.  The only exception to this is when an MDJ is physically sitting on the bench.

B.   Public access will only be allowed for an individual who has business with Night Court or while an MDJ is sitting on the bench.

C.   A Judicial Center Officer will be on the Central Court floor at all times while an MDJ is conducting business.
   1.   A check of the courtroom will be conducted before it is opened to the public.
   2.   A handheld metal detector will be used on all individuals who enter the courtroom.
   3.   A list of items not allowed in the courtroom is posted in the public lobby area and it shall be strictly adhered to at all times.

D.   In the event of a disturbance, the offending party shall be asked to leave the Judicial Center.  If they refuse, Swatara Township Police will be notified by a JCO.

E.   During hours that Night Court is operating and/or an MDJ is present, the two side doors leading to the lobby area will be secured.

Presented By: _____   Date: 31 January 2017
Director Stanley M. Pleskenko

Approved By: _____   Date: 31 January 2017
Commissioner Jeffrey T. Haste, Prison Board Chair

Dauphin DFS 298

 **ORDERS FOR POST # 3**
**INTAKE LOBBY**

DEFINITION

Maintain strict security and orderly transition between the North Vehicle Entrance gates and inner lobby gates.

MISSION

The mission of the intake officer is to handle all inmate commitments and/or releases.

TOUR OF DUTY

The tour of duty will be from 6:00 AM to 10:00 PM, seven (7) days a week or as otherwise directed by the Shift Commander.

ACTION

This post is a roving patrol located adjacent to the main Central Control in the rear of the prison.

A.    The officer assigned to this post will:

1.    Maintain custody, exercise control and supervise movement of inmates and official visitors within the inner lobby area.

2.    Verify the count for the holding cells and bullpen area prior to assuming the post and at established times during the shifts, as well as keep the population board current.

3.    During shift will check all doors, windows, bars and other physical facilities for potential security problems.

4.    Supervise all inmate movement in the inner lobby area.

5.    Spot check the classroom, church and attorney conference rooms when in use.

6.    Checks all inmates being discharged, going to court, hearings, or arraignments, etc. to ensure proper identification.

7.    Monitor visiting area.

8.    Report any and all discrepancies immediately to the Shift Commander or Assistant Shift Commander.

9.    Be knowledgeable of all emergency plans (i.e. riot, fire, hostage, etc.).

10.   Only leave their post when properly relieved, or to perform duties relevant to this post, or by special permission of the Shift Commander.

**Dauphin DFS 299**

### ORDERS FOR POST # 3
### INTAKE LOBBY

11.   Brief the oncoming officer upon arrival, of any special instructions, orders, or other information pertaining to this post.

12.   Process all inmates being committed to or being released from Dauphin County Prison, as covered in the  "North Vehicle Entrance" procedure.

13.   Supervise the movement of inmates from Spring Creek to Main Side or movement of inmate through the connecting corridor.

14.   Screen all new commitments for injuries and notify medical of any medical problems before acceptance of inmate.

15.   Ensure that those inmates housed in the booking cell receive their daily phone calls.

16.   Ensure that the area of assignment is in an excellent state of cleanliness.

17.   Remain awake and alert at all times and conduct yourself in a professional manner.

18.   Perform ALL related duties as assigned and/or required.

**Dauphin DFS 300**

## ORDERS FOR POST # 4
## BOOKING / RECEIVING OFFICER



### DEFINITION

The Booking/Receiving Officer is responsible for work of considerable difficulty. The process of booking in an inmate must be done efficiently and professionally; that his/her property is intact and secured; and that his/her basic rights are not violated. It is also essential to ensure that proper records are maintained and care and caution are used to preserve the health and wellbeing of the Officer and inmate.

### MISSION

The mission of the Booking/Receiving Officer is to process each new commitment and or release, including responsibility for the detection and removal of contraband and the securing of property of that inmate.

### TOUR OF DUTY

The tour of duty for Booking and Receiving is twenty-four (24) hours a day, seven (7) days a week.

### ACTION

The Officer assigned to this post will:

1. Determine if the new commitment meets the criteria to be strip searched in accordance with Policy 9.20, Searches of Newly Committed Inmates of DCP. In addition, should any injury be discovered during the search process, the Shift Commander shall be notified to photograph and document the injury. If it is determined that a new commitment is to be strip searched, the search shall be conducted in a professional, non-humiliating manner and, for security and privacy reasons, the search will be conducted in an area of the search room where the inmate is in view of only the Officer in charge of the search.

2. Photograph all new commitments during the initial book-in and fingerprint as needed. The following forms and tasks will also be completed at this time:

   a. Complete the Prisoner Property Inventory Form.

   b. Issue approved Property.

   c. Photograph the inmate and print two (2) ID badges: One for the inmate and the other for Central Control.

   d. Fingerprint the inmate if they are a new commitment or if it has been three (3) or more years since last commitment.

3. Remove, record and describe in detail all personal property, item by item, in the presence of the inmate.

**Dauphin DFS 301**

## ORDERS FOR POST # 4
## BOOKING / RECEIVING OFFICER

4. Check the inventory listing together with the inmate and sign the Prisoner Property Inventory Receipt form. The front copy (white) will be placed in the inmate's shakedown folder, the middle copy (yellow) will be given to the inmate and the back copy (pink) will be included with the property being placed in the Shakedown Storage area.

5. Ensure the stored personal property of an inmate is not released without first obtaining an approved request form. The person picking up the property must be the individual approved to receive the property, show ID, and sign for property received before anything can be given to them.

6. Deposit, in the locked box, any valuables that are to be placed in the Administrative safe (such as watches, rings, necklaces, earrings, etc.) Any envelope that is too large to fit in the assigned box will be given to the Shift Commander or Assistant Shift Commander, who will lock the envelope in the Secure Drop Box. In addition, any contraband (such as weapons, drugs, tobacco products, lighters, matches, undisclosed body piercings, etc.) shall be given to the Shift Commander to be documented and placed in the Secure Drop Box.

7. Maintain an adequate inventory of clothing, bedding, and hygiene kits to be issued to inmates. The Officer will ensure that each newly committed inmate receives the following:

> a. Blanket, one (1).
>
> b. Sheets, two (2); towel and wash cloth, one (1) each.
>
> c. Uniform, one (1) set.
>
> e. Inmate Handbook, one (1).
>
> f. Personal Hygiene Kit, one (1)

8. Ensure that all inmates sign a receipt for all items received.

9. Ensure that each newly committed inmate takes a shower, if necessary or required for hygiene purposes, and uses the provided soap.

10. Ask the inmate if there is anything in their personal belongings that they will need (such as phone numbers, legal paperwork, etc.). If what they need is permitted, the inmate may retain possession of the item. All other items shall be placed in the Booking safe. All inmates are to be told that once items are placed in Booking storage, those items will remain there until the inmate is released or Administrative permission is granted for removal.

11. Place one set of clothing, as complete as possible (shirt, pants, jacket, belt, shoes and socks ONLY), of a new commitment's personal clothing in a garment bag and place it in storage. It is to be clearly marked with the inmate's name, DCP number and date. ALL other items are to be placed in a box and marked with the inmate's name, DCP number, and sealed with tape with the Officer's name and date written across the tape. This way, if the tape is removed, it will be easily recognized. The box is to remain sealed until the release or transfer of that inmate. <u>NOTHING</u> will be removed from this box. The entire contents of the box can be sent out provided the inmate follows the prescribed request procedure.

**Dauphin DFS 302**

## ORDERS FOR POST # 4
### BOOKING / RECEIVING OFFICER

12. Clearly identify items on the inmate inventory sheet. For example: Color and style of clothing, color of jewelry – "white" and "yellow" color NOT "silver" or "gold" color. Stones in rings are "stones," NOT "rubies" or "diamonds." Watches shall be logged using type of watch and any serial number that may be on the watch.

13. Ensure that, if Court clothing or a new set of clothing is brought to the prison, those items are only exchanged upon approval. Proper documentation on the Inmate Request Form shall be completed as well as on the inmate's initial Inmate Property Inventory Form where items removed from the facility must be logged. In addition, all items received shall be inventoried on a new property sheet. The two sheets are to be stapled together and placed in the inmate's shakedown file. The person bringing in the clothes to the prison must be identified as the person on the request slip. They will also have to sign for the property that is being removed from the prison. NO inmate will be allowed to take to the housing area any personal or non-prison issued clothing except for approved underwear, socks or shoes.

> NOTE: Inmates must have one (1) set of street clothes at the prison at all times. Clothing will be exchanged one for one (if a new set is brought in, an old set must be sent out).

14. Facilitate dressing of inmates when needed to attend Court or for any other reason.

15. Ensure that only authorized inmates are in the booking room and that only authorized persons handle inmate property. This area must be locked when not in use.

16. Possess knowledge and be able to discharge all responsibilities of emergency plans (i.e. fire, riot, hostage, etc.), including all duties specific to this post. In addition, each Officer shall know what is considered contraband and what items are permitted within the facility and enforce same.

17. Remain at this post unless properly relieved or by receiving permission from the Shift Commander.

18. Brief the oncoming Officer, upon arrival, of any special instructions, orders, or other information pertaining to this post.

19. Ensure that the area of assignment is in an excellent state of cleanliness.

20. Remain awake and alert at all times and conduct him/herself in a professional manner.

21. Adhere to and enforce all Policies, Procedures, Directives, Orders (both written and verbal) and inmate Rules & Regulations. Each Officer shall also report to the Shift Commander and document, in detail, any violation or incident that occurs.

22. Perform ALL related duties as assigned and/or required.

**Dauphin DFS 303**



 **DAUPHIN COUNTY PRISON**

**Local Policy Chapter 12.16**

| Subject: | **Medical and Health Services** |
|---|---|
| Reference: | **Title 37 Chapter 95 Section 95.232** |
| ACA: | **4-ALDF-4C-01; 4-4353; 4-4360; 4-4424** |

**POLICY:**

It shall be the policy of Dauphin County Prison to have its Medical Department, which shall be contracted with a qualified health care professional, provide all aspects of medical, dental and mental health services to the inmate population. The facility shall also have a suicide prevention plan that will be developed in conjunction with medical professionals.

**PENOLOGICAL INTEREST:**

It is in the penological interest of Dauphin County Prison to maintain a high degree of efficiency while providing professional health care to the inmate population.

**PROCEDURE:**

It shall be the practice of Dauphin County Prison to adhere to the policies of its Medical provider. However, in the case of forced medication, the policy of the facility is for the Medical provider to obtain an Order from the Dauphin County Court of Common Pleas before unilateral implementation of its policy. Contact shall be made to obtain either a verbal or written Order from the Court prior to forced medication of an inmate. In an extreme life-threatening emergency, when it is impractical to obtain either a verbal or written Order from the Court, forced medication may be employed upon the approval and agreement of either the treating licensed physician or treating licensed psychiatrist.

Any inmate in need of medical attention is instructed to follow the guidelines set forth by Dauphin County Prison as outlined in the Inmate Handbook.

It shall be required that the Medical provider submit an annual report to the Prison Administration to be included in the facility's Year End Report available for public review. Further, the Medical provider shall submit copies of their Annual Policy Reviews to the Prison Administration.

In addition, all employees, and all vendors working at the facility, shall be trained annually on the suicide prevention plan.

_____
Warden Dominick L. DeRose

**_RESTRICTED CORRECTIONAL DATA_**
_This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency. Data subject to this restriction is contained throughout this publication._

Revised September 30, 2015

**Dauphin DFS 304**

| | |
|---|---|
| **TITLE:** | Medical Program / Hospital Administration |
| **POLICY:** | 12.1  page 1 of 2 |
| **CHAPTER:** | Medical and Health Care Service |

**REFERENCE:**

     **ACA:**    3-4326, 3-4327M, 3-4328, 3-4329, 3-4334M,
                 3-4335M, 3-4338, 3-4339, 3-4340, 3-4364,
                 3-ALDF-4E-09M, 13, 14, 16, 24M, & 34

**PURDONS STATUE 61: 05.232**



**POLICY:**    The medical program shall be managed and directed by a fully licensed contracted Service Corporation (hereafter referred to as "the Provider") authorized to practice in the jurisdiction. The Provider shall be responsible for clinical supervision of all physicians and allied health personnel within the Prison and have sole responsibility for all final medical judgment relating to patient care in the Prison.

    A.    All matters of medical judgement are the sole province of the Provider working for, or under contract, with the Prison;

    B.    All security regulations which apply to Prison personnel shall also apply to medical staff;

    C.    The Provider shall be responsible for planning and developing adequate staffing programs for the health care program and report monthly to the Board of Prison Inspectors.

**PROCEDURE:**

    A.    The health administrator designated by the Provider shall be responsible for the overall operation of the medical services program. The Program Administrator's duties shall include, but not be limited to:

        1.    Adequate staffing of the Medical Unit;

        2.    Overseeing of the general and special functions of the Medical Unit on a day to day basis;

        3.    Acting as liaison between the Board, Administration and Security with the Medical Unit;

        4.    Submission of a monthly report to the Warden by the fifth (5th) day of each month for presentation to the Board;

**Dauphin DFS 305**

| | |
|---|---|
| TITLE: | Medical Program / Hospital Administration |
| POLICY: | 12.1  page 2 of 2 |
| CHAPTER: | Medical and Health Care Service |

    5.   Carry out the day to day business procedures as described by the Provider in the job description.

    6.   Be responsible for meeting standards as set forth in the Dauphin County/Provider contract.

B.   The Medical Director/Doctors shall be responsible for making and reviewing all medical decisions, and shall include, but not be limited to the following as indicated in the job description set forth by the Provider:

    1.   Review of all laboratory, X-ray and requested medical information;

    2.   Approval and/or development of the Medical Unit Drug Formulary;

    3.   Give direction to the Medical personnel in emergency situations;

    4.   Development of standard procedures;

    5.   Work with the Program Administrator to facilitate smooth continuity of care and to insure delivery of all appropriate medical program services.

C.   Final medical judgement rests with the Medical Director at all times and neither the Provider nor Prison personnel shall place any restrictions on the physician's practice of medicine.

D.   All security regulations which apply to Prison personnel shall apply also to medical staff.

APPROVED  *Anthony Petrucci*        1-19-95
     Anthony Petrucci - Prison Board Chairman   Date

APPROVED                       1-19-95
     Dominick L. DeRose - Warden       Date

**Dauphin DFS 306**

# DAUPHIN COUNTY PRISON



**Policy Name:**   **Commitments and Releases for Dauphin County Prison**

**Purpose:**   It is the intent of this administration to provide the staff of Dauphin County Prison with the direction and guidance for procedures by which ALL individuals committed to and/or released from the Dauphin County Prison are to be processed.

**Scope:**   The North Vehicle Prisoner Entrance (NVPE) is to be utilized for ALL commitments and releases.   This area should provide law enforcement personnel and Dauphin County Prison staff with a safer and more efficient area in which to commit and release prisoners.   This procedure is to be utilized during the following situations.

A.   All commitments

B.   All releases (escorted AND unescorted)

C.   All escorted prisoner transports (i.e., MDJ. hearings, court, hospital, investigations, etc.)

D.   Returns from court, hearings, investigations etc.

E.   Transfers to the Work Release Centers

F.   Releases (escorted & unescorted) from the Work Release Centers

NOTE:   When it is necessary for law enforcement officials to interview an inmate to verify information with prison personnel or to meet with a staff member, the Main Lobby entrance is to be used.

**Procedure:**

A.   Commitments - Business Hours:

1.   The committing officer will fill out a Dauphin County Prison-99 form and hand the completed form to the Records Office, along with the charge sheet/s.

2.   The Records Officer assigned to the pass-through window is to check all commitment paperwork to insure that it is complete.   At that time, all paperwork received is to be time and date stamped and initialed by the receiving Records Officer.   The Records Officer will then fill out a booking slip with all information that is available.   The booking slip is to be then given to the committing officer.   The Records Officer will notify Central Control via the telephone that the paper work is correct and to let the officer in the Prison.

1

**Dauphin DFS 307**



3. The committing officer/s will place the inmate/prisoner between the first set of doors. The inmate MUST be in restraints before being placed between the doors.

4. Once the prisoner/inmate is placed between the doors, the committing officer/s will secure their weapons, and then enter the Prison.

5. The committing officer will take the prisoner/inmate and booking slip, and turn both over to the lobby officer. The lobby officer will then pat search and check the inmate for any medical problems.

    a. Should the inmate/prisoner have a medical concern, the inmate/prisoner MUST be checked by medical before the committing officer will be permitted to exit the prison.

        1. Should the inmate/prisoner NOT be cleared, the committing officer is to remove the inmate from the Prison. The commitment paperwork will be returned to the committing officer after the time and date stamp is voided. The lobby officer and medical staff are to submit a memo to the Shift Commander regarding the commitment being turned away.

    b. Should the inmate have no apparent medical concern, the committing officer will be permitted to exit the prison, AFTER the inmate has been searched.

6. After searching the new commitment, the lobby officer will place the new commitment in Bullpen # 2.

7. The lobby officer will then log the needed information on the "Lobby Log".

8. The lobby officer will then hand the booking slip to Central Control.

9. The Central Control officer will then enter the needed information in the Central Control logbook.

10. Central Control will notify the booking officer that they have a booking slip for a new commitment.

11. The booking officer will then, as expediently as possible, pick up the booking slip and inmate, and process the inmate into the Dauphin County Prison.

B.   <u>Commitments - After Business Hours:</u>

    1. The committing officer/s will place the inmate/prisoner between the first set of doors. The inmate MUST be in restraints before being placed between the doors.

2

**Dauphin DFS 308**

2.   Once the prisoner/inmate is placed between the doors, the committing officer/s will secure their weapons, and then enter the prison.

3.   The committing officer will fill out a Dauphin County Prison-99 form, and hand the completed form to the booking/receiving officer along with the charge sheet/s.

4.   The booking/receiving officer MUST contact the Shift Commander to have them check all commitment paperwork to insure that it is complete. The Shift Commander is then to time and date stamp, and initial, all paperwork received. The Shift Commander will retain all paperwork, until such time, as Records Office personal is on duty. Once the paperwork has been determined to be complete, the booking/receiving officer will fill out a booking slip with all information that is available. The booking/receiving officer will pat search and check the inmate for any medical problems.

    a.   Should the inmate/prisoner have a medical concern, the inmate/prisoner MUST be checked by medical before the committing officer will be permitted to exit the prison.

        1.   Should the inmate/prisoner NOT be cleared, the committing officer is to remove the inmate from the Prison. The commitment paperwork will be returned to the committing officer after the time and date stamp is voided. The lobby officer and medical staff are to submit a memo to the Shift Commander regarding the commitment being turned away.

    b.   Should the inmate have no apparent medical concern, the committing officer will be permitted to exit the prison, AFTER the inmate has been searched.

5.   After searching the new commitment, the booking/receiving officer will place the new commitment in Bullpen # 2.

6.   The booking/receiving officer will then enter the needed information on the "Lobby Log".

7.   The booking/receiving officer will then hand the booking slip to Central Control.

8.   The Central Control officer will enter the needed information in the Central Control logbook.

9.   The booking officer will then, as expediently as possible, pick up the booking slip and inmate, and process the inmate into the Dauphin County Prison.

**Dauphin DFS 309**

C.     Releases – Escorted (including hearings, court, other counties, etc.):

1.     The transporting officer will hand the appropriate paperwork for a release to the Records Office.

2.     The records officer assigned to the pass-through window is to check all release paperwork to insure that it is complete.  At that time, all paperwork received is to be time and date stamped and initialed by the receiving records officer.  The records officer will then fill out a release slip.  The release slip is then to be given to the transporting officer.

3.     The transporting officer/s will secure their weapons, and then enter the prison.

4.     The transporting officer will take the release slip, and hand it over to the lobby officer.

5.     The lobby officer will enter the needed information on the "Lobby Log".

6.     The lobby officer will then hand the release slip to Central Control.

7.     Central Control will enter the appropriate information in the Central Control logbook.

8.     Central Control will then give the release slip to the appropriate staff member to facilitate the release (i.e. obtain the appropriate signatures that the inmate's ID was checked).

9.     The inmate will then be processed out of the Dauphin County Prison by the booking/receiving officer and turned over to the transporting officer.

   a.     The booking/receiving officer will notify the Business Office (during normal business hours), that an inmate is being released, giving the inmate's name and DCP number so that any monies and/or property can be issued before the inmate is released

   b.     The Business Office will check for monies and/or property.  Should the inmate have no funds and/or property, the Business Office will call the lobby officer and notify the officer of such.  Should the inmate have funds and/or property, the Business Office will take these items to the lobby to be issued to the escorting officer.

D.     Releases - Unescorted:

1.     When the release is brought into the main lobby, the reception desk officer will contact Central Control, informing them that paperwork for a release has been brought in and needs to be picked up.

4

**Dauphin DFS 310**

2.  Central Control will then dispatch an officer to the reception desk for the release. The officer will take the release paperwork to the Records Office.

3.  The Records Office will fill out an UNESCORTED release form, and give to the lobby officer.

4.  The lobby officer will enter the needed information on the "Lobby Log".

5.  The lobby officer will then hand the release slip to Central Control.

6.  Central Control will enter the appropriate information in the Central Control logbook.

7.  Central Control will then give the release slip to the appropriate staff member to facilitate the release (i.e. obtain the appropriate signatures that the inmate's ID was checked).

8.  The inmate will then be processed out of the Dauphin County Prison.

9.  Upon completion of the release process, the lobby officer will escort the individual out of the prison via the NVPE notifying Central Control by two-way radio to open the NVPE gate, and then have it closed once the prisoner is through the gate.

10. The lobby officer will inform the inmate to report to the main lobby to receive their money and/or property, if applicable.

E.  <u>Returns from Court, Hearings, Investigations etc.:</u>

1.  The committing officer will fill out a Dauphin County Prison-99 form and hand the filled out form to the Records Office, along with the charge sheet/s.

2.  The records officer assigned to the pass-through window is to check and time and date stamp all re-commitment paperwork to insure that it is complete.

3.  The committing officer/s will place the inmate/prisoner between the first set of doors. The inmate MUST be in restraints before being placed between the doors.

4.  Once the prisoner/inmate is placed between the doors, the committing officer/s will secure their weapons, and then enter the prison.

5.  The committing officer will take the prisoner/inmate, and turn the prisoner/inmate over to the lobby officer. The lobby officer will check the inmate (i.e. pat search).

6.  The inmate is to be taken to the booking room and stripped searched before returning to their housing area.

5

**Dauphin DFS 311**

7. The lobby officer will then return the inmate's ID, and log the inmate in as returning, on the "Lobby Log".

8. The lobby officer will then send the inmate to Central Control.

9. Central Control will verify the inmates ID, make the appropriate entry in the Central Control logbook and then have the inmate return to their housing area.

F. <u>Transfers to the Work Release Centers</u>

1. A memo will be issued by a member of the administration or their designee stating which inmates are to be transferred to work release as well as the date they are to be transferred.

2. The memo will be distributed to Records Office, Captains Office, Central Control, Lobby and the Business Office.

3. Only those inmates listed will be transferred to work release.

4. The lobby officer will log behind each name the time the inmates are to be transferred to work release.

5. The lobby officer will hand the memo with the times listed to the Shift Commander.

6. The Shift Commander will hand this memo in with the operational paper work.

G. <u>Releases (escorted & unescorted) from the Work Release Centers.</u>

1. The Records Office will fax to the appropriate work release center either an escorted or an unescorted release slip.

2. The Records Office, once the signed release slip is returned from work release, will then send the slip to Central Control.

3. Central Control will remove the inmates' tag from the population board and adjust the population accordingly.

4. The release slip will be forwarded to the administration with the operational paper work.

**<u>Miscellaneous:</u>**

A. The Records Office is off limits to ALL individuals other than those staff members assigned to work in the Records Office. The only exception will be the Warden,

**Dauphin DFS 312**

Deputy Wardens, Major and those staff members that have received permission from the Warden or his designee. At NO time will a non-prison employee be in the Records Office for ANY reason. The door into the Records Office will be closed and locked at all times.

B.    The Shift Commander will maintain the "COMMITMENT-AFTER BUSINESS HOURS" log and hand the log into the Records Office the next morning at 0600 hours.

**Dauphin DFS 313**

| | |
|---|---|
| TITLE: | Requested Medical Clearance of Inmates |
| POLICY: | 12.3  page 1 of 2 |
| CHAPTER: | Medical and Health Care Services |
| REFERENCE: | |
| ACA: | |
| PURDONS STATUE 61: 95.222 | |



**POLICY:**     Any person brought into the Prison for booking and felt to be in need of medical attention shall be examined by a nurse from the Medical Unit.  If the nurse determines that the prisoner is in need of emergency medical / detoxification clearance it shall be necessary for the arresting officer/s to obtain such clearance from an outside Medical Doctor before the Prison and the Provider accept responsibility of the prisoner.

**PROCEDURE:**

A.   Any inmate brought into the Prison in the apparent listed conditions shall be examined by the Medical Unit before acceptance:

1.   Extreme drug/alcohol intoxications;
2.   Visible untreated injuries/bleeding;
3.   Any claims of pain or serious medical problems;
4.   Any claims of "police brutality";
5.   Any appearance of a dazed or confused condition;
6.   Any head injury;
7.   Unconscious or semi-conscious or any inmate who appears to "pass out" or have seizure activity.
8.   Acute Mental health crisis.

B.   Examination by Medical personnel shall determine if the inmate should receive medical clearance.  Clearance is provided by:

1.   A Community Treatment facility for illness, injury, drug/alcohol related problems and/or Mental Health Problems.

C.   It shall be the responsibility of the arresting officer/s to obtain medical clearance of the inmate.

D.   An inmate shall not be detained in the Prison while the officer goes for medical clearance.

E.   The Medical Unit shall be notified immediately if the arresting officer/s present medical clearance for the prisoner.

**Dauphin DFS 314**

| TITLE: | Requested Medical Clearance of Inmates |
|---|---|
| POLICY: | 12.3   page 2 of 2 |
| CHAPTER: | Medical and Health Care Service |

F.   The medical Unit shall be contacted if there is concern about any other condition other than those listed above.

APPROVED _____   1-19-95
Anthony Petrucci - Prison Board Chairman   Date

APPROVED _____   1-19-95
Dominick L. DeRose - Warden   Date

Dauphin DFS 315

| | |
|---|---|
| TITLE: | Physical Examinations |
| POLICY: | 12.4 page 1 of 2 |
| CHAPTER: | Medical and Health Care Service |
| REFERENCE: | |
| ACA: | 3-4330, 3-4343M, 3-4344M, 3-4345, 3-4346, 3-4348<br>3-ALDF-43-19M & 21M |
| PURDONS STATUE 61: 95.222 & 95.232 | |



POLICY: Each inmate shall be provided with medical care from the time of admission, throughout the period of incarceration, until release. This continuous care requires timely physical examinations which shall include medical screening of clinical history for each admission, complete physical examination of each inmate (except intra-system transfers) within 72 hours following all inmates received in transfer from other prison facilities.

PROCEDURE:

Physical Examinations (Health Appraisal)

1. Inmate shall be brought to the Unit by a Correctional Officer assigned by security when called by Medical personnel.

2. All Medical histories and physicals shall be completed by qualified Medical personnel and recorded on Admission Data and Medical History and Physical Assessment forms (attached).

3. The History and Physical shall include at a minimum:

   a. Review of Receiving Screening;

   b. Collection of additional data to complete the medical, dental and psychiatric histories;

   c. Communicable disease testing, as appropriate, for venereal disease and tuberculosis;

   d. Recording of height, weight and vital signs;

   e. Physical examination of all systems;

   f. Completion of other clinically indicated tests and examinations;

| TITLE: | Physical Examinations |
|---|---|
| POLICY: | 12.4   page 2 of 2 |
| CHAPTER: | Medical and Health Care Service |

      g.   Review of all laboratory tests requested by the physician and referral to the physician when clinically indicated;

      h.   Initiation of appropriate treatment when indicated or ordered by the physician.

4.   All inmates shall receive annual physical examinations, appropriate for their age group.

5.   Identified chronic health problems (diabetes, epilepsy, etc.) shall have a specialized treatment initiated by the physician, in concert with the inmate's private physician.

6.   Information on current or chronic health treatments shall be requested from attending physicians or hospital facilities, and become part of inmates medical file.

7.   Medical charts of inmates previously incarcerated at this Prison shall be merged with new chart.

8.   Any inmate incarcerated 90 days or less prior to present incarceration need not have a complete physical examination done.

      a.   Inmate shall be interviewed for any change in physical history;

      b.   Physical examination shall be done as indicated by clinical findings.

9.   A blood test shall be taken from all inmates, regardless of prior dates of incarceration, for performance of VDRL (Venereal Disease Screening). The sample shall be obtained and handled in accordance with applicable state statutes.

APPROVED _____    1-19-95
        Anthony Petrucci - Prison Board Chairman    Date

APPROVED _____    1-19-95
        Dominick L. DeRose - Warden    Date

**Dauphin DFS 317**

| | |
|---|---|
| TITLE: | Mental Health Care Program |
| POLICY: | 12.5  page 1 of 3 |
| CHAPTER: | Medical and Health Care Service |

REFERENCE:

    ACA:    3-4336, 3-4337, 3-4367, 3-4368, 3-4369
             3-ALDF-4E-37 & 38

PURDONS STATUE 61: 95.232



POLICY: All inmates shall be provided, through the Treatment Services Section, access to a mental health program, increasing their probability of functioning within normal limits of socially acceptable behavior. The mental health program shall be designed to examine, diagnose and provide access to treatment for all inmate clients who have significant mental illness. At a minimum, the mental health program shall include:

A. **Screening Services** - Screening shall be provided by qualified mental health professionals who shall be fully licensed in their prospective disciplines;

B. **Mental Health Transfers** - Any inmate whose condition is beyond the range of services available in this Prison may be transferred to a non-correctional facility or a specially designed correctional unit located in the mental hospital;

C. **Program Changes** - Except for emergencies, all program changes regarding inmates identified as mentally ill or retarded shall be made by the Treatment Services Section in consultation with the Provider.

PROCEDURE:

A. **Screening Services**

    1. Receiving Screening completed on all inmates at the time of commitment shall identify:

        a. Prior mental health and substance abuse problems;

        b. Prior treatment received;

        c. Prescribed medications;

        d. Suicidal tendencies;

        e. Violent or disruptive behavior.

| TITLE: | Mental Health Care Program |
|---|---|
| POLICY: | 12.5  page 3 of 3 |
| CHAPTER: | Medical and Health Care Service |

C.  **Housing**

    1.  All inmates suspected of having Mental Health problems shall be housed in an area as determined by Classification.

    2.  Housing changes shall be at the discretion of Classification with input from the Medical unit.

D.  **Program Changes**

    1.  Except in emergencies, all program changes shall be made only by the Medical staff and Treatment.

    2.  Emergency release of an inmate to a mental health facility shall include:

        a.  Filing and signing of a temporary release by the designated responsible party;

        b.  Retention of such release in the inmates legal file located in the records office;

        c.  Notification of the committing authority.

APPROVED _____     1-19-95

      Anthony Petrucci - Prison Board Chairman     Date

APPROVED _____     1-19-95

      Dominick L. DeRose - Warden     Date

**Dauphin DFS 320**

| | |
|---|---|
| TITLE: | Mental Health Care Program |
| POLICY: | 12.5  page 2 of 3 |
| CHAPTER: | Medical and Health Care Service |

2.  The Provider shall be responsible for the provision of a qualified forensic team including;

    a.  Part-time Board Certified psychiatrist;

    b.  Part-time psychologist;

    c.  Nursing personnel trained in mental health assessment.

3.  Services provided shall include but not limited to:

    a.  Evaluation by the psychiatrist;

    b.  Ordering of medication;

    c.  Individual counseling;

    d.  Group counseling;

    e.  Referral to local mental health facilities;

    f.  Contacting of previous providers to confirm treatment programs for continuity of services and treatment.

    g.  Utilization of existing community services for special problems (ie. Mental retardation, etc.)

4.  Therapists shall be available approximately 40 hrs/wk, to provide the above listed services.

B.  **Mental Health Transfers**

1.  Inmates diagnosed as being severely disturbed and/or mentally retarded (ie. a danger to himself or others, or incapable of attending to basic physiological needs) shall be referred to an appropriate non-correctional facility.

    a.  Transfer of inmates shall follow the procedures outlined by Sections 302 and/or 304 of the Mental Health Act.

    b.  Until transfer can be secured such inmates shall be housed in an area s determined by Classification.

 **DAUPHIN COUNTY PRISON**

**Local Policy Chapter 9.22**

| Subject: | Security |
|---|---|
| Reference: | Title 37 Chapter 95 Section 95.241(2.1) |

## POLICY:

It shall be the policy of Dauphin County Prison to have in place various procedures and policies regarding the Use of Force and the documentation of any incident.

## PENOLOGICAL INTEREST:

It is in the penological interest of Dauphin County Prison to have in place various procedures to ensure the lawful Use of Force when dealing with individuals exhibiting aberrant behavior.

## PROCEDURE:

All staff shall be trained annually in the Use of Force (Policy 9.17 Use of Force). Special Teams shall be trained not only annually but during any additional training that they attend.

The facility trainers shall be responsible for the proper securing and inventorying of all weapons and less-lethal devices. A monthly inventory will be completed by the facility trainers. When security equipment is issued, it shall be logged by those responsible for the supervision of equipment issue, and logged back in upon return.

Any "hands on" or Use of Force against any inmate shall be reported immediately to the on-duty Shift Commander who shall ensure the inmate is seen immediately by a medical professional and have the incident documented.

There shall be no lethal weapons permitted within the secure perimeter of the facility except in the case of an emergency. Appropriate weapons lockers shall be located in the North Vehicle Entry for those agencies transporting inmates and in the facility's Main Lobby for those visiting staff or inmates.

All Use of Force incidents shall be documented and forwarded to the Administration for review and reporting to the District Attorney's Office as well as the Pennsylvania Department of Corrections.

Warden Brian S. Clark

**EXHIBIT**
DCP-2
4-19-22 NO

***RESTRICTED CORRECTIONAL DATA***
*This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency. Data subject to this restriction is contained throughout this publication.*

September 19, 2017

DAUPHIN DFS 227



**DAUPHIN COUNTY PRISON**

**POLICY 9.17**

Page 1 of 5

| | |
|---|---|
| **TITLE:** | Use of Force |
| **CHAPTER 9:** | Security and Control |
| **REFERENCE:** | PPCT Defensive Tactics Instructor Manual |

<u>POLICY:</u>

To ensure that staff use the appropriate level of force in the performance of their duties, employees will be provided with proper training and guidance on the permissible use of force. Force, including the use of restraints, shall only be used when necessary and only to the degree required to control an individual, facilitate Court-ordered medical treatment, restore order to a disruptive group of individuals, enforce the rules and regulations of the facility, in self-defense and the defense of others, prevent damage to property, prevent an escape, or recapture an escapee. Only the minimum amount of force necessary to resolve a situation shall be employed. The use of force and restraints shall never be used as a means of punishment or revenge.

<u>PENOLOGICAL INTEREST:</u>

It is in the penological interest of Dauphin County Prison to maintain a high degree of efficiency, security and management control in this facility and provide reasonable force options when an inmate exhibits resistance, attempts an escape, is non-compliant to lawful instructions, or threatens or uses force.

<u>PROCEDURE:</u>

1. Trained Security staff shall be authorized and shall use appropriate force as defined in this policy and only as much as is reasonable and necessary under the circumstances.

2. Force and restraint equipment are intended to be used only as control measures when absolutely necessary; they are not intended, and shall never be used, as a means of punishment.

3. The facility follows the concept of responding to resistance with proportional, reasonable use of force. This approach advocates that an officer can use one level of force higher than the level of resistance used by the subject. The only time an officer can reasonably escalate to the next level of force is when the officer finds lower levels of force ineffective, or the officer reasonably believes that a lower form of force will be ineffective. Officers do not need to escalate response controls in a step-by-step progression. As a subject de-escalates their actions, the officer must reduce the amount of force used proportionally.

4. The following steps shall be utilized to gain or maintain control of a subject, unless the acting staff member reasonably believes that the situation requires immediate escalation to a greater degree of force within the use of force continuum or finds lower levels of force ineffective.

*RESTRICTED CORRECTIONAL DATA*

*This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency. Data subject to this restriction is contained throughout this publication.*

DAUPHIN DFS 228



**POLICY 9.17**

**DAUPHIN COUNTY PRISON**

Page **2** of **5**

| TITLE: | Use of Force |
|---|---|
| **CHAPTER 9:** | Security and Control |
| **REFERENCE:** | PPCT Defensive Tactics Instructor Manual |

    a.  Officer Presence.
    b.  Verbal Direction.
    c.  Soft Empty Hand Techniques.
    d.  Hard Empty Hand Techniques.
    e.  Intermediate Weapons.
    f.  Deadly Force.

5.  The following are the escalating levels of resistance by a subject.

    a.  Psychological Intimidation.
    b.  Verbal Noncompliance.
    c.  Passive Resistance.
    d.  Defensive Resistance.
    e.  Active Aggression.
    f.  Deadly Force Assault.

6.  After physical force or oleoresin capsicum products have been used against a subject, the subject must be examined by medical personnel as soon as possible. Immediate medical attention will be provided to the subject if the subject received any injuries.

7.  The Shift Commander or Acting Shift Commander shall be notified immediately when physical force is used. The officer/s who used physical force shall submit a written report to the Shift Commander no later than the conclusion of the officer's shift and shall include:

    a.  Date, time and location of the incident.
    b.  An accounting of events leading to the use of force.
    c.  An accurate and precise description of the incident along with the amount of force used and the justification for using that amount of force.
    d.  A description of any weapon/s involved and the manner of its use.
    e.  Any medical attention received.
    f.  A list of all participants and witnesses to the incident.

DEFINITIONS: Officers' Levels of Control.

1.  *Officer Presence* – Identification of the officer's authority either by identification of the uniform or verbal indication. The officer's mere presence dictates the authority of the facility's rules and regulations and should initiate compliance.

*RESTRICTED CORRECTIONAL DATA*
*This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency.*
*Data subject to this restriction is contained throughout this publication.*

DAUPHIN DFS 229



**POLICY 9.17**

**DAUPHIN COUNTY PRISON**

Page 3 of 5

| TITLE: | Use of Force |
|---|---|
| **CHAPTER 9:** | Security and Control |
| **REFERENCE:** | PPCT Defensive Tactics Instructor Manual |

2. *Verbal Direction* – A clear, understandable, reasonable, and lawful command of direction or compliance.

3. *Soft Empty Hand Techniques* – Techniques which may cause pain but virtually no potential for injury. They include, but are not limited to, oleoresin capsicum products, strength techniques, joint locks, pressure points or a knee strike to the subject's common peroneal. These techniques are designed to control Passive or Defensive Resistance and are used when verbal directions are not effective and there is non-compliance with lawful orders.

    a. *Oleoresin Capsicum Products* – A nonlethal aerosol spray, foam, or gel made with the pepper derivative oleoresin capsicum designed to spray directly into a subject's face; used to inflame the skin and mucous membranes.

4. *Hard Empty Hand Techniques* – Techniques that have the potential for injury in the form of bruises, contusions or lacerations. They include, but are not limited to, defensive counter strikes (straight punch, palm heel strike, front thrust and angle kick, brachial stun, etc.) and the Shoulder Pin Restraint. These techniques are designed to control Active Aggression but can also be used to control Defensive Resistance.

5. *Intermediate Weapons* – The amount of force when utilized has the high propensity for extreme pain and possibility of injury. The application/use of any weapon or object that is not part of the human body to control resistance or an assault. Examples include any form of chemical agent (i.e., PepperBalls), impact weapons or emergency/improvised impact weapons (e.g., keys, radio, broom/mop handle, flashlight, handcuffs, or any object that could be used as a weapon in defense of oneself or another). The use of an intermediate weapon is justified when lower forms of empty hand control have failed or when the officer believes that empty hand control will be insufficient and the use of deadly force is not justified. Intermediate Weapons are used only with the intent to temporarily disable a subject and never with the intent to cause permanent injury.

6. *Deadly Force* – Any force used by an officer that may result in serious bodily injury or the loss of human life. In this definition, "may" means "likely to," and not just a mere possibility.

    a. This ultimate step is appropriate only to protect oneself or another from death or serious bodily injury, or as a last resort in preventing an escape. Use of force to protect oneself or another from death or serious bodily injury may also include emergency/improvised impact weapons in circumstances of necessity. Such emergency/improvised weapons include, but are not limited to, keys, radio, broom/mop handle, flashlight, handcuffs, or any object that could be used as a

*RESTRICTED CORRECTIONAL DATA*
*This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency.*
*Data subject to this restriction is contained throughout this publication.*

DAUPHIN DFS 230



**POLICY 9.17**

**DAUPHIN COUNTY PRISON**

Page 4 of 5

| TITLE: | Use of Force |
|---|---|
| **CHAPTER 9:** | Security and Control |
| **REFERENCE:** | PPCT Defensive Tactics Instructor Manual |

weapon in defense of oneself or another. Firearms shall be considered the final deployment of force to be used when all other means or levels of force have failed.

b. Firearms shall be used only in situations where there is a danger of death or serious bodily injury. Firearms shall not be discharged if other measures will suffice. In other words, deadly force should only be used as a last resort. If there are reasonable alternatives that can be employed short of using deadly force, these alternatives must be exhausted before deadly force can be used. In addition, the fact that an officer is legally justified in using deadly force in certain extreme circumstances does not permit the officer to engage in reckless conduct that endangers innocent persons. Displaying and discharge of firearms should be held to the minimum needed to fulfill the responsibilities of the facility and to protect the safety of the officers. Time permitting, a clear oral warning or order shall be given before shots are fired. In the event shots are fired at an individual, the shots will be aimed at center mass.

c. An officer may use deadly force under the following circumstances:

   i. At an inmate or other person carrying a weapon or attempting to obtain a weapon by force encountered in the officer's official duties, if the officer reasonably believes that the inmate or person intends to cause death or serious bodily injury to the officer or another person.

   ii. At an inmate or other person encountered in the officer's official duties, whom the officer(s) has seen kill or seriously injure any person and who refuses to halt and surrender when ordered.

   iii. At an escaping inmate as a last resort if the escape is actually in progress, if the inmate has freed him/herself of all barriers and there are no other effective means of preventing the escape. Under no circumstances shall deadly force be used unless it is clear that a lesser means of force would not prevent the escape and there is no likelihood of injury to innocent persons by the use of that force.

   iv. At an inmate or other person encountered in the officer's official duties if there is no other way to prevent serious bodily injury or death to the officer or another person.

   v. To stop or break up a riot when the situation has escalated to an actual threat of death or serious bodily injury to other inmates, staff, officers, or other persons.

*RESTRICTED CORRECTIONAL DATA*
*This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency.*
*Data subject to this restriction is contained throughout this publication.*

DAUPHIN DFS 231



**DAUPHIN COUNTY PRISON**

| TITLE: | Use of Force |
|---|---|
| CHAPTER 9: | Security and Control |
| REFERENCE: | PPCT Defensive Tactics Instructor Manual |

DEFINITIONS: Subjects' Levels of Resistance.

1. *Psychological Intimidation* – Nonverbal cues indicating a subject's attitude, appearance, and physical readiness (e.g., blank stare, clenching of fist/s, tightening of jaw muscles, etc.) The subject may comply with verbal commands but displays visual nonverbal cues that indicate potential physical resistance.

2. *Verbal Noncompliance* – Any verbal response indicating the subject's unwillingness to obey an order or command.

3. *Passive Resistance* – Any type of resistance where the subject does not attempt to defeat the officer's attempt to control them, but will not voluntarily comply with verbal and physical attempts of control (e.g., dead-weight resistance, does not react to verbal commands, etc.).

4. *Defensive Resistance* – Any action by a subject that attempts to prevent an officer from gaining control (e.g., pulling or pushing away). It is not an attack rather a physical act to prevent control.

5. *Active Aggression* – Actions or assaults with less than deadly force (e.g., advancing, challenging, punching, kicking, grabbing, wrestling, etc.) but with the intent to harm the officer.

6. *Deadly Force Assault* – Any force used that may result in great serious bodily injury or loss of life. This act does not require the use of a weapon by the subject.

Presented By: _____   Date:  14 May 2014
Warden Dominick L. DeRose

Approved By: _____   Date:  14 May 2014
Commissioner Jeffrey T. Haste, Prison Board Chair

*RESTRICTED CORRECTIONAL DATA*
*This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency.*
*Data subject to this restriction is contained throughout this publication.*

DAUPHIN DFS 232

 **DAUPHIN COUNTY PRISON**

**Local Policy 9.17.T**

Page 1 of 3

| Title: | Use of Force |
|---|---|
| Chapter 9: | Security and Control |
| Subject: | Use of Force Training |
| Reference: | Title 37 Chapter 95 Section 95.220a |

**POLICY:**

Force, including the use of restraints, shall only be used when necessary and only to the degree required to control an individual, facilitate Court-ordered medical treatment, restore order to a disruptive group of individuals, enforce the rules and regulations of the facility, in self-defense and the defense of others, prevent damage to property, prevent an escape, or recapture an escapee. Only the minimum amount of force necessary to resolve a situation shall be employed. The use of force and restraints shall never be used as a means of punishment or revenge.

**PENOLOGICAL INTEREST:**

It is in the penological interest of Dauphin County Prison to have Training and Policies that are clear and easily understood.

**PROCEDURE:**

Use of Force Breakdown:

1. **No more force than necessary**- Force cannot be gratuitous or excessive.

2. **Levels of force:**

    a. **Officer presence**- identify authority by uniform or words

    b. **Verbal order**- must be a clear, reasonable, understandable and lawful command to comply

    c. **Soft empty hand**- if verbal commands are ineffective
        i. May cause pain but virtually no potential to injure

    d. **Hard empty hand**- can be used to control active aggression or defensive resistance
        i. May cause cuts or bruises

    e. **Intermediate weapons**- can be used when empty hand techniques fail or officer reasonably believes would be insufficient
        i. Highly likely to cause pain or injury

    f. **Deadly force**- to protect self or others from death or serious injury
        i. Likely to cause serious injury or loss of life

*RESTRICTED CORRECTIONAL DATA*
*This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency. Data subject to this restriction is contained throughout this publication.*

DAUPHIN DFS 233

 **DAUPHIN COUNTY PRISON**

Local Policy 9.17.T

Page 2 of 3

| Title: | Use of Force |
|---|---|
| Chapter 9: | Security and Control |
| Subject: | Use of Force Training |
| Reference: | Title 37 Chapter 95 Section 95.220a |

3. **Levels of resistance:**

    a.  Psychological intimidation
    b.  Verbal disobedience/noncompliance
    c.  Passive resistance
    d.  Defensive resistance
    e.  Active aggression
    f.  Deadly force assault

4. **Can use one level of force higher than resistance of inmate-** It may be necessary to use more force than the inmate is using. An officer may use more force only if the force seems reasonably necessary under the circumstances. If an inmate reduces the level of force, the officer should too.

5. **Steps after force used**

    a.  Medical exam of officer and inmate as soon as possible if physical force or pepper spray is used

    b.  Immediately notify Shift Commander or Acting Shift Commander

    c.  Written report to Shift Commander before end of shift

**The law:**

There are three constitutional amendments that apply to the use of force in prisons, depending on the subject of the force. The Fourth Amendment protects persons in the prison other than inmates, such as visitors, from excessive force. The Fourteenth Amendment protects inmates who have not been yet convicted, but are awaiting trial (pretrial detainees). The Eighth Amendment protects convicted prisoners.

**Persons other than inmates:**

Under the Fourth Amendment, the Supreme Court has held that persons have the right to be free from excessive force. In *Graham v. Connor*, 490 U.S. 386 (1989), the Supreme Court held that an officer can use only that much force as is necessary under all of the circumstances. Dauphin County Prison's policy teaches the *Graham* standard by prohibiting correctional officers from using more force than is necessary under the circumstances. Under the *Graham* standard, a

*RESTRICTED CORRECTIONAL DATA*
*This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency. Data subject to this restriction is contained throughout this publication.*

DAUPHIN DFS 234

 **DAUPHIN COUNTY PRISON**

**Local Policy 9.17.T**

Page 3 of 3

| Title: | Use of Force |
|---|---|
| Chapter 9: | Security and Control |
| Subject: | Use of Force Training |
| Reference: | Title 37 Chapter 95 Section 95.220a |

variety of factors can help determine whether force used is appropriate, such as: the person's history of violence or lack thereof, any prior attempts to gain compliance with words or less force, the level of threat posed to the correctional officer or others, and the level of force used by the person.

**Pretrial detainees:**

In *Kingsley v. Hendrickson*, 2015 WL 2473447, at *6 (U.S. June 22, 2015), the Supreme Court recently announced that the *Graham* standard applies to pretrial detainees under the Fourteenth Amendment. Previously, courts had applied a higher standard in pretrial detainee excessive force cases, requiring the inmate to show that 1) the force was excessive, and 2) that the correctional officer acted with intent to harm the inmate or lack of care for the inmate. Now, as in the Fourth Amendment context, an inmate only has to prove that the force was excessive. Practically speaking, the Dauphin County Prison's use of force policy already taught the *Graham* standard for the use of force with all inmates, so if a correctional officer follows the policy, then he or she will follow the *Kingsley* standard as well.

**Convicted prisoners:**

The Eighth Amendment applies to convicted prisoners, which prohibits "cruel and unusual punishment." Under the Eighth Amendment, the Supreme Court still requires an inmate in a lawsuit to show that 1) the force was excessive, and 2) that the correctional officer acted with intent to harm the inmate or lack of care for the inmate. As mentioned above, the Supreme Court recently held that the *Graham* standard applies to pretrial detainees in *Kingsley*. In the *Kingsley* case, the Supreme Court mentioned that it may in the future apply the *Graham* standard to convicted prisoners as well. Regardless, the Dauphin County Prison's use of force policy already teaches the *Graham* standard. The critical question under *Graham* and the Dauphin County Prison policy is whether the correctional officer uses the minimal amount of force necessary under the circumstances. If the answer is yes, then the correctional officer has followed policy and the law.

_____
Warden Dominick L. DeRose

July 2015

**RESTRICTED CORRECTIONAL DATA**
*This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency. Data subject to this restriction is contained throughout this publication.*

DAUPHIN DFS 235

# DAUPHIN COUNTY PRISON

**Procedure Name:**    **Methods of Restraint**

**Purpose:**    The purpose of this policy is to ensure that, when needed, every inmate is retrained in an appropriate manner that will ensure the safety of the institution, staff and inmate. This policy is to insure the safe, secure and consistent handling of those inmates that are a suicide risk or have idealized some form of suicide tendency.

**Scope:**    Certain incarcerated individuals will from time to time act out making it necessary to restrain these individuals for their protection, the protection of the institution, staff and other inmates.

**Policy:**    Restraining methods shall be divided into two different restraint methods. Each restraint method will be explained throughout this policy. Certain characteristics unique to incarcerated individuals make them more susceptible to suicidal attempts. Therefore, if an inmate exhibits any sign of possible suicide, or verbalizes suicide intent in words, deed or action, the Shift Commander, in conjunction with medical personnel, shall take appropriate steps to stabilize the individual as follows:

    A.    Restraint Chair

    B.    Four Point Restraint

**Action:**

When an inmate's behavior becomes aberrant to a point where they are uncontrollable or there is documented evidence of self-mutilation, and all other avenues of help and/or control have proven ineffective, the use of the "Restraint Chair", Four Points Restraint Procedure, or other restraint devices may be utilized only under the authorization of the Warden, Deputy Warden or Major.

When the situation warrants such action, and authorization has been obtained, the following guidelines MUST BE ADHERED TO:

**Cell: - Restraint Chair**

The cell must be cleared of everything that is not permanently attached.

    A.    The inmate will be dressed in, at minimum, a Dauphin County Prison uniform.

    B.    The inmate will be provided with one (1) roll of toilet tissue



1

DAUPHIN DES 226

C.    The Cell is to be searched and all contraband, and/or potential weapons removed from the cell.

**Cell: - Four Point Restraint:**

A.    The inmate will be dressed in, at minimum, a Dauphin County Prison uniform.

B.    The inmate will be provided with one (1) roll of toilet tissue

C.    A Mobile bunk (bed springs) to be placed on the floor.

D.    A Mattress (only with mobile bunk) will be provided.

E.    The Cell is to be searched and all contraband, and/or potential weapons removed from the cell.

**Inmates:**

Any inmate who warrants such action shall be restrained as follows:

A.    Restraint Chair (to be used primarily):

    1.    Strip-searched and then furnished with, at minimum, a uniform.

    2.    Placed in Restraint Chair

    3.    Hands shall be cuffed either in front, in back, or at each side depending on demeanor of inmate.

    4.    With hands cuffed in back or at sides, the shoulder straps shall be placed over shoulder, across chest, and attached at opposite sides.

    5.    With hands cuffed in front, the shoulder straps shall be placed over shoulder, across chest, over arm, and attached at opposite sides.

    6.    Lap belts to go across waist and attached to opposite side.

    7.    Legs shall be secured with strap across ankle area.

    **NOTE:** If necessary, leg irons may be used in conjunction with leg straps. When using one set of leg irons, legs are to be secured together. When using two sets, each leg is to be secured to the same side of the chair near bottom/side area.

    8.    Once the chair has been positioned, the roller device is to be retracted and the chair is to be flat on the floor.

2

DAUPHIN DFS 237

B.   Four Point Restraint (to be used secondarily due to special needs):

    1.   Strip-searched, and furnished with, at minimum, a uniform.

    2.   Placed face down (belly down) on the mattress at all times when secured.

    3.   The arms are to be secured with the nylon webbing cuffs -- one around the wrist and one around the elbow. the wrist is to be placed along side the inmate's body, down near the waist.

    4.   The legs are to be secured with the nylon webbing cuffs, one nylon webbing cuff around each ankle, and the ankle cuffs are to be secured to the bunk.

    5.   The body is to be secured to the bunk with the three (3) nylon webbing straps provided. One at the shoulder area. One at the buttocks area. The last over the calf of the legs.

### Helmet:

When an inmates actions warrant (i.e. banging head on floor, wall, back of chair, etc.) a helmet is to be placed on the head and strapped under the chin.

### Watch:

Inmate is to be on a constant watch (one-on-one) by assigned officer when placed in the restraint chair or four point restraints (see one-on-one policy).

### Release Procedure:

Inmate is to be TOTALLY RELEASED every two (2) hours for fifteen (15) minutes. When released, the inmate shall be allowed to walk around, void (if necessary), get a drink of water, or eat (if meal time).

    NOTE: Inmate is NOT to leave the immediate area of the cell. Release time is to be logged and type of activity noted. Inmate's behavior will determine the number of officers needed to be present when inmate is released.

### Visits / Phone:

Inmate is NOT eligible for visits nor allowed use of the phone.

### Possessions:

Inmate may possess nothing.

3

DAUPHIN DFS 238

<u>Showers:</u>

Inmate may shower only if behavior is acceptable and approval is obtained from Warden, Deputy Warden, or Major. Showers will be scheduled twice a week.

<u>Meals:</u>

Inmate is to be served <u>FINGER FOOD ONLY - NO UTENSILS OF ANY TYPE.</u>

<u>Medical:</u>

Medical is to be notified immediately that an inmate is being secured by either the restraint chair or the four point restraint. Medical at that time will examine the inmate (in the cell) and log it. After the initial examination, medical will be notified each time the inmate is released from the restraints, and the inmate must be re-examined once every two (2) hours. Each time medical visits the inmate, it is to be logged.

<u>Officer:</u>

All officers assigned to watch the inmate are to be knowledgeable of this directive.

When an inmate is placed in the restraint chair or four point restraint, an officer is to be assigned to watch this inmate per one-on-one watch policy.

A. Checks are to be constant and logged, at minimum, EVERY fifteen (15) minutes.

B. The staff shall TOTALLY release the inmate at the start of the shift and every two (2) hours thereafter. Medical is to be notified each time the inmate is released and notification is to be logged.

C. Inmate is to be released for a total of fifteen (15) minutes and logged. At NO time is the inmate to be left alone. The officer must be present at all times.

D. Each officer, at the start of the shift, is to shake-down the cell for any contraband, log it, and report any findings to the Shift Commander immediately.

E. Inmate's cell door is to remain OPEN at all times when the inmate is in the restraint chair or is in four point restraints, unless otherwise directed by the Warden, Deputy Warden, or Major.

F. The inmate must be watched by the officer assigned at all times.

G. The inmate is NOT to have any contact with any other inmates at any time.

4

DAUPHIN DFS 239

**Supervisors:**

The Shift Commander is to notify the kitchen that an inmate has been placed in the restraint chair or four point restraints, and that finger foods will be needed.

**Treatment:**

The Treatment Department in conjunction with the Medical Department will evaluate the inmate placed in the restraint chair or four point restraint for suicidal behavior, on at minimum, a daily basis and determine if additional action is needed.

### Description of Restraint Methods (see attached):

A. When an inmate is placed in four point restraints, he/she must be secured face down (belly down) on the mattress at all times when in restraints. At no time shall the inmate be secured on his/her back or side.

B. Individuals whose behavior has warranted them being placed in restraints are to be considered dangerous, and all caution shall be used when placing them in the restraints and when releasing them from restraints.

C. The sign-off sheet must be used every time an inmate is placed in restraints. All staff watching the inmates must sign off indicating that they have read and understood the policy, and all Shift Commanders and Assistant Shift Commanders must sign off indicating the name of the inmate, who authorized placement, and who (Captain/Lieutenant) actually placed the inmate in restraints.

## RESTRAINT CHAIR (Primary Use)

When it becomes necessary to utilize the restraint chair, the inmate shall be secured as shown in the picture on page 7. When handcuffing in front or on side, the rear pad may be left in place. When handcuffing in the rear, the rear pad must be removed.

The straps are to be placed as the numbers below indicate.

A. Shoulder Straps (left and right).

B. Waist Strap

C. Leg Strap

DAUPHIN DFS 240

**FOUR POINT RESTRAINT** (Secondary Use):

When it becomes necessary to use the nylon webbing restraint on an inmate, you will secure the inmate as shown in the pictures below. It may be necessary to make adjustments to the nylon webbing depending on the inmates' heights and weight. These adjustments will be easily made by loosening the nylon webbing from the bunk and repositioning them.

The nylon cuffs and straps are to be placed as the numbers below indicate:

| | |
|---|---|
| A and B. | Placed around the upper arm area. |
| C and D. | Placed around the wrists. |
| E and F. | Placed around the ankles. |
| G. | Placed around the shoulder area going UNDER the arms and up over the back. |
| H. | Placed around the buttocks area. |
| I. | Placed over the calf of the inmate. |

PROCEDURE:

1.  Where signs of a possible suicide are exhibited by an inmate, including verbalization of an intent to commit suicide, behavior that jeopardizes the safety of the inmate, or behavior that jeopardizes the safety of an-other person when combined with a factor(s) suggesting a possible suicide, the following shall be notified:

    A.  Shift Commander shall be notified to assess the situation.

    B.  Medical personnel shall be notified by the Shift Commander to review the situation and the individual inmate involved.

    C.  Medical personnel shall determine the stability and well being of inmate.

    D.  Medical to immediately determine whether the inmate is at risk.

    E.  Medical, in conjunction with security and the Treatment Department, shall determine the appropriate means of classification.

    F.  Medical personnel shall notify the psychiatrist of the situation and take appropriate action as ordered. The psychologist will be notified if the

DAUPHIN DFS 241

psychiatrist is not available and will consult with the psychiatrist or on-call physician as soon as possible.

2.   After notification, the following steps shall be followed to protect the inmate from self inflicted injuries and to protect others from any aberrant behavior associated with the inmate who is potentially suicidal.

A   Remove, relocate and re-class inmate

1).   New housing area shall be searched and all items not secured will be removed.

2).   Inmate shall be stripped searched and all clothing removed.

a).   Inmate will be furnished with, at minimum from Shakedown, a fresh uniform and/or paper garment.

b).   Housing area to be furnished with, at minimum, a mattress and blanket. And,

B   Inmate to be placed on a 15 minute watch. Or,

C   Inmate to be placed on a one (1) on one (1) watch. And/or,

D   Inmate to be placed in restraints

1).   Handcuffs/side cuffs

2).   Handcuffs/side cuffs with leg-irons

3).   Four (4) point restraints

E   The psychiatrist shall review the status of such inmates at least every 24 hours and shall determine when such status shall be changed.  Other medical personnel may be used by the psychiatrist as appropriate to fulfill this responsibility.

F   The danger level associated with the inmate in question shall determine what action level to be taken.

1)   After review of the situation/circumstance, action taken shall be compatible with neutralizing the aberrant behavior and providing a safe, secure environment, using the minimum restraints necessary under the circumstances.

7

DAUPHIN DFS 242

D)      Once an inmate has exhibited such aberrant behavior that restraints are
        necessary, the inmate shall be examined immediately after being secured
        to ensure that the inmate is not in medical danger and shall be re-examined
        at minimum every two (2) hours until released - as approved by the
        National Commission for Correctional Health Care.

   1)      Once it is determined by medical that the inmate has stabilized,
           then, after consultation with security and treatment, the
           restraints shall be removed.

   2)      It is the intent of this facility that all steps be taken to insure
           the safe secure housing of the inmate population.  At no times are
           restraints to be used as punishment.

E)      It is the intent of this policy to use same sex correctional officers to strip
        search inmates.  In the event of problems, or security concerns, the listed
        guidelines shall be followed:

   1)      If the situation warrants additional staff and opposite sex staff
           respond, they shall position themselves out of direct view of the
           inmate but close enough to respond.

   2)      Only in extreme cases, when all other methods have failed, shall
           opposite sex staff be present during a strip search.

8

DAUPHIN DFS 243