Page 1

THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

— — —

| | |
|---|---|
| CARMEN RILEY, | : |
| Administrator of the | : |
| Estate of Ty'rique | : |
| Riley, et al | : CIVIL ACTION NO. |
| | : 4:20-CV-00325 |
| vs. | : |
| | : |
| BRIAN CLARK, Warden of | : |
| Dauphin County Prison, | : |
| et al | : |

— — —

Zoom deposition of MATTHEW DANNER, taken pursuant to notice, beginning at 10:05 A.M., on Friday, March 17, 2023, before Nicholas DiPiero, Registered Professional Reporter and Notary Public.

— — —

DIPIERO COURT REPORTING
Registered Professional Reporters
1175 Marlkress Road, Unit 2460
Cherry Hill, NJ  08034
(215) 735-8101
dipieroreporting@aol.com

MATTHEW DANNER

Page 2

```
 1     APPEARANCES:
 2
           MINCEY FITZPATRICK ROSS, LLC
 3         BY: RILEY H. ROSS, III, ESQUIRE
               KEVIN V. MINCEY, ESQUIRE
 4             One Liberty Place
               1650 Market Street
 5             Suite 3600
               Philadelphia, PA  19103
 6             (215)550-1995
               Riley@minceyfitzross.com
 7         Co-counsel for the Plaintiffs
 8
 9         LAVERY LAW
           BY: FRANK J. LAVERY, JR., ESQUIRE
10             225 Market Street
               P.O. Box 1245
11             Harrisburg, PA  17108
               (717) 233-6633
12             Awn@@laverylaw.com
           Counsel for Defendant,
13         Lt. Greg Mendenhall
14
15         MARSHALL DENNEHEY
           BY: JOHN R. NINOSKY, ESQUIRE
16             100 Corporate Drive, Suite 201
               Camp Hill, PA  17011
17             (717) 651-3529
               Jninosky@mdwcg.com
18         Counsel for Defendant,
           Prime Care & Ms. Bentacourt
19
20
           MacMAIN, CONNELL & LEINHAUSER
21         BY: MATTHEW POLALA, ESQUIRE
               433 West Market Street, Suite 200
22             West Chester, PA  19382
               (484) 463-1014
23             Mpolaha@macmainlaw.com
           Counsel for Susquehanna Defendants
24
25
```

MATTHEW DANNER

Page 3

1          MARSHALL DENNEHEY
           BY: DONALD CARMELITE, ESQUIRE
2              100 Corporate Center Drive
               Suite 201
3              Camp Hill, PA  17011
               (717) 651-3529
4              Dcarmelite@mdwcg.com
           Counsel for Defendant,
5          Angela Swanson

6

    ALSO PRESENT:
7
           THOMAS SLOUGHTER
8

9
                         -   -   -
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MATTHEW DANNER

Page 4

INDEX OF WITNESS

NAME                                    PAGE

MATTHEW DANNER

   BY MR. ROSS:                         5

   BY MR. LAVERY:                       107

   BY MR. POLALA:                       117


                    —   —   —


INDEX OF EXHIBITS

NUMBER           DESCRIPTION            PAGE

DANNER

1        USE OF FORCE DFS 233           40
2        USE OF FORCE POLICY            41
         DFS 244-288

3        SECURITY DFS 227-232           47

4        INCIDENT REPORT                82

5        INTERVIEW CID 521-553          95

6        VIDEO 18A1 TO FRONT            101

7        EMAIL CID 97-98                106

                    —   —   —

MATTHEW DANNER

Page 5

1            (It is stipulated and agreed by and
2    among counsel that sealing, certification and filing
3    are waived, and that all objections, except as to the
4    form of the questions, are reserved until the time of
5    trial.)
6                      - - -
7            MATTHEW DANNER, SR., having
8       been duly sworn, was examined and testified
9       as follows:
10                     - - -
11   BY MR. ROSS:
12   Q.       Good morning. My name is Riley Ross along
13   with Kevin Mincey and we represent the plaintiffs in
14   this litigation.
15            Could you state your full name for
16   the record.
17   **A.       Matthew Danner, Senior.**
18   Q.       Officer Danner, you are a correction officer;
19   is that correct?
20   **A.       No.**
21   Q.       You're no longer a correction officer?
22   **A.       Correct.  No longer a correction officer.**
23   Q.       What's your current employment?
24   **A.       I'm a security guard at a hospital.**
25   Q.       Is it still appropriate to call you Officer

MATTHEW DANNER

Page 6

1    Danner because I'm probably going to keep slipping

2    into that title.  Is that all right with you?

3    **A.        That's fine.**

4    Q.        Have you ever been deposed before?

5    **A.        No.**

6    Q.        I'm going to go over some rules for the

7    deposition and to make sure we're on the same page for

8    today.  This is merely a question and answer session.

9    Okay. There are no right or wrong answers. The Rules

10   of Civil Procedure which all the lawyers here in this

11   lawsuit are governed by allow the lawyers to question

12   witnesses, to question defendants, to question

13   plaintiffs even and to get information from them

14   that's called discovery.

15   **A.        Yes.**

16   Q.        And what I'm going to be doing here is just

17   asking you questions and I just want to get your best

18   recollection of events in the past and your best

19   ability to answer my questions, okay?

20   **A.        Okay.**

21   Q.        First and foremost, because there is a court

22   reporter here that's taking down that we say it is

23   important that your answers be verbal, okay. You can

24   shake and nod your head, that's fine, but as long as

25   you also say something when you're doing that will

MATTHEW DANNER

Page 7

1    allow the court reporter to take down everything,

2    every answer that you give, okay?

3    **A.        Okay.**

4    Q.        All right. As I said, I'm asking for your

5    best recollection of events.  I'm not asking you to

6    guess unless I specifically ask you to guess or to

7    approximate.  But if you need to guess or approximate

8    you can just let me know that in answer, okay?

9    **A.        Okay.**

10   Q.        Do your best to as I give a clear response.

11   A yes or no is much better than an uh-uh or a nuh-uh

12   or something like that. Do you understand that?

13   **A.        Yes.**

14   Q.        Also, so that the court reporter can take

15   down everything that we say it is important that we

16   speak one at a time. So I'm going to do my best not to

17   start talking before you finish answering your

18   question and I'm going to ask you to allow me to ask

19   my question completely before you begin your answer,

20   okay?

21   **A.        Yes.**

22   Q.        It's quite common when people are talking

23   that you may hear me ask the question, you answer it

24   and I ask another question that you know exactly what

25   I'm about to say and you may want to come in with the

MATTHEW DANNER

Page 8

1    answer before I finish my question. But for today's

2    purposes just allow me to finish the question even if

3    you know exactly what I'm going to ask so that the

4    court reporter can take everything down, okay?

5    **A.        Okay.**

6    Q.        If you don't understand my question just let

7    me know and I'll rephrase it. I'll do my best to put

8    it in a way that you do understand it. But if you do

9    answer my question I'm going to assume that you

10   understood my question. Is that fair?

11   **A.        Yes.**

12   Q.        We can take a break at any time if you need

13   to use the restroom, if you need to get a drink of

14   water, if you need to talk to your attorney, for any

15   reason at all we can take that break.  Just let me

16   know that you want to take a break. The only thing

17   that I ask is that you answer the question that's been

18   asked before we take the break, okay?

19   **A.        Yes.**

20   Q.        Do you understand all those rules that I've

21   just gone over?

22   **A.        I do.**

23   Q.        Do you have any questions about them?

24   **A.        No.**

25   Q.        Have you taken any medication in the past 24

MATTHEW DANNER

Page 9

1    hours that would influence your ability to participate

2    in today's deposition?

3    **A.        No.**

4    Q.        Have you consumed any alcohol in the past 24

5    hours?

6    **A.        No.**

7    Q.        Have you consumed any drugs in the past 24

8    hours?

9    **A.        Drugs as in prescription drugs or?**

10   Q.        Any type, any types of drugs.

11   **A.        I take prescription drugs, yes.**

12   Q.        Okay. Do those prescription drugs interfere

13   with your ability to recall any events from the past?

14   **A.        No.**

15   Q.        Do they interfere with your ability to listen

16   to questions and to answer those questions?

17   **A.        No.**

18   Q.        Is there anything about you as you sit here

19   today that make you unprepared to go forward with

20   today's deposition?

21   **A.        No.**

22   Q.        Have you reviewed any documents in

23   preparation for you deposition today?

24   **A.        I have.**

25   Q.        What have you reviewed?

MATTHEW DANNER

Page 10

1    **A.        My memo from the prison on the date of the**
2    **CID report and use of force.**
3    Q.        When you say use of force what are you
4    referring to?
5    **A.        The policy that was in place at the time I**
6    **was employed at the prison there.**
7    Q.        Are there any other documents that you
8    reviewed in preparation for today?
9    **A.        No.**
10   Q.        When you say the CID report what are you
11   referring to?
12   **A.        The report that was done by the county**
13   **investigator.**
14               MR. CARMELITE: And, Riley, just to
15   be clear, he reviewed his statement.
16               MR. ROSS: I was just going to ask
17   that next.
18               MR. CARMELITE: He had the reports.
19   He did not review all thousands of pages we got.  He
20   just reviewed his recorded statement. That was it.
21   BY MR. ROSS:
22   Q.        Officer Danner, have you reviewed any videos
23   in connection with your preparation for today?
24   **A.        I did.**
25   Q.        What video did you review?

MATTHEW DANNER

Page 11

1    **A.         The block camera.**

2    Q.         When you say the block camera are you

3    referring to a particular block camera?

4    **A.         A-block.**

5    Q.         Did you review the A-block camera only?  Let

6    me ask a different question. How many videos did you

7    review?

8    **A.         I believe four.**

9    Q.         Okay. We're going to look at some video today

10   and so I'll be able to ask you some more questions. If

11   there's other videos that you reviewed that we don't

12   talked about today we can talk about that when we get

13   there.

14              Other than the videos and the

15   documents that you described have you reviewed any

16   other materials in preparation for your deposition

17   today?

18   **A.         No.**

19   Q.         Are you aware that you're named as a

20   defendant in the lawsuit that brings us here today?

21   **A.         I am.**

22   Q.         Have you reviewed the complaint in that

23   lawsuit ever?

24   **A.         I don't recall. I don't think so.**

25   Q.         Have you ever been asked to turn over any

MATTHEW DANNER

Page 12

1    documents in connection with this lawsuit that you're

2    aware of?

3    **A.        The only document I would have turned over**

4    **would have been that original memo to the prison.  But**

5    **I've never turned anything over to anybody else.**

6    Q.        Okay. Have you yourself other than the --

7    well, let me back up. The memo that you just referred

8    to is that something that was written by you?

9    **A.        It was.**

10   Q.        Other than that memo have you created any

11   other documents in connection with the death of

12   Ty'rique Riley?

13   **A.        No.**

14   Q.        We're going to move into some background

15   information. Did you graduate from high school?

16   **A.        Yes.**

17   Q.        And what year were you born first of all?

18   **A.        1980.**

19   Q.        What year did you graduate from high school?

20   **A.        1998.**

21   Q.        What high school did you graduate from?

22   **A.        East Pennsboro Area High School.**

23   Q.        East Pennsboro Area High School.

24   **A.        East Pennsbori.**

25   Q.        Did you attend any college?

MATTHEW DANNER

Page 13

1    **A.        I did.**

2    Q.        What college or colleges did you attend?

3    **A.        I attended Lackawanna Junior College for a**

4    **summer semester and fall semester.  And then I**

5    **attended Harrisburg Area Community College for one**

6    **semester.**

7    Q.        Any other colleges?

8    **A.        No.**

9    Q.        What year did you attend Harrisburg Area

10   Community College?

11   **A.        1999. Spring. No. Yeah. Spring of 1999.**

12   Q.        As of June 26, 2019 what county or city did

13   you live in?

14   **A.        You said 2019?**

15   Q.        Yes. June 26. 2019 where were you living?

16   **A.        Cumberland County.**

17   Q.        And June 26, 2019 you were working for the

18   Dauphin County prison; is that correct?

19   **A.        Correct.**

20   Q.        Did anyone else live in that home with you at

21   the time and date, did anyone else work for the

22   Dauphin County Prison?

23   **A.        No.**

24   Q.        Have you ever been arrested?

25   **A.        No.**

MATTHEW DANNER

Page 14

1    Q.        Have you ever been a party to a lawsuit other

2    than this current lawsuit?

3    **A.        I have been sued before.**

4    Q.        How many times have you been sued before?

5    **A.        I'm unsure of the number.**

6    Q.        More than two not counting this lawsuit?

7    **A.        Yes.**

8    Q.        More than five?

9    **A.        I don't believe so.**

10   Q.        So somewhere between two and five you believe

11   other than this lawsuit.

12   **A.        I believe that would be a good.**

13   Q.        Did any of those lawsuits involve you as a

14   correctional officer?

15   **A.        All of them would have.**

16   Q.        So let's start with the most recent one. Can

17   you tell me the name of the plaintiff in the most

18   recent lawsuit.

19   **A.        No. I'm unsure any of the names in any of the**

20   **lawsuits.**

21   Q.        Other than, and so I don't have to keep

22   saying this.  I'm talking about anything other than

23   today's lawsuit, are any of them still ongoing today?

24   **A.        Unsure. I do not know. The prison hasn't**

25   **contacted me. They told me that I was being sued on**

MATTHEW DANNER

Page 15

1   occasion and then I heard nothing further.

2   Q.        And you haven' been deposed in any of those

3   other lawsuits; correct?

4   A.        Never been deposed.

5   Q.        Okay. Do you know if any of those lawsuits

6   have been complete?

7   A.        I do not know. All I know is they say I'm

8   mentioned in the lawsuit and then I heard nothing

9   further.

10  Q.        I know you said you heard nothing further but

11  I'm going to ask you a few more questions. Do you know

12  if any of those lawsuits are State lawsuits versus

13  Federal lawsuits?

14  A.        I do not know.

15  Q.        Do you know if you have an attorney for any

16  of those other lawsuits?

17  A.        The county would have been the attorney that

18  would have been representing me.

19  Q.        Okay. The county could mean lot of things.

20  So do you know the names of any other attorneys who

21  may have been representing you?

22  A.        Whoever the county solicitor was.

23  Q.        Okay. I'm just asking specifically.  Do you

24  know the names of anyone?

25  A.        No. I don't know the names of.

MATTHEW DANNER

Page 16

1    Q.         Let's talk about your employment. You said,

2    can you tell me again who you currently work for?

3              MR. CARMELITE: Riley, when this

4    incident happened he and his family were subject of a

5    number of threats.  So he is, because of that we're

6    not inclined to publically release where he's working,

7    where he lives. You can contact me through –– if you

8    want to contact me. If you really need his employment

9    records from his current employer we can a talk about

10   that. But generically he works as a security guard at

11   a local hospital.

12             MR. ROSS: Okay. That's fair enough,

13   Don. If I need that we'll get together off line on

14   that.

15   BY MR. ROSS:

16   Q.         So you just heard, Officer Danner, that

17   your attorney represented that you currently work as a

18   security officer at a local hospital.  Do you agree

19   with that representation?

20   **A.         Yes.**

21   Q.         When did you leave the Dauphin County Prison,

22   when did you stop working there?

23             MR. CARMELITE: And let me add one

24   more thing, Riley. Subsequent to the incident with

25   Ty'rique Riley the County disciplined Mr. Danner. That

MATTHEW DANNER

Page 17

1   has gone to an arbitration.  The arbitration is still

2   pending.

3               So at this time he's not going to

4   answer questions about what happened in that event

5   until the arbitration is resolved.  At that time he's

6   willing to come back if needed and answer questions if

7   you deem it necessary and it's relevant.

8               But generically I can tell you it

9   was a use of force incident. Inmate was charged with

10  assaulting Mr. Danner and that's also the subject of a

11  pending criminal matter that hasn't resolved. So I

12  think until both those matters are resolved he's not

13  going to answer questions about that incident.

14              But his separation of employment

15  with the prison stems from that incident.

16              MR. ROSS: So let me, and you can

17  represent this.  You don't have to have your client

18  represent this.

19              MR. CARMELITE: Sure.

20              MR. ROSS: You're stating that the

21  incident that is subject of arbitration right now hand

22  the basis for his discipline is not related to

23  Ty'rique Riley?

24              MR. CARMELITE: Correct. Correct.

25              MR. ROSS: Well, then I still would

MATTHEW DANNER

Page 18

1    like to know when he stopped working there because I

2    do think that that's relevant.

3                     MR. CARMELITE: That's fine. You can

4    answer if you know approximately when you stopped

5    working.

6    **A.        January 27th.**

7    Q.        Of this year?

8    **A.        2022.**

9    Q.        I'm going to come back to ask you some

10   questions about discipline but it's going to be

11   related to Ty'rique Riley. So we'll come back to that

12   in just a second.

13                     Were you working at the Dauphin

14   County Prison on June 18, 2019?

15   **A.        Yes.**

16   Q.        And how about also on June 26, 2019, were you

17   working at Dauphin County Prison?

18   **A.        Yes.**

19   Q.        What was your title on June 26, 2019?

20   **A.        Correction officer.**

21   Q.        As of June 26, 2019 how long had you been

22   working at the Dauphin County Prison?

23   **A.        What was the date?**

24   Q.        June 26th. Let me try to give you some

25   context. June 26, 2019 is the date that Ty'rique Riley

MATTHEW DANNER

Page 19

1  was taken out of Dauphin County Prison and sent to the

2  hospital. Do you agree with that statement?

3  **A.        That was the 26th?**

4  Q.        Yes.

5  **A.        Okay. I was working that day, yes. What was**

6  **the other date that you asked that I was working?**

7  Q.        June 18, 2019.  Actually I didn't ask you if

8  you were working that date. I just asked you if you

9  were employed at the Dauphin County Prison on June 26,

10 2019?

11 **A.        Yes.**

12 Q.        As of June 2, 2019 how long had you been

13 working at Dauphin County Prison?  It may be easier

14 for me to just simply ask when did you start working

15 --

16 **A.        15 years.**

17 Q.        When did you start working at the Dauphin

18 County Prison? Do you remember what year?

19 **A.        March 15, 2004.**

20 Q.        March 15, 2004?

21 **A.        Correct.**

22 Q.        And between March 15, 2004 and January 27,

23 2022, did you work continuously for the Dauphin County

24 Prison?

25 **A.        I was employed there continuously, yes.**

MATTHEW DANNER

Page 20

1    Q.        There was never a time when you stopped

2    working there and started working for someone else,

3    ended your employment with Dauphin County Prison and

4    started your employment somewhere else during that

5    time period?

6    **A.        No.**

7    Q.        Did you work any other jobs during that time

8    period?

9    **A.        No.**

10   Q.        Okay. During that time period that you were

11   employed by Dauphin County Prison did you hold any

12   other titles other than correctional officer?

13   **A.        No.**

14   Q.        And with regard to your title as a

15   correctional officer are there ranks even within that

16   title or is it simply a correctional officer and

17   that's the only title?

18   **A.        I was simply a correction officer. No other**

19   **title.**

20   Q.        Okay. Did you ever attend a police academy?

21   **A.        No. Not a police academy.**

22   Q.        Did you attend something similar to a police

23   academy?

24   **A.        Similar, for the field that we were working**

25   **in yes.**

MATTHEW DANNER

Page 21

1    Q.        Tell me what you're referring to.

2    **A.        The Pennsylvania Corrections Academy in E**

3    **Town.**

4    Q.        And when did you attend that academy?

5    **A.        Approximately a month after I was employed.**

6    Q.        So this would be approximately in April,

7    sometime in April of 2004?

8    **A.        Yeah.  It's hard for me to remember but**

9    **approximately a month, maybe a little longer than a**

10   **month after my start of employment.**

11   Q.        And how long did you attend the Pennsylvania

12   Corrections Academy?

13   **A.        That was a five week academy.**

14   Q.        Did you graduate?

15   **A.        I did.**

16   Q.        And you said it was in E Town?

17   **A.        E Town.**

18   Q.        Does that stand for something?

19   **A.        Elizabethtown.**

20   Q.        Have you received any special certifications

21   during your time as a correctional officer with the

22   Dauphin County Prison?

23   **A.        Special as in, when you talk about special?**

24   Q.        Well, let's just start with certifications.

25   Have you been certified in any way during your time as

MATTHEW DANNER

Page 22

1    a correctional officer with Dauphin County Prison?

2    **A.         Yeah.  We received a lot of certifications.**

3    Q.         And can you give me an example of some of the

4    types of certifications that you received.

5    **A.         Tactical handcuffing, OC, otherwise known as**

6    **OCAT.  We receive firearms training, weapons retention**

7    **training, first aid, CPR training, AED training,**

8    **transport training.**

9    Q.         Are these certifications certifications that

10   all correctional officers are required to obtain, if

11   you know?

12   **A.         All correctional officers have most of those,**

13   **yes.**

14   Q.         Have you ever been certified to train others?

15   **A.         No.**

16   Q.         Have you ever taken any classes to attempt to

17   get certified to train others?

18   **A.         No.**

19   Q.         Have you ever taken any tests to attempt to

20   get certified to train others?

21   **A.         The only test I took outside of the standard**

22   **test would have been the one for promotion to**

23   **Lieutenant. Other than that, no.**

24   Q.         When did you take the test for a promotion to

25   Lieutenant?

MATTHEW DANNER

Page 23

1  **A.        I want to say, I'm not 100 sure. Probably**
2  **about two years before I left here. So I would say it**
3  **was about two years previous to January 2022 would be**
4  **the general time.**
5  Q.        That would put us approximately January of
6  2020; does that sound right?
7  **A.        Something in that ballpark. Not a 100 percent**
8  **positive.**
9  Q.        COVID has become a good measure of time. So
10  do you know if the COVID pandemic when you took this
11  test or not?
12  **A.        I'm not sure.**
13  Q.        Other than taking the test for a promotion to
14  Lieutenant are there any certifications that you
15  attempted to achieve other than the standard training
16  certifications?
17  **A.        No. The only one that would not have been a**
18  **standard certification would have been the transport**
19  **training.**
20  Q.        What is that?
21  **A.        That is to be able to transport inmates to**
22  **and from prison outside facilities.**
23  Q.        So you did receive a certification to
24  transport inmates outside of facilities?
25  **A.        It's not a certification.  Like we didn't get**

MATTHEW DANNER

Page 24

1  **a certification. You were just placed on a transport**

2  **team, went through additional education and then put**

3  **as a transport officer within the prison. You were**

4  **utilized for that.**

5  Q.      Do you recall when you received that

6  authorization or designation to be take transport

7  officer?

8  **A.      No. It was early in my career. They selected**

9  **us and sent us to that additional training.**

10  Q.      As of on June 26, 2019 were you authorized to

11  transport individuals outside of facilities?

12  **A.      I was.**

13  Q.      Did you retain that authorization to

14  transport individuals outside of facilities up until

15  the time that you left Dauphin County Prison?

16  **A.      I did.**

17  Q.      From the time you began Dauphin County Prison

18  up until June 26, 2019 had you received any discipline

19  as a correctional officer?

20  **A.      Can you repeat that.**

21  Q.      Between the time that you began at Dauphin

22  County Prison up until June 26, 2019 had you received

23  any discipline as a correctional officer?

24  **A.      Yes.**

25  Q.      How many times have you been disciplined in

MATTHEW DANNER

Page 25

1  that time period?

2  **A.        I'm not sure of the total amount because of**

3  **some of the discipline that is actually put in the**

4  **file.**

5  Q.        Okay.

6  **A.        Stuff like that. So I'm unsure of how much of**

7  **that is in there. Outside of that more of what we**

8  **consider a discipline is like a write-up process. I**

9  **believe it was two or three.**

10            MR. CARMELITE: Just tell him what

11  you remember. He can ask you questions.

12  Q.        You said something that I didn't quite catch.

13  It sounded like you were making a distinction between

14  types of discipline and you cut out at least on my

15  end.  So if you were saying, trying to make a

16  distinction between types of discipline could you

17  repeat that, please.

18  **A.        Some of the types of discipline that are in**

19  **our folders are like call-offs. It deals with a**

20  **seniority in a call-off. We never seen that as a**

21  **discipline because you don't receive per se a write-up**

22  **for that. It's a point process that they put in your**

23  **folder.  So I'm unsure of how many of those I have.**

24  **But discipline with receiving a write-up would be two**

25  **or tree write-ups.**

MATTHEW DANNER

Page 26

1    Q.        What is a call-off?

2    A.        A call-off there is they allot so many slots

3    in a book for a day for people to be off with personal

4    time. So if you're outside of a seniority gap you end

5    up getting a slot if that book is full and they issue

6    you a points letter.  So you get one point for

7    call-offs.

8    Q.        That is all related to your showing up for

9    work or not showing up for work; is that correct?

10   A.        It does but it, you can say that per se, yes.

11   That's, it's not like a tardiness or not -- it's a

12   call-off using your time.  It has to do with a

13   seniority gap. So if you're outside, when you're don't

14   have a lot of time in you end up utilizing that to

15   take-off. You have to call in and they say, hey,

16   book's full.  Okay. I still want the day.  They give

17   you that day off.

18   Q.        Okay. I understand. With regard to the

19   write-ups you said there may be two or three.  Let's

20   start with the first write-up that you recall. Can you

21   tell me the nature of that write-up.

22   A.        The first one would have been and I don't

23   know how the write-up was worded. It was with another

24   officer.  And it had to do with I believe her actions.

25   And beings I was with her they then wrote both of us

MATTHEW DANNER

Page 27

1    up for that action.

2    Q.       What was that action?

3    **A.       They claim she was unprofessional.**

4    Q.       In what way was she claimed to have been

5    unprofessional?

6    **A.       What do you mean by?**

7    Q.       What was the allegation regarding her being

8    unprofessional?

9                MR. CARMELITE: What did she do to

10   make them say that she was unprofessional?

11   **A.       Well, I believe it was the way she was**

12   **talking to the supervisors during an incident.**

13   Q.       And you were written up for that as well?

14   **A.       Because I stated she was -- I felt she was**

15   **acting in a professional manner while doing her duty.**

16   **I didn't know about the run-in with the supervisor. I**

17   **knew about what was being questioned within her job.**

18   **When she was questioned she became unprofessional with**

19   **the supervisor which I was not there for.  But when I**

20   **did my paperwork I had logged that she was carrying**

21   **herself in a professional manner. That got tied into**

22   **one big event between doing her job and having the**

23   **run-in with the supervisor.**

24   Q.       Okay. What was the consequence of you being

25   written up for that if any?

MATTHEW DANNER

Page 28

1   **A.        That one was thrown out. There was no**
2   **discipline. It was washed.**
3   Q.        Tell me about the next write-up that you
4   recall.
5   **A.        That would have been one with me and a**
6   **co-worker. We had words.**
7   Q.        Was there a physical altercation leading to
8   this?
9   **A.        No.**
10  Q.        And what was the consequence of you being
11  written up for this incident?
12  **A.        That was a verbal.**
13  Q.        When you say a verbal what do you mean?
14  **A.        To not do it anymore. Stop that conduct.**
15  Q.        Do you recall when this verbal was given,
16  what year?
17  **A.        No clue.**
18  Q.        Do you know if it was before or after June
19  26, 2019?
20  **A.        Before.**
21  Q.        Tell me about the next write-up that you
22  recall.
23  **A.        The next one was written up and that was**
24  **actually a failure to follow a written order.**
25  Q.        And what order were you accused of failing to

MATTHEW DANNER

Page 29

1   follow?

2   **A.        I still to this day I'm unsure of.**

3   Q.        Do you know what that incident had to deal

4   with, what it involved?

5   **A.        I had a female on a block law librarian, she**

6   **was watching an inmate masturbate partaking in the**

7   **sexual act by watching.  And I came across the**

8   **intercom and asked her how long she was going to stand**

9   **there and watch him masturbate to her and to get the**

10  **fuck off the block to be frank, sir.**

11  Q.        And what was the consequence of you being

12  written up for that?

13  **A.        I ended up getting suspended.  It was a two**

14  **day stayed, one day served suspension.**

15  Q.        When you two day stayed, one day served tell

16  me what you mean by that.

17  **A.        So the way I believe it's done it's an**

18  **administrative thing.  So I actually had a three day**

19  **in my folder but I only had to serve one day on the**

20  **street as a penalty but the three day stay in your**

21  **folder.  So if you get further discipline it jumps to**

22  **like a five day discipline.**

23  Q.        Okay. What's the next write-up that you

24  recall?

25  **A.        Those are the only three of that sort that I**

MATTHEW DANNER

Page 30

1  **recall. Like I said, other than some call-offs or they**

2  **call it a pattern if you call certain days within a**

3  **timeframe they feel like you're extending a weekend,**

4  **something like that. Other than that those are the**

5  **only three that I recall.**

6           MR. CARMELITE: And, Riley, other

7  than the one I'm not going to let him answer questions

8  about it.

9           MR. ROSS: Right. And actually I

10  think I kept this in the timeframe of up until June

11  26, 2019.

12           MR. CARMELITE: Fair.

13  BY MR. ROSS:

14  Q.       Up until June 26, 2019 had you, are you aware

15  of any complaints that were made about you by any

16  inmates of the Dauphin County Prison?

17  **A.       Complaints?**

18  Q.       Yes.

19  **A.       I had many complaints, yes.**

20  Q.       Did any of those complaints -- let me ask you

21  this. What is or what was at the time the protocol for

22  dealing with complaints at Dauphin County Prison to

23  the extent that you know?

24  **A.       Just a complaint?**

25  Q.       Yes.

MATTHEW DANNER

Page 31

1   **A.         Sometimes they stopped administration white**

2   **shirt Lieutenant and made complaints.   One made**

3   **complaints to other staff member, sergeant.**

4   Q.         Did any of complaints that you're aware of

5   from inmates involve an excessive use of force?

6   **A.         I would imagine some of them.**

7   Q.         Have any of those complaints resulted in any

8   discipline against you?

9   **A.         No.**

10  Q.         Have any of those complaints resulted in an

11  investigation of those allegations?

12  **A.         An investigation of what kind?**

13  Q.         Well, that would be my next question, if

14  there was anything that you would consider an

15  investigation, have any of those complaints led to an

16  investigation into the allegations?

17  **A.         I imagine most of them were investigated**

18  **inhouse.**

19  Q.         Have you for any of those complaints have you

20  received any type of interviews, questioning about the

21  allegations?

22  **A.         Interviewed by who?**

23  Q.         Anyone.

24  **A.         Yeah.**

25  Q.         Let's start with one of the interviews that

1  you recall. What was the allegation?

2  **A.       I've been talked to and investigated numerous**

3  **times. I couldn't break each individual one down.**

4  Q.       Just tell me about the ones that you

5  remember. Do you recall being interviewed about an

6  allegation regarding the excessive use of force I want

7  you to tell me what you remember about that interview

8  and about the allegations.  So let's just start with

9  any that you remember.

10  **A.       I really don't remember any of them.  To be**

11  **honest with you I've been out of there for what, a**

12  **year. And those were are years away.**

13  Q.       So there are no allegations that you -- let

14  me start with this. Do you recall any allegations

15  against you involving the excessive use of force?

16              MR. CARMELITE: Are you asking

17  specifically or generally?

18              MR. ROSS: I'm asking about anything

19  that he recalls an inmate making an allegation against

20  him saying that he used force against that inmate

21  excessively.

22              MR. CARMELITE: And I think what he's

23  testifying to is that he remembers generally that

24  someone's made that allegation. I don't know if he

25  specifically can tell you I remember Inmate X made

MATTHEW DANNER

Page 33

1    this specific allegation in this specific

2    investigation.  If I'm wrong he'll correct.  I think

3    that's what he's saying.

4                 But you can, essentially he wants to

5    know do you remember any specific instance of an

6    inmate making an allegation and there being an

7    investigation. Do you?

8    **A.        No.**

9    Q.        Officer Danner, I know that you may not

10   remember every specific detail of anything but I got

11   to believe that you remember something. So what I'm

12   asking is just that something that you remember. If

13   it's, hey, I remember an inmate, I can't tell his name

14   but he said that I hit him in the head and I didn't do

15   it.  Some guy said that I tripped him and I didn't do

16   it. That's what I'm asking you.

17                 What do you recall about any

18   allegations against you regarding the use of force

19   even if it's very again or it's very specific. I want

20   to know what you recall.

21   **A.        That's what I'm saying.  I've had multiple**

22   **complaints of people claiming I have done, used force**

23   **when it wasn't supposed to be used.  You know what I**

24   **mean, like that's in fifteen years using force in the**

25   **prison it was used weekly, monthly. Just taking**

MATTHEW DANNER

Page 34

1    **somebody by the arm is a use of force and they**
2    **complained that I've escorted them by taking them by**
3    **their arm or putting handcuffs on them when they**
4    **weren't supposed to be handcuffed.  That kind of**
5    **stuff.**
6    Q.      Well, let me ask you this. When complaints
7    are made I'm assuming they can made in different forms
8    with one of those forms being filing some type of
9    grievance. Is that one method that an inmate can make
10   a complaint at the Dauphin County Prison?
11   **A.      Correct.**
12   Q.      When a grievance is filed against a
13   correctional officer and this is just to the extent
14   you know, when a grievance is filed against a
15   correctional officer is the correctional officer made
16   aware of that grievance?
17   **A.      Usually yes.**
18   Q.      And if a grievance is filed against a
19   correctional officer does that grievance get
20   investigated by someone other than the correctional
21   officer that it's made about?
22   **A.      Yes. Usually the shift commander.**
23   Q.      And do you recall having a grievance being
24   filed against you that was investigated by a shift
25   commander that involved the use of force?

MATTHEW DANNER

Page 35

1   **A.        That's many. Over my fifteen years, as I**
2   **said, any time you used force the majority of the time**
3   **there were complaints. Not all the time grievances, a**
4   **majority complaints, sometimes grievances. But there**
5   **were many grievances over my fifteen years that were**
6   **filed.**
7   Q.        Other than file a grievance are there any
8   other ways that you're aware that an inmate can make a
9   formal complaint?  And by formal I mean something
10  other than just telling someone that hey, I'm
11  complaining about this. Is there any other method that
12  they can make a complaint other than filing a
13  grievance?
14  **A.        Well, the grievance was filed through papers.**
15  **So we've had many complaints.  Grievances they would**
16  **file through paper and put them into the shift**
17  **commander or it would go up front depending on how**
18  **they addressed it. The Deputy Warden, the director of**
19  **security.**
20  Q.        And when a grievance is investigated is there
21  a finding that is made relating to that grievance?
22  **A.        I assume so. I never seen a finding**
23  **personally. We don't get the finding.**
24  Q.        Have you ever been informed that a grievance
25  against you led to an investigation, that the outcome

MATTHEW DANNER

Page 36

1   was that that grievance was substantiated meaning that

2   that grievance was found to have been true by someone?

3   **A.        No.**

4   Q.        Have you ever been told that a grievance that

5   was filed against you that was investigated was found

6   to have not been not substantiated meaning to have

7   found to have not been true or supported by the facts?

8   **A.        So the grievance -- repeat that.**

9   Q.        Have you ever been told that a grievance

10  filed against you was found to have been not

11  substantiated?

12  **A.        Was I told?**

13  Q.        Yes.

14  **A.        Probably.**

15  Q.        Are you aware of any grievances ever being

16  filed against you involving the use of a restraint

17  chair?

18  **A.        No.**

19  Q.        So we talked about you having write-ups.

20  Have you ever had a write-up against you involving the

21  use of force?

22  **A.        No.**

23              MR. CARMELITE: Other than the ones

24  that we;re not going to talk about?

25              MR. ROSS: Yes. Yes.

MATTHEW DANNER

Page 37

1   Q.        So I have been asking you questions up until

2   June 26, 2019. So between regarding the incident of

3   June 26, 2019 do you know if you were written up in

4   any way related to that incident involving Ty'rique

5   Riley?

6   **A.        I was not.**

7   Q.        Did you receive any discipline in relation to

8   the incident involving Ty'rique Riley?

9   **A.        No.**

10  Q.        After June 26. 2019 not counting the incident

11  in which is the subject of a disciplinary or subject

12  of an appeal of a disciplinary action were you written

13  up in connection with any other any other allegations

14  after June 26, 2019?

15  **A.        Was I written up after the 26th of '19?**

16  Q.        Yes. Not counting the incident that led to

17  your leaving Dauphin County Prison.

18  **A.        I believe that was third write-up that I**

19  **discussed with you. The inmate masturbating.  I**

20  **believe that was after that date.**

21  Q.        Any other write-ups after June 26, 2019 other

22  than what we're not talking about?

23  **A.        No.**

24            MR. ROSS: Don, I don't think that

25  you would have control over this. I don't think you

MATTHEW DANNER

Page 38

1   would have control of this but the disciplinary file,

2   I don't believe that we have that . So I'm going to, I

3   can make a formal request, Frank.  I'm assuming that

4   would be something in your possession and not Don's.

5                MR. CARMELITE: We can address it.

6                MR. LAVERY: Yeah.  Just make a

7   request, Riley, and we'll respond.

8                MR. ROSS: All right. Will do.

9   BY MR. ROSS:

10   Q.       Officer Danner, I want to talk about your

11   training right now. On June 26, 2019 as correction

12   officer what did you consider your duties to be as a

13   correctional officer?

14   **A.       Duties?**

15   Q.       Yes.

16   **A.       Standard duties of a correctional officer.**

17   Q.       Yes. What did you consider those to be?

18   **A.       Care, custody and control. That was the job.**

19   Q.       Did you receive, I want to ask you about

20   training and whether or not you received instruction

21   in the law. Did you receive updates on legal decisions

22   regarding Constitutional violations such as the 4th

23   Amendment and the 8th Amendment?

24   **A.       You asked if I received training on them?**

25   Q.       Yes. I'm asking as a form of training did you

MATTHEW DANNER

Page 39

1  receive updates on legal decisions that were being

2  made about Constitutional violations regarding the 4th

3  Amendment and the 8th Amendment?

4  **A.        I don't know what the Amendments are so I**

5  **don't know how the training that I was receiving and**

6  **those come together.**

7  Q.        Do you recall ever receiving training

8  regarding being provided updates on legal decisions

9  that were being made in the courts?

10  **A.        Yes.**

11  Q.        Tell me what you recall, what training do you

12  recall receiving in that interview?

13  **A.        The one specifically was with the pregnant**

14  **females in transporting them. That was one I remember**

15  **specifically.**

16  Q.        And that involved a legal decision that had

17  been handed down from the courts?

18  **A.        Correct.  I think it was when Rendell was in**

19  **office.**

20  Q.        Any other time that you recall being told

21  about legal decisions coming down from the Court?

22  **A.        I don't remember specifically.  But I imagine**

23  **during training that they were spoken about.**

24  Q.        I'm going to show you an exhibit. Give me a

25  second to pull that up. Do you see that exhibit there?

MATTHEW DANNER

Page 40

1   **A.        Yes.**

2   Q.        And we'll call this Danner 1. It begins as

3   bate stamp Dauphin DFS 233. Officer Danner, do you see

4   that notation at that bottom that I'm referring to

5   that says DFS 233?

6   **A.        Yes.**

7   Q.        That is a what we call bate stamp. It's a way

8   of marking documents that will help us to identify

9   them easily. And I will represent to you that that is

10  a marking that has been put on this document by

11  Dauphin County. And so I may refer to that, those

12  numbers as a way to know what we're talking about and

13  to identify what we're talking about.

14              I'm going to go back to the top of

15  this document. Do you see there it says Dauphin County

16  Prison at the top, title Use of Force, Chapter 9,

17  Security and Control. Subject, Use of Force Training.

18  Do you see all that there?

19  **A.        Yes.**

20  Q.        Do you know if you, do you recall having seen

21  this document before?

22  **A.        I have.**

23  Q.        Can you tell me what it is. And I can scroll

24  through it if you need to?

25  **A.        That was the use of force at the time for a**

MATTHEW DANNER

Page 41

1   **majority of my employment there, yes.**

2   Q.          When you say use of force what do you mean?

3   Let me ask you that again. I'm sorry.  Are you saying

4   is this a use of force manual or some type of training

5   document?

6   **A.          This would have been the policy that was**

7   **shown to us and gone over throughout the training.**

8   Q.          Okay. Got it. Let me pull that down because I

9   don't think that's the one I wanted to show you just

10  yet. Give me one second.

11                    I'm going to page 2 of the document.

12  Do you see there the part that says the law?

13  **A.          I do.**

14  Q.          Do you recall receiving instruction on, and

15  you can read this first if you want and I can go to

16  the next page because it continues to the next page

17  just to familiarize yourself with it.  So why don't

18  you take a second to look at it and then let me know

19  if you need me to move to the next page.

20  **A.          Okay.**

21  Q.          That's the end of the document. Just let me

22  know when you get there.

23  **A.          Okay.**

24  Q.          Do you recall receiving any training

25  regarding these legal decisions that have been

MATTHEW DANNER

Page 42

1   mentioned in these paragraphs you just read?

2   **A.        I received training on the context of that**

3   **stuff.  The legal names I don't ever remember being**

4   **brought up but we've seen these forms.  And that**

5   **context of most of those were discussed and brought**

6   **forward, yeah.**

7   Q.        Is this something that was discussed and

8   brought forward once or is this something that's done

9   annually?

10  **A.        It's supposed to be done annually.**

11  Q.        Did it happen annually for you?

12  **A.        I believe it did.**

13  Q.        Who provided that training?

14  **A.        The training instructors that went from -- I**

15  **had a couple within my time.**

16  Q.        And for annual training would this be part of

17  a -- let me start over. Is there a set time of year

18  where you received this annual training?

19  **A.        I'd say yeah. It was usually towards the**

20  **beginning I believe of the year but I don't know if it**

21  **was followed on a dead schedule like they had**

22  **something.  Like I don't remember it being the exact**

23  **same week of the month of that same year. You know**

24  **what I mean?**

25  Q.        Was this something that you when you attended

MATTHEW DANNER

Page 43

1   this training was there some type of verification that

2   was done to verify that you had attended the training?

3   **A.        We had to sign in.**

4   Q.        And do you know if that is something that is

5   kept as a record, something that you could actually

6   access to see what type of training you had?

7   **A.        I'm unsure.**

8   Q.        I want to talk next about away from the legal

9   decision to policies regarding the use of force. Do

10  you recall other than we looked at the beginning of

11  this document talks about the use of force.  Is there

12  a manual that you receive as a correction officer that

13  outlines the prison use of force policy?

14  **A.        A manual?**

15  Q.        Yes.

16  **A.        No.**

17  Q.        I'm going to show you a document.  I pulled

18  up what is bate stamped Dauphin DFS 244 and I'm going

19  to scroll through this and I want to know first if

20  this looks familiar to you?  Does any of this look

21  familiar?

22  **A.        It does. It looks like the power points for**

23  **what we would have during our training.**

24  Q.        So during your training you're presented --

25  one way that your training occurs is that you're

MATTHEW DANNER

Page 44

1  presented power points?

2  **A.         Correct.**

3  Q.         Do you recall if this particular document is

4  something that you ever actually received a physical

5  copy of?

6  **A.         I could have but I'm not positive if I**

7  **received this exact document.**

8  Q.         We're going to label this as Danner 2.  And

9  I'll represent that it goes from Dauphin DFS 244 to

10 288.

11              Could you tell me what your

12 understanding of the use of force policy is within

13 Dauphin County Prison.

14              MR. CARMELITE: At what point in

15 time?

16 Q.         Thank you. As of June 26, 2019 what was your

17 understanding of the Dauphin County Prison's use of

18 force policy?

19              MR. LAVERY: I'm just going to object

20 to form on that, Riley.

21 Q.         As of June 26. 2019 what was your

22 understanding of the use of force policy within the

23 Dauphin County Prison?

24 **A.         I don't understand what you want, my**

25 **understanding of the use of force.**

MATTHEW DANNER

Page 45

1    Q.        What did you understand that you were allowed

2    to do and that you weren't allowed to do when it came

3    to using force against inmates at the any Dauphin

4    County Prison.

5              MR. LAVERY: Same objection to form.

6    It's overbroad and vague.

7    Q.        Do you understand my question, Officer?

8              MR. CARMELITE: You can answer if you

9    understand the question.

10   **A.        I'm not understanding it fully with my**

11   **understanding of use of force. The use of force was to**

12   **go with the policy that the policy lays out the use of**

13   **force.**

14   Q.        Okay. And that's what I'm asking you, what

15   was your understanding of the policy, like what did

16   the policy tell you you could and could not do?

17   **A.        It allowed us --**

18             MR. LAVERY: Before you answer.  Same

19   objection. Overbroad, vague.

20   Q.        Go ahead, Officer Danner.

21   **A.        So it allowed us to use force when it was**

22   **necessary to use force.**

23   Q.        Are you familiar with the use of force

24   continuum?

25   **A.        Yes.**

MATTHEW DANNER

Page 46

1    Q.        What's your understanding of the use of force

2    continuum?  First of all, was there a use of force

3    continuum outlined in the use of force policy at

4    Dauphin County Prison?

5    **A.        Yes.**

6    Q.        What was your understanding of that

7    continuum?

8    **A.        What was the use of force continuum or**

9    **what --**

10   Q.        Yes.  What was your understanding of -- you

11   said that you're aware of the use of force continue.

12   What's your understanding of what that continuum was

13   as of June 26, 2019?

14   **A.        My understanding of it when there was a**

15   **resistance presented we were allowed to use equal or**

16   **one level above on the force continuum to keep control**

17   **or gain control of a situation.**

18   Q.        Okay. And levels of force what was your

19   understanding of, first of all, were there different

20   levels of force that you could apply?

21   **A.        Yes.**

22   Q.        Tell me what your recollection of those

23   levels of force were as of June 26, 2019?

24   **A.        It was officer presence, it was verbal**

25   **command, it was soft empty hands. At that time it was**

MATTHEW DANNER

Page 47

1   hard empty hands, intermediate weapons and then lethal

2   force.

3   Q.        You said that at that time it was hard empty

4   hands. Did that sometime, did that somehow change at

5   some point?

6   A.        I believe OC spray was put in there at some

7   point in time. I don't remember the date because we

8   started carrying OC spray on our side but that would

9   have been because it's not considered a chemical

10  munition so it fell between, the way we were trained

11  it fell between the, with the soft empty hand, hard

12  empty hand process.

13  Q.        Did the use of force policy as of June 26,

14  2019 did it include any instruction on deescalation?

15  A.        I do not recall if they had deescalation

16  within that policy.

17  Q.        Give me one second. I'm going to pull up

18  another exhibit. I just pulled up what's been bates

19  stamped Dauphin DFS is 227. It says at the top

20  Security Title 37, Chapter 95, Section 95-241. Let me

21  get the range of this document before I ask you about

22  it.  It goes up to Dauphin DFS 232. I'll start with

23  the first page there and I'm going to give you a

24  chance to look at this because I'm going to ask you if

25  you recognize this document. Do you recognize this

MATTHEW DANNER

Page 48

1  document?

2  **A.        It's not one that strikes in my head, no.**

3  Q.        I'm going to scroll through just so you can

4  see it. I'm going to ask you some specific questions

5  and then when we get there I'll give you a chance to

6  read it. But I'll just scroll through just to see if

7  it's -- and one thing I forget to say that the first

8  page says on the top right hand corner Local Policy

9  Chapter 9.22. The second page says Policy 9.17. So it

10  appears that the first page may be a cover letter for

11  the rest of it. But the second page is pages 1 through

12  5, it says Use of Force, PPCT Defensive Tactics

13  Instructor Manual. So just seeing that title is that

14  something that rings a bell with you as something

15  you've seen before?

16  **A.        The names up there sound familiar yeah but.**

17  Q.        Let me go back to the first page.  You see

18  that is signed there by Warden Brian S. Clark?

19  **A.        Correct.**

20  Q.        Was he the Warden on June 26, 2019?

21  **A.        What was the date?**

22  Q.        June 26, 2019.

23  **A.        I'm unsure when he received his promotion. He**

24  **was the Warden. I don't know up to what date and then**

25  **he went to the Director of Corrections at some point**

MATTHEW DANNER

Page 49

1    **in time in that timeframe. I don't know when that was.**

2    Q.        Do you see there that they're in the third

3    paragraph under procedure it says, "Any hands-on or

4    use of force against any inmate shall be reported

5    immediately to the on-duty Shift Commander who shall

6    insure the inmate is seen immediately by a medical

7    professional and have the incident documented."

8                Did you believe that to be the

9    policy as of June 26, 2019?

10   **A.        Yeah.**

11   Q.        And in the last paragraph says, "All use of

12   force incidents shall be documented and forwarded to

13   the administration for review and reporting to the

14   District Attorney's Office as well as the Pennsylvania

15   department of Corrections."

16                Did you believe that to be the

17   policy on June 26, 2019?

18   **A.        Yes.**

19   Q.        I'm going to skip to pages 228 and 229 bate

20   stamp. Paragraph 4, I want you to read that and read

21   that through up until No. 5 on the next page and let

22   me know when you're done.

23   **A.        You said 5 also?**

24   Q.        Not yet. Just 4.

25   **A.        Okay.**

MATTHEW DANNER

Page 50

1    Q.      Do those in Paragraph 4 represent the

2    continuum of use of force that you just spoke of?

3    **A.      Yeah.**

4    Q.      And you were trained on those, that use of

5    force continuum?

6    **A.      Correct.**

7    Q.      And with regard to, go ahead and read

8    Paragraph 5, please.

9    **A.      Okay.**

10    Q.      Do you recall being trained on ways that the

11    escalating levels of resistance by a subject, do you

12    recall being trained on those levels?

13    **A.      Yes.**

14    Q.      Is that something that came up during your

15    annual training or were you trained on it just once?

16    **A.      That was part, that 5 was part of the annual**

17    **training.**

18    Q.      Okay. Regarding Ty'rique Riley, we'll get

19    into more on him in just a second. But regarding

20    Ty'rique Riley did you ever fill out a use of force

21    form in relation to your encounter with him on June

22    26, 2019?

23    **A.      What do you mean use of force form?**

24    Q.      I'm just asking you, did you fill out a use

25    of force form?

MATTHEW DANNER

Page 51

1  **A.        We don't have use of force forms on our**
2  **level.**
3  Q.        When you say our level what are you referring
4  to?
5  **A.        As a CO.**
6  Q.        Is there a method for you reporting the use
7  of force on an inmate as a CO?
8  **A.        It gets reported to the shift Commander,**
9  **Lieutenants, Captains.  Usually a disciplinary report**
10  **would be filed by an officer and memos would be filed**
11  **by involved officers.**
12  Q.        What if anything did you do to report the use
13  of force relating to Ty'rique Riley in your encounter
14  with him on June 26, 2019?
15  **A.        I know I did a memo.**
16  Q.        And is that the memo that you mentioned that
17  you mentioned that you had reviewed in preparation for
18  your deposition here today?
19  **A.        Yes.**
20  Q.        Are there any other things that you did to
21  report use of force involving Ty'rique Riley on June
22  26, 2019?
23  **A.        I don't believe so. The Shift Commander was**
24  **present so there was no need to report it. It was**
25  **policy or procedure to do the standard paperwork for**

MATTHEW DANNER

Page 52

1  an officer. But the Shift Commander was already aware.

2  Q.          Had you ever, up until June 26, 2019 had you

3  received any training in the use of restraint chairs

4  involving inmates?

5  A.          Yes.

6  Q.          Was this training that was done just once or

7  was it part of your annual training?

8  A.          I don't recall if it's annual. I don't think

9  it would have been. I don't remember doing it annual

10  per se. But I remember we went over the restraint

11  chair several times in my career.

12  Q.          When you say we went over the restraint chair

13  what do you mean?

14  A.          We trained with it as in the function of the

15  restraint chair.

16  Q.          Did that training include instruction on when

17  and when not to use the restraint chair?

18  A.          I as a CO couldn't make the decision when or

19  when not to use the restraint chair. That was my

20  knowledge of the restraint chair.  I knew how to

21  operate and was trained and shown and talked about how

22  to use it but I was not allowed to make the decision

23  to use the restraint chair in the back of the jail.

24  Q.          When you say in back of the jail what do you

25  mean?

MATTHEW DANNER

Page 53

1    **A.          Anywhere.**

2    Q.          Whose decision was that if you know to use

3    the restraint chair?

4                        MR. CARMELITE: In general or with

5    regard to Mr. Riley?

6    Q.          In general. I think you were talking in

7    general about CO's are not allowed to make that

8    decision.  So in general who is allowed to make that

9    decision if you know?

10   **A.          The Shift Commander.**

11   Q.          Did you receive any training as of June 26,

12   2019 in recognizing an individual's mental health

13   condition?

14   **A.          We did have mental health training, yes.**

15   Q.          Was that training done once or was it done as

16   part of your annual training?

17   **A.          I'm considering like suicide training as**

18   **mental health training and that was done annually.**

19   Q.          Okay. Other than suicide training any other

20   training that you believe constitutes mental health

21   training?

22   **A.          I don't recall if it was done annually, no.**

23   **Some of the things we were trained in kind of, so you**

24   **were doing suicide training and mental health was**

25   **brought into that.**

MATTHEW DANNER

Page 54

1            MR. CARMELITE: Riley, I don't mean

2    to interrupt your deposition but I can use a restroom

3    break. Like if you're hitting a conclusion on your

4    line I'll be happy to wait.

5            MR. ROSS: Okay. Let me just ask him

6    a question about policy and then we can take a break.

7    I'm going to shift to something else.

8            MR. CARMELITE: Okay.

9    BY MR. ROSS:

10   Q.       Do you know as of June 26, 2019, do you know

11   if there was a policy at Dauphin County Prison

12   regarding the reporting of bad behavior by a

13   co-worker?

14           MR. LAVERY: Object to form.

15   Q.       Let me restate that. I'll restate the

16   question. Do you know if as of June 26, 2019 if there

17   was a policy at the Dauphin County Prison that covered

18   the reporting of policy violations by a co-worker?

19   **A.       So you're saying if I knew something was**

20   **wrong was there a policy for me to report?**

21   Q.       Yes.

22   **A.       I'm not sure if there was a policy but we**

23   **were -- you're required to report a violation or a**

24   **wrongdoing?**

25   Q.       That requirement extends to co-workers?

MATTHEW DANNER

Page 55

1    **A.        Correct.**

2    Q.        And you don't know if that was a policy that

3    you that was written, do you know if it was a policy

4    that was written?

5    **A.        I am not sure if there was a written policy**

6    **that we, no. I'm not sure.**

7    Q.        Do you recall how you were made aware of the

8    rule requiring you to report wrongdoing by a

9    co-worker?

10   **A.        Throughout trainings.**

11              MR. ROSS: Why don't we take a break

12   here. Do you want to come back at 9:30.

13              MR. CARMELITE: Yes.

14              MR. LAVERY: That's fine.

15              (Recess taken.)

16   BY MR. ROSS:

17   Q.        Officer Danner, I want to go back to the

18   policy regarding reporting co-workers for wrongdoing.

19   Had you ever reported a co-worker for wrongdoing?

20   **A.        No. Not officially.**

21   Q.        Okay. Have you ever unofficially or

22   officially reported a co-worker for anything involving

23   the use of force?

24   **A.        No.**

25   Q.        I want to shift now to talk about

MATTHEW DANNER

Page 56

1  specifically Ty'rique Riley. When is the first time

2  you came into contact with Ty'rique Riley?

3  **A.        The morning of that incident.**

4  Q.        And can we agree that that incident you're

5  referring to is the date that he was put into the

6  restraint chair?

7  **A.        Yes. That's the only time I had contact. Up**

8  **to that point.**

9  Q.        I'm sorry. Say that again.

10  **A.        Up to that point that's the only point I had**

11  **contact with Riley.**

12  Q.        Okay. And I'll represent that that date was

13  June 26, 2019. So you had not come into contact with

14  Ty'rique Riley before June 26, 2019; is that correct?

15  **A.        Not I recall, no.**

16  Q.        How did you come to come into contact with

17  Ty'rique Riley on June 26, 2019?

18  **A.        I was ordered to do a transport.**

19  Q.        Who gave you that order?

20  **A.        The actual order came from central control is**

21  **who I got the call from.**

22  Q.        When you say you got the call, is that

23  something that came over your radio?

24  **A.        No. By a phone.**

25  Q.        And were you provided any information as to

MATTHEW DANNER

Page 57

1  why the transport was needed?

2  **A.          Not at that time, no.**

3  Q.          At some point later were you provided

4  information as to why the transport was needed?

5  **A.          Yes.**

6  Q.          When were you provided with that information

7  and what was that information that you were provided?

8  **A.          I believe it was when I went up to central**

9  **control to get, to basically drop off some of my**

10 **property in that area to get prepared to go to the**

11 **transport at which time we were told that we were**

12 **transporting him.**

13 Q.          So when you say we were transporting him who

14 are you referring to?

15 **A.          Myself and the other transport officer**

16 **Singleton.**

17 Q.          And what what's Singleton's first name?

18 **A.          Steve.**

19 Q.          And as of that date what was his title if you

20 know?

21 **A.          CO.**

22 Q.          So you get the order, you get the phone call

23 that you're going to have to transfer someone.  This

24 phone call is coming from central control and at some

25 point you went up to central control. What did you do

MATTHEW DANNER

1  between the time you got the phone call and you went

2  up to central control?  What if anything did you do

3  between those two times?

4  **A.        Gathered some of my property up where I was**

5  **working, where I started my shift that day which was**

6  **out on P Block.**

7  Q.        What shift were you on that day?

8  **A.        First shift, 6 to 2.**

9  Q.        6:00 A.M. to 2:00 P.M.?

10  **A.        Correct.**

11  Q.        And you were on P block that day?

12  **A.        That was my assigned post from roll call,**

13  **yeah.**

14  Q.        And approximately what time did you get the

15  call from central control saying that you needed to do

16  a transport if you know?

17  **A.        Unsure.**

18  Q.        Was it closer to, well, strike that. After

19  gathering your property did you then go to central

20  control or did you do something else?

21  **A.        No. I went immediate to central.**

22  Q.        And what were you told at central about the

23  nature of the transport?

24  **A.        We were doing a transport on Ty'rique Riley**

25  **and it was an emergency transport by county vehicle is**

MATTHEW DANNER

Page 59

1    the term that was used.

2    Q.        What else were you told?

3    A.        I don't know what else we were told at that

4    point in time.

5    Q.        An emergency transport by county vehicle.

6    What does that mean?

7    A.        That means we're transporting within our

8    prison vehicle, our secure vehicle.

9    Q.        And by saying emergency transport does that,

10   the fact that it's called an emergency transport does

11   that make it different than some other type of

12   transport?

13   A.        Yeah. We would have other transports for say

14   a doctor's appointment, stuff like that, absolutely.

15   Or transport to a hospital that wasn't, what would be

16   considered. We don't determine the emergency. That

17   would be the medical staff.

18   Q.        Okay. And when that determination is made

19   that it's an emergency transport does that make that

20   transport somehow different than other types of

21   transports?

22   A.        It makes it priority. It makes it a little

23   more urgent.

24   Q.        And did you consider this transport to be

25   more urgent than other transports?

MATTHEW DANNER

Page 60

1   **A.        When I'm told by emergency transcript by**
2   **county vehicle, yes.**
3   Q.        Were you told why this was designated as an
4   emergency transport by county vehicle?
5   **A.        I don't know when I was told but I was told**
6   **at some point in time of why we were doing the**
7   **transport, yes.**
8   Q.        What were you told?
9   **A.        That it was altered mental status was the**
10  **term that was used.**
11  Q.        And who told you that?
12  **A.        I'm not sure. Like I said, I don't know when**
13  **that came into play. I don't know if it was from**
14  **central or when we were getting, what we call geared**
15  **up, our equipment to do the transport. But it was**
16  **within that timeframe of central to getting our**
17  **equipment for transport.**
18  Q.        So you were told that it was an altered
19  mental state before you encountered Ty'rique Riley?
20  **A.        Correct.**
21  Q.        Anything else that you were told about this
22  transport before you encountered Ty'rique Riley?
23  **A.        Not that I can recall at this point.**
24  Q.        I want to go back to the designation of
25  emergency transport by county vehicle. Are there any

MATTHEW DANNER

Page 61

1  other types of transport that you would be involved in

2  other than by county vehicle?

3  **A.        We would be involved in all transports other**

4  **than what would be a standard transport for like court**

5  **and that's by Sheriffs but the doctors' appointments,**

6  **emergency transports.  Anything outside of like taking**

7  **somebody to court which the Sheriffs do we do the**

8  **transports.**

9  Q.        And my question is, would there be a

10  transport that would be done in any other fashion

11  other than by a county vehicle?

12  **A.        For that situation?**

13  Q.        For any types of transports. That's what I'm

14  asking.  Like for instance, like if an ambulance came

15  would that be considered a transport that you would be

16  involved with but it's not involving a county vehicle?

17  **A.        Yes.**

18  Q.        Okay.  Is there something about using the

19  county vehicle take makes a transport different than

20  other types of transports?

21  **A.        Other than we're using county vehicles both**

22  **officers are in that vehicle.  If an ambulance would**

23  **come we would have one officer in a vehicle, one**

24  **officer in an ambulance.**

25  Q.        Let's talk about emergency transports. Is

MATTHEW DANNER

Page 62

1    there such a thing as an emergency transport that's

2    done by ambulance?

3    **A.        Yes.**

4    Q.        Is there any type of significance in the fact

5    that emergency transport is done by county vehicle

6    versus one done by ambulance?

7                    MR. CARMELITE: Objection to form.

8    You can answer.

9    **A.        Repeat.**

10   Q.        Is there any significance in the fact that a

11   transport is designated it being done by emergency

12   transport by county vehicle versus an emergency

13   transport by ambulance?

14   **A.        What do you mean by significance?**

15   Q.        So if let's say that their designation is

16   done by emergent by county vehicle does that speak to

17   it being a more urgent matter than waiting for an

18   ambulance to arrive to do the emergency transport?

19                    MR. CARMELITE: Objection to form.

20   You can answer.

21   **A.        Both are emergency transports. Like I said,**

22   **we don't make the decision of how the transport goes**

23   **out. That's made by medical staff.**

24   Q.        So from your perspective though what I'm

25   asking is, if you're told hey, we're going to do an

MATTHEW DANNER

Page 63

1   emergency transport by county vehicle does that to you

2   signify that the matter is more urgent than an

3   emergency transfer that's done by ambulance?

4                    MR. CARMELITE: Objection to form.

5   You can answer.

6   **A.          Both are urgent. Both are an emergency**

7   **transport.**

8   Q.          I understand that. Is the one done by county

9   vehicle does that signify to you that it is more

10  urgent or does it not signify the urgency?

11  **A.          No.**

12                   MR. CARMELITE: Objection to form.

13  You can answer.

14  **A.          No. To me it doesn't, an emergency transport**

15  **is an emergency transport. We're trying to get there**

16  **as soon as possible. That's for to us get up, get**

17  **armed and do what we have to do immediately.**

18  Q.          When you are directed to make an emergency

19  transport are there any forms that you have to fill

20  out that will lead towards to you making that

21  transport?

22  **A.          No.  I have no forms to fill out.**

23  Q.          Is there anything that you have to do to

24  signify to for instance those on P Block that you're

25  leaving to go do this emergency transport?

MATTHEW DANNER

Page 64

1   **A.          Just let them know. All we do is tell them.**

2   Q.          Do you need to sign out the county vehicle

3   when you do the emergency transport?

4   **A.          We don't sign out a county vehicle. No. The**

5   **county vehicle will be issued.  The keys and the stuff**

6   **that we need are all signed out too. We have a form in**

7   **the vehicle that we fill out.**

8   Q.          Is there anything that you can think of that

9   would represent the time that you received the call to

10  make the emergency transport?

11  **A.          Repeat that again.**

12  Q.          Is there anything that you can think of that

13  would be documented that would represent the time that

14  you received the call to make the emergency transport?

15  **A.          No.**

16  Q.          Did you have a sense of urgency with regard

17  to this particular emergency transport?

18  **A.          Yes.**

19  Q.          And I want you to tell me, you described that

20  you got the call and you went to control. Is there

21  anything else that happened at central control that

22  you haven't spoke to me about?

23  **A.          Not take I recall, no.**

24  Q.          And what did you do next after leaving

25  central control?

MATTHEW DANNER

Page 65

1   **A.        We go up front to the armory.**

2   Q.        When you say we who are you referring to?

3   **A.        Myself, Singleton and a Shift Commander or**

4   **somebody who's able to issue the firearm and duty**

5   **belts and transport box.**

6   Q.        Do you know who that Shift Commander was?

7   **A.        I do not know who signed the equipment out to**

8   **us, no.**

9   Q.        What is the purpose of going to the Armory?

10  **A.        To get the proper equipment we need to do a**

11  **transport.**

12  Q.        And what is that equipment that you gather?

13  **A.        That's the duty belt, the transport kit.**

14  Q.        Anything else?

15  **A.        Sometimes the Shift Commander, I don't recall**

16  **in this instance.  The Shift Commander will have like**

17  **a vehicle key. That's issued at that point in time.**

18  Q.        And for the duty belt describe to me what is

19  a duty belt?

20  **A.        A duty belt is just a belt that goes over top**

21  **of your regular belt to secure. It has a holster for**

22  **your pistol. It has a magazine holder that holds two**

23  **magazines. It has OC spray. It has handcuffs and at**

24  **the time I wasn't sure if were carrying an ASP baton**

25  **and if we were not carrying an ASP baton it had a**

MATTHEW DANNER

Page 66

1   baton loop on it for what we used to have issued or

2   could have been issued was an PR-24. But when I was

3   there we never were issued that PR-24. When I was

4   there we never were issued that PR-24. You asked about

5   baton.  I don't know when that was implemented into

6   our duty belt.

7   Q.        What is the transport kit?

8   A.        It looks like a tool box. I has a padlock on

9   it. When you open up it has a leather belt with a

10  D-ring. It usually has two handcuffs in it, two sets

11  of shackles, flash light, spit shield, a metal

12  transport belt, it looks like a chain. And flex cuffs

13  or they look like zip ties, a set of flex cuffs.

14  Q.        And you stated you had to sign these items

15  out?

16  A.        They get issued to us.  The Shift Commander

17  whoever is issuing it to us signs it out in a log in

18  the armory.

19  Q.        Did you do anything else at the Armory?

20  A.        Not that I recall. As I said, sometimes we

21  get issued papers so we'll get someone's medical

22  paperwork that we'll transfer paperwork there. I don't

23  know if that happened that day.  But mostly we're up

24  here to get the duty belt and the transfer box.

25  Q.        What happened next?

MATTHEW DANNER

Page 67

1   A.         We walk around to -- we leave there. We go

2   around to the what's called north sally.  We arm the

3   weapon, enter north sally, secure the weapon, cell

4   phone.  We get issued a cell phone also at the Armory.

5   We store the cell phone, the firearms, the ammo, the

6   tools that are on the belt into the box before

7   entering the back of the prison.

8   Q.         And north sally you said; is that --

9   A.         That's what we refer to it as north sally.

10  Q.         Is that referring to a certain area of the

11  prison?

12  A.         That's the main vehicle entrance that we use.

13  Q.         What did you do next?

14  A.         After we unloaded our stuff into the box we

15  went into the lobby.

16  Q.         And what happened next?

17  A.         What I remember is from there we removed or

18  somebody removed, it would have been the opened up the

19  box and removed the leather box with the D ring and

20  the shackles.  The inmate was not in the lobby and not

21  medical so we went through central to find out where

22  the inmate was and at that point what we're to do,

23  where we're to go to to get the individual for the

24  transport.

25  Q.         And did you learn where the inmate was?

MATTHEW DANNER

Page 68

1    **A.**        **We did.**

2    Q.        What did you do next?

3    **A.**        **Went to A-block. A-1 drive specifically.**

4    Q.        Why don't you describe to me what happened

5    next.

6    **A.**        **Walked up o the door.  I was the first one at**

7    **the door.  Looking in through the windows.   Inmate**

8    **Riley was standing there. That's who we were taking to**

9    **transport. He was in a smock, suicide smock standing**

10   **inside the cell looking out at me.**

11   Q.        Keep going.

12   **A.**        **I gave the order for him to step back away**

13   **from the door. He did. At that time I motioned for the**

14   **door to be open and entered the cell.**

15   Q.        Tell me what happened next.

16   **A.**        **Beings he was in a smock I let him know we**

17   **need to remove the smock. He was going on a transport**

18   **and we need to put him into a uniform that I had with**

19   **me.**

20   Q.        When did you get that uniform?

21   **A.**        **I'm unsure of when or where I picked the**

22   **uniform up. I just know I had it with me.**

23   Q.        At some point were you informed that he would

24   need a uniform?

25   **A.**        **When we take inmates out on transports the**

MATTHEW DANNER

Page 69

1   policy or the directive was that they were to be in a

2   uniform. They could not wear a smock in public, a

3   suicide smock.

4   Q.        Were you told at some point before arriving

5   on A-block that Ty'rique Riley was in a suicide smock?

6   A.        I believe I was told he was a Level 1 suicide

7   watch which means he would be in a suicide smock. So I

8   don't know if I was told I was in a smock but I was

9   told he was a Level 1 suicide watch to me that means

10  that it was standard for a Level 1.

11  Q.        Do you remember who told you that he was a

12  Level 1?

13  A.        No.

14  Q.        What happened next after you told him that he

15  would need to change out of his smock into his

16  uniform?

17  A.        He kind of stood there and stared at me,

18  didn't give me any response verbally. It was repeated

19  several times.  During one of those he reached up. His

20  smock has Velcro. As if he was going to remove the

21  smock, grabbed ahold of the Velcro. But he didn't

22  remove the -- I don't recall him removing the smock.

23  At that point I remember him standing in front of me

24  without the smock on.

25  Q.        Okay. What happened next?

MATTHEW DANNER

Page 70

1   **A.          I offered him the uniform. I told him he**
2   **needed to put the uniform on. I extended my arm with**
3   **the uniform in it. No response. Didn't say anything.**
4   **Just kept staring. Several times, hey, put the uniform**
5   **on was kind of addressed. At some point he grabbed my**
6   **arm and wrist.**
7   Q.          Keep going.
8   **A.          At which time we used force, I used force. I**
9   **regrabbed his arm and we ended up getting into -- and**
10  **it was physical.**
11  Q.          Up until the time before he grabbed your
12  wrist were you and Ty'rique Riley the only ones in the
13  cell?
14  **A.          No it was myself, Steve. I knew, that's who I**
15  **knew was in the cell at that time.**
16  Q.          And when he grabbed your arm, you said it got
17  physical, what happened when it got physical?
18  **A.          He came forward. We pulled him forward. And**
19  **the way it says is we tried to dress him. To me to**
20  **remember that now I remember reading that now but I**
21  **don't know of that. I pulled him forward, tried to put**
22  **the shirt on. He pulled it off because he didn't have**
23  **a shirt on.**
24  **               We ended up having to take him to**
25  **the ground. Went to the ground. I had the upper**

MATTHEW DANNER

Page 71

1   **extremities. There was an officer who pulled his foot**

2   **out. The other foot was still on the ground so I swept**

3   **it out with my foot, placed my foot behind and kind of**

4   **pushed it forward taking him to the ground on his**

5   **back.**

6   Q.      You stated that you didn't know, you read

7   that he tried to put the clothes on but you didn't

8   know that -- tell me what you mean.

9   **A.      So in my statement I believe it was the CID**

10  **it says that we attempted to put the shirt on, pulled**

11  **him forward and attempted to put the shirt on. Like I**

12  **said, I can remember reading that now but I don't,**

13  **right now I don't remember that actual moment within**

14  **that incident.**

15  Q.      And was it your intent to take Ty'rique Riley

16  to the ground?

17  **A.      At that time, yes.**

18  Q.      And what was the -- why was that your intent?

19  **A.      The ground is safer for us to try to gain**

20  **control.**

21  Q.      Did you believe that you did not have control

22  at the time before you took him to the ground?

23  **A.      I did not have control.**

24  Q.      Other than him grabbing your wrist what other

25  actions were being done by Ty'rique Riley to make you

MATTHEW DANNER

Page 72

1   feel like you didn't have control?

2   A.        He was grabbing manipulating his body,

3   pushing into us just not allowing us to control him.

4   At that point we would be ordering him, we did order

5   him to cuff up as we were going through him stop

6   resisting.

7   Q.        Was he wearing any clothes at this time?

8   A.        No.

9   Q.        Okay. So at any point prior to you taking him

10  to the ground did he make any, did he say anything?

11  A.        No.

12  Q.        Did he make any noises of any kind, screams,

13  yells, laughter, anything like that?

14  A.        No screams, no laughter, he did make noise

15  but it was not, it was more of -- I don't even know

16  how to explain it. It was kind of like a noise you

17  would hear from like a goat, like a mad noise.

18  Q.        And how often did he make that noise before

19  you took him to the ground?

20  A.        At that point there were so many orders being

21  given I couldn't tell you how many times he made that

22  noise.

23  Q.        Did he make it more than once?

24  A.        I would say yeah.

25  Q.        When you took him to the ground did you go to

MATTHEW DANNER

Page 73

1    the ground with him?

2    **A.        I did.**

3    Q.        Did anyone else go to the ground with him

4    other than you and him?

5    **A.        Everything would have been behind me. I would**

6    **assume that they did in the positions that we were in**

7    **afterwards, yeah.**

8    Q.        You mentioned that an officer had extended

9    his leg. Was that Officer Singleton?

10   **A.        I'm not sure.**

11   Q.        You mentioned, you just mentioned the

12   position that you were.  In what position were you

13   when he went to the ground?

14   **A.        He was in a position of on his back looking**

15   **up at me.**

16   Q.        And you were on top of him?

17   **A.        No. Not on top of him.**

18   Q.        Where were you positioned?

19   **A.        I was on my knees. I was over him but I**

20   **wouldn't say I was on top of him.**

21   Q.        And where were his hands?

22   **A.        One was definitely still on me. I don't know**

23   **where the other was. When he grabbed I want to say it**

24   **was my left arm, he held.**

25   Q.        You're on the ground. Your position was as

MATTHEW DANNER

Page 74

1    you stated.  Tell me what happened next.

2    **A.        The orders were to stop resisting, cuff up.**

3    **He refused.  We were trying to use force to get the**

4    **restraints on him. At one point I got him rolled face**

5    **down so we could apply handcuffs with the hands behind**

6    **his back.**

7    Q.        And were handcuffs applied?

8    **A.        I was able to successfully put one handcuff**

9    **on almost immediately. And the second one he would not**

10   **give his hand up. He kept moving it or posting it**

11   **away.**

12   Q.        What happened next?

13   **A.        I continued to attempt to get the hand.**

14   **Eventually I did gain control of that hand, got ahold**

15   **of it and brought it to the center of the back.  So**

16   **both hands ended up being cuffed.**

17   Q.        What happened next?

18   **A.        I don't know when the shackles were put on.**

19   **Once we had him restrained and realized he was**

20   **restrained we kept him in a prone position for the**

21   **most part. He was able to roll to his side.**

22   Q.        If shackles were placed on where were they

23   placed?

24   **A.        The shackles go on his legs, his ankles.**

25   Q.        So he was, tell me, describe the shackles.

MATTHEW DANNER

Page 75

1   Was it just like a bracelet on each ankle joined by a

2   chain? Is that how the shackle --

3   **A.      Correct.**

4   Q.      And was that chain fastened to anything else?

5   **A.      No.**

6   Q.      His waist or his hands or anything like that?

7   **A.      No.**

8   Q.      So at this point is he still on the ground?

9   **A.      He is.**

10   Q.      So he's cuffed behind his back.  He also had

11   shackles on his ankles; is that correct?

12   **A.      Correct.**

13   Q.      Any other restraints on him?

14   **A.      No.**

15   Q.      What happens next?

16   **A.      As I said, he ended up in the prone position**

17   **face down able to roll off to his side. He was**

18   **manipulating to turn his body just continuing to be**

19   **resistant, not complying to the orders to, you know,**

20   **calm down, lay there.**

21           **At that point I had to call as I**

22   **said for somebody to make a decision.  Because at that**

23   **point in time I was unsure if he was still going on**

24   **the transport with the two officers, they were going**

25   **to add officers, if what there, what the supervisor or**

MATTHEW DANNER

Page 76

1    shift Commander's decision was to do with Riley.

2    Q.        And who did you call?

3    A.        I didn't call anybody. I ended up yelling

4    because I was still knelt on the ground with Riley.

5    Q.        What did you yell?

6    A.        I believe I yelled, call somebody that could

7    make a fucking decision.

8    Q.        What happened next?

9    A.        I waited.

10   Q.        When you called out for someone to make a

11   decision who else was in the cell with you and Officer

12   Singleton and Ty'rique Riley?

13   A.        It was me, Singleton, Riley, I believe

14   Hoffman was in the cell at that time.

15   Q.        What's Hoffman's first name?

16   A.        I can't remember his first name. He left,

17   retired, I don't know how long ago. We used last names

18   very, that's how we talked to each other, it's all

19   last names in there.

20   Q.        Okay. Understood. Who else was in the cell?

21   A.        I don't think anybody else was in the cell at

22   that point in time.

23   Q.        What happened next?

24   A.        Eventually officers showed up and then from

25   watching the video I know Sergeants were there.  I

MATTHEW DANNER

Page 77

1  **want to say Sergeant Hess. I can't remember the exact**

2  **timing. But I know Hess, Sergeant Hess ended up being**

3  **there, CO Donovan was there, CO Swanson was there,**

4  **eventually Sergeant Biter was there, Sergeant Lewis**

5  **was there, and Captain Clark showed up.**

6  Q.        And I know you said that a bunch of people

7  showed up.  So I want to what you next did with

8  Ty'rique Riley and then we can talk about who was

9  there when these things happened. But are you still on

10  the ground when you call out for someone to make a

11  decision?

12  **A.        Yes.**

13  Q.        What happens next between you and Ty'rique

14  Riley?

15  **A.        Nothing. He continued to just contort his**

16  **body, move his body, lift his hips, pull his shoulders**

17  **up.  And it was just verbal orders telling him to calm**

18  **down, relax.**

19  Q.        Okay. At some point you all go from, I'm

20  assuming you went from the floor. So that's what I'm

21  asking. What's the next thing after being on the floor

22  with him?

23  **A.        He went from the floor to the other officers**

24  **and they were placing him in a restraint chair.**

25  Q.        So at the time, at some point a restraint

MATTHEW DANNER

Page 78

1   chair arrived; is that correct?

2   **A.        Correct.**

3   Q.        Do you see it arrive?

4   **A.        I couldn't see it. As I said, there was**

5   **definitely more people showing up at that point in**

6   **time. I wouldn't have seen it arrive.  You can hear**

7   **it. I knew it was called for.**

8   Q.        While Ty'rique Riley is on the floor and he's

9   handcuffed behind his back and shackled on his legs,

10  are you maintaining physical contact with him?

11  **A.        Yes. I had my hands on him.**

12  Q.        Did anyone else have their hands on him while

13  he was on the ground?

14  **A.        I can't speak for other people and I don't**

15  **remember. More than likely but I can't say for a fact**

16  **yes.**

17  Q.        You mentioned other people coming into the

18  cell. How many more people came into the cell?

19  **A.        I don't know how many other people entered**

20  **that cell.**

21  Q.        The names that you just gave me, did CO

22  Donovan enter the cell?

23              MR. CARMELITE: Objection to form.

24  At what point in time, Riley?

25  Q.        I'm saying, we're talking about, you said

MATTHEW DANNER

Page 79

1    that Ty'rique Riley went from the floor to the

2    restraint chair; is that correct?

3    **A.        Correct.**

4    Q.        When he went to the restraint chair was the

5    restraint chair inside or outside of the cell?

6    **A.        Outside.**

7    Q.        So in the time, between the time that he was

8    on the floor and he went into the restraint chair he

9    was in the cell, correct?

10   **A.        Correct.**

11   Q.        So during that time that he was in the cell

12   after he was handcuffed and shackled up until the time

13   that he went into the restraint chair outside of the

14   cell I want to know who entered the cell. So do you

15   know if CO Donovan entered the cell?

16   **A.        I don't know for a fact if she entered the**

17   **cell. I mean, I watched the video. If I could clearly**

18   **say yes or no.  But I don't know if she entered the**

19   **cell, what time she entered the cell, if she did. At**

20   **that time I knew it was me, Singleton and Hoffman.**

21   Q.        Hoffman is a CO?

22   **A.        Yes.  That's the one I don't know his first**

23   **name.**

24   Q.        CO Swanson, do you know if she entered the

25   cell?

MATTHEW DANNER

Page 80

1  **A.          I don't know. Like I wasn't paying attention**
2  **to those officers and who was in and out at what times**
3  **or at what periods with him on the floor.**
4  Q.          Did CO Hoffman make physical contact in the
5  cell Ty'rique Riley?
6  **A.          I would assume so. I don't know what he did**
7  **or, but he was in there assisting myself and Singleton**
8  **during the incident.**
9  Q.          At any point did you see CO Hoffman on the
10 floor while you were on the floor with Ty'rique Riley?
11 **A.          Again, I assume he was kneeled down. He was**
12 **the third man.  And being I could look and see out the**
13 **door I assume he was knelt down at that point in time.**
14 Q.          CO Singleton, did he make any physical
15 contact with Ty'rique Riley while you were inside the
16 cell?
17 **A.          Yes.**
18 Q.          What physical contact did you see him make
19 with Ty'rique Riley?
20 **A.          I didn't see him make physical contact but I**
21 **know that he was assisting me with taking him to the**
22 **ground and cuffing. I don't know what physical contact**
23 **he made with the individual.**
24 Q.          Do you recall anyone else making physical
25 contact with Ty'rique Riley inside the cell?

MATTHEW DANNER

Page 81

1    **A.**         **At which point?**

2    Q.          At any point from the time that he was taken

3    to the ground until he was taken out of the cell and

4    put into the restraint chair.

5    **A.**         **When we brought him off the floor there were**

6    **other officers that took control of Riley to get him**

7    **out of the cell the last maybe two feet, three feet of**

8    **the cell.**

9    Q.          Do you know which officers had took control

10   of Ty'rique Riley?

11   **A.**         **No.**

12   Q.          At any point prior to Ty'rique Riley being

13   put into the restraint chair did he say anything?

14   **A.**         **No.**

15   Q.          I think we talked before about him prior to

16   being taken to the ground. Once he was taken to the

17   ground to the time he was taken to the ground and

18   placed in to restraint chair did you hear him say

19   anything?

20   **A.**         **No.**

21   Q.          Did you hear him scream?

22   **A.**         **No.**

23   Q.          Did you hear him laugh?

24   **A.**         **No.**

25   Q.          Did he make anymore of those noises that you

MATTHEW DANNER

Page 82

1   referred to before that sounded almost like a goat you

2   said?

3   **A.        I don't remember.**

4   Q.        Okay.

5   **A.        I don't remember hearing them, no.**

6   Q.        I'm going to show you a document here. We're

7   going to make this D-4.  Do you see at the bottom,

8   it's bate stamped CID000161. Have you seen this

9   document before?

10  **A.        Yes.**

11  Q.        What is this document?

12  **A.        That's my memo from the day.**

13  Q.        This is something you wrote yourself?

14  **A.        Yes.**

15  Q.        You state here that other staff and myself

16  were ordered to put Inmate Riley into a restraint

17  chair.  Who gave that order?

18  **A.        The Captain.**

19  Q.        Captain Klahr?

20  **A.        Captain Klahr, yes.**

21  Q.        In giving that order did Captain Klahr say --

22  what did he say in giving that order?

23  **A.        I don't recall his exact statement. I just**

24  **knew the order was to place him in a restraint chair.**

25  Q.        You had stated before that you didn't know if

MATTHEW DANNER

Page 83

1  he was still going to be transported or not.  Did

2  anyone speak to whether or not he was going to be

3  transported in connection with him being placed into

4  the restraint chair?

5  **A.**        **No.**

6  Q.        Did Captain Klahr or anyone state any reason

7  as to why Ty'rique Riley should be placed in the

8  restraint chair?

9  **A.**        **You said did he state?**

10  Q.        Yes. Did anyone give any reasons as to why

11  Ty'rique Riley should be place in the restraint chair?

12  **A.**        **No.**

13  Q.        Did anyone object verbally to Ty'rique Riley

14  being placed in the restraint chair?

15  **A.**        **No.**

16  Q.        Based on your training did you believe it was

17  appropriate for Ty'rique Riley to be placed in the

18  restraint chair?

19  **A.**        **Yes.**

20  Q.        Why is that?

21  **A.**        **He was combative and even at the point of**

22  **getting off the floor affair we got handcuffs and**

23  **shackled he continued to not comply.  So is my opinion**

24  **the safest place for him would have been in the**

25  **restraint chair.**

MATTHEW DANNER

Page 84

1    Q.        What has your training been with regard to
2    the purpose of using a restraint chair?
3    **A.        Repeat that.**
4    Q.        What was your training as to why an
5    individual would be placed into a restraint chair, how
6    were you trained as to why an individual would be
7    placed into a restraint chair?
8    **A.        If they were a threat to themselves to harm**
9    **themselves or a threat to harm staff.**
10   Q.        Did you feel that at that time that Ty'rique
11   Riley was a threat to himself to harm himself?
12   **A.        Yes.**
13   Q.        How so?
14   **A.        His actions towards staff would have created**
15   **a higher use of force, to escort him without using a**
16   **chair.**
17   Q.        And at the time did you feel that he was a
18   threat to harm staff?
19   **A.        Yes.**
20   Q.        How so?
21   **A.        Just because an individual is handcuffed and**
22   **shackled doesn't make them not a threat. They still**
23   **use body parts to assault people.**
24   Q.        And what way did you that Ty'rique Riley at
25   that time was a threat to harm staff?

MATTHEW DANNER

Page 85

1   **A.          He wasn't following verbal directives. He was**

2   **still moving and contorting his body to resist our**

3   **abilities to keep constant control of him.**

4   Q.          And at some point he was placed into the

5   restraint chair; is that correct?

6   **A.          Correct.**

7   Q.          Did you assist in placing him into the

8   restraint chair?

9   **A.          I did.**

10  Q.          Tell me what if anything you did in getting

11  him in the restraint chair and getting him restrained.

12  **A.          I assisted by controlling at that point when**

13  **he was going into the restraint chair.  When I got to**

14  **him I went to the opposite side and controlled his**

15  **hips and torso a little bit to keep him sitting down**

16  **into the chair.**

17  Q.          How did you control his hips and torso?

18  **A.          Just pressure.**

19  Q.          With your hands?

20  **A.          Correct. I used my leg I believe to block his**

21  **leg from kicking outward.**

22  Q.          At this time he was still shackled; is that

23  correct?

24  **A.          Correct.**

25  Q.          At any point were his legs I guess bound to

MATTHEW DANNER

Page 86

1    the restraint chair?

2    **A.        I do not recall.**

3    Q.        At any point were his arms bound to the

4    restraint chair?

5    **A.        No.**

6    Q.        How was he kept in place in the restraint

7    chair?

8    **A.        The restraint chair has straps, seat belts,**

9    **like straps.**

10   Q.        And how do the -- what body parts do the

11   straps cover?

12   **A.        There's a strap for each shoulder that comes**

13   **across the shoulder down to the hip just like in a**

14   **vehicle seat belt.**

15   Q.        So it comes from one shoulder across the body

16   to the opposite hip?

17   **A.        Correct. There's one for each shoulder.**

18   Q.        So it creates like a cross, an X across the

19   body?

20   **A.        Correct. There's a lap belt that comes from**

21   **one side of the hip to the other side of the hip.  The**

22   **same thing as a vehicle's seat belt.**

23   Q.        Is there a particular order in which those

24   straps and the lap belt are to be applied?

25   **A.        Most of the time we secure the lap belt first**

MATTHEW DANNER

Page 87

1    **and the shoulder belt second.**

2    Q.        Is there anything about the restraint chair

3    that would prevent any other order for those three

4    devices?  For instance, if you started with the

5    shoulder first are you not able then to do the lap?

6    **A.        The lap would just be less effective because**

7    **of the way the buckles come into the side I believe.**

8    **So we usually put the lap belt on first.**

9    Q.        You're saying the lap would be less effective

10   if you were to use the shoulders first?

11   **A.        Correct.**

12   Q.        And were the shoulder straps applied to

13   Ty'rique Riley?

14   **A.        They were.**

15   Q.        And was the lap belt applied to Ty'rique

16   Riley?

17   **A.        It was.**

18   Q.        And do you know if the lap belt was applied

19   first?

20   **A.        Do not know.**

21   Q.        Did you apply any of the restraints?

22   **A.        I do not remember putting any of those**

23   **restraints on, no.**

24   Q.        Other than those three restraints, the two

25   shoulders and the one lap are there any other

MATTHEW DANNER

Page 88

1    restraints on the restraint chair?

2    **A.        There's a belt that comes across the shin**

3    **just above the ankle for both feet.  The same as like**

4    **the lap belt except across the shins just above the**

5    **ankles.**

6    Q.        So one belt that is extended to go across

7    both shins?

8    **A.        Correct.**

9    Q.        Any other restraints?

10   **A.        No.**

11   Q.        Do you know if the belt across the shin was

12   applied to Ty'rique Riley?

13   **A.        It was.**

14   Q.        And you did not apply that yourself?

15   **A.        I don't believe so.**

16   Q.        Is there any type of head restraint on the

17   restraint chair?

18   **A.        No.**

19   Q.        And was there some time of spit shield or

20   head device that was used on Ty'rique Riley?

21   **A.        There was.**

22   Q.        What was used?

23   **A.        It was a spit shield. It's a mesh fabric.**

24   Q.        Was that applied before or after he was

25   placed in the restraint chair?

MATTHEW DANNER

Page 89

1    **A.        I believe it was before. I believe it was**
2    **after we got the handcuffs and shackles on him. After**
3    **that the spit shield was placed on him.**
4    Q.        Do you believe that the spit shield was
5    placed on him inside the cell?
6    **A.        Yes. I know it was placed on him inside the**
7    **cell.**
8    Q.        Who placed that on him inside the cell?
9    **A.        I did.**
10   Q.        Where did you get the spit shield from to
11   place on him inside the cell?
12   **A.        It was handed to me through officers.**
13   Q.        And why was the spit shield placed on
14   Ty'rique Riley?
15   **A.        I called for it because after the incident he**
16   **was breathing heavy, blowing air. I don't say he was**
17   **spitting but he was blowing air hard.  And the stuff**
18   **from his mouth was coming out.**
19   Q.        When you say stuff from his mouth what are
20   you referring to?
21   **A.        Spit. Spit.  And there was like a cotton**
22   **mouth, a white foamy cotton mouth.**
23   Q.        Did you get any of the spit on you before
24   placing the spit shield on him?
25   **A.        Not that I believe.**

MATTHEW DANNER

Page 90

1   Q.        Did you get any of the white foam on you

2   before placing the spit shield on him?

3   **A.        Not that I recall.**

4   Q.        How about anyone else in the cell, did anyone

5   else complain about getting spit on before the spit

6   shield was applied?

7   **A.        Not that I recall.**

8   Q.        Did anyone complain of getting the white foam

9   on him them before the submit shield was applied?

10  **A.        No the that I recall.**

11  Q.        Was the spit shield applied by you as a

12  preventive measure?

13  **A.        Correct.**

14  Q.        Did Ty'rique Riley ever try to bite you

15  before the spit shield was applied?

16  **A.        Not that I recall.**

17  Q.        Do you know if he tried to bite anyone else?

18  **A.        Not that I recall.**

19  Q.        No one else complained of him trying to bite

20  them while in the cell, correct?

21  **A.        Not that I recall. No.**

22  Q.        At some point in your report you stated that

23  he became unresponsive. At what point during this

24  encounter did Ty'rique Riley become unresponsive?

25  **A.        I noticed that as they were taking the chair**

MATTHEW DANNER

Page 91

1  off of the block and another officer made a statement

2  about they didn't think he was breathing.

3  Q.      When you had your hands on him in the

4  restraint chair you mentioned you were holding his

5  waist down, was he responsive at that time?

6  A.      Yes. He was kicking.  He was also using his

7  legs, pushing them into the base of the chair or floor

8  area driving his hips upward out of the chair, using

9  his shoulders to arch his back.

10  Q.      Was he responsive when the shoulder straps

11  were applied to him if you know?

12  A.      As far as I know, yeah. Because shoulder

13  straps were applied before the legs and he was

14  kicking.  That's why I had to place my leg in front of

15  his leg so he wouldn't kick the staff that was trying

16  to put the leg strap across him.

17  Q.      When the leg strap was placed across him was

18  he responsive?

19  A.      I don't recall at that time. He was secured

20  and I believe they put a green smock and we were

21  starting to take him off of the block.

22  Q.      And you stated that you noticed him being

23  unresponsive as the chair was moving off the block.

24  Did you notice it or were you told that he was

25  unresponsive?

MATTHEW DANNER

Page 92

1  **A.       I don't recall if I -- it all happened I**
2  **think simultaneously in my mind. Like I don't -- I**
3  **didn't see him and say he was unresponsive. It was**
4  **kind of as they said it I looked I believe and that's**
5  **how I found that he just looked unresponsive. He**
6  **wasn't moving.**
7  Q.       And what happened next?
8  **A.       There were two sternum rubs done. One was by**
9  **Sergeant Biter. The other one I do not know who did**
10 **it.**
11 Q.       Was that while the restraint chair was still
12 on the A-block?
13 **A.       Correct.**
14 Q.       And what happened next?
15 **A.       There was no response to the sternum rub. He**
16 **appeared not to be breathing.  That would be the**
17 **discussion, the talk that happened during that short**
18 **period of time there.**
19 Q.       And what happened next?
20 **A.       Somebody I believe called the medical**
21 **emergency.  I do not know who.**
22 Q.       And what does that signify to you when
23 somebody calls the medical emergency?
24 **A.       So that goes over our radio and that let's**
25 **medical staff know that we're having a medical**

MATTHEW DANNER

Page 93

1    emergency that they need to respond to where the call

2    was made which was A-block at the time.

3    Q.       Okay. And what happened next?

4    A.       The order was given that we would get him

5    back to medical before medical showed up to take him

6    back to medical or go on the way back to medical.

7    Q.       So the emergency call was made which

8    signifies that an emergency, that medical is to

9    respond to the place where the call came and then

10   after that the decision was made to take him to

11   medical?

12   A.       It happened the same time simultaneously.

13   At the time the call was going out and that it was

14   made that we can get him to medical faster than

15   medical would probably respond to us at that

16   particular time.  So medical is en route. The way we

17   have to go we would come across medical as they were

18   responding.

19   Q.       Do you know who made the order to take him to

20   medical?

21   A.       Captain Klahr.

22   Q.       And did you then take him to medical?

23   A.       We did.

24   Q.       What happened when you got to medical?

25   A.       At that time beings he was not breathing --

MATTHEW DANNER

Page 94

1    well, as we were going to medical we passed medical

2    staff that was coming out of the room to respond as we

3    were going in the small waiting area.

4                        We took him into medical, and again,

5    multiple people talking, saying things to do things.

6    As I say the order to get him out of the chair. People

7    were saying that. We were already in the process of

8    removing the straps and getting him out of the chair,

9    getting the handcuffs, shackles off of him, laying

10   flat in medical.

11   Q.        At that point you're actually in medical,

12   you're not in the area outside of medical; is that

13   correct?

14   A.        Correct. We ended up taking, yeah, like three

15   feet.  And got him into the medical department and had

16   him right there in medical.

17   Q.        And at some point did you do chest

18   compressions on Ty'rique Riley?

19   A.        I did.

20   Q.        Were you ordered to do that by someone?

21   A.        No.

22   Q.        How long did you do chest compressions?

23   A.        I did at least one series and we were

24   rotating in. So it was -- I haven't had my

25   certification. I believe it's 30 or 40 chest

MATTHEW DANNER

Page 95

1    **compressions.  And then they were doing two breaths.**
2    **They had a bag that medical uses. So I did at least**
3    **one rotation.**
4    Q.        At some point was the shield taken off of
5    him?
6    **A.        It was.**
7    Q.        Was that done prior to getting to medical or
8    after you got into medical?
9    **A.        I believe it was after we got to medical.**
10   Q.        Is there anything that prevented you from
11   doing chest compressions on the A-block?
12   **A.        The fact that he was in the restraint chair.**
13   **Other than that no.**
14   Q.        D-4 was the incident report that you wrote.
15   We'll mark this next one as D-5. Have you seen this
16   document before?
17   **A.        I have.**
18   Q.        What is this?
19   **A.        That's the detective's, that's my interview**
20   **with Detective Walborn.**
21   Q.        Did you get a chance to review this written
22   transcript of your interview in connection with giving
23   this interview?
24   **A.        Yes.**
25   Q.        And were you able to read it for accuracy?

MATTHEW DANNER

Page 96

1   **A.**        **Yes.**

2   Q.        And did you determine that it was accurate?

3   **A.**        **It was pretty accurate, yes.**

4   Q.        And we'll mark this as D-5. It starts with

5   bates stamp CID 521 and it goes through to CID 533

6   with a photo ID. Is that a photo of you at the time?

7   **A.**        **It is.**

8   Q.        And this is taken on July 5, 2019, correct?

9   **A.**        **Yeah.  That's what it says.**

10  Q.        I'm want to ask you some specific questions.

11  On page 3 it says on line 113, "Now usual procedure,

12  in a previous interview you said that most of the

13  individuals who are being transported are up in

14  medical or in intake." Your answer was correct. What

15  is the previous interview that the questionnaire is

16  referring to?

17  **A.**        **I don't know.**

18  Q.        Had this individual interviewed you before

19  July 5th at 10:17 hours which would be, I guess that

20  would be 8:17 P.M.?

21  **A.**        **Not that I recall interviewing with him, no.**

22            MR. LAVERY: Riley, for the record,

23  it looks like it was 10:17 A.M.

24            MR. ROSS: Oh, yeah. You're right.

25  I'm bad military time. You're right 10:17 A.M., not

MATTHEW DANNER

Page 97

1    8:17 P.M.

2    **A.          Correct.**

3    Q.          Thank you. The person that interviewed you

4    had you met him before that date that he interviewed

5    you?

6    **A.          Have I met Walborn before?**

7    Q.          Yes. Had you met him before the date of the

8    interview, before July 5th of 2019?

9    **A.          Yes.**

10   Q.          So you knew who he was?

11   **A.          Yes.**

12               MR. CARMELITE: Riley, I don't want

13   to get this off on a tangent.  Before you had this

14   question and answer discussion, right, did you talk to

15   Detective Walborn that day before?

16   **A.          Yes.**

17   Q.          So you had a, before you did this interview

18   you had spoken with Walborn before about the incidents

19   relating to Ty'rique Riley?

20   **A.          We talked about it yes.**

21   Q.          And let me start with this particular

22   interview that began at 10:17. Where did this

23   interview take place?

24   **A.          Up in Admin I believe in a conference room.**

25   Q.          At Dauphin County Prison?

MATTHEW DANNER

Page 98

1    **A.          Yes. Administration.**

2    Q.          And when you spoke to Walborn, Detective

3    Walborn before this interview that your Counsel just

4    referenced did that also occur in the Admin in the at

5    the Dauphin County Prison?

6    **A.          Yes.**

7    Q.          How much earlier, how much earlier before

8    10:17 did that occur?

9    **A.          I don't know.**

10   Q.          How long did you speak to him before this

11   interview actually occurred?

12   **A.          I don't know.**

13   Q.          This interview that we're talking about here

14   was that recorded with some type of a recording

15   device?

16   **A.          Yes.**

17   Q.          So at some point someone turns on a recording

18   device and you begin this interview, correct?

19   **A.          Correct.**

20   Q.          So I want to focus on everything that

21   happened before that recorder went on. You have a

22   conversation with Detective Walborn in Admin before

23   the recording begins; is that correct?

24   **A.          Correct.**

25   Q.          And how long did that conversation last?

MATTHEW DANNER

Page 99

1   **A.        I do not know.**

2   Q.        Were you questioned about what happened

3   between you and Ty'rique Riley during that period?

4   **A.        I don't believe so. It was a -- he was giving**

5   **me the format of how he wanted to walk through the**

6   **incident where we were going to start and end and**

7   **everything to get it into a chronological order so we**

8   **didn't have to go back.**

9   Q.        Are you done with your answer?

10  **A.        Yeah.**

11  Q.        Did that conversation include any facts about

12  what happened with Ty'rique Riley?

13  **A.        I don't recall.**

14  Q.        Did that conversation include any type of

15  discussion about transporting individuals from the

16  prison to some other place?

17  **A.        I don't recall. Could have.**

18  Q.        So when he says on page 3 in a previous

19  interview you said that most of the times the

20  individuals were being transported are up in medical

21  or intake do you recall talking to him prior to this

22  interview about transporting individuals, at any time?

23  **A.        I don't recall. I don't recall. No.**

24  Q.        Did you give an interview about what happened

25  to Ty'rique Riley to anyone other than Detective

MATTHEW DANNER

Page 100

1   Walborn?

2   **A.        Not that I recall, no.**

3                   **(Recess taken.)**

4   BY MR. ROSS:

5   Q.        Officer Danner, you mentioned that you did

6   not to any chest compressions while on A-block. Is

7   there anything that would have prevented Ty'rique

8   Riley from being taken out of the restraint chair once

9   he became unresponsive on A-block to be given chest

10  compressions?

11  **A.        No. Not that I could see.**

12  Q.        I want to show you some videos now. Can you

13  see that?

14  **A.        Yes.**

15  Q.        Are in any of the individuals that are in

16  this video here if you can tell?

17  **A.        No. I don't believe, no.**

18  Q.        Do you know who the correctional officers

19  are, the men in blue shirts?

20  **A.        No.**

21  Q.        Let me just try to move forward to try and

22  get some better views. Still no?

23  **A.        No.**

24  Q.        This video I'm going to show you. You still

25  see a video or you do not?

MATTHEW DANNER

Page 101

1    **A.        I still see a video. Yes**

2    Q.        Okay. Great. This video I'll show you is it's

3    named on the file as 18 A-1 to front, times of 9:27 to

4    10:00 A.M.  So we'll make this D-6.

5                MR. CARMELITE: And that's the video

6    he used with me when he spoke of what documents.

7    Q.        So have you seen this video before, Officer

8    Danner?

9    **A.        Yes.**

10   Q.        I'm just going to speed it up because I want

11   to do it for identification purposes. I'm going to

12   pause it here.  We're at the 2:58 mark.  Who, if you

13   know, is in the frame now at the cell door?

14   **A.        I believe that's Donovan the female with her**

15   **back to us and I believe that is Hoffman.**

16   Q.        Pause here at 23:05.  Who is that there now?

17   **A.        It appears to be Swanson.**

18   Q.        Now, at this point do you believe you have

19   gone into the cell yet?

20   **A.        You have to rewind it. I believe I did.**

21   Q.        Let me go back.  Maybe I missed you going in.

22   **A.        I believe you did.**

23   Q.        Yeah, there we go.  Yes. Yeah.  It should be

24   22:25. I went to 22:55.  So let's back it up.  So

25   right here at 22:55 --

MATTHEW DANNER

Page 102

1           MR. CARMELITE: 25 you mean.

2      Q.      I did it again. 22:25 who's that in the

3  frame?

4      **A.      That's myself in front with the uniform in my**

5  **hand and Steve Singleton.**

6      Q.      And you both go into the cell?

7      **A.      Correct.**

8      Q.      Is this you believe CO Donovan that's there?

9      **A.      I believe that's her, yes.**

10     Q.      We already identified people at 22:55.  I'm

11  going to go now to 25:50.  Do you know who these folks

12  are?

13     **A.      The one is Sergeant Hess that would be on my**

14  **right.**

15     Q.      With the lighter colored shirt?

16     **A.      Yes.**

17     Q.      And then on the left approaching the cell

18  with the darker colored shirt?

19     **A.      I can't make that one out right now.**

20     Q.      We'll go forward to 27:17. That we believe is

21  walking way.  We still believe that to be Donovan?

22     **A.      I believe that's Donovan, yes.**

23     Q.      We'll go to 27:46. You see a gentleman about

24  to enter. Do yu know who that is?

25     **A.      The black shirt would be Captain Klahr.**

MATTHEW DANNER

Page 103

1   Q.          That's at 27:49.  And then he's followed by

2   at 27:53 who is that?

3   **A.          Sergeant Lewis.**

4   Q.          Fast forward. We're going to go to 29:20 and

5   it appears that the restraint chair has arrived. Can

6   you tell me who is pushing the restraint chair?

7   **A.          That appears to be Sergeant Biter.**

8   Q.          Okay. Let me go a little more. The person,

9   the gentleman about to enter, the bald an right there,

10  that's Sergeant Biter?

11  **A.          Sergeant Biter, yes.**

12  Q.          So we'll put that at 20:31. And then there's

13  leaning on the restraint chair can you recognize who

14  that person is?

15  **A.          Which?**

16  Q.          The person who's behind the restraint chair

17  kind of where the head would go.

18  **A.          That appears to be Swanson.**

19  Q.          And then to Swanson's right on the other side

20  of the chair across from Sergeant Biter who does that

21  appear to be?

22  **A.          It appears to be Sergeant Hess.**

23  Q.          The first person -- we're now at 30:34. The

24  person that appears to be pulling Ty'rique Riley out,

25  the first person out of the cell who is that?

MATTHEW DANNER

Page 104

1    **A.**          **I'm not positive.**

2    Q.          If you at any point recognize who that is let

3    me know. That person is now on the far side of the

4    chair next to Captain Klahr. Any idea who that is?

5    **A.**          **No.**

6    Q.          And we're at 30:52, that is you that just

7    exited the cell and you're on the left side of the

8    chair closest to the camera; is that right?

9    **A.**          **The chair is facing me. I'm on the left side**

10   **of the chair.**

11   Q.          You're next to Sergeant Biter, correct?

12   **A.**          **Correct.**

13   Q.          Can you tell who is on the other side of

14   Sergeant Biter at this time?

15   **A.**          **The other bald head?**

16   Q.          Yes. No, not the black shirt. I guess the one

17   behind where the head would go on the chair. It looks

18   like he has a little bit of hair.

19   **A.**          **Sergeant Lewis it looks like.**

20              MR. CARMELITE: Just for the record,

21   I pointed to the individual on my screen for him.

22   Q.          Okay. So that appears to be Sergeant Lewis at

23   the top of the chair; is that correct?

24   **A.**          **That's Sergeant Lewis.**

25   Q.          Do you recall Sergeant Lewis having Ty'rique

MATTHEW DANNER

Page 105

1    Riley's head while you were trying to get him into the

2    restraint chair?

3    **A.        Again, I don't recall it no. Like seeing**

4    **this, yeah. But.**

5    Q.        Now, do you see to your left it looks to be a

6    gentleman on the ground. Is that CO Singleton?

7    **A.        I would assume that would be him but it's**

8    **just the top of his head.**

9    Q.        He's standing up now. Does that help at all?

10   **A.        That looks like Singleton, yes.**

11   Q.        I paused it there at 31:50.  It looks like

12   something orange was placed on top of Ty'rique Riley.

13   Was that the uniform you brought with you for him to

14   wear?

15   **A.        It appears to be uniform  pants or shirt,**

16   **yes.**

17   Q.        Under kind of in between you and Sergeant

18   Biter's is that Ty'rique Riley's leg that's sticking

19   out there; can you tell?

20   **A.        I believe that's his foot, yes.**

21   Q.        Do you know what you all are doing right now?

22   **A.        I believe this is where he became more**

23   **responsive with the sternum rub. That's what happened**

24   **right there.**

25   Q.        I'll take that down. Are you familiar with

MATTHEW DANNER

Page 106

1   anyone who has an e-mail address mbig1339@gmail?

2   **A.        What was it again?**

3   Q.        Mbig1339@gmail.com.

4   **A.        No.**

5   Q.        Do you recall ever being asked or questioned

6   about someone with that e-mail address?

7   **A.        No.**

8   Q.        I'm going to put this on the screen. This is

9   a couple of e-mails that go from CID 97 and goes to

10  CID 97 G /O is had ER the. I'm going to go to page 98

11  and ask if you were ever shown this e-mail dated July

12  25, 2019?

13  **A.        No.**

14  Q.        Did anyone ever question you about someone

15  making I guess an inquiry or allegation that you

16  needed to be looked into regarding Ty'rique Riley's

17  death?

18              MR. CARMELITE: He means other than

19  me.

20              MR. RILEY: Yes.

21              MR. CARMELITE: Anybody besides me

22  ask you about that?

23  **A.        The detective who conducted the interview.**

24  Q.        So Detective Walborn?

25  **A.        For the interview, yes, during the interview.**

MATTHEW DANNER

Page 107

1    Q.        He asked you about that?

2    **A.        At the time of the interview, yes. You're**

3    **saying about this e-mail or about the --**

4                MR. CARMELITE: He's asking, he wants

5    to know did anybody ever ask you about this e-mail.

6    **A.        No.**

7    Q.        What you're referring to about Detective

8    Walborn asking you about what were you referring to?

9    **A.        About the incident with Ty'rique. That's the**

10   **only one that asked me about my involvement with this**

11   **incident.**

12   Q.        Did Detective Walborn ever mention to you

13   that someone had stated that you needed to be looked

14   into?

15   **A.        No.**

16                MR. ROSS: Give me a second.  Why

17   don't we just take like two minutes. Let me look at my

18   notes and confer with Kevin and see if I have any

19   other questions.

20                MR. LAVERY: I have a couple. Not

21   many but I have a couple.

22   BY MR. LAVERY:

23   Q.        Mr. Danner, I'm Frank Lavery. I represent the

24   prison. I represent the prison.  I don't have a whole

25   lot for you but I do want to go over if we could

MATTHEW DANNER

Page 108

1   Exhibit D-5, specifically page 5 into 6 on than and it

2   would be marked CID 525 and 526 if the court reporter

3   can just put that up.

4                    And scroll down at the bottom of 5.

5   Mr. Danner, at the bottom of page 5 you were asked, so

6   the door opens.  Inmate Riley is in the middle of the

7   cell. What happened next?"  And then your answers then

8   follow on the next page would be again Page 6 of the

9   interview until a it's bates marked 526 on the bottom.

10  Do you see that?

11  **A.        Yes.**

12  Q.        And as you testified before you answered the

13  question that was asked at the bottom of CID 525.5,

14  you entered cell, directing him towards the back of

15  the cell to the wall area of the cell, ah, he

16  complied.

17                   Is that accurate?

18  **A.        Correct.**

19  Q.        And then you were asked the next question on

20  line 230 on the page, "Has he said anything to you

21  yet?"  Do you see your answer there?  On line 232.

22  **A.        Yeah.**

23  Q.        You indicated, "No. At which time, I told the

24  inmate that he was going to be transported or that he

25  had to remove the smock for transport.  He gave me a

MATTHEW DANNER

Page 109

1   blank stare, at which time I repeated the order. The

2   inmate reached up and grabbed the shoulder piece of

3   the smock to un-Velcro it, and the sock was removed."

4           Do you see that?

5   **A.       Yes.**

6   Q.       Your statement doesn't indicate by whom that

7   smock was removed, correct?

8   **A.       Correct.**

9   Q.       I think you're asked the next question, "Did

10  Riley do that?  Was he assisted by anybody else?" Do

11  you see that?

12  **A.       Yes.**

13  Q.       And then what was your answer there at that

14  point?

15  **A.       "I'm not positive. I'm not sure if he was**

16  **assisted or not. I remember the smock being removed. I**

17  **remember him reaching, too. My focus was more on the**

18  **inmate and his actions than the removal of the smock."**

19  Q.       Is that true and accurate?

20  **A.       Yes.**

21  Q.       And then you were asked on line 243, "What

22  happened next?" And what your answer to that? It's on

23  line 245.

24  **A.       "I ordered the inmate to put on the uniform**

25  **that I had. It was a lock-in uniform. I offered it to**

MATTHEW DANNER

Page 110

1   him and told him to put it on. He gave me a blank

2   stare. I repeated the order and attempted to hand it

3   to him.  At which time Inmate Riley grabbed ahold of

4   my arm, my wrist, my left wrist."

5   Q.        Stop there. At that point is that the first

6   time you had any, that you can remember any physical

7   contact with Ty'rique Riley?

8   A.        That I can remember, yes.

9   Q.        Okay. Did you in any way strike, hit, do

10  anything to him whatsoever physically before he

11  grabbed your arm?

12  A.        No.

13  Q.        Had you told him to put the uniform on?

14  A.        Yes.

15  Q.        And at that point did you know whether or not

16  he was going to put the uniform on before he grabbed

17  ahold of your wrist?

18  A.        No.

19  Q.        And then you were asked in the statement line

20  250, "What happened then?"  And what was your answer

21  at that point?

22  A.        "At which time I reversed his grab and

23  regrabbed his arm pulling him forward. He was bent

24  over at the waist. We attempted to place the uniform

25  top on him. It went over his head at which time Riley

MATTHEW DANNER

Page 111

1   **removed the top from his head with his hands."**

2   Q.        Is that accurate?

3   **A.        I said it then. I do not remember that part.**

4   **Other than seeing it there I do not remember that**

5   **happening.**

6   Q.        And I get that.  That makes sense. It

7   happened a while back. But back on July 5 at 10:17 in

8   the morning that would have been pretty much within

9   like a week of the incident, correct?

10  **A.        Correct.**

11  Q.        So if you said it back then your memory would

12  have been better as to what happened at that time,

13  correct?

14  **A.        Possibly.**

15  Q.        The point I'm getting at though, I guess is

16  that at some point someone tried to get him in a

17  uniform top and he got the top off from his head.  Is

18  that accurate to the best of your recollection?

19  **A.        Reading it I say yes. Remembering it no. I**

20  **don't remember.**

21  Q.        No. I get that. But would you have any reason

22  to dispute the validity of that if that's an accurate

23  transcript of what you would have said on July 5th?

24  **A.        No.**

25  Q.        Okay. Good. So at that stage, again, other

MATTHEW DANNER

Page 112

1    than reversing his grab, regrabbing his arm, pulling

2    him forward bent over after he grabbed you had you

3    done anything else to him?

4    **A.          Up to that point, no.**

5    Q.          Then when was it that the decision was made

6    to take him down to the ground to put the shackles and

7    the handcuffs on him and, well, strike that.

8                 When was that made at that point

9    that that decision was made at some point, hey, we got

10   to get this guy to the ground and get him shackled up

11   and cuffed up?

12   **A.          It wasn't long after. I don't know exactly**

13   **when or who even made the comment to take him to the**

14   **ground or it was just, it wasn't working and we**

15   **decided to take him to the ground.**

16   Q.          Well, that's kind of my point on the whole

17   thing. Were you attempting to do something else before

18   you had to take him down to the ground?

19   **A.          As I read there I believe we were trying to**

20   **put his uniform top on.**

21   Q.          And is it true that the only reason you had

22   to take him down to the ground is he wouldn't

23   cooperate in that process and he resisted your

24   attempts to do that?

25   **A.          That's why we took him to the ground, yes.**

MATTHEW DANNER

Page 113

1    Q.        Before that had you used any type of force at
2    all on him other than where you indicate that you
3    reversed his grab on the top?  Had you used any force
4    on him whatsoever?
5    **A.        No other physical force, no.**
6    Q.        Did you see anybody else use any physical
7    force on him before that?
8    **A.        No.**
9    Q.        So when Riley is on the ground in the cell
10   you're in the cell I think, I think you said Singleton
11   was in the cell and I think you said Hoffman may have
12   been in the cell at some point; is that right?
13   **A.        After watching the video Hoffman was in the**
14   **cell.**
15   Q.        Okay. Yeah. I agree with you on that. He was.
16   Did either you, Singleton or Hoffman do anything to
17   strike, hit, anything to him while he was in the cell
18   at that point and you tried to handcuff him while he
19   was on the ground?
20   **A.        I did not and I did not see either of them,**
21   **no.**
22   Q.        Now, in terms of how he got to the ground I a
23   was a little unclear.  Could you just explain that
24   briefly as to how that briefly occurred physically.
25   **A.        As I had his arm we went down. Somebody ended**

MATTHEW DANNER

Page 114

1    up grabbing a leg removing one leg.

2    Q.        From the ground?

3    A.        I would assume they had to bend down. Yeah.

4    He was standing up so they had to bend down to get the

5    leg between.  I was in front of Riley because they

6    came below me and got in front of leg and removed the

7    leg, pulled it forward.

8    Q.        So someone pulled his leg forward and you're

9    up top with him; is that correct?

10   A.        Correct.

11   Q.        And so where do you have control or where

12   were you trying to get control of him from up top as

13   you best recall?

14   A.        The hands and the upper extremities, the mid

15   section up. I was trying to control that area.

16   Q.        Was Riley in any way thrown or slammed to the

17   ground?

18   A.        No.

19   Q.        And at that point you have control of his

20   upper torso when the other officer gets down below and

21   gets the leg out from under him; is that right?

22   A.        I would say had control but I was working to

23   gain control. So I was, yes. I was attempting to

24   control his upper extremities and upper half.

25   Q.        So what parts, as he was going down, I mean,

MATTHEW DANNER

Page 115

1  obviously we know his legs and arms.  What part of his

2  upper torso would have come down and impacted with the

3  floor as he's going down if you remember?

4  **A.        As he went down it would have been more of**

5  **his rear end lower back making first contact with the**

6  **floor being the cell size and where we were in the**

7  **cell. Does that make sense?**

8  Q.        Yeah. I think I do get what you're saying.

9  Did his head, did any part of his head hit the floor

10  when you took him down?

11  **A.        No.**

12  Q.        I am just about done. I'm sorry it took

13  longer than I thought. And, again, it's fine taking

14  that off.  Have you had a chance to look through this

15  entire recorded statement, it goes from CID 521 to CID

16  533, correct?

17  **A.        Correct.**

18  Q.        All right. And is there anything -- I think

19  you testified again today that in reading the

20  statement you remember the part about putting a

21  uniform on him but you didn't remember that from your

22  own independent recollection, correct?

23  **A.        Correct.**

24  Q.        Is there anything else in that statement that

25  you don't think is accurate or may not be accurate?

MATTHEW DANNER

Page 116

1   And again, I'm talking about the CID statement?

2   **A.        There's some errors as in the name at the top**

3   **is Michael Danner.**

4   Q.        Yeah. That's a good point.

5   **A.        There's a thing marked as an answer when I**

6   **believe it's a question.**

7   Q.        Right. Anything else?

8   **A.        For the limited time I had it for I believe**

9   **everything is basically correct.**

10   Q.        Okay. And then just I'm finished. Exhibit, I

11   think it's D-4 was your handwritten statement, that's

12   the one page that was shown to you by Mr. Ross. That

13   what would have been written when in time in relation

14   to the incident itself?  How soon after the incident

15   did you write that statement out?

16   **A.        I'm not sure when I wrote that. I would have**

17   **dated it properly to date but I'm unsure because I did**

18   **continue to transport via ambulance. I don't know if I**

19   **wrote that after I got back at what point when I got**

20   **back the time of day from the incident.**

21   Q.        But it would have been written the same day

22   as the incident occurred, correct?

23   **A.        It's written as stated, yes.**

24   Q.        And is there anything as you look at that

25   that you don't believe is accurate in there?

MATTHEW DANNER

Page 117

1    **A.        No. I believe that it's accurate.**

2              MR. LAVERY: Thank you, CO Danner.

3    Those are all the questions I have of you.

4              MR. POLAHA: Very briefly. Hopefully

5    two questions.

6    BY MR. POLAHA:

7    Q.        Good afternoon or good morning. My name is

8    Matt Polaha.  I represent the Susquehanna Township

9    Police Department and it's officers that are named in

10   this lawsuit.

11             On June 26th of 2019 during your

12   interactions with Mr. Riley both in Dauphin County

13   Prison, on the transport and at the hospital were any

14   Susquehanna police officers present at that time?

15   **A.        Repeat that again.**

16   Q.        During your interactions with Mr. Riley on

17   June 26th of 2019 inside the Dauphin County Prison,

18   during transport to the hospital or at the hospital

19   were any Susquehanna Township police officers present?

20   **A.        Not that I know, no.**

21   Q.        And were you working in the Dauphin County

22   Booking Center on June 18th of 2019 in the early

23   morning hours?

24   **A.        No. Not that I recall.**

25             MR. POLALA: Thank you.

MATTHEW DANNER

Page 118

1              MR. NINOSKY: No questions.

2              MR. CARMELITE: The deposition is

3     concluded. You're free to go.

4                   (Witness excused.)

5                   (Deposition concluded 11:35 A.M.)

6                        –   –   –

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MATTHEW DANNER

Page 119

1                    C E R T I F I C A T I O N

2

3

4              I hereby certify that the proceedings,

5    evidence and objections noted, are contained fully and

6    accurately in the notes taken by me on the hearing of

7    this matter, and that this copy is a correct

8    transcript of the same.

9

10

11

12                        _____

13                        NICHOLAS DiPIERO, R.P.R.
                          Registered Professional Reporter
14                        Notary Public

15

16

17

18              (The foregoing certification of this

19    transcript does not apply to any reproduction of the

20    same by any means unless under the direct control

21    and/or supervision of the certifying reporter.)

22

23

24

25

MATTHEW DANNER

Page 120

1                    WITNESS CERTIFICATION

2

3                    I have read the foregoing transcript

4      of my deposition given on Friday, March 17, 2023, and

5      it is true, correct and complete, to the best of my

6      knowledge, recollection and belief, except for the

7      list of corrections, if any, attached on a separate

8      sheet herewith.

9

10

11                                    _____

12                                    MATTHEW DANNER

13      _____DATE

14

15

16

17

18

19

20

21

22

23

24

25

MATTHEW DANNER

**A**

**abilities** 85:3
**ability** 6:19 9:1,13
  9:15
**able** 11:10 23:21
  65:4 74:8,21
  75:17 87:5 95:25
**absolutely** 59:14
**academy** 20:20,21
  20:23 21:2,4,12
  21:13
**access** 43:6
**accuracy** 95:25
**accurate** 96:2,3
  108:17 109:19
  111:2,18,22
  115:25,25 116:25
  117:1
**accurately** 119:6
**accused** 28:25
**achieve** 23:15
**act** 29:7
**acting** 27:15
**action** 1:5 27:1,2
  37:12
**actions** 26:24
  71:25 84:14
  109:18
**actual** 56:20 71:13
**add** 16:23 75:25
**additional** 24:2,9
**address** 38:5 106:1
  106:6
**addressed** 35:18
  70:5
**Admin** 97:24 98:4
  98:22
**administration**
  31:1 49:13 98:1
**administrative**
  29:18
**Administrator** 1:4
**AED** 22:7
**affair** 83:22

**afternoon** 117:7
**ago** 76:17
**agree** 16:18 19:2
  56:4 113:15
**agreed** 5:1
**ah** 108:15
**ahead** 45:20 50:7
**ahold** 69:21 74:14
  110:3,17
**aid** 22:7
**air** 89:16,17
**al** 1:5,8
**alcohol** 9:4
**allegation** 27:7
  32:1,6,19,24 33:1
  33:6 106:15
**allegations** 31:11
  31:16,21 32:8,13
  32:14 33:18
  37:13
**allot** 26:2
**allow** 6:11 7:1,18
  8:2
**allowed** 45:1,2,17
  45:21 46:15
  52:22 53:7,8
**allowing** 72:3
**altercation** 28:7
**altered** 60:9,18
**ambulance** 61:14
  61:22,24 62:2,6
  62:13,18 63:3
  116:18
**Amendment** 38:23
  38:23 39:3,3
**Amendments** 39:4
**ammo** 67:5
**amount** 25:2
**and/or** 119:21
**Angela** 3:5
**ankle** 75:1 88:3
**ankles** 74:24 75:11
  88:5
**annual** 42:16,18

50:15,16 52:7,8,9
  53:16
**annually** 42:9,10
  42:11 53:18,22
**answer** 6:8,19 7:2
  7:8,19,23 8:1,9
  8:17 9:16 17:4,6
  17:13 18:4 30:7
  45:8,18 62:8,20
  63:5,13 96:14
  97:14 99:9
  108:21 109:13,22
  110:20 116:5
**answered** 108:12
**answering** 7:17
**answers** 6:9,23
  108:7
**anybody** 12:5 76:3
  76:21 106:21
  107:5 109:10
  113:6
**anymore** 28:14
  81:25
**appeal** 37:12
**appear** 103:21
**APPEARANCES**
  2:1
**appeared** 92:16
**appears** 48:10
  101:17 103:5,7
  103:18,22,24
  104:22 105:15
**applied** 74:7 86:24
  87:12,15,18
  88:12,24 90:6,9
  90:11,15 91:11
  91:13
**apply** 46:20 74:5
  87:21 88:14
  119:19
**appointment** 59:14
**appointments** 61:5
**approaching**
  102:17

**appropriate** 5:25
  83:17
**approximate** 7:7,7
**approximately**
  18:4 21:5,6,9
  23:5 58:14
**April** 21:6,7
**arbitration** 17:1,1
  17:5,21
**arch** 91:9
**area** 12:22,23 13:5
  13:9 57:10 67:10
  91:8 94:3,12
  108:15 114:15
**arm** 34:1,3 67:2
  70:2,6,9,16 73:24
  110:4,11,23
  112:1 113:25
**armed** 63:17
**armory** 65:1,9
  66:18,19 67:4
**arms** 86:3 115:1
**arrested** 13:24
**arrive** 62:18 78:3,6
**arrived** 78:1 103:5
**arriving** 69:4
**asked** 8:18 11:25
  19:6,8 29:8 38:24
  66:4 106:5 107:1
  107:10 108:5,13
  108:19 109:9,21
  110:19
**asking** 6:17 7:4,5
  15:23 32:16,18
  33:12,16 37:1
  38:25 45:14
  50:24 61:14
  62:25 77:21
  107:4,8
**ASP** 65:24,25
**assault** 84:23
**assaulting** 17:10
**assigned** 58:12
**assist** 85:7

**assisted** 85:12
  109:10,16
**assisting** 80:7,21
**assume** 8:9 35:22
  73:6 80:6,11,13
  105:7 114:3
**assuming** 34:7
  38:3 77:20
**attached** 120:7
**attempt** 22:16,19
  74:13
**attempted** 23:15
  71:10,11 110:2
  110:24
**attempting** 112:17
  114:23
**attempts** 112:24
**attend** 12:25 13:2
  13:9 20:20,22
  21:4,11
**attended** 13:3,5
  42:25 43:2
**attention** 80:1
**attorney** 8:14
  15:15,17 16:17
**attorneys** 15:20
**Attorney's** 49:14
**authorization** 24:6
  24:13
**authorized** 24:10
**aware** 11:19 12:2
  30:14 31:4 34:16
  35:8 36:15 46:11
  52:1 55:7
**Awn** 2:12
**A-block** 11:4,5
  68:3 69:5 92:12
  93:2 95:11 100:6
  100:9
**A-1** 68:3 101:3
**A.M** 1:11 58:9
  96:23,25 101:4
  118:5

**B**

**back** 12:7 17:6
  18:9,11 40:14
  48:17 52:23,24
  55:12,17 60:24
  67:7 68:12 71:5
  73:14 74:6,15
  75:10 78:9 91:9
  93:5,6,6 99:8
  101:15,21,24
  108:14 111:7,7
  111:11 115:5
  116:19,20
**background** 12:14
**bad** 54:12 96:25
**bag** 95:2
**bald** 103:9 104:15
**ballpark** 23:7
**base** 91:7
**Based** 83:16
**basically** 57:9
  116:9
**basis** 17:22
**bate** 40:3,7 43:18
  49:19 82:8
**bates** 47:18 96:5
  108:9
**baton** 65:24,25
  66:1,5
**began** 24:17,21
  97:22
**beginning** 1:11
  42:20 43:10
**begins** 40:2 98:23
**behavior** 54:12
**beings** 26:25 68:16
  93:25
**belief** 120:6
**believe** 11:8 14:9
  14:10,12 25:9
  26:24 27:11
  29:17 33:11
  37:18,20 38:2
  42:12,20 47:6

49:8,16 51:23
  53:20 57:8 69:6
  71:9,21 76:6,13
  83:16 85:20 87:7
  88:15 89:1,1,4,25
  91:20 92:4,20
  94:25 95:9 97:24
  99:4 100:17
  101:14,15,18,20
  101:22 102:8,9
  102:20,21,22
  105:20,22 112:19
  116:6,8,25 117:1
**bell** 48:14
**belt** 65:13,18,19,20
  65:20,21 66:6,9
  66:12,24 67:6
  86:14,20,22,24
  86:25 87:1,8,15
  87:18 88:2,4,6,11
**belts** 65:5 86:8
**bend** 114:3,4
**bent** 110:23 112:2
**Bentacourt** 2:18
**best** 6:17,18 7:5,10
  7:16 8:7 111:18
  114:13 120:5
**better** 7:11 100:22
  111:12
**big** 27:22
**bit** 85:15 104:18
**bite** 90:14,17,19
**Biter** 77:4 92:9
  103:7,10,11,20
  104:11,14
**Biter's** 105:18
**black** 102:25
  104:16
**blank** 109:1 110:1
**block** 11:1,2,3 29:5
  29:10 58:6,11
  63:24 85:20 91:1
  91:21,23
**blowing** 89:16,17

**blue** 100:19
**body** 72:2 75:18
  77:16,16 84:23
  85:2 86:10,15,19
**book** 26:3,5
**Booking** 117:22
**book's** 26:16
**born** 12:17
**bottom** 40:4 82:7
  108:4,5,9,13
**bound** 85:25 86:3
**box** 2:10 65:5 66:8
  66:24 67:6,14,19
  67:19
**bracelet** 75:1
**break** 8:12,15,16
  8:18 32:3 54:3,6
  55:11
**breathing** 89:16
  91:2 92:16 93:25
**breaths** 95:1
**Brian** 1:7 48:18
**briefly** 113:24,24
  117:4
**brings** 11:20
**brought** 42:4,5,8
  53:25 74:15 81:5
  105:13
**buckles** 87:7
**bunch** 77:6

**C**

**C** 119:1,1
**call** 5:25 26:15
  30:2,2 40:2,7
  56:21,22 57:22
  57:24 58:1,12,15
  60:14 64:9,14,20
  75:21 76:2,3,6
  77:10 93:1,7,9,13
**called** 6:14 59:10
  67:2 76:10 78:7
  89:15 92:20
**calls** 92:23

**call-off** 25:20 26:1
  26:2,12
**call-offs** 25:19 26:7
  30:1
**calm** 75:20 77:17
**camera** 11:1,2,3,5
  104:8
**Camp** 2:16 3:3
**Captain** 77:5
  82:18,19,20,21
  83:6 93:21
  102:25 104:4
**Captains** 51:9
**Care** 2:18 38:18
**career** 24:8 52:11
**CARMELITE** 3:1
  10:14,18 16:3,23
  17:19,24 18:3
  25:10 27:9 30:6
  30:12 32:16,22
  36:23 38:5 44:14
  45:8 53:4 54:1,8
  55:13 62:7,19
  63:4,12 78:23
  97:12 101:5
  102:1 104:20
  106:18,21 107:4
  118:2
**CARMEN** 1:4
**carrying** 27:20
  47:8 65:24,25
**catch** 25:12
**cell** 67:3,4,5 68:10
  68:14 70:13,15
  76:11,14,20,21
  78:18,18,20,22
  79:5,9,11,14,14
  79:15,17,19,19
  79:25 80:5,16,25
  81:3,7,8 89:5,7,8
  89:11 90:4,20
  101:13,19 102:6
  102:17 103:25
  104:7 108:7,14

108:15,15 113:9
  113:10,11,12,14
  113:17 115:6,7
**center** 3:2 74:15
  117:22
**central** 56:20 57:8
  57:24,25 58:2,15
  58:19,21,22
  60:14,16 64:21
  64:25 67:21
**certain** 30:2 67:10
**certification** 5:2
  23:18,23,25 24:1
  94:25 119:18
  120:1
**certifications**
  21:20,24 22:2,4,9
  22:9 23:14,16
**certified** 21:25
  22:14,17,20
**certify** 119:4
**certifying** 119:21
**chain** 66:12 75:2,4
**chair** 36:17 52:11
  52:12,15,17,19
  52:20,23 53:3
  56:6 77:24 78:1
  79:2,4,5,8,13
  81:4,13,18 82:17
  82:24 83:4,8,11
  83:14,18,25 84:2
  84:5,7,16 85:5,8
  85:11,13,16 86:1
  86:4,7,8 87:2
  88:1,17,25 90:25
  91:4,7,8,23 92:11
  94:6,8 95:12
  100:8 103:5,6,13
  103:16,20 104:4
  104:8,9,10,17,23
  105:2
**chairs** 52:3
**chance** 47:24 48:5
  95:21 115:14

change 47:4 69:15
Chapter 40:16
47:20 48:9
charged 17:9
chemical 47:9
Cherry 1:23
chest 94:17,22,25
95:11 100:6,9
Chester 2:22
chronological 99:7
CID 4:19,21 10:2
10:10 71:9 96:5,5
106:9,10 108:2
108:13 115:15,15
116:1
CID000161 82:8
city 13:12
Civil 1:5 6:10
claim 27:3
claimed 27:4
claiming 33:22
Clark 1:7 48:18
77:5
classes 22:16
clear 7:10 10:15
clearly 79:17
client 17:17
closer 58:18
closest 104:8
clothes 71:7 72:7
clue 28:17
college 12:25 13:2
13:3,5,10
colleges 13:2,7
colored 102:15,18
combative 83:21
come 7:25 17:6
18:9,11 39:6
55:12 56:13,16
56:16 61:23 87:7
93:17 115:2
comes 86:12,15,20
88:2
coming 39:21

57:24 78:17
89:18 94:2
command 46:25
commander 34:22
34:25 35:17 49:5
51:8,23 52:1
53:10 65:3,6,15
65:16 66:16
Commander's
76:1
comment 112:13
common 7:22
Community 13:5
13:10
complain 90:5,8
complained 34:2
90:19
complaining 35:11
complaint 11:22
30:24 34:10 35:9
35:12
complaints 30:15
30:17,19,20,22
31:2,3,4,7,10,15
31:19 33:22 34:6
35:3,4,15
complete 15:6
120:5
completely 7:19
complied 108:16
comply 83:23
complying 75:19
compressions
94:18,22 95:1,11
100:6,10
concluded 118:3,5
conclusion 54:3
condition 53:13
conduct 28:14
conducted 106:23
confer 107:18
conference 97:24
connection 10:23
12:1,11 37:13

83:3 95:22
CONNELL 2:20
consequence 27:24
28:10 29:11
consider 25:8
31:14 38:12,17
59:24
considered 47:9
59:16 61:15
considering 53:17
constant 85:3
constitutes 53:20
Constitutional
38:22 39:2
consumed 9:4,7
contact 16:7,8 56:2
56:7,11,13,16
78:10 80:4,15,18
80:20,22,25
110:7 115:5
contacted 14:25
contained 119:5
context 18:25 42:2
42:5
continue 46:11
116:18
continued 74:13
77:15 83:23
continues 41:16
continuing 75:18
continuously
19:23,25
continuum 45:24
46:2,3,7,8,12,16
50:2,5
contort 77:15
contorting 85:2
control 37:25 38:1
38:18 40:17
46:16,17 56:20
57:9,24,25 58:2
58:15,20 64:20
64:21,25 71:20
71:21,23 72:1,3

74:14 81:6,9 85:3
85:17 114:11,12
114:15,19,22,23
114:24 119:20
controlled 85:14
controlling 85:12
conversation 98:22
98:25 99:11,14
cooperate 112:23
copy 44:5 119:7
corner 48:8
Corporate 2:16
3:2
correct 5:19,22
13:18,19 15:3
17:24,24 19:21
26:9 33:2 34:11
39:18 44:2 48:19
50:6 55:1 56:14
58:10 60:20 75:3
75:11,12 78:1,2
79:2,3,9,10 85:5
85:6,20,23,24
86:17,20 87:11
88:8 90:13,20
92:13 94:13,14
96:8,14 97:2
98:18,19,23,24
102:7 104:11,12
104:23 108:18
109:7,8 111:9,10
111:13 114:9,10
115:16,17,22,23
116:9,22 119:7
120:5
correction 5:18,21
5:22 18:20 20:18
38:11 43:12
correctional 14:14
20:12,15,16
21:21 22:1,10,12
24:19,23 34:13
34:15,15,19,20
38:13,16 100:18

corrections 21:2
21:12 48:25
49:15 120:7
cotton 89:21,22
counsel 2:12,18,23
3:4 5:2 98:3
counting 14:6
37:10,16
county 1:8 10:12
13:12,16,18,22
15:17,19,22
16:21,25 18:14
18:17,22 19:1,9
19:13,18,23 20:3
20:11 21:22 22:1
24:15,17,22
30:16,22 34:10
37:17 40:11,15
44:13,17,23 45:4
46:4 54:11,17
58:25 59:5 60:2,4
60:25 61:2,11,16
61:19,21 62:5,12
62:16 63:1,8 64:2
64:4,5 97:25 98:5
117:12,17,21
couple 42:15 106:9
107:20,21
court 1:1,22 6:21
7:1,14 8:4 39:21
61:4,7 108:22
courts 39:9,17
cover 48:10 86:11
covered 54:17
COVID 23:9,10
CO's 53:7
Co-counsel 2:7
co-worker 28:6
54:13,18 55:9,19
55:22
co-workers 54:25
55:18
CPR 22:7
created 12:10

84:14
**creates** 86:18
**criminal** 17:11
**cross** 86:18
**cuff** 72:5 74:2
**cuffed** 74:16 75:10
　112:11
**cuffing** 80:22
**cuffs** 66:12,13
**Cumberland** 13:16
**current** 5:23 14:2
　16:9
**currently** 16:2,17
**custody** 38:18
**cut** 25:14

**D**

**D** 67:19
**Danner** 1:10 4:3
　4:13 5:7,17,18
　6:1 10:22 16:16
　16:25 17:10 33:9
　38:10 40:2,3 44:8
　45:20 55:17
　100:5 101:8
　107:23 108:5
　116:3 117:2
　120:12
**darker** 102:18
**date** 10:1 13:21
　18:23,25 19:6,8
　37:20 47:7 48:21
　48:24 56:5,12
　57:19 97:4,7
　116:17 120:13
**dated** 106:11
　116:17
**Dauphin** 1:8 13:18
　13:22 16:21
　18:13,17,22 19:1
　19:9,13,17,23
　20:3,11 21:22
　22:1 24:15,17,21
　30:16,22 34:10

37:17 40:3,11,15
　43:18 44:9,13,17
　44:23 45:3 46:4
　47:19,22 54:11
　54:17 97:25 98:5
　117:12,17,21
**day** 19:5 26:3,16
　26:17 29:2,14,14
　29:15,15,18,19
　29:20,22 58:5,7
　58:11 66:23
　82:12 97:15
　116:20,21
**days** 30:2
**Dcarmelite@md...**
　3:4
**dead** 42:21
**deal** 29:3
**dealing** 30:22
**deals** 25:19
**death** 12:11 106:17
**decided** 112:15
**decision** 39:16
　43:9 52:18,22
　53:2,8,9 62:22
　75:22 76:1,7,11
　77:11 93:10
　112:5,9
**decisions** 38:21
　39:1,8,21 41:25
**deem** 17:7
**deescalation** 47:14
　47:15
**defendant** 2:12,18
　3:4 11:20
**defendants** 2:23
　6:12
**Defensive** 48:12
**definitely** 73:22
　78:5
**DENNEHEY** 2:15
　3:1
**department** 49:15
　94:15 117:9

**depending** 35:17
**deposed** 6:4 15:2,4
**deposition** 1:10 6:7
　9:2,20,23 11:16
　51:18 54:2 118:2
　118:5 120:4
**Deputy** 35:18
**describe** 65:18
　68:4 74:25
**described** 11:15
　64:19
**DESCRIPTION**
　4:12
**designated** 60:3
　62:11
**designation** 24:6
　60:24 62:15
**detail** 33:10
**detective** 95:20
　97:15 98:2,22
　99:25 106:23,24
　107:7,12
**detective's** 95:19
**determination**
　59:18
**determine** 59:16
　96:2
**device** 88:20 98:15
　98:18
**devices** 87:4
**DFS** 4:15,16,17
　40:3,5 43:18 44:9
　47:19,22
**different** 11:6 34:7
　46:19 59:11,20
　61:19
**DiPiero** 1:12,22
　119:13
**dipieroreporting...**
　1:24
**direct** 119:20
**directed** 63:18
**directing** 108:14
**directive** 69:1

**directives** 85:1
**director** 35:18
　48:25
**disciplinary** 37:11
　37:12 38:1 51:9
**discipline** 17:22
　18:10 24:18,23
　25:3,8,14,16,18
　25:21,24 28:2
　29:21,22 31:8
　37:7
**disciplined** 16:25
　24:25
**discovery** 6:14
**discussed** 37:19
　42:5,7
**discussion** 92:17
　97:14 99:15
**dispute** 111:22
**distinction** 25:13
　25:16
**District** 1:1,2
　49:14
**doctors** 61:5
**doctor's** 59:14
**document** 12:3
　40:10,15,21 41:5
　41:11,21 43:11
　43:17 44:3,7
　47:21,25 48:1
　82:6,9,11 95:16
**documented** 49:7
　49:12 64:13
**documents** 9:22
　10:7 11:15 12:1
　12:11 40:8 101:6
**doing** 6:16,25
　27:15,22 52:9
　53:24 58:24 60:6
　95:1,11 105:21
**Don** 16:13 37:24
**DONALD** 3:1
**Donovan** 77:3
　78:22 79:15

101:14 102:8,21
　102:22
**Don's** 38:4
**door** 68:6,7,13,14
　80:13 101:13
　108:6
**dress** 70:19
**drink** 8:13
**drive** 2:16 3:2 68:3
**driving** 91:8
**drop** 57:9
**drugs** 9:7,9,9,10,11
　9:12
**duly** 5:8
**duties** 38:12,14,16
**duty** 27:15 65:4,13
　65:18,19,20 66:6
　66:24
**D-ring** 66:10
**D-4** 82:7 95:14
　116:11
**D-5** 95:15 96:4
　108:1
**D-6** 101:4

**E**

**E** 21:2,16,17 119:1
**earlier** 98:7,7
**early** 24:8 117:22
**easier** 19:13
**easily** 40:9
**East** 12:22,23,24
**education** 24:2
**effective** 87:6,9
**either** 113:16,20
**Elizabethtown**
　21:19
**EMAIL** 4:21
**emergency** 58:25
　59:5,9,10,16,19
　60:1,4,25 61:6,25
　62:1,5,11,12,18
　62:21 63:1,3,6,14
　63:15,18,25 64:3

64:10,14,17
92:21,23 93:1,7,8
**emergent** 62:16
**employed** 10:6
19:9,25 20:11
21:5
**employer** 16:9
**employment** 5:23
16:1,8 17:14 20:3
20:4 21:10 41:1
**empty** 46:25 47:1,3
47:11,12
**en** 93:16
**encounter** 50:21
51:13 90:24
**encountered** 60:19
60:22
**ended** 20:3 29:13
70:9,24 74:16
75:16 76:3 77:2
94:14 113:25
**enter** 67:3 78:22
102:24 103:9
**entered** 68:14
78:19 79:14,15
79:16,18,19,24
108:14
**entering** 67:7
**entire** 115:15
**entrance** 67:12
**equal** 46:15
**equipment** 60:15
60:17 65:7,10,12
**ER** 106:10
**errors** 116:2
**escalating** 50:11
**escort** 84:15
**escorted** 34:2
**ESQUIRE** 2:3,3,9
2:15,21 3:1
**essentially** 33:4
**Estate** 1:5
**et** 1:5,8
**event** 17:4 27:22

**events** 6:18 7:5
9:13
**eventually** 74:14
76:24 77:4
**evidence** 119:5
**exact** 42:22 44:7
77:1 82:23
**exactly** 7:24 8:3
112:12
**examined** 5:8
**example** 22:3
**excessive** 31:5 32:6
32:15
**excessively** 32:21
**excused** 118:4
**exhibit** 39:24,25
47:18 108:1
116:10
**EXHIBITS** 4:10
**exited** 104:7
**explain** 72:16
113:23
**extended** 70:2 73:8
88:6
**extending** 30:3
**extends** 54:25
**extent** 30:23 34:13
**extremities** 71:1
114:14,24
**e-mail** 106:1,6,11
107:3,5
**e-mails** 106:9

F

**F** 119:1
**fabric** 88:23
**face** 74:4 75:17
**facilities** 23:22,24
24:11,14
**facing** 104:9
**fact** 59:10 62:4,10
78:15 79:16
95:12
**facts** 36:7 99:11

**failing** 28:25
**failure** 28:24
**fair** 8:10 16:12
30:12
**fall** 13:4
**familiar** 43:20,21
45:23 48:16
105:25
**familiarize** 41:17
**family** 16:4
**far** 91:12 104:3
**fashion** 61:10
**Fast** 103:4
**fastened** 75:4
**faster** 93:14
**Federal** 15:13
**feel** 30:3 72:1
84:10,17
**feet** 81:7,7 88:3
94:15
**fell** 47:10,11
**felt** 27:14
**female** 29:5 101:14
**females** 39:14
**field** 20:24
**fifteen** 33:24 35:1
35:5
**file** 25:4 35:7,16
38:1 101:3
**filed** 34:12,14,18
34:24 35:6,14
36:5,10,16 51:10
51:10
**filing** 5:2 34:8
35:12
**fill** 50:20,24 63:19
63:22 64:7
**find** 67:21
**finding** 35:21,22
35:23
**fine** 6:3,24 18:3
55:14 115:13
**finish** 7:17 8:1,2
**finished** 116:10

**firearm** 65:4
**firearms** 22:6 67:5
**first** 6:21 12:17
22:7 26:20,22
41:15 43:19 46:2
46:19 47:23 48:7
48:10,17 56:1
57:17 58:8 68:6
76:15,16 79:22
86:25 87:5,8,10
87:19 103:23,25
110:5 115:5
**FITZPATRICK**
2:2
**five** 14:8,10 21:13
29:22
**flash** 66:11
**flat** 94:10
**flex** 66:12,13
**floor** 77:20,21,23
78:8 79:1,8 80:3
80:10,10 81:5
83:22 91:7 115:3
115:6,9
**foam** 90:1,8
**foamy** 89:22
**focus** 98:20 109:17
**folder** 25:23 29:19
29:21
**folders** 25:19
**folks** 102:11
**follow** 28:24 29:1
108:8
**followed** 42:21
103:1
**following** 85:1
**follows** 5:9
**foot** 71:1,2,3,3
105:20
**force** 4:15,16 10:2
10:3 17:9 31:5
32:6,15,20 33:18
33:22,24 34:1,25
35:2 36:21 40:16

40:17,25 41:2,4
43:9,11,13 44:12
44:18,22,25 45:3
45:11,11,13,21
45:22,23 46:1,2,3
46:8,11,16,18,20
46:23 47:2,13
48:12 49:4,12
50:2,5,20,23,25
51:1,7,13,21
55:23 70:8,8 74:3
84:15 113:1,3,5,7
**foregoing** 119:18
120:3
**foremost** 6:21
**forget** 48:7
**form** 5:4 38:25
44:20 45:5 50:21
50:23,25 54:14
62:7,19 63:4,12
64:6 78:23
**formal** 35:9,9 38:3
**format** 99:5
**forms** 34:7,8 42:4
51:1 63:19,22
**forward** 9:19 42:6
42:8 70:18,18,21
71:4,11 100:21
102:20 103:4
110:23 112:2
114:7,8
**forwarded** 49:12
**found** 36:2,5,7,10
92:5
**four** 11:8
**frame** 101:13
102:3
**frank** 2:9 29:10
38:3 107:23
**free** 118:3
**Friday** 1:12 120:4
**front** 4:20 35:17
65:1 69:23 91:14
101:3 102:4

114:5,6
**fuck** 29:10
**fucking** 76:7
**full** 5:15 26:5,16
**fully** 45:10 119:5
**function** 52:14
**further** 15:1,9,10
29:21

**G**

G 106:10
**gain** 46:17 71:19
74:14 114:23
**gap** 26:4,13
**gather** 65:12
**Gathered** 58:4
**gathering** 58:19
**geared** 60:14
**general** 23:4 53:4,6
53:7,8
**generally** 32:17,23
**generically** 16:10
17:8
**gentleman** 102:23
103:9 105:6
**getting** 26:5 29:13
60:14,16 70:9
83:22 85:10,11
90:5,8 94:8,9
95:7 111:15
**give** 7:2,10 18:24
22:3 26:16 39:24
41:10 47:17,23
48:5 69:18 74:10
83:10 99:24
107:16
**given** 28:15 72:21
93:4 100:9 120:4
**giving** 82:21,22
95:22 99:4
**go** 6:6 9:19 35:17
40:14 41:15
45:12,20 48:17
50:7 55:17 57:10

58:19 60:24
63:25 65:1 67:1
67:23 72:25 73:3
74:24 77:19 88:6
93:6,17 99:8
101:21,23 102:6
102:11,20,23
103:4,8,17
104:17 106:9,10
107:25 118:3
**goat** 72:17 82:1
**goes** 44:9 47:22
62:22 65:20
92:24 96:5 106:9
115:15
**going** 6:1,6,16 7:16
7:18 8:3,9 10:16
11:9 12:14 15:11
17:3,13 18:9,10
29:8 30:7 36:24
38:2 39:24 40:14
41:11 43:17,18
44:8,19 47:17,23
47:24 48:3,4
49:19 54:7 57:23
62:25 65:9 68:11
68:17 69:20 70:7
72:5 75:23,24
82:6,7 83:1,2
85:13 93:13 94:1
94:3 99:6 100:24
101:10,11,21
102:11 103:4
106:8,10 108:24
110:16 114:25
115:3
**good** 5:12 14:12
23:9 111:25
116:4 117:7,7
**governed** 6:11
**grab** 110:22 112:1
113:3
**grabbed** 69:21
70:5,11,16 73:23

109:2 110:3,11
110:16 112:2
**grabbing** 71:24
72:2 114:1
**graduate** 12:15,19
12:21 21:14
**Great** 101:2
**green** 91:20
**Greg** 2:13
**grievance** 34:9,12
34:14,16,18,19
34:23 35:7,13,14
35:20,21,24 36:1
36:2,4,8,9
**grievances** 35:3,4
35:5,15 36:15
**ground** 70:25,25
71:2,4,16,19,22
72:10,19,25 73:1
73:3,13,25 75:8
76:4 77:10 78:13
80:22 81:3,16,17
81:17 105:6
112:6,10,14,15
112:18,22,25
113:9,19,22
114:2,17
**guard** 5:24 16:10
**guess** 7:6,6,7 85:25
96:19 104:16
106:15 111:15
**guy** 33:15 112:10

**H**

H 2:3
**hair** 104:18
**half** 114:24
**hand** 17:21 47:11
47:12 48:8 74:10
74:13,14 102:5
110:2
**handcuff** 74:8
113:18
**handcuffed** 34:4

78:9 79:12 84:21
**handcuffing** 22:5
**handcuffs** 34:3
65:23 66:10 74:5
74:7 83:22 89:2
94:9 112:7
**handed** 39:17
89:12
**hands** 46:25 47:1,4
73:21 74:5,16
75:6 78:11,12
85:19 91:3 111:1
114:14
**hands-on** 49:3
**handwritten**
116:11
**happen** 42:11
**happened** 16:4
17:4 64:21 66:23
66:25 67:16 68:4
68:15 69:14,25
70:17 74:1,12,17
76:8,23 77:9 92:1
92:7,14,17,19
93:3,12,24 98:21
99:2,12,24
105:23 108:7
109:22 110:20
111:7,12
**happening** 111:5
**happens** 75:15
77:13
**happy** 54:4
**hard** 21:8 47:1,3
47:11 89:17
**harm** 84:8,9,11,18
84:25
**Harrisburg** 2:11
13:5,9
**haven** 15:2
**head** 6:24 33:14
48:2 88:16,20
103:17 104:15,17
105:1,8 110:25

111:1,17 115:9,9
**health** 53:12,14,18
53:20,24
**hear** 7:23 72:17
78:6 81:18,21,23
**heard** 15:1,8,10
16:16
**hearing** 82:5 119:6
**heavy** 89:16
**held** 73:24
**help** 40:8 105:9
**herewith** 120:8
**Hess** 77:1,2,2
102:13 103:22
**hey** 26:15 33:13
35:10 62:25 70:4
112:9
**he'll** 33:2
**high** 12:15,19,21
12:22,23
**higher** 84:15
**Hill** 1:23 2:16 3:3
**hip** 86:13,16,21,21
**hips** 77:16 85:15
85:17 91:8
**hit** 33:14 110:9
113:17 115:9
**hitting** 54:3
**Hoffman** 76:14
79:20,21 80:4,9
101:15 113:11,13
113:16
**Hoffman's** 76:15
**hold** 20:11
**holder** 65:22
**holding** 91:4
**holds** 65:22
**holster** 65:21
**home** 13:20
**honest** 32:11
**Hopefully** 117:4
**hospital** 5:24 16:11
16:18 19:2 59:15
117:13,18,18

**hours** 9:1,5,8
96:19 117:23
_____
**I**
**ID** 96:6
**idea** 104:4
**identification**
101:11
**identified** 102:10
**identify** 40:8,13
**III** 2:3
**imagine** 31:6,17
39:22
**immediate** 58:21
**immediately** 49:5
49:6 63:17 74:9
**impacted** 115:2
**implemented** 66:5
**important** 6:23
7:15
**incident** 4:18 16:4
16:24 17:9,13,15
17:21 27:12
28:11 29:3 37:2,4
37:8,10,16 49:7
56:3,4 71:14 80:8
89:15 95:14 99:6
107:9,11 111:9
116:14,14,20,22
**incidents** 49:12
97:18
**inclined** 16:6
**include** 47:14
52:16 99:11,14
**independent**
115:22
**INDEX** 4:1,10
**indicate** 109:6
113:2
**indicated** 108:23
**individual** 32:3
67:23 80:23 84:5
84:6,21 96:18
104:21

**individuals** 24:11
24:14 96:13
99:15,20,22
100:15
**individual's** 53:12
**influence** 9:1
**information** 6:13
12:15 56:25 57:4
57:6,7
**informed** 35:24
68:23
**inhouse** 31:18
**inmate** 17:9 29:6
32:19,20,25 33:6
33:13 34:9 35:8
37:19 49:4,6 51:7
67:20,22,25 68:7
82:16 108:6,24
109:2,18,24
110:3
**inmates** 23:21,24
30:16 31:5 45:3
52:4 68:25
**inquiry** 106:15
**inside** 68:10 79:5
80:15,25 89:5,6,8
89:11 117:17
**instance** 33:5
61:14 63:24
65:16 87:4
**instruction** 38:20
41:14 47:14
52:16
**Instructor** 48:13
**instructors** 42:14
**insure** 49:6
**intake** 96:14 99:21
**intent** 71:15,18
**interactions**
117:12,16
**intercom** 29:8
**interfere** 9:12,15
**intermediate** 47:1
**interrupt** 54:2

**interview** 4:19
32:7 39:12 95:19
95:22,23 96:12
96:15 97:8,17,22
97:23 98:3,11,13
98:18 99:19,22
99:24 106:23,25
106:25 107:2
108:9
**interviewed** 31:22
32:5 96:18 97:3,4
**interviewing** 96:21
**interviews** 31:20
31:25
**investigated** 31:17
32:2 34:20,24
35:20 36:5
**investigation** 31:11
31:12,15,16 33:2
33:7 35:25
**investigator** 10:13
**involve** 14:13 31:5
**involved** 29:4
34:25 39:16
51:11 61:1,3,16
**involvement**
107:10
**involving** 32:15
36:16,20 37:4,8
51:21 52:4 55:22
61:16
**issue** 26:5 65:4
**issued** 64:5 65:17
66:1,2,3,4,16,21
67:4
**issuing** 66:17
**items** 66:14
_____
**J**
**J** 2:9
**jail** 52:23,24
**January** 18:6
19:22 23:3,5
**Jninosky@mdw...**

**interview** 2:17
**job** 27:17,22 38:18
**jobs** 20:7
**JOHN** 2:15
**joined** 75:1
**JR** 2:9
**July** 96:8,19 97:8
106:11 111:7,23
**jumps** 29:21
**June** 13:12,15,17
18:14,16,19,21
18:24,25 19:7,9
19:12 24:10,18
24:22 28:18
30:10,14 37:2,3
37:10,14,21
38:11 44:16,21
46:13,23 47:13
48:20,22 49:9,17
50:21 51:14,21
52:2 53:11 54:10
54:16 56:13,14
56:17 117:11,17
117:22
**Junior** 13:3
_____
**K**
**keep** 6:1 14:21
46:16 68:11 70:7
85:3,15
**kept** 30:10 43:5
70:4 74:10,20
86:6
**Kevin** 2:3 5:13
107:18
**key** 65:17
**keys** 64:5
**kick** 91:15
**kicking** 85:21 91:6
91:14
**kind** 31:12 34:4
53:23 69:17 70:5
71:3 72:12,16
92:4 103:17

**105:17 112:16
**kit** 65:13 66:7
**Klahr** 82:19,20,21
83:6 93:21
102:25 104:4
**kneeled** 80:11
**knees** 73:19
**knelt** 76:4 80:13
**knew** 27:17 52:20
54:19 70:14,15
78:7 79:20 82:24
97:10
**know** 7:8,24 8:3,7
8:16 14:24 15:5,7
15:7,10,11,14,15
15:20,24,25 18:1
18:4 22:11 23:10
26:23 27:16
28:18 29:3 30:23
32:24 33:5,9,20
33:23 34:14 37:3
39:4,5 40:12,20
41:18,22 42:20
42:23 43:4,19
48:24 49:1,22
51:15 53:2,9
54:10,10,16 55:2
55:3 57:20 58:16
59:3 60:5,12,13
64:1 65:6,7 66:5
66:23 68:16,22
69:8 70:21 71:6,8
72:15 73:22
74:18 75:19
76:17,25 77:2,6
78:19 79:14,15
79:16,18,22,24
80:1,6,21,22 81:9
82:25 87:18,20
88:11 89:6 90:17
91:11,12 92:9,21
92:25 93:19
96:17 98:9,12
99:1 100:18

101:13 102:11,24
104:3 105:21
107:5 110:15
112:12 115:1
116:18 117:20
knowledge 52:20
120:6
known 22:5

**L**

label 44:8
Lackawanna 13:3
lap 86:20,24,25
87:5,6,8,9,15,18
87:25 88:4
laugh 81:23
laughter 72:13,14
Lavery 2:9,9 4:5
38:6 44:19 45:5
45:18 54:14
55:14 96:22
107:20,22,23
117:2
laverylaw.com
2:12
law 2:9 29:5 38:21
41:12
lawsuit 6:11 11:20
11:23 12:1 14:1,2
14:6,11,18,23
15:8 117:10
lawsuits 14:13,20
15:3,5,12,12,13
15:16
lawyers 6:10,11
lay 75:20
laying 94:9
lays 45:12
lead 63:20
leading 28:7
leaning 103:13
learn 67:25
leather 66:9 67:19
leave 16:21 67:1

leaving 37:17
63:25 64:24
led 31:15 35:25
37:16
left 23:2 24:15
73:24 76:16
102:17 104:7,9
105:5 110:4
leg 73:9 85:20,21
91:14,15,16,17
105:18 114:1,1,5
114:6,7,8,21
legal 38:21 39:1,8
39:16,21 41:25
42:3 43:8
legs 74:24 78:9
85:25 91:7,13
115:1
LEINHAUSER
2:20
lethal 47:1
letter 26:6 48:10
let's 14:16 16:1
21:24 26:19
31:25 32:8 61:25
62:15 92:24
101:24
level 46:16 51:2,3
69:6,9,10,12
levels 46:18,20,23
50:11,12
Lewis 77:4 103:3
104:19,22,24,25
Liberty 2:4
librarian 29:5
Lieutenant 22:23
22:25 23:14 31:2
Lieutenants 51:9
lift 77:16
light 66:11
lighter 102:15
limited 116:8
line 16:13 54:4
96:11 108:20,21

109:21,23 110:19
list 120:7
listen 9:15
litigation 5:14
little 21:9 59:22
85:15 103:8
104:18 113:23
live 13:13,20
lives 16:7
living 13:15
LLC 2:2
lobby 67:15,20
local 16:11,18 48:8
lock-in 109:25
log 66:17
logged 27:20
long 6:24 18:21
19:12 21:11 29:8
76:17 94:22
98:10,25 112:12
longer 5:21,22
21:9 115:13
look 11:9 41:18
43:20 47:24
66:13 80:12
107:17 115:14
116:24
looked 43:10 92:4
92:5 106:16
107:13
looking 68:7,10
73:14
looks 43:20,22
66:8,12 96:23
104:17,19 105:5
105:10,11
loop 66:1
lot 15:19 22:2
26:14 107:25
lower 115:5
Lt 2:13

**M**

MacMAIN 2:20

mad 72:17
magazine 65:22
magazines 65:23
main 67:12
maintaining 78:10
majority 35:2,4
41:1
making 25:13
32:19 33:6 63:20
80:24 106:15
115:5
man 80:12
manipulating 72:2
75:18
manner 27:15,21
manual 41:4 43:12
43:14 48:13
March 1:12 19:19
19:20,22 120:4
mark 95:15 96:4
101:12
marked 108:2,9
116:5
Market 2:4,10,21
marking 40:8,10
Marlkress 1:23
MARSHALL 2:15
3:1
masturbate 29:6,9
masturbating
37:19
materials 11:16
Matt 117:8
matter 17:11 62:17
63:2 119:7
matters 17:12
Matthew 1:10 2:21
4:3 5:7,17 120:12
mbig1339@gmail
106:1
Mbig1339@gma...
106:3
mean 15:19 27:6
28:13 29:16

33:24 35:9 41:2
42:24 50:23
52:13,25 54:1
59:6 62:14 71:8
79:17 102:1
114:25
meaning 36:1,6
means 59:7 69:7,9
106:18 119:20
measure 23:9
90:12
medical 49:6 59:17
62:23 66:21
67:21 92:20,23
92:25,25 93:5,5,6
93:6,8,11,14,15
93:16,17,20,22
93:24 94:1,1,4,10
94:11,12,15,16
95:2,7,8,9 96:14
99:20
medication 8:25
member 31:3
memo 10:1 12:4,7
12:10 51:15,16
82:12
memory 111:11
memos 51:10
men 100:19
Mendenhall 2:13
mental 53:12,14,18
53:20,24 60:9,19
mention 107:12
mentioned 15:8
42:1 51:16,17
73:8,11,11 78:17
91:4 100:5
merely 6:8
mesh 88:23
met 97:4,6,7
metal 66:11
method 34:9 35:11
51:6
Michael 116:3

**mid** 114:14
**middle** 1:2 108:6
**military** 96:25
**Mincey** 2:2,3 5:13
**mind** 92:2
**minutes** 107:17
**missed** 101:21
**moment** 71:13
**month** 21:5,9,10
   42:23
**monthly** 33:25
**morning** 5:12 56:3
   111:8 117:7,23
**motioned** 68:13
**mouth** 89:18,19,22
   89:22
**move** 12:14 41:19
   77:16 100:21
**moving** 74:10 85:2
   91:23 92:6
**Mpolaha@mac...**
   2:23
**multiple** 33:21
   94:5
**munition** 47:10

**N**

**N** 119:1
**name** 4:2 5:12,15
   14:17 33:13
   57:17 76:15,16
   79:23 116:2
   117:7
**named** 11:19 101:3
   117:9
**names** 14:19 15:20
   15:24,25 42:3
   48:16 76:17,19
   78:21
**nature** 26:21 58:23
**necessary** 17:7
   45:22
**need** 7:7 8:12,13
   8:14 16:8,13

**40**:24 41:19
   51:24 64:2,6
   65:10 68:17,18
   68:24 69:15 93:1
**needed** 17:6 57:1,4
   58:15 70:2
   106:16 107:13
**never** 12:5 15:4
   20:1 25:20 35:22
   66:3,4
**Nicholas** 1:12
   119:13
**NINOSKY** 2:15
   118:1
**NJ** 1:23
**nod** 6:24
**noise** 72:14,16,17
   72:18,22
**noises** 72:12 81:25
**north** 67:2,3,8,9
**Notary** 1:13
   119:14
**notation** 40:4
**noted** 119:5
**notes** 107:18 119:6
**notice** 1:11 91:24
**noticed** 90:25
   91:22
**nuh-uh** 7:11
**number** 4:12 14:5
   16:5
**numbers** 40:12
**numerous** 32:2

**O**

**o** 68:6 106:10
   119:1
**object** 44:19 54:14
   83:13
**objection** 45:5,19
   62:7,19 63:4,12
   78:23
**objections** 5:3
   119:5

**obtain** 22:10
**obviously** 115:1
**OC** 22:5 47:6,8
   65:23
**OCAT** 22:6
**occasion** 15:1
**occur** 98:4,8
**occurred** 98:11
   113:24 116:22
**occurs** 43:25
**offered** 70:1
   109:25
**office** 39:19 49:14
**officer** 5:18,18,21
   5:22,25 10:22
   14:14 16:16,18
   18:20 20:12,15
   20:16,18 21:21
   22:1 24:3,7,19,23
   26:24 33:9 34:13
   34:15,15,19,21
   38:10,12,13,16
   40:3 43:12 45:7
   45:20 46:24
   51:10 52:1 55:17
   57:15 61:23,24
   71:1 73:8,9 76:11
   91:1 100:5 101:7
   114:20
**officers** 22:10,12
   51:11 61:22
   75:24,25 76:24
   77:23 80:2 81:6,9
   89:12 100:18
   117:9,14,19
**officially** 55:20,22
**Oh** 96:24
**okay** 6:9,19,20,23
   7:2,3,8,9,20 8:4,5
   8:18 9:12 11:9
   12:6 15:5,19,23
   16:12 19:5 20:10
   20:20 25:5 26:16
   26:18 27:24

**29**:23 41:8,20,23
   45:14 46:18
   49:25 50:9,18
   53:19 54:5,8
   55:21 56:12
   59:18 61:18
   69:25 72:9 76:20
   77:19 82:4 93:3
   101:2 103:8
   104:22 110:9
   111:25 113:15
   116:10
**once** 42:8 50:15
   52:6 53:15 72:23
   74:19 81:16
   100:8
**ones** 32:4 36:23
   70:12
**ongoing** 14:23
**on-duty** 49:5
**open** 66:9 68:14
**opened** 67:18
**opens** 108:6
**operate** 52:21
**opinion** 83:23
**opposite** 85:14
   86:16
**orange** 105:12
**order** 28:24,25
   56:19,20 57:22
   68:12 72:4 82:17
   82:21,22,24
   86:23 87:3 93:4
   93:19 94:6 99:7
   109:1 110:2
**ordered** 56:18
   82:16 94:20
   109:24
**ordering** 72:4
**orders** 72:20 74:2
   75:19 77:17
**original** 12:4
**outcome** 35:25
**outlined** 46:3

**outlines** 43:13
**outside** 22:21
   23:22,24 24:11
   24:14 25:7 26:4
   26:13 61:6 79:5,6
   79:13 94:12
**outward** 85:21
**overbroad** 45:6,19

**P**

**P** 58:6,11 63:24
**PA** 2:5,11,16,22
   3:3
**padlock** 66:8
**page** 4:2,12 6:7
   41:11,16,16,19
   47:23 48:8,9,10
   48:11,17 49:21
   96:11 99:18
   106:10 108:1,5,8
   108:8,20 116:12
**pages** 10:19 48:11
   49:19
**pandemic** 23:10
**pants** 105:15
**paper** 35:16
**papers** 35:14 66:21
**paperwork** 27:20
   51:25 66:22,22
**paragraph** 49:3,11
   49:20 50:1,8
**paragraphs** 42:1
**part** 41:12 42:16
   50:16,16 52:7
   53:16 74:21
   111:3 115:1,9,20
**partaking** 29:6
**participate** 9:1
**particular** 11:3
   44:3 64:17 86:23
   93:16 97:21
**parts** 84:23 86:10
   114:25
**party** 14:1

passed 94:1
pattern 30:2
pause 101:12,16
paused 105:11
paying 80:1
penalty 29:20
pending 17:2,11
Pennsbori 12:24
Pennsboro 12:22
  12:23
Pennsylvania 1:2
  21:2,11 49:14
people 7:22 26:3
  33:22 77:6 78:5
  78:14,17,18,19
  84:23 94:5,6
  102:10
percent 23:7
period 20:5,8,10
  25:1 92:18 99:3
periods 80:3
person 97:3 103:8
  103:14,16,23,24
  103:25 104:3
personal 26:3
personally 35:23
perspective 62:24
Philadelphia 2:5
phone 56:24 57:22
  57:24 58:1 67:4,4
  67:5
photo 96:6,6
physical 28:7 44:4
  70:10,17,17
  78:10 80:4,14,18
  80:20,22,24
  110:6 113:5,6
physically 110:10
  113:24
picked 68:21
piece 109:2
pistol 65:22
place 2:4 10:5
  82:24 83:11,24

86:6 89:11 91:14
  93:9 97:23 99:16
  110:24
placed 24:1 71:3
  74:22,23 81:18
  83:3,7,14,17 84:5
  84:7 85:4 88:25
  89:3,5,6,8,13
  91:17 105:12
placing 77:24 85:7
  89:24 90:2
plaintiff 14:17
plaintiffs 2:7 5:13
  6:13
play 60:13
please 25:17 50:8
point 25:22 26:6
  44:14 47:5,7
  48:25 56:8,10,10
  57:3,25 59:4 60:6
  60:23 65:17
  67:22 68:23 69:4
  69:23 70:5 72:4,9
  72:20 74:4 75:8
  75:21,23 76:22
  77:19,25 78:5,24
  80:9,13 81:1,2,12
  83:21 85:4,12,25
  86:3 90:22,23
  94:11,17 95:4
  98:17 101:18
  104:2 109:14
  110:5,15,21
  111:15,16 112:4
  112:8,9,16
  113:12,18 114:19
  116:4,19
pointed 104:21
points 26:6 43:22
  44:1
Polaha 117:4,6,8
POLALA 2:21 4:6
  117:25
police 20:20,21,22

117:9,14,19
policies 43:9
policy 4:16 10:5
  41:6 43:13 44:12
  44:18,22 45:12
  45:12,15,16 46:3
  47:13,16 48:8,9
  49:9,17 51:25
  54:6,11,17,18,20
  54:22 55:2,3,5,18
  69:1
position 73:12,12
  73:14,25 74:20
  75:16
positioned 73:18
positions 73:6
positive 23:8 44:6
  104:1 109:15
possession 38:4
possible 63:16
Possibly 111:14
post 58:12
posting 74:10
power 43:22 44:1
PPCT 48:12
pregnant 39:13
preparation 9:23
  10:8,23 11:16
  51:17
prepared 57:10
prescription 9:9
  9:11,12
presence 46:24
present 3:6 51:24
  117:14,19
presented 43:24
  44:1 46:15
pressure 85:18
pretty 96:3 111:8
prevent 87:3
prevented 95:10
  100:7
preventive 90:12
previous 23:3

96:12,15 99:18
Prime 2:18
prior 72:9 81:12
  81:15 95:7 99:21
priority 59:22
prison 1:8 10:1,6
  12:4 13:18,22
  14:24 16:21
  17:15 18:14,17
  18:22 19:1,9,13
  19:18,24 20:3,11
  21:22 22:1 23:22
  24:3,15,17,22
  30:16,22 33:25
  34:10 37:17
  40:16 43:13
  44:13,23 45:4
  46:4 54:11,17
  59:8 67:7,11
  97:25 98:5 99:16
  107:24,24 117:13
  117:17
Prison's 44:17
probably 6:1 23:1
  36:14 93:15
procedure 6:10
  49:3 51:25 96:11
proceedings 119:4
process 25:8,22
  47:12 94:7
  112:23
professional 1:13
  1:22 27:15,21
  49:7 119:13
promotion 22:22
  22:24 23:13
  48:23
prone 74:20 75:16
proper 65:10
properly 116:17
property 57:10
  58:4,19
protocol 30:21
provided 39:8

42:13 56:25 57:3
  57:6,7
PR-24 66:2,3,4
public 1:13 69:2
  119:14
publically 16:6
pull 39:25 41:8
  47:17 77:16
pulled 43:17 47:18
  70:18,21,22 71:1
  71:10 114:7,8
pulling 103:24
  110:23 112:1
purpose 65:9 84:2
purposes 8:2
  101:11
pursuant 1:11
pushed 71:4
pushing 72:3 91:7
  103:6
put 8:7 23:5 24:2
  25:3,22 35:16
  40:10 47:6 56:5
  68:18 70:2,4,21
  71:7,10,11 74:8
  74:18 81:4,13
  82:16 87:8 91:16
  91:20 103:12
  106:8 108:3
  109:24 110:1,13
  110:16 112,6,20
putting 34:3 87:22
  115:20
P.M 58:9 96:20
  97:1
P.O 2:10

─────────────

**Q**

question 6:8,11,12
  6:12 7:18,19,23
  7:24 8:1,2,6,9,10
  8:17 11:6 31:13
  45:7,9 54:6,16
  61:9 97:14

106:14 108:13,19
109:9 116:6
**questioned** 27:17
27:18 99:2 106:5
**questioning** 31:20
**questionnaire**
96:15
**questions** 5:4 6:17
6:19 8:23 9:16,16
11:10 15:11 17:4
17:6,13 18:10
25:11 30:7 37:1
48:4 96:10
107:19 117:3,5
118:1
**quite** 7:22 25:12

**R**

**R** 2:15 119:1
**radio** 56:23 92:24
**range** 47:21
**ranks** 20:15
**reached** 69:19
109:2
**reaching** 109:17
**read** 41:15 42:1
48:6 49:20,20
50:7 71:6 95:25
112:19 120:3
**reading** 70:20
71:12 111:19
115:19
**realized** 74:19
**really** 16:8 32:10
**rear** 115:5
**reason** 8:15 83:6
111:21 112:21
**reasons** 83:10
**recall** 9:13 11:24
24:5 26:20 28:4
28:15,22 29:24
30:1,5 32:1,5,14
33:17,20 34:23
39:7,11,12,20

40:20 41:14,24
43:10 44:3 47:15
50:10,12 52:8
53:22 55:7 56:15
60:23 64:23
65:15 66:20
69:22 80:24
82:23 86:2 90:3,7
90:10,16,18,21
91:19 92:1 96:21
99:13,17,21,23
99:23 100:2
104:25 105:3
106:5 114:13
117:24
**recalls** 32:19
**receive** 22:6 23:23
25:21 37:7 38:19
38:21 39:1 43:12
53:11
**received** 21:20
22:2,4 24:5,18,22
31:20 38:20,24
42:2,18 44:4,7
48:23 52:3 64:9
64:14
**receiving** 25:24
39:5,7,12 41:14
41:24
**Recess** 55:15 100:3
**recognize** 47:25,25
103:13 104:2
**recognizing** 53:12
**recollection** 6:18
7:5 46:22 111:18
115:22 120:6
**record** 5:16 43:5
96:22 104:20
**recorded** 10:20
98:14 115:15
**recorder** 98:21
**recording** 98:14,17
98:23
**records** 16:9

**refer** 40:11 67:9
**referenced** 98:4
**referred** 12:7 82:1
**referring** 10:4,11
11:3 21:1 40:4
51:3 56:5 57:14
65:2 67:10 89:20
96:16 107:7,8
**refused** 74:3
**regard** 20:14 26:18
50:7 53:5 64:16
84:1
**regarding** 27:7
32:6 33:18 37:2
38:22 39:2,8
41:25 43:9 50:18
50:19 54:12
55:18 106:16
**Registered** 1:13,22
119:13
**regrabbed** 70:9
110:23
**regrabbing** 112:1
**regular** 65:21
**related** 17:22
18:11 26:8 37:4
**relating** 35:21
51:13 97:19
**relation** 37:7 50:21
116:13
**relax** 77:18
**release** 16:6
**relevant** 17:7 18:2
**remember** 19:18
21:8 25:11 32:5,7
32:9,10,25 33:5
33:10,11,12,13
39:14,22 42:3,22
47:7 52:9,10
67:17 69:11,23
70:20,20 71:12
71:13 76:16 77:1
78:15 82:3,5
87:22 109:16,17

110:6,8 111:3,4
111:20 115:3,20
115:21
**Remembering**
111:19
**remembers** 32:23
**removal** 109:18
**remove** 68:17
69:20,22 108:25
**removed** 67:17,18
67:19 109:3,7,16
111:1 114:6
**removing** 69:22
94:8 114:1
**Rendell** 39:18
**repeat** 24:20 25:17
36:8 62:9 64:11
84:3 117:15
**repeated** 69:18
109:1 110:2
**rephrase** 8:7
**report** 4:18 10:2
10:10,12 51:9,12
51:21,24 54:20
54:23 55:8 90:22
95:14
**reported** 49:4 51:8
55:19,22
**reporter** 1:13 6:22
7:1,14 8:4 108:2
119:13,21
**Reporters** 1:22
**reporting** 1:22
49:13 51:6 54:12
54:18 55:18
**reports** 10:18
**represent** 5:13
17:17,18 40:9
44:9 50:1 56:12
64:9,13 107:23
107:24 117:8
**representation**
16:19
**represented** 16:17

**representing** 15:18
15:21
**reproduction**
119:19
**request** 38:3,7
**required** 22:10
54:23
**requirement** 54:25
**requiring** 55:8
**reserved** 5:4
**resist** 85:2
**resistance** 46:15
50:11
**resistant** 75:19
**resisted** 112:23
**resisting** 72:6 74:2
**resolved** 17:5,11
17:12
**respond** 38:7 93:1
93:9,15 94:2
**responding** 93:18
**response** 7:10
69:18 70:3 92:15
**responsive** 91:5,10
91:18 105:23
**rest** 48:11
**restate** 54:15,15
**restrained** 74:19
74:20 85:11
**restraint** 36:16
52:3,10,12,15,17
52:19,20,23 53:3
56:6 77:24,25
79:2,4,5,8,13
81:4,13,18 82:16
82:24 83:4,8,11
83:14,18,25 84:2
84:5,7 85:5,8,11
85:13 86:1,4,6,8
87:2 88:1,16,17
88:25 91:4 92:11
95:12 100:8
103:5,6,13,16
105:2

**restraints** 74:4
75:13 87:21,23
87:24 88:1,9
**restroom** 8:13 54:2
**resulted** 31:7,10
**retain** 24:13
**retention** 22:6
**retired** 76:17
**reversed** 110:22
113:3
**reversing** 112:1
**review** 10:19,25
11:5,7 49:13
95:21
**reviewed** 9:22,25
10:8,15,20,22
11:11,15,22
51:17
**rewind** 101:20
**right** 6:2,9 7:4
17:21 23:6 30:9
38:8,11 48:8
71:13 94:16
96:24,25 97:14
101:25 102:14,19
103:9,19 104:8
105:21,24 113:12
114:21 115:18
116:7
**Riley** 1:4,5 2:3
5:12 10:14 12:12
16:3,24,25 17:23
18:11,25 30:6
37:5,8 38:7 44:20
50:18,20 51:13
51:21 53:5 54:1
56:1,2,11,14,17
58:24 60:19,22
68:8 69:5 70:12
71:15,25 76:1,4
76:12,13 77:8,14
78:8,24 79:1 80:5
80:10,15,19,25
81:6,10,12 82:16

83:7,11,13,17
84:11,24 87:13
87:16 88:12,20
89:14 90:14,24
94:18 96:22
97:12,19 99:3,12
99:25 100:8
103:24 105:12
106:20 108:6
109:10 110:3,7
110:25 113:9
114:5,16 117:12
117:16
**Riley's** 105:1,18
106:16
**Riley@minceyfit...**
2:6
**ring** 67:19
**rings** 48:14
**Road** 1:23
**roll** 58:12 74:21
75:17
**rolled** 74:4
**room** 94:2 97:24
**Ross** 2:2,3 4:4 5:11
5:12 10:16,21
16:12,15 17:16
17:20,25 30:9,13
32:18 36:25
37:24 38:8,9 54:5
54:9 55:11,16
96:24 100:4
107:16 116:12
**rotating** 94:24
**rotation** 95:3
**route** 93:16
**rub** 92:15 105:23
**rubs** 92:8
**rule** 55:8
**rules** 6:6,9 8:20
**run-in** 27:16,23
**R.P.R** 119:13

―――――――――
**S**

**S** 48:18
**safer** 71:19
**safest** 83:24
**sally** 67:2,3,8,9
**saying** 14:22 25:15
32:20 33:3,21
41:3 54:19 58:15
59:9 78:25 87:9
94:5,7 107:3
115:8
**says** 40:5,15 41:12
47:19 48:8,9,12
49:3,11 70:19
71:10 96:9,11
99:18
**schedule** 42:21
**school** 12:15,19,21
12:22,23
**scream** 81:21
**screams** 72:12,14
**screen** 104:21
106:8
**scroll** 40:23 43:19
48:3,6 108:4
**se** 25:21 26:10
52:10
**sealing** 5:2
**seat** 86:8,14,22
**second** 18:12 39:25
41:10,18 47:17
48:9,11 50:19
74:9 87:1 107:16
**section** 47:20
114:15
**secure** 59:8 65:21
67:3 86:25
**secured** 91:19
**security** 4:17 5:24
16:10,18 35:19
40:17 47:20
**see** 39:25 40:3,15
40:18 41:12 43:6
48:4,6,17 49:2
78:3,4 80:9,12,18

80:20 82:7 92:3
100:11,13,25
101:1 102:23
105:5 107:18
108:10,21 109:4
109:11 113:6,20
**seeing** 48:13 105:3
111:4
**seen** 25:20 35:22
40:20 42:4 48:15
49:6 78:6 82:8
95:15 101:7
**selected** 24:8
**semester** 13:4,4,6
**Senior** 5:17
**seniority** 25:20
26:4,13
**sense** 64:16 111:6
115:7
**sent** 19:1 24:9
**separate** 120:7
**separation** 17:14
**sergeant** 31:3 77:1
77:2,4,4 92:9
102:13 103:3,7
103:10,11,20,22
104:11,14,19,22
104:24,25 105:17
**Sergeants** 76:25
**series** 94:23
**serve** 29:19
**served** 29:14,15
**session** 6:8
**set** 42:17 66:13
**sets** 66:10
**sexual** 29:7
**shackle** 75:2
**shackled** 78:9
79:12 83:23
84:22 85:22
112:10
**shackles** 66:11
67:20 74:18,22
74:24,25 75:11

89:2 94:9 112:6
**shake** 6:24
**sheet** 120:8
**Sheriffs** 61:5,7
**shield** 66:11 88:19
88:23 89:3,4,10
89:13,24 90:2,6,9
90:11,15 95:4
**shift** 34:22,24
35:16 49:5 51:8
51:23 52:1 53:10
54:7 55:25 58:5,7
58:8 65:3,6,15,16
66:16 76:1
**shin** 88:2,11
**shins** 88:4,7
**shirt** 31:2 70:22,23
71:10,11 102:15
102:18,25 104:16
105:15
**shirts** 100:19
**short** 92:17
**shoulder** 86:12,13
86:15,17 87:1,5
87:12 91:10,12
109:2
**shoulders** 77:16
87:10,25 91:9
**show** 39:24 41:9
43:17 82:6
100:12,24 101:2
**showed** 76:24 77:5
77:7 93:5
**showing** 26:8,9
78:5
**shown** 41:7 52:21
106:11 116:12
**side** 47:8 74:21
75:17 85:14
86:21,21 87:7
103:19 104:3,7,9
104:13
**sign** 43:3 64:2,4
66:14

signed 48:18 64:6
65:7
significance 62:4
62:10,14
signifies 93:8
signify 63:2,9,10
63:24 92:22
signs 66:17
similar 20:22,24
simply 19:14 20:16
20:18
simultaneously
92:2 93:12
Singleton 57:16
65:3 73:9 76:12
76:13 79:20 80:7
80:14 102:5
105:6,10 113:10
113:16
Singleton's 57:17
sir 29:10
sit 9:18
sitting 85:15
situation 46:17
61:12
size 115:6
skip 49:19
slammed 114:16
slipping 6:1
slot 26:5
slots 26:2
SLOUGHTER 3:7
small 94:3
smock 68:9,9,16
68:17 69:2,3,5,7
69:8,15,20,21,22
69:24 91:20
108:25 109:3,7
109:16,18
sock 109:3
soft 46:25 47:11
solicitor 15:22
somebody 34:1
61:7 65:4 67:18

75:22 76:6 92:20
92:23 113:25
someone's 32:24
66:21
soon 63:16 116:14
sorry 41:3 56:9
115:12
sort 29:25
sound 23:6 48:16
sounded 25:13
82:1
speak 7:16 62:16
78:14 83:2 98:10
special 21:20,23,23
specific 33:1,1,5,10
33:19 48:4 96:10
specifically 7:6
15:23 32:17,25
39:13,15,22 56:1
68:3 108:1
speed 101:10
spit 66:11 88:19,23
89:3,4,10,13,21
89:21,23,24 90:2
90:5,5,11,15
spitting 89:17
spoke 50:2 64:22
98:2 101:6
spoken 39:23
97:18
spray 47:6,8 65:23
Spring 13:11,11
SR 5:7
staff 31:3 59:17
62:23 82:15 84:9
84:14,18,25
91:15 92:25 94:2
stage 111:25
stamp 40:3,7 49:20
96:5
stamped 43:18
47:19 82:8
stand 21:18 29:8
standard 22:21

23:15,18 38:16
51:25 61:4 69:10
standing 68:8,9
69:23 105:9
114:4
stare 109:1 110:2
stared 69:17
staring 70:4
start 7:17 14:16
19:14,17 21:10
21:24 26:20
31:25 32:8,14
42:17 47:22
97:21 99:6
started 20:2,4 47:8
58:5 87:4
starting 91:21
starts 96:4
state 5:15 15:12
60:19 82:15 83:6
83:9
stated 27:14 66:14
71:6 74:1 82:25
90:22 91:22
107:13 116:23
statement 10:15,20
19:2 71:9 82:23
91:1 109:6
110:19 115:15,20
115:24 116:1,11
116:15
STATES 1:1
stating 17:20
status 60:9
stay 29:20
stayed 29:14,15
stems 17:15
step 68:12
sternum 92:8,15
105:23
Steve 57:18 70:14
102:5
sticking 105:18
stipulated 5:1

stood 69:17
stop 16:22 28:14
72:5 74:2 110:5
stopped 18:1,4
20:1 31:1
store 67:5
strap 86:12 91:16
91:17
straps 86:8,9,11,24
87:12 91:10,13
94:8
street 2:4,10,21
29:20
strike 58:18 110:9
112:7 113:17
strikes 48:2
stuff 25:6 34:5
42:3 59:14 64:5
67:14 89:17,19
subject 16:4 17:10
17:21 37:11,11
40:17 50:11
submit 90:9
Subsequent 16:24
substantiated 36:1
36:6,11
successfully 74:8
sued 14:3,4,25
suicide 53:17,19,24
68:9 69:3,5,6,7,9
Suite 2:5,16,21 3:2
summer 13:4
supervision 119:21
supervisor 27:16
27:19,23 75:25
supervisors 27:12
supported 36:7
supposed 33:23
34:4 42:10
sure 6:7 17:19 23:1
23:12 25:2 54:22
55:5,6 60:12
65:24 73:10
109:15 116:16

suspended 29:13
suspension 29:14
Susquehanna 2:23
117:8,14,19
Swanson 3:5 77:3
79:24 101:17
103:18
Swanson's 103:19
swept 71:2
sworn 5:8

---

T

T 119:1,1
Tactical 22:5
Tactics 48:12
take 7:1,14 8:4,12
8:15,16,18 9:11
22:24 24:6 41:18
54:6 55:11 61:19
64:23 68:25
70:24 71:15
91:21 93:5,10,19
93:22 97:23
105:25 107:17
112:6,13,15,18
112:22
taken 1:11 8:25
19:1 22:16,19
55:15 81:2,3,16
81:16,17 95:4
96:8 100:3,8
119:6
take-off 26:15
talk 8:14 11:12
16:1,9 21:23
36:24 38:10 43:8
55:25 61:25 77:8
92:17 97:14
talked 11:12 32:2
36:19 52:21
76:18 81:15
97:20
talking 7:17,22
14:22 27:12

37:22 40:12,13
53:6 78:25 94:5
98:13 99:21
116:1
**talks** 43:11
**tangent** 97:13
**tardiness** 26:11
**team** 24:2
**tell** 14:17 16:2 17:8
21:1 25:10 26:21
28:3,21 29:15
32:4,7,25 33:13
39:11 40:23
44:11 45:16
46:22 64:1,19
68:15 71:8 72:21
74:1,25 85:10
100:16 103:6
104:13 105:19
**telling** 35:10 77:17
**term** 59:1 60:10
**terms** 113:22
**test** 22:21,22,24
23:11,13
**testified** 5:8 108:12
115:19
**testifying** 32:23
**tests** 22:19
**Thank** 44:16 97:3
117:2,25
**thing** 8:16 16:24
29:18 48:7 62:1
77:21 86:22
112:17 116:5
**things** 15:19 51:20
53:23 77:9 94:5,5
**think** 11:24 17:12
18:2 30:10 32:22
33:2 37:24,25
39:18 41:9 52:8
53:6 64:8,12
76:21 81:15 91:2
92:2 109:9
113:10,10,11

115:8,18,25
116:11
**third** 37:18 49:2
80:12
**THOMAS** 3:7
**thought** 115:13
**thousands** 10:19
**threat** 84:8,9,11,18
84:22,25
**threats** 16:5
**three** 25:9 26:19
29:18,20,25 30:5
81:7 87:3,24
94:14
**thrown** 28:1
114:16
**tied** 27:21
**ties** 66:13
**time** 5:4 7:16 8:12
10:5 13:21 17:3,5
20:1,5,7,10 21:21
21:25 23:4,9
24:15,17,21 25:1
26:4,12,14 30:21
35:2,2,3 39:20
40:25 42:15,17
44:15 46:25 47:3
47:7 49:1 56:1,7
57:2,11 58:1,14
59:4 60:6 64:9,13
65:17,24 68:13
70:8,11,15 71:17
71:22 72:7 75:23
76:14,22 77:25
78:6,24 79:7,7,11
79:12,19,20
80:13 81:2,17
84:10,17,25
85:22 86:25
88:19 91:5,19
92:18 93:2,12,13
93:16,25 96:6,25
99:22 104:14
107:2 108:23

109:1 110:3,6,22
110:25 111:12
116:8,13,20
117:14
**timeframe** 30:3,10
49:1 60:16
**times** 14:4 24:25
32:3 52:11 58:3
69:19 70:4 72:21
80:2 99:19 101:3
**timing** 77:2
**title** 6:2 18:19
20:14,16,17,19
40:16 47:20
48:13 57:19
**titles** 20:12
**today** 6:8 9:19,23
10:8,23 11:9,12
11:17,20 14:23
51:18 115:19
**today's** 8:1 9:2,20
14:23
**told** 14:25 36:4,9
36:12 39:20
57:11 58:22 59:2
59:3 60:1,3,5,5,8
60:11,18,21
62:25 69:4,6,8,9
69:11,14 70:1
91:24 108:23
110:1,13
**tool** 66:8
**tools** 67:6
**top** 40:14,16 47:19
48:8 65:20 73:16
73:17,20 104:23
105:8,12 110:25
111:1,17,17
112:20 113:3
114:9,12 116:2
**torso** 85:15,17
114:20 115:2
**total** 25:2
**Town** 21:3,16,17

**Township** 117:8
117:19
**train** 22:14,17,20
**trained** 47:10 50:4
50:10,12,15
52:14,21 53:23
84:6
**training** 22:6,7,7,7
22:8 23:15,19
24:9 38:11,20,24
38:25 39:5,7,11
39:23 40:17 41:4
41:7,24 42:2,13
42:14,16,18 43:1
43:2,6,23,24,25
50:15,17 52:3,6,7
52:16 53:11,14
53:15,16,17,18
53:19,20,21,24
83:16 84:1,4
**trainings** 55:10
**transcript** 60:1
95:22 111:23
119:8,19 120:3
**transfer** 57:23
63:3 66:22,24
**transport** 22:8
23:18,21,24 24:1
24:3,6,11,14
56:18 57:1,4,11
57:15 58:16,23
58:24,25 59:5,9
59:10,12,15,19
59:20,24 60:4,7
60:15,17,22,25
61:1,4,10,15,19
62:1,5,11,12,13
62:18,22 63:1,7
63:14,15,19,21
63:25 64:3,10,14
64:17 65:5,11,13
66:7,12 67:24
68:9,17 75:24
108:25 116:18

117:13,18
**transported** 83:1,3
96:13 99:20
108:24
**transporting** 39:14
57:12,13 59:7
99:15,22
**transports** 59:13
59:21,25 61:3,6,8
61:13,20,25
62:21 68:25
**tree** 25:25
**trial** 5:5
**tried** 70:19,21 71:7
90:17 111:16
113:18
**tripped** 33:15
**true** 36:2,7 109:19
112:21 120:5
**try** 18:24 71:19
90:14 100:21,21
**trying** 25:15 63:15
74:3 90:19 91:15
105:1 112:19
114:12,15
**turn** 11:25 75:18
**turned** 12:3,5
**turns** 98:17
**two** 14:6,10 23:2,3
25:9,24 26:19
29:13,15 58:3
65:22 66:10,10
75:24 81:7 87:24
92:8 95:1 107:17
117:5
**type** 9:10 31:20
34:8 41:4 43:1,6
59:11 62:4 88:16
98:14 99:14
113:1
**types** 9:10 22:4
25:14,16,18
59:20 61:1,13,20
**Ty'rique** 1:5 12:12

16:25 17:23
18:11,25 37:4,8
50:18,20 51:13
51:21 56:1,2,14
56:17 58:24
60:19,22 69:5
70:12 71:15,25
76:12 77:8,13
78:8 79:1 80:5,10
80:15,19,25
81:10,12 83:7,11
83:13,17 84:10
84:24 87:13,15
88:12,20 89:14
90:14,24 94:18
97:19 99:3,12,25
100:7 103:24
104:25 105:12,18
106:16 107:9
110:7

**U**

**uh-uh** 7:11
**unclear** 113:23
**understand** 7:12
8:6,8,20 26:18
44:24 45:1,7,9
63:8
**understanding**
44:12,17,22,25
45:10,11,15 46:1
46:6,10,12,14,19
**understood** 8:10
76:20
**uniform** 68:18,20
68:22,24 69:2,16
70:1,2,3,4 102:4
105:13,15 109:24
109:25 110:13,16
110:24 111:17
112:20 115:21
**Unit** 1:23
**UNITED** 1:1
**unloaded** 67:14

**unofficially** 55:21
**unprepared** 9:19
**unprofessional**
27:3,5,8,10,18
**unresponsive**
90:23,24 91:23
91:25 92:3,5
100:9
**unsure** 14:5,19,24
25:6,23 29:2 43:7
48:23 58:17
68:21 75:23
116:17
**un-Velcro** 109:3
**updates** 38:21 39:1
39:8
**upper** 70:25
114:14,20,24,24
115:2
**upward** 91:8
**urgency** 63:10
64:16
**urgent** 59:23,25
62:17 63:2,6,10
**use** 4:15,16 8:13
10:2,3 17:9 31:5
32:6,15 33:18
34:1,25 36:16,21
40:16,17,25 41:2
41:4 43:9,11,13
44:12,17,22,25
45:11,11,12,21
45:22,23 46:1,2,3
46:8,11,15 47:13
48:12 49:4,11
50:2,4,20,23,24
51:1,6,12,21 52:3
52:17,19,22,23
53:2 54:2 55:23
67:12 74:3 84:15
84:23 87:10
113:6
**uses** 95:2
**usual** 96:11

**usually** 34:17,22
42:19 51:9 66:10
87:8
**utilized** 24:4
**utilizing** 26:14

**V**

**V** 2:3
**vague** 45:6,19
**validity** 111:22
**vehicle** 58:25 59:5
59:8,8 60:2,4,25
61:2,11,16,19,22
61:23 62:5,12,16
63:1,9 64:2,4,5,7
65:17 67:12
86:14
**vehicles** 61:21
**vehicle's** 86:22
**Velcro** 69:20,21
**verbal** 6:23 28:12
28:13,15 46:24
77:17 85:1
**verbally** 69:18
83:13
**verification** 43:1
**verify** 43:2
**versus** 15:12 62:6
62:12
**video** 4:20 10:25
11:9 76:25 79:17
100:16,24,25
101:1,2,5,7
113:13
**videos** 10:22 11:6
11:11,14 100:12
**views** 100:22
**violation** 54:23
**violations** 38:22
39:2 54:18
**vs** 1:6

**W**

**waist** 75:6 91:5

110:24
**wait** 54:4
**waited** 76:9
**waiting** 62:17 94:3
**waived** 5:3
**Walborn** 95:20
97:6,15,18 98:2,3
98:22 100:1
106:24 107:8,12
**walk** 67:1 99:5
**Walked** 68:6
**walking** 102:21
**wall** 108:15
**want** 6:17 7:25
8:16 16:8 23:1
26:16 32:6 33:19
38:10,19 41:15
43:8,19 44:24
49:20 55:12,17
55:25 60:24
64:19 73:23 77:1
77:7 79:14 96:10
97:12 98:20
100:12 101:10
107:25
**wanted** 41:9 99:5
**wants** 33:4 107:4
**Warden** 1:7 35:18
48:18,20,24
**washed** 28:2
**wasn't** 33:23 59:15
65:24 80:1 85:1
92:6 112:12,14
**watch** 29:9 69:7,9
**watched** 79:17
**watching** 29:6,7
76:25 113:13
**water** 8:14
**way** 8:8 21:25 27:4
27:11 29:17 37:4
40:7,12 43:25
47:10 70:19
84:24 87:7 93:6
93:16 102:21

110:9 114:16
**ways** 35:8 50:10
**weapon** 67:3,3
**weapons** 22:6 47:1
**wear** 69:2 105:14
**wearing** 72:7
**week** 21:13 42:23
111:9
**weekend** 30:3
**weekly** 33:25
**went** 24:2 42:14
48:25 52:10,12
57:8,25 58:1,21
64:20 67:15,21
68:3 70:25 73:13
77:20,23 79:1,4,8
79:13 85:14
98:21 101:24
110:25 113:25
115:4
**weren't** 34:4 45:2
**West** 2:21,22
**we'll** 16:13 18:11
38:7 40:2 50:18
66:21,22 95:15
96:4 101:4
102:20,23 103:12
**we're** 6:7 11:9
12:14 16:5 37:22
40:12,13 44:8
59:7 61:21 62:25
63:15 66:23
67:22,23 78:25
82:6 92:25 98:13
101:12 103:4,23
104:6
**we've** 35:15 42:4
**we;re** 36:24
**whatsoever** 110:10
113:4
**white** 31:1 89:22
90:1,8
**willing** 17:6
**windows** 68:7

| | | | | |
|---|---|---|---|---|
| **Witness** 4:1 118:4 120:1 | **X** 32:25 86:18 | **11:35** 118:5 | 56:17 96:8 97:8 106:12 117:11,17 117:22 | 37:15 117:11,17 |
| **witnesses** 6:12 | **Y** | **113** 96:11 | | **27** 19:22 |
| **worded** 26:23 | **yeah** 13:11 21:8 | **117** 4:6 | **2020** 23:6 | **27th** 18:6 |
| **words** 28:6 | 22:2 31:24 38:6 | **1175** 1:23 | **2022** 18:8 19:23 | **27:17** 102:20 |
| **work** 13:21 16:2 | 42:6,19 48:16 | **1245** 2:10 | 23:3 | **27:46** 102:23 |
| 16:17 19:23 20:7 | 49:10 50:3 58:13 | **15** 19:16,19,20,22 | **2023** 1:12 120:4 | **27:49** 103:1 |
| 26:9,9 | 59:13 72:24 73:7 | **1650** 2:4 | **215** 1:24 | **27:53** 103:2 |
| **working** 13:17 | 91:12 94:14 96:9 | **17** 1:12 120:4 | **215)550-1995** 2:6 | **288** 44:10 |
| 16:6,22 18:1,5,13 | 96:24 99:10 | **17011** 2:16 3:3 | **22:25** 101:24 102:2 | **29:20** 103:4 |
| 18:17,22 19:5,6,8 | 101:23,23 105:4 | **17108** 2:11 | **22:55** 101:24,25 | **3** |
| 19:13,14,17 20:2 | 108:22 113:15 | **18** 18:14 19:7 | 102:10 | **3** 4:17 96:11 99:18 |
| 20:2,24 58:5 | 114:3 115:8 | 101:3 | **225** 2:10 | **30** 94:25 |
| 112:14 114:22 | 116:4 | **18A1** 4:20 | **227** 47:19 | **30:34** 103:23 |
| 117:21 | **year** 12:17,19 13:9 | **18th** 117:22 | **227-232** 4:17 | **30:52** 104:6 |
| **works** 16:10 | 18:7 19:18 28:16 | **19** 37:15 | **228** 49:19 | **31:50** 105:11 |
| **wouldn't** 73:20 | 32:12 42:17,20 | **19103** 2:5 | **229** 49:19 | **3600** 2:5 |
| 78:6 91:15 | 42:23 | **19382** 2:22 | **23:05** 101:16 | **37** 47:20 |
| 112:22 | **years** 19:16 23:2,3 | **1980** 12:18 | **230** 108:20 | **4** |
| **wrist** 70:6,12 71:24 | 32:12 33:24 35:1 | **1998** 12:20 | **232** 47:22 108:21 | **4** 4:18 49:20,24 |
| 110:4,4,17 | 35:5 | **1999** 13:11,11 | **233** 4:15 40:3,5 | 50:1 |
| **write** 116:15 | **yell** 76:5 | **2** | **233-6633** 2:11 | **4th** 38:22 39:2 |
| **write-up** 25:8,21 | **yelled** 76:6 | **2** 4:16 19:12 41:11 | **24** 8:25 9:4,7 | **4:20-CV-00325** 1:6 |
| 25:24 26:20,21 | **yelling** 76:3 | 44:8 58:8 | **243** 109:21 | **40** 4:15 94:25 |
| 26:23 28:3,21 | **yells** 72:13 | **2:00** 58:9 | **244** 43:18 44:9 | **41** 4:16 |
| 29:23 36:20 | **yu** 102:24 | **2:58** 101:12 | **244-288** 4:16 | **433** 2:21 |
| 37:18 | **Z** | **20:31** 103:12 | **245** 109:23 | **463-1014** 2:22 |
| **write-ups** 25:25 | **zip** 66:13 | **200** 2:21 | **2460** 1:23 | **47** 4:17 |
| 26:19 36:19 | **Zoom** 1:10 | **2004** 19:19,20,22 | **25** 102:1 106:12 | **484** 2:22 |
| 37:21 | **0** | 21:7 | **25:50** 102:11 | **5** |
| **written** 12:8 27:13 | **08034** 1:23 | **201** 2:16 3:2 | **250** 110:20 | **5** 4:4,19 48:12 |
| 27:25 28:11,23 | **1** | **2019** 13:12,14,15 | **26** 13:12,15,17 | 49:21,23 50:8,16 |
| 28:24 29:12 37:3 | **1** 4:15 40:2 48:11 | 13:17 18:14,16 | 18:16,19,21,25 | 96:8 108:1,4,5 |
| 37:12,15 55:3,4,5 | 69:6,9,10,12 | 18:19,21,25 19:7 | 19:9 24:10,18,22 | 111:7 |
| 95:21 116:13,21 | **10:00** 101:4 | 19:10,12 24:10 | 28:19 30:1,14 | **5th** 96:19 97:8 |
| 116:23 | **10:05** 1:11 | 24:18,22 28:19 | 37:2,3,10,14,21 | 111:23 |
| **wrong** 6:9 33:2 | **10:17** 96:19,23,25 | 30:11,14 37:2,3 | 38:11 44:16,21 | **521** 96:5 115:15 |
| 54:20 | 97:22 98:8 111:7 | 37:10,14,21 | 46:13,23 47:13 | **521-553** 4:19 |
| **wrongdoing** 54:24 | **100** 2:16 3:2 23:1,7 | 38:11 44:16,21 | 48:20,22 49:9,17 | **525** 108:2 |
| 55:8,18,19 | **101** 4:20 | 46:13,23 47:14 | 50:22 51:14,22 | **525.5** 108:13 |
| **wrote** 26:25 82:13 | **106** 4:21 | 48:20,22 49:9,17 | 52:2 53:11 54:10 | **526** 108:2,9 |
| 95:14 116:16,19 | **107** 4:5 | 50:22 51:14,22 | 54:16 56:13,14 | **533** 96:5 115:16 |
| **X** | | 52:2 53:12 54:10 | 56:17 | |
| | | 54:16 56:13,14 | **26th** 18:24 19:3 | |

MATTHEW DANNER

| **6** | | | | |
|---|---|---|---|---|
| **6** 4:20 58:8 108:1,8 | | | | |
| **6:00** 58:9 | | | | |
| **651-3529** 2:17 3:3 | | | | |

| **7** | | | | |
|---|---|---|---|---|
| **7** 4:21 | | | | |
| **717** 2:11,17 3:3 | | | | |
| **735-8101** 1:24 | | | | |

| **8** | | | | |
|---|---|---|---|---|
| **8th** 38:23 39:3 | | | | |
| **8:17** 96:20 97:1 | | | | |
| **82** 4:18 | | | | |

| **9** | | | | |
|---|---|---|---|---|
| **9** 40:16 | | | | |
| **9.17** 48:9 | | | | |
| **9.22** 48:9 | | | | |
| **9:27** 101:3 | | | | |
| **9:30** 55:12 | | | | |
| **95** 4:19 47:20 | | | | |
| **95-241** 47:20 | | | | |
| **97** 106:9,10 | | | | |
| **97-98** 4:21 | | | | |
| **98** 106:10 | | | | |



**DAUPHIN COUNTY PRISON**

**Local Policy 9.17.T**

Page 1 of 3

| Title: | Use of Force |
|---|---|
| Chapter 9: | Security and Control |
| Subject: | Use of Force Training |
| Reference: | Title 37 Chapter 95 Section 95.220a |

**POLICY:**

Force, including the use of restraints, shall only be used when necessary and only to the degree required to control an individual, facilitate Court-ordered medical treatment, restore order to a disruptive group of individuals, enforce the rules and regulations of the facility, in self-defense and the defense of others, prevent damage to property, prevent an escape, or recapture an escapee. Only the minimum amount of force necessary to resolve a situation shall be employed. The use of force and restraints shall never be used as a means of punishment or revenge.

**PENOLOGICAL INTEREST:**

It is in the penological interest of Dauphin County Prison to have Training and Policies that are clear and easily understood.

**PROCEDURE:**

**Use of Force Breakdown:**

1. **No more force than necessary-** Force cannot be gratuitous or excessive.

2. **Levels of force:**

   a. **Officer presence-** identify authority by uniform or words

   b. **Verbal order-** must be a clear, reasonable, understandable and lawful command to comply

   c. **Soft empty hand-** if verbal commands are ineffective
      i. May cause pain but virtually no potential to injure

   d. **Hard empty hand-** can be used to control active aggression or defensive resistance
      i. May cause cuts or bruises

   e. **Intermediate weapons-** can be used when empty hand techniques fail or officer reasonably believes would be insufficient
      i. Highly likely to cause pain or injury

   f. **Deadly force-** to protect self or others from death or serious injury
      i. Likely to cause serious injury or loss of life



_**RESTRICTED CORRECTIONAL DATA**_
*This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency. Data subject to this restriction is contained throughout this publication.*

DAUPHIN DFS 233



**DAUPHIN COUNTY PRISON**

| Title: | Use of Force |
|---|---|
| Chapter 9: | Security and Control |
| Subject: | Use of Force Training |
| Reference: | Title 37 Chapter 95 Section 95.220a |

3.  **Levels of resistance:**

    a.  Psychological intimidation
    b.  Verbal disobedience/noncompliance
    c.  Passive resistance
    d.  Defensive resistance
    e.  Active aggression
    f.  Deadly force assault

4.  **Can use one level of force higher than resistance of inmate-** It may be necessary to use more force than the inmate is using. An officer may use more force only if the force seems reasonably necessary under the circumstances. If an inmate reduces the level of force, the officer should too.

5.  **Steps after force used**

    a.  Medical exam of officer and inmate as soon as possible if physical force or pepper spray is used

    b.  Immediately notify Shift Commander or Acting Shift Commander

    c.  Written report to Shift Commander before end of shift

**The law:**

There are three constitutional amendments that apply to the use of force in prisons, depending on the subject of the force. The Fourth Amendment protects persons in the prison other than inmates, such as visitors, from excessive force. The Fourteenth Amendment protects inmates who have not been yet convicted, but are awaiting trial (pretrial detainees). The Eighth Amendment protects convicted prisoners.

**Persons other than inmates:**

Under the Fourth Amendment, the Supreme Court has held that persons have the right to be free from excessive force. In *Graham v. Connor*, 490 U.S. 386 (1989), the Supreme Court held that an officer can use only that much force as is necessary under all of the circumstances. Dauphin County Prison's policy teaches the *Graham* standard by prohibiting correctional officers from using more force than is necessary under the circumstances. Under the *Graham* standard, a

*RESTRICTED CORRECTIONAL DATA*

*This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency. Data subject to this restriction is contained throughout this publication.*

DAUPHIN DFS 234



**DAUPHIN COUNTY PRISON**

**Local Policy 9.17.T**

Page 3 of 3

| Title: | Use of Force |
|---|---|
| Chapter 9: | Security and Control |
| Subject: | Use of Force Training |
| Reference: | Title 37 Chapter 95 Section 95.220a |

variety of factors can help determine whether force used is appropriate, such as: the person's history of violence or lack thereof, any prior attempts to gain compliance with words or less force, the level of threat posed to the correctional officer or others, and the level of force used by the person.

**Pretrial detainees:**

In *Kingsley v. Hendrickson*, 2015 WL 2473447, at *6 (U.S. June 22, 2015), the Supreme Court recently announced that the *Graham* standard applies to pretrial detainees under the Fourteenth Amendment. Previously, courts had applied a higher standard in pretrial detainee excessive force cases, requiring the inmate to show that 1) the force was excessive, <u>and</u> 2) that the correctional officer acted with intent to harm the inmate or lack of care for the inmate. Now, as in the Fourth Amendment context, an inmate only has to prove that the force was excessive. Practically speaking, the Dauphin County Prison's use of force policy already taught the *Graham* standard for the use of force with all inmates, so if a correctional officer follows the policy, then he or she will follow the *Kingsley* standard as well.

**Convicted prisoners:**

The Eighth Amendment applies to convicted prisoners, which prohibits "cruel and unusual punishment." Under the Eighth Amendment, the Supreme Court still requires an inmate in a lawsuit to show that 1) the force was excessive, <u>and</u> 2) that the correctional officer acted with intent to harm the inmate or lack of care for the inmate. As mentioned above, the Supreme Court recently held that the *Graham* standard applies to pretrial detainees in *Kingsley*. In the *Kingsley* case, the Supreme Court mentioned that it may in the future apply the *Graham* standard to convicted prisoners as well. Regardless, the Dauphin County Prison's use of force policy already teaches the *Graham* standard. The critical question under *Graham* and the Dauphin County Prison policy is whether the correctional officer uses the minimal amount of force necessary under the circumstances. If the answer is yes, then the correctional officer has followed policy and the law.

Warden Dominick L. DeRose

July 2015

***RESTRICTED CORRECTIONAL DATA***
*This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency. Data subject to this restriction is contained throughout this publication.*

DAUPHIN DFS 235



DAUPHIN COUNTY PRISON

USE OF FORCE

2017

EXHIBIT
DANNER
2

DAUPHIN DFS 244

# Identify the two Philosophies for Force/Control Continuums

- Total Control Theory:

  – Associated with a training system centered upon the use of an intermediate weapon for all levels of resistance.

- **One Plus One Theory:**

  – Advocates that officers can use one level of force higher than the level of resistance.

  – This theory puts more of an emphasis on the use of empty hand control techniques.

DAUPHIN DFS 245

# REACTIONARY GAP

- The minimum safe zone that an officer should maintain from others.

- The average distance of the Reactionary Gap is **approximately 6 feet.**

  – The Reactionary Gap can be affected by the amount of the officer's training.

- The Reactionary Gap is never penetrated unless subject control is attempted.

DAUPHIN DFS 246

# USE OF FORCE

- AUTHORIZATION:
  - Official permission or approval.

- **JUSTIFICATION:**
  - To prove or show to be just, right, or reasonable.

  - Reason, fact, circumstance, or explanation that justifies or defends.

DAUPHIN DFS 247

# USE OF FORCE

- Force and restraint equipment are intended to be used only as control measures when absolutely necessary; they are not intended, and shall never be used, as a means of punishment.

- Staff shall be authorized, and should use appropriate force in instances of:

  – Self-defense and the defense of others.

  – Effecting compliance with the rules and regulations of the facility.

  – Restoring order to a disruptive group of individuals.

  – Preventing damage to property.

  – Preventing escapes or recapturing an escapee.

  – Facilitating Court-ordered medical treatment.

DAUPHIN DFS 248

# FORCE CONTINUUM

- Officers **do not** need to escalate response controls in a step by step progression, but may enter at any _acceptable level_ of control.

- The only time an officer can reasonably escalate to the next level of force is when:

  - **The officer finds lower levels of force ineffective,** or

  - **The officer reasonably believes that a lower level of force will be ineffective.**

DAUPHIN DFS 249

# FORCE CONTINUUM

- As the subject de-escalates their actions, the officer must reduce the amount of force used proportionally.

DAUPHIN DFS 250

# DUTY to INTERVENE

- If you are witness to an officer using excessive force, you have an obligation to stop the act.

  – If you decide to do nothing, you can be held liable along with those using the force.

DAUPHIN DFS 251

# Variables Affecting the Use of Force

- Type of crime
- Officer/subject size and gender
- Exigent (emergency) conditions
- Reaction time
- Access to weapons
- Influence of Alcohol or drugs
- Injury or exhaustion of officer
- Weather or terrain conditions
- Special knowledge

DAUPHIN DFS 252

# PPCT Use of Force
# Resistance/Control Continuum

## *CONTROL*

**Deadly Force**

Intermediate Weapons

Hard Empty Hand Control

Soft Empty Hand Control

Verbal Commands

Officer Presence

## *RESISTANCE*

**Deadly Force Attack**

Active Aggression

Defensive Resistance

Passive Resistance

Verbal Non-compliance

Psychological Intimidation

DAUPHIN DFS 253

# OFFICER PRESENCE

- Identification of the officer's authority either by identification of the uniform or verbal indication.

- The officer's mere presence dictates the authority of the institution's rules and regulations and should initiate compliance.

DAUPHIN DFS 254

# PPCT Use of Force
# Resistance/Control Continuum

## *RESISTANCE*

**Deadly Force Attack**

**Active Aggression**

**Defensive Resistance**

**Passive Resistance**

**Verbal Non-compliance**

**Psychological Intimidation**

## *CONTROL*

**Deadly Force**

**Intermediate Weapons**

**Hard Empty Hand Control**

**Soft Empty Hand Control**

**Verbal Commands**

**Officer Presence**

DAUPHIN DFS 255

# PSYCHOLOGICAL INTIMIDATION

- Nonverbal cues indicating a subject's attitude, appearance, and physical readiness.
  - Blank stare.
  - Clenching of fists.
  - Tightening jaw muscles.
- The subject may comply with verbal commands, but displays visual nonverbal cues that indicate potential physical resistance.

DAUPHIN DFS 256

# PPCT Use of Force
# Resistance/Control Continuum

## RESISTANCE

**Deadly Force Attack**

**Active Aggression**

**Defensive Resistance**

**Passive Resistance**

**Verbal Non-compliance**

**Psychological Intimidation**

## CONTROL

**Deadly Force**

**Intermediate Weapons**

**Hard Empty Hand Control**

**Soft Empty Hand Control**

**Verbal Direction**

**Officer Presence**

DAUPHIN DFS 257

# VERBAL DIRECTION

- A clear, understandable, reasonable, and lawful command of direction or compliance.

- Commands should be loud, clear, and constant.

DAUPHIN DFS 258

# PPCT Use of Force
## Resistance/Control Continuum

### CONTROL

**Deadly Force**

Intermediate Weapons

**Hard Empty Hand Control**

**Soft Empty Hand Control**

**Verbal Direction**

**Officer Presence**

### RESISTANCE

**Deadly Force Attack**

Active Aggression

Defensive Resistance

Passive Resistance

Verbal Noncompliance

Psychological Intimidation

DAUPHIN DFS 259

# VERBAL NONCOMPLIANCE

- Any verbal response indicating the subject's unwillingness to obey an order or command.

DAUPHIN DFS 260

# PPCT Use of Force
## Resistance/Control Continuum

### CONTROL

**Deadly Force**

Intermediate Weapons

Hard Empty Hand Control

Soft Empty Hand Techniques

Verbal Direction

Officer Presence

### RESISTANCE

**Deadly Force Attack**

Active Aggression

Defensive Resistance

Passive Resistance

Verbal Noncompliance

Psychological Intimidation

DAUPHIN DFS 261

# SOFT EMPTY HAND TECHNIQUES

- Techniques which may cause pain but virtually no potential for injury.

- Designed to control Passive or Defensive Resistance.

- They are used when verbal directions are not effective and there is noncompliance with lawful orders.

- Examples include, but are not limited to:
  - Strength techniques.
  - Pressure points.
  - Handcuffing.
  - Joint locks.
  - Knee strikes to the Common Peroneal.
  - Oleoresin Capsicum products.

DAUPHIN DFS 262

# SOFT EMPTY HAND TECHNIQUES

- Oleoresin Capsicum (O.C.)Products

  –A nonlethal aerosol spray, foam, or gel made with the pepper derivative oleoresin capsicum designed to spray directly into a subject's face; used to inflame the skin and mucous membranes.

DAUPHIN DFS 263

# PPCT Use of Force
# Resistance/Control Continuum

## *RESISTANCE*

Deadly Force Attack

Active Aggression

Defensive Resistance

Passive Resistance

Verbal Noncompliance

Psychological Intimidation

## *CONTROL*

Deadly Force

Intermediate Weapons

Hard Empty Hand Control

Soft Empty Hand Techniques

Verbal Direction

Officer Presence

DAUPHIN DFS 264

# PASSIVE RESISTANCE

- Any type of resistance where the subject does not attempt to defeat the officer's attempt to control them, but will not voluntarily comply with verbal and physical attempts of control.  i.e.,

  – Dead weight resistance.

  – Does not react to verbal commands.

  – etc.

DAUPHIN DFS 265

# PPCT Use of Force
## Resistance/Control Continuum

### RESISTANCE

**Deadly Force Attack**

**Active Aggression**

**Defensive Resistance**

**Passive Resistance**

**Verbal Noncompliance**

**Psychological Intimidation**

### CONTROL

**Deadly Force**

**Intermediate Weapons**

**Hard Empty Hand Techniques**

**Soft Empty Hand Techniques**

**Verbal Direction**

**Officer Presence**

DAUPHIN DFS 266

# HARD EMPTY HAND TECHNIQUES

- Techniques that have the potential for injury in the form of bruises, contusions, and lacerations.

- Designed to control **Active Aggression,** but can be used to control **Defensive Resistance.**

DAUPHIN DFS 267

# HARD EMPTY HAND TECHNIQUES

- These techniques include, but are not limited to:

- Defensive Counterstrikes:
  - Straight Punch.
  - Palm Heal Strike.
  - Front Thrust Kick.
  - Angle Kick.
  - Brachial Stun.

- Shoulder Pin Restraint.

DAUPHIN DFS 268

# PPCT Use of Force
## Resistance/Control Continuum

### CONTROL

**Deadly Force**

Intermediate Weapons

Hard Empty Hand Techniques

Soft Empty Hand Techniques

Verbal Direction

Officer Presence

### RESISTANCE

**Deadly Force Attack**

Active Aggression

Defensive Resistance

Passive Resistance

Verbal Noncompliance

Psychological Intimidation

DAUPHIN DFS 269

# DEFENSIVE RESISTANCE

- Any action by a subject that attempts to prevent an officer from gaining control.

  –Pulling or Pushing Away, etc.

- It is not an attack, but a physical act to prevent control.

DAUPHIN DFS 270

# PPCT Use of Force
## Resistance/Control Continuum

### RESISTANCE

Deadly Force Attack

Active Aggression

Defensive Resistance

Passive Resistance

Verbal Noncompliance

Psychological Intimidation

### CONTROL

Deadly Force

Intermediate Weapons

Hard Empty Hand Techniques

Soft Empty Hand Techniques

Verbal Direction

Officer Presence

DAUPHIN DFS 271

# INTERMEDIATE WEAPONS

- The amount of force when utilized has the high propensity for extreme pain and the possibility of injury.

- The application/use of any weapon or object that is not part of the human body to control resistance or an assault.

- The officer *should attempt* to target motor points first, joints and bony areas second.

DAUPHIN DFS 272

# INTERMEDIATE WEAPONS

- They are used only with the intent to temporarily disable a subject and NEVER with the intent to cause permanent injury.

- The use of an Intermediate Weapon is justified:

  – When lower forms of empty hand control have failed, or

  – When the officer believes his/her skill in empty hand control will be insufficient, and

  – When Deadly Force is not justified.

DAUPHIN DFS 273

# INTERMEDIATE WEAPONS

- Examples include, but are not limited to:
  - Impact Weapons.
  - Emergency/Improvised impact weapons:
    - Keys.
    - Radio.
    - Handcuffs.
    - Flashlight.
    - Broom/mop handle.
    - Any object that could be used as a weapon of defense.
  - Any form of chemical agents

DAUPHIN DFS 274

# PPCT Use of Force
## Resistance/Control Continuum

### *CONTROL*

**Deadly Force**

Intermediate Weapons

Hard Empty Hand Techniques

Soft Empty Hand Techniques

Verbal Direction

Officer Presence

### *RESISTANCE*

**Deadly Force Assault**

Active Aggression

Defensive Resistance

Passive Resistance

Verbal Noncompliance

Psychological Intimidation

DAUPHIN DFS 275

# ACTIVE AGGRESSION

- Physical actions or assaults with _**less than**_ _**deadly force**_, but with the intent to harm.

  – Advancing.

  – Challenging.

  – Punching.

  – Kicking.

  – Grabbing.

  – Wrestling.

  – etc.

DAUPHIN DFS 276

# DEADLY FORCE ASSAULT

- Any force that may result in serious bodily injury or the loss of human life.

- This act does not require the use of a weapon by a subject.

DAUPHIN DFS 277

# PPCT Use of Force
## Resistance/Control Continuum

### RESISTANCE

**Deadly Force Assault**

**Active Aggression**

**Defensive Resistance**

**Passive Resistance**

**Verbal Noncompliance**

**Psychological Intimidation**

### CONTROL

**Deadly Force**

**Intermediate Weapons**

**Hard Empty Hand Techniques**

**Soft Empty Hand Techniques**

**Verbal Direction**

**Officer Presence**

DAUPHIN DFS 278

# DEADLY FORCE

- Is any force used by an officer that **may** result in serious bodily injury or the loss of human life.

  – In this definition, "may" means "likely to" and not just a mere possibility.

DAUPHIN DFS 279

# DEADLY FORCE

- This ultimate step is appropriate ONLY:

  - To protect yourself or another from death or serious bodily injury.

  - As a last resort in preventing an escape.

DAUPHIN DFS 280

# DEADLY FORCE

- This use of force, in circumstances of necessity, may involve the use of techniques or emergency/improvised impact weapons.

- Firearms shall be considered the final deployment of force to be used when all other means or levels of force have failed.

DAUPHIN DFS 281

# DEADLY FORCE

- Time permiting, a clear oral warning or order shall be given before any shots are fired.

- In the event that you will fire a weapon at an individual, the point of aim will be the **_CENTER OF MASS_**.

DAUPHIN DFS 282

# DEADLY FORCE

- Officers may use deadly force under these circumstances:

a) At an inmate or other person carrying a weapon or attempting to obtain a weapon by force **encountered in the officer's official duties**, if the officer reasonably believes that the inmate or person intends to cause death or serious bodily injury to the officer or another person.

b) At an inmate or other person **encountered in the officer's official duties**, whom the officer(s) has seen kill or seriously injure any person and who refuses to halt and surrender when ordered.

DAUPHIN DFS 283

# DEADLY FORCE

- Officers may use deadly force under these circumstances:

c) At an escaping inmate as a last resort if the escape is actually in progress and if the prisoner has freed him/herself of all barriers and there are no other effective means of preventing the escape.

 ⋀ Under no circumstances shall deadly force be used unless it is clear that a lesser means of force would not prevent the escape and there is no likelihood of injury to innocent persons by the use of that force.

DAUPHIN DFS 284

# DEADLY FORCE

- Officers may use deadly force under these circumstances:

d) At an inmate or other person **encountered in the officer's official duties** if there is no other way to prevent serious bodily injury or death to the officer or another person.

e) To stop or break up a riot when the situation has escalated to an actual threat of death or serious bodily injury to other inmates, staff, officers, or other persons.

DAUPHIN DFS 285

# USE OF FORCE

- After physical force or O.C. products have been used against a subject:

1) The Shift Commander or Acting Shift Commander will be notified immediately.

2) The subject **must** be examined by medical personnel as soon as possible.

3) The officers who used the physical force or O.C. product must submit a detailed written report to the Shift Commander or Acting Shift Commander no later than the conclusion of the officer's shift.

DAUPHIN DFS 286

# DOCUMENTATION

- The use of force written report shall include:

  - Date, Time, and Location of the incident.

  - An accounting of the events leading to the use of force.

  - An accurate and precise description of the incident along with the amount of force used and the justification for using that amount of force.

  - A description of any weapons involved and the manner of its use.

  - Any medical attention received.

  - A list of all participants and witnesses to the incident.

  - Any other pertinent information.

DAUPHIN DFS 287



DAUPHIN DFS 288



**DAUPHIN COUNTY PRISON**

**Local Policy Chapter 9.22**

| Subject: | Security |
|---|---|
| Reference: | Title 37 Chapter 95 Section 95.241(2.1) |

**POLICY:**

It shall be the policy of Dauphin County Prison to have in place various procedures and policies regarding the Use of Force and the documentation of any incident.

**PENOLOGICAL INTEREST:**

It is in the penological interest of Dauphin County Prison to have in place various procedures to ensure the lawful Use of Force when dealing with individuals exhibiting aberrant behavior.

**PROCEDURE:**

All staff shall be trained annually in the Use of Force (Policy 9.17 Use of Force). Special Teams shall be trained not only annually but during any additional training that they attend.

The facility trainers shall be responsible for the proper securing and inventorying of all weapons and less-lethal devices. A monthly inventory will be completed by the facility trainers. When security equipment is issued, it shall be logged by those responsible for the supervision of equipment issue, and logged back in upon return.

Any "hands on" or Use of Force against any inmate shall be reported immediately to the on-duty Shift Commander who shall ensure the inmate is seen immediately by a medical professional and have the incident documented.

There shall be no lethal weapons permitted within the secure perimeter of the facility except in the case of an emergency. Appropriate weapons lockers shall be located in the North Vehicle Entry for those agencies transporting inmates and in the facility's Main Lobby for those visiting staff or inmates.

All Use of Force incidents shall be documented and forwarded to the Administration for review and reporting to the District Attorney's Office as well as the Pennsylvania Department of Corrections.

Warden Brian S. Clark

**EXHIBIT**
DANNER
3

_**RESTRICTED CORRECTIONAL DATA**_
_This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency. Data subject to this restriction is contained throughout this publication._

September 19, 2017

3

DAUPHIN DFS 227



**POLICY 9.17**

## DAUPHIN COUNTY PRISON

Page 1 of 5

| TITLE: | Use of Force |
|---|---|
| **CHAPTER 9:** | Security and Control |
| **REFERENCE:** | PPCT Defensive Tactics Instructor Manual |

POLICY:

To ensure that staff use the appropriate level of force in the performance of their duties, employees will be provided with proper training and guidance on the permissible use of force. Force, including the use of restraints, shall only be used when necessary and only to the degree required to control an individual, facilitate Court-ordered medical treatment, restore order to a disruptive group of individuals, enforce the rules and regulations of the facility, in self-defense and the defense of others, prevent damage to property, prevent an escape, or recapture an escapee. Only the minimum amount of force necessary to resolve a situation shall be employed. The use of force and restraints shall never be used as a means of punishment or revenge.

PENOLOGICAL INTEREST:

It is in the penological interest of Dauphin County Prison to maintain a high degree of efficiency, security and management control in this facility and provide reasonable force options when an inmate exhibits resistance, attempts an escape, is non-compliant to lawful instructions, or threatens or uses force.

PROCEDURE:

1. Trained Security staff shall be authorized and shall use appropriate force as defined in this policy and only as much as is reasonable and necessary under the circumstances.

2. Force and restraint equipment are intended to be used only as control measures when absolutely necessary; they are not intended, and shall never be used, as a means of punishment.

3. The facility follows the concept of responding to resistance with proportional, reasonable use of force. This approach advocates that an officer can use one level of force higher than the level of resistance used by the subject. The only time an officer can reasonably escalate to the next level of force is when the officer finds lower levels of force ineffective, or the officer reasonably believes that a lower form of force will be ineffective. Officers do not need to escalate response controls in a step-by-step progression. As a subject de-escalates their actions, the officer must reduce the amount of force used proportionally.

4. The following steps shall be utilized to gain or maintain control of a subject, unless the acting staff member reasonably believes that the situation requires immediate escalation to a greater degree of force within the use of force continuum or finds lower levels of force ineffective.

*RESTRICTED CORRECTIONAL DATA*
*This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency.*
*Data subject to this restriction is contained throughout this publication.*



**DAUPHIN COUNTY PRISON**

| TITLE: | Use of Force |
|---|---|
| **CHAPTER 9:** | Security and Control |
| **REFERENCE:** | PPCT Defensive Tactics Instructor Manual |

  a. Officer Presence.
  b. Verbal Direction.
  c. Soft Empty Hand Techniques.
  d. Hard Empty Hand Techniques.
  e. Intermediate Weapons.
  f. Deadly Force.

5. The following are the escalating levels of resistance by a subject.

  a. Psychological Intimidation.
  b. Verbal Noncompliance.
  c. Passive Resistance.
  d. Defensive Resistance.
  e. Active Aggression.
  f. Deadly Force Assault.

6. After physical force or oleoresin capsicum products have been used against a subject, the subject must be examined by medical personnel as soon as possible. Immediate medical attention will be provided to the subject if the subject received any injuries.

7. The Shift Commander or Acting Shift Commander shall be notified immediately when physical force is used. The officer/s who used physical force shall submit a written report to the Shift Commander no later than the conclusion of the officer's shift and shall include:

  a. Date, time and location of the incident.
  b. An accounting of events leading to the use of force.
  c. An accurate and precise description of the incident along with the amount of force used and the justification for using that amount of force.
  d. A description of any weapon/s involved and the manner of its use.
  e. Any medical attention received.
  f. A list of all participants and witnesses to the incident.

<u>DEFINITIONS: Officers' Levels of Control.</u>

1. *Officer Presence* – Identification of the officer's authority either by identification of the uniform or verbal indication. The officer's mere presence dictates the authority of the facility's rules and regulations and should initiate compliance.

***RESTRICTED CORRECTIONAL DATA***
*This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency.*
*Data subject to this restriction is contained throughout this publication.*

DAUPHIN DFS 229



**DAUPHIN COUNTY PRISON**

| TITLE: | Use of Force |
|---|---|
| CHAPTER 9: | Security and Control |
| REFERENCE: | PPCT Defensive Tactics Instructor Manual |

2. *Verbal Direction* – A clear, understandable, reasonable, and lawful command of direction or compliance.

3. *Soft Empty Hand Techniques* – Techniques which may cause pain but virtually no potential for injury. They include, but are not limited to, oleoresin capsicum products, strength techniques, joint locks, pressure points or a knee strike to the subject's common peroneal. These techniques are designed to control Passive or Defensive Resistance and are used when verbal directions are not effective and there is non-compliance with lawful orders.

    a. *Oleoresin Capsicum Products* – A nonlethal aerosol spray, foam, or gel made with the pepper derivative oleoresin capsicum designed to spray directly into a subject's face; used to inflame the skin and mucous membranes.

4. *Hard Empty Hand Techniques* – Techniques that have the potential for injury in the form of bruises, contusions or lacerations. They include, but are not limited to, defensive counter strikes (straight punch, palm heel strike, front thrust and angle kick, brachial stun, etc.) and the Shoulder Pin Restraint. These techniques are designed to control Active Aggression but can also be used to control Defensive Resistance.

5. *Intermediate Weapons* – The amount of force when utilized has the high propensity for extreme pain and possibility of injury. The application/use of any weapon or object that is not part of the human body to control resistance or an assault. Examples include any form of chemical agent (i.e., PepperBalls), impact weapons or emergency/improvised impact weapons (e.g., keys, radio, broom/mop handle, flashlight, handcuffs, or any object that could be used as a weapon in defense of oneself or another). The use of an intermediate weapon is justified when lower forms of empty hand control have failed or when the officer believes that empty hand control will be insufficient and the use of deadly force is not justified. Intermediate Weapons are used only with the intent to temporarily disable a subject and never with the intent to cause permanent injury.

6. *Deadly Force* – Any force used by an officer that may result in serious bodily injury or the loss of human life. In this definition, "may" means "likely to," and not just a mere possibility.

    a. This ultimate step is appropriate only to protect oneself or another from death or serious bodily injury, or as a last resort in preventing an escape. Use of force to protect oneself or another from death or serious bodily injury may also include emergency/improvised impact weapons in circumstances of necessity. Such emergency/improvised weapons include, but are not limited to, keys, radio, flashlight, handcuffs, or any object that could be used as a

*RESTRICTED CORRECTIONAL DATA*
*This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency.*
*Data subject to this restriction is contained throughout this publication.*

DAUPHIN DFS 230



**DAUPHIN COUNTY PRISON**

**POLICY 9.17**

Page **4** of **5**

| | |
|---|---|
| **TITLE:** | **Use of Force** |
| **CHAPTER 9:** | Security and Control |
| **REFERENCE:** | PPCT Defensive Tactics Instructor Manual |

weapon in defense of oneself or another. Firearms shall be considered the final deployment of force to be used when all other means or levels of force have failed.

b. Firearms shall be used only in situations where there is a danger of death or serious bodily injury. Firearms shall not be discharged if other measures will suffice. In other words, deadly force should only be used as a last resort. If there are reasonable alternatives that can be employed short of using deadly force, these alternatives must be exhausted before deadly force can be used. In addition, the fact that an officer is legally justified in using deadly force in certain extreme circumstances does not permit the officer to engage in reckless conduct that endangers innocent persons. Displaying and discharge of firearms should be held to the minimum needed to fulfill the responsibilities of the facility and to protect the safety of the officers. Time permitting, a clear oral warning or order shall be given before shots are fired. In the event shots are fired at an individual, the shots will be aimed at center mass.

c. An officer may use deadly force under the following circumstances:

    i. At an inmate or other person carrying a weapon or attempting to obtain a weapon by force encountered in the officer's official duties, if the officer reasonably believes that the inmate or person intends to cause death or serious bodily injury to the officer or another person.

    ii. At an inmate or other person encountered in the officer's official duties, whom the officer(s) has seen kill or seriously injure any person and who refuses to halt and surrender when ordered.

    iii. At an escaping inmate as a last resort if the escape is actually in progress, if the inmate has freed him/herself of all barriers and there are no other effective means of preventing the escape. Under no circumstances shall deadly force be used unless it is clear that a lesser means of force would not prevent the escape and there is no likelihood of injury to innocent persons by the use of that force.

    iv. At an inmate or other person encountered in the officer's official duties if there is no other way to prevent serious bodily injury or death to the officer or another person.

    v. To stop or break up a riot when the situation has escalated to an actual threat of death or serious bodily injury to other inmates, staff, officers, or other persons.

***RESTRICTED CORRECTIONAL DATA***
*This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency.*
*Data subject to this restriction is contained throughout this publication.*

DAUPHIN DFS 231



**DAUPHIN COUNTY PRISON**

| TITLE: | Use of Force |
|---|---|
| CHAPTER 9: | Security and Control |
| REFERENCE: | PPCT Defensive Tactics Instructor Manual |

DEFINITIONS: Subjects' Levels of Resistance.

1. *Psychological Intimidation* – Nonverbal cues indicating a subject's attitude, appearance, and physical readiness (e.g., blank stare, clenching of fist/s, tightening of jaw muscles, etc.)  The subject may comply with verbal commands but displays visual nonverbal cues that indicate potential physical resistance.

2. *Verbal Noncompliance* – Any verbal response indicating the subject's unwillingness to obey an order or command.

3. *Passive Resistance* – Any type of resistance where the subject does not attempt to defeat the officer's attempt to control them, but will not voluntarily comply with verbal and physical attempts of control (e.g., dead-weight resistance, does not react to verbal commands, etc.).

4. *Defensive Resistance* – Any action by a subject that attempts to prevent an officer from gaining control (e.g., pulling or pushing away).  It is not an attack rather a physical act to prevent control.

5. *Active Aggression* – Actions or assaults with less than deadly force (e.g., advancing, challenging, punching, kicking, grabbing, wrestling, etc.) but with the intent to harm the officer.

6. *Deadly Force Assault* – Any force used that may result in great serious bodily injury or loss of life.  This act does not require the use of a weapon by the subject.

Presented By: _____          Date:  14 May 2014
Warden Dominick L. DeRose

Approved By: _____          Date:  14 May 2014
Commissioner Jeffrey T. Haste, Prison Board Chair

*RESTRICTED CORRECTIONAL DATA*
*This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency.*
*Data subject to this restriction is contained throughout this publication.*

DAUPHIN DFS 232