Page 1

THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

_ _ _

CARMEN RILEY,                    :
Administrator of the            :
Estate of Ty'rique              :
Riley, et al                    :   CIVIL ACTION NO.
                                :   4:20-CV-00325
          vs.                   :
                                :
BRIAN CLARK, Warden of          :
Dauphin County Prison,          :
et al                           :

_ _ _

Zoom deposition of WARDEN GREGORY

BRIGGS, taken pursuant to notice, beginning at 10:04

A.M., on Tuesday, April 19, 2022, before Nicholas

DiPiero, Registered Professional Reporter and Notary

Public.

_ _ _

DIPIERO COURT REPORTING
Registered Professional Reporters
1175 Marlkress Road, Unit 2460
Cherry Hill, NJ  08034
(215) 735-8101
dipieroreporting@aol.com

Page 2

```
 1  APPEARANCES:
 2
    MINCEY FITZPATRICK ROSS, LLC
 3  BY: RILEY H. ROSS, III, ESQUIRE
       One Liberty Place
 4     1650 Market Street
       Suite 3600
 5     Philadelphia, PA 19103
       (215)550-1995
 6     Riley@minceyfitzross.com
    Counsel for the Plaintiffs
 7
 8  LAVERY LAW
    BY: FRANK J. LAVERY, JR., ESQUIRE
 9     225 Market Street
       P.O. Box 1245
10     Harrisburg, PA 17108
       (717) 233-6633
11     Flavery@laverylaw.com
    Counsel for Defendant,
12  Lt. Greg Mendenhall
13
    MARSHALL DENNEHEY
14  BY: JOHN R. NINOSKY, ESQUIRE
       DONALD CARMELITE, ESQUIRE
15     100 Corporate Drive, Suite 201
       Camp Hill, PA 17011
16     (717) 651-3529
       Jrninosky@mdwcg.com
17     Dlcarmelite@mdwdg.com
    Counsel for Defendant,
18  Prime Care
19
    MacMAIN, CONNELL & LEINHAUSER
20  BY: MATTHEW S. POLAHA, ESQUIRE
       433 West Market Street, Suite 200
21     West Chester, PA 19382
       (484) 463-1014
22     Mpolaha@macmainlaw.com
    Counsel for Susquehanna Defendants
23
24          - - -
25
```

Page 3

```
 1          INDEX OF WITNESS
 2  NAME                        PAGE
 3
    WARDEN GREGORY BRIGGS
 4
    BY MR. ROSS:              4, 65
 5
    BY MR. POLAHA:              64
 6
 7          - - -
 8
 9
            INDEX OF EXHIBITS
10
11  NUMBER    DESCRIPTION      PAGE
12
    DCP 1   POLICIES & PROCEDURES   17
13
14          - - -
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1          (It is stipulated and agreed by and
 2  among counsel that sealing, certification and filing
 3  are waived, and that all objections, except as to the
 4  form of the questions, are reserved until the time of
 5  trial.)
 6          - - -
 7          GREG BRIGGS, having been duly
 8  sworn, was examined and testified as
 9  follows:
10          - - -
11          MR. LAVERY: The witness will read
12  and sign the transcript, both witnesses.
13  BY MR. ROSS:
14  Q.      Mr. Briggs, can you again just state your
15  name and your title for record, please.
16  A.      Gregory Briggs. Warden at Dauphin County
17  Prison.
18  Q.      And how long have you been the Warden at
19  Dauphin County Prison?
20  A.      I came in October 2018 as the Associate
21  Warden and then title changed in 2019 to Warden.
22  Q.      Do you remember what month in 2019 you became
23  a Warden?
24  A.      I don't know. I'm sorry.
25  Q.      Have you ever been deposed before?
```

Page 5

```
 1  A.      Yes.
 2  Q.      I'm going to go over just a few rules about
 3  the deposition just even though you've been deposed
 4  before, I want to go over those just to make sure
 5  we're on the same page.
 6          So this is a question and answer
 7  session. The Rules of Civil Procedure allow the
 8  parties to conduct what's called discovery which is
 9  basically just gathering information from each side.
10  And to that end one of the ways that we gather that
11  information is through a deposition which is what
12  we're doing today.
13          So I will be asking you questions
14  and you will answer those questions to the best of
15  your ability as a what's called 30(b)(6) witness which
16  is essentially a designee representing the Dauphin
17  County and Dauphin County Prison.
18          The point of my questions is really
19  just to gather information. It's not a guessing or got
20  you game or anything like that. I'm really just trying
21  to gather information. So in answering that I just
22  want as best as you can answer.
23          If at some point you don't
24  understand my question or it's confusing just let me
25  know and I'll do my best to restate it in a way that
```

Page 6

1  you could understand it. Is that okay?
2  **A.     Okay.**
3  Q.     And because this is a deposition that's being
4  recorded by the court reporter, the stenographer, they
5  are taking down everything that we're saying.  And so
6  in order to do that that means we have to actually
7  speak words.  So just like you answered my question
8  verbally I'm going to ask you to make sure that you
9  answer or say all your answers in verbal format
10  instead of shaking or nodding your head, okay?
11  **A.     Yes, sir.**
12  Q.     Again, because the court reporter is taking
13  down everything we say it's great if at the end of all
14  this we can have a record that's clean that looks like
15  question, answer, question, answer.
16            So to that end I will ask you to let
17  me complete my question even if you know exactly what
18  I'm going to ask you. Let me complete my question
19  before you answer it. Okay?
20  **A.     Okay.**
21  Q.     And I will do my best to let you fully answer
22  my question before I begin with a new question.  If at
23  some point though you feel like I've cut you off or
24  you did not get to complete your answer just let me
25  know and I'll give you a chance to do that, okay.

Page 7

1  **A.     Sounds good.**
2  Q.     On that same note, if at some point later you
3  want to amend your answer or chance your answer or do
4  anything regarding a prior question or topic that
5  we've discussed just let me know and we'll go back to
6  that issue to address whatever it is we need to
7  address, okay?
8  **A.     Okay.**
9  Q.     If you need to take a break at any time, if
10  you need to use the restroom, if you need to talk to
11  your attorney for any reason we can take a break.
12  Just let me know when you would like to take a break
13  and we can do that. The only thing I ask is that if
14  I've asked you a question that you answer that
15  question before we take that break, okay?
16  **A.     Okay.**
17  Q.     Do you understand all of these rules that
18  I've just gone over?
19  **A.     Yes.**
20  Q.     Do you have any questions about those rules?
21  **A.     Nope.**
22  Q.     Have you taken any medication in the past 24
23  hours that would interfere with your ability to
24  proceed today?
25  **A.     No.**

Page 8

1  Q.     Have you consumed any alcohol in the past 24
2  hours?
3  **A.     No.**
4  Q.     Have you taken any types of medication
5  prescribed or over the counter in the past 24 hours?
6  **A.     No.**
7  Q.     Is there any reason that you're not prepared
8  to go forward with the deposition at this time?
9  **A.     Nope. Ready to go.**
10  Q.     Have you reviewed any documents in
11  preparation for the deposition today?
12  **A.     Yes.**
13  Q.     What have you reviewed?
14  **A.     Policies and procedures.**
15  Q.     Do you remember which policies and procedures
16  you reviewed?
17  **A.     As it relates to the Judicial Center and the**
18  **medical services provided.**
19  Q.     I'm going to show you some documents.  It's
20  likely that what I show you are the things that you
21  reviewed.  But when we're said and done I'm going to
22  also ask you if there are any other documents that you
23  reviewed that I did not show you, so please keep that
24  in mind, okay?
25  **A.     Okay.**

Page 9

1  Q.     Do you understand that you are here as a
2  30(b)(6) witness?
3  **A.     Yes.**
4  Q.     And what is your understanding of you serving
5  as a 30(b)(6) witness?
6  **A.     It's more of an expert testimony on the**
7  **policies and procedures as it relates.**
8  Q.     Do you understand that you're speaking on
9  behalf of Dauphin County and Dauphin County Prison in
10  your capacity as a 30(b)(6) witness?
11  **A.     I do.**
12  Q.     If at any time you want to give me an answer
13  that is based on something other than your role as a
14  30(b)(6) witness please let me know that, okay?
15  **A.     Okay.**
16  Q.     For instance, if you were talking about a
17  policy and then you want to tell me about your
18  experience with that policy as it relates to this
19  lawsuit or some other factual thing that you observed
20  and you want to tell me that just as in your capacity
21  as Greg Briggs just let me know that you're no longer
22  testifying on behalf of Dauphin County or Dauphin
23  County Prison, okay?
24  **A.     Okay.**
25  Q.     But if you do not tell me that I'm going to

Page 10

1  assume through your answer that you are speaking as a
2  representative of Dauphin County and Dauphin County
3  Prison, okay?
4  **A.       Okay.**
5  Q.       Now, it's my understanding just for the
6  record -- did you take a look at the Notice of
7  Deposition that was sent by me for this deposition?
8  **A.       I didn't look at it specifically but with**
9  **counsel.**
10  Q.       Okay. The Notice of Deposition included
11  several categories that I want to discuss at today's
12  deposition. It's my understanding that you are going
13  to be able to speak to some specific categories but
14  not all of the categories that were on that Notice of
15  Deposition. Is that your understanding?
16  **A.       Yes.**
17  Q.       So I'm going to just say these for the
18  records the ones that my understanding that you will
19  be able to speak for. And that is, and again, I'm
20  referring to the notice of deposition for the 30(b)(6)
21  witness.  But you would be able to speak to No. 1
22  which is the policies and procedures that govern the
23  acceptance and denial of arrestees at the Dauphin
24  County Prison and booking center. Category No. 2, the
25  policies and procedures that govern the monitoring and

Page 11

1  treatment of the mental health of Dauphin County
2  Prison detainees and inmates. Category 4, the
3  policies and procedures that govern the monitoring and
4  supervision of treatment rendered to Dauphin County
5  Prison detainees and inmates by Prime Care employees.
6             Category No. 5, the policies and
7  procedures that govern the treatment of Dauphin County
8  Prison detainees and inmates that need emergency care.
9  And Category 6, the policies and procedures that
10  govern the documentation of mental health and physical
11  care rendered to Dauphin County Prison detainees and
12  inmates.
13             Do you agree that those are the
14  categories that you're prepared to testify about
15  today?
16  **A.       Yes.**
17  Q.       Before we get into those categories at this
18  point I just want to get some information about you as
19  the witness. You stated that your position in October
20  2018 was the Associate Warden of Dauphin County
21  Prison; is that correct?
22  **A.       Correct.**
23  Q.       Did you hold any other positions with Dauphin
24  County Prison prior to October 2018?
25  **A.       No.**

Page 12

1  Q.       And in 2019 you became the Warden of Dauphin
2  County Prison, correct?
3  **A.       Correct.**
4  Q.       And that is your current title today?
5  **A.       Yes.**
6  Q.       Did you hold any positions within the
7  correctional system before October 2018?
8  **A.       Yes.**
9  Q.       Tell me what positions you held, we can
10  either go from the beginning up until October 2018 or
11  work backwards.
12  **A.       Okay.  From 2006 through 2011 I worked at the**
13  **Franklin County Jail. I worked my way up from**
14  **correctional officer to Correctional Lieutenant and**
15  **then a shift manager.  Then in 2011 I moved to**
16  **Somerset County Jail as the Warden from 2011 to 2018.**
17  Q.       Before being at Franklin County Jail did you
18  serve in any capacity as a law enforcement officer?
19  **A.       No.**
20  Q.       And do you hold a college degree?
21  **A.       Yes.**
22  Q.       What is your degree in?
23  **A.       Criminal justice.**
24  Q.       Where did you graduate and when did you
25  graduate?

Page 13

1  **A.       Shippensburg University 2006.**
2  Q.       Did you go to the Franklin County Jail to
3  work after graduating from college?
4  **A.       Yes. I actually did my internship there to**
5  **close out my degree and then stayed on.**
6  Q.       Do you possess a post college degree?
7  **A.       No.**
8  Q.       Do you possess any type of degree or
9  certification other than the degree in criminal
10  justice?
11  **A.       No.**
12  Q.       I want to start by talking about that first
13  category, the policies and procedures that govern the
14  acceptance and denial of arrestees at Dauphin County
15  Prison and booking. I think that you, I think I heard
16  you mention the Judicial Center.  So can you tell me
17  what is the, where is it that a person is taken to
18  when they are first introduced into the Dauphin County
19  Prison system if they were arrested?
20  **A.       Okay. If they're arrested with new charges**
21  **they would go to the Judicial Center. Anybody on a**
22  **bench warrant would still be a direct commit to the**
23  **Dauphin County Prison.**
24  Q.       Now, I used in my category I called it the
25  booking center. Is that synonymous, is that the same

Page 14

1  as the Judicial Center?
2  A.    Yes.
3  Q.    And is the Judicial Center known by any other
4  names?
5  A.    No. That's all.
6  Q.    So what happens when an individual is taken
7  to, who's arrested and then taken to the Judicial
8  Center?
9  A.    They come in the door.  We wait until they
10  can be seen by a Judge for an arraignment. Once the
11  bail is set either non-monetary and released or if
12  they're a commitment to the Dauphin County Prison and
13  that may go up at that point to do the fingerprints,
14  et cetera in that process as well.
15  Q.    Is there an evaluation that's done by the
16  arrestee upon reaching the Judicial Center?
17  A.    Yes.
18  Q.    Tell me about that.  What type of evaluation
19  is done and who does it?
20  A.    Upon commitment medical does evaluations.
21  Back at that time we would also have a pretrial
22  assessment done and then a diversion specialist would
23  also see them as well and gather as much information
24  as possible before the arraignment if it is done for
25  the Judge.

Page 15

1  Q.    Let's start with the medical does the
2  evaluation. What type of evaluation is done by
3  medical?
4  A.    We determine a clearance to incarcerate
5  evaluation.  So any type of assessment that they would
6  need to determine if they were fit to stay.
7  Q.    I'm sorry. I didn't hear what you said. At
8  the beginning of that you determine --
9  A.    Clearance to incarcerate.
10  Q.    Clearance to incarcerate. Thank you. And when
11  you say it's done by medical what do you mean?  Is
12  this a nurse, a doctor, something else?
13  A.    Typically a nurse or M.A.
14  Q.    And is that nurse or M.A. employed as a
15  Dauphin County Prison employee or something else?
16  A.    Prime Care.
17  Q.    Tell me about the relationship with Dauphin
18  County Prison and Prime Care. Is Prime Care the prime
19  medical provider for Dauphin County Prison?
20  A.    Yes.
21  Q.    How long has Prime Care been the medical
22  provider for Dauphin County Prison?
23  A.    I'm not sure how long that contract is.
24  Q.    Was that contract in place when you came in
25  as an Associate Warden in 2018?

Page 16

1  A.    Yes.
2  Q.    And you mentioned a contract.  So this
3  relationship is governed by a contract between the two
4  Dauphin County Prison and Prime Care?
5  A.    Yes.
6  Q.    Do you know if that contract is -- I made an
7  assumption and I shouldn't have. Is that contract
8  between Prime Care and Dauphin County Prison or is it
9  between Prime Care and Dauphin County?
10  A.    Dauphin County.
11  Q.    Does that contract have a shelf life? Is it
12  contracted for a certain number of years?
13  A.    Yes.
14  Q.    How many years?
15  A.    I'm not sure when it runs out on this one.
16  Q.    And does that contract provide for how Prime
17  Care will conduct evaluations of arrestees upon
18  presentation to the Judicial Center?
19        MR. LAVERY: If you know.
20  A.    I'm not sure if that's spelled out in the
21  contract or not.
22  Q.    Have you ever reviewed the contract?
23  A.    It's been a while, yes.
24  Q.    In addition to Prime Care does the Dauphin
25  County Prison itself have any employees that are

Page 17

1  employed as medical workers in any capacity?
2  A.    No.
3        MR. ROSS: I'm going to show you some
4  policies. I'm going to mark this just as, why don't
5  call this Briggs 1 on that. I don't want to call it
6  Briggs.
7        MR. LAVERY: How about Dauphin County
8  1. It's a 30(b)(6).  So why don't you just make it
9  Dauphin County 1.
10        MR. ROSS: Why don't we make it DCP
11  1. That way he doesn't have to write out Dauphin
12  County each time we do it.
13        MR. LAVERY: That's fine.
14        MR. ROSS: And we'll just keep the
15  number going, Frank, for across the witnesses.
16        MR. LAVERY: That's fine.
17  BY MR. ROSS:
18  Q.    Warden Briggs, can you see that on your
19  screen?
20  A.    Yes.
21        MR. LAVERY: Just so you know, Riley,
22  he has a copy in front of him as well.
23        MR. ROSS: Okay. Great. That's
24  perfect.
25  Q.    So, Warden Briggs, since you have a copy in

WARDEN GREGORY BRIGGS

Page 18

1   front of you as well feel free to refer to that. So
2   let me start by, and again, this is DCP 1. At the
3   bottom there is a notation that it says Dauphin DFS
4   290. Do you see that?
5   A.       Yes.
6   Q.       That's what we call a bate stamp. That is
7   something that is actually placed on the documents by
8   the parties. It's not part of the original document.
9   And it's done so as a point of reference. So we can
10  refer to that like page numbers. So often times I'm
11  going to refer to that as the page number that we're
12  dealing with. So we're looking at DFS 290 and we have
13  about 30 pages in this exhibit but we're going to
14  cover different policies and I'll refer to them as
15  such.
16          MR. LAVERY: I think, Riley, for the
17  record, I think this particular policy goes from DFS
18  290 to DFS 298. I think signatures are right on the
19  bottom of that page.
20  Q.       Great. So we're going to be looking at this
21  first policy which states at the top Dauphin County
22  Judicial Center Policies and Procedures. And we're
23  going to go through a couple of things on there.
24          So the question I have, Warden
25  Briggs, is that we're talking about you see on this

Page 19

1   document part 1 is dealing with booking, intake
2   procedure and it mentions intake searches. It talks
3   about the Dauphin County Judicial Center which we
4   talked about before.
5           My first question is that, is the
6   Judicial Center the only place of entry for an
7   arrestee to come into the Dauphin County Prison?
8   A.       For an arrestee, yes.
9   Q.       Is there --
10          MR. LAVERY: Why don't you explain
11  for him because this will make this go probably
12  quicker what you mean by that just so --
13  A.       So arrestees anybody with new charges, new
14  criminal charges goes through the Judicial Center. If
15  it's somebody with an existing charge like a bench
16  warrant example they would still come into the Dauphin
17  County Prison.
18          MR. LAVERY: Directly?
19  A.       Correct.
20          MR. LAVERY: What he's saying is
21  there's direct admits to the prison and then there's
22  arrestees that go through the Judicial Center.
23  Q.       So okay. So let's talk then, lets make that
24  distinction, the direct admits to the prison, who were
25  those and how does that happen?

Page 20

1   A.       Anybody with for example a probation, bench
2   warrant, out of county warrants at that time would
3   come straight to Dauphin County Prison as opposed to
4   the Judicial Center. So the distinction is if they
5   have a detainer plus new charges they would still have
6   to go to the Judicial Center first to get the new
7   charges squared away and then they would come up to
8   the Dauphin County Prison. But anybody with a
9   detainer only would come into the Dauphin County
10  Prison directly.
11  Q.       And where is the Judicial Center located?
12  A.       It's adjacent to the prison, a parking lot in
13  between.
14  Q.       And for the direct admit would they not even
15  come into the Judicial Center, they would come in
16  Dauphin County Prison through some other route?
17  A.       Correct. They would come straight to DCP.
18  Q.       And then how about for someone who for
19  instance is being transferred to Dauphin County
20  Prison, let's say that they're doing time and it's at
21  a different facility but they come down to Dauphin
22  County Prison because of charges or I should say two
23  things. One, because they come down for new charges to
24  Dauphin County Prison. Do they come in through the
25  Judicial Center or a direct admit?

Page 21

1   A.       Yeah. The distinction is if they need an
2   arraignment they would go to the Judicial Center. So
3   if need to be arraigned on new charges they would go
4   there. If not they would come straight to the Dauphin
5   County Prison.
6   Q.       And then how about someone who is simply on
7   their way somewhere else and they are stopping at
8   Dauphin County Prison to be held there for a certain
9   amount of time. Is that something that's a direct
10  admit?
11  A.       A direct commit, yeah.
12  Q.       I'm sorry. You said direct commit or admit?
13  A.       Direct commit to the prison.
14  Q.       So this policy that we're looking at just
15  governs those who are coming with new charges that
16  need to be processed through the Judicial Center; is
17  that correct?
18  A.       Correct.
19  Q.       I've also heard Dauphin County Prison
20  referred to as Dauphin County Jail. Is there any
21  difference in prison versus jail?
22  A.       Just the title change for here. We do house
23  others as well, so Federal inmates as well so I don't
24  know whether that's why it was called prison or not.
25  Q.       The Judicial Center itself does it have

Page 22

1  holding cells?
2  A.    Yes.
3  Q.    But that's not considered the jail as opposed
4  to the prison being the other facility; is that
5  correct?
6  A.    Correct.
7  Q.    I want to go to DFS 292 under medical
8  treatment.
9          MR. LAVERY: Okay. We're there.
10  Q.    Do you see there, it states all necessary
11  medical treatment shall be provided to the detainees
12  in a timely manner.  It also states that, I'm looking
13  at A, B, C and D. Why don't you take a second and read
14  that. Once you're done I'm going to ask you a couple
15  questions.
16  A.    Okay.
17  Q.    So under B it talks about if a Prime Care
18  medical staff member is present they will make the
19  determination regarding a clearance to incarcerate.
20  And I take it that that means just getting the green
21  light to allow them to be brought into the Dauphin
22  County Prison; is that correct?
23  A.    Yes.
24  Q.    No. 3 says if prime care is not present the
25  processing JCO will determine if the nature of the

Page 23

1  injury requires a clearance to incarcerate. First of
2  all, what is JCO?
3  A.    Judicial Center officer.
4  Q.    And what is a Judicial Center officer?
5  A.    Correctional officer.
6  Q.    So that's any correctional officer, no type
7  of specific title is needed to make that
8  determination?
9  A.    Typically they would even if Prime Care
10  wasn't present they would call Prime Care at the
11  Dauphin County Prison to come down to assess in those
12  scenarios.
13  Q.    But under this policy if Prime Care was not
14  present any correctional officer could make that
15  determination on whether a clearance is required to
16  incarcerate?
17  A.    Yes. That's the policy. Like I said, the
18  typical practice is calling Prime Care to come down
19  from the main prison.
20  Q.    And when calling Prime Care to come down is
21  there a special type of Prime Care worker that needs
22  to come down? For instance, it needs to be a nurse,
23  it can't be a physician's assistant or something like
24  that?
25  A.    Correct. A nurse or a medical assistant

Page 24

1  typically.
2  Q.    And when it says that it requires a clearance
3  to incarcerate. What is the clearance?
4  A.    They send them to a hospital and then when
5  the offender comes back there's a clearance to
6  incarcerate form depending on the hospital what the
7  form looks like.
8  Q.    So when we're talking about for instance in
9  1, it's B1, it says continues with injury requiring a
10  medical clearance. You're saying that the clearance
11  means that that detainee needs to go to a hospital and
12  be cleared for their or at least be checked out for
13  their injuries before they can be incarcerated; is
14  that what you're saying?
15  A.    Correct.
16          MR. LAVERY: Under B1, yes.
17  Q.    Is there anything that governs that the JCO
18  can look to to help make his or her determination of
19  whether a clearance is required? Are their any
20  policies that they should be considering when
21  determining if a clearance is required to incarcerate?
22          MR. LAVERY: Object to form. And the
23  only reason is without foundation. Because his
24  testimony is they call down, the practice is they call
25  down a medical person to do that. But you can answer

Page 25

1  it.
2  A.    I'm sorry. Can you repeat that.
3  Q.    So the policy allows for a judicial, a JCO to
4  determine if a clearance is necessary. I understand
5  you said the policy is to have a nurse or have
6  someone from Prime Care called down. But the policy
7  does allow for a JCO to make that determination. My
8  question is, is there something that a JCO can
9  consider to aid him or her in making that
10  determination, are there any policies or procedures
11  that they can use to help make that determination?
12  A.    The Prime Care policies would help on that.
13  But typically, like I said, it's always a Prime Care
14  call.
15  Q.    So let me ask you about that. When you say
16  it's always a Prime Care call. So is there any
17  discipline that is given if a JCO does not call Prime
18  Care to come and make that determination?
19          MR. LAVERY: Object to form. You can
20  answer.
21  A.    I can't think of a scenario where that
22  happened to be honest with you.
23  Q.    Are there any written policies that call for
24  discipline where a JCO does not call for a Prime Care
25  to come and make that determination?

Page 26

1  **A.       I'm not sure.**
2  Q.       And then you mention that Prime Care policies
3  are something that a JCO could use. Where are those
4  Prime Care policies kept?
5  **A.       No. I didn't say that they can use the Prime**
6  **Care --**
7          MR. LAVERY: Yeah. I'm just going to
8  object. Because I believe his testimony is that if
9  Prime Care is there they make the call. That's what
10 the policy says.  And if they're not there the
11 practice, and I agree with you that it's not in the
12 policy. The practice is they call Prime Care to come
13 down and then they would have Prime Care's policies. I
14 think that's what he's trying to say.
15         MR. ROSS: Well, Frank, I appreciate
16 it but I'm going to ask you to stop with your long
17 objections. Just make the objection and stop speaking
18 objections because you're giving testimony.
19         MR. LAVERY: That's fine. But I would
20 add though --
21         MR. ROSS: Hold on, Frank. I told the
22 witness that if I'm incorrect in my questioning he can
23 let me know that. If I say something that he said and
24 he didn't say it he can tell me that. He can let me
25 know.

Page 27

1          MR. LAVERY: And my obligation to him
2  is if you're mischaracterizing his testimony which you
3  are and that is a form objection because the form
4  objection is it doesn't have foundation. You already
5  told you what happens. You don't like the answer but
6  he told you.  And you're mischaracterizing his
7  testimony. And I have a right to say it on the record.
8          MR. ROSS: Right. Exactly. And your
9  objection is objection, mischaracterizes the
10 testimony. End of objection. That's what I'm asking
11 you to do.
12         MR. LAVERY: I would ask that you not
13 mischaracterize his testimony because I think it was
14 pretty clear.
15 BY MR. ROSS:
16 Q.       Warden Briggs, what I heard you say and you
17 can tell me if I'm wrong, is that there are Prime Care
18 policies that the JCO can consult; is that not
19 correct?
20 **A.       No. That's not correct. So we would call**
21 **Prime Care and they would refer to their policies on**
22 **it.**
23 Q.       Okay. So Prime Care has their own policies
24 and it's not something that the JCO can consult?
25 **A.       Correct.**

Page 28

1  Q.       Are there any policies that the JCO can
2  consult, any written policies that the  JCO can consult
3  if he or she were going to make that determination
4  that a clearance is needed to incarcerate?
5  **A.       Not that I'm aware of.**
6  Q.       You see for No. C it talks about detainees
7  determined to be under the influence.  Who makes that
8  determination if the detainee is under the influence
9  of alcohol or any controlled substance?
10 **A.       Medical.**
11 Q.       And I should clarify, it's not just that C
12 talks not just being under the influence but to the
13 extent that they present a danger to themselves or
14 present with a similar condition. Medical makes that
15 determination for C?
16 **A.       Yes.**
17 Q.       Is there any punishment or what is the
18 punishment for a medical professional that does not
19 require that an arrestee who is determined to be under
20 the influence as prescribed by C. I'm sorry. That's a
21 bad question. Let me start over.
22         I'm just talking about C. So let's
23 say an arrestee presents and qualified under C for
24 medical treatment. And the Prime Care person does not
25 require that the arresting officer take that person to

Page 29

1  a medical facility. Is there some type of discipline
2  that is given to the Prime Care worker by Dauphin
3  County for failing to do that?
4          MR. LAVERY: Object to form.  You can
5  answer.
6  **A.       Prime Care handles their own discipline as it**
7  **relates to that.**
8  Q.       Are there any policies that require Dauphin
9  County employees to monitor whether or not Prime Care
10 is correctly making that determination as laid out in
11 C?
12         MR. LAVERY: Object to the form of
13 the question.
14 **A.       We have policies that govern how they**
15 **administer their care, yes.**
16 Q.       So they're Dauphin County policies that
17 govern how Prime Care administers their care. Is that
18 what you're saying?
19 **A.       Not how but what specifically needs done. It**
20 **doesn't give a timeframe et cetera, but there has to**
21 **be some assessment done.**
22 Q.       So they're Dauphin County policies that
23 govern some things that Prime Care needs to do in
24 performing their jobs under as medical for the prison;
25 is that right?

Page 30

1 **A.     Correct.**
2 Q.     If we do not go over those policies today,
3 again, I'm going to ask you at the end can you to let
4 me know if we have not seen those policies that you're
5 referring to?
6 **A.     Okay.**
7         MR. LAVERY: Or you can just ask him
8 what they are and he can identify them now for you.
9 You got them.  They were sent to you.
10        MR. ROSS: Frank, I just asked him to
11 easily say if we don't go over them just let me know.
12        MR. LAVERY: Yeah. But why does he
13 have to remember that? If you want to go over them you
14 have them. I don't know why we're playing games here.
15 You have them.
16        MR. ROSS: Frank, can you be quiet,
17 please, and let me do my job. When you conduct
18 deposition you can conduct them the way you want to
19 conduct them.
20        MR. LAVERY: You can't conduct a
21 deposition trying to make a witness remember what you
22 didn't or you failed to go over. That's not fair to
23 the witness.  That's on you. You should go over what
24 you need to go over.  It's not fair for the witness to
25 have to recall what you didn't go over. So I'm telling

Page 31

1 you right now. You have the policies. If you want to
2 ask him about them ask him about them now.
3         MR. ROSS: Frank, I'm asking him
4 about the policies. We're going over the policies.
5 All right. My request was that when we get to the end
6 if there are any policies that I haven't then he can
7 let me know. You can tell me that I have them but I
8 want to hear from the witness.
9         So do you want to quit interrupting
10 me, Frank, so we can get through this or are we going
11 to take all day?
12        MR. LAVERY: Yeah. We're going to
13 take all, Riley, because you're not going to sit here
14 --
15        MR. ROSS: Well, it doesn't make any
16 sense because you're being ridiculous right now.
17        MR. LAVERY: I don't care. No, you're
18 being ridiculous. So why don't you keep asking
19 questions --
20        MR. RILEY: Why don't you shut up,
21 Frank. Why don't you shut up and let me talk.
22        MR. LAVERY: Why don't you stop
23 acting like a jerk, Riley, and --
24        MR. ROSS: I'm being the jerk. You're
25 the one that's constantly interrupting me but I'm

Page 32

1 being the jerk.
2 BY MR. ROSS:
3 Q.     Warden Briggs, the next question, Warden
4 Briggs, the next question, I want to go to page 297.
5 So we have question.  So we have part 3 and again
6 we're still on the same policy. Court operations. Why
7 don't you read that over A, B, C and D and then I'll
8 ask you some I questions about it. Let me know when
9 you're done.
10 **A.     Okay.**
11 Q.     So with regard to detainee hearings it
12 references video appearance, B1. Are those video
13 hearings recorded and kept?
14 **A.     I don't know.**
15 Q.     I want to go to the next page of 298. Do you
16 see there that it's signed January 2017. Have there
17 been revisions made to this policy since January of
18 2017?
19 **A.     No.**
20 Q.     Let's go to the next policy.  This says
21 orders for post No. 3 intake lobby. Can you tell me
22 what's meant by orders for post?
23        MR. LAVERY: Is that a new exhibit or
24 are you just keeping that as part of 1?
25        MR. ROSS: This is all part of 1.

Page 33

1 It's 31 pages. There's going to be several policies in
2 it but we'll just make it all the same exhibit.
3         MR. LAVERY: Just for the record
4 though, I think so we have a clear record, I think 299
5 and 300 constitute the next document.
6         MR. ROSS: Right.
7 Q.     So we're looking at DFS 299, orders for post.
8 What does that mean, orders for post?
9 **A.     Post orders for the staff member.**
10 Q.     And post, does post mean actually posts like
11 hanging up somewhere or the particular shift that
12 someone is working?
13 **A.     Yeah.  Where they're assigned to that day so**
14 **they're assigned in the intake lobby so that's they're**
15 **assigned post.**
16 Q.     And does No. 3 reference the intake lobby or
17 does No. 3 just mean the third of the post?
18 **A.     The intake lobby.**
19 Q.     And in your capacity, do you understand as
20 the 30(b)(6) witness that the incident or the intake
21 regarding Ty'rique Riley in this lawsuit occurred on
22 June 18, 2019?
23 **A.     Yes.**
24 Q.     Did you review any documents in preparation
25 for your deposition as the 30(b)(6) witness involving

WARDEN GREGORY BRIGGS

| | Page 34 |
|---|---|

1 the intake or the admission of Ty'rique Riley into
2 Dauphin County Judicial Center on June 18, 2019?
3 **A.      I reviewed the policies.  The one you're**
4 **referring to now?**
5 Q.      Okay. So do you know who the intake officer
6 was on that day in reviewing your materials?
7 **A.      I don't know offhand.**
8 Q.      Let's go to the next policy which starts on
9 DFS 301.
10          And, Frank, I think you said that
11 goes to 303?
12          MR. LAVERY: 304. It's signed by the
13 then Warden at the time so it would be 301 to 304.
14 Q.      So let's look at 301. This says orders for
15 post No. 4, booking receiving officer. Just for
16 clarification does the booking receiving officer is
17 that the booking receiving officer within the Judicial
18 Center?
19 **A.      This one relates to the prison.**
20 Q.      So this is different?
21 **A.      Yes.**
22 Q.      So this would not relate to an individual who
23 is arrested and brought to the Judicial Center as an
24 arrestee?
25 **A.      Correct.**

| | Page 35 |
|---|---|

1          MR. LAVERY: You may want to ask him
2 that same question for the one before, Riley, as well.
3 That was the order for post No. 3. Just so the record
4 is clear.
5 Q.      Let me go back to 299. And this was order for
6 post No. 3. Is this related to the Judicial Center?
7 **A.      No. The prison as well. Dauphin County**
8 **Prison.**
9 Q.      So when we're talking about the intake
10 officer here that was for the prison?
11 **A.      Yes.**
12          MR. ROSS: Thank you, Frank.
13          I want to go to -- so 304, Frank,
14 you said that this was a sign in for what was the post
15 before; is that correct, or is this a different
16 policy?
17          MR. LAVERY: Oh, I'm sorry.  You're
18 right on that, Riley, that's my bad. I'm sorry about
19 that. You're right. It should be 301 to 303.  My
20 apologies. 304 is a separate policy I believe.
21          MR. ROSS: That's the way I took it
22 that 304 was a separate one.
23          MR. LAVERY: I think you're right.
24 Because if you look at 303 it says page 3 of 3. So it
25 should be 301 through 303. 304 is a separate policy

| | Page 36 |
|---|---|

1 signed by the Warden.
2 BY MR. ROSS:
3 Q.      I now want to look at 304 which says it's
4 local policy chapter 12.16.  The subject is medical
5 and health services. And have you reviewed this,
6 Warden Briggs, this page?
7 **A.      Yes.**
8 Q.      I just want to ask you specifically about,
9 under procedure the second full paragraph, it says,
10 any inmate in need of medical attention is instructed
11 to follow the guidelines set forth by Dauphin County
12 Prison as outlined in the inmate handbook.
13          Is this a policy that refers or
14 governs arrestees that are brought into the Judicial
15 Center.
16 **A.      No. It's separate.**
17 Q.      And let me ask you this. Once someone is
18 brought in through the Judicial Center they're given
19 clearance and they are admitted do they then become an
20 inmate in the Dauphin County Prison?
21 **A.      Once the arraignment is completed we**
22 **considered them an inmate and have a bail.**
23 Q.      So prior to arraignment and some
24 determination made as to whether or not that person is
25 released or incarcerated what is that person's

| | Page 37 |
|---|---|

1 designation, what do you call them?
2 **A.      Arrestee or detainee.**
3 Q.      And in preparation for your deposition as
4 30(b)(6) witness do you know if Ty'rique Riley was
5 ever designated as an inmate or if he remained as
6 detainee the entire time he was at Dauphin County
7 Prison?
8 **A.      No. He went through the arraignment process**
9 **and had a bail.**
10 Q.      So he went from being a detainee to an
11 inmate; is that correct?
12 **A.      Correct.**
13 Q.      So does this policy govern those who become
14 an inmate because they have gone through the
15 arraignment process?
16 **A.      Yes.**
17 Q.      Is that person given an inmate handbook?
18 **A.      Yes.**
19 Q.      And this policy states that the inmate
20 handbook contains guidelines regarding an inmate who
21 wants medical attention; is that correct?
22 **A.      Yes.**
23          MR. ROSS: Frank, I'm going to put
24 together a list of things if I need after I'm done
25 with this. But I think the inmate handbook is

Page 38

1  something we don't have.
2       MR. LAVERY: You're probably right.
3  Like I said, what I did is when I saw your notice I
4  went through and looked to see if there were any
5  policies that would directly pertain to the notice as
6  opposed to what you initially asked for. And I agree,
7  that that's something that you're entitled to. I will
8  get it to you. I didn't in the initial production but
9  I will get it for you.
10      MR. ROSS: Okay. Thank you.
11 BY MR. ROSS:
12 Q.     The next paragraph references a year end
13 report.  You can read that if you need to. Because I
14 want to ask you what that is, what is the facility's
15 year end report?
16 **A.     Okay. So Prime Care provides reports on**
17 **medical for the prison board monthly as well as a year**
18 **end report.**
19 Q.     What's contained in the year end report?
20 **A.     All their statistics as it relates to suicide**
21 **watches or E-talks, all those different stats compiled**
22 **into one report.**
23 Q.     Does Dauphin County do anything once
24 reviewing these reports to make changes, to make
25 recommendations to Prime Care, et cetera?  What does

Page 40

1  **A.     I believe it was Lynn Fuhrman.**
2  Q.     Lynn Fuhrman?
3  **A.     Yeah.**
4  Q.     Is that F-U-R-M-A-N?
5  **A.     F-U-H-R-M-A-N I think. Don't quote me on that**
6  **though.**
7  Q.     And the policy references a medical
8  director/doctors. If you know, who was the medical
9  director on June 18, 2019?
10 **A.     The head doctor would have been Dr. Young.**
11 Q.     Let's go to the next policy. It starts on
12 307. And that goes through --
13      MR. LAVERY: That goes a little ways.
14 I think that's through 313. 307 through 313.
15 Q.     So the policy name is Commitments and
16 Releases for Dauphin County Prison. Can you tell me
17 what is meant by commitment?
18 **A.     Anybody committed to the Dauphin County**
19 **Prison, so anybody with a bail or detainer of some**
20 **sort.**
21 Q.     So again, that is for an arrestee that would
22 be after the arraignment procedure and it's determined
23 that they need to be incarcerated; is that correct?
24 **A.     Correct.**
25 Q.     So this policy would only govern those who

Page 39

1  Dauphin County do with the report?
2  **A.     Typically, like I said, when they present it**
3  **at a prison board meeting we review it and then if**
4  **there's any follow-up questions we ask at that point.**
5  Q.     Let's go to the next policy which begins on
6  DFS 305 and goes through 306.
7       MR. LAVERY: Yeah.  That is correct.
8  He has them in front of him as well.
9  Q.     Warden Briggs, is this a policy created by
10 Dauphin County or created by Prime Care?
11 **A.     Dauphin County.**
12 Q.     And the second page references that it was
13 signed in 1995. Has this policy been updated since
14 1995?
15 **A.     No.**
16 Q.     The end of the policy represents a provider.
17 And was Prime Care the provider for Dauphin County
18 Prison on June 18, 2019?
19 **A.     Yes.**
20 Q.     If you know these answers as in preparation
21 for or in capacity of 30(b)(6) witness you can tell me
22 and if you don't know that's fine.  You're looking at
23 it perfect. But the policy itself references a health
24 administrator. Do you know who the health
25 administrator was on June 18, 2019?

Page 41

1  are placed in Dauphin County Prison after going
2  through arraignment. Nothing about pre-arraignment
3  when the person is just an arrestee, correct?
4  **A.     Yes.**
5  Q.     Let's go to the next policy which begins on
6  DFS 314.
7  **A.     Okay.**
8       MR. LAVERY: I think that's two pages
9  Riley. 314 and 3:15.
10      MR. ROSS: Yes. Thank you.
11 Q.     Do you know if this policy has been updated
12 since January of 1995?
13 **A.     No, it has not.**
14 Q.     Under the policy in the first paragraph it
15 says if the nurse determines that the prisoner is in
16 need of emergency medical/detoxification clearance it
17 shall be necessary for the arresting officers to
18 obtain such clearance from an outside medical doctor
19 before the prison and the provider accepts
20 responsibility of the prisoner.
21      I think we said before we
22 established before, I just want to make sure this is
23 correct. The nurse would be someone from Prime Care.
24 There are no nurses employed by Dauphin County Prison;
25 is that correct?

WARDEN GREGORY BRIGGS

Page 42

1  **A.      Correct.**
2  Q.      Why must a clearance be obtained outside of
3  the prison?
4  **A.      To make sure they're okay to be incarcerated,**
5  **if they meet that criteria for prison.**
6  Q.      Are there certain things that the prison is
7  not equipped to do medically?
8  **A.      Yes. Yeah.**
9  Q.      What are some of the things that the prison
10 is not equipped to do medically? Well, let me ask you
11 this. Is the prison equipped to perform x-rays?
12 **A.      Yes.**
13 Q.      Is the prison equipped to perform CAT scans?
14 **A.      No.**
15 Q.      Is the prison equipped to perform stomach
16 pumps?
17 **A.      I'm not sure on that one.**
18 Q.      Is the prison equipped to perform
19 detoxification of an individual?
20 **A.      Yes.**
21 Q.      Is the prison equipped to perform minor
22 surgery?
23 **A.      No.**
24            MR. LAVERY: I'm just going to object
25 to the form of the question of that. I think I know

Page 43

1  what you're getting at but go ahead.
2  **A.      I think it depends on the severity. It**
3  **depends on who's on site or et cetera, I'm not sure,**
4  **it depends.**
5  Q.      Are there any prison guidelines that
6  determine when a clearance is required?
7  **A.      Prime Care determines that.**
8  Q.      If you see there under procedures it says A4,
9  well, A says any inmate brought into the prison in the
10 apparent listed conditions shall be examined by the
11 medical unit before acceptance.
12            No. 4 talks about, it's says, any
13 claims of police brutality. Is that, when you say any
14 claims is that a claim being made by the arrestee?
15 **A.      Yes.**
16 Q.      So a claim made by the arrestee could trigger
17 an examination by the medical unit before acceptance?
18 **A.      Yeah. They would have to determine whether**
19 **the person would need a clearance or not.**
20 Q.      Let's say that a correctional officer
21 observes police brutality. Is that correctional
22 officer required to demand that an examination be done
23 before the arrestee is accepted?
24            MR. LAVERY: Object to form. You can
25 answer.

Page 44

1  **A.      Yes.**
2  Q.      You see B1 there's a reference to a community
3  treatment facility.
4  **A.      Okay.**
5  Q.      On June 18, 2018 what was the community
6  treatment facility that was used for mental health,
7  illnesses and injuries?
8  **A.      We would send anybody to the hospital if they**
9  **met the criteria for evaluation.**
10 Q.      What hospital was that?
11 **A.      Harrisburg.**
12 Q.      And I should ask. Was that the designated
13 hospital or is that just one of any hospitals that the
14 person can be sent to?
15 **A.      One of many.**
16 Q.      So there's no specific designation of where
17 the person has to be sent out to for evaluation?
18 **A.      Correct.**
19 Q.      C, it states that, and again, I'm under
20 procedure. On C it states that it shall be the
21 responsibility of the arresting officer to obtain
22 medical clearance of the inmate.
23            I may have asked you this before, at
24 least some version of it, so my apologies. But is
25 there any discipline given to a Prime Care worker by

Page 45

1  Dauphin County for not turning away an inmate who
2  needs medical clearance?
3            MR. LAVERY: Object to form. You did
4  it, but go can answer it again. Go ahead.
5  **A.      That would be Prime Care's disciplinary**
6  **policy on that.**
7  Q.      Does the Dauphin County correctional officer
8  play any role in insuring that an arrestee gets
9  medical clearance before being admitted?
10 **A.      They would relay if somebody needs, if**
11 **somebody is in of course to be checked. But other than**
12 **that, no, the determination will be on Prime Care.**
13 Q.      Are there any policies that govern
14 disciplining an correctional officer for not relaying
15 such information?
16            MR. LAVERY: Object to form. You can
17 answer.
18 **A.      Not specifically.**
19 Q.      Let's go to the next policy which is on DFS
20 16 and that is two pages. It's 16 and 17.
21            MR. LAVERY: He has it.
22 Q.      This policy, again, just to be clear it
23 references each inmate shall be provided with medical
24 care. So this policy as I understand it then deals
25 with the treatment of people who have already gone

WARDEN GREGORY BRIGGS

Page 46

1 through the arraignment process. Is that correct?
2 A.    Yes.
3 Q.    I'm going to ask you some questions about
4 this policy so just go ahead and read through it and
5 let me know when you're done.
6 A.    Okay.
7 Q.    First, has this policy been updated since
8 1995, we see on the signature line on DFS 17?
9 A.    No.
10 Q.    This policy governs the physical examination
11 of an inmate; is that correct?
12 A.    Yes.
13 Q.    What if the inmate is not responsive when the
14 physical examination is being conducted, what happens
15 then?
16 A.    **That would be on Prime Care's policy on that.**
17 Q.    And if the inmate is confused or not making
18 sense is this something that Prime Care would govern
19 or is this something that Dauphin County Prison
20 officials get involved with?
21 A.    **Prime Care would determine.**
22 Q.    And let me just do this. I don't want to keep
23 asking you about discipline if it's just related to
24 Prime Care. Let me go ahead and ask you. If there's
25 any violation to this policy are there any Dauphin

Page 47

1 County guidelines that cover discipline for the Prime
2 Care person for violations of the policy?
3         MR. LAVERY: Just object to form. You
4 can answer.
5 A.    **No. Prime Care's policies would dictate.**
6 Q.    Are there any situations in which Dauphin
7 County had policies that govern discipline for Prime
8 Care employees?
9 A.    **Security related aspects we would.**
10 **Contraband, yes, something like that, yes, then we**
11 **will get involved. But as it relates to medical**
12 **decisions, no, we wouldn't.**
13 Q.    So I'm going to then assume if we're talking
14 about any policy in which Prime Care controls that
15 Dauphin County does not have any policy regarding
16 discipline of those Prime Care workers; is that fair?
17 A.    **That's fair.**
18 Q.    But just to be clear. These policies that
19 we're looking at, these policies that discuss medical
20 care even though Prime Care is the one that's going to
21 be implementing the policies these were policies
22 created by Dauphin County; is that correct?
23 A.    Yes.
24 Q.    If at any point we're looking at a policy
25 that was not created by Dauphin County just let me

Page 48

1 know. Otherwise I'm going to assume that these were
2 created by Dauphin County; is that fair?
3 A.    Okay.
4 Q.    Let's look at the next policy which begins on
5 DFS 18 and goes through 320.
6 A.    Okay.
7 Q.    Before we do that, I want to ask you a
8 question referencing back to physical examinations
9 that were covered under the last policy. Are there any
10 policies that govern other than what we looked at that
11 govern the physical examination of arrestees?
12         MR. LAVERY: These are at Dauphin
13 County policies?
14 Q.    Are any other Dauphin County policies other
15 than what we've already reviewed that govern the
16 physical examination of arrestees?
17 A.    No.
18 Q.    Now, I'm now looking at the policy on titled
19 Mental Health Care Program on DFS 318. Do you have
20 that in front of you?
21 A.    Yep.
22 Q.    This represents inmates so my understanding
23 is that this deals with those individuals who have
24 gone through the arraignment process and are now being
25 held at Dauphin County Prison; is that correct?

Page 49

1 A.    Correct.
2         MR. LAVERY: Can we take a five
3 minute break.
4         MR. ROSS: It's 11:15 so we'll go off
5 for five minutes.
6         (Recess taken.)
7 BY MR. ROSS:
8 Q.    So back with, I think we started with DFS
9 318. Warden Briggs, do you see there under the policy
10 that it states, the second there. The mental health
11 program shall be designed to examine, diagnose and
12 provide access to all inmate clients who have
13 significant mental illness. At a minimum the mental
14 health program shall include and then it lists, A,
15 screening services, B, mental health transfers, C,
16 program changes.
17         Regarding what the mental health
18 program should have who decides, who within Dauphin
19 County if anyone decides what the program should have?
20 A.    **The policy dictates what it should have. We**
21 **do have a Deputy Warden of Operations that oversees to**
22 **make sure that they have those three criterias.**
23 Q.    Okay. That was going to be my next question.
24 Who actually makes sure that those criterias are being
25 met. So you said a Deputy Warden of Operations?

Page 50

1  **A.     Yes.**
2  Q.     Who was the Deputy Warden of Operations on
3  June 18, 2019?
4  **A.     It would have been Brenda Hoffer. Her title**
5  **actually would have been Director of Operations at**
6  **that time.**
7  Q.     Brenda, what's her last name, please?
8  **A.     Hoffer, H-O-F-F-E-R.**
9  Q.     Is she still the Director of Operations
10 today?
11 **A.     No.**
12 Q.     Who is the Director of Operations today?
13 **A.     Bruce Levalley.**
14 Q.     How do you spell the last name?
15 **A.     L-E-V-A-L-L-E-Y.**
16 Q.     You said the Deputy Warden of Operations and
17 was that a term that was used before and now Director
18 of Operations is being used?
19 **A.     Vice versa. It used to be Director of**
20 **Operations. Now it's Deputy Warden. Just the name, a**
21 **title change I should say.**
22 Q.     So in June of 2019 the Director of Operations
23 would have been the person to make sure that these
24 criteria were being met?
25 **A.     Correct.**

Page 51

1  Q.     But today the person who makes sure that the
2  criteria is being met is called the Deputy Warden of
3  Operations?
4  **A.     Yes.**
5  Q.     And today who is the Deputy Warden of
6  Operations?
7  **A.     Bruce Levalley.**
8  Q.     Okay. Got it. Who is responsible for reaching
9  these criteria, making sure that these criteria are in
10 place?
11 **A.     Prime Care.**
12 Q.     And are there any consequences for Prime Care
13 if these criterias aren't in place?
14 **A.     Yeah. It would be against the contract if**
15 **they didn't stuck to it.**
16 Q.     Are there penalties for not meeting these
17 criteria to Prime Care?
18 **A.     Yeah. If there is a breach in the contract**
19 **then there would be, yes.**
20 Q.     And, if you know, does the contract provide
21 for anything that happens when a breach of this nature
22 occurs?
23 **A.     I don't know.**
24 Q.     On the next page on 320 it talks about
25 housing. Do you see that there?

Page 52

1  **A.     Yes.**
2  Q.     Can you tell me what's meant by all inmates
3  suspected of having mental health problems shall be
4  housed in an area that's determined by classification.
5  Can you tell me what's meant by as determined by
6  classification?
7  **A.     So anybody coming in would be on a**
8  **classification block so that's referring to after the**
9  **classification process is over where they would be**
10 **housed would be on the classification person at that**
11 **point. Or a team, not specifically a person. But a**
12 **treatment team wouldn't make that determination.**
13 Q.     So when an inmate, when a person becomes an
14 inmate in Dauphin County Prison they're given a
15 certain classification and that classification
16 determines, dictates where they're going to be housed;
17 is that correct?
18 **A.     Correct.**
19 Q.     Then so is this policy saying that part of
20 that classification is a consideration of the mental
21 health problems of the inmate?
22 **A.     Yes.**
23 Q.     And is there a special place within Dauphin
24 County Prison where those with mental health problems
25 are housed?

Page 53

1  **A.     We try to put them in specific locations.**
2  **Certain number of beds of course but yes.**
3  Q.     So said locations. So is there more than one
4  location where inmates with mental health problems are
5  housed?
6  **A.     Yes.**
7  Q.     What are those locations?
8  **A.     We try to put them on what we call L block or**
9  **M block after the classification process over**
10 **typically, but there are people on a mental health**
11 **watch that aren't on those two blocks as well.**
12 Q.     Do you know where Ty'rique Riley was housed
13 once he became an inmate at Dauphin County Prison?
14 **A.     He was classification.**
15 Q.     I'm sorry?
16 **A.     The classification block still.**
17 Q.     What is the classification block?
18 **A.     A-block.**
19 Q.     And that is where arrestees or inmates are
20 going through the classification process?
21 **A.     Correct.**
22 Q.     So he remained there his entire time as an
23 inmate in Dauphin County Prison?
24 **A.     Yes.**
25 Q.     Within the classification block are there any

Page 54

1  beds or areas designated for those with mental health
2  problems?
3              MR. LAVERY: Object to form.  You can
4  answer.
5  **A.      No. The whole block could house all different**
6  **kinds of classifications I guess is the best way to**
7  **put it.**
8  Q.      Because they're all going through the
9  classification process; is that correct?
10 **A.      Correct.**
11 Q.      I think I asked you, maybe I didn't. Has this
12 policy been updated since 1995?
13 **A.      No.**
14 Q.      And I was wondering how we got to 320. This
15 looks this last page of exhibit is out of order.
16 That's all I have for those policy exhibits.  I want
17 to ask you a question about -- I'm not going to be
18 marking that as of yet.  I'm going to ask you some
19 questions about it.
20             Warden Briggs, first of all, this is
21 a document that's on the first page says Dauphin
22 County Prison, Suicide Prevention and Intervention.
23 Bate stamped Dauphin DFS 34 through 97. Have you seen
24 this document before?
25 **A.      Yes.**

Page 55

1  Q.      Is this a policy or is this some type of
2  presentation or something else?
3  **A.      Presentation, training.**
4              MR. LAVERY: He can testify on this
5  but this is an area where Mr. Lucas I believe was also
6  -- well, no. I guess you're right. I'm sorry.  I
7  withdraw that. This is him.  You're right. Go ahead.
8  Q.      So, Warden Briggs, can you say answer again,
9  what is this document?
10 **A.      Training slide show.**
11 Q.      What is it used for?
12 **A.      Training of correctional staff on suicide**
13 **prevention and intervention and how to deal with**
14 **mental health.**
15 Q.      And how often is this used to train
16 correctional staff?
17 **A.      Yearly.**
18 Q.      Do you know if this was the slide
19 presentation that was provided -- well, strike that.
20 You said it's done yearly.  Is there a certain time of
21 the year it's done?
22 **A.      I'm not sure if it's the same time of year**
23 **every year or not.**
24 Q.      And when it's done is it given to all
25 correctional officers at once or is it broken up into

Page 56

1  some type of schedule?
2  **A.      Broken up into a schedule typically by shift.**
3  Q.      But are all correctional officers required to
4  undergo this training each year?
5  **A.      Yes.**
6  Q.      And do you know if this particular slide show
7  was the one that was used in the year of 2018?
8  **A.      Yes.**
9  Q.      Do you know if this particular slide show was
10 the one that was used in the year 2019?
11 **A.      Yes.**
12 Q.      And are there policies, written policies that
13 govern suicide prevention for Dauphin County
14 correctional officers?
15 **A.      Yes.**
16 Q.      And they are separate from this slide show,
17 correct?
18 **A.      Correct.**
19 Q.      I'm going to ask you a question.  Do you have
20 this slide show in front of you?
21             MR. LAVERY: I can get it for him.
22 It's right here. I'll just take it out of my folder. I
23 believe it goes from 34 all the way through --
24             MR. ROSS: I have 97.
25             MR. LAVERY: Yeah. 98 and 97 I

Page 57

1  believe given at the same time. I mean, you can ask
2  him. So at least that's my understanding of it. That's
3  a part of the same training. So you have 34 through 97
4  and then 98 through 127. That would be given at the
5  same time. At least that's my understanding of it.
6  But he can testify on it.
7  Q.      Warden Briggs, if we go onto what starts at
8  98 which I believe is what says mental health. Is that
9  a slide show that was given at the same time for the
10 training?
11 **A.      Yeah.**
12 Q.      I want to go to a specific page which is 67,
13 DFS 67.
14 **A.      Okay.**
15 Q.      Regarding the different levels of suicide
16 watch.  The level that a suicide watch that an inmate
17 is placed on is that a determination made by
18 correctional officers or by medical?
19 **A.      Medical.**
20 Q.      And whether or not an inmate moves through
21 the level do the correctional officers play a role in
22 that determination or is this all done by medical?
23 **A.      Medical.**
24 Q.      And do the policies governing suicide
25 prevention are they related only to inmates or are

WARDEN GREGORY BRIGGS

Page 58

1  there policies that relate to arrestees as well?
2  A.      This would be -- once the arrestee's, this
3  would be the same procedure.
4           MR. LAVERY: Just so the record is
5  clear. You're saying it's the same procedure for
6  arrestees as it would be for inmates?
7  A.      Yeah.
8  Q.      So the training that correctional officers
9  could take or undergo for suicide prevention is
10 training that applies both to their interactions with
11 arrestees and their interactions with inmates; is that
12 correct?
13 A.      Correct.
14 Q.      And by the way, correctional officers, do
15 they work sometimes in the prison with inmates and
16 sometimes in the Judicial Center with arrestees or are
17 they designated one or the other?
18 A.      Yeah. Both. They cross.
19 Q.      They cross. And so any given week could a
20 correctional officer be working one shift in the
21 Judicial Center and another shift in the prison?
22 A.      Yes.
23 Q.      Are there any special requirements that a
24 correctional officer has to have in order to work in
25 the Judicial Center as opposed to working in the

Page 59

1  prison?
2           MR. LAVERY: Object to the form but
3  you can answer.
4  A.      As it relates to the JNET and clean
5  certification they need to have that for the booking
6  center. Otherwise they're the same training.
7  Q.      Could you say that again. What do they need
8  to have?
9  A.      Clean access for the clean terminal which is
10 for fingerprinting purposes they have to be clean
11 certified to work down there.
12 Q.      What is clean certified mean?
13 A.      Ability to be able to able to fingerprint and
14 process into the PFC system.
15 Q.      Any other separate distinctions or
16 qualifications they have to have in order to work in
17 the Judicial Center?
18 A.      Just JNET and clean which is the same type of
19 access as it relates.
20          MR. ROSS: Let me take five minutes.
21 Let me see if I have any other questions for Warden
22 Briggs. Okay.
23          (Recess taken.)
24 BY MR. ROSS:
25 Q.      Warden Briggs, we talked about or we looked

Page 60

1  at policies regarding determinations made by an
2  arrestee whether or not the outside an outside
3  clearance must be sought. And you've testified that
4  that is the determination that is by practice is made
5  by Prime Care; is that correct?
6  A.      Yes.
7  Q.      Does a correctional officer working in the
8  Judicial Center have the ability to overrule a
9  decision by Prime Care that an arrestee does not need
10 to go out for clearance and thereby demand that a
11 clearance be sought?
12 A.      No.
13 Q.      Once the Prime Care official or medical makes
14 a decision that decision is the final decision?
15 A.      Correct.
16 Q.      Once is an arrestee is brought into the
17 Judicial Center if a correctional officer sees that
18 that arrestee or believes that that arrestee needs
19 medical attention outside of the Judicial Center does
20 the correctional officer have the ability to demand
21 that the arrestee be given that outside medical
22 attention?
23 A.      No.
24          MR. LAVERY: Object to the form of
25 the question, specifically the word demand. But he

Page 61

1  answered it.
2  A.      No. They would ask for a medical assessment.
3  Q.      And so in that situation the medical
4  assistant would be the one who would make that
5  determination?
6  A.      Yes or make the call to the higher-ups but
7  yeah.
8  Q.      But that determination would be made by
9  someone with Prime Care; is that what you're saying?
10 A.      Yes.
11 Q.      Same scenario but having occurring in the
12 prison instead of in the Judicial Center, does a
13 correctional officer have the ability to demand that
14 the inmate receive medical attention outside the
15 prison?
16          MR. LAVERY: Object to form. You can
17 answer go ahead.
18 A.      No. They would consult with Prime Care,
19 discuss with Prime Care.
20 Q.      I want to ask this question and then I'm
21 going to ask it for the Judicial Center and in the
22 prison. If there's a distinction please point it out,
23 but I'm asking for both scenarios.
24          If the correctional officer believes
25 that the inmate needs medical assistance does the

**Page 62**

1  correctional officer have an obligation to contact
2  Prime Care?
3  **A.      Depending on the severity, yes.**
4               MR. LAVERY: Object to the form of
5  the question but he's answered it. That's fine.
6  Q.      When you say depending on the severity is
7  there a level of severity that does not trigger that
8  obligation?
9  **A.      No. They have a sick call, the inmate has a**
10 **sick call ability to relay their concerns.  But if**
11 **they don't have that ability then yes.**
12 Q.      So if an inmate is not capable of telling
13 someone that he or she needs medical attention the
14 correctional officer has an obligation to inform
15 medical; is that correct?
16              MR. LAVERY: Object to form.
17 **A.      Yes.**
18 Q.      And is there discipline that is handed down
19 to the correctional officer who does not follow
20 through with that obligation?
21              MR. LAVERY: Object to form. You can
22 answer.
23 **A.      I haven't had that scenario. There would be a**
24 **discipline if they didn't act if that's what you're**
25 **asking.**

**Page 63**

1  Q.      Did you say that there would be discipline if
2  they did not act?
3  **A.      Correct.**
4  Q.      Are there policies that govern the discipline
5  that would occur if they did not act?
6  **A.      We have a progressive discipline in the**
7  **contract. What that would be under we would have to**
8  **look.**
9  Q.      When you say in the contract what contract
10 are you referring to?
11 **A.      The union contract.**
12 Q.      So the union contract that -- so there's a
13 union contract that governs the employment of
14 correctional officers; is that correct?
15 **A.      Yes.**
16 Q.      And does that contract speak to disciplining
17 officers who failed to provide medical care for
18 inmates that need it?
19 **A.      Not specifically. Yeah. It governs what level**
20 **discipline depending on the act but there's nothing**
21 **specific to a medical related incident.**
22 Q.      But that level of discipline that it does
23 cover that could apply to medical situations?
24 **A.      Yes.**
25 Q.      Does the contract address things like a

**Page 64**

1  grievance procedure for instance if an officer
2  discipline and does not like the discipline then they
3  can take action?
4  **A.      Yes.**
5  Q.      Are there any other policies outside of the
6  union contract that govern discipline for correctional
7  officers?
8  **A.      No.**
9               MR. ROSS: Okay. Thank you, Warden
10 Briggs. That's all I have for you.
11              THE WITNESS: Thank you.
12              MR. ROSS: I guess we should see if
13 anyone else has questions for you before.
14              MR. NINOSKY: No questions.
15              MR. POLAHA: I just have a couple of
16 a few questions.
17 BY MR. POLAHA:
18 Q.      Good morning, Warden.  My name is Matthew
19 Polaha. I represent the Susquehanna defendants in this
20 case. I have a question as far, are there any
21 circumstances where an arresting officer bringing in
22 an arrestee to the Judicial Center would be turned
23 away and the Judicial Center and would not take
24 custody of that arrestee?
25 **A.      Yes.**

**Page 65**

1  Q.      And what kind of situations would those be?
2  **A.      Anything outlined in the policy.**
3  Q.      And by policy do you mean --
4  **A.      The Judicial Center policy.**
5  Q.      And would that include needing a medical
6  evaluation by an outside hospital?
7  **A.      Yes.**
8  Q.      So if an arrestee is brought to the Judicial
9  Center and the Judicial Center then takes custody of
10 that arrestee and the arresting officer then departs
11 does that mean that the Judicial Center has taken
12 custody of that individual.
13              MR. LAVERY: Object to the form of
14 the question. You can answer.
15 **A.      Not necessarily. We've had scenarios where**
16 **they come back to take somebody out after they already**
17 **leave.**
18 Q.      You testified earlier about having knowledge
19 of Ty'rique Riley.  Was there any situation where the
20 Susquehanna officer bringing in Ty'rique Riley would
21 back for any reason?
22 **A.      No.**
23              MR. POLAHA: I have no more
24 questions. Thank you.
25              THE WITNESS: You're welcome.

WARDEN GREGORY BRIGGS

18 (Pages 66 to 68)

---

Page 66

1  By MR. ROSS:
2  Q.      Warden Briggs, I did forget to ask the
3  question I said I was going to ask you. Were there any
4  other policies that you reviewed for preparation for
5  your deposition that we did not discuss?
6  **A.      No. You hit them all.**
7              MR. CARMELITE: I have no questions.
8              (Witness excused.)
9              (Deposition concluded 11:50 A.M.
10             - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 68

1              WITNESS CERTIFICATION
2
3         I have read the foregoing transcript
4  of my deposition given on Tuesday, April 19, 2022, and
5  it is true, correct and complete, to the best of my
6  knowledge, recollection and belief, except for the
7  list of corrections, if any, attached on a separate
8  sheet herewith.
9
10
11  _____
12         WARDEN GREGORY BRIGGS
13  _____DATE
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 67

1         C E R T I F I C A T I O N
2
3
4         I hereby certify that the proceedings,
5  evidence and objections noted, are contained fully and
6  accurately in the notes taken by me on the hearing of
7  this matter, and that this copy is a correct
8  transcript of the same.
9
10
11
12  _____
13         NICHOLAS DiPIERO, R.P.R.
         Registered Professional Reporter
14         Notary Public
15
16
17
18         (The foregoing certification of this
19  transcript does not apply to any reproduction of the
20  same by any means unless under the direct control
21  and/or supervision of the certifying reporter.)
22
23
24
25

---

**A**

**ability** 5:15 7:23
  59:13 60:8,20
  61:13 62:10,11
**able** 10:13,19,21
  59:13,13
**acceptance** 10:23
  13:14 43:11,17
**accepted** 43:23
**accepts** 41:19
**access** 49:12 59:9
  59:19
**accurately** 67:6
**act** 62:24 63:2,5,20
**acting** 31:23
**action** 1:5 64:3
**add** 26:20
**addition** 16:24
**address** 7:6,7
  63:25
**adjacent** 20:12
**administer** 29:15
**administers** 29:17
**administrator** 1:4
  39:24,25
**admission** 34:1
**admit** 20:14,25
  21:10,12
**admits** 19:21,24
**admitted** 36:19
  45:9
**agree** 11:13 26:11
  38:6
**agreed** 4:1
**ahead** 43:1 45:4
  46:4,24 55:7
  61:17
**aid** 25:9
**al** 1:5,8
**alcohol** 8:1 28:9
**allow** 5:7 22:21
  25:7
**allows** 25:3
**amend** 7:3

**amount** 21:9
**and/or** 67:21
**answer** 5:6,14,22
  6:9,15,15,19,21
  6:24 7:3,3,14
  9:12 10:1 24:25
  25:20 27:5 29:5
  43:25 45:4,17
  47:4 54:4 55:8
  59:3 61:17 62:22
  65:14
**answered** 6:7 61:1
  62:5
**answering** 5:21
**answers** 6:9 39:20
**anybody** 13:21
  19:13 20:1,8
  40:18,19 44:8
  52:7
**apologies** 35:20
  44:24
**apparent** 43:10
**appearance** 32:12
**APPEARANCES**
  2:1
**applies** 58:10
**apply** 63:23 67:19
**appreciate** 26:15
**April** 1:12 68:4
**area** 52:4 55:5
**areas** 54:1
**arraigned** 21:3
**arraignment** 14:10
  14:24 21:2 36:21
  36:23 37:8,15
  40:22 41:2 46:1
  48:24
**arrested** 13:19,20
  14:7 34:23
**arrestee** 14:16 19:7
  19:8 28:19,23
  34:24 37:2 40:21
  41:3 43:14,16,23
  45:8 60:2,9,16,18

60:18,21 64:22
  64:24 65:8,10
**arrestees** 10:23
  13:14 16:17
  19:13,22 36:14
  48:11,16 53:19
  58:1,6,11,16
**arrestee's** 58:2
**arresting** 28:25
  41:17 44:21
  64:21 65:10
**asked** 7:14 30:10
  38:6 44:23 54:11
**asking** 5:13 27:10
  31:3,18 46:23
  61:23 62:25
**aspects** 47:9
**assess** 23:11
**assessment** 14:22
  15:5 29:21 61:2
**assigned** 33:13,14
  33:15
**assistance** 61:25
**assistant** 23:23,25
  61:4
**Associate** 4:20
  11:20 15:25
**assume** 10:1 47:13
  48:1
**assumption** 16:7
**attached** 68:7
**attention** 36:10
  37:21 60:19,22
  61:14 62:13
**attorney** 7:11
**aware** 28:5
**A-block** 53:18
**A.M** 1:12 66:9
**A4** 43:8

**B**

**B** 22:13,17 32:7
  49:15
**back** 7:5 14:21

24:5 35:5 48:8
  49:8 65:16,21
**backwards** 12:11
**bad** 28:21 35:18
**bail** 14:11 36:22
  37:9 40:19
**based** 9:13
**basically** 5:9
**bate** 18:6 54:23
**beds** 53:2 54:1
**beginning** 1:11
  12:10 15:8
**begins** 39:5 41:5
  48:4
**behalf** 9:9,22
**belief** 68:6
**believe** 26:8 35:20
  40:1 55:5 56:23
  57:1,8
**believes** 60:18
  61:24
**bench** 13:22 19:15
  20:1
**best** 5:14,22,25
  6:21 54:6 68:5
**block** 52:8 53:8,9
  53:16,17,25 54:5
**blocks** 53:11
**board** 38:17 39:3
**booking** 10:24
  13:15,25 19:1
  34:15,16,17 59:5
**bottom** 18:3,19
**Box** 2:9
**breach** 51:18,21
**break** 7:9,11,12,15
  49:3
**Brenda** 50:4,7
**BRIAN** 1:7
**Briggs** 1:11 3:3 4:7
  4:14,16 9:21 17:5
  17:6,18,25 18:25
  27:16 32:3,4 36:6
  39:9 49:9 54:20

55:8 57:7 59:22
  59:25 64:10 66:2
  68:12
**bringing** 64:21
  65:20
**broken** 55:25 56:2
**brought** 22:21
  34:23 36:14,18
  43:9 60:16 65:8
**Bruce** 50:13 51:7
**brutality** 43:13,21
**B1** 24:9,16 32:12
  44:2

**C**

**C** 22:13 28:6,11,15
  28:20,22,23
  29:11 32:7 44:19
  44:20 49:15 67:1
  67:1
**call** 17:5,5 18:6
  23:10 24:24,24
  25:14,16,17,23
  25:24 26:9,12
  27:20 37:1 53:8
  61:6 62:9,10
**called** 5:8,15 13:24
  21:24 25:6 51:2
**calling** 23:18,20
**Camp** 2:15
**capable** 62:12
**capacity** 9:10,20
  12:18 17:1 33:19
  39:21
**care** 2:18 11:5,8,11
  15:16,18,18,21
  16:4,8,9,17,24
  22:17,24 23:9,10
  23:13,18,20,21
  25:6,12,13,16,18
  25:24 26:2,4,6,9
  26:12 27:17,21
  27:23 28:24 29:2
  29:6,9,15,17,17

29:23 31:17
38:16,25 39:10
39:17 41:23 43:7
44:25 45:12,24
46:18,21,24 47:2
47:8,14,16,20,20
48:19 51:11,12
51:17 60:5,9,13
61:9,18,19 62:2
63:17
**Care's** 26:13 45:5
46:16 47:5
**CARMELITE**
2:14 66:7
**CARMEN** 1:4
**case** 64:20
**CAT** 42:13
**categories** 10:11
10:13,14 11:14
11:17
**category** 10:24
11:2,6,9 13:13,24
**cells** 22:1
**center** 8:17 10:24
13:16,21,25 14:1
14:3,8,16 16:18
18:22 19:3,6,14
19:22 20:4,6,11
20:15,25 21:2,16
21:25 23:3,4 34:2
34:18,23 35:6
36:15,18 58:16
58:21,25 59:6,17
60:8,17,19 61:12
61:21 64:22,23
65:4,9,9,11
**certain** 16:12 21:8
42:6 52:15 53:2
55:20
**certification** 4:2
13:9 59:5 67:18
68:1
**certified** 59:11,12
**certify** 67:4

**certifying** 67:21
**cetera** 14:14 29:20
38:25 43:3
**chance** 6:25 7:3
**change** 21:22
50:21
**changed** 4:21
**changes** 38:24
49:16
**chapter** 36:4
**charge** 19:15
**charges** 13:20
19:13,14 20:5,7
20:22,23 21:3,15
**checked** 24:12
45:11
**Cherry** 1:23
**Chester** 2:21
**circumstances**
64:21
**Civil** 1:5 5:7
**claim** 43:14,16
**claims** 43:13,14
**clarification** 34:16
**clarify** 28:11
**CLARK** 1:7
**classification** 52:4
52:6,8,9,10,15,15
52:20 53:9,14,16
53:17,20,25 54:9
**classifications** 54:6
**clean** 6:14 59:4,9,9
59:10,12,18
**clear** 27:14 33:4
35:4 45:22 47:18
58:5
**clearance** 15:4,9
15:10 22:19 23:1
23:15 24:2,3,5,10
24:10,19,21 25:4
28:4 36:19 41:16
41:18 42:2 43:6
43:19 44:22 45:2
45:9 60:3,10,11

**cleared** 24:12
**clients** 49:12
**close** 13:5
**college** 12:20 13:3
13:6
**come** 14:9 19:7,16
20:3,7,9,15,15,17
20:21,23,24 21:4
23:11,18,20,22
25:18,25 26:12
65:16
**comes** 24:5
**coming** 21:15 52:7
**commit** 13:22
21:11,12,13
**commitment** 14:12
14:20 40:17
**Commitments**
40:15
**committed** 40:18
**community** 44:2,5
**compiled** 38:21
**complete** 6:17,18
6:24 68:5
**completed** 36:21
**concerns** 62:10
**concluded** 66:9
**condition** 28:14
**conditions** 43:10
**conduct** 5:8 16:17
30:17,18,19,20
**conducted** 46:14
**confused** 46:17
**confusing** 5:24
**CONNELL** 2:19
**consequences**
51:12
**consider** 25:9
**consideration**
52:20
**considered** 22:3
36:22
**considering** 24:20
**constantly** 31:25

**constitute** 33:5
**consult** 27:18,24
28:2,2 61:18
**consumed** 8:1
**contact** 62:1
**contained** 38:19
67:5
**contains** 37:20
**continues** 24:9
**Contraband** 47:10
**contract** 15:23,24
16:2,3,6,7,11,16
16:21,22 51:14
51:18,20 63:7,9,9
63:11,12,13,16
63:25 64:6
**contracted** 16:12
**control** 67:20
**controlled** 28:9
**controls** 47:14
**copy** 17:22,25 67:7
**Corporate** 2:15
**correct** 11:21,22
12:2,3 19:19
20:17 21:17,18
22:5,6,22 23:25
24:15 27:19,20
27:25 30:1 34:25
35:15 37:11,12
37:21 39:7 40:23
40:24 41:3,23,25
42:1 44:18 46:1
46:11 47:22
48:25 49:1 50:25
52:17,18 53:21
54:9,10 56:17,18
58:12,13 60:5,15
62:15 63:3,14
67:7 68:5
**correctional** 12:7
12:14,14 23:5,6
23:14 43:20,21
45:7,14 55:12,16
55:25 56:3,14

57:18,21 58:8,14
58:20,24 60:7,17
60:20 61:13,24
62:1,14,19 63:14
64:6
**corrections** 68:7
**correctly** 29:10
**counsel** 2:6,11,17
2:22 4:2 10:9
**counter** 8:5
**county** 1:8 4:16,19
5:17,17 9:9,9,22
9:23 10:2,2,24
11:1,4,7,11,20,24
12:2,13,16,17
13:2,14,18,23
14:12 15:15,18
15:19,22 16:4,8,9
16:10,25 17:7,9
17:12 18:21 19:3
19:7,17 20:2,3,8
20:9,16,19,22,24
21:5,8,19,20
22:22 23:11 29:3
29:9,16,22 34:2
35:7 36:11,20
37:6 38:23 39:1
39:10,11,17
40:16,18 41:1,24
45:1,7 46:19 47:1
47:7,15,22,25
48:2,13,14,25
49:19 52:14,24
53:13,23 54:22
56:13
**couple** 18:23 22:14
64:15
**course** 45:11 53:2
**court** 1:1,22 6:4,12
32:6
**cover** 18:14 47:1
63:23
**covered** 48:9
**created** 39:9,10

WARDEN GREGORY BRIGGS

47:22,25 48:2
**criminal** 12:23
13:9 19:14
**criteria** 42:5 44:9
50:24 51:2,9,9,17
**criterias** 49:22,24
51:13
**cross** 58:18,19
**current** 12:4
**custody** 64:24 65:9
65:12
**cut** 6:23

---
**D**
---

**D** 22:13 32:7
**danger** 28:13
**DATE** 68:13
**Dauphin** 1:8 4:16
4:19 5:16,17 9:9
9:9,22,22 10:2,2
10:23 11:1,4,7,11
11:20,23 12:1
13:14,18,23
14:12 15:15,17
15:19,22 16:4,8,9
16:10,24 17:7,9
17:11 18:3,7,21
19:3,7,16 20:3,8
20:9,16,19,21,24
21:4,8,19,20
22:21 23:11 29:2
29:8,16,22 34:2
35:7 36:11,20
37:6 38:23 39:1
39:10,11,17
40:16,18 41:1,24
45:1,7 46:19,25
47:6,15,22,25
48:2,12,14,25
49:18 52:14,23
53:13,23 54:21
54:23 56:13
**day** 31:11 33:13
34:6

**DCP** 3:12 17:10
18:2 20:17
**deal** 55:13
**dealing** 18:12 19:1
**deals** 45:24 48:23
**decides** 49:18,19
**decision** 60:9,14,14
60:14
**decisions** 47:12
**Defendant** 2:11,17
**defendants** 2:22
64:19
**degree** 12:20,22
13:5,6,8,9
**demand** 43:22
60:10,20,25
61:13
**denial** 10:23 13:14
**DENNEHEY** 2:13
**departs** 65:10
**depending** 24:6
62:3,6 63:20
**depends** 43:2,3,4
**deposed** 4:25 5:3
**deposition** 1:10 5:3
5:11 6:3 8:8,11
10:7,7,10,12,15
10:20 30:18,21
33:25 37:3 66:5,9
68:4
**Deputy** 49:21,25
50:2,16,20 51:2,5
**DESCRIPTION**
3:11
**designated** 37:5
44:12 54:1 58:17
**designation** 37:1
44:16
**designed** 49:11
**designee** 5:16
**detainee** 24:11
28:8 32:11 37:2,6
37:10
**detainees** 11:2,5,8

11:11 22:11 28:6
**detainer** 20:5,9
40:19
**determination**
22:19 23:8,15
24:18 25:7,10,11
25:18,25 28:3,8
28:15 29:10
36:24 45:12
52:12 57:17,22
60:4 61:5,8
**determinations**
60:1
**determine** 15:4,6,8
22:25 25:4 43:6
43:18 46:21
**determined** 28:7
28:19 40:22 52:4
52:5
**determines** 41:15
43:7 52:16
**determining** 24:21
**detoxification**
42:19
**DFS** 18:3,12,17,18
22:7 33:7 34:9
39:6 41:6 45:19
46:8 48:5,19 49:8
54:23 57:13
**diagnose** 49:11
**dictate** 47:5
**dictates** 49:20
52:16
**difference** 21:21
**different** 18:14
20:21 34:20
35:15 38:21 54:5
57:15
**DiPiero** 1:13,22
67:13
**dipieroreporting...**
1:24
**direct** 13:22 19:21
19:24 20:14,25

21:9,11,12,13
67:20
**directly** 19:18
20:10 38:5
**director** 40:9 50:5
50:9,12,17,19,22
**director/doctors**
40:8
**disciplinary** 45:5
**discipline** 25:17,24
29:1,6 44:25
46:23 47:1,7,16
62:18,24 63:1,4,6
63:20,22 64:2,2,6
**disciplining** 45:14
63:16
**discovery** 5:8
**discuss** 10:11
47:19 61:19 66:5
**discussed** 7:5
**distinction** 19:24
20:4 21:1 61:22
**distinctions** 59:15
**DISTRICT** 1:1,2
**diversion** 14:22
**Dlcarmelite@m...**
2:17
**doctor** 15:12 40:10
41:18
**document** 18:8
19:1 33:5 54:21
54:24 55:9
**documentation**
11:10
**documents** 8:10,19
8:22 18:7 33:24
**doing** 5:12 20:20
**DONALD** 2:14
**door** 14:9
**Dr** 40:10
**Drive** 2:15
**duly** 4:7

---
**E**
---

**E** 67:1
**earlier** 65:18
**easily** 30:11
**either** 12:10 14:11
**emergency** 11:8
41:16
**employed** 15:14
17:1 41:24
**employee** 15:15
**employees** 11:5
16:25 29:9 47:8
**employment** 63:13
**enforcement** 12:18
**entire** 37:6 53:22
**entitled** 38:7
**entry** 19:6
**equipped** 42:7,10
42:11,13,15,18
42:21
**ESQUIRE** 2:3,8
2:14,14,20
**essentially** 5:16
**established** 41:22
**Estate** 1:5
**et** 1:5,8 14:14
29:20 38:25 43:3
**evaluation** 14:15
14:18 15:2,2,5
44:9,17 65:6
**evaluations** 14:20
16:17
**evidence** 67:5
**exactly** 6:17 27:8
**examination** 43:17
43:22 46:10,14
48:11,16
**examinations** 48:8
**examine** 49:11
**examined** 4:8
43:10
**example** 19:16
20:1
**excused** 66:8
**exhibit** 18:13

32:23 33:2 54:15
**exhibits** 3:9 54:16
**existing** 19:15
**experience** 9:18
**expert** 9:6
**explain** 19:10
**extent** 28:13
**E-talks** 38:21

_____

**F**

**F** 67:1
**facility** 20:21 22:4
    29:1 44:3,6
**facility's** 38:14
**factual** 9:19
**failed** 30:22 63:17
**failing** 29:3
**fair** 30:22,24 47:16
    47:17 48:2
**far** 64:20
**Federal** 21:23
**feel** 6:23 18:1
**filing** 4:2
**final** 60:14
**fine** 17:13,16 26:19
    39:22 62:5
**fingerprint** 59:13
**fingerprinting**
    59:10
**fingerprints** 14:13
**first** 13:12,18
    18:21 19:5 20:6
    23:1 41:14 46:7
    54:20,21
**fit** 15:6
**FITZPATRICK**
    2:2
**five** 49:2,5 59:20
**Flavery@laveryl...**
    2:11
**folder** 56:22
**follow** 36:11 62:19
**follows** 4:9
**follow-up** 39:4

**foregoing** 67:18
    68:3
**forget** 66:2
**form** 4:4 24:6,7,22
    25:19 27:3,3 29:4
    29:12 42:25
    43:24 45:3,16
    47:3 54:3 59:2
    60:24 61:16 62:4
    62:16,21 65:13
**format** 6:9
**forth** 36:11
**forward** 8:8
**foundation** 24:23
    27:4
**Frank** 2:8 17:15
    26:15,21 30:10
    30:16 31:3,10,21
    34:10 35:12,13
    37:23
**Franklin** 12:13,17
    13:2
**free** 18:1
**front** 17:22 18:1
    39:8 48:20 56:20
**Fuhrman** 40:1,2
**full** 36:9
**fully** 6:21 67:5
**F-U-H-R-M-A-N**
    40:5
**F-U-R-M-A-N**
    40:4

_____

**G**

**game** 5:20
**games** 30:14
**gather** 5:10,19,21
    14:23
**gathering** 5:9
**getting** 22:20 43:1
**give** 6:25 9:12
    29:20
**given** 25:17 29:2
    36:18 37:17

44:25 52:14
    55:24 57:1,4,9
    58:19 60:21 68:4
**giving** 26:18
**go** 5:2,4 7:5 8:8,9
    12:10 13:2,21
    14:13 18:23
    19:11,22 20:6
    21:2,3 22:7 24:11
    30:2,11,13,22,23
    30:24,25 32:4,15
    32:20 34:8 35:5
    35:13 39:5 40:11
    41:5 43:1 45:4,4
    45:19 46:4,24
    49:4 55:7 57:7,12
    60:10 61:17
**goes** 18:17 19:14
    34:11 39:6 40:12
    40:13 48:5 56:23
**going** 5:2 6:8,18
    8:19,21 9:25
    10:12,17 17:3,4
    17:15 18:11,13
    18:20,23 22:14
    26:7,16 28:3 30:3
    31:4,10,12,13
    33:1 37:23 41:1
    42:24 46:3 47:13
    47:20 48:1 49:23
    52:16 53:20 54:8
    54:17,18 56:19
    61:21 66:3
**good** 7:1 64:18
**govern** 10:22,25
    11:3,7,10 13:13
    29:14,17,23
    37:13 40:25
    45:13 46:18 47:7
    48:10,11,15
    56:13 63:4 64:6
**governed** 16:3
**governing** 57:24
**governs** 21:15

24:17 36:14
    46:10 63:13,19
**graduate** 12:24,25
**graduating** 13:3
**great** 6:13 17:23
    18:20
**green** 22:20
**Greg** 2:12 4:7 9:21
**Gregory** 1:10 3:3
    4:16 68:12
**grievance** 64:1
**guess** 54:6 55:6
    64:12
**guessing** 5:19
**guidelines** 36:11
    37:20 43:5 47:1

_____

**H**

**H** 2:3
**handbook** 36:12
    37:17,20,25
**handed** 62:18
**handles** 29:6
**hanging** 33:11
**happen** 19:25
**happened** 25:22
**happens** 14:6 27:5
    46:14 51:21
**Harrisburg** 2:10
    44:11
**head** 6:10 40:10
**health** 11:1,10 36:5
    39:23,24 44:6
    48:19 49:10,14
    49:15,17 52:3,21
    52:24 53:4,10
    54:1 55:14 57:8
**hear** 15:7 31:8
**heard** 13:15 21:19
    27:16
**hearing** 67:6
**hearings** 32:11,13
**held** 12:9 21:8
    48:25

**help** 24:18 25:11
    25:12
**herewith** 68:8
**higher-ups** 61:6
**Hill** 1:23 2:15
**hit** 66:6
**Hoffer** 50:4,8
**hold** 11:23 12:6,20
    26:21
**holding** 22:1
**honest** 25:22
**hospital** 24:4,6,11
    44:8,10,13 65:6
**hospitals** 44:13
**hours** 7:23 8:2,5
**house** 21:22 54:5
**housed** 52:4,10,16
    52:25 53:5,12
**housing** 51:25
**H-O-F-F-E-R** 50:8

_____

**I**

**identify** 30:8
**III** 2:3
**illness** 49:13
**illnesses** 44:7
**implementing**
    47:21
**incarcerate** 15:4,9
    15:10 22:19 23:1
    23:16 24:3,6,21
    28:4
**incarcerated** 24:13
    36:25 40:23 42:4
**incident** 33:20
    63:21
**include** 49:14 65:5
**included** 10:10
**incorrect** 26:22
**INDEX** 3:1,9
**individual** 14:6
    34:22 42:19
    65:12
**individuals** 48:23

influence 28:7,8,12
28:20
inform 62:14
information 5:9,11
5:19,21 11:18
14:23 45:15
initial 38:8
initially 38:6
injuries 24:13 44:7
injury 23:1 24:9
inmate 36:10,12,20
36:22 37:5,11,14
37:17,19,20,25
43:9 44:22 45:1
45:23 46:11,13
46:17 49:12
52:13,14,21
53:13,23 57:16
57:20 61:14,25
62:9,12
inmates 11:2,5,8
11:12 21:23
48:22 52:2 53:4
53:19 57:25 58:6
58:11,15 63:18
instance 9:16
20:19 23:22 24:8
64:1
instructed 36:10
insuring 45:8
intake 19:1,2 32:21
33:14,16,18,20
34:1,5 35:9
interactions 58:10
58:11
interfere 7:23
internship 13:4
interrupting 31:9
31:25
intervention 54:22
55:13
introduced 13:18
involved 46:20
47:11

involving 33:25
issue 7:6

**J**

J 2:8
jail 12:13,16,17
13:2 21:20,21
22:3
January 32:16,17
41:12
JCO 22:25 23:2
24:17 25:3,7,8,17
25:24 26:3 27:18
27:24 28:1,2
jerk 31:23,24 32:1
JNET 59:4,18
job 30:17
jobs 29:24
JOHN 2:14
JR 2:8
Jrninosky@md...
2:16
Judge 14:10,25
judicial 8:17 13:16
13:21 14:1,3,7,16
16:18 18:22 19:3
19:6,14,22 20:4,6
20:11,15,25 21:2
21:16,25 23:3,4
25:3 34:2,17,23
35:6 36:14,18
58:16,21,25
59:17 60:8,17,19
61:12,21 64:22
64:23 65:4,8,9,11
June 33:22 34:2
39:18,25 40:9
44:5 50:3,22
justice 12:23 13:10

**K**

keep 8:23 17:14
31:18 46:22
keeping 32:24

kept 26:4 32:13
kind 65:1
kinds 54:6
know 4:24 5:25
6:17,25 7:5,12
9:14,21 16:6,19
17:21 21:24
26:23,25 30:4,11
30:14 31:7 32:8
32:14 34:5,7 37:4
39:20,22,24 40:8
41:11 42:25 46:5
48:1 51:20,23
53:12 55:18 56:6
56:9
knowledge 65:18
68:6
known 14:3

**L**

L 53:8
laid 29:10
LAVERY 2:8,8
4:11 16:19 17:7
17:13,16,21
18:16 19:10,18
19:20 22:9 24:16
24:22 25:19 26:7
26:19 27:1,12
29:4,12 30:7,12
30:20 31:12,17
31:22 32:23 33:3
34:12 35:1,17,23
38:2 39:7 40:13
41:8 42:24 43:24
45:3,16,21 47:3
48:12 49:2 54:3
55:4 56:21,25
58:4 59:2 60:24
61:16 62:4,16,21
65:13
law 2:8 12:18
lawsuit 9:19 33:21
leave 65:17

LEINHAUSER
2:19
let's 15:1 19:23
20:20 28:22
32:20 34:8,14
39:5 40:11 41:5
43:20 45:19 48:4
Levalley 50:13
51:7
level 57:16,21 62:7
63:19,22
levels 57:15
Liberty 2:3
Lieutenant 12:14
life 16:11
light 22:21
line 46:8
list 37:24 68:7
listed 43:10
lists 49:14
little 40:13
LLC 2:2
lobby 32:21 33:14
33:16,18
local 36:4
located 20:11
location 53:4
locations 53:1,3,7
long 4:18 15:21,23
26:16
longer 9:21
look 10:6,8 24:18
34:14 35:24 36:3
48:4 63:8
looked 38:4 48:10
59:25
looking 18:12,20
21:14 22:12 33:7
39:22 47:19,24
48:18
looks 6:14 24:7
54:15
lot 20:12
Lt 2:12

Lucas 55:5
Lynn 40:1,2
L-E-V-A-L-L-E-Y
50:15

**M**

M 53:9
MacMAIN 2:19
main 23:19
making 25:9 29:10
46:17 51:9
manager 12:15
manner 22:12
mark 17:4
Market 2:4,9,20
marking 54:18
Marlkress 1:23
MARSHALL 2:13
materials 34:6
matter 67:7
Matthew 2:20
64:18
mean 15:11 19:12
33:8,10,17 57:1
59:12 65:3,11
means 6:6 22:20
24:11 67:20
meant 32:22 40:17
52:2,5
medical 8:18 14:20
15:1,3,11,19,21
17:1 22:7,11,18
23:25 24:10,25
28:10,14,18,24
29:1,24 36:4,10
37:21 38:17 40:7
40:8 41:18 43:11
43:17 44:22 45:2
45:9,23 47:11,19
57:18,19,22,23
60:13,19,21 61:2
61:3,14,25 62:13
62:15 63:17,21
63:23 65:5

medically 42:7,10
medical/detoxifi...
 41:16
medication 7:22
 8:4
meet 42:5
meeting 39:3 51:16
member 22:18
 33:9
Mendenhall 2:12
mental 11:1,10
 44:6 48:19 49:10
 49:13,13,15,17
 52:3,20,24 53:4
 53:10 54:1 55:14
 57:8
mention 13:16
 26:2
mentioned 16:2
mentions 19:2
met 44:9 49:25
 50:24 51:2
MIDDLE 1:2
MINCEY 2:2
mind 8:24
minimum 49:13
minor 42:21
minute 49:3
minutes 49:5 59:20
mischaracterize
 27:13
mischaracterizes
 27:9
mischaracterizing
 27:2,6
monitor 29:9
monitoring 10:25
 11:3
month 4:22
monthly 38:17
morning 64:18
moved 12:15
moves 57:20
Mpolaha@mac...

2:22
M.A 15:13,14

N

N 67:1
name 3:2 4:15
 40:15 50:7,14,20
 64:18
names 14:4
nature 22:25 51:21
necessarily 65:15
necessary 22:10
 25:4 41:17
need 7:6,9,10,10
 11:8 15:6 21:1,3
 21:16 30:24
 36:10 37:24
 38:13 40:23
 41:16 43:19 59:5
 59:7 60:9 63:18
needed 23:7 28:4
needing 65:5
needs 23:21,22
 24:11 29:19,23
 45:2,10 60:18
 61:25 62:13
new 6:22 13:20
 19:13,13 20:5,6
 20:23 21:3,15
 32:23
Nicholas 1:12
 67:13
NINOSKY 2:14
 64:14
NJ 1:23
nodding 6:10
non-monetary
 14:11
Nope 7:21 8:9
Notary 1:13 67:14
notation 18:3
note 7:2
noted 67:5
notes 67:6

notice 1:11 10:6,10
 10:14,20 38:3,5
number 3:11 16:12
 17:15 18:11 53:2
numbers 18:10
nurse 15:12,13,14
 23:22,25 25:5
 41:15,23
nurses 41:24

O

O 67:1
object 24:22 25:19
 26:8 29:4,12
 42:24 43:24 45:3
 45:16 47:3 54:3
 59:2 60:24 61:16
 62:4,16,21 65:13
objection 26:17
 27:3,4,9,9,10
objections 4:3
 26:17,18 67:5
obligation 27:1
 62:1,8,14,20
observed 9:19
observes 43:21
obtain 41:18 44:21
obtained 42:2
occur 63:5
occurred 33:21
occurring 61:11
occurs 51:22
October 4:20
 11:19,24 12:7,10
offender 24:5
offhand 34:7
officer 12:14,18
 23:3,4,5,6,14
 28:25 34:5,15,16
 34:17 35:10
 43:20,22 44:21
 45:7,14 58:20,24
 60:7,17,20 61:13
 61:24 62:1,14,19

64:1,21 65:10,20
officers 41:17
 55:25 56:3,14
 57:18,21 58:8,14
 63:14,17 64:7
official 60:13
officials 46:20
Oh 35:17
okay 6:1,2,10,19
 6:20,25 7:7,8,15
 7:16 8:24,25 9:14
 9:15,23,24 10:3,4
 10:10 12:12
 13:20 17:23
 19:23 22:9,16
 27:23 30:6 32:10
 34:5 38:10,16
 41:7 42:4 44:4
 46:6 48:3,6 49:23
 51:8 57:14 59:22
 64:9
once 14:10 22:14
 36:17,21 38:23
 53:13 55:25 58:2
 60:13,16
ones 10:18
operations 32:6
 49:21,25 50:2,5,9
 50:12,16,18,20
 50:22 51:3,6
opposed 20:3 22:3
 38:6 58:25
order 6:6 35:3,5
 54:15 58:24
 59:16
orders 32:21,22
 33:7,8,9 34:14
original 18:8
outlined 36:12
 65:2
outside 41:18 42:2
 60:2,2,19,21
 61:14 64:5 65:6
overrule 60:8

oversees 49:21

P

PA 2:5,10,15,21
page 3:2,11 5:5
 18:10,11,19 32:4
 32:15 35:24 36:6
 39:12 51:24
 54:15,21 57:12
pages 18:13 33:1
 41:8 45:20
paragraph 36:9
 38:12 41:14
parking 20:12
part 18:8 19:1 32:5
 32:24,25 52:19
 57:3
particular 18:17
 33:11 56:6,9
parties 5:8 18:8
penalties 51:16
PENNSYLVAN...
 1:2
people 45:25 53:10
perfect 17:24
 39:23
perform 42:11,13
 42:15,18,21
performing 29:24
person 13:17 24:25
 28:24,25 36:24
 37:17 41:3 43:19
 44:14,17 47:2
 50:23 51:1 52:10
 52:11,13
person's 36:25
pertain 38:5
PFC 59:14
Philadelphia 2:5
physical 11:10
 46:10,14 48:8,11
 48:16
physician's 23:23
place 2:3 15:24

19:6 51:10,13
52:23
**placed** 18:7 41:1
57:17
**Plaintiffs** 2:6
**play** 45:8 57:21
**playing** 30:14
**please** 4:15 8:23
9:14 30:17 50:7
61:22
**plus** 20:5
**point** 5:18,23 6:23
7:2 11:18 14:13
18:9 39:4 47:24
52:11 61:22
**Polaha** 2:20 3:5
64:15,17,19
65:23
**police** 43:13,21
**policies** 3:12 8:14
8:15 9:7 10:22,25
11:3,6,9 13:13
17:4 18:14,22
24:20 25:10,12
25:23 26:2,4,13
27:18,21,23 28:1
28:2 29:8,14,16
29:22 30:2,4 31:1
31:4,4,6 33:1
34:3 38:5 45:13
47:5,7,18,19,21
47:21 48:10,13
48:14 56:12,12
57:24 58:1 60:1
63:4 64:5 66:4
**policy** 9:17,18
18:17,21 21:14
23:13,17 25:3,5,6
26:10,12 32:6,17
32:20 34:8 35:16
35:20,25 36:4,13
37:13,19 39:5,9
39:13,16,23 40:7
40:11,15,25 41:5

41:11,14 45:6,19
45:22,24 46:4,7
46:10,16,25 47:2
47:14,15,24 48:4
48:9,18 49:9,20
52:19 54:12,16
55:1 65:2,3,4
**position** 11:19
**positions** 11:23
12:6,9
**possess** 13:6,8
**possible** 14:24
**post** 13:6 32:21,22
33:7,8,9,10,10,15
33:17 34:15 35:3
35:6,14
**posts** 33:10
**practice** 23:18
24:24 26:11,12
60:4
**preparation** 8:11
33:24 37:3 39:20
66:4
**prepared** 8:7
11:14
**prescribed** 8:5
28:20
**present** 22:18,24
23:10,14 28:13
28:14 39:2
**presentation** 16:18
55:2,3,19
**presents** 28:23
**pretrial** 14:21
**pretty** 27:14
**prevention** 54:22
55:13 56:13
57:25 58:9
**pre-arraignment**
41:2
**prime** 2:18 11:5
15:16,18,18,18
15:21 16:4,8,9,16
16:24 22:17,24

23:9,10,13,18,20
23:21 25:6,12,13
25:16,17,24 26:2
26:4,5,9,12,13
27:17,21,23
28:24 29:2,6,9,17
29:23 38:16,25
39:10,17 41:23
43:7 44:25 45:5
45:12 46:16,18
46:21,24 47:1,5,7
47:14,16,20
51:11,12,17 60:5
60:9,13 61:9,18
61:19 62:2
**prior** 7:4 11:24
36:23
**prison** 1:8 4:17,19
5:17 9:9,23 10:3
10:24 11:2,5,8,11
11:21,24 12:2
13:15,19,23
14:12 15:15,18
15:19,22 16:4,8
16:25 19:7,17,21
19:24 20:3,8,10
20:12,16,20,22
20:24 21:5,8,13
21:19,21,24 22:4
22:22 23:11,19
29:24 34:19 35:7
35:8,10 36:12,20
37:7 38:17 39:3
39:18 40:16,19
41:1,19,24 42:3,5
42:6,9,11,13,15
42:18,21 43:5,9
46:19 48:25
52:14,24 53:13
53:23 54:22
58:15,21 59:1
61:12,15,22
**prisoner** 41:15,20
**probably** 19:11

38:2
**probation** 20:1
**problems** 52:3,21
52:24 53:4 54:2
**procedure** 5:7 19:2
36:9 40:22 44:20
58:3,5 64:1
**procedures** 3:12
8:14,15 9:7 10:22
10:25 11:3,7,9
13:13 18:22
25:10 43:8
**proceed** 7:24
**proceedings** 67:4
**process** 14:14 37:8
37:15 46:1 48:24
52:9 53:9,20 54:9
59:14
**processed** 21:16
**processing** 22:25
**production** 38:8
**professional** 1:13
1:22 28:18 67:13
**program** 48:19
49:11,14,16,18
49:19
**progressive** 63:6
**provide** 16:16
49:12 51:20
63:17
**provided** 8:18
22:11 45:23
55:19
**provider** 15:19,22
39:16,17 41:19
**provides** 38:16
**Public** 1:14 67:14
**pumps** 42:16
**punishment** 28:17
28:18
**purposes** 59:10
**pursuant** 1:11
**put** 37:23 53:1,8
54:7

**P.O** 2:9

---

**Q**

**qualifications**
59:16
**qualified** 28:23
**question** 5:6,24 6:7
6:15,15,17,18,22
6:22 7:4,14,15
18:24 19:5 25:8
28:21 29:13 32:3
32:4,5 35:2 42:25
48:8 49:23 54:17
56:19 60:25
61:20 62:5 64:20
65:14 66:3
**questioning** 26:22
**questions** 4:4 5:13
5:14,18 7:20
22:15 31:19 32:8
39:4 46:3 54:19
59:21 64:13,14
64:16 65:24 66:7
**quicker** 19:12
**quiet** 30:16
**quit** 31:9
**quote** 40:5

---

**R**

**R** 2:14 67:1
**reaching** 14:16
51:8
**read** 4:11 22:13
32:7 38:13 46:4
68:3
**Ready** 8:9
**really** 5:18,20
**reason** 7:11 8:7
24:23 65:21
**recall** 30:25
**receive** 61:14
**receiving** 34:15,16
34:17
**Recess** 49:6 59:23

WARDEN GREGORY BRIGGS

recollection 68:6
recommendations
  38:25
record 4:15 6:14
  10:6 18:17 27:7
  33:3,4 35:3 58:4
recorded 6:4 32:13
records 10:18
refer 18:1,10,11,14
  27:21
reference 18:9
  33:16 44:2
references 32:12
  38:12 39:12,23
  40:7 45:23
referencing 48:8
referred 21:20
referring 10:20
  30:5 34:4 52:8
  63:10
refers 36:13
regard 32:11
regarding 7:4
  22:19 33:21
  37:20 47:15
  49:17 57:15 60:1
Registered 1:13,22
  67:13
relate 34:22 58:1
related 35:6 46:23
  47:9 57:25 63:21
relates 8:17 9:7,18
  29:7 34:19 38:20
  47:11 59:4,19
relationship 15:17
  16:3
relay 45:10 62:10
relaying 45:14
released 14:11
  36:25
Releases 40:16
remained 37:5
  53:22
remember 4:22

8:15 30:13,21
rendered 11:4,11
repeat 25:2
report 38:13,15,18
  38:19,22 39:1
reporter 1:13 6:4
  6:12 67:13,21
Reporters 1:22
REPORTING
  1:22
reports 38:16,24
represent 64:19
representative
  10:2
representing 5:16
represents 39:16
  48:22
reproduction
  67:19
request 31:5
require 28:19,25
  29:8
required 23:15
  24:19,21 43:6,22
  56:3
requirements
  58:23
requires 23:1 24:2
requiring 24:9
reserved 4:4
responsibility
  41:20 44:21
responsible 51:8
responsive 46:13
restate 5:25
restroom 7:10
review 33:24 39:3
reviewed 8:10,13
  8:16,21,23 16:22
  34:3 36:5 48:15
  66:4
reviewing 34:6
  38:24
revisions 32:17

ridiculous 31:16
  31:18
right 18:18 27:7,8
  29:25 31:1,5,16
  33:6 35:18,19,23
  38:2 55:6,7 56:22
Riley 1:4,5 2:3
  17:21 18:16
  31:13,20,23
  33:21 34:1 35:2
  35:18 37:4 41:9
  53:12 65:19,20
Riley@minceyfit...
  2:6
Road 1:23
role 9:13 45:8
  57:21
ROSS 2:2,3 3:4
  4:13 17:3,10,14
  17:17,23 26:15
  26:21 27:8,15
  30:10,16 31:3,15
  31:24 32:2,25
  33:6 35:12,21
  36:2 37:23 38:10
  38:11 41:10 49:4
  49:7 56:24 59:20
  59:24 64:9,12
  66:1
route 20:16
rules 5:2,7 7:17,20
runs 16:15
R.P.R 67:13

────────────────
        S
────────────────
S 2:20
saw 38:3
saying 6:5 19:20
  24:10,14 29:18
  52:19 58:5 61:9
says 18:3 22:24
  24:2,9 26:10
  32:20 34:14
  35:24 36:3,9

41:15 43:8,9,12
  54:21 57:8
scans 42:13
scenario 25:21
  61:11 62:23
scenarios 23:12
  61:23 65:15
schedule 56:1,2
screen 17:19
screening 49:15
sealing 4:2
searches 19:2
second 22:13 36:9
  39:12 49:10
Security 47:9
see 14:23 17:18
  18:4,25 22:10
  28:6 32:16 38:4
  43:8 44:2 46:8
  49:9 51:25 59:21
  64:12
seen 14:10 30:4
  54:23
sees 60:17
send 24:4 44:8
sense 31:16 46:18
sent 10:7 30:9
  44:14,17
separate 35:20,22
  35:25 36:16
  56:16 59:15 68:7
serve 12:18
services 8:18 36:5
  49:15
serving 9:4
session 5:7
set 14:11 36:11
severity 43:2 62:3
  62:6,7
shaking 6:10
sheet 68:8
shelf 16:11
shift 12:15 33:11
  56:2 58:20,21

Shippensburg
  13:1
show 8:19,20,23
  17:3 55:10 56:6,9
  56:16,20 57:9
shut 31:20,21
sick 62:9,10
side 5:9
sign 4:12 35:14
signature 46:8
signatures 18:18
signed 32:16 34:12
  36:1 39:13
significant 49:13
similar 28:14
simply 21:6
sir 6:11
sit 31:13
site 43:3
situation 61:3
  65:19
situations 47:6
  63:23 65:1
slide 55:10,18 56:6
  56:9,16,20 57:9
somebody 19:15
  45:10,11 65:16
Somerset 12:16
sorry 4:24 15:7
  21:12 25:2 28:20
  35:17,18 53:15
  55:6
sort 40:20
sought 60:3,11
Sounds 7:1
speak 6:7 10:13,19
  10:21 63:16
speaking 9:8 10:1
  26:17
special 23:21 52:23
  58:23
specialist 14:22
specific 10:13 23:7
  44:16 53:1 57:12

63:21
**specifically** 10:8
   29:19 36:8 45:18
   52:11 60:25
   63:19
**spell** 50:14
**spelled** 16:20
**squared** 20:7
**staff** 22:18 33:9
   55:12,16
**stamp** 18:6
**stamped** 54:23
**start** 13:12 15:1
   18:2 28:21
**started** 49:8
**starts** 34:8 40:11
   57:7
**state** 4:14
**stated** 11:19
**states** 1:1 18:21
   22:10,12 37:19
   44:19,20 49:10
**statistics** 38:20
**stats** 38:21
**stay** 15:6
**stayed** 13:5
**stenographer** 6:4
**stipulated** 4:1
**stomach** 42:15
**stop** 26:16,17
   31:22
**stopping** 21:7
**straight** 20:3,17
   21:4
**Street** 2:4,9,20
**strike** 55:19
**stuck** 51:15
**subject** 36:4
**substance** 28:9
**suicide** 38:20
   54:22 55:12
   56:13 57:15,16
   57:24 58:9
**Suite** 2:4,15,20

**supervision** 11:4
   67:21
**sure** 5:4 6:8 15:23
   16:15,20 26:1
   41:22 42:4,17
   43:3 49:22,24
   50:23 51:1,9
   55:22
**surgery** 42:22
**suspected** 52:3
**Susquehanna** 2:22
   64:19 65:20
**sworn** 4:8
**synonymous** 13:25
**system** 12:7 13:19
   59:14

─────────────
**T**
T 67:1,1
**take** 7:9,11,12,15
   10:6 22:13,20
   28:25 31:11,13
   49:2 56:22 58:9
   59:20 64:3,23
   65:16
**taken** 1:11 7:22 8:4
   13:17 14:6,7 49:6
   59:23 65:11 67:6
**takes** 65:9
**talk** 7:10 19:23
   31:21
**talked** 19:4 59:25
**talking** 9:16 13:12
   18:25 24:8 28:22
   35:9 47:13
**talks** 19:2 22:17
   28:6,12 43:12
   51:24
**team** 52:11,12
**tell** 9:17,20,25 12:9
   13:16 14:18
   15:17 26:24
   27:17 31:7 32:21
   39:21 40:16 52:2

52:5
**telling** 30:25 62:12
**term** 50:17
**terminal** 59:9
**testified** 4:8 60:3
   65:18
**testify** 11:14 55:4
   57:6
**testifying** 9:22
**testimony** 9:6
   24:24 26:8,18
   27:2,7,10,13
**Thank** 15:10 35:12
   38:10 41:10 64:9
   64:11 65:24
**thing** 7:13 9:19
**things** 8:20 18:23
   20:23 29:23
   37:24 42:6,9
   63:25
**think** 13:15,15
   18:16,17,18
   25:21 26:14
   27:13 33:4,4
   34:10 35:23
   37:25 40:5,14
   41:8,21 42:25
   43:2 49:8 54:11
**third** 33:17
**three** 49:22
**time** 4:4 7:9 8:8
   9:12 14:21 17:12
   20:2,20 21:9
   34:13 37:6 50:6
   53:22 55:20,22
   57:1,5,9
**timeframe** 29:20
**timely** 22:12
**times** 18:10
**title** 4:15,21 12:4
   21:22 23:7 50:4
   50:21
**titled** 48:18
**today** 5:12 7:24

8:11 11:15 12:4
   30:2 50:10,12
   51:1,5
**today's** 10:11
**told** 26:21 27:5,6
**top** 18:21
**topic** 7:4
**train** 55:15
**training** 55:3,10,12
   56:4 57:3,10 58:8
   58:10 59:6
**transcript** 4:12
   67:8,19 68:3
**transferred** 20:19
**transfers** 49:15
**treatment** 11:1,4,7
   22:8,11 28:24
   44:3,6 45:25
   52:12
**trial** 4:5
**trigger** 43:16 62:7
**true** 68:5
**try** 53:1,8
**trying** 5:20 26:14
   30:21
**Tuesday** 1:12 68:4
**turned** 64:22
**turning** 45:1
**two** 16:3 20:22
   41:8 45:20 53:11
**type** 13:8 14:18
   15:2,5 23:6,21
   29:1 55:1 56:1
   59:18
**types** 8:4
**typical** 23:18
**typically** 15:13
   23:9 24:1 25:13
   39:2 53:10 56:2
**Ty'rique** 1:5 33:21
   34:1 37:4 53:12
   65:19,20

─────────────
**U**

**undergo** 56:4 58:9
**understand** 5:24
   6:1 7:17 9:1,8
   25:4 33:19 45:24
**understanding** 9:4
   10:5,12,15,18
   48:22 57:2,5
**union** 63:11,12,13
   64:6
**unit** 1:23 43:11,17
**UNITED** 1:1
**University** 13:1
**updated** 39:13
   41:11 46:7 54:12
**use** 7:10 25:11 26:3
   26:5

─────────────
**V**

**verbal** 6:9
**verbally** 6:8
**versa** 50:19
**version** 44:24
**versus** 21:21
**Vice** 50:19
**video** 32:12,12
**violation** 46:25
**violations** 47:2
**vs** 1:6

─────────────
**W**

**wait** 14:9
**waived** 4:3
**want** 5:4,22 7:3
   9:12,17,20 10:11
   11:18 13:12 17:5
   22:7 30:13,18
   31:1,8,9 32:4,15
   35:1,13 36:3,8
   38:14 41:22
   46:22 48:7 54:16
   57:12 61:20
**wants** 37:21
**Warden** 1:7,10 3:3
   4:16,18,21,21,23

WARDEN GREGORY BRIGGS

| | | | | |
|---|---|---|---|---|
| 11:20 12:1,16 | 68:1 | **0** | **215** 1:24 | 43:12 |
| 15:25 17:18,25 | **witnesses** 4:12 | **08034** 1:23 | **215)550-1995** 2:5 | **4:20-CV-00325** 1:6 |
| 18:24 27:16 32:3 | 17:15 | | **225** 2:9 | **433** 2:20 |
| 32:3 34:13 36:1,6 | **wondering** 54:14 | **1** | **233-6633** 2:10 | **463-1014** 2:21 |
| 39:9 49:9,21,25 | **word** 60:25 | **1** 3:12 10:21 17:5,8 | **24** 7:22 8:1,5 | **484** 2:21 |
| 50:2,16,20 51:2,5 | **words** 6:7 | 17:9,11 18:2 19:1 | **2460** 1:23 | |
| 54:20 55:8 57:7 | **work** 12:11 13:3 | 24:9 32:24,25 | **290** 18:4,12,18 | **5** |
| 59:21,25 64:9,18 | 58:15,24 59:11 | **10:04** 1:11 | **292** 22:7 | **5** 11:6 |
| 66:2 68:12 | 59:16 | **100** 2:15 | **297** 32:4 | |
| **warrant** 13:22 | **worked** 12:12,13 | **11:15** 49:4 | **298** 18:18 32:15 | **6** |
| 19:16 20:2 | **worker** 23:21 29:2 | **11:50** 66:9 | **299** 33:4,7 35:5 | **6** 11:9 |
| **warrants** 20:2 | 44:25 | **1175** 1:23 | | **64** 3:5 |
| **wasn't** 23:10 | **workers** 17:1 | **12.16** 36:4 | **3** | **65** 3:4 |
| **watch** 53:11 57:16 | 47:16 | **1245** 2:9 | **3** 22:24 32:5,21 | **651-3529** 2:16 |
| 57:16 | **working** 33:12 | **127** 57:4 | 33:16,17 35:3,6 | **67** 57:12,13 |
| **watches** 38:21 | 58:20,25 60:7 | **16** 45:20,20 | 35:24,24 | |
| **way** 5:25 12:13 | **wouldn't** 47:12 | **1650** 2:4 | **3:15** 41:9 | **7** |
| 17:11 21:7 30:18 | 52:12 | **17** 3:12 45:20 46:8 | **30** 18:13 | **717** 2:10,16 |
| 35:21 54:6 56:23 | **write** 17:11 | **17011** 2:15 | **30(b)(6)** 5:15 9:2,5 | **735-8101** 1:24 |
| 58:14 | **written** 25:23 28:2 | **17108** 2:10 | 9:10,14 10:20 | |
| **ways** 5:10 40:13 | 56:12 | **18** 33:22 34:2 | 17:8 33:20,25 | **9** |
| **week** 58:19 | **wrong** 27:17 | 39:18,25 40:9 | 37:4 39:21 | **97** 54:23 56:24,25 |
| **welcome** 65:25 | | 44:5 48:5 50:3 | **300** 33:5 | 57:3 |
| **went** 37:8,10 38:4 | **X** | **19** 1:12 68:4 | **301** 34:9,13,14 | **98** 56:25 57:4,8 |
| **West** 2:20,21 | **x-rays** 42:11 | **19103** 2:5 | 35:19,25 | |
| **we'll** 7:5 17:14 | | **19382** 2:21 | **303** 34:11 35:19,24 | |
| 33:2 49:4 | **Y** | **1995** 39:13,14 | 35:25 | |
| **we're** 5:5,12 6:5 | **yeah** 21:1,11 26:7 | 41:12 46:8 54:12 | **304** 34:12,13 35:13 | |
| 8:21 18:11,12,13 | 30:12 31:12 | | 35:20,22,25 36:3 | |
| 18:20,22,25 | 33:13 39:7 40:3 | **2** | **305** 39:6 | |
| 21:14 22:9 24:8 | 42:8 43:18 51:14 | **2** 10:24 | **306** 39:6 | |
| 30:14 31:4,12 | 51:18 56:25 | **200** 2:20 | **307** 40:12,14 | |
| 32:6 33:7 35:9 | 57:11 58:7,18 | **2006** 12:12 13:1 | **31** 33:1 | |
| 47:13,19,24 | 61:7 63:19 | **201** 2:15 | **313** 40:14,14 | |
| **we've** 7:5 48:15 | **year** 38:12,15,17 | **2011** 12:12,15,16 | **314** 41:6,9 | |
| 65:15 | 38:19 55:21,22 | **2017** 32:16,18 | **318** 48:19 49:9 | |
| **withdraw** 55:7 | 55:23 56:4,7,10 | **2018** 4:20 11:20,24 | **320** 48:5 51:24 | |
| **witness** 3:1 4:11 | **yearly** 55:17,20 | 12:7,10,16 15:25 | 54:14 | |
| 5:15 9:2,5,10,14 | **years** 16:12,14 | 44:5 56:7 | **34** 54:23 56:23 | |
| 10:21 11:19 | **Yep** 48:21 | **2019** 4:21,22 12:1 | 57:3 | |
| 26:22 30:21,23 | **Young** 40:10 | 33:22 34:2 39:18 | **3600** 2:4 | |
| 30:24 31:8 33:20 | | 39:25 40:9 50:3 | | |
| 33:25 37:4 39:21 | **Z** | 50:22 56:10 | **4** | |
| 64:11 65:25 66:8 | **Zoom** 1:10 | **2022** 1:12 68:4 | **4** 3:4 11:2 34:15 | |



# DAUPHIN COUNTY

JUDICIAL CENTER

DAUPHIN COUNTY JUDICIAL CENTER
451 MALL ROAD
HARRISBURG, PA 17111
(717) 547-4000



**BOARD OF COMMISSIONERS**
JEFF HASTE, CHAIRMAN
MIKE PRIES, VICE CHAIRMAN
GEORGE P. HARTWICK III, SECRETARY

**CHIEF CLERK/CHIEF OF STAFF**
Chad Saylor

**DIRECTOR OF JUDICIAL CENTER**
Stanley M. Pleskonko

## Dauphin County Judicial Center Policies and Procedures

### Part 1 -- Booking/Intake Procedure

#### I. INTAKE SEARCHES

1. Pat Search

   A. All individuals booked into the Dauphin County Judicial Center shall be subject to a thorough pat search, in order to retrieve contraband, prior to being accepted from the arresting law enforcement agency. Pat searches are conducted by an officer that is the same gender as the individual being searched.

2. Method

   A. All detainees will be searched upon entry in the secure area of the booking center and before they are placed in a holding cell. Any items not specifically allowed shall be removed. Weapons, evidence, or contraband shall be immediately returned to the accompanying police officer before accepting the detainee. A thorough hand search shall be conducted on individuals before any restraints are removed. If possible, the hand search will be conducted by an officer of the same gender as the detainee.

      1. Visually inspect the detainee for obvious injuries.
      2. When you are satisfied it is safe, remove handcuffs, shackels and instruct detainee to place hands on the wall.
      3. Conduct an outer clothing search of the detainee. Run hands under shirt collar and down upper part of each arm to wrist. Check along underside of arms and armpits, sweeping hands down shirt front to belt from front to back. Run hands down front and back of legs to shoe tops and back up sides of legs. A thorough search includes all areas where items can be hidden, waistband, crotch, pockets, hat etc.
      4. Instruct the detainee to face you and open their mouth, lift their tongue. Do a visual inspection of the oral cavity to insure nothing is being concealed.
      5. If the detainee has long hair, have them run their fingers through their hair and lift the hair off their neck so you can see nothing is hidden. If they are wearing a wig, ask them to remove it or assist them in removing the wig (if it is not sewn in).



EXHIBIT

DCP-1

4-19-22   ND

PENGAD 800-631-6989

**Dauphin DFS 290**

6. Ask the detainee to be seated on the bench, remove their shoes and hand them to you. Avoid bending down in front of the detainee.

7. After you have inspected the shoes and are satisfied they are free of contraband or weapons, ask the detainee to remove their socks, turn them inside out and show you the bottom of their feet.

8. Remove shoelaces, drawstrings and any other item the detainee is not allowed to have on their person while in the DCJC.

9. When all property has been taken from the detainee, instruct them to walk through the Cell Sense metal detector and insure they are clear of contraband.

10. If the detainee is not cooperative, or you have a security concern, use a set of lockable flex cuffs to secure their hands prior to walking through the Cell Sense metal detector.

11. After clearing the detainee through the Cell Sense, instruct the detainee to kneel up on the bench with both legs (if possible), or with one leg at a time. Apply, check for fit, and double lock the leg restraints. Do not bend down in front of detainee to apply or remove restraints unless the detainee is physically unable to stand

B. All safety and security precautions should be adhered to while searching detainees.

C. A strip search shall not be performed unless authorized by the Director of the Judicial Center or their designee. If a strip search is ordered it will be conducted by an officer of the same gender as the detainee and will take place in the medical area of the facility.

## II. Property

A. It is the policy of the Dauphin County Judicial Center to ensure that all detainee property is accounted for. In order for a possible transfer to a detention facility and due to space limitations, certain items will not be maintained at the judicial center.

B. The following items will not be accepted by the center and shall be immediately turned over to the accompanying police officer:
1. Weapons
2. Tobacco products and lighters/matches
3. Food items
4. All Medication – No Exceptions
5. Electronics to include cell phone and all accessories. The exception to this policy is that cell phones will be held for summary arrest detainees that will be released from the Judicial Center.
6. Toiletries
7. Purses/Backpacks/Luggage

C. The following items will be removed from a detainee and held at the center during detention period only:
1. Shoelaces
2. Belts
3. Drawstrings

**Dauphin DFS 291**

4. Jewelry, Watches, and Piercings
5. All hair ties, barrettes, bobby pins, head bands, elastic bands
6. Coats, Jackets, Sweaters, Sweat Shirts
7. Hats
8. Suspenders
9. Gloves
10. Wallet
11. Keys

D. All allowable items that remain at the center shall be inventoried and these items shall be returned to detainee upon a release to the street or accompany the detainee to a detention facility.
1. An inventory sheet for each detainee shall be maintained.
2. The property inventory receipt will be removed from the inventory bag either upon release on bail or after transfer to a detention facility. The receipt will be stapled to the completed Booking Form.
3. Once sealed, the property bag is not to be opened by any individual without express permission from the Judicial Center Director or their designee.

E. The property container shall be kept in the designated area within the center and only center staff shall have access to said property.

I. **Medical Treatment**

A. All necessary medical treatment shall be provided to detainees in a timely manner.
B. All detainees presented at the Judicial Center shall be asked if they are injured.
1. Detainees with injuries requiring a medical clearance to incarcerate will not be accepted at the center without noted clearance.
2. If a PrimeCare Medical staff member is present, they will make the determination regarding a clearance to incarcerate.
3. If PrimeCare is not present, the processing JCO will determine if the nature of the injury requires a clearance to incarcerate.

C. Detainees determined to be under the influence of alcohol or a controlled substance to the extent that they present a danger to themselves, or who present with a similar condition, will be taken by the arresting officer to a medical facility for evaluation and treatment before being committed to the Judicial Center.

D. Upon noting a detainee injury after commitment to the center that requires medical attention the PrimeCare staff member assigned to the Judicial Center will be notified.
1. If a PrimeCare staff member is not present at the center, PrimeCare at the Dauphin County Prison will be notified immediately of noted injury.
2. Emergency first-aid will be utilized by the Judicial Center Staff until the arrival of medical personnel.

E. Prisoners will not be given or permitted to take any medications without the supervision of authorized medical personnel.

**Dauphin DFS 292**

II.  **Holding Cells**

A.  Holding cells at the Judicial Center shall be utilized on an as needed basis for the temporary housing of detainees awaiting arraignment, or awaiting release from custody, or transportation to a detention facility.

B.  Available cell space will be utilized in a manner that does not cause overcrowding of a particular holding cell.
   1.  Male and female detainees will not be held in the same holding cells.
   2.  Juveniles should be held in the designated cell and separated by gender.

C.  While detainees are being held in a holding cell there will be at least one officer monitoring the holding area.  A periodic check of detainees shall be conducted.
   1.  Two of the monitors at the control desk will rotate views of the holding cells.
   2.  A physical check of detainees will occur at least every thirty minutes.
   3.  An officer will not open a cell or enter a cell unless there is another officer present in the booking/intake area.

D.  All holding cells will be inspected before and after a detainee is housed there for contraband and/or damage.  Discrepancies will be reported through the proper channels.

III.  **Police Reporting Procedure**

A.  Police Officers with detainees will report to the Judicial Center via the secure garage entrance located at the lower level of the center.
   1.  If transporting several detainees, the agency will notify the center in advance.
   2.  Police Officers will identify who they are via the intercom system located at the drive-up.

B.  The secure garage area is designed to hold two vehicles at a time.
   1.  Once the secure garage door is closed, the Police Officer will secure their firearms in a locker.
   2.  Only two prisoners per transporting agency will be admitted to the booking/intake area at one time.
   3.  A Judicial Center Officer will meet the committing agency at the door and begin the search process with the detainee.
   4.  While a Judicial Center Officer is searching and securing the detainees, the committing agency will be completing the necessary paperwork for commitment.

C.  As soon as the paperwork is completed and it has been determined there are no medical concerns with the detainee, the committing agency may exit the center.

IV.  **Detainee Processing**

A.  All detainees will be processed through the Dauphin County Judicial Center in as timely and efficient manner as possible.

**Dauphin DFS 293**

B. The listed steps for processing will be utilized as needed for each detainee.
1. Detainee Record of Supervision
2. CPIN Photographs
3. LiveScan Finger/Palm Prints
4. Detainee Property Receipt

C. None of the listed records shall be released to the public without authorization.

V. **Juvenile Procedure**

A. The following procedure must be followed when a police officer arrests a juvenile offender. This procedure does not pertain to juveniles who are being direct filed into the Adult Criminal Justice System and who do not fall under the jurisdiction of the Pennsylvania Juvenile Act. FOLLOW ADULT PROCEDURE FOR ALL DIRECT FILE CASES.
1. When a police officer arrests a juvenile offender and secure detention is being requested, the police officer will contact the juvenile probation officer on duty and request detention.
2. If the detention request is approved by the juvenile probation officer, the police officer will transport the juvenile to the Dauphin County Judicial Center. The juvenile transportation company will pick the juvenile up at the Judicial Center and transport him to an appropriate juvenile detention facility.
3. If fingerprinting capabilities are available to the officer at the arresting police station or at a nearby station, fingerprinting and processing of the juvenile should take place at that location before the juvenile is transported to the Judicial Center.
4. If fingerprinting capabilities are not available to the officer at the arresting police station or at a nearby station, the officer will transport the juvenile to the Judicial Center and fingerprint him there. The juvenile transportation company will transport the juvenile to a juvenile detention facility after the fingerprinting is completed.
5. Anticipated fingerprinting and processing time must be communicated to the juvenile probation officer so the juvenile transportation company can be notified when the juvenile will be ready to be transported to a juvenile detention facility.
6. When a police officer arrests a juvenile offender and placement in shelter at the Schaffner Youth Center is being requested, the police officer will transport the juvenile to the police station and contact the juvenile probation officer on duty and request shelter.
7. If shelter is approved by the juvenile probation officer, the police officer will fingerprint and process the juvenile at either the arresting police station, a nearby police station, or at the Dauphin County Judicial Center. After the fingerprinting and processing is completed, the police officer will transport the juvenile to the Schaffner Youth Center for admission to shelter.
8. When a police officer arrests a juvenile offender and releases the offender to his parent/guardian, or other responsible adult, the police officer will need to fingerprint and process the juvenile at the arresting station, a nearby station, or at the Dauphin County Judicial Center. After the fingerprinting and processing has

**Dauphin DFS 294**

occurred, the police officer must ensure that the juvenile is released before the police officer leaves the Judicial Center.

9. Prior to transporting a juvenile offender to the Judicial Center, the arresting officer must call the center and notify staff that they will be bringing a juvenile to the center.

## VI. Pregnant Females

A. The purpose of this order is to establish guidelines to provide adequate safeguards to monitor the pregnant detainee during processing and detention at the Dauphin County Judicial Center.

1. Judicial Center Officers shall not shackle female detainees who are known to be pregnant, or who self-report pregnancy during intake, processing, or detention.
2. Shackling is defined as placement of ankle restraints.
3. Female detainees who are pregnant should only be restrained by handcuffing in the front of their body.
4. Only standard handcuffs, checked for fit, and double locked should be applied. No transport belts or flex cuffs are permitted.

B. Extraordinary Occurrences

Section III shall not bar reasonable restraint provided the staff assigned to the detainee makes an individualized determination that the detainee presents a substantial risk of imminent flight, or some other extraordinary medical, or security circumstance dictates that the detainee be restrained to ensure the safety and security of the detainee.

1. Reporting

When an extraordinary occurrence takes place, the supervisor shall report the incident by telephone to the Director or his designee as soon as practicable. The officer shall complete a written report detailing the circumstances which led to the determination the detainee was at substantial risk for imminent flight, or other extraordinary medical or security circumstance. This report shall be completed prior to going off duty.

## PART 2 – EMERGENCY PLANS

I. Emergency Evacuations

A. In the event that it is determined that the Dauphin County Judicial Center requires evacuation, every effort should be made to proceed in an orderly manner. Examples of why the center would be evacuated include, but are not limited to, major fire, and/or man-made or natural disasters.

Dauphin DFS 295

B.   In case of a total or partial evacuation of the Dauphin County Judicial Center, the Director, Deputy Director, or the Manager shall be notified immediately.

C.   Judicial Center Officers are responsible for removing all detainees from holding cells in a timely manner.  Detainees should be secured to each other and evacuated to one of the parking lot areas.  Dauphin County Communications (EMA) and the Dauphin County Prison shall be notified immediately upon determining that evacuation is necessary.

D.   At least one officer should remain with the detainees at all times and any removal to other temporary holding facilities shall be coordinated.  Accountability of detainees shall be maintained at all times.

E.   In case of evacuation, Judicial Center Officers will ensure that all areas of the Judicial Center are evacuated.   All staff and visitors shall be directed to the nearest safe exit.

F.   The center shall not be reoccupied until it is deemed safe by the appropriate authority or it is directed by the Director or their designee.

G.   In the event of a partial or total evacuation of the center, an incident report will be completed by a Judicial Center Officer.

II.   Escape

A.   In the event of an escape from the Dauphin County Judicial Center, the officers will ensure the following:
1.   Check to see that all remaining detainees are secured.
2.   Dauphin County Communications (EMA) shall be notified immediately, a detailed description of the escapee shall be provided.
3.   The Dauphin County Prison shall be notified and provided with a description.
4.   The Director, Deputy Director, or Manager shall be notified immediately of an escape.  For all escapes an incident report is required by a Judicial Center Officer.
5.   The arresting agency (of the escaped detainee) shall be notified and the on-call Victim Witness Advocate shall also be notified.
6.   If the detainee is recaptured, all involved agencies/individuals shall be notified as soon as possible.
7.   A recaptured detainee shall be medically examined by PrimeCare personnel and any injuries shall be recorded on the incident report.

III.   Mass Arrest/Overcrowding

A.   In the case of a mass arrest program instituted by local law enforcement, the center should receive prior notice and steps will be put into place to handle the additional detainees.
1.   Coordination with the Courts for timely arraignment of detainees.

**Dauphin DFS 296**

    2.  Additional DCJC staff may be utilized. This will be coordinated by the Director or their designee.

    3.  Coordination with the Dauphin County Prison to expedite the transfer of applicable prisoners.

    4.  The utilization of the Derry Township Police Department holding area.

    5.  Release of detainees on summons as provided for in the Pennsylvania Rules of Criminal Procedure.

B.    In the event that mass arrests occur without the prior knowledge of the DCJC or the holding areas become overcrowded, the Director or their designee will be notified and a combination of the above listed methods will be utilized.

C.    The large holding cells in the booking intake area (116 and 135) will house no more than ten detainees. The small holding cells will house no more than four each; and the two designated juvenile holding cells will house no more than four each. At no time will inmates of a different gender be housed together. Adults will not be housed with juvenile detainees.

D.    In the event of overcrowding, the cells on the second floor of the facility will be utilized. Holding cell 219 can house up to ten prisoners while holding cell 220 can hold four prisoners. All listed rules of observation will apply while detainees are held in these holding cells.

## PART 3 -- Court Operations

I.   **Detainee Hearings**

A.    After detainees are processed in the booking area they shall be placed back in a holding cell until appearance in front of a Magisterial District Justice.

B.    The Night Court staff will determine when a detainee is to be presented before an MDJ.

    1.  If no MDJ is present the detainee will be arraigned via video feed and this can be accomplished in the court room or the designated location in the booking/intake area depending on the circumstances.

    2.  During the hours Night Court is not in operation it is the Judicial Staff responsibilities to arrange for a video arraignment with the designated MDJ.

C.    All detainees presented before an MDJ will be restrained with both handcuffs and leg irons at all times and will be escorted by a JCO.

D.    Prisoners will be transported from the booking/intake area to the courtroom area by the secure elevator. At no time will a detainee be in an elevator without restraints (handcuffs and leg irons).

**Dauphin DFS 297**

E.   In the case of a disruptive or combative detainee the Night Court staff shall be notified and if the detainee is still requested to appear in front of the sitting MDJ, two officers will escort.

F.   After the hearing, provided the detainee is cooperating they will be given an opportunity to make a phone call to arrange bail, if applicable, upon return to the booking/intake area.

## II.   Courtroom Security

A.   Courtroom doors will be secured at all times.  The only exception to this is when an MDJ is physically sitting on the bench.

B.   Public access will only be allowed for an individual who has business with Night Court or while an MDJ is sitting on the bench.

C.   A Judicial Center Officer will be on the Central Court floor at all times while an MDJ is conducting business.
1.   A check of the courtroom will be conducted before it is opened to the public.
2.   A handheld metal detector will be used on all individuals who enter the courtroom.
3.   A list of items not allowed in the courtroom is posted in the public lobby area and it shall be strictly adhered to at all times.

D.   In the event of a disturbance, the offending party shall be asked to leave the Judicial Center.  If they refuse, Swatara Township Police will be notified by a JCO.

E.   During hours that Night Court is operating and/or an MDJ is present, the two side doors leading to the lobby area will be secured.

Presented By: _____   Date: 31 January 2017
Director Stanley M. Pleskenko

Approved By: _____   Date: 31 January 2017
Commissioner Jeffrey T. Haste, Prison Board Chair

**Dauphin DFS 298**



## ORDERS FOR POST #3
### INTAKE LOBBY

DEFINITION

Maintain strict security and orderly transition between the North Vehicle Entrance gates and inner lobby gates.

MISSION

The mission of the intake officer is to handle all inmate commitments and/or releases.

TOUR OF DUTY

The tour of duty will be from 6:00 AM to 10:00 PM, seven (7) days a week or as otherwise directed by the Shift Commander.

ACTION

This post is a roving patrol located adjacent to the main Central Control in the rear of the prison.

A.   The officer assigned to this post will:

1.   Maintain custody, exercise control and supervise movement of inmates and official visitors within the inner lobby area.

2.   Verify the count for the holding cells and bullpen area prior to assuming the post and at established times during the shifts, as well as keep the population board current.

3.   During shift will check all doors, windows, bars and other physical facilities for potential security problems.

4.   Supervise all inmate movement in the inner lobby area.

5.   Spot check the classroom, church and attorney conference rooms when in use.

6.   Checks all inmates being discharged, going to court, hearings, or arraignments, etc. to ensure proper identification.

7.   Monitor visiting area.

8.   Report any and all discrepancies immediately to the Shift Commander or Assistant Shift Commander.

9.   Be knowledgeable of all emergency plans (i.e. riot, fire, hostage, etc.).

10.   Only leave their post when properly relieved, or to perform duties relevant to this post, or by special permission of the Shift Commander.

**Dauphin DFS 299**

## ORDERS FOR POST # 3
### INTAKE LOBBY

11.   Brief the oncoming officer upon arrival, of any special instructions, orders, or other information pertaining to this post.

12.   Process all inmates being committed to or being released from Dauphin County Prison, as covered in the  "North Vehicle Entrance" procedure.

13.   Supervise the movement of inmates from Spring Creek to Main Side or movement of inmate through the connecting corridor.

14.   Screen all new commitments for injuries and notify medical of any medical problems before acceptance of inmate.

15.   Ensure that those inmates housed in the booking cell receive their daily phone calls.

16.   Ensure that the area of assignment is in an excellent state of cleanliness.

17.   Remain awake and alert at all times and conduct yourself in a professional manner.

18.   Perform ALL related duties as assigned and/or required.

**Dauphin DFS 300**

## ORDERS FOR POST # 4
## BOOKING / RECEIVING OFFICER



### DEFINITION

The Booking/Receiving Officer is responsible for work of considerable difficulty. The process of booking in an inmate must be done efficiently and professionally; that his/her property is intact and secured; and that his/her basic rights are not violated. It is also essential to ensure that proper records are maintained and care and caution are used to preserve the health and wellbeing of the Officer and inmate.

### MISSION

The mission of the Booking/Receiving Officer is to process each new commitment and or release, including responsibility for the detection and removal of contraband and the securing of property of that inmate.

### TOUR OF DUTY

The tour of duty for Booking and Receiving is twenty-four (24) hours a day, seven (7) days a week.

### ACTION

The Officer assigned to this post will:

1. Determine if the new commitment meets the criteria to be strip searched in accordance with Policy 9.20, Searches of Newly Committed Inmates of DCP. In addition, should any injury be discovered during the search process, the Shift Commander shall be notified to photograph and document the injury. If it is determined that a new commitment is to be strip searched, the search shall be conducted in a professional, non-humiliating manner and, for security and privacy reasons, the search will be conducted in an area of the search room where the inmate is in view of only the Officer in charge of the search.

2. Photograph all new commitments during the initial book-in and fingerprint as needed. The following forms and tasks will also be completed at this time:

    a. Complete the Prisoner Property Inventory Form.

    b. Issue approved Property.

    c. Photograph the inmate and print two (2) ID badges: One for the inmate and the other for Central Control.

    d. Fingerprint the inmate if they are a new commitment or if it has been three (3) or more years since last commitment.

3. Remove, record and describe in detail all personal property, item by item, in the presence of the inmate.

        Revised February 2008

**Dauphin DFS 301**

## ORDERS FOR POST # 4
### BOOKING / RECEIVING OFFICER

4. Check the inventory listing together with the inmate and sign the Prisoner Property Inventory Receipt form. The front copy (white) will be placed in the inmate's shakedown folder, the middle copy (yellow) will be given to the inmate and the back copy (pink) will be included with the property being placed in the Shakedown Storage area.

5. Ensure the stored personal property of an inmate is not released without first obtaining an approved request form. The person picking up the property must be the individual approved to receive the property, show ID, and sign for property received before anything can be given to them.

6. Deposit, in the locked box, any valuables that are to be placed in the Administrative safe (such as watches, rings, necklaces, earrings, etc.) Any envelope that is too large to fit in the assigned box will be given to the Shift Commander or Assistant Shift Commander, who will lock the envelope in the Secure Drop Box. In addition, any contraband (such as weapons, drugs, tobacco products, lighters, matches, undisclosed body piercings, etc.) shall be given to the Shift Commander to be documented and placed in the Secure Drop Box.

7. Maintain an adequate inventory of clothing, bedding, and hygiene kits to be issued to inmates. The Officer will ensure that each newly committed inmate receives the following:

      a. Blanket, one (1).

      b. Sheets, two (2); towel and wash cloth, one (1) each.

      c. Uniform, one (1) set.

      e. Inmate Handbook, one (1).

      f. Personal Hygiene Kit, one (1)

8. Ensure that all inmates sign a receipt for all items received.

9. Ensure that each newly committed inmate takes a shower, if necessary or required for hygiene purposes, and uses the provided soap.

10. Ask the inmate if there is anything in their personal belongings that they will need (such as phone numbers, legal paperwork, etc.). If what they need is permitted, the inmate may retain possession of the item. All other items shall be placed in the Booking safe. All inmates are to be told that once items are placed in Booking storage, those items will remain there until the inmate is released or Administrative permission is granted for removal.

11. Place one set of clothing, as complete as possible (shirt, pants, jacket, belt, shoes and socks ONLY), of a new commitment's personal clothing in a garment bag and place it in storage. It is to be clearly marked with the inmate's name, DCP number and date. ALL other items are to be placed in a box and marked with the inmate's name, DCP number, and sealed with tape with the Officer's name and date written across the tape. This way, if the tape is removed, it will be easily recognized. The box is to remain sealed until the release or transfer of that inmate. NOTHING will be removed from this box. The entire contents of the box can be sent out provided the inmate follows the prescribed request procedure.

**Dauphin DFS 302**

## ORDERS FOR POST # 4
### BOOKING / RECEIVING OFFICER

12. Clearly identify items on the inmate inventory sheet. For example: Color and style of clothing, color of jewelry – "white" and "yellow" color NOT "silver" or "gold" color. Stones in rings are "stones," NOT "rubies" or "diamonds." Watches shall be logged using type of watch and any serial number that may be on the watch.

13. Ensure that, if Court clothing or a new set of clothing is brought to the prison, those items are only exchanged upon approval. Proper documentation on the Inmate Request Form shall be completed as well as on the inmate's initial Inmate Property Inventory Form where items removed from the facility must be logged. In addition, all items received shall be inventoried on a new property sheet. The two sheets are to be stapled together and placed in the inmate's shakedown file. The person bringing in the clothes to the prison must be identified as the person on the request slip. They will also have to sign for the property that is being removed from the prison. NO inmate will be allowed to take to the housing area any personal or non-prison issued clothing except for approved underwear, socks or shoes.

>    NOTE: Inmates must have one (1) set of street clothes at the prison at all times. Clothing will be exchanged one for one (if a new set is brought in, an old set must be sent out).

14. Facilitate dressing of inmates when needed to attend Court or for any other reason.

15. Ensure that only authorized inmates are in the booking room and that only authorized persons handle inmate property. This area must be locked when not in use.

16. Possess knowledge and be able to discharge all responsibilities of emergency plans (i.e. fire, riot, hostage, etc.), including all duties specific to this post. In addition, each Officer shall know what is considered contraband and what items are permitted within the facility and enforce same.

17. Remain at this post unless properly relieved or by receiving permission from the Shift Commander.

18. Brief the oncoming Officer, upon arrival, of any special instructions, orders, or other information pertaining to this post.

19. Ensure that the area of assignment is in an excellent state of cleanliness.

20. Remain awake and alert at all times and conduct him/herself in a professional manner.

21. Adhere to and enforce all Policies, Procedures, Directives, Orders (both written and verbal) and inmate Rules & Regulations. Each Officer shall also report to the Shift Commander and document, in detail, any violation or incident that occurs.

22. Perform ALL related duties as assigned and/or required.

**Dauphin DFS 303**



 **DAUPHIN COUNTY PRISON**

Local Policy Chapter 12.16

| Subject: | **Medical and Health Services** |
|---|---|
| Reference: | **Title 37 Chapter 95 Section 95.232** |
| ACA: | **4-ALDF-4C-01; 4-4353; 4-4360; 4-4424** |

**POLICY:**

It shall be the policy of Dauphin County Prison to have its Medical Department, which shall be contracted with a qualified health care professional, provide all aspects of medical, dental and mental health services to the inmate population. The facility shall also have a suicide prevention plan that will be developed in conjunction with medical professionals.

**PENOLOGICAL INTEREST:**

It is in the penological interest of Dauphin County Prison to maintain a high degree of efficiency while providing professional health care to the inmate population.

**PROCEDURE:**

It shall be the practice of Dauphin County Prison to adhere to the policies of its Medical provider. However, in the case of forced medication, the policy of the facility is for the Medical provider to obtain an Order from the Dauphin County Court of Common Pleas before unilateral implementation of its policy. Contact shall be made to obtain either a verbal or written Order from the Court prior to forced medication of an inmate. In an extreme life-threatening emergency, when it is impractical to obtain either a verbal or written Order from the Court, forced medication may be employed upon the approval and agreement of either the treating licensed physician or treating licensed psychiatrist.

Any inmate in need of medical attention is instructed to follow the guidelines set forth by Dauphin County Prison as outlined in the Inmate Handbook.

It shall be required that the Medical provider submit an annual report to the Prison Administration to be included in the facility's Year End Report available for public review. Further, the Medical provider shall submit copies of their Annual Policy Reviews to the Prison Administration.

In addition, all employees, and all vendors working at the facility, shall be trained annually on the suicide prevention plan.

_____
Warden Dominick L. DeRose

**_RESTRICTED CORRECTIONAL DATA_**
_This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency. Data subject to this restriction is contained throughout this publication._

Revised September 30, 2015

**Dauphin DFS 304**

| TITLE: | Medical Program / Hospital Administration |
|---|---|
| POLICY: | 12.1  page 1 of 2 |
| CHAPTER: | Medical and Health Care Service |
| REFERENCE: | |
| ACA: | 3-4326, 3-4327M, 3-4328, 3-4329, 3-4334M, 3-4335M, 3-4338, 3-4339, 3-4340, 3-4364, 3-ALDF-4E-09M, 13, 14, 16, 24M, & 34 |
| PURDONS STATUE 61: 05.232 | |



**POLICY:** The medical program shall be managed and directed by a fully licensed contracted Service Corporation (hereafter referred to as "the Provider") authorized to practice in the jurisdiction.  The Provider shall be responsible for clinical supervision of all physicians and allied health personnel within the Prison and have sole responsibility for all final medical judgment relating to patient care in the Prison.

    A.    All matters of medical judgement are the sole province of the Provider working for, or under contract, with the Prison;

    B.    All security regulations which apply to Prison personnel shall also apply to medical staff;

    C.    The Provider shall be responsible for planning and developing adequate staffing programs for the health care program and report monthly to the Board of Prison Inspectors.

**PROCEDURE:**

    A.    The health administrator designated by the Provider shall be responsible for the overall operation of the medical services program.   The Program Administrator's duties shall include, but not be limited to:

        1.    Adequate staffing of the Medical Unit;

        2.    Overseeing of the general and special functions of the Medical Unit on a day to day basis;

        3.    Acting as liaison between the Board, Administration and Security with the Medical Unit;

        4.    Submission of a monthly report to the Warden by the fifth (5th) day of each month for presentation to the Board;

**Dauphin DFS 305**

| TITLE: | Medical Program / Hospital Administration |
|---|---|
| POLICY: | 12.1  page 2 of 2 |
| CHAPTER: | Medical and Health Care Service |

     5.    Carry out the day to day business procedures as described by the Provider in the job description.

     6.    Be responsible for meeting standards as set forth in the Dauphin County/Provider contract.

B.    The Medical Director/Doctors shall be responsible for making and reviewing all medical decisions, and shall include, but not be limited to the following as indicated in the job description set forth by the Provider:

     1.    Review of all laboratory, X-ray and requested medical information;

     2.    Approval and/or development of the Medical Unit Drug Formulary;

     3.    Give direction to the Medical personnel in emergency situations;

     4.    Development of standard procedures;

     5.    Work with the Program Administrator to facilitate smooth continuity of care and to insure delivery of all appropriate medical program services.

C.    Final medical judgement rests with the Medical Director at all times and neither the Provider nor Prison personnel shall place any restrictions on the physician's practice of medicine.

D.    All security regulations which apply to Prison personnel shall apply also to medical staff.

APPROVED _Anthony Petrucci_  1-19-95
Anthony Petrucci - Prison Board Chairman  Date

APPROVED _____  1-19-95
Dominick L. DeRose - Warden  Date

**Dauphin DFS 306**

# DAUPHIN COUNTY PRISON



**Policy Name:**      **Commitments and Releases for Dauphin County Prison**

**Purpose:**      It is the intent of this administration to provide the staff of Dauphin County Prison with the direction and guidance for procedures by which ALL individuals committed to and/or released from the Dauphin County Prison are to be processed.

**Scope:**      The North Vehicle Prisoner Entrance (NVPE) is to be utilized for ALL commitments and releases.  This area should provide law enforcement personnel and Dauphin County Prison staff with a safer and more efficient area in which to commit and release prisoners.  This procedure is to be utilized during the following situations.

A.   All commitments

B.   All releases (escorted AND unescorted)

C.   All escorted prisoner transports (i.e., MDJ. hearings, court, hospital, investigations, etc.)

D.   Returns from court, hearings, investigations etc.

E.   Transfers to the Work Release Centers

F.   Releases (escorted & unescorted) from the Work Release Centers

NOTE:   When it is necessary for law enforcement officials to interview an inmate to verify information with prison personnel or to meet with a staff member, the Main Lobby entrance is to be used.

**Procedure:**

A.   <u>Commitments - Business Hours:</u>

1.   The committing officer will fill out a Dauphin County Prison-99 form and hand the completed form to the Records Office, along with the charge sheet/s.

2.   The Records Officer assigned to the pass-through window is to check all commitment paperwork to insure that it is complete.  At that time, all paperwork received is to be time and date stamped and initialed by the receiving Records Officer.  The Records Officer will then fill out a booking slip with all information that is available.  The booking slip is to be then given to the committing officer.  The Records Officer will notify Central Control via the telephone that the paper work is correct and to let the officer in the Prison.

1

**Dauphin DFS 307**



3.  The committing officer/s will place the inmate/prisoner between the first set of doors.  The inmate MUST be in restraints before being placed between the doors.

4.  Once the prisoner/inmate is placed between the doors, the committing officer/s will secure their weapons, and then enter the Prison.

5.  The committing officer will take the prisoner/inmate and booking slip, and turn both over to the lobby officer.  The lobby officer will then pat search and check the inmate for any medical problems.

    a.  Should the inmate/prisoner have a medical concern, the inmate/prisoner MUST be checked by medical before the committing officer will be permitted to exit the prison.

        1.  Should the inmate/prisoner NOT be cleared, the committing officer is to remove the inmate from the Prison.  The commitment paperwork will be returned to the committing officer after the time and date stamp is voided.  The lobby officer and medical staff are to submit a memo to the Shift Commander regarding the commitment being turned away.

    b.  Should the inmate have no apparent medical concern, the committing officer will be permitted to exit the prison, AFTER the inmate has been searched.

6.  After searching the new commitment, the lobby officer will place the new commitment in Bullpen # 2.

7.  The lobby officer will then log the needed information on the "Lobby Log".

8.  The lobby officer will then hand the booking slip to Central Control.

9.  The Central Control officer will then enter the needed information in the Central Control logbook.

10. Central Control will notify the booking officer that they have a booking slip for a new commitment.

11. The booking officer will then, as expediently as possible, pick up the booking slip and inmate, and process the inmate into the Dauphin County Prison.

B.  <u>Commitments - After Business Hours:</u>

    1.  The committing officer/s will place the inmate/prisoner between the first set of doors.  The inmate MUST be in restraints before being placed between the doors.

2

**Dauphin DFS 308**

2.   Once the prisoner/inmate is placed between the doors, the committing officer/s will secure their weapons, and then enter the prison.

3.   The committing officer will fill out a Dauphin County Prison-99 form, and hand the completed form to the booking/receiving officer along with the charge sheet/s.

4.   The booking/receiving officer MUST contact the Shift Commander to have them check all commitment paperwork to insure that it is complete. The Shift Commander is then to time and date stamp, and initial, all paperwork received. The Shift Commander will retain all paperwork, until such time, as Records Office personal is on duty. Once the paperwork has been determined to be complete, the booking/receiving officer will fill out a booking slip with all information that is available. The booking/receiving officer will pat search and check the inmate for any medical problems.

   a.   Should the inmate/prisoner have a medical concern, the inmate/prisoner MUST be checked by medical before the committing officer will be permitted to exit the prison.

      1.   Should the inmate/prisoner NOT be cleared, the committing officer is to remove the inmate from the Prison. The commitment paperwork will be returned to the committing officer after the time and date stamp is voided. The lobby officer and medical staff are to submit a memo to the Shift Commander regarding the commitment being turned away.

   b.   Should the inmate have no apparent medical concern, the committing officer will be permitted to exit the prison, AFTER the inmate has been searched.

5.   After searching the new commitment, the booking/receiving officer will place the new commitment in Bullpen # 2.

6.   The booking/receiving officer will then enter the needed information on the "Lobby Log".

7.   The booking/receiving officer will then hand the booking slip to Central Control.

8.   The Central Control officer will enter the needed information in the Central Control logbook.

9.   The booking officer will then, as expediently as possible, pick up the booking slip and inmate, and process the inmate into the Dauphin County Prison.

**Dauphin DFS 309**

C. <u>Releases – Escorted (including hearings, court, other counties, etc.):</u>

    1.    The transporting officer will hand the appropriate paperwork for a release to the Records Office.

    2.    The records officer assigned to the pass-through window is to check all release paperwork to insure that it is complete. At that time, all paperwork received is to be time and date stamped and initialed by the receiving records officer. The records officer will then fill out a release slip. The release slip is then to be given to the transporting officer.

    3.    The transporting officer/s will secure their weapons, and then enter the prison.

    4.    The transporting officer will take the release slip, and hand it over to the lobby officer.

    5.    The lobby officer will enter the needed information on the "Lobby Log".

    6.    The lobby officer will then hand the release slip to Central Control.

    7.    Central Control will enter the appropriate information in the Central Control logbook.

    8.    Central Control will then give the release slip to the appropriate staff member to facilitate the release (i.e. obtain the appropriate signatures that the inmate's ID was checked).

    9.    The inmate will then be processed out of the Dauphin County Prison by the booking/receiving officer and turned over to the transporting officer.

        a.    The booking/receiving officer will notify the Business Office (during normal business hours), that an inmate is being released, giving the inmate's name and DCP number so that any monies and/or property can be issued before the inmate is released

        b.    The Business Office will check for monies and/or property. Should the inmate have no funds and/or property, the Business Office will call the lobby officer and notify the officer of such. Should the inmate have funds and/or property, the Business Office will take these items to the lobby to be issued to the escorting officer.

D. <u>Releases - Unescorted:</u>

    1.    When the release is brought into the main lobby, the reception desk officer will contact Central Control, informing them that paperwork for a release has been brought in and needs to be picked up.

**Dauphin DFS 310**

2.  Central Control will then dispatch an officer to the reception desk for the release. The officer will take the release paperwork to the Records Office.

3.  The Records Office will fill out an UNESCORTED release form, and give to the lobby officer.

4.  The lobby officer will enter the needed information on the "Lobby Log".

5.  The lobby officer will then hand the release slip to Central Control.

6.  Central Control will enter the appropriate information in the Central Control logbook.

7.  Central Control will then give the release slip to the appropriate staff member to facilitate the release (i.e. obtain the appropriate signatures that the inmate's ID was checked).

8.  The inmate will then be processed out of the Dauphin County Prison.

9.  Upon completion of the release process, the lobby officer will escort the individual out of the prison via the NVPE notifying Central Control by two-way radio to open the NVPE gate, and then have it closed once the prisoner is through the gate.

10.  The lobby officer will inform the inmate to report to the main lobby to receive their money and/or property, if applicable.

E.  <u>Returns from Court, Hearings, Investigations etc.:</u>

1.  The committing officer will fill out a Dauphin County Prison-99 form and hand the filled out form to the Records Office, along with the charge sheet/s.

2.  The records officer assigned to the pass-through window is to check and time and date stamp all re-commitment paperwork to insure that it is complete.

3.  The committing officer/s will place the inmate/prisoner between the first set of doors. The inmate MUST be in restraints before being placed between the doors.

4.  Once the prisoner/inmate is placed between the doors, the committing officer/s will secure their weapons, and then enter the prison.

5.  The committing officer will take the prisoner/inmate, and turn the prisoner/inmate over to the lobby officer. The lobby officer will check the inmate (i.e. pat search).

6.  The inmate is to be taken to the booking room and stripped searched before returning to their housing area.

5

**Dauphin DFS 311**

7.    The lobby officer will then return the inmate's ID, and log the inmate in as returning, on the "Lobby Log".

8.    The lobby officer will then send the inmate to Central Control.

9.    Central Control will verify the inmates ID, make the appropriate entry in the Central Control logbook and then have the inmate return to their housing area.

F.    <u>Transfers to the Work Release Centers</u>

1.    A memo will be issued by a member of the administration or their designee stating which inmates are to be transferred to work release as well as the date they are to be transferred.

2.    The memo will be distributed to Records Office, Captains Office, Central Control, Lobby and the Business Office.

3.    Only those inmates listed will be transferred to work release.

4.    The lobby officer will log behind each name the time the inmates are to be transferred to work release.

5.    The lobby officer will hand the memo with the times listed to the Shift Commander.

6.    The Shift Commander will hand this memo in with the operational paper work.

G.    <u>Releases (escorted & unescorted) from the Work Release Centers.</u>

1.    The Records Office will fax to the appropriate work release center either an escorted or an unescorted release slip.

2.    The Records Office, once the signed release slip is returned from work release, will then send the slip to Central Control.

3.    Central Control will remove the inmates' tag from the population board and adjust the population accordingly.

4.    The release slip will be forwarded to the administration with the operational paper work.

**<u>Miscellaneous:</u>**

A.    The Records Office is off limits to ALL individuals other than those staff members assigned to work in the Records Office. The only exception will be the Warden,

**Dauphin DFS 312**

Deputy Wardens, Major and those staff members that have received permission from the Warden or his designee. At NO time will a non-prison employee be in the Records Office for ANY reason. The door into the Records Office will be closed and locked at all times.

B.    The Shift Commander will maintain the "COMMITMENT-AFTER BUSINESS HOURS" log and hand the log into the Records Office the next morning at 0600 hours.

**Dauphin DFS 313**

| | |
|---|---|
| **TITLE:** | Requested Medical Clearance of Inmates |
| **POLICY:** | 12.3  page 1 of 2 |
| **CHAPTER:** | Medical and Health Care Services |
| **REFERENCE:** | |
| **ACA:** | |
| **PURDONS STATUE 61: 95.222** | |



**POLICY:**   Any person brought into the Prison for booking and felt to be in need of medical attention shall be examined by a nurse from the Medical Unit.  If the nurse determines that the prisoner is in need of emergency medical / detoxification clearance it shall be necessary for the arresting officer/s to obtain such clearance from an outside Medical Doctor before the Prison and the Provider accept responsibility of the prisoner.

**PROCEDURE:**

A.   Any inmate brought into the Prison in the apparent listed conditions shall be examined by the Medical Unit before acceptance:

    1.   Extreme drug/alcohol intoxications;
    2.   Visible untreated injuries/bleeding;
    3.   Any claims of pain or serious medical problems;
    4.   Any claims of "police brutality";
    5.   Any appearance of a dazed or confused condition;
    6.   Any head injury;
    7.   Unconscious or semi-conscious or any inmate who appears to "pass out" or have seizure activity.
    8.   Acute Mental health crisis.

B.   Examination by Medical personnel shall determine if the inmate should receive medical clearance.  Clearance is provided by:

    1.   A Community Treatment facility for illness, injury, drug/alcohol related problems and/or Mental Health Problems.

C.   It shall be the responsibility of the arresting officer/s to obtain medical clearance of the inmate.

D.   An inmate shall not be detained in the Prison while the officer goes for medical clearance.

E.   The Medical Unit shall be notified immediately if the arresting officer/s present medical clearance for the prisoner.

**Dauphin DFS 314**

| TITLE: | Requested Medical Clearance of Inmates |
|---|---|
| POLICY: | 12.3   page 2 of 2 |
| CHAPTER: | Medical and Health Care Service |

F.   The medical Unit shall be contacted if there is concern
     about any other condition other than those listed above.

APPROVED _____     1-19-95
          Anthony Petrucci - Prison Board Chairman    Date

APPROVED _____     1-19-95
          Dominick L. DeRose - Warden                 Date

**Dauphin DFS 315**

| TITLE: | Physical Examinations |
|---|---|
| POLICY: | 12.4   page 1 of 2 |
| CHAPTER: | Medical and Health Care Service |

| REFERENCE: | |
|---|---|
| ACA: | 3-4330, 3-4343M, 3-4344M, 3-4345, 3-4346, 3-4348<br>3-ALDF-43-19M & 21M |

PURDONS STATUE 61: 95.222 & 95.232



POLICY:   Each inmate shall be provided with medical care from the time of admission, throughout the period of incarceration, until release. This continuous care requires timely physical examinations which shall include medical screening of clinical history for each admission, complete physical examination of each inmate (except intra-system transfers) within 72 hours following all inmates received in transfer from other prison facilities.

PROCEDURE:

Physical Examinations (Health Appraisal)

1. Inmate shall be brought to the Unit by a Correctional Officer assigned by security when called by Medical personnel.

2. All Medical histories and physicals shall be completed by qualified Medical personnel and recorded on Admission Data and Medical History and Physical Assessment forms (attached).

3. The History and Physical shall include at a minimum:

   a. Review of Receiving Screening;

   b. Collection of additional data to complete the medical, dental and psychiatric histories;

   c. Communicable disease testing, as appropriate, for venereal disease and tuberculosis;

   d. Recording of height, weight and vital signs;

   e. Physical examination of all systems;

   f. Completion of other clinically indicated tests and examinations;

| | |
|---|---|
| TITLE: | Physical Examinations |
| POLICY: | 12.4  page 2 of 2 |
| CHAPTER: | Medical and Health Care Service |

      g.   Review of all laboratory tests requested by the physician and referral to the physician when clinically indicated;

      h.   Initiation of appropriate treatment when indicated or ordered by the physician.

4.   All inmates shall receive annual physical examinations, appropriate for their age group.

5.   Identified chronic health problems (diabetes, epilepsy, etc.) shall have a specialized treatment initiated by the physician, in concert with the inmate's private physician.

6.   Information on current or chronic health treatments shall be requested from attending physicians or hospital facilities, and become part of inmates medical file.

7.   Medical charts of inmates previously incarcerated at this Prison shall be merged with new chart.

8.   Any inmate incarcerated 90 days or less prior to present incarceration need not have a complete physical examination done.

      a.   Inmate shall be interviewed for any change in physical history;

      b.   Physical examination shall be done as indicated by clinical findings.

9.   A blood test shall be taken from all inmates, regardless of prior dates of incarceration, for performance of VDRL (Venereal Disease Screening). The sample shall be obtained and handled in accordance with applicable state statutes.

APPROVED _____    1-19-95
      Anthony Petrucci - Prison Board Chairman    Date

APPROVED _____    1-19-95
      Dominick L. DeRose - Warden    Date

**Dauphin DFS 317**

| | |
|---|---|
| TITLE: | Mental Health Care Program |
| POLICY: | 12.5   page 1 of 3 |
| CHAPTER: | Medical and Health Care Service |
| REFERENCE: | |
| ACA: | 3-4336, 3-4337, 3-4367, 3-4368, 3-4369<br>3-ALDF-4E-37 & 38 |
| PURDONS STATUE 61: 95.232 | |



**POLICY:**   All inmates shall be provided, through the Treatment Services Section, access to a mental health program, increasing their probability of functioning within normal limits of socially acceptable behavior.   The mental health program shall be designed to examine, diagnose and provide access to treatment for all inmate clients who have significant mental illness.   At a minimum, the mental health program shall include:

A.   <u>Screening Services</u> - Screening shall be provided by qualified mental health professionals who shall be fully licensed in their prospective disciplines;

B.   <u>Mental Health Transfers</u> - Any inmate whose condition is beyond the range of services available in this Prison may be transferred to a non-correctional facility or a specially designed correctional unit located in the mental hospital;

C.   <u>Program Changes</u> - Except for emergencies, all program changes regarding inmates identified as mentally ill or retarded shall be made by the Treatment Services Section in consultation with the Provider.

**PROCEDURE:**

A.   <u>Screening Services</u>

1.   Receiving Screening completed on all inmates at the time of commitment shall identify:

a.   Prior mental health and substance abuse problems;

b.   Prior treatment received;

c.   Prescribed medications;

d.   Suicidal tendencies;

e.   Violent or disruptive behavior.

| | |
|---|---|
| TITLE: | Mental Health Care Program |
| POLICY: | 12.5  page 3 of 3 |
| CHAPTER: | Medical and Health Care Service |

C.  <u>Housing</u>

    1.  All inmates suspected of having Mental Health problems shall be housed in an area as determined by Classification.

    2.  Housing changes shall be at the discretion of Classification with input from the Medical unit.

D.  <u>Program Changes</u>

    1.  Except in emergencies, all program changes shall be made only by the Medical staff and Treatment.

    2.  Emergency release of an inmate to a mental health facility shall include:

        a.  Filing and signing of a temporary release by the designated responsible party;

        b.  Retention of such release in the inmates legal file located in the records office;

        c.  Notification of the committing authority.

APPROVED *[signature]* Anthony Petrucci        1-19-95
        Anthony Petrucci - Prison Board Chairman    Date

APPROVED *[signature]*        1-19-95
        Dominick L. DeRose - Warden    Date

Dauphin DFS 320

| | |
|---|---|
| **TITLE:** | Mental Health Care Program |
| **POLICY:** | 12.5  page 2 of 3 |
| **CHAPTER:** | Medical and Health Care Service |

2.   The Provider shall be responsible for the provision of a qualified forensic team including;

   a.   Part-time Board Certified psychiatrist;

   b.   Part-time psychologist;

   c.   Nursing personnel trained in mental health assessment.

3.   Services provided shall include but not limited to:

   a.   Evaluation by the psychiatrist;

   b.   Ordering of medication;

   c.   Individual counseling;

   d.   Group counseling;

   e.   Referral to local mental health facilities;

   f.   Contacting of previous providers to confirm treatment programs for continuity of services and treatment.

   g.   Utilization of existing community services for special problems (ie. Mental retardation, etc.)

4.   Therapists shall be available approximately 40 hrs/wk, to provide the above listed services.

**B.   Mental Health Transfers**

1.   Inmates diagnosed as being severely disturbed and/or mentally retarded (ie. a danger to himself or others, or incapable of attending to basic physiological needs) shall be referred to an appropriate non-correctional facility.

   a.   Transfer of inmates shall follow the procedures outlined by Sections 302 and/or 304 of the Mental Health Act.

   b.   Until transfer can be secured such inmates shall be housed in an area s determined by Classification.

 **DAUPHIN COUNTY PRISON**

Local Policy Chapter 9.22

| Subject: | Security |
|----------|----------|
| Reference: | Title 37 Chapter 95 Section 95.241(2.1) |

**POLICY:**

It shall be the policy of Dauphin County Prison to have in place various procedures and policies regarding the Use of Force and the documentation of any incident.

**PENOLOGICAL INTEREST:**

It is in the penological interest of Dauphin County Prison to have in place various procedures to ensure the lawful Use of Force when dealing with individuals exhibiting aberrant behavior.

**PROCEDURE:**

All staff shall be trained annually in the Use of Force (Policy 9.17 Use of Force). Special Teams shall be trained not only annually but during any additional training that they attend.

The facility trainers shall be responsible for the proper securing and inventorying of all weapons and less-lethal devices. A monthly inventory will be completed by the facility trainers. When security equipment is issued, it shall be logged by those responsible for the supervision of equipment issue, and logged back in upon return.

Any "hands on" or Use of Force against any inmate shall be reported immediately to the on-duty Shift Commander who shall ensure the inmate is seen immediately by a medical professional and have the incident documented.

There shall be no lethal weapons permitted within the secure perimeter of the facility except in the case of an emergency. Appropriate weapons lockers shall be located in the North Vehicle Entry for those agencies transporting inmates and in the facility's Main Lobby for those visiting staff or inmates.

All Use of Force incidents shall be documented and forwarded to the Administration for review and reporting to the District Attorney's Office as well as the Pennsylvania Department of Corrections.

Warden Brian S. Clark

**EXHIBIT**
PENGAD 800-631-6989
DCP-2
4-19-22 N O

*RESTRICTED CORRECTIONAL DATA*
*This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency. Data subject to this restriction is contained throughout this publication.*

September 19, 2017

DAUPHIN DFS 227



**POLICY 9.17**

**DAUPHIN COUNTY PRISON**

Page 1 of 5

| TITLE: | Use of Force |
|---|---|
| **CHAPTER 9:** | Security and Control |
| **REFERENCE:** | PPCT Defensive Tactics Instructor Manual |

POLICY:

To ensure that staff use the appropriate level of force in the performance of their duties, employees will be provided with proper training and guidance on the permissible use of force. Force, including the use of restraints, shall only be used when necessary and only to the degree required to control an individual, facilitate Court-ordered medical treatment, restore order to a disruptive group of individuals, enforce the rules and regulations of the facility, in self-defense and the defense of others, prevent damage to property, prevent an escape, or recapture an escapee. Only the minimum amount of force necessary to resolve a situation shall be employed. The use of force and restraints shall never be used as a means of punishment or revenge.

PENOLOGICAL INTEREST:

It is in the penological interest of Dauphin County Prison to maintain a high degree of efficiency, security and management control in this facility and provide reasonable force options when an inmate exhibits resistance, attempts an escape, is non-compliant to lawful instructions, or threatens or uses force.

PROCEDURE:

1.  Trained Security staff shall be authorized and shall use appropriate force as defined in this policy and only as much as is reasonable and necessary under the circumstances.

2.  Force and restraint equipment are intended to be used only as control measures when absolutely necessary; they are not intended, and shall never be used, as a means of punishment.

3.  The facility follows the concept of responding to resistance with proportional, reasonable use of force. This approach advocates that an officer can use one level of force higher than the level of resistance used by the subject. The only time an officer can reasonably escalate to the next level of force is when the officer finds lower levels of force ineffective, or the officer reasonably believes that a lower form of force will be ineffective. Officers do not need to escalate response controls in a step-by-step progression. As a subject de-escalates their actions, the officer must reduce the amount of force used proportionally.

4.  The following steps shall be utilized to gain or maintain control of a subject, unless the acting staff member reasonably believes that the situation requires immediate escalation to a greater degree of force within the use of force continuum or finds lower levels of force ineffective.

*RESTRICTED CORRECTIONAL DATA*
*This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency.*
*Data subject to this restriction is contained throughout this publication.*

DAUPHIN DFS 228



**POLICY 9.17**

**DAUPHIN COUNTY PRISON**

Page **2** of **5**

| TITLE: | Use of Force |
|---|---|
| **CHAPTER 9:** | Security and Control |
| **REFERENCE:** | PPCT Defensive Tactics Instructor Manual |

    a.  Officer Presence.
    b.  Verbal Direction.
    c.  Soft Empty Hand Techniques.
    d.  Hard Empty Hand Techniques.
    e.  Intermediate Weapons.
    f.  Deadly Force.

5. The following are the escalating levels of resistance by a subject.

    a.  Psychological Intimidation.
    b.  Verbal Noncompliance.
    c.  Passive Resistance.
    d.  Defensive Resistance.
    e.  Active Aggression.
    f.  Deadly Force Assault.

6. After physical force or oleoresin capsicum products have been used against a subject, the subject must be examined by medical personnel as soon as possible. Immediate medical attention will be provided to the subject if the subject received any injuries.

7. The Shift Commander or Acting Shift Commander shall be notified immediately when physical force is used. The officer/s who used physical force shall submit a written report to the Shift Commander no later than the conclusion of the officer's shift and shall include:

    a.  Date, time and location of the incident.
    b.  An accounting of events leading to the use of force.
    c.  An accurate and precise description of the incident along with the amount of force used and the justification for using that amount of force.
    d.  A description of any weapon/s involved and the manner of its use.
    e.  Any medical attention received.
    f.  A list of all participants and witnesses to the incident.

DEFINITIONS: Officers' Levels of Control.

1. *Officer Presence* – Identification of the officer's authority either by identification of the uniform or verbal indication. The officer's mere presence dictates the authority of the facility's rules and regulations and should initiate compliance.

*RESTRICTED CORRECTIONAL DATA*
*This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency.*
*Data subject to this restriction is contained throughout this publication.*

DAUPHIN DFS 229



**DAUPHIN COUNTY PRISON**

| TITLE: | Use of Force |
|---|---|
| **CHAPTER 9:** | Security and Control |
| **REFERENCE:** | PPCT Defensive Tactics Instructor Manual |

2. *Verbal Direction* – A clear, understandable, reasonable, and lawful command of direction or compliance.

3. *Soft Empty Hand Techniques* – Techniques which may cause pain but virtually no potential for injury. They include, but are not limited to, oleoresin capsicum products, strength techniques, joint locks, pressure points or a knee strike to the subject's common peroneal. These techniques are designed to control Passive or Defensive Resistance and are used when verbal directions are not effective and there is non-compliance with lawful orders.

    a. *Oleoresin Capsicum Products* – A nonlethal aerosol spray, foam, or gel made with the pepper derivative oleoresin capsicum designed to spray directly into a subject's face; used to inflame the skin and mucous membranes.

4. *Hard Empty Hand Techniques* – Techniques that have the potential for injury in the form of bruises, contusions or lacerations. They include, but are not limited to, defensive counter strikes (straight punch, palm heel strike, front thrust and angle kick, brachial stun, etc.) and the Shoulder Pin Restraint. These techniques are designed to control Active Aggression but can also be used to control Defensive Resistance.

5. *Intermediate Weapons* – The amount of force when utilized has the high propensity for extreme pain and possibility of injury. The application/use of any weapon or object that is not part of the human body to control resistance or an assault. Examples include any form of chemical agent (i.e., PepperBalls), impact weapons or emergency/improvised impact weapons (e.g., keys, radio, broom/mop handle, flashlight, handcuffs, or any object that could be used as a weapon in defense of oneself or another). The use of an intermediate weapon is justified when lower forms of empty hand control have failed or when the officer believes that empty hand control will be insufficient and the use of deadly force is not justified. Intermediate Weapons are used only with the intent to temporarily disable a subject and never with the intent to cause permanent injury.

6. *Deadly Force* – Any force used by an officer that may result in serious bodily injury or the loss of human life. In this definition, "may" means "likely to," and not just a mere possibility.

    a. This ultimate step is appropriate only to protect oneself or another from death or serious bodily injury, or as a last resort in preventing an escape. Use of force to protect oneself or another from death or serious bodily injury may also include emergency/improvised impact weapons in circumstances of necessity. Such emergency/improvised weapons include, but are not limited to, keys, radio, broom/mop handle, flashlight, handcuffs, or any object that could be used as a

*RESTRICTED CORRECTIONAL DATA*
*This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency.*
*Data subject to this restriction is contained throughout this publication.*

DAUPHIN DFS 230



**POLICY 9.17**

**DAUPHIN COUNTY PRISON**

Page 4 of 5

| TITLE: | Use of Force |
|---|---|
| **CHAPTER 9:** | Security and Control |
| **REFERENCE:** | PPCT Defensive Tactics Instructor Manual |

weapon in defense of oneself or another. Firearms shall be considered the final deployment of force to be used when all other means or levels of force have failed.

b. Firearms shall be used only in situations where there is a danger of death or serious bodily injury. Firearms shall not be discharged if other measures will suffice. In other words, deadly force should only be used as a last resort. If there are reasonable alternatives that can be employed short of using deadly force, these alternatives must be exhausted before deadly force can be used. In addition, the fact that an officer is legally justified in using deadly force in certain extreme circumstances does not permit the officer to engage in reckless conduct that endangers innocent persons. Displaying and discharge of firearms should be held to the minimum needed to fulfill the responsibilities of the facility and to protect the safety of the officers. Time permitting, a clear oral warning or order shall be given before shots are fired. In the event shots are fired at an individual, the shots will be aimed at center mass.

c. An officer may use deadly force under the following circumstances:

    i. At an inmate or other person carrying a weapon or attempting to obtain a weapon by force encountered in the officer's official duties, if the officer reasonably believes that the inmate or person intends to cause death or serious bodily injury to the officer or another person.

    ii. At an inmate or other person encountered in the officer's official duties, whom the officer(s) has seen kill or seriously injure any person and who refuses to halt and surrender when ordered.

    iii. At an escaping inmate as a last resort if the escape is actually in progress, if the inmate has freed him/herself of all barriers and there are no other effective means of preventing the escape. Under no circumstances shall deadly force be used unless it is clear that a lesser means of force would not prevent the escape and there is no likelihood of injury to innocent persons by the use of that force.

    iv. At an inmate or other person encountered in the officer's official duties if there is no other way to prevent serious bodily injury or death to the officer or another person.

    v. To stop or break up a riot when the situation has escalated to an actual threat of death or serious bodily injury to other inmates, staff, officers, or other persons.

*RESTRICTED CORRECTIONAL DATA*
*This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency.*
*Data subject to this restriction is contained throughout this publication.*

DAUPHIN DFS 231



**DAUPHIN COUNTY PRISON**

**POLICY 9.17**

Page 5 of 5

| TITLE: | Use of Force |
|---|---|
| CHAPTER 9: | Security and Control |
| REFERENCE: | PPCT Defensive Tactics Instructor Manual |

DEFINITIONS: Subjects' Levels of Resistance.

1. *Psychological Intimidation* – Nonverbal cues indicating a subject's attitude, appearance, and physical readiness (e.g., blank stare, clenching of fist/s, tightening of jaw muscles, etc.) The subject may comply with verbal commands but displays visual nonverbal cues that indicate potential physical resistance.

2. *Verbal Noncompliance* – Any verbal response indicating the subject's unwillingness to obey an order or command.

3. *Passive Resistance* – Any type of resistance where the subject does not attempt to defeat the officer's attempt to control them, but will not voluntarily comply with verbal and physical attempts of control (e.g., dead-weight resistance, does not react to verbal commands, etc.).

4. *Defensive Resistance* – Any action by a subject that attempts to prevent an officer from gaining control (e.g., pulling or pushing away).  It is not an attack rather a physical act to prevent control.

5. *Active Aggression* – Actions or assaults with less than deadly force (e.g., advancing, challenging, punching, kicking, grabbing, wrestling, etc.) but with the intent to harm the officer.

6. *Deadly Force Assault* – Any force used that may result in great serious bodily injury or loss of life.  This act does not require the use of a weapon by the subject.

Presented By: _____  Date: 14 May 2014
Warden Dominick L. DeRose

Approved By: _____  Date: 14 May 2014
Commissioner Jeffrey T. Haste, Prison Board Chair

*RESTRICTED CORRECTIONAL DATA*
*This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency.*
*Data subject to this restriction is contained throughout this publication.*

 **DAUPHIN COUNTY PRISON**

**Local Policy 9.17.T**

Page 1 of 3

| Title: | Use of Force |
|---|---|
| Chapter 9: | Security and Control |
| Subject: | Use of Force Training |
| Reference: | Title 37 Chapter 95 Section 95.220a |

**POLICY:**

Force, including the use of restraints, shall only be used when necessary and only to the degree required to control an individual, facilitate Court-ordered medical treatment, restore order to a disruptive group of individuals, enforce the rules and regulations of the facility, in self-defense and the defense of others, prevent damage to property, prevent an escape, or recapture an escapee. Only the minimum amount of force necessary to resolve a situation shall be employed. The use of force and restraints shall never be used as a means of punishment or revenge.

**PENOLOGICAL INTEREST:**

It is in the penological interest of Dauphin County Prison to have Training and Policies that are clear and easily understood.

**PROCEDURE:**

Use of Force Breakdown:

1. **No more force than necessary**- Force cannot be gratuitous or excessive.

2. **Levels of force:**

    a. **Officer presence**- identify authority by uniform or words

    b. **Verbal order**- must be a clear, reasonable, understandable and lawful command to comply

    c. **Soft empty hand**- if verbal commands are ineffective
        i. May cause pain but virtually no potential to injure

    d. **Hard empty hand**- can be used to control active aggression or defensive resistance
        i. May cause cuts or bruises

    e. **Intermediate weapons**- can be used when empty hand techniques fail or officer reasonably believes would be insufficient
        i. Highly likely to cause pain or injury

    f. **Deadly force**- to protect self or others from death or serious injury
        i. Likely to cause serious injury or loss of life

_RESTRICTED CORRECTIONAL DATA_
_This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency. Data subject to this restriction is contained throughout this publication._

DAUPHIN DFS 233

 **DAUPHIN COUNTY PRISON**

**Local Policy 9.17.T**

Page 2 of 3

| Title: | Use of Force |
|---|---|
| Chapter 9: | Security and Control |
| Subject: | Use of Force Training |
| Reference: | Title 37 Chapter 95 Section 95.220a |

3. **Levels of resistance:**

   a. Psychological intimidation
   b. Verbal disobedience/noncompliance
   c. Passive resistance
   d. Defensive resistance
   e. Active aggression
   f. Deadly force assault

4. **Can use one level of force higher than resistance of inmate-** It may be necessary to use more force than the inmate is using. An officer may use more force only if the force seems reasonably necessary under the circumstances. If an inmate reduces the level of force, the officer should too.

5. **Steps after force used**

   a. Medical exam of officer and inmate as soon as possible if physical force or pepper spray is used

   b. Immediately notify Shift Commander or Acting Shift Commander

   c. Written report to Shift Commander before end of shift

**The law:**

There are three constitutional amendments that apply to the use of force in prisons, depending on the subject of the force. The Fourth Amendment protects persons in the prison other than inmates, such as visitors, from excessive force. The Fourteenth Amendment protects inmates who have not been yet convicted, but are awaiting trial (pretrial detainees). The Eighth Amendment protects convicted prisoners.

**Persons other than inmates:**

Under the Fourth Amendment, the Supreme Court has held that persons have the right to be free from excessive force. In *Graham v. Connor*, 490 U.S. 386 (1989), the Supreme Court held that an officer can use only that much force as is necessary under all of the circumstances. Dauphin County Prison's policy teaches the *Graham* standard by prohibiting correctional officers from using more force than is necessary under the circumstances. Under the *Graham* standard, a

*RESTRICTED CORRECTIONAL DATA*
*This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency. Data subject to this restriction is contained throughout this publication.*

DAUPHIN DFS 234



**DAUPHIN COUNTY PRISON**

**Local Policy 9.17.T**

Page 3 of 3

| Title: | Use of Force |
|---|---|
| Chapter 9: | Security and Control |
| Subject: | Use of Force Training |
| Reference: | Title 37 Chapter 95 Section 95.220a |

variety of factors can help determine whether force used is appropriate, such as: the person's history of violence or lack thereof, any prior attempts to gain compliance with words or less force, the level of threat posed to the correctional officer or others, and the level of force used by the person.

**Pretrial detainees:**

In *Kingsley v. Hendrickson*, 2015 WL 2473447, at *6 (U.S. June 22, 2015), the Supreme Court recently announced that the *Graham* standard applies to pretrial detainees under the Fourteenth Amendment. Previously, courts had applied a higher standard in pretrial detainee excessive force cases, requiring the inmate to show that 1) the force was excessive, <u>and</u> 2) that the correctional officer acted with intent to harm the inmate or lack of care for the inmate. Now, as in the Fourth Amendment context, an inmate only has to prove that the force was excessive. Practically speaking, the Dauphin County Prison's use of force policy already taught the *Graham* standard for the use of force with all inmates, so if a correctional officer follows the policy, then he or she will follow the *Kingsley* standard as well.

**Convicted prisoners:**

The Eighth Amendment applies to convicted prisoners, which prohibits "cruel and unusual punishment." Under the Eighth Amendment, the Supreme Court still requires an inmate in a lawsuit to show that 1) the force was excessive, <u>and</u> 2) that the correctional officer acted with intent to harm the inmate or lack of care for the inmate. As mentioned above, the Supreme Court recently held that the *Graham* standard applies to pretrial detainees in *Kingsley*. In the *Kingsley* case, the Supreme Court mentioned that it may in the future apply the *Graham* standard to convicted prisoners as well. Regardless, the Dauphin County Prison's use of force policy already teaches the *Graham* standard. The critical question under *Graham* and the Dauphin County Prison policy is whether the correctional officer uses the minimal amount of force necessary under the circumstances. If the answer is yes, then the correctional officer has followed policy and the law.

_____

Warden Dominick L. DeRose

July 2015

**RESTRICTED CORRECTIONAL DATA**
*This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency. Data subject to this restriction is contained throughout this publication.*

DAUPHIN DFS 235

# DAUPHIN COUNTY PRISON

**Procedure Name:**   **Methods of Restraint**

**Purpose:**   The purpose of this policy is to ensure that, when needed, every inmate is retrained in an appropriate manner that will ensure the safety of the institution, staff and inmate. This policy is to insure the safe, secure and consistent handling of those inmates that are a suicide risk or have idealized some form of suicide tendency.

**Scope:**   Certain incarcerated individuals will from time to time act out making it necessary to restrain these individuals for their protection, the protection of the institution, staff and other inmates.

**Policy:**   Restraining methods shall be divided into two different restraint methods. Each restraint method will be explained throughout this policy. Certain characteristics unique to incarcerated individuals make them more susceptible to suicidal attempts. Therefore, if an inmate exhibits any sign of possible suicide, or verbalizes suicide intent in words, deed or action, the Shift Commander, in conjunction with medical personnel, shall take appropriate steps to stabilize the individual as follows:

    A.    Restraint Chair

    B.    Four Point Restraint

**Action:**

When an inmate's behavior becomes aberrant to a point where they are uncontrollable or there is documented evidence of self-mutilation, and all other avenues of help and/or control have proven ineffective, the use of the "Restraint Chair", Four Points Restraint Procedure, or other restraint devices may be utilized only under the authorization of the Warden, Deputy Warden or Major.

When the situation warrants such action, and authorization has been obtained, the following guidelines MUST BE ADHERED TO:

**Cell: - Restraint Chair**

The cell must be cleared of everything that is not permanently attached.

    A.    The inmate will be dressed in, at minimum, a Dauphin County Prison uniform.

    B.    The inmate will be provided with one (1) roll of toilet tissue



DAUPHIN DES 236

    C.    The Cell is to be searched and all contraband, and/or potential weapons removed from the cell.

**Cell: - Four Point Restraint:**

    A.    The inmate will be dressed in, at minimum, a Dauphin County Prison uniform.

    B.    The inmate will be provided with one (1) roll of toilet tissue

    C.    A Mobile bunk (bed springs) to be placed on the floor.

    D.    A Mattress (only with mobile bunk) will be provided.

    E.    The Cell is to be searched and all contraband, and/or potential weapons removed from the cell.

**Inmates:**

Any inmate who warrants such action shall be restrained as follows:

    A.    Restraint Chair (to be used primarily):

        1.    Strip-searched and then furnished with, at minimum, a uniform.

        2.    Placed in Restraint Chair

        3.    Hands shall be cuffed either in front, in back, or at each side depending on demeanor of inmate.

        4.    With hands cuffed in back or at sides, the shoulder straps shall be placed over shoulder, across chest, and attached at opposite sides.

        5.    With hands cuffed in front, the shoulder straps shall be placed over shoulder, across chest, over arm, and attached at opposite sides.

        6.    Lap belts to go across waist and attached to opposite side.

        7.    Legs shall be secured with strap across ankle area.

            **NOTE:** If necessary, leg irons may be used in conjunction with leg straps. When using one set of leg irons, legs are to be secured together. When using two sets, each leg is to be secured to the same side of the chair near bottom/side area.

        8.    Once the chair has been positioned, the roller device is to be retracted and the chair is to be flat on the floor.

DAUPHIN DES 237

B.   Four Point Restraint (to be used secondarily due to special needs):

    1.   Strip-searched, and furnished with, at minimum, a uniform.

    2.   Placed face down (belly down) on the mattress at all times when secured.

    3.   The arms are to be secured with the nylon webbing cuffs -- one around the wrist and one around the elbow.  the wrist is to be placed along side the inmate's body, down near the waist.

    4.   The legs are to be secured with the nylon webbing cuffs, one nylon webbing cuff around each ankle, and the ankle cuffs are to be secured to the bunk.

    5.   The body is to be secured to the bunk with the three (3) nylon webbing straps provided.  One at the shoulder area.  One at the buttocks area.  The last over the calf of the legs.

**Helmet:**

When an inmates actions warrant (i.e. banging head on floor, wall, back of chair, etc.) a helmet is to be placed on the head and strapped under the chin.

**Watch:**

Inmate is to be on a constant watch (one-on-one) by assigned officer when placed in the restraint chair or four point restraints (see one-on-one policy).

**Release Procedure:**

Inmate is to be <u>TOTALLY RELEASED</u> every two (2) hours for fifteen (15) minutes.  When released, the inmate shall be allowed to walk around, void (if necessary), get a drink of water, or eat (if meal time).

> **NOTE**: Inmate is NOT to leave the immediate area of the cell.  Release time is to be logged and type of activity noted.  Inmate's behavior will determine the number of officers needed to be present when inmate is released.

**Visits / Phone:**

Inmate is NOT eligible for visits nor allowed use of the phone.

**Possessions:**

Inmate may possess nothing.

3

DAUPHIN DFS 238

<u>Showers:</u>

Inmate may shower only if behavior is acceptable and approval is obtained from Warden, Deputy Warden, or Major. Showers will be scheduled twice a week.

<u>Meals:</u>

Inmate is to be served <u>FINGER FOOD ONLY - NO UTENSILS OF ANY TYPE.</u>

<u>Medical:</u>

Medical is to be notified immediately that an inmate is being secured by either the restraint chair or the four point restraint. Medical at that time will examine the inmate (in the cell) and log it. After the initial examination, medical will be notified each time the inmate is released from the restraints, and the inmate must be re-examined once every two (2) hours. Each time medical visits the inmate, it is to be logged.

<u>Officer:</u>

All officers assigned to watch the inmate are to be knowledgeable of this directive.

When an inmate is placed in the restraint chair or four point restraint, an officer is to be assigned to watch this inmate per one-on-one watch policy.

A.   Checks are to be constant and logged, at minimum, EVERY fifteen (15) minutes.

B.   The staff shall TOTALLY release the inmate at the start of the shift and every two (2) hours thereafter. Medical is to be notified each time the inmate is released and notification is to be logged.

C.   Inmate is to be released for a total of fifteen (15) minutes and logged. At NO time is the inmate to be left alone. The officer must be present at all times.

D.   Each officer, at the start of the shift, is to shake-down the cell for any contraband, log it, and report any findings to the Shift Commander immediately.

E.   Inmate's cell door is to remain OPEN at all times when the inmate is in the restraint chair or is in four point restraints, unless otherwise directed by the Warden, Deputy Warden, or Major.

F.   The inmate must be watched by the officer assigned at all times.

G.   The inmate is NOT to have any contact with any other inmates at any time.

4

DAUPHIN DFS 239

**Supervisors:**

The Shift Commander is to notify the kitchen that an inmate has been placed in the restraint chair or four point restraints, and that finger foods will be needed.

**Treatment:**

The Treatment Department in conjunction with the Medical Department will evaluate the inmate placed in the restraint chair or four point restraint for suicidal behavior, on at minimum, a daily basis and determine if additional action is needed.

### Description of Restraint Methods (see attached):

A.   When an inmate is placed in four point restraints, he/she must be secured face down (belly down) on the mattress at all times when in restraints.  At no time shall the inmate be secured on his/her back or side.

B.   Individuals whose behavior has warranted them being placed in restraints are to be considered dangerous, and all caution shall be used when placing them in the restraints and when releasing them from restraints.

C.   The sign-off sheet must be used every time an inmate is placed in restraints.  All staff watching the inmates must sign off indicating that they have read and understood the policy, and all Shift Commanders and Assistant Shift Commanders must sign off indicating the name of the inmate, who authorized placement, and who (Captain/Lieutenant) actually placed the inmate in restraints.

**RESTRAINT CHAIR** (Primary Use)

When it becomes necessary to utilize the restraint chair, the inmate shall be secured as shown in the picture on page 7.  When handcuffing in front or on side, the rear pad may be left in place. When handcuffing in the rear, the rear pad must be removed.

The straps are to be placed as the numbers below indicate.

A.   Shoulder Straps (left and right).

B.   Waist Strap

C.   Leg Strap

5

DAUPHIN DFS 240

**FOUR POINT RESTRAINT** (Secondary Use):

When it becomes necessary to use the nylon webbing restraint on an inmate, you will secure the inmate as shown in the pictures below. It may be necessary to make adjustments to the nylon webbing depending on the inmates' heights and weight. These adjustments will be easily made by loosening the nylon webbing from the bunk and repositioning them.

The nylon cuffs and straps are to be placed as the numbers below indicate:

| | |
|---|---|
| A and B. | Placed around the upper arm area. |
| C and D. | Placed around the wrists. |
| E and F. | Placed around the ankles. |
| G. | Placed around the shoulder area going UNDER the arms and up over the back. |
| H. | Placed around the buttocks area. |
| I. | Placed over the calf of the inmate. |

PROCEDURE:

1.  Where signs of a possible suicide are exhibited by an inmate, including verbalization of an intent to commit suicide, behavior that jeopardizes the safety of the inmate, or behavior that jeopardizes the safety of an-other person when combined with a factor(s) suggesting a possible suicide, the following shall be notified:

    A.  Shift Commander shall be notified to assess the situation.

    B.  Medical personnel shall be notified by the Shift Commander to review the situation and the individual inmate involved.

    C.  Medical personnel shall determine the stability and well being of inmate.

    D.  Medical to immediately determine whether the inmate is at risk.

    E.  Medical, in conjunction with security and the Treatment Department, shall determine the appropriate means of classification.

    F.  Medical personnel shall notify the psychiatrist of the situation and take appropriate action as ordered. The psychologist will be notified if the

6

DAUPHIN DFS 241

psychiatrist is not available and will consult with the psychiatrist or on-call physician as soon as possible.

2.  After notification, the following steps shall be followed to protect the inmate from self inflicted injuries and to protect others from any aberrant behavior associated with the inmate who is potentially suicidal.

A   Remove, relocate and re-class inmate

1).  New housing area shall be searched and all items not secured will be removed.

2).  Inmate shall be stripped searched and all clothing removed.

a).  Inmate will be furnished with, at minimum from Shakedown, a fresh uniform and/or paper garment.

b).  Housing area to be furnished with, at minimum, a mattress and blanket. And,

B   Inmate to be placed on a 15 minute watch. Or,

C   Inmate to be placed on a one (1) on one (1) watch. And/or,

D   Inmate to be placed in restraints

1).  Handcuffs/side cuffs

2).  Handcuffs/side cuffs with leg-irons

3).  Four (4) point restraints

E   The psychiatrist shall review the status of such inmates at least every 24 hours and shall determine when such status shall be changed.  Other medical personnel may be used by the psychiatrist as appropriate to fulfill this responsibility.

F   The danger level associated with the inmate in question shall determine what action level to be taken.

1)  After review of the situation/circumstance, action taken shall be compatible with neutralizing the aberrant behavior and providing a safe, secure environment, using the minimum restraints necessary under the circumstances.

7

DAUPHIN DFS 242

D)   Once an inmate has exhibited such aberrant behavior that restraints are necessary, the inmate shall be examined immediately after being secured to ensure that the inmate is not in medical danger and shall be re-examined at minimum every two (2) hours until released - as approved by the National Commission for Correctional Health Care.

    1)   Once it is determined by medical that the inmate has stabilized, then, after consultation with security and treatment, the restraints shall be removed.

    2)   It is the intent of this facility that all steps be taken to insure the safe secure housing of the inmate population.  At no times are restraints to be used as punishment.

E)   It is the intent of this policy to use same sex correctional officers to strip search inmates.  In the event of problems, or security concerns, the listed guidelines shall be followed:

    1)   If the situation warrants additional staff and opposite sex staff respond, they shall position themselves out of direct view of the inmate but close enough to respond.

    2)   Only in extreme cases, when all other methods have failed, shall opposite sex staff be present during a strip search.

8

DAUPHIN DFS 243