IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
– – –

| | |
|---|---|
| CARMEN RILEY, Administrator: | CIVIL ACTION |
| of the Estate for Tyrique : | NO. 4:20-CV-00325 |
| Riley, et al. : | |
| : | |
| Plaintiffs, : | |
| : | |
| V. : | |
| : | |
| BRIAN CLARK, Warden of : | |
| Dauphin County Prison, et : | |
| al. : | |
| Defendants. : | |

– – –

Thursday, July 7, 2022

– – –

Oral deposition of GARRETT ROSAS, PSYD,

taken via Zoom Video Communications on the

above date, beginning at approximately 1:30

p.m., before Maria Rousakis, Professional

Court Reporter and Notary Public.

– – –

DiPIERO COURT REPORTING
Registered Professional Reporters
1175 Marlkress Road – Unit 2460
Cherry Hill, New Jersey  08034
(215) 735-8101

Page 2

APPEARANCES:

MINCEY FITZPATRICK ROSS, LLC
BY:  KEVIN V. MINCEY, ESQUIRE
       RILEY H. ROSS, ESQUIRE
  One Liberty Place
  1650 Market Street
  Suite 3600
  Philadelphia, Pennsylvania  19103

Counsel for Plaintiffs

MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN
BY:  JOHN R. NINOSKY, ESQUIRE
  100 Corporate Center Drive
  Suite 201
  Camp Hill, Pennsylvania  17011

Counsel for Defendant,
Prime Care and Ms. Betancourt

LAVERY LAW
BY:  FRANK LAVERY, ESQUIRE
  225 Market Street
  P.O. Box 1245
  Harrisburg, Pennsylvania  17108

Counsel for Defendant,
Lt. Greg Mendenhall

MARSHALL DENNEHEY
BY: ALISSA CARDENAS HARRISON, ESQUIRE
  100 Corporate Drive
  Suite 201
  Camp Hill, Pennsylvania  17011

Counsel for Defendant,
Angela Swanson

Page 3

APPEARANCES: (Cont'd.)


MacMAIN, CONNELL & LEINHAUSER

BY:  MATTHEW S. POLAHA, ESQUIRE

  433 West Market Street

  Suite 200

  West Chester, Pennsylvania  19382


Counsel for Susquehanna Defendants


- - -

Page 4

INDEX TO TESTIMONY

WITNESS                              PAGE

GARRETT ROSAS, PSYD

Examined By

  Mr. Mincey:              5

- - -

(No exhibits were marked at this time.)

- - -

Page 5

```
 1          (It was stipulated by and
 2     between counsel for the
 3     respective parties that reading,
 4     signing, sealing, certification
 5     and filing are not waived, and
 6     that all objections, except as to
 7     the form of the question, are
 8     reserved to the time of trial.)
 9          - - -
10          .... GARRETT ROSAS, PSYD,
11     having been first duly sworn as a
12     witness, was examined and
13     testified as follows ....
14          - - -
15          EXAMINATION
16          - - -
17 BY MR. MINCEY:
18 Q.  Good afternoon, Mr. Rosas.  My
19     name is Kevin Mincey.  I am an attorney
20     based in Philadelphia.  My partner,
21     Riley Ross, is also with us.  We
22     represent the Estate of Tyrique Riley
23     and his parents in a lawsuit that
24     involves Prime Care and a number of
25     other Defendants today.
```

GARRETT ROSAS, PSYD

Page 6

1      You are here for a deposition.
2  Have you ever been deposed before?
3  **A.  I don't believe so.  No, sir.**
4  Q.  Okay.  I'm going to give you some
5  ground rules, and I'm sure Mr. Ninosky
6  has already gone over them with you a
7  little bit, so if they're repetitive,
8  just bear with me.
9      This is a question and answer
10  session.  I am simply here trying to
11  gather information.  I want you to give
12  me your best recollection of whatever I
13  ask you about.  I don't want you to
14  guess, okay.  There will be times when I
15  ask you to approximate maybe a length
16  time or a distance, or something like
17  that.  Or if you're doing that in
18  answering the questions, I just want you
19  to let me know that.  Okay?
20  **A.  (The witness nods.)**
21  Q.  All your responses need to be
22  verbal, and, so, this is a perfect
23  example of what we just did.  I asked
24  you a question, and you nodded your
25  head.  In normal life, that would be

Page 7

1  fine.  I would understand everything
2  you're saying, but we have a court
3  reporter here who's transcribing the
4  entire event.
5      So, if you can give me all your
6  responses verbally, maybe a clear "yes"
7  or "no" if possible, but definitely no
8  "uh-uh" or "uh-huh" so that we can make
9  the record as clear as possible.  Okay?
10  **A.  Yes, sir.  Understood.**
11  Q.  And you don't have to call me, sir
12  but --
13  **A.  Habit.**
14      **(Laughter.)**
15  **BY MR. MINCEY:**
16  Q.  There's going to be times where
17  you're going to anticipate what I'm
18  about to say or ask you, and I can
19  probably do the same for you in your
20  answering.  But in order to get the
21  cleanest record, I'm going to ask you
22  not to do that.
23      Let me get my question out, and I,
24  in turn, will let you get your answer
25  out before I ask you the next question.

Page 8

1  To the best I can do that, I'll try to
2  do that.  Sometimes I forget where I am,
3  and I might jump in front of you.  But
4  I'll do my best not to do that.  Do you
5  understand that?
6  **A.  Yes, sir.**
7  Q.  Okay.  If you don't understand a
8  question that I ask you, let me know,
9  and I'll do my best to rephrase it.  If
10  you answer a question that I ask you,
11  I'm going to assume that you understood
12  the question.  Okay?
13  **A.  Yes.**
14  Q.  And this shouldn't be a real long
15  endeavor today, but to the extent you
16  need to take a break, go to the
17  restroom, talk to your lawyer, make a
18  phone call or whatever, let me know.  We
19  can accommodate you.
20      My only request is that if there's
21  been a question asked, before you ask to
22  take the break, that you answer the
23  question before we take a break.  Do you
24  understand?
25  **A.  Understood.**

Page 9

1  Q.  Okay.  Have you taken any
2  medication this morning that would
3  influence your ability to be able to
4  hear, understand and give truthful
5  answers to my questions?
6  **A.  No.**
7  Q.  You understand that the oath that
8  you just took a couple of minutes ago
9  was the same oath you might take in a
10  courtroom in front of a judge or a jury?
11  Do you understand that?
12  **A.  Yes.**
13  Q.  At this point in time, is there any
14  reason that you are not prepared to go
15  forward with your deposition?
16  **A.  No.**
17  Q.  Okay.  In advance or in preparation
18  for your deposition today, did you
19  review any documents?
20  **A.  Today, sir?**
21  Q.  Or any day in advance of your
22  deposition today, did you review any
23  documents to get ready?
24  **A.  Yes.**
25  Q.  What did you look at?

GARRETT ROSAS, PSYD

Page 10

1  A.  I looked at past progress notes
2  from the timeframe in question.
3  Q.  Okay.  I'm going to start with some
4  background stuff for you.  Can you give
5  me your full name?
6  A.  Garrett.  Middle name is Lee,
7  L-e-e.  Last name Rosas, R-o-s-a-s.
8  Q.  What's your date of birth, Mr.
9  Rosas?
10  A.  12/6, 1976.  December 6th of 1976.
11  Q.  And I'm assuming you graduated from
12  high school?
13  A.  Yes, sir.
14  Q.  And where was that?
15  A.  Eastmont High School, and that's
16  located in East Wenatchee, Washington.
17  Do you need the spelling of Wenatchee?
18  Q.  The court reporter might.
19  A.  W-e-n-a-t-c-h-e-e, in Washington.
20  Q.  What year was that?
21  A.  That was 1995.
22  Q.  And after you graduated from high
23  school, did you go to college?
24  A.  Yes, sir.
25  Q.  And what college did you go to?

Page 11

1  A.  Western Washington University.  And
2  that's located in Bellingham,
3  B-e-l-l-i-n-g-h-a-m, and that's also in
4  the state of Washington.
5  Q.  What year did you enroll in Western
6  Washington?
7  A.  1995 was the year of my enrollment.
8  Q.  And what year did you graduate?
9  A.  1999.
10  Q.  What kind of degree did you
11  graduate with?
12  A.  I received a Bachelor of Arts in
13  psychology.
14  Q.  Did you pursue any other education
15  after college?
16  A.  Yes, sir.
17  Q.  Where was that?
18  A.  I enrolled in a doctoral program
19  Wright State University, and that's
20  W-r-i-g-h-t.
21  Q.  When did you enroll in Wright
22  State?
23  A.  1999.  So I matriculated from my
24  undergraduate program into my graduate
25  program.

Page 12

1  Q.  And when did you graduate from
2  Wrights State?
3  A.  My formal graduation date was in
4  2004.
5  Q.  Okay.  And the degree you got from
6  Wright State was?
7  A.  A Doctor of Psychology.
8  Q.  Okay.  So, this whole time I've
9  been calling you "Mr.," I'm supposed to
10  be calling you "Dr.," right?
11  A.  That's quite all right.
12  Q.  All right, Dr. Rosas.  I got you
13  from here.
14       MR. MINCEY:  John, are you
15       going lodge the same objection
16       about the address and stuff?
17       MR. NINOSKY:  Yes.  If for
18       some reason I can't produce him,
19       I'll give you the last known
20       address at that time.
21       MR. MINCEY:  Great.
22  BY MR. MINCEY:
23  Q.  Dr. Rosas, does anybody live with
24  you?
25  A.  Yes, sir.

Page 13

1  Q.  Who lives with you?
2  A.  My spouse and my seven-year old
3  child.
4  Q.  And how long have you been
5  married?
6  A.  Oh.  That's a good question here.
7       MR. NINOSKY:  I might
8       instruct him not to answer if his
9       wife is going to say the
10       transcript.
11       (Laughter.)
12       THE DOCTOR:  Approximately
13       five years.  Can I say that?
14  BY MR. MINCEY:
15  Q.  Yeah.  That's close.
16  A.  Hold on a second.  May I correct
17  the record?
18  Q.  Go ahead.
19  A.  I have a seven-year-old, and, so,
20  she was pregnant when we got married,
21  so...
22  Q.  TMI.
23  A.  So, I think it's closer to six than
24  seven at this point.
25  Q.  Okay.  Have you ever been arrested

GARRETT ROSAS, PSYD

Page 14

1  before?
2  **A.  No, sir.**
3  Q.  Have you ever been involved in a
4  lawsuit before?
5  **A.  No, sir.**
6  Q.  What do you do for a living?
7  **A.  I am a licensed psychologist in the**
8  **Commonwealth of Pennsylvania.**
9  Q.  Do you work for yourself, or do you
10  work for some institute?
11  **A.  I am employed by Prime Care Medical**
12  **as a psychologist.**
13  Q.  How long have you worked for Prime
14  Care?
15  **A.  I began working with Prime Care in**
16  **2019.**
17  Q.  Did you work anywhere else as a
18  psychologist before you worked for Prime
19  Care?
20  **A.  Yes, sir.**
21  Q.  Where did you work?
22  **A.  In reverse order from the time**
23  **prior to Prime Care?**
24  Q.  Whichever is easier for you.
25  **A.  Prior to Prime Care, I worked at --**

Page 15

1  **the abbreviation IMA, but I do believe**
2  **it stood for Industrial Medical**
3  **Associates.  They're located in**
4  **Mechanicsburg, Pennsylvania, and I was**
5  **employed as a Psychologist Assessor.  I**
6  **forget what the formal title was.**
7  Q.  And when did you work there?
8  **A.  I worked there briefly.  2019 I**
9  **began and ended my terms of employment**
10  **with them.  I can't recall the exact**
11  **start date.**
12  Q.  Okay.  And before you worked at
13  IMA, where did you work?
14  **A.  I worked as a psychologist for a**
15  **group, a private practice, in Lancaster,**
16  **Pennsylvania.  The practice was**
17  **abbreviated ACTS, A-C-T-S, and it stood**
18  **for Advanced Counseling and Testing**
19  **Solutions.**
20  Q.  And how long did you work at ACTS?
21  **A.  I worked at ACTS approximately**
22  **six months.**
23  Q.  Okay.  And what year?
24  **A.  2018.**
25  Q.  Okay.  And what was your role at

Page 16

1  ACTS?
2  **A.  I was Clinical Director.**
3  Q.  And what were your duties when you
4  were a Clinical Director?
5  **A.  Administrative and clinical**
6  **oversight as well as direct therapeutic**
7  **care, direct service.**
8  Q.  I forgot to ask you about your
9  duties when you were a psychologist
10  assessor.
11  **A.  I did Social Security and**
12  **disability evaluations for the purposes**
13  **of compensation.**
14  Q.  Okay.  And before you worked at
15  ACTS, where did you work?
16  **A.  The Commonwealth of Pennsylvania.**
17  Q.  Okay.  And what did you do for the
18  Commonwealth?
19  **A.  I was a psychologist consultant.**
20  Q.  And when was that?
21  **A.  I'm going to approximate the dates**
22  **of tenure.  I worked there beginning in --**
23  **I worked there approximately seven years**
24  **prior to this, so 2011 to 2018.**
25  Q.  Okay.  And what were your duties as

Page 17

1  a psych consultant?
2  **A.  I was involved in regulatory and**
3  **policy development as well as**
4  **Commonwealth-wide programatic oversight**
5  **for the children's behavioral health**
6  **services Commonwealth-wide.  And that**
7  **included all Medicaid to publicly funded**
8  **behavioral health services for children**
9  **ages 18 to birth.**
10  Q.  And before you worked for the
11  Commonwealth of Pennsylvania, where did
12  you work?
13  **A.  I worked for a private practice,**
14  **Pennsylvania Counseling Services.**
15  Q.  Where is that?
16  **A.  They have a multiclinic location.**
17  **They're headquartered out of Lebanon,**
18  **Pennsylvania, but I predominantly worked**
19  **out of an Adams County location.  I**
20  **worked out of a variety of locations,**
21  **but that was the one I was at most**
22  **often.**
23  Q.  And what was your job at PA
24  Counseling Services?
25  **A.  I was initially was employed as a**

GARRETT ROSAS, PSYD

Page 18

1 therapist due to the fact that at the
2 time, I was not yet licensed in the
3 Commonwealth.
4 Q.  And how long did you work for
5 them?
6 A.  I worked for them until 2011.
7 Q.  You said -- when did you start
8 working there?
9 A.  I started in 2008.
10 Q.  Okay.  You said you finished in
11 2011?
12 A.  Correct.  I'm -- I'm sorry, sir.
13 Q.  I'm sorry.  I didn't mean to cut
14 off your answer.
15 A.  I was clarifying the fact that I
16 was initially employed as a therapist,
17 and after becoming licensed in 2009, my
18 job title then became Licensed
19 Psychologist.
20 Q.  Were you licensed in another state
21 before you were licensed in
22 Pennsylvania?
23 A.  No, sir.
24 Q.  And where did you work before you
25 worked for PA Counseling Services?

Page 19

1 A.  In a professional capacity?
2 Q.  I'm not sure how to answer that.  I
3 will say yes, in a professional
4 capacity.
5 A.  I would list the Pennsylvania
6 Counseling Services role as my first
7 paid professional role outside of an
8 education program.
9 Q.  Okay.  Did you do any volunteer
10 work or pro bono work before you
11 started working with PA Counseling
12 Services?
13 A.  Yes, but within the scope of my
14 education program, my doctoral program
15 prior to that.  So, I held other various
16 roles throughout my doctoral program as
17 part of my training regimen.
18 Q.  And you graduated in 2004 from
19 Wrights State for your doctoral program,
20 right?
21 A.  Yes, sir.
22 Q.  Did you do any type of therapy or
23 counseling work or anything associated
24 with your professional degree from 2004
25 until 2008?

Page 20

1 A.  No, sir.
2 Q.  Did you do any type of work between
3 2004 and 2008?
4 A.  I may have been incorrect for my
5 start date for Pennsylvania Counseling.
6 That was my first professional
7 employment.
8 Q.  Okay.
9 A.  There was a period of time where I
10 was searching for a job and that type of
11 stuff that would account for any break
12 between the graduation date of my
13 program and starting with Pennsylvania
14 Counseling Services.
15 Q.  So, you think you started at
16 Pennsylvania Counseling Services before
17 2008?
18 A.  One of the reasons I'm confused is
19 I did my predoctoral internship also at
20 Pennsylvania Counseling Services.  I
21 then was still in the process of
22 finishing my dissertation.  I had then
23 done a postdoctoral fellowship for
24 Seattle Children's Hospital in Seattle,
25 Washington, and then eventually I ended

Page 21

1 up being employed with Pennsylvania
2 Counseling sometime thereafter.
3     I moved to Minnesota briefly and
4 attempted to begin working for the Mayo
5 Clinic.  It was not an advantageous
6 situation for me.  The location in
7 Minnesota wasn't for me either, and I
8 found alternative employment
9 opportunities with Pennsylvania
10 Counseling.  So, I relocated from
11 Minnesota and never worked there, never
12 been formally employed by the Mayo
13 Clinic.  And I came to Pennsylvania and
14 began working for Pennsylvania
15 Counseling.
16 Q.  Thank you for that.
17     In your work at Prime Care, have
18 you ever worked in any other prisons
19 other than Dauphin County Prison?
20 A.  When I was initially employed, I
21 did a brief training stint at another
22 facility, but, no, I have never worked
23 at any other facility.
24 Q.  And where did you do your training
25 at?

GARRETT ROSAS, PSYD

Page 22

1  A.  Franklin County Prison.
2  Q.  And when was that?
3  A.  Within the first two weeks of
4  employment.  I don't have that exact
5  date.  I can find that for you.
6  Q.  Okay.  And when you were training
7  at Franklin County Prison, what was that
8  training like?
9  A.  It was a review of the policies and
10 procedures pertaining to the work
11 involved of a psychologist in a
12 corrections setting.
13 Q.  And did that involve -- was that
14 like a classroom setting?  Is that
15 handouts?  How is that information --
16 A.  It's a hands-on expediential
17 walkthrough with already established
18 professionals and the administrative
19 oversight there at that facility.
20 Q.  And after your training at Franklin
21 County, then you were assigned to
22 Dauphin County?
23 A.  Yes, sir.  I said training.  I
24 think it's listed as a training.  It's
25 an orientation, heavy, if you will, more

Page 23

1  so than like a clinical formal training
2  aspect, but I think it's referred to as
3  training.
4  Q.  And I may have already asked you
5  this.  Your formal title at Prime Care
6  is what?
7  A.  Psychologist.
8  Q.  Okay.  And have you held any other
9  titles while you worked for Prime Care?
10 A.  No.
11 Q.  Have you received any other types
12 of certifications or any type of skills
13 since you graduated from Wrights State
14 in 2004?
15 A.  I hold no other formal
16 certification by way of credentialing.
17 No, sir.
18 Q.  Okay.  Have you ever received any
19 discipline in your time as a
20 psychologist for Prime Care?
21 A.  No.
22 Q.  Have you ever had any complaints
23 filed against you?
24 A.  No.
25 Q.  What about -- any of your other

Page 24

1  places of employment, have you ever been
2  disciplined?
3  A.  No.
4  Q.  Professionally?
5  A.  No.
6  Q.  Any complaints ever filed against
7  you?
8  A.  Not to my awareness.
9  Q.  I'm taking you back to June 18th,
10 2019.  Were you working at Dauphin
11 county Prison that day?
12 A.  I presume so.  Without looking at a
13 calender, I presume so.
14 Q.  Would there have been any other
15 place that you would be working --
16 A.  No, sir.
17 Q.  -- in 2019?
18 A.  No, sir.
19 Q.  And do you recall what your shift
20 was?  Did you work in shifts?
21 A.  I worked, if you will, first shift
22 only.  The hours are somewhat arbitrary
23 as far as the exact start time, but I am
24 salaried.  And I do put in my minimum --
25 my allocated hours for the day.  I

Page 25

1  generally begin 6:00 a.m., 7:00 a.m.
2  depending on the time of day -- the day
3  of the week.  I'm sorry.
4  Q.  And in your role as a psychologist
5  for Prime Care, do you evaluate inmates
6  for potential mental health issues?
7  A.  Yes, sir.
8  Q.  What other things do you do as a
9  psychologist for Prime Care?
10 A.  I'm also responsible for assessing
11 other potential risk scenarios such as
12 the presence of suicidality, as you
13 mentioned, assessing the presence of
14 mental illness, and also providing
15 direct care and treatment to individuals
16 who may have treatable mental health
17 conditions that I'm able to see and
18 provide direct care for.
19 Q.  Are there policies at Prime Care
20 that govern how you are to react when
21 you come across an inmate that you deem
22 to be untreatable?
23      MR. NINOSKY: Object to the
24    form.
25      You can answer if you

GARRETT ROSAS, PSYD

Page 26

1    understand.
2         THE DOCTOR: I'm sorry. I
3    don't understand the nature of
4    the question, sir.
5    BY MR. MINCEY:
6    Q.  In your last answer, you said that
7    you provide care and treatment to
8    individuals who are treatable, I think
9    is what you used, and, so, my question
10   was, is there some type of policy that
11   exists that directs how you respond when
12   you come across an inmate that, in your
13   evaluation, is not treatable at the
14   prison?
15        MR. NINOSKY: Object to the
16        form.
17        But you can answer.
18        THE DOCTOR: Yes. I
19        apologize, sir. The question is
20        still difficult to answer. When
21        you say come across or is there a
22        policy that directs me how to
23        respond, I think that's -- I'm
24        hanging up on the respond piece.
25   BY MR. MINCEY:

Page 27

1    Q.  Is there a policy that exists that
2    provides rules or certain instructions
3    for what you're supposed to do when a
4    certain situation arises?
5    A.  There are existing policies, yes.
6    Q.  And what is the policy for when you
7    encounter an inmate that you deem is not
8    able to be treated at the prison?
9         MR. NINOSKY: Object to the
10        form.
11        But you can answer.
12        THE DOCTOR: I'm not aware
13        of a direct policy statement that
14        could provide guidance in the
15        scenario that you described. It
16        may exist, the policy. I'm not
17        familiar without looking at the
18        policy at this point.
19   BY MR. MINCEY:
20   Q.  Understood.
21        As a psychologist at Prime Care, is
22   there a certain set of policies and
23   procedures that you are required to
24   follow?
25        MR. NINOSKY: Object to the

Page 28

1    form.
2         You can answer.
3         THE DOCTOR: There are
4         policies that pertain to the work
5         that I'm involved with and
6         provide guidance specifically to
7         staff, not necessarily specific
8         to psychologists.
9    BY MR. MINCEY:
10   Q.  Okay. And are those policies in
11   writing?
12   A.  The ones I'm referring to, yes.
13   Q.  And are they in a particular
14   location?
15   A.  Yes. They are present and
16   accessible to all staff on the unit.
17   Q.  And where are they kept?
18   A.  They're kept specifically outside
19   the HSA, which stands for Health Service
20   Administrative. That's the designated
21   position within our department that is
22   responsible for the administrative
23   oversight and operations of the medical
24   unit. That's my understanding.
25   Q.  And are those policies kept in like

Page 29

1    a binder or something?
2    A.  Yes, sir. They are both kept in a
3    paper-based form in a binder, again, an
4    unlocked location, available to staff.
5    They're also located in digital form and
6    can be accessed online.
7    Q.  And the idea is if you encounter a
8    situation where you don't know exactly
9    what to do, you can go to the binder and
10   see if the policies apply to your
11   situation?
12   A.  That would be one way to go about a
13   situation, yes.
14   Q.  And what would be another way?
15   A.  Through professional consultation.
16   Q.  In your case, would that be with
17   other psychologists?
18   A.  So, we have one other licensed
19   psychologist. It could also be a
20   psychiatrist or a psychiatric nurse
21   practitioner who is also licensed who I
22   work hand in hand and side by side
23   with.
24        Just to clarify, too, it could
25   also be the physicians. We have

GARRETT ROSAS, PSYD

Page 30

1  physicians who are also employed and
2  present on the unit.  So, depending on
3  the nature of the concern, whether it be
4  a physical health or behavioral health
5  concern, that might dictate the
6  consultation I would seek in that
7  regard.
8  Q.  Is there a particular policy that
9  exists that determines when you should
10  refer an inmate for medical treatment at
11  a hospital versus staying at the jail?
12       MR. NINOSKY:  Object to the
13       form.
14       But you can answer.
15       THE DOCTOR:  I do believe
16       there exists a policy that
17       defines what to do in those
18       scenarios.
19  BY MR. MINCEY:
20  Q.  And do you know what that is?
21  A.  Do I know specifically what the
22  policy is or the statement?
23  Q.  Yes.
24  A.  Not without refreshing my
25  recollection exactly where it's at and

Page 31

1  what it says.  There is a policy that
2  isn't specific to necessarily any one
3  situation, but what you mentioned about
4  cases were there is a lack of -- without
5  knowing what to do with a particular
6  scenario, if somebody's physical health
7  or the signs that they are not doing
8  well fall below some type of threshold,
9  there are indicators that suggest that
10  more invasive action should be taken in
11  those scenarios.
12  Q.  And did you ever have a situation
13  arise where you recommended that an
14  inmate receive treatment in a formal
15  hospital setting versus remaining at the
16  jail?
17  A.  Can you clarify what you intend
18  when you say "recommend?"
19  Q.  Well, I used the word "recommend"
20  because I don't know if you have the
21  authority to just say this person needs
22  to be treated, I'm sending him to the
23  hospital.  Or does that need to go up
24  some type of bureaucratic chain and get
25  approved before a person is transferred

Page 32

1  from the prison to the hospital?
2  A.  I'm uncertain if I specifically
3  have the authority.  I have the
4  abilities to engage staff and highly
5  recommend it.
6  Q.  And has that ever happened?
7  A.  Me specifically, no.
8  Q.  Do you recall when you first came
9  into contact with Tyrique Riley?
10  A.  Yes, sir.
11  Q.  Okay.  Can you tell us what date
12  that was?
13  A.  The date of my first progress
14  note.  Specifically without looking at
15  that --
16  Q.  No worries.  That wasn't a trick
17  question.  I just asked.  I have it in
18  front of me.
19  A.  Okay.
20  Q.  Okay.
21       MR. NINOSKY:  Again, I'm
22       just going to slide over the
23       chart beside him so it's
24       available.  Is that okay with
25       you?

Page 33

1       MR. MINCEY:  No problem.
2  I'm going to start on 84, PCM84.
3       MR. NINOSKY:  I presume you
4       meant the 18th, sir?  I just
5       wanted to make sure.
6       MR. MINCEY:  Yes, the 18th.
7  BY MR. MINCEY:
8  Q.  The bottom of 83 and onto Page 84,
9  Dr. Rosas, do you recognize this that's
10  on my screen?
11  A.  Yes.  Yes, sir.
12  Q.  Can you describe what this is for
13  us?
14  A.  This is electronic charting through
15  our EMR, electronic medical records, for
16  the date and entry on 6/18, 2019.  They
17  call it a SOAP format, Subjective,
18  Objective -- the SOAP aspect of it
19  pertains to the domains involved, so
20  the Subjective, Objective, Assessment,
21  Plan.
22  Q.  Got it.
23       Okay.  And, so, are these words
24  that are typed here -- under Subjective,
25  Objective, these are your words?

GARRETT ROSAS, PSYD

Page 34

1  **A.  Yes, sir.**
2  Q.  Okay.  You generated this report
3  after your first meeting with Mr.
4  Riley?
5  **A.  Yes.**
6  Q.  Okay.  And your note says, "New
7  intake.  Met him at cell side."  Is it
8  traditional for you to meet inmates for
9  the first time at cell side?
10  **A.  Not in the traditional sense, no.**
11  **That's not preferred.**
12  Q.  What's the preferred?
13  **A.  The preferred method is to have**
14  **them ambulate down to our medical**
15  **department for an in-person assessment.**
16  Q.  Okay.  Is there a reason why that
17  wasn't done here?
18  **A.  There could be a number of reasons**
19  **why an individual is not seen in the**
20  **medical department including the point**
21  **of first contact.  Without going back**
22  **and being there in that moment of time,**
23  **I can't say specifically what reason**
24  **existed on that day.**
25  Q.  And later on in your note, it says

Page 35

1  that "He," being Mr. Riley, "was
2  prevented from being seen in medical
3  this morning due to uncooperative
4  behavior."  Do you see that?
5  **A.  Yes, sir.**
6  Q.  Is that something that you
7  observed, or was that something that was
8  told to you?
9  **A.  That was something I believe was**
10  **told to me.  It was not something I**
11  **observed.  I wrote that with the**
12  **understanding that it was told to me.**
13  Q.  And because of your background, do
14  you almost treat it like when a doctor
15  comes on to the floor; do you review
16  kind of like the medical notes for all
17  of the people that you may see on that
18  shift and then start your shift?  Or are
19  you going person to person and learning
20  about them individually?
21  **A.  I generally try to get some**
22  **background information before I engage**
23  **somebody I have no other dealings with.**
24  **That's not always possible, but that is**
25  **something I attempt to do.**

Page 36

1  Q.  And what are some of the things
2  that you review prior to starting your
3  rounds, so to speak?
4  **A.  Depending on the available**
5  **documents and information provided, it**
6  **could be other professionals' entries**
7  **into the medical charting.  It could be**
8  **scanned and saved documents that are**
9  **collected through the intake process or**
10  **even a request for previous treatment**
11  **records that we routinely gather from**
12  **individuals where present.**
13     **And then we request those records**
14  **be sent to our facility, and then we**
15  **gain and store those to assist us with**
16  **patient care.**
17  Q.  And this highlighted portion, the
18  phrase "uncooperative behavior" in
19  quotation marks, did you add those
20  quotation marks?
21  **A.  Yes, sir.**
22  Q.  Is that because someone else used
23  the phrase "uncooperative behavior" to
24  you?
25  **A.  So, that describes a scenario when**

Page 37

1  **a request for a patient is made to be**
2  **brought to the medical department or to**
3  **have them come down to the medical**
4  **department depending on their ability to**
5  **do so.  There's security reasons why an**
6  **individual might not be able to be**
7  **brought down unaccompanied.  If they're**
8  **not doing well physically or have some**
9  **difficulty ambulating under their own**
10  **power, sometimes that presents some**
11  **difficulty.**
12     **But the process is, I make a**
13  **request for an inmate through a member**
14  **of the custody or security staff who are**
15  **always present when patients are in the**
16  **medical department, so the request is**
17  **made to a member of Dauphin County**
18  **Prison's custody staff.  They contact**
19  **the unit wherever a patient is residing**
20  **at that time, and they speak with other**
21  **members of the custody staff on the**
22  **housing unit to make the request for a**
23  **particular inmate.**
24  Q.  But the term "uncooperative
25  behavior" is not like some term of art

GARRETT ROSAS, PSYD

Page 38

1  that --
2  A.  That is the feedback I get as to
3  the reason why I am not going to be able
4  to see a particular person, and for that
5  individual on that day, I put it in
6  quotation marks because that was the
7  feedback I received from a member of the
8  custody staff at that time.
9  Q.  Did you ask for any information to
10  clarify what uncooperative behavior
11  meant?
12  A.  No, sir.  I don't believe so.
13  Q.  Can you describe to me what you
14  observed the first time you met Mr.
15  Riley?
16  A.  May I review the note?
17  Q.  If you need to.  First I'd like for
18  you to give me your impressions of what
19  you remember, but if you need to refer
20  to your notes, then just --
21  A.  I was relatively new in the
22  position at the time.  I just began
23  working at Prime Care in May of that
24  year, so it's several weeks prior to
25  first encountering Mr. Riley.  So,

Page 39

1  although I'd feel quite confident in my
2  clinical abilities and the profession
3  that I practice, that being said, the
4  process of engaging individuals in a
5  corrections setting was all knew to me
6  and was new to me at that time.
7      And my recollection of Mr. Riley
8  at the first meeting was at his cell
9  door.  It was difficult to hear a good
10  amount of the conversation for two
11  reasons.  One is the ambient
12  environmental noise.  The other was Mr.
13  Riley's presentation.
14  Q.  What do you mean by "Mr. Riley's
15  presentation?"
16  A.  It was difficult -- I recall it
17  being difficult to communicate with him.
18  Part of the communication was
19  comprehendible and understood, and then
20  there were other aspects that either I
21  couldn't make out clearly.
22      Or even when I did hear him, it
23  was -- there were some nonsensical
24  things being said.  Some of them were --
25  words were involved.  Some of them were

Page 40

1  utterances, if you will.  It was garbled
2  not because I couldn't hear it, but
3  because he was not articulating what he
4  was trying to communicate.
5  Q.  Of the words you could understand,
6  do you recall what those were?
7  A.  Not specifically other than what I
8  have documented.
9  Q.  Were you asking him questions?
10  A.  I presume.  I --
11  Q.  What is your normal -- I'm sorry.
12  Go ahead.
13  A.  I'm sorry for cutting you off, sir.
14  I was going to clarify that response and
15  say my normal routine would be to either
16  directly or indirectly be gathering
17  information and data, especially if it's
18  a new individual who I have no
19  familiarity with.
20      So, it's a form of an assessment,
21  if you will, but it gets carried out
22  through the form of, you know, a back
23  and forth conversation, sometimes direct
24  questions and answers.  Sometimes I let
25  it go freeform and then let them just

Page 41

1  sort of provide me some type of
2  response.  It gives me a lot of
3  information regardless.
4  Q.  Do you recall which questions you
5  asked that prompted what you call
6  nonsensical words or utterances?
7  A.  Not particularly, no.
8  Q.  Do you recall what questions you
9  asked that he was able to answer?
10  A.  Directly about suicidality.  I
11  think that's where I had most concerns.
12  Q.  It looks like a little bit further
13  down in this note, it says, "When asked
14  directly about whether he had any
15  thoughts of suicide, harming self or
16  others, he replied no."  Is that what
17  you're talking about?
18  A.  Yes, sir.
19  Q.  Okay.  How much time did you spend
20  with Mr. Riley at your first meeting
21  with him?
22  A.  I don't recall.
23  Q.  What's the typical amount of time
24  that you would spend with somebody while
25  making these types of rounds?

Page 42

1     MR. NINOSKY:  Object to the
2 form.
3     But you can answer.
4     THE DOCTOR:  That would be
5 difficult to answer due to the
6 variety of different
7 circumstances I engage
8 individuals with.  I think it's
9 situationally specific.  There's
10 a lot of different scenarios that
11 I'm involved with, so depending
12 on the location of the housing
13 and the opportunity provided,
14 that might dictate the amount of
15 time.
16 BY MR. MINCEY:
17 Q.  In the section labeled "Objective,"
18 you described -- you wrote "Depressed
19 mood with flat or blunting affect,
20 insight and judgement impaired,
21 moderately distressed by observation."
22 Are those your words?
23 A.  Yes.
24 Q.  What was it that you observed that
25 made you write these words?

Page 43

1 A.  A blunting of affect refers to what
2 appears to be a more restricted range of
3 emotional response.  It was sort of
4 generic, bland and withdrawn of sorts.
5 And, again, given the environmental
6 factors and the ability to engage
7 somebody in that environment, it's a lot
8 of -- you know, it's a lot of
9 observation and surmising some aspects
10 of this without having a better
11 opportunity to engage them.  So, when
12 writing up something in the Objective
13 section like that, it's in that moment
14 of time that's kind of what I observe
15 in, you know, providing some attribution
16 potentially where appropriate to some of
17 those descriptions.
18     So, when I say depressed and
19 withdrawn, that was part of when I
20 engage somebody at a cell side setting.
21 I like to look in there.  I like to see
22 if I can see them -- like, what they're
23 doing prior to them acknowledging my
24 presence.  So, a little bit of
25 observation to see kind of how they're

Page 44

1 living at the moment.
2     Sometimes it's about a modesty
3 thing, too.  I don't want to kind of
4 intrude on somebody who may be undressed
5 or using the bathroom of sorts, so you
6 tread somewhat lightly when you come up
7 to a cell door.  And before I start
8 sticking my face in there, I try to see
9 if I can observe any aspect of an
10 individual prior to alerting them to my
11 presence.
12 Q.  When you say that he was moderately
13 distressed, what does that mean?
14 A.  So, going back in the rolodex of
15 events in my mind here, the distress
16 piece as I recall referred to Mr. Riley
17 looked somewhat askew or disheveled, and
18 instead of noting disheveled, I think I
19 interpreted visually sort of the tone of
20 our engagement of some distress
21 involved.  It wasn't clear whether that
22 was situational because he was
23 incarcerated.
24     Previously I told you, you know, it
25 was unclear if he was saying everything

Page 45

1 he intended to say, or if there was more
2 that he was trying to express and became
3 somewhat frustrated about his ability to
4 communicate.  I recall asking him if he
5 could repeat himself a lot throughout
6 all my engagements with him, so I'll
7 leave my answer at that.
8 Q.  Okay.  And then in the Assessment
9 category, it says, "No MH diagnosis."  I
10 assume that means no mental health
11 diagnosis?
12 A.  That means I didn't provide any
13 speculation on his condition
14 diagnostically.
15 Q.  Based on the fact -- according to
16 this note, it says that you didn't have
17 enough information to do such a thing;
18 is that correct?
19 A.  Yes.
20 Q.  Okay.  Now, when you encounter
21 somebody for the first time and you're
22 unable to make a determination on their
23 condition, are there any tools that you
24 can use to gain more information about
25 the inmate as far as their past medical

GARRETT ROSAS, PSYD

Page 46

1 treatment or conditions?
2 A. Are there other tools? The routine
3 for somebody in a situation like you
4 described, to answer your question
5 specifically, would probably fall more
6 in line with what I discussed previously
7 as far as consultation purposes would
8 go. That would be one way to go about
9 seeing if other staff members who had
10 also potentially engaged the individual,
11 if they had been able to gather or
12 ascertain additional information that
13 wasn't readily available in chart work.
14     Additionally, going through, like I
15 said, if there were any documents that
16 had already been generated or completed
17 and that were stored electronically, a
18 review of those, if I had not already
19 done so, would be another way to gather
20 more information about the individual.
21 Q. And outside of professional
22 consultation, is there any way that you
23 are allowed to contact either an
24 inmate's family or someone outside of
25 the institution to try and get more

Page 47

1 information on the medical background of
2 an inmate?
3 A. Is there a pathway for that? I
4 presume so. I'm not certain of that
5 pathway by way of policy specifics. As
6 far as outside family members, because
7 our work is protected health
8 information, without having releases to
9 provide for -- you know, to make contact
10 with others is -- you know, there's
11 certain particulars involved with being
12 able to reveal that type of information.
13 Q. And lastly, it looks like it says
14 here you asked him why he was
15 incarcerated, and he said he was unable
16 to offer a reasonable explanation for
17 why he was incarcerated. Do you
18 remember what exactly he said to you?
19 A. I don't recall what exactly he had
20 said to me. I do recall that eludes to
21 part of the conversation that was
22 inaudible either for environmental
23 reasons or what he was expressing was
24 nonsensical.
25 Q. Did you observe these injuries to

Page 48

1 Mr. Riley in your first visit with him?
2 A. I do not recall any injuries.
3 Q. There's a note here under
4 Subjective of him having a heavy
5 bandage on his right wrist. Do you
6 recall that?
7 A. Yes, sir.
8 Q. Okay. Other than that heavy
9 bandage on his wrist, do you recall any
10 other injuries that you observed to Mr.
11 Riley?
12 A. No, sir.
13 Q. I'm scrolling further up on Page 83
14 and at the bottom of Page 82, and this
15 looks like your note from June 19th,
16 2019; is that correct, Dr. Rosas?
17 A. Yes, sir.
18 Q. And it says -- (inaudible) -- at
19 2:50 p.m.?
20 A. I'm sorry. Can you repeat that,
21 sir?
22 Q. You met with Mr. Riley at 2:50 in
23 the afternoon?
24 A. Oh. That's the time that the
25 electronic documentation note is

Page 49

1 completed and locked into its final
2 form. So, not necessarily --
3 Q. That's what this time is, right,
4 15:16?
5 A. Yes. That's the time that the
6 document or the note, if you will, is --
7 once you complete the note, it gives you
8 an opportunity to save it, which makes
9 it revisable without it having to have
10 an addendum to it. The time listed, the
11 time stamp, is the day or time at which
12 the note is locked in its form. And the
13 only way to make any sort of revisions,
14 additions or any clarifications is it
15 comes in a separate little field, and
16 it's listed as addendum. And it shows
17 that information.
18     Whatever is present there was
19 drafted at a distinctly different time
20 than the note above. So, the time
21 stamps on a particular note, depending
22 on its proximity to the time of contact,
23 you know, there could be a significant
24 gap in time depending on the reasons why
25 the documentation gets delayed, and

GARRETT ROSAS, PSYD

Page 50

1  **there's a number of reasons why the**
2  **actual time of contact and the**
3  **documentation could be a gap.**
4  Q.  In the Subjective section, it looks
5  like your notes say you met with him at
6  2:50 in the afternoon.  Do you see the
7  highlighted part right there?
8  **A.  Yes.**
9  Q.  Would you agree with that?
10  **A.  Yes.**
11  Q.  And it says that you met with him
12  "cell side after he was prevented from
13  being in medical department this a.m.
14  due to uncooperative behavior."  That
15  looks like the same language that you
16  used in the 6/18 note; would you agree
17  with me on that?
18  **A.  Yes.**
19  Q.  What were the uncooperative
20  behaviors on June 19th?
21  **A.  I don't know specifically what the**
22  **uncooperative behavior is.**
23  Q.  Is this information that you
24  observed yourself, or did you get this
25  from somebody else?

Page 51

1  **A.  In reviewing the notes, I believe I**
2  **adopted it really from the note that**
3  **preceded it.**
4  Q.  Okay.  But this is -- at least the
5  first part is like a cut and paste job?
6  **A.  May I clarify a few points about**
7  **that?**
8  **Yes, it could be a cut and paste**
9  **check, and I do believe that part of**
10  **that document I probably either adopted**
11  **literally, like I said, or literally cut**
12  **and pasted it.  Generally, the first --**
13  **it's often the case that the first line**
14  **within a note comes already prefabbed.**
15  **So, if there is -- for example, where it**
16  **says, "Suicide watch," that is already**
17  **prepopulated, so that part wasn't cut**
18  **and pasted.  That's already**
19  **prepopulated, but the notation above,**
20  **the "disruptive behavior," that's my**
21  **explanation.  I adopted my own note from**
22  **the one previous.**
23  Q.  And so I understand, the purpose of
24  the notes is to help you, when you look
25  back at the records, to determine what

Page 52

1  type of treatment is available or is
2  needed?
3  **A.  In part, yes.**
4  Q.  Okay.  And also for others; if
5  someone else needs to find out what
6  happened with a particular inmate, they
7  can look back at your notes?
8  **A.  Yes.**
9  Q.  And you want to be as accurate as
10  possible when you are making these types
11  of notes for those reasons, right?
12  **A.  Yes.**
13  Q.  And when you reuse the term
14  "uncooperative behaviors," is there
15  something else that substantiated you to
16  reuse that, or you just kind of kept
17  with the same language you used before?
18      MR. NINOSKY:  Object to the
19      form.
20      But you can answer.
21      THE DOCTOR:  Without having
22      anything additional or distinctly
23      different to say, I went with the
24      last indication that I was aware
25      of.

Page 53

1  BY MR. MINCEY:
2  Q.  When you went to his cell, it says
3  that he was resting at the time.  What
4  did you observe when you first went to
5  observe Mr. Riley at his cell on
6  June 19th?
7  **A.  I don't recall beyond what I**
8  **described in written form.**
9  Q.  When you say "resting," was he
10  laying down?  Is he going to bed?  Is he
11  on the floor?  What is he doing?
12  **A.  I don't recall the exact position**
13  **he might have been in at that time.**
14  Q.  How did you ask for him to come to
15  the window?  Do you recall that?
16  **A.  Not specifically on that day, no.**
17  Q.  Are do you talk through an opening
18  in the window?  Do you knock on the
19  door?  How do you usually do it?
20  **A.  The location where Mr. Riley is at,**
21  **it's a covered glass or plexiglass**
22  **covering, I don't know what the**
23  **dimensions of the window are, and a**
24  **solid closed door.  So, the conversation**
25  **occurs between the door and the actual**

GARRETT ROSAS, PSYD

Page 54

1  wall, so we have a juncture of -- I
2  don't know if you can see, about that
3  big (indicating).
4        MR. MINCEY:  For the
5     record, he's holding about like
6     two inches wide.
7  BY MR. MINCEY:
8  Q.  Is that fair?
9  A.  Yeah.  It's generally about that
10 thin (indicating) if you can see it, and
11 then kind of talk like that.  The voices
12 do get amplified on the inside I've come
13 to learn, so they hear me probably
14 better than I'm able to hear them
15 sometimes depending on the ambient
16 noise.
17 Q.  And when Mr. Riley came over to the
18 window, what did you talk with him
19 about?
20 A.  I don't recall specifically.  I do
21 recall having a more difficult time than
22 the day prior.  The communication was
23 somewhat more difficult the day before.
24 Again, part of it was his ability to
25 communicate.  Some of it was his

Page 55

1  condition.  I think he hadn't improved
2  since the day prior.
3  Q.  Your note here says, "He," Mr.
4  Riley, "was entirely unresponsive to
5  question today, failing to even make
6  mild verbal gestures to confirm an
7  understanding of our conversation."
8  Were those your words?
9  A.  Yes.
10 Q.  Is that a fair representation of
11 what occurred between you and Mr.
12 Riley?
13 A.  (The witness nods.)
14 Q.  Is that a yes?
15 A.  I'm contemplating my response.  May
16 I consult with my attorney?
17 Q.  I think you need to answer the
18 question first.
19 A.  I'm so sorry, sir.
20 Q.  Okay.
21 A.  Yes.  Yes.
22 Q.  Okay.  Do you still wanted to talk
23 with Mr. Ninosky?
24 A.  I do need a break.
25 Q.  You want a break?

Page 56

1        MR. NINOSKY:  Can we take
2     ten minutes?
3        MR. MINCEY:  Sure.  No
4     problem.  Let's come back at
5     2:40.
6        - - -
7     (A brief recess was taken
8     at this time.)
9        - - -
10 BY MR. MINCEY:
11 Q.  Dr. Rosas, you had an opportunity
12 to speak with Mr. Ninosky.  Are you
13 prepared to continue?
14 A.  Yes, sir.
15 Q.  Okay.  And can I ask what you
16 discussed with Mr. Ninosky during the
17 recess?
18 A.  I asked how --
19        MR. NINOSKY:  Hold it.
20     You're not going to talk about
21     what we talked about.
22        He's not going to answer
23     questions about what we talked
24     about.
25        MR. MINCEY:  Are you

Page 57

1  instructing him not -- I'm sorry?
2        MR. NINOSKY:  He's not
3     going to answer any questions
4     about what we discussed.
5        MR. MINCEY:  I think
6     there's some caselaw that says
7     it's appropriate to ask just to
8     determine whether or not there's
9     been any witness coaching.  I'm
10    not accusing you, John.  I'm just
11    being diligent.
12        MR. NINOSKY:  No.  And I'm
13    not offended, but I'm not going
14    to let him answer any questions
15    about what we discussed.
16 BY MR. MINCEY:
17 Q.  Are you prepared to proceed, Dr.
18 Rosas?
19 A.  Yes.
20 Q.  Okay.  Can you see my screen?
21 A.  Yes.
22 Q.  And, so, I think we left off
23 talking about Mr. Riley being entirely
24 unresponsive to the questions?
25 A.  Yes.

GARRETT ROSAS, PSYD

Page 58

1  Q.  And that was a deterioration from
2  his situation the day before; is that
3  fair?
4       MR. NINOSKY:  Object to the
5       form.
6       But you can answer.
7       THE DOCTOR:  I have no
8       reason to believe differently
9       than what I previously stated.
10      It reflects a deterioration from
11      the day before.
12 BY MR. MINCEY:
13 Q.  Okay.  Under Objective, you wrote,
14 "Presentation today may be indicative
15 of negative symptoms related to a
16 psychotic disorder."  Do you recall
17 writing that?
18 **A.  It's there in writing.  I have no**
19 **reason to believe different.  I don't**
20 **recall writing it, but I'm reading it.**
21 Q.  And why would you feel it was
22 significant to add this to the note?
23 **A.  My understanding at the time was**
24 **Mr. Riley had been unable to complete**
25 **his initial intake, medical nursing**

Page 59

1  **assessment intake, that every inmate**
2  **does upon entry into the facility.  I**
3  **had no other basis or information to**
4  **explain Mr. Riley's clinical**
5  **presentation at the time, and the**
6  **notation there indicates a best**
7  **clinical guess based on the information**
8  **provided.**
9  Q.  If someone is suffering from a
10 psychotic disorder, is that reason
11 enough for you to recommend them be
12 treated in a formal hospital setting?
13      MR. NINOSKY:  Object to the
14      form.
15      You can answer.
16      THE DOCTOR:  No.
17 BY MR. MINCEY:
18 Q.  Okay.  Are psychic disorders
19 something that are routinely treated at
20 the prison?
21 A.  Yes.
22 Q.  This next part again talks about,
23 under Assessment, "unresponsive to
24 questions."  Then it says, "No known
25 SUD."  What does SUD mean?

Page 60

1  **A.  In that regard, I intended that to**
2  **mean or stand for -- abbreviation for**
3  **substance use disorder.**
4  Q.  All right.  And "No withdraw
5  syndrome present at this time," correct?
6  **A.  By observation, yes.  Yes, that's**
7  **what I wrote.**
8  Q.  How did your meeting with Mr. Riley
9  end on June 19th?
10 **A.  I don't recall.**
11 Q.  Did Mr. Riley walk away from you
12 while you were still talking to him?
13 **A.  I don't recall.**
14 Q.  Did you observe any injuries to
15 Mr. Riley during your meeting on
16 June 19th?
17 **A.  I don't recall.**
18 Q.  Did he still have the bandage on
19 his hand?
20 **A.  I believe so.  And the reason I**
21 **recall that, and allow me to explain**
22 **that piece, is it is atypical for them**
23 **to both be in suicide smock and have**
24 **something like a bandage present, so**
25 **that, I do recall.**

Page 61

1  Q.  You said it's typical for them to
2  be in a suicide smock and have a
3  bandage?
4  **A.  I apologize.  Not typical, no.**
5  Q.  Not typical?
6  **A.  Not typical.**
7  Q.  So, it's something you would have
8  noticed, right?
9  **A.  After having worked there now, I am**
10 **far more able to notice that than**
11 **probably at that time.  Yes.**
12 Q.  Had you ever seen anybody in a
13 suicide smock with a bandage in the
14 couple of weeks that you had been
15 working at DCP prior to this?
16 **A.  No.**
17 Q.  This would have been the first time
18 you saw that, right?
19 **A.  Yes.**
20 Q.  Okay.  Scrolling up now to the top
21 of Page 82, PCM82, do you see this right
22 here (indicating)?  This is your note
23 from June 20th, 2019; is that correct?
24 **A.  Yes.**
25 Q.  Saved at 2:42 p.m.?

Page 62

1  A.  Yes.
2  Q.  Okay.  It says that you "met with
3  patient," Mr. Riley, "cell side at
4  12:45 in the afternoon after he was
5  prevented again from being seen in the
6  medical department this a.m. due to
7  ongoing uncooperative behavior."  Do you
8  see that?
9  A.  Yes, sir.
10  Q.  Do you agree with me that that is
11  language that is substantially similar
12  to the language you used on June 18th
13  and June 19th to describe Mr. Riley's
14  mornings?
15  A.  Yes.
16  Q.  Did you witness uncooperative
17  behaviors from Mr. Riley on June 20th?
18  A.  No.
19  Q.  Okay.  Is this your reporting of
20  something that was told to you by
21  somebody else?
22  A.  Yes.
23  Q.  Do you recall who told you that?
24  A.  No.  I don't believe it to be any
25  different than how I initially arrived

Page 63

1  at that language I used in the first
2  example that we described.
3  Q.  So, this first line, again,
4  "Suicide watch," that's self-populated,
5  and "Met with patient cell side at"
6  seems to be language that you typically
7  use at the beginning of your reports; is
8  that fair?
9  A.  Well, for that week because the
10  conditions which I had to meet with him
11  did not vary at that time.  I had not
12  been able to see him in clinic, and so,
13  yes.  I literally probably borrowed from
14  a previous note just for shorter
15  purposes.
16  Q.  You cut this part here, and then
17  you just added the time, right?
18  A.  Yeah.  I probably just altered the
19  time.
20  Q.  Okay.  And, then, it looks like the
21  only change you made to the beginning of
22  your Subjective part was that you added
23  the word "again" saying, "After he was
24  prevented again from being seen in the
25  medical department for uncooperative

Page 64

1  behaviors;" would you agree with that?
2  A.  Yes.
3  Q.  Is there a reason that you added
4  the word "again?"
5  A.  I don't recall any specific reason.
6  Q.  Okay.  And this time, can you
7  describe what you saw when you saw Mr.
8  Riley on June 20th?
9  A.  Can you repeat the question, sir?
10  Q.  Can you describe for me what you
11  observed when you first saw Mr. Riley on
12  June the 20th?
13  A.  I have no reason to believe that
14  what's documented there is any different
15  than my assessment at the time.  I don't
16  recall specifically anything different
17  than what's in documentation form.
18  Q.  Earlier you said sometimes you
19  would start by kind of quietly observing
20  them in their environment before you let
21  them know you were there.  Did you do
22  that in this instance?
23  A.  I can't recall if I had done that
24  by routine at that point.
25  Q.  Did you call Mr. Riley over to the

Page 65

1  window, or was he already there?
2  A.  I'm not reading these notes over
3  here, and I'm going based on
4  recollection.  Not particularly since I
5  do believe he was at the window.
6  Q.  You believe he was at the window
7  already?
8  A.  Yes.
9  Q.  Okay.  And when you got to the
10  window, it says here that "He," Mr.
11  Riley, "was naked and standing at the
12  window;" is that fair?
13  A.  Yes.
14  Q.  Okay.  And it looks like you
15  informed him about the need to be able
16  to complete the intake; is that fair?
17  A.  Yeah.  I made statements.  I wasn't
18  sure if he was comprehending what was
19  being said at that point in time during
20  his stay at DCP.  I had made the
21  statement.  I know that for a fact, yes.
22  Q.  And what is it that you recall
23  about your encounter with Mr. Riley that
24  makes you say that you were unable to be
25  sure if he was understanding what you

GARRETT ROSAS, PSYD

Page 66

1 were saying?
2 A. His presentation, by recollection,
3 had not improved to any noticeable
4 degree. If anything, he had been less
5 able to engage in that environment. It
6 was evident to me that it was becoming
7 increasingly difficult to getting any
8 sort of meaningful interaction from
9 him.
10 Q. Okay. And then it looks like up
11 here, it says "F28." What does F28
12 mean?
13 A. The F28 in that regard is in
14 reference to the ICD-10 version of
15 mental health disorders, and that's the
16 diagnostic label or the nomenclature
17 used in that particular manual. So, the
18 ICD-10 and the DSM, which is the other
19 guiding document, if you will, to mental
20 health psychiatric disorders -- it's a
21 coding nomenclature.
22 Q. And was this code added here by you
23 under "Related problems?"
24 A. It's a click box that gets checked.
25 Q. Did you check it?

Page 67

1 A. Yes. I have no reason to believe I
2 didn't.
3 Q. Okay. And, so, you checked it
4 because -- does this mean that you made
5 a determination that Mr. Riley was
6 suffering from a psychotic disorder not
7 due to a substance or known
8 physiological condition?
9 A. Based on the information I gathered
10 up until that point, including on that
11 day and the days prior, I began to kind
12 of just formulate a diagnostic
13 assessment of sorts to at least explain
14 Mr. Riley's presentation, and, so, I
15 have the ability to click several boxes
16 if I feel like it pertains.
17 Again, I was still new there and
18 probably noting the electronic record
19 keeping system as a whole, but my
20 ability to venture a guess I think at
21 that point was clicking boxes like
22 that.
23 Q. And it's fair to say that at the
24 time you first met Mr. Riley on June
25 the 18th until this date on June

Page 68

1 the 20th, that Mr. Riley's condition had
2 deteriorated each day; is that fair?
3 MR. NINOSKY: Object to the
4 form.
5 But you can answer.
6 THE DOCTOR: I think that's
7 a fair assessment. That's my
8 recollection.
9 BY MR. MINCEY:
10 Q. Would you call the deterioration
11 significant?
12 MR. NINOSKY: Object to the
13 form.
14 But you can answer.
15 THE DOCTOR: I can't say at
16 that time. I thought it was
17 extraordinary. I mean I thought
18 it was meaningful if that's what
19 you mean by significant, but I
20 didn't think it was extraordinary
21 or something prompting. Yeah,
22 notable but not overly gruesome
23 to the point of, you know, what
24 had ultimately happened.
25 BY MR. MINCEY:

Page 69

1 Q. On June 18th he was clothed and
2 able to answer some of your questions,
3 correct?
4 A. He was wearing a suicide smock, but
5 he was wearing it appropriately, to a
6 state of decline, so he was no longer
7 wearing that.
8 Q. On June 19th he was still wearing a
9 suicide smock, but he was wearing it
10 inappropriately, or was he wearing it
11 appropriately?
12 A. I don't recall specifically.
13 Q. And on June 19th, he was unable to
14 really answer any questions; is that
15 right?
16 A. Not the ones I was asking him.
17 Q. Do you recall what, if anything, he
18 was saying to you when you saw him on
19 June the 20th?
20 A. Nothing. I don't recall any part
21 of that, and by recollection, I don't
22 recall him being in a state -- being
23 able to respond. I think I understood
24 that at that time. I wasn't fully aware
25 of whether -- or I wasn't clear on

Page 70

1 whether he was unable or would respond.
2 Q.  When you say "unable," what do you
3 mean by unable?
4 A.  Well, people sometimes are -- their
5 presentation, because they're under the
6 influence of drugs or alcohol, or as a
7 result of their particular form of
8 mental illness, the ability to engage,
9 respond, provide any meaningful
10 information is one thing.
11    But those same conditions, being
12 under the influence of drugs or alcohol
13 or the mental illness, sometimes they
14 have the capability of engaging or
15 responding, but because of something
16 like paranoia or some delusional belief
17 that they might withhold or
18 intentionally avoid engagement.
19 Q.  Dr. Rosas, I'm showing you Page 62,
20 PCM62, and at the top of the page here,
21 it looks like this is a note from sick
22 call.  Do you see that there?
23 A.  Yes.
24 Q.  Actually, you know what?  I think
25 this really just references your note

Page 72

1 there, there probably have been other
2 revisions to it.  So, it's just another
3 version of that form.
4 Q.  Okay.  And you're listed at the top
5 of the page here as the Interviewer on
6 June 20th at 2:52 p.m.; is that
7 accurate?
8 A.  That's what's written there.
9 Q.  Okay.  And is this a format for
10 this interview where you're reading a
11 script off a computer?
12 A.  No.
13 Q.  Okay.  Are you performing this at
14 cell side?
15 A.  Yes.
16 Q.  Okay.  Are you handwriting answers,
17 or is someone -- this appears to be a
18 type of form that you would click
19 buttons and fill in dropdowns; am I
20 incorrect in that?
21 A.  Yes.
22 Q.  I'm incorrect or it is one of
23 those --
24 A.  You are correct, sir.
25 Q.  Okay.  So, is this something that

Page 71

1 from 6/20, so let me take that down and
2 move to the next thing.
3    MR. NINOSKY:  That's a
4 feature in the notes that kind of
5 compiles stuff, Kevin, is all
6 that was.  That's nothing new.
7    MR. MINCEY:  Yes.  I just
8 realized that.  Thanks, John.
9 BY MR. MINCEY:
10 Q.  Dr. Rosas, I have Page 85 in front
11 of me.  Do you recognize this form?
12 A.  Yes.
13 Q.  Okay.  And it says, "Suicide Risk
14 Assessment OLD."  What does OLD stand
15 for?
16 A.  It would be a presumption, but I do
17 believe that form has been revised over
18 time.
19 Q.  Okay.
20 A.  Generally, when the forms are
21 revised, when you could still access
22 documents that were created with the old
23 version of a form, if you will, in this
24 regard, by the time we access the
25 printout, the form that we're looking at

Page 73

1 you conduct the interview, and then go
2 back and complete the form later?
3 A.  If I need to, yes.
4 Q.  Okay.  And what determines whether
5 or not you need to go back and complete
6 the form?
7 A.  I'm sorry.  My answer was in
8 reference to whether it's done with the
9 individual line by line or whether it's
10 ascertained through formal, informal
11 parts of a conversation that speak
12 directly to those elements.
13 Q.  Well, how did you complete this
14 form that we're looking at?
15 A.  So, the form was completed based on
16 the information I gathered at the time
17 for that interaction on that date, and
18 given that it was done on the unit cell
19 side, I don't have a computer with me at
20 that time.  So, the information gathered
21 regardless, including the information
22 that feeds into the completion of this
23 form, needs to be done post contact.
24 Q.  And, so, after you met with Mr.
25 Riley and basically in summation of your

Page 74

1  three days of meeting with Mr. Riley,
2  you completed this form?
3       MR. NINOSKY: Objection to
4  the form.
5       But you can answer.
6       THE DOCTOR: My
7  recollection was that, again,
8  because I was newer to the
9  process, there was -- I needed
10  some clarification on what
11  exactly was needed to be
12  accomplished administratively or
13  recordkeeping-wise for this
14  individual.
15       My understanding was the
16  reason why he was in the suicide
17  precaution status wasn't because
18  he was suicidal per se. There
19  was no indication that he was
20  ever suicidal or at risk for self
21  harm, but he was placed in that
22  status due to the inability to
23  get the information necessary to
24  make a determination of risk for
25  potential self harm, for other

Page 75

1  medical illness, et cetera, et
2  cetera. So, it's a girth of
3  information that prompted him to
4  be placed on the suicide
5  precaution status.
6       I don't know if I was
7  entirely clear about the
8  associated forms that needed to
9  be completed at the time likely
10  because, again, conjecture or a
11  guess at this point, I didn't
12  perceive him as suicidal. I
13  believe I was prompted to the
14  need to complete the forms
15  regardless, and I don't recall if
16  I had done that after my first
17  encounter with Mr. Riley or not.
18  BY MR. MINCEY:
19  Q.  Who would have prompted you to
20  complete the forms?
21  A.  I mean my direct oversight would be
22  the likely individual, but I can't
23  recall who did or specifically if that
24  was the conversation. I recall being
25  made aware of that. There was -- there

Page 76

1  were some forms that needed to be
2  completed in association with my contact
3  with Mr. Riley.
4  Q.  Who was your direct oversight?
5  A.  At that time, it was another
6  licensed psychologist. First name was
7  Ademola, last name Fowale, F-o-w-a-l-e.
8  Q.  Do you recall; is it Dr. Fowale?
9  A.  Yes.
10  Q.  Do you recall Dr. Fowale come to
11  you and explained that you need to
12  complete some forms?
13  A.  I don't recall him coming to me or
14  how that information was brought to my
15  attention. I could have asked questions
16  about it. I don't recall directly.
17  Q.  Other than this form, this Suicide
18  Risk Assessment Form that we're looking
19  at, were there other forms that needed
20  to be completed?
21  A.  There are other forms that do need
22  to be completed. I don't recall whether
23  or not I needed to complete them for Mr.
24  Riley.
25  Q.  What are the forms that are

Page 77

1  supposed to be completed?
2  A.  The ones that I would complete, so
3  the note, the Suicide Risk Assessment,
4  and if I was able to complete a mental
5  health intake, that would be the other
6  typical form that gets completed for an
7  individual.
8  Q.  When would you complete a mental
9  health intake?
10  A.  The attempt should be made at the
11  point of first contact.
12  Q.  So, that would be June 18th, 2019?
13  A.  For my purposes, yes.
14  Q.  Did you complete one of those?
15  A.  I don't recall. I don't believe
16  so.
17  Q.  And what was the purpose of
18  completing a Mental Health Intake Form?
19  A.  It would be a summation of the
20  available information regarding an
21  individual's mental health or substance
22  abuse treatment background, and it also
23  contains whatever shared information
24  about their own subjective appraisal of
25  care needs, information like that.

GARRETT ROSAS, PSYD

Page 78

1  Q.  You were directed to complete the
2  Suicide Risk Assessment only and not the
3  Mental Health Intake Form?
4  A.  The Mental Health Intake is a
5  onetime completed document for
6  individuals who have consented to care
7  and treatment.  That's a requirement
8  that does need to be completed as part
9  of that process.
10     The Suicide Risk Assessment is
11  performed on individuals who are suicide
12  status, and it gets completed at the
13  point of first contact.  And, also, as
14  individuals move between the various
15  restrictive levels of the suicide
16  precaution protocol, at each juncture
17  that form gets filled out and revised
18  accordingly.  Some of the information
19  builds upon one another.  Some of it is
20  new to the task at hand depending.
21     So, the document itself has a
22  multiuse purpose.  It's been revised
23  since this time to kind of better
24  reflect that, but that was always my
25  understanding.  That was always the

Page 79

1  interpretation of this document,
2  including the time in question here.
3  Q.  So, in this first section, "Suicide
4  Ideations Definitions and Prompts," you
5  asked two questions, and then are these
6  your words, that "Mr. Riley was
7  unresponsive and refuses to respond to
8  question?"
9  A.  Yes.
10  Q.  "To wish to be dead?"
11  A.  Yes.
12  Q.  And then "General nonspecific
13  thoughts of wanting to end one's life
14  meant suicide," you wrote that "Mr.
15  Riley was unresponsive, refuses respond
16  to question?"
17  A.  Yes.
18  Q.  Were those answers meant to reflect
19  for each day, June 18th, June 19th and
20  June 20th?
21  A.  They were intended to reflect my
22  best understanding of the situation at
23  that time.  They are not all inclusive
24  or in incorporate, but at the time I
25  filled that out, that incorporated my

Page 80

1  assessment in those domains up until
2  that point.
3  Q.  But in your notes from June 18th,
4  June 19th and June 20th, basically the
5  only question Mr. Riley answered was he
6  did not want to kill himself; is that
7  right?
8  A.  Yes.
9  Q.  So, these answers here would appear
10  to be inconsistent with what you wrote
11  in those reports; would you agree with
12  me?
13     MR. NINOSKY:  Object to the
14     form.
15     THE DOCTOR:  Are you able
16     to rephrase the question?
17  BY MR. MINCEY:
18  Q.  When you wrote that Mr. Riley was
19  unresponsive to questions about his
20  suicide ideations, this appears to be
21  incorrect based upon what you wrote in
22  your reports on June 18th, 19th and
23  20th; would you agree with me?
24  A.  Yes.  Yes, I agree.
25  Q.  Can you explain why you would write

Page 81

1  these things when it's not correct?
2     MR. NINOSKY:  Object to the
3     form.
4     But you can answer.
5     THE DOCTOR:  No.  I have no
6     rational explanation for that.
7  BY MR. MINCEY:
8  Q.  And I guess you skipped these
9  questions because it's either not
10  required to be asked -- looks like you
11  answered Question Number 6 though, if
12  asked, "How long do any of the above
13  behaviors," and your answer here is
14  "Unresponsive, refuses to respond
15  question."  Do you see that?
16  A.  Yes.
17  Q.  Okay.  Is that just a mistake?
18     MR. NINOSKY:  Object to the
19     form.
20     THE DOCTOR:  I can't say if
21     it was a mistake or not.
22  BY MR. MINCEY:
23  Q.  Did Mr. Riley tell you that he had
24  ever tried to commit suicide?
25  A.  I don't recall ever hearing a

GARRETT ROSAS, PSYD

Page 82

1  response to a question like that.
2  Q.  And Question 6 says, "Have you ever
3  done anything, started to do anything or
4  prepared to do anything to end your
5  life," and then it list examples.  Your
6  answer here is "Unresponsive, refuses to
7  respond to question?"
8  A.  I don't believe I committed to
9  whether that was a yes or a no.  I think
10 unresponsive was -- this is a guess, but
11 I think I was just trying to accomplish
12 filling out that field on the form at
13 that time.
14 Q.  Did you ask any Questions 3, 4 or 5
15 that are on Page 85?
16 A.  I don't recall.
17 Q.  Here it says, "Type of watch and
18 frequency, type suicide precaution," and
19 you have selected "Level 1 suicide
20 watch."  What is Level 1 suicide watch?
21 A.  Level 1 suicide watch refers to the
22 protocol of -- I'm striking out on the
23 language.  In essence, those various
24 levels refer to a level of
25 restrictiveness and oversight by medical

Page 83

1  staff.  So, Level 1 is an individual who
2  has some risk factors involved.  They're
3  not actively engaging in self harming or
4  suicidal like behaviors, but there's a
5  risk involved such that they're required
6  to be placed in a suicide proof
7  environment, which includes the smock
8  and other environmental supports for an
9  individual with that level of risk
10 involved.
11       So, that's the placement.  That's
12 the default for individuals who are
13 unable to complete the receiving intake
14 process, and that's done as they enter
15 the facility after they exit the booking
16 process.  So, he was placed on a level
17 by virtue of not completing the intake
18 and less so because there was any known
19 or assessed risk for suicide.
20 Q.  If an inmate or patient for you is
21 unable to complete the intake process
22 for a number of days, are there any
23 steps taken to understand why that is,
24 or is it -- well, I'll stop right there.
25 Are there any steps taken to understand

Page 84

1  why this person is unable to complete
2  the intake?
3       MR. NINOSKY:  Objection to
4  the form.
5       You can answer.
6       THE DOCTOR:  I'm unable to
7  answer that.  Yes, there's steps.
8  I wasn't aware of steps at that
9  time.
10 BY MR. MINCEY:
11 Q.  Are you aware of the steps now?
12 A.  Yes.
13 Q.  What are those steps?
14 A.  Are you looking for timeframes?
15 I'm unclear about what particular aspect
16 of the question you're seeking
17 information on.
18 Q.  How many days are supposed to go by
19 before you take additional steps to help
20 someone complete the intake process?
21       MR. NINOSKY:  Object to the
22 form.
23       You can answer.
24       THE DOCTOR:  There's not a
25 stated number of days.

Page 85

1  BY MR. MINCEY:
2  Q.  What factors are you to consider
3  before you make the determination to
4  take extra steps to help someone
5  complete the intake process?
6       MR. NINOSKY:  Object to the
7  form.
8       You can answer.
9       THE DOCTOR:  I'm unable to
10 answer that specifically.
11 BY MR. MINCEY:
12 Q.  So, when you say you're aware of
13 extra steps that are taken or that can
14 be taken, what are those?
15 A.  The extra steps that are taken are
16 accomplished through a consultation of
17 other staff, other collaborative effort
18 by staff members.  I don't have any
19 specific steps that I specifically am
20 tasked to carry out or undertake at that
21 time.  I don't have a specific number of
22 days, and there isn't a detailed
23 descriptive list of conditions that
24 require those extra steps.  That's
25 variable.

GARRETT ROSAS, PSYD

Page 86

1    I'm aware of the steps because
2 we've gone through them.  I don't know
3 if those steps are incorporated into a
4 written formal policy or not.  It may be
5 present.  I'm not certain if I'm aware
6 of it.
7 Q.  In your experience, what's the most
8 amount of days that an inmate has been
9 allowed to not complete the intake
10 process and remain on Level 1 suicide
11 watch without any additional steps being
12 taken?
13        MR. NINOSKY:  Object to the
14    form.
15        You can answer.
16        THE DOCTOR:  I'm aware of
17    at least one individual who spent
18    eight days in that process.
19 BY MR. MINCEY:
20 Q.  Do you have the authority to raise
21 somebody's suicide precaution?
22 A.  By "raise," do you mean make it
23 more restrictive?
24 Q.  To go from Level 1 to constant
25 watch.  I'm assuming constant watch is a

Page 87

1 step above Level 1?
2 A.  Yes.  And that would be your
3 one-to-one where there's a constant line
4 of sight, observation of the individual
5 24 hours a day.
6 Q.  You have the authority to order
7 that?
8 A.  Yes.
9 Q.  Okay.  And are there a particular
10 set of factors that you consider when
11 you are deciding whether you should
12 raise somebody's suicide precaution from
13 Level 1 to constant watch?
14 A.  Yes.
15 Q.  Okay.  And what are those?
16 A.  Actively engaging in self harming
17 or suicidal behavior, so it's the act,
18 not just the intent or the likelihood,
19 but it's the active engagement of.
20 Q.  This is Page 86 that I'm looking at
21 now.  It looks like a Mental Status
22 Exam, and then for Orientation, it looks
23 like you wrote "Not oriented."  Do you
24 see that?
25 A.  Yes.

Page 88

1 Q.  Can you tell me what factors you
2 were considering that caused you to
3 write that Mr. Riley was not oriented to
4 person, place, time or situation?
5 A.  I can't recall the specifics on why
6 I used that word choice.
7 Q.  What do you do to determine whether
8 or not a person is oriented to person,
9 place, time or situation?
10 A.  It's somewhat of a imprecise
11 practice.  It reflects the individual's
12 general awareness of their surroundings,
13 the environmental factors involved,
14 whether or not they recognize me as the
15 person they saw the day before.
16    For instance, for the place, unless
17 somebody says, "Where am I," or "How did
18 I get here," which happens because
19 they're under a certain -- under the
20 influence of drugs or alcohol at the
21 time, they might not have any
22 recollection of how they got there or
23 even what particular facility they're
24 at.
25    The time orientation is, you know,

Page 89

1 difficult to tell time.  There's no
2 clocks anywhere, that type of stuff.
3 They'll ask, "Is this the evening, the
4 morning?"  Generally they'll seek some
5 sort of understanding about what time of
6 day it might be if they're confused or
7 have no better way of ascertaining that
8 information.
9    That's common parlance within the
10 mental health field in general.  That's
11 part of a mental status exam, that
12 particular domain, so it's applicability
13 in this regard.  It's not perfect or
14 it's not always easy to come up with a
15 good response to those.
16    So, I'm guessing at the time, for
17 lack of a better way to successfully
18 fill out that form, I went with the
19 notation to the side with the belief
20 that if one were to be able to kind of
21 get in and ask more detailed question,
22 or to better understand what Mr. Riley
23 was aware of at that time, I would have
24 ventured a clinical guess that he
25 wouldn't have had any sort of

GARRETT ROSAS, PSYD

Page 90

1  **orientation to those questions.**
2  Q.  Was there anytime during your
3  encounters on either June 18th or
4  June 19th where you believed that Mr.
5  Riley was oriented to person, place,
6  time and situation?
7  **A.  I don't believe so.  If he was, it**
8  **was probably the first day, but it**
9  **wouldn't have been a complete**
10 **orientation even at that time.**
11 Q.  What would you have believed he was
12 oriented to on that first day,
13 June 18th?
14 **A.  Maybe place.**
15 Q.  And then after that, not even
16 place; is that fair?
17 **A.  I would have surmised that.  I**
18 **would have surmised that.**
19 Q.  Under "Eye contact," here you have
20 "None."  Did he make any contact with
21 you on the first day, eye contact?
22 **A.  Yes.**
23 Q.  He did?
24 **A.  Yes.**
25 Q.  Okay.  What about on the second

Page 91

1  day, June 19th?  Was he making eye
2  contact with you?
3  **A.  He was able to look in my general**
4  **direction.**
5  Q.  Was that yes?
6  **A.  Yes.**
7  Q.  And the third day, he was unable to
8  make any eye contact with you?
9  **A.  The third day I don't recall.**
10 Q.  You clicked "none," and this is
11 completed on the third day.  So, is it
12 fair to say on the third day, he didn't
13 make any contact with you at all?
14 **A.  Yeah.  I think it's fair.  It's**
15 **fair.**
16 Q.  Do you think it would have been
17 important to note in the records that
18 Mr. Riley's level of eye contact was
19 deteriorating from day to day?
20        MR. NINOSKY:  Object to the
21     form.
22        You can answer.
23        THE DOCTOR:  As far as the
24     clinical detail goes, I wouldn't
25     place an over-importance on that

Page 92

1  in a vacuum outside of the other
2  pieces of information, the other
3  parts of his presentation.  Eye
4  contact alone, again, it could be
5  avoidant.  It could have been
6  inability, you know, all of the
7  above, none of the above.  So the
8  "none" I used likely to
9  incorporate all possibilities at
10 that time.  There was a lot of
11 guesswork going on with him.
12 BY MR. MINCEY:
13 Q.  I'm not asking you to assess it in
14 a vacuum.  I'm asking you to assess it
15 in combination with all the other things
16 you observed.
17      Do you think in combination with
18 everything you observed, from his
19 appearance to his ability to
20 communicate -- do you think the level of
21 eye contact dropping from where it was
22 on June 18th to where it was on
23 June 20th would be significant enough
24 for you to note in his records
25 somewhere?

Page 93

1        MR. NINOSKY:  Objection to
2     the form.
3        You can answer.
4        THE DOCTOR:  Oh.  Yes.
5     Yes.
6  BY MR. MINCEY:
7  Q.  On Page 87, I'm looking at -- it
8  says "Sleep."  You have "poor" checked.
9  What is that based on?
10 **A.  I don't know if I have a realistic**
11 **response to that question.**
12 Q.  Is there a requirement that you are
13 to choose something in each of these
14 boxes?
15 **A.  That was the general impression I**
16 **was working under at that time.**
17 Q.  Did your impression change since
18 then?
19 **A.  I would definitely have filled out**
20 **a number of these forms differently,**
21 **yes.  I think the usability of some of**
22 **these forms has also been improved.**
23 Q.  Under "Hallucinations," you checked
24 "None evident."  Then you also wrote
25 "suspected" here.  Do you see that?

GARRETT ROSAS, PSYD

Page 94

1   **A.  Yes, sir.**
2   Q.  Okay.  Why would you write that you
3   suspected Mr. Riley was having
4   hallucinations?
5   **A.  Consistent with what I had in the**
6   **other parts of the document, my best**
7   **clinical guess to help explain his**
8   **presentation and my impression of his**
9   **presentation at that time.  I was**
10  **working under the assumption that this**
11  **was mental illness and not substance**
12  **intoxication.**
13  Q.  In the Judgement section, there are
14  five categories that you can choose
15  from.  Starting at the bottom, at the
16  bottom here it says, "Impulsive."  What
17  does that mean to you when you're
18  filling out this form?
19  **A.  What would that have meant to me to**
20  **be able to say impulsive, is that what**
21  **you're looking for, or what type of**
22  **presentation would have garnered an**
23  **impulsive?**
24  Q.  Yes.
25  **A.  Yeah.  That would have been more of**

Page 95

1   **an active engagement type of**
2   **presentation, but certainly somebody**
3   **that -- something that could change**
4   **without notice or, you know, somebody**
5   **engaging in disruptive behaviors without**
6   **thinking through the potential**
7   **consequences for the time.**
8       **So, this would be a much more**
9   **actively engaged kind of individual who**
10  **you could see clearly that the behaviors**
11  **and the choices involved were occurring**
12  **without much regard for the**
13  **consequences.**
14  Q.  And what about "severe impairment,"
15  what would that mean?
16  **A.  In retrospect, probably something**
17  **more akin to what I observed with Mr.**
18  **Riley.  My explanation for why I chose**
19  **moderate at the time was just guesswork**
20  **and not having a better idea of how**
21  **those terms were operationally defined**
22  **at the time.**
23  Q.  In your opinion, would the
24  treatment of an individual be different
25  if they were categorized as being

Page 96

1   severely impaired versus moderately
2   impaired?
3       MR. NINOSKY:  Object to the
4   form.
5       But you can answer if you
6   understand.
7       THE DOCTOR:  Yes.  I can't
8   say it would change.
9   BY MR. MINCEY:
10  Q.  And then at the bottom here,
11  "Summary of Impressions," you wrote,
12  "Unresponsive, refuses to respond to
13  questions."  Are these words you typed,
14  or is this a dropdown option?
15  **A.  Those are words I typed.**
16  Q.  And, again, it says, "Current
17  suicidal ideations," you clicked
18  "Refuses to answer," but we know that he
19  did answer those questions for you,
20  correct?
21      MR. NINOSKY:  On June 18th.
22  BY MR. MINCEY:
23  Q.  On June 18th, June 19th and
24  June 20th; am I correct, Doctor?
25      MR. NINOSKY:  I think

Page 97

1   that's mischaracterizing the
2   testimony.  I don't think he ever
3   testified to that --
4       MR. MINCEY:  If I --
5       MR. MINCEY:  -- do that
6   again with him.
7       MR. MINCEY:  If I'm wrong,
8   he can tell me.
9   BY MR. MINCEY:
10  Q.  Doctor?
11  **A.  Can you repeat the question,**
12  **please?**
13  Q.  Here you checked that Mr. Riley
14  refused to answer questions about
15  current suicidal ideations, but we know
16  from your testimony earlier that on
17  June 18th, 19th and 20th, he answered
18  your questions about not wanting to kill
19  himself, correct?
20      MR. NINOSKY:  Object to the
21  form because I don't think that
22  was his testimony.
23      But you can answer the
24  question.
25      THE DOCTOR:  I don't

GARRETT ROSAS, PSYD

Page 98

1     believe that is correct, sir.
2   BY MR. MINCEY:
3   Q.  Okay.  Let's go back to Page 83.
4   Oh.  You might be right.  83, no.  84 --
5   I'm sorry.  82, "Yes, I don't want to
6   kill myself."  Do you see that right
7   here (indicating)?
8       Do you see that right here,
9   Doctor?
10        MR. NINOSKY:  On June 20th?
11        MR. MINCEY:  On June 20th,
12      yes.
13   BY MR. MINCEY:
14   Q.  So, on June 18th and June 20th, he
15   was able to answer those questions,
16   correct, Dr. Rosas?
17   **A.  If that's what I have written, I**
18   **don't have any reason to believe**
19   **differently.**
20   Q.  And for his estimated current level
21   of suicide, self harm suicide risk,
22   which is on Page 89, you clicked "High,"
23   and then you wrote, "Unresponsive,
24   refuses to respond to question," fair?
25   **A.  Yes.**

Page 99

1   Q.  And the reason that you viewed Mr.
2   Riley as a high suicidal risk, was that
3   because he was unable to complete the
4   intake?
5   **A.  Yes.**
6   Q.  What would put somebody in the
7   moderate suicidal risk category?
8   **A.  In a vacuum, somebody maybe with**
9   **some known risk factors historically who**
10  **we might say under a certain set of**
11  **conditions, it wouldn't be the most**
12  **surprising thing if somebody had some**
13  **issues regarding self harm.  So, the**
14  **potential for self harm might be there**
15  **or the motivating factors.**
16      **If it's somebody who's really**
17  **struggling with their legal situation,**
18  **you know, or their characteristics**
19  **involved, it wouldn't be a non-number,**
20  **but they had an elevated number of**
21  **potential risk factors historically or**
22  **present that they weren't engaging in.**
23  **They denied it, but there was always a**
24  **chance it could be something to keep an**
25  **eye out for.**

Page 100

1   Q.  And it was on June the 20th that
2   you made the determination that Mr.
3   Riley does not suffer from any
4   substance use disorder but some type of
5   psychotic disorder, correct?
6         MR. NINOSKY:  Object to the
7   form.
8         You can answer.
9         THE DOCTOR:  Without any
10      other available pieces of
11      information, that was my best
12      clinical guess at that time.
13   BY MR. MINCEY:
14   Q.  And once you make that clinical
15   determination, do the inmates still
16   continue to have detox tests?
17   **A.  When it's ordered, yes.**
18   Q.  Okay.  So, that clinical
19   determination that you make does not
20   change any existing orders regarding,
21   you know, substance abuse questions?
22   **A.  In this regard, no, because he had**
23   **not completed the intake, so he gets**
24   **tasked for all lines of service**
25   **regardless until that process is**

Page 101

1   **completed.**
2   Q.  Okay.  So, we're looking at
3   Page 156, and this looks like some
4   tasks.  Looks like a list of tasks and
5   updated notes in the system; is that a
6   fair assessment of what we're looking
7   at, Doctor?
8   **A.  Yes.**
9   Q.  And I see your name down here on
10  6/24, 2019.  Does that mean that you
11  entered this information in the updated
12  notes?
13      Do you see where we're looking at?
14  **A.  Am I able to review this document?**
15  **It's kind of hard to see on this screen.**
16        MR. NINOSKY:  He has the
17      written here.  He can look at it.
18        MR. MINCEY:  Okay.
19   BY MR. MINCEY:
20   Q.  Looks like it says, "Completed by
21   Rosas, Garrett," on 6/24, 2019 at
22   1:57 p.m.  Do you see what I'm looking
23   at at the top?
24   **A.  Yes.**
25   Q.  Does that mean you completed this

Page 102

1  task or updated note?
2  **A. Yes.**
3  Q. Did you write these words here?
4  **A. Yes.**
5  Q. "Patient was unable to be seen in
6  the medical suite, but was able to be
7  evaluated cell side by Dr. Miller. Were
8  you with Dr. Miller when she saw Mr.
9  Riley?
10 **A. I don't recall, but I do not**
11 **believe so.**
12 Q. You do not believe?
13 **A. I don't have a recollection of**
14 **being present at that time. I consulted**
15 **with Dr. Miller and was aware that she**
16 **was going to engage Mr. Riley, but I**
17 **don't have any recollection of being**
18 **present when she had.**
19 Q. Is it common for you to prepare a
20 note or updated note about a patient
21 meeting that you did not observe?
22         MR. NINOSKY: Object to the
23 form.
24         You can answer.
25         THE DOCTOR: In this

Page 103

1         regard, yes, because there's a
2  task that is my responsibility
3  to address either directly
4  through -- and it would look like
5  the other notes we just got done
6  reviewing.
7         It also suffices from a
8  policy and procedural standpoint
9  that individuals who are on a
10 suicide precaution are seen daily
11 by one of the qualified mental
12 health staff, that being the
13 psychologist or the psychiatrist.
14 The psychiatrist or psychiatric
15 providers engaging with an
16 individual on a suicide watch
17 also suffices for that
18 professional or that engagement.
19         So, in the process of
20 fielding this task that was
21 assigned to the mental health
22 individuals -- and at that time,
23 it wasn't my sole responsibility,
24 but I was operating in the
25 classification unit and those

Page 104

1  individuals at that point in
2  time. And, so, that with Mr.
3  Riley, the task wasn't assigned
4  to me specifically, but given I
5  was seeing the other individuals
6  at close proximity and who are
7  housed on that unit, I explained
8  away the task by referring to the
9  fact that Dr. Miller had seen him
10 or was going to see him,
11 something of that nature, which
12 would have sufficed
13 administratively to complete that
14 form of documentation.
15 BY MR. MINCEY:
16 Q. Did you spend any time with Mr.
17 Riley on June 24th, 2019?
18 **A. I don't recall specifically if I**
19 **had or not. I could have, but I don't**
20 **recall if that was the case or not.**
21 Q. If you had seen Mr. Riley on
22 June 24th or on any date, would you be
23 required to document that in some way?
24 **A. That's a requirement. Yes.**
25 Q. I'm looking at Page 327. This

Page 105

1  looks like a list of mental health sick
2  calls. Doctor, is this just maybe a
3  collection of your notes from all the
4  mental health sick calls you made
5  related to Mr. Riley? Is that a yes?
6  **A. I don't know if I recall. I've**
7  **never seen this screen that we're**
8  **looking at. It might be a different**
9  **formulation of the already provided**
10 **documentation, but this is -- it might**
11 **just be the formatting, but this is**
12 **unfamiliar to me.**
13         MR. NINOSKY: Kevin, if you
14 look at the top of the page,
15 you'll see "Full Patient
16 History." The Full Patient
17 History is basically everything
18 in a running tab from start to
19 finish of the care, but it's just
20 pulling together the prior
21 screenshots.
22         So, when you had gone
23 through his notes, they're the
24 same as what you see here, and
25 what we had gone through with him

Page 106

1      earlier would be actually what it
2      looks like on the screen as
3      opposed to this format.
4          MR. MINCEY: Okay.
5  BY MR. MINCEY:
6  Q. Dr. Rosas, when you come on to the
7  block for your shift, would the Full
8  Patient History be something that you
9  would review to give yourself as much
10 information as you can get about the
11 people you may see that day?
12 **A. If I'm able to, I take the**
13 **opportunity to do so.**
14 Q. Was the Full Patient History
15 something that you reviewed prior to any
16 of your encounters with Mr. Riley?
17 **A. I don't recall having any**
18 **meaningful information to review prior**
19 **to engaging with Mr. Riley.**
20 Q. Can you tell me approximately how
21 much time you spent with Mr. Riley on
22 June 20th?
23 **A. An approximate time, 15 minutes.**
24 **If I had to take a guess, 15 minutes or**
25 **less.**

Page 107

1  Q. Okay. What about on 6/19?
2  **A. I'm not certain.**
3      MR. NINOSKY: He doesn't
4      want you to guess. You can
5      estimate if you can.
6      THE DOCTOR: Yeah. I
7      can't. I can't really say.
8  BY MR. MINCEY:
9  Q. Do you think your meeting on the
10 19th was longer or shorter than the one
11 you had on the 20th?
12 **A. Guesswork, probably longer.**
13 Q. What about your initial meeting on
14 the 18th, can you give me an
15 approximation on that?
16 **A. Somewhat in the vicinity of 15,**
17 **20 minutes maybe, but, again, guesswork.**
18 Q. Okay. So, on June 19th you spent
19 more than 15 minutes speaking to Mr.
20 Riley without him being responsive to
21 any of your questions?
22 **A. That wouldn't strike me as odd or**
23 **inconsistent.**
24 Q. I guess that's my way of asking
25 you, is that accurate?

Page 108

1          MR. NINOSKY: Asked and
2      answered.
3          You can answer it again.
4          THE DOCTOR: Yes. That's
5      my testimony.
6  BY MR. MINCEY:
7  Q. Okay. In the course of your
8  treatment of Mr. Riley, was there ever
9  any discussion about taking him to a
10 formal hospital setting to either
11 receive a clearcut diagnosis of what was
12 bothering him or to get him treatment
13 that he needed?
14         MR. NINOSKY: Object to the
15     form.
16         But go ahead. You can
17     answer his question.
18         THE DOCTOR: My
19     recollection is there was some
20     type of conversation about what
21     to do next with Mr. Riley, and
22     that included getting him to an
23     outside provider for further
24     assessment.
25 BY MR. MINCEY:

Page 109

1  Q. Do you remember when that
2  conversation was?
3  **A. I don't recall specifically. It**
4  **was in close proximity. It was likely**
5  **the day prior to his demise.**
6  Q. That would be June the 25th?
7  **A. If that's what the record reflects,**
8  **yes.**
9  Q. Okay. Do you recall who would have
10 been a part of that conversation?
11 **A. Ademola Fowale we would be one**
12 **individual who would have been privy to**
13 **that conversation, and likely Dr. Miller**
14 **as well.**
15 Q. So, Dr. Fowale and Dr. Miller?
16 **A. Yes.**
17 Q. And other than that conversation on
18 June 25th, were there any other
19 conversations about whether Mr. Riley
20 should go to an outside provider for
21 medical treatment?
22         MR. NINOSKY: Object to the
23     form, but he can answer.
24         THE DOCTOR: I don't recall
25     any specific discussions about

Page 110

```
1    him going out to a hospital.  I
2    had questions about what to do
3    next, but I don't recall any
4    conversations about whether or
5    not to send him out for further
6    assessment until the day prior.
7  BY MR. MINCEY:
8  Q.   And those other discussions about
9  what to do next, was there a decision on
10 the course of conduct to take?
11 A.  The reason why I'm confident about
12 my response is I had asked for some
13 feedback or help with the case of Mr.
14 Riley.  I felt that I didn't get a lot
15 of help clinically about how situations
16 like this are handled.
17 Q.  When did you ask for help?
18 A.  Specifically I'm not certain, but
19 if I'm taking a guess, by the 20th.  By
20 the third interaction, I've started to
21 generate more than just casual concern
22 for this individual.
23 Q.   And what was it about either June
24 the 20th or the combination of the 18th,
25 19th and 20th that gave you concern to
```

Page 111

```
1  ask Dr. Fowale for help?
2  A.  His presentation was atypical in
3  the sense that it became -- you know, it
4  seemed to advance in acuity, and by
5  that, I mean negative symptoms of
6  psychosis in particular are viewed as
7  often more acute than something like
8  auditory or visual hallucinations, let's
9  say.
10     So, the fact that he had become
11 less able to respond and providing less
12 appropriate engagement over that period
13 of time gave some indication that it was
14 less likely substance induced
15 presentation that I was looking at.
16 That was my assumption at the time given
17 the fact that whatever it was seemed to
18 be advancing instead of retreating, and,
19 so, given that it was heading in that
20 direction, I wasn't certain about at
21 what point anybody else becomes
22 concerned about these patterns.
23     Given that I worked in that
24 environment for a relatively short
25 period of time, I was still not fully
```

Page 112

```
1  aware of the acuity of these individuals
2  coming in from the community or the
3  frequency in which they present
4  themselves in the prison setting.
5     A prison, in professional terms, is
6  viewed as a normative population,
7  meaning the presumption shouldn't be
8  that everybody there has the propensity
9  for mental illness per se.  We should
10 look at it as a sick population who all
11 require some form of care.  We generally
12 view that as a normalized population.
13 And some individuals there require some
14 occasional help, but the facility itself
15 wasn't designed to be an inpatient
16 psychiatric hospital, which was the bulk
17 of my experience.  You know, prior to
18 working in the setting, I was working in
19 more clinic-based or hospital-type
20 settings.
21     So, I did have questions that at
22 what point does this become a concern to
23 staff sort of in general, and I do
24 recall seeking to get a better
25 understanding of that, certainly by the
```

Page 113

```
1  point of third contact.
2  Q.  Do you recall what response Dr.
3  Fowale had when you asked him for help
4  on June 20th?
5  A.  I don't recall specifically about
6  any sort of help that he would be able
7  to provide.  I do recall a sense of a
8  frustration that there was -- it didn't
9  seem to register on many other
10 individuals radars, in particular his.
11 Q.   When you say you don't recall any
12 help he was able to give you, do you
13 recall what he said when you mentioned
14 it to him?
15 A.  I don't recall.  I don't recall
16 what he had said.  It wasn't helpful to
17 the case, or it wasn't helpful for my
18 purposes.
19 Q.  How long was the conversation that
20 you had with Dr. Fowale on June
21 the 20th?
22 A.  I can't say specifically other than
23 it was brief and not -- it wasn't
24 meaningful, from my recollection.
25 Q.  Where would that conversation have
```

GARRETT ROSAS, PSYD

Page 114

1  happened?
2  **A.  On the unit -- or in the medical**
3  **department, I'm sorry.  Not on the**
4  **housing unit.  Within the medical**
5  **department in the facility.**
6  Q.  Did you ask anybody else other than
7  Dr. Fowale?
8  **A.  I don't recall specifically if I**
9  **had asked anybody else.  Not likely, but**
10  **I don't recall either.**
11  Q.  When you say you were frustrated,
12  did you do anything to address your
13  frustrations?
14  **A.  I don't recall doing anything about**
15  **it come the 20th.**
16  Q.  Did you make a notation anywhere
17  about your meeting with Dr. Fowale?
18  **A.  No, sir.  I am not aware of any**
19  **notation.  I wish I had.**
20  Q.  Was anybody else present when you
21  had your meeting with Dr. Fowale on
22  June 20th?
23  **A.  In my minds eye, I don't see**
24  **anybody else -- it wasn't like a team or**
25  **group setting, no.**

Page 115

1  Q.  Was the response, or lack thereof,
2  that you described from Dr. Fowale
3  unusual based on other environments you
4  worked in as a psychologist?
5      MR. NINOSKY:  Object to the
6      form.
7      THE DOCTOR:  Yeah.  I
8      can't say if that was typical or
9      not.
10  BY MR. MINCEY:
11  Q.  Okay.  If the choice had been
12  yours, would you have sent Mr. Riley to
13  the hospital, or would you have allowed
14  him to stay at the jail?
15      MR. NINOSKY:  Object to the
16      form.  Speculation.
17      But you can answer if you
18      can.
19      THE DOCTOR:  Yeah.  I don't
20      believe so.  I mean in
21      retrospect, obviously I wish we
22      would have, but at that time, I
23      don't believe so.
24  BY MR. MINCEY:
25  Q.  When you say you don't believe so,

Page 116

1  you would say you don't believe you
2  would have recommended Mr. Riley go to
3  the hospital?
4  **A.  Other than his presentation that**
5  **precluded from him engaging in a**
6  **productive or meaningful type of way,**
7  **the acuity of what was going on didn't**
8  **suggest to me that there was a disease**
9  **state or process that was so acute that**
10  **he required urgent care.**
11  Q.  Why do you wish that you had
12  documented your conversation with Dr.
13  Fowale?
14      MR. NINOSKY:  Object to the
15      form.
16      THE DOCTOR:  So I didn't
17      have to surmise what those
18      conversations were about some
19      three years later, yeah
20      (laughter).
21  BY MR. MINCEY:
22  Q.  Okay.  Give me one second, Dr.
23  Rosas.  Let me check my notes real
24  quick.  I think I'm just about done.
25      (Brief pause.)

Page 117

1      MR. MINCEY:  Dr. Rosas, I
2  don't have any other questions
3  for you, but the other counsel on
4  the call may have some.  So, I'm
5  going to open it up to them and
6  see if they have any questions
7  for you.  Okay?
8      THE DOCTOR:  Okay.
9      MR. NINOSKY:  Does anybody
10  have questions?
11      MR. LAVERY:  Frank Lavery.
12  I do not.
13      MR. POLAHA:  Matt Polaha.
14  I do not.
15      MS. HARRISON:  Alissa
16  Cardenas Harrison.  I do not.
17      MR. NINOSKY:  Okay.  You're
18  done.
19      MR. MINCEY:  Dr. Rosas, I
20  appreciate your time and
21  patience.  Thanks for being a
22  part of this, and if we need to
23  contact you, we'll reach out to
24  your counsel.  Okay?
25      THE DOCTOR:  Very well.

Page 118

1      Thank you.
2              - - -
3           (Witness excused.)
4              - - -
5      (Deposition concluded at 4:00 p.m.)
6              - - -
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 120

**C E R T I F I C A T E**

I, the undersigned, GARRETT ROSAS, PSYD,
do hereby certify that I have read the foregoing
deposition and that, to the best of my knowledge,
said deposition is true and accurate (with the
exception of the corrections listed below):

PAGE-LINE

_____-____- _____
_____-____- _____
_____-____- _____
_____-____- _____
_____-____- _____
_____-____- _____
_____-____- _____
_____-____- _____
_____-____- _____
_____-____- _____
_____-____- _____
_____-____- _____
_____-____- _____
_____-____- _____
_____-____- _____
_____-____- _____
_____-____- _____
_____-____- _____

_____   _____
DATE              GARRETT ROSAS, PSYD

DiPIERO COURT REPORTING
Registered Professional Reporters
1175 Marlkress Road - Unit 2460
Cherry Hill, New Jersey  08034
(215) 735-8101

Page 119

1      C E R T I F I C A T I O N
2
3
4
5         I, Maria Rousakis, hereby
6      certify that the foregoing is a
7      true and correct transcript of
8      the proceedings held in this
9      matter as transcribed from the
10     stenographic notes taken by me on
11     Thursday, July 7, 2022.
12
13
14
15
16     ----------------------
       Maria Rousakis
       Court Reporter
17
18
19
20     (This certification does
       not apply to any reproduction
21     of this transcript, unless
       under the direct supervision
22     of the certifying reporter.)
23
24         - - -
25

GARRETT ROSAS, PSYD

## A

**abbreviated** 15:17
**abbreviation** 15:1
60:2
**abilities** 32:4 39:2
**ability** 9:3 37:4
43:6 45:3 54:24
67:15,20 70:8
92:19
**able** 9:3 25:17 27:8
37:6 38:3 41:9
46:11 47:12
54:14 61:10
63:12 65:15 66:5
69:2,23 77:4
80:15 89:20 91:3
94:20 98:15
101:14 102:6
106:12 111:11
113:6,12
**abuse** 77:22
100:21
**access** 71:21,24
**accessed** 29:6
**accessible** 28:16
**accommodate** 8:19
**accomplish** 82:11
**accomplished**
74:12 85:16
**account** 20:11
**accurate** 52:9 72:7
107:25 120:3
**accusing** 57:10
**acknowledging**
43:23
**act** 87:17
**action** 1:4 31:10
**active** 87:19 95:1
**actively** 83:3 87:16
95:9
**ACTS** 15:17,20,21
16:1,15
**actual** 50:2 53:25
**acuity** 111:4 112:1

116:7
**acute** 111:7 116:9
**Adams** 17:19
**add** 36:19 58:22
**added** 63:17,22
64:3 66:22
**addendum** 49:10
49:16
**additional** 46:12
52:22 84:19
86:11
**Additionally** 46:14
**additions** 49:14
**address** 12:16,20
103:3 114:12
**Ademola** 76:7
109:11
**administrative**
16:5 22:18 28:20
28:22
**administratively**
74:12 104:13
**Administrator** 1:4
**adopted** 51:2,10,21
**advance** 9:17,21
111:4
**Advanced** 15:18
**advancing** 111:18
**advantageous** 21:5
**affect** 42:19 43:1
**afternoon** 5:18
48:23 50:6 62:4
**ages** 17:9
**ago** 9:8
**agree** 50:9,16
62:10 64:1 80:11
80:23,24
**ahead** 13:18 40:12
108:16
**akin** 95:17
**al** 1:5,9
**alcohol** 70:6,12
88:20
**alerting** 44:10

**Alissa** 2:19 117:15
**allocated** 24:25
**allow** 60:21
**allowed** 46:23 86:9
115:13
**altered** 63:18
**alternative** 21:8
**ambient** 39:11
54:15
**ambulate** 34:14
**ambulating** 37:9
**amount** 39:10
41:23 42:14 86:8
**amplified** 54:12
**Angela** 2:25
**answer** 6:9 7:24
8:10,22 13:8
18:14 19:2 25:25
26:6,17,20 27:11
28:2 30:14 41:9
42:3,5 45:7 46:4
52:20 55:17
56:22 57:3,14
58:6 59:15 68:5
68:14 69:2,14
73:7 74:5 81:4,13
82:6 84:5,7,23
85:8,10 86:15
91:22 93:3 96:5
96:18,19 97:14
97:23 98:15
100:8 102:24
108:3,17 109:23
115:17
**answered** 80:5
81:11 97:17
108:2
**answering** 6:18
7:20
**answers** 9:5 40:24
72:16 79:18 80:9
**anticipate** 7:17
**anybody** 12:23
61:12 111:21

114:6,9,20,24
117:9
**anytime** 90:2
**apologize** 26:19
61:4
**appear** 80:9
**appearance** 92:19
**APPEARANCES**
2:1 3:6
**appears** 43:2 72:17
80:20
**applicability** 89:12
**apply** 29:10 119:20
**appraisal** 77:24
**appreciate** 117:20
**appropriate** 43:16
57:7 111:12
**appropriately** 69:5
69:11
**approved** 31:25
**approximate** 6:15
16:21 106:23
**approximately**
1:15 13:12 15:21
16:23 106:20
**approximation**
107:15
**arbitrary** 24:22
**arises** 27:4
**arrested** 13:25
**arrived** 62:25
**art** 37:25
**articulating** 40:3
**Arts** 11:12
**ascertain** 46:12
**ascertained** 73:10
**ascertaining** 89:7
**asked** 6:23 8:21
23:4 32:17 41:5,9
41:13 47:14
56:18 76:15 79:5
81:10,12 108:1
110:12 113:3
114:9

**askew** 44:17
**asking** 40:9 45:4
69:16 92:13,14
107:24
**aspect** 23:2 33:18
44:9 84:15
**aspects** 39:20 43:9
**assess** 92:13,14
**assessed** 83:19
**assessing** 25:10,13
**assessment** 33:20
34:15 40:20 45:8
59:1,23 64:15
67:13 68:7 71:14
76:18 77:3 78:2
78:10 80:1 101:6
108:24 110:6
**assessor** 15:5
16:10
**assigned** 22:21
103:21 104:3
**assist** 36:15
**associated** 19:23
75:8
**Associates** 15:3
**association** 76:2
**assume** 8:11 45:10
**assuming** 10:11
86:25
**assumption** 94:10
111:16
**attempt** 35:25
77:10
**attempted** 21:4
**attention** 76:15
**attorney** 5:19
55:16
**attribution** 43:15
**atypical** 60:22
111:2
**auditory** 111:8
**authority** 31:21
32:3 86:20 87:6
**available** 29:4

32:24 36:4 46:13
52:1 77:20
100:10
**avoid** 70:18
**avoidant** 92:5
**aware** 27:12 52:24
69:24 75:25 84:8
84:11 85:12 86:1
86:5,16 89:23
102:15 112:1
114:18
**awareness** 24:8
88:12
**A-C-T-S** 15:17
**a.m** 25:1,1 50:13
62:6

**B**

**Bachelor** 11:12
**back** 24:9 34:21
40:22 44:14
51:25 52:7 56:4
73:2,5 98:3
**background** 10:4
35:13,22 47:1
77:22
**bandage** 48:5,9
60:18,24 61:3,13
**based** 5:20 45:15
59:7 65:3 67:9
73:15 80:21 93:9
115:3
**basically** 73:25
80:4 105:17
**basis** 59:3
**bathroom** 44:5
**bear** 6:8
**becoming** 18:17
66:6
**bed** 53:10
**began** 14:15 15:9
21:14 38:22
67:11
**beginning** 1:15

16:22 63:7,21
**behavior** 35:4
36:18,23 37:25
38:10 50:14,22
51:20 62:7 87:17
**behavioral** 17:5,8
30:4
**behaviors** 50:20
52:14 62:17 64:1
81:13 83:4 95:5
95:10
**belief** 70:16 89:19
**believe** 6:3 15:1
30:15 35:9 38:12
51:1,9 58:8,19
60:20 62:24
64:13 65:5,6 67:1
71:17 75:13
77:15 82:8 90:7
98:1,18 102:11
102:12 115:20,23
115:25 116:1
**believed** 90:4,11
**Bellingham** 11:2
**best** 6:12 8:1,4,9
59:6 79:22 94:6
100:11 120:3
**Betancourt** 2:12
**better** 43:10 54:14
78:23 89:7,17,22
95:20 112:24
**beyond** 53:7
**big** 54:3
**binder** 29:1,3,9
**birth** 10:8 17:9
**bit** 6:7 41:12 43:24
**bland** 43:4
**block** 106:7
**blunting** 42:19
43:1
**bono** 19:10
**booking** 83:15
**borrowed** 63:13
**bothering** 108:12

**bottom** 33:8 48:14
94:15,16 96:10
**box** 2:15 66:24
**boxes** 67:15,21
93:14
**break** 8:16,22,23
20:11 55:24,25
**BRIAN** 1:8
**brief** 21:21 56:7
113:23 116:25
**briefly** 15:8 21:3
**brought** 37:2,7
76:14
**builds** 78:19
**bulk** 112:16
**bureaucratic**
31:24
**buttons** 72:19
**B-e-l-l-i-n-g-h-a-m**
11:3

**C**

**C** 119:1,1 120:1,1
**calender** 24:13
**call** 7:11 8:18
33:17 41:5 64:25
68:10 70:22
117:4
**calling** 12:9,10
**calls** 105:2,4
**Camp** 2:10,22
**capability** 70:14
**capacity** 19:1,4
**Cardenas** 2:19
117:16
**care** 2:12 5:24
14:11,14,15,19
14:23,25 16:7
21:17 23:5,9,20
25:5,9,15,18,19
26:7 27:21 36:16
38:23 77:25 78:6
105:19 112:11
116:10

**CARMEN** 1:4
**carried** 40:21
**carry** 85:20
**case** 29:16 51:13
104:20 110:13
113:17
**caselaw** 57:6
**cases** 31:4
**casual** 110:21
**categories** 94:14
**categorized** 95:25
**category** 45:9 99:7
**caused** 88:2
**cell** 34:7,9 39:8
43:20 44:7 50:12
53:2,5 62:3 63:5
72:14 73:18
102:7
**Center** 2:9
**certain** 27:2,4,22
47:4,11 86:5
88:19 99:10
107:2 110:18
111:20
**certainly** 95:2
112:25
**certification** 5:4
23:16 119:20
**certifications**
23:12
**certify** 119:6 120:2
**certifying** 119:22
**cetera** 75:1,2
**chain** 31:24
**chance** 99:24
**change** 63:21
93:17 95:3 96:8
100:20
**characteristics**
99:18
**chart** 32:23 46:13
**charting** 33:14
36:7
**check** 51:9 66:25

116:23
**checked** 66:24
67:3 93:8,23
97:13
**Cherry** 1:24
120:24
**Chester** 3:13
**child** 13:3
**children** 17:8
**children's** 17:5
20:24
**choice** 88:6 115:11
**choices** 95:11
**choose** 93:13 94:14
**chose** 95:18
**circumstances**
42:7
**CIVIL** 1:4
**clarification** 74:10
**clarifications**
49:14
**clarify** 29:24 31:17
38:10 40:14 51:6
**clarifying** 18:15
**CLARK** 1:8
**classification**
103:25
**classroom** 22:14
**cleanest** 7:21
**clear** 7:6,9 44:21
69:25 75:7
**clearcut** 108:11
**clearly** 39:21 95:10
**click** 66:24 67:15
72:18
**clicked** 91:10
96:17 98:22
**clicking** 67:21
**clinic** 21:5,13
63:12
**clinical** 16:2,4,5
23:1 39:2 59:4,7
89:24 91:24 94:7
100:12,14,18

**clinically** 110:15
**clinic-based** 112:19
**clocks** 89:2
**close** 13:15 104:6 109:4
**closed** 53:24
**closer** 13:23
**clothed** 69:1
**coaching** 57:9
**code** 66:22
**coding** 66:21
**COLEMAN** 2:8
**collaborative** 85:17
**collected** 36:9
**collection** 105:3
**college** 10:23,25 11:15
**combination** 92:15 92:17 110:24
**come** 25:21 26:12 26:21 37:3 44:6 53:14 54:12 56:4 76:10 89:14 106:6 114:15
**comes** 35:15 49:15 51:14
**coming** 76:13 112:2
**commit** 81:24
**committed** 82:8
**common** 89:9 102:19
**Commonwealth** 14:8 16:16,18 17:11 18:3
**Commonwealth-...** 17:4,6
**communicate** 39:17 40:4 45:4 54:25 92:20
**communication** 39:18 54:22

**Communications** 1:14
**community** 112:2
**compensation** 16:13
**compiles** 71:5
**complaints** 23:22 24:6
**complete** 49:7 58:24 65:16 73:2 73:5,13 75:14,20 76:12,23 77:2,4,8 77:14 78:1 83:13 83:21 84:1,20 85:5 86:9 90:9 99:3 104:13
**completed** 46:16 49:1 73:15 74:2 75:9 76:2,20,22 77:1,6 78:5,8,12 91:11 100:23 101:1,20,25
**completing** 77:18 83:17
**completion** 73:22
**comprehendible** 39:19
**comprehending** 65:18
**computer** 72:11 73:19
**concern** 30:3,5 110:21,25 112:22
**concerned** 111:22
**concerns** 41:11
**concluded** 118:5
**condition** 45:13,23 55:1 67:8 68:1
**conditions** 25:17 46:1 63:10 70:11 85:23 99:11
**conduct** 73:1 110:10
**confident** 39:1

110:11
**confirm** 55:6
**confused** 20:18 89:6
**conjecture** 75:10
**CONNELL** 3:9
**consented** 78:6
**consequences** 95:7 95:13
**consider** 85:2 87:10
**considering** 88:2
**Consistent** 94:5
**constant** 86:24,25 87:3,13
**consult** 55:16
**consultant** 16:19 17:1
**consultation** 29:15 30:6 46:7,22 85:16
**consulted** 102:14
**contact** 32:9 34:21 37:18 46:23 47:9 49:22 50:2 73:23 76:2 77:11 78:13 90:19,20,21 91:2 91:8,13,18 92:4 92:21 113:1 117:23
**contains** 77:23
**contemplating** 55:15
**continue** 56:13 100:16
**Cont'd** 3:6
**conversation** 39:10 40:23 47:21 53:24 55:7 73:11 75:24 108:20 109:2,10,13,17 113:19,25 116:12
**conversations** 109:19 110:4

116:18
**Corporate** 2:9,20
**correct** 13:16 18:12 45:18 48:16 60:5 61:23 69:3 72:24 81:1 96:20,24 97:19 98:1,16 100:5 119:7
**corrections** 22:12 39:5 120:4
**counsel** 2:6,11,16 2:24 3:15 5:2 117:3,24
**counseling** 15:18 17:14,24 18:25 19:6,11,23 20:5 20:14,16,20 21:2 21:10,15
**county** 1:8 17:19 21:19 22:1,7,21 22:22 24:11 37:17
**couple** 9:8 61:14
**course** 108:7 110:10
**court** 1:1,17,21 7:2 10:18 119:16 120:22
**courtroom** 9:10
**covered** 53:21
**covering** 53:22
**created** 71:22
**credentialing** 23:16
**current** 96:16 97:15 98:20
**custody** 37:14,18 37:21 38:8
**cut** 18:13 51:5,8,11 51:17 63:16
**cutting** 40:13

_____
**D**
_____

**daily** 103:10
**data** 40:17
**date** 1:15 10:8 12:3 15:11 20:5,12 22:5 32:11,13 33:16 67:25 73:17 104:22 120:20
**dates** 16:21
**Dauphin** 1:8 21:19 22:22 24:10 37:17
**day** 9:21 24:11,25 25:2,2 34:24 38:5 49:11 53:16 54:22,23 55:2 58:2,11 67:11 68:2 79:19 87:5 88:15 89:6 90:8 90:12,21 91:1,7,9 91:11,12,19,19 106:11 109:5 110:6
**days** 67:11 74:1 83:22 84:18,25 85:22 86:8,18
**DCP** 61:15 65:20
**dead** 79:10
**dealings** 35:23
**December** 10:10
**deciding** 87:11
**decision** 110:9
**decline** 69:6
**deem** 25:21 27:7
**default** 83:12
**Defendant** 2:11,16 2:24
**Defendants** 1:9 3:15 5:25
**defined** 95:21
**defines** 30:17
**definitely** 7:7 93:19
**Definitions** 79:4

GARRETT ROSAS, PSYD

Page 124

**degree** 11:10 12:5 19:24 66:4
**delayed** 49:25
**delusional** 70:16
**demise** 109:5
**denied** 99:23
**DENNEHEY** 2:8 2:18
**department** 28:21 34:15,20 37:2,4 37:16 50:13 62:6 63:25 114:3,5
**depending** 25:2 30:2 36:4 37:4 42:11 49:21,24 54:15 78:20
**deposed** 6:2
**deposition** 1:13 6:1 9:15,18,22 118:5 120:3,3
**depressed** 42:18 43:18
**describe** 33:12 38:13 62:13 64:7 64:10
**described** 27:15 42:18 46:4 53:8 63:2 115:2
**describes** 36:25
**descriptions** 43:17
**descriptive** 85:23
**designated** 28:20
**designed** 112:15
**detail** 91:24
**detailed** 85:22 89:21
**deteriorated** 68:2
**deteriorating** 91:19
**deterioration** 58:1 58:10 68:10
**determination** 45:22 67:5 74:24 85:3 100:2,15,19

**determine** 51:25 57:8 88:7
**determines** 30:9 73:4
**detox** 100:16
**development** 17:3
**diagnosis** 45:9,11 108:11
**diagnostic** 66:16 67:12
**diagnostically** 45:14
**dictate** 30:5 42:14
**different** 42:6,10 49:19 52:23 58:19 62:25 64:14,16 95:24 105:8
**differently** 58:8 93:20 98:19
**difficult** 26:20 39:9 39:16,17 42:5 54:21,23 66:7 89:1
**difficulty** 37:9,11
**digital** 29:5
**diligent** 57:11
**dimensions** 53:23
**DiPIERO** 1:21 120:22
**direct** 16:6,7 25:15 25:18 27:13 40:23 75:21 76:4 119:21
**directed** 78:1
**direction** 91:4 111:20
**directly** 40:16 41:10,14 73:12 76:16 103:3
**Director** 16:2,4
**directs** 26:11,22
**disability** 16:12
**discipline** 23:19

**disciplined** 24:2
**discussed** 46:6 56:16 57:4,15
**discussion** 108:9
**discussions** 109:25 110:8
**disease** 116:8
**disheveled** 44:17 44:18
**disorder** 58:16 59:10 60:3 67:6 100:4,5
**disorders** 59:18 66:15,20
**disruptive** 51:20 95:5
**dissertation** 20:22
**distance** 6:16
**distinctly** 49:19 52:22
**distress** 44:15,20
**distressed** 42:21 44:13
**DISTRICT** 1:1,2
**doctor** 12:7 13:12 26:2,18 27:12 28:3 30:15 35:14 42:4 52:21 58:7 59:16 68:6,15 74:6 80:15 81:5 81:20 84:6,24 85:9 86:16 91:23 93:4 96:7,24 97:10,25 98:9 100:9 101:7 102:25 105:2 107:6 108:4,18 109:24 115:7,19 116:16 117:8,25
**doctoral** 11:18 19:14,16,19
**document** 49:6 51:10 66:19 78:5 78:21 79:1 94:6

101:14 104:23
**documentation** 48:25 49:25 50:3 64:17 104:14 105:10
**documented** 40:8 64:14 116:12
**documents** 9:19,23 36:5,8 46:15 71:22
**doing** 6:17 31:7 37:8 43:23 53:11 114:14
**domain** 89:12
**domains** 33:19 80:1
**door** 39:9 44:7 53:19,24,25
**Dr** 12:10,12,23 33:9 48:16 56:11 57:17 70:19 71:10 76:8,10 98:16 102:7,8,15 104:9 106:6 109:13,15,15 111:1 113:2,20 114:7,17,21 115:2 116:12,22 117:1,19
**drafted** 49:19
**Drive** 2:9,20
**dropdown** 96:14
**dropdowns** 72:19
**dropping** 92:21
**drugs** 70:6,12 88:20
**DSM** 66:18
**due** 18:1 35:3 42:5 50:14 62:6 67:7 74:22
**duly** 5:11
**duties** 16:3,9,25

———————
**E**
———————

**E** 119:1 120:1,1
**earlier** 64:18 97:16 106:1
**easier** 14:24
**East** 10:16
**Eastmont** 10:15
**easy** 89:14
**education** 11:14 19:8,14
**effort** 85:17
**eight** 86:18
**either** 21:7 39:20 40:15 46:23 47:22 51:10 81:9 90:3 103:3 108:10 110:23 114:10
**electronic** 33:14,15 48:25 67:18
**electronically** 46:17
**elements** 73:12
**elevated** 99:20
**eludes** 47:20
**emotional** 43:3
**employed** 14:11 15:5 17:25 18:16 21:1,12,20 30:1
**employment** 15:9 20:7 21:8 22:4 24:1
**EMR** 33:15
**encounter** 27:7 29:7 45:20 65:23 75:17
**encountering** 38:25
**encounters** 90:3 106:16
**endeavor** 8:15
**ended** 15:9 20:25
**engage** 32:4 35:22 42:7 43:6,11,20 66:5 70:8 102:16

GARRETT ROSAS, PSYD

Page 125

engaged 46:10 95:9
engagement 44:20 70:18 87:19 95:1 103:18 111:12
engagements 45:6
engaging 39:4 70:14 83:3 87:16 95:5 99:22 103:15 106:19 116:5
enroll 11:5,21
enrolled 11:18
enrollment 11:7
enter 83:14
entered 101:11
entire 7:4
entirely 55:4 57:23 75:7
entries 36:6
entry 33:16 59:2
environment 43:7 64:20 66:5 83:7 111:24
environmental 39:12 43:5 47:22 83:8 88:13
environments 115:3
especially 40:17
ESQUIRE 2:3,3,9 2:14,19 3:10
essence 82:23
established 22:17
Estate 1:4 5:22
estimate 107:5
estimated 98:20
et 1:5,8 75:1,1
evaluate 25:5
evaluated 102:7
evaluation 26:13
evaluations 16:12
evening 89:3
event 7:4

events 44:15
eventually 20:25
everybody 112:8
evident 66:6 93:24
exact 15:10 22:4 24:23 53:12
exactly 29:8 30:25 47:18,19 74:11
exam 87:22 89:11
EXAMINATION 5:15
examined 4:12 5:12
example 6:23 51:15 63:2
examples 82:5
exception 120:4
excused 118:3
exhibits 4:18
exist 27:16
existed 34:24
existing 27:5 100:20
exists 26:11 27:1 30:9,16
exit 83:15
expediential 22:16
experience 86:7 112:17
explain 59:4 60:21 67:13 80:25 94:7
explained 76:11 104:7
explanation 47:16 51:21 81:6 95:18
express 45:2
expressing 47:23
extent 8:15
extra 85:4,13,15 85:24
extraordinary 68:17,20
eye 90:19,21 91:1,8 91:18 92:3,21

99:25 114:23

## F

F 119:1 120:1
face 44:8
facility 21:22,23 22:19 36:14 59:2 83:15 88:23 112:14 114:5
fact 18:1,15 45:15 65:21 104:9 111:10,17
factors 43:6 83:2 85:2 87:10 88:1 88:13 99:9,15,21
failing 55:5
fair 54:8 55:10 58:3 63:8 65:12 65:16 67:23 68:2 68:7 90:16 91:12 91:14,15 98:24 101:6
fall 31:8 46:5
familiar 27:17
familiarity 40:19
family 46:24 47:6
far 24:23 45:25 46:7 47:6 61:10 91:23
feature 71:4
feedback 38:2,7 110:13
feeds 73:22
feel 39:1 58:21 67:16
fellowship 20:23
felt 110:14
field 49:15 82:12 89:10
fielding 103:20
filed 23:23 24:6
filing 5:5
fill 72:19 89:18
filled 78:17 79:25

93:19
filling 82:12 94:18
final 49:1
find 22:5 52:5
fine 7:1
finish 105:19
finished 18:10
finishing 20:22
first 5:11 19:6 20:6 22:3 24:21 32:8 32:13 34:3,9,21 38:14,17,25 39:8 41:20 45:21 48:1 51:5,12,13 53:4 55:18 61:17 63:1 63:3 64:11 67:24 75:16 76:6 77:11 78:13 79:3 90:8 90:12,21
FITZPATRICK 2:2
five 13:13 94:14
flat 42:19
floor 35:15 53:11
follow 27:24
follows 5:13
foregoing 119:6 120:2
forget 8:2 15:6
forgot 16:8
form 5:7 25:24 26:16 27:10 28:1 29:3,5 30:13 40:20,22 42:2 49:2,12 52:19 53:8 58:5 59:14 64:17 68:4,13 70:7 71:11,17,23 71:25 72:3,18 73:2,6,14,15,23 74:2,4 76:17,18 77:6,18 78:3,17 80:14 81:3,19 82:12 84:4,22

85:7 86:14 89:18 91:21 93:2 94:18 96:4 97:21 100:7 102:23 104:14 108:15 109:23 112:11 115:6,16 116:15
formal 12:3 15:6 23:1,5,15 31:14 59:12 73:10 86:4 108:10
formally 21:12
format 33:17 72:9 106:3
formatting 105:11
forms 71:20 75:8 75:14,20 76:1,12 76:19,21,25 93:20,22
formulate 67:12
formulation 105:9
forth 40:23
forward 9:15
found 21:8
Fowale 76:7,8,10 109:11,15 111:1 113:3,20 114:7 114:17,21 115:2 116:13
Frank 2:14 117:11
Franklin 22:1,7,20
freeform 40:25
frequency 82:18 112:3
front 8:3 9:10 32:18 71:10
frustrated 45:3 114:11
frustration 113:8
frustrations 114:13
full 10:5 105:15,16 106:7,14
fully 69:24 111:25

GARRETT ROSAS, PSYD

Page 126

**funded** 17:7
**further** 41:12
  48:13 108:23
  110:5
**F-o-w-a-l-e** 76:7
**F28** 66:11,11,13

**G**
**gain** 36:15 45:24
**gap** 49:24 50:3
**garbled** 40:1
**garnered** 94:22
**Garrett** 1:13 4:10
  5:10 10:6 101:21
  120:2,20
**gather** 6:11 36:11
  46:11,19
**gathered** 67:9
  73:16,20
**gathering** 40:16
**general** 79:12
  88:12 89:10 91:3
  93:15 112:23
**generally** 25:1
  35:21 51:12 54:9
  71:20 89:4
  112:11
**generate** 110:21
**generated** 34:2
  46:16
**generic** 43:4
**gestures** 55:6
**getting** 66:7
  108:22
**girth** 75:2
**give** 6:4,11 7:5 9:4
  10:4 12:19 38:18
  106:9 107:14
  113:12 116:22
**given** 43:5 73:18
  104:4 111:16,19
  111:23
**gives** 41:2 49:7
**glass** 53:21

**go** 8:16 9:14 10:23
  10:25 13:18 29:9
  29:12 31:23
  40:12,25 46:8,8
  73:1,5 84:18
  86:24 98:3
  108:16 109:20
  116:2
**goes** 91:24
**GOGGIN** 2:8
**going** 6:4 7:16,17
  7:21 8:11 10:3
  12:15 13:9 16:21
  32:22 33:2 34:21
  35:19 38:3 40:14
  44:14 46:14
  53:10 56:20,22
  57:3,13 65:3
  92:11 102:16
  104:10 110:1
  116:7 117:5
**good** 5:18 13:6
  39:9 89:15
**govern** 25:20
**graduate** 11:8,11
  11:24 12:1
**graduated** 10:11
  10:22 19:18
  23:13
**graduation** 12:3
  20:12
**Great** 12:21
**Greg** 2:17
**ground** 6:5
**group** 15:15
  114:25
**gruesome** 68:22
**guess** 6:14 59:7
  67:20 75:11 81:8
  82:10 89:24 94:7
  100:12 106:24
  107:4,24 110:19
**guessing** 89:16
**guesswork** 92:11

95:19 107:12,17
**guidance** 27:14
  28:6
**guiding** 66:19

**H**
**H** 2:3
**Habit** 7:13
**hallucinations**
  93:23 94:4 111:8
**hand** 29:22,22
  60:19 78:20
**handled** 110:16
**handouts** 22:15
**hands-on** 22:16
**handwriting** 72:16
**hanging** 26:24
**happened** 32:6
  52:6 68:24 114:1
**happens** 88:18
**hard** 101:15
**harm** 74:21,25
  98:21 99:13,14
**harming** 41:15
  83:3 87:16
**Harrisburg** 2:15
**Harrison** 2:19
  117:15,16
**head** 6:25
**heading** 111:19
**headquartered**
  17:17
**health** 17:5,8 25:6
  25:16 28:19 30:4
  30:4 31:6 45:10
  47:7 66:15,20
  77:5,9,18,21 78:3
  78:4 89:10
  103:12,21 105:1
  105:4
**hear** 9:4 39:9,22
  40:2 54:13,14
**hearing** 81:25
**heavy** 22:25 48:4,8

**held** 19:15 23:8
  119:8
**help** 51:24 84:19
  85:4 94:7 110:13
  110:15,17 111:1
  112:14 113:3,6
  113:12
**helpful** 113:16,17
**high** 10:12,15,22
  98:22 99:2
**highlighted** 36:17
  50:7
**highly** 32:4
**Hill** 1:24 2:10,22
  120:24
**historically** 99:9
  99:21
**History** 105:16,17
  106:8,14
**hold** 13:16 23:15
  56:19
**holding** 54:5
**hospital** 20:24
  30:11 31:15,23
  32:1 59:12
  108:10 110:1
  112:16 115:13
  116:3
**hospital-type**
  112:19
**hours** 24:22,25
  87:5
**housed** 104:7
**housing** 37:22
  42:12 114:4
**HSA** 28:19

**I**
**ICD-10** 66:14,18
**idea** 29:7 95:20
**ideations** 79:4
  80:20 96:17
  97:15
**illness** 25:14 70:8

70:13 75:1 94:11
  112:9
**IMA** 15:1,13
**impaired** 42:20
  96:1,2
**impairment** 95:14
**important** 91:17
**imprecise** 88:10
**impression** 93:15
  93:17 94:8
**impressions** 38:18
  96:11
**improved** 55:1
  66:3 93:22
**impulsive** 94:16,20
  94:23
**inability** 74:22
  92:6
**inappropriately**
  69:10
**inaudible** 47:22
  48:18
**incarcerated** 44:23
  47:15,17
**inches** 54:6
**included** 17:7
  108:22
**includes** 83:7
**including** 34:20
  67:10 73:21 79:2
**inclusive** 79:23
**inconsistent** 80:10
  107:23
**incorporate** 79:24
  92:9
**incorporated**
  79:25 86:3
**incorrect** 20:4
  72:20,22 80:21
**increasingly** 66:7
**INDEX** 4:6
**indicates** 59:6
**indicating** 54:3,10
  61:22 98:7

indication 52:24
74:19 111:13
indicative 58:14
indicators 31:9
indirectly 40:16
individual 34:19
37:6 38:5 40:18
44:10 46:10,20
73:9 74:14 75:22
77:7 83:1,9 86:17
87:4 95:9,24
103:16 109:12
110:22
individually 35:20
individuals 25:15
26:8 36:12 39:4
42:8 78:6,11,14
83:12 103:9,22
104:1,5 112:1,13
113:10
individual's 77:21
88:11
induced 111:14
Industrial 15:2
influence 9:3 70:6
70:12 88:20
informal 73:10
information 6:11
22:15 35:22 36:5
38:9 40:17 41:3
45:17,24 46:12
46:20 47:1,8,12
49:17 50:23 59:3
59:7 67:9 70:10
73:16,20,21
74:23 75:3 76:14
77:20,23,25
78:18 84:17 89:8
92:2 100:11
101:11 106:10,18
informed 65:15
initial 58:25
107:13
initially 17:25

18:16 21:20
62:25
injuries 47:25 48:2
48:10 60:14
inmate 25:21
26:12 27:7 30:10
31:14 37:13,23
45:25 47:2 52:6
59:1 83:20 86:8
100:15
inmates 25:5 34:8
inmate's 46:24
inpatient 112:15
inside 54:12
insight 42:20
instance 64:22
88:16
institute 14:10
institution 46:25
instruct 13:8
instructing 57:1
instructions 27:2
intake 34:7 36:9
58:25 59:1 65:16
77:5,9,18 78:3,4
83:13,17,21 84:2
84:20 85:5 86:9
99:4 100:23
intend 31:17
intended 45:1 60:1
79:21
intent 87:18
intentionally 70:18
interaction 66:8
73:17 110:20
internship 20:19
interpretation
79:1
interpreted 44:19
interview 72:10
73:1
Interviewer 72:5
intoxication 94:12
intrude 44:4

invasive 31:10
involve 22:13
involved 14:3 17:2
22:11 28:5 33:19
39:25 42:11
44:21 47:11 83:2
83:5,10 88:13
95:11 99:19
involves 5:24
in-person 34:15
issues 25:6 99:13

**J**

jail 30:11 31:16
115:14
Jersey 1:24 120:24
job 17:23 18:18
20:10 51:5
John 2:9 12:14
57:10 71:8
judge 9:10
judgement 42:20
94:13
July 1:11 119:11
jump 8:3
juncture 54:1
78:16
June 24:9 48:15
50:20 53:6 60:9
60:16 61:23
62:12,13,17 64:8
64:12 67:24,25
69:1,8,13,19 72:6
77:12 79:19,19
79:20 80:3,4,4,22
90:3,4,13 91:1
92:22,23 96:21
96:23,23,24
97:17 98:10,11
98:14,14 100:1
104:17,22 106:22
107:18 109:6,18
110:23 113:4,20
114:22

jury 9:10

**K**

keep 99:24
keeping 67:19
kept 28:17,18,25
29:2 52:16
Kevin 2:3 5:19
71:5 105:13
kill 80:6 97:18
98:6
kind 11:10 35:16
43:14,25 44:3
52:16 54:11
64:19 67:11 71:4
78:23 89:20 95:9
101:15
knew 39:5
knock 53:18
know 6:19 8:8,18
29:8 30:20,21
31:20 40:22 43:8
43:15 44:24 47:9
47:10 49:23
50:21 53:22 54:2
64:21 65:21
68:23 70:24 75:6
86:2 88:25 92:6
93:10 95:4 96:18
97:15 99:18
100:21 105:6
111:3 112:17
knowing 31:5
knowledge 120:3
known 12:19 59:24
67:7 83:18 99:9

**L**

label 66:16
labeled 42:17
lack 31:4 89:17
115:1
Lancaster 15:15
language 50:15

52:17 62:11,12
63:1,6 82:23
lastly 47:13
laughter 7:14
13:11 116:20
Lavery 2:13,14
117:11,11
LAW 2:13
lawsuit 5:23 14:4
lawyer 8:17
laying 53:10
learn 54:13
learning 35:19
leave 45:7
Lebanon 17:17
Lee 10:6
left 57:22
legal 99:17
LEINHAUSER
3:9
length 6:15
let's 56:4 98:3
111:8
level 82:19,20,21
82:24 83:1,9,16
86:10,24 87:1,13
91:18 92:20
98:20
levels 78:15 82:24
Liberty 2:4
licensed 14:7 18:2
18:17,18,20,21
29:18,21 76:6
life 6:25 79:13 82:5
lightly 44:6
likelihood 87:18
line 46:6 51:13
63:3 73:9,9 87:3
lines 100:24
list 19:5 82:5 85:23
101:4 105:1
listed 22:24 49:10
49:16 72:4 120:4
literally 51:11,11

63:13
**little** 6:7 41:12
43:24 49:15
**live** 12:23
**lives** 13:1
**living** 14:6 44:1
**LLC** 2:2
**located** 10:16 11:2
15:3 29:5
**location** 17:16,19
21:6 28:14 29:4
42:12 53:20
**locations** 17:20
**locked** 49:1,12
**lodge** 12:15
**long** 8:14 13:4
14:13 15:20 18:4
81:12 113:19
**longer** 69:6 107:10
107:12
**look** 9:25 43:21
51:24 52:7 91:3
101:17 103:4
105:14 112:10
**looked** 10:1 44:17
**looking** 24:12
27:17 32:14
71:25 73:14
76:18 84:14
87:20 93:7 94:21
101:2,6,13,22
104:25 105:8
111:15
**looks** 41:12 47:13
48:15 50:4,15
63:20 65:14
66:10 70:21
81:10 87:21,22
101:3,4,20 105:1
106:2
**lot** 41:2 42:10 43:7
43:8 45:5 92:10
110:14
**Lt** 2:17

**L-e-e** 10:7

---

**M**

**MacMAIN** 3:9
**making** 41:25
52:10 91:1
**manual** 66:17
**Maria** 1:16 119:5
119:16
**marked** 4:18
**Market** 2:4,14
3:11
**marks** 36:19,20
38:6
**Marlkress** 1:23
120:23
**married** 13:5,20
**MARSHALL** 2:8
2:18
**matriculated**
11:23
**Matt** 117:13
**matter** 119:9
**MATTHEW** 3:10
**Mayo** 21:4,12
**mean** 18:13 39:14
44:13 59:25 60:2
66:12 67:4 68:17
68:19 70:3 75:21
86:22 94:17
95:15 101:10,25
111:5 115:20
**meaning** 112:7
**meaningful** 66:8
68:18 70:9
106:18 113:24
116:6
**means** 45:10,12
**meant** 33:4 38:11
79:14,18 94:19
**Mechanicsburg**
15:4
**Medicaid** 17:7
**medical** 14:11 15:2

28:23 30:10
33:15 34:14,20
35:2,16 36:7 37:2
37:3,16 45:25
47:1 50:13 58:25
62:6 63:25 75:1
82:25 102:6
109:21 114:2,4
**medication** 9:2
**meet** 34:8 63:10
**meeting** 34:3 39:8
41:20 60:8,15
74:1 102:21
107:9,13 114:17
114:21
**member** 37:13,17
38:7
**members** 37:21
46:9 47:6 85:18
**Mendenhall** 2:17
**mental** 25:6,14,16
45:10 66:15,19
70:8,13 77:4,8,18
77:21 78:3,4
87:21 89:10,11
94:11 103:11,21
105:1,4 112:9
**mentioned** 25:13
31:3 113:13
**met** 34:7 38:14
48:22 50:5,11
62:2 63:5 67:24
73:24
**method** 34:13
**MH** 45:9
**Middle** 1:2 10:6
**mild** 55:6
**Miller** 102:7,8,15
104:9 109:13,15
**Mincey** 2:2,3 4:14
5:17,19 7:15
12:14,21,22
13:14 26:5,25
27:19 28:9 30:19

33:1,6,7 42:16
53:1 54:4,7 56:3
56:10,25 57:5,16
58:12 59:17 68:9
68:25 71:7,9
75:18 80:17 81:7
81:22 84:10 85:1
85:11 86:19
92:12 93:6 96:9
96:22 97:4,7,9
98:2,11,13
100:13 101:18,19
104:15 106:4,5
107:8 108:6,25
110:7 115:10,24
116:21 117:1,19
**mind** 44:15
**minds** 114:23
**minimum** 24:24
**Minnesota** 21:3,7
21:11
**minutes** 9:8 56:2
106:23,24 107:17
107:19
**mischaracterizing**
97:1
**mistake** 81:17,21
**moderate** 95:19
99:7
**moderately** 42:21
44:12 96:1
**modesty** 44:2
**moment** 34:22
43:13 44:1
**months** 15:22
**mood** 42:19
**morning** 9:2 35:3
89:4
**mornings** 62:14
**motivating** 99:15
**move** 71:2 78:14
**moved** 21:3
**multiclinic** 17:16
**multiuse** 78:22

**N**

**N** 119:1
**naked** 65:11
**name** 5:19 10:5,6,7
76:6,7 101:9
**nature** 26:3 30:3
104:11
**necessarily** 28:7
31:2 49:2
**necessary** 74:23
**need** 6:21 8:16
10:17 31:23
38:17,19 55:17
55:24 65:15 73:3
73:5 75:14 76:11
76:21 78:8
117:22
**needed** 52:2 74:9
74:11 75:8 76:1
76:19,23 108:13
**needs** 31:21 52:5
73:23 77:25
**negative** 58:15
111:5
**never** 21:11,11,22
105:7
**new** 1:24 34:6
38:21 39:6 40:18
67:17 71:6 78:20
120:24
**newer** 74:8
**Ninosky** 2:9 6:5
12:17 13:7 25:23
26:15 27:9,25
30:12 32:21 33:3
42:1 52:18 55:23
56:1,12,16,19
57:2,12 58:4
59:13 68:3,12
71:3 74:3 80:13
81:2,18 84:3,21
85:6 86:13 91:20
93:1 96:3,21,25
97:5,20 98:10

100:6 101:16
102:22 105:13
107:3 108:1,14
109:22 115:5,15
116:14 117:9,17
nodded 6:24
nods 6:20 55:13
noise 39:12 54:16
nomenclature
66:16,21
nonsensical 39:23
41:6 47:24
nonspecific 79:12
non-number 99:19
normal 6:25 40:11
40:15
normalized 112:12
normative 112:6
notable 68:22
Notary 1:17
notation 51:19
59:6 89:19
114:16,19
note 32:14 34:6,25
38:16 41:13
45:16 48:3,15,25
49:6,7,12,20,21
50:16 51:2,14,21
55:3 58:22 61:22
63:14 70:21,25
77:3 91:17 92:24
102:1,20,20
notes 10:1 35:16
38:20 50:5 51:1
51:24 52:7,11
65:2 71:4 80:3
101:5,12 103:5
105:3,23 116:23
119:10
notice 61:10 95:4
noticeable 66:3
noticed 61:8
noting 44:18 67:18
number 5:24 34:18

50:1 81:11 83:22
84:25 85:21
93:20 99:20
nurse 29:20
nursing 58:25

### O

O 119:1
oath 9:7,9
Object 25:23 26:15
27:9,25 30:12
42:1 52:18 58:4
59:13 68:3,12
80:13 81:2,18
84:21 85:6 86:13
91:20 96:3 97:20
100:6 102:22
108:14 109:22
115:5,15 116:14
objection 12:15
74:3 84:3 93:1
objections 5:6
Objective 33:18,20
33:25 42:17
43:12 58:13
observation 42:21
43:9,25 60:6 87:4
observe 43:14 44:9
47:25 53:4,5
60:14 102:21
observed 35:7,11
38:14 42:24
48:10 50:24
64:11 92:16,18
95:17
observing 64:19
obviously 115:21
occasional 112:14
occurred 55:11
occurring 95:11
occurs 53:25
odd 107:22
offended 57:13
offer 47:16

Oh 13:6 48:24 93:4
98:4
okay 6:4,14,19 7:9
8:7,12 9:1,17
10:3 12:5,8 13:25
15:12,23,25
16:14,17,25
18:10 19:9 20:8
22:6 23:8,18
28:10 32:11,19
32:20,24 33:23
34:2,6,16 41:19
45:8,20 48:8 51:4
52:4 55:20,22
56:15 57:20
58:13 59:18
61:20 62:2,19
63:20 64:6 65:9
65:14 66:10 67:3
71:13,19 72:4,9
72:13,16,25 73:4
81:17 87:9,15
90:25 94:2 98:3
100:18 101:2,18
106:4 107:1,18
108:7 109:9
115:11 116:22
117:7,8,17,24
old 13:2 71:14,14
71:22
once 49:7 100:14
ones 28:12 69:16
77:2
onetime 78:5
one's 79:13
one-to-one 87:3
ongoing 62:7
online 29:6
open 117:5
opening 53:17
operating 103:24
operationally
95:21
operations 28:23

opinion 95:23
opportunities 21:9
opportunity 42:13
43:11 49:8 56:11
106:13
opposed 106:3
option 96:14
Oral 1:13
order 7:20 14:22
87:6
ordered 100:17
orders 100:20
orientation 22:25
87:22 88:25 90:1
90:10
oriented 87:23
88:3,8 90:5,12
outside 19:7 28:18
46:21,24 47:6
92:1 108:23
109:20
overly 68:22
oversight 16:6
17:4 22:19 28:23
75:21 76:4 82:25
over-importance
91:25

### P

PA 17:23 18:25
19:11
page 4:8 33:8
48:13,14 61:21
70:19,20 71:10
72:5 82:15 87:20
93:7 98:3,22
101:3 104:25
105:14
PAGE-LINE
120:5
paid 19:7
paper-based 29:3
paranoia 70:16
parents 5:23

parlance 89:9
part 19:17 39:18
43:19 47:21 50:7
51:5,9,17 52:3
54:24 59:22
63:16,22 69:20
78:8 89:11
109:10 117:22
particular 28:13
30:8 31:5 37:23
38:4 49:21 52:6
66:17 70:7 84:15
87:9 88:23 89:12
111:6 113:10
particularly 41:7
65:4
particulars 47:11
parties 5:3
partner 5:20
parts 73:11 92:3
94:6
paste 51:5,8
pasted 51:12,18
pathway 47:3,5
patience 117:21
patient 36:16 37:1
37:19 62:3 63:5
83:20 102:5,20
105:15,16 106:8
106:14
patients 37:15
patterns 111:22
pause 116:25
PCM62 70:20
PCM82 61:21
PCM84 33:2
Pennsylvania 1:2
2:5,10,15,22 3:13
14:8 15:4,16
16:16 17:11,14
17:18 18:22 19:5
20:5,13,16,20
21:1,9,13,14
people 35:17 70:4

GARRETT ROSAS, PSYD

106:11
**perceive** 75:12
**perfect** 6:22 89:13
**performed** 78:11
**performing** 72:13
**period** 20:9 111:12
111:25
**person** 31:21,25
35:19,19 38:4
84:1 88:4,8,8,15
90:5
**pertain** 28:4
**pertaining** 22:10
**pertains** 33:19
67:16
**Philadelphia** 2:5
5:20
**phone** 8:18
**phrase** 36:18,23
**physical** 30:4 31:6
**physically** 37:8
**physicians** 29:25
30:1
**physiological** 67:8
**piece** 26:24 44:16
60:22
**pieces** 92:2 100:10
**place** 2:4 24:15
88:4,9,16 90:5,14
90:16 91:25
**placed** 74:21 75:4
83:6,16
**placement** 83:11
**places** 24:1
**Plaintiffs** 1:6 2:6
**Plan** 33:21
**please** 97:12
**plexiglass** 53:21
**point** 9:13 13:24
27:18 34:20
64:24 65:19
67:10,21 68:23
75:11 77:11
78:13 80:2 104:1

111:21 112:22
113:1
**points** 51:6
**Polaha** 3:10
117:13,13
**policies** 22:9 25:19
27:5,22 28:4,10
28:25 29:10
**policy** 17:3 26:10
26:22 27:1,6,13
27:16,18 30:8,16
30:22 31:1 47:5
86:4 103:8
**poor** 93:8
**population** 112:6
112:10,12
**portion** 36:17
**position** 28:21
38:22 53:12
**possibilities** 92:9
**possible** 7:7,9
35:24 52:10
**post** 73:23
**postdoctoral** 20:23
**potential** 25:6,11
74:25 95:6 99:14
99:21
**potentially** 43:16
46:10
**power** 37:10
**practice** 15:15,16
17:13 39:3 88:11
**practitioner** 29:21
**precaution** 74:17
75:5 78:16 82:18
86:21 87:12
103:10
**preceded** 51:3
**precluded** 116:5
**predoctoral** 20:19
**predominantly**
17:18
**prefabbed** 51:14
**preferred** 34:11,12

34:13
**pregnant** 13:20
**preparation** 9:17
**prepare** 102:19
**prepared** 9:14
56:13 57:17 82:4
**prepopulated**
51:17,19
**presence** 25:12,13
43:24 44:11
**present** 28:15 30:2
36:12 37:15
49:18 60:5,24
86:5 99:22
102:14,18 112:3
114:20
**presentation** 39:13
39:15 58:14 59:5
66:2 67:14 70:5
92:3 94:8,9,22
95:2 111:2,15
116:4
**presents** 37:10
**presume** 24:12,13
33:3 40:10 47:4
**presumption** 71:16
112:7
**prevented** 35:2
50:12 62:5 63:24
**previous** 36:10
51:22 63:14
**previously** 44:24
46:6 58:9
**Prime** 2:12 5:24
14:11,13,15,18
14:23,25 21:17
23:5,9,20 25:5,9
25:19 27:21
38:23
**printout** 71:25
**prior** 14:23,25
16:24 19:15 36:2
38:24 43:23
44:10 54:22 55:2

61:15 67:11
105:20 106:15,18
109:5 110:6
112:17
**prison** 1:8 21:19
22:1,7 24:11
26:14 27:8 32:1
59:20 112:4,5
**prisons** 21:18
**Prison's** 37:18
**private** 15:15
17:13
**privy** 109:12
**pro** 19:10
**probably** 7:19 46:5
51:10 54:13
61:11 63:13,18
67:18 72:1 90:8
95:16 107:12
**problem** 33:1 56:4
**problems** 66:23
**procedural** 103:8
**procedures** 22:10
27:23
**proceed** 57:17
**proceedings** 119:8
**process** 20:21 36:9
37:12 39:4 74:9
78:9 83:14,16,21
84:20 85:5 86:10
86:18 100:25
103:19 116:9
**produce** 12:18
**productive** 116:6
**profession** 39:2
**professional** 1:16
1:22 19:1,3,7,24
20:6 29:15 46:21
103:18 112:5
120:23
**Professionally**
24:4
**professionals**
22:18 36:6

**program** 11:18,24
11:25 19:8,14,14
19:16,19 20:13
**programatic** 17:4
**progress** 10:1
32:13
**prompted** 41:5
75:3,13,19
**prompting** 68:21
**Prompts** 79:4
**proof** 83:6
**propensity** 112:8
**protected** 47:7
**protocol** 78:16
82:22
**provide** 25:18 26:7
27:14 28:6 41:1
45:12 47:9 70:9
113:7
**provided** 36:5
42:13 59:8 105:9
**provider** 108:23
109:20
**providers** 103:15
**provides** 27:2
**providing** 25:14
43:15 111:11
**proximity** 49:22
104:6 109:4
**psych** 17:1
**psychiatric** 29:20
66:20 103:14
112:16
**psychiatrist** 29:20
103:13,14
**psychic** 59:18
**psychologist** 14:7
14:12,18 15:5,14
16:9,19 18:19
22:11 23:7,20
25:4,9 27:21
29:19 76:6
103:13 115:4
**psychologists** 28:8

29:17
**psychology** 11:13
12:7
**psychosis** 111:6
**psychotic** 58:16
59:10 67:6 100:5
**PSYD** 1:13 4:10
5:10 120:2,20
**Public** 1:17
**publicly** 17:7
**pulling** 105:20
**purpose** 51:23
77:17 78:22
**purposes** 16:12
46:7 63:15 77:13
113:18
**pursue** 11:14
**put** 24:24 38:5
99:6
**p.m** 1:16 48:19
61:25 72:6
101:22 118:5
**P.O** 2:15

**Q**

**qualified** 103:11
**question** 5:7 6:9,24
7:23,25 8:8,10,12
8:21,23 10:2 13:6
26:4,9,19 32:17
46:4 55:5,18 64:9
79:2,8,16 80:5,16
81:11,15 82:1,2,7
84:16 89:21
93:11 97:11,24
98:24 108:17
**questions** 6:18 9:5
40:9,24 41:4,8
56:23 57:3,14,24
59:24 69:2,14
76:15 79:5 80:19
81:9 82:14 90:1
96:13,19 97:14
97:18 98:15

100:21 107:21
110:2 112:21
117:2,6,10
**quick** 116:24
**quietly** 64:19
**quite** 12:11 39:1
**quotation** 36:19,20
38:6

**R**

**R** 2:9 119:1 120:1
**radars** 113:10
**raise** 86:20,22
87:12
**range** 43:2
**rational** 81:6
**reach** 117:23
**react** 25:20
**read** 120:2
**readily** 46:13
**reading** 5:3 58:20
65:2 72:10
**ready** 9:23
**real** 8:14 116:23
**realistic** 93:10
**realized** 71:8
**really** 51:2 69:14
70:25 99:16
107:7
**reason** 9:14 12:18
34:16,23 38:3
58:8,19 59:10
60:20 64:3,5,13
67:1 74:16 98:18
99:1 110:11
**reasonable** 47:16
**reasons** 20:18
34:18 37:5 39:11
47:23 49:24 50:1
52:11
**recall** 15:10 24:19
32:8 39:16 40:6
41:4,8,22 44:16
45:4 47:19,20

48:2,6,9 53:7,12
53:15 54:20,21
58:16,20 60:10
60:13,17,21,25
62:23 64:5,16,23
65:22 69:12,17
69:20,22 75:15
75:23,24 76:8,10
76:13,16,22
77:15 81:25
82:16 88:5 91:9
102:10 104:18,20
105:6 106:17
109:3,9,24 110:3
112:24 113:2,5,7
113:11,13,15,15
114:8,10,14
**receive** 31:14
108:11
**received** 11:12
23:11,18 38:7
**receiving** 83:13
**recess** 56:7,17
**recognize** 33:9
71:11 88:14
**recollection** 6:12
30:25 39:7 65:4
66:2 68:8 69:21
74:7 88:22
102:13,17 108:19
113:24
**recommend** 31:18
31:19 32:5 59:11
**recommended**
31:13 116:2
**record** 7:9,21
13:17 54:5 67:18
109:7
**recordkeeping-...**
74:13
**records** 33:15
36:11,13 51:25
91:17 92:24
**refer** 30:10 38:19

82:24
**reference** 66:14
73:8
**references** 70:25
**referred** 23:2
44:16
**referring** 28:12
104:8
**refers** 43:1 82:21
**reflect** 78:24 79:18
79:21
**reflects** 58:10
88:11 109:7
**refreshing** 30:24
**refused** 97:14
**refuses** 79:7,15
81:14 82:6 96:12
96:18 98:24
**regard** 30:7 60:1
66:13 71:24
89:13 95:12
100:22 103:1
**regarding** 77:20
99:13 100:20
**regardless** 41:3
73:21 75:15
100:25
**regimen** 19:17
**register** 113:9
**Registered** 1:22
120:23
**regulatory** 17:2
**related** 58:15
66:23 105:5
**relatively** 38:21
111:24
**releases** 47:8
**relocated** 21:10
**remain** 86:10
**remaining** 31:15
**remember** 38:19
47:18 109:1
**repeat** 45:5 48:20
64:9 97:11

**repetitive** 6:7
**rephrase** 8:9 80:16
**replied** 41:16
**report** 34:2
**reporter** 1:17 7:3
10:18 119:16,22
**Reporters** 1:22
120:23
**reporting** 1:21
62:19 120:22
**reports** 63:7 80:11
80:22
**represent** 5:22
**representation**
55:10
**reproduction**
119:20
**request** 8:20 36:10
36:13 37:1,13,16
37:22
**require** 85:24
112:11,13
**required** 27:23
81:10 83:5
104:23 116:10
**requirement** 78:7
93:12 104:24
**reserved** 5:8
**residing** 37:19
**respective** 5:3
**respond** 26:11,23
26:24 69:23 70:1
70:9 79:7,15
81:14 82:7 96:12
98:24 111:11
**responding** 70:15
**response** 40:14
41:2 43:3 55:15
82:1 89:15 93:11
110:12 113:2
115:1
**responses** 6:21 7:6
**responsibility**
103:2,23

GARRETT ROSAS, PSYD

responsible 25:10 28:22
responsive 107:20
resting 53:3,9
restricted 43:2
restrictive 78:15 86:23
restrictiveness 82:25
restroom 8:17
result 70:7
retreating 111:18
retrospect 95:16 115:21
reuse 52:13,16
reveal 47:12
reverse 14:22
review 9:19,22 22:9 35:15 36:2 38:16 46:18 101:14 106:9,18
reviewed 106:15
reviewing 51:1 103:6
revisable 49:9
revised 71:17,21 78:17,22
revisions 49:13 72:2
right 12:10,11,12 19:20 48:5 49:3 50:7 52:11 60:4 61:8,18,21 63:17 69:15 80:7 83:24 98:4,6,8
Riley 1:4,5 2:3 5:21,22 32:9 34:4 35:1 38:15,25 39:7 41:20 44:16 48:1,11,22 53:5 53:20 54:17 55:4 55:12 57:23 58:24 60:8,11,15 62:3,17 64:8,11

64:25 65:11,23 67:5,24 73:25 74:1 75:17 76:3 76:24 79:6,15 80:5,18 81:23 88:3 89:22 90:5 94:3 95:18 97:13 99:2 100:3 102:9 102:16 104:3,17 104:21 105:5 106:16,19,21 107:20 108:8,21 109:19 110:14 115:12 116:2
Riley's 39:13,14 59:4 62:13 67:14 68:1 91:18
risk 25:11 71:13 74:20,24 76:18 77:3 78:2,10 83:2 83:5,9,19 98:21 99:2,7,9,21
Road 1:23 120:23
role 15:25 19:6,7 25:4
roles 19:16
rolodex 44:14
Rosas 1:13 4:10 5:10,18 10:7,9 12:12,23 33:9 48:16 56:11 57:18 70:19 71:10 98:16 101:21 106:6 116:23 117:1,19 120:2,20
Ross 2:2,3 5:21
rounds 36:3 41:25
Rousakis 1:16 119:5,16
routine 40:15 46:2 64:24
routinely 36:11 59:19

rules 6:5 27:2
running 105:18
R-o-s-a-s 10:7

_____

S

S 3:10
salaried 24:24
save 49:8
saved 36:8 61:25
saw 61:18 64:7,7 64:11 69:18 88:15 102:8
saying 7:2 44:25 63:23 66:1 69:18
says 31:1 34:6,25 41:13 45:9,16 47:13 48:18 50:11 51:16 53:2 55:3 57:6 59:24 62:2 65:10 66:11 71:13 82:2,17 88:17 93:8 94:16 96:16 101:20
scanned 36:8
scenario 27:15 31:6 36:25
scenarios 25:11 30:18 31:11 42:10
school 10:12,15,23
scope 19:13
screen 33:10 57:20 101:15 105:7 106:2
screenshots 105:21
script 72:11
scrolling 48:13 61:20
se 74:18 112:9
sealing 5:4
searching 20:10
Seattle 20:24,24
second 13:16 90:25 116:22

section 42:17 43:13 50:4 79:3 94:13
security 16:11 37:5 37:14
see 25:17 29:10 35:4,17 38:4 43:21,22,25 44:8 50:6 54:2,10 57:20 61:21 62:8 63:12 70:22 81:15 87:24 93:25 95:10 98:6 98:8 101:9,13,15 101:22 104:10 105:15,24 106:11 114:23 117:6
seeing 46:9 104:5
seek 30:6 89:4
seeking 84:16 112:24
seen 34:19 35:2 61:12 62:5 63:24 102:5 103:10 104:9,21 105:7
selected 82:19
self 41:15 74:20,25 83:3 87:16 98:21 99:13,14
self-populated 63:4
send 110:5
sending 31:22
sense 34:10 111:3 113:7
sent 36:14 115:12
separate 49:15
service 16:7 28:19 100:24
services 17:6,8,14 17:24 18:25 19:6 19:12 20:14,16 20:20
session 6:10

set 27:22 87:10 99:10
setting 22:12,14 31:15 39:5 43:20 59:12 108:10 112:4,18 114:25
settings 112:20
seven 13:24 16:23
seven-year 13:2
seven-year-old 13:19
severe 95:14
severely 96:1
shared 77:23
shift 24:19,21 35:18,18 106:7
shifts 24:20
short 111:24
shorter 63:14 107:10
showing 70:19
shows 49:16
sick 70:21 105:1,4 112:10
side 29:22,22 34:7 34:9 43:20 50:12 62:3 63:5 72:14 73:19 89:19 102:7
sight 87:4
significant 49:23 58:22 68:11,19 92:23
signing 5:4
signs 31:7
similar 62:11
simply 6:10
sir 6:3 7:10,11 8:6 9:20 10:13,24 11:16 12:25 14:2 14:5,20 18:12,23 19:21 20:1 22:23 23:17 24:16,18 25:7 26:4,19 29:2

32:10 33:4,11
34:1 35:5 36:21
38:12 40:13
41:18 48:7,12,17
48:21 55:19
56:14 62:9 64:9
72:24 94:1 98:1
114:18
**situation** 21:6 27:4
29:8,11,13 31:3
31:12 46:3 58:2
79:22 88:4,9 90:6
99:17
**situational** 44:22
**situationally** 42:9
**situations** 110:15
**six** 13:23 15:22
**skills** 23:12
**skipped** 81:8
**Sleep** 93:8
**slide** 32:22
**smock** 60:23 61:2
61:13 69:4,9 83:7
**SOAP** 33:17,18
**Social** 16:11
**sole** 103:23
**solid** 53:24
**Solutions** 15:19
**somebody** 35:23
41:24 43:7,20
44:4 45:21 46:3
50:25 62:21
88:17 95:2,4 99:6
99:8,12,16
**somebody's** 31:6
86:21 87:12
**somewhat** 24:22
44:6,17 45:3
54:23 88:10
107:16
**sorry** 18:12,13
25:3 26:2 40:11
40:13 48:20
55:19 57:1 73:7

98:5 114:3
**sort** 41:1 43:3
44:19 49:13 66:8
89:5,25 112:23
113:6
**sorts** 43:4 44:5
67:13
**speak** 36:3 37:20
56:12 73:11
**speaking** 107:19
**specific** 28:7 31:2
42:9 64:5 85:19
85:21 109:25
**specifically** 28:6
28:18 30:21 32:2
32:7,14 34:23
40:7 46:5 50:21
53:16 54:20
64:16 69:12
75:23 85:10,19
104:4,18 109:3
110:18 113:5,22
114:8
**specifics** 47:5 88:5
**speculation** 45:13
115:16
**spelling** 10:17
**spend** 41:19,24
104:16
**spent** 86:17 106:21
107:18
**spouse** 13:2
**staff** 28:7,16 29:4
32:4 37:14,18,21
38:8 46:9 83:1
85:17,18 103:12
112:23
**stamp** 49:11
**stamps** 49:21
**stand** 60:2 71:14
**standing** 65:11
**standpoint** 103:8
**stands** 28:19
**start** 10:3 15:11

18:7 20:5 24:23
33:2 35:18 44:7
64:19 105:18
**started** 18:9 19:11
20:15 82:3
110:20
**starting** 20:13 36:2
94:15
**state** 11:4,19,22
12:2,6 18:20
19:19 23:13 69:6
69:22 116:9
**stated** 58:9 84:25
**statement** 27:13
30:22 65:21
**statements** 65:17
**STATES** 1:1
**status** 74:17,22
75:5 78:12 87:21
89:11
**stay** 65:20 115:14
**staying** 30:11
**stenographic**
119:10
**step** 87:1
**steps** 83:23,25 84:7
84:8,11,13,19
85:4,13,15,19,24
86:1,3,11
**sticking** 44:8
**stint** 21:21
**stipulated** 5:1
**stood** 15:2,17
**stop** 83:24
**store** 36:15
**stored** 46:17
**Street** 2:4,14 3:11
**strike** 107:22
**striking** 82:22
**struggling** 99:17
**stuff** 10:4 12:16
20:11 71:5 89:2
**subjective** 33:17
33:20,24 48:4

50:4 63:22 77:24
**substance** 60:3
67:7 77:21 94:11
100:4,21 111:14
**substantially**
62:11
**substantiated**
52:15
**successfully** 89:17
**SUD** 59:25,25
**suffer** 100:3
**suffering** 59:9 67:6
**sufficed** 104:12
**suffices** 103:7,17
**suggest** 31:9 116:8
**suicidal** 74:18,20
75:12 83:4 87:17
96:17 97:15 99:2
99:7
**suicidality** 25:12
41:10
**suicide** 41:15
51:16 60:23 61:2
61:13 63:4 69:4,9
71:13 74:16 75:4
76:17 77:3 78:2
78:10,11,15 79:3
79:14 80:20
81:24 82:18,19
82:20,21 83:6,19
86:10,21 87:12
98:21,21 103:10
103:16
**suite** 2:5,10,21
3:12 102:6
**Summary** 96:11
**summation** 73:25
77:19
**supervision** 119:21
**supports** 83:8
**supposed** 12:9
27:3 77:1 84:18
**sure** 6:5 19:2 33:5
56:3 65:18,25

**surmise** 116:17
**surmised** 90:17,18
**surmising** 43:9
**surprising** 99:12
**surroundings**
88:12
**suspected** 93:25
94:3
**Susquehanna** 3:15
**Swanson** 2:25
**sworn** 5:11
**symptoms** 58:15
111:5
**syndrome** 60:5
**system** 67:19 101:5

---
**T**

**T** 119:1,1 120:1,1
**tab** 105:18
**take** 8:16,22,23 9:9
56:1 71:1 84:19
85:4 106:12,24
110:10
**taken** 1:14 9:1
31:10 56:7 83:23
83:25 85:13,14
85:15 86:12
119:10
**talk** 8:17 53:17
54:11,18 55:22
56:20
**talked** 56:21,23
**talking** 41:17
57:23 60:12
**talks** 59:22
**task** 78:20 102:1
103:2,20 104:3,8
**tasked** 85:20
100:24
**tasks** 101:4,4
**team** 114:24
**tell** 32:11 81:23
88:1 89:1 97:8
106:20

ten 56:2
tenure 16:22
term 37:24,25
   52:13
terms 15:9 95:21
   112:5
testified 5:13 97:3
testimony 4:6 97:2
   97:16,22 108:5
Testing 15:18
tests 100:16
Thank 21:16 118:1
Thanks 71:8
   117:21
therapeutic 16:6
therapist 18:1,16
therapy 19:22
thereof 115:1
thin 54:10
thing 44:3 45:17
   70:10 71:2 99:12
things 25:8 36:1
   39:24 81:1 92:15
think 13:23 20:15
   22:24 23:2 26:8
   26:23 41:11 42:8
   44:18 55:1,17
   57:5,22 67:20
   68:6,20 69:23
   70:24 82:9,11
   91:14,16 92:17
   92:20 93:21
   96:25 97:2,21
   107:9 116:24
thinking 95:6
third 91:7,9,11,12
   110:20 113:1
thought 68:16,17
thoughts 41:15
   79:13
three 74:1 116:19
threshold 31:8
Thursday 1:11
   119:11

time 4:18 5:8 6:16
   9:13 12:8,20
   14:22 18:2 20:9
   23:19 24:23 25:2
   34:9,22 37:20
   38:8,14,22 39:6
   41:19,23 42:15
   43:14 45:21
   48:24 49:3,5,10
   49:11,11,19,20
   49:22,24 50:2
   53:3,13 54:21
   56:8 58:23 59:5
   60:5 61:11,17
   63:11,17,19 64:6
   64:15 65:19
   67:24 68:16
   69:24 71:18,24
   73:16,20 75:9
   76:5 78:23 79:2
   79:23,24 82:13
   84:9 85:21 88:4,9
   88:21,25 89:1,5
   89:16,23 90:6,10
   92:10 93:16 94:9
   95:7,19,22
   100:12 102:14
   103:22 104:2,16
   106:21,23 111:13
   111:16,25 115:22
   117:20
timeframe 10:2
timeframes 84:14
times 6:14 7:16
title 15:6 18:18
   23:5
titles 23:9
TMI 13:22
today 5:25 8:15
   9:18,20,22 55:5
   58:14
told 35:8,10,12
   44:24 62:20,23
tone 44:19

tools 45:23 46:2
top 61:20 70:20
   72:4 101:23
   105:14
traditional 34:8,10
training 19:17
   21:21,24 22:6,8
   22:20,23,24 23:1
   23:3
transcribed 119:9
transcribing 7:3
transcript 13:10
   119:7,21
transferred 31:25
tread 44:6
treat 35:14
treatable 25:16
   26:8,13
treated 27:8 31:22
   59:12,19
treatment 25:15
   26:7 30:10 31:14
   36:10 46:1 52:1
   77:22 78:7 95:24
   108:8,12 109:21
trial 5:8
trick 32:16
tried 81:24
true 119:7 120:3
truthful 9:4
try 8:1 35:21 44:8
   46:25
trying 6:10 40:4
   45:2 82:11
turn 7:24
two 22:3 39:10
   54:6 79:5
type 19:22 20:2,10
   23:12 26:10 31:8
   31:24 41:1 47:12
   52:1 72:18 82:17
   82:18 89:2 94:21
   95:1 100:4
   108:20 116:6

typed 33:24 96:13
   96:15
types 23:11 41:25
   52:10
typical 41:23 61:1
   61:4,5,6 77:6
   115:8
typically 63:6
Tyrique 1:4 5:22
   32:9

                U
uh-huh 7:8
uh-uh 7:8
ultimately 68:24
unable 45:22 47:15
   58:24 65:24
   69:13 70:1,2,3
   83:13,21 84:1,6
   85:9 91:7 99:3
   102:5
unaccompanied
   37:7
uncertain 32:2
unclear 44:25
   84:15
uncooperative
   35:3 36:18,23
   37:24 38:10
   50:14,19,22
   52:14 62:7,16
   63:25
undergraduate
   11:24
undersigned 120:2
understand 7:1 8:5
   8:7,24 9:4,7,11
   26:1,3 40:5 51:23
   83:23,25 89:22
   96:6
understanding
   28:24 35:12 55:7
   58:23 65:25
   74:15 78:25

79:22 89:5
   112:25
understood 7:10
   8:11,25 27:20
   39:19 69:23
undertake 85:20
undressed 44:4
unfamiliar 105:12
unit 1:23 28:16,24
   30:2 37:19,22
   73:18 103:25
   104:7 114:2,4
   120:23
UNITED 1:1
University 11:1,19
unlocked 29:4
unresponsive 55:4
   57:24 59:23 79:7
   79:15 80:19
   81:14 82:6,10
   96:12 98:23
untreatable 25:22
unusual 115:3
updated 101:5,11
   102:1,20
urgent 116:10
usability 93:21
use 45:24 60:3 63:7
   100:4
usually 53:19
utterances 40:1
   41:6

                V
V 1:7 2:3
vacuum 92:1,14
   99:8
variable 85:25
variety 17:20 42:6
various 19:15
   78:14 82:23
vary 63:11
venture 67:20
ventured 89:24

GARRETT ROSAS, PSYD

Page 135

**verbal** 6:22 55:6
**verbally** 7:6
**version** 66:14
  71:23 72:3
**versus** 30:11 31:15
  96:1
**vicinity** 107:16
**Video** 1:14
**view** 112:12
**viewed** 99:1 111:6
  112:6
**virtue** 83:17
**visit** 48:1
**visual** 111:8
**visually** 44:19
**voices** 54:11
**volunteer** 19:9

**W**

**waived** 5:5
**walk** 60:11
**walkthrough**
  22:17
**wall** 54:1
**want** 6:11,13,18
  44:3 52:9 55:25
  80:6 98:5 107:4
**wanted** 33:5 55:22
**wanting** 79:13
  97:18
**Warden** 1:8
**WARNER** 2:8
**Washington** 10:16
  10:19 11:1,4,6
  20:25
**wasn't** 21:7 32:16
  34:17 44:21
  46:13 51:17
  65:17 69:24,25
  74:17 84:8
  103:23 104:3
  111:20 112:15
  113:16,17,23
  114:24

**watch** 51:16 63:4
  82:17,20,20,21
  86:11,25,25
  87:13 103:16
**way** 23:16 29:12
  29:14 46:8,19,22
  47:5 49:13 89:7
  89:17 104:23
  107:24 116:6
**wearing** 69:4,5,7,8
  69:9,10
**week** 25:3 63:9
**weeks** 22:3 38:24
  61:14
**Wenatchee** 10:16
  10:17
**went** 52:23 53:2,4
  89:18
**weren't** 99:22
**West** 3:11,13
**Western** 11:1,5
**we'll** 117:23
**we're** 71:25 73:14
  76:18 101:2,6,13
  105:7
**we've** 86:2
**Whichever** 14:24
**wide** 54:6
**wife** 13:9
**window** 53:15,18
  53:23 54:18 65:1
  65:5,6,10,12
**wish** 79:10 114:19
  115:21 116:11
**withdraw** 60:4
**withdrawn** 43:4,19
**withhold** 70:17
**witness** 4:8 5:12
  6:20 55:13 57:9
  62:16 118:3
**word** 31:19 63:23
  64:4 88:6
**words** 33:23,25
  39:25 40:5 41:6

  42:22,25 55:8
  79:6 96:13,15
  102:3
**work** 14:9,10,17
  14:21 15:7,13,20
  16:15 17:12 18:4
  18:24 19:10,10
  19:23 20:2 21:17
  22:10 24:20 28:4
  29:22 46:13 47:7
**worked** 14:13,18
  14:25 15:8,12,14
  15:21 16:14,22
  16:23 17:10,13
  17:18,20 18:6,25
  21:11,18,22 23:9
  24:21 61:9
  111:23 115:4
**working** 14:15
  18:8 19:11 21:4
  21:14 24:10,15
  38:23 61:15
  93:16 94:10
  112:18,18
**worries** 32:16
**wouldn't** 89:25
  90:9 91:24 99:11
  99:19 107:22
**Wright** 11:19,21
  12:6
**Wrights** 12:2
  19:19 23:13
**wrist** 48:5,9
**write** 42:25 80:25
  88:3 94:2 102:3
**writing** 28:11
  43:12 58:17,18
  58:20
**written** 53:8 72:8
  86:4 98:17
  101:17
**wrong** 97:7
**wrote** 35:11 42:18
  58:13 60:7 79:14

  80:10,18,21
  87:23 93:24
  96:11 98:23
**W-e-n-a-t-c-h-e-e**
  10:19
**W-r-i-g-h-t** 11:20

**Y**

**yeah** 13:15 54:9
  63:18 65:17
  68:21 91:14
  94:25 107:6
  115:7,19 116:19
**year** 10:20 11:5,7,8
  15:23 38:24
**years** 13:13 16:23
  116:19

**Z**

**Zoom** 1:14

**0**

**08034** 1:24 120:24

**1**

**1** 82:19,20,21 83:1
  86:10,24 87:1,13
**1:30** 1:15
**1:57** 101:22
**100** 2:9,20
**1175** 1:23 120:23
**12/6** 10:10
**12:45** 62:4
**1245** 2:15
**15** 106:23,24
  107:16,19
**15:16** 49:4
**156** 101:3
**1650** 2:4
**17011** 2:10,22
**17108** 2:15
**18** 17:9
**18th** 24:9 33:4,6
  62:12 67:25 69:1
  77:12 79:19 80:3

  80:22 90:3,13
  92:22 96:21,23
  97:17 98:14
  107:14 110:24
**19th** 48:15 50:20
  53:6 60:9,16
  62:13 69:8,13
  79:19 80:4,22
  90:4 91:1 96:23
  97:17 107:10,18
  110:25
**19103** 2:5
**19382** 3:13
**1976** 10:10,10
**1995** 10:21 11:7
**1999** 11:9,23

**2**

**2:40** 56:5
**2:42** 61:25
**2:50** 48:19,22 50:6
**2:52** 72:6
**20** 107:17
**20th** 61:23 62:17
  64:8,12 68:1
  69:19 72:6 79:20
  80:4,23 92:23
  96:24 97:17
  98:10,11,14
  100:1 106:22
  107:11 110:19,24
  110:25 113:4,21
  114:15,22
**200** 3:12
**2004** 12:4 19:18,24
  20:3 23:14
**2008** 18:9 19:25
  20:3,17
**2009** 18:17
**201** 2:10,21
**2011** 16:24 18:6,11
**2018** 15:24 16:24
**2019** 14:16 15:8
  24:10,17 33:16

GARRETT ROSAS, PSYD

Page 136

48:16 61:23
77:12 101:10,21
104:17
**2022** 1:11 119:11
**215** 1:25 120:25
**225** 2:14
**24** 87:5
**24th** 104:17,22
**2460** 1:23 120:23
**25th** 109:6,18

**3**
**3** 82:14
**327** 104:25
**3600** 2:5

**4**
**4** 82:14
**4:00** 118:5
**4:20-CV-00325** 1:4
**433** 3:11

**5**
**5** 4:14 82:14

**6**
**6** 81:11 82:2
**6th** 10:10
**6/18** 33:16 50:16
**6/19** 107:1
**6/20** 71:1
**6/24** 101:10,21
**6:00** 25:1
**62** 70:19

**7**
**7** 1:11 119:11
**7:00** 25:1
**735-8101** 1:25
120:25

**8**
**82** 48:14 61:21
98:5
**83** 33:8 48:13 98:3

98:4
**84** 33:2,8 98:4
**85** 71:10 82:15
**86** 87:20
**87** 93:7
**89** 98:22