# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CARMEN RILEY, et al.,** | **:** | |
| **Plaintiffs** | **:** | **CIVIL ACTION** |
| | **:** | **DOCKET No.: 4:20 - cv - 00325** |
| **v.** | **:** | |
| | **:** | **JURY TRIAL DEMANDED** |
| **BRIAN CLARK, WARDEN, et al** | **:** | |
| **Defendants** | **:** | |

**BRIEF IN SUPPORT OF PLAINTIFFS' RESPONSE
TO MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS BRIAN
CLARK, DAUPHIN COUNTY, ANDREW KLAHR, STEVE SMITH, MARK
NEIDIGH, RICHARD ARMERMANN, GREG MENDENHALL, SCOTT
GRIEB, JASON ADAMS, MICHAEL BLOUCH, SCOTT LEWIS, KEITH
BITER, ROBERT INGERSOLL, CAMERON WEAVER, TAYLOR GLENN,
MARTIN MYERS, DELTA BAUER, STEVE SINGLETON, KEITH
HOFFMAN AND TAMI DONOVAN**

## TABLE OF AUTHORITIES

*Abraham v. Raso*, 183 F.3d 279, 290 (3d Cir. 1999)…………………..…..14

*Adkins v. Peede*, No. 5:17-CV-033-TBR,
  2018 WL 3762975 (W.D. Ky. Aug. 8, 2018) …………………….…..49

*Alspaugh v. McConnell*, 643 F.3d 162 (6th Cir. 2011)……………..……49

*A.M. ex rel. J.M.K. v. Luzerne County Juvenile Detention*
  *Center,* 372 F.3d 572 (3d Cir. 2004)………..…………………..……35

*Anderson v. Creighton*, 483 U.S. 635 (1987)………..…………………44

*Baker v. McCollan,* 443 U.S. 137 (1979)……………………………..4

*Barkes v. First Correctional Medicine*,
  766 F. 3d 307 (3d Cir. 2014)………………………………..………25

*Bd. of County Comm'rs of Bryan County v. Brown*,
  520 U.S. 397 (1997)………………………………………………36

*Beck v. City of Pittsburgh,* 89 F.3d 966 (3d Cir. 1996)……………….....35

*Berg v. County of Allegheny*, 219 F.3d 261 (3d Cir. 2000)…..……….…35

*Bielevicz v. Dubinon,* 915 F.2d 845 (3d Cir. 1990)…..……………….…36

*Bultema v. Benzie County,* 146 Fed. Appx. 28, 35 (6th Cir. 2005)………9

*Capps v. Dixon*, No. CV1912002, 2024 WL 340842
  (D.N.J. Jan. 30, 2024)…………………………………………………5

*Celotex Corp v. Catrett*, 477 U.S. 317 (1986)………………………………3

*Champion v. Outlook Nashville, Inc.,* 380 F.3d 893 (6th Cir. 2004)…......9

*City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985)…..………………36

*Commonwealth v. Davalos*, 779 A.2d 1190 (Pa.Super.2001)…..……...29

*Commonwealth v. Johnson*, 719 A.2d 778 (Pa.Super.1998)…..……….29

*Commonwealth v. Swerdlow*, 431 Pa.Super. 453 (1994)……………....29

*County of Humboldt v. Headwaters Forest Def.,*

534 U.S. 801, (2001)……………………………………………….8, 17, 30

*DeShaney v. Winnebago County Social Services Dept.*,

489 U.S. 189 (1989)……………………………………………….24

*Estate of Bailey by Oare v. County of York*,

768 F.2d 503 (3d Cir. 1985)……………………………...…………36

*Estelle v. Gamble*, 429 U.S. 97 (1976)………………………………….23

*Flagg Bros., Inc. v. Brooks,* 436 U.S. 149 (1978)…………………………4

*Graham v. Connor*, 490 U.S. 386 (1989)………………………………….4

*Gruenke v. Seip*, 225 F.3d 290 (3d Cir. 2000)…..………………………47

*Halsey v. Pfeiffer*, 750 F.3d 273 (3d Cir. 2014)……...…………………46

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982)…………………………………44

*Headwaters Forest Def. v. Cnty. of Humboldt*,

211 F.3d 1121 (9th Cir.)..………………………………………….8, 17, 30

*Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265 (3d Cir. 2005)…...……3

*J.E. Mamiye & Sons, Inc. v. Fid. Bank*,

813 F.2d 610 (3d Cir. 1987)..………………………………………...3

*Kedra v. Schroeter*, 876 F.3d 424 (3d Cir. 2017)...……………………45

*Kingsley v. Hendrickson*, 576 U.S. 389 (2015)……………………………5

*Klein v. Madison*, 374 F. Supp. 3d 389, 422 (E.D. Pa. 2019)…..………33

*Leer Elec., Inc. v. Pennsylvania, Dep't of Lab. & Indus.*,

597 F. Supp. 2d 470 (M.D. Pa. 2009)…………………………………23

*Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)……………34

*Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*,

834 F.2d 326 (3d Cir. 1987)…..……………………………………47

*Natale v. Camden County Corr. Facility*,

318 F.3d 575 (3rd Cir. 2003)..………………………………23, 24, 34, 47

*Nicini v. Morra*, 212 F.3d 798 (3d Cir. 2000)..………………………47

*Noble v. City of Camden*, 112 F. Supp. 3d 208 (D.N.J. 2015)..…………..9

*Parkway Garage, Inc. v. City of Philadelphia,*

    5 F.3d 685 (3d Cir.1993)…………………………………………..23

*Revere v. Mass. Gen. Hospital*, 463 U. S. 239 (1983)……………………23

*Rivas v. City of Passaic*, 365 F.3d 181 (3d Cir. 2004)………………45, 46

*Rivera v. Redfern*, No. 1:21-CV-01118,

    2023 WL 2139827 (M.D. Pa. Feb. 21, 2023)…………………………48

*Robinson v. Danberg*, 673 F. App'x 205, 209 (3d Cir. 2016)…………5, 16

*Schneyder v. Smith*, 653 F.3d 313 (3d Cir. 2011)…..…………………….46

*Smith v. Mensinger*, 293 F.3d 641, 649 (3d Cir. 2002)…...……………...9, 17

*Sterling v. Borough of Minersville*, 232 F.3d 190, 198 (3d Cir. 2000)...47

*Taylor v. Barkes,* 135 S. Ct. 2042 (2015)………………………………...25

*Thomas v. City of Harrisburg*, 88 F.4th 275, 284 (3d Cir. 2023)...…46, 47

*Thomas v. Harrisburg City Police Dep't*, No. 1:20-CV-01178,

    2021 WL 694807 (M.D. Pa. Feb. 23, 2021)…………………………24

*Tunstall v. Office of Judicial Support of Court of Common Pleas of Delaware County,* 820 F.2d 631 (3d Cir.1987)……………………………4

*United States v. Wright*, 665 F.3d 560 (3d Cir. 2012)……………………33

*Young v. Martin*, 801 F.3d 172, 177 (3d Cir. 2014)…………………………3


**Statutes**

42 U.S.C. § 1983………………………………………………………4


**Rules**

Fed. R. Civ. P. 56 (a) & (c)…..…………………………………………..3

# TABLE OF CONTENTS

I.   Statement of Undisputed Key Facts…………………………………2

II.  Statement of Questions Presented…………...……………………2

III. Standard of Review……………………………...…………………3

IV.  Argument……………………………………………………………4

  A. The individual Defendant's Used Excessive Force on Mr. Riley on Numerous Occasions………………………………………………4

    1. Defendants Mendenhall, Ingersoll, Weaver, Grieb and Bauer use excessive force against Ty'Rique when he arrives to the Booking Center……………………………….……………..5

    2. Defendant's Adams, Bloch, Glenn, Myers and Armenmann use excessive force against Ty'rique to place him in a restraint belt…………….………………………………10

    3. Defendant's Singleton, Hoffman, Klahr, Lewis and Biter use excessive force against Ty'rique in his cell and in placing him in a restraint chair…………………..………………………11

    4. The repeated uses of excessive force against Ty'rique were not objectively reasonable………………...………………………17

  B. The Named Defendants Failed to Intervene……………………18

  C. Defendants Conspired Together…………………………….……22

  D. Plaintiffs' Have Clearly Proven Monell Claims Against Defendants.………………………………………………………34

  E. Defendants Exerted Intentional Infliction of Emotional Distress on Mr. Riley……………………………………………………………44

  F. Defendants Assaulted and Battered Mr. Riley ……..………...……44

  G. Plaintiffs' Wrongful Death and Survival Claims Survive……..…..44

  H. The Individual Defendants are not Entitled to Qualified Immunity……………………………………………………...45

  I. Plaintiffs Do Not Seek Punitive Damages Against Dauphin County.50

  J. Plaintiff's Do not Object to the dismissal of John Does……………51

V.   Conclusion………...………………………………………...........51

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CARMEN RILEY, et al.,** | : | |
| **Plaintiffs** | : | **CIVIL ACTION** |
| | : | **DOCKET No.: 4:20 - cv - 00325** |
| **v.** | : | |
| | : | **JURY TRIAL DEMANDED** |
| **BRIAN CLARK, WARDEN, et al** | : | |
| **Defendants** | : | |

### BRIEF IN SUPPORT OF PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS BRIAN CLARK, DAUPHIN COUNTY, ANDREW KLAHR, STEVE SMITH, MARK NEIDIGH, RICHARD ARMERMANN, GREG MENDENHALL, SCOTT GRIEB, JASON ADAMS, MICHAEL BLOUCH, SCOTT LEWIS, KEITH BITER, ROBERT INGERSOLL, CAMERON WEAVER, TAYLOR GLENN, MARTIN MYERS, DELTA BAUER, STEVE SINGLETON, KEITH HOFFMAN AND TAMI DONOVAN

Plaintiffs, Carmen Riley, as Administrator of the Estate of Ty'rique Riley, Carmen Riley, and Thomas Matthews-Kemrer, submit this Brief in support of their Response in Opposition to Motion for Summary Judgment of Defendants Brian Clark, Dauphin County, Andrew Klahr, Steve Smith, Mark Neidigh, Richard Armermann, Greg Mendenhall, Scott Grieb, Jason Adams, Michael Blouch, Scott Lewis, Keith Biter, Robert Ingersoll, Cameron Weaver, Taylor Glenn, Martin Myers, Delta Bauer, Steve Singleton, Keith Hoffman, and Tami Donovan ("Defendants"). Defendants' Motion should be denied for the reasons herein stated.

## I.      Statement of Disputed Key Facts

Plaintiffs' Statement of Disputed Material Facts is filed separately

pursuant to Local Rule 56.1 and is incorporated herein by reference.

## II.     Statement of Questions Presented

1.      Should Plaintiffs' claims of excessive force and failure to intervene against the Dauphin County Defendants be dismissed when the force used against Decedent Ty'rique Riley ("Ty'rique") was excessive, unwarranted and unnecessary, and Plaintiffs have demonstrated that Defendants had a duty in intervene and reasonable opportunity to do so but failed to intervene?

2.      Should Plaintiffs' conspiracy claims against the individual County Defendants be dismissed when Plaintiffs established underlying constitutional violations and showed that County Defendants engaged in a conspiracy?

3.      Should Plaintiffs' claims of failure to train and supervise against Defendant Clark and DCP Supervisory Officers be dismissed when Plaintiffs have proven a Section 1983 violation under *Monell*?

4.      Should Plaintiffs' IIED claim against DCP Supervisors and correctional officers be dismissed?

5.      Should Plaintiffs' assault and battery claims be dismissed?

6.      Should Plaintiffs' wrongful death claim and claim under the survivor act be dismissed when Plaintiffs established underlying constitutional violations?

7.      Are the individual County Defendants entitled to qualified immunity?

8.      Should Plaintiffs' claim for punitive damages against the County (Count VIII) be dismissed?

9.     Should the John Doe correctional officers be dismissed when Defendants do not have standing to raise such an issue?

## III.    Standard of Review

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, the pleadings, documents, electronically stored information, depositions, answers to interrogatories and admissions on file, together with any affidavits or declarations, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56 (a) & (c); Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986).  The party seeking summary judgment must identify those portions of the record that it believes demonstrate the absence of material fact disputes. *Id.* at 323.  By contrast, if "reasonable minds could differ . . . [then] and issue of material fact remains . . . for the trier of fact, and the grant of summary judgment" should not occur. *Young v. Martin*, 801 F.3d 172, 177 (3d Cir. 2014) (citing *J.E. Mamiye & Sons, Inc. v. Fid. Bank*, 813 F.2d 610, 617 (3d Cir. 1987)). In undertaking this review, the Court must view the facts in the light most favorable to the non-moving party. *See, e.g.*, *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

## IV.    Argument

Plaintiffs assert numerous violations of 42 U.S.C. § 1983 against Defendants.  The Supreme Court has made clear that "§ 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred.  *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (*quoting Baker v. McCollan,* 443 U.S. 137, 144 (1979)).  An individual will be held liable on a § 1983 claim if a plaintiff proves a deprivation of Constitutional right or a violation of the laws of the United States by a defendant acting under color of law.  *Tunstall v. Office of Judicial Support of Court of Common Pleas of Delaware County,* 820 F.2d 631 (3d Cir.1987) (citing *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149 (1978)). Defendants do not contest that any particular individual Defendant acted under the color of law at any time relevant to the allegations in this lawsuit. Instead, Defendants assert that they did not commit specific Constitutional violations.  As shown below, Defendants' arguments fail, thereby necessitating a denial of their Motion for Summary Judgment.

## A. <u>The Individual Defendants Used Excessive Force on Ty'rique Riley on Numerous Occasions</u>

"Under 42 U.S.C. § 1983, a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable to prevail on an excessive force claim."  *Kingsley v.*

*Hendrickson*, 576 U.S. 389, 389 (2015). Furthermore, "[t]hough law enforcement officers are clearly entitled to use force to effectuate a lawful arrest, their privilege to do so is not *carte blanche* to exercise whatever degree of force desired. *Capps v. Dixon*, 2024 WL 340842, at *15 (D.N.J. Jan. 30, 2024) (citing *Graham*, 490 U.S. at 396).

   Defendants rely on an unpublished Third Circuit opinion to guide their analysis of an excessive force claim under the Due Process Clause of the Fourteenth Amendment, "which protects a pretrial detainee from the use of excessive force that amounts to punishment." *Robinson v. Danberg*, 673 F. App'x 205, 209 (3d Cir. 2016) (*quoting Kingsley,* 576 U.S. at 397). Despite the nonbinding status of the *Robinson* opinion, it is clear that several individual Defendants committed excessive force against Ty'rique on several occasions under the factors laid out by the *Robinson* court.

### 1. Defendants Mendenhall, Ingersoll, Weaver, Grieb and Bauer use excessive force against Ty'rique when he arrives to the Booking Center

When Ty'rique arrives at the Booking Center on June 18, 2019, Defendants Mendenhall, Ingersoll, Weaver, Grieb and Bauer collectively, and at times independently, repeatedly use excessive force against him in the lobby of the Booking Center.  See Judicial Center Booking Cam C

Video Footage, dated June 18, 2019, attached hereto as **Exhibit W** and shows, *inter alia*, the following:

- While Ty'rique was face-down on the ground and handcuffed, Defendant Ingersoll places his knee on the Ty'rique's neck and holds it there for almost 1 minute. **Exhibit W**, 1:28; <u>see</u> Deposition Transcript of Lieutenant Greg A. Mendenhall, attached hereto as **Exhibit U**, 48:18 – 49:3 ("Obviously, that would not be the thing to do that would be condoned."); <u>see</u> Expert Report of Roy T. (Tim) Gravette attached hereto as **Exhibit AP**, p. 5 ("The placement of a knee on Riley's neck area is unacceptable, correctional professionals are instructed to avoid the neck and spine when attempting to restrain an inmate.").

- While Ty'rique is still on the ground and handcuffed behind his back and restrained with leg shackles with four officers physically restraining him, Defendant Mendenhall sprays him in the face with a capsicum oleoresin solution, i.e., "OC spray" or mace. **Exhibit W**, 2:23; **Exhibit U**, 47:18 – 48:6; **Exhibit AP**, p. 5 ("[T]he use of OC spray by Lieutenant Mendenhall was excessive and unwarranted.").

- At the same time that Mendenhall was spraying OC spray in Ty'rique's face, Defendants Ingersoll and Weaver worked together to deny Ty'rique oxygen as Ingersoll placed his forearm across Ty'rique's neck and Weaver applied his left hand and body weight on top of Ingersoll's forearm.  They applied this pressure for 1 minute. **Exhibit W**, 2:23.

In addition to the above specific uses of excessive force, Defendants Mendenhall, Ingersoll, Weaver, Grieb and Bauer collectively used excessive force against Ty'rique because the force used was unnecessary as it was done with the sole purpose of returning handcuffs to Susquehanna Township Police Officer Christopher Haines.  **Exhibit U**, 48:13-14 ("They were trying to remove the handcuffs and leg irons of the police agencies to give them back.")  In the professional opinion of Expert Gravette, Defendants used unnecessary force for an excessive period of time simply to exchange one pair of handcuffs belonging to Officer Haines for another set of DCP handcuffs.  **Exhibit AP**, p. 4-5.  Mr. Gravette stated "to continue to use force to exchange a pair of handcuffs was in my opinion unnecessary…. Based on my experience and training to avoid injury of both staff members and inmates the use of force is a last resort in controlling a situation and to struggle with an inmate to remove a pair of

handcuffs and simultaneously replace them with another pair of handcuffs is both reckless and pointless."  **Exhibit AP**, p. 4-5.  The amount of time this struggle ensued was also reckless.  DCP's correctional officers used increasing amounts of force on Ty'rique for four minutes.  **Exhibit AP**, p. 4. "To put this amount of time in perspective, a round of fighting in a boxing match ends at the three-minute mark."  **Exhibit AP**, p. 4.  Because the Defendants engaged in the unnecessary use of force to obtain handcuffs and leg irons that could have been obtained later, the force used by them was excessive.  *See Headwaters Forest Def. v. Cnty. of Humboldt*, 211 F.3d 1121, 1133 (9th Cir.), *vacated on other grds by County of Humboldt v. Headwaters Forest Def.,* 534 U.S. 801 (2001) ("Thus, where there is no need for force, *any* force used is constitutionally unreasonable.") (emphasis in original).

Moreover, as noted by Expert Gravette, the fact that Ty'rique was on the ground, handcuffed, in leg irons and restrained by several officers cannot not be overlooked and support a determination that Defendants used excessive force.  It is well-established that the gratuitous use of force on a restrained and outnumbered individual violates the constitution.  *Noble v. City of Camden*, 112 F. Supp. 3d 208, 228 (D.N.J. 2015) (collecting cases)*; see Giles v. Kearney*, 571 F.3d 318, 326 (3d Cir. 2009) ("[I]t was

established that an officer may not kick or otherwise use gratuitous force against an inmate who has been subdued."); *Smith v. Mensinger*, 293 F.3d 641, 649 (3d Cir. 2002) ("Punching and kicking someone who is handcuffed behind his back and under the control of at least six prison guards as he is being thrown into cabinets and walls is repugnant to the conscience of mankind, absent the extraordinary circumstances necessary to justify that kind of force.") (internal citations and quotations omitted); *see also Bultema v. Benzie County,* 146 Fed. Appx. 28, 35 (6th Cir. 2005) (holding that "the gratuitous use of force on a suspect who has already been subdued and placed in handcuffs is unconstitutional"); *Champion v. Outlook Nashville, Inc.,* 380 F.3d 893, 900-01 (6th Cir. 2004) (finding it was excessive for police officers to lay on top of a mentally challenged individual who, though squirming and kicking his feet, had stopped resisting arrest and posed no flight risk, and spray him with pepper spray even after he was immobilized by handcuffs and a hobbling device").

Additionally, after Ty'rique was sprayed with OC spray by Defendant Mendenhall, he was made to sit in his cell for hours with the OC spray still on his face.  See Photo of Ty'rique Riley with OC Spray on Face, attached as **Exhibit Z**.  OC spray is a chemical compound that irritates eyes and skin to cause tears, pain, and even temporary blindness.  **Exhibit AP**, p. 5.

The use of OC spray is normally limited to incidents of violent behavior on inmates that are not yet restrained.  **Exhibit AP**, p. 5.  Because he was handcuffed while in his cell, he had no way to remove the chemical that is used as self-defense against dogs and bears, from his face.  *Id.* at 5.  As such, he continued to suffer.  Spraying OC spray in Ty'rique's face was excessive, reckless, and unnecessary**.  Exhibit AP**, p. 5.

### 2. Defendants Adams, Bloch, Glenn, Myers and Armermann use excessive force against Ty'rique to place him in a restraint belt

A few hours after the multiple uses of excessive force described above, Defendants Adams, Bloch, Glenn, Myers and Armermann exerted excessive force against Ty'rique in an effort to place him in a restraint belt at a time when no such force was necessary.  These Defendants reportedly entered Ty'rique's cell to place him in a restraint belt because Ty'rique "began hitting the restraints on the glass window of his cell."  See Lieutenant Richard Armermann's Extraordinary Occurrence Report dated June 18, 2019, attached hereto as **Exhibit AC**, Dauphin DFS 9.  However, video of Ty'rique in his cell at this time does not show him hitting the window of his cell.  See **Exhibit AP**, at 7; see also Video Ty'rique being placed in Restraint Belt (14-JC-Booking Cell), attached hereto as **Exhibit AV**, 21:40.  Nevertheless, a group of officers, led and directed by

Defendant Armermann, entered the cell and used unnecessary and excessive force against Ty'rique.  **Exhibit AV**, 28:37;[1] see also Richard Armermann Interview with Detective Brian Walborn, attached hereto as **Exhibit AW**, CID000415.

The force used by Defendants Adams, Bloch, Glenn, Myers and Armermann was excessive and unwarranted.  As Expert Gravette makes clear, the rationale for going into Ty'rique's cell was not justified and the method used was unsound, resulting in the unnecessary use of force. **Exhibit AP**, p. 7 ("I observed no such actions by Riley that would warrant a use of force like the one utilized by Lieutenant Armermann.").  Ty'rique was thrown against the wall, thrown on the bench and had several larger officers on top of him all while he was suffering a mental health crisis.  This use of force was excessive and unnecessary.

### 3. Defendants Singleton, Hoffman, Klahr, Lewis and Biter use excessive force against Ty'rique in his cell and in placing him in a restraint chair

On June 26, 2019, Defendants Singleton, Hoffman, Klahr, Lewis and Biter used excessive force against Ty'rique.  Expert Gravette noted

---

[1] Armermann can be seen entering the cell at the 29:33 mark and assists Defendant Myers by placing a hand on Ty'rique back to allow Myers to continue to exert excessive force on him.  **Exhibit AV**, 29:33.

numerous problems with the way Ty'rique was handled by these

Defendants.  First, there was no plan in place for sending Ty'rique to the

hospital.  **Exhibit AP**, p. 10.  CO Danner and Defendant Singleton should

not have approached the cell alone and a supervisor should have been

present to assess the situation and possibly avoid a use of force altogether.

Id.  While in the cell, CO Danner and Defendant Singleton used force on

Ty'rique immediately.  See Deposition of Correctional Officer Matthew

Danner Senior, attached hereto as **Exhibit P**, 70:8.  CO Danner had his

upper body, while another correctional officer pulled his foot out.  **Exhibit**

**P**, 70:24-25:2.  CO Danner swept the other foot out from underneath

Ty'rique, taking a naked Ty'rique to the ground.  **Exhibit P**, 71:2-5.  This

force was unnecessary. "[T]here were numerous options that could have

been used to accomplish moving Riley out of his assigned cell getting him

dressed and then transporting him to the hospital.  Having more staff

present and accompanied by a supervisor for possible direction would have

been my first option.  Having someone there preferably Ms. Irvine to talk

with him to possibly gain compliance and get him moved was a good

option.  Also, giving Riley some time to calm down after being in the

medical department….  Sending two correctional officers into a cell with an

inmate identified as having a mental health issue unsupervised and ill

prepared was not the option I would have selected." **Exhibit AP**, p. 12. Using force is not the safest option to gain control of an inmate having a mental health crisis. **Exhibit AP**, p. 12.  The COs handling Ty'rique failed to use any crisis intervention and de-escalation tactics as DCP Policies require.  **Exhibit V**, Dauphin DFS 143-176.

Second, Defendants can be seen on video dragging Ty'rique to the restraint chair.  <u>See</u> Video of Restraint Chair, attached hereto as **Exhibit BG**.  In Expert Gravette's review of video footage, "[t]wo staff members drag Riley out of the cell towards the restraint chair.  Based on my review of the video the dragging of Riley from the cell to the restraint chair was inconsistent with my training and experience of moving a restrained inmate. Riley's body should have been supported by the available staff and not dragged in the fashion depicted in the video." **Exhibit AP**, p. 10.  Expert Gravette also attaches a photograph taken from the video of two staff members dragging Ty'rique out the cell with no support to his feet or legs and attaches it as an Exhibit G to his report. **Exhibit AP**, p.10.  This is not only the use of excessive force in violation of multiple DCP Policies and Procedures relating to Use of Force, it specifically violates DCP's Methods of Restraint Procedures, requiring inmates be dressed with medical present

to do an evaluation before and after being put in a restraint chair.  <u>See</u>

**Exhibit M**, DFS 236-243.

Third, Defendants Singleton, Klahr, Lewis and Biter, along with CO

Danner, continued to use excessive force by escalating the levels of

restraint being used on Ty'rique.  He was handcuffed, shackled, with a spit

shield over his head, and they continued to add additional restraints by

putting him in a restraint chair.  <u>See</u> Investigative Report of Dauphin County

Criminal Investigation Division Detective Brian Walborn, attached hereto as

**Exhibit AB**, CID000010.  Once in the chair, Defendants and CO Danner

continued to use excessive force on Ty'rique.  The video outside of

Ty'rique's cell shows the five large men on top of the much smaller

Ty'rique.

The final use of excessive force came just before Ty'rique became

unresponsive.  Defendant Lewis assisted in placing Ty'rique into the

restraint chair and controlled Ty'rique's head using a hypoglossal pressure

point technique that would force Ty'rique to have a response to the painful

stimuli.  <u>See</u> Sergeant Keith Biter's Interview with Detective Brian Walborn,

dated July 5, 2019, attached hereto as **Exhibit AH**, CID000381.  Dr.

Zhonghue Hua, M.D., PhD, a licensed forensic pathologist and

neuropathologist, found that when Defendant Lewis used the hypoglossal

pressure point technique bilaterally to pull Ty'rique's head backward and upwards for a duration of about a minute, this conduct led to Ty'rique becoming unresponsive. <u>See</u> Dr. Zhonghue Hua's Expert Report, attached hereto as **Exhibit AK**, ¶3-5.

Defendants assert that the amount of force used against Ty'rique in his cell was justified by Ty'rique's actions.  Defs' Br. at 16.  As an initial matter, the resistance of an individual does not give an officer to use excessive force.  *Abraham v. Raso*, 183 F.3d 279, 290 (3d Cir. 1999) (holding that an officer's use of force can be deemed excessive despite an arrestee or prisoner resisting).  Additionally, several factors need to be pointed out when addressing the use of force in Ty'rique's cell.  First, unlike the videos that captured what occurred in the lobby of the Booking Center, inside of Ty'rique's cell at the Booking Center and outside of Ty'rique's cell when he was forced into the restraint chair, there is no video that captured what occurred in Ty'rique's cell when Officer Danner and Defendant Singleton went into his cell to get him to change out of his smock for transfer to the hospital. Second, Ty'rique is not here to provide his version of what occurred in the cell because he was killed.  As such, we are only left with the versions of events provided by Defendants.  However, there are enough disputes, contradictions and discrepancies to call Defendants'

versions into question.  For example, Defendant Klahr documents that he

ordered the restraint chair because Ty'rique was combative, still grabbing

CO Danner's hands, kicking, spitting at staff and refusing to calm down.

See Andrew Klahr Incident Report, attached hereto as **Exhibit R**,

CID000159-000160.  Defendant Klahr's version of events is not possible

because at this time, Ty'rique's hands were already handcuffed behind his

back and his ankles were bonded by shackles. **Exhibit P**, 74:2-75:5.

Additionally, Defendant Klahr reported that Ty'rique "spit in the direction of

Danner's feet."  See Klahr Interview with Detective Brian Walborn, dated

July 5, 2019, attached hereto as **Exhibit S**, CID000559.  When asked if

any spit had gotten on him, CO Danner confirmed that it had not.  **Exhibit

P**, 89: 23-25.  CO Danner confirmed that Ty'rique was never spitting at

staff, he was breathing heavy and blowing air; the white foam that had

gathered from cotton mouth was coming out.  **Exhibit P**, 89:13-25.  CO

Danner stated, "I called for [the spit shield] because after the incident he

was breathing heavy, blowing air.  I don't say he was spitting but he was

blowing air hard. And the stuff from his mouth was coming out."  **Exhibit P**,

89:13-25.  This contradicts Defendant Klahr's statements that it was he

who requested the spit shield, "I asked for the restraint- the uh, spit shield

so he couldn't- couldn't spit on any of us."  **Exhibit S**, CID000560.  Given

these disputes, Defendants' versions of what occurred in Ty'rique's cell

cannot be taken at face value.

### 4. The repeated uses of excessive force against Ty'rique were not objectively reasonable

A consideration of each factor that Defendants cite in *Robinson v. Danberg*, 673 F. App'x 205, 209 (3d Cir. 2016) shows clearly that the uses of force against Ty'rique by Defendants were unreasonable and excessive. Expert Gravette repeatedly described how the amount of force used at the Booking Center to put on the restraint belt and inside of Ty'rique's cell far exceeded the need for the use of force; how Defendants repeatedly failed to temper or limit the amount of force used; how situations such as the need to return handcuffs and leg irons to Officer Haines were not severe enough to warrant the use of force; and how the Defendants perception of the need for the use of force were not reasonable. **Exhibit AP** at 4-7, 10-11. Furthermore, Ty'rique's injuries were quite extensive, ultimately resulting in death. **Exhibit AK**, ¶3-5, 11.

As mentioned above, "where there is no need for force, *any* force used is constitutionally unreasonable." *Headwaters Forest,* 211 F.3d at 1133. Expert Gravette cited several situations in which Defendants used force where no force was needed at all. For these reasons, Defendants' request for summary judgment on the excessive use of force claims must

fail.  At the very least, Plaintiffs have demonstrated enough disputes about the factual basis for their claims that summary judgment cannot be granted. Indeed, the reasonableness of the use of force is normally an issue for the jury.  *Raso*, 183 F.3d at 290.

**B. <u>The Named Defendants Failed to Intervene</u>**

The Third Circuit has held that to establish a claim of failure to intervene, a plaintiff must establish that (1) the officer failed or refused to intervene when a constitutional violation took place in his/her presence or with his/her knowledge and (2) there was a "realistic and reasonable opportunity to intervene." <u>Smith v. Mensinger</u>, 293 F.3d 641, 650-51 (3d Cir. 2002).  In Court IV of the Second Amended Complaint, Plaintiffs assert that Defendants Mendenhall, Grieb, Ingersoll, Weaver, and Bauer failed to intervene when Ty'rique was subjected to excessive force when he arrived at the Booking Center.  **Exhibit AX** at ¶¶ 150-157.  In Count VI, Plaintiffs assert that Defendants Klahr, Smith, Neidigh, Armermann, Mendenhall, Grieb, Adams, Blouch, Lewis, Biter, Ingersoll, Weaver, Glenn, Myers, Bauer, Singleton, Hoffman, and Donovan failed to intervene when Ty'rique was subjected to excessive force at various times during the time he was at

Dauphin County Prison.[2]  **Exhibit AX** at ¶¶ 165-172.  Defendants' heading

seems to assert an argument on behalf of Defendants Mendenhall, Grieb,

Ingersoll, Weaver, Bauer and Donovan **only**. Defs' Br. at 17.  However,

with the exception of Defendants Smith and Neidigh, these Defendants

were all present when excessive uses of force were asserted against

Ty'rique, had an opportunity to intervene and failed to do so.[3]

Defendants rely solely on the argument that Counts IV and VI must

fail because no underlying constitutional violation occurred.  Defs Br. at 17.

However, as shown above, Ty'rique was subjected to the excessive use of

force on several occasions.  Additionally, each named Defendant

witnessed the excessive use of force, had the opportunity to intervene and

failed to do so.

First, Defendants Mendenhall, Ingersoll, Weaver, Grieb and Bauer

were present when excessive uses of force were used by Defendants

Mendenhall, Ingersoll, and Weaver.  Specifically, these Defendants

_____

[2] Plaintiffs' use of the term "Dauphin County Prison" in this brief includes the Booking Center.

[3] Because Defendants Smith and Neidigh were not present when excessive uses of force were asserted against Ty'rique and had no reasonable opportunity to intervene, Count VI will be withdrawn against both Smith and Neidigh.

observed the following uses of force, had a reasonable opportunity to intervene and failed to do so:

- When Defendant Ingersoll placed and held his knee on Ty'rique's neck.  **Exhibit W**,1:28; **Exhibit U**, 48:18 – 49:3 ("Obviously, that would not be the thing to do that would be condoned."); **Exhibit AP**, p. 5 ("The placement of a knee on Riley's neck area is unacceptable, correctional professionals are instructed to avoid the neck and spine when attempting to restrain an inmate.");

- When Defendant Mendenhall sprayed Ty'rique with OC spray, **Exhibit W**, 2:23; **Exhibit U**, 47:18 – 48:6; **Exhibit AP**, p. 5 ("[T]he use of OC spray by Lieutenant Mendenhall was excessive and unwarranted."); and

- When Defendant Ingersoll placed his forearm across Ty'rique's neck and Defendant Weaver applied his left hand and body weight on top of Ingersoll's forearm.  **Exhibit W**, 2:23.

Next, Defendants Adams, Bloch, Glenn, Myers and Armermann observed each other use excessive force against Ty'rique in applying a restraint belt in a manner that was unnecessary and constituted excessive force.  **Exhibit AV**, 28:37; **Exhibit AW**, CID000415; **Exhibit AP**, p. 7 ("I

observed no such actions by Riley that would warrant a use of force like the one utilized by Lieutenant Armermann."). Each Defendant had the opportunity to observe the other and to intervene to stop one another but each and every Defendant failed to do so.

Lastly, Defendants Singleton, Hoffman, Klahr, Lewis, Biter, and Donovan each observed excessive uses of force against Ty'rique both in his cell and in the course of being placed in the restraint chair. **Exhibit P**, 70:8, 24-25:2; 71:2-5; **Exhibit AP**, p. 10,12; **Exhibit V**, Dauphin DFS 143-176; **Exhibit AB**, CID000010; **Exhibit AH**, CID000381; **Exhibit AK**, ¶¶3-5, 11. Each of these Defendants had the opportunity to observe the other and to intervene to stop one another but each and every Defendant failed to do so.

Additionally, Defendant Donovan was aware that Ty'rique was suffering an altered mental state requiring emergency medical transport. **Exhibit AB**, CID000010. She actually had the most interaction and observation of Ty'rique on that day. **Exhibit AB**, CID000010. Earlier that day, she observed Ty'rique in his cell, naked, and "clucking like a chicken." **Exhibit AB**, CID000010. She observed him every ten minutes and noticed dry white stuff around his mouth and believed Ty'rique had not been drinking. **Exhibit AB**, CID000010. She assisted in dressing him in his

smock, so she was aware that he physically needed help getting dressed. **Exhibit AB**, CID000010.  Defendant Donovan also witnessed that Ty'rique could not swallow his medication or water that was given to him.  **Exhibit AB**, CID000010.  In the later moments, when she observed multiple correctional officers applying increasing levels of force with Ty'rique, she could have intervened to promote the use of crisis response and de-escalation tactics. The levels of force Defendant Donovan witnessed and failed to stop were inconsistent with the force that would be used by professionally trained reasonable correctional professionals.  **Exhibit AP**, p. 12.

For these reasons, Counts IV and VI against Defendants Klahr, Armermann, Mendenhall, Grieb, Adams, Blouch, Lewis, Biter, Ingersoll, Weaver, Glenn, Myers, Bauer, Singleton, Hoffman, and Donovan should survive summary judgement and Defendants' motion should be denied.

## C. <u>Defendants Conspired Together</u>

Count I of the Second Amended Complaint alleges that Defendants Klahr, Smith, Neidigh, Armermann, Mendenhall, Grieb, Adams, Blouch, Lewis, Biter, Ingersoll, Weaver, Glenn, Myers, Bauer, Singleton, Hoffman, and Donovan agreed and conspired to use and/or cover up the use of unreasonable and excessive force against Ty'rique, to deny him adequate

care and to cover up and conceal their efforts.  **Exhibit AX** at ¶¶ 129-135.

Count II alleges that those same Defendants, minus Defendant Donovan,

conspired with each other and employees of PrimeCare to deny Ty'rique

adequate mental and physical health care, and then to cover up and

conceal the excessive force that had been used against him and his need

for mental health treatment.  **Exhibit AX** at ¶¶ 136-142.

"To demonstrate a conspiracy under § 1983, a plaintiff must show

that two or more conspirators reached an agreement to deprive him or her

of a constitutional right under color of law."  *Leer Elec., Inc. v.*

*Pennsylvania, Dep't of Lab. & Indus.*, 597 F. Supp. 2d 470, 484 (M.D. Pa.

2009) (quoting *Parkway Garage, Inc. v. City of Philadelphia,* 5 F.3d 685,

700 (3d Cir.1993)).  Additionally, a plaintiff must establish an underlying

constitutional violation to succeed on a claim of civil conspiracy.  *Glass v.*

*City of Phila.,* 455 F.Supp.2d 302, 359-60 (E.D. Pa. 2006).  Here, Plaintiffs

assert underlying constitutional violations of excessive force and the denial

of medical care.  Plaintiffs have detailed the repeated uses of excessive

force against Ty'rique above.  As for the denial of medical care, it is clear

that Defendants violated Ty'rique's constitutional right to such.

<u>Ty'rique Did Not Receive Medical Care</u>

23

At the time that Ty'rique was brought into the Booking Center on June 18, 2019, a detainee's right to medical care when in custody was clearly established such that Defendants should have been on notice that their failure to provide Ty'rique with medical care while being held at the Dauphin County Prison amounted to a constitutional violation. (App. 030.). See *Revere v. Mass. Gen. Hospital*, 463 U.S. 239 (1983); *Estelle v. Gamble*, 429 U.S. 97 (1976); and *Natale v. Camden County Corr. Facility*, 318 F.3d 575 (3rd Cir. 2003). The reason for this is clear. When a person is in the custody of law enforcement and is deprived of his liberty, that person cannot seek medical attention for himself and he cannot act on his own behalf. This type of deprivation of personal liberty triggers the protections of the 14th Amendment's Due Process Clause. *DeShaney v. Winnebago County Social Services Dept.*, 489 U.S. 189, 200 (1989).

To establish a claim for the denial of medical care, a plaintiff must show that the defendant acted with deliberate indifference to the plaintiff's medical needs. *Natale v. Camden Cty. Corr. Facility,* 318 F.3d 575, 582 (3d Cir. 2003). In *Natale*, the Third Circuit held that deliberate indifference requires evidence of "(i) a serious medical need, and (ii) acts or omissions by [] officials that indicate deliberate indifference to that need." *Id.* As a Court in this District noted from the *Natale* case, "deliberate indifference

may exist in circumstances where there was 'objective evidence that [a] plaintiff had a serious need for medical care, and [] officials ignored that evidence or where necessary medical treatment is delayed for non-medical reasons." *Thomas v. Harrisburg City Police Dep't*, 2021 WL 694807, at *6 (M.D. Pa. Feb. 23, 2021).

Subsequent to the *Natale* decision, the Third Circuit further defined what is necessary to plead and prove deliberate indifference:

> [U[nder *Farmer* [intentional acts] are not *required* to make that allegation. *Farmer* stated that although "deliberate indifference entails something more than mere negligence, the cases are also clear that it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." 511 U.S. at 835, 114 S.Ct. 1970. Deliberate indifference falls "somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Id.* at 836, 114 S.Ct. 1970. "[A] claimant need not show that [an] official acted or failed to act believing that harm actually would befall an [individual]; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.

*Barkes v. First Correctional Medicine*, 766 F. 3d 307, 325 (3d Cir. 2014) *reversed on other grounds, Taylor v. Barkes,* 135 S.Ct. 2042 (2015).  As such, Plaintiffs here are not required to prove that Defendants failed to get Ty'rique medical care because they wanted to harm Ty'rique.  It is enough that Defendants failed to get Ty'rique medical care despite knowing that he had a serious medical need.

Ty'rique's need for medical care was clear and apparent from the time he arrived at the Booking Center on June 18, 2019 until the time he was rendered unresponsive on June 26, 2019.  Dr. Rosas confirmed that Ty'rique was not oriented to person, place, time, or situation, "likely not even his first day" at DCP.  <u>See</u> Deposition Transcript of Garrett Rosas, PsyD, attached hereto as **Exhibit K**, 87:27-90:10.  When asked about Ty'rique's demeanor upon arriving at Booking Center, Defendant Ingersoll commented that, Ty'rique "was very noncompliant. Uh, he – he – I'm trying to come up with the proper word.  Uh, just he was – didn't seem fully lucid, um, perhaps not, uh, in the right state of mind, whether that be because of, uh, a mental issue or because of any drugs he may have been on, but he certainly didn't act in any normal fashion that most people would come in acting like."  <u>See</u> Robert Ingersoll Interview with Detective Brian Walborn, dated July 5, 2019, attached hereto as **Exhibit T**, CID000491.  Additionally, Coroner Graham Hetrick's theory is that the condition that the condition that caused Ty'rique's death (brain vasculitis) existed on the night he was arrested and brought to the Booking Center.  <u>See</u> Coroner Hetrick Press Conference, attached hereto as **Exhibit AY**, 21:20 – 21:44.

On June 20, 2019, Dr. Rosas met with Ty'rique at his cell as Ty'rique stood naked in front of the window.  **Exhibit K**, 65:9-13.  Dr. Rosas was not

sure Ty'rique was comprehending what was being said to him at that point in time.  **Exhibit K**, 65:17-19.  "It was becoming increasingly difficult to getting any sort of meaningful interaction from him."  **Exhibit K**, 66:6-9.  "He had been less able to engage in that environment."  **Exhibit K**, 66:4-5.   Dr. Rosas concluded that Ty'rique had mentally deteriorated by day three and could no longer engage in his current environment (the Judicial Center), and Dr. Rosas still did not recommend Ty'rique receive additional treatment in a hospital setting.

When Ms. Irvine observed Ty'rique on June 26, 2019, she was immediately concerned.  See Deposition Transcript of Susan K. Irvine, attached hereto as **Exhibit AG**, 28:19-21.  Ty'rique was wobbly and not responding conversationally with her.  **Exhibit AG**, 28:11-21.  Ms. Irvine immediately concluded that "he needs to go to medical."  **Exhibit AG**, 28:21-23.

Dauphin County Prison's own polices indicated that Ty'rique displayed all the signs of a detainee "in crisis" throughout the time he was at DCP —"fearful, anxious, angry/hostile, paranoid, acting strangely, speaking bizarrely, poor personal hygiene"—all of the signs DCP's correctional officers are trained to recognize in a detainee/inmate experiencing an "SMI," a serious mental illness.  See Dauphin County

Prison Crisis Intervention and De-escalation, attached hereto as **Exhibit V**, Dauphin DFS 176.  Given these obvious signs, anyone who observed Ty'rique while he was at Dauphin County Prison could tell he was in crisis and in need of medical attention.  For example, Defendant Myers stated that Ty'rique had "very blank stare like he didn't know what was taking place…."  See Martin Myers Interview with Detective Brian Walborn, dated July 26, 2019, attached hereto as **Exhibit BA**, CID000486.  When asked about Ty'rique's demeanor, Defendant Hoffman stated, "Uh, his – his demeanor is he always looked at you like he was incoherent.  Uh, when you tried to talk to him during feed time he would give you a blank stare and be unresponsive to anything that you would ask or tell him to do such as return his meal tray or Styrofoam I should say because he was a finger food from the time he was there."  See Keith Hoffman Interview with Detective Brian Walborn, dated July 03, 2019, attached hereto as **Exhibit BC,** CID000496.

Despite obvious signs of the need for medical care, Defendants did not get Ty'rique the care he needed.  They either ignored him altogether or often times met his indications of being in a crisis with the use of force.  For example, Lieutenant Mendenhall, the shift supervisor on June 18, 2019, stated, "We're trying to escort him into the Judicial Center.  He resisted.  He

became dead weight and basically we had to escort him in.  He refused to walk." Q. Do you recall anything that he said at the time? A. I don't recall him ever saying anything, no. Q. Did you ask him questions at this time? A. I kept instructing him to comply with the process.  He never responded to me verbally. Q. Did you at any point make an assessment as to whether or not he was impaired. A. I did not. Q. Did you at any point make an assessment as to whether or not he was mentally stable? A. No.  See Deposition Transcript of Lieutenant Greg A. Mendenhall, attached hereto as **Exhibit U**, 42:25-43:18.  Lieutenant Mendenhall, confirms that on June 18, 2019, he "was the officer in charge of the Dauphin County Judicial Center."  **Exhibit U**, 18:18-21. As the "officer in charge," he did not once consider Ty'rique's mental state as he was brought through the doors of the Judicial Center, yet he authorized and initiated an immediate use of force— which ultimately labeled Ty'rique "resistant" and failing to "comply."  That labeling followed Ty'rique for next nine days.

Dr. Rosas stressed that a Mental Health Intake form should be completed at the first point of contact to provide an individual's mental health and substance abuse treatment background, but it required consent, so Ty'rique never had a form completed.  **Exhibit K**, 77:4-78:9. Additionally, the correctional officers prevented Ty'rique from receiving

medical treatment.  Dr. Miller stated that, "in this case in particular the prison guards were extremely reluctant to take [Ty'rique] out of his cell because he was very uncooperative.  Usually if we feel we need to, you know, get a better handle on what's going on the prisoner has to be sent to the medical unit for that.  And in this case we were prevented from sending him to the medical unit several times."  <u>See</u> Deposition Transcript of Robin Kate Miller, M.D., attached hereto as **Exhibit J**, 17:12-23.  When asked who prevented Ty'rique from being sent to the medical unit, Dr. Miller confirmed the "prison guards."  **Exhibit J**, 17:23.   The medical staff felt that if the prison guards refused to take the patient out of the cell, there was not a lot they could do about that.  **Exhibit J**, 18:2-12.  Dr. Miller confirmed that the prison guards' reluctance to remove Ty'rique from his cell made it difficult to give him effective treatment.  **Exhibit J**, 35:17-23.

As these events indicate, Defendants were deliberately indifferent as they failed to get Ty'rique medical care despite knowing that he had a serious medical need.

<u>Evidence of a Civil Conspiracy</u>

A conspiracy is almost always proved through circumstantial evidence. *Commonwealth v. Swerdlow*, 636 A.2d 1173, 1176 (Pa. Super.

1994); *Commonwealth v. Davalos*, 779 A.2d 1190 (Pa.Super. 2001), appeal denied, 790 A.2d 1013 (Pa. 2001). "The conduct of the parties and the circumstances surrounding their conduct may create `a web of evidence' linking the accused to the alleged conspiracy beyond a reasonable doubt." *Commonwealth v. Johnson*, 719 A.2d 778, 785 (Pa.Super.1998).

Here, Defendants Mendenhall, Ingersoll, Weaver, Grieb and Bauer agreed to use excessive force against Ty'rique by using unnecessary force to remove handcuffs to return to Susquehanna Township Police Officer Haynes.  **Exhibit U**, 48:13-14; **Exhibit AP**, p. 4-5.  Defendants Ingersoll and Weaver worked together to deny Ty'rique oxygen as Ingersoll placed his forearm across Ty'rique's neck and Weaver applied  his left hand and body weight on top of Ingersoll's forearm.  **Exhibit W**, 2:23.  *See also Headwaters Forest*, 211 F.3d at 1133 ("Thus, where there is no need for force, *any* force used is constitutionally unreasonable.") (emphasis in original)

Defendants Adams, Bloch, Glenn, Myers and Armermann agreed to exert excessive force against Ty'rique in an effort to place him in a restraint belt at a time when no such force was necessary.  They did not have a legitimate reason to enter Ty'rique's cell since he was not hitting his

restraints against the window of his cell.  **Exhibit AP**, p. 7; **Exhibit AV**, 21:40.  Additionally, the force used was unwarranted. **Exhibit AP**, p. 7 ("I observed no such actions by Riley that would warrant a use of force like the one utilized by Lieutenant Armermann.").

Defendants Singleton, Hoffman, Klahr, Lewis and Biter agreed to use excessive force against Ty'rique in his cell and in placing him in a restraint chair and ultimately rendering him unresponsive on June 26, 2019.  Each Defendant made physical contact with Ty'rique and the use of force was unnecessary.  **Exhibit P**, 70:8, 24-25:2; 71:2-5; **Exhibit AP,** p. 10, 12; **Exhibit V**, Dauphin DFS 143-176; **Exhibit AB**, CID000010; **Exhibit AH**, CID000381; **Exhibit AK**, ¶¶3-5, 11.

Additionally, Defendants Klahr, Armermann, Mendenhall, Grieb, Adams, Blouch, Lewis, Biter, Ingersoll, Weaver, Glenn, Myers, Bauer, Singleton, Hoffman, and Donovan all filed false incident reports to justify the uses of force and to present Ty'rique as an uncooperative and violent inmate in need of restraints instead of mentally unstable patient in need of medical care.  See Incident Reports, attached hereto at **Exhibit BB**. Defendant Klahr alleged that he ordered the restraint chair because Ty'rique was combative, still grabbing CO Danner's hands, kicking, spitting at staff and refusing to calm down.  See Andrew Klahr Incident Report,

attached hereto as **Exhibit R**, CID000159-000160.  Defendant Klahr's
version of events is not possible because at this time, Ty'rique's hands
were already handcuffed behind his back and his ankles were bonded by
shackles. **Exhibit P**, 74: 2-75:5.  Additionally, Defendant Klahr reported
that Ty'rique "spit in the direction of Danner's feet."  <u>See</u> Deposition
Transcript of Lieutenant Greg A. Mendenhall, attached hereto as **Exhibit S**,
CID000559.  When asked if any spit had gotten on him, CO Danner
confirmed that it had not.  **Exhibit P**, 89: 23-25.  In fact, CO Danner
confirmed that Ty'rique was never spitting at staff, he was breathing heavy
and blowing air; the white foam that had gathered from cotton mouth was
coming out.  **Exhibit P**, 89:13-25.  These false reports helped to cover up
the excessive uses of force.  Additionally, because Ty'rique was labeled as
uncooperative and in need of restraints, the reports help to substantiate
and continue the denial of medical care.  **Exhibit J**, 35:17-23.

Using false incident reports to cover up constitutional violations has
been the basis to deny summary judgment.  *See Klein v. Madison*, 374 F.
Supp. 3d 389, 422 (E.D. Pa. 2019) (denying summary judgment  and
holding that "a reasonable jury could find that the Officers conspired to
make the plaintiff appear worse in the reports to justify her arrest and their
search.").  Although Defendants seek to require Plaintiffs to produce direct

evidence of conversations and agreements, circumstantial evidence more than suffices and is often all that is available.  An agreement can be inferred and is a task left to the jury.  *Id. (* "Inferring mental state from circumstantial evidence is among the chief tasks of factfinders." quoting *United States v. Wright*, 665 F.3d 560, 569 (3d Cir. 2012)).

Plaintiffs have shown evidence of constitutional violations and agreements by Defendants to either commit those violations or to cover them up or both.  For these reasons, Counts I and II should survive summary judgment and Defendants' motion should be denied.

## D. Plaintiffs' Have Clearly Proven *Monell* Claims Against Defendants

Count VII of the Second Amended Complaint alleges that Defendants Brian Clark, Dauphin County and the DCP Supervisory Officers (Defendants Captain Andrew Klahr, Captain Steve Smith, Captain Mark Neidigh, Lieutenant Richard Armermann, Lieutenant Greg Mendenhall, Sergeant Scott Grieb, Sergeant Jason Adams, Sergeant Michael Blouch, Sergeant Scott Lewis, and Sergeant Keith Biter) failed to properly train and supervise their subordinates when they failed to implement and enforce polices that trained correctional and medical staff how to identify and handle inmates with mental health issues and how to identify and apply the proper use of force when dealing with inmates.  **Exhibit AX, ¶¶** 173 – 190.

It is well understood that municipal entities "cannot be held responsible for the acts of its employees under a theory of *respondeat superior* or vicarious liability." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 583 (3d Cir. 2003), *citing Monell v. N.Y.C. Dep't. of Soc. Servs.*, 436 U.S. 658, 691 (1978). Instead, to establish municipal liability plaintiffs must generally allege there is a municipal "policy or custom, and that the policy caused the constitutional violation they allege."  Id. The acts of a government employee, however, may be considered to trigger *Monell* liability as the result of policy or custom of a governmental entity in three circumstances: (1) where an "officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is an implementation of the policy," (2) no policy is announced but "federal law has been violated by an act of the policymaker itself" and (3) "the policymaker has failed to act affirmatively at all, though the need to take some action to control the agents of the government is so obvious and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need." *Natale,* 318 F.3d at 584 (internal citations omitted).

Furthermore, merely adopting a policy is not enough to avoid liability, where the policy is routinely disregarded. It is substance, not form that determines liability. *Beck v. City of Pittsburgh,* 89 F.3d 966, 974 (3d Cir. 1996). With respect to the causation element of a municipal liability claim under *Monell*, the question is whether the entity's actions or inactions were a "moving force" in causing the claimed injury. *Berg v. County of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000). A "plaintiff can establish causation by 'demonstrat[ing] that the municipal action was taken with "deliberate indifference" as to its known or obvious consequences.'" *A.M. ex rel. J.M.K. v. Luzerne County Juvenile Detention Center,* 372 F.3d 572, 580 (3d Cir. 2004) (quoting *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 407 (1997)). The question for the Court is whether the plaintiff has "demonstrate[d] a 'plausible nexus' or 'affirmative link' between the municipality's custom and the specific deprivation of constitutional rights at issue." *Bielevicz,* 915 F.2d at 850-51 (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985); *Estate of Bailey by Oare v. County of York*, 768 F.2d 503, 507 (3d Cir. 1985)).

Plaintiffs have demonstrated numerous policies that either were not implemented at all or implemented incorrectly, often times by Supervisory Defendants themselves. These failures resulted in constitutional violations

to Ty'rique where the likelihood of such violations was obvious.  For

example, it is noted above that several Defendants, including Supervisory

Defendants Klahr, Mendenhall, and Armermann inflicted excessive force on

Ty'rique.  The uses of force were the direct result of a custom at Dauphin

County Prison of officers ignoring mental health warning signs and meeting

medical needs with brute force.  Defendants immediately began using force

against Ty'rique, when even according to their own policies, there are de-

escalation procedures and tactics that could have been employed given

Ty'rique's mental presentation.  *See* Dauphin County Prison Crisis

Intervention and De-escalation, attached hereto as **Exhibit V**, Dauphin

DFS 143-176.  According to DCP's own policy, Ty'rique displayed all the

signs of a detainee "in crisis"—"fearful, anxious, angry/hostile, paranoid,

acting strangely, speaking bizarrely, poor personal hygiene"—all of the

signs DCP's correctional officers are trained to recognize in a

detainee/inmate experiencing an "SMI," a serious mental illness.  **Exhibit**

**V**, Dauphin DFS 176.  In these cases, DCP's correctional officers have

been instructed to establish a basic human connection (empathy), be

patient if they are not responding quickly, in a non-threatening manner, and

ask them questions about what they are experiencing.  **Exhibit V**, Dauphin

DFS 155.  These are the tactics DCP's correctional officers should have

employed, but instead their first resort was to control by force because they did not once consider Ty'rique Riley's mental state.  *See also* Plaintiffs' Statement of Facts at ¶ 39.

Next, there was a custom of correctional officers interfering with the medical treatment of detainees and prisoners.  Dr. Miller related that "the prison guards run the prison, you know.  The medical staff is subservient to what the prison guards want to do. So if they refuse to take the patient out of the cell there's not a lot we can do about that."  **Exhibit J**, 18:3-6. Dr. Miller stated that, "in this case in particular the prison guards were extremely reluctant to take [Ty'rique] out of his cell because he was very uncooperative.  Usually if we feel we need to, you know, get a better handle on what's going on the prisoner has to be sent to the medical unit for that.  And in this case we were prevented from sending him to the medical unit several times."  **Exhibit J**, 17:12-23.  When asked who prevented Ty'rique from being sent to the medical unit, Dr. Miller confirmed the "prison guards."  **Exhibit J**, 17:23.   The medical staff felt that if the prison guards refused to take the patient out of the cell, there was not a lot they could do about that.  **Exhibit J**, 18:2-12.  Dr. Miller confirmed that the prison guards' reluctance to remove Ty'rique from his cell made it difficult to give him effective treatment.  **Exhibit J**, 35:17-23.

There is also a custom of allowing officers, including Supervisory

Defendants, to ignore polices designed to ensure detainees receive

medical care without any consequences.  According to DCP's Use of Force

Policy, Lieutenant Mendenhall's use of OC spray on Ty'rique required that

he be examined by medical personnel.  **Exhibit M**, Dauphin DFS 229.

Flushing his eyes for six seconds is not a medical examination, "and a six

second assessment is not acceptable."  **Exhibit AP**, p. 6; *see* Video of

Decontamination by PrimeCare Medical Assistant Vanessa Talley, dated

June 18, 2019, attached hereto as **Exhibit Y**, 2:35-2:41.  A photo of

Ty'rique taken after his eyes were flushed shows Ty'rique still wincing in

discomfort unable to open his eyes with the OC spray still visible on his

face.  *See* **Exhibit Z**.  Additionally, Ty'rique should have received a medical

examination at Intake in order to be medically cleared to remain at the

Judicial Center.  **Exhibit M**, Dauphin DFS 314.  According to DCP's

Requested Medical Clearance of Inmates Policy, inmates brought into the

prison with the following apparent conditions are required to be medically

examined before acceptance: extreme drug/alcohol intoxication, visible

untreated injuries, any appearance of a dazed or confused condition,

and/or an acute mental health crisis.  **Exhibit M**, Dauphin DFS 314.

Lieutenant Mendenhall did not recall any other medical evaluations being

done to determine if Ty'rique was impaired, injured, or mentally stable.

**Exhibit U**, 54:1-17. Ty'rique only had his eyes flushed from the OC spray, this was not sufficient, adequate or compliant care.  **Exhibit AP**, p. 6.

Lieutenant Mendenhall completed a report of Extraordinary Occurrence, **Exhibit AC**, Dauphin DFS 1-2, but did not complete a Use of Form Memo as required under DCP's Use of Force Policy when OC spray is used.  **Exhibit U**, 55:9-56:19; *see* **Exhibit M**, Dauphin DFS 229. Lieutenant Mendenhall did not recall a Use of Force Form and confirmed that he used the Extraordinary Occurrence report to document the encounter with Ty'rique.  **Exhibit U**, 55:9-56:19.   Lieutenant Mendenhall's Extraordinary Occurrence report documented a different sequence of events than what he reported during his deposition, **Exhibit U**, 47:23-48:17, and what is shown through video footage, **Exhibit W**, 2:25-3:35. Additionally, in his report, Lieutenant Mendenhall did not select the box indicating that physical force with used on Ty'rique.  *See* **Exhibit AC**, Dauphin DFS 2**; Exhibit U**, 57:6-9.  When asked why he did not check this box, he did not recall why he did not but confirmed that this form would be the one used when force is used on a detainee/inmate.  **Exhibit U**, 57:6-16. CO Ingersoll failed to report and document the excessive force he used

when he put his knee and full body weight on Ty'rique's neck.  **Exhibit W**, 1:27-2:15; **Exhibit T**, CID000490-000491.

Despite DCP's Use of Force Policy requiring a medical evaluation to be completed following any use of force, no adequate medical evaluations occurred after the numerous uses of force against Ty'rique.  *See* **Exhibit M**, Dauphin DFS 229.  Despite DCP's Use of Force Policy, establishing a duty to intervene where excessive force is being used, no officer intervened at any point.  *See* **Exhibit X**, Dauphin DFS 251.  Again, no officers suffered consequences.

Incredibly, officers are allowed to forego training on issues like the use of force without consequence.  Lieutenant Mendenhall stated Use of Force training is supposed be yearly, however, it was not done "the last couple years."  **Exhibit U**, 28:17-29:2.  All DCP correctional staff also receive a Crisis De-escalation training, yet Lieutenant Mendenhall, as the officer in charge on June 18, 2019, confirmed that he did not recall these trainings.  **Exhibit U**, 61:9-64:18.  According to DCP's training records, Lieutenant Mendenhall last received Crisis De-Escalation Training on October 25, 2017.  *See* Dauphin County Prison Crisis De-escalation Training- 2017 Signature Page, attached hereto as **Exhibit AA**, Dauphin DFS 200.

Ty'rique should have received a medical examination at Intake in order to be medically cleared to remain at the Judicial Center.  **Exhibit M**, Dauphin DFS 314.  According to DCP's Requested Medical Clearance of Inmates Policy, inmates brought into the prison with the following apparent conditions are required to be medically examined before acceptance: extreme drug/alcohol intoxication, visible untreated injuries, any appearance of a dazed or confused condition, and/or an acute mental health crisis.  **Exhibit M**, Dauphin DFS 314.  Lieutenant Mendenhall did not recall any other medical evaluations being done to determine if Ty'rique was impaired, injured, or mentally stable beyond the supposed "decontamination" of Ty'rique's eyes.  **Exhibit U**, 54:1-17. Ty'rique only had his eyes flushed from the OC spray, this was not sufficient, adequate or compliant care.  **Exhibit AP**, p. 6.  The care and treatment Ty'rique Riley received during the intake and booking process at DCP from DCP and PrimeCare staff was inadequate, below behavioral health standards, and failed to meet the requirements mandated within their own intake and admission policies and procedures.  **Exhibit AO**, p. 14.  Specifically, during the intake process DCP correctional staff and PrimeCare medical staff failed to appropriately and adequately assess and appreciate the severity of Ty'rique's mental health conditions, and they failed to take timely and

appropriate action in response to his impaired mental status, acute psychotic symptoms, and bizarre behaviors.  **Exhibit AO**, p. 14.

It should be noted that although Defendants Smith and Neidigh did not come in direct contact with Ty'rique, they were the Supervisor in Charge during times when Ty'rique's constitutional rights were violated. Defendant Smith was the Supervisor in Charge when Defendants Mendenhall, Ingersoll and Weaver used excessive force against Ty'rique Riley in the Booking Center.  **Exhibit AC** at Dauphin DFS 1.  Likewise, Defendant Neidigh was the Supervisor in Charge when Defendants Armermann, Adams, Bloch, Glenn and Myers used excessive force against Ty'rique to put him in a restraint belt.  **Exhibit AC** at Dauphin DFS 8.  As Supervisors, these Defendants had the opportunity and duty to enforce policies designed to protect Ty'rique.  By not doing such, they perpetuated the custom and pattern of bad behavior of officers whereby there is no fear of discipline or punishment.  Likewise, as the policymaker and ultimate authority of Dauphin County Prison, Defendants Clark and Dauphin County likewise perpetuated the custom and pattern of bad behavior at Dauphin County Prison that led to Ty'rique's injuries and ultimate death.

For these reasons, Defendants' request for summary judgment on Count VII should be denied.

**E. Defendants Exerted Intentional Infliction of Emotional Distress on Mr. Riley**

Defendants content that Count X should be dismissed because 1) they used reasonable force against Ty'rique; and 2) Ty'rique died of natural causes. Defs' Br. at 32-33. As detailed above, Defendants used excessive and unreasonable force against Ty'rique on multiple occasions. The force used was extreme and outrageous because it often was not warranted or necessary. Moreover, the force used resulted in severe distress and physical harm. Ty'rique was maced with OC spray and was left on his face to continue to burn him; a knee was placed on his neck for an extended period of time; he was dragged to a restraint chair and eventually rendered unresponsive. Lastly, Ty'rique's death was not natural but the result of actions of Defendants. **Exhibit AK**, ¶¶3-5, 11. For these reasons, Count X should survive Defendants' request for summary judgment.

**F. Defendants Assaulted and Battered Mr. Riley**

Defendants assert that Plaintiffs' assault and battery claims must fail because the touch of Ty'rique was reasonable. Defs Br. at 32-33. As detailed above, Defendants used excessive and unreasonable force against Ty'rique on multiple occasions. As such, Counts XI and XII are proper and Defendants' request for summary judgment should be denied.

**G. Plaintiffs' Wrongful Death and Survival Claims Survive**

44

Defendants next assert that where Plaintiffs' assault and battery claims fail, Plaintiffs' wrongful death and survival claims must also fail. Because the assault and battery claims do not fail, Plaintiffs' wrongful death and survival claims must survive summary judgment.

## H. The Individual Defendants are not Entitled to Qualified Immunity

In civil suits for money damages, government officials are entitled to qualified immunity for discretionary acts that do "not violate clearly established [federal] statutory or constitutional rights of which a reasonable person would have known." *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To perform the qualified immunity analysis here, the question is whether Ty'rique's right to medical care when he is in police custody and suffering a mental health crisis is "sufficiently clear that 'a reasonable officer would understand that what he is doing violates that right.'" *Kedra v. Schroeter*, 876 F.3d 424, 449–50 (3d Cir. 2017) (quoting *Rivas v. City of Passaic*, 365 F.3d 181, 200 (3d Cir. 2004)).

In answering this question, it is not relevant that there is no directly analogous precedent to have addressed the specific facts at issue in this case. Instead, the "salient question" is whether the law at the time the

Defendants encountered Ty'rique gave them "fair warning" their actions

were unconstitutional.  *See Hope v. Pelzer*, 536 U.S. 730, 741

(2002).  Thus, "officials can still be on notice that their conduct violates

established law even in novel factual circumstances."  *Id.*  As the Third

Circuit recently explained:

> The law, however, does not require such specificity. Although
> the Officers are correct that the right must be defined beyond a
> high level of generality, there need not be a case directly on
> point for a right to be clearly established.  A public official, after
> all, does not get the benefit of one liability-free violation simply
> because the circumstance of his case is not identical to that of
> a prior case.  Instead, the law requires only that the right is
> sufficiently clear that a reasonable official would understand
> that what he is doing violates that right.  That standard is met
> when a violation is so obvious it becomes likewise evident that
> a clearly established right is in play, even in the absence of
> closely analogous precedent. As a result, qualified immunity is
> not appropriate when the case in question presents extreme
> circumstances to which a general constitutional rule already
> identified in the decisional law may apply with obvious
> clarity. That is the case before us.

*Thomas v. City of Harrisburg*, 88 F.4th 275, 284 (3d Cir. 2023) (citations

and quotations omitted).

A long line of Third Circuit cases illustrates the broad scope of

situations in which a defendant law enforcement officer can be found to

have had "fair warning," such that a qualified immunity defense

fails.  *See Halsey v. Pfeiffer*, 750 F.3d 273, 295-96 (3d Cir. 2014) (plaintiff

could pursue due-process based fabrication of evidence claim despite lack

of precedent establishing such cause of action on ground that "[t]he established-right prong of a qualified immunity defense does not demand that there had been a precise preview of the applicable legal analysis underlying the defense; rather, what is required is that government officials have fair and clear warning that their conduct is unlawful") (internal quotations omitted); *Schneyder v. Smith*, 653 F.3d 313, 329-31 (3d Cir. 2011) (holding that despite lack of any prior similar decision, prosecutor could be held liable under § 1983 due to "self-evident wrongfulness" of her conduct); *Rivas*, 365 F.3d at 200 (3d Cir. 2004) (quoting *Hope*, 536 U.S. at 741) ("[I]n some cases 'a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful.'"); *Sterling v. Borough of Minersville*, 232 F.3d 190, 198 (3d Cir. 2000) (citing *Gruenke v. Seip*, 225 F.3d 290, 299 (3d Cir. 2000)) (holding that "constitutional violation was apparent" and officer was not entitled to qualified immunity despite "the fact that the very action in question had not previously been held to be unlawful").

There may be no Third Circuit decision covering the facts of this case *exactly* given the medical needs of Ty'rique and the many incidents of excessive use of the force that ultimately resulted in death. However, there

is little question that a reasonable officer in the place of Defendants would know that the constitutional duty to provide "adequate" medical care, *Monmouth Cty. Corr. Inst. Inmates*, 834 F.2d at 347, required seeking medical care for a detainee who was experiencing a mental health crisis and drastically deteriorated over the course of 9 days.[4]  It has been clear in the Third Circuit for decades that an officer may not ignore evidence of a serious need for medical care, *Natale*, 318 F.3d at 582 (citing *Nicini v. Morra*, 212 F.3d 798, 815 n.14 (3d Cir. 2000)), or delay care for "non-medical reasons."  *Id.* (citing *Monmouth Cty. Corr. Inst. Inmates*, 834 F.2d at 347).  *See also*, *Thomas v. City of Harrisburg*, 88 F.4th 275, 283-84 (3d Cir. 2023) ("The District Court properly recognized the 'right to medical care for persons in custody of law enforcement.'  The Supreme Court has established such a right, as have we.") (citations omitted).

---

[4] Defendants seem to limit their argument for qualified immunity to allegations relating to the use of force.  Defs Br. at 35-37.  The denial of medical care is addressed here should the Court construe Defendants qualified immunity argument to cover such allegations.  Additionally, Defendants do not contest that an officer's duty to intervene when excessive force is being used was clearly established when Ty'rique was at DCP, nor can they so contest.  *See Thomas v. City of Harrisburg*, 88 F.4th 275, 285 (3d Cir. 2023) "[W]e have recognized a right to have a governmental actor intervene when the underlying constitutional violation involves excessive force . . . ."). Therefore, Defendants are not entitled to qualified immunity on the failure to intervene claims.

Likewise, the law is sufficiently clear that a reasonable officer would understand that placing knee on the neck of a detainee; or spraying him with OC spray while he is on the ground and restrained with handcuffs and leg irons and multiple officers on him; or placing a forearm across the neck of a detainee and having another officer apply his body weight to that forearm; or using force to place a detainee in a restraint belt when no such force is needed, especially when he is not hitting his restraints against a window; or using excessive force to drag a detainee out of his cell into a restraint chair and then applying so much force that he becomes unresponsive.  *See e.g., Rivera v. Redfern*, No. 1:21-CV-01118, 2023 WL 2139827, at *8, n18 (M.D. Pa. Feb. 21, 2023) (noting several cases examining the use of OC spray as excessive force).

Additionally, the DCP policies that call for medical evaluations to be given to detainees like Ty'rique to determine if medical aid is needed indicate an awareness that a denial of medical care is prohibited.  Likewise, the DCP polices governing the documentation of the use of force is evidence that the excessive use of force is prohibited.  Indeed, Defendant Mendenhall admitted that placing a knee on Tyrique's neck is prohibited.  **Exhibit U** (Mendenhall Dep.) at 48:18 – 49:3 ("Obviously, that would not be the thing to do that would be condoned.").

49

In any event, Defendants center their argument for qualified immunity around the assumption that the use of force used by specific officers was reasonable and not excessive.  This requires a factual determination reserved for the jury.  See *Adkins v. Peede*, No. 5:17-CV-033-TBR, 2018 WL 3762975, at *3 (W.D. Ky. Aug. 8, 2018) ("[W]here the issue of qualified immunity turns on contested issues of fact, its determination is not one for summary judgment.") (*quoting Alspaugh v. McConnell*, 643 F.3d 162, 168 (6th Cir. 2011)).  There is no argument that the law allows for a reasonable use of force.  Defendants seek qualified immunity because they claim such force was reasonable.  That argument underscores that the right to be free from excessive force is and was clearly established when they encountered Ty'rique.  For all of these reasons, Defendants' request for qualified immunity should be denied.

## I.  Plaintiffs Do Not Seek Punitive Damages Against Dauphin County

Plaintiffs agree that municipalities are immune from punitive damages under Section 1983.  Plaintiffs further note that Count VII seeks all *appropriate* relief.  **Exhibit AX** at 40.  Where punitive damages are not appropriate against Defendant Dauphin County, Plaintiffs do not seek such.

**J.** **Plaintiffs Do Object to the Dismissal of John Does**

Plaintiffs do not object to the dismissal of John Doe Correctional

Officers 1-10.

**V.** **Conclusion**

For the reasons stated above and in the accompanying and

supporting Plaintiffs' Statement of Facts, it is respectfully requested that

Defendants' Motion for Summary Judgement be denied.

Respectfully submitted,

**MINCEY FITZPATRICK ROSS, LLC.**
/s/ Riley H. Ross III
Kevin V. Mincey, PA ID No. 90201
Riley H. Ross III, PA ID No. 204676
Jennifer A. Nearn, PA ID No. 307517
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, Pa 19103
Telephone: (215) 587-0006
*Attorneys for Plaintiffs*

## **Certificate of Service**

I, Riley H. Ross III, hereby certify that on this 5th day of April, 2024,

the foregoing Response in Opposition was filed via ECF and therefore is

considered served on all parties and is available for viewing.

/s/ Riley H. Ross III
Riley H. Ross III