UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CARMEN RILEY, *et al.*, | ) | CIVIL ACTION NO. 4:20-CV-325 |
| Plaintiffs | ) | |
| | ) | (BRANN, C.J.) |
| v. | ) | |
| | ) | (ARBUCKLE, M.J.) |
| WARDEN BRIAN CLARK, *et al.*, | ) | |
| Defendants | ) | |

## REPORT AND RECOMMENDATIONS

## I.     INTRODUCTION

Twenty-one-year-old Ty'rique Riley was taken into custody by Officers from the Susquehanna Township Police Department around 4:00 am on June 18, 2019, following a 911 call from his mother that he was acting bizarrely. He was arrested and transported to the Dauphin County Booking Center. Later in the day he was transferred to the Dauphin County Prison ("DCP") where he remained until June 26, 2019, when he was transferred, unconscious, to a local hospital. He never regained consciousness and was pronounced dead at the hospital six days later on July 1, 2019.

In this lawsuit his parents claim that he was subjected to a combination of excessive uses of force and denied proper medical care that caused his death. They have sued over fifty (50) individuals, Susquehanna Township, Dauphin County, and PrimeCare Medical, Inc. (the contracted prison healthcare provider). After two Amended Complaints, the remaining Defendants all deny that he was subjected to

excessive force or denied medical care. Following an autopsy, the Dauphin County Coroner ruled that Ty'rique died of natural causes. A forensic pathologist hired by the family disagreed and opined that his death was a homicide.

Currently before the Court are four Motions for Summary Judgment filed by Defendants. For the following reasons, it is respectfully recommended that:

(1)  Defendants Danner and Swanson's Motion for Summary Judgment (Doc. 157) be GRANTED in part and DENIED in part.

(2)  Defendant PrimeCare Medical's Motion for Summary Judgment (Doc. 160) be DENIED.

(3)  The Susquehanna Defendants' Motion for Summary Judgment (Doc. 164) be GRANTED.

(4)  The County Defendants' Motion for Summary Judgment (Doc. 173) be GRANTED in part and DENIED in part.

## II.    BACKGROUND AND PROCEDURAL HISTORY

The relevant background set forth below is composed of facts gathered from the parties' statements of material facts and the summary judgment record. Where possible, I have relied on primary sources.

### A.    RELEVANT PROCEDURAL HISTORY

On August 20, 2019, Carmen Riley (as administrator of the estate and as Ty'rique's parent) ("Carmen") and Thomas Matthews (as Ty'rique's parent) ("Thomas") (collectively "Plaintiffs") initiated this civil action in the Dauphin County Court of Common Pleas through a Writ of Summons, alleging claims related

to the death of their son, Ty'rique Riley ("Tyrique"). (Doc. 1-1). On February 11, 2020, Plaintiffs filed their Complaint in state court. (Doc. 1-21).

On February 25, 2020, the case was removed to federal court. (Doc. 1). Plaintiffs' pleading was amended twice, and the operative pleading—Plaintiffs' Second Amended Complaint—was filed on April 9, 2021, and names thirty-eight Defendants. (Doc. 64). Seven of the Defendants were subsequently dismissed.[1] Twenty-seven named Defendants remain and have sorted themselves into four separate groups. Discovery is closed and the four groups of Defendants have each filed a Motion for Summary Judgment. (Docs. 157, 160, 164, 173). In addition, there are several groups of "John Doe" Defendants. The Second Amended Complaint asserts the following fourteen claims:

Count I. § 1983 Conspiracy to Commit Excessive Force (Doc. 64, ¶¶ 129-135);

Count II. § 1983 Conspiracy to Deny Medical Care (Doc. 64, ¶¶ 136-142);

Count III. § 1983 Excessive Force (Doc. 64, ¶¶ 143-149);

Count IV. § 1983 Failure to Intervene (Doc. 64, ¶¶ 150-157);

Count V. § 1983 Excessive Force (Doc. 64, ¶¶ 158-164);

---

[1] On January 23, 2024, the parties filed a stipulation dismissing all claims against Defendants Aaron Osman and Richard Adams. (Doc. 168). On January 24, 2024, the parties filed a stipulation dismissing all claims against Defendants Joseph Doyle, Richard Otten, Scott Rowe, Michaela Shaeffer, and Derek Umberger. (Doc. 172).

Count VI. § 1983 Failure to Intervene (Doc. 64, ¶¶ 165-172);

Count VII. § 1983 Failure to Train and Supervise (Doc. 64, ¶¶ 173-190);

Count VIII. § 1983 Failure to Provide Medical Care (Doc. 64, ¶¶ 191-198);

Count IX. Medical Negligence (Doc. 64, ¶¶ 199-203);

Count X. Intentional Infliction of Emotional Distress (Doc. 64, ¶¶ 204-207);

Count XI. Assault (Doc. 64, ¶¶ 208-211);

Count XII. Battery (Doc. 64, ¶¶ 212-214);

Count XIII. Wrongful Death (Doc. 64, ¶¶ 215-221); and

Count XIV. Survival Action (Doc. 64, ¶¶ 222-225).

On January 22, 2024, Defendants Matthew Danner, and Angela Swanson, both Correctional Officers at Dauphin County Prison, filed a Motion for Summary Judgment, (Doc. 157), Brief in Support, (Doc. 158), and Statement of Facts (Doc. 159). On April 6, 2024, Plaintiffs filed a Brief in Opposition, (Doc. 190), and a Responsive Statement of Facts, (Doc. 191). On May 31, 2024, Defendants Danner and Swanson filed a Reply Brief. (Doc. 211).

On January 22, 2024, Defendant PrimeCare Medical, Inc. ("PrimeCare"), filed a Motion for Summary Judgment, (Doc. 160), a Brief in Support, (Doc. 162), and a Statement of Facts, (Doc. 161). On April 5, 2024, Plaintiffs filed a Brief in Opposition, (Doc. 184), and a Responsive Statement of Facts, (Doc. 185). On June 6, 2024, PrimeCare filed a Reply Brief. (Doc. 213).

On January 22, 2024, Defendants

> (1)   Michael Darcy, Susquehanna Township Police ("STP") Officer;

> (2)   Demetrius Glenn, STP Officer;

> (3)   Chris Haines, STP Officer; and

> (4)   Richard Wilson, STP Corporal,

(collectively the "Susquehanna Defendants") filed a Motion for Summary Judgment, (Doc. 164), Brief in Support, (Doc. 167), and Statement of Facts, (Doc. 166). On April 5, 2024, Plaintiffs filed a Brief in Opposition, (Doc. 188), and Responsive Statement of Facts, (Doc. 189). On June 3, 2024, the Susquehanna Defendants filed a Reply Brief. (Doc. 214).

On January 30, 2024, Defendants

> (1)   Brian Clark, DCP Warden;

> (2)   Dauphin County;

> (3)   Andrew Klahr, DCP Captain;

> (4)   Steve Smith, DCP Captain;

> (5)   Mark Neidigh, DCP Captain;

> (6)   Richard Armermann, DCP Lieutenant;

> (7)   Greg Mendenhall, DCP Lieutenant;

> (8)   Scott Grieb, DCP Sergeant;

> (9)   Jason Adams, DCP Sergeant;

(10)    Michael Blouch, DCP Sergeant;

(11)    Scott Lewis, DCP Sergeant;

(12)    Keith Biter, DCP Sergeant;

(13)    Robert Ingersoll, DCP C.O.;

(14)    Cameron Weaver, DCP C.O.;

(15)    Taylor Glenn, DCP C.O.;

(16)    Martin Myers, DCP C.O.;

(17)    Delta Bauer, DCP C.O.;

(18)    Steve Singleton, DCP C.O.;

(19)    Tami Donovan, DCP C.O.; and

(20)    Keith Hoffman, DCP C.O.

(collectively "County Defendants") filed a Motion for Summary Judgment, (Doc. 173), Brief in Support, (Doc. 174), and Statement of Facts, (Doc. 175). On April 6, 2024, Plaintiffs filed a Brief in Opposition, (Doc. 192), and a Responsive Statement of Facts, (Doc. 193). On June 10, 2024, County Defendants filed a Reply Brief. (Doc. 217). Per Plaintiff's Second Amended Complaint, the Defendants employed by DCP are broken up into two groups, the first collectively known as "DCP Supervisory Officers:"

(1)    Andrew Klahr, DCP Captain;

(2)    Steve Smith, DCP Captain;

(3)     Mark Neidigh, DCP Captain;

(4)     Richard Armermann, DCP Lieutenant;

(5)     Greg Mendenhall, DCP Lieutenant;

(6)     Scott Grieb, DCP Sergeant;

(7)     Jason Adams, DCP Sergeant;

(8)     Michael Blouch, DCP Sergeant;

(9)     Scott Lewis, DCP Sergeant; and

(10)    Keith Biter, DCP Sergeant,

and the second collectively known as "DCP Correctional Officers:"

(1)     Robert Ingersoll, DCP C.O.;

(2)     Cameron Weaver, DCP C.O.;

(3)     Taylor Glenn, DCP C.O.;

(4)     Martin Myers, DCP C.O.;

(5)     Delta Bauer, DCP C.O.;

(6)     Matthew Danner, DCP C.O.;

(7)     Steve Singleton, DCP C.O.; and

(8)     Keith Hoffman, DCP C.O.

(Doc. 64, ¶ 130).

Susquehanna Township John Doe Police Officers 1-5, PrimeCare John Doe Medical Employees 1-5, DCP John Doe Correctional Officers 1-10, and

Susquehanna Township John Doe 911 Operator remain as unrepresented Defendants. However, in their Motions for Summary Judgment, County Defendants argue DCP John Doe Correctional Officers 1-10 should be dismissed, and PrimeCare argues that all Doe Defendants should be dismissed. (Docs. 174, 162).

### B.   EVENTS LEADING TO TY'RIQUE RILEY'S ARREST ON JUNE 18, 2019

#### 1.   The June 18, 2019 Incident

On June 18, 2019, twenty-one-year-old Ty'rique Riley lived with his parents Carmen and Thomas in a home on Franklin Avenue.[2] As far as Ty'rique's parents were aware, Ty'rique had never received any kind of mental health treatment and had not been diagnosed with a mental health condition.[3] However, in the days preceding June 18, 2019, they noticed Ty'rique was acting strangely.[4]

Thomas testified at his deposition that he was acting as a caretaker for a neighboring Franklin Avenue property and would stay overnight at that property

---

[2] UPMC Medical Records (Pls.' Ex. AI, Doc. 196-9, p. 1) (noting Ty'rique was born in June of 1998); Carmen Riley Dep. (Pls.' Ex. A, Doc. 194-1, pp. 11:14-12:11, 25:19-21) (reporting that Carmen Riley, her mother, her brother, Thomas Matthews-Kemrer, and prior to his death Ty'rique, lived in Ms. Riley's childhood home on Franklin Avenue).

[3] Carmen Riley Dep. (Pls.' Ex. A, Doc. 194-1, p. 29:4-16); Thomas Matthews-Kemrer Dep. (Pls.' Ex. B, Doc. 194-2, p. 28:6-24).

[4] Carmen Riley Dep. (Pls.' Ex. A, Doc. 194-1, pp. 51:5-52:8); Thomas Matthews-Kemrer Dep. (Pls.' Ex. B, Doc. 175-3, pp. 28:6-29:6) (stating that he did not notice any signs of a mental or emotional health issue before June 14, 2019).

every other day.[5] Thomas also stored his tools, including his sledgehammer, at this property.[6] On the evening of June 17, 2019, Thomas, Carmen, and Ty'rique decided to sleep at the neighboring property.[7] Thomas and Carmen slept on a mattress located on the living room floor, and Ty'rique slept on the couch in the same room.[8]

At some point between 4:00 a.m. and 4:44 a.m. on June 18, 2019, Ty'rique woke up, mumbled something, and retrieved a sledgehammer from the kitchen.[9] This woke up Carmen.[10] Carmen then woke up Thomas.[11] Thomas attempted to take the sledgehammer from Ty'rique and a struggle between the two ensued.[12] Thomas testified that Ty'rique did not swing the sledgehammer or strike him with the sledgehammer at any point.[13] Thomas testified that during the struggle he began to stumble, hit the wall, and slid to the floor, hitting his shoulder on the radiator cover on his way down.[14] The struggle ended with Thomas, a 58-year-old man with a pre-

---

[5] Thomas Matthews-Kemrer Dep. (Pls.' Ex. B, Doc. 194-2, pp. 18:6-11, 69:13-70:7).

[6] *Id*. at 74:2-16.

[7] *Id*. at 69:13-70:7.

[8] Carmen Riley Dep. (Pls.' Ex. A, Doc. 194-1, pp. 35:18-36:6); Thomas Matthews-Kemrer Dep. (Pls.' Ex. B, Doc. 194-2, pp. 75:20-76:8).

[9] Carmen Riley Dep. (Pls.' Ex. A, Doc. 194-1, pp. 35:11-15, 36:12-14).

[10] Carmen Riley Dep. (Pls.' Ex. A, Doc. 194-1, pp. 38:23-39:1).

[11] Carmen Riley Dep. (Pls.' Ex. A, Doc. 194-1, p. 39:5-8); Thomas Matthews-Kemrer Dep. (Pls.' Ex. B, Doc. 194-2, p. 76:17-18).

[12] Thomas Matthews-Kemrer Dep. (Pls.' Ex. B, Doc. 194-2, p. 77:20-22).

[13] *Id*. at p. 80:3-20.

[14] *Id*. at pp. 82:15-83:21.

existing heart condition, laying on the floor breathing heavily.[15] At that point, Thomas told Carmen to call an ambulance.[16] Carmen did so at approximately 4:44 a.m. on June 18, 2019.[17] A recording of that 911 call is a part of the summary judgment record.[18]

## 2.    The 911 Call and Police Dispatch

During the thirteen-minute and four second 911 call, Carmen primarily requests medical care for Thomas, but also describes the circumstances that led to Thomas's health emergency.[19] The call begins with Carmen requesting an ambulance, explaining that Thomas has a heart problem, and that during an argument with their son, Thomas was pushed over and is now laying on the floor breathing heavily.[20] When asked what started the argument and why Ty'rique is upset, Carmen replies that she is afraid to say anything.[21] The Operator then asks whether Ty'rique has any mental conditions that the responding Officers need to be aware of she

---

[15] *Id*. at p. 83:2-8; Audio Recording of 911 Call (Pls.' Ex. C, Doc. 194, 1:02-1:08).

[16] Carmen Riley Dep. (Pls.' Ex. A, Doc. 194-1, p. 59:3-15); Thomas Matthews-Kemrer Dep. (Pls.' Ex. B, Doc. 194-2, p. 83:13-21).

[17] Dauphin County Office of Emergency Communications Event Chronology, Event No. P20190117625 (Pls.' Ex. E, Doc. 194-4, p. 1).

[18] *See* Audio Recording of 911 Call (Susquehanna Defs.' Ex. A, Doc. 166-2) (provided to the Court on a flash drive); Audio Recording of 911 Call (Pls.' Ex. C, Doc. 194) (provided to the Court on a flash drive).

[19] Audio Recording of 911 Call (Pls.' Ex. C, Doc. 194).

[20] *Id*. at 00:03-00:15, 00:50-01:08, 01:30-01:38.

[21] *Id*. at 04:50-05:05.

responded, "well, yeah," and describing that Ty'rique had "just snapped" and that this had been going on for a couple of days.[22] Carmen also confirms when asked that Thomas had not been hit with the sledgehammer.[23] When the Operator asks Carmen whether she feels her and Thomas are in danger with Ty'rique right now she responds "yes."[24]

During the phone call, Carmen can be heard repeatedly asking Ty'rique to put down the sledgehammer.[25] Carmen can also be heard talking to Ty'rique, telling him that her and Thomas did not try to do anything and that he "started it," that, "no, we're not putting you away Ty," and that nobody is going to do anything with him.[26] Carmen also repeatedly tells Ty'rique that there are no "decoys."[27]

The summary judgment record also includes a two-minute and fourteen second compressed audio recording (omitting periods of silence) of the police dispatch for the incident.[28] The dispatcher reported that an ambulance was sent to the Franklin Avenue address "for a fifty-eight-year-old male" who was "pushed

---

[22] *Id*. at 05:07-05:32.

[23] *Id*. at 05:41-05:44.

[24] *Id*. at 05:56-06:00.

[25] *Id*. at 00:18-00:21, 00:30-00:33, 01:42-01:50, 02:19-02:23, 03:22-03:23, 08:59-09:08, 09:35-09:41,10:06-10:15, 10:38-10:43, 11:31-11:42.

[26] *Id*. at 02:06-02:11, 02:29-02:32, 03:34-03:38, 04:22-04:26, 08:14-08:20.

[27] *Id*. at 03:42-03:46, 05:47-05:48, 06:52-06:56, 10:22-10:24, 12:02-12:03.

[28] Audio Recording of Police Radio Transmissions (Susquehanna Defs.' Ex. C, Doc. 166-4).

down by his son during a domestic."[29] The dispatcher also reported that "the twenty-one-year-old son currently has a sledgehammer. We're trying to get him to put it down. It's not going very well" and that "the mother is refusing to give any information on the son since she was in earshot."[30] The dispatcher instructed the Officers to enter through the unlocked back door.[31]

### 3.    Susquehanna Township Police Officers Respond

Susquehanna Township Police Officers Demetrius Glenn, Michael Darcy, Christopher Haines, Richard Adams, and Corporal Richard Wilson responded to the 911 call on June 18, 2019.[32] Wilson was the Officer in charge and Haines was second in charge.[33] Upon their arrival, Glenn, Haines and Wilson made their way to the backdoor as advised by dispatch and found a locked storm door that prevented their entrance into the house.[34] Glenn reported seeing Ty'rique still holding the sledgehammer.[35] Eventually, Ty'rique put the sledgehammer down and opened the

---

[29] *Id*. at 00:06-00:14.

[30] *Id*. at 00:14-00:21.

[31] *Id*. at 00:46-00:49.

[32] Susquehanna Defs.' Statement of Facts (Doc. 166, ¶ 6); Pls.' Resp. to Susquehanna Defs.' Statement of Facts (Doc. 189, ¶ 6).

[33] Susquehanna Defs.' Statement of Facts (Doc. 166, ¶ 12); Pls.' Resp. to Susquehanna Defs.' Statement of Facts (Doc. 189, ¶ 12).

[34] Susquehanna Defs.' Statement of Facts (Doc. 166, ¶ 13); Pls.' Resp. to Susquehanna Defs.' Statement of Facts (Doc. 189, ¶ 13) (Plaintiffs' write "admitted in part" but provide no further explanation of what is admitted and what is denied).

[35] Susquehanna Defs.' Statement of Facts (Doc. 166, ¶ 13); Pls.' Resp. to Susquehanna Defs.' Statement of Facts (Doc. 189, ¶ 13) (Plaintiffs' write that ¶ 13

storm door.[36] Ty'rique was then removed from the house, handcuffed, and placed into a police car.[37]

Wilson then entered the house and observed Thomas unconscious on the floor.[38] Thomas regained consciousness at the scene.[39] Due to Thomas's injuries, Emergency Medical Services ("EMS") advised that he needed to be transported to the nearest trauma center.[40] EMS then transported Thomas to the nearest trauma center, with Darcy following the ambulance.[41]

---

is "admitted in part" but provide no further explanation of what is admitted and what is denied).

[36] Susquehanna Defs.' Statement of Facts (Doc. 166, ¶ 14); Pls.' Resp. to Susquehanna Defs.' Statement of Facts (Doc. 189, ¶ 14) (denying ¶ 14 as stated, but without refuting the Susquehanna Defendants' assertion that Ty'rique put the sledgehammer down and opened the door).

[37] Susquehanna Defs.' Statement of Facts (Doc. 166, ¶ 14); Pls.' Resp. to Susquehanna Defs.' Statement of Facts (Doc. 189, ¶ 14) (denying ¶ 14 as stated, but without refuting the Susquehanna Defendants' assertion that Ty'rique was removed from the house, placed in handcuffs, and put into a police car).

[38] Susquehanna Defs.' Statement of Facts (Doc. 166, ¶ 15); Pls.' Resp. to Susquehanna Defs.' Statement of Facts (Doc. 189, ¶ 15) (admitting ¶ 15 in part, but without refuting Thomas was unconscious when Wilson entered the house).

[39] Susquehanna Defs.' Statement of Facts (Doc. 166, ¶ 16); Pls.' Resp. to Susquehanna Defs.' Statement of Facts (Doc. 189, ¶ 16) (admitting ¶ 16 in part, but without refuting Thomas regained consciousness at the scene).

[40] Susquehanna Defs.' Statement of Facts (Doc. 166, ¶ 23); Pls.' Resp. to Susquehanna Defs.' Statement of Facts (Doc. 189, ¶ 23) (admitting ¶ 23 in part, but without refuting EMS advised Thomas should be taken to the nearest trauma center due to his injuries).

[41] Susquehanna Defs.' Statement of Facts (Doc. 166, ¶ 24); Pls.' Resp. to Susquehanna Defs.' Statement of Facts (Doc. 189, ¶ 24) (admitting ¶ 24 in part, but without refuting Darcy followed the ambulance transporting Thomas to the hospital).

At the hospital, Darcy took photographs of Thomas's injuries, which included lacerations and contusions to Thomas's shoulder, elbow, and knee.[42] The summary judgment record includes those photographs.[43]

### C.    TRANSPORTATION OF TY'RIQUE RILEY TO THE DAUPHIN COUNTY BOOKING CENTER[44]

Wilson directed Haines to transport Ty'rique to the Dauphin County Booking Center ("the Booking Center").[45] At the scene, Haines noted Ty'rique had a flat affect and believed Ty'rique was either having a mental health issue or was under the influence of a narcotic.[46] The parties dispute whether Wilson conveyed that belief to Haines and instructed Haines to share that information with the staff at the

---

[42] Susquehanna Defs.' Statement of Facts (Doc. 166, ¶ 24); Pls.' Resp. to Susquehanna Defs.' Statement of Facts (Doc. 189, ¶ 24) (admitting ¶ 24 in part, but without refuting Darcy took photographs of Thomas's injuries, including lacerations and contusions at the hospital); Victim Injury Photographs (Ex. F, Doc. 166-7).

[43] Victim Injury Photographs (Susquehanna Defs.' Ex. F, Doc. 166-7).

[44] The Dauphin County Booking Center is sometimes referred to as the Dauphin County Judicial Center. I will use Dauphin County Booking Center throughout this Report and Recommendations.

[45] Susquehanna Defs.' Statement of Facts (Doc. 166, ¶ 31); Pls.' Resp. to Susquehanna Defs.' Statement of Facts (Doc. 189, ¶ 31) (admitting ¶ 31 in part, but without refuting Wilson directed Haines to take Ty'rique to the Dauphin County Booking Center).

[46] Susquehanna Defs.' Statement of Facts (Doc. 166, ¶ 30); Pls.' Resp. to Susquehanna Defs.' Statement of Facts (Doc. 189, ¶ 30).

Booking Center.[47] Ty'rique was to be processed and charged with Aggravated Assault and Simple Assault-Physical Menace.[48]

The summary judgment record includes a twenty-eight minute and seven second dashcam video of the transport.[49] During the transport, Ty'rique continually repeated "yo" and "bro," asked Haines to let him go, to take him home, and stated that he "had nothing to do" with it and that he did not do it.[50] Ty'rique can also be heard mumbling about "some weird shit," and stating that "y'all are trippin.'"[51]

At one point after Ty'rique claimed he did not do it, Haines asked him, "what happened?"[52] Ty'rique replied, "I swear to god I aint do that shit."[53] Haines also asked Ty'rique "did [he] take anything tonight?"[54] When Ty'rique did not immediately respond, Haines asked if Ty'rique took "any drugs?"[55] Ty'rique

---

[47] Susquehanna Defs.' Statement of Facts (Doc. 166, ¶ 31); Pls.' Resp. to Susquehanna Defs.' Statement of Facts (Doc. 189, ¶ 31).

[48] Susquehanna Defs.' Statement of Facts (Doc. 166, ¶ 40); Pls.' Resp. to Susquehanna Defs.' Statement of Facts (Doc. 189, ¶ 40) (admitting ¶ 40 in part, but without refuting that Ty'rique was to be so charged).

[49] Video Footage of Haines' Transport of Ty'rique Riley from Franklin Street to Dauphin County Booking Center (Pls.' Ex. F, Doc. 194).

[50] *Id*. at 01:52-02:07, 02:33-02:41, 02:52-02:54, 03:43-03:58, 04:03-04:20, 04:52-04:56, 05:44-06:08, 06:14-06:17, 07:33-08:17, 08:41-08:46, 08:59-09:01, 09:35-09:42, 09:50-09:54, 10:06-10:14, 10:16-10:23, 10:37-10:41, 11:12-11:17, 11:21-11:26, 11:53-12:02.

[51] *Id*. at 02:48-2:51, 03:00-03:02.

[52] *Id*. at 02:55-02:56.

[53] *Id*. at 02:56-02:58.

[54] *Id*. at 06:31-06:33.

[55] *Id*. at 06:35-06:36.

responded "no."[56] Haines then asked Ty'rique "why [is he] acting so funny?"[57] Ty'rique did not reply. Haines continued attempting to engage with Ty'rique, leading to the following exchange:

Haines:       "Did grandpa fall?"

Ty'rique:     "Bro, yeah my grandpa fell, bro . . . I swear to god my grandpa fell bro, alright."

Haines:       "Or did you push him?"

Ty'rique:     Groans inaudibly, then groans "bro."

Haines:       "I'm asking. I wasn't there."

Ty'rique:     "I said bro I'm done bro, I'm done bro . . . . Bro I don't wanna go down there, I don't want no problems, I don't want no none of that bro. I swear to god I don't bro, I swear to god I don't bro."[58]

Approximately two minutes and fifteen seconds after this exchange, Ty'rique again said "yo . . . I sorry bro, yo . . . yo" and then successfully unlatches his seatbelt and gets it off.[59] A few second later, Haines told Ty'rique he was going to the Booking Center and Ty'rique asked "for what?"[60] Haines did not respond.

---

[56] *Id*. at 06:36-06:37.
[57] *Id*. at 06:39-06:40.
[58] *Id*. at 06:49-07:13.
[59] *Id*. at 09:35-09:50.
[60] *Id*. at 10:01-10:04.

### D. TY'RIQUE RILEY'S TIME AT THE DAUPHIN COUNTY BOOKING CENTER

#### 1. Ty'rique Riley's Arrival at the Dauphin County Booking Center

Upon arrival at the Booking Center, Haines can be heard asking for Booking Center Officers to "come out" because Ty'rique was "getting a little excited."[61] Haines then asked Ty'rique "what are you scooting around for, man?"[62] Ty'rique replied, "bro," Haines told him to "just calm down," and Ty'rique then asked "so I'm going away for life?"[63] Haines replied, "no."[64]

Once the car was parked in the Booking Center garage, Haines can be heard telling persons not visible on camera that Ty'rique took his seatbelt off and "I don't know if he's high or it's mental health."[65] Haines also reported that the only thing Ty'rique "knows is 'yo.'"[66] A video of the security camera in the Booking Center garage shows that Lieutenant Greg Mendenhall, and Officers Ingersoll and Weaver entered the garage.[67] On the dashcam video, a person tells Ty'rique "easy," and

---

[61] *Id*. at 11:30-11:34.

[62] *Id*. at 11:42-11:45.

[63] *Id*. at 11:45-11:49.

[64] *Id*. at 11:49.

[65] *Id*. at 12:13-12:17.

[66] *Id*. at 12:23-12:24.

[67] Garage Camera Footage (Susquehanna Defs.' Ex. I, Doc. 166-10, 00:49). This footage does not have audio.

"come on" before a different person tells him to "come on out."[68] When Ty'rique does not exit the car a hand reached in and grabbed him over his shoulder and pulled him out of the car.[69] Once Ty'rique was out of the car he can again be heard repeating "yo," "bro," and proclaiming his innocence.[70] Ty'rique was told twice by one of the Booking Center Officers that he has "one shot at this," instructed not "to stand on that" and instructed twice to "stand up."[71] Ty'rique was then told to "stay down."[72]

Video footage of this same time period shows Ty'rique refused to walk and repeatedly picked up both of his feet.[73] Mendenhall, Ingersoll and Weaver appear at times to be supporting Ty'rique to keep him upright as they attempted to bring him into the Booking Center.[74] At one point, due to his refusal to walk and Mendenhall, Ingersoll and Weaver's attempt to support Ty'rique, he ends up sliding and sitting on the floor with his legs out in front of him for a few seconds before the Officers

---

[68] Video Footage of Haines' Transport of Ty'rique Riley from Franklin Street to Dauphin County Booking Center (Pls.' Ex. F, Doc. 194, 12:25-12:35).

[69] Video Footage of Haines' Transport of Ty'rique Riley from Franklin Street to Dauphin County Booking Center (Pls.' Ex. F, Doc. 194, 12:36-12:37); Garage Camera Footage (Susquehanna Defs.' Ex. I, Doc. 166-10, 01:25-01:29).

[70] Video Footage of Haines' Transport of Ty'rique Riley from Franklin Street to Dauphin County Booking Center (Pls.' Ex. F, Doc. 194, 12:40-12:43, 12:59-13:13, 13:55-13:56, 14:04-14:16, 14:31-14:48, 15:02-15:04, 15:23-15:28).

[71] *Id*. at 13:31-13:50.

[72] *Id*. at 14:40-14:41.

[73] Garage Camera Footage (Susquehanna Defs.' Ex. I, Doc. 166-10, 01:30-02:03).

[74] *Id*.

are able to get him standing again.[75] Mendenhall, Ingersoll and Weaver then continued trying, and were ultimately successful, at getting an uncooperative Ty'rique into the Booking Center.[76] Haines, who had been standing to the side not assisting Mendenhall, Ingersoll and Weaver in getting Ty'rique into the Booking Center, followed them in.[77]

Once inside the Booking Center, Ty'rique was instructed to stand and face the wall.[78] Officer Delta Bauer was in the room standing near a desk.[79] Surveillance video from inside the Booking Center shows Mendenhall, Ingersoll and Weaver maneuvering Ty'rique to face the wall.[80] Bauer is behind the other Officers and Ty'rique but not physically involved.[81] Once facing the wall, Ty'rique attempted to step on top of a bench, and Mendenhall, Ingersoll and Weaver pulled him back to prevent him from doing so.[82] At this point, Ty'rique was hunched over, though it is impossible to know for certain from the video whether Ty'rique was deliberately

---

[75] *Id*. at 01:34-01:36.

[76] *Id*. at 01:36-02:03.

[77] *Id*. at 01:13-02:06.

[78] County Defs.' Statement of Facts (Doc. 175, ¶ 37); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 37) (admitting ¶ 37 in part, but without refuting that Ty'rique was asked to stand and face the wall).

[79] Greg Mendenhall Dep. (County Defs.' Ex. E, Doc. 175-6, pp. 44:21-45:2); Booking Camera E Footage (Susquehanna Defs.' Ex. M, Doc. 166-14, 00:00-00:13).

[80] Booking Camera E Footage (Susquehanna Defs.' Ex. M, Doc. 166-14, 00:21-00:27).

[81] *Id*.

[82] *Id*. at 00:26-00:31.

positioning himself this way or if the Officers were keeping him down as two hands can be seen at the nape of Ty'rique's neck.[83]

Ty'rique then began to walk backwards and attempt to pull away from the officers.[84] Weaver and Ingersoll then took Ty'rique to the ground with his stomach on the floor.[85] While on the floor, the Officers searched Ty'rique.[86] Bauer held down Ty'rique's legs while Ingersoll and Weaver held down Ty'rique's torso and head.[87] Haines then stepped in and assisted Bauer in removing Ty'rique's shoes and socks and placing him in leg restraints.[88] Eventually, Bauer placed one of her knees on top of the back of Ty'rique's leg to help hold him down.[89] During this time, Sergeant, Scott Grieb walks into view and prepares to help the other Officers by putting on gloves.[90] Officer Ingersoll can be seen with one hand on the nape of Ty'rique's neck and his other on the backside of Ty'rique's skull.[91] Ingersoll can be seen placing his

---

[83] Booking Camera C Footage (Susquehanna Defs.' Ex. L, Doc. 166-13, 00:31-00:47).

[84] *Id*. at 00:46-00:50; County Defs.' Statement of Facts (Doc. 175, ¶ 38); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 38) (admitting ¶ 38 in part, but without refuting that Ty'rique pulled away from the officers).

[85] Booking Camera C Footage (Susquehanna Defs.' Ex. L, Doc. 166-13, 00:50-00:53).

[86] *Id*. at 00:53-04:31.

[87] *Id*. at 00:54.

[88] *Id*. at 01:04-02:08.

[89] *Id*. at 01:13.

[90] *Id*. at 01:46; Greg Mendenhall Dep. (County Defs.' Ex. E, Doc. 175-6, p. 50:3-7).

[91] Booking Camera C Footage (Susquehanna Defs.' Ex. L, Doc. 166-13, 01:24-2:16).

knee on the back of Ty'rique's neck for approximately forty-seven seconds while Bauer and Haines were securing him in the leg shackles.[92] The video shows that Ty'rique's shoulder is visible.[93] From the video, it is not clear whether and, if at all, to what extent Ty'rique was actively resisting or kicking his feet, was being held down by three officers, with ultimately three Officers standing by watching when the knee was placed and held on his neck.[94]

Once Ty'rique was in leg restraints, the Dauphin County Officers attempted to roll Ty'rique on his back and Ty'rique began to struggle.[95] Mendenhall then administered a shot of oleoresin capsicum ("OC" or "pepper spray") to Ty'rique's face.[96] The Officers continued searching Ty'rique, removed his belt and switched out Ty'rique's handcuffs.[97] During this time, Ingersoll is leaning down on Ty'rique with his forearm across Ty'rique's neck, and at other times he and Weaver have their hands near Ty'rique's head and neck.[98] Grieb, Ingersoll and Weaver then assisted Ty'rique in standing up with Bauer, Mendenhall and Haines watching.[99] Ty'rique was then escorted into a holding cell with his hands restrained behind his back and

---

[92] *Id.* at 01:27-2:14.
[93] *Id.*
[94] *Id.*
[95] *Id.* at 02:14-02:19.
[96] *Id.* at 02:23-02:26.
[97] *Id.* at 02:26-04:22.
[98] *Id.* at 02:21-03:21.
[99] *Id.* at 04:32-04:33.

with leg restraints on.[100] During the short walk to the cell, Ty'rique is hunched over, and appears to attempt to go dead weight and not walk.[101]

Once in the cell, Grieb, Ingersoll, Weaver and Ty'rique all fell to the floor while Mendenhall and Bauer watched from within the cell.[102] Bauer then gets down on the floor.[103] The positioning of the Officers obstructs the view of Ty'rique and the reason for the continued struggle is not clear from the video.[104] The Officers are 'off' Ty'rique in less than forty seconds.[105] Once all Officers were away from Ty'rique he was sitting on the floor of the cell with his hands restrained behind his back and with leg shackles on.[106]

At some point, Mendenhall instructed the Medical Department to flush Ty'rique's eyes due to the use of pepper spray.[107] Four Officers return to the cell, and restrain Ty'rique.[108] Grieb and Bauer are seen stepping on Ty'rique's legs near

---

[100] *Id.* at 04:33-04:38.

[101] *Id.*

[102] Video of Vanessa Talley with Ty'rique Riley, Dated June 18, 2019 (Pls.' Ex. Y, Doc. 194, 00:40).

[103] *Id.* at 00:44.

[104] *Id.* at 00:41-1:14.

[105] *Id.* at 00:39-1:11.

[106] *Id.* at 01:31.

[107] County Defs.' Statement of Facts (Doc. 175, ¶ 45); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 45) (admitting ¶ 45 in part and denying it in part, but without refuting that Mendenhall instructed the medical department to flush Ty'rique's eyes).

[108] Video of Vanessa Talley with Ty'rique Riley, Dated June 18, 2019 (Pls.' Ex. Y, Doc. 194, 00:40).

his ankles to hold him down, with Bauer removing her foot when Grieb moved to a more central positioning.[109] At the 02:30 minute mark, PrimeCare medical assistant Vanessa Talley entered the holding cell to flush Ty'rique's eyes.[110] At the 02:34 mark, Talley first leans over Ty'rique and brings the bottle she is holding up to Ty'rique to flush his eyes.[111] At the 02:41 mark Talley begins to retreat from Ty'rique having finished flushing his eyes.[112]

The Officers and Talley then left the cell, leaving Ty'rique sitting on the floor with his hands handcuffed behind his back and his legs shackled.[113] A short while later, four Officers including Mendenhall enter the cell and take a photograph of Ty'rique. That photograph is a part of the summary judgment record.[114] Mendenhall completed a report of extraordinary occurrence, and Ingersoll, Grieb, Weaver and Bauer completed a use of force memo for this incident.[115] Defendants Mendenhall,

---

[109] *Id.* at 02:29-02:32.,

[110] *Id.* at 02:30.

[111] *Id.* at 02:33.

[112] *Id.* at 02:41.

[113] *Id.* at 2:45-2:53.

[114] *Id.* at 4:15-4:34; Photo of Ty'rique Riley with OC Spray on Face (Pls.' Ex. Z, Doc. 195-12).

[115] Lieutenant Greg Mendenhall's Extraordinary Occurrence Report dated June 18, 2019, (County Defs.' Ex. H, Doc. 175-1, pp. 1-3); DCP Extraordinary Occurrence Reports to Include Individual Officer Reports (County Defs.' Ex. H, Doc. 175-9, pp. 1-2, 4-7).

Ingersoll, Weaver and Bauer subsequently gave transcribed statements to Dauphin County Criminal Investigation Division Detective Brian Walborn.[116]

### 2.    Placing Ty'rique Riley in a Restraint Belt

Ty'rique remained in the holding cell from approximately 05:17 to 10:34.[117] The surveillance video from the holding cell shows that Ty'rique did not sit still.[118] He paced in the cell, and often approached and leaned against the cell door.[119]

Surveillance video from inside the holding cell shows that at approximately 09:14, Ty'rique slipped his handcuffs from the back of his body to the front.[120] The parties dispute whether Ty'rique began banging on the cell door and window.[121] At times, Ty'rique can be seen bending over, almost appearing to try and step back through his cuffs to get his hands behind his back again.[122] Approximately seven minutes later, four Officers enter Ty'rique's cell to place a restraint belt on him.[123]

---

[116] County Defs.' Statement of Facts (Doc. 175, ¶ 51); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 51).

[117] County Defs.' Video # 4 (Ex. F, Doc. 175-7, 04:40); County Defs.' Video # 17 (Ex. F, Doc. 175-7, 42:31).

[118] *Id*. at Video #s 7, 8, 11, 14, 17.

[119] *Id.*

[120] *Id*. at Video # 14, 21:38.

[121] County Defs.' Statement of Facts (Doc. 175, ¶ 53); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 53).

[122] County Defs.' Video # 14 (Ex. F, Doc. 175-7, 22:01-22:03, 22:13-22:14, 22:44-22:53, 23:32-23:38, 23:56-24:00, 24:37-24:44, 25:30-25:33, 25:41-25:47, 25:58-26:03, 26:28-26:40, 27:37-27:41).

[123] *Id*. at 28:36. County Defendants state that six officers, Lieutenant Richard Armermann, Sergeants Jason Adams, Michael Blouch, Scott Grieb, and Officers Taylor Glenn and Martin Myers entered the cell. County Defs.' Statement of Facts

A fifth Officer watches from near the desks.[124] Approximately twenty-five seconds later, a sixth Officer walks up to the cell door, initially remaining in the doorway before turning to leave briefly and then returning and entering the cell to assist the other four officers.[125]

Surveillance video from the booking cell shows an Officer entering and immediately grabbing Ty'rique to guide him to sit on the bench in the cell.[126] The other three Officers follow him in.[127] All four Officers surround Ty'rique as he sits on the bench, obscuring him from view for most of the video.[128] The guards and Ty'rique struggle at times, but with the obstructed view of Ty'rique it is difficult to tell the extent to which, if at all, he was resisting or being combative or uncooperative.[129] It took the Officers approximately three minutes to place Ty'rique in the restraint belt.[130]

Armermann only gave Ty'rique verbal commands and did not use any physical force on Ty'rique.[131] After placing Ty'rique in the restraint belt,

---

(Doc. 175, ¶ 54). The surveillance video clearly shows that initially, only four Officers enter the cell.

[124] County Defs.' Video # 15 (Ex. F, Doc. 175-7, 13:55).

[125] *Id*. at 14:20, 14:54-15:01, 15:03.

[126] County Defs.' Video # 14 (Ex. F, Doc. 175-7, 28:36-28:38).

[127] *Id*. at 28:38-28:41.

[128] *Id*. at 28:36-31:37.

[129] *Id*.

[130] *Id*.

[131] County Defs.' Statement of Facts (Doc. 175, ¶ 56); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 56) (admitting ¶ 56 in part and denying it in

Armermann completed a report of extraordinary occurrence, and J. Adams, Armermann, Blouch, Glenn, Grieb and Myers completed use of force reports.[132] Later, J. Adams, Armermann, Blouch, Glenn, Grieb and Myers gave transcribed statements to Walborn.[133]

### 3.    Ty'rique Riley's Initial Medical Intake Screening at the Dauphin County Booking Center

Dauphin County Prison has a written policy that states:

> Any person brought into the Prison for booking and felt to be in need of medical attention shall be examined by a nurse from the Medical Unit. If the nurse determines that the prisoner in need of emergency medical / detoxification clearance it shall be necessary for the arresting officer/s to obtain such clearance from an outside Medical Doctor before the Prison and the Provider accept responsibility for the prisoner.[134]

Under this policy, any detainee brought to Dauphin County Prison in these apparent conditions must be examined by the Medical Unit before acceptance:

(1)    Extreme drug/alcohol intoxications;

---

part but without refuting that Armermann only gave Ty'rique verbal instructions and did not use physical force on him).

[132] Lieutenant Richard Armermann's Extraordinary Occurrence Report dated June 18, 2019, (County Defs.' Ex. H, Doc. 175-1, pp. 8-10); DCP Extraordinary Occurrence Reports to Include Individual Officer Reports (County Defs.' Ex. H, Doc. 175-9, pp. 11-15).

[133] County Defs.' Statement of Facts (Doc. 175, ¶ 57); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 57).

[134] Dauphin County Judicial Center Policies and Procedures, Requested Medical Clearance of Inmates, Dauphin DFS 314-315 (Pls.' Ex. M, Doc. 195-1, p. 42).

(2)     Visible untreated injuries/bleeding;

(3)     Any claims of pain or serious medical problems;

(4)     Any claims of "police brutality;"

(5)     Any appearance of a dazed or confused condition;

(6)     Any head injury;

(7)     Unconscious or semi-conscious or any inmate who appears to "pass out" or have seizure activity;

(8)     Acute mental health crisis.[135]

Personnel from the Medical Unit will then determine whether the detainee should receive medical clearance.[136] A different Booking Center policy instructing on booking and intake procedures provides:

> Detainees determined to be under the influence of alcohol or a controlled substance to the extent that they present a danger to themselves, or who present with a similar condition, will be taken by the arresting officer to a medical facility for evaluation and treatment before being committed to the Judicial Center.[137]

Dauphin County and PrimeCare Medical entered into a Comprehensive Health Services Agreement.[138] Thus, PrimeCare, through its employees, is

---

[135] *Id.*

[136] *Id.*

[137] Booking/Intake Procedure, Dauphin DFS 290-303 (Pls.' Ex. M, Doc. 195-1, p. 20).

[138] County Defs.' Statement of Facts (Doc. 175, ¶ 63); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 63).

responsible for medically clearing detainees for admission into Dauphin County Prison, where clearance is required.[139] Kassandra Betancourt ("Betancourt"), the PrimeCare medical assistant from the Dauphin County Prison Medical Unit who attempted to complete Ty'rique's medical clearance, stated that the staff member doing the evaluation reports to a charge nurse, and that it is the charge nurse who decides whether a detainee requires outside medical clearance.[140] Betancourt stated during deposition that when medical intake cannot be completed, a detainee is automatically placed on Level 1 Suicide Watch and the charge nurse is informed.[141] Betancourt also reported that where a detainee's medical intake is not completed, the medical staff would attempt to attempt to complete the evaluation every shift (three times per day).[142] Once a detainee was put on a Level 1 Suicide Watch, the only person who can remove them from that level is a psychologist or psychiatrist.[143]

---

[139] County Defs.' Statement of Facts (Doc. 175, ¶ 64); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 64).

[140] Kassandra Betancourt Dep. (Pls.' Ex. I, Doc. 194-7, pp. 25:20-26:3).

[141] *Id*. at pp. 40:22-41:2, 43:9-14; County Defs.' Statement of Facts (Doc. 175, ¶ 81); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 81).

[142] Kassandra Betancourt Dep. (Pls.' Ex. I, Doc. 194-7, p. 77:3-14).

[143] *Id*. at 41:3-20; County Defs.' Statement of Facts (Doc. 175, ¶ 84); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 84) (admitting in part and denying in part ¶ 84, but without refuting that once a detainee is put on a Level 1 Suicide Watch only a psychologist or psychiatrist can move the detainee to a different level).

When a detainee is placed at a Level 1 Suicide Watch, checks are supposed to be done every 10 minutes.[144]

During her deposition, Betancourt explained that when she does medical intakes, she first checks a detainee's vitals and blood sugar, and does a PPD test to screen for tuberculosis.[145] After these tasks are complete, Betancourt asks a series of questions from a computer-generated intake questionnaire and records her notes.[146]

On June 18, 2019, at approximately 10:06 a.m., Betancourt attempted to complete Ty'rique's intake examination.[147] Betancourt successfully recorded Ty'rique's vitals.[148] As part of the intake screening, Betancourt filled out an "Influenza Infection Control Surveillance" form.[149] On that form, Betancourt recorded Ty'rique's temperature, and noted the absence of various symptoms associated with influenza.[150] She also recorded that Ty'rique's level of awareness was "confused," but that he was oriented to person, place, and time.[151] When asked at deposition why she selected "confused" as Ty'rique's level of awareness, she

---

[144] County Defs.' Statement of Facts (Doc. 175, ¶ 81); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 81).

[145] Kassandra Betancourt Dep. (Pls.' Ex. I, Doc. 194-7, p. 30:11-17).

[146] *Id.* at pp. 30:18-31:24.

[147] *Id.* at pp. 33:11-34:7.

[148] County Defs.' Statement of Facts (Doc. 175, ¶ 71); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 71).

[149] Ty'rique Riley Influenza and Exit Control Surveillance Form (Pls.' Ex. L, Doc. 194-10).

[150] *Id.*

[151] *Id.*

stated that Ty'rique was repeating the word "bro" and saying that he "didn't do it."[152] Betancourt was unable to remember how she made the determination that Ty'rique was oriented to person, place and time.[153] Betancourt stated during deposition that Ty'rique initially responded to questions by shaking his head.[154] Betancourt stopped her evaluation before it was complete because Ty'rique stopped answering questions.[155] Because Betancourt was unable to complete Ty'rique's intake she placed Ty'rique on a Level 1 Suicide Watch, checking boxes on a DCP Suicide Precaution form indicating Ty'rique was to be restricted from the unit until cleared by a psychologist or psychiatrist.[156] The Suicide Precaution form indicated there were to be ten minute checks at irregular intervals.[157]

Betancourt stated at her deposition that while she was with Ty'rique in the examination room, Ty'rique began attempting to "break through the handcuffs" by "trying to separate his hands from the handcuffs causing injuries to his forearms."[158]

---

[152] Kassandra Betancourt Dep. (Pls.' Ex. I, Doc. 194-7, pp. 34:17-35:1, 35:22-36:8).

[153] *Id*. at p. 36:9-14.

[154] *Id*. at p. 35:4-8.

[155] *Id*.

[156] *Id*. at pp. 40:6-41:2; PrimeCare Medical Full Patient History for Ty'rique Riley (County Defs.' Ex. R, Doc. 175-19, p. 5); County Defs.' Statement of Facts (Doc. 175, ¶¶ 80-82); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶¶ 80-82).

[157] PrimeCare Medical Full Patient History for Ty'rique Riley (County Defs.' Ex. R, Doc. 175-19, p. 5).

[158] Kassandra Betancourt Dep. (Pls.' Ex. I, Doc. 194-7, pp. 46:19-47:12).

Plaintiffs dispute whether this is what caused the injuries to Ty'rique's wrist/forearm, asserting that there is no evidence those injuries did not come from the use of force used by Officers when Ty'rique first entered the Booking Center.[159] The County Defendants and Plaintiffs agree that Betancourt observed the Officers verbally instruct Ty'rique to stop, which he did, and that none of the Officers made physical contact with him at that time.[160] The County Defendants and Plaintiffs also agree that Ty'rique was calm while Betancourt cleaned and bandaged the injury to his wrist/forearm.[161]

Betancourt testified that when she first did intake on Ty'rique she did not notice any injuries or a condition that she reported to the charge nurse.[162]

### 4. Transport of Ty'rique Riley to Dauphin County Prison

According to the Investigative Report by Dauphin County Criminal Investigation Division Detective Brian Walborn, Ty'rique was arraigned on June 18, 2019, at 09:12 a.m. by Judge James Lenker, who set bail at $20,000.[163] According

---

[159] Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 72).

[160] County Defs.' Statement of Facts (Doc. 175, ¶¶ 73-74); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶¶ 73-74).

[161] County Defs.' Statement of Facts (Doc. 175, ¶ 75); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 75).

[162] Kassandra Betancourt Dep. (Pls.' Ex. I, Doc. 194-7, p. 81:13-21).

[163] Investigative Report of Dauphin County Criminal Investigation Division Detective Brian Walborn (Pls.' Ex. AB, Doc. 196-2, p. 6).

to Warden Gregory Briggs, once an arraignment is complete a detainee is then considered an inmate.[164]

On June 18, 2019, at approximately 10:33 a.m., three Officers approached and opened Ty'rique's cell to remove him and prepare him for transportation to Dauphin County Prison ("DCP").[165] Two Officers watched from the desk area.[166] Once the cell door opened, Ty'rique stayed within the doorframe.[167] At this time the Officers were speaking with Ty'rique, but it is unclear about what and if they were instructing him.[168] Shortly after the cell door opened, another Officer arrives carrying a pair of shoes for Ty'rique to wear, and hands them to one of the three Officers near Ty'rique.[169] The shoes were placed on the floor and Ty'rique stepped out of the cell and slipped them on.[170] Ty'rique then followed the Officers calmly and on his own out a door.[171] None of the Officers needed to be or were touching Ty'rique as he followed them and he displayed no physical signs of resistance.[172] During this time

---

[164] Gregory Briggs Dep. (Pls.' Ex. AL, Doc. 196-12, pp. 36:17-37:2).
[165] County Defs.' Video # 18 (Ex. F, Doc. 175-7, 44:33); Investigative Report of Dauphin County Criminal Investigation Division Detective Brian Walborn (Pls.' Ex. AB, Doc. 196-2, p. 6).
[166] County Defs.' Video # 18 (Ex. F, Doc. 175-7, 44:33).
[167] *Id*. at 44:37- 45:00.
[168] *Id*.
[169] *Id*. at 44:56-45:04.
[170] *Id*. at 45:11-45:21.
[171] *Id*. at 45:21-45:38.
[172] *Id*.

Ty'rique still had his hands in the restraint belt and his legs shackled.[173] Upon arrival at DCP, Ty'rique was placed on a Level 1 Suicide Watch in cell A-1-5.[174]

### E.    MEDICAL CARE TY'RIQUE RILEY RECEIVED AT DAUPHIN COUNTY PRISON

Once Ty'rique was at DCP various other medical staff members attempted to complete his intake screening, as well as perform regular detox checks. Ty'rique's medical chart records from DCP are in the summary judgment record.[175] Ty'rique primarily received mental health care from psychologist Garrett Rosas, Psy.D. ("Dr. Rosas"), and psychiatrist Robin Miller, M.D. ("Dr. Miller"). I will discuss the care Ty'rique received in greater detail below.

#### 1.    Medical Screenings and Detox Checks Attempted

Betancourt testified that at the time Ty'rique was in DCP, medical staff did not go directly to an inmate's cell to perform detox checks, but that inmates were brought to the medical department by security.[176] DCP corrections staff are always present when an inmate is seen in the Medical Department for security reasons.[177]

---

[173] *Id*. at 44:33-45:38.

[174] Investigative Report of Dauphin County Criminal Investigation Division Detective Brian Walborn (Pls.' Ex. AB, Doc. 196-2, p. 6).

[175] PrimeCare Medical Full Patient History for Ty'rique Riley (County Defs.' Ex. R, Doc. 175-19).

[176] Kassandra Betancourt Dep. (Pls.' Ex. I, Doc. 194-7, pp. 61:7-16, 66:7-13). Betancourt indicated that this policy changed due to COVID-19. *Id*. at 61:17-23).

[177] County Defs.' Statement of Facts (Doc. 175, ¶ 91); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 91).

Betancourt reported that, during her shifts, she would give a list of inmates that needed to be seen to a medical officer, that officer would call the block, and the Officers in a particular block would notify medical if those inmates were coming to medical or not.[178] If a detainee did not come to medical when called, the medical officer would advise Ms. Betancourt that the detainee "refused," which she would then write down.[179] Thus, when Betancourt wrote that an inmate "refused" a detox check, she was getting that information from a third party.[180] Sometimes Betancourt would be able to go to the detainee's cell to complete the inmate refusal form, but her ability to do so was contingent upon security giving her permission to go to the cell.[181]

A review of Ty'rique's medical chart notes suggests he consistently refused attempts to complete his medical intake examination and to have detox checks.[182] On June 18, 2019, at 10:22 a.m., Betancourt noted in Ty'rique's chart, "PPD was successfully planted in LFA and BS was completed. Unable to finish intake due to

---

[178] Kassandra Betancourt Dep. (Pls.' Ex. I, Doc. 194-7, p. 66:7-13).

[179] *Id*. at pp. 66:7-19.

[180] PrimeCare Medical Full Patient History for Ty'rique Riley (County Defs.' Ex. R, Doc. 175-19).

[181] Kassandra Betancourt Dep. (Pls.' Ex. I, Doc. 194-7, p. 67:2-10).

[182] PrimeCare Medical Full Patient History for Ty'rique Riley (County Defs.' Ex. R, Doc. 175-19, pp. 1-2).

inmate refusing."[183] At 8:40 p.m. that evening, LauraJo Funck, noted in Ty'rique's chart, "Inmate refused to complete intake, refused to sign refusal form."[184]

On June 19, 2019, at 7:52 a.m., Sarai Montanez, MA noted in Ty'rique's chart that he "refused detox check, refused to complete intake, [and] refused to sign refusal form."[185] At 7:09 p.m. that evening, Tykeisha Metz, MA, noted in Ty'rique's chart that he "refused detox check, refused to complete intake, [and] refused to sign refusal form."[186] The record also includes two "Refusal to Consent to Treatment" forms dated June 19, 2019, both of which are unsigned by Ty'rique.[187] The form indicating first shift is signed by two witnesses, one of whom appears to be Montanez.[188] The second form does not indicate what shift, but is also signed by two witnesses.[189]

On June 20, 2019, at 4:30 a.m., Katelyn Summerville ("Summerville"), EMT, noted in Ty'rique's chart that he "refused to attempt intake and refused to sign refusal form."[190] At 8:25 p.m. that evening, Tyra Real, MA, noted in Ty'rique's chart that he "refused to attempt intake and refused to sign refusal form."[191] The record also includes two "Refusal to Consent to Treatment" forms dated June 20, 2019,

---

[183] *Id*. at p. 1.
[184] *Id*.
[185] *Id*.
[186] *Id*.
[187] *Id*. at pp. 6, 14.
[188] *Id*. at p. 6.
[189] *Id*. at p. 14.
[190] *Id*. at p. 1.
[191] *Id*. at p. 2.

both of which are unsigned by Ty'rique.[192] One of the forms is signed by two witnesses, one of whom appears to be Summerville, and the other form is signed by one witness.[193]

On June 21, 2019, the only note in Ty'rique's chart reflected his negative PPD result.[194] However, the record includes a "Refusal to Consent to Treatment" form dated June 21, 2019, that is signed by two witnesses, suggesting Ty'rique may have refused to attempt to complete his intake or a detox check.[195]

On June 22, 2019, at 9:34 a.m., Betancourt noted in Ty'rique's chart that he "refused detox check, refused to sign refusal form."[196] At 4:19 p.m. that evening, Brittny Spencer noted in Ty'rique's chart that he "refused detox check, refused to sign refusal form."[197] No "Refusal to Consent to Treatment" forms dated June 20, 2019, are included in the summary judgment record.

On June 23, 2019, at 8:55 p.m., Summerville noted in Ty'rique's chart that he "refused detox check and refused to sign refusal form."[198] The record also includes a "Refusal to Consent to Treatment" form dated June 23, 2019, which is unsigned

---

[192] *Id.* at pp. 12-13.
[193] *Id.*
[194] *Id.* at p. 2.
[195] *Id.* at p. 7.
[196] *Id.* at p. 2.
[197] *Id.*
[198] *Id.*

by Ty'rique.[199] The form is signed by two witnesses, one of whom appears to be Summerville.[200]

On June 24, 2019, at 5:53 a.m., Sarai Santos noted in Ty'rique's chart that he "refused to attempt intake and refused to sign refusal form."[201] That same morning at 10:11 a.m., Noel Oates, MA, noted in Ty'rique's chart that he "refused detox check."[202] The record also includes a "Refusal to Consent to Treatment" form dated June 24, 2019, which is unsigned by Ty'rique.[203] The form is signed by one witness.[204]

On June 25, 2019, at 8:42 a.m., Betancourt noted in Ty'rique's chart, that he "refused detox check and refused to sign refusal form."[205] The record also includes a "Refusal to Consent to Treatment" form dated June 25, 2019, which is unsigned by Ty'rique.[206] The form is signed by two witnesses.[207]

## 2.    Treatment by Psychologist Garrett Rosas

Dr. Garrett Rosas, Psy.D., is a licensed psychologist employed by PrimeCare and was working as a staff psychologist at Dauphin County Prison at the time

---

[199] *Id*. at p. 8.
[200] *Id*.
[201] *Id*. at p. 2.
[202] *Id*.
[203] *Id*. at p. 9.
[204] *Id*.
[205] *Id*. at p. 2.
[206] *Id*. at p. 11.
[207] *Id*.

relevant to this action.[208] Dr. Rosas testified that he began working at Dauphin County Prison in May 2019, weeks before encountering Ty'rique, and that working in a corrections setting was new to him at the time.[209]

Ty'rique's Mental Health Sick Calls Record is a part of the summary judgment record.[210] That Record reveals that on June 18, 2019, at 3:05 p.m., Dr. Rosas evaluated Ty'rique for the first time.[211] Dr. Rosas recorded in Ty'rique's chart that he met with Ty'rique cell-side "after [Ty'rique] was prevented from being seen in medical dept [sic] this AM due to 'uncooperative behaviors.'"[212] Dr. Rosas testified that he did not observe the "uncooperative behaviors," but someone shared that information with him.[213] During deposition, Dr. Rosas recalled having difficulty communicating with Ty'rique due to a combination of ambient noise, and because parts of Ty'rique's responses were "nonsensical" or "garbled."[214] In the "Subjective" section of the relevant mental health sick call record, Dr. Rosas wrote:

> Subjective: Suicide watch. New intake. Met with pt cell-side at 1505h today after he was prevented from being seen in medical dept this AM due to "uncooperative behaviors". He was resting at the time but made himself available at the window when requested. He was informed about the need to be evaluated by MH staff before he's able to be

---

[208] County Defs.' Statement of Facts (Doc. 175, ¶ 88); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 88).

[209] Dr. Garrett Rosas Dep. (Pls.' Ex. K, Doc. 194-9, pp. 38:21-39:6).

[210] Ty'rique Riley's Mental Health Sick Calls (Pls.' Ex. AD, Doc. 196-4).

[211] Id. at p. 1.

[212] Id.

[213] Dr. Garrett Rosas Dep. (Pls.' Ex. K, Doc. 194-9, p. 35:6-12).

[214] Id. at p. 39:9-13.

removed from level 1. He said he'd would make an effort to show when called tomorrow. Will be reevaluated in 24 hours. When asked directly about whether he had any thoughts of suicide/harming self or others, he replied "no", he otherwise had no other statements or changes to report. MHA no[t] completed at this time due to his overall level of distress. Wearing a heavy bandage on his right wrist. When asked about what happened, he was unable to provide any type of response.[215]

In the "Objective" portion of the record, Dr. Rosas wrote, "Depressed mood with flat or blunted affect. Insight and judgment impaired. Moderately distressed by observation."[216] In the "Assessment" portion of the record, Dr. Rosas wrote, "No mental health diagnosis was given due to "the lack of information regarding symptoms, prior MH treatment, subjective appraisal of current needs and circumstances. He was unable to offer even a reasonable explanation for why he was incarcerated."[217] Dr. Rosas planned to "reevaluate risk to self/others in 24hrs . . . ."[218]

On June 19, 2019, at 2:50 p.m., Dr. Rosas evaluated Ty'rique a second time.[219] In the "Subjective" section of the relevant mental health sick call record, Dr. Rosas wrote:

Suicide watch. Met with pt cell-side at 1450h today after he was prevented from being seen in medical dept this AM due to "uncooperative behaviors". He was resting at the time but made himself available at the window when requested. He was informed about the need to be evaluated by MH staff before he's able to be removed from

---

[215] Ty'rique Riley's Mental Health Sick Calls (Pls.' Ex. AD, Doc. 196-4, p. 1).

[216] *Id.*

[217] *Id.*

[218] *Id.*

[219] *Id.*

level 1. He was entirely unresponsive to questions today, failing to even make nonverbal gestures to confirm an understanding of our conversation. Fixed gaze, ridged posture, disheveled. Unable to assess risk for harm to self or others due to unresponsive communication at this time.[220]

In the "Objective" portion of the record, Dr. Rosas wrote:

Although alert and able to present himself at the window today, he was entirely unresponsive to questions today, failing even to make nonverbal gestures to confirm an understanding of our conversation. Fixed gaze, rigid posture. Disheveled. Presentation today may be indicative of negative symptoms related to a psychotic disorder.[221]

As his "Assessment," Dr. Rosas noted that Ty'rique was "[u]nresponsive to questions, fixed stare, constricted affect indicative of negative symptoms of psychosis. No known [Substance Use Disorder] or withdrawal syndrome present at this time."[222] He planned to reevaluate Ty'rique in twenty-four hours to assess Ty'rique's risk to himself or others, and to place Ty'rique on the appropriate suicide precaution level.[223]

On June 20, 2019, at 12:45 p.m., Dr. Rosas evaluated Ty'rique a third time.[224] In the "Subjective" section of the record, Dr. Rosas wrote:

Suicide watch. Met with pt cell-side at 1245h today after he was prevented again from being seen in medical dept this AM due to ongoing "uncooperative behaviors". He was naked and standing at the window. He was informed about the need to be evaluated by MH staff

---

[220] *Id.*

[221] *Id.*

[222] *Id.*

[223] *Id.*

[224] *Id.* at p. 2.

before he's able to be removed from level 1. He was mostly unresponsive to questions today, but was able to verbalize that "I don't want to kill myself".[225]

In the "Objective" section of the record, Dr. Rosas wrote, "Blunted affect and mood. Appearance disheveled, absent eye contact, rigid/tense posture. See SRA." *Id.* As his "Assessment," Dr. Rosas wrote:

> Unresponsive to questions, fixed stare, constricted affect indicative of negative symptoms of psychosis. No known [Substance Use Disorder] or withdrawal syndrome present at this time. Will be diagnosed with Unspecified/Other psychotic disorder not due to a substance or known psychological condition.[226]

In the "Plan" section, Dr. Rosas wrote "[w]ill reevaluate risk to self/others in 24 hours and placed on the appropriate suicide precaution level according to the outcome of that assessment."[227]

### 3.    Treatment by Psychiatrist Robin Miller

Dr. Robin Miller, M.D., was working as a staff psychiatrist at Dauphin County Prison at the time relevant to this action.[228]

On June 21, 2019, at 2:59 p.m., psychiatrist Robin Miller, M.D., evaluated Ty'rique.[229] In the "Subjective" section of her treatment record, she wrote:

---

[225] *Id.*

[226] *Id.*

[227] *Id.*

[228] County Defs.' Statement of Facts (Doc. 175, ¶ 118); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 118).

[229] Ty'rique Riley's Mental Health Sick Calls (Pls.' Ex. AD, Doc. 196-4, p. 2).

> 21 y/o male with unknown psychotic h[istory]. Was admitted to the jail on 6/18. Since admission he has been naked in his cell, has been noted to be acutely psychotic. When seen in his cell today he refused to answer questions, was moving his mattress around in his room, put a juice box into his toilet. The COs state that he has not be assaultive but remains agitated.[230]

In the "Objective" section of the record, Dr. Miller wrote that Ty'rique "was mute, irritable, no eye contact, not able to assess suicidality/homicidality."[231] In the "Assessment" section of the record, Dr. Miller wrote, "Psychotic d/o NOS r/o substance induced psychotic d/o."[232] In the "Plan" section of the record, Dr. Miller wrote, "[w]ill start Zyprexa 5 mg po BID, will start Depakote 500 mg po BID 90 days, will check a Depakote level, liver functions, cbc with diff in 3-4 weeks, will see back Monday 6/24 for F/U."[233] It does not appear that Ty'rique ever gave informed consent to taking these medications or that there was a court order authorizing use of the medications.

On June 24, 2019, at 1:21 p.m., Dr. Miller evaluated Ty'rique a second time.[234] In the "Subjective" section of the record, Dr. Miller wrote:

> 21 y/o male with unknown psychiatric history. Was seen at cellside. Was not responsive to questions, was sitting on his bunk and would not

---

[230] *Id.*

[231] *Id.*

[232] *Id.*

[233] *Id*.

[234] *Id*.

come to the door when asked to answer questions. Has been refusing detox checks. Has been only partially compliant with meds.[235]

In the "Objective" section of the record, Dr. Miller wrote, "[m]ute, not able to assess suicidality/homicidality, appeared to be psychotic."[236] In the "Assessment" section, Dr. Miller wrote, "Psychotic d/o NOS r/o substance induced psychotic disorder.[237] Dr. Miller wrote in the "Plan" section, "Continue Depakote/Zyprexa at same doses, will see back 4 days for reeval, will remain on Level I watch because not able to do assessment."[238] Dr. Miller testified that after seeing Ty'rique on June 24, 2019, she did not feel that his condition was such that he needed to be taken to a hospital for evaluation or treatment.[239]

### F.    TY'RIQUE'S CONDITION ON JUNE 25, 2019

On June 25, 2019, Ty'rique was seen by Licensed Professional Counselor Christina Langseth.[240] In the "Subjective" section of the record Langseth wrote,

Suicide watch. Pt seen by MH cell side as he was not responsive to the call to come to MH unit. He was seen at 3:00 p.m. When I went to the door, he was sitting up and staring ahead. Previously he was seen and appeared to be frightened, but at this time, he appeared to be out of touch with present situation. He did not speak or acknowledge my presence.[241]

---

[235] *Id.*

[236] *Id.*

[237] PrimeCare Medical Records (PrimeCare Ex. A, Doc. 161-2, p. 8).

[238] *Id.*

[239] Dr. Robin Miller Dep. (Pls.' Ex. J, Doc. 194-8, p. 68:11-15).

[240] PrimeCare Medical Records (PrimeCare Ex. A, Doc. 161-2, p. 7).

[241] *Id.*

In the "Objective" section Langseth wrote that Ty'rique "made minimal movement except for slight shaking of arms and hands," that there was "no verbal response, no eye contact," and that she was not able to assess suicidality/homicidality.[242] In the "Assessment" section Langseth wrote,

> Pt seems to be catatonic currently. Though there has been minimal response in past visits there was no response today. He has presented no relevant information himself and the only diagnosis until further information is gathered is Other psychotic disorder not due to a substance or know physiological condition."[243]

Langseth planned to keep Ty'rique on Level 1 and to continue to attempt "relevant discourse."[244]

Dr. Miller testified that on June 25, 2019, she conferred with Dr. Rosas and did not think it was necessary to send Ty'rique to a hospital for further evaluation or treatment because he was still eating and drinking.[245]

## G.    EVENTS OF JUNE 26, 2019

### 1.    Ty'rique's Condition on June 26, 2019

Ty'rique's medical records indicate that on June 26, 2019, at 7:28 a.m., LaQuanda Simmons noted Ty'rique "refused detox check, and refused to sign

---

[242] *Id.*
[243] *Id.*
[244] *Id.*
[245] Dr. Robin Miller Dep. (Pls.' Ex. J, Doc. 194-8, p. 69:12-19).

refusal form."[246] The record also includes a "Refusal to Consent to Treatment" form dated June 26, 2019, signed by two witnesses, including Simmons.[247]

Ty'rique was also seen by Susan Irvine on June 26, 2019. Irvine is a licensed social worker and was the Treatment Coordinator at Dauphin County Prison at the time relevant to this action.[248] Irvine was also a part of the Mental Illness Substance Abuse collaborative panel ("MISA").[249] Irvine testified that one of MISA's purposes was to do case planning, and for "[t]hose that had significant mental illnesses [MISA would try] to connect them with a case manager, set up intakes for them."[250]

In her deposition Irvine testified that Ty'rique had been brought to her attention through MISA, and she was asked to go see him.[251] Irvine did so on June 26, 2019.[252] When Irvine looked into Ty'rique's cell, she observed that he had removed his suicide smock and was naked, and that there was urine all over the floor and an odor of urine.[253] Irvine introduced herself and remembered Ty'rique staring at her and giving her short answers.[254] Irvine asked Ty'rique if he understood why

---

[246] PrimeCare Medical Full Patient History for Ty'rique Riley (County Defs.' Ex. R, Doc. 175-19, p. 2).

[247] *Id.* at p. 10.

[248] County Defs.' Statement of Facts (Doc. 175, ¶ 111); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 111).

[249] Susan Irvine Dep. (Pls.' Ex. AG, Doc. 196-7, p. 18-22).

[250] *Id.* at p. 16:10-15.

[251] *Id.* at p. 20:2-13.

[252] *Id.* at p. 25:4-12.

[253] *Id.* at p. 27:12-18.

[254] *Id.* at p. 27:19-24.

he was incarcerated and Ty'rique replied "I did a very bad thing," and he "sounded very sad."[255] Irvine observed that Ty'rique was "wobbly."[256] Irvine asked one of the Officers to open the door to place the smock back on Ty'rique to preserve his dignity, and remembered a female Officer coming and putting the smock back on him quickly.[257]

At some point, Irvine spoke with a PrimeCare employee a couple of cells down who was passing out meds, expressing that Ty'rique did not look good, and the employee agreed to come down and take a look at Ty'rique.[258] The employee did and, attempted to give Ty'rique his medication.[259] When Ty'rique was given the medications and a drink to take them with, Irvine testified that "he wasn't able to swallow it because he just wasn't able to swallow it. I don't know if he understood that he needed to swallow it. I don't know."[260]

Once the smock was back on, Irvine was still concerned about Ty'rique medically "because he was so wobbly and still not responding" or engaging in conversation with her.[261] Irvine then said to the Officer that Ty'rique needed to go

---

[255] *Id.* at p. 28:5-10.
[256] *Id.* at p. 28:11-12.
[257] *Id.* at p. 28:12-18.
[258] *Id.* at p. 29:14-19.
[259] *Id.* at p. 29:20-22.
[260] *Id.* at pp. 29:22-30:2.
[261] *Id.* at p. 28:19-22.

to medical, or that medical needed to come see him.[262] Irvine testified that she engaged with the Director of Nursing or "the HSA" to express her worries about Ty'rique and was told that he had not been talking to medical either.[263]

Ultimately, Ty'rique was transported to medical via wheelchair by an Officer with Irvine.[264] Once there, a woman looked at Ty'rique and tried to ask him questions.[265] Ty'rique called this woman "teacher," and the woman was able to get Ty'rique to sip on some Gatorade.[266] Irvine remembered that Ty'rique was initially calm when transport began, but he ultimately grew "agitated" and started "bucking the wheelchair, like pushing his feet down really hard on the floor and bucking the wheelchair back multiple times . . . ."[267] Because of this, Irvine recalled more Officers coming around.[268] Irvine then left because her "role was done."[269]

Ty'rique's medical chart notes show that on June 26, 2019, at 9:36 a.m., Carl Daubenspeck, LPN, wrote a note in Ty'rique's chart that he was brought to medical at 9:00 a.m. "for concerns by Mental health" for his physical health.[270] Daubenspeck

---

[262] *Id*. at p. 28:2-24.
[263] *Id*. at p. 28:24-29:9.
[264] *Id*. at p. 29:11-13.
[265] *Id*. at p. 30:12-14.
[266] *Id*. at p. 30:23-25.
[267] *Id*. at p. 31:1-8.
[268] *Id*. at p. 31:9-11.
[269] *Id*. at p. 31:15-18.
[270] PrimeCare Medical Full Patient History for Ty'rique Riley (County Defs.' Ex. R, Doc. 175-19, p. 2).

noted that it was reported that Ty'rique had appeared unable to drink fluids during medication pass and was having "LOC" (level of consciousness) changes.[271] Daubenspeck wrote, "[w]hile in medical [Ty'rique] was uncooperative for vitals and taking fluids. [He] was resistive and was returned to cell. [He] continued to state loudly that he 'did not want to be gay or look gay' wearing the mental health suit for suicide precautions."[272]

On June 26, 2019, Daubenspeck entered a note in Ty'rique's chart that stated, "Mental Health Provide, Dr. Miller was called for orders re: [inmate] with mental health/LOC changes. Provider ordered [inmate] to be sent to area hospital for further evaluation. Choice was left up to security whether to send him by county vehicle or ambulance."[273]

### 2. Attempt to Transport Ty'rique Riley and Use of Restraint Chair

The parties dispute much of what transpired after the order was given to take Ty'rique to an area hospital. There is no surveillance video showing the interior of Ty'rique's cell. Unsurprisingly, then, the order of the events that took place in Ty'rique's cell is not particularly clear or well established. There is surveillance

---

[271] *Id.*
[272] *Id.*
[273] *Id.*

video showing the hallway that Ty'rique's cell was in.[274] The video quality is poor, and it is often difficult to identify a given individual.

Once the decision to transport Ty'rique to an area hospital was made, Officers Danner, Singleton and Donovan went to Ty'rique's cell to change him into the DCP uniform all inmates were required to wear when transported out of DCP.[275] Danner and Singleton walked into Ty'rique's cell while Swanson remained just outside the door.[276] Inside the cell, Danner offered Ty'rique the uniform, but Ty'rique did not immediately take it.[277] The parties dispute whether Ty'rique was refusing to comply with the order or whether he stared at Danner and did not put the uniform on because he was not capable of doing so.[278]

---

[274] County Defs.' Video 18-A-1 (Ex. S, Doc. 175-20).

[275] County Defs.' Video 18-A-1 (Ex. S, Doc. 175-20, 22:32); County Defs.' Statement of Facts (Doc. 175, ¶ 148); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 148); Swanson and Danner Statement of Facts (Doc. 159, ¶ 30); Pls.' Resp. to Swanson and Danner Statement of Facts (Doc. 191, ¶ 30) (admitting in part and denying in part ¶ 30, but without refuting that Danner, Singleton and Swanson went to Ty'rique's cell).

[276] County Defs.' Video 18-A-1 (Ex. S, Doc. 175-20, 22:32-22:56); Swanson and Danner Statement of Facts (Doc. 159, ¶ 30); Pls.' Resp. to Swanson and Danner Statement of Facts (Doc. 191, ¶ 30) (admitting in part and denying in part ¶ 30, but without refuting that Danner, Singleton and Swanson went to Ty'rique's cell).

[277] County Defs.' Statement of Facts (Doc. 175, ¶ 149); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 149) (denying ¶ 149).

[278] County Defs.' Statement of Facts (Doc. 175, ¶ 149); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 149) (denying ¶ 149).

Approximately thirty seconds later, Officers Swanson and Hoffman arrived at Ty'rique's cell.[279] Approximately sixteen seconds after arriving, Hoffman enters Ty'rique's cell, while Donovan and Swanson remain outside the door.[280] The parties dispute whether Ty'rique grabbed Danner's wrist and arm or reached to grab the uniform.[281] The parties also dispute whether Ty'rique was resisting and kicking at this time.[282] Officer Donovan can be seen repeatedly entering and exiting Ty'rique's cell, but she did not have any physical contact with him.[283] Approximately a minute after Hoffman entered Ty'rique's cell, Donovan is seen on camera running to A Control to notify a shift commander of the situation.[284]

---

[279] County Defs.' Video 18-A-1 (Ex. S, Doc. 175-20, 23:02); Swanson and Danner Statement of Facts (Doc. 159, ¶ 33); Pls.' Resp. to Swanson and Danner Statement of Facts (Doc. 191, ¶ 33) (denying ¶ 33, but without refuting that Hoffman and Swanson went to Ty'rique's cell).

[280] County Defs.' Video 18-A-1 (Ex. S, Doc. 175-20, 23:18); Swanson and Danner Statement of Facts (Doc. 159, ¶ 33); Pls.' Resp. to Swanson and Danner Statement of Facts (Doc. 191, ¶ 33) (denying ¶ 33, but without refuting that Hoffman entered Ty'rique's cell).

[281] County Defs.' Statement of Facts (Doc. 175, ¶ 149); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 149) (denying ¶ 149).

[282] County Defs.' Statement of Facts (Doc. 175, ¶ 152); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 152) (denying ¶ 152 in part).

[283] County Defs.' Statement of Facts (Doc. 175, ¶ 159); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 159) (denying ¶ 159 as stated, but without refuting Donovan did not use physical force on Ty'rique).

[284] County Defs.' Video 18-A-1 (Ex. S, Doc. 175-20, 24:15-24:27); Swanson and Danner Statement of Facts (Doc. 159, ¶ 35); Pls.' Resp. to Swanson and Danner Statement of Facts (Doc. 191, ¶ 35) (denying ¶ 35 as stated, but without refuting that Donovan ran to A Control to notify a shift commander of the situation).

The parties agree that Danner and Singleton took Ty'rique to the ground, but they dispute whether Ty'rique was resisting and whether taking him to the ground was necessary.[285] The parties dispute whether Ty'rique resisted while on the floor but agree that Danner was able to roll Ty'rique onto his stomach and secure his hands behind his back with handcuffs and that leg shackles were applied to Ty'rique's ankles.[286]

Approximately one minute after leaving for A Control, Donovan returns to Ty'rique's cell with another officer, remaining outside of the cell.[287] Approximately one minute later, Donovan enters Ty'rique's cell.[288] After approximately seventeen seconds, Donovan exits the cell, pauses, and then begins returning to A Control.[289] Approximately twenty-three seconds later, Donovan returns to Ty'rique's cell with Captain Klahr and Sergeant Lewis.[290] Klahr was the Shift Commander on June 26,

---

[285] County Defs.' Statement of Facts (Doc. 175, ¶ 154); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 154) (denying ¶ 154 in part).

[286] County Defs.' Statement of Facts (Doc. 175, ¶ 156); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 156) (denying ¶ 156 in part); County Defs.' Statement of Facts (Doc. 175, ¶ 157); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 157).

[287] County Defs.' Video 18-A-1 (Ex. S, Doc. 175-20, 25:54).

[288] County Defs.' Video 18-A-1 (Ex. S, Doc. 175-20, 26:50).

[289] County Defs.' Video 18-A-1 (Ex. S, Doc. 175-20, 27:07-27:26); Swanson and Danner Statement of Facts (Doc. 159, ¶ 38); Pls.' Resp. to Swanson and Danner Statement of Facts (Doc. 191, ¶ 38).

[290] County Defs.' Video 18-A-1 (Ex. S, Doc. 175-20, 27:49); Swanson and Danner Statement of Facts (Doc. 159, ¶ 37); Pls.' Resp. to Swanson and Danner Statement of Facts (Doc. 191, ¶ 37) (denying ¶ 37, but without refuting that Donovan left to return to A Control).

2019.[291] The parties dispute whether Klahr and Lewis observed Danner and Singleton place Ty'rique on the floor before he was handcuffed and shackled him.[292] The parties dispute whether Ty'rique began spitting toward Danner and grabbing Danner's arm, or whether white foam that had gathered from cotton mouth was coming out of Ty'rique's mouth.[293]

Klahr then ordered for Ty'rique to be placed into a restraint chair.[294] The parties dispute why Klahr ordered Ty'rique to be placed into a restraint chair.[295] The parties also dispute who gave the order for a spit hood to be placed on Ty'rique and whether the spit hood was necessary.[296] Sergeant Biter, who had been ordered to

---

[291] County Defs.' Statement of Facts (Doc. 175, ¶ 163); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 163).

[292] County Defs.' Statement of Facts (Doc. 175, ¶ 164); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 164) (denying ¶ 164); Swanson and Danner Statement of Facts (Doc. 159, ¶ 37); Pls.' Resp. to Swanson and Danner Statement of Facts (Doc. 191, ¶ 37) (denying ¶ 37).

[293] County Defs.' Statement of Facts (Doc. 175, ¶ 166); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 166) (denying ¶ 166).

[294] County Defs.' Statement of Facts (Doc. 175, ¶ 167); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 167) (denying ¶ 167, but without refuting that Klahr called for the restraint chair); Swanson and Danner Statement of Facts (Doc. 159, ¶ 40); Pls.' Resp. to Swanson and Danner Statement of Facts (Doc. 191, ¶ 40) (denying ¶ 40, but without refuting that Klahr ordered the restraint chair).

[295] County Defs.' Statement of Facts (Doc. 175, ¶ 169); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 169) (denying ¶ 169); Swanson and Danner Statement of Facts (Doc. 159, ¶ 40); Pls.' Resp. to Swanson and Danner Statement of Facts (Doc. 191, ¶ 40) (denying ¶ 40).

[296] County Defs.' Statement of Facts (Doc. 175, ¶ 167); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 166) (denying ¶ 167); Swanson and Danner Statement of Facts (Doc. 159, ¶ 41); Pls.' Resp. to Swanson and Danner Statement of Facts (Doc. 191, ¶ 41) (denying ¶ 41).

bring a restraint chair to Ty'rique's cell, did so with two other Officers accompanying him.[297] During the time between Klahr and Lewis arriving, and Biter bringing the restraint chair, Officers can be seen walking up and down the hall.[298] After the restraint chair arrived, a spit hood was placed on Ty'rique.[299] Around a minute after the restraint chair is brought to Ty'rique's cell, another Officer returns to stand near the restraint chair.[300] During this entire time, Swanson remained outside of the cell, and shortly after the restraint chair arrived, she left the area and returned to the front of the block.[301] The parties dispute whether Swanson was able to see into the cell during this time.[302]

Ty'rique is then removed from his cell and placed into the restraint chair.[303] At this point in the video, it is not clear who is who. At first, Ty'rique's torso and

---

[297] County Defs.' Video 18-A-1 (Ex. S, Doc. 175-20, 29:25); County Defs.' Statement of Facts (Doc. 175, ¶ 168); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 168); Swanson and Danner Statement of Facts (Doc. 159, ¶ 40); Pls.' Resp. to Swanson and Danner Statement of Facts (Doc. 191, ¶ 40) (denying ¶ 40, but without refuting that Biter brought the restraint chair to Ty'rique's cell).

[298] County Defs.' Video 18-A-1 (Ex. S, Doc. 175-20, 27:49-29:25).

[299] Swanson and Danner Statement of Facts (Doc. 159, ¶ 41); Pls.' Resp. to Swanson and Danner Statement of Facts (Doc. 191, ¶ 41) (denying ¶ 41, but without refuting that once the restraint chair arrived a spit hood was placed on Ty'rique).

[300] County Defs.' Video 18-A-1 (Ex. S, Doc. 175-20, 30:19).

[301] Swanson and Danner Statement of Facts (Doc. 159, ¶ 42); Pls.' Resp. to Swanson and Danner Statement of Facts (Doc. 191, ¶ 42) (admitting ¶ 42 in part, but without refuting that Swanson remained outside of the cell and left the area).

[302] Swanson and Danner Statement of Facts (Doc. 159, ¶ 43); Pls.' Resp. to Swanson and Danner Statement of Facts (Doc. 191, ¶ 43) (denying ¶ 43 as stated).

[303] County Defs.' Video 18-A-1 (Ex. S, Doc. 175-20, 30:31-30:43).

upper body are obscured from view by Officers standing around him.[304] However, Ty'rique, including his lower body, quickly becomes more obscured from view as additional Officers surround him.[305] For the majority of the time Ty'rique is in the restraint chair and Officers are attempting to secure the restraints Ty'rique is heavily obscured from view and nearly unable to be seen. This makes it difficult to tell the extent to which, if at all, Ty'rique was being combative, struggling or kicking. Unsurprisingly, the parties disagree on whether Ty'rique was combative and noncompliant with orders while being placed into the restraint chair.[306]

After Ty'rique is placed in the restraint chair one of the Officers places what appears to be some sort of cloth over Ty'rique's legs.[307] The video shows that at one point Ty'rique raised his legs when no Officers were standing in front of him.[308] Lewis, Klahr, Biter, Danner, and Singleton attempted to secure the restraints of the

---

[304] County Defs.' Video 18-A-1 (Ex. S, Doc. 175-20, 30:43-30:51).

[305] County Defs.' Video 18-A-1 (Ex. S, Doc. 175-20, 30:51).

[306] County Defs.' Statement of Facts (Doc. 175, ¶ 169); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 169) (denying ¶ 169); Swanson and Danner Statement of Facts (Doc. 159, ¶ 45); Pls.' Resp. to Swanson and Danner Statement of Facts (Doc. 191, ¶ 45) (denying ¶ 45).

[307] County Defs.' Video 18-A-1 (Ex. S, Doc. 175-20, 30:44-30:47).

[308] *Id.*

chair.[309] While assisting, Lewis applied a hypoglossal pressure point to Ty'rique.[310] The parties dispute whether the hypoglossal pressure point was ever necessary.[311] It is difficult to see in the video when Lewis is applying the hypoglossal pressure point. It took approximately one minute and fifteen seconds for the Officers to get Ty'rique into the restraint chair and the restraints secured.[312]

Once the restraints are secure, the Officers step back from Ty'rique and begin moving him down the hallway.[313] The parties dispute when Ty'rique became unresponsive and stopped breathing.[314] Defendants assert it was once Ty'rique was secured in the restraint chair, and Plaintiffs allege it was when Lewis used the

---

[309] Swanson and Danner Statement of Facts (Doc. 159, ¶ 46); Pls.' Resp. to Swanson and Danner Statement of Facts (Doc. 191, ¶ 46) (denying ¶ 46, but without refuting Lewis, Klahr, Biter, Danner, and Singleton attempted to secure the restraints).

[310] County Defs.' Statement of Facts (Doc. 175, ¶ 171); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 171) (denying ¶ 171); Swanson and Danner Statement of Facts (Doc. 159, ¶ 45); Pls.' Resp. to Swanson and Danner Statement of Facts (Doc. 191, ¶ 45) (denying ¶ 45).

[311] County Defs.' Statement of Facts (Doc. 175, ¶ 171); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 171) (denying ¶ 171); Swanson and Danner Statement of Facts (Doc. 159, ¶ 45); Pls.' Resp. to Swanson and Danner Statement of Facts (Doc. 191, ¶ 45) (denying ¶ 45).

[312] County Defs.' Video 18-A-1 (Ex. S, Doc. 175-20, 30:33-31:48).

[313] *Id.* at 31:48-32:00.

[314] County Defs.' Statement of Facts (Doc. 175, ¶ 175); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 175) (denying ¶ 175); Swanson and Danner Statement of Facts (Doc. 159, ¶ 47); Pls.' Resp. to Swanson and Danner Statement of Facts (Doc. 191, ¶ 47) (denying ¶ 47).

hypoglossal pressure point technique.[315] Sternal rubs were performed to which Ty'rique was unresponsive.[316] The parties dispute whether the medical emergency was called immediately or whether there was a short discussion before it was called.[317]

Klahr then issued an order for the Officers to take Ty'rique to the Medical Department because it was likely the Officers could transport Ty'rique to the Medical Department before the Medical Department staff could get to Ty'rique.[318] CPR was not attempted.[319]

### 3.   Treatment of Ty'rique Riley in the Medical Department

Video surveillance footage showing the entrance to the Medical Department and its waiting room shows that when Ty'rique was brought to medical the spit hood was still covering his head.[320] When Ty'rique arrived at the Medical Department, PrimeCare employees observed that Ty'rique was unresponsive, pulseless and not

---

[315] County Defs.' Statement of Facts (Doc. 175, ¶ 175); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 175) (denying ¶ 175); Swanson and Danner Statement of Facts (Doc. 159, ¶ 47); Pls.' Resp. to Swanson and Danner Statement of Facts (Doc. 191, ¶ 47) (denying ¶ 47).

[316] County Defs.' Statement of Facts (Doc. 175, ¶ 176); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 176) (denying ¶ 176, but without refuting that sternal rubs were performed).

[317] County Defs.' Statement of Facts (Doc. 175, ¶ 177); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 177) (denying ¶ 177).

[318] County Defs.' Statement of Facts (Doc. 175, ¶ 178); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 178) (admitting ¶ 178).

[319] County Defs.' Video 18-A-1 (Ex. S, Doc. 175-20, 32:17-32:44).

[320] County Defs.' Video 25-Med-waitroom (Ex. S, Doc. 175-20, 00:14).

breathing.[321] Officers removed Ty'rique from the restrain chair, and removed the handcuffs, shackles and spit hood so that life-saving procedures could begin.[322] The parties dispute who performed chest compressions on Ty'rique.[323]

Approximately twelve minutes and sixteen seconds after Ty'rique is brought to the Medical Department, Life Team EMS arrived and took over Ty'rique's medical care, transporting him to UPMC Harrisburg Hospital Emergency Room.[324]

## H.    TY'RIQUE'S TREATMENT AT UPMC

Ty'rique arrived in the emergency department and was admitted to the Intensive Care Unit ("ICU") after being resuscitated following cardiac arrest.[325] Ty'rique's estimated down time was 25-30 minutes.[326] A CT scan of Ty'rique's

---

[321] Swanson and Danner Statement of Facts (Doc. 159, ¶ 48); Pls.' Resp. to Swanson and Danner Statement of Facts (Doc. 191, ¶ 48) (denying ¶ 48, but without refuting that PrimeCare employees observed that Ty'rique was unresponsive, pulseless and not breathing).

[322] County Defs.' Statement of Facts (Doc. 175, ¶ 179); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 179) (admitting ¶ 179).

[323] County Defs.' Statement of Facts (Doc. 175, ¶ 180); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 180) (denying ¶ 180, without refuting chest compressions were performed); Swanson and Danner Statement of Facts (Doc. 159, ¶ 49); Pls.' Resp. to Swanson and Danner Statement of Facts (Doc. 191, ¶ 49) (denying ¶ 49, but without refuting that chest compressions were performed).

[324] County Defs.' Video 25-Med-waitroom (Ex. S, Doc. 175-20, 12:30); County Defs.' Statement of Facts (Doc. 175, ¶ 182); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 182) (admitting ¶ 182).

[325] County Defs.' Statement of Facts (Doc. 175, ¶ 183); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 183) (admitting ¶ 183).

[326] UPMC Internal Medicine Discharge Summary (Pls.' Ex. AI, Doc. 196-9, p. 1).

chest and abdomen showed pneumomediastinum,[327] pneumoperitoneum,[328] extensive subcutaneous emphysema,[329] and a fracture of the sternum.[330] Initially, a CT scan of Ty'rique's head did not show any acute intracranial abnormalities.[331] A repeat CT scan showed diffuse[332] cerebral edema[333] and an EEG[334] showed encephalopathy.[335]

After evaluating Ty'rique in the ICU, Dr. Oscar Portillo, M.D., made the following assessments of Ty'rique: "Status post cardiac arrest: Etiology unknown, suspected drug overdose, [urine drug screen] positive for cannabinoid," "Acute renal

---

[327] Pneumomediastinum is the presence of air or gas in the mediastinum, which may interfere with respiration and circulation. *Pneumomediastinum*, Dorland's Illustrated Medical Dictionary (32nd ed. 2012).

[328] Pneumoperitoneum is the presence of gas or air in the peritoneal cavity. *Pneumoperitoneum*, Dorland's Illustrated Medical Dictionary (32nd ed. 2012).

[329] Subcutaneous emphysema is air in subcutaneous tissue and is associated with pneumomediastinum. *Emphysema, subcutaneous*, Dorland's Illustrated Medical Dictionary (32nd ed. 2012).

[330] UPMC Internal Medicine Discharge Summary (Pls.' Ex. AI, Doc. 196-9, p. 3.

[331] *Id.*

[332] Diffuse means widely distributed. *Diffuse*, Dorland's Illustrated Medical Dictionary (32nd ed. 2012).

[333] Cerebral Edema is the excessive accumulation of fluid in the brain substance. *Edema, cerebral*, Dorland's Illustrated Medical Dictionary (32nd ed. 2012).

[334] An EEG (electroencephalogram) is a test measuring electrical activity in the brain. *Electroencephalogram*, Dorland's Illustrated Medical Dictionary (32nd ed. 2012).

[335] UPMC Internal Medicine Discharge Summary (Pls.' Ex. AI, Doc. 196-9, p. 3. Encephalopathy is any degenerative disease of the brain. *Encephalopathy*, Dorland's Illustrated Medical Dictionary (32nd ed. 2012).

failure,"[336] "Metabolic acidosis,"[337] "Acute hypoxic respiratory failure,"[338] "Anoxic brain injury,"[339] "Hyperkalemia,"[340] "Hypernatremia,"[341] "Pneumomediastinum and subcutaneous emphysema without pneumothorax,"[342] "Pneumoperitoneum/air in retroperitoneal region," [343] and "sternal fracture."[344]

On July 1, 2019, fourteen days after he was arrested and five days after arriving in the hospital, Ty'rique Riley was declared brain dead, and was pronounced deceased at 14:30.[345]

---

[336] Acute renal failure is also known as acute kidney failure. *Renal*, Dorland's Illustrated Medical Dictionary (32nd ed. 2012).

[337] Acidosis is a condition where too much acid is present in the blood and body tissues resulting in a decrease in pH. *Acidosis*, Dorland's Illustrated Medical Dictionary (32nd ed. 2012).

[338] Hypoxic refers to having low levels of oxygen. *Hypoxia*, Dorland's Illustrated Medical Dictionary (32nd ed. 2012).

[339] Anoxic refers to refers to a total lack of oxygen resulting from interference with the source of oxygen. *Anoxia, anoxic*, Dorland's Illustrated Medical Dictionary (32nd ed. 2012).

[340] Hyperkalemia refers to high levels of potassium in the blood. *Hyperkalemia*, Dorland's Illustrated Medical Dictionary (32nd ed. 2012).

[341] Hypernatremia refers to high levels of sodium in the blood. *Hypernatremia*, Dorland's Illustrated Medical Dictionary (32nd ed. 2012).

[342] A pneumothorax is an accumulation of air or gas in the pleural (membrane investing the lungs and lining the chest) space. *Pneumothorax*, Dorland's Illustrated Medical Dictionary (32nd ed. 2012).

[343] Retroperitoneal refers to the space behind the peritoneum (membrane lining the inside of the abdomen and pelvis). *Retroperitoneal*, Dorland's Illustrated Medical Dictionary (32nd ed. 2012).

[344] UPMC Hospital Select Medical Records for Ty'rique Riley (County Dfs.' Ex T, Doc. 175-21, pp. 3-4).

[345] *Id*. at p. 2.

## I.    CAUSE AND MANNER OF DEATH

The parties dispute the cause and manner of death. The Dauphin County Coroner's Office, through Dr. Wayne Ross, conducted a full autopsy on Ty'rique on July 2, 2019.[346] The Postmortem Report noted a contusion on Ty'rique's mid-forehead, multiple abrasions to his left upper lip with the lip intact, a contusion to the distal end of his tongue, no blood in the nose, mouth or ears, bruises on his left lateral chest "medical or other," bruises on his left upper shoulder, contusions to his right upper arm, inner elbow area "compatible with medical effects," abrasions on his right wrist compatible with handcuffs, bruises on his left upper arm compatible with needle punctures, a bruise to his left inner elbow area, an abrasion to his left wrist compatible with handcuffs, an abrasion on his left fourth mid-knuckle, an abrasion to the left second finger, an abrasion to the left lower leg on the outside of his knee, an abrasion to the left ankle, an abraded healing contusion to the base of the left toe, an abrasion to the right ankle, abrasions to the right base of his foot, an abrasion to his mid-right second toe, a contusion on his right thigh, a healing abrasion to his right knee, and a bruise to his right lateral hip.[347] Dr. Ross confirmed

---

[346] County Defs.' Statement of Facts (Doc. 175, ¶¶ 190-191); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶¶ 190-191) (admitting ¶¶ 190-191).

[347] Dauphin County Coroner's Office Postmortem Report, (Pls.' Ex. AJ, Doc. 196-10, pp. 3-4).

that the fractured sternum was likely related to CPR.[348] Dr. Ross did not opine that any of Ty'rique's injuries were related to the use of excessive force.[349] Dr. Ross opined that the manner of death was natural.[350] Dr. Ross further opined that the cause of death was from complications of cerebral vasculitis/encephalitis,[351] thromboemboli[352] and rhabdomyolysis.[353] Dr. Ross found that the vasculitis to the brain was consistent with cocaine usage or infection and noted cocaine was found in Ty'rique's hair indicating usage.[354]

Ty'rique's death was also investigated by Brian Walborn, a detective for the Dauphin County District Attorney's Office.[355] Plaintiffs contend the investigation

---

[348] County Defs.' Statement of Facts (Doc. 175, ¶ 193); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 193) (admitting ¶ 193).

[349] County Defs.' Statement of Facts (Doc. 175, ¶ 195); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 195) (admitting ¶ 195 as stated).

[350] Dauphin County Coroner's Office Postmortem Report, (Pls.' Ex. AJ, Doc. 196-10, p. 9).

[351] Cerebral vasculitis refers to inflammation of the blood or lymph vessels in the brain. *Vasculitis*, Dorland's Illustrated Medical Dictionary (32nd ed. 2012). Encephalitis refers to inflammation of the brain. *Encephalitis*, Dorland's Illustrated Medical Dictionary (32nd ed. 2012).

[352] Thromboemboli are blood clots brought by the bloodstream through the vasculature lodging in a vessel or bifurcation to small for it to pass through, obstructing the circulation. *Emboli* and *Thrombus*, Dorland's Illustrated Medical Dictionary (32nd ed. 2012).

[353] *Id*. Rhabdomyolysis refers to the breakdown of the muscles. *Rhabdomyolysis*, Dorland's Illustrated Medical Dictionary (32nd ed. 2012).

[354] *Id*.

[355] *See* Investigative Report of Dauphin County Criminal Investigation Division Detective Brian Walborn (Pls.' Ex. AB, Doc. 196-2).

was not full, complete, or unbiased.[356] As part of the investigation, Walborn reviewed memos written by the Correctional Officers, medical reports, videos, and conducted interviews.[357] Once Walborn received the Postmortem Report concluding Ty'rique's manner of death was natural, Walborn ended his investigation and found no crime had been committed.[358]

Plaintiffs' experts disagree with Dr. Ross's opinions. Dr. Zhongxue Hua, M.D., Ph.D., opined that Ty'rique's "death was due to neck compression during physical restraint, and his manner of death was 'homicide,' which is defined as 'death at the hands of another' in medicolegal investigation."[359] Dr. Hua noted that the actual autopsy findings included a picture demonstrating an "unexpected recent left anterior neck muscle bruise (near the midline on photo DCC00154), which was microscopically confirmed subsequently[.]"[360] Dr. Hua also wrote,

> 6. Dr. Ross claimed microscopic findings of cerebral vasculitis/encephalitis, brain/lung thromboemboli, and rhabdomyolysis as Riley's direct cause of death. Note: all three were rare medical conditions, and a definite diagnosis of brain vasculitis and/or encephalitis requires a neuropathologist (*i.e.*, pathologist with formal

---

[356] Resp. to Swanson and Danner Statement of Facts (Doc. 191, ¶ 59).

[357] Swanson and Danner Statement of Facts (Doc. 159, ¶ 60); Pls.' Resp. to Swanson and Danner Statement of Facts (Doc. 191, ¶ 60).

[358] Swanson and Danner Statement of Facts (Doc. 159, ¶ 61); Pls.' Resp. to Swanson and Danner Statement of Facts (Doc. 191, ¶ 61) (admitting in part and denying in part ¶ 61, but without refuting that Walborn ended his investigation after receiving the Postmortem Report and found no crime had been committed).

[359] Expert Report of Dr. Zhongxue Hua, MD, PhD (Pls.' Ex. AK, Doc. 196-11, ¶ 11).

[360] *Id*. at ¶ 4.

and specialized subspeciality training in brain pathology). However, your provided histopathology recut slides do not have microscopical evidence of brain vasculitis, brain encephalitis, brain thromboemboli, lung thromboemboli, or meaningful rhabdomyolysis;

7. The microscopically observed perivenular inflammatory cuffing was a normally expected finding during prolonged hypoxic-ischemic encephalopathy (*aka,* "brain death" and/or death by neurological criteria) for five (5) days (from 6/26/2019 to 7/1/2019), a common neuropathological finding in dying brain tissues, which are also frequently misdiagnosed as brain vasculitis and/or encephalitis by some non-neuropathologist(s);

8. Riley's microscopic evidence of slight rhabdomyolysis was insignificant, which could represent either muscle damage during prior and/or current physical restraint/altercation (before and/or on 6/26/2019), muscle damage during prolonged "brain death" (from 6/26/2019 to 7/1/2019), or Zyprexa-related rhabdomyolysis. In brief, Riley died with slight rhabdomyolysis, and he did not die of his slight rhabdomyolysis;

. . . .

10. Riley's neck compression occurred during his being physical restrained and immediately before his witnessed sudden unconsciousness and pulseless electrical activity (PEA), which was due to a traumatic neck compression, not due to his pre-existing heart disease or non-traumatic cardiac arrhythmia. Note: although with hypoxic-ischemic encephalopathy (*aka,* "brain death") and ventilation-dependent respiratory failure, Riley's heart continued its function for the next five (5) days and without subsequent autopsy evidence of heart attack[.][361]

Plaintiffs' expert forensic psychologist Dr. Marcus R. Patterson, Psy.D. opined that,

Based on my review and analysis of the records provided to me and listed in this report, it is my professional forensic and clinical opinion that the mental health care and treatment provided to Mr. Riley by DCP

---

[361] *Id*. at ¶¶ 6-8, 10.

and PrimeCare failed to meet behavioral health standards, and these failures significantly contributed to and more likely than not were the causes in bringing about the harm, i.e. the severe mental decline and eventual death of Tyrique Riley on July 1, 2019. My opinion is based upon the materials provided to me, the facts of the case, and issues identified and discussed within this report.[362]

## III.   LEGAL STANDARDS

### A.   MOTIONS FOR SUMMARY JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[363] A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law.[364] For a dispute to be genuine, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."[365]

A party moving for summary judgment bears the initial burden "of informing the district court of the basis for its motion, and identifying those portions of [the

---

[362] Forensic Psychological Report of Dr. Marcus R. Patterson, PsyD (Pls.' Ex. AO, Doc. 196-15, p. 19).

[363] Fed. R. Civ. P. 56(a).

[364] *Haybarger v. Laurence Cnty. Adult Prob. & Parole*, 667 F.3d 408, 412 (3d Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[365] *Id.* (quoting *Anderson,* 477 U.S. at 248-49).

record], which it believes demonstrate the absence of a genuine issue of material fact."[366] "If the burden of persuasion at trial would be on the non-moving party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways."[367] First, the party moving for summary judgment "may submit affirmative evidence that negates an essential element of the nonmoving party's claim."[368] Second, the party moving for summary judgment "may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim."[369]

Once the party moving for summary judgment has met its burden, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."[370] To show that there is a genuine dispute of material fact, the non-moving party must cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, declarations, stipulations (including

---

[366] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[367] *Id.* at 331 (Brennan, J., dissenting); *see also Finley v. Pennsylvania Dep't. of Corrections*, 2015 WL 1967262, at *9 n.1 (M.D. Pa. Apr. 30, 2015) (observing that the Third Circuit has found that Justice Brennan's dissent in *Celotex* "does not differ with the opinion of the Court regarding the appropriate standards for summary judgment) (citing *In re Bressman*, 327 F.3d 229, 337 n.3 (3d Cir. 2003) and *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 84 n.2 (3d Cir. 1987)).

[368] *Id.*

[369] *Id.*

[370] *Berckeley Inv. Grp. Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006); *Celotex*, 477 U.S. at 324.

those made for the purposes of the motion only), admissions, interrogatory answers, or other materials."[371] If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial[,]" summary judgment is appropriate.[372] Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence.[373]

Finally, when ruling on a motion for summary judgment, it is not the province of the court to weigh evidence or assess credibility. It must view the evidence presented and draw all inferences in the light most favorable to the non-moving party.[374] The court may not decide whether the evidence unquestionably favors one side or the other or make credibility determinations.[375] Instead, it must decide whether a fair-minded jury could return a verdict for the non-movant on the evidence presented.[376] The Third Circuit has instructed that:

> To raise a genuine issue of material fact . . . the opponent need not match, item for item, each piece of evidence proffered by the movant. In practical terms, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its

---

[371] Fed. R. Civ. P. 56(c)(1)(A).

[372] *Celotex*, 477 U.S. at 322.

[373] *Anderson*, 477 U.S. at 249.

[374] *Lawrence v. City of Phila., Pa.*, 527 F.3d 299, 310 (3d Cir. 2008) (citing *Davis v. Mountaire Farms Inc.*, 453 F.3d 554, 556 (3d Cir. 2006)).

[375] *Anderson*, 477 U.S. at 252.

[376] *Id.*

opponent. It thus remains the province of the fact finder to ascertain the believability and weight of the evidence.[377]

In contrast, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."[378] And although "the court need consider only the cited materials, [] it may consider other materials in the record."[379]

## B. CLAIMS FOR CIVIL RIGHTS VIOLATIONS PURSUANT TO 42 U.S.C. § 1983

"Section 1983 imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States."[380] "It is well settled that § 1983 does not confer any substantive rights, but merely 'provides a method for vindicating federal rights elsewhere conferred.'"[381] To establish a claim under § 1983, a plaintiff must establish two things: (1) a deprivation of a federally protected right; and (2) that the deprivation was committed by a person or persons

---

[377] *Big Apple BMW v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

[378] *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587.

[379] Fed. R. Civ. P. 56(c)(3).

[380] *Shuman v. Penn Manor Sch. Dist.*, 422 F.3d 141, 146 (3d Cir. 2005) (citing *Gruenke v. Seip*, 225 F.3d 290, 298 (3d Cir. 2000)).

[381] *Williams v. Pennsylvania Human Relations Comm'n*, 870 F.3d 294, 297 (3d Cir. 2017) (quoting *Hildebrand v. Allegheny Cnty.*, 757 F.3d 99, 104 (3d Cir. 2014)).

acting under color of state law.[382]

## IV.  ANALYSIS

### A.  JOHN DOE DEFENDANTS

As an initial matter, Plaintiffs name as Defendants Susquehanna Township John Doe Police Officers 1-5, Susquehanna Township John Doe 911 Operator, PrimeCare John Doe Medical Employees 1-5, and Dauphin County Prison John Doe Correctional Officers 1-10. The County Defendants argue in their Motion for Summary Judgment that Dauphin County Prison John Doe Correctional Officers 1-10 should be dismissed. (Doc. 174, p. 44). In their Brief in Opposition, Plaintiffs write that they "do not object" to the dismissal of these Defendants. (Doc. 192, p. 56). In its Motion for Summary Judgment, PrimeCare requests that "all Doe Defendants" be dismissed. (Doc. 162, p. 13). In their Brief in Opposition, Plaintiffs "agree to dismiss Doe Defendants at this time." (Doc. 84, pp. 12-13). It therefore appears that Plaintiffs consent to the dismissal of all Doe Defendants.

Moreover, Federal Rule of Civil Procedure 21 provides, in part, "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party." As the Third Circuit has observed, "[t]he case law is clear that [f]ictitious parties must

---

[382] *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005) (quoting *Lake v. Arnold*, 112 F.3d 682, 689 (3d Cir. 1997)).

eventually be dismissed, if discovery yields no identities[.]"[383] Discovery in this case has closed and Plaintiffs have not identified their Doe Defendants or moved to amend their Second Amended Complaint.[384] Accordingly, I will recommend that all claims against Defendants Susquehanna Township John Doe Police Officers 1-5, Susquehanna Township John Doe 911 Operator, PrimeCare John Doe medical employees 1-5, and Dauphin County Prison John Doe Correctional Officers 1-10 be dismissed.[385]

### B.    DEFENDANTS NEIDIGH AND SMITH

Plaintiffs assert claims against Neidigh and Smith for excessive force in Count V and failure to intervene in the excessive uses of force in Count VI. The County Defendants seek summary judgment on Neidigh and Smith's behalf for both Counts. In their Brief in Opposition, Plaintiffs note that, "[b]ecause Defendants Smith and Neidigh were not present when excessive uses of force were asserted against Ty'rique and had no reasonable opportunity to intervene, Count VI will be

---

[383] *Hindes v. F.D.I.C.*, 137 F.3d 148, 155 (3d Cir. 1998). *See also McCrudden v. United States*, 763 F. App'x 142, 145 (3d Cir. 2019).

[384] *See* Doc. 144.

[385] The County Defendants argue in their Motion for Summary Judgment that Dauphin County Prison John Doe Correctional Officers 1-10 should be dismissed. (Doc. 174, p. 44). In their Brief in Opposition, Plaintiffs write that they "do not object" to the dismissal of these Defendants. (Doc. 192, p. 56). In its Motion for Summary Judgment, PrimeCare requests that "all Doe Defendants" be dismissed. (Doc. 162, p. 13). In their Brief in Opposition, Plaintiffs "agree to dismiss Doe Defendants at this time." (Doc. 84, pp. 12-13).

withdrawn against both Smith and Neidigh." (Doc. 192, p. 24 n.3). Accordingly, I will recommend Count VI be dismissed against Smith and Neidigh.

Plaintiffs do not indicate the same withdrawal of Count V against Smith and Neidigh. However, because Plaintiffs have acknowledged that Smith and Neidigh were not present when excessive uses of force were asserted against Ty'rique, they of course could not have used excessive force against him. Thus, I will recommend the County Defendants' Motion be granted insofar as it seeks summary judgment for Smith and Neidigh on Count V.

### C. PLAINTIFFS' CLAIMS FOR PUNITIVE DAMAGES AGAINST DAUPHIN COUNTY

County Defendants assert that Plaintiffs' claims for punitive damages against Dauphin County must be dismissed because punitive damages are not available against a municipality in a suit brought under § 1983. (Doc. 174, p. 43). Plaintiffs respond by agreeing that municipalities are immune from punitive damages under § 1983 and assert they do not seek punitive damages against Dauphin County. (Doc. 192, p. 55). The parties are correct that municipalities are immune from punitive damages under § 1983.[386] Accordingly, out of caution, I will recommend that Plaintiffs' claims for punitive damages against Dauphin County brought pursuant to § 1983, to the extent any such claims are brought, be dismissed with prejudice.

---

[386] *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).

**D.    Plaintiffs' Claims for Medical Negligence (Count IX), Wrongful Death (Count XIII), and Survival Action (Count XIV) Against PrimeCare**

In their Second Amended Complaint, Plaintiffs bring claims against PrimeCare for medical negligence relating to the medical treatment Ty'rique received (Count IX), wrongful death (Count XIII), and survival action (Count XIV). (Doc. 64, ¶¶ 199-203, 215-225).

PrimeCare seeks summary judgment in its favor on all three claims Plaintiffs bring against it: a medical negligence claim, and derivative wrongful death and survival action claims. PrimeCare correctly asserts that, "[b]ecause the negligence of a physician encompasses matters not within the ordinary knowledge and experience of laypersons a medical malpractice plaintiff must present expert testimony to establish the applicable standard of care, the deviation from that standard, causation and the extent of the injury."[387] As of the time PrimeCare filed its Brief in Support, Plaintiffs had not yet produced an expert report opining on causation. Therefore, PrimeCare argues, because expert testimony on causation is

---

[387] *Toogood v. Owen J. Rogal, D.D.S., P.C.*, 824 A.2d 1140, 1145 (Pa. 2003). *Toogood* establishes "A very narrow exception to the requirement of expert testimony in medical malpractice actions applies "where the matter is so simple or the lack of skill or care so obvious as to be within the range of experience and comprehension of even non-professional persons," also conceptualized as the doctrine of *res ipsa loquitur*. *Id*. No parties argue, nor does it appear true, that this exception applies in this case. *See also*, *Gharbi v. United States*, No. 1:19-CV-1943, 2024 WL 329149, at *44 (M.D. Pa. Jan. 29, 2024).

required, Plaintiffs cannot demonstrate a viable cause of action for medical negligence against it. (Doc. 162, p. 8). PrimeCare concedes, however, that the Plaintiffs had time remaining to produce an expert report to support their claim. *Id.*

Plaintiffs respond that on March 22, 2024, they produced the expert report of Marcus Patterson Psy.D., a licensed clinical psychologist, on the issues of PrimeCare's deviation from the standard of care owed and causation of injury. (Doc. 184, p. 4). Plaintiffs argue that "by its own concession" that they may timely produce an expert report to support their medical negligence claim, PrimeCare's request for summary judgment on this issue must be denied. *Id.*

In reply, PrimeCare asserts that Plaintiffs have "produced a causation expert report from Zhongxue Hua, [M.D., Ph.D.]," whose causation opinion is "unequivocal that Mr. Riley died as a result of neck compression during physical restraint." (Doc. 213, pp. 2-3). PrimeCare points out that nobody from the medical team asked for Ty'rique to be restrained, was present when he was restrained or participated in restraining him. *Id.* at p. 3. PrimeCare argues that "though Plaintiffs have produced an expert to opine PrimeCare deviated from the applicable standard of care, Plaintiffs have not produced any expert evidence that the deviation caused Mr. Riley's death" and it is therefore entitled to summary judgment.[388] *Id.* PrimeCare

---

[388] PrimeCare is correct that Plaintiffs' expert Dr. Hua wrote in his expert report,

does not respond to Plaintiffs' argument that they produced the expert report of Dr. Patterson on the issue of deviation and causation. PrimeCare does not mention Dr. Patterson in their reply.

Contrary to PrimeCare's assertion that Plaintiffs have produced no expert evidence on causation, Dr. Patterson wrote in his expert report,

> Based on my review and analysis of the records provided to me and listed in this report, it is my professional forensic and clinical opinion that the mental health care and treatment provided to Mr. Riley by DCP and *PrimeCare failed to meet behavioral health standards, and these failures significantly contributed to and more likely than not were the causes in bringing about the harm, i.e. the severe mental decline and eventual death of Tyrique Riley* on July 1, 2019. My opinion is based upon the materials provided to me, the facts of the case, and issues identified and discussed within this report.[389]

Accordingly, PrimeCare's assertion that "Plaintiffs have not produced any expert evidence that the deviation caused Mr. Riley's death" and it is therefore entitled to summary judgment, is refuted by the presence of Dr. Patterson's report explicitly opining that PrimeCare's failure to meet behavioral health standards was a cause of Ty'rique's eventual death. (Doc. 213, p. 3). As this is PrimeCare's only argument, I

---

> Based on my experience both as a board-certified and practicing forensic pathologist and neuropathologist, within a reasonable degree of medical certainty, it is my considered opinion that Riley's death was due to neck compression during physical restraint, and his manner of death was a "homicide", which is defined as "death at the hands of another" in medicolegal investigation[.]

Expert Report of Dr. Zhongxue Hua, M.D., Ph.D. (Pls.' Ex. AK, Doc. 196-11, p. 3).

[389] Forensic Psychological Report of Dr. Marcus R. Patterson, Psy.D. (Pls.' Ex. AO, Doc. 196-15, p. 19) (emphasis added).

will recommend that PrimeCare's Motion seeking summary judgment on Plaintiffs' medical negligence claim be denied. Because Plaintiffs' medical negligence claim should survive summary judgment, so too should their derivative wrongful death claim and survival action.

PrimeCare also argues that it is entitled to summary judgment as to Plaintiffs' request for punitive damages. (Doc. 162, pp. 9-13). In its argument, PrimeCare cites to § 505(a) of the Medical Care Availability and Reduction of Error Act ("MCARE Act"), which provides:

> Punitive damages may be awarded for conduct that is the result of the health care provider's willful or wanton conduct or reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the health care provider's act, the nature and extent of the harm to the patient that the health care provider caused or intended to cause and the wealth of the health care provider.[390]

PrimeCare then makes a series of arguments that Plaintiffs cannot show its conduct was willful, wanton or recklessly indifferent. (Doc. 162, pp. 9-13). However, Plaintiffs have pleaded a vicarious liability claim against PrimeCare, seeking to hold it responsible "by and through its respective agents, workmen, doctors and nurses[.]" (Doc. 64, ¶ 202). Therefore, it is § 505(c) of the MCARE Act that applies to Plaintiffs' requests for punitive damages. Section 505(c) provides:

> Punitive damages shall not be awarded against a health care provider who is only vicariously liable for the actions of its agent that caused the

---

[390] 40 P.S. § 1303.505(a).

injury unless it can be shown by a preponderance of the evidence that the party knew of and allowed the conduct by its agent that resulted in the award of punitive damages.[391]

PrimeCare does not make any arguments regarding whether Plaintiffs can show by a preponderance of the evidence that it knew of and allowed the conduct by its employees that would result in the award of punitive damages. Accordingly, PrimeCare has not shown how it is entitled to summary judgment as to Plaintiffs' request for punitive damages. Therefore, I will recommend that summary judgment be denied.

### E.    PLAINTIFFS' CLAIMS FOR EXCESSIVE FORCE AT THE BOOKING CENTER AND DCP (COUNT V) AND FAILURE TO INTERVENE IN THE EXCESSIVE FORCE USED AT THE BOOKING CENTER AND DCP (COUNT VI)

Count V of the Second Amended Complaint asserts 42 U.S.C. § 1983 claims for excessive force in violation of Ty'rique's Fourteenth Amendment Right to Due Process against Danner, Klahr, Smith, Neidigh, Armermann, Mendenhall, Grieb, Adams, Blouch, Lewis, Biter, Ingersoll, Weaver, Glenn, Myers, Bauer, Singleton, and Hoffman stemming from uses of force that occurred while Ty'rique was at DCP. Count V of the Second Amended Complaint alleges that "after being taken into the Dauphin County Prison," the County Defendants and Danner "subjected [Ty'rique] to excessive force, including by but not limited to, shooting excessive pepper spray

---

[391] 40 P.S. § 1303.505(c).

into his face and mouth, beatings, and subjecting him to handcuffs and other physical restraints in such a way as to cause him physical pain and emotional pain and anguish." (Doc. 64, ¶ 159). It appears Plaintiffs include the Booking Center as part of the Prison in Count V, as evidenced by the OC (pepper) spray being used on Ty'rique while he was at the Booking Center, not in the Prison proper.

In their Brief in Support, County Defendants noted the broad scope of Plaintiffs' Counts. They argue broadly that Plaintiffs have failed to show the personal involvement of each Officer they allege subjected Ty'rique to excessive force in Count V of the Second Amended Complaint. (Doc. 174, pp. 16-17). They assert that Plaintiffs attempt to attribute the same actions to all of the County Defendants without describing any individual involvement. County Defendants assert that the available surveillance videos show that only reasonable force was used in response to Ty'rique's failure to comply with orders and his ongoing efforts to resist County Defendants while they attempted to gain his compliance. *Id*. County Defendants then make more specific arguments about (1) the force used to place Ty'rique in restraints when he arrived at the Booking Center, (2) the use of force while placing Ty'rique in a restraint belt at the Booking Center, and (3) the use of the restraint chair. (Doc. 174, pp. 16-23).

Plaintiffs' excessive force claim against Danner relates to his involvement in preparing Ty'rique for transport on June 26, 2019. Danner argues in his Brief in

Support that his use of force preparing Ty'rique for transport to the hospital was reasonable.

Plaintiffs addressed the wide scope of the Counts in their Second Amended Complaint by clarifying their claims, and, similarly to County Defendants, address their excessive force claims utilizing three events: (1) Ty'rique's arrival at the Booking Center, (2) Ty'rique's placement in a restraint belt while at the Booking Center, and (3) the use of force against Ty'rique on June 26, 2019. I will use these three events when evaluating the Motions for Summary Judgment on the excessive force claims.

### 1.    Legal Standard for Fourteenth Amendment Excessive Force Claims

Plaintiffs and Defendants agree that Plaintiffs' excessive force claims should be evaluated under the Fourteenth Amendment's Due Process Clause because Ty'rique was a pretrial detainee.[392] For Plaintiffs to succeed on this claim, they "must show only that the force purposely or knowingly used against [Ty'rique] was objectively unreasonable."[393] Plaintiffs can establish the force used was excessive if they can show the force used was "not rationally related to a legitimate governmental objective" or that the force used was "excessive in relation to that purpose."[394]

---

[392] *See Kingsley v. Hendrickson*, 576 U.S. 389 (2015).
[393] *Kingsley*, 576 U.S. at 397.
[394] *Id*. at 398.

There is no mechanical formula a court or jury uses to determine when force is objectively unreasonable under the Fourteenth Amendment.[395] Rather, "objective reasonableness turns on the facts and circumstances of each particular case," including, "[1] the relationship between the need for the use of force and the amount of force used; [2] the extent of the plaintiff's injury; [3] any effort made by the officer to temper or to limit the amount of force; [4] the severity of the security problem at issue; [5] the threat reasonably perceived by the officer; and [6] whether the plaintiff was actively resisting."[396] These circumstances are sometimes called the *Kingsley* factors and must be considered "from the perspective of a reasonable officer on the scene."[397]

### 2. Excessive Force Claims Relating to Ty'rique's Arrival at the Booking Center on June 18, 2019

County Defendants argue that Mendenhall, Ingersoll, Weaver, Bauer and Grieb used reasonable force when placing Ty'rique in restraints upon his arrival at the Booking Center. (Doc. 174, pp. 17-18). I interpret this as covering Plaintiffs' three identified uses of force that happened upon Ty'rique's arrival at the Booking Center as defined *infra*. As to the *Kingsley* factors as related to these three uses of force at the time Ty'rique arrived at the Booking Center, County Defendants argue

---

[395] *Id.* at 397.

[396] *Id.* (quoting *Graham v. Connor,* 490 U.S. 386, 396 (1989)) (internal quotation marks omitted).

[397] *Id.*

that (1) they used objectively reasonable force to gain control over Ty'rique, (2) that Ty'rique's injuries were limited to one short exposure to OC spray, (3) that there was no opportunity to temper the amount of force used because Ty'rique was resisting, (4) that there was a severe security issue because Ty'rique was actively resisting, and (5) that Ty'rique posed a reasonable threat by failing to comply with orders and actively and passively resisting. (Doc. 174, pp. 18-19). County Defendants do not directly address the sixth factor, whether Ty'rique was actively resisting, likely because they assert he was resisting in their brief explanation of the other five factors.

In response to County Defendants argument that Plaintiffs have failed to show individual personal involvement, Plaintiffs identify three specific uses of force by specific County Defendants relating to Ty'rique's arrival at the Booking Center they allege were unreasonable: (1) Ingersoll placing his knee on Ty'rique's neck while Ty'rique was face-down on the ground and handcuffed, (2) Mendenhall spraying Ty'rique with oleoresin capsicum ("OC spray" or "pepper spray"), and (3) Ingersoll and Weaver denying Ty'rique oxygen while Mendenhall used the OC spray on Ty'rique. *Id*. at pp. 11-12. Plaintiffs also allege a collective excessive use of force claim against Mendenhall, Ingersoll, Weaver, Grieb and Bauer. *Id*. at pp. 12-15.

County Defendants do not dispute whether any of those uses of force happened. They do not respond directly to Plaintiffs' arguments about Ingersoll

having his knee on Ty'rique's neck or Ingersoll and Weaver putting pressure on Ty'rique's neck while Mendenhall used the OC spray on Ty'rique. Instead, County Defendants again argue that "the use of force was objectively reasonable because [Ty'rique] was being noncompliant in a correctional facility and was a security concern as officers were unsuccessfully attempting to search him." (Doc. 217, p. 11).

I will evaluate each of the *Kingsley* factors in determining whether Plaintiffs' claims for excessive force as to each of these three incidents can survive summary judgment.

### i.    Ingersoll's Placement of His Knee on Ty'rique's Neck

Plaintiffs assert that Ingersoll's placement of his knee against Ty'rique's neck for almost one minute was unreasonable because Ty'rique was face-down on the ground and handcuffed, and because placement of a knee on a detainee's neck is never reasonable. (Doc. 192, p. 11). Plaintiffs cite to the video they allege shows Ingersoll's knee on Ty'rique's neck, deposition testimony by Mendenhall, and the opinion of their expert, Gravette. *Id*. County Defendants do not directly respond to this specific argument by Plaintiffs, but do generally assert that Ty'rique was resisting, noncompliant and a security concern and so all use of force on him at the time he arrived in the Booking Center was reasonable.

County Defendants rely heavily, if not exclusively, on this resistance to justify Ingersoll placing and holding his knee on Ty'rique's neck. (Doc. 174, pp. 18-19;

Doc. 217, p. 11). Surveillance video captured the near minute Ingersoll's knee appears to be directly on Ty'rique's neck.[398] Plaintiffs contend that Ty'rique was face-down on the ground and handcuffed when Ingersoll placed and held his knee on Ty'rique's neck. (Doc. 192, p. 11). Far from "blatantly contradict[ing]"[399] this characterization of the facts, the video footage leading up to Ingersoll moving his knee onto Ty'rique's neck and holding it there shows Ty'rique being held down on the floor by Ingersoll, Weaver, Bauer and Haines, handcuffed with his hands behind his back, in leg shackles, with Bauer and Haines removing his shoes and socks.[400] As to County Defendants' contention that Ty'rique was resisting at this time, Ty'rique's body is not obscured from view and he is visibly laying still and his legs are not moving as though he is actively kicking at the Officers.[401] In the few seconds immediately preceding Ingersoll's movement of his knee, the Officers and Ty'rique do shift slightly.[402] However, this follows Weaver looking over his shoulder and shifting his positioning on Ty'rique.[403] Reasonable minds may disagree on whether the shifting that occurred immediately before Ingersoll moved his knee is due to

---

[398] Booking Camera C Footage (Susquehanna Defs.' Ex. L, Doc. 166-13, 01:27-2:14).

[399] *Scott v. Harris*, 550 U.S. 372, 380 (2007).

[400] Booking Camera C Footage (Susquehanna Defs.' Ex. L, Doc. 166-13, 01:04-1:26).

[401] *Id*.

[402] *Id*. at 01:24-01:28.

[403] *Id*.

Weaver shifting his stance to observe Bauer and Haines or the Officers reacting to Ty'rique resisting them. And a reasonable trier of fact may find that Ty'rique had stopped resisting, and so the force used by Ingersoll after that was disproportionate to "the need for the use of force."[404] Moreover, a reasonable trier of fact may find that, even if Ty'rique was resisting, the placement of Ingersoll's knee on Ty'rique's neck was nevertheless an excessive use of force. After being shown the relevant video footage and questioned as to whether DCP had a policy regarding using a knee on an individual's neck to restrain them, Mendenhall testified that placing a knee on a detainee's neck "would not be the thing to do that would be condoned."[405]

The extent to which Ty'rique was injured by Ingersoll's knee on Ty'rique's neck is not developed by the parties. But, even if the injury was "minor" or "minimal," this would not automatically defeat Plaintiffs claims. This is because the injury is only one of the *Kingsley* factors and, as the Third Circuit has noted, "there is no fixed minimum quantum of injury that a prisoner must prove that he suffered through objective or independent evidence in order to state a claim for . . . excessive force."[406] This in turn is because "[t]he touchstone of a due process claim is whether the application of force was punitive."[407] While the severity of an injury may be

---

[404] *Kingsley*, 576 U.S. at 397.

[405] Greg Mendenhall Dep. (Pls.' Ex. U, Doc. 195-9, p. 49:10-22).

[406] *Brooks v. Kyler*, 204 F.3d 102, 104 (3d Cir. 2000).

[407] *Robinson v. Danberg*, 673 F. App'x 205, 210 (3d Cir. 2016) (citing *Kingsley*, 576 U.S. at 397-98).

useful in determining whether a use of force was excessive by giving a visible injury, not every bruise and physical symptom of an injury appear immediately, and it does not appear from the record that any medical care providers were able to perform a thorough exam on Ty'rique in the days following this incident to identify any further injuries.

It is indisputable based on the video that Ty'rique's hands were cuffed behind his back and he was in leg shackles, while lying on the floor and being held down by four Officers at the time Ingersoll placed and held his knee on Ty'rique's neck.[408] A reasonable jury may find that these facts lessened the threat Ty'rique posed to the Officers and therefore Ingersoll's placement of his knee on Ty'rique's neck was objectively unreasonable.

In addition, a reasonable trier of fact may also find that "the number of persons with whom the [] officers must contend at one time" made Ingersoll's use of force objectively unreasonable.[409] During the time Ingersoll placed his knee on Ty'rique's neck and held it there, it is indisputable based on the video evidence that Ty'rique was held down by four Officers while a fifth watched and that Ty'rique was the only

---

[408] Booking Camera C Footage (Susquehanna Defs.' Ex. L, Doc. 166-13, 1:27-2:14). Booking Camera E Footage (Susquehanna Defs.' Ex. L, Doc. 166-14, 1:27-2:14).

[409] *Sharrar v. Felsing*, 128 F. 3d 810, 822 (3d. Cir. 1977).

inmate present in the Booking Center lobby. [410] A reasonable trier of fact may find that these facts made Ingersoll's use of force unreasonable.

Accordingly, when viewing the circumstances from the perspective of a reasonable officer on the scene and construing the evidence in the light most favorable to Plaintiffs, there are genuine disputes of material fact requiring a jury to resolve about whether Ingersoll's placement and holding of his knee on Ty'rique's neck was an excessive use of force and so summary judgment should be denied.

### ii.    Mendenhall's Use of OC Spray on Ty'rique

County Defendants argue Mendenhall's use of OC spray on Ty'rique was reasonable and not excessive because Ty'rique's injuries were minimal, no opportunity to temper the force used was possible because Ty'rique was resisting, that Ty'rique was a security concern because he was actively resisting Officers, and that he posed a reasonable threat by failing to comply with orders and actively and passively resisting the Officers. Plaintiffs assert that Mendenhall's use of OC spray was unreasonable because Ty'rique was on the ground, handcuffed behind his back and restrained with leg shackles with four Officers physically restraining him when Mendenhall sprayed him with the OC spray. (Doc. 192, p. 11). While Plaintiffs do cite to the report of their correctional expert Tim Gravette, they also cite to video

---

[410] Booking Camera C Footage (Susquehanna Defs.' Ex. L, Doc. 166-13, 1:27-2:14). Booking Camera E Footage (Susquehanna Defs.' Ex. L, Doc. 166-14, 1:27-2:14).

footage of the incident and testimony in Mendenhall's deposition. (Doc. 192, p. 11). The County Defendants respond by reasserting that "the use of force was objectively reasonable because [Ty'rique] was being noncompliant in a correctional facility and was a security concern as officers were unsuccessfully attempting to search him," and attacking Plaintiffs' reliance on their expert's opinion (Doc. 217, p. 11).

Again, County Defendants rely heavily, if not almost exclusively, on the fact that Ty'rique was resisting them at the time Mendenhall deployed the OC spray. (Doc. 174, pp. 18-19; Doc. 217, p. 11). Mendenhall and Ingersoll testified that Ty'rique was resisting at the time the OC spray was used and Weaver reported the same to Detective Walborn.[411] However, in addition to these Officers' testimony, surveillance video captured Mendenhall's use of OC spray on Ty'rique.[412] The video however does not clearly show whether or to what extent Ty'rique was resisting the Officers at the time Mendenhall deployed the OC spray.[413] The video only definitively demonstrates that Weaver, Ingersoll, Grieb and Bauer were on top

---

[411] Greg Mendenhall Dep. (Pls.' Ex. U, Doc. 195-9, p. 48:9-17); Robert Ingersoll Dep. (Pls.' Ex. T, Doc. 195-8, p. 3:100-102); Cameron Weaver Transcribed Statement (County Defs.' Ex. I, Doc. 175-10, p. 52:223-224).

Grieb mentions in his description of his first interaction with Ty'rique that Ty'rique was placed on the floor of the cell so that medical could come and flush his eye because OC spray had been used. Scott Grieb Transcribed Statement (County Defs.' Ex. I, Doc. 175-10, p. 9:84). Bauer is only asked if Ty'rique was maced. Delta Bauer Transcribed Statement (County Defs.' Ex. I, Doc. 175-10, p. 121:262-264).

[412] Booking Camera C Footage (Susquehanna Defs.' Ex. L, Doc. 166-13).

[413] Booking Camera C Footage (Susquehanna Defs.' Ex. L, Doc. 166-13, 2:24-2:26).

of Ty'rique and restraining him.[414] Ultimately, the way the Officers are positioned obscures Ty'rique's body from view.[415] However, the guards and Ty'rique do move at this time in the video.[416] Reasonable minds may disagree whether that movement is of their own accord, from the gravity of rolling Ty'rique seconds before or from Ty'rique actively resisting them. A reasonable trier of fact may find that Ty'rique was not resisting and so spraying OC spray in his face after he was no longer resisting was disproportionate to "the need for the use of force" and thus an excessive use of force.[417]

County Defendants assert that the only injury Ty'rique suffered was a short exposure to OC spray. (Doc. 174, p. 19). However, even if I consider the exposure to OC spray and the discomfort and pain it surely would have caused "minor" or "minimal," as explained above, this would not automatically defeat Plaintiffs' claims because there is no minimum quantum an excessive force plaintiff must show and this is only one of the factors to be considered in the excessive force determination.[418] And while the severity of an injury may be useful in determining whether a use of force was excessive by giving a visible injury to indicate a use of

---

[414] Booking Camera C Footage (Susquehanna Defs.' Ex. L, Doc. 166-13, 2:24-2:26).

[415] *Id.*

[416] *Id.*

[417] *Kingsley*, 576 U.S. at 397.

[418] *Brooks*, 204 F.3d at 104.

force hard enough to leave a mark, not every bruise and physical symptom of an injury appear immediately, and it does not appear from the record that any medical care providers were able to perform a thorough exam on Ty'rique in the days following this incident to identify any further injuries.

Again, it is indisputable based on the video evidence that Ty'rique's hands were cuffed behind his back, he was in leg shackles, and being held down by four Officers at the time Mendenhall deployed the OC spray in this face.[419] A reasonable jury may find that these facts made Mendenhall's use of the OC spray objectively unreasonable as they could find these facts lessen the threat Ty'rique posed to the Officers.

Further, it is also indisputable based on the videos that Ty'rique was the only inmate present in the Booking Center lobby at the time the OC spray was deployed, was surrounded by six total Officers, four of whom were holding him down and one of whom was standing by watching at the time Mendenhall sprayed Ty'rique with the OC spray.[420] A reasonable trier of fact may find that these facts made Mendenhall's use of the OC spray objectively unreasonable.

---

[419] Booking Camera C Footage (Susquehanna Defs.' Ex. L, Doc. 166-13, 2:24-2:26); Booking Camera E Footage (Susquehanna Defs.' Ex. M, Doc. 166-14, 2:24-2:26).

[420] Booking Camera C Footage (Susquehanna Defs.' Ex. L, Doc. 166-13, 2:24-2:26); Booking Camera E Footage (Susquehanna Defs.' Ex. M, Doc. 166-14, 2:24-2:26).

In sum, when viewing the circumstances from the perspective of a reasonable officer on the scene and construing the evidence in the light most favorable to Plaintiffs, there are genuine disputes of material fact that a jury is required to resolve as to whether Mendenhall's use of OC spray on Ty'rique was an excessive use of force and so summary judgment should be denied.

### iii. Ingersoll's Placement of His Forearm and Weaver's Placement of His Hand and Bodyweight on Ty'rique's Neck While Mendenhall Used OC Spray

Plaintiffs assert that while Mendenhall sprayed Ty'rique with OC spray, Ingersoll and Weaver "worked together to deny Ty'rique oxygen as Ingersoll placed his forearm across Ty'rique's neck and Weaver applied his left hand and body weight on top of Ingersoll's forearm. They applied this pressure for one minute." (Doc. 192, p. 12). I interpret this as Plaintiffs alleging that when Ingersoll placed his forearm on Ty'rique's neck and when Weaver placed his hand and leaned his bodyweight onto that hand on Ty'rique's neck they used excessive force on him. Plaintiffs cite to the video they allege shows Ingersoll and Weaver doing this. *Id.* County Defendants do not directly respond to this specific argument by Plaintiffs, but do generally assert that Ty'rique was resisting, noncompliant and a security concern and so all use of force on him at the time he arrived in the Booking Center was reasonable. (Doc. 174, pp. 18-19; Doc. 217, p. 11).

Once again, County Defendants rely heavily, if not exclusively, on this resistance to justify the use of force on Ty'rique when he arrived at the booking center. (Doc. 174, pp. 18-19; Doc. 217, p. 11). Mendenhall, Ingersoll, and Weaver testify that Ty'rique was resisting at the time the OC spray was used, and therefore the time Plaintiffs allege Ingersoll had his forearm and Weaver had his hand and bodyweight on Ty'rique's neck.[421] However, in addition to these Officers' testimony, surveillance videos captured Mendenhall's use of OC spray on Ty'rique and Ingersoll and Weaver's use of force at that same time.[422] Neither view clearly depicts whether or to what extent Ty'rique was resisting the Officers at the time Mendenhall deployed the OC spray.[423] The video only definitively demonstrates that Weaver, Ingersoll, Grieb and Bauer were on top of Ty'rique and restraining him, and that Ingersoll and Weaver had their arms and hands near Ty'rique's neck.[424] Ultimately, the way the Officers are positioned obscures Ty'rique's body from view.

---

[421] Greg Mendenhall Dep. (Pls.' Ex. U, Doc. 195-9, p. 48:9-17); Robert Ingersoll Dep. (Pls.' Ex. T, Doc. 195-8, p. 3:100-102); Cameron Weaver Transcribed Statement (County Defs.' Ex. I, Doc. 175-10, p. 52:223-224).

Grieb mentions in his description of his first interaction with Ty'rique that Ty'rique was placed on the floor of the cell so that medical could come and flush his eye because OC spray had been used. Scott Grieb Transcribed Statement (County Defs.' Ex. I, Doc. 175-10, p. 9:84). Bauer is only asked if Ty'rique was maced. Delta Bauer Transcribed Statement (County Defs.' Ex. I, Doc. 175-10, p. 121:262-264).

[422] Booking Camera C Footage (Susquehanna Defs.' Ex. L, Doc. 166-13).

[423] Booking Camera C Footage (Susquehanna Defs.' Ex. L, Doc. 166-13, 2:24-2:26).

[424] Booking Camera C Footage (Susquehanna Defs.' Ex. L, Doc. 166-13, 2:24-2:26).

However, the guards and Ty'rique do move at this time in the video.[425] Reasonable minds may disagree whether that movement is of their own accord, from the gravity of rolling Ty'rique seconds before or from Ty'rique actively resisting them. A reasonable trier of fact could view the video and find that Ty'rique was not resisting and so Ingersoll's placement of his forearm on Ty'rique's neck and Weaver's placement of his hand and leaning his bodyweight onto that hand on Ty'rique's neck at the time Mendenhall used OC spray on him was an excessive use of force.

The extent to which Ty'rique was injured by Ingersoll's forearm or Weaver's hand and bodyweight on his neck is again not developed by the parties. But, even if I consider the injury as "minor" or "minimal," as explained above, this would not automatically defeat Plaintiffs claims because there is no minimum quantum an excessive force plaintiff must show and this is only one of the factors to be considered in the excessive force determination.[426] And again, while the severity of an injury may be useful in determining whether a use of force was excessive by giving a visible injury to indicate a use of force hard enough to leave a mark, not every bruise and physical symptom of an injury appear immediately, and it does not appear from the record that any medical care providers were able to perform a

---

[425] *Id.*
[426] *Brooks*, 204 F.3d at 104.

thorough exam on Ty'rique in the days following this incident to identify any further injuries.

And once again it is indisputable based on the video evidence that Ty'rique's hands were cuffed behind his back, he was in leg shackles and being held down by four Officers total including Ingersoll and Weaver at the time Ingersoll placed his forearm and Weaver placed his hand and bodyweight on Ty'rique's neck.[427] A reasonable trier of fact may find these facts made this use of force by Ingersoll and Weaver objectively unreasonable as it could find these facts lessen the threat Ty'rique posed to the Officers.

Further, it is also indisputable that Ty'rique was the only inmate present in the Booking Center lobby at the time of these uses of force by Mendenhall and Ingersoll, was surrounded by six total Officers, four of whom were holding him down and one of whom was standing by watching at the time these uses of force occurred.[428] A reasonable trier of fact may find that these facts lessened the security risk Ty'rique presented and made these uses of force by Ingersoll and Weaver excessive.[429]

---

[427] Booking Camera C Footage (Susquehanna Defs.' Ex. L, Doc. 166-13, 2:24-2:26); Booking Camera E Footage (Susquehanna Defs.' Ex. M, Doc. 166-14, 2:24-2:26).

[428] Booking Camera C Footage (Susquehanna Defs.' Ex. L, Doc. 166-13, 2:24-2:26); Booking Camera E Footage (Susquehanna Defs.' Ex. M, Doc. 166-14, 2:24-2:26).

[429] *Sharrar*, 128 F.2d at 822.

Therefore, viewing the circumstances from the perspective of a reasonable officer on the scene, and construing the evidence in the light most favorable to Plaintiffs, genuine disputes of material fact exist that a jury is required to resolve relating to Ingersoll's placement of his forearm on Ty'rique's neck and Weaver's placement of his hand and bodyweight on Ty'rique's neck at the time Mendenhall sprayed him with OC spray. Accordingly, summary judgment should be denied.

### iv.    Plaintiffs' Collective Use of Force Claim

Plaintiffs also allege that "Mendenhall, Ingersoll, Weaver, Grieb and Bauer collectively used excessive force against Ty'rique because the force used was unnecessary as it was done with the sole purpose of returning handcuffs to" Haines. (Doc. 174, p. 12). Plaintiffs state that "[b]ecause the Defendants engaged in the unnecessary use of force to obtain handcuffs and leg irons that could have been obtained later, the force used by them was excessive." *Id*. at p. 13. Plaintiffs then cite to *Headwaters Forest Def. v. Cnty. of Humboldt*, for the proposition that, "where there is no need for force, *any* force used is unconstitutional."[430] (Doc. 192, p. 13). It appears then that Plaintiffs are attempting to argue that, because the handcuffs could have been obtained or exchanged later, there was no need for any use of force,

---

[430] *Headwaters Forest Def. v. Cnty. of Humboldt*, 211 F.3d 1121 (9th Cir.), *opinion amended and superseded on denial of reh'g*, 240 F.3d 1185 (9th Cir. 2000), *cert. granted, judgment vacated*, 534 U.S. 801 (2001). *Headwaters* involved the use of pepper spray on nine nonviolent protesters, factually a far cry away from this case.

so all force used by Mendenhall, Ingersoll, Weaver, Grieb during this time was automatically excessive. (Doc. 192, p. 13). The only thing Plaintiffs offer to support their position is the opinion of correctional expert Tim Gravette that,

> to continue to use force to exchange a pair of handcuffs was in my opinion unnecessary . . . .  Based on my experience and training to avoid injury of both staff members and inmates the use of force is a last resort in controlling a situation and to struggle with an inmate to remove a pair of handcuffs and simultaneously replace them with another pair of handcuffs is both reckless and pointless.

(Doc. 192, pp. 12-13). First, this singular opinion that continuing to use force to exchange handcuffs was reckless and pointless is simply insufficient to support the exceedingly broad proposition that, because the handcuffs "could have been obtained later," there was no need for force and so any force used was constitutionally unreasonable. Moreover, this argument presumes that the only reason force was used was to exchange the handcuffs. However, surveillance video shows that Ty'rique was taken to the ground and force was used to place leg shackles on him in addition to exchanging handcuffs.[431] Further, Mendenhall testified at his deposition that Ty'rique was taken to the ground "in an attempt to gain compliance."[432] Bauer told Detective Walborn that detainees who are uncooperative

---

[431] Booking Camera C Footage (Susquehanna Defs.' Ex. L, Doc. 166-13, 00:50-1:20).

[432] Greg Mendenhall Dep. (Pls.' Ex. U, Doc. 195-9, pp. 46:24-47:4).

are taken to the ground so that the Officers can search the detainee.[433] Plaintiffs have not shown that the only reason Ty'rique was taken to the floor and subjected to force was to exchange handcuffs. Accordingly, Plaintiffs collective use of force claim fails. As this is the only claim of excessive force Plaintiffs make against Bauer and Grieb, County Defendants' Motion should be granted insofar as it seeks summary judgment entered in favor of Bauer and Grieb on Count V.

### 3. Excessive Force Claim Relating to Ty'rique's Placement in a Restraint Belt While at the Booking Center on June 18, 2019

County Defendants argue that Adams, Blouch, Glenn, and Myers used reasonable force to place Ty'rique in the restraint belt on June 18, 2019. (Doc. 174, pp. 19-20; Doc. 217, p. 12). County Defendants then argue that video evidence confirms that Plaintiffs' claim that Adams, Blouch, Glenn and Myers used excessive force to place Ty'rique in the restraint belt is wrong. *Id*. They argue that Ty'rique "was placed in a restraint belt only after manipulating his legs to slip his handcuffs from behind his back to the front of his body and using the handcuffs to bang on the holding cell door and window, creating a dangerous condition," citing to portions of the videos in support. *Id*. As to the *Kingsley* factors, County Defendants argue (1) the Officers used only the minimal force necessary to gain control over Ty'rique after he created a dangerous environment by moving his handcuffs to the front of his

---

[433] Delta Bauer Transcribed Statement (County Defs.' Ex. I, Doc. 175-10, pp. 120:219-121:228).

body, (2) Ty'rique's only injury was an abrasion to his wrist that he caused by manipulating the handcuffs, (3) the Officers had no opportunity to temper the force because Ty'rique created a dangerous environment, (4) the security problem at issue was severe because Ty'rique posed a reasonable threat when he moved his hands to the front of his body, and (5) Ty'rique actively resisted the Officers. (Doc. 174, p. 21). I will evaluate these factors in determining whether this claim survives summary judgment.

Plaintiffs clarify they also bring this claim against Armermann and argue that Ty'rique was not a security risk or threat and was not banging his hands on the cell door or window. (Doc. 192, p. 16). In support they cite to Lieutenant Armermann's Extraordinary Occurrence Report, and the video surveillance footage of Ty'rique in his cell. *Id*. County Defendants respond that Ty'rique was a danger to himself, DCP and PrimeCare staff by moving his handcuffs to the front of his body. (Doc. 217, p. 12).

County Defendants rely heavily on the video surveillance footage to show that Ty'rique was resisting, banging his hands on the cell door, and a security concern and threat to himself and others. The video, however, is not as clear as they make it out to be. Plaintiffs challenge these justifications, particularly by pointing out that the video footage does not show Ty'rique banging on his cell window or door. The video footage from the cell does show that once Ty'rique slips his handcuffs to the

front he does sometimes bring his hands up to his chest.[434] As County Defendants argue, the video footage does show Ty'rique raise his arms above his head.[435] However, the cell door and window are not in view of the camera. Instead, the cell door is outset so that it can slide open on the officer side of the wall. This means that one can see down to where the wall meets the doorframe, but the actual door itself is not in view. Thus, while it is true that Ty'rique does go and stand close to the door, all that is visible is his back.[436] Like Plaintiffs assert, the video footage does not show Ty'rique banging the handcuffs on the cell door or window, calling into question County Defendants' assertion that Ty'rique was banging.[437] (Doc. 192, p. 15). Moreover, it is indisputable that Ty'rique was locked in his cell while his cuffs were in front of him.[438] A reasonable trier of fact could find Ty'rique did not represent a reasonably perceived threat or a security concern because he was locked in his cell without access to the Officers, PrimeCare employees or DCP generally, and was not a threat to himself because his movement was still greatly restricted by the handcuffs and leg shackles.

---

[434] County Defs.' Video # 14 (Ex. F, Doc. 175-7, 21:38-28:36).

[435] *Id*. at 28:01.

[436] *See id*. at 21:53; 23:14; 23:40; 24:07; 24:30; 25:05; 25:52; 26:13; 26:42; 27:13; 27:43.

[437] *Id*. at 21:38-28:36.

[438] County Defs.' Video # 14 (Ex. F, Doc. 175-7, 21:38-28:36).

County Defendants point out that Ty'rique "was immediately examined by medical staff" and the only documented injury was a small abrasion to his wrist. (Doc. 217, p. 12; Doc. 174, p. 21). County Defendants argue the abrasion was caused by Ty'rique's manipulation of the handcuffs. (Doc. 174, p. 21). As explained above, even "minor" or "minimal" injuries do not automatically defeat Plaintiffs claims because there is no minimum quantum an excessive force plaintiff must show and this is only one of the factors to be considered in the excessive force determination.[439] And again, while the severity of an injury may be useful in determining whether a use of force was excessive by giving a visible injury to indicate a use of force hard enough to leave a mark, not every bruise and physical symptom of an injury declares itself immediately, and it does not appear from the record that any medical care providers were able to perform a thorough exam on Ty'rique in the days following this incident to identify any further injuries.

County Defendants rely heavily on Ty'rique's resistance to justify the use of force. However, the surveillance video footage leaves open the question whether, and if so, to what extent, Ty'rique was resisting. It shows that once Adams, Blouch, Glenn and Myers enter the cell and get Ty'rique on the bench to put the belt on him, their bodies quickly obscure Ty'rique from view.[440] It is clear that there was

---

[439] *Brooks*, 204 F.3d at 104.
[440] County Defs.' Video # 14 (Ex. F, Doc. 175-7, 28:36-22:40).

movement while Ty'rique was on the bench- Ty'rique and the Officers come off the bench and slide to the far end of the bench before the Officers bring Ty'rique to the near side, with the view of Ty'rique's body remaining obstructed.[441] Once Ty'rique is back on the bench there are times where his face and part of his chest are visible, but it reveals little about the source of the movements.[442] Reasonable minds may disagree whether that movement was due to Ty'rique resisting, due to the Officers manipulating his body to get the belt around his waist and secured, and reasonable minds may disagree whether the bigger movements were caused by the Officers' manipulation of Ty'rique's body to get the belt around his waist and secured or by Ty'rique resisting and momentarily overpowering the four Officers.

As described above, under these facts and circumstances, there are genuine disputes of material facts respecting the severity of the security problem at issue, the threat reasonably perceived by the Officers, the need for the use of force and the amount of force used and whether Ty'rique was actively resisting. As it stands now, when viewing the circumstances from the perspective of a reasonable officer on the scene and construing the evidence in the light most favorable to Plaintiffs, there are genuine disputes of material facts a jury must resolve as to whether Adams, Blouch, Glenn, and Myers used excessive force while putting Ty'rique in the restraint belt.

---

[441] *Id.* at 28:36-31:37.
[442] *Id.* at 29:43-31:37.

It will be recommended that County Defendants' Motion be denied insofar as it seeks summary judgment in favor of Adams, Blouch, Glenn and Myers.

However, it will be recommended summary judgment be granted in favor of Armermann. Plaintiffs admit in their Responsive Statement of Material Facts that Armermann only gave Ty'rique verbal commands and did not use any physical force on him.[443] In their Brief in Opposition, Plaintiffs state in a footnote that "Armermann can be seen entering the cell at the 29:33 mark and assists Defendant Myers by placing a hand on Ty'rique [sic] back to allow Myers to continue to exert excessive force on him." (Doc. 192, p. 16 n.1). However, the video footage definitively shows that Armermann never touches Ty'rique and so this footnote argument does not rehabilitate Plaintiffs' excessive force claim against Armermann.[444]

### 4.    Excessive Force Claim Relating to the Use of Force Against Ty'rique on June 26, 2019

#### i.    Defendant Danner

Danner argues that the record is undisputed that he was acting to achieve the legitimate government purpose of preparing and transporting Ty'rique to the hospital

---

[443] County Defs.' Statement of Facts (Doc. 175, ¶ 56); Pls.' Resp. to County Defs.' Statement of Facts (Doc. 193, ¶ 56) (admitting ¶ 56 in part and denying it in part but without refuting that Armermann only gave Ty'rique verbal instructions and did not use physical force on him).

[444] County Defs.' Video # 14 (Ex. F, Doc. 175-7, 29:53-31:07).

and so the only question is whether the force used was excessive in relation to that purpose. (Doc. 158, pp. 19-24; Doc. 211, pp. 8-17).

As to the first and sixth *Kingsley* factors, Danner relies heavily on Ty'rique's continued and escalating resistance to justify the use of force. However, the video footage leaves open the question whether, and if so, to what extent, Ty'rique was resisting. Danner argues that Ty'rique began resisting in the cell by reaching out to grab at his hand and kicking. (Doc. 158, p. 22; Doc. 211, p. 12). Danner argues that even once Ty'rique had his legs shackled he continued to resist having handcuffs put on him. (Doc. 158, p. 22). Once the order was made for Ty'rique to be placed in the restraint chair and the chair arrived, Danner argues that Ty'rique "continued to struggle and kick repeatedly" as he was extracted from his cell and being placed in the restraint chair. (Doc. 158, p. 22; Doc. 211, p. 14). Danner helped to secure Ty'rique in the chair and asserts that Ty'rique only went still once he was secured in the restraint chair. (Doc. 158, p. 22; Doc. 211, p. 12). Plaintiffs note that, even if Ty'rique had been resisting, that does not give an officer the ability to use excessive force. (Doc. 190, p. 12). Plaintiffs assert that the video footage shows an increasing escalation of the use of force against Ty'rique. (Doc. 190, p. 11). In a sense this appears to be an argument that Danner and his fellow Officers did not attempt to temper the use of force that the third *Kinglsey* factor looks at. Plaintiffs also point to the video footage to show that Defendants, including Danner, were unnecessarily

dragging Ty'rique from his cell to the restraint chair. (Doc. 190, p. 10). Danner asserts that the video of Ty'rique being extracted and placed into the restraint chair "clearly shows" he was still struggling and kicking, and that the Court cannot adopt a version of the facts contradicted by the video footage. (Doc. 211, p. 14). I disagree with Danner's assertion that the video "clearly shows" Ty'rique was still resisting. The video quality itself is not particularly clear. Further, the video shows that as Ty'rique is removed from his cell he is being dragged, by what appears to be only his arms.[445] A reasonable trier of fact could conclude that Ty'rique was not resisting at this time, and so the force being use was disproportionate to "the need to use force."[446] Then, as Ty'rique's is picked up and put onto the chair, his torso and upper body are obscured from view by the Officers standing around him.[447] Ty'rique, including his lower body, quickly becomes more obscured from view as additional Officers surround him, making it unclear whether, and if so to what extent, Ty'rique was actually resisting as he was dragged from his cell, placed in the chair and secured in it.[448] Once Ty'rique is placed in the restraint chair, the video does show that at one point Ty'rique raised his legs when no Officers were standing in front of him.[449] However, reasonable minds could disagree as to whether the movement was caused

---

[445] County Defs.' Video 18-A-1 (Ex. S, Doc. 175-20, 30:34).
[446] *Kinglsey*, 576 U.S. at 397.
[447] County Defs.' Video 18-A-1 (Ex. S, Doc. 175-20, 30:43-30:51).
[448] County Defs.' Video 18-A-1 (Ex. S, Doc. 175-20, 30:51).
[449] *Id.*

by Ty'rique resisting or his legs coming up from the force of being placed in and secured in the chair or even from Defendants moving his legs to be able to properly secure him. And certainly, there is movement while Ty'rique is being secured within the chair. However, the video does not show that Ty'rique is actively resisting the five Officers surrounding him because he is obscured from view. Reasonable minds could also differ as to whether this movement was caused by Ty'rique resisting the five Officers working to secure him in the chair or the Officers needing to move each other and Ty'rique in order to get him properly secured.

Regarding the second *Kinglsey* factor, Danner cites to the cause and manner of Ty'rique's death as found by the Coroner's Office. (Doc. 158, p. 23). Danner also cites to Ty'rique's hospital records that show his extremities were noted to be normal with no edema or skin discoloration and that while he had lacerations on his wrists, they were described as self-inflicted. *Id*. Danner asserts that these injuries "do little to undercut the necessary and non-punitive oriented force applied to subdue" Ty'rique. *Id*. However, even assuming Ty'rique's injuries were "minor" or "minimal," such injuries do not automatically defeat Plaintiffs claims because there is no minimum quantum an excessive force plaintiff must show and this is only one of the factors to be considered in the excessive force determination.[450] While the severity of an injury may be useful in determining whether a use of force was

---

[450] *Brooks*, 204 F.3d at 104.

excessive by giving a visible injury to indicate a use of force hard enough to leave a mark, not every bruise and physical symptom of an injury declares itself immediately.

As to the fourth and fifth *Kingsley* factors, Danner asserts that the continuation and "escalation" of Ty'rique's resisting posed "a clear security threat" because he was going to be transported to the hospital by only two Officers. (Doc. 158, p. 22). Danner argues that this "powder-keg" created a rapidly evolving, uncertain and tense situation that required he and his fellow Officers to respond in order to maintain order, discipline and institutional security. *Id*. at p. 23. However, earlier that morning Treatment Coordinator Susan Irvine had observed Ty'rique and described him as "wobbly," observed that he could not swallow, and felt he was in such a bad state that she asked for him to be taken to medical immediately.[451] A reasonable trier of fact could find that Ty'rique's physical condition at the time Defendants, including Danner, began preparing to transport Ty'rique to the hospital was poor enough that it lessened, perhaps significantly, the reasonably perceived threat or security concern Ty'rique posed to DCP and the Officers.

Accordingly, under the above-described facts and circumstances, there are genuine issues of material facts respecting the severity of the security concern at issue, the threat reasonably perceived by the Officers, the need for the use of force

---

[451] Susan Irvine Dep. (Pls.' Ex. AG, Doc. 196-7, p. 18-22).

and the amount of force used, and whether Ty'rique was actively, or otherwise, resisting. Thus, there are genuine disputes of material facts a jury must resolve about whether Danner used excessive force against Ty'rique on June 26, 2019 and Danner's request for summary judgment should be denied.

> ii.    *Defendants Hoffman, Klahr, Lewis, Biter, and Singleton*

County Defendants argue that the use of the restraint chair was objectively reasonable. (Doc. 174, pp. 22-23). They set forth a broad factual recitation of the events of June 26, 2019, beginning with the order for Ty'rique to be taken to the hospital and ending with the medical emergency being called and Ty'rique being taken to the medical department. *Id*. at 22. In support they cite to the deposition testimony of Danner and note that the officers involved on June 26, 2019, all wrote written reports and gave transcribed statements. *Id*. at 22-23 They assert that Plaintiffs have not produced documents, affidavits, or video to refute Danner's testimony. *Id*. at 23.

Plaintiffs reply that Singleton, Hoffman, Klahr, Lewis and Biter used excessive force against Ty'rique on June 26, 2019, beginning in his cell through to placing him in the restraint chair. (Doc. 192, pp. 16-22). While Plaintiffs do rely on the expert opinion of Gravette, they also cite to video footage, Danner's Deposition testimony, the expert opinion of Dr. Hua, and Klahr's interview with Detective Walborn. *Id*.

County Defendants reply that the use of the restraint chair was objectively reasonable. (Doc. 217, p. 13). They assert that Ty'rique was not compliant when Officers were trying to help him change to be transferred and that Gravette only offers suggestions as to what could have been done differently and point out that Gravette does not mention the use of Lewis' hypoglossal pressure point in his report or conclude the use of the restraint chair was excessive. *Id*. County Defendants do not make any arguments beyond that the use of the chair was objectively reasonable even though Plaintiffs address the claim as whether the use of the chair was excessive and whether the actions of County Defendants in getting Ty'rique into the chair was excessive. Though neither party discusses the *Kingsley* factors explicitly, the Court must analyze them in determining whether this claim survives summary judgment.

As to the first and sixth *Kingsley* factors, County Defendants argue that when Ty'rique resisted Danner and Singleton's attempts to help him change to be transported to the hospital he was taken to the ground. (Doc. 174, p. 22). They assert that Ty'rique spit at the officers and so a spit hood was used. *Id*. The video footage, however, leaves open the question whether, and if so, to what extent, Ty'rique was resisting and thus leaves open questions about the need for the use of force and amount of force used. The video quality itself is not particularly clear. Further, the video shows that as Ty'rique is removed from his cell he is being dragged, by what

appears to be only his arms.[452] A reasonable trier of fact could conclude that Ty'rique was not resisting at this time, and so the force being use was disproportionate to "the need to use force."[453] Then, when Ty'rique is picked up and put onto the chair, his torso and upper body are obscured from view by the Officers standing around him.[454] Ty'rique, including his lower body, quickly becomes more obscured from view as additional Officers surround him, making it unclear whether, and if so to what extent, Ty'rique was actually resisting as he was dragged from his cell, placed in the chair and secured in it.[455] Once Ty'rique is in the restraint chair, the video does show that at one point he raised his legs when no Officers were in front of him.[456] Reasonable minds could disagree as to whether the movement was caused by Ty'rique's legs coming up from the force of being placed in and secured in the chair, from his own resistance, or even from County Defendants moving his legs to be able to properly secure him. There is movement while Ty'rique is being secured within the chair. But the video does not show that Ty'rique is actively resisting the five Officers surrounding him because he is obscured from view. Reasonable minds could differ as to whether this movement was caused by Ty'rique resisting the five Officers

---

[452] County Defs.' Video 18-A-1 (Ex. S, Doc. 175-20, 30:34).
[453] *Kinglsey*, 576 U.S. at 397.
[454] County Defs.' Video 18-A-1 (Ex. S, Doc. 175-20, 30:43-30:51).
[455] County Defs.' Video 18-A-1 (Ex. S, Doc. 175-20, 30:51).
[456] *Id*.

working to secure him in the chair or the Officers needing to move each other and Ty'rique in order to get him properly secured.

Plaintiffs assert that Defendant Lewis' use of the hypoglossal pressure point technique bilaterally to pull Ty'rique's head backward and upwards for a duration of about a minute led to Ty'rique becoming unresponsive. (Doc. 192, pp. 19-20). In support they rely on their expert Dr. Hua's opinion that,

> Riley's neck compression occurred during his being physical [sic] restrained and immediately before his witnessed sudden unconsciousness and pulseless electrical activity (PEA), which was due to a traumatic neck compression . . . . Based on my experience both as a board-certified and practicing forensic pathologist and neuropathologist, within a reasonable degree of medical certainty, it is my considered opinion that Riley's death was due to neck compression during physical restraint, and his manner of death was a "homicide", [sic] which is defined as "death at the hands of another" in medicolegal investigation[.][457]

This contradicts considerably with Dr. Ross's opinion that the manner of death was natural and that the cause of death was from complications of cerebral vasculitis/encephalitis, thromboemboli and rhabdomyolysis.[458] A reasonable trier of fact could accept the opinion of Dr. Hua or Dr. Ross as accurately describing Ty'rique's cause and manner of death.

---

[457] Expert Report of Dr. Zhongxue Hua, MD, PhD (Pls.' Ex. AK, Doc. 196-11, ¶¶ 10-11).

[458] Dauphin County Coroner's Office Postmortem Report, (Pls.' Ex. AJ, Doc. 196-10, p. 9).

County Defendants assert that Ty'rique was not compliant with the Officers who were attempting to help him change into a uniform. (Doc. 217, p. 13). They also assert that Ty'rique was a threat to himself and others at the time Klahr ordered Officers to place Ty'rique in a restraint chair. (Doc. 174, p. 22). Plaintiffs, however, assert that according to Danner's testimony, Ty'rique's hands were already handcuffed behind his back and his legs shackled at the time Klahr ordered the use of the restraint chair. (Doc. 192, p. 21). If this were true, a reasonable trier of fact could find that the threat and security concern Ty'rique posed to himself, others and DCP was greatly lessened. Further, earlier that morning Irvine had observed Ty'rique and described him as "wobbly," observed that he could not swallow, and felt he was in such a bad state that she asked for him to be taken to medical immediately.[459] A reasonable trier of fact could find that Ty'rique's physical condition at the time was poor enough that it lessened, perhaps significantly, the reasonably perceived threat or security concern Ty'rique posed to DCP and the Officers.

Thus, under the facts and circumstances described above there are genuine issues of material facts respecting the extent of Ty'rique's injury, the threat reasonably perceived by the officers, the need for the use of force and the amount of force used, the severity of the security concern at issue, and whether Ty'rique was

---

[459] Susan Irvine Dep. (Pls.' Ex. AG, Doc. 196-7, p. 18-22).

actively, or otherwise, resisting. Accordingly, there are genuine disputes of material facts a jury must resolve about whether Hoffman, Klahr, Lewis, Biter, and Singleton used excessive force against Ty'rique on June 26, 2019 and their request for summary judgment should be denied.

### 5. Failure to Intervene in the Excessive Force Used at the Booking Center and DCP (Count VI)

In Count VI, Plaintiffs bring a § 1983 claim for failure to intervene in the excessive uses of force pleaded in Count V against Danner, Swanson, Klahr, Smith, Neidigh, Armermann, Mendenhall, Grieb, Adams, Blouch, Lewis, Biter, Ingersoll, Weaver, Glenn, Myers, Bauer, Singleton, Donovan, and Hoffman. (Doc. 64, ¶¶ 165-172). County Defendants assert that they are entitled to summary judgment on Count VI because Plaintiffs "failed to demonstrate that officers used excessive force against Ty'rique, their actions were objectively reasonable, and no underlying constitutional violation occurred," and therefore none of the Officers had a duty or opportunity to prevent the excessive use of force. (Doc. 174, p. 23). However, as explained above, Plaintiffs' excessive force claims survive summary judgment. Accordingly, I will recommend that County Defendants' Motion be denied insofar as it seeks summary judgment on Count VI.

Danner asserts that he is entitled to summary judgment on Count VI first because Plaintiffs have failed to demonstrate there were any excessive uses of force for him to intervene in, and second because "while Plaintiffs contend that Danner

used unreasonable force against Ty'rique on June 26, 2019, Plaintiffs can point to no evidence establishing that Danner failed to intervene in some other, ongoing constitutional violation" and the same evidence that Plaintiffs use to maintain an excessive force claim against him "does not support a failure to intervene claim against him." (Doc. 158, p. 26). As to Danner's first argument, again, as explained above, Plaintiffs' claims for excessive use of force survive summary judgment. As to Danner's second argument, as Plaintiffs argue, Danner is not the only individual Plaintiffs allege used excessive force on June 26, 2019. (Doc. 190, p. 27). Danner does not reply directly to this argument in his Reply Brief and instead restates that no excessive force was used and so there was nothing for him to have failed to intervene in. (Doc. 211, p. 22). Plaintiffs are not attempting to use the evidence they rely on for their claim of excessive force against Danner as evidence he failed to intervene- they are not attempting to argue Danner failed to intervene in his own use of force. Instead, Plaintiffs assert that Danner failed to intervene in the excessive uses of force by Defendants Klahr, Lewis, Biter, Singleton and Hoffman, to which Danner offers no argument. Accordingly, summary judgment should be denied.

Swanson asserts that she is entitled to summary judgment on Count VI because she was outside of Ty'rique's cell on June 26, 2019 and could not see inside the cell, so Plaintiffs "cannot establish that Swanson observed anyone using excessive force on Ty'rique." (Doc. 159, pp. 26-28). Plaintiffs point out that in her

use of force report Swanson wrote that Ty'rique was "fighting the whole time," but in her deposition said that she did look into Ty'rique's cell but could not recall seeing anything because she could only see the backs of the Officers in the cell. (Doc. 190, p. 27). Plaintiffs argue that this creates a genuine dispute of material fact that should negate summary judgment but not create a defense to the claim that Swanson failed to intervene. *Id*. Swanson does not reply directly to this argument and instead reasserts that no excessive force was used so there was nothing for her to fail to intervene in. (Doc. 211, p. 22). I agree with Plaintiffs that Swanson's contradicting use of force report and deposition creates a genuine dispute of material fact.[460] And construing that evidence in the light most favorable to them, the evidence that suggests Swanson could see into the cell and therefore observe the alleged uses of excessive force occurring in the cell. Thus, summary judgment should be denied.

## F.  COUNTY DEFENDANTS' ARGUMENT FOR QUALIFIED IMMUNITY

In their Second Amended Complaint, Plaintiffs assert several claims under 42 U.S.C. § 1983. The County Defendants argue that they are entitled to the entry of summary judgment as to Plaintiffs' § 1983 damages claims arising out of the use of excessive force because they are shielded by qualified immunity.

---

[460] Angela Swanson Dep. (Pls.' Ex. O, Doc. 195-3, pp. 40:22-41:25); Incident Reports, Dauphin DFS 1-24 (Pls.' Ex. BB, Doc. 198-1, p. 8).

When evaluating whether a particular defendant is entitled to qualified immunity, courts:

> engage in a two-pronged inquiry. The first prong probes whether the allegations . . . 'show the officer's conduct violated a [federal] right[.]'" [*Muth v. Woodring*, 666 F. App'x 137, 139 (3d Cir. 2016).] The second prong considers "whether the law was clearly established at the time of the violation." *Id.* (quoting *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d. Cir. 2010)). The focus is on whether "the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Dean v. Borough of Glassboro*, No. 21-2468, 2023 WL 2597586, at *2 (3d Cir. Mar. 22, 2023).

> However, since *Pearson v. Callahan*, district courts are not required to resolve whether a constitutional violation occurred in-fact before deciding whether that right was clearly established. *See* 555 U.S. 223, 236 (2009). "*Pearson* explained that courts can assume a constitutional violation and immediately consider whether the challenged actions were prohibited by clearly established law if that would end the case." *Dean*, 2023 WL 2597586, at *2 (*citing id.* at 236–37).[461]

The County Defendants set forth the legal standard for qualified immunity, and then attempt to define the scope of the right at issue. They are correct that the manner in which the "right" at issue is framed is important because "at some level, any right is definite and undebatable."[462] For example,

> All understand that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. But that is too general, too abstract to provide a reasonable official proper guidance.

---

[461] *Moorehead v. Sch. Dist. of City of Allentown*, No. 5:22-CV-03959-JMG, 2024 WL 3361611, at *8 (E.D. Pa. July 9, 2024).

[462] *Dean v. Borough of Glassboro*, No. 21-2468, 2023 WL 2597586, at *3 (3d Cir. Mar. 22, 2023).

> Indeed, the Supreme Court has "repeatedly told courts ... not to define clearly established law at a high level of generality." *Plumhoff* [ *v. Rickard*, 572 U.S. 765, 778, 779 (2014)] (quoting [ *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)]. So the District Court must look for clearly established law "in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)) (reversing because the lower court failed to focus on the "dispositive question" of "whether the violative nature of *particular* conduct is clearly established" (citation omitted)).[463]

In their qualified immunity argument, the County Defendants identify two uses of force common to all of them: (1) the force used while searching Ty'rique and putting him in restraints in the Booking area; and (2) the force used to change Ty'rique into a DCP uniform to be transported to the hospital. (Doc. 174, p. 42-43). They identify a third use of force unique to Mendenhall; the use of OC spray in the booking area. *Id.* The County Defendants suggest that this case presents the issue of "whether the law was clearly established to make unconstitutional the use of force necessary to subdue [Ty'rique] and gain his compliance – without striking, punching, or kicking [Ty'rique]." (Doc. 174, pp. 42-43). Then, they succinctly conclude that "[i]t was not." (Doc. 174, p. 43). In their Reply Brief, the County Defendants attempt to raise a new argument, by contending that they are entitled to the entry of summary judgment as to Plaintiffs' § 1983 damages claims arising out of the denial of adequate *medical* care because they are shielded by qualified immunity. The

---

[463] *Id.*

argument in the reply is equally concise, and simply states that the County
Defendants did not deny Ty'rique access to medical care. (Doc. 217, p. 22-23). Thus,
it does not address the "clearly established" prong at all.

The County Defendants' qualified immunity arguments are undeveloped and
conclusory. The County Defendants do not cite to evidence, and aside from a
boilerplate standard do not cite to any legal authority demonstrating why they are
entitled to summary judgment. At summary judgment, a party must do more than
recite the elements of their claim and provide a conclusory statement that they are
entitled to judgment. Therefore, the Court should decline to consider these
inadequately developed arguments on summary judgment.[464]

### G.    PLAINTIFFS' CLAIMS FOR EXCESSIVE FORCE DURING TY'RIQUE'S REMOVAL FROM THE POLICE CAR (COUNT III) AND FAILURE TO INTERVENE IN THE EXCESSIVE FORCE USED TO REMOVE TY'RIQUE FROM THE POLICE CAR (COUNT IV)

In Count III of the Second Amended Complaint, Plaintiffs assert 42 U.S.C.
§ 1983 claims for excessive force in violation of Ty'rique's Fourteenth Amendment
Right to Due Process against Haines, Mendenhall, Weaver, Bauer, Grieb, Ingersoll,
and DCP John Does stemming from the removal of Ty'rique from Haines' police

---

[464] *Terilli v. Falvey*, No. 1:17-CV-1360, 2019 WL 1429350 (M.D. Pa. Mar.
28, 2019) (citing *Rice v. First Energy Corp.*, 339 F. Supp. 3d 523, 533 (W.D. Pa.
2018) ("Plaintiffs' argument is woefully inadequate, and the Court is not required to
consider any undeveloped or conclusory arguments.") (citing *Reynolds v. Wagner*,
128 F.3d 166, 178 (3d Cir. 1997))).

car.[465] (Doc. 64, ¶¶143-149). Plaintiffs allege that Mendenhall, Weaver, Bauer, Grieb, and Ingersoll "struck [Ty'rique] severely and unnecessarily about the head, shoulders and torso" in removing Ty'rique from the police car. (Doc. 64, ¶ 85). Count III alleges that Mendenhall, Weaver, Bauer, Grieb, and Ingersoll "forcibly removed [Ty'rique] from Defendant Haines' police vehicle by brutally beating, striking and hitting [him]." (Doc. 64, ¶ 145).

County Defendants argue in their Brief in Support that Bauer is entitled to summary judgment as to Count III because she was not present at the time Ty'rique was brought from the police car to the Booking Center, and that Ingersoll, Mendenhall and Weaver are entitled to summary judgment because the force used to transfer Ty'rique from the police car into the Booking Center was reasonable. (Doc. 174, p. 15). County Defendants note that Count III alleges Officers "forcibly removed [Ty'rique] from Defendant Haines' police vehicle by brutally beating, striking and hitting [him]." (Doc. 64, ¶ 151; Doc. 174, pp. 14-15). They argue that the video footage showing Ty'rique's removal from the police car clearly shows that Ty'rique was not "beaten" or hit or struck anywhere and that Bauer was not present when Ty'rique was removed from the car. (Doc. 174, pp. 14-15).

---

[465] I previously recommended dismissal of the DCP John Does in this Report and Recommendations and Count III was dismissed against Haines before the summary judgment motions were filed. (Doc. 95) (dismissing Count III and Count XII against Haines).

I agree with County Defendants that the video shows Ty'rique was not beaten or hit or struck anywhere as he was removed from the police car.[466] I also agree that the video shows Bauer was not present for Ty'rique's removal from the police car.[467] The video further shows that Grieb was not present at the time Ty'rique was removed from the police car.[468] It appears as though Plaintiffs may agree with County Defendants too because they do not respond to these arguments. In any event, Plaintiffs have not presented any evidence to establish a genuine dispute of material fact about whether Mendenhall, Weaver, Bauer, Grieb, or Ingersoll used excessive force when removing Ty'rique from the police car. Accordingly, I will recommend County Defendants' Motion be granted insofar as it seeks summary judgment on Count III of the Second Amended Complaint.

In Count IV, Plaintiffs bring a claim for failure to intervene in the excessive use of force pleaded in Count III against Haines, Mendenhall, Weaver, Bauer, Grieb, Ingersoll and DCP John Does.[469] "To be directly liable under a failure to intervene theory, [] the plaintiff must have demonstrate[d] that underlying constitutional rights were violated[.]"[470] Here, as explained above,

---

[466] Garage Camera Footage (Susquehanna Defs.' Ex. I, Doc. 166-10, 00:55-2:05).

[467] *Id.*

[468] *Id.*

[469] Again, I have already recommended dismissal of the John Doe Defendants.

[470] *Klein v. Madison*, 374 F. Supp. 3d 389, 419 (E.D. Pa. 2019).

Plaintiffs have not established the underlying constitutional violation that they predicate their failure to intervene claim on.[471] Accordingly, Mendenhall, Weaver, Bauer, Grieb, Ingersoll and Haines are entitled to summary judgment on Count IV of the Second Amended Complaint and I will recommend their Motions be granted insofar as they seek summary judgment on Count IV of the Second Amended Complaint.

### H. PLAINTIFFS' CLAIMS FOR CONSPIRACY TO COMMIT EXCESSIVE FORCE (COUNT I) AND CONSPIRACY TO DENY MEDICAL CARE (COUNT II)

In Counts I and II, Plaintiffs assert conspiracy claims pursuant to 42 U.S.C. § 1983.

> The Third Circuit requires individuals suing for conspiracy to show two elements: (1) "deprivation of a constitutional right," and (2) "some factual basis to support" the conspiracy. *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 293-94 (3d Cir. 2018) (quoting *Capogrosso v. Sup. Ct. of N.J.*, 588 F.3d 180, 184-85 (3d Cir. 2009)). Claimants must "support the existence of a conspiracy" by plausibly alleging an "agreement and concerted action." *Estate of Rodriguez v. Johnson*, 2019 WL 3297193, at *6 (D.N.J. July 23, 2019).

> To demonstrate the existence of an agreement, the allegations must show the parties "somehow reached an understanding to deny [an

---

[471] The video footage clearly shows that Grieb and Bauer were not present in the garage when Ty'rique was removed from the police car. Garage Camera Footage (Susquehanna Defs.' Ex. I, Doc. 166-10, 00:55-2:05). Therefore, even if the Court found an excessive force claim relating to Ty'rique's removal from the police car, Grieb and Bauer would still be entitled to summary judgment on the derivative failure to intervene claim as they would not have had a "realistic and reasonable opportunity to intervene" as required in failure to intervene claims. *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002).

individual] his rights under § 1983." *Kost v. Kozakiewicz*, 1 F.3d 176, 185 (3d Cir. 1993); *see also Ashton v. City of Uniontown*, 459 F. App'x 185, 191 (3d Cir. 2012) (stating an "inference of an agreement" among co-conspirators must "arise[ ] from the facts"). "In the absence of direct proof, such an agreement can be inferred from circumstantial evidence, such as evidence demonstrating that the alleged conspirators 'did or said something ... to create an understanding,' 'the approximate time when the agreement was made, the specific parties to the agreement[,] the period of the conspiracy, or the object of the conspiracy.' " *Graham v. New Jersey*, 2022 WL 4010856, at *14 (D.N.J. Sept. 2, 2022) (alteration in original) (quoting *Great W. Mining & Min. Co. v. Fox Rothschild LLP*, 615 F.3d 159, 178-79 (3d Cir. 2010)).[472]

### 1.    Conspiracy to Commit Excessive Force

In Count I, Plaintiffs allege that Defendants Danner, Swanson, Klahr, Smith, Neidigh, Armermann, Mendenhall, Grieb, Adams, Blouch, Lewis, Biter, Ingersoll, Weaver, Glenn, Myers, Bauer, Singleton, Donovan and Hoffman conspired "to use and/or to cover up" their use of excessive force. (Doc. 64, ¶¶ 129-135). Because the arguments put forth by County Defendants and Danner and Swanson are so similar I will address their Motions together.

Both County Defendants and Officers Danner and Swanson argue that they are entitled to summary judgment on this Count because Plaintiffs have not shown an underlying constitutional violation for excessive force. (Doc. 158, pp. 11-12; Doc. 174, pp. 24-25). However, I have found in other sections of this Report that the

---

[472] *Kinney v. Cnty. of Berks*, No. CV 22-2566, 2023 WL 3868379 (E.D. Pa. June 6, 2023).

question of whether certain Defendants used excessive force on June 18, 2019, and June 26, 2019 is a jury question. Therefore, these arguments fail.

County Defendants and Officers Danner and Swanson argue that Plaintiffs have not established that any Correctional Officer, Danner, or Swanson agreed, *before the fact*, to use excessive force. (Doc. 158, p. 12; Doc. 174, p. 25). Both sets of Defendants argue that they reacted to Ty'rique's actions as they occurred and that no evidence in the record demonstrates that any of these individuals reached some prior understanding or agreement or plotted, planned and conspired together to use excessive force on Ty'rique. (Doc. 158, pp. 12-13; Doc. 174, p. 25). These Defendants also argue that Plaintiffs attempt to support their conspiracy claim by asserting that the Defendants allegedly falsified documents after the fact to cover up Ty'rique's injuries, but that concealing a constitutional violation only amounts to a separate constitutional violation if the victim if the concealment is deprived of his rights of access to the courts. (Doc. 158, pp. 13-14; Doc. 174, pp. 25-26). Danner and Swanson point out that in this case, Plaintiffs claim only that the alleged harms caused by the conspiracy are the injuries to and death of Ty'rique. (Doc. 158, p. 14).

Plaintiffs' Briefs in Opposition are substantially similar. (Docs. 190, 192). Plaintiffs rely on the circumstantial evidence that each Defendant made physical contact with Ty'rique to establish a conspiracy. (Doc. 190, p. 23; Doc. 192, pp. 36-39). However, this does not show that any of these individuals reached a prior

agreement or understanding or planned, plotted or conspired together to use excessive force against Ty'rique. It simply shows that they all made physical contact with Ty'rique.

Plaintiffs also rely on their allegations that these Defendants filed false incident reports to justify the uses of force. (Doc. 190, p. 23; Doc. 192, p. 38). Plaintiffs argue that "these false reports helped to cover up the excessive uses of force." (Doc. 192, p. 38; Doc. 190, p. 25). However, I disagree with Plaintiffs that the alleged falsification of documents supports their conspiracy claim. This "argument tries to jam an allegation supporting an 'after-the-fact' conspiracy – a cover-up of [Defendants' excessive use of force against Ty'rique] – into the conspiracy [they] allege[] caused [Ty'rique's] injuries."

To the extent Plaintiffs are attempting to assert a "cover-up" conspiracy,

> The Third Circuit has said "cover-up" conspiracies "occur[ ] when the defendants have conspired to prevent a potential plaintiff from obtaining the information needed to make a valid legal claim, implicating the First Amendment right of access to the courts." *Estate of Rodriguez*, 2019 WL 3297193, at *6 (citing *Jutrowski*, 904 F.3d at 295-98). But "concealing a constitutional violation . . . does not amount to a separate constitutional violation unless the victim of the concealment was deprived of his right of access to the courts." *Jutrowski*, 904 F.3d at 294-95 (quoting *Swiggett v. Upper Marion Township*, 2008 WL 4916039, at *4 (E.D. Pa. Nov. 17, 2008)).[473]

---

[473] *Kinney v. Cnty. of Berks*, No. CV 22-2566, 2023 WL 3868379, at *11 (E.D. Pa. June 6, 2023).

Here, Plaintiffs have not claimed the falsification of the reports deprived Ty'rique of his access to courts. Instead, they claim the harms caused by the conspiracy were Ty'rique's injuries and death. Therefore, Plaintiffs' allegations of falsified reports "do not support the object of the purported conspiracy."[474]

Asserting no further arguments, Plaintiffs have failed to show some factual basis to support their conspiracy to commit excessive force claim against Defendants Danner, Swanson, Klahr, Smith, Neidigh, Armermann, Mendenhall, Grieb, Adams, Blouch, Lewis, Biter, Ingersoll, Weaver, Glenn, Myers, Bauer, Singleton, Donovan and Hoffman. Accordingly, it will be recommended that County Defendants' Motion and Danner and Swanson's Motion be granted insofar as they seek summary judgment on Count I.

### 2.    Conspiracy to Deny Medical Care

In Count II, Plaintiffs allege that Defendants Danner, PrimeCare John Does, Klahr, Smith, Neidigh, Armermann, Mendenhall, Grieb, Adams, Blouch, Lewis, Biter, Ingersoll, Weaver, Glenn, Myers, Bauer, Singleton, and Hoffman conspired to deny Ty'rique medical care. (Doc. 64, ¶¶ 136-142). Because the arguments put forth by County Defendants and Danner are so similar I will address their Motions together.

---

[474] *Id.*

Both County Defendants and Officer Danner argue that they are entitled to summary judgment on this Count because Plaintiffs have not shown an underlying constitutional violation for denial of medical care. They are correct.

Plaintiffs articulate an obvious need for medical care based on Ty'rique's behavior throughout his time in custody. Plaintiffs argue that the care Ty'rique received was not adequate, and that might well be true. But deliberate indifference to medical needs is not shown by poor care, and the parties all agree that Ty'rique received medical care during his stay at the prison.

> Claims for denial of medical care to arrestees are analyzed under the same standards as Eighth Amendment claims for denial of medical care to prisoners. *See Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003). In order to state a claim for denial of medical care, a plaintiff must allege sufficient facts to show the defendant acted with deliberate indifference to his or her medical needs. *See id.* at 582. The Third Circuit has noted that deliberate indifference requires evidence of "(i) a serious medical need, and (ii) acts or omissions by [] officials that indicate deliberate indifference to that need." *See id.* Further, deliberate indifference may exist in circumstances where there was "'objective evidence that [a] plaintiff had a serious need for medical care,' and [] officials ignored that evidence" or "where 'necessary medical treatment is delayed for non-medical reasons.'" *See id.* at 582 (citing *Nicini v. Morra*, 212 F.3d 798, 815 n.14 (3d Cir. 2000); *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)).
>
> A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *See Monmouth Cnty.*, 834 F.2d at 347 (citing *Pace v. Fauver*, 479 F. Supp. 456, 458 (D.N.J. 1979), *aff'd*, 649 F.2d 860 (3d Cir. 1981)). Deliberate indifference is a subjective standard analogous to criminal law's "recklessness" standard, meaning a plaintiff must demonstrate a

reckless disregard of a known "substantial risk of serious harm." *See Peters v. Brown*, 793 F. App'x 118, 123 (3d Cir. 2019). Further, an official must "be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists" and must "also draw the inference." *See Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).[475]

Courts have routinely held that regular assessment, treatment, and care preclude a finding of deliberate indifference. A claim of deliberate indifference against medically untrained correctional officers fails when a detainee, like Ty'rique, receives medical treatment.[476]

Ty'rique received regular medical treatment at DCP, including mental health examinations by licensed medical professionals. Beginning on June 18, 2019, Ty'rique was seen by Dr. Garrett Rosas, a licensed psychologist with PrimeCare.[477] Dr. Rosas determined that Decedent did not need urgent medical care.[478] Dr. Miller, a PrimeCare staff psychiatrist, started Decedent on medication to treat his psychosis.[479] On June 24 and 25, 2019, Dr. Miller did not believe Decedent needed

---

[475] *Thomas v. Harrisburg City Police Dep't*, No. 1:20-CV-01178, 2021 WL 694807, at *6 (M.D. Pa. Feb. 23, 2021).

[476] *See Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)("[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official...will not be chargeable with deliberate indifference.").

[477] Garrett Rosas Dep. (County Defs.' Ex. O. Doc. 175-16, p. 14:7-8, 24:9-13).

[478] *Id*. at p. 110:23-25.

[479] Robin Miller Dep. (County Defs.' Ex. P, Doc. 175-17, p. 29:9-23).

to be transferred to a hospital.[480] Dr. Miller believed that Decedent could be treated at DCP.[481] Dr. Miller confirmed that the correctional officers did not prevent her from effectively treating Decedent.[482] Dr. Miller confirmed that DCP lockdowns did not occur while Decedent was housed at DCP.[483] Dr. Miller also confirmed that she never made a request to send an inmate to the hospital that was refused.[484] Dr. Rosas testified that he was able to meet with Decedent at his cell.[485] Dr. Rosas did not testify that a correctional officer denied Decedent medical treatment.

One final point on denial of medical care. Defendants Danner and Swanson argue that they were in the process of preparing Ty'rique to go to the hospital. Attempting to take him to the hospital is not a denial of medical care.[486]

Because the record clearly shows that Ty'rique received medical care while at Dauphin County Prison, allegations that the non-medical staff were deliberately indifferent to his medical needs must fail. Without a constitutional violation, Plaintiff's conspiracy to deny Ty'rique access to medical care claim fails.

---

[480] *Id.* at p. 68:11-19, 52:22-25, 69:16-19, 25.

[481] *Id.* at p. 66:9-23.

[482] *Id*. at p. 36:11-18.

[483] *Id.* at p. 41:1-5.

[484] *Id.* at pp. 76:24-77:5.

[485] Garrett Rosas Dep. (County Defs.' Ex. O. Doc. 175-16, p. 50:11-18; 62:2-9).

[486] (Doc. 158, p. 16) (citing facts to establish that Danner had not encountered Ty'rique until June 26 and Swanson was tasked with taking Ty'rique to the medical block where an evaluation determined that he should be sent to the hospital).

Accordingly, I will recommend that County Defendants' Motion and Danner's Motion be granted insofar as they seek summary judgment on Count II.

## I.   PLAINTIFFS' CLAIM FOR FAILURE TO PROVIDE MEDICAL CARE (COUNT VIII)

In Count VIII, Plaintiffs assert a 42 U.S.C. § 1983 claim for failure to provide medical care in violation of Ty'rique's Fourteenth Amendment Right to Due Process against Susquehanna Defendants. (Doc. 64, ¶¶ 191-198). Plaintiffs allege that despite having actual knowledge of Ty'rique's serious mental health crisis, Susquehanna Defendants showed deliberate indifference to this serious medical need by taking him to a prison rather than a hospital or mental health facility. (Doc. 64, ¶¶ 195-196).

> Claims for denial of medical care to arrestees are analyzed under the same standards as Eighth Amendment claims for denial of medical care to prisoners. *See Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003). In order to state a claim for denial of medical care, a plaintiff must allege sufficient facts to show the defendant acted with deliberate indifference to his or her medical needs. *See id*. at 582. The Third Circuit has noted that deliberate indifference requires evidence of "(i) a serious medical need, and (ii) acts or omissions by [] officials that indicate deliberate indifference to that need." *See id*. Further, deliberate indifference may exist in circumstances where there was "'objective evidence that [a] plaintiff had a serious need for medical care,' and [] officials ignored that evidence" or "where 'necessary medical treatment is delayed for non-medical reasons.'" *See id*. at 582 (citing *Nicini v. Morra*, 212 F.3d 798, 815 n.14 (3d Cir. 2000); *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)).

> A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would

easily recognize the necessity for a doctor's attention." *See Monmouth Cnty.*, 834 F.2d at 347 (citing *Pace v. Fauver*, 479 F. Supp. 456, 458 (D.N.J. 1979), *aff'd*, 649 F.2d 860 (3d Cir. 1981)). Deliberate indifference is a subjective standard analogous to criminal law's "recklessness" standard, meaning a plaintiff must demonstrate a reckless disregard of a known "substantial risk of serious harm." *See Peters v. Brown*, 793 F. App'x 118, 123 (3d Cir. 2019). Further, an official must "be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists" and must "also draw the inference." *See Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).[487]

The Susquehanna Defendants contend they are entitled to summary judgment on Plaintiffs' § 1983 failure to provide medical care claim against them. The Susquehanna Defendants first argue that Ty'rique did not have a serious medical need. (Doc. 167, p. 15). The record is clear, by Plaintiffs' admissions, that Ty'rique did not have a mental health condition diagnosed as requiring treatment.[488] Accordingly, Plaintiffs must point to evidence that would allow a reasonable trier of fact to find that Ty'rique had a serious medical need that is "so obvious that a lay person would easily recognize the necessity for a doctor's attention."[489] Susquehanna Defendants argue that the summary judgment record includes no evidence showing that Ty'rique's need for a doctor's attention was easily recognized

---

[487] *Thomas v. Harrisburg City Police Dep't*, No. 1:20-CV-01178, 2021 WL 694807, at *6 (M.D. Pa. Feb. 23, 2021).

[488] Carmen Riley Dep. (Pls.' Ex. A, Doc. 194-1, p. 29:8-16); Thomas Matthews-Kemrer Dep. (Pls.' Ex. B, Doc. 194-2, p. 28:13-20).

[489] *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347–48 (3d Cir. 1987) (quoting *Pace v. Fauver*, 479 F.Supp. 456, 458 (D.N.J. 1979), *aff'd*, 649 F.2d 860 (3d Cir. 1981)).

by a lay person. (Doc. 167, p. 16). They argue that based on their own testimony, Plaintiffs have admitted they did not think Ty'rique needed to go to the hospital or receive psychiatric care or any other medical attention from a doctor. *Id*.

Plaintiffs contend that "at least three lay persons recognized that Ty'rique was suffering from a mental health crisis, or at the very least, had a need for a doctor's attention." (Doc. 188, p. 16). First, Plaintiffs assert that this exchange with the 911 Operator demonstrates that Carmen recognized the need for a doctor's attention:

| Operator | Does he have any sort of mental conditions they need to be aware of? |
|---|---|
| Carmen | Well, yeah, yeah, I mean now we, we [inaudible] something and he just, he just snapped. |
| Operator | Ok. So he doesn't have any like, pre- or anything like [inaudible]- |
| Carmen | No, no- |
| Operator | (talking over each other) …ahead of time? Ok. He just snapped tonight? |
| Carmen | The last couple of days, you know. The last couple of days. |
| Operator | Got you. |
| Carmen | And today he just, you know. |
| Operator | Ok. I, I also wanna verify for everybody, was the sledgehammer used when the- your husband got pushed over, or- |
| Carmen | Kind of. |

| Operator | Kind of? |
|---|---|
| Carmen | Yeah- |
| Operator | Ok, but he didn't get hit with the hammer, right? |
| Carmen | No. |
| Operator | Or nothing like that? |

(Doc. 188, pp. 16-17, citing 911 Call at 5:07 mark). It is not clear how this exchange demonstrates that Carmen recognized the need for a doctor's attention, and Plaintiffs fail to explain how this evidence supports their argument. The record supports the opposite conclusion. At no time during the call did Carmen ask for an ambulance to be sent for Ty'rique or state that she thought Ty'rique needed medical attention. Carmen testified to this at her deposition, and that she "called the ambulance for [Thomas]."[490] Carmen also testified that she never indicated to the responding Officers that she thought Ty'rique needed to be taken to a hospital.[491] Further, Carmen recognized that Ty'rique had "snapped" in the last couple of days but testified that she had not believed Ty'rique had a need for mental health treatment over those couple of days and at no point over those couple of days did she seek medical attention for Ty'rique.[492]

---

[490] Carmen Riley Dep. (Pls.' Ex. A, Doc. 194-1, pp. 59:6-7; 84:11-21).
[491] *Id.* at pp. 84:22-85:4.
[492] *Id.* at p. 80:10-12, 15.

Second, Plaintiffs contend that the 911 Operator who inquired about Ty'rique's mental state and learned from Carmen that Ty'rique had snapped in the last few days "believed that this information was important enough to relay to those responding to the 911 call, including Susquehanna Defendants."[493] (Doc. 188, p. 17). Again, Plaintiffs do not explain how this demonstrates that the 911 Operator recognized the need for a doctor's attention. And again, the record supports the opposite conclusion. At no point during the call did the 911 Operator recommend Ty'rique go to the hospital to be evaluated to either Carmen or the responding Officers or dispatch a second ambulance to the house for Ty'rique.[494]

Third, Plaintiffs contend that, because Haines "was concerned enough to inquire about [Ty'rique's] mental state" and believed Ty'rique was either suffering from a mental health issue or was under the influence, he recognized the need for a doctor's attention. (Doc. 188, p. 18). But Plaintiffs do not explain how inquiring

---

[493] The Susquehanna Defendants dispute whether the information about Ty'rique "snapping" was relayed to them "by Plaintiff parents." (Doc. 167, p. 16). However, based upon the Event Chronology and Audio Recording of Police Radio Transmissions, it appears that this information was relayed during the police dispatch. Dauphin County Office of Emergency Communications Event Chronology, Event No. P20190117625 (Pls.' Ex. E, Doc. 194-4, p. 3). Audio Recording of Police Radio Transmissions (Susquehanna Defs.' Ex. C, Doc. 166-4). For the purposes of deciding the Summary Judgment Motion as to this claim, I will assume that the Susquehanna Defendants were informed about the snapping by the 911 Operator.

[494] *See* Audio Recording of 911 Call (Pls.' Ex. C, Doc. 194); Audio Recording of Police Radio Transmissions (Susquehanna Defs.' Ex. C, Doc. 166-4).

about Ty'rique's mental state or believing he was having a mental health issue or was under the influence shows that Haines recognized anything other than Ty'rique might be having a mental health issue or be under the influence, much less how it shows he recognized the necessity for a doctor's attention. Recognizing the fact that Ty'rique may have been having a mental health crisis or have been under the influence is not the same as recognizing a need for a doctor's attention.

Plaintiffs also argue that Wilson believed Ty'rique was suffering from a mental health issue or under the influence of narcotics and allegedly told Haines to share his suspicions with the booking officer.[495] (Doc. 188, pp. 18-19). But again, as with Haines, Plaintiffs do not explain how that shows Wilson recognized that Ty'rique needed a doctor's attention.

Although Plaintiffs frame their arguments as showing that lay persons recognized Ty'rique's need for a doctor's attention, it appears that Plaintiffs' arguments boil down to arguing that Carmen and the 911 Operator recognized Ty'rique may be having a mental health crisis and that Haines and Wilson recognized Ty'rique was either having a mental health crisis or was under the influence. However, this does not, by itself, establish that any one of the four recognized that Ty'rique needed a doctor's attention. Plaintiffs have not pointed to

---

[495] Whether Wilson did in fact tell Haines this is disputed. Susquehanna Defs.' Statement of Facts (Doc. 166, ¶ 31); Pls.' Resp. to Susquehanna Defs.' Statement of Facts (Doc. 189, ¶ 31) (admitting ¶ 31 in part).

evidence that would allow a reasonable trier of fact to find that Ty'rique had a serious medical need that is "so obvious that a lay person would easily recognize the necessity for a doctor's attention." Because Plaintiffs have failed to make a sufficient showing to establish one element of their denial of medical care claim, I will recommend that summary judgment be granted.

### J.    PLAINTIFFS' CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (COUNT X)

In Count X of their Second Amended Complaint, Plaintiffs allege a claim of Intentional Infliction of Emotional Distress ("IIED") against Danner, Klahr, Smith, Neidigh, Armermann, Mendenhall, Grieb, Adams, Blouch, Lewis, Biter, Ingersoll, Weaver, Glenn, Myers, Bauer, Singleton and Hoffman. (Doc. 64, ¶¶ 204-207).[496] In substance, Plaintiffs allege the DCP Supervisory Officers and DCP Correctional Officers "acted intentionally and recklessly toward" Ty'rique, and that their "acts in deliberately agreeing and conspiring to hurt and harm [Ty'rique] by subjecting him to deliberate excessive harmful force and restraints, and then deliberately hurting

---

[496] The Pennsylvania Supreme Court has not yet explicitly recognized the tort of intentional infliction of emotional distress. *See Taylor v. Albert Einstein Med. Ctr.*, 754 A.2d 650, 652 (Pa. 2000). The Third Circuit has predicted that the Commonwealth's high court ultimately will adopt the Restatement (Second) of Torts' formulation. *Williams v. Guzzardi*, 875 F.2d 46, 50-51 (3d Cir. 1989); *see also Mills v. City of Harrisburg*, 589 F.Supp.2d 544, 558 n.13 (M.D. Pa. 2008) (citing Taylor, 754 A.2d at 652).

and harming him" caused Ty'rique "severe and extreme emotional pain and distress." (Doc. 64, ¶¶ 205-06).

> An IIED claim requires proof that: (1) the defendant's conduct was extreme and outrageous; (2) the conduct caused the plaintiff severe emotional distress; and (3) the defendant acted intending to cause such distress and or with knowledge that the same was "substantially certain" to occur. *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 217-18 (3d Cir. 2001) (quoting Restatement (Second) of Torts § 46, cmt. d).[] Additionally, "a plaintiff must suffer some type of resulting physical harm due to the defendant's outrageous conduct." *Reedy v. Evanson*, 615 F.3d 197, 231 (3d Cir. 2010) (quoting *Swisher v. Pitz*, 868 A.2d 1228, 1230 (Pa. Super. Ct. 2005)). Whether conduct could reasonably be regarded as extreme and outrageous is a threshold inquiry for the court's determination. *M.S. ex rel. Hall v. Susquehanna Twp. Sch. Dist.*, 43 F. Supp. 3d 412, 430 (M.D. Pa. 2014) (citing *Reimer v. Tien*, 514 A.2d 566, 569 (Pa. Super. Ct. 1986)). The Supreme Court of Pennsylvania has cited approvingly the Superior Court's requirement that "[t]he conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998) (alteration in original) (quoting *Buczek v. First Nat'l Bank of Mifflintown*, 531 A.2d 1122, 1125 (Pa. Super. Ct. 1987)).[497]

The County Defendants argue that the DCP Supervisory Officers and the DCP Correctional Officers (excluding Danner) are entitled to the entry of summary judgment for two reasons. Their one-page argument sets out the legal standard, and then offers the following four-sentence analysis as to why they are entitled to the entry of summary judgment:

---

[497] *Hughes v. Herbster*, No. 1:20-CV-2204, 2023 WL 7285453, at *7 (M.D. Pa. Nov. 3, 2023) (footnote omitted), aff'd, No. 23-3122, 2024 WL 4707882 (3d Cir. Nov. 7, 2024).

Plaintiffs' claims fail for two reasons. First, Plaintiffs failed to show that any DCP Supervisory Officer or DCP Correctional Officer used objectively unreasonable force. Nothing about the officers' actions is "extreme" or "outrageous." Second, Plaintiffs did not show that Decedent suffered some resulting physical harm. To the contrary, the Dauphin County Coroner concluded that Decedent died of natural causes, and his injuries were consistent with the medical care he received. Therefore, Plaintiffs' IIED claims fail.

(Doc. 174, pp. 38-39).

The County Defendants generally argue that Plaintiffs "did not show that any DCP Supervisory Officer or DCP Correctional Officer used objectively unreasonable force" and did not show resulting physical harm. They cite to no evidence in their argument that the force was objectively reasonable. Moreover, they do not make any attempt to affirmatively show the absence of such evidence.

It is well-established that a party moving for summary judgment bears the initial responsibility of informing the district court of the basis for its motion, *and* identifying those portions of the summary judgment record which they believe demonstrates the absence of a genuine issue of material fact.[498] Where the burden of persuasion at trial is on the non-movant, the movant can satisfy this burden by: (1) submitting affirmative evidence that negates an essential element of the nonmoving party's claim; or (2) demonstrating to the Court that the nonmoving party's evidence

---

[498] *Butts v. Southwestern Energy Production Co.*, No. 3:12-CV-1330, 2014 WL 4626560, at *2 (M.D. Pa. Sept. 15, 2014) (citing *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 145 (3d Cir. 2004) (emphasis added) (quoting *Celotex*, 477 U.S. at 323)).

is insufficient to establish an essential element of their claim.[499] Where the movant does not discharge this initial burden, Plaintiffs are not required to respond with specific facts establishing a genuine issue of material fact. Here, County Defendants offer only the conclusory statement that Plaintiffs "did not show" DCP Supervisory Officers or DCP Correctional Officers used objectively unreasonable force. To meet their initial burden by demonstrating Plaintiffs evidence is insufficient, however, Defendants must "affirmatively show" the absence of evidence in the record.[500]

> [A] party who moves for summary judgment on the ground that the nonmoving party has no evidence must affirmatively show the absence of evidence in the record. . . . This may require the moving party to depose the nonmoving party's witnesses or to establish the inadequacy of documentary evidence. If there is literally no evidence in the record, the moving party may demonstrate this by reviewing for the court the admissions, interrogatories and other exchanges between the parties that are in the record.[501]

The County Defendants' conclusory statements that Plaintiffs have not shown they used "unreasonable force," and that "nothing about the officers' actions is 'extreme' or 'outrageous'" fail to discharge their initial responsibility of *affirmatively* showing the absence of evidence. Because they have not discharged their initial responsibility, the burden does not shift to Plaintiffs to show a genuine dispute of material fact and summary judgment should be denied.

---

[499] *Celotex*, 477 U.S. at 331, (Brennan, J., dissenting).
[500] *Id.* at 332 (Brennan, J., dissenting).
[501] *Id.*

Regarding the County Defendants' argument that Ty'rique did not suffer physical harm, there is a material dispute of fact. Although the County Defendants rely on the coroner's report, the summary judgment record includes conflicting evidence as to Ty'rique's cause of death, and the injuries he sustained because of Defendants' uses of force.[502] Therefore, I will recommend that summary judgment be denied.

Danner argues that he is entitled to the entry of summary judgment because: (1) he is entitled to immunity under the Political Subdivision Tort Claims Act ("PSTCA"); and (2) the Court should decline to exercise jurisdiction over Plaintiffs' state law claims. (Doc. 158, pp. 27-30). Danner fails to discharge his initial responsibility. After providing a legal standard for his PSTCA argument, Danner simply states:

> Here, Plaintiffs have not met the high bar of demonstrating that an exception to immunity applies. Specifically, Plaintiffs cannot establish that Danner acted willfully and intentionally used excessive force. As a result, summary judgment should be granted for Danner . . . .

(Doc. 158, p. 28). Because Danner makes no attempt to affirmatively demonstrate a lack of evidence, he did not meet his initial responsibility, the burden does not shift

---

[502] Expert Report of Dr. Zhongxue Hua, MD, PhD (Pls.' Ex. AK, Doc. 196-11); Forensic Psychological Report of Dr. Marcus R. Patterson, PsyD (Pls.' Ex. AO, Doc. 196-15).

to Plaintiffs to show a genuine dispute of material fact and summary judgment should be denied.

Last, Danner argues, relying on 28 U.S.C. § 1367(c)(3), that this Court should decline to exercise supplemental jurisdiction over Plaintiffs state law claims because all federal law claims have been dismissed and only state law claims remain. His argument is unpersuasive because not all federal law claims have been dismissed, nor have I recommended summary judgment be granted on all federal law claims. Therefore, summary judgment should be denied.

### K.    PLAINTIFFS' *MONELL* AND SUPERVISORY LIABILITY CLAIMS (COUNT VII)

Count VII of the Second Amended Complaint is not a model of clarity. Plaintiffs allege that Dauphin County, Brian Clark, and the DCP Supervisory Officers failed to properly train and supervise staff at Dauphin County Prison. (Doc. 64, ¶¶ 174-190). County Defendants argue that they are entitled to the entry of summary judgment.

#### 1.    *Monell* Claim against Dauphin County

In *Monell v. New York City Dep't of Social Services*, the Supreme Court held that municipalities are "person[s]" who may be sued under § 1983; however, municipalities are not vicariously liable for the constitutional torts of their

employees or agents.[503] "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."[504] A municipality is liable under § 1983 when a plaintiff can demonstrate that the municipality itself, through the implementation of a municipal policy or custom, causes a constitutional violation.[505]

A municipality's failure to properly train its employees and officers can amount to a "custom" under § 1983.[506] In that context, "a plaintiff need not allege an unconstitutional policy."[507] Instead,

> [a] *Monell* claim premised on the alleged failure to train employees requires the plaintiff to show that the alleged training deficiency amounts to "deliberate indifference" to the constitutional rights of individuals who will come into contact with those employees. *Thomas*, 749 F.3d at 222 (quoting *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999)); *see also Reitz v. County of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997) ("[F]ailure to train can serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom [a municipal employee] come[s] into contact."). This demanding standard requires evidence that the municipality "disregarded a known or obvious consequence" of its action. *Connick*, 563 U.S. at 61. The alleged training deficiency must be

---

[503] *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 690-94 (1978)

[504] *Id.* at 694.

[505] *Colburn* II, 946 F.2d at 1027 (citing *Monell*, 436 U.S. at 691–95). !

[506] *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

[507] *Est. of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019).

closely related to the constitutional injury suffered by the plaintiff. *Connick*, 563 U.S. at 61.[508]

Based on the arguments they raise in their Brief in Opposition, Plaintiffs are alleging two *Monell* claims under a failure to train theory, one deriving from their excessive force claims against County Defendants, (Doc. 192, pp. 42-43, 45-46), and one deriving from the denial of medical care they allege Ty'rique suffered in their conspiracy to deny medical care claim. (Doc. 192, pp. 43-44, 47-48).

County Defendants first argue that they are entitled to summary judgment because *Monell* claims are derivative and Plaintiffs' excessive force and denial of adequate medical care claims against them fail as a matter of law. (Doc. 177, pp. 32-37). They are half right. Because I found Plaintiffs' excessive force claims against County Defendants should survive summary judgment in Count V, there is a derivative basis for a *Monell* claim. However, I found that Plaintiffs did not state a denial of medical care claim against County Defendants in the Count II Conspiracy to deny medical care section.[509] Without a denial of medical care claim, the County Defendants are also entitled to summary judgment on Plaintiffs *Monell* claim deriving from that claim.

---

[508] *Fought v. City of Wilkes-Barre, Pennsylvania*, No. 3:17-CV-01825, 2024 WL 4341343, *8 (M.D. Pa. Sept. 27, 2024).

[509] There is not a separate denial of medical care claim against the County Defendants.

County Defendants next argue that they are entitled to summary judgment on Plaintiffs' *Monell* claim deriving from Plaintiffs' excessive force claims because Plaintiffs do not identify deficiencies in DCP training. (Doc. 174, p. 35). County Defendants argue that officers at DCP do receive annual training on the use of force and in support, they cite to the Dauphin County Use of Force Training Materials. *Id*.

In response, Plaintiffs attempt to show deficiencies in DCP training on use of force. Plaintiffs first argue that the uses of excessive force against Ty'rique by County Defendants occurred as the direct result of a custom of officers ignoring mental health warning signs and meeting medical needs with brute force, citing to nothing in support of this proposition. (Doc. 192, p. 42). Plaintiffs, however, then allege that County Defendants immediately began using force when, pursuant to their own policies, they should have used de-escalation procedures and tactics. *Id*. This argument therefore turned into an assertion that County Defendants failed to follow DCP policies and does identify any deficiency in DCP training on use of force, but rather alleges the failure of County Defendants to follow DCP policy on crisis intervention and de-escalation tactics.

Plaintiffs then discuss how Lt. Mendenhall completed a report of Extraordinary Occurrence, but not a Use of Force Memo as required under DCP's Use of Force Policy when OC spray is used. (Doc. 192, p. 45). They discuss how Mendenhall's report documented a different sequence of events than what he

reported during his deposition, and what is shown through video footage. *Id*. They also note that Mendenhall did not select the box indicating physical force was used with Ty'rique and that he did not have an answer when asked why he did not check this box at his deposition. *Id*. Plaintiffs then turn to how C.O. Ingersoll failed to report and document the excessive force he used when he put his knee and full body weight on Ty'rique's neck. *Id*. It is not clear what precisely Plaintiff intends this discussion to do for them. At most it is another argument that two County Defendants failed to follow DCP policies, but it does not identify a deficiency in DCP use of force training.

Finally, Plaintiffs assert that "officers are allowed to forego training on issues like the use of force without consequence." (Doc. 192, p. 46). Plaintiffs however cite to nothing in support of this assertion. Plaintiffs do point to deposition testimony from Mendenhall where he stated that use of force training is supposed to be yearly but had not been done in the last couple of years. *Id*. Plaintiffs do not explain how this lack of annual refresher training demonstrates a deficiency in DCP's use of force training.

With no further arguments, Plaintiffs have failed "to make a showing sufficient to establish the existence of an element essential" to their *Monell* claim from their excessive force claims against Dauphin County.[510] Accordingly, it will be

---

[510] *Celotex*, 477 U.S. at 322.

recommended that Dauphin County's Motion be granted insofar as it seeks summary judgment on Plaintiffs' *Monell* claims against the County.

### 2.    Supervisory Liability Claim

Plaintiffs allege that the DCP Supervisors are responsible for their subordinates' conduct due to a failure to supervise. To establish a claim for failure to supervise under § 1983, Plaintiffs must:

> (1) identify the specific supervisory practice or procedure that the supervisor failed to employ, and show that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk, and (5) the underling's violation resulted from the supervisor's failure to employ that supervisory practice or procedure.[511]

In their brief, the County Defendants argue:

> Plaintiffs' claims fail for several reasons. First, Plaintiffs never identify the "supervisory correctional officers" or their personal involvement in failing to supervise specific correctional officers. Instead, Plaintiffs attribute alleged failures to "DCP Supervisory Officers." (DOC. 64, ¶¶ 173-176, 181, 184-188). Second, Plaintiffs did not demonstrate an absent custom or procedure that caused Decedent's death or created an unreasonable risk of Decedent's death. Plaintiffs also failed to identify a supervisor who knew of a risk to Decedent but was indifferent to that risk. Therefore, summary judgment is appropriate to Plaintiffs' failure to supervise claims.

---

[511] *Fought v. City of Wilkes-Barre, Pennsylvania*, No. 3:17-CV-01825, 2024 WL 4341343, at *9 (M.D. Pa. Sept. 27, 2024) (quoting *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 216 (3d Cir. 2001), and citing *Dotter v. Pinto*, No. CV 13-06903, 2016 WL 336870, at *9 (E.D. Pa. Jan. 27, 2016) and *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989)).

(Doc. 174, p. 37).

In their first argument, the County Defendants argue they are entitled to summary judgment because Plaintiffs did not plead each DCP Supervisor's personal involvement.[512] The County Defendants rely only on Plaintiffs' pleading and do not argue or attempt to show the absence of a genuine dispute of fact.[513] To the extent the County Defendants intended these arguments under the summary judgment standard, they have not discharged their initial responsibility of affirmatively showing the absence of evidence of their personal involvement or an affirmative lack of evidence that they failed to demonstrate an absent policy caused Ty'rique's death. Because they have not discharged their initial responsibility, the burden does not shift to Plaintiffs to show a genuine dispute of material fact and summary judgment should be denied.

---

[512] To the extent the County Defendants seek dismissal of the supervisory liability claim, I find that the sufficiency of Plaintiffs' pleading in this regard suffices, just barely. Plaintiffs allege the DCP Supervisor Defendants failed to implement and enforce policies to train correctional and medical staff on how to handle inmates with mental illnesses, and how to apply the proper use of force.

[513] The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

### L.    PLAINTIFFS' CLAIMS FOR ASSAULT (COUNT XI) AND BATTERY (COUNT XII)

In Counts XI and XII of the Second Amended Complaint, Plaintiffs allege a claim for assault and battery, respectively, against Defendants Danner, Haines,[514] Klahr, Smith, Neidigh, Armermann, Mendenhall, Grieb, Adams, Blouch, Lewis, Biter, Ingersoll, Weaver, Glenn, Myers, Bauer, Singleton and Hoffman. (Doc. 64, ¶¶ 208-214).

Haines argues that Plaintiffs' assault claim against him fails because he only approached Ty'rique once inside the Booking Center to assist Bauer in placing leg shackles on Ty'rique. (Doc. 167, p. 23). Plaintiffs respond by arguing that Haines is not being sued for his contact with Ty'rique, rather because he failed to intervene when excessive force was being used on Ty'rique. (Doc. 188, p. 27). They argue that "a jury could reasonably conclude that Haines purposefully failed to intervene in order to gain Ty'rique's compliance so that he could retrieve his handcuffs. His intention is a question for the jury and not to be decided on summary judgment." (Doc. 188, p. 27). "The tort of assault requires that the defendant act with the intent to place the plaintiff in apprehension of imminent harmful or offensive bodily contact and that the plaintiff actually experience such apprehension."[515] Plaintiffs'

---

[514] Count XII was dismissed against Haines prior to summary judgment. (Doc. 195).

[515] *Dull v. W. Manchester Twp. Police Dep't*, 604 F. Supp. 2d 739, 754 (M.D. Pa. 2009).

argument that a reasonable jury could find that Haines intentionally did not intervene so that he could retrieve his handcuffs is misplaced and does not address the relevant intent they must show to succeed on their claim. The intent that matters in a claim for the tort of assault is the intent "to place the plaintiff in apprehension of imminent or harmful or offensive bodily contact[.]"[516] Plaintiffs instead address Haines intent in remaining at the Booking Center, and do not otherwise explain to the Court how that intent weighs on his intent to place Ty'rique in fear of apprehension of imminent harmful or offensive bodily contact. Accordingly, summary judgment should be granted in favor of Haines on this claim.

As with Plaintiffs' claims for IIED, Danner argues that he is entitled to the entry of summary judgment on Plaintiffs' assault and battery claims because: (1) he is entitled to immunity under the Political Subdivision Tort Claims Act ("PSTCA"); and (2) the Court should decline to exercise jurisdiction over Plaintiffs' state law claims. (Doc. 158, pp. 27-30). However, for the reasons explained above in discussing Plaintiffs' IIED claim, these arguments likewise fail as to Danner's request for summary judgment on Plaintiffs' assault and battery claims. Thus, summary judgment should be denied.

County Defendants assert that "if a correctional officer uses reasonable force necessary to carry out his duties, that amount of force, when applied to an inmate is

---

[516] *Id*.

not tortuous." (Doc. 174, p. 39). Thus, according to County Defendants, because Plaintiffs did not demonstrate that any of the Officers used objectively unreasonable force, and the actions of the Officers were reasonable in relation to their duties, Plaintiffs' "assault and battery claims fail as a matter of law" and they are entitled to summary judgment *Id*. at 40. However, as discussed above, there are genuine disputes of material fact regarding whether the force the used by Klahr, Mendenhall, Adams, Blouch, Lewis, Biter, Ingersol, Weaver, Glenn, Myers, Singleton and Hoffman was reasonable. Thus, summary judgment should be denied for these Defendants. As to Defendants Bauer, Neidigh, Grieb, Armermann and Smith, summary judgment is appropriate as, for the reasons explained above in my discussion of Plaintiffs' excessive force claims, Plaintiffs' have not shown any unreasonable use of force by these Defendants.

### M. PLAINTIFFS' REMAINING CLAIMS FOR WRONGFUL DEATH (COUNT XIII) AND SURVIVAL (COUNT XIV)

In Counts XIII and XIV Plaintiffs bring claims for wrongful death and a survival action, respectively, against all Defendants. "Pennsylvania's wrongful death and survival statutes do not create independent causes of action; rather, they are derivative in the sense that the substance of the claim derives from the injury to the decedent."[517]

---

[517] *McCracken v. Fulton Cnty.*, No. 19-CV-1063, 2020 WL 2767577, at *10 (M.D. Pa. May 28, 2020) (citing *Pisano v. Extendicare Homes, Inc.*, 77 A.3d 651,

Danner and Swanson argue that they are entitled to summary judgment on Plaintiffs' wrongful death claims and survival action because wrongful death claims and survival actions require a viable claim to derive from, and Plaintiffs' have not "adduced evidence of a viable claim on one or more of the underlying causes of action" brought against them. (Doc. 158, p. 30). However, as I have explained above, some of Plaintiffs' claims against Danner and Swanson survive summary judgment. Therefore, summary judgment for Danner and Swanson as to Plaintiffs' wrongful death claims and survival action should be denied.

County Defendants argue that,

> [t]here can be no wrongful death or survival action without an underlying tort. Plaintiffs' claims against the County Defendants under Pennsylvania law sound in the torts of assault and battery. The County Defendants are immune from suit on these claims under the PSTCA, and, therefore, without the existence of an underlying tort, Counts XIII and XIV are appropriate for summary judgment.

(Doc. 174, pp. 40-41). County Defendants offer only the single sentence conclusion that they are immune from suit on Plaintiffs' assault and battery claims against them under the PSTCA to support their argument they should be granted summary judgment. They do not cite to any evidence or authority to support their argument. The County Defendants' argument is undeveloped and conclusory and, thus, the

---

660 (Pa. Super. Ct. 2013)); *see also Sullivan v. Warminster Twp.*, 765 F.Supp.2d 687, 707 (E.D. Pa. 2011) ("wrongful death and survival actions are not substantive causes of action; rather they provide a vehicle through which plaintiffs can recover for unlawful conduct that results in death").

Court should decline to consider it on summary judgment.[518] However, because no tort claims remain against Dauphin County, summary judgment should be granted to Dauphin County on Plaintiffs' wrongful death claim and survival action.

Susquehanna Defendants argue that "absent a violation in the first place, there can be no derivative recovery for any damages, much less damages for wrongful death and survival." (Doc. 167, p. 24). This Report recommends granting summary judgment on all potential predicate claims brought against the Susquehanna Defendants, leaving no "violation in the first place," for Plaintiffs' wrongful death claim and survival action to derive from against them. Accordingly, I will recommend the Susquehanna Defendants' Motion be granted as to Plaintiffs' wrongful death claims and survival action.

## N. REMAINING CLAIMS

Should this recommendation be adopted, the following claims will proceed against the following Defendants:

(1) **Count I** (§ 1983 Conspiracy), **Count II** (§ 1983 Conspiracy), **Count III** (Excessive Force while removing Ty'rique from police car), and **Count IV** (Failure to Intervene to prevent the application of force while removing Ty'rique from the police car) **should not** proceed against any Defendant.

---

[518] *Terilli v. Falvey*, No. 1:17-CV-1360, 2019 WL 1429350 (M.D. Pa. Mar. 28, 2019) (*Rice v. First Energy Corp.*, 339 F. Supp. 3d 523, 533 (W.D. Pa. 2018) ("Plaintiffs' argument is woefully inadequate, and the Court is not required to consider any undeveloped or conclusory arguments.") (citing *Reynolds v. Wagner*, 128 F.3d 166, 178 (3d Cir. 1997))).

(2)    **Count V** (Excessive Force Used Against Ty'rique in DCP) **should** proceed against Defendants Klahr, Mendenhall, Adams, Blouch, Lewis, Biter, Ingersoll, Weaver, Glenn, Myers, Singleton, Hoffman, and Danner.

**Count V should not** proceed against Defendants Smith, Neidigh, Armermann, Grieb, or Bauer.

(3)    **Count VI** (Failure to Intervene in the Force Used Against Ty'rique in DCP) **should** proceed against Defendants Klahr, Armermann, Mendenhall, Grieb, Adams, Blouch, Lewis, Biter, Ingersoll, Weaver, Glenn, Myers, Bauer, Singleton, Hoffman, Donovan, Swanson, and Danner.

**Count VI should not** proceed against Defendants Smith or Neidigh.

(4)    **Count VII** (Failure to Train and Supervise) **should** proceed against Defendants Clark, Klahr, Smith, Neidigh, Armermann, Mendenhall, Greib, Adams, Blouch, Lewis, and Biter.

**Count VII should not** proceed against Defendant Dauphin County.

(5)    **Count VIII** (Failure to Provide Medical Care Upon Arrest) **should not** proceed against any Defendant.

(6)    **Count IX** (Medical Negligence) **should** proceed against Defendant PrimeCare Medical.

(7)    **Count X** (IIED) **should** proceed against Defendants Klahr, Smith, Neidigh, Armermann, Mendenhall, Grieb, Adams, Blouch, Lewis, Biter, Ingersoll, Weaver, Glenn, Myers, Bauer, Danner, Singleton, and Hoffman.

(8)    **Count XI** (Assault) **should** proceed against Defendants Klahr, Mendenhall, Adams, Blouch, Lewis, Biter, Ingersoll, Weaver, Glenn, Myers, Singleton, Hoffman, and Danner.

**Count XI should not** proceed against Defendants Haines, Smith, Neidigh, Armermann, Grieb, or Bauer.

(9)    **Count XII** (Battery) **should** proceed against Defendant Klahr, Mendenhall, Adams, Blouch, Lewis, Biter, Ingersoll, Weaver, Glenn, Myers, Singleton, Hoffman, and Danner.

**Count XII should not** proceed against Defendants Smith, Neidigh, Armermann, Grieb, or Bauer.

(10)    **Count XIII** (Wrongful Death) **should** proceed against Defendants PrimeCare Medical, Clark, Klahr, Smith, Neidigh, Armermann, Mendenhall, Greib, Adams, Blouch, Lewis, Biter, Ingersoll, Weaver, Glenn, Myers, Bauer, Singleton, Hoffman, Donovan, Danner, and Swanson.

**Count XIII should not** proceed against Defendants Dauphin County, Darcy, D. Glenn, Wilson, or Haines.

(11)    **Count XIV** (Survivor Act) **should** proceed against Defendants PrimeCare Medical, Clark, Klahr, Smith, Neidigh, Armermann, Mendenhall, Greib, Adams, Blouch, Lewis, Biter, Ingersoll, Weaver, Glenn, Myers, Bauer, Singleton, Hoffman, Donovan, Danner, and Swanson.

**Count XIV** (Survivor Act) **should not** proceed against Defendants Dauphin County, Darcy, D. Glenn, Wilson, or Haines.

## V.    RECOMMENDATIONS

The parties are placed on notice that, at the direction of the District Judge assigned to this case, **no extensions of time to the objection period will be granted**.

For the reasons explained herein, it is RECOMMENDED that:

(1)    Defendants Danner and Swanson's Motion for Summary Judgment (Doc. 157) be GRANTED in part and DENIED in part.

(2)    Defendant PrimeCare Medical's Motion for Summary Judgment (Doc. 160) be DENIED.

(3)    The Susquehanna Defendants' Motion for Summary Judgment (Doc. 164) be GRANTED.

(4)    The County Defendants' Motion for Summary Judgment (Doc. 173) be GRANTED in part and DENIED in part.

(5)     All "Doe" Defendants be dismissed from this case.

(6)     The Clerk of Court be directed to terminate the following Defendants from the docket because all claims against them have been resolved: Susquehanna Township John Doe Police Officers 1-5; PrimeCare John Doe Medical Employees 1-5; Dauphin County Prison John Doe Correctional Officers 1-10, Susquehanna Township John Doe 911 Operator; Dauphin County; Michael Darcy; Demetrius Glenn, Richard Wilson, and Christopher Haines.

Date: February 18, 2025                    BY THE COURT

                                           *s/William I. Arbuckle*
                                           William I. Arbuckle
                                           U.S. Magistrate Judge

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CARMEN RILEY, *et al.*, | ) | CIVIL ACTION NO. 4:20-CV-325 |
| Plaintiffs | ) | |
| | ) | (BRANN, C.J.) |
| v. | ) | |
| | ) | (ARBUCKLE, M.J.) |
| WARDEN BRIAN CLARK, *et al.*, | ) | |
| Defendants | ) | |

## <u>NOTICE OF LOCAL RULE 72.3</u>

NOTICE IS HEREBY GIVEN that any party may obtain a review of the Report and Recommendation pursuant to Local Rule 72.3, which provides:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses, or recommit the matter to the magistrate judge with instructions.

Date: February 18, 2025

BY THE COURT

*s/William I. Arbuckle*
William I. Arbuckle
U.S. Magistrate Judge