**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CARMEN RILEY, *et al.*, | No. 4:20-CV-00325 |
| Plaintiffs, | (Chief Judge Brann) |
| v. | |
| WARDEN BRIAN CLARK, *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION**

**MARCH 31, 2025**

## I.  BACKGROUND

Plaintiffs Carmen Riley and Thomas Matthews-Kemrer filed the instant action in February 2020, and after removal to this Court, it was jointly assigned to the undersigned and to a magistrate judge.[1] In April 2021, Plaintiffs filed a second amended complaint.[2] In January 2024, four motions for summary judgment were filed by the remaining Defendants: one by Matthew Danner and Angela Swanson; one my PrimeCare Medical, Inc. ("PrimeCare"); one by Michael Darcy, Demetrius Glenn, Chris Haines, and Richard Wilson (the "Susquehanna Township Defendants"); and one by Brian Clark, Dauphin County, Andrew Klahr, Steve Smith, Mark Neidigh, Richard Armermann, Greg Mendenhall, Scott Grieb, Jason Adams, Michael Blouch, Scott Lewis, Keith Biter, Robert Ingersoll, Cameron Weaver, Taylor Glenn, Martin Myers,

---

[1]    Complaint, Doc. 1-21.
[2]    Second Amended Complaint, Doc. 64.

Delta Bauer, Steve Singleton, Tami Donovan, and Keith Hoffman (the "Dauphin County Defendants").[3]

Upon designation, a magistrate judge may "conduct hearings, including evidentiary hearings, and . . . submit to a judge of the court proposed findings of fact and recommendations."[4] Once filed, this report and recommendation ("R&R") is disseminated to the parties in the case who then have the opportunity to file written objections.[5]

On February 18, 2025, Magistrate Judge William I. Arbuckle, to whom this matter is jointly assigned, issued a R&R recommending a resolution of the pending motions for summary judgment.

The R&R recommends that:

- As to Counts I and II (§ 1983 Conspiracy), Count III (Excessive Force), and Count IV (Failure to Intervene), summary judgment be granted against all defendants;

- As to Count V (Excessive Force), summary judgment be denied against defendants Klahr, Mendenhall, Adams, Blouch, Lewis, Biter, Ingersoll, Weaver,

---

[3]    Motion for Summary Judgment by Matthew Danner, Angela Swanson ("Danner and Swanson MSJ"), Doc. 157; Motion for Summary Judgment by PrimeCare Medical, Inc. ("PrimeCare MSJ"), Doc. 160; Motion for Summary Judgment by Michael Darcy, Demetrius Glenn, Chris Haines, Richard Wilson ("Susquehanna MSJ"), Doc. 164; Motion for Summary Judgment by Jason Adams, Richard Armermann, Delta Bauer, Keith Biter, Michael Blouch, Brian Clark, Dauphin County, Tami Donovan, Taylor Green, Scott Grieb, Keith Hoffman, Robert Ingersoll, Andrew Klahr, Scott Lewis, Greg Mendenhall, Martin Myers, Mark Neidigh, Steve Singleton, Steve Smith, Cameron Weaver ("Dauphin MSJ"), Doc. 173.

[4]    28 U.S.C. 636(b)(1)(B).

[5]    28 U.S.C. 636(b)(1).

Glenn, Myers, Singleton, Hoffman, and Danner, and granted against Defendants Smith, Neidigh, Armermann, Grieb, and Bauer;

- As to Count VI (Failure to Intervene), summary judgment be denied against Defendants Klahr, Armermann, Mendenhall, Grieb, Adams, Blouch, Lewis, Biter, Ingersoll, Weaver, Glenn, Myers, Bauer, Singleton, Hoffman, Donovan, Swanson, and Danner and granted against Defendants Smith and Neidigh;

- As to Count VII (Failure to Train and Supervise), summary judgment be denied against defendants Clark, Klahr, Smith, Neidigh, Armermann, Mendenhall, Grieb, Adams, Blouch, Lewis, and Biter and granted against Dauphin County;

- As to Count VIII (Failure to Provide Medical Care), summary judgment be granted in its entirety;

- As to Count IX (Medical Negligence), summary judgment be denied in its entirety;

- As to Count X (Intentional Infliction of Emotional Distress), summary judgment be denied in its entirety;

- As to Count XI (Assault), summary judgment be denied against Defendants Klahr, Mendenhall, Adams, Blouch, Lewis, Biter, Ingersoll, Weaver, Glenn, Myers, Singleton, Hoffman, and Danner, and granted against Haines, Smith, Neidigh, Armermann, Grieb, and Bauer;

- As to Count XII (Battery), summary judgment be denied against Defendants Klahr, Mendenhall, Adams, Blouch, Lewis, Biter, Ingersoll, Weaver, Glenn,

3

Myers, Singleton, Hoffman, and Danner, and granted as to Smith, Neidigh, Armermann, Grieb, and Bauer;

- As to Count XIII (Wrongful Death), summary judgment be denied against PrimeCare Medical, Clark, Klahr, Smith, Neidigh, Armermann, Mendenhall, Grieb, Adams, Blouch, Lewis, Biter, Ingersoll, Weaver, Glenn, Myers, Bauer, Singleton, Hoffman, Donovan, Danner, and Swanson, and granted against Dauphin County, Darcy, D. Glenn, Wilson, and Haines;

- And, that as to Count XIV (Survivor Act), summary judgment should be denied against PrimeCare Medical, Clark, Klahr, Smith, Neidigh, Armermann, Mendenhall, Grieb, Adams, Blouch, Lewis, Biter, Ingersoll, Weaver, Glenn, Myers, Bauer, Singleton, Hoffman, Donovan, Danner, and Swanson, and granted against defendants Dauphin County, Darcy, D. Glenn, Wilson, and Haines.[6]

On March 4, 2025, four timely objections to the R&R were filed: one by PrimeCare;[7] one by Danner and Swanson;[8] one by the Dauphin County Defendants;[9] and one by the Plaintiffs.[10] "If a party objects timely to a magistrate judge's report and recommendation, the district court must 'make a de novo determination of those portions of the report or specified proposed findings or recommendations to which

---

[6]  Report and Recommendations, Doc. 247 at 147-149.
[7]  PrimeCare Objections BIS, Doc. 249.
[8]  Danner and Swanson Objections BIS, Doc. 251.
[9]  Dauphin County Defendants' Objections BIS, Doc. 253.
[10]  Plaintiffs' Objections BIS, Doc. 255.

objection is made.'"[11] Portions of a R&R to which no objections are filed are reviewed only for clear error.[12] Regardless of whether timely objections are made, district courts may accept, reject, or modify—in whole or in part—the magistrate judge's findings or recommendations.[13]

On June 18, 2019, the parents of a twenty-one-year-old man named Ty'rique Riley called 9-1-1 because he was wielding a sledgehammer and behaving strangely. That same day, Susquehanna Township Police Officers brought Riley to the Dauphin County Booking Center at Dauphin County Jail to be held as a pretrial detainee, and after his arraignment, he was transferred to Dauphin County Prison. Throughout Riley's pretrial detention at these facilities, from June 18 to June 26, his mental health visibly deteriorated. And, prison guards used force against Riley in three main incidents—two at the Dauphin County Booking Center and once at the Dauphin County Prison. Though the issue is hotly contested, the Plaintiffs claim that the last use of force on June 26 caused Riley to become unresponsive and, after Riley's transfer to a local hospital, ultimately resulted in his death.

The Court has found the Magistrate Judge's recitation of facts to be thorough and accurate in view of the record evidence in this case. Accordingly, and because the Court

---

[11]   *Equal Emp't Opportunity Comm'n v. City of Long Branch*, 866 F.3d 93, 99 (3d Cir. 2017) (quoting 28 U.S.C. § 636(b)(1)).

[12]   Fed. R. Civ. P. 72(b), advisory committee notes; *see Henderson v. Carlson*, 812 F.2d 874, 878 (3d Cir. 1987) (explaining that court should in some manner review recommendations regardless of whether objections were filed). *See Snyder v. Bender*, 548 F. App'x 767, 771 (3d Cir. 2013) (noting that district courts need not conduct *de novo* review of portions of recommendation to which no party files specific objections).

[13]   28 U.S.C. § 636(b)(1); Local Rule 72.31.

writes solely for the parties, it will not restate the facts, but will instead in large part adopt the recitation of facts as set forth by the Magistrate Judge, unless stated otherwise in this memorandum opinion. Objections made to the R&R's resolution of the record shall be resolved in the corresponding section. The Court has conducted a de novo review of this case and will adopt the R&R in part and reject it in part. My reasoning is as follows.

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[14] Material facts are those "that could alter the outcome" of the litigation, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[15] A defendant "meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[16] Conversely, to survive summary judgment, a plaintiff must "point to admissible evidence that would be sufficient to show all elements of a prima facie case under applicable substantive law."[17]

---

[14]  Fed. R. Civ. P. 56(a).

[15]  *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010).

[16]  *Clark v. Mod. Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993).

[17]  *Id.*

In assessing "whether there is evidence upon which a jury can properly proceed to find a verdict for the [nonmoving] party,"[18] the Court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party."[19] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the Court may "consider the fact undisputed for purposes of the motion."[20] Finally, although "the court need consider only the cited materials, . . . it may consider other materials in the record."[21]

## III.    ANALYSIS

### A.    Section 1983 Claims

Title 42 U.S.C. § 1983 "creates a species of tort liability for the deprivation of any rights, privileges, or immunities secured by the Constitution."[22] For a defendant to be liable under Section 1983, there must be an underlying violation of the plaintiff's constitutional rights,[23] the defendant must be personally involved in that violation,[24] and that defendant must have acted "under color of state law."[25] Section 1983 also incorporates the common law defense of qualified immunity, which generally shields

---

[18]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 448 (1871)).

[19]  *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

[20]  Fed. R. Civ. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613-14 (3d Cir. 2018).

[21]  Fed. R. Civ. P. 56(c)(3).

[22]  *Manuel v. City of Joliet*, 580 U.S. 357, 362 (2017) (cleaned up).

[23]  *Curley v. Klem*, 298 F.3d 271, 277 (3d Cir. 2002).

[24]  *Lozano v. N.J.*, 9 F.4th 239, 241 (3d Cir. 2021).

[25]  *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982).

"government officials performing discretionary functions . . . from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated."[26]

Qualified immunity shields officers from suit unless they "violated a statutory or constitutional right that was clearly established at the time of the challenged conduct."[27] "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful."[28] "For qualified-immunity purposes, 'clearly established rights are derived either from binding Supreme Court and Third Circuit precedent or from a 'robust consensus of cases of persuasive authority in the Courts of Appeals."[29]

The more fact-bound a legal standard is, the more precise the established law must be to place the question beyond debate in that context. So because "the reasonability of force often hinges on the details of an individual case,"[30] "the specificity of caselaw [is] 'especially important" in the excessive force area,[31] and "officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue."[32] While acknowledging these principles, the Third Circuit

---

[26]   *Anderson v. Creighton*, 483 U.S. 635, 639 (1987).

[27]   *Thomas v. Tice*, 948 F.3d 133, 141 (3d Cir. 2020) (quoting *Richle v. Howards*, 566 U.S. 658, 664 (2012)).

[28]   *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (internal quotation marks omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

[29]   *James v. N.J. State Police*, 957 F.3d 165, 170 (3d Cir. 2020) (cleaned up).

[30]   *Jacobs*, 8 F.4th at 196.

[31]   *Id.* (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).

[32]   *Kisela v. Hughes*, 584 U.S. 100, 105 (2018) (per curiam) (quoting *Mullenix*, 577 U.S. at 12).

has continued to emphasize that there need not be "a case directly on point"[33] because in the Third Circuit, "[w]e take a 'broad view' of what makes a right clearly established, which can be satisfied 'even without a precise factual correspondence between the case at issue and the previous case.'"[34]

Plaintiffs seek relief from various defendants for four alleged uses of excessive force against Riley and corresponding claims for failure to intervene, in violation of the Fourteenth Amendment; for failure to provide medical care to Riley, in violation of the Fourteenth Amendment; for a conspiracy to deprive Riley of these civil rights; and for the failure to train and supervise, resulting in these civil rights violations. Some defendants also assert qualified immunity defenses as to certain alleged violations. I shall first explain where I depart from the R&R in finding these qualified immunity defenses forfeited. Then, I will parse the excessive force, failure to intervene, failure to provide medical care, conspiracy, and failure to train and supervise claims, conducting de novo analysis for those claims garnering objections.

### 1.    Forfeiture of Qualified Immunity Defenses

The R&R concluded that *all* defendants forfeited *all* qualified immunity defenses because no defendant cited case law showing that the constitutional rights at issue were

---

[33]  *Thomas v. City of Harrisburg*, 88 F.4th 275, 284 (3d Cir. 2023) (quoting *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam)).

[34]  *Mack v. Yost*, 63 F.4th 211, 232 (3d Cir. 2023) (quoting *Peroza-Benitez v. Smith*, 994 F.3d 157, 166 (3d Cir. 2021)); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (quoting *United States v. Lanier*, 520 U.S. 259, 261 (1997)) ("Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding.").

not clearly established.[35] It relied upon case law in which courts had found other arguments to be forfeited due to "undeveloped or conclusory" briefing; in those cases the briefing simply quoted the legal standard and provided one sentence stating that the legal standard applied.[36] In this case, the defendants in several instances provided briefing and case law on the general qualified immunity standard, explicitly argued the defense should apply in their opening briefings, and defined the scope of the right alleged to be clearly established.[37]

The R&R appears to contend that defendants have forfeited their qualified immunity arguments by failing to fully develop them, in particular, due to the lack of case citations.[38] In evaluating this recommendation, I note that District Judges have the "widest discretion" in determining whether, and to what extent, to adopt a Magistrate Judge's R&R.[39] And, the application of waiver and forfeiture doctrines based upon

---

[35]  R&R, Doc. 247 at 114.

[36]  *Terilli v. Falvey*, No. 1:17-cv-1360, 2019 WL 1429350, at *4 (M.D. Pa. Mar. 28, 2019) ("Plaintiff does little more than quote the above standard and states in a conclusory fashion that Mr. Falvey had a societal duty to plaintiff and breached that duty by pulling him to the ground."); *Rice v. First Energy Corp.*, 339 F.Supp. 3d 523, 533 (W.D. Pa. 2018) ("Plaintiffs make the single, conclusory statement that 'there can be no issue that FE is the successor by *de jure* merger with Allegheny Power."); *Reynolds v. Wagner*, 128 F.3d 166, 178 (3d Cir. 1997) ("[A]n argument consisting of no more than a conclusory assertion such as the one made here (without even a citation to the record) will be deemed waived.").

[37]  *See* Dauphin MSJ BIS, Doc. 174 at 41-43; Susquehanna MSJ BIS, Doc. 167 at 18-22.

[38]  "'Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the "intentional relinquishment or abandonment of a known right."'" *Montemuro v. Jim Thorpe Area Sch. Dist.*, 99 F.4th 639, 646 (3d Cir. 2024) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)).

[39]  *United States v. Raddatz*, 447 U.S. 667, 675-76 (1980) ("Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and recommendations."); 28 U.S.C. § 636(b)(1)(C) ("A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.").

party presentation is committed to the discretion of the District Court.[40] So in rejecting the R&R's recommendation on qualified immunity, I do not hold that this forfeiture constitutes an abuse of discretion. I instead simply reject the R&R because I have decided to exercise my judicial discretion differently.

Unlike certain other federal courts, the Third Circuit evaluates qualified immunity under the "general rule" that the party seeking an affirmative defense has the burden of demonstrating it.[41] For this reason I reject any argument that special rules apply to the briefing of qualified immunity, such as that the defense must be forfeited if the defendant does not cite case law,[42] despite potentially confusing dictum from our

---

[40]  Although no Third Circuit decision known to this Court states this principle as applied in the specific context of forfeiture by insufficiently thorough briefing, it is well-established that the application of waiver and forfeiture is discretionary and therefore evidence that this particular application of forfeiture would also be discretionary. *See, e.g.*, *Kars 4 Kids Inc. v. America Can!*, 8 F.4th 209, 219 n.9 (3d Cir. 2021) ("We review a district court's determination whether a party waived an argument by failing to raise it earlier in the proceedings for abuse of discretion"); *United States v. Dowdell*, 70 F.4th 134, 140 (3d Cir. 2023) (reviewing district court's determination of whether government forfeited argument for abuse of discretion); *United States v. CITGO Asphalt Ref. Co. (In re Frescati Shipping Co.)*, 886 F.3d 291, 313 (3d Cir. 2018) ("A District Court's holding that an affirmative defense has been waived is reviewed for abuse of discretion.").

[41]  *See Aspinall v. Thomas*, 118 F.Supp. 3d 664, 679 (M.D. Pa. 2015) ("The Supreme Court has established, and this Circuit has affirmed, the principle that the defendant bears the burden of demonstrating qualified immunity, as it is a defense."); *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014) ("Unlike some other courts, we follow the general rule of placing the burden of persuasion at a summary judgment proceeding on the party asserting the affirmative defense of qualified immunity.")

[42]  It is not clear whether Plaintiffs intend this argument in their briefing or instead intend to argue that qualified immunity, like any other affirmative defense, *may* be forfeited through insufficient briefing—subject to the district court's discretion. *See* Dauphin Objections BIO, Doc. 265 at 17-18. To the extent Plaintiffs intend the latter, I agree; to the extent they intend the former, I do not, because I view the relevant precedents to require treating qualified immunity like any other affirmative defense (as *Haley* puts it, subsuming it under the "general rule") rather than creating special rules for discharging the burden to raise it.

Court of Appeals to which Plaintiffs cite on this point.[43]  Accordingly, judges within this Circuit have followed a wide array of practices in evaluating when insufficient briefing forfeits a qualified immunity defense, most of which are likely within their discretion.[44]

"[A]s a general rule, our system 'is designed around the premise that [parties represented by competent counsel] know what is best for them, and are responsible for advancing" affirmative defenses immunizing them from liability.[45] "[W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present."[46] Once the parties have raised an issue to the district court, the court has a duty to follow the parties' lead and resolve it.[47] Moreover, the "party presentation principle is supple, not ironclad," and there "are no doubt circumstances

---

[43] *See Halsey*, 750 F.3d at 288 ("Thus, appellees . . . [had to] show that reasonable officers could not have known that their conduct constituted such a violation when they engaged in it.").

[44] *Compare Njos v. Carney*, No. 3:12-cv-01375, 2017 U.S. Dist. LEXIS 118600, at *3 n.1 (M.D. Pa. Jul. 28, 2017) (Kane, J.) (Opining that "in this Circuit, a qualified immunity defense cursorily raised in an answer to a complaint and not referenced in a motion for summary judgment is not necessarily deemed abandoned" because "the Court is vested with the authority to *sua sponte* grant summary judgment on grounds not raised by the Defendants, such as qualified immunity, so long as the non-moving party has notice and an opportunity to be heard.") *with Aspinall*, 118 F.Supp. 3d at 679 (Mannion, J.) ("Without providing any case-law or further support to demonstrate whether the right was clearly established, the defendants urge this court to conclude that the defendants deserve qualified immunity status . . . . Since the defendants have not provided any support to prove the second prong of the qualified immunity inquiry, the court concludes that they are not entitled to qualified immunity at this stage in the litigation").

[45] *United States v. Sineneng-Smith*, 590 U.S. 371, 375-76 (2020) (quoting *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in the judgment)).

[46] *Id.* at 375.

[47] *See, e.g.*, *Golan v. Saada*, 596 U.S. 666, 679 (2022) ("[A] district court exercising its discretion is still responsible for addressing and responding to nonfrivolous arguments timely raised by the parties before it.").

in which a modest initiating role for a court is appropriate;"[48] "[w]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."[49]

At the same time, finding conclusory or undeveloped defenses to be properly raised in briefing can, in extreme cases, deprive the opposing party of notice and unfairly require them to anticipate, develop, apply, and dispute these unformulated arguments. "'An issue is waived unless a party raises it in its opening brief, and for those purposes "a passing reference to an issue . . . will not suffice to bring that issue before this court."'"[50] "To raise an issue, a party must present it with sufficient specificity to allow the court to pass on it."[51] "Mere allusion or reference is not enough; the issue must actually be raised with a minimum level of thoroughness."[52]

---

[48] *Id.* at 376.

[49] *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991).

[50] *Comm. of Pa. Dep't of Pub. Welfare v. United States Dep't of Health and Human Servs.*, 101 F.3d 939, 946 (3d Cir. 1996) (quoting *Laborers Int'l Union of N. Am. V. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir. 1994)). The Third Circuit has more recently recognized that, although the proper term here would be "forfeited" rather than "waived," "judges frequently use forfeiture and waiver 'interchangeably' even though they 'are not synonymous.'" *United States v. Dowdell*, 70 F.4th 134, 142 (3d Cir. 2023) (quoting *Hamer v. Neighborhood Hous. Servs. Of Chicago*, 583 U.S. 17, 17 n.1 (2017)).

[51] *Teleglobe Comms. Corp. v. BCE, Inc. (In re Teleglobe Comms. Corp.)*, 493 F.3d 345, 376 (3d Cir. 2007); *Shell Petroleum, Inc. v. United States*, 182 F.3d 212, 218 (3d Cir. 1999) ("A party . . . must unequivocally put its position before the trial court at a point and in a manner that merits the court to consider its merits."); *Keenan v. City of Phila.*, 983 F.2d 459, 471 (3d Cir. 1992) ("The crucial question regarding waiver is whether defendants presented the argument with sufficient specificity to alert the district court.").

[52] *Seifert v. Pa. Human Relations Comm'n*, 301 F.App'x 194, 196-97 (3d Cir. 2008).

Applying these principles, I will find the qualified immunity defense forfeited where it is not squarely raised such that the briefing defines the scope of the right alleged to not be clearly established; however, I will not find the defense forfeited just because that section of the briefing does not provide specific case citations. Where such defendants have already provided briefing on the underlying merits of the constitutional violation at issue, such case law is also pertinent to whether the violation was clearly established, even if it is not designed to tackle the qualified immunity question specifically.

I therefore diverge from the R&R's recommendation here and find several assertions of qualified immunity to be properly presented before this Court. However, the Dauphin County Defendants' assertion of qualified immunity for "using only the force necessary to gain Decedent's compliance in changing into a DCP uniform"[53] will be deemed forfeited because this passing and conclusory reference did not sufficiently specify which uses of force—several are disputed—are not be clearly established.[54] I will also deem the qualified immunity defenses for inadequate medical care raised for the first time in the Dauphin County Defendants' Reply Brief,[55] as well as the qualified immunity defenses raised by Danner and Swanson for the first time in their objections to the R&R,[56] to be forfeited as they were not presented in these defendants' opening

---

[53] Dauphin MSJ BIS, Doc. 174 at 43.
[54] *Id.* at 43.
[55] Dauphin MSJ Reply, Doc. 217 at 22-23.
[56] Danner and Swanson Objections BIS, Doc. 252 at 12, 18.

14

briefs. Finally, I note that nowhere in the initial set of briefings did any defendant request qualified immunity for the failure to intervene claims. I will not apply the defense to those claims, either.

### 2.    Excessive Force and Failure to Intervene Claims

Plaintiffs bring excessive force and failure to intervene claims based on three incidents involving various defendants. Defendants also raise a qualified immunity defense. The first incident involves two claims: the force used when Riley was removed from the police car and during Riley's arrival at the Dauphin County Prison Booking Center. The second incident involves the force used when Riley was placed in a restraint belt in his cell on June 18. The third incident involves the allegedly fatal force used during officers' attempt to transport Riley to the hospital on June 29. I will begin by setting out the generally applicable legal standards for excessive force and failure to intervene. In the subsequent subsections, I will analyze each incident separately, briefly setting out relevant facts and resolving relevant factual objections[57] and applying the excessive force, failure to intervene, and qualified immunity standards where that defense was properly raised.

The Due Process Clause of the Fourteenth Amendment protects pretrial detainees from "the use of excessive force that amounts to punishment."[58] "[M]ost importantly,

---

[57] For each incident, I will set out a very brief restatement of relevant facts, with additional discussion where a party has objected to the R&R's interpretation of those facts for purposes of summary judgment. Unless otherwise stated—such as when resolving objections—I agree with the R&R's statement of facts and present a shortened rendition here for brevity.

[58] *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989).

pretrial detainees (unlike convicted prisoners) cannot be punished at all."[59] Accordingly, "the Fourteenth Amendment, like the Fourth, exclusively employs an objective-reasonableness standard."[60] This means that pretrial detainees need not show "that the officers were *subjectively aware* that their use of force was unreasonable," nor must they show that force was used to punish them "maliciously and sadistically."[61] One "cannot apply this standard mechanically;" it requires "careful attention to the facts and circumstances of each particular case"[62] and must be assessed "from the perspective of a reasonable officer on the scene."[63] Force is excessive under the Fourteenth Amendment where it is not "rationally related to a legitimate nonpunitive governmental purpose" or where it is "excessive in relation to that purpose."[64]

In *Kingsley v. Hendrickson*, the Supreme Court noted a non-exhaustive list of six factors which may be relevant to assessing whether the use of force is objectively reasonable: "[1] the relationship between the need for the use of force and the amount of force used; [2] the extent of the plaintiff's injury; [3] any effort made by the officer to temper or to limit the amount of force; [4] the severity of the security problem at issue; [5] the threat reasonably perceived by the officer; and [6] whether the plaintiff was actively resisting."[65] Because the Fourth and Fourteenth Amendment excessive use

---

[59] *Kingsley v. Henrickson*, 576 U.S. 389, 400 (2015).
[60] *Jacobs v. Cumberland Cnty.*, 8 F.4th 187, 194 (3d Cir. 2021).
[61] *Kingsley*, 576 U.S. at 391-92, 400.
[62] *Graham*, 490 U.S. at 396.
[63] *Kingsley*, 576 U.S. at 397.
[64] *Id.* at 398 (quoting *Bell v. Wolfish*, 441 U.S. 520, 538, 561 (1979)).
[65] *Id.* at 397.

of force standards are "now almost identical," "courts applying the objective standard in the Fourteenth Amendment context may find useful guidance in Fourth Amendment excessive-force cases."[66]

"[A] police officer has a duty to take responsible steps to protect a victim from another officer's use of excessive force," but only "if there is a realistic and reasonable opportunity to intervene."[67] If the officer fails to intervene under such circumstances, "the officer is directly liable under Section 1983."[68] "Naturally enough, the duration of the incident is key to determining whether there was a reasonable opportunity."[69] "[W]here an incident is momentary, its 'brevity' may 'defeat[] [a] . . . failure-to-intervene claim."[70]

### a.    Riley's arrival at the Booking Center on June 18, 2019

Riley's first excessive force claim is based on force used when officers removed him from a police car upon its arrival at Dauphin County Prison Booking Center. His second excessive force claim subdivides into four distinct allegedly excessive uses of force: the force used when Officers Mendenhall, Ingersoll, Weaver, Grieb, and Bauer take Riley to the ground and hold him there for over four minutes; the force used when

---

[66]  *Jacobs*, 8 F.4th at 195 n.6.

[67]  *Smith v. Mensinger*, 293 F.3d 641, 650-51 (3d Cir. 2002); *See also Godson v. City of Phila.*, Civil Action No. 24-6461, 2025 U.S. Dist. LEXIS 42242, at *19 (E.D. Pa. Mar. 10, 2025) (restating this standard through the following three elements: "(1) plaintiff suffered an underlying constitutional violation; (2) defendant had a duty to intervene; and (3) defendant had a realistic and reasonable opportunity to intervene.").

[68]  *Id.* at 651 (quoting *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir. 1986).

[69]  *El v. City of Pittsburgh*, 975 F.3d 327, 335 (3d Cir. 2020).

[70]  *Id.* (quoting *Ricks v. Shover*, 891 F.3d 468, 479 (3d Cir. 2018)).

Officer Ingersoll placed his knee on Riley's neck for about one minute; the force used when Lieutenant Mendenhall deployed OC Spray directly into Riley's eyes; and the forced used when Officers Ingersoll and Weaver simultaneously placed their bodyweight on Riley's neck and back for about one minute. The R&R found that the first use of force did not survive summary judgment but the remaining uses of force did. I will adopt the R&R on this basis but reject it with respect to some of the failure to intervene claims.

Defendants object to the R&R's resolution of several facts. The first objection relates to Riley's resistance prior to the first use of force. Riley is removed from the squad car, resists being brought into the booking center by going limp as officers struggle to carry him, attempts to climb onto a bench, does not follow officers' verbal commands, and is eventually taken to the ground. Shackles are added to Riley's handcuffs while Officer Ingersoll holds Riley's head down with two hands, and Ingersoll then places his knee on Riley's neck for just under one minute.[71] The R&R found that on this summary judgment record, there is at least an issue of fact as to whether Riley was resisting or struggling in the eighteen seconds prior to Officer Ingersoll placing his knee on Riley's neck, and so such an issue should be construed in Riley's favor as the nonmovant.[72]

---

[71]    Booking Camera C Footage, Doc. 166-13 at 1:27-2:14.
[72]    R&R, Doc. 247 at 82.

Though the Dauphin County Defendants take issue with this finding in their objections,[73] the R&R did not err in this respect. I agree with the Magistrate Judge that for approximately eighteen seconds prior to Officer Ingersoll shifting his knee over Riley's neck, the video footage appears to depict Riley lying still, with four officers on top of him.[74] This is sufficient to create an issue of fact despite the countervailing deposition testimony of various officers that Riley was generally struggling throughout the encounter, which in any case does not opine on whether he was resisting immediately prior to this use of force.[75]

The second factual objection is whether Riley was resisting before the next uses of force. After officers remove Riley's shoes and socks and begin removing his belt, Officer Ingersoll removes his knee, Riley is briefly flipped to a supine position and back again, and officers rotate Riley to a different angle on the floor, with Ingersoll pushing Riley onto the floor with his elbow to Riley's neck and continuing to hold it there for another minute, and Officer Weaver also placing his bodyweight on Riley's neck or

---

[73]  Dauphin Objections BIS, Doc. 254 at 8 ("The Magistrate Judge failed to consider Decedent's actions . . . including . . . efforts made by the officers to temper or limit the amount of force while Decedent continued to resist as outlined in the uncontroverted testimony of Mendenhall and Haines.").

[74]  R&R at 81 (citing Booking Camera C Footage, Doc. 166-13 at 1:04-1:26).

[75]  *See* Dauphin Objections BIS, Doc. 254 at 8 (citing Mendenhall Deposition, Doc. 175-6 at 47-48 and Haines Deposition, Doc. 175-5 at 68); Mendenhall Deposition, Doc. 175-6 at 47-48 (stating generally that Riley was resisting, and stating more specifically that he was resisting at the time that Mendenhall deployed the OC spray, but not stating that he was resisting at the time Ingersoll initially placed his knee on Riley's neck); Haines Deposition Doc. 175-5 at 68 (stating that "Mr. Riley was taken to the ground. He was resisting the guards there," but not stating that Riley was resisting the guards at the time Ingersoll initially placed his knee on Riley's neck).

upper back around the same time. A few seconds later, Lieutenant Mendenhall sprays Riley in the eyes with OC spray. While officers are maneuvering Riley prior to these two uses of force, they appear to visibly struggle to handle him. The R&R concludes that a "reasonable trier of fact may find that Riley was not resisting" at this time because "the way the Officers are positioned obscured Riley's body from view" and "reasonable minds may disagree whether that movement [of the guards] is of their own accord, from the gravity of rolling Riley seconds before or from Riley actively resisting them."[76]

I agree that this was error.[77] As Dauphin County Defendants point out in their objections to the R&R, deposition testimony from multiple officers states that Riley was resisting when Lieutenant Mendenhall deployed his OC spray and when Officers Ingersoll and Weaver initially applied force to Riley's neck and back; Plaintiffs' own expert, upon reviewing the footage, states the same.[78] The parties also agreed in their statements of facts that Riley "pulled his body away" or nonviolently failed to comply

---

[76] R&R, Doc. 247 at 85-86, 89-90.

[77] Dauphin Objections BIS, Doc. 254 at 9, 11.

[78] *Id.*; Mendenhall Deposition, Doc. 195-9 at 28:9-17 ("while [Riley] was on the ground as he is now resisting officers pulling away . . . He kept pulling away resisting the officers' attempts. At which time I deployed my OC spray."); Ingersoll Deposition, Doc. 195-8 at 3:100-102 (stating that Riley "continued to resist. He was fighting with us as far as refusing to follow any orders given. At that point in time, Lieutenant Mendenhall sprayed him with oleoresin capsicum to try and, uh, receive compliance. Uh, he continued to resist. Um, we then at that point in time did manage to gain control of him."); Dauphin County CID Transcribed Statements, Doc. 175-10 at 51-52:223-228 (Weaver stating that Riley "continued to resist, contort his body, spin around, wiggle around. Lieutenant Mendenhall applied OC spray," after which Riley "was still contorting his body and kicking and resisting"); Gravette Expert Report, Doc. 195-1 at 5 (stating that [b]ased on [his] review of the video footage, Riley was not compliant and he was resisting the attempts fo the officers to control him but his actions were not of a violent nature such as biting, punching, grabbing or kicking.").

at this time.[79] I agree with the R&R that the video footage does not show Riley's body or whether he was resisting due to his body being obscured at key moments, and this means that the inconclusive footage cannot create a genuine dispute of fact in the fact of this uncontroverted testimony.

At the same time, I must construe the existing record evidence in the light most favorable to Riley, which becomes relevant regarding the *extent and form* of Riley's resistance. Considering the footage video and deposition transcripts in the record, a reasonable trier of fact could conclude that Riley's resistance was limited to minimal flailing—as Officer Weaver characterized it, contorting his body, spinning, wiggling around, and kicking—as officers held him down on the floor. Taking all reasonable inferences in favor of Riley, the non-movant, there is a genuine dispute as to whether this resistance was not so significant that it created difficulty in continuing to subdue Riley, especially given his position on the floor: handcuffed, shackled, and held down by four officers during the relevant timeframe. And on the other end of the spectrum, Riley's position on the floor as confirmed by the footage means that finding any actively violent form of resistance, such as forcefully punching officers, would also be "blatantly contradicted" by the video evidence.[80]

---

[79] Dauphin SUMF, Doc. 175 ¶41; Plaintiffs' Response to Dauphin SUMF, Doc. 193 ¶41.

[80] *See Jacobs*, 8 F.4th at 192 (quoting *Scott*, 550 U.S. at 378) ("In cases where there is a reliable video depicting the events in question, courts must not adopt a version of the facts that is 'blatantly contradicted' by the video footage.").

The County Defendants' third objection is related to Officers Ingersoll and Weaver's use of force. They point to the R&R's statement that "Ingersoll and Weaver had their arms and hands *near* Decedent's neck" and claim that it was therefore error for the R&R to conclude that "Ingersoll and Weaver placed their forearm and hand/weight, respectively, *on* Decedent's neck for one minute."[81] I overrule this objection. The word "near" signals the approximate location of Ingersoll and Weaver's arms and hands and that description is readily confirmed by the video footage. To the extent that the County Defendants are arguing that being "near" Riley's neck and back means "not making contact with" Riley neck and back, they are playing a semantic game rather than making a substantive objection. This interpretation would be erroneous because it is clearly contradicted by the video footage.[82]

The final objection relates to whether Riley sustained any injuries from these uses of force—Ingersoll's knee, Mendenhall's use of OC spray, and Ingersoll and Weaver's forearms and hands. The R&R states that "the extent to which Riley was injured . . . is not developed by the parties" and concludes that Riley may have sustained some injuries because despite the lack of visible marks on Riley, "not every bruise and physical symptom of an injury appear immediately, and it does not appear from the

---

[81]   Dauphin Objections BIS, Doc. 254 at 6-7.

[82]   *See* 2:25-3:22; *Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

record that any medical care providers were able to perform a thorough exam on Riley in the days following this incident to identify any further injuries."[83]

The evidence County Defendants claim to muster showing that Riley sustained no injuries is unpersuasive,[84] but because it is not met with any responsive countervailing evidence, I must nevertheless sustain the objection. "At the summary judgment stage, the absence of evidence on an issue redounds to the detriment of the party who bears the burden of proof on that issue."[85] As the party with the burden of proof to show a use of excessive force at trial, Plaintiffs had to "do more than point to a dearth of evidence," and were required to "adduce definite, competent evidence showing that" an injury was sustained.[86] Nor does the Court see any non-speculative evidence of lasting injury in the record which is sufficient to create a genuine dispute of fact on this issue. The circumstantial evidence of the uses of force themselves, as shown by the videos, does not show any visible injuries in the immediate aftermath of these uses of force and cannot support the inference of an injury absent speculation or

---

[83] R&R, Doc. 247 at 82-83; 86-87; 90-91.

[84] County Defendants' Objections to the R&R, Doc. 254 at 6; 7-8; 9. County Defendants first cite to the fact that Nurse Talley saw Riley when flushing his eyes of the OC spray, but she was in and out of Riley's cell in less than thirty seconds and never inspected him for bruises or other injuries, nor would this eliminate the possibility of non-visible injuries such as damage to Riley's windpipe. Exhibit Y, Doc. 194 at 2:30-2:53; *see also Gravette Expert Report*, Doc. 195-1 at 6 ("Talley was only bent over in Riley's direction for six seconds. I have been involved in more inmate medical assessments than I can remember and a six second assessment is not acceptable."). And while Riley was visited by medical professionals on June 18, 19, 20, 21, and 24, these visits occurred "cell side" and so the physicians did not thoroughly inspect Riley for injuries. R&R, Doc. 247 at 38-44.

[85] *Perez v. Lorraine Enters., Inc.*, 769 F.3d 23, 30 (1st Cir. 2014) (citing *McCarthy v. N.W. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

[86] *Id.* at 30.

23

page

an expert opinion—lacking here—explaining why or how a lasting injury would be likely to develop.[87] Though the coroner's report does list various bruises, contusions, and hemorrhages, the Court is ill-equipped to assess such medical reports in the absence of an expert opinion, and the distance of time between Riley's autopsy as well as the number of additional incidents involving force makes any tie between these acts and Riley's injuries speculative.[88] So the Court cannot assume that any injury resulted from these uses of force in analyzing the excessive force claims.[89]

I turn now to legal analysis of the excessive force claims here. First, Plaintiffs' excessive force claims based upon Riley's removal from the police car are rightly dismissed; the complaint's allegations that Officers Haines, Mendenhall, Weaver, Bauer, Grieb, and Ingersoll unnecessarily beat Riley about the head, shoulders and torso when removing him are completely contradicted by the video footage and there is no record evidence in support of them. The R&R was correct to grant summary judgment, then, on Counts III and IV of the complaint as to all defendants.[90]

Next, I agree that the use of force in taking Riley to the floor and holding him there while applying shackles and removing his belt and shoes was reasonable. Courts

---

[87]  *See Robertson v. Allied Signal, Inc.*, 914 F.3d 360, 382 n.12 (3d Cir. 1990) ("inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment").

[88]  Doc. 125-22, Dauphin County Coroner's Report, at 3-6. The Court is not even suggesting that these bruises, contusions and hemorrhages are all the result of excessive force; at least some are likely self-inflicted or the result of medical procedures such as intubation.

[89]  I hasten to add, however, that this only reflects the Court's analysis of the summary judgment record—the trial may develop differently.

[90]  *See* R&R, Doc. 247 at 114-117.

must "account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'"[91] By going limp during his transport into the Booking Center, not following officers' verbal commands, and attempting to climb onto a bench, Riley exhibited a pattern of passive resistance, either because he did not want to comply, or could not.

This noncompliance justified the application of shackles to ensure that no threat would be posed if Riley tried to escalate his resistance while being escorted to his cell. Although improperly undertaken handcuffing or shackling may be the basis for an excessive force claim, generally the application of such restraints satisfies legitimate police and safety concerns.[92] It was also eminently reasonable for officers to conclude that Riley would not comply with the removal of his belt and shoes. To accomplish these legitimate aims when posed with a pretrial detainee who is nonresponsive to verbal commands and continually resisting, even in a nonviolent manner, taking him to the ground and holding him in a prone position is reasonable.[93]

---

[91] *Kingsley*, 576 U.S. at 397 (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)).

[92] *See, e.g.*, *Rosenberg v. Homoki*, Civil Action No. 06-3719, 2009 U.S. Dist. LEXIS 31626, at *35-36 (E.D. Pa. Apr. 9, 2009); *Hernandez-Tirado v. Lowe*, No. 3:14-CV-1897, 2019 WL 367168, at *9 (M.D. Pa. Jan. 30, 2019) (applying shackles to pretrial detainee not excessive force).

[93] *See, e.g.*, *Estate of Phillips v. City of Milwaukee*, 123 F.3d 568, 593 (7th Cir. 1997) (holding in the Fourth Amendment context that "[r]estraining a person in a prone position is not, in and of itself, excessive force when the person restrained is resisting arrest."); *Bornstad v. Honey Brook Twp.*, 211 F.App'x 118, 124-24 (3d Cir. 2007).

Although Plaintiffs argue that officers should have attempted to deescalate because Riley was experiencing a mental health crisis, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[94] Faced with the need for such "split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—"[95] Riley's mental health crisis could even be perceived as creating a need to apply the restraints in the first place, since they demonstrate his inability to comply with commands and therefore the potential danger he posed to himself or others.[96] Absent excessive force, any related failure to intervene claims also fail.

Next, the R&R was correct to conclude that Officer Ingersoll's placement of his knee on Riley's neck and back for almost one minute was an excessive use of force. While the lack of evidence suggesting that Riley suffered lasting injuries weighs in Ingersoll's favor, this alone does not defeat Riley's excessive force claim.[97] Courts must "decide excessive force claims based on the nature of the force rather than the extent of the injury;" "injury and force, however, are only imperfectly correlated, and it is the

---

[94]  *Estate of Smith v. Marasco*, 318 F.3d 497, 515 (3d Cir. 2003) (quoting *Graham v. O'Connor*, 490 U.S. 386, 396-97 (1989)).

[95]  *Id.*

[96]  *See, e.g.*, *Doby v. DeCrescenzo*, 171 F.3d 858, 874-75 (3d Cir. 1999)

[97]  *See Aruanno v. Maurice*, 790 F.App'x 431, 434 (3d Cir. 2019) (Explaining that "the lack of any significant injury weighs against [a pretrial detainee's] claim, but it is not dispositive," and elaborating that "*Wilkins* is a case involving a convicted prisoner. A non-convicted detainee need only show that the 'use of force was unreasonable in light of the facts and circumstances at the time.'").

latter that ultimately counts."[98] In contrast to the brief and lawful placement of an officer's knee on a suspect's back,[99] courts have broadly recognized that placing one's bodyweight on a prone person for a prolonged period of time is a severe use of force causing significant pain, restricting the ability to breathe, and creating a risk of asphyxiation.[100] The video footage demonstrates that Ingersoll is much larger than Riley and permits an inference that he leaned on Riley's neck with his bodyweight, to a sufficient extent that it restricted Riley's ability to breathe, for a full minute. While this use of force may be justified to a certain extent where a defendant is continuously resisting and has not been subdued yet, that is not the case where he is lying still.[101]

---

[98] *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010). *See also Smith v. Mensinger*, 293 F.3d 641, 649 (3d Cir. 2002) ("[*D*]*e minimis* injuries do not necessarily establish *de minimis* force.").

[99] *See, e.g.*, *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 7 (2021) (determining that there was no clearly established use of excessive force under Supreme Court and Ninth Circuit precedent where an officer placed his knee on defendant's lower back in the process of retrieving a knife for "no more than eight seconds" while he was prone, restrained and not resisting); *Capps v. Dixon*, Civil Nos. 19-12002 & 20-01118, 2024 WL 340842, at *16 (D.N.J. Jan. 30, 2024) (finding that no reasonable jury could find an excessive use of force where, even if an officer momentarily placed his knee on plaintiff's back, it was for less than sixteen seconds while she was actively resisting and he was handcuffing her).

[100] *See Lombardo v. City of St. Louis*, 594 U.S. 464, 467-68 (2021) (per curiam) (summarily reversing and remanding a grant of summary judgment in an excessive force case based on officers placing pressure on a prone subject's back); *Rivas v. Passaic*, 365 F.3d 181, 200 (3d Cir. 2004) (excessive force claim stated where officers placed their bodyweight onto a prone suspect's back with secured hands and ankles until he fell unconscious); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903-904 (6th Cir. 2004) ("Creating asphyxiating conditions by putting substantial or significant pressure, such as body weight, on the back of an incapacitated and bound suspect constitutes objectively unreasonable excessive force."); *Bornstad*, 211 F.App'x at 123-24 (although finding it to not be excessive under the unique circumstances of the case, characterizing the force of an officer placing his bodyweight on a prone suspect's neck or back as "severe force").

[101] *Bornstad*, 211 F.App'x at 124-25.

Despite Riley's prior passive resistance, a reasonable factfinder could conclude from this record that Riley's resistance had been quelled because he was lying still for the eighteen seconds before Officer Ingersoll placed his knee on Riley's neck. The severity of the security problem at issue and the threat to be reasonably perceived from Riley also weigh against escalating the use of force. Because Riley had ceased moving, was prone on the floor, was handcuffed and shackled, and was surrounded and held down by four officers, he posed no threat and had little ability to attack officers or attempt to flee. The only things that changed after Riley was taken to the ground *decreased* the need for force. Considering the overall relationship between the amount of force used and the need for the use of force, then, Ingersoll's severe use of force against a quelled, passive, subdued, prone pretrial detainee appears unrelated from the need for force at all. On these facts "a jury could find that there was no penological need for *any* additional force," making Ingersoll's placement of his knee on his Riley's neck "wholly gratuitous and objectively unreasonable."[102] It was excessive.

All this analysis obtains for Officers Ingersoll and Weaver's subsequent extended placement of their bodyweight on Riley's neck and back, which also occurred for around one minute. The distinguishing feature at this moment is Riley's resistance. But it would be a mistake to analyze resistance as a binary and simply conclude *that* Riley was resisting without analyzing *how* he was resisting, as this approach "would contravene the careful, context-specific analysis required by this Court's excessive

---

[102] *Jacobs*, 8 F.4th at 195-96.

force precedent."[103] Given that excessive force had just been deployed against Riley by placing a knee on his neck for a full minute, Riley's minimal nonviolent struggles could well have been the result of panic, pain, or an attempt to breathe.[104] Even if not, the minimal, nonviolent form of resistance of contorting his body to pull away from officers was not threatening because of how thoroughly Riley was subdued and restrained and accordingly this did not justify the use of force.[105] And it certainly could not justify the continued use of force for a full minute after Riley had also been OC sprayed to gain compliance. No evidence in the record indicates that the force already being deployed—holding Riley down while he was shackled and handcuffed—was insufficient to accomplish the officers' purposes. So the significance of Riley's resistance was minimal and the deployment of this force in response was so disproportionate as to be gratuitous. This was also excessive.

---

[103] *Lombardo*, 594 U.S. at 468 (summarily reversing and remanding, in an excessive force case involving officers kneeling on the neck and back of a prone, handcuffed and leg-shackled defendant for an extended period of time, because the opinion of the United States Court of Appeals for the Eighth Circuit "could be read to treat Gilbert's 'ongoing resistance' as controlling as a matter of law,' which 'would contravene the careful, context-specific analysis required by this Court'").

[104] *Id.* at 467 ("the struggles of a prone suspect may be due to oxygen deficiency, rather than a desire to disobey officers' commands. Such evidence, when considered alongside the duration of the restraint and the fact that Gilbert was handcuffed and leg shackled at the time, may be pertinent to the relationship between the need for the use of force and the amount of force used, the security problem at issue, and the threat—to both Gilbert and others—reasonably perceived by the officers").

[105] *See Shultz v. Carlisle Police Dep't*, 706 F.Supp. 2d 613, 621 (M.D. Pa. 2010) ("While plaintiff certainly appears to have resisted defendants' attempts to place him on the gurney, a jury could also conclude that the tape demonstrates that plaintiff was not a danger to anyone and did not pose a threat to the police officers' safety.").

Much of the same analysis applies for Lieutenant Mendenhall's use of OC spray: the severity of the security problem at issue and the threat reasonably perceived by the officer were minimal because Riley was restrained by handcuffs and shackles and held down by four officers. And the limited nature of Riley's resistance means this factor only slightly favors Mendenhall. However, because Mendenhall deployed the OC spray in one quick burst rather than continuing to deploy it, this effort to limit the amount of force also weighs in his favor, as does the lack of evidence showing that Riley sustained any lasting injuries.

Turning to the amount of force used, chemical irritants like OC spray have "a variety of incapacitating and painful effects, and, as such, their use constitutes a significant use of force" not to be "used lightly or gratuitously;"[106] the Third Circuit has therefore found the use of OC spray against compliant pretrial detainees to constitute excessive force even in the absence of permanent injury.[107] At the same time, such chemical irritants are "a very reasonable alternative to escalating a physical struggle

---

[106] *Tracy v. Freshwater*, 623 F.3d 90, 98 (2d Cir. 2010) (explaining that "a number of our sister circuits have made clear that [pepper spray] should not be used lightly or gratuitously against an arrestee who is complying with police commands or otherwise poses no immediate threat"); *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 961-62 (9th Cir. 2000); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902-903 (6th Cir. 2004).

[107] *See, e.g.*, *Robinson v. Danberg*, 673 F.App'x 205, 212 (3d Cir. 2016). *See also Couden v. Duffy*, 446 F.3d 483 (3d Cir. 2006) (holding that where a 14-year-old boy who entered his own home was tackled by officers, handcuffed, and sprayed with mace despite being cooperative and not resisting arrest, this was an excessive use of force); *Dean v. Jones*, 984 F.3d 295, 303 (4th Cir. 2021) ("Although we once considered the severity of an inmate's *injuries* under the objective component, the Supreme Court has clarified that what matters is the severity of the *force* employed . . . a reasonable jury could find that a blast of sustained pepper spray directly to the face constitutes something more than de minimis force . . . it is the force itself that is the focus").

with a [detainee]" because they are "generally of limited intrusiveness, and it is designed to disable a suspect without causing permanent physical injury."[108] OC spray therefore has a legitimate use as a compliance tool within the prison setting, namely where inmates pose a threat to others[109] engage in active physical resistance to their transportation around the prison, or repeatedly refuse to comply with safety-related directives.[110] Arguably, this would have made for a much closer case if Lieutenant Mendenhall had deployed his OC spray before Riley had been fully subdued and restrained. However, at the point in time where Mendenhall deployed his OC spray, officers had already gotten control over Riley and subdued him. Taking all reasonable inferences in Riley's favor, his minimal resistance did not create any need to gain immediate compliance, especially given that Riley's minimal struggles, again, may have been a response to pain or panic rather than a desire not to comply. And this use of force becomes even more unreasonable given that it occurred seconds after Officers

---

[108]  *Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002) (internal citations omitted).

[109]  *See, e.g.*, *Williams v. Russell*, Civil Action No. 20-CV-3511, 2024 U.S. Dist. LEXIS 887298, at *23-24 (E.D. Pa. May 15, 2024) (no excessive use of force when OC spray was used against pretrial detainee who aggressively confronted another inmate and then charged at the prison guard)

[110]  *See, e.g.*, *White v. Gonzales*, Civil Action No. 22-1226, 2023 U.S. Dist. LEXIS 167109, at *12-13 (E.D. Pa. Sep. 20, 2023) (concluding that, where prison inmate was actively physically resisted being moved to a new cell in a wheelchair, the use of OC spray was not excessive); *Jones v. Wetzel*, 737 F.App'x 61, 65-66 (3d Cir. 2018) (deploying pepper spray into prisoner's cell was not excessive force where prisoner failed to comply with directives to remove towel covering his cell door numerous times); *Spada v. Houghton*, No. 22-2816, 2024 U.S. App. LEXIS 28929, at *5-6 (3d Cir. Jul. 3, 2023) (concluding that the use of OC spray when pretrial detainee had smeared feces on the walls and windows of his cell and refused to be handcuffed so he could be removed from his cell was not excessive because it was used "to manage the ongoing threat posed by Spada's potential use of bodily waste as a weapon," but concluding that use of OC spray when pretrial detainee had covered his cell camera with medical cream despite multiple warnings but had returned to his bunk with his back turned was excessive).

Ingersoll and Weaver had begun placing pressure on Riley's neck and back. Because there was no need for additional force in this context, the deployment of pepper spray was excessive; there appears to be little sense in adding to what was already being done in that context.

I hasten to add that these latter two excessive force claims turn upon the summary judgment standard. I deny summary judgment because a reasonable jury could infer, on this record, that Riley's resistance was minimal, passive, and non-threatening. But a reasonable jury could also infer that Riley's resistance was substantial enough that it he was not fully subdued, necessitating the use of OC spray to gain compliance. This is a classic jury question.

Finally, as to the failure to intervene claims relating to both instances where officers placed their weight on Riley's neck or upper back, I note that both uses of force lasted approximately one minute while the other officers were right next to the defendant. A reasonable fact-finder could conclude that despite the officers' involvement in subduing Riley, this provided sufficient time and opportunity to attempt intervene in the excessive forced used by Ingersoll and Weaver, whether verbally or physically.[111] In contrast, because Mendenhall's short deployment of OC spray lasted

---

[111] *See, e.g.*, *Diaz v. Aberts*, Civil Action No. 10-5939, 2013 U.S. Dist LEXIS 14334, at *25-28 (E.D. Pa. Feb. 4, 2013) (officers present for an excessive use of force lasting approximately one minute had a realistic opportunity to intervene).

under a second, no defendant had a realistic opportunity to intervene, so any corresponding failure to intervene claim does not survive.[112]

It was also clearly established law, in 2019, that all three of these uses of force were excessive.[113] The first instance is the most obvious. The Third Circuit has held several times over that the use of gratuitous force against a subdued, physically restrained, and nonthreatening detainee—as was clearly the case here—is excessive.[114] Defendants argue that this is not a clearly established violation because they used force but "did not hit, strike, or kick Decedent."[115] However, as the preceding analysis established, placing weight on a prone detainee's neck and/or back for extended time is

---

[112] *See, e.g.*, *El*, 976 F.3d at 335 (granting summary judgment as to failure to intervene claim where use of force occurred "within a matter of roughly five seconds," which was not sufficient time for the officer to intervene even when he stood next to the victim).

[113] With the caveat, of course, that the record is construed in Riley's favor as the non-movant.

[114] *See Jacobs*, 8 F.4th at 191 ("the specific conduct here—striking a physically restrained and nonthreatening inmate—was clearly unlawful under the precedent of this court and our sister circuits"); *Anthony v. Seltzer*, 696 F.App'x 79, 82 (3d Cir. 2017) ("[U]nder long-established Fourth Amendment law, force may not legitimately be used against an individual who is compliant and poses no ongoing threat to himself or others, or who is not resisting arrest, even if he was initially non-compliant."); *Keller v. Crawford*, 465 F.Supp. 3d 472, 482 (E.D. Pa. 2020) ("Third Circuit case law repeatedly stresses that force is not to be continually applied to a compliant, non-threatening person"); *Giles v. Kearney*, 571 F.3d 318, 326 (3d Cir. 2009) ("[A]t the time of the incident in 2001, it was established that an officer may not kick or otherwise use gratuitous force against an inmate who has been subdued."); *Lockhoff v. Slonaker*, No., 2017 WL 2423790, at *11 (E.D. Pa. Jun. 5, 2017) (collecting a robust consensus of authorities and holding that it was a clearly established Fourth Amendment violation for a police officer to continue using force after subduing a detainee by tackling him); *Meyers v. Baltimore Cnty. Md.*, 713 F.3d 723, 735 (4th Cir. 2013) (concluding that officers' excessive use of force against a non-resisting plaintiff who was "unarmed and effectively secured with several officers sitting on his back" was clearly established). *See also Sledge v. Martin*, No. 1:21-CV-00348-RAL, 2023 U.S. Dist. LEXIS 37285 (W.D. Pa. Mar. 2, 2023) (Lanzillo, M.J.) (collecting cases and holding that in January 2020, "a robust consensus of persuasive precedent existed to place [defendant] on notice that deploying OC spray on a physically contained inmate who was complying with instructions and posing no threat to the officer was unlawful").

[115] Dauphin MSJ BIS, Doc. 174 at 42.

a similarly severe use of force. This too is well established, even in this very specific factual context. District Court decisions within this Circuit have overwhelmingly agreed with the holding, stated by the United States Court of Appeals for the Sixth Circuit, that it is "clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitute[s] excessive force."[116]

Defendants point to Riley's resistance to distinguish the latter two uses of force.[117] However, because Riley's resistance was so minimal and nonthreatening, the accepted principle of law described above is sufficient to rebut qualified immunity as to the remaining two uses of excessive force, namely because nonviolently flailing does

---

[116] *Champion*, 380 F.3d at 903 (holding, in 2004, that "it [is] also clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constituted excessive force."); *Rivas*, 365 F.3d at 200 (holding in 2004 that a still, prone, handcuffed and shackled person was subjected to excessive force when officers applied pressure to his back until he fell unconscious); *Bornstad*, 211 F.App'x at 124 (characterizing this as "severe force"); *Keller*, 465 F.Supp. 3d at 481 (finding that "it was clearly established that once an individual is subdued and not resisting, that individual no longer poses a sufficient threat to warrant the continued application of force, specifically the force of an officer pressing their body weight through the force of their knee into the back of a handcuffed person lying face down on the pavement"); *McCue v. City of Bangor*, 838 F.3d 55, 64 (1st Cir. 2016) ("[I]t was clearly established in September 2012 that exerting significant, continued force on a person's back while that person is in a face-down position after being subdued and/or incapacitated constituted excessive force"); *LaLonde v. Cnty. of Riverside*, 204 F.3d 947 (9th Cir. 2000) (holding that officer placing his knee in defendant's back or shoulder blade while he was prone and being handcuffed, "if the extent of the injury to LaLonde's back is serious enough," could be excessive force "even if LaLonde had been resisting at the time."); *Carroll v. Ellington*, 800 F.3d 154, 176-77 (5th Cir. 2015) (delivering continued force of "side strikes" to handcuffed, non-resisting, prone defendant who was being restrained by four officers was a clearly established excessive use of force).

[117] Dauphin MSJ BIS, Doc. 174 at 42.

nothing to make a handcuffed and shackled inmate who is being held down by four officers any more threatening.

Moreover, a robust consensus of authorities decided within the Fourth Amendment arrestee context[118] have held that it is "clearly established that the disproportionate use of force against an individual who does not pose a credible threat and who engages in merely passive resistance violates the Fourth Amendment."[119] Case law in this context also firmly establishes that where officers have fully restrained a prone individual who is engaging in the minimal resistance of contorting his body or flailing about, using a taser, kneeling on his back for an extended period of time, or deploying OC spray, are gratuitous, disproportionate, and excessive uses of force.[120]

---

[118] "As *Kingsley* demonstrates, courts applying the objective standard in the Fourteenth Amendment context may find useful guidance in Fourth Amendment excessive-force cases. *See Kingsley*, 576 U.S. at 397-400. Although the factual scenarios in the two contexts may differ, the Fourteenth Amendment standard is now almost identical to the Fourth Amendment standard." *Jacobs*, 8 F.4th at 195 n.6. The most relevant aspect in which the factual scenarios differ is the heightened need for compliance and security, but this aspect does not make the difference in the context at bar, when (1) the pretrial detainee has already been subdued and (2) the confrontation takes place in a booking center and so less forcibly creates the risk of prison security concerns, such as a prisoner riot of resistance is not quelled quickly.

[119] *Capps v. Dixon*, Civil Nos. 19-12002 & 20-01118, 2024 WL 340842, at *15 (D.N.J. Jan. 30, 2024) (applying this principle to an officer's "takedown maneuver" when, after an officer attempted to handcuff plaintiffs, they took one step away); *El*, 975 F.3d at 339 (an unarmed individual who is not suspected of a serious crime—including one who is verbally uncooperative or passively resists the police—has the right not to be subjected to physical force such as being grabbed, dragged, or taken down); *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013) ("The right to be free from the application of non-trivial force for engaging in mere passive resistance was clearly established prior to 2008.").

[120] *Anthony*, 696 F.App'x at 82 (continuing to tase plaintiff experiencing a seizure after he had been subdued, placed in handcuffs, strapped to a gurney, and loaded into an ambulance was a clearly established excessive use of force); *Rivas*, 365 F.3d at 200 (kneeling on back of a man experiencing a seizure when he was handcuffed, his feet were bound, and he was carried from his apartment on a stretcher was a clearly established excessive use of force because due to being subdued, he "did not present a threat to anyone's safety"); *Perea v. Baca*, 817 F.3d 1198, 1203-1205 (10th Cir. 2016) (repeatedly tasing a mentally ill defendant who was resisting arrest

Accordingly, as to Plaintiffs' excessive use of force claim, summary judgment is denied against Defendants Ingersoll, Weaver, and Mendenhall and granted against Defendants Grieb and Bauer. As to Plaintiffs' failure to intervene claim, summary judgment is granted as to Defendant Ingersoll and denied as to Defendants Weaver, Mendenhall, Grieb, and Bauer.

### b. Excessive Force: Placing Riley in Restraint Belt on June 18

Plaintiffs bring an Excessive Force claim against County Defendants Adams, Blouch, Glenn, Myers, and Armermann for the force used when placing Riley in a restraint belt on June 18, 2019. I will first briefly resolve the County Defendants' objections the R&R's resolution of relevant facts to this claim. I will also clarify several critical facts not relied upon in the R&R's analysis. I then reevaluate it de novo.[121]

---

by thrashing about and swinging a crucifix, even after he was pushed to the ground and held down by officers with his arms under his body, was a clearly established use of excessive force); *Landis v. Baker*, 297 F.App'x 453, 465 (6th Cir. 2008) (concluding that applying pressure to keep a defendant face-down in nearly two feet of water and mud where defendant's "only act of resistance was to refuse to give his arms up to the officers, when his arms were apparently the only things holding his face out of the water," was a clearly established excessive use of force); *Danley v. Allen*, 540 F.3d 1298, 1309 (11th Cir. 2008) (Holding, in case involving pepper spray used against pretrial detainee, that "[w]hen jailers continue to use substantial force against a prisoner who has stopped resisting—whether because he has decided to become compliant, he has been subdued, or he is otherwise incapacitated—that use of force is excessive."); *Champion*, 380 F.3d at 900-903 (where agitated plaintiff with severe autism who continued to squirm and move around until handcuffs and leg restraints were applied was subjected to the uses of force of being pepper sprayed in the eyes while officers placed weight on his back, both instances constituted a clearly established excessive use of force in 1999).

[121] Among other issues, the R&R does not explain with particularity which distinct uses of force it is analyzing when officers place Riley in the restraint belt, or even refer to some relevant uses of force at all; it is not clear which uses of force are being discussed in which sections of the R&R's analysis because it never discusses the use of force, itself, as a relevant factor in its *Kingsley* analysis.

The County Defendants' first factual objection relates to whether Riley was banging on his cell door or window. The R&R acknowledges, and I agree, that the video footage clearly displays Riley slipping his handcuffs to the front of his body, walking to the door of his cell, and bringing his hands up to his chest and raising his arms above his head.[122] Yet the R&R concludes that there is a genuine dispute of fact on this issue, and thus construes it in Riley's favor, because from the vantage point of cell's surveillance camera Riley is visible but his hands are not.[123] This is clear error.

All involved officers—Lieutenant Armermann and Sergeants Adams and Blouch, and Officers Glenn, and Myers—state, either in incident reports, interviews, or both, that Riley was banging on his cell window at this time.[124] Given that Riley visibly slipped his handcuffs in front of his body and raised his hands and arms over his head at this time while standing in front of the window of his cell door, the video footage

---

[122] R&R, Doc. 247 at 95-96.

[123] *Id.* at 96 ("However, the cell door and window are not in view of the camera. Instead, the cell door is outset so that it can slide open on the officer side of the wall. This means that one can see down to where the wall meets the doorframe, but the actual door itself is not in view. Thus, while it is true that Ty'rique does go and stand close to the door, all that is visible is his back. Like Plaintiffs assert, the video footage does not show Ty'rique banging the handcuffs on the cell door or window, calling into question County Defendants' assertion that Ty'rique was banging.").

[124] DCP Extraordinary Occurrence Reports, Doc. 175-9 at 8-10 (Armermann stating that Riley "began hitting the restraints on the glass window of his cell"), 11 (Blouch stating that Riley "began to bang on the cell window"), 12 (Adams stating in a report that Riley "began to hit the glass"), 15 (Myers stating that Riley "started to bang on his window"); Dauphin County CID Transcribed Statements, Doc. 175-10 at 17:205-212 (Blouch explaining that Riley was "standing at the cell door with his handcuffs in front of him kind of tapping on the window with his fists"), 30:248-49 (Adams explaining that Riley was "hitting the glass cell door with the cuffs"), 43:66-67 (Armermann explaining that Riley was "hitting the cell window with [his] handcuffs"), 72:194-97 (Myers explaining that Riley "started banging on the door—glass"), 90-91:178-182 (Glenn explaining that Riley "was hitting the glass of the cell door with the cuffs").

does not create a genuine dispute with these officers' testimony simply because it did not capture Riley's arms and hands.[125] Non-probative evidence definitionally cannot create a genuine dispute of fact in the face of probative evidence.[126] It was error for the Magistrate Judge to discount the uncontroverted testimony of all five officers present at the scene where the video footage was inconclusive on this question.

The second factual objection relates to Riley's injuries after officers entered his cell and placed him in a restraint belt. The R&R observes that Riley was immediately examined by medical staff after this incident and was only found to have one documented injury, an abrasion to his wrist likely caused by Riley's manipulation of the handcuffs.[127] Yet the R&R nevertheless repeats verbatim its prior analysis of injury, stating that:

> [W]hile the severity of an injury may be useful in determining whether a use of force was excessive by fiving a visible injury to indicate a use of force hard enough to leave a mark, not every bruise and physical symptom of an injury declares itself immediately, and it does not appear from the record that any medical care providers were able to perform a thorough

---

[125] Though not relied upon in the R&R, Plaintiffs' sole evidence in support of their position is the unexplained conclusion of their expert that "I watched the video footage and Riley did not appear to be hitting on the cell door glass." Gravette Expert Report, Doc. 197-1 at 7. The video footage completely contradicts this interpretation—and no reasonable finder of fact could conclude otherwise. If anything, the video footage provides circumstantial *support* for the proposition that Riley was banging on his cell window. At best it can be argued that, despite Riley standing with his hands raised over his head right in front of the cell window, the footage does not speak to whether he was banging on the door due to not capturing his hands or arms. But the footage cannot be construed to *rule out the possibility* that Riley was banging on the window since it does not show the window, door, or Riley's arms or hands while he is standing in this position.

[126] *See West v. Lincoln Benefit Life Co.*, 509 F.3d 160, 172 (3d Cir. 2007) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) and *El v. Southeastern Pa. Transp. Auth.*, 479 D.3d 232, 238 (3d Cir. 2007)) ("Evidence that is merely colorable or not significantly probative is insufficient to create a genuine issue of material fact for trial.").

[127] R&R, Doc. 247 at 97.

exam on Ty'rique in the days following this incident to identify any further injuries.[128]

Although this language is opaque, the R&R appears to imply that this record does not rule out the possibility that officers injured Riley in this encounter. So the County Defendants object that the R&R discounts the examination conducted after officers applied the restraint belt to Riley.

Construed in Riley's favor, the record permits a fair inference that the abrasions to Riley's wrists were the result of officers' use of force and movement and control of Riley's wrists while restraining him and attaching the restraint belt. It is equally plausible that these abrasions are self-inflicted because Riley had just contorted his body to reposition the handcuffs and struggled throughout the encounter. However, because the immediately subsequent medical examination (as well as the officers' reports) noted a recent injury which can result from officers using force to subdue or contort a handcuffed individual's wrists—as demonstrated in the video footage—this issue will be resolved in Riley's favor. But to the extent the R&R presumed that these uses of force could have resulted in unseen injuries or bruising, the objections are sustained for the reasons stated when analyzing the prior excessive force claim: there is simply no non-speculative evidence supporting this contention.

Additionally and because I may review the R&R *de novo* in the exercise of my discretion, I clarify two factual errors not explicitly raised in the County Defendants'

---

[128] *Id.* at 97.

briefing.[129] As to Riley's resistance, the R&R concludes that "the surveillance video footage leaves open the question whether, and if so, to what extent, Ty'rique was resisting" because the officers' "bodies quickly obscure Ty'rique from view."[130] It observes that the footage "reveals little about the source of the movements" on the bench visible in the footage and so concludes that "[r]easonable minds may disagree whether that movement was due to Ty'rique resisting, due to the Officers manipulating his body to get the belt around his waist and secured, and reasonable minds may disagree whether the bigger movements were caused by the Officers' manipulation of Ty'rique's body to get the belt around his waist and secured or by Ty'rique resisting and momentarily overpowering the four Officers."[131] This was error.

As I observed earlier, to the extent the video footage is entirely inconclusive because officers block Riley's body—and I agree that much of it is—it cannot create an issue of fact sufficient to dispute the uncontroverted testimony of officers Armermann, Adams, Blouch, Glenn, and Myers, all of whom stated that Riley both did not follow verbal commands and actively resisted throughout the encounter and none of whom ever asserted anything to the contrary.[132] The video footage "blatantly

---

[129]  The County Defendants' objections generally take issue with the R&R's assessment that Riley was not a threat or security concern but does not raise with specificity the issue of Riley's resistance or its vague assessment of the amount of force used in this encounter. *See* Dauphin Objections BIS, Doc. 254 at 14-15.

[130]  R&R, Doc. 247 at 97.

[131]  *Id.* at 98.

[132]  Dauphin County CID Transcribed Statements, Doc. 175-10 at 17:216-217 (Blouch explaining that "[h]e was pulling away, he was falling to the floor, he was trying to prevent us from putting the belt around him by struggling and twisting and turning"), 31:287-90 (Adams explaining that placing Riley in restraint belt "took some time" because "he was struggling with us and

contradicts" the narrative that Ty'rique is passive, compliant, and nonresistant.[133] The "larger movements" referenced by the R&R clearly show officers shifting back and forth along the cell bench as they visibly struggle to gain control of Riley to fit him in the restraint belt, and at the rare points in this struggle where Riley is visible, he is visibly shifting away from officers.[134] There is no other plausible explanation for why officers uninvolved in applying the restraint belt to Riley would be visibly struggling and shifting continuously along the bench in the attempt to subdue Riley while Riley is also visibly shifting of his own accord. And, unlike the prior instances in which Riley was resisting, here the footage shows that Riley was sitting rather than prone and so less fully subdued by the officers, meaning that he could create, and evidently was creating, more forcible resistance.

Finally, one fact the R&R never discusses in its excessive use of force analysis is the use of force itself. Its only word on this point is that "there are genuine disputes of material facts respecting . . . the amount of force used."[135] This is insufficiently specific to assess the excessive force claims because Plaintiffs frame two allegedly

---

we were trying to not really use any force against him"), 44:110-131 (Armermann explaining that "he was resistant to our actions and would not listen to verbal orders . . . . He kicked at one of the officers and knocked her glasses off"), 72:201-203 (Myers explaining that "he was not allowing us to take his cuffs from the back of him and put him into the restraint belt"), 90-91:186-190, 214-216 (Glenn explaining that "about part way through he started to fight with us, um, and I held his legs so he couldn't kick because he was kicking his legs . . . and then he started wiggling, trying to get off of the bench").

[133] *Jacobs*, 8 F.4th at 192 (quoting *Scott*, 550 U.S. at 380) ("In cases where there is a reliable video depicting the events in question, courts must not adopt a version of the facts that is 'blatantly contradicted' by the video footage.").

[134] Doc. 177-14 at 28:36-31:37.

[135] R&R, Doc. 247 at 98.

excessive uses of force in their briefings: (1) Riley being "thrown against the wall [and] on the bench;" and (2) Riley being held in place for the duration of this encounter.[136] The R&R's statement of facts, however, accurately observes that the video footage shows "an Officer entering and immediately grabbing Ty'rique to *guide* him to sit on the bench in the cell."[137] I agree with the R&R's assessment of the footage—it clearly shows that the officer firmly guides Riley to the bench, and it conclusively demonstrates that Riley's head did not hit the wall when he was placed on the bench, such that no reasonable juror could believe that Riley was thrown against the wall and onto the bench as characterized in Plaintiffs' briefings.[138]

As to the force exerted thereafter, the R&R merely states that the officers "surround Ty'rique as he sits on the bench" and "struggle at times."[139] I agree with this assessment of the record evidence, though I will add to it to clarify the ensuing analysis. The uncontroverted evidence record shows that officers used physical force to hold Riley in place on the bench in his holding cell for approximately three minutes while outfitting him in the restraint belt, without punching, hitting, or kicking him.[140]

---

[136] Dauphin MSJ BIO, Doc. 192 at 16. Plaintiffs never explicitly challenge the need to apply the restraint belt itself, which is also a use of force. If they intended to, I find that using the restraint belt was eminently reasonable in light of the threat Riley posed to himself at this time.

[137] *Id.* at 25 (emphasis added).

[138] *Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

[139] R&R, Doc. 247 at 25.

[140] Doc. 177-14 at 28:36-31:37. Dauphin SUMF, Doc. 175 ¶56; Dauphin County CID Transcribed Statements, Doc. 175-10 at 18:234-238 (Blouch stating that no one punched, kicked, struck, choked, or pinned Riley against any object or the wall or ground for an extended time during

After clarifying the record, disposing of these excessive force claims is straightforward. Placing Riley on the bench and holding him there for three minutes while applying the restraint belt are easily justifiable based on the *Kingsley* factors. No one disputes that placing Riley in the restraint belt was a justifiable and non-punitive measure designed to protect the safety of Riley and others. Riley posed a significant security threat, and threat of injury to himself, by banging on the glass window of his cell door in the context of a mental health crisis, as he could have injured himself or others by shattering the glass or creating further handcuff abrasions on his wrists. Because he was physically struggling in a non-prone sitting position—and was able to raise his hands above his head due to manipulating his handcuffs—Riley's flails also posed a threat to officers if he was not held in place.

As to placing Riley on the bench, Riley appears to have suffered no pain or injury at all; "[a]n inmate who complaints of a push or shove that causes no discernible injury almost certainly fails to state a valid excessive force claim."[141] Being held in place only rose minimally beyond that, even if Riley suffered minor wrist abrasions during the struggle to keep him subdued. Officers' attempts to temper their use of force is also a significant mitigating factor; aside from attempting to issue verbal commands before physically intervening, officers continued to hold Riley in place over several minutes

---

this encounter), 31:287-315 (Adams), 45:174-46:196 (Armermann), 74:272-295 (Myers), 94:318-339 (Glenn).

[141] *Wilkins*, 559 U.S. at 38 (2010) (internal quotations omitted). Although this language arose in the Eighth Amendment context, it remains instructive in the Fourteenth Amendment context despite the fact that the Fourteenth Amendment confers a higher degree of protections.

while wrangling him into the belt, despite the visible strain of doing so, rather than escalating their use of force. They did not push Riley into a prone position on the floor, they did not hit or strike him, and they did not deploy OC spray. Considering this analysis, the relationship between the need for force and amount of force is particularly stark.

The officers' use of force here was quite minimal, and it was reasonably calculated to accomplish the legitimate aim of abating the threat Riley posed when he was banging on his cell window. Accordingly, I reject the Magistrate Judge's recommendation that summary judgment be denied as to these excessive force claims. Summary judgment is therefore granted in favor of Adams, Blouch, Glenn, Myers, and Armermann as to Plaintiffs' excessive force and failure to intervene claims.

### c.    Excessive Force: Transporting Riley on June 26

Plaintiffs bring excessive force and failure to intervene claims against County Defendants Danner, Hoffman, Klahr, Lewis, Biter and Singleton for the attempt to transport Riley which ultimately resulted in his death. They solely bring a failure to intervene claim against Defendant Swanson. As before, I shall resolve the pending objections to the R&R's assessment of the factual record and then determine which excessive force claims survive.[142] Additionally, in several instances the R&R described the parties' factual contentions, never resolved whether a genuine dispute existed, and

---

[142] Among other issues, the R&R does not explain with particularity which distinct uses of force it is analyzing during officers' attempt to transport Riley, or even refer to some relevant uses of force at all.

never mentions such facts in its analysis. Where such disputes are material I will resolve them.

The first objections relate to the R&R's assessment of the record before Riley leaves his cell. After the decision to transport Riley to an area hospital was made, Danner, Singleton and Donovan went to Riley's cell to change him from his suicide smock into a DCP uniform.[143] Riley stared back at the officers without immediately taking his suicide smock off and, after officers assisted him in doing that, without taking the uniform or heeding verbal commands to do so; the R&R notes without resolving that the parties disagree whether Riley was refusing to comply or was not mentally capable of comprehending the instruction at this time.[144] I find Plaintiffs' mental incompetency argument to be a reasonable inference, which I will construe in their favor as the nonmovants, based on this record.[145]

Less than a minute later and after two additional officers arrive at Riley's cell, the R&R notes, "[t]he parties dispute whether Ty'rique grabbed Danner's wrist and arm or reached to grab the uniform."[146] Later, the R&R highlights this dispute over whether Riley grabbed Danner's wrist and concludes generally that "the video footage leaves open the question whether, and if so, to what extent, Ty'rique was resisting,"[147] even

---

[143] R&R, Doc. 247 at 49.

[144] *Id.*

[145] *See* R&R at 33-48 (describing Riley's continuously worsening mental health decline leading up to this incident).

[146] R&R, Doc. 247 at 50.

[147] *Id.* at 100.

though "there is no surveillance video showing the interior of Ty'rique's cell."[148] But there is no genuine dispute here, so the R&R's determination was error. Though ensconced within a lengthy denial claiming that Riley was attempting to reach for the uniform, Plaintiffs nevertheless admit that "Ty'rique instead grabbed his arm and wrist" based on Danner's testimony.[149] Singleton and Danner's statements also state that Riley grabbed Danner's wrist.[150] Nothing in the record creates a dispute of fact here.

Officers then attempt to fit Riley into a uniform, and in this context the R&R notes the parties' dispute as to whether Riley was resisting and kicking but ultimately concludes that "the video footage leaves open the question whether, and if so, to what extent, Ty'rique was resisting."[151] This was error. There *was* no video showing these

---

[148] *Id.* at 48.

[149] Plaintiffs' Response to Danner and Swanson's SUMF, Doc. 191 ¶32:92-94 Plaintiffs' Response to Dauphin County Defendants' SUMF, Doc. 194 ¶149. Plaintiffs attempt to qualify this admission by stating that Riley was attempting to grab the uniform and inadvertently grabbed Danner's arm and wrist. Regardless of whether this inference is reasonable on the record, Riley's subjective intent is not a material issue in this context. Whether force against a pretrial detainee is excessive under the Fourteenth Amendment is based upon an objective standard, and thus any intent to grab the uniform rather than Danner's arm or wrist is only relevant to the extent that some fact objectively manifested that intent to Danner. *Kingsley*, 576 U.S. at 397 ("A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time.").

[150] *See* Dauphin County CID Transcribed Statements, Doc. 175-10 at 61:272-298 (Singleton stating that Riley "fought" and "resisted" attempts to place a shirt on him), 83:163-172 (Hoffman stating that Riley was "struggling" and "resisting" officers' attempts to place a shirt on him; "he was doin' everything he could not to get that shirt on. He was not gonna put that uniform on regardless") 108:252-56 (stating that Riley "removed the top [of the uniform] from his head with his hands" and Danner "decided it was not going to be successful to probably be able to dress Riley, so at which time we attempted to take him to the ground"); 125:89-90 (Klahr explaining that Lewis interrupted a meeting to inform him that "the gentlemen that was going to the hospital won't get dressed" and "[t]hey're having some issues with him.").

[151] R&R, Doc. 247 at 50, 100.

events.[152] Everyone said Riley was resisting.[153] And Plaintiffs' partial denials to these factual assertions, which lack any citation to countervailing evidence, are tacit admissions that Riley was not cooperating or remaining still while officers attempted to place him in uniform.[154]

Donovan left to notify a shift commander of the situation, Hoffman applied leg restraints to Riley, and Danner took him to the ground by using his foot to sweep Riley's leg out from under him.[155] Once Riley had been taken to the ground, flipped to a prone position, and secured with handcuffs in addition to shackles, the R&R continues to ultimately conclude that a reasonable person could conclude Riley was not resisting.[156] That interpretation continues to be erroneous, because of the uncontroverted statements establishing Riley's continued resistance and the lack of any countervailing evidence.[157]

---

[152] As the R&R states, the only available footage portrayed the hallway and not the inside of Riley's cell at this time.

[153] *See* Dauphin County CID Transcribed Statements, Doc. 175-10 at 3 (Lewis stating that upon approaching cell he heard Danner stating "stop grabbing my hands"), 108:245-248 (Danner stating that Riley "grabbed ahold of my arm, my wrist – my left wrist").

[154] Plaintiffs' Response to Danner and Swanson's SUMF, Doc. 191 ¶34 (offering no evidence or reply to controvert the assertion that "Ty'rique grabbed Danner's hand and began kicking and struggling"); Plaintiffs' Response to Dauphin County Defendants' SUMF, Doc. 193 ¶152 (replying to the assertion that "Decedent resisted and kicked" with "denied in part. DCP staff labeled Ty'rique as resistant to justify the increasing levels of force being used. Ty'rique was experiencing a severe mental health crisis and was unnecessarily subjected to excessive force inconsistent with the force that would be used by professionally trained reasonable correctional professionals.").

[155] Dauphin County Defendants' SUMF, Doc. 175 ¶54; Plaintiffs' Response to Dauphin County Defendants' SUMF, Doc. 193 ¶54; Danner and Swanson's SUMF, Doc. 159 ¶36; Plaintiffs' Response to Danner and Swanson's SUMF, Doc. 191 ¶36 (attempting to supplement, without denying, these facts)

[156] R&R, Doc. 247 at 51, 100-101.

[157] *See* Dauphin County CID Transcribed Statements, Doc. 175-10 at 63:368-382 (Singleton stating that Riley continued to resist after being taken to the ground), 84:214-217 (Hoffman

The R&R also states that the parties dispute whether Riley "began spitting toward Danner" or the "white foam that had gathered from cotton mouth was coming out of Ty'rique's mouth"[158] due to dehydration but never resolves this objection. There is a genuine dispute as to this issue because a medical chart from that day states Riley appeared unable to drink fluids[159] and Danner described the presence of such foam on Riley's mouth since the beginning of the encounter, which was coming out because he was blowing air hard by this point.[160] From this record, it is a reasonable inference that Riley was not intentionally spitting at officers.

Klahr then arrives and orders Riley to be placed into a restraint chair while waiting for the ambulance, a spit shield is placed on Riley's head after the restraint chair is brought outside his cell, and Riley is dragged the short distance from his cell to the restraint chair positioned in the hallway, without any officers holding his lower body, and placed in the chair.[161] Officers spend approximately one minute and fifteen seconds placing Riley into the restraint chair and securing the restraints,[162] during which the next alleged use of excessive force occurs.

With the availability of video footage, the R&R continues to find that there is a genuine issue of fact as to whether Riley is resisting after being placed in the chair. In

---

stating that Riley continued to resist) 109:287-308 (Danner stating that Riley continued to resist); 126:125-127 (Klahr stating that Riley continued to resist).

[158] R&R, Doc. 247 at 52.
[159] PrimeCare Medical Full Patient History for Ty'rique Riley, Doc. 175-19 at 2.
[160] Dauphin County CID Transcribed Statements, Doc. 175-10 at 107:191-192, 110:339-341.
[161] R&R, Doc. 247 at 52-53.
[162] R&R, Doc. 247 at 55.

support of this contention, the R&R states that despite visible "movement while Ty'rique is being secured within the chair," "the video does not show that Ty'rique is actively resisting the five Officers because he is obscured from view," and so "[r]easonable minds could differ as to whether this movement was caused by Ty'rique resisting the five Officers working to secure him in the chair or the Officers needing to move each other and Ty'rique in order to get him properly secured."[163] The R&R further acknowledges that the "video does show that at one point [Riley] raised his legs when no Officers were in front of him" but concludes that this fact is not probative of whether Riley was resisting because "[r]easonable minds could disagree as to whether the movement was caused by Ty'rique's legs coming up from the force of being placed in and secured in the chair, from his own resistance, or even from County Defendants moving his legs to be able to properly secure him."[164]

This finding is error for well-trodden reasons: the video is at best inconclusive as to Riley's resistance for most of the encounter and so the officers' uncontroverted testimony that Riley was continuing to struggle[165] governs in the absence of any contrary evidence sufficient to create a genuine dispute, which is lacking here. As the

---

[163] *Id.* at 54.

[164] *Id.* at 54, 106.

[165] *See* Dauphin County CID Transcribed Statements, Doc. 175-10 at 4:163-175 (Singleton stating that Riley was offering "dead weight resistance" after being placed in the chair and that "someone said he was kicking" at the time), 111:368-374 (Danner stating after Riley was placed in the chair he "noticed the inmate was kicking . . . arched his back using his shoulders and feet to push his hips up . . . started kicking again); 127-128:145-146, 179-186 (Klahr stating that Riley was kicking as he was placed in the chair). 23:136-172 (Biter describing Riley's resistance in detail); 65:451-457 (Singleton stating that Riley was not cooperative "at all" and was "kicking" and "contorting his body and flailing around").

49

R&R itself acknowledged, the only other probative evidence, a moment in the footage in which Riley raises his feet without any Officer standing in front of him, strengthens the argument that Riley is struggling. The only reasonable interpretation of this part of the footage is that Riley is raising his feet of his own accord and the R&R's alternative explanations are contradicted. Riley's feet raise after he is placed in the restraint chair, meaning they do not raise from the force of placing him down, and the video footage shows that no officer is touching Riley's legs.

Finally, defendants object to the R&R's conclusion that the extent or strength of resistance Riley was capable of exerting was diminished due to his weakened state. However, the R&R aptly provides record evidence supporting this reasonable inference: "earlier that morning [Nurse] Irvine had observed Ty'rique and described him as 'wobbly,' observed that he could not swallow, and felt he was in such a bad state that she asked him to be taken to medical immediately."[166] Defendants cite to countervailing testimony that Ty'rique was agitated, resistive, and bucking the wheelchair when visiting the medical department earlier that day.[167] But all this does is create an issue of fact regarding just how much Riley's weakened state impacted his ability to exert force; this is a genuine dispute of fact and is construed in Riley's favor at summary judgment.

---

[166] R&R, Doc. 247 at 108.
[167] Dauphin Objections BIS, Doc. 254 at 13.

Before moving to the use of force analysis, I frame the relevant issues. In particular, the R&R does not explain with particularity which distinct uses of force it is analyzing or even refer to some relevant uses of force at all. It is clear, however, that Plaintiffs frame four distinct uses of force throughout this encounter as excessive in their briefings, and the Court shall analyze them in turn below: (1) the force used when Danner took Riley to the ground and applied restraints; (2) the force of placing Riley in a restraint chair; (3) the force used in taking Riley to the restraint chair, namely by dragging him along the ground; and (4) the force used when Lewis applied a hypoglossal pressure point to Riley's head after he was restrained.[168]

I begin with Danner's decision to take Riley to the ground. Before this occurred, Danner and Singleton tried to limit the use of unnecessary force: they attempted to let Riley dress himself and, when he did not respond to verbal requests, to help him get dressed, before using force. The lack of evidence that Riley was injured from this use of force also weighs in his favor. And, even though Riley may not have been able to comply due to his mental condition at this time, his noncompliance and his active resistance, by physically struggling when Danner and Singleton attempted to dress him and grabbing Danner's wrist, still weighs in Danner's favor because it does not change the fact that his Riley's active resistance impeded the legitimate goal of dressing him.

Riley's active resistance also demonstrates that he would pose a security problem and create a threat to the officers if they attempted to transport or dress him without

---

[168] *See* Danner and Swanson MSJ BIO, Doc. 190 at 8-14; Dauphin MSJ BIO, Doc. 192 at 16-22

using restraints. It was also reasonable for Danner to perceive a sufficient threat meriting this response based on Riley grabbing his wrist, which regardless of Riley's subjective intent reasonably suggested the possibility of more forcible resistance by Riley—especially in the context of Riley's ongoing physical struggles and mental incompetency—and therefore, a corresponding danger if Riley was not subdued. In this scenario, it had become apparent that there was a need for force to transport Riley, both because it had become evident that force was needed to dress him and because it had become evident that restraints would be necessary to safely transport Riley. Considering the range of options available to Danner, taking Riley to the ground was minimal in proportion to the need to do so. This use of force was not excessive.[169]

Plaintiffs' main argument, based on their expert's report, is that "CO Danner and Defendant Singleton should not have approached the cell alone and a supervisor should have been present to assess the situation and possibly avoid a use of force altogether.[170] Plaintiffs speculate that "having more staff" or a supervisor already present, having "someone there . . . to talk with him," or "giving Riley some time to calm down after being in the medical department" would have been more appropriate and could have avoided the need for any force at all.[171] But the excessive force question is not evaluated

---

[169] *See, e.g.*, *Washington v. Obdrejka*, 822 F.App'x 104, 106-107 (3d Cir. 2020) (officers did not deploy excessive force in using force not resulting in injury to extract a suicidal and disorderly inmate from his cell).

[170] Dauphin MSJ BIO, Doc. 192 at 17; Danner and Swanson MSJ BIO, Doc. 190 at 9.

[171] Dauphin MSJ BIO, Doc. 192 at 17-18; Danner and Swanson MSJ BIO, Doc. 190 at 9-10 (quoting Gravette Expert Report, Doc. 197-1 at 10, 12).

"with the 20/20 vision of hindsight."[172] Based on Riley's mental health condition alone, officers could not have known how this force would escalate during their encounter with Riley until they were "forced to make [these] split-second judgments."[173] In any case, although it is certainly preferable to avoid force where possible, this kind of minimal use of force, commonplace within the setting, is not so grave that Danner and Singleton should have exhausted every possible other method before even attempting to enter Riley's cell.

Plaintiffs also contend that putting Riley in a restraint chair was an act of excessive force. The facts do not support such a claim.[174] In *Young v. Martin*, the Third Circuit observed in the Eighth Amendment context that "as applied to mechanical restraints," the "particular criteria relevant to the use of excessive force test" identified by the Supreme Court of the United States served as a useful "yardstick" for measuring such claims.[175] *Hope v. Pelzer* held "that (1) where the inmate had 'already been subdued, handcuffed, [and] placed in leg irons,' and (2) there was a 'clear lack of an emergency situation' such that '[a]ny safety concerns had long since abated,' then (3) subjecting the inmate to 'substantial risk of physical harm' and 'unnecessary pain'

---

172  *Kingsley*, 576 U.S. at 397 (quoting *Graham*, 490 U.S. at 396)).

173  *Id.* at 399 (quoting *Graham*, 490 U.S. at 397).

174  *Compare, e.g., Young v. Martin*, 801 F.3d 172, 181-82 (3d Cir. 2015) (leaving subdued, handcuffed, shackled, and non-violent inmate in a restraint chair for fourteen hours after he walked out of his unlocked cell, in restraints so tight that he cried out in pain and in a cold room while he was naked, rose to the level of excessive force) *with Washington v. Ondrejka*, 822 F.App'x 104, 107 (3d Cir. 2020) (placing an actively combative inmate in a restraint chair, where his "suicidal and disorderly" conduct supported the existence of an "emergency," justified his placement in a restraint chair for five hours).

175  801 F.3d 172, 180-81 (3d Cir. 2015) (citing *Hope v. Pelzer*, 536 U.S. 730 (2002)).

serves no penological justification.'"[176] Although *Hope* and *Young* were decided in the Eighth Amendment context, they are nevertheless instructive guidance in my application of the *Kingsley* factors here.[177]

The security problem or threat reasonable perceived by the officers are low in isolation and favor Riley, but in context, attempting to transport Riley while he continued to struggle—even where he is physically subdued—would pose a significant security problem. Even though Riley was handcuffed, shackled and physically weakened and thus his continued resistance created little safety threat or risk that he would overpower the officers in his cell, Riley's resistance impeded officers' ability to transport him and was therefore significant in the specific context of placing him in a restraint chair. As is also relevant, officers planned to, and did, use the restraint chair to accomplish Riley's transport to the hospital. So the length of this use of force made is minimal and did not appear to expose Riley to a substantial risk of harm, unnecessary pain, or any identifiable injury. It then appears that there was a genuine need to control a struggling Riley, in the emergency of his mental health crisis,[178] to transport him and that his handcuffs and shackles would not be an ideal method of doing so even in Riley's

---

[176] *Young*, 801 F.3d at 180 (quoting *Hope*, 536 U.S. at 738).

[177] In doing so I remain cognizant that in the Fourteenth Amendment pretrial detainee context—unlike in the Eighth Amendment prison inmate context—any act intended to punish is excessive. *See Kingsley*, 576 U.S. at 398. I intertwine these factors into the relevantly corresponding *Kingsley* factors.

[178] *See, e.g.*, *Washington*, 822 F.App'x at 107 (inmate's suicidal and disorderly conduct and continued resistance and noncompliance, in context of legitimate goal of extracting him from his cell, constituted an "emergency situation" justifying the use of force of placing him in a restraint chair).

weakened state.[179] When these genuine needs are measured against the minimal force of temporary placement in a restraint chair, it is beyond question that confining Riley to the chair was reasonable and appropriate in this situation.

But I deny summary judgment as to the final use of force, Lewis's use of a hypoglossal pressure point after Riley's arms, but before his legs, had been restrained in the chair. Looking initially to the factor of active resistance, this factor weighs in Lewis's favor given the undisputed testimony—but its weight is mitigated by two facts: first, that Riley's mostly-restrained position minimized his ability to resist; second, that a reasonable factfinder could infer that Riley had a diminished capacity to exert force in resistance due to his weakened physical state.

The existence of a security problem—the need to transport a struggling, mentally ill detainee to the ambulance—justified some restraint or use of force, as the above analysis demonstrates. But because Riley was handcuffed, shackled, partially restrained in the chair aside from his feet, and being held back by several officers, this factor only weighs slightly in Lewis's favor. And, although Riley may have posed some threat of kicking, in his weakened and mostly restrained state this threat again only weighs slightly in favor of using force.[180]

---

[179] In fact, the necessity of dragging Riley without supporting his feet may itself show how transporting him in the restraint chair was a less excessive means of accomplishing this aim.

[180] For example, this resistance easily justifies holding Riley in place while the restraints were applied.

It is not clear to what extent Lewis attempted to temper his use of force; he states that he was holding Riley's head up and applying brief, repeated uses of the hypoglossal pressure point until Riley "was secured in the chair properly" which took "about a minute," but cannot recall how many times he used it throughout that minute.[181] Nevertheless, resorting to a technique designed to render a detainee unconscious itself demonstrates that Lewis was not tempering his use of force. And, turning to the injury sustained, I agree—though the issue is hotly disputed—that the record supports an inference that this use of force caused Riley's brain death, and was therefore in the relevant sense lethal.[182] Relatedly, although it does not appear to squarely fit into any of the *Kingsley* factors, the special circumstances of Riley's weakened state—i.e., the fact that he was mentally ill, dehydrated, "wobbly," and being taken to the hospital—is a factor which strongly counsels the hesitation of wanton or unnecessary force.

In this context, the relationship between the need for the use of force and the amount of force used here weighs strongly in Riley's favor. To begin with, it is not clear

---

[181] *See* Dauphin County CID Transcribed Statements, Doc. 175-10 at 6:227-243.

[182] Hua's expert report is a bit unclear as to the causal relationship between this pressure point and Riley's death but that is a fair reading of the report which I construe in Riley's favor. In any case, Hua ascribes Riley's cause of death to homicide via "neck compression during his being physical restrained" and Lewis's own testimony establishes that he alone maintained control over Riley's head during the minute before Riley went unresponsive. *See* Hua Expert Report, Doc. 196-11, at 2, 4 (describing Lewis's hypoglossal pressure point technique and concluding several pages later that "Riley's death was due to neck compression during physical restraint, and his manner of death was a 'homicide'"); Dauphin County CID Transcribed Statements, Doc. 175-10 at 6:227-243 (Lewis describing this use of force, stating when asked when he "released control of [Riley's] head" that he did so "[o]nce he was secured in the chair properly," and stating that shortly after he stopped applying the hypoglossal pressure point, Riley fell limp and unresponsive).

why there was any need to gain Riley's immediate compliance at all; everything but Riley's feet was well secured and multiple officers were holding them down to secure them, so the force already being exerted was sufficient to accomplish the purpose of restraining Riley to eventually gain compliance. "Under this set of facts, a jury could conclude that there was no penological need for *any* additional force," which *de facto* substantiates Plaintiffs' excessive force claim.[183] Even if there remains a question about the appropriate *degree* of additional force, the entitlement to use force "is not *carte blanche* to exercise whatever degree of force desired."[184] intentionally rendering Riley unconscious—and unintentionally causing his death—was a disproportionate method of gaining his compliance in light of the fact that he was already significantly restrained.[185] So this was an excessive use of force.[186]

---

[183] *Jacobs*, 8 F.4th at 195-96; *Headwaters Forest Def. v. Cnty. of Humboldt*, 211 F.3d 1121, 1133 (9th Cir. 2001) ("where there is no need for force, any force used is constitutionally unreasonable").

[184] *Capps*, 2024 U.S. Dist. LEXIS 25869, at *49.

[185] *See, e.g.*, *Rivas*, 365 F.3d at 200 (placing bodyweight on prone suspect's back with secured hands and ankles until he fell unconscious was an excessive use of force); *Champion*, 380 F.3d at 903-904; *Perea*, 817 F.3d at 1203-1205 (resistance of mentally ill defendant who was prone, handcuffed, shackled, and held down by officers did not justify repeatedly tasing her); *Landis*, 297 F.App'x at 465 (keeping prone and restrained defendant's face down where he was being restrained in nearly two feet of water was excessive force despite the "act of resistance" of "refus[ing] to give his arms up to the officers, when his arms were apparently the only things holding his face out of the water").

[186] Though I doubt that this violation was not clearly established at the time of the offense conduct, there is no need to evaluate any qualified immunity defense because Dauphin County Defendants did not attempt to claim that the constitutional violation at issue was not clearly established law at the time of the relevant conduct. They only state that "[u]sing only the force necessary to gain Decedent's compliance in changing into a DCP uniform to be transported outside of the Prison was not clearly established as excessive force." Dauphin County Defendants' BIS, Doc. 174 at 43. This was insufficient to raise the issue of whether using an ultimately lethal hypoglossal pressure point on a resisting pretrial detainee who is already

As to the failure to intervene claims, there is no genuine dispute that Officers Swanson and Donovan had no opportunity to intervene. Although Swanson and Donovan had been assisting the other officers with Riley, they were instructed by Sergeant Lewis to leave the area before Riley was put into the restraint chair because Riley was naked.[187] This is reflected in the video footage, which shows Swanson and Donovan walking down the hallway and out of sight along with Sergeant Hess.[188] Swanson and Donovan state after moving to the front of the block, they did not know Riley had even fallen unconscious from their vantage point.[189] This is critical because the use of force here—a hypoglossal pressure point—was both hard to spot at a distance generally (and more so where five officers were obstructing the view of Riley), and took place for only one minute.

Failure to intervene liability requires that the defendant "who did not directly participate in the alleged constitutional wrong was *aware* it was happening or about to happen and had a realistic opportunity to prevent it, but instead stood by."[190] Nor did

---

restrained in a restraint chair apart from his legs was a non-excessive means of gaining compliance.

[187] 18-A-1-to-front, Doc. 175-20 at 30:24; Dauphin County CID Transcribed Statements, Doc. 175-10 at 4:156-159.

[188] 18-A-1-to-front, Doc. 175-20 at 30:24-30:42 (Riley placed into restraint chair; Swanson and Donovan are halfway down the hallway at this time), 30:42-31:00 (the struggle begins as Swanson and Donovan are barely visible standing at the far end of the block), 31:00-31:40 (the struggle continues and Riley falls limp at 31:40).

[189] Swanson Deposition, Doc. 159-6 at 42:6-18, 44:6-7; 45:18-25; Dauphin County CID Transcribed Statements, Doc. 175-10 at 101:275-305 (Donovan stating that she stood at the end of the block and attended to other duties, and that *after* a medical emergency was called she looked "and he appeared to be passed out in the chair").

[190] *Degroat v. Felsman*, No. 3:16-CV-01186, 2019 U.S. Dist. LEXIS 24838, at *13 (M.D. Pa. Feb. 15, 2019) (quoting *Fields v. City of Chi.*, No 10 C 1168, 2014 U.S. Dist. LEXIS 14621, at *10 (N.D. Ill. Feb. 6, 2014)) (emphases altered).

hearing loud voices put Swanson or Donovan on notice that Riley—who was being extracted from his cell while experiencing acute psychosis—was being subjected to excessive force by Lewis for one minute. Accordingly, there is no genuine dispute of fact showing that Swanson or Donovan had a realistic opportunity to intervene in this use of force, so the failure to intervene claims fail.

Likewise, Lewis could not have intervened against himself, so the failure to intervene claim against him fails because no remaining defendant involved in this incident used excessive force.[191] As to the remaining officers, however, the fact that they were assisting in placing Riley into the restraint chair does not show that they had no opportunity to intervene in Lewis's on-minute excessive use of force, either verbally or physically. Because these defendants stood next to Lewis, there is at least an issue of fact regarding whether they had the opportunity to intervene.[192]

In sum, from Danner's decision to take Riley to the ground to Riley's placement in a restraint chair, the uses of force deployed by officers in this rapidly evolving situation were a reasonable and proportional response to the legitimate, non-punitive goals of getting Riley dressed, responding to his resistance, and transporting him to the

---

[191] *See, e.g.*, *El*, 976 F.3d at 335 (granting summary judgment as to failure to intervene claim where use of force occurred "within a matter of roughly five seconds," which was not sufficient time for the officer to intervene even when he stood next to the victim).

[192] *See, e.g.*, *Diaz v. Aberts*, Civil Action No. 10-5939, 2013 U.S. Dist LEXIS 14334, at *25-28 (E.D. Pa. Feb. 4, 2013) (officers present for an excessive use of force lasting approximately one minute had a realistic opportunity to intervene). County Defendants' arguments that these officers "participated directly in an alleged constitutional violation" is unpersuasive because none of these defendants were engaged in the excessive use of force. Certainly, the fact that they were exercising *some* force to control Riley might mean that they did not have a realistic opportunity to intervene. But it might not; it's an issue of fact.

hospital. In contrast, a reasonable juror could conclude that Lewis's use of a hypoglossal pressure point after Riley had been restrained was unreasonable. Summary judgment will be granted for Defendants Danner, Hoffman, Klahr, and Singleton on Plaintiffs' excessive force claim. Summary judgment shall be denied against Lewis as to the excessive force claim. Summary judgment shall be denied against Defendants Danner, Hoffman, Klahr, and Singleton on Plaintiffs' failure to intervene claim, and granted against Defendants Swanson, Donovan, and Lewis.

### d.    John Doe Defendants, Neidigh, and Smith

Finally, the Court agrees that summary judgment should be granted as to any remaining John Doe Defendants in this case, specifically those identified in the second amended complaint as Susquehanna Township John Doe Police Officers 1-5, Susquehanna Township John Doe 911 Operator, PrimeCare John Doe Medical Employees 1-5, and Dauphin County Prison John Doe Correctional Officers 1-10.[193] And, as Plaintiffs acknowledged that defendants Neidigh and Smith "were not present when excessive uses of force were asserted against Riley and had no reasonable opportunity to intervene," the Court also agrees that it is appropriate to grant summary judgment as to the excessive force and related failure to intervene claim, at Counts VI and V, against these defendants.[194]

---

[193] R&R, Doc. 247 at 68-69; Brief in Opposition, Doc. 192 at 51 (concurring in the dismissal of John Doe defendants).
[194] *Id.* at 69-70.

### 3.    Denial of Medical Care Claims

Plaintiffs bring two claims based on the denial of medical care: one against the Susquehanna Township Defendants, Michael Darcy, Demetrius Glenn, Chris Haines, and Richard Wilson, and one against several of the Dauphin County Defendants. The R&R recommended granting summary judgments on both counts,[195] and the Plaintiffs objected only to the dismissal of the claim against Dauphin County Defendants.[196] I analyze the claim against Dauphin County Defendants *de novo* and adopt the recommendation of the Magistrate Judge.[197]

---

[195] R&R, Doc. 247 at 121-131.

[196] *See* Riley Objections BIS, Doc. 255 at 5 ("[T]he Court should decline to adopt the recommendation that Plaintiffs have not established that Ty'rique was denied medical care for purposes of Count II and the *Monell* claim against Dauphin County."); Second Amended Complaint, Doc. 64 at 28 (pleading the Failure to Provide Medical Care and related Conspiracy claim against Dauphin County Defendants in Count II); 40 (pleading the Failure to Provide Medical Care claim against Susquehanna Township Defendants in Count VII).

[197] As to the claim against the Susquehanna Township Defendants, I note that it was based upon Susquehanna Township Defendants' decision to take Riley, who Plaintiffs argue was experiencing an observable mental health crisis, to the booking center instead of a hospital. The R&R failed to engage with on-point Third Circuit precedent holding that taking a defendant who had just ingested a large amount of cocaine to a booking center instead of a hospital, where he was complaining of overdose-related symptoms, staked out a successful denial of medical care claim—and that the violation was *so obvious* that qualified immunity should still be denied. *Thomas v. City of Harrisburg*, 88 F.4th 275, 283-85 (3d Cir. 2023). This oversight would ordinarily call out for *de novo* review. I nevertheless agree with the R&R's thorough analysis of the record—it shows that various persons (such as Riley's parents and Officer Haines) knew that Riley was either having a mental health crisis (i.e., was mentally unstable, not fully lucid, or psychotic, but not suicidal) or was under the influence of drugs, but concluded that the knowledge of either did not import the need for immediate medical attention. R&R, Doc. 247 at 130. The obvious distinction between this case and *Thomas* is that the risk of overdose creates an urgent need for medical attention. Ordinarily a mental health crisis in which the detainee does not appear fully lucid, such as psychosis, will not lead to death if one receives medical attention at the booking center instead of the hospital. *Cf. Means v. Wash. Twp.*, Civil Action No. 23-353, 2025 U.S. Dist. LEXIS 17507, at *11-15 (W.D. Pa. Jan. 31, 2025) (denying dismissal where officers' failure to ensure detainee received mental health treatment while he was in serious mental distress and repeated threats of killing himself, though a "close question," stated a claim for failure to provide medical care following his suicide).

The Eighth Amendment to the United States Constitution proscribes cruel and unusual punishments.[198] Because an "inmate must rely on prison authorities to treat his medical needs," failure to provide a prisoner adequate medical care is a cruel and unusual punishment violating the Eighth Amendment.[199] And, although pretrial detainees are protected from inadequate medical care under the Fourteenth Amendment rather than the Eighth Amendment,[200] the Third Circuit has applied the legal standard prevailing in Eighth Amendment cases to evaluate the inadequate medical care claims of pretrial detainees.[201]

"In order to establish this constitutional claim under 42 U.S.C. § 1983, a plaintiff must make (1) a subjective showing that 'the defendants were deliberately indifferent to [his or her] medical needs' and (2) an objective showing that 'those needs were serious.'"[202] "Deliberate indifference is a subjective standard consistent with recklessness. It requires both that an individual be aware of facts from which the inference could be drawn of a substantial risk and that the individual actually draws that

---

Likewise, if officers perceive a possibility that a defendant is under the influence of intoxicants but does not see any evidence of a risk of overdose—such as physical symptoms of overdose or knowledge that the detainee just ingested a large quantity of drugs—this too does not mandate immediate medical attention. This means that a "serious medical need" was not evident to the Susquehanna Township Defendants when they transported Riley. For these reasons I do not disturb the recommendation of the Magistrate Judge on this count.

[198]  U.S. Const. amend. iix. ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.").

[199]  *Estelle v. Gamble*, 429 U.S. 97, 103-104 (1976).

[200]  *Thomas*, 88 F.4th at 281 n.23.

[201]  *Id.* (citing *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581-82 (3d Cir. 2003)).

[202]  *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Rouse v. Plantier*, 183 F.3d 192, 197 (3d Cir. 1999)).

inference."[203] A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a layperson would easily recognize the necessity for a doctor's attention."[204]

It's not entirely clear whether Riley is bringing a claim for inadequate medical care or denial of medical care. "While both types of claims require evidence of the defendant's state of mind, they differ in other respects. In addition to the scienter requirement, adequacy of care claims require an 'objective inquiry' into the medical care provided."[205] Plaintiffs at times seem to characterize the treatment being rendered by Drs. Rosas and Miller as inadequate and at times seem to characterize it as being no treatment at all because allegedly only a hospital could effectively treat Riley. But the distinction ultimately does not matter here as Plaintiffs fail on the shared element of scienter, that is, deliberate indifference.

Plaintiffs have provided a wealth of persuasive record evidence demonstrating a serious need for medical treatment which was obvious to non-medical prison

---

[203] *Thomas*, 88 F.4th at 281. Then-Judge Alito outlined four potential routes to discharging this burden in *Rouse v. Plantier*. *Rouse*, 183 F.3d at 197 ("where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; [] (3) prevents a prisoner from receiving needed or recommended medical treatment[;]" or (4) "persists in a particular course of treatment 'in the face of resultant pain and risk of permanent injury.").

[204] *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347-38 (3d Cir. 1987) (quoting *Pace v. Faucer*, 479 F.Supp. 456, 458 (D.N.J. 1979), *aff'd*, 649 F.2d 860 (3d Cir. 1981)).

[205] *Robinson v. Corizon Health, Inc.*, No., 2019 WL 448900, at *6 (E.D. Pa. Feb. 5, 2019) (quoting *Pearson*, 850 F.3d at 536).

Case 4:20-cv-00325-MWB    Document 272    Filed 03/31/25    Page 64 of 103

officials,[206] but even this serious medical need coupled with inadequate care is insufficient if Plaintiffs cannot create an issue of fact on the remaining element—the defendants' deliberate indifference—to avoid summary judgment.[207] Even where care is inadequate or lacking, a significant obstacle to a non-medical prison official "actually draw[ing] that inference" of inadequate medical care is his justifiable belief "that the prisoner is in capable hands" when he is "under the care of medical experts," a rule of thumb which "follows naturally from the division of labor within a prison." [208] And as the R&R correctly notes, while Riley's condition continued to get progressively worse, he was continuously being seen by medical staff, who—perhaps wrongfully, perhaps not—believed they could treat Riley at the prison and so did not tell non-medical prison officials that Riley had to be taken to a hospital.[209] The medical staff changed their minds on June 26, and Riley was transported that same day.[210] In this factual context of continuous medical treatment Plaintiffs have failed to show the non-medical prison officials' deliberate indifference.

Plaintiffs object that just because "a detainee, like Ty'rique, receives medical treatment, even at regular intervals," this fact "does not preclude a jury from providing

---

[206] *See, e.g.*, Dauphin MSJ BIO, Doc. 192 at 31-34 (citing persuasive record evidence that Riley's need for medical care was obvious and known to the non-medical prison staff); Danner and Swanson MSJ BIO, Doc. 190 at 16-21 (same).

[207] *Pearson*, 850 F.3d at 535, citing *Durmer*, 991 F.2d at 69 n.13 ("[T]he mere receipt of inadequate medical care does not itself amount to deliberate indifference—the defendant must also act with the requisite state of mind.").

[208] *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004).

[209] R&R, Doc. 247 at 123-24.

[210] *Id.*

64

that the provided care was inadequate."[211] They are correct in theory; the general rule set out by *Spruill v. Gillis*, as cited by the R&R, allows for exceptions in a small category of cases. "A non-medical prison official . . . will not be chargeable with deliberate indifference" "*absent a reason to believe (or actual knowledge)* that prison doctors or their assistants are mistreating (or not treating) a prisoner."[212] For example, where the need for additional medical treatment becomes evident to a non-medical prison official—either through the detainee's direct medical complaints or, in extreme cases, through the severity of the worsening symptoms themselves—then he is deliberately indifferent when he completely ignores that need.[213] But a non-medical prison official generally does *not* ignore this need where the detainee receives treatment. So in this context of *continuous* medical treatment, the general presumption is that non-medical prison officials would have no reason to suspect that the medical staff is not effectively changing their course of treatment in response to the detainee's evolving symptoms and needs.

Case law bears this out. Even as to the medical professionals themselves, deliberate indifference, being a subjective standard, is not established just because they negligently misdiagnose the detainee's medical condition or commit medical

---

[211] Plaintiffs' Objections BIS, Doc. 255 at 4.

[212] R&R, Doc. 247 at 123 n.476 (quoting *Spruill*, 372 F.3d at 236) (emphasis added). *See also Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993) (affirming the grant of summary judgment under these circumstances).

[213] *See, e.g.*, *Gravley v. Tretinik*, 414 F.App'x 391, 394 (3d Cir. 2011); *Koukos v. Chester Cnty.*, 2017 WL 511634, at *6 (E.D. Pa. Feb. 7, 2017); *Leflar v. Warden, Montgomery Corr. Facility*, 2017 WL 5559910, at *3 (E.D. Pa. Nov. 16, 2017); *Eades v. Thompson*, 823 F.2d 1055, 1058 (7th Cir. 1987).

malpractice.[214] In this context our Court of Appeals has instructed that "it is difficult to establish deliberate indifference" "[w]here a prisoner has received *some* amount of medical treatment" "because prison officials are afforded considerable latitude in the diagnosis and treatment of prisoners."[215] This bar climbs even higher as the non-medical prison officials at issue here, who in their justifiable reliance upon medical staff cannot "be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being [continuously] treated by the prison doctor."[216] It is also apparent that non-medical prison officials cannot be held liable for following the directions of physicians even if those directions are erroneous.[217]

All this analysis applies to both the determination not to send Riley to a hospital until June 26 and the determination of whether the care rendered was adequate. But Plaintiffs raise an inventive argument against the Dauphin County Defendants as to the latter, contending that prison officials partially obstructed Riley's medical examination

---

[214] *Pearson*, 850 F.3d 538-39 ("even if a reasonable jury could find that Nurse Thomas was negligent in diagnosing or treating his pain, that would not be enough for the jury to find that Nurse Thomas acted with deliberate indifference in violation of the Eighth Amendment"); *Spruill*, 372 F.3d at 235 ("Allegations of medical malpractice are not sufficient to establish a Constitutional violation"); *Estelle*, 428 U.S. at 106 ("a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment").

[215] *Palakovic v. Wetzel*, 854, F.3d 209, 227 (3d Cir. 2017) (emphasis added).

[216] *Durmer*, 991 F.2d at 69.

[217] *See, e.g.*, *Estate of Henson v. Kraica*, 440 F.App'x 341 (5th Cir. 2011); *Collins v. Alevizos*, 404 F.App'x 58 (7th Cir. 2010); *Webb v. Hendrick*, 409 F.App'x 33 (8th Cir. 2010); *Townsend v. Jefferson Cnty.*, 601 F.3d 1152 (11th Cir. 2010); *Spears v. Ruth*, 589 F.3d 249 (6th Cir. 2009).

or treatment within the facility.[218] Specifically, they argue that prison guards "prevented

Ty'rique from being sent to the medical unit,"[219] and that as a result the medical staff

only saw Riley cell-side[220] until his medical unit examination on June 26, which was

also the day that medical staff decided Riley had to be taken to the hospital.[221] Dr.

Miller's testimony certainly creates a genuine dispute on this issue, and it is worth

setting it out in some detail:

> [I]n the prison's case and in this case in particular the prison guards were
> extremely reluctant to take him out of his cell because he was very
> uncooperative. Usually if we feel we need to, you know, get a better
> handle on what's going on the prisoner has to be sent to the . . . medical
> unit for that. And in this case we were prevented from sending him to the
> medical unit several times.[222]

When asked who "prevented" the medical staff from bringing Riley to the medical unit,

Dr. Miller stated:

> The prison guards . . . . The medical staff is subservant to what the prison
> guards want to do. So if they refuse to take the patient out of the cell
> there's not a lot we can do about that. And in this case because he was
> acutely psychotic they figured if they took him out of his cell they would
> have to pepper spray him or put him in the restraint chair or something
> like that and wrestle him back into the cell. So that's why they were
> reluctant to take him out of the cell . . . . We can run on up the line. You
> know, we can talk to the head of the prison. But a lot of times I would be
> overruled, put it that way.[223]

---

[218] Dauphin MSJ BIO, Doc. 192 at 34-35. I evaluate the argument here because the R&R did not.

[219] *Id.*

[220] *See* R&R, Doc. 247 at 37-43 (detailing the history of Riley's cell-side visits by Dr. Rosas on June 18, 19, and 20, Dr. Miller on June 21 and 24, Dr. Langseth on 25, and social worker Irvine on June 26).

[221] *See id.* at 47-48.

[222] Transcript of Robin Miller, Doc. 194-8 at 17:12-20. *See also id.* at 71:12-21 (Dr. Miller stating that she "probably did" ask for Riley to be taken to the medical unit and "I'm sure they probably said no but I don't recall.").

[223] *Id.* at 17:21-18:12.

Miller described evaluating Riley "though a small little window in a jail cell" as "much more difficult," "limited," and "a challenge," stating that it "would have been definitely better to get him to the medical unit to evaluate him face to face" but concluding that as she was able to prescribe Riley his medication, "I don't think it effectively prevented me from treating him" and it was "probably not" a wise thing to attempt to extract him due to the force which that might entail.[224]

On this record Plaintiffs' arguments have some intuitive appeal. And given the right set of facts, I have no doubt that non-medical prison officials could have reason to believe that the treatment they are intentionally obstructing is inadequate.[225] But three shortcomings show how this is not the right set of facts.

The first: it's not clear whether the difference between medical unit and cell-side examinations and care is a difference between adequate and inadequate examinations and care.[226] That's fatal because the prison guards must cause inadequate medical care to be liable for it. The second: it's not clear that Drs. Rosas or Miller *told* the non-medical prison staff that they were incapable of rendering adequate care if Riley was

---

[224] *Id.* at 22:14-23; 35:13-16; 36:18; 72:18-73:2.

[225] For example, deliberate indifference can exist "where 'necessary medical treatment is delayed for non-medical reasons.'" *Natale*, 318 F.3d at 582. Where the necessary medical treatment can only be provided in the medical unit—i.e., the cell-side examinations rise to the level of inadequate medical care and medical staff makes this known to the guards—the violation would seem to logically follow.

[226] Although there is some marginal record evidence pertaining to this question it may not be sufficient to create an issue of fact. *See* Patterson Expert Report, Doc. 196-15 at 17-19 (detailing what expert viewed to be inadequate assessments of Riley's mental status and condition but opining that Miller "never made such a request" to take him to the medical unit.

not brought to the medical unit. That's fatal because non-medical prison staff cannot be expected to know otherwise, and hence, deliberate indifference cannot be established, if this deficiency in treatment is not communicated by the medical staff. The third: with only statements that "the prison guards" refused to bring Riley to the medical unit, the Court cannot determine *which* prison guards were involved in this refusal, and which guards were not. That's fatal because the personal involvement of each defendant must be established in a successful Section 1983 claim.[227] For these three reasons Plaintiffs' argument must fail on this record.

Accordingly, neither the failure to second-guess the medical staff's decision not to send Riley to a hospital nor the reluctance to transport Riley to the medical unit supports a denial of medical care or inadequate medical care claim. The Court will adopt the recommendation of the report and recommendations as to Counts II and VII and grant summary judgment on Plaintiffs' denial of medical care and inadequate medical care claims against all defendants.

### 4.    Civil Rights Conspiracy Claims

Plaintiffs plead one count for Conspiracy to Commit Excessive Force and one count for Conspiracy to Deny Medical Care. To prevail in showing an actionable conspiracy to violate civil rights under 42 U.S.C. § 1983 plaintiffs must demonstrate

---

[227] *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). Having made some effort to search the record, it is not apparent to the Court that the record clarifies this ambiguity. To the extent it does, the Plaintiffs have failed to effectively bring it to the Court's attention through citations to record evidence and the Court will not construct this argument on Plaintiffs' behalf.

(1) "deprivation of a constitutional right" and (2) "some factual basis to support the conspiracy: agreement and concerted action."[228] "Because 'inferring mental state from circumstantial evidence is among the chief tasks of factfinders,' an allegation of conspiracy can only be overcome at summary judgment when 'the moving parties' submissions foreclose[] the possibility of the existence of certain facts from which "it would be open to a jury . . . to infer from the circumstances" that there had been a meeting of the minds.'"[229]

I agree with the R&R's recommendations to grant summary judgment on each conspiracy count. As to excessive force, Plaintiffs' only alleged circumstantial evidence tending to show a meeting of the minds involves the simultaneous acts of guards in restraining Riley and Defendants' inaccurate, or falsified, subsequent incident reports.[230] However, the simultaneous response of guards to a detainee is insufficient evidence of a before-the-fact agreement. In nearly every excessive force case brought by a prisoner, prison officials will act simultaneously because they are reacting to what the detainee is doing. Likewise, I agree with the R&R that even an after-the-fact agreement to create false incident reports regarding uses of force against Riley would only substantiate a claim for depriving Riley of access to the Courts, a First Amendment claim which was never pled in this complaint.[231] I also note that the Plaintiffs' use of

---

[228] *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 293-94 (3d Cir. 2018) (quoting *Capogrosso v. Supreme Court of N.J.*, 588 F.3d 180, 184-85 (3d Cir. 1990)).

[229] *Id.* at 295.

[230] *See* Danner and Swanson MSJ BIO, Doc. 190 at 19-25; Dauphin MSJ BIO, Doc. 192 at 30-34.

[231] *See Jutrowski*, 904 F.3d at 294-95.

the term "false" is particularly cavalier; Plaintiffs identify arguable omissions or minor qualifications but never identify anything tantamount to perjury in the incident reports.[232] So to the extent that Plaintiffs rely on the "false incident reports" as circumstantial evidence of an excessive force conspiracy, that evidence is too speculative to support this claim.

Finally, because Plaintiffs have not made out an underlying claim for inadequate medical care against the Dauphin County Defendants, the related conspiracy claim also fails.[233]

### 5.    Claims against Dauphin County

Plaintiffs bring Section 1983 claims against Dauphin County for their excessive force and medical care claims, based on theories of custom and failure to train. Because

---

[232] First, the incident reports by Danner, Swanson, Klahr, Armermann, Mendenhall, Grieb, Adams, Blouch, Lewis, Biter, Ingersoll, Weaver, Glenn, Myers, Bauer, Singleton, Hoffman, and Donovan referring to Riley as an "uncooperative and violent inmate in need of restraints" are not false just because Riley was "mentally unstable." Riley was uncooperative, violent, *and* mentally unstable. Second, Swanson changing her story from describing Riley as "fighting the entire time" to describing him as engaged in "muffled commotion" does not demonstrate any falsehood—these non-contradictory statements merely differ in degree. Third, Klahr's statement that Riley was "grabbing CO Danner's hands, kicking, spitting at staff and refusing to calm down" is not a falsehood just because "Ty'rique's hands were already handcuffed;" Riley was doing this before Klahr arrived on the scene, and could have continued attempting to do so even after he was handcuffed. Klahr's statement that Riley "spit in the direction of Danner's feet" is not contradicted by the fact that Riley was "breathing heavy and blowing air" because the "white foam that had gathered from cotton mouth [and] was coming out" could reasonably be misinterpreted as spit. And, the fact that Danner's report did not mention that Riley was "dragged out of his cell and place[d] in the chair," that "five COs were on top of the smaller Ty'rique and that Defendant Lewis was using a pressure point technique," though it appears to have made important omissions, is certainly not a "false incident report" and does not evidence any attempt at a "cover up."

[233] *Parkway Garage, Inc. v. City of Phila.*, 5 F.3d 685, 700 (3d Cir. 1993).

they object to the R&R's decision to grant summary judgment of these claims, I review them *de novo*.[234] I agree with the outcome reached by the Magistrate Judge.

A municipal body is a "person" which can be liable under Section 1983.[235] But municipalities are only liable for their own acts, not the acts of their employees. A Section 1983 claim against a municipality must show an underlying constitutional violation caused by the municipality's execution of municipal policy, custom, or training.[236] Put differently, the municipality's actions must be the "moving force" behind a constitutional violation, which obviously requires that an underlying constitutional violation occurred in the first place.[237] Because of the demanding burden of making this showing in a failure-to-train scenario, the Supreme Court has cautioned

---

[234] In doing so I resolve arguments raised in Plaintiffs' briefings which were not explicitly analyzed in the R&R.

[235] *Monell v. New York Dep't of Social Servs.*, 436 U.S. 658, 690 (1978).

[236] *Natale*, 318 F.3d at 581; *Canton v. Harris*, 489 U.S. 378, 385 (1989).

[237] *Monell*, 436 U.S. at 694; *Barna v. Bd. of Sch. Dirs. of the Panther Valley Sch. Dist.*, 877 F.3d 136, 145 & n.6 (3d Cir. 2017). This does not mean, as the R&R says, that *Monell* liability necessarily fails where no individual defendant is held liable. "Where it is possible for the *Monell* defendant to cause constitutional harm without any individual defendant violating the plaintiff's rights, it is not inconsistent . . . to find only the *Monell* defendant liable." *Mervilius v. Union Cnty.*, 73 F.4th 185, 196-97 (3d Cir. 2023) (holding that even if an officer was not individually liable due to not acting in bad faith, it is not contradictory for municipal failure-to-train liability to prevail for due process protection against criminal investigators' fabrication of inculpatory evidence through polygraph examinations, if training deficiencies nevertheless caused the violation and the municipality was deliberately indifferent to that risk). This is such a case because the medical staff are not party to the suit; dismissing the claims against the non-medical prison officials based on the failure to show deliberate indifference, then, did not mean that there cannot be an underlying violation as to the medical staff's deliberate indifference. It also does not mean that the municipality could not be liable where it is aware of and deliberately indifferent to inadequacies in medical treatment even where no individual defendant was deliberately indifferent.

that a "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."[238]

Municipalities act through a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."[239] This includes unconstitutional practices which are "so permanent and well settled as to constitute a custom or usage with the force of law."[240] Naturally, demonstrating such a custom requires a history of past similar violations.[241] A Section 1983 plaintiff may also support municipal liability by showing that his constitutional injury was "caused by a failure or inadequacy by the municipality that 'reflects a deliberate or conscious choice,'"[242] such that the failure can "properly be thought of as a [municipal] 'policy or custom' actionable under § 1983."[243] "'[D]eliberate indifference' is a stringent standard of fault,"[244] "consist[ing] of a showing as to whether (1) municipal policymakers know

---

[238] *Connick*, 563 U.S. at 61.

[239] *Monell*, 436 U.S. at 690.

[240] *City of St. Louis v. Prapotnik*, 485 U.S. 112, 117 (1988). *See also Britton v. Maloney*, 901 F.Supp. 444, 450 (D. Mass. 1995) ("Unlike a 'policy,' which comes into existence because of the top-down affirmative decision of a policymaker, a custom develops from the bottom-up. Thus, the liability of a municipality for customary constitutional violations derives not from its creation of the custom, but from its tolerance or acquiescence in it.").

[241] *See Wolfe v. Sunbury*, No. 4:24-CV-00251, 2024 U.S. Dist. LEXIS 219959, at *22 (M.D. Pa. Dec. 5, 2024) ("The very definition of a widespread custom or practice implies that it is something that has happened more than once."); *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 215 (3d Cir. 2001) ("A custom . . . must have the force of law by virtue of the *persistent practice* of state [or municipal] officials.") (internal quotation marks omitted and emphasis added); *Hildreth v. Butler*, 960 F.3d 420, 430 (7th Cir. 2020) (holding that three potential violations over nineteen months "does not establish a widespread custom or practice," and proposing that "the frequency of conduct necessary to impose *Monell* liability must be more than three.").

[242] *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019).

[243] *Canton*, 389 U.S. at 392.

[244] *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997).

that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights."[245]

Regarding this second element, "[a] pattern of similar constitutional violations," i.e., a history of employees mishandling, is ordinarily necessary "to demonstrate deliberate indifference for purposes of failure to train."[246] Plaintiffs have the burden of showing that a policymaker with the authority to correct the violations had notice of this pattern.[247] Absent a pattern of violations, municipal liability only attaches if the need for training "can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights."[248] Accordingly, aside from this rare exception, both the custom and failure-to-train routes to *Monell* liability require record evidence of a history of past similar constitutional violations.

Moreover, because a causal relationship must be shown between the municipal body's deliberate indifference and the constitutional violation, "[l]iability cannot rest only on showing that the employees 'could have been better trained or that additional training was available that would have reduced the overall risk of continued injury."[249] Instead, a plaintiff must "identify a failure to provide specific training that has a causal

---

[245] *Forest v. Parry*, 930 F.3d 93, 105-106 (3d Cir. 2019).

[246] *Connick v. Thompson*, 563 U.S. 51, 62 (2011).

[247] *Beck v. City of Pittsburgh*, 89 F.3d 966 (3d Cir. 1996) (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990)).

[248] *Connick*, 563 U.S. at 62.

[249] *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 226 (3d Cir. 2014).

nexus with th[e plaintiff's] injuries," and it must identify "the specific training th[at] should have [been] offered."[250]

Both the excessive force and inadequate medical care claims, in their custom and failure-to-train articulations, fall on the same basis: evidence. "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."[251] This, Plaintiffs have not done.

Plaintiffs made allegations of a pattern or practice of past violations in their second amended complaint but failed to cite record evidence of those past incidents when it came time to file their brief in opposition.[252] Plaintiffs also baldly assert in briefing that the excessive uses of force in this case "were the direct result of a custom at Dauphin County Prison of officers ignoring mental health warning signs and meeting medical needs with brute force," yet fail to cite to any historical record evidence of past constitutional violations consistent with that supposed custom.[253] So no such custom has been genuinely placed in dispute.

---

[250] *Reitz v. Cnty. of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997) (citing *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1030 (3d Cir. 1991)).

[251] *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

[252] Second Amended Complaint, Doc. 64 ¶¶177-180, 182; Dauphin MSJ BIO, Doc. 190 at 39-48 (failing to cite any record evidence of a pattern or practice of similar constitutional violations). I note that the supplement Plaintiffs attempted to introduce to the summary judgment record would not be competent evidence of a pattern of violations. That supplement showed a disproportionate impact of deaths among black men involved in use of force incidents at the prison, but such evidence does not show that any of these incidents involved excessive force. It's certainly relevant circumstantial evidence—it's just not sufficient to move the needle on its own.

[253] Dauphin MSJ BIO, Doc. 192 at 42.

Plaintiffs cite to Dr. Miller's deposition testimony to argue that "there was a custom of correctional officers interfering with the medical treatment of detainees and prisoners."[254] Even if this were sufficient to create a dispute of fact as to the existence of such a custom, Plaintiffs have not, as discussed above, developed a sufficient record to show how the custom caused a constitutional violation in this case; they have not shown how the custom resulted in constitutional violations in the past; and they have not demonstrated that a policymaker with the authority to correct the violations arising from such a custom had notice of it.[255]

As to both their excessive force and medical care claims, Plaintiffs cite to various alleged violations arising in Riley's case itself to show a custom or a pattern of past violations.[256] This is insufficient. "[C]ontemporaneous or subsequent conduct cannot establish a pattern of violations that would provide 'notice to the [county] and the opportunity to conform to constitutional dictates.'"[257] Plaintiffs also cite to evidence showing that some prison officials did not attend trainings with the frequency required

---

[254] *Id.* at 43.

[255] For this reason I need not reach the issue of whether—despite the fact that no inadequate medical care claim survived against any of the individual defendants in this case—a constitutional violation has nevertheless been established. This remains possible most obviously because the medical staff are not defendants to this action. In any case, I note that the Plaintiffs failed to develop this route to *Monell* liability in their briefing.

[256] Dauphin MSJ BIO, Doc. 192 at 44-47 (describing "custom of allowing officers, including Supervisory Defendants, to ignore policies designed to ensure detainees receive medical care without any consequences" based on: inadequate medical treatment when flushing Riley's eyes of OC spray; failure to conduct medical examination at intake; Mendenhall's allegedly poor completion of his report of Extraordinary Occurrence; allegedly insufficient medical evaluations following uses of force; failure to attend trainings; ).

[257] *Connick*, 563 U.S. at 63 n.7.

by prison policy.[258] But this is not evidence of a pattern of similar violations;[259] trainings on use of force and crisis de-escalation which are held biannually rather than annually, absent a pattern of violations, does not obviously result in constitutional violations. Finally, the Plaintiffs offer no explanation of how providing these trainings would have adverted the alleged violations at issue or what training should have been offered.

Accordingly, on this record Plaintiffs have failed to muster record evidence demonstrating that Dauphin County was deliberately indifferent to the risk of constitutional violations occurring in Riley's case, namely because Riley has not mustered sufficient evidence to show an unconstitutional custom; because he has not shown any pattern of past constitutional violations putting Dauphin County on notice that the existing training regime foreseeably led to such violations; and because these violations are not the obvious result of biannual training or any other feature of the existing training regime.

### 6. Supervisory Liability Claims

Plaintiffs also seek to impose supervisory liability against several of the Dauphin County Defendants, specifically Warden Brian Clark, Captain Andrew Klahr, Captain Steve Smith, Captain Mark Neidigh, Lieutenant Richard Armermann, Lieutenant Greg Mendenhall, Sergeant Scott Rowe, Sergeant Scott Grieb, Sergeant Jason Adams,

---

[258] Dauphin MSJ BIO, Doc. 192 at 46 (Mendenhall stating he did not attent either the use of force or crisis de-escalation trainings within the last two years).

[259] That would remain equally true even if Plaintiffs had adduced evidence that there was *no training whatsoever*. They would instead be forced to argue that this is the rare case in which the training regime—in that hypothetical the entire absence of any training—would obviously cause constitutional violations.

Sergeant Michael Blouch, Sergeant Scott Lewis, and Sergeant Keith Biter.[260] The R&R recommended denying summary judgment on these supervisory liability claims.[261] I reject this recommendation.

In limited circumstances, supervisors may be held liable for the unlawful conduct of their subordinates under Section 1983; like any other Section 1983 claim, though, a supervisory liability claim requires that the defendants have had "personal involvement in the alleged wrong,"[262] which entails "the defendant's participation in or actual knowledge of and acquiescence in the wrongful conduct."[263] As summarized by our Court of Appeals in *Chavarriaga v. New Jersey Department of Corrections*, to establish supervisory liability, a Section 1983 plaintiff must:

> (1) identify the specific supervisory practice or procedure that the supervisor failed to employ, and show that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk; and (5) the underling's violation resulted from the supervisor's failure to employ that supervisory practice or procedure.[264]

For present purposes, what is most important is the shared core between municipal and supervisory liability: deliberate indifference. "[T]he standard of individual liability for supervisory public officials will be found no less stringent than

---

[260] Dauphin MSJ BIO, Doc. 192 at 39; Second Amended Complaint, Doc. 64 at 37 (pleading Count VII Section 1983 failure to train and supervise claim against Brian Clark, Dauphin County, and DCP Supervisory Officers), 27 ¶130 (defining class of supervisory officers).

[261] R&R, Doc. 247 at 142.

[262] *Rode*, 845 F.2d at 1207.

[263] *Chavarriaga v. New Jersey Dep't of Corr.*, 806 F.3d 210, 227 (3d Cir. 1998).

[264] *Id.* at 222 (quoting *Brown*, 269 F.3d at 216).

the standard of liability for the public entities that they serve. In either case, a 'person' is not the 'moving force (behind) the constitutional violation' of a subordinate unless that 'person'-whether a natural one or a municipality-has exhibited deliberate indifference to the plight of the person deprived."[265] Accordingly, "[b]oth municipal and supervisory liability require that the plaintiff's injury result from a policy, practice or custom maintained by the defendant."[266] The reasoning set out in this Court's *Monell* analysis, then, also demonstrates why the supervisory liability claims must fail. It is likewise true that the existence of the current training regime—absent a pattern of violations showing supervisors that it was insufficient—foils the notion that such supervisors were deliberately indifferent to the risk of violations.[267] For the same reasons, then, the supervisory liability claims must also fail.

The R&R never reached this issue, however. It concluded that County Defendants, as the movants, failed to discharge their initial burden under the summary judgment standard because the supervisory liability section of their brief in support "rel[ies] on Plaintiffs' pleading and do[es] not argue or attempt to show the absence of a genuine dispute of fact,"[268] rather than "demonstrat[ing] the absence of evidence" "by reviewing for the court the admissions, interrogatories and other exchanges between the

---

[265] *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989) (quoting *Canton*, 489 U.S. at 389).

[266] *Dull v. Manchester Twp. Police Dep't*, 604 F.Supp. 2d 739, 753 n.9 (M.D. Pa. Mar. 31, 2009).

[267] Plaintiffs have argued—nor would they succeed in doing so—that the existing policies or training regime would obviously result in the constitutional violations at issue here absent a pattern of similar violations.

[268] R&R, Doc. 247 at 142.

parties that are in the record."[269] The parties therefore argue in the briefings over what a movant who does not bear the burden of proof at trial must do to discharge his initial burden at summary judgment, and whether citations to the complaint are sufficient to trigger the nonmoving party's burden where the movant's argument is based on the absence of evidence.[270]

It's true that the movant has the "burden of identifying specific portions of the record that establish the absence of a genuine issue of material fact;"[271] as subsection 56(a) says, he must "*show*[] that there is no genuine dispute."[272] The operative word is "show;" "the burden on the moving party may be discharged by 'showing' – that is, *pointing out* to the district court – that there is an absence of evidence to support the nonmoving party's case."[273] According to Wright and Miller, the movant "cannot sustain its burden merely by denying the allegations in the opponent's pleadings, or

---

[269] R&R, Doc. 247 at 134 (quoting *Celotex*, 477 U.S. at 331 (Brennan, J., Dissenting)).

[270] Dauphin Objections BIS, Doc. 254 at 20-22; Dauphin Objections BIO, Doc. 265 at 18-19. For cases taking various approaches to this issue, *see Spierer v. Rossman*, 798 F.3d 502, 508 (7th Cir. 2015) (Explaining that movant discharged the initial burden at summary judgment where he "reli[ed] solely on citations to facts alleged in the complaint" and "brought the motion[] with no additional evidence."); *Evans Cabinet Corp. v. Kitchen Intern., Inc.*, 593 F.3d 135, 140 (1st Cir. 2010) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)) ("The moving party must 'put the ball in play' by averring the absence of any genuine issue of fact. Once the ball is in play, however, the non-moving party must come forward with competent evidence to rebut the assertion of the moving party."); *Fairbank v. Johnson*, 212 F.3d 528, 532 (9th Cir. 2000) ("a moving defendant may shift the burden of producing evidence to the nonmoving plaintiff merely by 'showing' – that is, pointing out through argument – the absence of evidence to support plaintiff's claim.").

[271] *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015); *see also Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996) ("On summary judgment, the moving party need not disprove the opposing party's claim but does have the burden to show the absence of any genuine issues of material fact.").

[272] Fed. R. Civ. P. 56(a) (emphasis added).

[273] *Celotex*, 477 U.S. at 325 (emphasis added).

merely by asserting that the nonmovant lacks evidence to support its claim;" instead, "[t]he movant must show why the opponent's allegations of fact are insufficient to support the claim for relief as a matter of law or why the court should conclude that its opponent lacks sufficient evidence." [274]

It's not clear that this requirement rules out pointing to allegations in the pleadings. The 2010 amendment to Federal Rule of Civil Procedure 56 seems to support the defendants' view;[275] according to the advisory committee's note the rule "recognizes that a party need not always point to specific record materials . . . a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact."[276]

The Seventh Circuit, by way of example, aptly described this initial burden not as a "burden of production" but a "burden of demonstration," holding that one competent method of making this initial showing is by "[r]elying solely on citations to facts alleged in the complaint," bringing the "motion[] with no additional evidence."[277] "To be sure, it is a rare case in which a moving party can establish a basis for summary

---

[274] Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 2727.1 (rev. ed. 2024)

[275] "A party asserting that a fact cannot be . . . genuinely disputed must support he assertion by . . . showing that . . . an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).

[276] Fed. R. Civ. P. 56 advisory committee's note (2010).

[277] *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015); *Federal Practice and Procedure* § 2727.1 ("[I]t is important to note that, as established in *Celotex*, it is not necessary for the movant to introduce any evidence in order to prevail on summary judgment, at least in cases in which the nonmoving party will bear the burden of proof at trial.").

judgment without putting forth some evidence[,] [b]ut such cases exist."[278] Likewise the First Circuit has held: "The moving party must 'put the ball in play' by *averring* the absence of any genuine issue of fact. Once the ball is in play, however, the non-moving party must come forward with competent evidence to rebut the assertion of the moving party."[279] The utility of this method is that it "forc[es] the opposing party to come forward with some evidence or risk having judgment entered against him."[280]

Arguably, defendants' briefing on *Monell* liability discharged even the heightened burden demanded by Justice William Brennan, citing to record evidence suggesting absence of evidence of such a custom[281] and record evidence regarding the training regime already in place.[282] Accordingly, the subsequent supervisory liability section of County Defendants' briefing, when it sets out the general liability standard and then asserts that the above-referenced elements are deficient in conclusory terms, reasonably incorporates by reference the identical analysis that had just been made in the preceding pages.[283]

---

[278] *Spierer*, 798 F.3d at 507.

[279] *Evans Cabinet Corp. v. Kitchen Intern., Inc.*, 593 F.3d 135, 140 (1st Cir. 2010) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)) (emphasis added).

[280] *Federal Practice and Procedure* § 2727.1; *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) ("[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, the nonmoving party bears the burden of production under Rule 56 to designate specific facts showing that there is a genuine issue for trial.").

[281] *Id.* at 33 ("Further, Plaintiffs deposed Warden Briggs as a 30(b)(6) witness. Plaintiffs did not question Warden Briggs about these alleged incidents or any other alleged pattern of the use of excessive force."); Briggs Deposition Testimony, Doc. 174-14.

[282] *Id.* at 35 (citing to testimony and exhibits regarding suicide prevention and use of force training).

[283] *Id.* at 37 (providing conclusory assertions that "Plaintiffs did not demonstrate an absent custom or procedure that caused Decedent's death or created an unreasonable risk of Decedent's

But even if this is insufficient in the view of Justice Brennan's dissent, I do not think it prudent to deny summary judgment on this basis. Although the substance of a moving party's initial burden at summary judgment may be debated as an academic matter,[284] in practice this arcane basis for summary judgment is rarely invoked today.[285] Permitting movants to meet their "showing" by pointing to allegations, through argument, that it contends the nonmovant cannot show at trial avoids placing the rather awkward burden upon a movant, where there is a total absence of evidence, of being forced to "prove a negative"[286] and furthers the "very mission of summary judgment procedures:" "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."[287]

For that reason—even if the movants have arguably failed to discharge their initial burden—I grant summary judgment *sua sponte* anyway. "[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence."[288] "'Notice' [] mean[s] that the targeted party "had reason to believe the

---

death" and that "Plaintiffs also failed to identify a supervisor who knew of a risk to Decedent but was indifferent to that risk.").

[284] *See* Adam N. Steinman, *The Irrepressible Myth of* Celotex: *Reconsidering Summary Judgment Burdens Twenty Years After the Trilogy*, 63 WASH. & LEE L. REV. 81, 126 (2006); 11 Moore's Federal Practice – Civil § 56.40.

[285] *See* Edward Brunet, John Parry, & Martin Redish, *Summary Judgment: Federal Law and Practice* § 5:7 (rev. ed. 2024) (contending that the practical result of *Celotex* was to "largely remove[] any significant triggering burden from the nonmovant").

[286] *Catrett v. Johns-Manville Sales Corp.*, 756 F.2d 181, 187 (D.C. Cir. 1985) (Bork, J., Dissenting), *rev'd sub. nom. Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

[287] Fed. R. Civ. P. 56 advisory committee's note (1946).

[288] *Celotex*, 477 U.S. at 326.

court might reach the issue and received a fair opportunity to put its best foot forward."""[289] Therefore, "when a party has had the opportunity to present all the evidence that would be used to oppose a motion for summary judgment, the fact that the actual notice was not given becomes irrelevant if the party was not prejudiced by that lack of notice."[290] This principle has been applied, for example, to *sua sponte* dismiss the claims of a non-moving defendant where the reasoning of the motions to dismiss filed by other defendants applied with equal force.[291]

Here, not only do these custom and training arguments apply with equal force as to both the *Monell* and supervisory liability claims, but Plaintiffs apparently "put their best foot forward" by providing extensive record citations in response to both claims anyways.[292] It accordingly "appears clearly upon the record that all of the evidentiary materials that [Plaintiffs] might submit in response to a motion for summary judgment" on supervisory liability "are before the court."[293] Summary judgment on this issue is therefore appropriate, whether because Defendants have discharged their initial burden or on the Court's own initiative.

---

[289] *Gibson v. Mayor and Council of City of Wilmington*, 355 F.3d 215, 223-24 (3d Cir. 2004) (quoting *Leyva v. On the Beach, Inc.*, 171 F.3d 717, 720 (1st Cir. 1999)).

[290] *Gibson*, 355 F.3d at 224.

[291] *Silverstein v. Percudani*, 422 F.Supp. 2d 468, 473 (M.D. Pa. 2006), *aff'd*, 207 F.App'x 238 (3d Cir. 2006).

[292] *See* Dauphin MSJ BIO, Doc. 192 at 42-48.

[293] *Gibson*, 355 F.3d at 224 (quoting *Ramsey v. Coughlin*, 94 F.3d 71, 74 (2d Cir. 1996)).

**B.    Medical Negligence Claims Against PrimeCare**

The R&R denied summary judgment as to three surviving claims against PrimeCare: Medical Negligence (Count IX), Wrongful Death and Survival (XIII and XIV), and Punitive Damages.[294] The Court will sustain PrimeCare's objections to the R&R and grant summary judgment on this basis.

Beginning with Medical Negligence, the motion for summary judgment initially stated that Plaintiffs had not yet produced an expert report opining on causation.[295] Plaintiffs subsequently produced a report authored by expert forensic psychologist Marcus R. Patterson, but PrimeCare argued in its Reply brief that summary judgment should still be granted because "though Plaintiffs have produced an expert to opine PrimeCare deviated from the applicable standard of care, Plaintiffs had not produced any expert evidence that the deviation caused Mr. Riley's death," given that Plaintiffs' other expert Dr. Zhonxue Hua concluded that Riley's death was caused by neck compression through his subsequent physical restraint.[296]

The R&R recommended denying summary judgment because Dr. Patterson's report stated that  PrimeCare's failures "significantly contributed to and more likely than not were the causes in bringing about the harm, i.e. the severe mental decline and eventual death of Tyrique Riley on July 1, 2019."[297] From this language the Magistrate

---

[294]  R&R, Doc. 247 at 70-75.
[295]  Brief in Support of PrimeCare's Motion for Summary Judgment ("Primecare MSJ BIS"), Doc. 162.
[296]  Reply Brief in Support of PrimeCare's Motion for Summary Judgment ("Primecare MSJ Reply"), Doc. 213.
[297]  R&R, Doc. 247 at 73 (quoting Doc. 196-15 at 19).

Judge found that there is "expert evidence that the deviation [from the standard of care] caused Mr. Riley's death."[298] It ended its analysis there by stating that PrimeCare's "only argument" was that "Plaintiffs have not produced *any* expert evidence."[299] It therefore did not analyze this element of Plaintiffs' medical negligence claim.

I disagree with the R&R's assessment of the evidence because one conclusory sentence is not expert *evidence*. "[A]t the summary judgment stage [], '[a]n expert report that merely offers conclusory opinions, without explicit factual foundation, is insufficient to defeat a motion for summary judgment.'"[300] "Likewise, a plaintiff cannot rely on legal conclusions set forth by his expert in an attempt to create a factual dispute to survive summary judgment."[301] By relying on this conclusory assertion of causation in Plaintiffs' expert report, the R&R did just that. And, because a conclusory sentence in an expert opinion is not expert *evidence* on causation, the R&R failed to resolve arguments regarding the lack of any expert evidence which, rather than being forfeited,

---

[298] *Id.* at 72.

[299] R&R, Doc. 247 at 73-74.

[300] *Rauso v. United States*, Civil Action No. 20-320 (ZNQ)(RLS), 2023 WL 3736353, at *7 (D.N.J. May 31, 2023) (quoting *Marvel v. Del. Cnty.*, No. 07-5054, 2029 U.S. Dist. LEXIS 46755, at *17 (E.D. Pa. Jun. 2, 2009), *aff'd*, 397 F.App'x 785 (3d Cir. 2010)). I note, however, that I do not—as both parties apparently urge me to do—make any determination as to the admissibility of the expert report at this time. See Primecare Objections BIS, Doc. 250 at 4-6; PrimeCare Objections BIO, Doc. 269 at 2-7. No motions in limine were filed to exclude this expert and *sua sponte* converting this portion of the motion for summary judgment to a motion in limine would be improper without providing notice to the parties, and particularly improper in this context, where the Court is resolving objections to an R&R. I therefore assume the admissibility of the expert report and determine whether the record provides support for Plaintiffs' claims against PrimeCare.

[301] *Id.*

were fairly within the scope of PrimeCare's original briefings.[302] As Patterson's expert report does not provide expert evidence of causation,[303] it fell short of what Plaintiffs' burden.

Moreover, though in my view PrimeCare's briefings were sufficient to place the issue of causation in dispute,[304] I would nevertheless reach the merits of this issue based on the record here.[305] For the reasons stated below, I find that Dr. Patterson's expert report is insufficient to support any medical negligence claim for Riley's death.[306] I now analyze this issue *de novo*.

---

[302] The R&R also reads too closely into the word "any" in PrimeCare's Reply Brief because PrimeCare's briefings, read in context, challenge the causation element of Plaintiffs' medical negligence claim. PrimeCare MSJ Reply, Doc. 213 at 1-3 ("Plaintiffs have produced their expert reports; however, Plaintiffs have not produced an expert who opines the purported deviations from the standard of care caused harm to Mr. Riley . . . Plaintiffs have not produced any expert evidence that the deviation caused Mr. Riley's death."); Primecare MSJ BIS, Doc. 162 at 7-8 (quoting *Toogood v. Rogal*, 824 A.2d 1140, 1145 (Pa. 2003)) (conceding that "Plaintiffs may timely produce an expert report to support their negligence cause of action" but contending that "'plaintiffs must present expert testimony to establish the applicable standard of care, the deviation from that standard, causation and the extent of the injury'" because "'causation is also a matter generally requiring expert testimony.'").

[303] The subsequent discussion involving the underlying merits of the causation issue will demonstrate why more fully.

[304] *See* PrimeCare MSJ BIO, Doc. 184 at 2 (stating as an issue presented whether the Court should deny the motion for summary judgment "where Plaintiffs have timely produced the expert report . . . on the issues of standard of care and causation"), 3-4 (providing case law regarding the kind of medical opinion necessary to establish causation).

[305] *See United States v. Dowdell*, 70 F.4th 134, 140-41 (3d Cir. 2023); *Davis v. United States*, 512 U.S. 452, 464 (1994) (Scalia, J. Concurring) ("the refusal to consider arguments not raised is a sound prudential practice, rather than a statutory or constitutional mandate, and there are times when prudence dictates the contrary"); 28 U.S.C. § 636(b)(1)(C) (explaining that district judges may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge").

[306] The Court would ordinarily consider affording the parties the opportunity for supplemental briefing on this issue, given that the nature of the summary judgment and expert report deadlines seems to have impeded, to some degree, PrimeCare's ability to make arguments in its initial brief in support, and Plaintiffs' ability to respond. However, such briefing would

"When a patient's medical malpractice claim sounds in negligence, the elements of the plaintiff's case are the same as those in ordinary negligence actions."[307] Accordingly, a plaintiff suing for medical negligence "must establish a duty owed by the physician to the patient, a breach of that duty by the physician, that the breach was the proximate cause of the harm suffered and the damages were a direct result of the harm."[308] Causation, like the other elements of medical negligence, is "a matter generally requiring expert testimony" unless "the matter is so simple or the lack of skill or care so obvious as to be within the range of experience and comprehension of even non-professional persons."[309]

Pennsylvania courts have found a "less than normal threshold of proof" to apply when analyzing causation in medical negligence cases relying upon expert reports.[310] Even if the "causal connection between the defendants' delay [to render treatment]" or other breach of duty and the injury "was not susceptible of proof to a reasonable degree of medical certainty," because "[s]uch cases by their very nature elude the degree of certainty one would prefer and upon which the law normally insists," a plaintiff need only demonstrate "'that a defendant's acts or omissions . . . have increased the risk of harm to another . . . furnish[ing] a basis for the fact-finder to go further and find that

---

prove futile here because of the deficiencies I identify below. In the interest of expediency, then, I resolve the causation issue fairly raised by PrimeCare's initial brief in support below.

[307] *Toogood v. Owen J. Rogal, D.D.S., P.C.*, 824 A.2d 1140, 1145 (Pa. 2003).

[308] *Hightower-Warren v. Silk*, 698 A.2d 52, 54 (Pa. 1997).

[309] *Toogood*, 824 A.2d at 1145 (quoting *Hightower-Warren*, 698 A.2d at 54).

[310] *Smith v. Grab*, 705 A.2d 894, 899 (Pa. Super. Ct. 1997) (quoting *Hamil v. Bashline*, 392 A.2d 1280, 1287-88 (Pa. 1978)).

such increased risk of harm was in turn a substantial factor in bringing about the harm.'"[311]

Because the contested element of causation asks whether the breach of duty is causally linked to the suffered harm, the Court must begin with the breaches alleged in the expert report despite PrimeCare's concession of this element.[312] The expert report alleges many breaches in this case: PrimeCare's failure to provide appropriate onboarding and comprehensive training; PrimeCare staff's failures to adequately and appropriately assess Riley's level of risk and misguided characterization of Riley as a suicide risk; PrimeCare staff's overall delay in completing intake screenings and inaccurate statements on forms; PrimeCare staff's failure to provide adequate assessments, coordination of care, and treatment planning to address Riley's persistent and steady decline in functioning, severely impaired mental status, and lack of treatment adherence and participation; PrimeCare's failure to make adequate efforts to appropriately assess Riley's mental status and psychiatric condition, causing delays in treatment planning, provision in care, and decline in functioning; the failure to obtain proper informed consent and appropriate medical history when prescribing powerful medications; and a failure by all of Riley's medical and mental health providers to collaborate around Riley's care and treatment, have discussions or consultations about

---

[311] *Smith*, 705 A.2d at 899 (quoting *Hamil*, 392 A.2d at 1287-88); *see also Vicari v. Spiegel*, 936 A.2d 503, 510 (Pa. Super. Ct. 2007); *Rolon v. Davies*, 232 A.3d 773, 777 (Pa. Super. Ct. 2020).

[312] *See* PrimeCare MSJ Reply, Doc. 213 at 2-3 ("Plaintiffs have produced an expert to opine PrimeCare deviated from the applicable standard of care.").

his condition, or develop preliminary or comprehensive treatment plan to confer about his mental health needs.[313]

These breaches are wide-ranging. Many of these breaches are linked to the cause of Riley's mental health decline. What all of them have in common, however, is that they have nothing to do with death by excessive force, which is the cause of death postulated by Plaintiffs' other expert, Dr. Hua. Indeed, Dr. Patterson offers no opinion as to what caused Riley's death. That is particularly noteworthy given that the parties are proffering different explanations, homicide versus natural causes, of Riley's death. As Dr. Patterson briefly summarizes the results of Riley's autopsy in his statement of facts,[314] PrimeCare appears to believe that Plaintiffs are relying on the coroner's explanation of natural causes for Plaintiffs' claims against PrimeCare, while simultaneously relying on their other expert's explanation of homicide for Plaintiffs'

---

[313] Patterson Report, Doc. 196-15 at 15-19.

[314] Patterson Report, Doc. 196-15 at 10 ("Mr. Riley died of natural causes secondary to complications of Cerebral Vasculitis/Encephalitis, Thromboemboli and Rhabdomyolysis. [The coroner] reported 'the vasculitis to the brain is consistent with cocaine usage or infection. Cocaine was found in the hair indicating usage.'"

excessive force claims.[315] But Plaintiffs expressly disclaim the coroner's natural causes theory of liability in their brief in opposition to PrimeCare's objections.[316]

Plaintiffs try to explain the causation gap in Dr. Patterson's report in a different way: the failure to render timely or adequate mental health treatment caused Ty'rique Riley's decline in mental health and resulting behavioral deterioration which, in turn, created the conditions in which the prison guards would foreseeably need to use force against him.[317] In the context of this medical negligence claim, then, Plaintiffs are proposing a four-step causal chain: the physicians' breach of their duty to render timely and adequate mental health care caused Riley's mental health to decline; this, in turn,

---

[315] PrimeCare Objections BIS, Doc. 250 at 6. PrimeCare appears to make this observation to advance an argument based upon the Pennsylvania courts' application of judicial estoppel to cases involving two irreconcilably conflicting expert reports. *Id.* (citing *N.T. v. Children's Hosp. of Phila.*, 308 A.3d 1284, 1289-90 (Pa. Super. 2024)). The Court doubts that judicial estoppel would be applicable under these circumstances, but it need not decide that issue because Plaintiffs' claim fails. *See, e.g.*, 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4477 (explaining that judicial estoppel is motivated by the idea that "absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory"); *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. GMC*, 337 F.3d 314, 319 (3d Cir. 2003) (explaining that judicial estoppel "should only be applied to avoid a miscarriage of justice . . . . Judicial estoppel is therefore not intended to eliminate all inconsistencies no matter how slight or inadvertent"); *Montrose Medical Grp. Participating Savings Plan v. Bulger*, 243 F.3d 773, 779-80 (3d Cir. 1996) ("[J]udicial estoppel is unwarranted unless the party changed his or her position 'in bad faith—i.e., with intent to play fast and loose with the court.'").

[316] PrimeCare Objections BIO, Doc. 262. In any case, the coroner's report does not opine that Riley's declining mental health was related to his cerebral vasculitis/encephalitis, thromboemboli, or rhabdomyolysis, so even taking the coroner's theory as true, there exists a causal gap between the failure to treat these symptoms and the cause of death. While this linkage may seem obvious, it would still require an expert report on causation, which the plaintiffs do not cite to or provide. So even if it were valid for Patterson to simply incorporate the coroner's analysis into his expert report by reference, that analysis would be insufficient because it did not explicitly provide analysis on the contested causal linkage in this medical negligence case.

[317] PrimeCare Objections BIO, Doc. 262 at 6-7.

caused his behavioral deterioration; that behavioral deterioration caused a confrontation requiring the use of force to break out between Riley and the prison guards; and that use of force became excessive, causing Riley's death.

There are two fatal flaws in this argument. The more granular issue is that no expert report opines on the type of mental health conditions Riley was experiencing and how they foreseeably led to this sort of behavioral deterioration.[318] The identification of Riley's underlying conditions and the knowledge of how their symptoms could manifest in behavior is not within the knowledge of a layperson. So to find for Plaintiffs on the issue of proximate cause, factfinders would need an expert opinion contextualizing how Riley's mental health decline could foreseeably manifest into the kind of behavioral degradation which would, in turn, foreseeably causes a potentially fatal confrontation with prison guards.

The broader problem, however, is that Plaintiffs cannot show proximate cause from the original breach to the ultimate injury of death.[319] Under Pennsylvania law, all

---

[318] There are two other causation gaps in the expert reports which might be remedied through *res ipsa loquitur*. First, Dr. Patterson's opinions are generally focused on demonstrating that the mental health care rendered to Ty'rique Riley was inadequate or delayed. He does not give much analysis showing that inadequate and delayed mental health care could foreseeably result in Riley's declining mental health throughout his stay in the prison. But this is likely "a matter so simple . . . as to be within the range of experience and comprehension of even non-professional persons." *Toogood*, 924 A.2d at 1145 (quoting *Hightower-Warren*, 598 A.2d at 54). The link between Riley's declining mental health and his behavioral deterioration is addressed in the body text above. Moving to the link between behavioral deterioration and confrontation, there is also no expert analysis as to the fact that such behavioral deterioration could foreseeably lead to a confrontation requiring the use of force or developing into excessive force. But this, too, is likely the kind of causation analysis which does not rely on expert medical testimony.

[319] As discussed above, the Court recognizes that the summary judgment and expert deadlines applicable in this case created a limited opportunity for briefing which would more aptly be

negligence claims require a showing "that the defendant's negligence was both the cause-in-fact and the legal, or proximate, cause of her injuries."[320] "In Pennsylvania, a negligent act is a cause-in-fact of the plaintiff's injuries 'if the harmful result would not have come about but for the negligent conduct.'"[321] "Regarding proximate cause, conduct is a proximate cause of the plaintiff's harm where the conduct 'was a substantial factor in bringing about the harm inflicted upon a plaintiff.'"[322]

The Pennsylvania Supreme Court has therefore embraced the concept of "superseding cause," stating that:

> The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime."[323]

The Pennsylvania Supreme Court has also cited Section 433 of the Second Restatement of Torts as consistent with Pennsylvania law.[324] And under that Section, three factors are key to analyzing proximate cause: "the number of other factors which contribute in

---

resolved through allowing additional briefing. However, the course of briefings throughout the original motion for summary judgment and subsequent objections to the report and recommendations demonstrate that, as the parties are actively disputing the causation issue, they are on notice that summary judgment may be granted on this basis. Given that additional briefings would be futile, the Court resolves this issue now in the interest of expediency.

[320] *Straw v. Fair*, 187 A.3d 966, 993 (Pa. Super. Ct. 2018).

[321] *Id.* (quoting *First v. Zem Zem Temple*, 686 A.2d 18, 21 n.2 (Pa. Super. Ct. 1996)).

[322] *Id.* (quoting *Jones v. Montefiore Hosp.*, 431 A.2d 920, 923 (Pa. 1981)).

[323] *Ford v. Jeffries*, 379 A.2d 111, 115 (Pa. 1977) (quoting Restatement (Second) of Torts § 448 (Am. L. Inst. 1965)).

[324] *Betz v. Pneumo Abex, LLC*, 44 A.3d 27, 56 n.36 (Pa. 2012).

producing the harm and the extent of the effect which they have in producing it[;] whether the actor's conduct has . . . created a situation harmless unless acted upon by other forces for which the actor is not responsible[; and] lapse of time."[325]

The Court can appreciate the cause-in-fact argument that, absent PrimeCare physicians' breaches, the confrontation causing Ty'rique Riley's death *may* never have occurred. Regardless of whether that argument passes muster at summary judgment, however, Plaintiffs' proximate cause argument certainly does not. Even if it were foreseeable that some kind of force would be deployed against Riley in the absence of additional treatment, it is not foreseeable that that force would be tortiously excessive, much less so excessive as to result in Riley's death. Physicians working in Dauphin County Prison—at least on this record—would not foresee that the prison guards would engage in tortious acts when faced with behavioral deterioration, so the behavior of these independent actors is a superseding cause severing the chain of causation between their breaches and Riley's death.

More globally still, the number of steps in this causal chain severely attenuates the causal link between PrimeCare physicians' conduct and Riley's death, and the extent of their negligence upon this injury becomes more speculative because it is not clear from the record how Riley's behavior would have changed in the care of more competent physicians.[326] Accordingly, there is insufficient record evidence to create an

---

[325] Restatement (Second) of Torts § 433 (Am L. Inst. 1948).

[326] *See Novak v. Kilby*, 647 A.2d 687, 691 n.10 (Pa. Commw. Ct. 1994) (quoting *Caldwell v. Commonwealth*, 548 A.2d 1284, 1286 (Pa. Commw. Ct. 1988) ("Proximate cause is a concept

issue of fact regarding the issue of causation, and summary judgment will be granted in PrimeCare's favor.

The remaining claims against PrimeCare—wrongful death and survival—are derivative claims. Because the underlying medical negligence claim fails, these claims fail as well.[327] The disputed punitive damages issue then becomes moot.[328] Accordingly, the Court will reject the R&R's recommendations as to Counts IX, XII, and XIV against PrimeCare and grant summary judgment accordingly.

## C.    Intentional Infliction of Emotional Distress

Count X pleads a claim of Intentional Infliction of Emotional Distress ("IIED") against all Dauphin County Prison Supervisory and Correctional Officers.[329] According

---

applied by the courts 'to limit liability where the causal chain resulting in a plaintiff's injuries is too remote.").

[327] *See Valentino v. Phila. Triathlon, LLC*, 150 A.3d 483, 497-98 (Pa. Super. Ct. 2016).

[328] However, I note that the R&R's analysis as to this claim—which appeared to deem the punitive damages issue forfeited because *neither* party cited to the MCARE Act's vicarious liability provision—was deeply flawed. R&R, Doc. 247 at 74-75. In the first place, it is odd to apply forfeiture as a one-way ratchet and hold only the moving party responsible where the non-moving party has also failed to cite the statute at issue. Regardless, the vicarious liability provision of the MCARE Act incorporates the requirement that a health care provider's agent committed an underlying act for which punitive damages may be imposed, *and also* requires the health care provider's knowledge of those acts. 40 Pa.C.S. § 1303.505(c) ("Punitive damages shall not be awarded against a health care provider who is only vicariously liable for the actions of its agent that caused the injury unless it can be shown by a preponderance of the evidence that the party knew of and allowed the conduct by its agent that resulted in the award of punitive damages."). The only question briefed or argued by the parties was whether the acts of PrimeCare physicians could justify punitive damages and the MCARE Act's vicarious liability provision itself requires this showing, so it was an abuse of discretion to bypass that question. But because all the claims against PrimeCare fail, the R&R reached the right outcome anyways.

[329] Like the supervisory liability claim, the R&R denied summary judgment on the IIED claim because it opined that the Defendants did not discharge their initial summary judgment burden by affirmatively citing to the absence of evidence. R&R, Doc. 247 at 131-34. But also like the supervisory liability claim, I acknowledge the facial insufficiency of the IIED briefings but observe that they incorporate more developed sections of the same brief by reference. In

to the County Defendants, Plaintiffs' IIED claims fail because they have failed to show that any defendant used objectively unreasonable force, to the extent of being extreme or outrageous, and because they have failed to show that Riley suffered some resulting physical harm.[330] I agree.

"The elements of intentional infliction of emotional distress are: (1) a person who by extreme and outrageous conduct (2) intentionally or recklessly causes (3) severe emotional distress to another."[331] The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."[332] As "the definition of 'outrageousness' is subjective and highly nebulous . . . the availability of recovery for IIED is 'highly circumscribed.'"[333] Accordingly "it has not been enough [to allege] that the defendant has acted with an intent which is tortious or even criminal" to show extreme and outrageous conduct in IIED cases.[334] Courts have therefore found most

---

particular, the defendants' IIED arguments state that because "Plaintiffs failed to show that any [defendant] used objectively unreasonable force[,]" "[n]othing about the officers' actions is 'extreme' or 'outrageous.'"[329] This obviously incorporates by reference the citations to record evidence provided in the preceding excessive force claims.

[330] Dauphin MSJ BIS, Doc. 174 at 38-39.

[331] *Manley v. Fitzgerald*, 997 A.2d 1235, 1241 (Pa. Commw. Ctr. 2010) (citing *Carson v. City of Phila.*, 574 A.2d 1184 (Pa. Commw. Ct. 1990)).

[332] *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998).

[333] *Gray v. Huntzinger*, 147 A.3d 924, 927 (Pa. Super. Ct. 2016) (citing *Kazatzky v. King Memorial Park*, 527 A.2d 988, 995 (Pa. 1987)).

[334] *Hoy*, 720 A.2d at 754 (quoting Rest. 2d Torts § 46 cmt. d (1977)). *Hoy* cited *Papieves v. Lawrence*, 263 A.2d 118 (Pa. 1970) as an example of sufficiently "egregious conduct." *Id.* The Pennsylvania Supreme Court parenthetically explained that case as follows: "defendant, after striking and killing plaintiff's son with automobile, and after failing to notify authorities or seek medical assistance, buried body in a field where discovered two months later and returned to parents." *Id.*

excessive force claims to be insufficient to rise to the level of IIED,[335] and I agree that this case is also insufficient to meet that high bar. Although this claim passes muster on the objective excessive force standard applicable to pretrial detainees, Defendants' conduct, as prison guards, has not departed so far outside the norm of what is ordinarily expected in their work that their conduct can be said to rise to the IIED level, even if it is tortious. Nor have Plaintiffs come forward with any evidence of extreme emotional injury because of a particular defendant's conduct.[336] Accordingly, I shall reject the R&R and grant summary judgment on the IIED claims against all defendants.

### D.    Assault and Battery

Counts XI and XII of the complaint plead claims of Assault and Battery against Danner, Klahr, Smith, Neidigh, Armermann Mendenhall, Grieb, Adams, Blouch, Lewis, Biter, Ingersoll, Weaver, Glenn, Myers, Bauer, Singleton, and Hoffman under Pennsylvania law.

Under Pennsylvania law, "[a]ssault is an intentional attempt by force to do an injury to the person of another, and a battery is committed whenever the violence menaced in an assault is actually done, though in ever so small a degree, upon the person."[337] Because "[t]he reasonableness of the force used in making the arrest determines whether the police officer's conduct constitutes an assault and battery,"[338] a

---

[335] *Burke v. Barr*, No. 5:22-cv-3464, 2025 U.S. Dist. LEXIS 51676, at *17 (E.D. Pa. Mar. 19, 2025).

[336] *See Mastromatteo v. Simock*, 866 F.Supp. 853, 859 (E.D. Pa. 1994).

[337] *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994) (quoting *Cohen v. Lit Bros.*, 70 A.2d 419, 421 (1950)).

[338] *Id.*

"claim brought under Pennsylvania law for excessive force by a police officer is a claim for assault and battery."[339] Accordingly, where plaintiffs have established an underlying claim Section 1983 excessive force claim, courts have held that the assault and battery claims follow.[340]

I also agree with the R&R that as assault claim should not lie against Defendant Haines "for failing to intervene when repeated excessive force was being used against him . . . in order to gain Ty'rique's compliance so that he could retrieve his handcuffs."[341] The R&R correctly observes that "[t]he tort of assault requires that the defendant act with the intent to place the plaintiff in the apprehension of imminent or offensive bodily contact and that the plaintiff actually experience such apprehension.[342] A defendant does not "act" with the requisite intent for assault when it is his "omission" allegedly leading to the plaintiff's apprehension of imminent or offensive bodily contact, and under such circumstances his "failure" to act certainly cannot be what is causing such an apprehension.

I therefore reject in part, and adopt in part, the R&R's recommendations on this count. I grant summary judgment in favor of all defendants against whom the underlying excessive force claim did not survive--Bauer, Neidigh, Grieb, Armermann, Smith, Klahr, Adams, Blouch, Biter, Glenn, Myers, Singleton, Danner, Hoffman—as

---

[339] *Russoli v. Salisbury Twp.*, 126 F.Supp. 2d 821, 860 (E.D. Pa. 2000).

[340] *See, e.g.*, *Dunn v. Tunkhannock Twp.*, Civil Action No. 3:20-cv-00515, at *11 (M.D. Pa. Mar. 24, 2021) (Saporito, M.J.).

[341] Susquehanna MSJ BIO, Doc. 174 at 27.

[342] R&R, Doc. 247 at 143 (quoting *Dull v. W.Manchester Twp. Police Dep't*, 604 F.Supp. 2d 739, 754 (M.D. Pa. 2009)).

well as against Officer Haines, whose conduct does not constitute assault. I deny summary judgment on the assault and battery claims as against all defendants against whom the underlying excessive force claim did survive: Lewis, Ingersoll, and Weaver.

### E.    Wrongful Death and Survival Claims

"Pennsylvania's wrongful death and survival statutes do not create independent causes of action; rather, they are derivative in the sense that the substance of the claim derives from the injury to the decedent."[343]

With respect to the wrongful death action, Pennsylvania law authorizes an action to be brought "to recover damages for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another."[344]   Lewis, Danner, Hoffman, Klahr, Biter, and Singleton are the only remaining defendants alleged to have caused Riley's death by "wrongful act or neglect or unlawful violence or negligence," whether due to excessive force or a failure to intervene, so the count shall be dismissed as to the remaining defendants. In contrast, the survival action survives against each live defendant.[345]

---

[343] *McCracken v. Fulton Cnty.*, No. 19-CV-1063, 2020 U.S. Dist. LEXIS 92956, at *27 (M.D. Pa. May 28, 2020) (citing 42 Pa. Cons. Stat. §§ 8301, 8302). *See also Maldet v. Johnstown Police Dep't*, Case No. 2:19-cv-325, 2019 U.S. Dist. LEXIS 97533, at *14 (W.D. Pa. Jun. 11, 2019) ("§ 1983 is thus recognized as a sufficient underlying basis for wrongful death and survival claims under Pennsylvania law.").

[344] 42 Pa. Cons. Stat. § 8301(a).

[345] 42 Pa. Cons. Stat. § 8302 ("All causes of action or proceedings, real or personal, shall survive the death of the plaintiff.").

## IV.    CONCLUSION

Accordingly, the R&R shall be adopted in part and rejected in part.

As to Counts I and II (§ 1983 Conspiracy), Count III (Excessive Force), and Count IV (Failure to Intervene). Summary judgment is granted against all defendants. In this respect the R&R is adopted in full.

As to Count V (Excessive Force), summary judgment is denied as to defendants Ingersoll, Weaver, Mendenhall, and Lewis, and is granted as to defendants Smith, Neidigh, Bauer, Grieb, Armermann, Adams, Blouch, Glenn, Myers, Klahr, Biter, Singleton, Hoffman, Danner. In this respect the R&R is adopted as to defendants Smith, Neidigh, Ingersoll, Weaver, Mendenhall, Armermann, and Lewis and rejected as to defendants Bauer, Grieb, Adams, Blouch, Glenn, Myers, Klahr, Biter, Singleton, Hoffman, and Danner.

As to Count VI (Failure to Intervene), summary judgment is denied against defendants Weaver, Mendenhall, Bauer, Grieb, Klahr, Biter, Singleton, Hoffman, and Danner and granted as to defendants Smith, Neidigh, Ingersoll, Armermann, Adams, Blouch, Glenn, Myers, Lewis, Swanson, and Donovan. In this respect the R&R is adopted as to defendants Smith, Neidigh, Weaver, Mendenhall, Bauer, Grieb, Klahr, Biter, Singleton, Hoffman, and Danner, and rejected as to defendants Ingersoll, Armermann, Adams, Blouch, Glenn, Myers, Lewis, Swanson, and Donovan.

As to Count VII (Failure to Train and Supervise), summary judgment is granted against all defendants. In this respect the R&R is adopted as to defendant Dauphin

County and rejected as to defendants Clark, Smith, Neidigh, Mendenhall, Grieb, Armermann, Klahr, Adams, Blouch, Lewis, and Biter.

As to Count VIII (Failure to Provide Medical Care), summary judgment is granted against all defendants. In this respect the R&R is adopted in full.

As to Count IX (Medical Negligence), summary judgment is granted against the sole defendant PrimeCare Medical. In this respect the R&R is rejected in full.

As to Count X (Intentional Infliction of Emotional Distress), summary judgment is granted against all defendants. In this respect the R&R is rejected in full.

As to Count XI (Assault), summary judgment is denied as to defendants Ingersoll, Weaver, Mendenhall, and Lewis, and granted as to defendants Smith, Neidigh, Haines, Bauer, Grieb, Armermann, Adams, Blouch, Glenn, Myers, Klahr, Biter, Singleton, Hoffman, and Danner. In this respect the R&R is adopted as to defendants Smith, Neidigh, Haines, Ingersoll, Weaver, Mendenhall, Bauer, Grieb, Armermann, Lewis, and rejected as to defendants Adams, Blouch, Glenn, Myers, Klahr, Biter, Singleton, Hoffman, and Danner.

As to Count XII (Battery), summary judgment is denied as to defendants Ingersoll, Weaver, Mendenhall, and Lewis, and granted as to defendants Smith, Neidigh, Bauer, Grieb, Armermann, Adams, Blouch, Glenn, Myers, Klahr, Biter, Singleton, Hoffman, and Danner. In this respect the R&R is adopted as to defendants Smith, Neidigh, Ingersoll, Weaver, Mendenhall, Bauer, Grieb, Armermann, Lewis, and

rejected as to defendants Adams, Blouch, Glenn, Myers, Klahr, Biter, Singleton, Hoffman, and Danner.

As to Count XIII (Wrongful Death), summary judgment is denied as to defendants Klahr, Lewis, Biter, Singleton, Hoffman, and Danner and granted as to defendants Dauphin County, Smith, Neidigh, PrimeCare Medical, Darcy, D. Glenn, Wilson, Haines, Ingersoll, Weaver, Mendenhall, Bauer, Grieb, Armermann, Adams, Blouch, Glenn, Myers, Donovan, Swanson, Clark. In this respect the R&R is adopted as to defendants Dauphin County, Darcy, D. Glenn, Wilson, Haines, Klahr, Lewis, Biter, Singleton, Hoffman, and Danner, and rejected as to defendants Clark, Smith, Neidigh, PrimeCare Medical, Ingersoll, Weaver, Mendenhall, Bauer, Grieb, Armermann, Adams, Blouch, Glenn, Myers, Donovan, and Swanson.

As to Count XIV (Survivor Act), summary judgment is denied as to defendants Ingersoll, Weaver, Mendenhall, Bauer, Grieb, Klahr, Lewis, Biter, Singleton, Hoffman, and Danner, and granted as to defendants Dauphin County, Clark, Smith, Neidigh, PrimeCare Medical, Darcy, D. Glenn, Wilson, Haines, Armermann, Adams, Blouch, Glenn, Myers, Donovan, and Swanson. In this respect the R&R is adopted as to defendants Dauphin County, Darcy, Wilson, D. Glenn, Haines, Klahr, Mendenhall, Grieb, Lewis, Biter, Ingersoll, Weaver, Bauer, Singleton, Hoffman, and Danner, and rejected as to defendants Clark, Smith, Neidigh, PrimeCare Medical, Armermann, Adams, Blouch, Glenn, Myers, Donovan, and Swanson.

In sum, there remain excessive force claims against Ingersoll, Weaver, Mendenhall, and Lewis and related failure to intervene claims against Weaver, Mendenhall, Bauer, and Grieb for the first excessive force incident and Klahr, Lewis, Biter, Singleton, Hoffman, and Danner for the second incident. Assault, battery, wrongful death, and survivor act claims also survive based on this same conduct. The remaining claims fall.

BY THE COURT:

_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge