**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CARMEN RILEY, ADMINISTRATOR OF THE ESTATE FOR TY'RIQUE RILEY and CARMEN RILEY AND THOMAS MATTHEWS KEMRER, Individually, as Parents and natural guardians of decedent Ty'rique Riley and as his sole survivors, | : : : : : : : | No.: 4:20-CV-00325-MWB-WIA<br><br>CIVIL ACTION – LAW |
| Plaintiffs | : : | JUDGE MATTHEW W. BRANN<br>M.J. WILLIAM I. ARBUCKLE |
| v. | : : | *Electronically Filed* |
| BRIAN CLARK, Warden, et al., | : : | |
| Defendants | : : : : : : | JURY TRIAL DEMANDED |

___

**PLAINTIFFS' REPLY TO DEFENDANT PRIMECARE MEDICAL INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR RECONSIDERATION**

Plaintiffs Carmen Riley, Administrator of the Estate of Ty'rique Riley, and Carmen Riley and Thomas Matthews-Kemrer, individually, as parents and natural guardians of decedent Ty'rique Riley and as his sole survivors, respectfully submit this reply in support of their Motion for Reconsideration of the Court's Order granting summary judgment to Defendant PrimeCare Medical, Inc. ("PrimeCare").

I.      **PrimeCare Mischaracterizes Plaintiffs' Causation Arguments**

PrimeCare's opposition fundamentally mischaracterizes the nature of Plaintiffs' motion, claiming that Plaintiffs have raised a new theory of liability not previously argued. This is absolutely incorrect. Throughout this litigation, Plaintiffs have consistently maintained that PrimeCare's negligence caused a continuum of injuries to Mr. Riley, including distinct non-fatal

injuries that occurred before any alleged superseding cause.  This position is evident in Plaintiffs' Second Amended Complaint which explicitly states that "Defendant PrimeCare's violation of its duty of care to decedent Riley was a direct and proximate cause and a substantial factor in bringing about the decedent's injuries and eventual death." Second Am. Compl. ¶ 203. Plaintiffs have maintained that Mr. Riley suffered multiple distinct injuries during his detention, including "deprivations of his rights, physical injuries, pain and suffering, emotional distress, and mental anguish." Second Am. Compl. ¶ 141.  The Complaint clearly distinguishes between different types of harm, alleging that "[a]s a direct and proximate result of Defendants' conduct, decedent Riley suffered deprivation of his rights, physical injuries, pain and suffering, emotional distress, and mental anguish, all to decedent's great detriment and loss." Second Am. Compl. ¶ 149.

Plaintiffs have consistently maintained this position throughout summary judgment briefing.  PrimeCare's assertion that Plaintiffs "did not argue separate and distinct injuries in opposing PrimeCare's Motion for Summary Judgment" is belied by the record. In Opposition to PrimeCare's Motion for Summary Judgment, Plaintiffs explicitly argued that PrimeCare's staff "failed to provide adequate assessments, coordination of care, and treatment planning to address Ty'rique's persistent and steady decline in functioning severely impaired mental status, and lack of treatment adherence and participation."  Doc. 184, p. 1. Plaintiffs emphasized that "Defendant PrimeCare's treatment of Ty'rique Riley was inadequate, below behavioral health standards, and failed to meet the requirements provided within their own intake and admission policies and procedures." Doc. 184, p.7.

Plaintiffs' briefing specifically highlighted the documented progression of Mr. Riley's deteriorating condition, noting that "Dr. Rosas completed three sick call contacts with Ty'rique at

his cell and testified that Ty'rique's condition deteriorated each day... Dr. Miller similarly confirmed that Ty'rique was acutely psychotic on the first day she evaluated him, and his physical and mental state deteriorated over the days she examined him." Doc. 184, p. 9. Plaintiffs further established the causal connection between PrimeCare's negligence and these non-fatal injuries, arguing that "[t]he consistent and incorrect labeling of Ty'rique Riley's presenting behavior as 'uncooperative' and 'difficult' led to his mental deterioration being ignored by PrimeCare and DCP staff..." Doc. 184, p. 11.

In summary, Plaintiffs emphasized that "Ty'rique Riley's mental health issues and their precipitous decline were observed, documented, and ignored by PrimeCare staff over the course of nine days. The indifference demonstrated by PrimeCare staff in their ignoring of Ty'rique's obvious mental infirmity, lack of assessment and treatment of his mental health... led him to remain within his cell at DCP instead of being directed to a hospital to receive medical care." Doc. 184, p. 12.

Dr. Patterson's expert report explicitly concluded that "the mental health care and treatment provided to Mr. Riley by DCP and PrimeCare failed to meet behavioral health standards, and these failures significantly contributed to and more likely than not were the causes in bringing about the harm, i.e. the severe mental decline and eventual death of Ty'rique Riley on July 1, 2019." Patterson Report, p. 19.

The Court's misapprehension was not fully addressing this aspect of Plaintiffs' claims, focusing exclusively on causation for death while overlooking the non-fatal injuries that were directly caused by PrimeCare's negligence. Dr. Patterson's expert report meticulously documents the progressive mental deterioration and suffering that Mr. Riley experienced as a direct result of

PrimeCare's negligence, clearly establishing multiple compensable injuries that occurred well before any alleged superseding cause on June 26, 2019:

**June 18, 2019 (Initial Detention)**: Dr. Patterson documented that upon Mr. Riley's admission to Dauphin County Prison, PrimeCare staff failed to adequately assess his mental status despite his presentation as "confused," and he was inappropriately medically cleared by MA Betancourt after only "5-6 minutes" of interaction, during which she recognized he "wasn't all the way there." Despite this recognition, PrimeCare staff failed to obtain appropriate medical clearance from an outside provider. As Dr. Patterson explicitly states, MA Betancourt "failed to adequately consider his severely impaired mental status and significant mental health symptoms as relevant factors when she signed off on his medical intake clearance."

**June 18-20, 2019**: During these crucial first days, Dr. Patterson documented a rapid deterioration in Mr. Riley's mental state. Dr. Rosas noted on June 18 that Mr. Riley displayed a "depressed mood with flat or blunted affect" and "impaired" insight and judgment. By June 19, Dr. Rosas observed that Mr. Riley was "entirely unresponsive to questions" with a "fixed gaze, rigid posture" and "disheveled" appearance. On June 20, the deterioration continued, with Dr. Rosas noting Mr. Riley was "naked in his cell" with "blunted affect and mood, no eye contact, disheveled appearance, and rigid posture." Dr. Patterson concluded that PrimeCare's "failures to provide adequate assessments, coordination of care, and treatment planning... directly impacted Mr. Riley's care and contributed to his decline in functioning."

**June 21-23, 2019**: Dr. Miller observed on June 21 that Mr. Riley "has been naked in his cell, has been noted to be acutely psychotic," was "moving his mattress around his room," and put "his juice box in the toilet." She described him as "mute, irritable, no eye contact, not able to assess suicidality/homicidality." Dr. Patterson notes that Dr. Miller prescribed powerful

medications without obtaining informed consent or appropriate medical history. During this period, an officer observed Mr. Riley "naked and playing in the water in his sink" while screaming "I'm locked in the basement."

**June 24-25, 2019**: Dr. Miller again observed Mr. Riley on June 24 and noted he "appeared to be psychotic" and was "waving his arms around" and "dancing around." By June 25, LPC Langseth found Mr. Riley "catatonic," appearing "to be out of touch with present situation," with "no verbal response, no eye contact," and displaying "minimal movement except for slight shaking of arms and hands."

**Morning of June 26, 2019 (Before Any Alleged Superseding Cause)**: CO Donovan observed Mr. Riley "naked in his cell" and "clucking like a chicken" with "dry white stuff" around his mouth. LCSW Irvine found Mr. Riley "wobbly" or unsteady on his feet, with "urine all over the floor," and she observed that when given water, "he was unable to swallow it." RN Daubenspeck noted Mr. Riley had a "distant glazed look about him," with "dry and warm" skin and "some unknown crusty substance" around his mouth.

This chronology establishes that Mr. Riley suffered concrete, compensable non-fatal injuries as a direct result of PrimeCare's negligence, independent of any alleged superseding cause on June 26, 2019. Dr. Patterson explicitly concluded that "the mental health care and treatment provided to Mr. Riley by DCP and PrimeCare failed to meet behavioral health standards, and these failures significantly contributed to and more likely than not were the causes in bringing about the harm, i.e. the severe mental decline" that occurred well before any alleged superseding cause.[1]

---

[1] It is appropriate and responsive to PrimeCare's present argument to highlight that PrimeCare initially argued in its Motion for Summary Judgment that Plaintiffs' claims for medical negligence should fail because Plaintiffs had not yet produced an expert report. Doc. 160. Plaintiffs submitted their expert reports timely and subsequent to PrimeCare's Motion for Summary Judgment.  At the time of receiving only Dr. Hua's expert report, PrimeCare's

## II.    The *Ponzini* Decision Provides Relevant and Persuasive Guidance

PrimeCare attempts to minimize the significance of the Third Circuit's decision

in Ponzini v. Monroe County, 789 Fed. Appx. 313 (3d Cir. 2019), by arguing that it is neither

binding nor persuasive. This argument misses the mark on multiple levels.

First, while Ponzini is not a reported decision, the Third Circuit has made clear that

unreported decisions, although not binding, do have persuasive value. See In re Grand Jury

Investigation, 445 F.3d 266, 276 (3d Cir. 2006) (noting that while non-precedential opinions are

not binding, they may have persuasive authority). The reasoning in Ponzini is highly persuasive

here given the striking similarities between the cases—both involve PrimeCare's provision of

healthcare in a correctional setting and both involve alleged patterns of healthcare failures.

Second, PrimeCare incorrectly asserts that causation was not at issue in Ponzini. To the

contrary, the Third Circuit affirmed the district court's finding that PrimeCare's pattern of

"policies ignored, medical records not reviewed, medical orders not followed, and medication

prescribed but not given" established the requisite causation for liability. Ponzini, 789 Fed.

Appx. at 315. This directly refutes PrimeCare's claim that the decision has "no comparison to the

present case."

Third, Ponzini specifically reinforces that PrimeCare can be held directly liable for its

"failure to oversee all persons providing patient care as well as for failing to adopt/enforce rules

---

Reply Brief argued that Plaintiffs presented an expert to opine on causation without offering an expert to opine on
professional negligence, specifically, that there was no expert who opined that "the purported deviations from the
standard of care caused harm to Mr. Riley." Doc. 213, p. 1. Magistrate Judge William I. Arbuckle issued a Report
and Recommendation ("R&R") denying PrimeCare's Motion for Summary Judgment. Doc. 247. In its Objections
to the R&R, PrimeCare argued that (1) Dr. Patterson's report did not sufficiently demonstrate causation of Mr.
Riley's death to overcome summary judgment, (2) Dr. Patterson, as a clinical psychologist, could not qualify as an
expert opining as to the cause of Mr. Riley's death, and lastly, (3) that the expert opinions of Dr. Patterson and Dr.
Hua presented irreconcilably conflicting theories as to Mr. Riley's cause of death. Doc. 249. PrimeCare raised no
argument relating to Dr. Patterson's ability to opine on the purported deviations from the standard of care that
caused Mr. Riley's other injuries. Prior to the District Court's Opinion, this issue was not directly raised or argued
by PrimeCare. Necessarily and properly, this is the basis of Plaintiffs' request for Reconsideration.

and policies adequate to ensure quality care." Id. at 314. These are precisely the types of systemic failures that Dr. Patterson documented in this case, which directly caused Mr. Riley's mental deterioration prior to any alleged superseding event.

### III.    The *Dubose* and *Embrey* Decisions Directly Support Plaintiffs' Claims for Non-Fatal Injuries Caused by Defendant PrimeCare's Medical Negligence

PrimeCare's attempts to distinguish Dubose v. Quinlan, 125 A.3d 1231 (Pa. Super. 2015) and Embrey v. Borough of West Mifflin, 390 A.2d 765 (Pa. Super. 1978) from the present case fundamentally mischaracterizes both the holdings of these cases and the nature of Plaintiffs' claims. PrimeCare argues that "neither of these cases involved disputed causation as to the cause of death" and thus provides no guidance here. Doc. 278, p. 6. This argument misses the central parallel between these cases and the present case: in all three cases, healthcare providers can be held directly liable for distinct, non-fatal injuries caused by substandard care, regardless of the ultimate cause of death.

In Dubose, the Pennsylvania Superior Court affirmed liability for a nursing home's deliberate indifference that led to a patient's suffering prior to death. 125 A.3d at 1240-1241. The Dubose court specifically recognized that the patient "was malnourished, suffered severe dehydration, conscious pain from bed sores, bone infection, and sepsis systemic infection that led ultimately to organ failure and death." Id. at 1237. The court upheld a separate award of $1 million in the survival action for these injuries, distinct from the $125,000 awarded for wrongful death. Id. at 1236-1237.

In Embrey, the Superior Court confronted precisely the same issue present here:  how to apportion liability between defendants responsible for separate and distinct injuries to the decedent, with one defendant being held specifically responsible for failures to provide requisite medical care.  The Embrey court explicitly held that "as between defendants, most of the

damages awarded for pain and suffering were placed on the doctor and hospital on the basis of evidence that the pain and discomfort [the decedent] suffered…could have been greatly minimized by proper diagnosis and treatment." 390 A.2d at 771.

The parallels to the present case are striking. In <u>Dubose</u>, the patient experienced "severe dehydration and lack of nutrition" while under institutional care, comparable to Mr. Riley's documented mental decline under PrimeCare's supervision and care. In both <u>Dubose</u> and the present case, the healthcare provider's systemic failures—including inadequate assessments, improper staffing, and failure to follow medical protocols—directly caused distinct, compensable injuries separate from death. In <u>Embrey</u>, the jury found that the medical defendants were "largely responsible for pain and suffering which [the decedent] experienced prior to death." 390 A.2d at 768. Likewise in this case, Dr. Patterson's report supports finding PrimeCare responsible for Mr. Riley's mental deterioration, physical pain, suffering, and emotional distress prior to his death. Patterson Report, p. 18. In all three cases, healthcare providers failed to provide adequate care, resulting in documented deterioration, suffering, and pain before death.

Just as in both <u>Dubose</u> and <u>Embrey</u>, where medical defendants were held liable for pain and suffering caused by their negligence, Dr. Patterson's report establishes that PrimeCare's "failures to provide adequate assessments, coordination of care, and treatment planning…directly impacted Mr. Riley's care and contributed to his decline in functioning." <u>Id.</u> This testimony directly parallels the expert testimony in <u>Embrey</u> that decedent's "pain and discomfort…could have been greatly minimized by proper diagnosis and treatment" and in <u>Dubose</u> where the nursing home's negligence led to "marked deterioration" and "conscious pain" prior to death. <u>Dubose</u>, 125 A.3d at 1237; <u>Embrey</u>, 390 A.2d at 771. The distinct injuries of mental deterioration, physical pain, suffering, and emotional distress have a causal connection to

PrimeCare's breaches that are entirely separate from the question of what ultimately caused Mr. Riley's death. The key insight from both precedential cases is not about the ultimate cause of death, but rather the principle that defendants can be held separately liable for the distinct harms they cause, even if they are not responsible for the ultimate death.

The <u>Embrey</u> court's approach to apportionment also provides a clear framework for this case. The court held that "apportionment of damages is applicable between joint tort-feasors, one of whom caused an accident which sent victim to hospital and other responsible for negligent medical treatment." <u>Embrey</u>, 390 A.2d at 768. Similarly here, even if excessive force by correctional officers was a superseding cause of Mr. Riley's death, PrimeCare remains liable for the distinct non-fatal injuries directly caused by its negligent care before that excessive force was applied. In <u>Embrey</u>, the jury found specifically that the medical defendants were "largely responsible for pain and suffering which [the decedent] experienced prior to death." 390 A.2d at 768. Likewise in this case, Dr. Patterson's report supports finding PrimeCare responsible for Mr. Riley's mental deterioration, physical pain, suffering, and emotional distress prior to his death.

The Court's failure to address these distinct injuries constitutes precisely the type of error that warrants reconsideration. This Court should follow the established Pennsylvania precedent in both cases recognizing that healthcare providers can be held separately liable for the distinct injuries caused by their negligence and reconsider its grant of summary judgment to PrimeCare for the non-fatal injuries that Mr. Riley suffered as a direct result of PrimeCare's negligent care.

## IV.    Plaintiffs Have Established Causation for Non-Fatal Injuries

This Court's analysis of causation focused solely on whether PrimeCare's breaches of the standard of care caused Mr. Riley's death. However, as explained in Plaintiffs' Motion for Reconsideration and above, Dr. Patterson's report contains substantial evidence establishing

causation for Mr. Riley's non-fatal injuries. <u>See</u> Patterson Report, p. 18 ("failures to provide adequate assessments, coordination of care, and treatment planning... directly impacted Mr. Riley's care and contributed to his decline in functioning."). PrimeCare attempts to sidestep this evidence by claiming the Court already considered "the scope of Dr. Patterson's report and the purported mental health decline of Mr. Riley." But the Court's analysis addressed only whether these factors causally contributed to Mr. Riley's death—not whether they caused distinct, compensable non-fatal injuries.

The Court did not apply the relaxed "less than normal threshold of proof" standard established in <u>Hamil v. Bashline</u> to these separate injuries. 392 A.2d 1280 (Pa. 1978) (holding that where there is at issue the adequacy of medical services rendered, a prima facie case of liability is established where expert testimony is presented to the effect that defendant's conduct did, with a reasonable degree of medical certainty, increase the risk that the harm sustained by plaintiff). While PrimeCare argues that Dr. Patterson's report is insufficient to establish causation for any of Mr. Riley's injuries, this argument fundamentally misunderstands Pennsylvania's relaxed causation standard under <u>Hamil</u>.

In <u>K.H. ex rel. H.S. v. Kumar</u>, 122 A.3d 1080, 1104 (Pa. Super. 2015), the Superior Court emphasized that a plaintiff need only present evidence that the defendant's actions "substantially increased the risk of harm" to establish a prima facie case of medical negligence. The court specifically rejected the argument that additional medical evidence beyond what was already presented was necessary to prove the defendant's conduct increased the risk of harm. <u>Id.</u> at 1105. Similarly, in <u>Klein v. Aronchick</u>, 85 A.3d 487, 496-497 (Pa. Super. 2014), the Superior Court reversed a trial court decision that precluded expert testimony on increased risk of harm, holding that a plaintiff is entitled to argue that the defendant's negligence either directly caused the harm

or increased the risk of such harm occurring. The court explicitly stated that "the relaxed standard of proof established in <u>Hamil</u> allows for causation to be established by showing that the defendant's negligence increased the risk of harm." <u>Id.</u> Most relevant to the present case, the Superior Court in <u>Montgomery v. South Philadelphia Medical Group, Inc.</u>, 656 A.2d 1385, 1390-1391 (Pa. Super. 1995), held that "as long as reasonable minds can conclude that the defendant's conduct was a substantial factor in causing the harm, the issue of causation may go to the jury upon a less than normal threshold of proof."

Dr. Patterson's expert opinion that PrimeCare's "failures to provide adequate assessments, coordination of care, and treatment planning... directly impacted Mr. Riley's care and contributed to his decline in functioning" satisfies this relaxed standard. Under Pennsylvania law, his opinion is sufficient to establish causation for Mr. Riley's mental deterioration and associated suffering that occurred prior to any alleged superseding cause. Even if this Court maintains its position that excessive force used by the correctional officers constitutes a superseding cause breaking the causal chain between PrimeCare's negligence and Mr. Riley's death, Pennsylvania law clearly establishes that PrimeCare remains liable for the separate, non-fatal injuries that occurred before that superseding cause. [2] This Court's failure to apply the <u>Hamil</u> standard to these distinct injuries constitutes a clear error of law that warrants reconsideration.

---

[2] Plaintiffs' argument regarding separate liability for non-fatal injuries should not be construed as acceptance of the Court's finding that excessive force was a superseding cause breaking the causal chain between PrimeCare's negligence and Mr. Riley's death. Plaintiffs maintain their objection to this finding and expressly reserve the right to challenge it on appeal. This Motion for Reconsideration addresses solely the Court's error in failing to recognize PrimeCare's separate liability for non-fatal injuries, regardless of the ultimate cause of death.

## V.      The Court's Error Warrants Reconsideration

PrimeCare argues that motions for reconsideration "should not be used to put forward arguments which the movant... could have made but neglected to make before judgment." This principle is inapplicable here because Plaintiffs are not presenting new arguments. Rather, Plaintiffs are requesting that the Court correctly apply the law to claims that have been consistently presented throughout this litigation.  See also *supra* n.1 (highlighting procedural sequence and development of these arguments).

The Court's decision granting summary judgment on all claims against PrimeCare, including those related to non-fatal injuries, constitutes a clear error of law that will result in manifest injustice if left uncorrected. This is precisely the type of situation where reconsideration is warranted—where the Court has "misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." Rohrbach v. AT&T Nassau Metals Corp., 902 F. Supp. 523, 527 (M.D. Pa. 1995).

For the foregoing reasons, and those stated in Plaintiffs' Motion for Reconsideration, Plaintiffs respectfully request that this Honorable Court reconsider its grant of summary judgment and reinstate the medical negligence claims against PrimeCare as they relate to Mr. Riley's non-fatal injuries, including his mental deterioration, physical pain, suffering and emotional distress.

Respectfully submitted,

**MINCEY FITZPATRICK ROSS, LLC.**
/s/ Kevin V. Mincey_____
Kevin V. Mincey, Esquire, PA ID No. 90201
Riley H. Ross III, Esquire, PA ID No. 20754
Jennifer A. Nearn, Esquire, PA ID No. 307517
One Liberty Place

Dated: May 12, 2025

1650 Market Street, Suite 3600
Philadelphia, Pa 19103
Telephone: (215) 587-0006
*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CARMEN RILEY, ADMINISTRATOR OF THE ESTATE FOR TY'RIQUE RILEY and CARMEN RILEY AND THOMAS MATTHEWS KEMRER, Individually, as Parents and natural guardians of decedent Ty'rique Riley and as his sole survivors, : | No.: 4:20-CV-00325-MWB-WIA |
| : | CIVIL ACTION – LAW |
| Plaintiffs : | |
| v. : | |
| BRIAN CLARK, Warden, et al., : | |
| Defendants : | |

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the Plaintiffs' Reply to Defendant Primecare Medical inc.'s opposition to Plaintiff's Motion for Reconsideration, was duly served on all counsel of record and unrepresented parties on the 12th of May 2025, electronically.

Respectfully submitted,

**MINCEY FITZPATRICK ROSS, LLC.**
<u>/s/ Kevin V. Mincey</u>
Kevin V. Mincey, Esquire, PA ID No. 90201
Riley H. Ross III, Esquire, PA ID No. 20754
Jennifer A. Nearn, Esquire, PA ID No. 307517
One Liberty Place
Dated: <u>May 12, 2025</u>
1650 Market Street, Suite 3600
Philadelphia, Pa 19103
Telephone: (215) 587-0006
*Attorneys for Plaintiff*