## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CARMEN RILEY, *et al.*,

      Plaintiffs,

      v.

ANDREW KLAHR, *et al.*,

      Defendants.

No. 4:20-CV-00325

(Chief Judge Brann)

## MEMORANDUM OPINION

### JULY 18, 2025

## I.    BACKGROUND

This case involves the medical care provided to Ty'rique Riley and the allegedly excessive force deployed against him during his detention at Dauphin County Prison between his booking on June 18, 2019, and his death on June 26, 2019.[1] Plaintiffs Carmen Riley and Thomas Matthews-Kemrer filed the instant action in February 2020, and after removal to this Court, it was jointly assigned to the undersigned and to a magistrate judge.[2] In April 2021, Plaintiffs filed a second amended complaint.[3] In January 2024, four motions for summary judgment were

---

[1]    A more comprehensive statement of relevant facts can be found by consulting the Magistrate Judge's original Report and Recommendation. Report and Recommendation ("R&R"), Doc. 247 at 8-64. This Court's Memorandum Opinion adopting the R&R in part and rejecting it in part clarified the factual record in light of various objections but did not relevantly alter the R&R's statement of facts regarding PrimeCare, Inc.'s conduct in the instant case. *See generally* Memorandum Opinion, Doc. 272.

[2]    Complaint, Doc. 1-21; Notice of Removal, Doc. 1.

[3]    Second Amended Complaint, Doc. 64.

filed by the remaining Defendants.[4] Magistrate Judge William I. Arbuckle then issued a Report and Recommendations ("R&R") recommending a resolution of the pending motions for summary judgment.[5] Three groups of Defendants and Plaintiffs then filed objections to the R&R.[6] In March 2025, I rejected the R&R in part and adopted it in part.[7]

In April 2025, Plaintiffs filed a motion for reconsideration regarding Defendant PrimeCare Medical, Inc. ("PrimeCare").[8] PrimeCare is a corporation that contracted with Dauphin County Prison to provide medical care to inmates incarcerated at Dauphin County Prison.[9] Plaintiffs originally sought damages against PrimeCare for civil rights conspiracy to deny medical care under 42 U.S.C. § 1983 and medical negligence under Pennsylvania state law, in addition to pleading

---

[4]  Motion for Summary Judgment by Matthew Danner, Angela Swanson, Doc. 157; Motion for Summary Judgment by PrimeCare Medical, Inc., Doc. 160; Motion for Summary Judgment by Michael Darcy, Demetrius Glenn, Chris Haines, Richard Wilson, Doc. 164; Motion for Summary Judgment by Jason Adams, Richard Armermann, Delta Bauer, Keith Biter, Michael Blouch, Brian Clark, Dauphin County, Tami Donovan, Taylor Green, Scott Grieb, Keith Hoffman, Robert Ingersoll, Andrew Klahr, Scott Lewis, Greg Mendenhall, Martin Myers, Mark Neidigh, Steve Singleton, Steve Smith, Cameron Weaver, Doc. 173.

[5]  R&R, Doc. 247.

[6]  Objection to R&R by PrimeCare Medical, Inc., Doc. 249; Objection to R&R by Matthew Danner and Angela Swanson, Doc. 251; Objection to R&R by Brian Clark, Dauphin County, Steve Smith, Mark Neidigh, Richard Armermann, Delta Bauer, Steve Singleton, Keith Hoffman, Andrew Klahr, Greg Mendenhall, Scott Grieb, Tami Donovan, Jason Adams, Michael Blouch, Scott Lewis, Keith Biter, Robert Ingersoll, Cameron Weaver, Taylor Glenn, Martin Myers, Doc. 253; Objection to R&R by Plaintiffs, Doc. 255.

[7]  Order, Doc. 273.

[8]  Motion for Reconsideration, Doc. 274.

[9]  Second Amended Complaint, Doc. 64 ¶21; Answer, Doc. 69 ¶21.

wrongful death and survival as separate causes of action.[10] Magistrate Judge Arbuckle's R&R recommended granting PrimeCare's motion for summary judgment as to the Section 1983 claims and denying PrimeCare's motion for summary judgment in full.[11] I adopted the R&R as to the Section 1983 claims and rejected the R&R as to the remaining claims, holding that summary judgment should be granted in full.[12] Plaintiffs' motion for reconsideration contends that the Court should have denied PrimeCare's motion for summary judgment as to the medical negligence claims because the Court focused its analysis on whether medical negligence caused Riley's death without considering other harms.[13] I agree. In granting reconsideration, I also return to the related survival, wrongful death, and punitive damages claims which initially fell with the medical negligence claim.

## II.    ANALYSIS

Federal Rule of Civil Procedure 59(e) authorizes parties to file a motion to alter or amend a judgment no later than 28 days after the entry of judgment. "A motion for reconsideration requires the movant to show (1) an intervening change in the controlling law; (2) new evidence that was not available when the court issued its order, or (3)," as relevant here, "the need to correct a clear error of law or prevent

---

[10]   Second Amended Complaint, Doc. 64 at 29 (Count II: Conspiracy), 42 (Count IX: Medical Negligence), 46 (Count XIII: Wrongful Death), 27 (Count XIV: Survival Action).
[11]   R&R, Doc. 247 at 75, 121-25
[12]   Memorandum Opinion, Doc. 272 at 69-71, 85-95.
[13]   Motion for Reconsideration Brief in Support ("MFR BIS"), Doc. 275.

manifest injustice."[14] As to the third basis, "reconsideration is appropriate where the court has 'misunderstood a party, or has made a decision outside the adversarial issues presented to the court by parties, or has made an error not of reasoning, but of apprehension.'"[15]

## A.    Medical Negligence

The opportunity for confusion in this case began when a scheduling order set the dispositive motions deadline before the expert report deadline.[16] PrimeCare's motion for summary judgment on Plaintiffs' medical negligence claim therefore asserted that "if Plaintiffs do not produce an expert report" in support, PrimeCare is entitled to summary judgment; it also "conceded that Plaintiffs may timely produce an expert report."[17] Plaintiffs responded by noting that they had produced an expert report written by Dr. Marcus Patterson, and so "[b]y its own concession, Defendant's request for Summary Judgment on this issue must be denied."[18] PrimeCare's reply countered that the expert report produced by Plaintiffs did not opine that "the purported deviations from the standard of care caused harm to Mr. Riley . . . Plaintiffs have not produced any expert evidence that the deviation caused Mr.

---

[14]   *Gibson v. State Farm Mut. Auto. Ins. Co.*, 994 F.3d 182, 190 (3d Cir. 2021).
[15]   *Watley v. Felsman*, No. 3:16-CV-2059, 2019 U.S. Dist. LEXIS 248225, at *2 (M.D. Pa. Jul. 16, 2019) (quoting *Rohrbach v. AT&T Nassau Metals Corp.*, 902 F.Supp. 523, 527 (M.D. Pa. 1995)).
[16]   Scheduling Order, Doc. 144
[17]   Motion for Summary Judgment Brief in Support ("MSJ BIS"), Doc. 162 at 8.
[18]   Motion for Summary Judgment Brief in Opposition ("MSJ BIO"), Doc. 184 at 5.

Riley's *death*."[19] The Magistrate Judge's R&R denied summary judgment solely on the basis that an expert report was produced which purported to connect Riley's death to medical negligence,[20] and this Court rejected the R&R on the basis that Dr. Patterson's expert report offered no expert evidence, beyond a conclusory sentence, tying Riley's death to the negligence of PrimeCare physicians.[21] This Court also explained why a medical negligence claim including prison guards' tortuously excessive force in the chain of causation would be unviable as a matter of law.[22]

Returning to the briefings with fresh eyes, I agree with Plaintiffs that with respect to the medical negligence claim, the Court made "an error not of reasoning, but of apprehension."[23] In large part due to the clumsy procedural posture in this case as well as the parties' framing of the issues, the Court failed to apprehend that Plaintiffs' medical negligence claim could be premised upon non-death-related injuries resulting from the PrimeCare physicians' breaches. Dr. Patterson's report identifies multiple instances during which PrimeCare staff medically assessed Riley, determines based upon Patterson's expertise that PrimeCare staff failed to

---

[19] Motion for Summary Judgment Reply ("MSJ Reply"), Doc. 213 at 1, 3 (emphasis added).
[20] R&R, Doc. 257 at 72-73.
[21] Memorandum Opinion, Doc. 272 at 86-87.
[22] *Id.* at 87-95.
[23] *Watley v. Felsman*, 2019 U.S. Dist. LEXIS 248225, at *2 (quoting *Rohrbach*, 902 F.Supp. at 527).

adequately assess him at each juncture, and explains that the resulting delays in treatment caused Riley's decline in mental functioning to continue.[24]

I also agree that wading any further into the sufficiency of Patterson's report—beyond observing that it offers non-conclusory expert evidence tying breaches to pre-death injuries—would be unwise in this posture.[25] PrimeCare never brought a more fulsome challenge to the substance of Dr. Patterson's report, nor could it, as Plaintiffs' expert report was due after PrimeCare's brief in support was due. To mount such a challenge, the onus was on PrimeCare to request an extension on its motion for summary judgment until after the expert report deadline, or to request a different dispositive motions deadline to begin with. As it stands, the parties still have not fully briefed the merits of Plaintiffs' medical negligence claim. It would be unwise to go any further than acknowledging that, at least as to these non-death injuries, Plaintiffs produced expert evidence in support.[26]

---

[24]  *See, e.g.*, Report of Marcus Patterson, Doc. 196-15 at 17 (explaining that PrimeCare staff's negligence, through the failure to provide adequate assessments, coordination of care, and treatment planning, caused "significant delays in treatment planning and the provision of care to manage Mr. Riley's symptoms and noted decline in functioning"). The Court appreciates Plaintiffs' breakdown of the expert report in their reply brief, which—while failing to provide citations to specific pages of the report—nevertheless assisted the Court in understanding Plaintiffs' argument. *See* Motion for Reconsideration Reply Brief ("MFR Reply"), Doc. 283 at 4-5. Furthermore, as the Court explained in its memorandum opinion, Patterson's failure to provide an expert opinion as to how delays in mental health treatment could cause mental deterioration is not fatal, because this is "a matter so simple . . . as to be within the range of experience and comprehension of even non-professional persons." Memorandum Opinion, Doc. 272 at 92 n.218 (quoting *Toogood v. Rogal*, 824 A.2d 1140, 1145 (Pa. 2003)).

[25]  *See* MFR Reply, Doc. 283 at 5-6 n.1.

[26]  This stands in contrast to Riley's death, which the Patterson report never connected to PrimeCare physicians' breaches with expert evidence, outside of at most implying the legally

I do not find these arguments to be waived or forfeited because, while the Court would have appreciated clearer advocacy, Plaintiffs had no duty to raise them in the first place.[27] PrimeCare's original brief in support only pointed to the necessity of expert evidence tying a breach to *any injury* suffered by Riley,[28] so it was unreasonable to expect Plaintiffs to respond by pointing to non-death-related injuries. Plaintiffs' original brief in opposition also never hinged on death alone; it contended that Dr. Patterson's report provided expert evidence that PrimeCare's deviations from the standard of care caused "injury" to Riley.[29] Only in PrimeCare's reply brief (and inconsistently at that) did PrimeCare specifically point to the lack of evidence tying PrimeCare's breaches of duty to the particular injury of Riley's death.[30] Plaintiffs were simply not obligated to respond to an argument which itself was never raised, or at best, raised in passing and by implication in a reply brief.[31]

---

unavailable theory that Riley's mental deterioration caused prison guards to deploy excessive and lethal force against him.

[27] In any case, application of waiver and forfeiture doctrines is discretionary, and the Court would not choose to apply those doctrines here because of the limited notice PrimeCare's original brief in support provided.

[28] *See* MSJ BIS, Doc. 162 at 7-8. Had PrimeCare's original brief argued that Plaintiffs must produce expert evidence tying medical negligence to the specific injury of *death* to survive summary judgment, it might have been incumbent upon Plaintiffs to argue that another route to surviving summary judgment existed.

[29] MSJ BIO, Doc. 184 at 5.

[30] *See* MSJ Reply, Doc. 213 at 1 ("Plaintiffs have not produced an expert who opines the purported deviations from the standard of care caused *harm* to Mr. Riley.") (emphasis added), 3 ("[I]t is submitted that though Plaintiffs have produced an expert to opine PrimeCare deviated from the applicable standard of care, Plaintiffs have not produced any expert evidence that the deviation caused Mr. Riley's *death*.") (emphasis added).

[31] *Cherry v. City of Phila.*, 216 F.App'x 205, 209 (3d Cir. 2007) ("[A]rguments raised for the first time in a reply brief are forfeited."); *Teleglobe Comms. Corp. v. BCE, Inc. (In re Teleglobe Comms. Corp.)*, 493 F.3d 345, 376 (3d Cir. 2007); ("'An issue is waived unless a party raises

To the extent PrimeCare's objections briefings implied that Plaintiffs could only survive summary judgment by tying its breaches to the specific injury of death,[32] Plaintiffs were not bound to reply to an argument which was both undeveloped and not properly raised in the first instance.[33] Moreover, though Plaintiffs appeared to suggest when opposing PrimeCare's objections that their medical negligence claim was tied to Riley's death,[34] the Court *now* appreciates that Plaintiffs were responding to PrimeCare's argument that Dr. Patterson's expert report was inconsistent with Dr. Zhongxue Hua's expert report, which appeared to postulate a different cause of death;[35] prior sections of Plaintiffs' briefings, though not very clear, seem to allude to a broader scope of injuries.[36]

---

it in its opening brief, and for those purposes "a passing reference to an issue . . . will not suffice to bring that issue before this court.""'."); *Seifert v. Pa. Human Relations Comm'n*, 301 F.App'x 194, 196-97 (3d Cir. 2008) ("Mere allusion or reference is not enough; the issue must actually be raised with a minimum level of thoroughness.").

[32] Objections Brief in Support ("Obj. BIS"), Doc. 250 at 6 ("The cause and manner of Mr. Riley's death is disputed in this case, and Dr. Patterson is simply not qualified to render an opinion as to how the alleged deficient mental health treatment provided to Mr. Riley caused Mr. Riley's *death*.") (emphasis added).

[33] *See In re Nat'l Collegiate Student Loan Trusts 2003-1, 2004-1, 2004-2, 2005-1, 2005-2, 2005-3*, 971 F.3d 433, 444 (3d Cir. 2020) ("Arguments not presented to a magistrate judge and raised for the first time in objections to the magistrate's recommendations are deemed waived."); *Seifert*, 301 F.App'x at 196-97 ("Mere allusion or reference is not enough; the issue must actually be raised with a minimum level of thoroughness.").

[34] *See* Objections Brief in Opposition ("Obj. BIO"), Doc. 269 at 4 ("Dr. Patterson's opinion that the mental health care provided to Mr. Riley failed to meet behavioral health standards and that these failures significantly contributed to and more likely than not were the causes in bringing about the harm, i.e., the severe mental decline and eventual death of Tyrique Riley, falls squarely within his professional expertise."), 6 ("The factfinder could reasonably conclude that inadequate mental health treatment led to further behavioral deterioration bringing about physical restraint, which in turn resulted in the physiological cause of death.").

[35] *Id.* at 6 (arguing that the expert reports are "complementary, not contradictory").

[36] *Id.* at 2 ("Dr. Patterson is entirely qualified to render an opinion on whether deficiencies in mental health treatment contributed to Mr. Riley's *decline* and death.") (emphasis added), 4

However, the Court stands on its prior reasoning regarding the lack of expert evidence tying PrimeCare's medical negligence to Riley's death. As this Court previously explained, the Patterson report failed to provide any expert evidence at all tying Riley's death to PrimeCare's medical negligence. Any injury caused by the tortuously excessive force deployed by prison guards was not proximately caused by preceding medical negligence, even if that medical negligence was a but-for cause of the mental deterioration which in turn caused the physical confrontation.

## B.    Derivative Claims

Wrongful death and survival actions are derivative claims, so their fate is tied to the existence of an underlying tort.[37] I initially granted summary judgment on these claims.[38] Because the medical negligence claim has now been revived in part, I also deny summary judgment as to the survival action. But I grant summary judgment on the wrongful death action because, as the Court previously held, the alleged medical negligence here could not have resulted in Riley's death as a matter of law.[39]

---

("Dr. Patterson's opinion that the mental health care provided to Mr. Riley failed to meet behavioral health standards and that these failures significantly contributed to and more likely than not were the causes in bringing about *the harm, i.e. the severe mental decline* and eventual death of Tyrique Riley, falls squarely within his professional expertise.") (emphasis added).

[37]    *Valentino v. Phila. Triathlon, LLC*, 150 A.3d 483, 497-98 (Pa. Super. Ct. 2016).

[38]    Memorandum Opinion, Doc. 272 at 95.

[39]    *Id.* at 85-95; 42 Pa. Cons. Stat. § 8301(a) (authorizing action to be brought "to recover damages for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another").

### C.    Punitive Damages

The Court initially found the punitive damages issue to be moot because the underlying medical negligence claim failed in full.[40] Because the medical negligence claim is revived in part, it is appropriate to reconsider the punitive damages issue given that the parties fully briefed it in the first instance.[41] As noted in the margin of my prior Memorandum Opinion, the R&R's analysis of this issue was flawed in its application of forfeiture to PrimeCare's arguments.[42] "The only question briefed or argued by the parties was whether the acts of PrimeCare physicians could justify punitive damages and the MCARE Act's vicarious liability provision itself requires this showing."[43] The Court accordingly turns to this issue now.

The Court does not disturb its grant of summary judgment on the punitive damages issue. While punitive damages are not a distinct cause of action in Pennsylvania,[44] "there is a distinction between negligence and punitive damages claims, with a plaintiff being required to meet a far lesser burden to establish a negligence claim than that which is imposed in connection with a punitive damages claim."[45] Punitive damages require showing that the defendant "has acted in an

---

[40]    Memorandum Opinion, Doc. 272 at 95.

[41]    *Gibson v. Mayor and Council of City of Wilmington*, 355 F.3d 215, 223-24 (3d Cir. 2004) ("[W]hen a party has had the opportunity to present all the evidence that would be used to oppose a motion for summary judgment, the fact that the actual notice was not given becomes irrelevant if the party was not prejudiced by the lack of notice.").

[42]    Memorandum Opinion, Doc. 272 at 95 n.328.

[43]    *Id.*

[44]    *Kirkbride v. Lisbon Contractors, Inc.*, 555 A.2d 800, 802 (Pa. 1989).

[45]    *Phillips v. Cricket Lighters*, 883 A.2d 439, 445-46 (Pa. 2005).

outrageous fashion due to either 'the defendant's evil motive or his reckless indifference to the rights of others.'"[46] To show reckless indifference sufficient for punitive damages, 'a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk."[47] The risk of harm must "involve an easily perceptible danger" and "the probability that it will so result must be substantially greater than is required for ordinary negligence."[48] But, what is most "vital" to the punitive damages determination is the defendant's "state of mind."[49]

Because this medical negligence claim is brought against a healthcare provider, it is subject to the Medical Care Availability and Reduction of Error ("MCARE") Act. Tracking the Pennsylvania common law of punitive damages, the MCARE only permits the imposition of punitive damages "for the health care provider's willful or wanton conduct or reckless indifference to the rights of others."[50] As to the acts of the healthcare provider's agents, the MCARE Act explicitly proscribes vicarious liability, limiting punitive damages to situations in

---

[46]   *Id.* at 445 (citing *Martin v. Johns Manville Corp.*, 494 A.2d 1088, 1096 n.14 (Pa. 1985).

[47]   *Hutchison v. Luddy*, 870 A.2d 766, 772 (Pa. 2005).

[48]   *Moran v. G. & W.H. Corson, Inc.*, 586 A.2d 416, 423 (Pa. Super. Ct. 1991) (quoting Restatement (Second) of Torts § 500 cmts. (a) & (g) (1965). *See also Phillips*, 883 A.2d at 445 (explaining that the Defendant's conduct must create a risk which is "substantially greater than that which is necessary to make his conduct negligent.").

[49]   *Feld v. Merriam*, 485 A.2d 742, 748 (Pa. 1984).

[50]   40 Pa.C.S. § 1303.505(a).

which the health care provider "knew of and allowed the conduct by its agent that resulted in the award of punitive damages."[51]

There is no underlying conduct by any of PrimeCare's agents rising above gross negligence. Plaintiffs have shown PrimeCare physicians' awareness that Riley was "confused," "incoherent," "not lucid and nonresponsive," and "appeared unable to understand what was being said to him," as reflected in the physicians' testimonies and reports.[52] Rightly or wrongly, PrimeCare physicians believed that Riley's condition could be treated within Dauphin County Prison and responded by prescribing Riley with medication and continuing to evaluate his declining mental state cell-side between the dates of June 18 and June 26, when they ultimately decided to arrange for Riley's transport to the hospital. Assistants attempted medical screenings and detox checks on June 18, June 19, June 20, June 21, June 22, June 23, June 24, and June 25.[53] Drs. Garrett Rosas and Robin Miller evaluated Riley on June 18, June 19, June 20, June 21, and June 24, with Miller prescribing Depakote and Zyprexa on the 21, and Licensed Professional Counselor Christina Langseth visited and evaluated Riley on June 25, on which date Rosas and Miller conferred

---

[51]  *Id.*; 40 Pa.C.S. § 1303.505(c) ("Punitive damages shall not be awarded against a health care provider who is only vicariously liable for the actions of its agent that caused the injury unless it can be shown by a preponderance of the evidence that the party knew of and allowed the conduct by its agent that resulted in the award of punitive damages.").

[52]  MSJ BIO, Doc. 184 at 7.

[53]  R&R, Doc. 247 at 33-37. In relying upon the R&R's statement of facts, I observe that the parties never objected to its assessment of the record.

and determined that Riley did not need to be sent to a hospital.[54] On June 26, licensed social worker Susan Irvine visited Riley's cell and expressed to a PrimeCare employee that Riley did not look good, after which Riley was transported to the medical center via wheelchair for further examination and the decision was made to transport Riley to an area hospital.[55]

Even assuming that PrimeCare physicians provided care which was "inadequate, below behavioral health standards, and failed to meet the requirements provided within [PrimeCare's] own intake and admission policies and procedures,"[56] this record cannot support punitive damages liability. Unlike the knowing failure to provide any treatment—for example, by ignoring a patient who is "crying for water" until she becomes dehydrated or ignoring a doctor's orders[57]—inadvertently providing a wrong or insufficient treatment, while it may rise to medical negligence, does not rise to recklessness.[58] The same may be said about PrimeCare physicians' prescription of medication without obtaining Riley's informed consent; in the case

---

[54] *Id.* at 37-34.

[55] *Id.* at 47-48.

[56] MSJ BIO, Doc. 184 at 6.

[57] *Scampone v. Grane Healthcare Co.*, 11 A.3d 967, 991-92 (Pa. Super. Ct. 2010). *See also Dubose v. Quinlan*, 125 A.3d 1231, 1240-41 (Pa. Super. Ct. 2015) (nurses provided "substandard care to the point of reckless indifference" by failing to follow physician's orders and leaving the patient malnourished, dehydrated, with bone infection and sepsis systemic infection, and suffering conscious pain, leading to severe organ failure and eventual death).

[58] *Williams v. Syed*, 782 A.2d 1090, 1096 (Pa. Commw. Ct. 2001) (no punitive damages available for prison doctor providing a migraine medication which lowered inmate's blood pressure and caused him to faint and suffer injury, even though underlying medical negligence claim survived).

of an acutely psychotic patient with a deteriorating mental condition, such an action does not rise to the severity of intentionally evil or reckless conduct even if it is negligent or violates of medical ethics, as it did not create a substantial risk of harm to Riley here.[59] Likewise, while some PrimeCare physicians testified that they did not believe Riley to be a suicide risk, placing Riley on suicide watch while he was undergoing acute psychosis is not the kind of reckless behavior justifying punitive damages, because it is not clear how placing Riley on suicide watch would increase his risk of harm. In sum, even if PrimeCare physicians negligently decided upon the wrong course of treatment for Riley, the record does not permit an inference that the physicians knew that their conduct created a substantial risk of harm to Riley and consciously disregarded that risk.

Plaintiffs point to physicians' characterization of Riley as being "uncooperative" or "refusing" intake or detox evaluations, even though it would be more accurate to state that Riley was *unable* to cooperate in his own medical treatment due to his mental deterioration, to contend that this led to PrimeCare staff ignoring his condition.[60] However, the timeline of events makes clear that PrimeCare staff continued to monitor and treat Riley and believed him to be psychotic. Nor does this characterization rise to the kind of falsification of medical records often

---

[59]  Because the punitive damages question does not turn on whether the failure to acquire informed consent was wrongful under these circumstances, the Court expresses no opinion on that question now.

[60]  MSJ BIO, Doc. 184 at 7-9, 11.

supporting punitive damages. While the falsification of records engineered to cover up or hide a lack of medical treatment is sufficiently outrageous to justify punitive damages,[61] inaccurate statements in medical reports do not justify punitive damages if they are not outrageous, badly motivated or recklessly indifferent.[62] At most, that is the case here; physicians described Riley as uncooperative to explain why his behavior interfered with their ability to evaluate him, but even if this description was inaccurate, it did not rise to a knowing or evil act, nor does it provide evidence that physicians knew that the treatment they provided was inadequate.

Plaintiffs do not appear to argue any "willful or wanton conduct or reckless indifference to the rights of others" by PrimeCare itself,[63] and mainly focus on the conduct of its physicians as described above.[64] To the extent Plaintiffs do make this argument, they only point to the minimal orientation, onboarding, or training provided to Drs. Rosas and Miller, which is insufficient alone to support punitive damages because it does not show knowledge of a substantial risk of danger.[65]

---

[61] *Scampone*, 11 A.3d at 991-92 (employees "deliberately altered records to hide that substandard care . . . [which] is outrageous and warrants submission of the question of punitive damages to the jury"); *Hall v. Episcopal Long Term Care*, 54 A.3d 381, 400 (Pa. Super. Ct. 2012) (understaffed nursing home "deliberately increased staff during times of state inspections, and "nurses falsified care logs" falsely indicating that the decedent had received care).

[62] *Starr v. Allegheny General Hosp.*, 451 A.2d 499, 506 (Pa. Super. Ct. 1982).

[63] 40 Pa.C.S. §§ 1303.505(a).

[64] Although PrimeCare never made this argument, I also note that holding a health care provider liable for punitive damages under the MCARE Act based upon the actions of its agents requires showing "by a preponderance of the evidence that the party knew of and allowed the conduct by its agent that resulted in the award of punitive damages." 40 Pa.C.S. § 1303.505(c). Plaintiffs did not attempt to impute knowledge of the deficiencies in Riley's care to PrimeCare.

[65] MSJ BIO, Doc. 184 at 11. For an example of a record sufficient to support such a punitive damages claim, *see Ponzini v. Monroe County*, 789 F.App'x 313, 315 (3d Cir. 2019) (record

Regardless of whether the record shows that Riley received medically negligent treatment, it does not show that that PrimeCare or its physicians subjectively appreciated that their conduct created a substantially likely risk of harm to Riley. The Court therefore properly granted summary judgment on the punitive damages claim in the first instance.

## III.    CONCLUSION

The original complaint in this case was filed over five years ago.[66] Though neither party may be fully satisfied with the outcome of this motion, the Court trusts that the parties are at least satisfied with the opportunity to move forward. Now that the Court has resolved the last issues regarding the parties' motions for summary judgment, the Court will endeavor to swiftly move this case to settlement, or to trial.

An appropriate Order follows.

BY THE COURT:

_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge

---

"filled with evidence of" various breaches by physicians, in combination with "PrimeCare ignoring nursing staff complaints about insufficient staffing and doctors not visiting [the prison] sufficiently frequently").

[66]    Complaint, Doc. 1-21 (originally docketed in state court on February 20, 2020, and docketed in this Court on February 25, 2020).