# EXHIBIT A

**Deposition Transcript of Lt. Greg A. Mendenhall**

Page 1

THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

— — —

CARMEN RILEY,                    :
Administrator of the             :
Estate of Ty'rique              :
Riley, et al                     :   CIVIL ACTION NO.
                                 :   4:20-CV-00325
        vs.                      :
                                 :
BRIAN CLARK, Warden of           :
Dauphin County Prison,           :
et al                            :

— — —

                Zoom deposition of LT. GREG A.
MENDENHALL, taken pursuant to notice, beginning at
10:00 A.M., on Wednesday, March 30, 2022, before
Nicholas DiPiero, Registered Professional Reporter and
Notary Public.

                — — —

DIPIERO COURT REPORTING
Registered Professional Reporters
1175 Marlkress Road, Unit 2460
Cherry Hill, NJ  08034
(215) 735-8101
dipieroreporting@aol.com

LT. GREG A. MENDENHALL

Page 2

```
 1    APPEARANCES:
 2
              MINCEY FITZPATRICK ROSS, LLC
 3            BY: RILEY H. ROSS, III, ESQUIRE
                  KEVIN V. MINCEY, ESQUIRE
 4                One Liberty Place
                  1650 Market Street
 5                Suite 3600
                  Philadelphia, PA  19103
 6                (215)550-1995
                  Riley@minceyfitzross.com
 7            Co-counsel for the Plaintiffs
 8
              LAVERY LAW
 9            BY: FRANK J. LAVERY, JR., ESQUIRE
                  225 Market Street
10                P.O. Box 1245
                  Harrisburg, PA  17108
11                (717) 233-6633
                  Flavery@laverylaw.com
12            Counsel for Defendant,
              Lt. Greg Mendenhall
13
14            MARSHALL DENNEHEY
              BY: ALISSA CARDENAS HARRISON, ESQUIRE
15                JOHN R. NINOSKY, ESQUIRE
                  100 Corporate Drive, Suite 201
16                Camp Hill, PA  17011
                  (717) 651-3529
17                Acharrison@mdwcg.com
              Co-counsel for Defendant,
18            Angela Swanson
19
              MacMAIN, CONNELL & LEINHAUSER
20            BY: MATTHEW S. POLAHA, ESQUIRE
                  433 West Market Street, Suite 200
21                West Chester, PA  19382
                  (484) 463-1014
22                Mpolaha@marcmainlaw.com
              Counsel for Susquehanna Defendants
23
                            -   -   -
24
25
```

LT. GREG A. MENDENHALL

Page 3

INDEX OF WITNESS

NAME                                        PAGE

LT. GREG A. MENDENHALL

  BY MR. ROSS:                              4, 88

  BY MR. POLAHA:                            85

&mdash;   &mdash;   &mdash;

INDEX OF EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| MENDENHALL | | |
| 1 | DFS 244 | 30 |
| 2 | DFS 227 | 33 |
| 3 | DFS 233 | 35 |
| 4 | VIDEO &ndash; BAY | 39 |
| 5 | VIDEO &ndash; BOOKING AREA | 44 |
| 6 | DFS 1 | 55 |
| 8 | DFS 4 | 58 |
| 9 | DFS 3 | 59 |
| 10 | DFS 150 | 62 |
| 11 | DFS 169 | 62 |
| 12 | DFS 177&ndash;186 | 62 |

&mdash;   &mdash;   &mdash;

LT. GREG A. MENDENHALL

Page 4

1           (It is stipulated and agreed by and

2    among counsel that sealing, certification and filing

3    are waived, and that all objections, except as to the

4    form of the questions, are reserved until the time of

5    trial.)

6                  –  –  –

7           LT. GREG A. MENDENHALL, having been

8    duly sworn, was examined and testified as follows:

9                  –  –  –

10          MR. LAVERY: Read and sign the

11   transcript.  Other than that as I understand the

12   stipulations, it's that all objections except as to

13   form of the question are reserved until the time of

14   trial.

15          Does everybody agree to that?

16          MS. HARRISON: Agreed.

17          MR. POLAHA: Agreed.

18          MR. RILEY: That is agreed by

19   plaintiffs.

20   BY MR. ROSS:

21   Q.       All right. Lt. Mendenhall, good morning.

22   **A.       Good morning.**

23   Q.       My name is Riley Ross. I represent the

24   plaintiffs in this matter and I'm going to be taking

25   your deposition today. I want to start by asking, have

LT. GREG A. MENDENHALL

Page 5

1    you ever been deposed before?

2    **A.         No.**

3    Q.         I'm going to go over a few of the rules of

4    the deposition just so that we all have an

5    understanding. It's not a kind of a normal thing that

6    most people experience, the back and forth that

7    occurs. So it's important to kind of go over these.

8                    So this is merely a question and

9    answer session.  I'll ask you some questions.  You'll

10   answer them.  They're being done pursuant to the

11   Federal Rules of Civil Procedure and those rules

12   require certain things to happen.

13                   And throughout this lawsuit there's

14   a process called discovery where both sides have to

15   exchange information. One of the ways we exchange

16   information is through deposition which is this. Where

17   you've been sworn in, you are under oath to provide

18   truthful answers. And I'll be asking you questions so

19   that you can answer them. I'm really just trying to

20   gather information.

21                   As I said, I'm entitled to get some

22   information.  It's not a, I'm not trying to trick you

23   or anything like that. I'm simply trying to gather

24   information and that's what my questions are going to

25   be targeted at.

LT. GREG A. MENDENHALL

Page 6

1        I'm going to be asking you for your
2   best recollection.  And unless I specifically say so
3   I'm not asking you to guess about anything, just what
4   you can recall. Okay?
5   **A.        Yes.**
6   Q.        And any time that you are approximating an
7   answer, like for instance, if I ask you how many years
8   has it been and you're not sure but you're
9   approximating just let me know so that we have a clear
10  record, okay, is that okay?
11  **A.        Yes.**
12  Q.        And speaking of the record, Nick here is the
13  court reporter and he's going to be taking down
14  everything that we say. And at the end of this he will
15  make a transcript which your lawyer just referred to
16  about you reading later.  And what we try to do is
17  make sure that the transcript is as clean and clear as
18  possible.  So to help that there are a few things we
19  can do.
20        The first is that we not talk over
21  each over each other. So I ask that you allow me to
22  finish my question before you start answering even if
23  you know exactly what I'm about to ask, maybe because
24  based on the previous question.  Just let me get the
25  question out so that Nick can take everything down

LT. GREG A. MENDENHALL

Page 7

1   before you begin to answer; is that okay?

2   **A.       Yes.**

3   Q.       Just like you're doing your answers should be

4   audible so that Nick can take them down. Like shaking

5   and nodding your head won't do.  Even though we can

6   all see it later on in this transcript we won't be

7   able to see that so it's important that you speak your

8   answers, okay?

9   **A.       Yes.**

10  Q.       And just like I've asked you to do regarding

11  letting me finish my question I will do the same or I

12  will at least try to do the same and let you finish

13  your answer before I begin with another question. If

14  at any point you feel like you haven't finished your

15  answer or if you want to add on to an answer that you

16  previously gave or need to change because you have a

17  different recollection or for any reason that's fine,

18  just let me know and we'll go back to that answer to

19  give you a chance to do that. Okay?

20  **A.       Yes.**

21  Q.       If at any point you want to take a break, go

22  to the bathroom, you want to get something to drink,

23  you want to talk to your lawyer that's fine too. Just

24  let me know and we can take a break. The only thing

25  that I ask is that if I've already asked you a

LT. GREG A. MENDENHALL

Page 8

1    question please answer it before we take that break,

2    okay?

3    **A.        Yes.**

4    Q.        Again, I'm going to do my best to ask you

5    questions that make sense.  But if at any point you

6    don't understand my question just let me know and I'll

7    do my best to rephrase it in a way that you can

8    understand it. But if you do answer my question I'm

9    going to assume that you understood the question; is

10   that fair?

11   **A.        Yes.**

12   Q.        Let's see. I think that that's everything

13   that I wanted to go over in regards to the rules. Do

14   you understand those rules?

15   **A.        Yes, I do.**

16   Q.        Do you have any questions about them?

17   **A.        No.**

18   Q.        Have you taken any medication in the last 24

19   hours that would interfere with your ability to

20   participate in today's deposition?

21   **A.        No.**

22   Q.        Have you consumed any alcohol in the past 24

23   hours?

24   **A.        No.**

25   Q.        Do you have any type of condition that would

LT. GREG A. MENDENHALL

Page 9

1    interfere with your ability to recall details from the

2    past with the exception of just normal lapse of time?

3    **A.        No.**

4    Q.        Do you take any medication that would

5    interfere with your ability to recall events from the

6    past?

7    **A.        No.**

8    Q.        Do you understand that the oath that you took

9    a few minutes ago is the same oath as if you were

10   sitting in a courtroom before a Judge?

11   **A.        I do.**

12   Q.        And is there any reason that you're not

13   prepared to go forward with today's deposition?

14   **A.        No.**

15   Q.        Have you reviewed any documents in

16   preparation for today's deposition?

17   **A.        I reviewed my documents from the incident**

18   **plus the officer's memo, officers that were involved.**

19   Q.        I was just going to say, I see you're

20   referring to some documents.  And can you tell me what

21   it is that you have in your hands?

22   **A.        Yeah. I have an Extraordinary Occurrence that**

23   **I did which is a report that we do. I've had four**

24   **officers' memos, the officers that was involved in the**

25   **initial incident at the booking center.  And I have a**

LT. GREG A. MENDENHALL

Page 10

1    **medical incident report.**

2    Q.        And we'll likely be referring to those a

3    little bit later in the deposition.  Are there any

4    other documents that you reviewed in preparation for

5    your deposition today?

6    **A.        No.**

7    Q.        Have you provided any documents to anyone in

8    connection with this lawsuit?

9    **A.        No.**

10    Q.        Have you been asked to provide any documents

11    in connection with this lawsuit?

12    **A.        No.**

13    Q.        Have you been asked to make a search for any

14    videos or any other materials in connection with this

15    lawsuit?

16    **A.        No.**

17    Q.        Other than the documents that you referenced

18    that are in your possession right now are you aware of

19    any documents that you created or drafted that relate

20    in any way to this lawsuit?

21    **A.        No.**

22    Q.        I'm going to ask you just some a couple of

23    basic questions regarding not necessarily this

24    incident but just your overall job.

25                   Do you agree that correctional

LT. GREG A. MENDENHALL

Page 11

1   officers should not use excessive force against

2   inmates at the Dauphin County Jail.

3   **A.        I do.**

4   Q.        And by inmates, I should have said this

5   before, but inmates I'm referring to both pretrial

6   detainees and those who have already been convicted.

7   Do you understand that?

8   **A.        Yes.**

9   Q.        And is your answer still the same?

10  **A.        It's the same.**

11  Q.        And do you agree that a correctional officer

12  who observes a fellow officer using excessive force

13  against an inmate has a duty to intervene to stop

14  that act?

15  **A.        I do.**

16  Q.        All right.  I'm going to ask you just some

17  background information to start with. Can you state

18  your full name for the record.

19  **A.        Yes. Greg, G-R-E-G, Alan, A-L-A-N,**

20  **Mendenhall, M-E-N-D-E-N-H-A-L-L.**

21  Q.        And what is your date of birth?

22  **A.        05/06/1962.**

23  Q.        Did you graduate from high school?

24  **A.        I did.**

25  Q.        And did you attend college?

LT. GREG A. MENDENHALL

Page 12

1  **A.        No.**

2  Q.        Do you have any type of post high school

3  degree?  Let me start with that. Just degree.

4  **A.        No. Just a degree, high school.**

5  Q.        Just a high school diploma?

6  **A.        Yes.**

7  Q.        And by way of city what is your current

8  address?

9  **A.        335 -- oh, just by city?**

10  Q.        Just by city.

11  **A.        New Cumberland.**

12  Q.        New Cumberland?

13  **A.        Yes.**

14  Q.        And how long have you lived in New

15  Cumberland?

16  **A.        22 years.**

17  Q.        Same address?

18  **A.        Same address.**

19  Q.        Regarding the people that you live with, do

20  you live with anyone that currently works at Dauphin

21  County Prison?

22  **A.        No.**

23  Q.        How about anyone who currently, do you live

24  with anyone who currently works for Prime Care?

25  **A.        No.**

LT. GREG A. MENDENHALL

Page 13

1    Q.        And do you live with anyone who currently

2    works for the Susquehanna Police Department?

3    **A.        No.**

4    Q.        Do you currently live with anyone who's ever

5    worked for the Dauphin County Prison?

6    **A.        No.**

7    Q.        How about for Prime Care?

8    **A.        No.**

9    Q.        How about for Susquehanna Police Department?

10   **A.        No.**

11   Q.        And let me just clear this up because I do

12   this a lot. I say Dauphin County Jail and Dauphin

13   County Prison.  What is the actual correct name for

14   the facility?

15   **A.        Dauphin County Prison.**

16   Q.        If I sometimes switch the Dauphin County Jail

17   do you understand that I'm referring to the same

18   thing?

19   **A.        Yes.**

20   Q.        Have you ever been arrested?

21   **A.        No, I haven't.**

22   Q.        Have you ever been a party to a lawsuit other

23   than the current lawsuit?

24   **A.        No.**

25   Q.        Never a plaintiff or defendant?

LT. GREG A. MENDENHALL

Page 14

1    **A.        No.**

2    Q.        What do you currently do for a living?

3    **A.        I'm retired.**

4    Q.        When did you retire?

5    **A.        February 9th of 2020.**

6    Q.        What did you retire from?

7    **A.        Dauphin County Prison.**

8    Q.        What was your title when you retired?

9    **A.        Lieutenant.**

10   Q.        How long were you employed by the Dauphin

11   County Prison?

12   **A.        36 years.**

13   Q.        And can you tell me what years you served as

14   a Lieutenant?

15   **A.        Yeah. From, it would be July of 1991 until my**

16   **retirement date 2020.**

17   Q.        And what other titles did you hold while you

18   were at Dauphin County Prison?

19   **A.        Correctional officer.**

20   Q.        And when did you start as a correction

21   officer?

22   **A.        March 12, 1984.**

23   Q.        And you were a correctional officer all the

24   way up until the time you became Lieutenant?

25   **A.        Yes. 1991.**

LT. GREG A. MENDENHALL

Page 15

1    Q.        Did you attend a Police Academy?

2    **A.        No.**

3              MR. LAVERY: Are you talking about a

4    correctional officer academy or a policy academy?

5              MR. ROSS: Thank you, Frank.

6    Q.        Let me start with a police academy. Your

7    answer was no to that. Did you attend a correctional

8    officer academy?

9    **A.        I did, yes.**

10   Q.        And what academy did you attend?

11   **A.        Camp Hill State Correctional Institute, their**

12   **the state academy which county employees have to**

13   **attend too.**

14   Q.        And when did you attend that academy?

15   **A.        That was September and October of 1985.**

16   Q.        And did you graduate from that academy?

17   **A.        Yes, I did.**

18   Q.        I have you down as starting as a CO in 1984.

19   Does that mean you attended the Academy after you

20   became a CO?

21   **A.        Yes.**

22   Q.        So I take it that you were not required to a

23   attend the academy to become a correctional officer?

24   **A.        That's when they sent me.  When I initially**

25   **started I did not attend the academy before being**

LT. GREG A. MENDENHALL

Page 16

1    **hired or before actually starting at the prison.**

2    Q.        Do you know if that's the case -- as of your

3    retirement do you know if that was the case for

4    Dauphin County Prison where correctional officers

5    first could become a correctional officer before

6    attending the correctional officer academy?

7    **A.        Yes.**

8    Q.        That was possible?

9    **A.        Yes.**

10   Q.        Other than your time at Dauphin County Prison

11   have you served as correctional officer anywhere else?

12   **A.        No, I haven't.**

13   Q.        Have you been a law enforcement officer in

14   any capacity other than at Dauphin County Prison?

15   **A.        No.**

16   Q.        What year did you graduate high school?

17   **A.        1980.**

18   Q.        During your time as correctional officer did

19   you receive any type of special certifications?

20   **A.        Yes.**

21   Q.        Can you tell me those that you recall

22   receiving?

23   **A.        First aid, CPR, firearms, various, I can't**

24   **recall, certain things that are mandatory for you to**

25   **maintain employment, training. Just certificates that**

LT. GREG A. MENDENHALL

Page 17

1    **you completed and passed. Different aspects of**

2    **training.**

3    Q.        Other than the mandatory certifications have

4    you received any type -- did you receive any type of

5    awards or commendations?

6    **A.        No.**

7    Q.        Have you ever been disciplined as a

8    correctional officer?

9    **A.        No.**

10   Q.        Have you ever been the subject of an

11   investigation during your time at Dauphin County

12   Prison?

13   **A.        I don't recall. No.**

14   Q.        Has anyone filed a complaint against you

15   during your time at Dauphin County Prison?

16                    MR. LAVERY: Object to form.

17   Q.        You can answer that if you understand the

18   question?

19   **A.        I don't believe so, no. Are you speaking of**

20   **-- no formal complaints, no, that I recall.**

21   Q.        Let's start with complaints such as a

22   grievance filed by an inmate?

23   **A.        I'm sorry.**

24                    MR. LAVERY: That's an objection so

25   it's noted on the record.  But go ahead.

LT. GREG A. MENDENHALL

Page 18

1    Q.        Have you ever received a grievance filed

2    against you by an inmate?

3    **A.        I don't recall.**

4    Q.        Have you ever been the subject of a grievance

5    filed by an inmate?

6    **A.        I don't recall.**

7    Q.        Have you ever been the subject of a complaint

8    filed by an employee of Dauphin County Prison?

9    **A.        No.**

10   Q.        I want to talk about -- from the frame of

11   reference unless I say otherwise I want to talk the

12   timeframe around June of 2019, okay. Do you understand

13   that?

14   **A.        Yes.**

15   Q.        In June of 2019 what was your position at

16   Dauphin County Prison?

17   **A.        I was a Lieutenant.**

18   Q.        And on June 18, 2019 what were your duties as

19   Lieutenant with Dauphin County Prison?

20   **A.        I was the officer in charge of the Dauphin**

21   **County Judicial Center.**

22   Q.        By being the officer in charge what does that

23   mean?

24   **A.        It means I was the Lieutenant and I oversaw**

25   **the supervision of my shift.**

LT. GREG A. MENDENHALL

Page 19

1    Q.        And you mentioned the Dauphin County Judicial

2    Center.  Is that different from the Dauphin County

3    Prison?

4    **A.        It's a different location but it's operated**

5    **by, under the Dauphin County Prison.**

6    Q.        What's the function of the judicial center,

7    does it have a certain purpose?

8    **A.        Basically that's where all new detainees go.**

9    **It's run by Dauphin County Prison. Basically it's a**

10   **similar entity.**

11   Q.        Would it be fair to say that it's an intake

12   place for processing pretrial detainees when they come

13   to the prison?

14   **A.        Yes.**

15   Q.        And when you say that you're the officer in

16   charge of the Judicial Center were you the officer in

17   charge for your shift only that particular day?

18   **A.        My shift only, yes.**

19   Q.        And are there certain shifts that you work as

20   a Lieutenant?

21   **A.        There are 12 hour shifts, two 12 hour shifts**

22   **a day.**

23   Q.        And what time are those shifts?

24   **A.        One is 09:00 to 21:00 and the second one was**

25   **21:00 to oh 09:00.**

LT. GREG A. MENDENHALL

Page 20

1    Q.        Do you recall what shift you were working on

2    June 18, 2019?

3    **A.        June 18th I would have been the 21:00 on June**

4    **17th to 09:00 on June 18th.**

5    Q.        I want to step away from the specific date

6    that we've just been referring to. And just talk to

7    you in general regarding your duties as a Lieutenant.

8    As a Lieutenant do you train correctional officers?

9    **A.        No.**

10   Q.        Have you ever been involved with training at

11   all for correctional officers?

12   **A.        No.**

13   Q.        You mentioned before certifications that you

14   had to receive. Are there specific types of training

15   that lieutenants must take in each year?

16   **A.        It's the same as all correction officers,**

17   **standard first aid, CPR, firearms, sexual harassment,**

18   **and a myriad of other things. Whatever the standard**

19   **correctional officer has to do we have to do also.  We**

20   **have to keep up certification.**

21   Q.        Are there any types of training that are

22   Lieutenant specific that for instance correctional

23   officers don't have to partake in?

24   **A.        We have been through different supervisory**

25   **courses that the standard correctional officer doesn't**

LT. GREG A. MENDENHALL

Page 21

1  do or doesn't have to go through.

2  Q.        Are these supervisory courses required to be

3  taken a certain amount of time each year?

4  A.        No.

5  Q.        And do you get certifications related to

6  these supervisory courses?

7  A.        **Whatever you participate in you are certified**

8  **in at the completion.**

9  Q.        Can you give me an example of a supervisory

10  course that you would have to take that a regular CO

11  would not?

12  A.        **Report writing.**

13  Q.        Any other examples?

14  A.        **No. I can't think of anything off the top or**

15  **I don't recall them.**

16  Q.        Are there certain policies that outline how

17  an individual, a pretrial detainee is processed when

18  they arrive at the Judicial Center?

19  A.        **No.**

20  Q.        There are no written directives that instruct

21  CO's on what to do when a pretrial detainee arrives at

22  the Judicial Center?

23  A.        **Not to my knowledge, no.**

24  Q.        Is there a policy regarding evaluating an

25  individual that arrives at the Judicial Center as a

LT. GREG A. MENDENHALL

Page 22

1    pretrial detainee?

2    **A.        No. Not to my knowledge.**

3    Q.        How do you make the determination as to

4    whether or not a pretrial detainee is going to be

5    processed through the Judicial Center?

6                MR. LAVERY: Object to the form of

7    the question. You can answer.

8    **A.        Could you repeat the question, please.**

9    Q.        My question is, how do you make the

10   determination as to whether or not a pretrial detainee

11   is going to be processed through the Judicial Center?

12               MR. LAVERY: Same objection.  Go

13   ahead.

14   **A.        We have to process everybody that comes**

15   **through.**

16   Q.        So you have no discretion as to whether or

17   not someone is processed once they arrive at the

18   Dauphin County Judicial Center?

19               MR. LAVERY: Objection to form.  You

20   can answer.

21   **A.        No.**

22   Q.        Let's say, and I want to give you an example.

23   Let's say an individual arrives and the person has

24   been shot. Will you still process that person rather

25   than for instance sending them to a hospital?

LT. GREG A. MENDENHALL

Page 23

1    **A.        No.**

2                MR. LAVERY: Object to form.

3    **A.        Medical would evaluate him and that would be**

4    **medical's determination on whether he's accepted or**

5    **not or he or she's accepted or not.**

6    Q.        So that do me sounds like at least some type

7    of procedure or policy that's in place for evaluation.

8    So can you tell me about that process. Like what

9    happens when an individual arrives at the Judicial

10   Center for processing?

11   **A.        He comes in, he's evaluated. If we notice**

12   **that he has injuries of any kind we'll have medical**

13   **evaluate him. Medical will come out.  They will**

14   **evaluate him and it will be their determination of**

15   **whether he's accepted or needs a clearance of**

16   **incarceration to be accepted from a hospital.**

17   Q.        So there's a decision that is made by a CO at

18   the Judicial Center to have medical perform the

19   evaluation or is the evaluation done every time a

20   pretrial detainee arrives at the Judicial Center?

21                MR. LAVERY: Object to form. You can

22   answer.

23   **A.        No. It's not done every time an individual**

24   **comes in. He we notice that he may be impaired so to**

25   **speak or injured then I would definitely have medical**

LT. GREG A. MENDENHALL

Page 24

1  **or an officer would have medical evaluate him to make**
2  **sure he can be incarcerated or he should be sent out**
3  **and have a clearance to incarcerate to be accepted.**
4  Q.        Is there a policy that gives instructions to
5  the correctional officer as to determine when medical
6  should be called to do an evaluation?
7  **A.        Not that I'm aware of no.**
8  Q.        So how does correctional officers know when
9  to call medical and when not to call medical for an
10  evaluation?
11  **A.        It's basically visual perception of the**
12  **individual. If they notice anything, like I said**
13  **before, that he's injured or he may be physically**
14  **impaired they usually would call medical to evaluate**
15  **him.**
16  Q.        What if there is a mental health issue that
17  may be afflicting the pre-trial detainee, is the
18  correctional officer trained in any way to recognize
19  that and to -- well, I'll stop there. Is the
20  correctional officer trained at all to recognize a
21  mental health issue for a pretrial detainee that
22  presents to the Judicial Center?
23              MR. LAVERY: Object to the form.
24  **A.        Not that I'm aware of, no.**
25  Q.        And is it the job of the correctional officer

LT. GREG A. MENDENHALL

Page 25

1    or the Lieutenant on duty that they should make the

2    call for medical to performed the evaluation?

3    **A.          Whoever is dealing with that particular**

4    **detainee or they would -- a lot of times if it would**

5    **be a correctional officer they would consult with the**

6    **Lieutenant if he is not in the area to this is what I**

7    **suspect, give me your opinion on this.  And if I feel**

8    **that there's grounds to what they're concerned about**

9    **then yes, I would have medical evaluate him.**

10   Q.        Is there paperwork that's filled out for a

11   pretrial detainee that is processed through the

12   Judicial Center?

13   **A.          Is there paperwork.**

14   Q.        Yes.

15   **A.          Yes.**

16   Q.        And does that paperwork have any indication

17   that a medical evaluation has been performed in

18   connection with an admission to the Judicial Center?

19   **A.          Not by security personnel. Pretrial services**

20   **does that. And I'm not sure what, exactly what that**

21   **procedure is. I've never sat. But pretrial does**

22   **interview every detainee but I'm not sure what the**

23   **process is. I've never sat in on that or.**

24   Q.        You just mentioned security.  Is security

25   something that's distinct from the CO that's there at

LT. GREG A. MENDENHALL

Page 26

1    the Judicial Center?

2                    MR. LAVERY: Sorry. Can I hear all

3    that. I didn't catch all that.

4    Q.        You mentioned security and I'm asking, is

5    that something different than the CO that is there

6    that does the processing?

7    **A.        No. No.**

8    Q.        When you said security were you referring to

9    the CO that does the processing?

10   **A.        Yes.**

11   Q.        And then once that person, once the pretrial

12   detainee is processed by security that person then

13   goes to or admitted to pretrial services; is that what

14   you're saying?

15   **A.        Eventually yes.**

16   Q.        Have you yourself ever directed that a

17   pretrial detainee be taken to a hospital for a mental

18   health evaluation rather than being processed through

19   the Judicial Center?

20   **A.        No.**

21   Q.        Have you yourself ever directed that a

22   pretrial detainee be taken to a hospital to attend to

23   any type of physical injuries instead of being

24   processed through the Judicial Center?

25   **A.        No.**

LT. GREG A. MENDENHALL

Page 27

1    Q.        I want to ask some questions about your

2    training that you received. And this is going to

3    include your time as Lieutenant and as a CO if

4    relevant. You have yearly training that you undergo as

5    a Lieutenant; is that correct?

6    **A.        Yes.**

7    Q.        I should say you had because you're retired.

8    So do you understand that?  I'm talking about the time

9    while you served as a Lieutenant you had yearly

10   trainings that you had to undergo; is that correct?

11   **A.        That's correct.**

12   Q.        And did those trainings include lessons or

13   instruction about case law?  What I mean by case law

14   is I mean judicial decisions that have been made

15   regarding Constitutional violations?

16              MR. LAVERY: Object to the form of

17   the question. You can answer it if you understand it.

18   **A.        I couldn't really understand but it would be**

19   **no. But I don't understand the question.**

20   Q.        Well, let me try to break it down. Let's take

21   your last year, your last full year of service,

22   Lieutenant. Did you undergo training during that year?

23   **A.        I don't recall if I did or not.**

24   Q.        I'm just saying training in again.  Did you

25   take any training courses during that last year?

LT. GREG A. MENDENHALL

Page 28

1    **A.        I don't believe but I don't recall so.**

2    Q.        How about in the year 2019, do you believe

3    that you took training courses?

4    **A.        I don't recall.**

5    Q.        Is there a record that is kept that will

6    document the training that you have that you receive

7    each year?

8    **A.        Yes.**

9    Q.        And is there a name for those records?

10   **A.        It would be through the prison training**

11   **department.**

12   Q.        As part of your training are you trained on

13   the use of?

14   **A.        Yes.**

15   Q.        Is that something you're trained on each

16   year?

17   **A.        It's supposed to be every year. Now, I know**

18   **through whatever reasons my last couple of years they**

19   **didn't do training as they normally would do. But yes,**

20   **it is a yearly training event.**

21   Q.        When you say they didn't -- could you say

22   that last part again.

23   **A.        The use of force is a yearly training event**

24   **but I can't state if the last couple of years I was**

25   **there that it was even done. They halted training for**

LT. GREG A. MENDENHALL

Page 29

1  **whatever reason. They didn't do it on a normal basis**

2  **as they have done in the past so I don't know.**

3  Q.        And when you say they who are you referring

4  to?

5  A.        **The training department.**

6  Q.        And when you say they halted training are you

7  saying training across the board or just training and

8  use of force?

9  A.        **The training across the board for.**

10  Q.        Is this halt of training did it happen before

11  let's say before 2019?

12  A.        **I don't recall. It's possible.**

13  Q.        Do you know if it happened before the

14  pandemic occurred?

15  A.        **It did, yes.**

16  Q.        When you were receiving training in use of

17  force did you receive training regarding judicial

18  decisions about the appropriate use of force?

19            MR. LAVERY: Object to the form of

20  the question.  You can answer if you understand it.

21  A.        **I don't understand the question. Can you**

22  **repeat it, please.**

23  Q.        Yes. When you were receiving training

24  regarding use of force did that training include

25  judicial decisions that have been made about the

LT. GREG A. MENDENHALL

Page 30

1    appropriate use of force?

2    **A.        I don't recall.**

3                MR. LAVERY: Same objection.

4    Q.        I want to show you a document. Just give me a

5    second.

6                MR. ROSS: We're going to mark this

7    as Mendenhall 1. Do you see the document that I placed

8    on the screen, Lieutenant?

9    **A.        Yes, I do.**

10    Q.        Do you recognize this document?

11                MR. LAVERY: This looks like it's the

12    first page of a larger document. We only see the first

13    page.

14                MR. ROSS: Right. I'm asking him does

15    he recognize the first page.

16    **A.        Yeah, that is familiar.**

17    Q.        Do you know, can you tell me what it is.

18    **A.        It looks like the cover page from the Use of**

19    **Force Policy.**

20    Q.        And so the first question I have I guess,

21    there is a Use of Force Policy that is written that is

22    implemented by the Dauphin County Prison; is that

23    correct?

24    **A.        That's correct.**

25    Q.        And I'm going to go through a couple of pages

LT. GREG A. MENDENHALL

Page 31

1    to see if this is what you believe is the Use of Force

2    Policy.  But I want to start by saying, if you notice

3    on the left hand side of the screen there is something

4    that says Dauphin DFS 244; do you see that?

5    **A.        Yes, I do.**

6    Q.         I'm going to represent to you that that's a

7    bate stamp which is a kind of a numbering system that

8    we lawyers use we put on documents to kind of help us

9    refer to them. And this is a bate stamp that was put

10   on by Dauphin County Prison in giving me this

11   material.  So I may refer to that number there to kind

12   of orient us and let us know what pages we're talking

13   about. But I just wanted to let you know that that's

14   not normally part of this document.  So I didn't want

15   to confusion you or anything.

16                    But I'm just going to scroll through

17   a couple of pages to see if this is something that

18   you've seen before.

19                    MR. LAVERY: How many pages is this

20   document total?

21                    MR. ROSS: It's 45 pages.

22                    MR. LAVERY: That looks like a

23   training program.

24                    MR. ROSS: Well, that's why I'm

25   showing him some pages to ask him questions about it.

LT. GREG A. MENDENHALL

Page 32

1      MR. LAVERY: Well, that's fine. But

2  if you're going to identify the whole thing you should

3  show him all of it is what I'm going to say.

4      MR. ROSS: That's what I'm doing,

5  Frank. I'm scrolling through the pages so that he can

6  see them.

7      MR. LAVERY: You said you were just

8  going to show him a couple. That was my concern.

9  BY MR. ROSS:

10 Q.      Lieutenant, do these pages I've shown you so

11 far do they look familiar?

12 **A.      They look familiar, yes.**

13 Q.      And why are they familiar, in what way are

14 they familiar to you?

15 **A.      It's the Use of Force Policy.  Everybody gets**

16 **a copy of whatever the policy is and it does look**

17 **familiar to me.  I don't recall a lot of it but.**

18 Q.      I'm just going to scroll all the way to the

19 end and if there's anything that changes about your

20 recollection you can let me know or if you need me to

21 stop just let me know. That's the end.

22      Your counsel referred to that it may

23 look like a type of training manual or training policy

24 or it may be something part of a training session that

25 was given. Do you recall receiving a training session

LT. GREG A. MENDENHALL

Page 33

1   where this document was used?

2   **A.        I don't recall.**

3   Q.        I'm going to show you a new document. We'll

4   mark this as Mendenhall 2. Can you see that document

5   that's on the screen, Lieutenant?

6   **A.        Yes.**

7   Q.        Let me know if I need to make it bigger. Do

8   you recognize this document?

9   **A.        I don't recall ever seeing it.**

10  Q.        Let me go to the next page. Actually let me

11  go back so I can describe it for the record.

12                 This first page is bate stamped

13  Dauphin DFS 227.  The top reads Dauphin County Prison.

14  Subject: Security. Reference: Title 37. Chapter 95,

15  Section 95.241. (2.1).  And at the top of the page it

16  always Local Policy Chapter 9.22.

17                 Let me go to the next page and see

18  if you recognize this. This begins with Dauphin

19  County, bate stamp Dauphin DFS 228. At the top it says

20  policy 9.17 and it's page 1 of 5, Security and

21  Control.  Reference PPCT. defensive tactics instructor

22  manual. Do you recognize this document at all,

23  Lieutenant.

24  **A.        No. I don't recall that document. No.**

25  Q.        I'm going scroll through it and you just tell

1    me if there's anything you recognize or not.

2                      MR. LAVERY: Are we going to

3    circulate these documents at the end of the deposition

4    so we have them?

5                      MR. ROSS: Well, I got them from you,

6    Frank.

7                      MR. LAVERY: I know you got them from

8    me but you're marking them as exhibits. I would like

9    to have copies of the exhibits.

10                     MR. ROSS: They're going to be given

11   to Nick and he'll put them, make them as exhibits to

12   the deposition.

13                     MR. LAVERY: Okay. Thank you.

14   BY MR. ROSS:

15   Q.           That's the last page, Lt. Mendenhall.

16   Anything look familiar about this document?

17   **A.           I don't recall. I may have seen them. I just**

18   **don't recall.**

19   Q.           Well, let me ask you questions about your

20   training on the use of force. I'm going back to bate

21   stamp Dauphin DFS 228. And as I said, the title is Use

22   of Force, from Chapter 9, Security and Control. The

23   reference is PPCT defensive tactics instructor manual.

24                     In your training on use of force

25   were you given a policy manual to instruct you on the

LT. GREG A. MENDENHALL

Page 35

1    use of force?

2                    MR. LAVERY: Object to form. You can

3    answer.

4    **A.        I don't recall.**

5    Q.        The next page where it says 2 of 5.  Well,

6    let me go back to No. 4. No. 4 says on page 228, it

7    says the following steps shall be utilized to gain or

8    maintain controlling of the subject unless the acting

9    staff member reasonably believes that the situation

10   requires immediate escalation to a greater degree of

11   force within the use of force continuum or five lower

12   levels of force ineffective.

13                    It then has A, officer present. B,

14   verbal direct. C, soft empty hand techniques. D, hard

15   empty hand techniques. E, intermediate weapons.  F,

16   deadly force.

17                    Do you recall being trained on the

18   use of force continuum?

19   **A.        Yeah, I have been trained on the use of force**

20   **continuum.**

21   Q.        And are these levels that were just described

22   in Paragraph 5, do you recall being trained about

23   these levels?

24   **A.        I do remember being trained, yes.**

25   Q.        I'm going to show you a new document. Let's

LT. GREG A. MENDENHALL

Page 36

1    mark this Mendenhall 3. I think we're on No. 3. This

2    is a three page document that is bate stamped Dauphin

3    DFS 233.  And at the top it states Dauphin County

4    Prison, Local Policy 9.17.T. Title is Use of Force.

5    Chapter 9, Security and Control.  Subject use of force

6    training.  Reference title 37, Chapter 95, Section

7    95.220A.

8             Do you recognize this document?

9    **A.        I don't recall the document, no.**

10   Q.        I'm going to scroll down. It's says procedure

11   use of force breakdown.  No. 1 it says no more force

12   than necessary. Force cannot be gratuitous or

13   excessive. No. 2, levels of force.  And then it goes

14   through the ones we just discussed before.

15             Again, have you been trained on

16   these areas of the use of force?

17             MR. LAVERY: Object to the form of

18   the question.  Also object that he just answered that

19   question before. Go ahead.  You can answer it again.

20   **A.        Yes, I've been trained in that levels of**

21   **force.**

22   Q.        Scroll to next page.  There's a subject there

23   that says The Law and I want to focus on that. I asked

24   you before about whether or not you received

25   instructions about judicial decisions that have been

LT. GREG A. MENDENHALL

Page 37

1    handed down in the use of force.  So I want to just

2    take a second to let you read this section and then

3    you can tell me whether or not you recall ever being

4    trained on these sections so you can let me know when

5    you're done and I'll move up, move forward.

6                    MR. LAVERY: Object to the form of

7    the question but you can answer.  Or the statement I

8    guess. I don't know if it was statement or not.  But

9    go ahead, read it.

10   **A.         No. I do not recall that document.**

11   Q.         I want you to read the section under the law

12   and then persons other than inmates and then once

13   you're done reading that I'm going to move to the next

14   page. So why don't you read those two paragraphs and

15   then we'll have you read some more and then I'll ask

16   you some questions.

17   **A.         I'm finished reading it.**

18   Q.         I'm going to scroll to the next page and I'll

19   allow you to finish that paragraph and then the

20   following paragraph under pretrial detainees and let

21   me know when you're done.

22   **A.         Okay.  I'm finished.**

23   Q.         Do you recall ever receiving any training on

24   the subject matters that were contained in those

25   paragraphs that you just read?

LT. GREG A. MENDENHALL

Page 38

1    **A.        I don't --**

2                 MR. LAVERY: Object to the form of

3    the question. You can answer.

4    **A.        I don't recall.**

5    Q.        Do you recall anyone giving you training

6    where they talk to you about decisions that were made

7    in the court regarding the use of force?

8    **A.        No.**

9    Q.        I want to ask you now some specific questions

10   about the incident involving Ty'rique Riley. Do you

11   understand that the -- let me backup. Have you

12   reviewed the complaint that's in this lawsuit?

13   **A.        No. Just my paperwork and officer's**

14   **paperwork.**

15   Q.        You never read the complaint in this lawsuit?

16   **A.        No.**

17   Q.        Are you familiar with who Ty'rique Riley is?

18   **A.        I am.**

19   Q.        And I know that you said that you have some

20   documents in front of you. So do you understand that

21   Ty'rique Riley arrived at the Dauphin County Prison on

22   June 18, 2019?

23   **A.        Yes.**

24   Q.        Were you made aware that he would be arriving

25   before he actually arrived at Dauphin County Prison?

LT. GREG A. MENDENHALL

Page 39

1    **A.        No.**

2    Q.        How did you first learn that he had arrived

3    at Dauphin County Prison?

4    **A.        The police officer pulled up to the bay**

5    **stating that he had, the Susquehanna Township Police**

6    **officer pulled up that he had an inmate for intake.**

7    Q.        Were you given any information as to why he

8    was being brought in for to the Dauphin County Jail?

9    **A.        No.**

10   Q.        I'm going to show you some video. Give me one

11   second. Can you see the video on the screen?

12   **A.        Yes.**

13   Q.        Do you recognize what's depicted there?

14   **A.        Yes. That's the bay of the Dauphin Judicial**

15   **Center.**

16   Q.        I'll start playing that. Make this Exhibit 4

17   so it will to bay of Dauphin County Prison. I want to

18   stop there.  I stopped it at the 56 second mark. I

19   want you to if you can, Lieutenant, to identify the

20   three men who are in the picture in order that they're

21   in.  The one closest to the camera first, it looks

22   like a bluish gray shirt. Do you know who that is?

23   **A.        Yeah. That's CO Robert Ingersoll.**

24   Q.        I think I know who's behind him but I don't

25   want to assume, so can you say who's behind him?

LT. GREG A. MENDENHALL

Page 40

1    **A.        That would be me. Lieutenant Mendenhall.**

2    Q.        And I notice you have a black shirt on. Does

3    the different colored shirt represent anything?

4    **A.        Lieutenants and Captains wear black shirts.**

5    **Sergeants and correctional officers wore the blue**

6    **colored.**

7    Q.        So that is more of a blue colored than a gray

8    colored shirt?

9    **A.        That's more of a blue, yes.**

10   Q.        And how about the third individual behind

11   you?

12   **A.        That is Correction Officer Cameron Weaver.**

13   Q.        As of June 18, 2019 do you know how long CO

14   Ingersoll had been a correctional officer?

15   **A.        At that time approximately nine to ten years.**

16   Q.        And how about Correctional Officer Weaver?

17   **A.        Approximately a little less, probably five to**

18   **seven.  I'm not sure.**

19   Q.        And at this point had you been told anything

20   about why the officer had arrived at the Dauphin

21   County Jail with the pretrial detainee?

22   **A.        I don't recall ever knowing why he was being**

23   **brought in, no.**

24   Q.        I'll play the video from there. I'm going to

25   pause it at the 120. Can you tell me what was being

LT. GREG A. MENDENHALL

Page 41

1    discussed there?

2    **A.        He was being instructed to get out of the**

3    **police vehicle. What was said I don't remember.  How**

4    **it was said I don't remember.  But he was being**

5    **instructed that he had to exit the vehicle.**

6    Q.        And so what do you recall happening?  Was he

7    compliant, was he not compliant, what do you recall?

8    **A.        He was, I would say passively resistant. He**

9    **didn't want to exit the vehicle and he was just**

10   **resistant to the commands given to him.**

11   Q.        And I should have asked you this before but

12   have you ever seen the video before?

13   **A.        Yes.**

14   Q.        How many times have you seen it?

15   **A.        I don't recall. Several.**

16   Q.        When was the first time that you saw this

17   video?

18   **A.        The day that it happened.**

19   Q.        And when was the last time that you seen this

20   again?

21   **A.        It would be last week, last Tuesday which**

22   **would have been the 22nd I had to prep for this**

23   **proceeding.**

24   Q.        So at the beginning of the deposition I asked

25   you if you reviewed any, and maybe I just said

LT. GREG A. MENDENHALL

Page 42

1  documents, I'm not sure. But I believe I asked you if

2  you reviewed any materials in preparation for your

3  deposition. You stated that you reviewed the papers

4  you had in front of you. But you also reviewed this

5  video in preparation for your deposition; is that

6  correct?

7  **A.       As the prep for this deposition I reviewed**

8  **the video.**

9  Q.       Are there any other videos that you reviewed

10 in preparation for your deposition?

11 **A.       No.**

12 Q.       And By when I say this video I'm referring to

13 the video that we're watching now in the bay. Did you

14 review any other videos from any other angles from

15 this day?

16 **A.       Yes.**

17 Q.       And we'll probably see those in just a

18 second. Any other materials that you reviewed in

19 preparation for your deposition other than the videos

20 and the papers that you have in your possession right

21 now?

22 **A.       No. None.**

23 Q.       Let's continue to play the video. I'm going

24 to stop the video at 143. What is occurring now?

25 **A.       We're tying to escort him into the Judicial**

LT. GREG A. MENDENHALL

Page 43

1    **Center. He resisted.  He became dead weight and**
2    **basically we had to escort him in. He refused to walk.**
3    Q.        Do you recall anything that he said at the
4    time?
5    **A.        I don't recall him ever saying anything, no.**
6    Q.        Did you ask him any questions at this time?
7    **A.        I kept instructing him to comply with the**
8    **process.  He never responded to me verbally.**
9    Q.        Did you at any point make an assessment as to
10   whether or not he was impaired?
11                   MR. LAVERY: Object to the form of
12   the question. You can answer.
13   **A.        I did not.**
14   Q.        Did you at any point make an assessment as to
15   whether or not he was mentally stable?
16                   MR. LAVERY: Object to the form of
17   the question.
18   **A.        No.**
19   Q.        Can you tell me why you did not make an
20   assessment as to why he was impaired?
21                   MR. LAVERY: Again, object to the
22   form of the question. You can answer if you understand
23   it.
24   **A.        I mean, are you asking my opinion or?**
25   Q.        No.  I'm asking you why you stated that you

LT. GREG A. MENDENHALL

Page 44

1    did not make an assessment as to why he was impaired.

2    I'm asking you why you did not make that assessment?

3    **A.        I don't recall.**

4    Q.        And why did you not make the assessment as to

5    whether or not he was mentally stable?

6                    MR. LAVERY: Object to the form of

7    the question. You can answer.

8    **A.        I don't recall.**

9    Q.        I'm going to start the video again. I'm going

10    to stop it at 208 as all individuals have entered the

11    facility from the bay. I know you've seen this video

12    before.  Is there anything else you want to say about

13    this portion of the video before I stop it but I'm

14    just letting you know I'm not playing the full video

15    is just a car sitting in the bay. But is there

16    anything else you wanted to add about this video that

17    I did not ask you about?

18    **A.        No.**

19    Q.        I'll stop that there. I'll show you another

20    video. Why don't we mark this Mendenhall 5. We'll call

21    this booking camera. Do you see that video there?

22    **A.        Yes.**

23    Q.        Do you see the correctional officer to the

24    right?

25    **A.        Yes.**

LT. GREG A. MENDENHALL

Page 45

1    Q.        Can you identify her?

2    **A.        Correctional Officer Delta Bauer, B-A-U-E-R.**

3    Q.        I'm going to start playing the video.  I'm

4    going to pause it here at 49 seconds. Can you tell me

5    what's occurring at this time?

6    **A.        He was instructed when he was brought in to**

7    **stand and face the wall. He attempted to get up on the**

8    **bench where he was pulled back down. Again, I gave him**

9    **a second command to stand there in front of the wall**

10    **and comply with the process.**

11    **                He continued to pull away from**

12    **officers at which point they proned him on the ground.**

13    Q.        What is the normal process for bringing in a

14    pretrial detainee? Does the processing occur in this

15    lobby area that we see right now or is there a

16    different place where it occurs? What normally happens

17    when a pretrial detainee comes in?

18    **A.        Right where I'm standing that bench there**

19    **that is where we conduct intake process on all new**

20    **detainees.**

21    Q.        And there's a camera that's above that

22    location; is that correct?

23    **A.        Yeah.**

24    Q.        And do you know if that's intentional?

25    **A.        I don't recall. I don't know.**

LT. GREG A. MENDENHALL

Page 46

1    Q.        I notice that you looked at the camera when

2    you came in there. Was there a reason that you did

3    that?

4              MR. LAVERY: Objection to the form of

5    the question. I think you should ask him whether he

6    recalls doing that. You're asking if there's a reason.

7              MR. ROSS: Well, I asked what I

8    asked. So you can answer the question.

9              MR. LAVERY: So object to the form.

10   It lacks foundation. Go ahead, you can answer.

11   **A.        I don't recall doing that.**

12   Q.        I'll wind it back just so you can see what

13   I'm referring to. I'm going start it at 5 seconds. I'm

14   paused there.  I was referring to that. Did you see

15   that look there?  Do you recall looking at the camera

16   at that point?

17   **A.        I don't recall doing that.**

18   Q.        I'm going to let the video continue to play.

19   I'll pause there at 3 seconds. Now, at this point

20   Ty'rique Riley is on the ground.  Do you recall if he

21   was taken to the ground purposely or was this

22   something where the individual fell to the ground?

23   **A.        He was taken down purposely.**

24   Q.        And why was that, if you know?

25   **A.        We were trying to get in compliance of the**

LT. GREG A. MENDENHALL

Page 47

1    **inmate. He was totally uncooperative at the bench. We**
2    **took him to the ground in an attempt to gain**
3    **compliance. The officers took him to the ground in an**
4    **attempt to gain compliance.**
5    Q.        Did you order the officers to take him to the
6    ground?
7    **A.        No.**
8    Q.        Did any of the officers indicate that they
9    were going to take him to the ground?
10   **A.        No.**
11   Q.        Tell me how you know then that this was
12   something that was done purposely?
13   **A.        I don't recall that. I mean, it's a standard**
14   **thing that we do if an inmate or a detainee is**
15   **resistant, uncooperative, we take them to the ground**
16   **in order to gain compliance.  We try to isolate them**
17   **in that position so that they become compliant.**
18   Q.        Okay. I'm going to continue playing from 53
19   seconds. I'm going to stop there. It looks like you
20   took something out of a holster on the side. Can you
21   tell me if that is correct and so what that was that
22   you took out?
23   **A.        That is correct. That's Oleoresin Capsicum**
24   **solution.**
25   Q.        Is there another name for that?

LT. GREG A. MENDENHALL

Page 48

1    **A.**        **In layman's terms it's Mace or OC.**

2    Q.        OC spray?

3    **A.**        **Yes.**

4    Q.        And at some point you did use the OC spray on

5    Mr. Riley; is that correct?

6    **A.**        **I did, yes.**

7    Q.        Did you use it more than once?

8    **A.**        **No.**

9    Q.        And what was the purpose of using the OC

10    spray?

11    **A.**        **He was still on the ground, while he was on**

12    **the ground as he is now resisting officers pulling**

13    **away.  They're trying to remove the handcuffs and leg**

14    **irons of the police agencies to give them back.  He is**

15    **not allowing them to do that. He kept pulling away**

16    **resisting the officers' attempts.  At which time I**

17    **deployed my OC spray.**

18    Q.        I'll keep playing there from the 58 second

19    mark. I'm going to stop there at the 1:30 mark.  It

20    appears to me that one of the correctional officers

21    has his knee on Mr. Riley's neck. Do you agree with

22    that observation that I just made?

23                MR. LAVERY: Object to form. Go

24    ahead. You can answer.

25    **A.**        **I can't tell.  I don't know.**

LT. GREG A. MENDENHALL

Page 49

1    Q.        And what officer if you can tell is that?  Is

2    that Officer Ingersoll or Weaver?

3    **A.        That is Officer Ingersoll.**

4    Q.        I'm going to keep playing from the 1:30 mark.

5    I'm going to stop there at the 1:40 mark. Can you tell

6    now whether or not Officer Ingersoll had his knee on

7    Mr. Riley's neck?

8    **A.        I can't tell if it's on his neck or across**

9    **his shoulder blade.**

10   Q.        At the time in June of 2019 did Dauphin

11   County Prison have any policy regarding using a knee

12   on someone's neck in order to restrain an individual?

13                  MR. LAVERY: Object to form. You can

14   answer.

15   **A.        I don't recall but I would say no.**

16   Q.        Do you mean you would say no that there was

17   no policy at the time?

18   **A.        That would not be a thing to do is what I'm**

19   **trying to say.**

20   Q.        I'm sorry. Go ahead.

21   **A.        Obviously that would not be the thing to do**

22   **that would be condoned.**

23   Q.        Do you recall as of June 2019 if there was a

24   policy that prohibited an officer from using his knee,

25   from placing his knee on the neck of a subject to

LT. GREG A. MENDENHALL

Page 50

1    detain him?

2    **A.        I'm sure there was but I just don't recall.**

3    Q.        I'm going to start from 1:40. I'm going to

4    pause at 1:48. There's another correctional officer

5    that enters the frame. Can you tell me who that is.

6    **A.        Yeah. That is Sergeant Scott Grieb,**

7    **G-R-I-E-B.**

8                MR. LAVERY: What point is this on

9    the video?

10               MR. ROSS: This is the 1:48 mark.

11   Q.        I'm going to keep playing from 1:48. I'm

12   going to pause it at 2:26 mark. Is this the point in

13   which you deployed the OC spray?

14   **A.        Yes.**

15   Q.        I'll keep playing it from there. Stop at the

16   3 minute mark.  What was the point of using the OC

17   spray at that particular time?

18               MR. LAVERY: Object to form. Also

19   object to the fact that he has already been asked and

20   answered that question but go ahead, you can answer it

21   again?

22   **A.        He was still being resistant and**

23   **uncooperative with the process.**

24   Q.        In June of 2019 was there a written policy

25   that governed the use of pepper spray on pretrial

LT. GREG A. MENDENHALL

Page 51

1  detainees?

2  **A.        I don't recall. I'm sure there was.**

3  Q.        And I said pepper spray. And I should have

4  said OC spray. Is the answer the same for OC spray?

5  **A.        Yes.**

6  Q.        I'll continue playing from there. And let me

7  stop it there at 3:44. We talked earlier about you

8  viewing videos in preparation for your deposition.

9  Have you seen this video before?

10 **A.        Yes.**

11 Q.        And did you review this video in preparation

12 for your deposition?

13 **A.        Yes.**

14 Q.        I'm going to skip ahead.  If there's anything

15 that you want to tell me about this video you can do

16 so. But I think I want to have just a possible

17 identification. That's what I want to address with the

18 rest of it. I'm fast forwarding ahead. We're at the

19 4:39 mark and it appears that Mr. Riley has been taken

20 and placed into a cell; is that correct?

21 **A.        That is correct.**

22 Q.        And what was the purpose of him being placed

23 into the cell?

24 **A.        All detainees are placed in a cell. Once**

25 **they're processed, the original intake process is**

LT. GREG A. MENDENHALL

Page 52

1    done.   They're placed in one of the four cells.

2    Q.        I'm going to continue to fast forward ahead.

3    I am stopping at the 5:10 mark. Do you know, it

4    appears to me that Correction Officer Bauer had

5    coughed in that frame. Do you know if pepper spray or

6    OC spray was used again in the cell on Ty'rique Riley?

7    A.        It was not.

8    Q.        I'm going to keep playing, fast forwarding

9    from 5:10. I'm starting at 6:19. It looks like someone

10   comes into the picture from the left wearing black

11   pants.  I want to direct your attention to that and

12   see if you can see. Do you see that person that walked

13   into the cell?

14   A.        Yes.

15   Q.        Do you know who that was?

16   A.        That was a nurse from Prime Care Medical.

17   Q.        That's at the 6:30 mark is where we are now.

18   Do you know the nurse's name?

19   A.        I mean, I know it now because I have the

20   document form the prep from last week. Before that I

21   didn't know it.

22   Q.        And that's one of the documents you're

23   referring to or that you have in your possession now?

24   A.        Yes.

25   Q.        And who is the nurse that's listed on that

LT. GREG A. MENDENHALL

Page 53

1   document?

2              MR. LAVERY: Just identify the

3   document for the record so we know what you're looking

4   at.

5   **A.        It's a Dauphin County Medical Incident Injury**

6   **Report. The nurse is Medical Assistant Vanessa Talley,**

7   **T-A-L-L-E-Y.**

8   Q.        I'm going to introduce that document in a

9   second. I just wanted to make sure we're looking at

10  the same document. And what happened when, what if

11  anything occurred once Nurse Talley entered the cell?

12  **A.        I instructed medical to come in, have an**

13  **officer get medical to come in and evaluate Detainee**

14  **Riley because I administered the OC spray and I wanted**

15  **his eyes flushed with saline solution.  So that was**

16  **the reason I had the nurse come in.**

17             MR. NINOSKY: Riley, for

18  clarification, she's not a nurse.  She's a medical

19  assistant. That's different.  Just so the record is

20  clear.

21             MR. RILEY: Thank you.

22  Q.        Lieutenant, you stated that the medical

23  assistant flushed Ty'rique Riley's eyes out because of

24  the OC spray; is that correct?

25  **A.        Yes.**

LT. GREG A. MENDENHALL

Page 54

1   Q.        And did she do anything else in connection

2   with Ty'rique Riley other than flush his eyes out?

3   **A.        I don't recall.**

4   Q.        Was there an evaluation performed to

5   determine if it was impaired at the time?

6              MR. LAVERY: Object to the form of

7   the question. Specifically to use of the word

8   impaired.  But go ahead, you can answer.

9   **A.        I don't recall.**

10  Q.        Was there an evaluation done to determine

11  whether or not he was injured?

12  **A.        I'm assuming so but I don't recall.**

13  Q.        Was an evaluation performed at the time to

14  determine if he was mentally stable.

15             MR. LAVERY: Object to the form of

16  the question.  You can answer.

17  **A.        No. There was not.**

18             **Counselor, is it possible I use the**

19  **bathroom?**

20  Q.        Absolutely. Let me just do this. I don't

21  think I have anything else on this video. So I'm just

22  going to fast forward to the end and it will take

23  about five seconds.

24             Is there anything else about this

25  video that you wanted to tell me, Lieutenant, that I

LT. GREG A. MENDENHALL

Page 55

1    didn't ask you about.

2    **A.        No.**

3                    MR. ROSS: Okay.  Why don't we take a

4    five minute break.  Is fine minutes enough?

5                    MR. LAVERY: Yes. That's fine.

6                    MR. ROSS: We'll come back at 11:55.

7                    (Recess taken.)

8    BY MR. ROSS:

9    Q.        Let me put up a new document. Lieutenant. We

10   are at Mendenhall 6.  So we'll mark this at Mendenhall

11   7. At the top it says Report of Extraordinary

12   Occurrence date 6/18/2019, reporting Officer

13   Lieutenant Greg Mendenhall. It is bate stamped DFS 1.

14   And it's a two page document 1 and 2.

15                    Lieutenant, is this the document

16   that you were referring to before the Report of

17   Extraordinary Occurrence that you completed.

18   **A.        Yes, it is.**

19   Q.        Is this something that was actually typed out

20   by you?

21   **A.        Yes, it was.**

22   Q.        And tell me about the report of Extraordinary

23   Occurrence. What is that?

24   **A.        It's a document we do when something above**

25   **and beyond the norm happens. Any incident involving an**

LT. GREG A. MENDENHALL

Page 56

1    **inmate, a detainee, an inmate on inmate, a fight,**

2    **anything that is above and beyond the norm an**

3    **Extraordinary Occurrence for is completed.**

4    Q.        Are you familiar with the term Use of Force

5    Form?

6    **A.        I don't recall, no.**

7    Q.        Is a Use of the Force Form used whenever the

8    use of force is used by correction officers?

9                MR. LAVERY: I'm going to object to

10   the form of the question just because I don't know

11   what your definition of the Use of Force Form is.  But

12   go ahead, you can answer.

13   **A.        Yeah. I don't recall the Use of Force Form.**

14   Q.        Is there a document that is filled out by

15   correction officers when the use of force is used on

16   an inmate?

17   **A.        Not a form. Just a standard memo that they**

18   **write stating what happened and what they did. But I**

19   **don't recall such a form, no.**

20   Q.        Was there a memo that you're referring to,

21   was such a memo completed in connection with the

22   incident we just seen on video with regard to Ty'rique

23   Riley?

24   **A.        Yes.  By all four officers.  Each one did an**

25   **individual memo.**

LT. GREG A. MENDENHALL

Page 57

1    Q.        I see here under the type of extraordinary

2    occurrence that you check other and it says

3    non-compliant. Detainee use of the OC, I'm not going

4    to try and pronounce that. But do you see that there?

5    **A.        Yes.**

6    Q.        I also see that there's a box there to be

7    checked for physical force on prisoners.  Is there a

8    reason that you did not check that box?

9    **A.        I don't recall. No.**

10   Q.        Could this report of extraordinary occurrence

11   when a physical force on an inmate is used?

12   **A.        Yes.**

13   Q.        Is it common for a report of extraordinary

14   occurrence to be filled out when physical force on an

15   inmate is used?

16   **A.        Yes.**

17                  MR. ROSS: So we'll go ahead and mark

18   this. And we said it's Mendenhall 6.

19   Q.        At the bottom of that form that there was a

20   it looks like a black and white picture.  It appeared

21   to be Ty'rique Riley; is that correct?

22   **A.        That is correct.**

23   Q.        I'm going to try to put up a picture that was

24   received. Is this the photo that was at the bottom of

25   the form; can you see that?

LT. GREG A. MENDENHALL

Page 58

1    **A.        Yes, it is.**

2    Q.        And can you tell me the circumstances that

3    led to this photo being taken?

4    **A.        Every time the OC spray is deployed in the**

5    **facial area a picture is to be taken and embedded in**

6    **the report.**

7    Q.        And where was this photo taken?

8    **A.        The holding cell 132.**

9    Q.        Is that the cell that we saw in the video

10   that Ty'rique Riley was placed in?

11   **A.        It is, yes.**

12   Q.        And it looks like several hands are on his

13   head. Do you know who was holding him at the time the

14   photo was taken?

15   **A.        I'm assuming it was the officers that were**

16   **involve. I don't know. I don't recall.**

17   Q.        We'll mark that as Mendenhall 7. I believe

18   these are the memos that were filled out by the

19   officers. Let's start out with the one on the first

20   page.  Is this the memo by CO Weaver that you were

21   referring to?

22   **A.        Yes, it is.**

23   Q.        And that is bate stamped Dauphin DFS 4. And

24   then we have it looks like a memo from CO Bauer; is

25   that correct?

LT. GREG A. MENDENHALL

Page 59

1    **A.        Yes.**

2    Q.        And then a memo by Sergeant Grieb?

3    **A.        Correct.**

4    Q.        And then a memo by CO Ingersoll; is that

5    correct?

6    **A.        Yes.**

7    Q.        And that ends at Dauphin DFS 7. Let me show

8    you one other document. This is a document

9    medical/incident report.  It is bate stamped Dauphin

10   DFS 3. Is this the medical document you were referring

11   to where you gave me the name for the medical

12   assistant?

13   **A.        Yes, it is.**

14   Q.        Why don't we mark this as Mendenhall 9. I'm

15   not going to mark this next document yet. I'm going to

16   see if it's anything that you know about.  Let me put

17   it up on the screen. This is a document that says at

18   the top Report of Extraordinary Occurrence 6/18/2019.

19   And it's bate stamped Dauphin DFS No. 8. It talks

20   about or what's checked under the type of

21   extraordinary occurrence is other destruction behavior

22   use of restraint belt. Were you involved in any way,

23   Lieutenant, with the use of a restraint belt on

24   Ty'rique Riley on June 18th?

25   **A.        No.**

LT. GREG A. MENDENHALL

Page 60

1    Q.        Lieutenant there is listed as Richard

2    Armermann. First of all, do you know him?

3    **A.        Yes. I do know him.**

4    Q.        Is that the, if you know, is that the shift

5    commander that came on after your shift ended?

6    **A.        It is. Captain Mark Neidigh was the shift,**

7    **captain, the shift commander. Lt. Armermann was the**

8    **assistant shift commander.**

9    Q.        Thank you for that clarification.  But you

10   didn't have anything to do with the use of the

11   restraint belt on Ty'rique Riley that day?

12   **A.        No.**

13   Q.        We won't mark that one. Let me show you

14   another report to see if anything to do with this one.

15   This is a report after extraordinary occurrence

16   occurring on June 26, 2019. And it is bate stamped

17   Dauphin DFS 16. The type of extraordinary occurrence

18   being other, medical emergency, medical transport. Did

19   you have anything to do with the emergency transport

20   of Ty'rique Riley on June 26, 2019?

21   **A.        No, I did not.**

22   Q.        Do you recall if you worked a shift on that

23   day?

24   **A.        I did work on that date up till 09:00 hours**

25   **prior to the medical emergency.**

LT. GREG A. MENDENHALL

Page 61

1    Q.        Did you have any interactions with Ty'rique

2    Riley during your shift that day?

3    **A.        No, I did not.**

4    Q.        I'm going to show you a video for, and see if

5    you can identify any of the individuals on the video.

6    Actually before I do that I did have a question I

7    wanted to ask you. I just put on the screen a document

8    that was turned over to us, it's bate stamped Dauphin

9    DFS 143.  It says Dauphin County Prison Crisis

10   De-excalation. Do you recall ever receiving any

11   training in crisis deescalation?

12   **A.        No, I do not.**

13   Q.        Does this page look familiar to you at all?

14   **A.        It does not look familiar at all, no.**

15   Q.        I'm going to show you a few pages from this

16   document, these documents that were given to us and

17   just ask you so questions. First of all, do you know

18   who, it appears that this says Lieutenant Virgil

19   Meyer.  Do you know who that is?

20   **A.        I do not, no.**

21   Q.        I'm going to go to Dauphin DFS 150. This says

22   characteristics of distressing voices.  It says

23   static, humming, machine grinding, familiar people

24   versus strangers, close versus distant, positive

25   versus negative, clear or garbled, conversational or

LT. GREG A. MENDENHALL

Page 62

1    one way monologue.

2                    Do you recall ever receiving

3    training regarding deescalation and the

4    characteristics of a distressing voice?

5                    MR. LAVERY: Object to the form.  You

6    can answer.

7    **A.        I don't recall that training at all. No.**

8    Q.        And I think I asked this but I don't remember

9    your answer so I'm going to ask you again. Do you

10   recall receiving any training at all regarding

11   deescalation tactics?

12   **A.        No. I don't recall.**

13   Q.        We'll mark that one as Mendenhall 10. I'm

14   going to show you some more pages from that from what

15   we received under the category deescalation. I'm going

16   to go to Dauphin DFS 169. Do you recall ever seeing

17   this page?

18   **A.        I do not, no.**

19   Q.        And there's a little comic there or what

20   appears to be a picture with a saying on it.  Do you

21   recall ever seeing that saying?

22   **A.        No.**

23   Q.        We'll mark this as Mendenhall 11.

24                   MR. LAVERY: Is that part of the

25   same, it looks like it's a power point?

LT. GREG A. MENDENHALL

Page 63

1          MR. ROSS: Yeah, it is. I'm just

2   pointing out specific pages.

3          MR. LAVERY: You're going to mark

4   that as a separate exhibit. You already have it in 10

5   as the exhibit. I'm just trying to keep it straight,

6   that's all.

7          MR. ROSS: Yeah. I'm just marking

8   those specific pages. I think it was a large document.

9          MR. LAVERY: So that's going to be 11

10   then?

11          MR. ROSS: Yes.

12          MR. LAVERY: And that's what?

13          MR. ROSS: That was Dauphin DFS 169.

14          MR. LAVERY: All right. Got it.

15   Sorry.

16   BY MR ROSS:

17   Q.       We're going to look at that same document a

18   few pages here. We're going to mark them as Dauphin

19   DFS 177 through 186. This first page says Verbal

20   De-escalation Playbook, the four plays. Do you recall

21   ever receiving training on playbook, the four plays?

22   **A.       No.**

23          MR. LAVERY: Object to form.

24   Q.       The next page Dauphin DFS 178 says the four

25   plays, introduce yourself, can you tell me your name,

LT. GREG A. MENDENHALL

Page 64

1   see what you see and summarizing. Do you recall

2   receiving any training on those four items?

3   **A.        No.**

4   Q.        I have another page here. Dauphin DFS 184. It

5   says Caution. Encounters to Avoid. And I'll let you

6   read those and then I'm going to ask you if you

7   recall receiving training on any of these encounters

8   to avoid?

9   **A.        Okay.  I read it.**

10  Q.        Do you recall ever receiving training on any

11  of these encounters to avoid?

12  **A.        No. I do not.**

13  Q.        And here are some more on Dauphin DFS 185

14  Additional Encounters to Avoid.

15  **A.        No. I do not.**

16  Q.        You do not recall receiving any training on

17  these?

18  **A.        No.**

19  Q.        So that's 177 through 186.

20             MR. LAVERY: Are those another

21  exhibit as well or is that part of the last one?

22             MR. ROSS: No. That was Mendenhall

23  12. That's separate one.

24  Q.        Lieutenant, did you after June 18, 2019 did

25  you have any encounters with Ty'rique Riley?

LT. GREG A. MENDENHALL

Page 65

1  **A.          No, I did not.**

2  Q.          Do you know, did you know that he was put on

3  a suicide watch?

4  **A.          No, I do not or did not.**

5  Q.          And you had no other encounters with him

6  during the time that he was at Dauphin County Prison?

7  **A.          No other dealings at all, no.**

8  Q.          We're going to go to the videos. I want to

9  see if you can identify. Can you see that video?

10 **A.          I can.**

11 Q.          Have you seen this video before?

12 **A.          I've never saw that video, no.**

13 Q.          And just from playing from there is there any

14 way you can recognize any one specific person there?

15 **A.          I do not recognize a person there, no.**

16 Q.          Let me see if I can find a better view.

17 There's going to be someone that's going to be coming

18 through. I want to see if you can identify the person

19 pushing the person in the wheelchair?

20 **A.          Yes. That is Correctional Officer Joanna --**

21 Q.          I'm sorry. I'm not referring to the woman.

22 I'm referring to the gentleman there in the black hat.

23 Are you able to recognize him?

24 **A.          That is Prime Care employee Carl Daulbenspek.**

25 **I believe that's how he pronounces his name. I'm not**

LT. GREG A. MENDENHALL

Page 66

1    sure what his title is. I'm not sure what his title is

2    or what it was or but that's who that is.

3                    MR. LAVERY: The guy in the black hat

4    pushing the wheelchair.

5    A.          That is CO Michael Sheffer, S-H-E-F-F-E-R.

6    I'm sorry.

7    Q.          That's all right because I was confused.  I

8    didn't realize, I thought you were saying the Prime

9    Care individuals were wearing the blue shirt.  So I'm

10   glad we cleared that up.

11                   So the first person pushing the

12   wheelchair is CO Michael Sheffer?

13   A.          That is correct.

14   Q.          The person you were describing as the Prime

15   Care employee was that the person in the black shirt

16   that was at the beginning of the --

17   A.          Yes. That is.

18   Q.          There's a few people that are going to follow

19   CO Sheffer. I want to see if you can identify them.

20   The first is the woman in the pink shirt.

21   A.          I do not know who she is.

22   Q.          How about the woman after her?

23   A.          That looks like, that is CO Angela Swanson.

24   Q.          And how about the gentleman after CO Swanson?

25   A.          That's a Prime Care employee.  I don't recall

LT. GREG A. MENDENHALL

Page 67

1    **what his name was. It was either, he's the**

2    **psychiatrist or psychologist, I'm not sure. I don't**

3    **know what his name was or remember what his name was.**

4    Q.        It's described in the file as A Block 8 is

5    that camera angle I'm assuming?

6    **A.        Yes.**

7    Q.        We don't need to mark that. And I thought I

8    gave you the best camera angle but apparently I did

9    not. So my apologies. Let me just show you this to

10   confirm the identifications you made. We'll give a

11   better picture. Is there anyone in there that you

12   misidentified?

13   **A.        No. Except the lady in the red shirt. I don't**

14   **know who she is.**

15            MR. LAVERY: It looks like there's

16   two people following there.  Do you know who they are?

17   **A.        Who are you talking about?**

18            MR. LAVERY: The two trailing people.

19   One in the black, it looks like a black shirt and the

20   other in a gray shirt or green shirt.

21   **A.        They're both Prime Care employees. One is**

22   **Carl Daubenspeck.  The other gentleman I don't know**

23   **what his name was. I know he was a psychiatrist or**

24   **psychologist but I don't know the name of.**

25   Q.        And the one in the black shirt you actually

LT. GREG A. MENDENHALL

Page 68

1    identified before is Carl Daubenspeck, right, Prime

2    Care?

3    **A.        Yes.**

4    Q.        And the tall gentleman in the back is the

5    psychologist or psychiatrist from Prime Care?

6    **A.        Yes. But I don't know the name.**

7    Q.        Got it. See if you can identify -- we have a

8    new person on this frame I believe.  So the person

9    pulling the wheelchair that is still CO Sheffer; is

10   that correct?

11   **A.        Correct.**

12   Q.        And do you know who the other CO is?

13   **A.        I do.  Correctional Officer Joseph Doyle,**

14   **D-O-Y-L-E.**

15               MR. LAVERY: Is this the same video

16   clip just so we know where it's at?

17               MR. ROSS: Yes. This is marked as

18   central gate, 0906.

19               MR. LAVERY: Okay. Thanks.

20   Q.        I'm going to ask you a question about this

21   video.  This is the marked as, and when I say marked,

22   I mean this is the file name that I was given.  It

23   says med wait room which I assume to mean medical

24   waiting room. Does this look familiar to you?

25   **A.        Yes.**

LT. GREG A. MENDENHALL

Page 69

1   Q.        What is this area?

2   **A.        That's the medical waiting room.**

3   Q.        You're going to see people coming into the

4   picture that you already identified. I know you

5   weren't able to identify the first woman but everyone

6   else you were able to identify in some way.  By the

7   way, the woman in the pinkish red shirt that you

8   couldn't identify do you know if she's a Prime Care

9   employee?

10  **A.        She is a Prime Care employee, yes.**

11  Q.        So the people are walking towards the entry

12  of the medical room; is that correct?

13  **A.        Yes.**

14  Q.        And this is an area that people wait outside

15  in order to be seen by someone in medical; is that how

16  it works?

17  **A.        That's correct.**

18  Q.        And how does one gain entry into the medical

19  unit?

20  **A.        They either have to be let in or if it's an**

21  **employee they have the key. It's a locked door.**

22  Q.        That's all I wanted to ask about that. This

23  next video is marked as A-1 to front. And it's my

24  understanding that this video along with the prior

25  video where you identified CO Doyle is capturing Mr.

LT. GREG A. MENDENHALL

Page 70

1    Riley being taken from the medical unit back to his
2    cell. I just want to stop there. Do you recognize the
3    -- well, is it correct we see the two CO's that we
4    previously discussed CO Sheffer and CO Doyle; is that
5    correct?
6    **A.        That's correct.**
7    Q.        Do you recognize the woman in the blue either
8    jacket or shirt?
9    **A.        I can't tell who that is from this angle.**
10   Q.        Can you tell me what area of the Dauphin
11   County Prison this is if you know?
12   **A.        That's the tier of A-block. It looks like**
13   **A-1-6 around that area. But it's the lower tier of**
14   **A-block.**
15   Q.        And is A-block, Does A-block have any special
16   significance like are there only types of certain
17   individuals housed there?
18   **A.        It was a classification block where new**
19   **people that come in are placed in A-block until**
20   **they're classified and they're moved to other areas of**
21   **the prison.  It's usually new commitments.**
22   Q.        So A-block is not a designation for any type
23   of medical, it's not a medical ward or for anyone
24   having medical problems; is that correct?
25   **A.        It's not a medical ward, no.**

LT. GREG A. MENDENHALL

Page 71

1  Q.        And when you said that it's for commitments
2  that are waiting to be classified what type of
3  classification would they receive to be moved out of
4  A-block?
5  **A.        I don't recall.  The counseling department**
6  **handles all of that.  How they determine their**
7  **classification I do not know.**
8  Q.        Does the moving them out of A-block have
9  anything to do with their criminal case?
10 **A.        Eventually yes. They're going to -- depending**
11 **on what their bond might be, what they're, I can't**
12 **remember the name. That they can't be in general**
13 **population, a myriad of reasons.  But it's usually**
14 **done by the counseling department and they make that**
15 **determination.**
16 Q.        Do you have any sense how long a new
17 commitment usually stays on A-block before being
18 classified?
19                 MR. LAVERY: Object to form.  You can
20 answer.
21 **A.        Two to three days on average.**
22 Q.        In your experience would it be unusual for
23 someone to remain in the A-block for more than ten
24 days?
25 **A.        Yes, it would.**

LT. GREG A. MENDENHALL

Page 72

1    Q.        Do you know if there would be any reason why
2    a pretrial detainee would remain in A-block for more
3    than ten days?
4                MR. LAVERY: Again, object to form.
5    If you can without speculating.
6    **A.        I do not know.**
7    Q.        This is going to be a different date but I'm
8    just really asking you for identification purposes,
9    not for anything that actually happened here. But it's
10   June 26th and it's marked as again A-1 to front. I
11   assume that's the camera angle?
12   **A.        Yes.**
13   Q.        Can you see that?
14   **A.        Yes, I can.**
15   Q.        Do you recognize that person?
16   **A.        I do not recognize her, no.**
17   Q.        I'm moving toward the 22.21 mark. I have two
18   look to be CO's to me. Do you recognize either one of
19   them?
20   **A.        Without 100 percent certainty the first one**
21   **at the door looks like CO Matthew Danner. The second**
22   **one I can't make out.**
23   Q.        I'm going to show you a different image and
24   maybe we'll come back to this one. We're going to go
25   to what's called still the same day but it's called

LT. GREG A. MENDENHALL

Page 73

1    central gate.

2    **A.          Okay.**

3    Q.          That first one is blurry. Actually let me

4    just ask. In the forefront we have two individuals

5    that are pulling what appears to be my understanding

6    is that that's Ty'rique Riley in a restraint chair.

7    First of all, am I correct in that, do you recognize

8    that to be a restraint chair?

9    **A.          Yes.**

10   Q.          The person on our right with the hat on

11   that's holding onto the restraint chair, do you

12   recognize that person?

13   **A.          That is CO Matthew Danner.**

14   Q.          And for the record I'm at the 18 second mark.

15   And the person on the right of the restraint chair is

16   Danner?

17   **A.          Yes.**

18   Q.          And how about to the left of the restraint

19   chair?

20   **A.          That is Sergeant Scott Lewis, L-E-W-I-S.**

21   Q.          And he's the one that appears to have a full

22   goatee beard there?

23   **A.          That is correct.**

24   Q.          Scott Lewis. And then trailing them are you

25   able to see who those folks are yet or do I need to

Case 4:20-cv-00325-MWB    Document 296-1    Filed 09/17/25    Page 75 of 91

LT. GREG A. MENDENHALL

Page 74

1   play some more?

2   **A.         I think you need to move it up a little bit**

3   **if you would.**

4   Q.         Okay. And we stopped at 21 seconds. And how

5   about the person on the right closest to the, in the

6   forefront closest to the bars?

7   **A.         That is CO Stephen Singleton.**

8   Q.         And then how about the person next to him?

9   **A.         That is Sergeant Keith Biter, B-I-T-E-R.**

10  Q.         So he is the shorter gentleman with the

11  glasses?

12  **A.         That is correct.**

13  Q.         And behind him is a gentleman is, I don't

14  know if that's a dark blue or a black shirt.  Do you

15  recognize that person?

16  **A.         I do. That is Captain Andrew Klarr.**

17  Q.         So that is a black shirt?

18  **A.         Yes.**

19  Q.         I want to go back now to the one that I was

20  showing you before which is A-to front. Then knowing

21  what we just saw I'll represent this is happening

22  before Mr. Riley is put in the restraint chair. Then

23  he's put into the restraint chair and that's the video

24  we just saw is he's wheeled to medical. I want to see

25  if there's anyone that appears in this video that you

LT. GREG A. MENDENHALL

Page 75

1    did not see wheeling him to medical so I'm going to

2    start playing it from here. If you can recognize

3    anyone. I'll move the video forward because it does

4    take a while. I'm at the 26.23 mark. Do you recognize

5    anyone that's in this frame?

6    **A.        Well, without 100 percent certainty the one**

7    **female in the back looks like Sergeant Ann Hess but I**

8    **can't say with 100 percent certainty.**

9                    MR. LAVERY: Which camera clip was

10   this, Mr. Ross?

11                   MR. ROSS: This is A-1 to front on

12   June 28.

13                   MR. LAVERY: Thank you.

14   Q.        And could you give me that name again. I

15   understand you said maybe that you're not certain?

16   **A.        Yes. Ann, A-N-N, Hess, H-E-S-S.**

17   Q.        I'll keep playing from there. I'll start

18   there 27:01. Any idea who is standing in front of the

19   person who you think may be Sergeant Ann Hess?

20   **A.        Well, the same thing, without 100 percent**

21   **certainty.  It looks to be CO Angela Swanson.**

22   Q.        Does that appear to be -- the individual

23   that's entering the cell right now do you know who

24   that is?

25   **A.        That's Captain Andrew Klarr. He would have**

LT. GREG A. MENDENHALL

Page 76

1    **been the shift Commander.**

2    Q.        How about the person behind him?

3    **A.        I can't make that person out. Oh, that's**

4    **Sergeant Scott Lewis.**

5    Q.        There's a woman who just kept walking by

6    after Sergeant Lewis and Captain Klarr went into the

7    cell. Let me play that again to see if you recognize

8    her. There she is. Do you recognize this woman here

9    that's looking into the different cell windows?

10   **A.        Again, without 100 percent certainty, it**

11   **looks to be possibly CO Joanna Hockenberry.**

12   Q.        And we're at the 28 minute mark here, zero

13   seconds. Could you give me the name again, please.

14   **A.        Joanna, J-O-A-N-N-A, Hockenberry,**

15   **H-O-C-K-E-N-B-E-R-R-Y.**

16   Q.        And that's a maybe I understand.

17   **A.        Yes, maybe.**

18   Q.        Any idea who the gentleman is who just walked

19   out of the cell and is walking away?

20   **A.        I can't tell. I do not know.**

21   Q.        I'm going to ask you a question just about

22   the camera angle here. This is A-1 to front. Is there

23   a camera that is on the A-block in any way or any

24   place that would give a 360 view of everything

25   happening on A-block?

LT. GREG A. MENDENHALL

Page 77

1    **A.          No. The three cameras are A-1 to front,**
2    **A-Front to rear and there is another one. I'm not**
3    **exactly sure of the title of it.  But none of them are**
4    **going to give you 360 resolution.**
5    Q.          Have you ever heard of anything called a fish
6    eye?
7    **A.          No.**
8    Q.          For a camera angle.
9    **A.          No, I have not.**
10   Q.          Keep playing from the 28:35 mark. Do you have
11   any idea of the gentleman that's on the right there?
12   **A.          That appears to be Sergeant Keith Biter.**
13   Q.          Am I correct that that is the restraint chair
14   that he just brought up to the cell?
15   **A.          That is correct.**
16   Q.          I'm going to go to the point where Ty'rique
17   is put into the restraint chair and I want to see if
18   anyone is there that you have not identified so far.
19   Okay.  I'm counting at least five individuals around
20   the restraint chair.  Do you believe that all five
21   have been identified by you?
22                MR. LAVERY: Do your best. I mean, if
23   you can you can. If you can't don't guess. But if you
24   can tell him.
25   **A.          I believe I ID's them all. It looks like CO**

LT. GREG A. MENDENHALL

Page 78

1    Matt Danner, CO Steve Singleton, Sergeant Andrew

2    Clark, Sergeant Scott Lewis, Sergeant Keith Biter.

3    Q.        Okay. I'm going to stop it there. I don't

4    have anyone else. Just a few more identifications.

5    This one is labeled med wait room for June 26th. You

6    did identify this CO, correct?

7    A.        Yes. Steve Singleton.

8    Q.        And do you know the woman that's in front of

9    him. And I paused it at the 21 second mark.

10   A.        No. She's a nurse. I'm not nurse her tell or

11   name.  I know she works for Prime Care.

12   Q.        And this gentleman that's going on at the 27

13   second mark?

14   A.        That is CO Donald Fockler, F-O-C-K-L-E-R.

15   Q.        27 second mark. How about the gentleman

16   that's escorting the inmates out?

17   A.        I can't. Can you back that up a little bit.

18   I can't. I think I do. That is, I just saw his face CO

19   Lamont Alderman.

20   Q.        And that was at the 33 second mark.  That's

21   Lamont Alderman; is that correct?

22   A.        Yes.

23   Q.        They have two gentleman coming in.  We're at

24   the 46 second mark. I will play a little more to see

25   if you can recognize them. The one has a black jacket,

LT. GREG A. MENDENHALL

Page 79

1    the second one a white shirt with a  tie. Do you

2    recognize either one?

3    **A.        Yeah.   That is Lieutenant Tim Good.**

4    Q.        Which one is that?

5    **A.        The one in the black jacket, I'm sorry.**

6    Q.        Could you give me his name again.

7    **A.        Tim Good, G-O-O-D, Lieutenant.**

8    Q.        And how about the gentleman that's with the

9    shirt and tie?

10   **A.        That's director of security Roger Lucas,**

11   **L-U-C-A-S.**

12   Q.        At the 3.27 mark, a gentleman comes in, a

13   different gentleman in a white shirt and a tie. Do you

14   recognize him?

15   **A.        Yeah. I'm not sure what his title was at that**

16   **point. It's Brian Clark. Whether he was warden or**

17   **director of corrections. Brian Clark.**

18   Q.        3:35 mark. Do you recognize this gentleman?

19   **A.        Yes. Lieutenant Damon, D-A-M-O-N, Morris,**

20   **M-O-R-R-I-S.**

21   Q.        3:38.  Do you recognize this gentleman?

22   **A.        I'm not sure who that is. Oh, that would be**

23   **Greg Briggs, B-R-I-G-G-S.**

24   Q.        Do you know his title?

25   **A.        He's warden now but I don't know if he was**

LT. GREG A. MENDENHALL

Page 80

1    back then. He was either Deputy Warden then or Warden

2    Briggs.

3    Q.        The officer that just left was that CO

4    Singleton?

5    A.        Yes, it is.

6    Q.        And is that CO Alderman?

7    A.        Correct. CO Alderman.

8    Q.        We're at the 10:27 mark.  Any idea who these

9    two individuals are?

10   A.        That's the female is a Prime Care employee.

11   I don't know her name. And the doctor is behind her. I

12   don't recall what his name is either.

13   Q.        11:19 mark. Any idea who that is walking out?

14   A.        I don't know. No idea.

15   Q.        And let me ask you a question regarding this

16   place where everyone is standing. Is there just a

17   single door that gives access to the medical unit?

18   A.        Yes. The one Warden Briggs is looking into is

19   one single door.

20   Q.        Does that door have a window?

21   A.        It does, yes.

22   Q.        And I'm looking at, if we look at the doors

23   that we see in the background there it looks like one

24   door has a very slim window and the other one has a

25   pretty wide window. Is that correct first of all?

LT. GREG A. MENDENHALL

Page 81

1    **A.        What are you talking about there?**

2    Q.        I'm looking at the doors that people entered

3    that they came under the doorway to get into the

4    waiting room. And it looks like one door is closed and

5    one door is open.

6    **A.        One is a door.  The other is a window.**

7    Q.        So they're not two doors?

8    **A.        No.**

9    Q.        So the window has a larger window and the

10   door has very narrow window; is that correct?

11   **A.        That's correct.**

12   Q.        So the door that Deputy Warden or Warden

13   Briggs is looking into does that have a narrow window

14   or a wide window?

15              MR. LAVERY: If you know?

16   **A.        I believe it's wide. Halfway up the door.**

17   **Without 100 percent certainty I do believe it's wide.**

18   **It's not narrow.**

19   Q.        Any idea, 12:33 mark, any idea who the woman

20   is that's walking with the white shirt?

21   **A.        She's a Prime Care employee. I don't know**

22   **what her name is.**

23   Q.        She's followed by individuals pulling a

24   stretcher. Any idea who these individuals are?

25   **A.        No. That would be the EMT's or the ambulance**

LT. GREG A. MENDENHALL

Page 82

1    crew. **I have no idea who they remember.**

2    Q.        I'm just asking you because I have to ask.

3    But any idea if it's a private company or if it's

4    someone affiliated with the hospital?

5    A.        **I do not know.**

6    Q.        Again, these are just individuals entering

7    the medical unit. They're again all EMT's, no one

8    associated with Dauphin County Prison that you know

9    of?

10   A.        **All but the one furthest in the back. That is**

11   **a county employee.**

12   Q.        You're talking about the gentleman no hat,

13   has a beard?

14   A.        **Yes.**

15   Q.        Who is that?

16   A.        **That is Sergeant Aiden Oldac, O-L-D-A-C.**

17   Q.        So he is in the back behind the EMT worker

18   with the hat on and the shade on his hat?

19   A.        **Correct.**

20   Q.        I'm going to stop it there. I just have one

21   more and you may have already identified everyone in

22   it. I actually have two more. This one is going to be

23   still med wait room but it's titled the 26 med wait

24   room. The previous one was 25. You already identified

25   everyone here, correct?

LT. GREG A. MENDENHALL

Page 83

1    **A.        Yes.**

2    Q.        I'm going to skip ahead. You've identified

3    everyone here, correct?

4    **A.        Yes.**

5    Q.        Any idea who this person is coming in at the

6    12:47 mark?

7    **A.        A Prime Care employee but I don't know her**

8    **name.  I don't recognize nice her.**

9    Q.        We're now at the 13:25 mark. Do you know who

10   this gentleman is coming with the white shirt and tie?

11   **A.        That's director of security Lucas.**

12   Q.        Okay. That's Lucas again. Again, everybody

13   has been identified before, correct?

14   **A.        Yes.**

15   Q.        And is this warden or at one point Warden

16   Clark?

17   **A.        Yes.**

18   Q.        Just a second.  There should be a few people

19   coming out. Let met see if we can identify them. How

20   about this gentleman in the blue shirt?  We're at

21   29:01 mark?

22   **A.        It looks like CO Donald Fockler.**

23   Q.        Did you already identify him?

24   **A.        I did, yes.**

25   Q.        And then the gentleman that Warden Clark is

LT. GREG A. MENDENHALL

Page 84

1    next to?

2    **A.        Sergeant Biter.**

3    Q.        And that is Danner behind him?

4    **A.        CO Danner, yes.**

5    Q.        This one is going to be 34 and it says N-

6    sally gate 1. I'm going to pause there at the 49

7    second mark.  In the forefront next to the SUV that is

8    again CO Danner, correct?

9    **A.        That is correct.**

10   Q.        Any idea what CO Danner has in his hand? Do

11   you know.

12   **A.        It appears to be a restraint belt. That's**

13   **what it is, a restraint belt.**

14   Q.        I think I missed the person getting into the

15   SUV. Let me go back. Sorry about that. They were

16   already in there.

17                  Are you aware of an investigation

18   being conducted into Ty'rique Riley's death, an

19   investigation being conducted at the Dauphin County

20   Prison into Ty'rique Riley's death.

21   **A.        I'm not aware, no.**

22   Q.        Were you ever questioned by any officers of

23   any department regarding Ty'rique Riley's death?

24   **A.        No, I was not.**

25   Q.        Were you ever questioned by anyone regarding

LT. GREG A. MENDENHALL

Page 85

1    the day that Ty'rique Riley was processed into DCP?

2    **A.        No, I was not.**

3                    MR. ROSS: Give my one second.  Let

4    me check my notes.

5                    I don't have any further questions,

6    Lieutenant. Thank you for your time. Some of the other

7    lawyers may have questions for you.

8                    MR. LAVERY: Anybody else?

9                    MR. NINOSKY: No questions.

10                   MS. HARRISON: No questions.

11                   MR. POLAHA: I have a few questions.

12   BY MR. POLAHA:

13   Q.        Good afternoon, Lieutenant. My name is Matt

14   Polaha. I represent the Susquehanna defendants in this

15   matter. I just have a few questions for you.

16                   Do you recall the name of the

17   Susquehanna police officer that brought Ty'rique Riley

18   to the booking center on June 18th of 2019?

19   **A.        I do not, sir.**

20   Q.        Would you have any reason to disagree that

21   that officer was PFC Haines?

22   **A.        I would have no reason to disagree with that,**

23   **no.**

24   Q.        And so we watched the video earlier of

25   Ty'rique Riley being brought to the booking center and

LT. GREG A. MENDENHALL

Page 86

1    brought into the booking center. When Ty'rique Riley

2    was brought to the booking center by PFC Haines did he

3    have any bruises, bumps, was he bleeding, did he have

4    any marks on him?

5    **A.          He had no visible injuries whatsoever.**

6    Q.          So when an outside law enforcement agency is

7    bringing a detainee into the booking center can you

8    describe for me the process of that agency bringing in

9    a detainee and turning that person over to the booking

10   center?

11   **A.          Yes. They pull up to the bay. Outside the bay**

12   **is an intercom. They press it and it let's us know**

13   **that they are there. They identify themselves and they**

14   **have say Susquehanna Township with one male commitment**

15   **or one female commitment.  We let them in. They get**

16   **out of the car, go over and secure their service**

17   **resolver. Once they do that they go over and get the**

18   **person out of the police vehicle and walk them into**

19   **the Judicial Center.**

20   Q.          And so watching the videos from earlier in

21   your deposition I notice that PFC Haines -- would you

22   agree that PFC Haines was not involved with removing

23   Ty'rique Riley from his police vehicle and bringing

24   him into the booking center?

25   **A.          He was not involved, no.**

LT. GREG A. MENDENHALL

Page 87

1    Q.        And why was PFC Haines not involved with

2    removing Ty'rique Riley from his vehicle and bringing

3    Ty'rique Riley into the booking center?

4    **A.        When he pulled up to the bay he made**

5    **reference to who he was and he may need help removing**

6    **the individual from the police car. That's why all**

7    **three of us went outside and met him there.**

8    **                    He didn't do it because we did it**

9    **for him basically. He secured his service revolver.**

10   **But he did not help in removing as you've seen.**

11   Q.        Was there any reason why PFC Haines didn't

12   help remove Ty'rique Riley from and bring Ty'rique

13   into the booking center and left it to the Dauphin

14   County officers to do that for him?

15   **A.        I don't know why.**

16                    MR. LAVERY: I'm going to object to

17   the form of the question.

18   Q.        And so once Ty'rique Riley is brought into

19   the booking center and then later escorted into the

20   holding cell was there any reason why PFC Haines had

21   limited involvement at that point?

22                    MR. LAVERY: Object to the form of

23   the question.

24   Q.        I can't answer that. I don't know.

25                    MR. POLAHA: That's all the questions

Page 88

1    I have.

2                    MR. ROSS: I do have a follow-up

3    question, Lieutenant Mendenhall.

4    BY MR. ROSS:

5    Q.        You stated that when Ty'rique Riley was

6    brought to the bay that Officer Haines stated that he

7    may need help removing him.  Do you recall what words

8    he used regarding needing help?

9    **A.        I don't recall. It was in the lines of I may**

10   **need assistance in bringing said detainee into the**

11   **Judicial Center.**

12                   MR. RILEY: Okay.  Thank you. That's

13   all I have.

14                   (Witness excused.)

15                   (Deposition concluded 1:22 P.M.)

16                        -   -   -

17

18

19

20

21

22

23

24                   C E R T I F I C A T I O N

25

LT. GREG A. MENDENHALL

Page 89

1

2              I hereby certify that the proceedings,

3    evidence and objections noted, are contained fully and

4    accurately in the notes taken by me on the hearing of

5    this matter, and that this copy is a correct

6    transcript of the same.

7

8

9

10                           _____

11                           NICHOLAS DiPIERO, R.P.R.
                             Registered Professional Reporter
12                           Notary Public

13

14

15

16              (The foregoing certification of this

17    transcript does not apply to any reproduction of the

18    same by any means unless under the direct control

19    and/or supervision of the certifying reporter.)

20

21

22

23

24

25                   WITNESS CERTIFICATION

LT. GREG A. MENDENHALL

Page 90

1

2                    I have read the foregoing transcript

3       of my deposition given on Wednesday, March 30, 2022,

4       and it is true, correct and complete, to the best of

5       my knowledge, recollection and belief, except for the

6       list of corrections, if any, attached on a separate

7       sheet herewith.

8

9

10                                      _____

11                              GREG A. MENDENHALL

12       _____DATE

13

14

15

16

17

18

19

20

21

22

23

24

25