**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CARMEN RILEY, *et al.*, | | No. 4:20-CV-00325 |
| Plaintiffs, | | (Chief Judge Brann) |
| v. | | |
| PRIMECARE MEDICAL, INC., *et al.*, | | |
| Defendants. | | |

**MEMORANDUM OPINION**

**APRIL 20, 2026**

This matter arises out of the tragic death of Ty'rique Riley ("Riley") while in custody of officials in Dauphin County, Pennsylvania. Riley was initially arrested and placed in the custody of several defendants associated with the Dauphin County Booking Center ("Booking Defendants") where he was allegedly subjected to excessive force before being transferred to the custody of several other defendants who are associated with the Dauphin County Prison ("Prison Defendants") where he was again allegedly subjected to excessive force.[1] During this time, PrimeCare Medical, Inc. ("PrimeCare"), allegedly provided negligent treatment for Riley, which exacerbated his mental health issues in the days before his death while in the custody of Prison Defendants.

---

[1] Booking Defendants and Prison Defendants are collectively referred to as "Correctional Defendants."

Defendants previously moved to sever the claims in this matter, which this Court denied. Correctional Defendants now move for reconsideration. However, the premise of the motion for reconsideration, that the denial of severance was legally and factually erroneous, is inaccurate. Because the evidence establishes that individuals knew of Riley's mental health struggles—while Correctional Defendants present nothing to genuinely dispute that knowledge—and because that knowledge is relevant to the reasonableness of any force used against Riley, the motion for reconsideration will be denied.

## I.      BACKGROUND

In February 2020, Carmen Riley, as administrator of Riley's estate, filed a complaint in this matter, which was subsequently twice amended.[2] The second amended complaint, filed in April 2021, raised claims for conspiracy to commit excessive force, conspiracy to deny medical care, two counts of excessive force, two counts of failure to intervene, failure to train and supervise, failure to provide medical care, medical negligence, intentional infliction of emotional distress, assault, battery, wrongful death, and a survival action.[3]

Several motions for summary judgment were filed, and a Report and Recommendation issued.[4] This Court thereafter adopt in part and rejected in part the

---

[2]   Docs. 1, 16, 64.
[3]   Doc. 64.
[4]   Docs. 157, 160, 164, 173, 247.

Report and Recommendation and granted in part and denied in part the motions for summary judgment.[5] Specifically, this Court found that the evidence was sufficient to support Plaintiffs' claim for: excessive force as against Robert Ingersoll, Cameron Weaver, Greg Mendenhall, and Scott Lewis; failure to intervene as to Weaver, Mendenhall, Delta Bauer, Scott Grieb, Andrew Klahr, Keith Biter, Steve Singleton, Keith Hoffman, and Matthew Danner; assault with respect to Ingersoll, Weaver, Mendenhall, and Lewis; battery as against Ingersoll, Weaver, Mendenhall, and Lewis; wrongful death with regard to Klahr, Lewis, Biter, Singleton, Hoffman, and Danner; and survivor act as to Ingersoll, Weaver, Mendenhall, Bauer, Grieb, Klahr, Lewis, Biter, Singleton, Hoffman, and Danner.[6]

The Court granted judgment in favor of PrimeCare, holding that Plaintiffs had failed to sustain a claim for medical negligence, wrongful death and survival, or punitive damages.[7] As to the claim for medical negligence, the Court determined that, although there were many alleged deficiencies in PrimeCare's treatment of Riley, these deficiencies had "nothing to do with death by excessive force."[8] Because any deficiency in mental health treatment was not the proximate cause of Riley's death, PrimeCare could not be held liable in any manner for Riley's death.[9]

---

[5]  Docs. 272, 273.
[6]  Doc. 273.
[7]  Doc. 272 at 85-95.
[8]  *Id.* at 90.
[9]  *Id.* at 91-95.

Plaintiffs filed a motion for reconsideration as to the dismissal of claims against PrimeCare, arguing that their medical negligence claim should survive.[10] This Court granted reconsideration, concluding that Plaintiffs had proffered an expert report that discussed multiple instances where PrimeCare staff failed to adequately assess Riley and opined that each failure "caused Riley's decline in mental functioning to continue."[11] However, as to any claim relating to Riley's death, this Court stood "on its prior reasoning regarding the lack of expert evidence tying PrimeCare's medical negligence to Riley's death" since Plaintiffs

> failed to provide any expert evidence at all tying Riley's death to PrimeCare's medical negligence. Any injury caused by the tortuously excessive force deployed by prison guards was not proximately caused by preceding medical negligence, even if that medical negligence was a but-for cause of the mental deterioration which in turn caused the physical confrontation.[12]

With that ruling, claims of excessive force under 42 U.S.C. § 1983 and related issues proceeded as against Correctional Defendants, while state law claims of medical negligence and survival action proceeded as to PrimeCare. In August of 2025, Defendants filed motions to sever the claims and proceed with separate trials.[13]

---

[10]   Doc. 274.

[11]   Doc. 286 at 6; *see id.* at 5-6.

[12]   *Id.* at 9.

[13]   Docs. 288, 290. PrimeCare further moved to dismiss claims against it for lack of subject matter jurisdiction. *See* Doc. 292 at 5-8. That motion was denied. Doc. 297 at 6-10.

This Court denied the motions.[14] It found that claims against PrimeCare should not be severed for several reasons.[15] First, the Court observed that the evidence presented against all three sets of defendants would entail significant overlap, as "all claims arise out of a series of interrelated occurrences; most incidents, although facially separate from the others, are necessary for a fulsome understanding of the events that form the central part of each claim against each defendant."[16] Understanding the initial use of force and preceding events is necessary for the jury to assess Riley's mental health decline and whether PrimeCare's treatment was negligent, while Riley's deteriorating mental health, treatment, and what Correctional Defendants knew of it is relevant to whether the force they used was objectively reasonable.[17]

Second, severance would not promote judicial economy, as a great deal of judicial resources have been expended in this matter, and requiring one trial for all Defendants would streamline the proceedings and prevent the presentation of repetitive and overlapping evidence in three separate trials.[18] Third, the Court found little prejudice in maintaining a unified trial, as much of the same evidence would need to be presented anyway, and a limiting instruction could cure any prejudice,

---

[14]   Docs. 297, 298.
[15]   Doc. 297 at 11-15.
[16]   *Id.* at 12.
[17]   *Id.* at 12-13.
[18]   *Id.* at 13-14.

while Plaintiffs would be prejudiced by requiring them to present largely the same evidence in three separate trials.[19]

As to Correctional Defendants' motion, this Court first found no misjoinder because the claims against all Defendants shared an aggregate of operative facts.[20] That is to say, "the jury could not reasonably understand the need for the use of force and the severity of the security problem the correctional officers may have faced without understanding Riley's mental state."[21]

Moreover, severance was not appropriate since there is both legal and factual overlap between the claims against various Defendants, as explained with PrimeCare's motion, and because Prison Defendants' knowledge of Riley's mental health may inform a reasonable officer as to whether the force applied by Prison Defendants was appropriate. [22] Additionally, severance would harm judicial economy, given that it would require presentation of much the same evidence at three separate trials.[23] Lastly, denying severance would not significantly prejudice Correctional Defendants, while severance would prejudice Plaintiffs.[24]

Correctional Defendants now move for reconsideration of that decision.[25] They first argue that there is no logical relationship between the claims against

---

[19]  *Id.* at 14-15.
[20]  *Id.* at 15-18.
[21]  *Id.* at 17-18.
[22]  *Id.* at 18-19.
[23]  *Id.* at 19-20.
[24]  *Id.* at 20-22.
[25]  Docs. 299, 300.

Prison Defendants and any other defendants, as the claims are not interconnected.[26] They argue that Prison Defendants "had little to no knowledge of the state of" Riley's mental health "and as such, the introduction of evidence related to Plaintiffs' claims against PrimeCare and the jury's consideration of the same in rendering a verdict as to Plaintiffs' claims against [Prison] Defendants would be improper."[27] They further contend that the evidence underlying claims against Prison Defendants is irrelevant to claims against PrimeCare, since PrimeCare's liability cut off at the moment of the incident involving Prison Defendants.[28]

Correctional Defendants also maintain that this Court improperly considered Prison Defendants' subjective mental state, when their actions must be viewed under an objective standard, which undercuts the Court's conclusion that much of the evidence against PrimeCare is relevant to claims against Prison Defendants.[29] Additionally they contend that the incidents involving the Booking Defendants and Prison Defendants are wholly disconnected and involve no overlap in evidence.[30]

Even if the claims were properly joined, Correctional Defendants argue that severance is appropriate since the claims are significantly different and require different evidence.[31] They contend that judicial economy would not be harmed by

---

[26]    Doc. 300 at 10-20.
[27]    *Id.* at 12, 14-15.
[28]    *Id.* at 15-17.
[29]    *Id.* at 12-13.
[30]    *Id.* at 17-19.
[31]    *Id.* at 20-22.

severance because there would be no need for new discovery, severance would not waste the efforts expended in addressing this matter to date, and little overlapping evidence would need to be presented at the trials.[32] Finally Correctional Defendants assert that Plaintiffs will not suffer prejudice from severance since there would be little overlapping evidence, whereas Prison Defendants would be prejudiced by the jury considering evidence that would otherwise be inadmissible.[33]

Plaintiffs respond that the motion should be denied for three reasons.[34] First, they argue that Correctional Defendants fail to point to a proper reason for reconsideration and instead simply reargue the bases for their original motion.[35]

Second, Plaintiffs assert that the claims have not been misjoined because they are all part of a continuous series of events, and the jury could not understand one event without knowing the entire series of events.[36] Furthermore, Plaintiffs assert that Correctional Defendants are incorrect in arguing that the Court erred in its use-of-force analysis since it understood the relevant objective analysis, and what Correctional Defendants knew of Riley's mental state is critical to any such analysis.[37] Furthermore, Plaintiffs argue, what precisely Correctional Defendants knew is a question of fact for the jury, not a reason to sever claims and, in any event,

---

[32]   *Id.* at 22-24.
[33]   *Id.* at 24-26.
[34]   Doc. 303.
[35]   *Id.* at 7-8.
[36]   *Id.* at 8-11.
[37]   *Id.* at 11-13.

the evidence demonstrates that those individuals knew of Riley's mental health struggles.[38]

Third, Plaintiffs maintain that the severance analysis was correct and should be sustained.[39] The claims require the jury to assess the use of force through the lens of Riley's decline in mental functioning and PrimeCare's deficient care, all of which are intertwined.[40] Moreover, largely the same evidence and witnesses would be required for each claim, as similar documents will be presented and the same witnesses who observed Riley's condition will need to testify.[41] And Plaintiffs would be prejudiced by severance as they would be forced to prepare for two or three trials.[42] Finally, Plaintiffs assert that any potential prejudice to Defendants would be adequately addressed by proper limiting instructions.[43]

Correctional Defendants have filed a reply brief, rendering the motion ripe for disposition.[44] For the following reasons, the motion will be denied.

## II.   DISCUSSION

To properly support a motion for reconsideration, a party must demonstrate "at least one of the following: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the

---

[38]   *Id.*
[39]   *Id.* at 13-17.
[40]   *Id.* at 13-14.
[41]   *Id.* at 14.
[42]   *Id.* at 14-15.
[43]   *Id.* at 15-17.
[44]   Doc. 304.

motion; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice."[45]  As to the third ground, in reviewing for clear error, reconsideration is warranted only if the "[C]ourt is left with the definite and firm conviction that a mistake has been committed."[46]  "Thus, [to warrant reconsideration, Correctional Defendants] must show more than mere disagreement with the earlier ruling; [they] must show that the . . . Court committed a direct, obvious, or observable error, and one that is of at least some importance to the larger proceedings."[47]

Correctional Defendants do not base their motion on either new evidence or an intervening change in controlling law and, accordingly, reconsideration is warranted only if they demonstrate clear error in this Court's prior ruling. They have not met this burden, as they present no compelling evidence or argument that the claims should be severed. Correctional Defendants instead continue to press the illogical theory that the jury should consider each incident individually without any understanding of the context in which they arose. That is patently wrong.

A large portion of Correctional Defendants' motion for reconsideration centers on the Supreme Court of the United States' decision in *Kingsley v. Hendrickson*, wherein the Supreme Court held that "a pretrial detainee must show .

---

[45] *In re Vehicle Carrier Servs. Antitrust Litig.*, 846 F.3d 71, 87 (3d Cir. 2017) (ellipsis and internal quotation marks omitted).

[46] *Prusky v. ReliaStar Life Ins. Co.*, 532 F.3d 252, 258 (3d Cir. 2008) (internal quotation marks omitted).

[47] *In re Energy Future Holdings Corp.*, 904 F.3d 298, 312 (3d Cir. 2018) (brackets, quotation marks, and citation omitted).

. . that the officers' use of that force was *objectively* unreasonable,"[48] and Correctional Defendants' erroneous assertion that this Court applied a subjective standard in its analysis.[49]

But in making this assertion Correctional Defendants misread and misinterpret several sentences of the Memorandum Opinion. They primarily focus on the following three portions of text from this Court's decision:

> [T]he jury must understand Riley's mental health and the Correctional Defendants' knowledge of his mental health to assess whether the uses of force were reasonable. Stated differently, a reasonable jury may well believe that a use of force is objectively unreasonable when used against an individual known to be suffering severe mental decline who the jury believes was not acting with any intention to do harm to others, but may well find such use of force reasonable if they concluded that the officers had limited knowledge of the mental decline.

> Riley's deteriorating mental health—and what the Correctional Defendants knew of that deterioration—may be relevant to whether the force used was reasonable under the circumstances.

> As to the elements for a use-of-force claim, the jury could not reasonably understand the need for the use of force and the severity of the security problem the correctional officers may have faced without understanding Riley's mental state.[50]

These sentences in context quite plainly refer to a legal principle to which Correctional Defendants themselves cite: that the reasonableness of any use of force must be judged "with the knowledge of a defendant officer."[51] That is to say, as

---

[48]  576 U.S. 389, 391-92 (2015).
[49]  *See* Doc. 300 at 13-15, 21-22; Doc. 304 at 9-11.
[50]  Doc. 300 at 12 (quoting Doc. 297 at 12, 17-19).
[51]  Doc. 304 at 14 (quoting *Kingsley*, 576 U.S. at 399).

explained in the Memorandum Opinion addressing the motion to sever, what Correctional Defendants knew of Riley's declining mental state bears a direct impact on whether the force used was reasonable under the circumstances.[52]

For example, Correctional Defendants make much of the sentence that the jury may conclude that certain

> force is objectively unreasonable when used against an individual known to be suffering severe mental decline who the jury believes was not acting with any intention to do harm to others, but may well find such use of force reasonable if they concluded that the officers had limited knowledge of the mental decline.[53]

The second part of that sentence clarifies its intended meaning—that a jury must examine the Prison Defendants' specific knowledge of Riley's mental health and determine whether a reasonable officer would objectively believe the force used was appropriate. That being said, the language used in the Memorandum Opinion was not as precise as it could have been. When the Court stated "who the jury believes was not acting with any intention to do harm to others," it would have been more accurate to write "who the jury believes [a reasonable officer would conclude based on the observable facts] was not acting with any intention to do harm to others." In short, this Court did not apply an erroneous standard; an objective

---

[52]  *See, e.g. Est. of Burnett v. City of Colorado Springs*, 762 F. Supp. 3d 1043, 1062-63 (D. Colo. 2025) (observing that "obvious mental illness" must be considered in evaluating an excessive force claim and collecting cases holding the same).

[53]  Doc. 300 at 13.

examination of Prison Defendants' actions is required, and to what extent they knew of Riley's mental health struggles and treatment is highly relevant to that inquiry.

Correctional Defendants further argue that, even if such information were relevant, "the evidentiary record offers no support to the conclusion that [Riley's] mental state had any bearing on the [Prison] Defendants' actions."[54] To support that argument, Correctional Defendants cite to evidence which they purport indicates that Prison Defendants knew, at most, that Riley was being transported to a hospital due to an "altered mental status."[55] However, that assertion is wholly undermined by the very evidence to which they cite.

It is true that Danner testified in his deposition that, prior to being assigned to assist in transporting Riley to the hospital, he had no prior contact with Riley—but Danner also acknowledged that he knew Riley had an altered mental status and was on suicide watch.[56] Importantly, the fact that Danner had no contact with Riley does not mean he had no knowledge of Riley's mental health struggles or treatment. Singleton similarly stated that he "didn't know" Riley, but again notably did not state whether he knew of Riley or Riley's mental health concerns.[57]

But in direct contradiction to Correctional Defendants' assertion in their brief, Hoffman plainly knew of Riley's declining mental health and discussed the depth of

---

[54]  Doc. 300 at 14; *see id.* at 14-15.
[55]  *Id.* at 14-15.
[56]  *See* Doc. 159-8 at 16; Doc. 175 ¶ 147; Doc. 175-12 at 69.
[57]  Doc. 175-10 at 56; *see id.* at 55-67.

his knowledge of Riley's mental health struggles.[58] Hoffman stated that, in the days leading up to the use of force, Riley was incoherent and unresponsive, would shout unintelligible words, was on suicide watch, would sometimes strip naked in his cell, and required assistance simply to eat food.[59] When asked whether he had anything else to add to the questions asked of him, Hoffman stated:

> Uh, the only thing I can . . . add to this is every time I — I tried to feed inmate Riley with the help of other COs there[,] he was, uh, kinda, incoherent towards what you were tryin' to tell him, you know, and he responded to nothing, just had a blank stare about him.[60]

Moreover, the facts as summed up by the Honorable William I. Arbuckle demonstrate the following: Riley was on suicide watch; he was consistently agitated; he would often be naked in his cell and on at least one occasion had urine on himself and had urinated on the floor of his cell; he was viewed as being catatonic; he was put in a special suit as a suicide precaution; and he was scheduled to be transported to a hospital due to mental health concerns.[61] Clearly, many correctional officers—including at least one of the Prison Defendants—knew of Riley's mental health struggles and mental health treatment while incarcerated. To pretend that the officers did not know of these issues given the magnitude of Riley's struggles and obvious outward manifestations of his mental deterioration is absurd and would ignore the

---

[58]  *See id.* at 80-86.
[59]  *Id.* at 81-82, 86.
[60]  *Id.* at 86.
[61]  Doc. 247 at 40, 42-45, 47-48.

fact that officers were required to be present for every single medical visit that Riley received.[62]

In the face of this evidence, the Court cannot reach any conclusion other than that Correctional Defendants have failed to demonstrate that they had no knowledge of Riley's mental health and treatment, as is their burden on a motion for reconsideration.[63] If Correctional Defendants wish for the Court to revisit a decision, they must produce more than conclusory assertions unsupported by evidence. Accordingly, there is no clear error of fact here.[64]

Third, Correctional Defendants argue that the uses of force by Booking Defendants and Correctional Defendants "are wholly unrelated."[65] But to reach this conclusion, Correctional Defendants continue to ignore claims against PrimeCare and the connection between the three groups of defendants collectively. The events surrounding Riley's detainment, initial intake, and Booking Defendants' use of force against him would inform PrimeCare's understanding of his mental health, how to

---

[62] *Id.* at 33.

[63] Correctional Defendants argue for the first time in their reply brief that the conclusion that Riley's mental health is relevant to claims against Prison Defendants is somehow "entirely contrary to this Court's prior decisions," while simultaneously acknowledging this Court's holding that Riley's mental health and intent is "relevant to the extent that some fact objectively manifested that intent." Doc. 304 at 9. But as discussed here, there is evidence that individuals knew of Riley's mental health struggles, which may have outwardly manifested his intentions.

[64] The Court agrees that "the use of force underlying Plaintiffs' claims against [Prison] Defendants [is] undoubtedly irrelevant to Plaintiffs' medical negligence claims against PrimeCare." Doc. 300 at 16-17. But the fact remains that the claims against PrimeCare and facts underlying those claims are relevant to the use of force claim against Correctional Defendants.

[65] *Id.* at 17; *see id.* at 17-18.

treat it, and whether its treatment of Riley was negligent. And, as explained previously, Riley's mental health and mental health treatment is relevant to whether the use of force used by Prison Defendants was reasonable under the circumstances.

No one set of claims may be severed from any other set of claims without creating extreme difficulty. If claims against Booking Defendants were severed, the jury would still need to be presented with evidence of the events surrounding that use of force to give context to PrimeCare's actions. Were claims against Prison Defendants severed, evidence of the events proceeding that use of force would likewise need to be presented for the jury to understand whether the use of force was appropriate. Given these conclusions, Correctional Defendants have presented no reason for the Court to reconsider its decision that the claims are properly joined.

Finally, Correctional Defendants argue that, even if the claims are properly joined, this Court should reconsider its conclusion that severance is not appropriate.[66] This argument rises or falls with Correctional Defendants' assertion that there were clear errors of law and fact regarding the conclusion that the jury should be permitted to consider Prison Defendants' knowledge of Riley's mental health, as the arguments are otherwise identical to those previously made in the original severance motion.[67]

---

[66] Doc. 300 at 21-26.
[67] *Compare* Doc. 291 at 18-26, *with* Doc. 300 at 21-26.

Given that the Court has rejected Correctional Defendants' arguments about the relevance of Riley's mental health to the claims against Prison Defendants, their arguments regarding the severance factors also fail. To determine whether severance is appropriate, courts consider three factors: "(1) whether the issues sought to be severed are significantly different from one another and would require distinct evidentiary proof; (2) whether severance would promote judicial economy; and (3) whether either party will be unduly prejudiced by severance or its absence."[68]

As discussed briefly above, and in more detail in the Memorandum Opinion denying the motion to sever, the various claims do not require distinct evidence, as much of the same evidence will be relevant to all claims. That is to say, the Booking Defendants use of force and events proceeding it are relevant to claims against PrimeCare, while evidence of PrimeCare's treatment of Riley and Riley's mental health is relevant to claims against Prison Defendants.[69]

Second, severance would not promote judicial economy. As explained in the original Memorandum Opinion, this Court has dedicated a great deal of time and effort to this case and understanding its nuances—efforts that would be lost if any of the claims were sent to another court.[70] Furthermore, maintaining one trial would

---

[68] *Henderson v. Mahally*, 639 F. Supp. 3d 481, 486-87 (M.D. Pa. 2022).

[69] Moreover, as Correctional Defendants acknowledge, Plaintiffs' expert testimony will overlap as well. Doc. 300 at 22.

[70] If claims against either Booking Defendants or Prison Defendants were severed, it would create the difficult task of determining which set of defendants would remain with PrimeCare, and the only reasonable solution would be to sever PrimeCare and create three cases. But were claims against PrimeCare to be severed, it would "create[] a separate case," *Arconic Inc. v.*

preserve judicial economy by allowing all evidence to be presented at once, rather than repetitively in multiple trials. Correctional Defendants' arguments to the contrary are either based on the incorrect premise that no overlapping evidence need be presented, or on arguments that this Court has already considered and rejected and,[71] accordingly, nothing that Correctional Defendants present undermines the Court's prior consideration of this factor.

Finally, as this Court previously observed in denying the motion to sever, Plaintiffs would be unduly prejudiced by severance, while Correctional Defendants would suffer little prejudice. The presentation of all this evidence is, as noted several times, necessary for the jury to understand the entirety of the events that are relevant to claims against each group of defendants. Because that evidence must be presented regardless, Defendants are not prejudiced by the evidence being presented in one trial with several sets of defendants, rather than several trials, each with one set of defendants. Nevertheless, the specific evidence relevant to each claim is easily distinguishable, and an appropriate limiting instruction will ensure that the jury is not confused in any way.

Plaintiffs, however, would be prejudiced by requiring them to undertake two or three trials, at which they would be required to present much the same evidence.

---

*Novelis Inc.*, No. CV 17-1434, 2021 WL 2338738, at *6 (W.D. Pa. June 8, 2021), meaning only state law claims would be left in the case against PrimeCare, and remand of that matter to state court would be appropriate. 28 U.S.C. § 1367(c)(3).

[71]    *See* Doc. 300 at 22-24.

18

This prejudice from severance outweighs any prejudice to Correctional Defendants from denying severance. As a result, again, the relevant factors weigh against severance, and the motion for reconsideration will be denied.

## III.    CONCLUSION

In accordance with the above discussion, Correctional Defendants' motion for reconsideration will be denied.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge
